**EXECUTION SCHEDULED FOR JANUARY 14, 2021**

No. 21-1

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

_____

**UNITED STATES OF AMERICA,**

**Plaintiff – Appellee,**

**v.**

**COREY JOHNSON, A/K/A O, A/K/A CO,**

**Defendant – Appellant.**

_____

**CAPITAL CASE**

**INFORMAL PRELIMINARY BRIEF, WITH
REQUEST FOR CERTIFICATE OF APPEALABILITY**

**ORAL ARGUMENT REQUESTED**

_____

Donald P. Salzman
Jonathan Marcus
David E. Carney
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue, NW
Washington, DC 20005
(202) 371-7983
donald.salzman@skadden.com
*Counsel for Appellant Corey Johnson*

**TABLE OF CONTENTS**

**Page**

Table of Authorities ........................................................................................ iii

Introduction ....................................................................................................1

Statement of Jurisdiction ...............................................................................1

Statement of the Issues ..................................................................................2

Statement of the Case .....................................................................................2

Summary of Argument ...................................................................................7

Argument ........................................................................................................8

    I.     Corey Johnson is intellectually disabled. .................................................8

    II.    Legal standard for Certificate of Appealability .......................................12

    III.   "Second or successive" is a term of art that does not apply to all second-in-time § 2255 motions ...........................................................................13

    IV.   Reasonable jurists could debate the district court's conclusion that Mr. Johnson's second-in-time § 2255 motion is successive. ...........................15

        A. Mr. Johnson's claim is not successive because it is based on a statutory provision that provides for review when an execution is imminent. ............................................................................................16

           1. The plain language of § 3596(c) demonstrates that a determination of mental status must be made when an execution date is set. ......19

           2. The Government itself has conceded that since § 3596 concerns the "implementation" of the sentence, it governs the process at the time the execution date is set and not earlier. ...............................20

3.  The other provisions of § 3596(c), as well as the broader structure of the FDPA, reinforce that the § 3596(c) bar is properly raised after an execution date is set. .......................................................22

4.  The legislative history of § 3596(c) demonstrates Congress's intent. ...................................................................................24

B.  Mr. Johnson's claim was not ripe until the execution date was set. ...26

Conclusion .....................................................................................31

Request for Oral Argument.................................................................32

Certificate of Compliance ..................................................................32

Certificate of Service

Statutory Addendum

Exhibit A (Excerpt of Brief of the Appellant and, in the Alternative, Petition for Writ of Mandamus, *United States v. Higgs*, No. 20-18 (4th Cir. Dec. 31, 2020), ECF No. 6)

Exhibit B (Excerpt of Government's Response in Opposition to "Amended Motion of Bruce Carneil Webster to Vacate Conviction and Sentence and for New Trial Pursuant to 28 U.S.C. § 2255 and Rule 33 of the Federal Rules of Criminal Procedure," *Webster v. United States*, No. 4-94-CR-0121-Y (N.D. Tex. Nov. 14, 2002)

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Barefoot v. Estelle*, 463 U.S. 880 (1983) ..........................................................12, 13

*Bourgeois v. Watson*, 977 F.3d 620 (7th Cir. 2020) ..........................................28, 29

*Calderon v. United States Dist. Ct.*, 163 F.3d 530 (9th Cir. 1998) .........................27

*Castro v. United States*, 540 U.S. 375 (2003)..........................................................14

*Davis v. Mich. Dep't of Treasury*, 489 U.S. 803 (1989)...........................................22

*Ford v. Wainwright*, 477 U.S. 399 (1986) ...............................................................17

*Garza v. Lappin*, 253 F.3d 918 (7th Cir. 2001) ..................................................14, 15

*Hoxha v. Levi*, 465 F.3d 554 (3d Cir. 2006) .............................................................18

*Johnson v. United States*, 546 U.S. 810 (2005) ..........................................................7

*Lambert v. Williams*, No. 98-2070, 1998 WL 904731 (Dec. 29, 1998
   4th Cir. 1998) (per curiam) .................................................................................27

*Magwood v. Patterson*, 561 U.S. 320 (2010) ...........................................................13

*Miller-El v. Cockrell*, 537 U.S. 322 (2003) .........................................................12, 13

*Moore v. Texas*, 137 S. Ct. 1039 (2017) .....................................................................9

*Murphy v. Smith*, 138 S. Ct. 784 (2018) ...................................................................22

*Panetti v. Quarterman*, 551 U.S. 930 (2007).......................................14, 15, 17, 27

*Slack v. McDaniel*, 529 U.S. 473 (2000) .............................................................12, 13

*Stanko v. Davis,* 617 F.3d 1262 (10th Cir. 2010) .....................................................30

*Stewart v. Martinez-Villareal*, 523 U.S. 637 (1998)..................................................15

*United States v. Barrett*, 178 F.3d 34 (1st Cir. 1999)..................................................27

*United States v. Bourgeois*, 537 F. App'x 604 (5th Cir. 2013) ..............................29

*United States v. Davis*, 139 S. Ct. 2319 (2019) ........................................................4

*United States v. Davis*, 611 F. Supp. 2d 472 (D. Md. 2009) ....................................5

*United States v. Hairston*, 754 F.3d 258 (4th Cir. 2014)....................................14, 15

*United States v. MacDonald*, 641 F.3d 596 (4th Cir. 2011)....................................30

*United States v. Roane*, 378 F.3d 382 (4th Cir. 2004)...............................................6

*United State v. Rodgers*, 803 F. App'x 728 (4th Cir. 2020) ....................................15

*United States v. Roland*, 281 F. Supp. 3d 470 (D. N.J. 2017) ..................................5

*United States v. Salad*, 959 F. Supp. 2d 865 (E.D. Va. 2013)..................................5

*United States v. Winestock*, 340 F.3d 200 (4th Cir. 2003).......................................30

## STATUTES AND RULES

18 U.S.C. § 924.......................................................................................................3, 4

18 U.S.C. § 1959...........................................................................................................3

18 U.S.C. § 3591........................................................................................................23

18 U.S.C. § 3592........................................................................................................23

18 U.S.C. § 3593........................................................................................................23

18 U.S.C. § 3594........................................................................................................23

18 U.S.C. § 3595....................................................................................................18, 23

18 U.S.C. § 3596 ...................................................................................passim

18 U.S.C. § 3597 ........................................................................................23

18 U.S.C. § 3598 ........................................................................................23

18 U.S.C. § 3599 ........................................................................................23

21 U.S.C. § 841 ............................................................................................3

21 U.S.C. § 846 ............................................................................................3

21 U.S.C. § 848 (repealed)..................................................................passim

28 U.S.C. § 1291 ..........................................................................................2

28 U.S.C. § 2241 ........................................................................................15

28 U.S.C. § 2253 .....................................................................................2, 12

28 U.S.C. § 2254 ...................................................................................17, 30

28 U.S.C. § 2255 ................................................................................passim

Fed. R. App. P. 22 ........................................................................................2

Local Rule 22 ..............................................................................................2

## INTRODUCTION

Corey Johnson, the Appellant in this capital case, is intellectually disabled. Federal law explicitly prohibits the government from implementing his death sentence—among the first in the modern era of the death penalty—on account of his infirmity, which is established by overwhelming evidence that no court or jury has ever heard. His disqualifying condition notwithstanding, the government is planning to carry out his execution on Thursday, January 14.

As explained in this brief, the district court erred in its interpretation of the federal statute prohibiting a death sentence from being "carried out upon a person who is mentally retarded." Based on that erroneous reading, which is contradicted by the statute's plain language, the legislative history, and the government's own long-standing interpretation, the district court improperly determined Mr. Johnson's pleading to be successive. For the reasons set forth herein, Mr. Johnson respectfully requests that this Court grant a Certificate of Appealability ("COA") and remand his case to the U.S. District Court for the Eastern District of Virginia for further proceedings.

## STATEMENT OF JURISDICTION

Corey Johnson moved to prohibit the carrying out of his death sentence under 28 U.S.C. § 2255 (the "§ 2255 Motion" or "2255 Mot."). The district court dismissed the § 2255 Motion as successive and denied a COA. On January 4, 2021,

1

Mr. Johnson noticed his appeal, which is from a final order. Pursuant to Fed. R. App. P. 22(b)(1), (2), and L.R. 22(a), Mr. Johnson files this brief and requests a COA. If granted, jurisdiction will arise under 28 U.S.C. §§ 1291, 2253.

## STATEMENT OF THE ISSUES

Corey Johnson respectfully requests that this Court issue a certificate of appealability on the following question:

Whether a second-in-time § 2255 motion filed by a death-sentenced federal prisoner seeking to establish his intellectual disability at the time of the implementation of his sentence, pursuant to the express language of 18 U.S.C. § 3596(c) and 21 U.S.C. § 848(*l*), must be deemed successive, even where the evidence proving his disability has never been considered by any court?

## STATEMENT OF THE CASE

### A. Trial and Sentencing Proceedings

Corey Johnson's 1993 trial was among the first federal capital trials in the modern era of the death penalty. Mr. Johnson and six co-defendants were charged in a 33-count indictment with offenses arising from a drug conspiracy pursuant to the Anti-Drug Abuse Act (the "ADAA").  (4/24/92 Indictment, Dkt. 1.) The

2

government sought the death penalty for three of the co-defendants[1]—Mr. Johnson, Richard Tipton, and James Roane—and tried them together.

In February of that year, the jury convicted Mr. Johnson of all the counts in the government's superseding indictment, including seven murders in the course of a continuing criminal enterprise ("CCE") under 21 U.S.C. § 848(e)(1)(A).[2]

At his penalty phase hearing, Mr. Johnson's defense team presented evidence to mitigate the death penalty, much of it through a University of Virginia psychologist, hired by the defense, named Dewey Cornell.[3] Dr. Cornell testified about Mr. Johnson's tumultuous and traumatic childhood, and what he

---

[1] The government initially filed a notice of intent to seek the death penalty against co-defendant, Vernon Lance Thomas who was eventually convicted of killing four people. 2255 Mot., Ex. 62 (10/28/92 Notice of Intention to Seek Death Penalty as to Mr. Thomas). Mr. Thomas's case was severed from that of the other three defendants for reasons related to the availability of his appointed counsel. Following authorization, but prior to trial, Mr. Thomas presented an expert report to the government that concluded Mr. Thomas had an IQ of 71 and was "mentally retarded." Shortly thereafter, the government withdrew its death authorization, and Mr. Thomas faced a maximum penalty of life without parole at his trial. 2255 Mot., Ex. 66 (4/15/93 Mot. to Have Def. Declared Mentally Retarded).

[2] The indictment also charged Mr. Johnson with conspiracy to violate provisions of the ADAA under 21 U.S.C. § 846, murder in the course of a CCE under 21 U.S.C. § 848(e)(1)(A), using a firearm during a crime of violence under 18 U.S.C. § 924(c), possession of cocaine base with the intent to distribute under 21 U.S.C. § 841(a)(1), and killing and maiming in aid of racketeering under 18 U.S.C. § 1959(a). 2255 Mot., Ex. 61 (Second Superseding Indictment).

[3] The defense specifically asked Dr. Cornell to: (1) determine whether Mr. Johnson was competent to stand trial; (2) determine if he was criminally responsible for his crimes; and (3) gather, analyze, and prepare potential mitigation evidence for the capital sentencing hearing. 2255 Mot., Ex. 15 ¶ 9 (9/20/16 Aff. of C. Cooley).

3

characterized as a severe learning disability. 2255 Mot., Ex 7 (2/10/93 Trial Tr. 3574). [4] Based on Dr. Cornell's conclusion that Mr. Johnson suffered from a broad learning disability, and that, having scored score a 77 on the IQ score the Dr. Cornell had administered, he could not have mentally retardation, the defense informed jurors in both opening and closing arguments that Mr. Johnson was *not* mentally retarded and that they would not be asked to make such a determination. 2255 Mot., Ex. 7 (2/10/93 Trial Tr. 3547); 2255 Mot., Ex. 9 (2/12/93 Trial Tr. 3921). The jury recommended Mr. Johnson be sentenced to death on each of his CCE convictions.[5] 2255 Mot., Ex. 65 (2/16/93 Special Findings, Dkt. 508).

---

[4] Exhibits to the § 2255 Motion are located in the Joint Appendix at J.A.148-J.A.1434.

[5] Mr. Johnson's death sentences, it should be noted, are infirm on several grounds. He is therefore currently seeking authorization from the U.S. Court of Appeals for the Fourth Circuit to challenge his § 924(c) convictions under *United States v. Davis*, 139 S. Ct. 2319 (2019).  Mot. for Authorization to File a Successive Mot. Pursuant to 28 U.S.C. § 2255(h)(2), *In re Corey Johnson*, No. 20-8 (4th Cir. May 22, 2020), ECF No. 2-1.  He is also appealing to the Fourth Circuit the denial of relief he sought pursuant to the First Step Act.  Mem. Order (E.D. Va. Nov. 19, 2020), ECF No. 75, *appeal docketed*, *United States v. Johnson*, No. 20-15 (4th Cir. Nov. 23, 2020). Mr. Johnson has also separately filed a Motion for Authorization in this Court raising two claims under the Eighth Amendment, one arguing that in light of the unique circumstances of his case, a previously unavailable *Atkins* claim should be heard, and the other asserting the unreliability of his death sentences.

### B. Appeal and 28 U.S.C. § 2255 Proceedings

Mr. Johnson timely appealed to this Court, raising issues relating to the guilt and penalty phases of his trial. No issue regarding intellectual disability was raised.

In the subsequent motion for collateral relief pursuant to 28 U.S.C. § 2255, Mr. Johnson's attorneys alleged for the first time that Mr. Johnson could not be sentenced to death because he was intellectually disabled. His attorneys did not, however, argue that Mr. Johnson met the criteria for a diagnosis of intellectual disability nor present any evidence to prove his intellectual disability. Instead, they asserted that trial counsel were ineffective for failing to challenge the IQ score results of Dr. Cornell's testing of Mr. Johnson; and that if Dr. Cornell had adjusted all of Mr. Johnson's IQ scores using the Flynn Effect, that would have led him to more fully evaluate Mr. Johnson for intellectual disability.[6]

The district court, in 2003, granted the government's motion for summary judgment, denying Mr. Johnson relief on all grounds.  2255 Mot., Ex. 73 (5/1/03

---

[6] Although at the time it was not widely accepted, the Flynn Effect is now routinely regarded as valid, "persuasive," and "best practice," by the courts considering federal capital cases, including those in the Fourth Circuit, and must be taken into account when expert testimony supports its use. *See United States v. Davis*, 611 F. Supp. 2d 472, 488 (D. Md. 2009); *United States v. Roland*, 281 F. Supp. 3d 470, 503 (D. N.J. 2017); *see also United States v. Salad*, 959 F. Supp. 2d 865, 872 n.10 (E.D. Va. 2013) ("The Flynn Effect describes a documented increase in IQ levels over time.  As a result, IQ tests must be periodically re-normed to account for the population becoming more intelligent; a score on an outdated test might overstate IQ relative to the contemporary population.").

Mem. Op., Dkt. 896).  In light of the fact that no new evidence had been offered with respect to the issue of Mr. Johnson's mental retardation, the Court found that "the record before the Court demonstrates that Johnson is not mentally retarded" and that Mr. Johnson's trial counsel was not ineffective for failing to raise the issue that Mr. Johnson's IQ score was overstated because counsel had reasonably relied on Dr. Cornell's assessment at trial. *Id*. at 82-84.

Post-conviction counsel appealed to this Court, arguing the district court had made a mistake in refusing to consider scores corrected for the Flynn Effect because the court had simply assumed that Dr. Cornell had considered the Flynn Effect, even though no evidence supported that assumption. 2255 Mot., Ex. 74 at 145-46 (Br. for Appellants Cory Johnson and Richard Tipton, *United States v. Johnson*, No. 03-13(L), 03-26, 03-27 (4th Cir. Feb. 17, 2004) (Excerpt)).  This Court did not rule on that issue directly but instead adopted the district court's rationale—that the IQ score Dr. Cornell had assigned Mr. Johnson placed him outside the diagnostic range for mental retardation and that ended the inquiry.  The Court also agreed with the district court that Mr. Johnson's counsel were not ineffective for failing to consider the Flynn Effect at sentencing because they were "under no mandate to second-guess" Dr. Cornell's report.  *United States v. Roane*, 378 F.3d 382, 408-09 (4th Cir. 2004); *see also id.* at 408 ("Johnson exhibited an IQ of 77, which indicated a 'generally impaired intelligence,' placing him 'just above the level of mental retardation.'").

6

The U.S. Supreme Court denied his subsequent petition for certiorari. *Johnson v. United States*, 546 U.S. 810 (2005).

In 2006, the government set an execution date for Mr. Johnson that was stayed as a result of litigation challenging the government's planned method of execution. That stay remained in effect until September 20, 2020, when it was vacated by the district court. On November 20, 2020, the Bureau of Prisons notified Mr. Johnson that they intended to execute him on January 14, 2021. Shortly thereafter he filed the § 2255 Motion in district court which is the subject of this appeal.

## SUMMARY OF ARGUMENT

The Court should grant Mr. Johnson's request for a COA, reverse the district court's dismissal of his § 2255 Motion, and remand this case to the Eastern District of Virginia for further proceedings, because his § 2255 Motion was, contrary to the district court's determination, non-successive. Rather, the claim asserted in his motion is based on a provision of federal law—18 U.S.C. § 3596(c) (which the district court correctly found was identical to now-repealed 21 U.S.C. § 848(*l*) under which Mr. Johnson was convicted)—that prohibits the implementation of his death sentence on account of his intellectual disability, and provides for review when an execution date is imminent. His asserted claim became timely when the government set his execution date.

7

This reading of the provision is correct based on the plain language of § 3596(c), which demonstrates that a determination of mental status must be made when an execution date is set; is supported by the government's own concessions making abundantly clear that because the provision concerns "implementation" of the sentence, it governs the process at the time the execution date is set and not earlier; and is evident when considered in the broader context of the other provisions in the statute as well as legislative history that demonstrate Congress's intent to ensure that intellectually disabled individuals like Mr. Johnson did not slip through the cracks and that federal law would not condone their execution. The decision of the district court below that it did not have jurisdiction to entertain this claim—although it clearly can be raised if viable at the time of execution—is, respectfully, incorrect and at the very least debatable by jurists of reason.

## ARGUMENT

## I.    COREY JOHNSON IS INTELLECTUALLY DISABLED

Overwhelming evidence establishes that Corey Johnson is intellectually disabled and ineligible for execution. Three of the nation's most respected experts in the field—Daniel J. Reschly, Ph.D., J. Gregory Olley, Ph.D., and Gary N. Siperstein, Ph.D.—all of whom comprehensively evaluated Mr. Johnson under modern medical standard—independently agree that he meets the clinical and legal criteria for intellectual disability: (1) he has significant deficits in intellectual functioning, usually represented by IQ scores of 75 or below; (2) he exhibits

8

significant deficits in adaptive functioning (i.e., "the inability to learn basic skills and adjust behavior to changing circumstances"); and (3) the onset of his impairment was before the age of 18. *See* 2255 Mot., Ex. 75 (American Association on Intellectual and Developmental Disabilities Definition Manual ("AAIDD-11")); 2255 Mot., Ex. 77 (Diagnostic and Statistical Manual of Mental Disorders ("DSM-5")); *see also Moore v. Texas*, 137 S. Ct. 1039, 1042, 1045 (2017) (quoting *Hall v. Florida*, 572 U.S. 701, 710 (2014), 1048 (recognizing these standards)); *see also* 2255 Mot. at 15-20.

Multiple IQ tests administered to Mr. Johnson when he was a child and young adult—which included Flynn-adjusted[7] scores of 72 at age 8, 75 at age 12, 65 at age 16, and 73 at age 23 —as well as other contemporaneous records created during his childhood, adolescence, and young adulthood contain evidence proving his intellectual disability. *Id.* at 20-43 (setting forth in greater depth the evidence of Mr. Johnson's intellectual disability). The records are corroborated by statements from more than two dozen family members, friends, teachers, mental health professionals, and others who have known Mr. Johnson and witnessed his

---

[7] Under the prevailing clinical standards, these IQ testing results reflect scores corrected for the Flynn Effect, which as noted previously is a testing phenomenon that causes IQ scores to inflate over time and requires scores to be corrected accordingly. 2255 Mot. at 17-18. Even uncorrected (though law and medicine demand they all should be corrected), two of the scores still demonstrate Mr. Johnson's intellectual functioning is consistent with intellectual disability. *Id.* at 21-24.

9

profound limitations; this evidence is confirmed by adaptive behavior instruments administered to individuals who knew Mr. Johnson well during his childhood and whose standardized scores place him solidly within the intellectual disability range for adaptive functioning. *Id.*

Indeed, bearing out these findings, Mr. Johnson's social history is rife with telltale experiences of an intellectually disabled man with profound intellectual and adaptive deficits. He remained in the second grade for three years; repeated third and fourth grades; and, as he got older, fell further and further behind academically despite having a strong motivation to learn. *See e.g., id.* at 25-29. At age eight, Corey Johnson had "no concept of number facts, no reading skills, [could not] retain sight vocabulary words," and "had difficulty saying the alphabet"; while in the second grade, when asked his birthday, he thought it was in March even though he was actually born in November. *See e.g., id.* at 25, 30 (internal citations omitted). At age thirteen, he could barely write his own name; and while he knew there were 12 months in the year, he could recite them only up to August. *See e.g., id.* at 27, 30. Corey was not able to tell time or perform arithmetic beyond a third-grade level. *Id.* at 30. At age 18, his teachers determined that he was unable to pass school competency tests, and he ultimately left high school without graduating. *Id.* at 26. In his early twenties, achievement testing demonstrated Mr. Johnson's reading and writing abilities were no higher than the second-grade level, and when he was last tested at age 45, he was still at an elementary school level. *Id.* at 28-29.

Corey Johnson struggled throughout his life with self-care: He wet and soiled his bed until he was 12 years old and needed constant reminders to keep himself clean. *Id.* at 37-38. As he entered his teen years and into his adulthood, Mr. Johnson continued to function like a younger child. At school, without the assistance of an assigned aide, he would get lost on his way back to class and wander into other classrooms. *Id.* at 38. He could not be expected to go to the store and receive correct change. *Id.* at 31. He was never able to make his way alone through any but the most familiar streets, even as he approached adulthood. *Id.* at 38. He has never managed to live on his own or hold down a job. *Id.* at 38-40. Displaying other hallmarks of intellectual disability, Mr. Johnson had "difficulty in understanding social cues and norms," and was, over the course of his life, the quintessential follower, easily influenced by and victimized by peers, who took his money, tricked and manipulated him; his desire to be accepted by them—to, as a cousin put it, "fit in with the crowd"— also led him to engage in risky behavior. *Id.* at 33-36 (citations omitted).

Mr. Johnson is irrefutably intellectually disabled as is evident from the evaluations of the field's foremost experts that were before the court below. He is, nonetheless, now scheduled to be executed on January 14, 2021. But he cannot be executed without the government violating the law.

11

## II.    LEGAL STANDARD FOR CERTIFICATE OF APPEALABILITY

The Supreme Court has determined that the "substantial showing" necessary for a COA to issue under the Antiterrorism and Effective Death Penalty Act (the "AEDPA")—a pre-condition to appellate review of the denial of a motion brought pursuant to 28 U.S.C. § 2255—presents a low bar. 28 U.S.C. § 2253(c)(2).  Proof of ultimate success is not required and the grant of a COA is especially favored in a capital case.

The leading cases on this issue are *Miller-El v. Cockrell*, 537 U.S. 322 (2003) and *Slack v. McDaniel*, 529 U.S. 473 (2000). These opinions demonstrate that the Supreme Court has adapted to the AEDPA the standards that were formerly applied to the issuance of a certificate of probable cause in pre AEDPA habeas litigation. *See Barefoot v. Estelle*, 463 U.S. 880, 893-94 (1983). In elaborating on the "substantial showing" language of the statute, *Miller-El* explained that the standard is met if "jurists of reason could disagree with the district court's resolution" of the claim or that "the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327. The determination of whether the standard is met is a "threshold inquiry" that "does not require full consideration of the factual or legal bases adduced in support of the claims. In fact, the statute forbids it." *Id*. at 336. In *Slack*, the Court noted that an applicant met the standard if it was "debatable" whether the district court's assessment of the claim was correct. *Slack*, 529 U.S. at 484.

12

The Supreme Court also has been clear that a COA application does not have to show "entitlement to relief." *Miller-El*, 537 U.S. at 337. "The holding in *Slack* would mean very little if appellate review were denied because the prisoner did not convince a judge, or, for that matter, three judges, that he or she would prevail." *Id*. A COA should issue even if it is unclear that relief will ultimately be obtained. *Id*. at 337-38 (holding that the COA standard "does not require a showing that the appeal will succeed," but merely "'something more than the absence of frivolity' or the existence of mere 'good faith' on his or her part." (citation omitted)).

The fact that this is a death penalty case further counsels in favor of granting a COA. In *Barefoot*, the Court emphasized that "in a capital case, the nature of the penalty is a proper consideration" in determining whether to certify an issue for appeal. *Barefoot*, 463 U.S. at 893.

## III. "SECOND OR SUCCESSIVE" IS A TERM OF ART THAT DOES NOT APPLY TO ALL SECOND-IN-TIME § 2255 MOTIONS

As the Supreme Court has repeatedly explained, the phrase "second or successive" "does not simply 'refe[r] to all [§ 2255] applications filed second or successively in time.'" *Magwood v. Patterson*, 561 U.S. 320, 332 (2010) (first alteration in original) (quoting *Panetti v. Quarterman*, 551 U.S. 930, 944 (2007)). Rather, the phrase is a "term of art" that takes its full meaning from the Supreme Court's case law, including decisions predating the enactment of the AEDPA. To

13

determine whether a second-in-time pleading should be deemed successive, a court must look to the purposes of the AEDPA, which are "to further the principles of comity, finality, and federalism." *Panetti*, 551 U.S. at 947.[8] The Supreme Court has cautioned courts to ensure that "petitioners [do not] 'run the risk' under the proposed interpretation of 'forever losing their opportunity for any federal review'" and to "resist[] an interpretation of the statute that would . . . 'close our doors to a class of habeas petitioners seeking review without any clear indication that such was Congress' intent.'" *Id*. at 945-46 (citations omitted); *see also Castro v. United States*, 540 U.S. 375, 380-81 (2003).

A second-in-time petition should be treated as non-successive where the asserted claims did not arise until after a prior petition was filed, or where the claim was premature, or where a subsequent filing is expressly contemplated by statute. *United States v. Hairston*, 754 F.3d 258, 262 (4th Cir. 2014); *see also Garza v. Lappin*, 253 F.3d 918 (7th Cir. 2001) (allowing second-in-time claim in federal capital case where issue, by its very nature, could only be raised after first

---

[8] It bears emphasis that two of these goals—comity and federalism—have no relevance in the context of a federal post-conviction case where no state court determination is being disturbed. This Court is interpreting federal law as applied to a federal case.

post-conviction review was completed).[9] Mr. Johnson's motion presented such a claim.

## IV. REASONABLE JURISTS COULD DEBATE THE DISTRICT COURT'S CONCLUSION THAT MR. JOHNSON'S SECOND-IN-TIME § 2255 MOTION IS SUCCESSIVE

The district court's dismissal of Mr. Johnson's § 2255 Motion as successive is plainly the type of issue that "deserves encouragement to proceed further" and is debatable by jurists of reason. *See Hairston*, 754 F.3d at 259 (granting COA and concluding second-in-time motion was not successive where basis for sentencing claim did not arise until after first § 2255 motion was denied); *United State v. Rodgers*, 803 F. App'x 728, 729 (4th Cir. 2020) (per curiam).

---

[9] Mr. Garza proceeded under 28 U.S.C. § 2241 but only after the Fifth Circuit deemed his pleadings successive. The Seventh Circuit, in its subsequent opinion, questioned that holding and suggested that, under *Stewart v. Martinez-Villareal*, 523 U.S. 637 (1998), his claim should have been considered non-successive. *Garza,* 253 F.3d at 923. Ultimately, the Seventh Circuit speculated that the Fifth Circuit must have rejected such an argument because Mr. Martinez-Villareal had previously raised the claim and it had been dismissed whereas Mr. Garza had not raised it in his initial § 2255 motion. *Id*. at 924. As this Court is aware, the Supreme Court in *Panetti* explicitly rejected that Fifth Circuit reasoning several years later.

**A.    Mr. Johnson's Claim Is Not Successive Because It Is Based on a Statutory Provision That Provides for Review When an Execution Is Imminent**

Mr. Johnson brings his claim pursuant to 18 U.S.C. § 3596(c)[10], a statute governing implementation of a death sentence. The plain language, structure, and statutory history of the FDPA establish that Mr. Johnson is permitted to raise his status as a person with intellectual disability now, at the time when he has a

---

[10] The government argued strenuously below that Mr. Johnson cannot rely on § 3596 because he was convicted pursuant to 21 U.S.C. § 848. This argument is both immaterial and questionable.  First, as the district court found, "§ 848(*l*) and § 3596(c) contain identically worded prohibitions on executing intellectually disabled individuals." Mem. Op. at 10 n.5 (Dismissing § 2255 Petition), ECF No. 99. The prohibition thus exists no matter which statute forms its basis, and both prohibited the "implementation" of a death sentence on a person with mental retardation. Discussion of the identical provision in the § 3596(c) legislative debate is thus instructive. Mr. Johnson will refer to both provisions because his argument is the same under either.

But second, the government has never been consistent in its view of whether the cases of those convicted under § 848 should now be governed by that since-repealed statute or by § 3596.  *See, e.g.*, Defendants' Opposition to Plaintiff Intervenor Dustin Lee Honken's Motion for a Preliminary Injunction at 5 n.1, *In re Federal Bureau of Prisons' Execution Protocol Cases*, No. 1:19-mc-00145, ECF No. 36 (D.D.C. Nov. 12, 2019) (where government contended that "[t]he FDPA did not initially govern death sentences, like [Dustin] Honken's, under the ADAA, 21 U.S.C. § 848(e) (1988)" and that "[i]n 2006, Congress repealed the capital provisions of § 848, 'effectively rendering the FDPA applicable to all federal death-eligible offenses'" (quoting *United States v. Barrett*, 496 F.3d 1079, 1106 (10th Cir. 2007))); Mem. Op. at 5, *In re Federal Bureau of Prisons' Execution Protocol Cases*, No. 1:19-mc-00145, ECF No. 378 (D.D.C. Dec. 30, 2019) (court holding that "Defendants clearly took the position at the beginning of this litigation that all plaintiffs were subject to the FDPA").

This Court should grant a Certificate of Appealability on this important question regardless of which provision it finds governs.

16

pending execution date. Unlike other claims by federal inmates seeking to challenge their convictions or sentences that must be raised in an initial § 2255 motion, this provision contemplates that, where applicable, a determination of "mental retardation" will be made when the government sets an execution date. Indeed, very the language of § 3596(c) and § 848(*l*) indicates that the question arises only after a death sentence has been imposed and when it is to be implemented. *See* 18 U.S.C. § 3596(c) ("A sentence of death shall not be *carried out* upon a person who is mentally retarded.") (emphasis added); 21 U.S.C. § 848(*l*) (same).

This statute creates an independent, substantive prohibition on the implementation of the sentence based on intellectual disability. It is unique to the federal death penalty: the § 2254 statute, pursuant to which state prisoners must raise their challenges, lacks a corresponding proscription. At the same time, it is not unlike the jurisprudentially required mechanism in § 2254 for resolving mental competency claims when an execution becomes imminent. *See Panetti*, 551 U.S. at 934-35; *Martinez-Villareal*, 523 U.S. at 644-45; *Ford v. Wainwright*, 477 U.S. 399, 418 (1986). In both instances, the claim if viable must be heard at the time of implementation even if presented in a second habeas motion.

As *Panetti* and *Martinez-Villareal* make clear, similar claims are not successive even though they are second-in-time because they should be litigated when an execution date is set. The Bureau of Prison's action setting an execution

date triggers the question raised in § 3596(c) (or § 848(*l*)): if the individual has mental retardation, is pregnant, or cannot appreciate the reason for the execution, the execution cannot be carried out. In that sense, prior to the Bureau of Prison's notice of an execution date, adjudication pursuant to § 3596(c) on the question of *implementation* is premature. *Cf. Hoxha v. Levi*, 465 F.3d 554, 564-65 (3d Cir. 2006) (finding, in habeas proceeding challenging extradition, that Administrative Procedure Act challenge under particular federal statute premature because agency action had not yet occurred and the government "may ultimately decide not to extradite Petitioner").  Whether the person has earlier litigated the legality of his sentence on the ground of intellectual disability thus would not obviate the statute's stated prohibition on implementation which could, as is the case here, come many years later.

Section 3596(c) (and § 848(*l*)) provide more specific process for inmates with compelling claims of intellectual disability than is afforded by the Eighth Amendment. Limiting § 3596 to the minimum process required by the Constitution ignores the reality of the FDPA. Indeed, the FDPA includes provisions clearly intended to provide greater protection than the minimum. This particular section, however, differs from other such provisions because it is not restricted by or dependent upon another avenue of review. *Cf.* 18 U.S.C. § 3595(c) (mandating independent review of death sentence to ensure it is free from arbitrariness and clearly stating this review is a part of the direct appeal). In contrast, the review

18

required by § 3596 is not confined to an earlier stage of review, and it articulates

no limitation on claims previously raised.[11] When there is evidence that a prisoner

scheduled for execution is a person with intellectual disability ("mental

retardation" in the statute and legislative history), § 3596(c) requires that

assessment to be made when the sentence is set to be implemented, even if that

issue had been previously litigated.[12]

### 1.    The Plain Language of § 3596(c)[13] Demonstrates That a Determination of Mental Status Must Be Made When an Execution Date Is Set

Section 3596(c) applies when the sentence of death is to "be carried out." In

its plainest terms, the § 3596(c) bar pertains to the period of time in which the

sentence is "complete[d]" or "accomplish[ed]"—or "put into execution." *Carryout*,

Merriam-Webster.com, https://www.merriam-webster.com/dictionary/carryout

(last visited Jan. 5, 2021). It applies *after* the defendant is "sentenced" and *after* a

federal death row inmate has "*exhaust[ed] . . . the procedures for appeal of the

judgment of conviction and for review of the sentence*." 18 U.S.C. § 3596(a)

(emphasis added). As is made clear by the title of the section, § 3596(c) applies at

---

[11] This is, again, the same for § 848, with the identical wording, in the ADAA.

[12] As addressed below, this was openly discussed during Congressional debate. *See* 2255 Mot., Ex. 79 (136 Cong. Rec. S6873, S6876 (daily ed. May 24, 1990)).

[13] Again, the language in § 848(*l*) is identical: "sentence of death shall not be carried out upon a person who is mentally retarded."

the "implementation" of the sentence: both § 3596(c) and § 848 (*l*) contemplate that a death sentence has already been imposed when the prohibition comes into play. Congress did not otherwise qualify this bar.

> **2.      The Government Itself Has Conceded That Because § 3596 Concerns the "Implementation" of The Sentence, It Governs the Process at the Time the Execution Date Is Set and Not Earlier**

Just over a week ago, the government filed a brief *in this Court* arguing the very point that Mr. Johnson makes—that because § 3596 concerns the *implementation* of the sentence, it governs actions to be taken when the execution date is set, and not earlier. *See* Exhibit A (Excerpt of Brief of the Appellant and, in the Alternative, Petition for Writ of Mandamus, *United States v. Higgs*, No. 20-18 (4th Cir. Dec. 31, 2020), ECF No. 6) ("Higgs Brief"). In *Higgs*, the government argues that under the plain terms of § 3596, a court's designation of the state law that will govern the manner of execution cannot be restricted to the time that the death sentence is *imposed*, but rather must include the time when the sentence will be carried out. *See* Higgs Brief at 18-19 ("[T]he temporal terms in § 3596(a) reinforce that the alternative-designation provision remains available post-sentencing. . . . The unmistakable temporal flow and present-tense verbs in Section

3596(a) *leave no room for a reading that the fallback provision can be invoked only at the time the death sentence is imposed.*" (emphasis added)).[14]

In fact, the government has accepted this reading of § 3596 for almost two decades. As far back as 2002, the government had argued that § 3596 does not prohibit a death sentence from being *imposed* on a person with intellectual disabilities, but rather—like a *Ford* claim—is triggered at the time that the sentence is to be carried out to prevent or delay the execution.

> [S]ubsection 3596(c) does not provide a "defense" to the *imposition* of the death penalty. Section 3596 is entitled "Implementation of a Sentence of Death." Subsection 3596(a) - subtitled "In general" - provides, *inter alia*, that "[a] person who has been sentenced to death pursuant to this chapter shall be committed to the custody of the Attorney General until exhaustion of the procedures for appeal of the judgment of conviction and for review of the sentence." Subsections 3596(b) and 3596(c) are subtitled "Pregnant woman" and "Mental capacity," respectively. Subsection 3596(b) provides that a sentence of death shall not be carried out upon a woman while she is pregnant, while subsection 3596(c) prohibits the carrying out of a sentence of death upon a person who is mentally retarded or who, as a result of mental disability, lacks the mental capacity to understand the death penalty and why it was imposed on that person. See 18 U.S.C. § 3596. *From the language of these subsections and as is signaled by the title of the statute, it should be clear that neither mental retardation nor pregnancy precludes the* imposition *of the death penalty under the statute, rather it prevents and/or may delay the* implementation *of the death penalty.*

_____

[14] *See also id.* at 18 (arguing that Congress explicitly recognized the temporal distinction by enacting "a separate provision of the FDPA—18 U.S.C. § 3594— that governs '[i]mposition of a sentence of death.' Section 3596, by contrast, governs '[i]mplementation of a sentence of death.'" (alterations in original)).

*See* Exhibit B (Excerpt of Government's Response in Opposition to "Amended Motion of Bruce Carneil Webster to Vacate Conviction and Sentence and for New Trial Pursuant to 28 U.S.C. § 2255 and Rule 33 of the Federal Rules of Criminal Procedure" at 44, *Webster v. United States*, No. 4-94-CR-0121-Y (N.D. Tex. Nov. 14, 2002) (emphasis added)).[15]

The government's own interpretation of § 3596—for nearly two decades, and as recently as last month—is sufficient to establish that Mr. Johnson's reading of the statute is, at the very least, debatable.

### 3. The Other Provisions of § 3596(c), as Well as the Broader Structure of the FDPA, Reinforce That the § 3596(c) Bar Is Properly Raised After an Execution Date Is Set

Statutory terms must be interpreted "in their context and with a view to their place in the overall statutory scheme." *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989). The "statutory scheme surrounding the specific language" of § 3596(c) "reinforces" its plain text. *Murphy v. Smith*, 138 S. Ct. 784, 789 (2018).

Congress placed the prohibition on carrying out the execution of persons with mental retardation (containing language identical to that in § 848(*l*)) in the "implementation" section of the FDPA statute, situating the intellectual disability bar between the pregnancy bar and mental competency bar—all challenges that are

---

[15] It should be noted that § 3596 took many of the same provisions of § 848 and reordered them so that they would appear in chronological order in terms of pretrial, trial, post-conviction, and execution. The provisions of the earlier statute were disorganized in that regard.

22

raised once execution is imminent. By structuring the statute in this manner, Congress made plain and clear its intent that an inmate seeking relief under these three prohibitions should do so when an execution is imminent.

The placement of the "mental retardation" provision within § 3596 is dispositive. Whereas the first subsection, § 3596(a) (entitled "In [G]eneral"), circumscribes this section of the U.S. Code and provides instructions about how and when the sentence is be implemented generally—after all appeals have concluded and the prisoner is released to the custody of a U.S. marshal— subsection (b) and (c) limit the marshal's implementation of the sentence by enumerating prohibitions to be raised "[w]hen the sentence is to be implemented." *See* 18 U.S.C. § 3596(a).

The FDPA's entire structure, moreover, which generally follows the chronological stages of a capital case, further supports this conclusion: the implementation provisions in § 3596, including the prohibitions on implementation, were placed after those subsections governing pre-trial and trial proceedings, *see* §§ 3591-3594; direct appeal provisions, *see* § 3595; and before those governing execution procedures once the U.S. marshals take custody of the prisoner. *See* § 3597.[16]

---

[16] The last two sections of the FDPA are miscellaneous provisions that do not have any temporal components: § 3598 governs capital proceedings for crimes occurring within the boundaries of Indian country, and § 3599 addresses the right to counsel in capital cases.

23

Congress's decision to place the mental retardation bar after the provisions governing ordinary judicial review of a capital proceeding, and specifically in the section titled "Implementation of a sentence of death," is telling: It intended that claims related to § 3596 prohibitions could be raised up to the eve of execution.

### 4.     The Legislative History of § 3596(c) Demonstrates Congress's Intent

The legislative history of the intellectual disability bar confirms that Congress understood that the FDPA would allow defendants to raise such claims "at any time," including between judgment and execution, and including after an execution date has been set, even if a claim based on intellectual disability was litigated earlier. *See* 2255 Mot., Ex. 79 (136 Cong. Rec. S6873, S6876 (daily ed. May 24, 1990) (comments by Sen. Hatch)).

During debate of the FDPA in May 1990, Senator Strom Thurmond of South Carolina introduced an amendment (the "Thurmond Amendment") to Senate Bill 1970, 101st Cong. (1990), which had been introduced by then-Senator Joseph Biden of Delaware. The amendment proposed to modify the existing mental retardation provision in the ADAA, which had passed two years earlier. Specifically, Senator Thurmond proposed to limit the mental retardation prohibition to only cases in which the defendant "lack[ed] the capacity to appreciate the wrongfulness of his actions" so that "it would prohibit the execution of mentally retarded persons who do not know the difference between right and

24

wrong." 2255 Mot., Ex. 79 (136 Cong. Rec. S6873, S6877, 6880 (daily ed. May 24, 1990) (comments by Sen. Thurmond)). During the debate on the Thurmond Amendment, Senator Orrin Hatch expressed his understanding of the intellectual disability prohibition both as incorporated in Senate Bill 1970, and as enacted in the ADAA.

> Let us understand something. The trial comes up. Defendants can raise any issue about mental capacity, disability or retardation they want. . . .
>
> Then the sentencing comes up. They have the right to come in and do it all over again. . . .
>
> The Biden amendment in this bill[17] then goes and *gives them a third time*, only it says it a little bit differently. It says, if you can show you are mentally retarded, you cannot be executed. You will stay in jail the rest of your life, but do you not [sic] have to suffer the death penalty. *This is better than habeas corpus for prisoners. They can raise it at any time.*

2255 Mot., Ex. 79 (136 Cong. Rec. S6873, S6876 (daily ed. May 24, 1990)

(comments by Sen. Hatch) (emphasis added)).[18]

---

[17] Senator Hatch's reference to the "Biden Amendment in this bill" is a reference to the already enacted "mental retardation" death penalty bar in the 1988 ADAA. *See* 2255 Mot., Ex. 79 (136 Cong. Rec. S6873, S6876 (daily ed. May 24, 1990)).

[18] Of course, this is not what has happened here. Corey Johnson's case relies not on finding a new expert but on the development and refinement in the medical profession, and the subsequent adoption by the courts, of standards for diagnosing intellectual disability that did not exist at the time he was tried in 1993 or pursued remedies in § 2255 in the late 1990s. No court has heard the compelling evidence establishing Mr. Johnson's intellectual disability.

25

Notably, no one, neither supporters nor opponents of § 3596(c), contradicted Senator Hatch's interpretation of S. 1970 that an intellectual disability claim could be brought long after an inmate was sentenced to death and could be brought more than once. Instead, the Senate rejected the Thurmond Amendment by a vote of 59 to 38. 2255 Mot., Ex. 79 (136 Cong. Rec. S6873, S6883 (daily ed. May 24, 1990)). Both houses of Congress passed the FDPA, with bipartisan support, and it was signed into law in 1994, with the intellectual disability provision intact.[19]

### B.    Mr. Johnson's Implementation Claim Was Not Ripe until the Execution Date Was Set

The district court opined that since Mr. Johnson had an opportunity to challenge the sentence based on intellectual disability at earlier stages, his claim ripened prior to the setting of his execution date and further review is foreclosed. Op. at 16, 18. This is not so. Although it is correct that the FDPA and the ADAA permit such challenges at the time of trial and the initial § 2255 proceeding, it does not follow from that fact that review of a prisoner's intellectual capacity should therefore be precluded at the time of the implementation of the sentence. The plain language and legislative history of § 3596 demonstrate that Congress intended that

---

[19] The less lengthy legislative history of the ADAA, which preceded the FDPA, reflects a similar commitment to ensuring that a person with intellectual disability will not be executed by the federal government. *See* 2255 Mot., Ex. 78 (134 Cong. Rec. 22,926, 22,993 (1988)) ("I think there is no danger here that there would be effective abuse by someone who inappropriately claimed mental retardation. *The purpose of this is very much confined to prohibit execution of those who are mentally retarded.*") (statement of Sen. Levin) (emphasis added).

review be available at the time the sentence is carried out; indeed, it is only then that a claim about the *implementation* of the sentence could become ripe. That the statute does not preclude the raising of a claim earlier about the *imposition* of the sentence does not transform that claim into one about implementation. The district court's conclusion otherwise is, at the very least, debatable by jurists of reason.

So, too, is the district court's opinion that the claim is barred by *res judicata*. Op. at 14. That doctrine does not apply to claims that were not yet ripe at the time of the prior adjudication. *See Lambert v. Williams*, No. 98-2070, 1998 WL 904731, at *1 (Dec. 29, 1998 4th Cir. 1998) (per curiam). Nor was the prior adjudication based on the same facts as those presented in Mr. Johnson's second-in-time § 2255 motion: indeed, the only fact that prior opinions relied on was that the psychologist trial counsel hired, who was not an expert in intellectual disability, believed that (an unadjusted) IQ score of 77 precluded a finding of intellectually disability altogether. (A "fact" we know now is incorrect.) *Res judicata* is not an issue here.[20]

The district court's attempt to distinguish *Ford* claims is unavailing, or at least debatable. *See* Op. at 15-16. Congress itself made no such distinction between

---

[20] First, it is questionable whether the doctrine is even applicable in habeas cases. *See Panetti*, 551 U.S. at 947 (describing the AEDPA as encompassing its own, "modified" *res judicata* rule (citation omitted)); *United States v. Barrett*, 178 F.3d 34, 44 (1st Cir. 1999) (holding that *res judicata* rule would not make sense in litigation of second petitions); *Calderon v. U.S. Dist. Ct.*, 163 F.3d 530, 538 (9th Cir. 1998) (en banc) (holding that *res judicata* does not apply to habeas cases.). But more significantly, that is a question that would arise for a court considering the merits, only after it has assumed jurisdiction.

lack of competency and intellectual disability. They are treated equally and are even contained in the same subdivision of the implementation statute: § 3596(c). Although the district court opined that it "makes little sense" to provide the same statutory remedy to intellectually disabled prisoners as to those who are incompetent at the time of execution, Op. at 18, the court was not entitled to substitute its own judgment for that of Congress. Congress designed both § 3596(c) and § 848(*l*) to act as one last safeguard—to ensure that an intellectually disabled person with a death sentence did not slip through the cracks—regardless of any prior litigation.

Indeed, the court's reliance on the "permanency" of intellectual disability, Op. at 18-19, is wholly irrelevant to the question at hand: whether § 3596 or § 848 permits review of a prisoner's mental status at the time of the implementation of the sentence. The fact that a court might at that stage be in a position to prevent such a person from being executed, based on the most current science and best evidence available, is entirely consistent with the plain language and legislative history of the statute—ensuring that an individual with intellectual disability will not be executed by the federal government.

The court's conclusion that Mr. Johnson's reading of the statute would frustrate the purposes of AEDPA or override the ban on successive § 2255 motions, *see* Op. at 20, is similarly misplaced, or at least debatable. First, its reliance on *Bourgeois v. Watson*, 977 F.3d 620 (7th Cir. 2020) is inapposite. The

concern raised there—that a fresh intellectual disability claim would arise every time the medical community updates its literature, *see* Op. at 20—has no relevance here.[21] What triggers potential review under § 3596 or § 848 is the setting of an execution date, not advancements in medical science.

Second, the population for whom this implementation provision is potentially applicable is tiny. Indeed, Mr. Johnson's case is a relic: he was tried in 1993, at a time when there were no federal standards and little understanding of how intellectual disability claims should be developed and litigated. The unique convergence of conditions that made it possible for Mr. Johnson's intellectual disability to be missed is also precisely what make his case so rare and unlikely to be repeated. Resort to § 3596 to identify other intellectually disabled prisoners simply will not be necessary in most cases. Here, though, there was essentially no factual record on Mr. Johnson's intellectual disability at the time of his trial, and what was presented—that a single, unadjusted (and therefore inaccurate) IQ score of 77 meant he was not intellectually disabled—depended on an outdated, rejected

---

[21] Unlike Mr. Johnson, Mr. Bourgeois, it should be noted, received a full evidentiary hearing concerning his intellectual disability claim at the time of his initial § 2255 proceeding. The courts also found that the district judge applied the correct medical and legal standards in making the requisite determination. *Bourgeois*, 977 F.3d at 625, 635-36. The fact-findings made in his robust post-conviction proceedings, moreover, received review in the Fifth Circuit and following that, in the Seventh Circuit. *Bourgeois v. Watson*, 977 F.3d 620, 625-26 (7th Cir.), *cert. denied*, 141 S. Ct. 507 (2020); *United States v. Bourgeois*, 537 F. App'x 604, 643-65 (5th Cir. 2013).  Corey Johnson has never had a court consider or review the facts that prove he is intellectually disabled.

view of how to properly make such a determination. The remedy afforded by §
3596 therefore is necessary to ensure that an otherwise ineligible individual is not
executed.

Finally, unlike with claims brought by state prisoners under § 2254, federal
prisoners are not prohibited from raising the same claim in a second or successive
§ 2255 motion. Section 2244(b)(1) unambiguously states: "A claim presented in a
second or successive habeas corpus *application under section 2254* that was
presented in a prior application shall be dismissed." (Emphasis added).  By the
plain language of § 2244, it is clear that Congress intended for the same claim
successor bar to apply only to claims brought by state prisoners under 28 U.S.C. §
2254, not to claims by federal prisoners, like Mr. Johnson. *See, e.g.*, *United States
v. Winestock*, 340 F.3d 200, 204-05 (4th Cir. 2003) (noting that § 2244(b)(1) "is
limited by its terms to § 2254 applications"); *United States v. MacDonald*, 641
F.3d 596, 614 n.9 (4th Cir. 2011) (noting application of  § 2244(b)(1) to § 2255
motion is an open question in the circuit); *see also Stanko v. Davis*, 617 F.3d 1262,
1269 n.5 (10th Cir. 2010) (holding § 2244(b)(1) & (2) "concern only 'habeas
corpus application[s] under section 2254'" (citation omitted)). Thus, the district
court's conclusion that consideration of this claim would frustrate AEDPA's
purpose is, at the very least, debatable.

30

## CONCLUSION

Corey Johnson is an intellectually disabled man slated for federal execution in less than a week. Federal law precludes the implementation of a sentence of death previously imposed on a person with intellectual disability. Whether Mr. Johnson, who has never even had a hearing on his ineligibility for a death sentence, may avail himself of the law as written to protect someone like him or is precluded from doing so by provisions of § 2255(h) is a question that reasonable jurists can surely debate. For the foregoing reasons, Mr. Johnson respectfully asks this Court to grant a COA, reverse the district court's dismissal of his § 2255 Motion, and remand the case for further proceedings.

Dated: January 8, 2021                 Respectfully submitted,


                                       /s/ Donald P. Salzman
                                       Donald P. Salzman
                                       Jonathan Marcus
                                       David E. Carney
                                       Skadden, Arps, Slate, Meagher & Flom, LLP
                                       1440 New York Avenue, NW
                                       Washington, DC 20005
                                       (202) 371-7983
                                       donald.salzman@skadden.com

                                       *Counsel for Corey Johnson*

31

## REQUEST FOR ORAL ARGUMENT

To counsel's present knowledge, this Court has not addressed the specific issues presented by this case. Counsel for Appellant accordingly asserts that the issues raised in this brief may be more fully developed through oral argument, and respectfully requests the same.

## CERTIFICATE OF COMPLIANCE

1.     This brief contains 8155 words, excluding the parts of the brief exempted from the word count by Fed. R. App. P. Rule 27(d)(2) and Rule 32(f).

2.     This brief complies with the font, spacing, and type size requirements set forth in Fed. R. App. P. Rule 32(a)(5).

/s/ Donald P. Salzman

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 8th day of January 2021, the foregoing document was

served on all parties or their counsel of record though the CM/ECF system, which

will then send notification of such filing to all parties and counsel included on the

Court's Electronic Mail notice list.

/s/ Donald P. Salzman
Donald P. Salzman
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue, NW
Washington, DC 20005
(202) 371-7983
donald.salzman@skadden.com

*Counsel For Appellant Corey Johnson*

# STATUTORY ADDENDUM
## (Relevant Excerpts)

**Key Statutes**

18 U.S.C. § 3596 .................................................................................ADD-1

21 U.S.C. § 848 (1988) (repealed 2006) .........................................ADD-2

28 U.S.C. § 2244 ...............................................................................ADD-14

28 U.S.C. § 2255 ...............................................................................ADD-17

UNITED STATES CODE ANNOTATED
TITLE 18. CRIMES AND CRIMINAL PROCEDURE
PART II. CRIMINAL PROCEDURE
CHAPTER 228. DEATH SENTENCE

## 18 U.S.C. § 3596. Implementation of a sentence of death

\*      \*      \*      \*      \*

(a) In general.—A person who has been sentenced to death pursuant to this chapter shall be committed to the custody of the Attorney General until exhaustion of the procedures for appeal of the judgment of conviction and for review of the sentence. When the sentence is to be implemented, the Attorney General shall release the person sentenced to death to the custody of a United States marshal, who shall supervise implementation of the sentence in the manner prescribed by the law of the State in which the sentence is imposed. If the law of the State does not provide for implementation of a sentence of death, the court shall designate another State, the law of which does provide for the implementation of a sentence of death, and the sentence shall be implemented in the latter State in the manner prescribed by such law.

(b) Pregnant woman. —A sentence of death shall not be carried out upon a woman while she is pregnant.

(c) Mental capacity. —A sentence of death shall not be carried out upon a person who is mentally retarded. A sentence of death shall not be carried out upon a person who, as a result of mental disability, lacks the mental capacity to understand the death penalty and why it was imposed on that person.

\*      \*      \*      \*      \*

ADD-1

UNITED STATES CODE
TITLE 21. FOOD AND DRUGS

## 21 U.S.C. § 848 (1988) (repealed 2006) Continuing criminal enterprise

\*    \*    \*    \*    \*

(a) Penalties; forfeitures

Any person who engages in a continuing criminal enterprise shall be sentenced to a term of imprisonment which may not be less than 20 years and which may be up to life imprisonment, to a fine not to exceed the greater of that authorized in accordance with the provisions of title 18 or $2,000,000 if the defendant is an individual or $5,000,000 if the defendant is other than an individual, and to the forfeiture prescribed in section 853 of this title; except that if any person engages in such activity after one or more prior convictions of him under this section have become final, he shall be sentenced to a term of imprisonment which may not be less than 30 years and which may be up to life imprisonment, to a fine not to exceed the greater of twice the amount authorized in accordance with the provisions of title 18 or $4,000,000 if the defendant is an individual or $10,000,000 if the defendant is other than an individual, and to the forfeiture prescribed in section 853 of this title.

(b) Life imprisonment for engaging in continuing criminal enterprise

Any person who engages in a continuing criminal enterprise shall be imprisoned for life and fined in accordance with subsection (a) of this section, if—

(1) such person is the principal administrator, organizer, or leader of the enterprise or is one of several such principal administrators, organizers, or leaders; and

(2)(A) the violation referred to in subsection (d)(1) of this section involved at least 300 times the quantity of a substance described in subsection 841(b)(1)(B) of this title, or

(B) the enterprise, or any other enterprise in which the defendant was the principal or one of several principal administrators, organizers, or leaders, received $10 million dollars in gross receipts during any twelve-month period of its existence for the manufacture, importation, or distribution of a substance described in section 841(b)(1)(B) of this title.

(c) "Continuing criminal enterprise" defined

For purposes of subsection (a) of this section, a person is engaged in a continuing criminal enterprise if—

(1) he violates any provision of this subchapter or subchapter II of this chapter the punishment for which is a felony, and

(2) such violation is a part of a continuing series of violations of this subchapter or subchapter II of this chapter—

(A) which are undertaken by such person in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and

(B) from which such person obtains substantial income or resources.

(d) Suspension of sentence and probation prohibited

In the case of any sentence imposed under this section, imposition or execution of such sentence shall not be suspended, probation shall not be granted, and the Act of July 15, 1932 (D.C. Code, secs. 24-203-24-207), shall not apply.

(e) Death penalty

(1) In addition to the other penalties set forth in this section-

(A) any person engaging in or working in furtherance of a continuing criminal enterprise, or any person engaging in an offense punishable under section 841(b)(1)(A) of this title or section 960(b)(1) of this title who intentionally kills or counsels, commands, induces, procures, or causes the intentional killing of an individual and such killing results, shall be sentenced to any term of imprisonment, which shall not be less than 20 years, and which may be up to life imprisonment, or may be sentenced to death; and

(B) any person, during the commission of, in furtherance of, or while attempting to avoid apprehension, prosecution or service of a prison sentence for, a felony violation of this subchapter or subchapter II of this chapter who intentionally kills or counsels, commands, induces, procures, or causes the intentional killing of any Federal, State, or local law enforcement officer engaged in, or on account of, the

ADD-3

performance of such officer's official duties and such killing results, shall be sentenced to any term of imprisonment, which shall not be less than 20 years, and which may be up to life imprisonment, or may be sentenced to death.

(2) As used in paragraph (1)(b), the term "law enforcement officer" means a public servant authorized by law or by a Government agency or Congress to conduct or engage in the prevention, investigation, prosecution or adjudication of an offense, and includes those engaged in corrections, probation, or parole functions.

(g) Hearing required with respect to death penalty

A person shall be subjected to the penalty of death for any offense under this section only if a hearing is held in accordance with this section.

(h) Notice by Government in death penalty cases

(1) Whenever the Government intends to seek the death penalty for an offense under this section for which one of the sentences provided is death, the attorney for the Government, a reasonable time before trial or acceptance by the court of a plea of guilty, shall sign and file with the court, and serve upon the defendant, a notice—

(A) that the Government in the event of conviction will seek the sentence of death; and

(B) setting forth the aggravating factors enumerated in subsection (n) of this section and any other aggravating factors which the Government will seek to prove as the basis for the death penalty.

(2) The court may permit the attorney for the Government to amend this notice for good cause shown.

(i) Hearing before court or jury

(1) When the attorney for the Government has filed a notice as required under subsection (h) of this section and the defendant is found guilty of or pleads guilty to an offense under subsection (e) of this section, the judge who presided at the trial or before whom the guilty plea was entered, or any other judge if the judge who presided at the trial or before whom the guilty plea was entered is unavailable, shall conduct a separate sentencing hearing

ADD-4

to determine the punishment to be imposed. The hearing shall be conducted—

>   (A) before the jury which determined the defendant's guilt;

>   (B) before a jury impaneled for the purpose of the hearing if—

>>   (i) the defendant was convicted upon a plea of guilty;

>>   (ii) the defendant was convicted after a trial before the court sitting without a jury;

>>   (iii) the jury which determined the defendant's guilt has been discharged for good cause; or

>>   (iv) after initial imposition of a sentence under this section, redetermination of the sentence under this section is necessary; or

>   (C) before the court alone, upon the motion of the defendant and with the approval of the Government.

(2) A jury impaneled under paragraph (1)(B) shall consist of 12 members, unless, at any time before the conclusion of the hearing, the parties stipulate with the approval of the court that it shall consist of any number less than 12.

(j) Proof of aggravating and mitigating factors

Notwithstanding rule 32(c) of the Federal Rules of Criminal Procedure, when a defendant is found guilty of or pleads guilty to an offense under subsection (e) of this section, no presentence report shall be prepared. In the sentencing hearing, information may be presented as to matters relating to any of the aggravating or mitigating factors set forth in subsections (m) and (n) of this section, or any other mitigating factor or any other aggravating factor for which notice has been provided under subsection (h)(1)(B) of this section. Where information is presented relating to any of the aggravating factors set forth in subsection (n) of this section, information may be presented relating to any other aggravating factor for which notice has been provided under subsection (h)(1)(B) of this section. Information presented may include the trial transcript and exhibits if the hearing is held before a jury or judge not present during the trial, or at the trial judge's discretion. Any other information relevant to such mitigating or aggravating factors

ADD-5

may be presented by either the Government or the defendant, regardless of its admissibility under the rules governing admission of evidence at criminal trials, except that information may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. The Government and the defendant shall be permitted to rebut any information received at the hearing and shall be given fair opportunity to present argument as to the adequacy of the information to establish the existence of any of the aggravating or mitigating factors and as to appropriateness in that case of imposing a sentence of death. The Government shall open the argument. The defendant shall be permitted to reply. The Government shall then be permitted to reply in rebuttal. The burden of establishing the existence of any aggravating factor is on the Government, and is not satisfied unless established beyond a reasonable doubt. The burden of establishing the existence of any mitigating factor is on the defendant, and is not satisfied unless established by a preponderance of the evidence.

(k) Return of findings

The jury, or if there is no jury, the court, shall consider all the information received during the hearing. It shall return special findings identifying any aggravating factors set forth in subsection (n) of this section, found to exist. If one of the aggravating factors set forth in subsection (n)(1) of this section and another of the aggravating factors set forth in paragraphs (2) through (12) of subsection (n) of this section is found to exist, a special finding identifying any other aggravating factor for which notice has been provided under subsection (h)(1)(B) of this section, may be returned. A finding with respect to a mitigating factor may be made by one or more of the members of the jury, and any member of the jury who finds the existence of a mitigating factor may consider such a factor established for purposes of this subsection, regardless of the number of jurors who concur that the factor has been established. A finding with respect to any aggravating factor must be unanimous. If an aggravating factor set forth in subsection (n)(1) of this section is not found to exist or an aggravating factor set forth in subsection (n)(1) of this section is found to exist but no other aggravating factor set forth in subsection (n) of this section is found to exist, the court shall impose a sentence, other than death, authorized by law. If an aggravating factor set forth in subsection (n)(1) of this section and one or more of the other aggravating factors set forth in subsection (n) of this section are found to exist, the jury, or if there is no jury, the court, shall then consider whether the aggravating factors found to exist sufficiently outweigh any mitigating factor or factors found to exist, or in the absence of mitigating factors, whether the aggravating factors are themselves sufficient to justify a sentence of

death. Based upon this consideration, the jury by unanimous vote, or if there is no jury, the court, shall recommend that a sentence of death shall be imposed rather than a sentence of life imprisonment without possibility of release or some other lesser sentence. The jury or the court, regardless of its findings with respect to aggravating and mitigating factors, is never required to impose a death sentence and the jury shall be so instructed.

(l) Imposition of sentence

Upon the recommendation that the sentence of death be imposed, the court shall sentence the defendant to death. Otherwise the court shall impose a sentence, other than death, authorized by law. A sentence of death shall not be carried out upon a person who is under 18 years of age at the time the crime was committed. A sentence of death shall not be carried out upon a person who is mentally retarded. A sentence of death shall not be carried out upon a person who, as a result of mental disability—

> (1) cannot understand the nature of the pending proceedings, what such person was tried for, the reason for the punishment, or the nature of the punishment; or

> (2) lacks the capacity to recognize or understand facts which would make the punishment unjust or unlawful, or lacks the ability to convey such information to counsel or to the court.

(m) Mitigating factors

In determining whether a sentence of death is to be imposed on a defendant, the finder of fact shall consider mitigating factors, including the following:

> (1) The defendant's capacity to appreciate the wrongfulness of the defendant's conduct or to conform conduct to the requirements of law was significantly impaired, regardless of whether the capacity was so impaired as to constitute a defense to the charge.

> (2) The defendant was under unusual and substantial duress, regardless of whether the duress was of such a degree as to constitute a defense to the charge.

> (3) The defendant is punishable as a principal (as defined in section 2 of title 18) in the offense, which was committed by another, but the defendant's

ADD-7

participation was relatively minor, regardless of whether the participation was so minor as to constitute a defense to the charge.

(4) The defendant could not reasonably have foreseen that the defendant's conduct in the course of the commission of murder, or other offense resulting in death for which the defendant was convicted, would cause, or would create a grave risk of causing, death to any person.

(5) The defendant was youthful, although not under the age of 18.

(6) The defendant did not have a significant prior criminal record.

(7) The defendant committed the offense under severe mental or emotional disturbance.

(8) Another defendant or defendants, equally culpable in the crime, will not be punished by death.

(9) The victim consented to the criminal conduct that resulted in the victim's death.

(10) That other factors in the defendant's background or character mitigate against imposition of the death sentence.

(n) Aggravating factors for homicide

If the defendant is found guilty of or pleads guilty to an offense under subsection (e) of this section, the following aggravating factors are the only aggravating factors that shall be considered, unless notice of additional aggravating factors is provided under subsection (h)(1)(B) of this section:

(1) The defendant-

(A) intentionally killed the victim;

(B) intentionally inflicted serious bodily injury which resulted in the death of the victim;

(C) intentionally engaged in conduct intending that the victim be killed or that lethal force be employed against the victim, which resulted in the death of the victim;

(D) intentionally engaged in conduct which—

ADD-8

(i) the defendant knew would create a grave risk of death to a person, other than one of the participants in the offense; and

(ii) resulted in the death of the victim.

(2) The defendant has been convicted of another Federal offense, or a State offense resulting in the death of a person, for which a sentence of life imprisonment or a sentence of death was authorized by statute.

(3) The defendant has previously been convicted of two or more State or Federal offenses punishable by a term of imprisonment of more than one year, committed on different occasions, involving the infliction of, or attempted infliction of, serious bodily injury upon another person.

(4) The defendant has previously been convicted of two or more State or Federal offenses punishable by a term of imprisonment of more than one year, committed on different occasions, involving the distribution of a controlled substance.

(5) In the commission of the offense or in escaping apprehension for a violation of subsection (e) of this section, the defendant knowingly created a grave risk of death to one or more persons in addition to the victims of the offense.

(6) The defendant procured the commission of the offense by payment, or promise of payment, of anything of pecuniary value.

(7) The defendant committed the offense as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value.

(8) The defendant committed the offense after substantial planning and premeditation.

(9) The victim was particularly vulnerable due to old age, youth, or infirmity.

(10) The defendant had previously been convicted of violating this subchapter or subchapter II of this chapter for which a sentence of five or more years may be imposed or had previously been convicted of engaging in a continuing criminal enterprise.

(11) The violation of this subchapter in relation to which the conduct described in subsection (e) of this section occurred was a violation of section 845 of this title.

(12) The defendant committed the offense in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to the victim.

(o) Right of defendant to justice without discrimination

(1) In any hearing held before a jury under this section, the court shall instruct the jury that in its consideration of whether the sentence of death is justified it shall not consider the race, color, religious beliefs, national origin, or sex of the defendant or the victim, and that the jury is not to recommend a sentence of death unless it has concluded that it would recommend a sentence of death for the crime in question no matter what the race, color, religious beliefs, national origin, or sex of the defendant, or the victim, may be. The jury shall return to the court a certificate signed by each juror that consideration of the race, color, religious beliefs, national origin, or sex of the defendant or the victim was not involved in reaching his or her individual decision, and that the individual juror would have made the same recommendation regarding a sentence for the crime in question no matter what the race, color, religious beliefs, national origin, or sex of the defendant, or the victim, may be.

(2) Not later than one year from November 18, 1988, the Comptroller General shall conduct a study of the various procedures used by the several States for determining whether or not to impose the death penalty in particular cases, and shall report to the Congress on whether or not any or all of the various procedures create a significant risk that the race of a defendant, or the race of a victim against whom a crime was committed, influence the likelihood that defendants in those States will be sentenced to death. In conducting the study required by this paragraph, the General Accounting Office shall—

(A) use ordinary methods of statistical analysis, including methods comparable to those ruled admissible by the courts in race discrimination cases under title VII of the Civil Rights Act of 1964 [42 U.S.C. 2000e et seq.];

(B) study only crimes occurring after January 1, 1976; and

ADD-10

(C) determine what, if any, other factors, including any relation between any aggravating or mitigating factors and the race of the victim or the defendant, may account for any evidence that the race of the defendant, or the race of the victim, influences the likelihood that defendants will be sentenced to death. In addition, the General Accounting Office shall examine separately and include in the report, death penalty cases involving crimes similar to those covered under this section.

(p) Sentencing in capital cases in which death penalty is not sought or imposed

If a person is convicted for an offense under subsection (e) of this section and the court does not impose the penalty of death, the court may impose a sentence of life imprisonment without the possibility of parole.

(q) Appeal in capital cases; counsel for financially unable defendants

(1) In any case in which the sentence of death is imposed under this section, the sentence of death shall be subject to review by the court of appeals upon appeal by the defendant. Notice of appeal must be filed within the time prescribed for appeal of judgment in section 2107 of title 28. An appeal under this section may be consolidated with an appeal of the judgment of conviction. Such review shall have priority over all other cases.

(2) On review of the sentence, the court of appeals shall consider the record, the evidence submitted during the trial, the information submitted during the sentencing hearing, the procedures employed in the sentencing hearing, and the special findings returned under this section.

(3) The court shall affirm the sentence if it determines that—

(A) the sentence of death was not imposed under the influence of passion, prejudice, or any other arbitrary factor; and

(B) the information supports the special finding of the existence of every aggravating factor upon which the sentence was based, together with, or the failure to find, any mitigating factors as set forth or allowed in this section.

In all other cases the court shall remand the case for reconsideration under this section. The court of appeals shall state in writing the reasons for its disposition of the review of the sentence.

ADD-11

(4)(A) Notwithstanding any other provision of law to the contrary, in every criminal action in which a defendant is charged with a crime which may be punishable by death, a defendant who is or becomes financially unable to obtain adequate representation or investigative, expert, or other reasonably necessary services at any time either—

(i) before judgment; or

(ii) after the entry of a judgment imposing a sentence of death but before the execution of that judgment;

shall be entitled to the appointment of one or more attorneys and the furnishing of such other services in accordance with paragraphs (5), (6), (7), (8), and (9).

(B) In any post-conviction proceeding under section 2254 or 2255 of title 28 seeking to vacate or set aside a death sentence, any defendant who is or becomes financially unable to obtain adequate representation or investigative, expert, or other reasonably necessary services shall be entitled to the appointment of one or more attorneys and the furnishing of such other services in accordance with paragraphs (5), (6), (7), (8), and (9).

(5) If the appointment is made before judgment, at least one attorney so appointed must have been admitted to practice in the court in which the prosecution is to be tried for not less than five years, and must have had not less than three years experience in the actual trial of felony prosecutions in that court.

(6) If the appointment is made after judgment, at least one attorney so appointed must have been admitted to practice in the court of appeals for not less than five years, and must have had not less than three years experience in the handling of appeals in that court in felony cases.

(7) With respect to paragraphs (5) and (6), the court, for good cause, may appoint another attorney whose background, knowledge, or experience would otherwise enable him or her to properly represent the defendant, with due consideration to the seriousness of the possible penalty and to the unique and complex nature of the litigation.

(8) Unless replaced by similarly qualified counsel upon the attorney's own motion or upon motion of the defendant, each attorney so appointed shall represent the defendant throughout every subsequent stage of available

ADD-12

judicial proceedings, including pretrial proceedings, trial, sentencing, motions for new trial, appeals, applications, for writ of certiorari to the Supreme Court of the United States, and all available post-conviction process, together with applications for stays of execution and other appropriate motions and procedures, and shall also represent the defendant in such competency proceedings and proceedings for executive or other clemency as may be available to the defendant.

(9) Upon a finding in ex parte proceedings that investigative, expert or other services are reasonably necessary for the representation of the defendant, whether in connection with issues relating to guilt or sentence, the court shall authorize the defendant's attorneys to obtain such services on behalf of the defendant and shall order the payment of fees and expenses therefore, under paragraph (10). Upon a finding that timely procurement of such services could not practicably await prior authorization, the court may authorize the provision of and payment for such services nunc pro tunc.

(10) Notwithstanding the rates and maximum limits generally applicable to criminal cases and any other provision of law to the contrary, the court shall fix the compensation to be paid to attorneys appointed under this subsection and the fees and expenses to be paid for investigative, expert, and other reasonably necessary services authorized under paragraph (9), at such rates or amounts as the court determines to be reasonably necessary to carry out the requirements of paragraphs (4) through (9).

(r) Refusal to participate by State and Federal correctional employees

No employee of any State department of corrections or the Federal Bureau of Prisons and no employee providing services to that department or bureau under contract shall be required, as a condition of that employment, or contractual obligation to be in attendance at or to participate in any execution carried out under this section if such participation is contrary to the moral or religious convictions of the employee. For purposes of this subsection, the term "participation in executions" includes personal preparation of the condemned individual and the apparatus used for execution and supervision of the activities of other personnel in carrying out such activities.

*    *    *    *    *

UNITED STATES CODE ANNOTATED
TITLE 28. JUDICIARY AND JUDICIAL PROCEDURE
PART VI. PARTICULAR PROCEEDINGS
CHAPTER 153. HABEAS CORPUS

## 28 U.S.C. § 2244 Finality of determination

*     *     *     *     *

 **(a)** No circuit or district judge shall be required to entertain an application for a writ of habeas corpus to inquire into the detention of a person pursuant to a judgment of a court of the United States if it appears that the legality of such detention has been determined by a judge or court of the United States on a prior application for a writ of habeas corpus, except as provided in section 2255.

**(b)(1)** A claim presented in a second or successive habeas corpus application under section 2254 that was presented in a prior application shall be dismissed.

**(2)** A claim presented in a second or successive habeas corpus application under section 2254 that was not presented in a prior application shall be dismissed unless—

**(A)** the applicant shows that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

**(B)(i)** the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and

**(ii)** the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

**(3)(A)** Before a second or successive application permitted by this section is filed in the district court, the applicant shall move in the appropriate court of appeals for an order authorizing the district court to consider the application.

ADD-14

**(B)** A motion in the court of appeals for an order authorizing the district court to consider a second or successive application shall be determined by a three-judge panel of the court of appeals.

**(C)** The court of appeals may authorize the filing of a second or successive application only if it determines that the application makes a prima facie showing that the application satisfies the requirements of this subsection.

**(D)** The court of appeals shall grant or deny the authorization to file a second or successive application not later than 30 days after the filing of the motion.
**(E)** The grant or denial of an authorization by a court of appeals to file a second or successive application shall not be appealable and shall not be the subject of a petition for rehearing or for a writ of certiorari.

**(4)** A district court shall dismiss any claim presented in a second or successive application that the court of appeals has authorized to be filed unless the applicant shows that the claim satisfies the requirements of this section.

**(c)** In a habeas corpus proceeding brought in behalf of a person in custody pursuant to the judgment of a State court, a prior judgment of the Supreme Court of the United States on an appeal or review by a writ of certiorari at the instance of the prisoner of the decision of such State court, shall be conclusive as to all issues of fact or law with respect to an asserted denial of a Federal right which constitutes ground for discharge in a habeas corpus proceeding, actually adjudicated by the Supreme Court therein, unless the applicant for the writ of habeas corpus shall plead and the court shall find the existence of a material and controlling fact which did not appear in the record of the proceeding in the Supreme Court and the court shall further find that the applicant for the writ of habeas corpus could not have caused such fact to appear in such record by the exercise of reasonable diligence.

**(d)(1)** A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of—

**(A)** the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

**(B)** the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

**(C)** the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

**(D)** the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

**(2)** The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

\* \* \* \* \*

ADD-16

UNITED STATES CODE ANNOTATED
TITLE 28. JUDICIARY AND JUDICIAL PROCEDURE
PART VI. PARTICULAR PROCEEDINGS
CHAPTER 153. HABEAS CORPUS

**28 U.S.C. § 2255 Federal custody; remedies on motion attacking sentence**

\*    \*    \*    \*    \*

**(a)** A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

**(b)** Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States attorney, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto. If the court finds that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate.

**(c)** A court may entertain and determine such motion without requiring the production of the prisoner at the hearing.

**(d)** An appeal may be taken to the court of appeals from the order entered on the motion as from a final judgment on application for a writ of habeas corpus.

**(e)** An application for a writ of habeas corpus in behalf of a prisoner who is authorized to apply for relief by motion pursuant to this section, shall not be entertained if it appears that the applicant has failed to apply for relief, by motion, to the court which sentenced him, or that such court has denied him relief, unless it

also appears that the remedy by motion is inadequate or ineffective to test the legality of his detention.

**(f)** A 1-year period of limitation shall apply to a motion under this section. The limitation period shall run from the latest of—

**(1)** the date on which the judgment of conviction becomes final;

**(2)** the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;

**(3)** the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

**(4)** the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

**(g)** Except as provided in section 408 of the Controlled Substances Act, in all proceedings brought under this section, and any subsequent proceedings on review, the court may appoint counsel, except as provided by a rule promulgated by the Supreme Court pursuant to statutory authority. Appointment of counsel under this section shall be governed by section 3006A of title 18.

**(h)** A second or successive motion must be certified as provided in section 2244 by a panel of the appropriate court of appeals to contain—

**(1)** newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense; or

**(2)** a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable.

\*     \*     \*     \*     \*
