**EXECUTION SCHEDULED FOR JANUARY 14, 2021**

No. 21-1

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

_____

**UNITED STATES OF AMERICA,**

**Plaintiff – Appellee,**

v.

**COREY JOHNSON, A/K/A O, A/K/A CO,**

**Defendant – Appellant.**

_____

Appeal from the United States District Court for the
Eastern District of Virginia

_____

**CAPITAL CASE**

**EMERGENCY MOTION OF COREY JOHNSON FOR STAY OF
EXECUTION PENDING CONSIDERATION AND DISPOSITION OF
APPEAL**

_____

David E. Carney
Donald P. Salzman
Jonathan Marcus
Skadden Arps Slate Meagher & Flom, LLP
1140 New York Avenue NW
Washington, DC 20005
(202) 371-7246
david.carney@skadden.com

*Counsel for Appellant Corey Johnson*

Corey Johnson, a person with intellectual disability, respectfully requests a stay of execution pending this Court's consideration and disposition of his appeal.[1] Absent a stay, Mr. Johnson will be executed on January 14, 2021, in violation of the law. In support of his stay request, he submits the following:

**INTRODUCTION**

Even before the Supreme Court barred the death penalty for those with intellectual disability,[2] as violative of the Eighth Amendment in *Atkins v. Virginia*, 536 U.S. 304 (2002), Congress enacted legislation prohibiting the government from executing those with intellectual disability—the Federal Death Penalty Act of 1994, Pub. L. No. 103-322, 108 Stat. 1959 ("FDPA" or "§ 3596"), 18 U.S.C. § 3596(c) ("A sentence of death shall not be *carried out upon* a person who is mentally retarded.") (emphasis added), and the Anti-Drug Abuse Act of 1988, Pub. L. No. 99-570, 100 Stat. 3207 ("ADAA" or "§ 848"), 21 U.S.C. § 848(*l*) (repealed 2006). The language, structure, and legislative history of these Acts make clear that

---

[1] Counsel has consulted with the government, and it intends to oppose this Motion. Given the district court's ruling below, including the denial of the certificate of appealability, it would have been futile to file a motion for stay in the district court and a requirement, if any, to do so, should be excused.

[2] The modern term is "intellectually disabled." This Motion uses "mentally retarded" only when citing statutes and case law or quoting documents.

*(cont'd)*

the implementation of a death sentence for an individual with intellectual disability is legally barred.[3]

Mr. Johnson is an intellectually disabled federal death row prisoner. Accordingly, shortly after the government set his execution date of January 14, 2021, his claim under § 3596 became ripe, and Mr. Johnson's attorneys filed a Motion Pursuant to 28 U.S.C. § 2255 Raising Claim of Ineligibility to Be Executed Under 18 U.S.C. § 3596(c) ("§ 2255 Motion" or "§ 2255 Mot.") in the U.S. District Court for the Eastern District of Virginia. Because the FDPA's bar is tied to "implementation" of a death sentence, this second-in-time motion is a non-successive action pursuant to 28 U.S.C. § 2255 ("§ 2255").

On January 2, 2021, after considering only the jurisdictional question of whether the § 2255 Motion required authorization from this Court, the district court improperly determined Mr. Johnson's pleading to be successive, dismissed it on jurisdictional grounds, and declined to issue a certificate of appealability ("COA"). Order (Dismissing § 2255 Motion) at 1 (Jan. 2, 2021); Mem. Op. (Dismissing § 2255 Motion) at 21 (Jan. 2, 2021). Because the district court believed it lacked jurisdiction, the district court did not address the merits of Mr. Johnson's intellectual disability claim.

---

[3] *See also Atkins*, 536 U.S. at 314 and n.10, noting that Congress included bars in both § 848(*l*) and § 3596 against executing the intellectually disabled, not just against sentencing them to death.

2

Mr. Johnson is likely to prevail on his request for a COA set forth in his Informal Preliminary Brief, with Request for Certificate of Appealability ("Brief" or "Br."), filed concurrently with this Motion. He satisfies the COA threshold inquiries that the issue on which he seeks review—that is, whether he is entitled to non-successive § 2255 review of his claim—is "debatable" among jurists of reason. *Slack v. McDaniel*, 529 U.S. 473, 474 (2000).

He is also likely to prevail in demonstrating that his § 2255 claim is not successive because the protections of § 3596 and § 848(*l*), which bar *implementation* of his death sentence due to his intellectual disability, are not ripe until the government set his execution date, and that this is so regardless of prior litigation.

Finally, Mr. Johnson is likely to prevail in demonstrating that he is, in fact, intellectually disabled based on overwhelming evidence, including the opinions of three of the nation's most respected experts in the field, who evaluated Mr. Johnson under modern medical standards and independently agree that he meets the clinical and legal criteria for intellectual disability. These evaluations are based on their clinical evaluations of him, and a wide universe of information including multiple IQ tests administered to Mr. Johnson when he was a child and young adult that establish his significant deficits in intellectual functioning; and on a thoroughly-documented record, corroborated by more than two dozen interviews

conducted with relatives, friends, and childcare professionals, and by the results of standardized assessments of adaptive functioning, all demonstrating his severe, life-long adaptive limitations.

For these reasons, Mr. Johnson respectfully asks that this Court stay his execution, scheduled for January 14, 2021, to allow full consideration of his informal preliminary brief and request for a COA, and to allow the district court to determine whether implementation of his death sentence is barred by operation of § 3596 and § 848(*l*). To allow this execution without first determining whether § 3596 establishes such a bar would give the government license to ignore laws Congress has enacted to prevent the execution of individuals over whom it has cast its protection and to moot their claims.

## ARGUMENT

Courts in this Circuit treat a motion to stay an execution as a request for a preliminary injunction. *See, e.g.*, *Prieto v. Clarke*, No. 15CV587, 2015 WL 5793903 (E.D. Va. Oct. 1, 2015). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Glossip v. Gross*, 576 U.S. 862, 876 (2015) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). As to the first of these factors, the Supreme Court has explained that

4

a stay applicant must make "a strong showing that he is likely to succeed on the merits" and that "[t]he first two factors . . . are the most critical." *Nken v. Holder*, 556 U.S. 418, 434 (2009).

As Mr. Johnson shows below, he not only has a likelihood of prevailing on his request for a COA, but he is also likely to succeed in demonstrating that § 3596 and § 848(*l*) give the district court jurisdiction to hear his claim as a second-in-time, non-successive § 2255 motion, and that he is, in fact, intellectually disabled.

## I.     MR. JOHNSON HAS A STRONG LIKELIHOOD OF PREVAILING ON HIS MOTION FOR A CERTIFICATE OF APPEALABILITY

Mr. Johnson meets the threshold requirement for a COA.

> When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a [certificate of appealability] should issue (and an appeal of the district court's order may be taken) if the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right, and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

*Slack*, 529 U.S. at 474. This Court has made clear the question of whether a "numerically second § 2255 motion is 'successive or successive' [within the meaning] of 28 U.S.C. § 2255(h) where the basis for his claim did not arise until after the district court denied his first § 2255 motion" is appropriate for a COA. *United States v. Hairston*, 754 F.3d 258, 259 (4th Cir. 2014) (citation omitted) (granting COA and concluding second-in-time motion was not successive where basis for sentencing claim did not arise until after the first § 2255 motion was

5

denied); *United States v. Rodgers*, 803 F. App'x 728, 729 (4th Cir. 2020) (per curiam); *see also Garza v. Lappin*, 253 F.3d 918, 922-23 (7th Cir. 2001) (allowing second-in-time claim in federal capital case where issue, by its very nature, could only be raised after first post-conviction review was completed).[4]

Mr. Johnson's claim mirrors those in *Hairston* and *Rodgers*, where the movants sought a COA based on a statute that did not provide relief until after the initial habeas process had concluded. Here, it is at least debatable that Mr. Johnson's right to seek relief is based on a statute—18 U.S.C. § 3596(c) or 28 U.S.C. § 848 (*l*)—that was triggered only when Mr. Johnson received notice of an execution date. Because he contends that this is a right that could not have been asserted at any earlier point in his litigation and, for the reasons discussed below,

---

[4] Mr. Garza proceeded under 28 U.S.C. § 2241 but only after the Fifth Circuit deemed his pleadings successive. The Seventh Circuit, in its subsequent opinion, questioned that holding and suggested that, under *Stewart v. Martinez-Villareal*, 523 U.S. 637 (1998), his claim should have been considered non-successive. *Garza,* 253 F.3d at 923. Ultimately, the Seventh Circuit speculated that the Fifth Circuit must have rejected such an argument because Mr. Martinez-Villareal had previously raised the claim and it had been dismissed whereas Mr. Garza had not raised it in his initial § 2255 motion. *Id*. at 924. As this Court is aware, the Supreme Court in *Panetti v. Quarterman*, 551 U.S. 930 (2007), explicitly rejected that Fifth Circuit reasoning several years later.

he, too, has a claim that "deserve[s] encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).

## II. MR. JOHNSON IS LIKELY TO SUCCEED ON HIS APPEAL OF THE DISTRICT COURT'S DENIAL BECAUSE HIS PLEADING WAS NOT AN IMPROPER SUCCESSIVE MOTION

Without ruling on whether § 3596(c) governed Mr. Johnson's execution, Mem. Op. at 9 n.5, the district court concluded it lacked jurisdiction over the § 2255 Motion because his intellectual disability claim "ripened years ago," before his "first petition for federal habeas relief," and "the courts rejected it years ago." Mem. Op. at 16. The court grounded its decision in the Eighth Amendment jurisprudence of *Atkins* and *Hall v. Florida*, 572 U.S. 701 (2014), concluding that the rationale of those cases was based on the reduced culpability of the intellectually disabled at the time of the crime and trial. Mem. Op. at 14-15. Because those issues were present at an earlier time (even in the absence of proper evidentiary support), the court held that Mr. Johnson's "current attempt to relitigate that claim would be deemed an abuse of the writ." *Id*. at 16.

As Mr. Johnson's COA request shows, the court erred in myriad ways. First and most obviously, the court strayed from its core task of federal statutory interpretation. Mr. Johnson's claim is based on a statute, the plain language, structure, and legislative history of which establish that Mr. Johnson is permitted to raise his status as a person with intellectual disability now, at the time when he has

7

a pending execution date. The Supreme Court's recognition in *Atkins* that an intellectually disabled person cannot be executed has no bearing on the manner in which that constitutional right is enforced. Congress could choose to exclude almost any category of prisoners from execution for any reason it wishes, independent of Supreme Court Eighth Amendment law.[5] And where Congress could have included other language but did not, this Court has, in a comparable circumstance, declined to add limitations to the rights Congress created, stating that the Court would not "expand the limitations crafted by Congress." *See, e.g.*, *United States v. Gravatt*, 953 F.3d 258, 264 (4th Cir. 2020). The same principle applies here, where Congress plainly chose an expansive protection for individuals with intellectual disability from the government carrying out their executions.

Congress can also choose how and when exclusions are determined and enforced. The legislative decision on enforcement does not depend on Supreme Court jurisprudence and the lower court erred when it conflated the content of the constitutional right with the legislative mechanisms for enforcing it. Moreover, *Atkins* itself recognized that § 848 and § 3596 create an independent, substantive prohibition on the implementation of the sentence based on intellectual disability.

---

[5] Indeed, the very statute in this case is an example: it was passed prior to the Supreme Court's *Atkins* decision and thus was not derived from the Supreme Court's reasoning.

> In 1988, when Congress enacted legislation reinstating the federal death penalty, it expressly provided that a 'sentence of death shall not *be carried out upon* a person who is mentally retarded.'. . .
>
> The Anti-Drug Abuse Act of 1988, Pub. L. 100—690, §7001(*l*), 102 Stat. 4390, 21 U.S.C. § 848(*l*). Congress expanded the federal death penalty law in 1994. It again included a provision that prohibited any individual with mental retardation from being sentenced to death *or executed*. Federal Death Penalty Act of 1994, 18 U.S.C. § 3596(c).

536 U.S. at 314 and n.10 (emphasis added).

The plain language of the statute demonstrates that the determination must be made when an execution date is set; it applies when the sentence of death is to "be carried out." This reading is clear on its face and, as Mr. Johnson notes in his COA application, it has been espoused by the government for almost two decades and reaffirmed recently. *See* Br., Section IV.A.2. To demonstrate likelihood of success in this case, Mr. Johnson need only quote the government itself:

> From the language of these subsections and as is signaled by the title of the statute, it should be clear that neither mental retardation nor pregnancy precludes the *imposition* of the death penalty under the statute, rather it prevents and/or may delay the *implementation* of the death penalty.

Ex. A (Excerpt of Government's Response in Opposition to "Amended Motion of Bruce Carneil Webster to Vacate Conviction and Sentence and for New Trial Pursuant to 28 U.S.C. § 2255 and Rule 33 of the Federal Rules of Criminal Procedure," *Webster v. United States*, No. 4-94-CR-0121-Y (N.D. Tex. Nov. 14, 2002)).

9

Second, as Mr. Johnson's Brief explains, the context of the statutory provision barring implementation of the death penalty on intellectually disabled persons further demonstrates the district court's error. Congress placed the FDPA's prohibition on carrying out the execution of persons with "mental retardation" in the "implementation" section of the statute, situating the intellectual disability bar between the pregnancy bar and mental competency bar—all challenges that are raised once execution is imminent. In addition, the placement of the "mental retardation" provision within § 3596 is dispositive. The first subsection § 3596(a) provides instructions about how the sentence is to be implemented, and subsections (b) and (c) are therefore limitations on the marshal's implementation of the sentence and enumerate prohibitions to be raised "when the sentence is to be implemented."

The FDPA's structure as a whole further supports this conclusion. The FDPA has nine sections which generally follow the chronological stages of a capital case. Congress's decision to place the "mental retardation" bar after the provisions governing ordinary judicial review of a capital proceeding, and specifically in the section titled "Implementation of a sentence of death," is telling. Congress intended that claims related to § 3596 prohibitions could be raised up to the eve of execution.

10

As Mr. Johnson's Brief shows, the legislative history also confirms that Congress understood that the FDPA would allow defendants to raise such claims "at any time," including between judgment and execution, and including after an execution date has been set, even if a claim based on intellectual disability was litigated earlier. Br., Section IV.A.4. During debate of the FDPA, Senator Hatch expressed his understanding of the intellectual disability prohibition both as incorporated in Senate Bill 1970, 101st Cong. (1990) and as enacted in the existing, then-current federal ADAA, saying this provision

> … *gives them a third time* [to raise the claim], only it says it a little bit differently. It says, if you can show you are mentally retarded, you cannot be executed. You will stay in jail the rest of your life, but do you not [sic] have to suffer the death penalty. *This is better than habeas corpus for prisoners. They can raise it at any time.*

Br. at 25 (quoting § 2255 Mot., Ex. 79 (136 Cong. Rec. S6873, S6876 (daily ed. May 24, 1990) (emphasis added))).

Mr. Johnson's claim is therefore not successive and can be litigated now; at the very least that conclusion is debatable among jurists.

## III.   MR. JOHNSON IS LIKELY TO SUCCEED IN DEMONSTRATING THAT HE IS INTELLECTUALLY DISABLED

A comprehensive review of the evidence of Mr. Johnson's intellectual disability is laid out in detail in the § 2255 Motion he submitted to the district court, § 2255 Mot. at 20-43; the highlights of that evidence are included in his Brief, Br., Section I. These pleadings, and the substantial body of materials that

11

accompany them, leave little doubt that, if he is given the opportunity to present his case to the district court, he will be able to prove he is intellectually disabled.

Three of the nation's leading experts in the field—Daniel J. Reschly, Ph.D., J. Gregory Olley, Ph.D., and Gary N. Siperstein, Ph.D.—agree that Mr. Johnson meets the "the generally accepted, uncontroversial intellectual-disability diagnostic definition, which identifies three core elements": (1) significant intellectual-functioning deficits, as represented by childhood IQ scores of 75 or below; (2) significant adaptive deficits; and (3) the onset of these deficits while still a minor. *Moore*, 137 S. Ct. at 1042, 1045 (quoting *Hall*, 572 U.S. at 710), 1048; *see also* J.A.1366 (§ 2255 Mot. Ex. 75 (AAIDD-11 Manual)); J.A.1405 (§ 2255 Mot. Ex. 77 (DSM-5)).[6]

These experts have reached their conclusions that Corey Johnson satisfies the first prong—significant deficits in intellectual functioning—based on multiple

---

[6] Exhibits to the § 2255 Motion are located in the Joint Appendix at J.A.148-J.A.1434.

These are the standards that district courts within this Circuit have adopted in federal capital cases, *e.g.*, *United States v. Salad*, 959 F. Supp. 2d 865, 868-69 (E.D. Va. 2013); *United States v. Davis*, 611 F. Supp. 2d 472, 475 (D. Md. 2009), as have other district courts around the country, *e.g.*, *United States v. Hardy*, 762 F. Supp. 2d 849, 856 (E.D. La. 2010); *United States v. Shields*, No. 04-20254, 2009 WL 10714661, at *1-2 (W.D. Tenn. May 11, 2009); *United States v. Smith*, 790 F. Supp. 2d 482, 485 (E.D. La. 2011).

*(cont'd)*

IQ tests administered to him when he was a child and young adult, which included four scores that placed him in the diagnostic range for intellectual disability.

The experts based their conclusions that he satisfies the second prong—significant deficits in adaptive functioning—on a review of extensive childhood records, documenting observations and concerns raised about him by teachers, counselors, mental health experts, and childcare professionals in numerous settings;[7] on dozens of interviews with relatives, family friends, counselors, teachers, and others; and on the results of standardized adaptive behavior instruments administered to individuals who knew Mr. Johnson well during his childhood. It is notable that while one must demonstrate deficits in only one of three defined "domains" of adaptive functioning for a diagnosis of intellectual disability, Mr. Johnson's deficits are so pervasive that all of his experts have concluded he has limitations diagnostic of intellectual disability in all three domains: conceptual, social, and practical. Not only was he never able to learn basic reading, writing, math, money, or time concepts, and to this day, has performed at notably low grade levels on academic achievement tests (the hallmark

---

[7] While claims of intellectual disability among prisoners are often met with skepticism on the basis that the defendant has incentive to malinger on IQ tests and manufacture evidence of his disabilities in an attempt to avoid being death-sentenced, Mr. Johnson's childhood record is replete with test scores and contemporaneous documentation that proves this is no late invention.

of deficits in the conceptual range), he has always been naïve, gullible, easily manipulated, and victimized by his peers (the hallmark of deficits in the social domain), and he has never been able to fend for himself or take care of even his own most basic needs (the hallmark of deficits in the practical domain). Br. at Section I; § 2255 Mot. at 24-42.

There can be no dispute but that Mr. Johnson's disability manifested itself during childhood.

Here, Mr. Johnson's underlying claims of intellectual disability are well-supported, as discussed above and in the § 2255 Motion, and Mr. Johnson has made a meritorious argument as to why his § 2255 Motion is the proper vehicle for his claims and not a second or successive motion. Accordingly, Mr. Johnson has clearly demonstrated his likelihood of appellate success.

## IV.   MR. JOHNSON FACES IRREPARABLE HARM ABSENT A STAY

Mr. Johnson has demonstrated irreparable harm because, in the absence of immediate relief, no court could reverse the harm caused by moving forward with his execution. *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 218 (4th Cir. 2019) ("[I]rreparable harm is often suffered when . . . the district court cannot remedy the injury following a final determination on the merits." (alterations in original) (quoting *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001))). "In cases

14

involving the death penalty when an execution date has been set, as here, it is a certainty that irreparable harm will result if the court of appeals' decision is not stayed." *Beaver v. Netherland*, 101 F.3d 977, 979 (4th Cir. 1996); *see also Oken v. Sizer*, 321 F. Supp. 2d 658, 666 (D. Md. 2004) ("[T]he irreparable harm to one seeking a stay of execution is ordinarily obvious."); *Battaglia v. Stephens*, 824 F.3d 470, 475 (5th Cir. 2016) ("[I]n a capital case, the possibility of irreparable injury weighs heavily in the movant's favor." (citation omitted)).

Mr. Johnson's execution date has been set and is imminent. Without a stay to allow this Court to consider his arguments, Mr. Johnson will suffer irreparable harm.

## V.    THE BALANCE OF EQUITIES TIPS IN FAVOR OF A STAY

Mr. Johnson requests a stay long enough to have this Court consider his COA application, and, if it is granted, long enough for the Court to decide his appeal. Although the government normally has a "strong interest" in "proceeding with its judgment," *Nelson v. Campbell,* 541 U.S. 637, 649-50 (2004) (citation omitted), no such interest exists here, where the government itself has caused a decade-long delay in bringing Mr. Johnson's case to this point. The government initially set an execution date for Mr. Johnson in 2006 but was unable to carry the execution out at that time because of flaws in its execution protocol. Tasked by the courts with the job of replacing its flawed protocol, the government then passed

15

eight years, from 2011 to 2019, without any execution protocol at all.[8] The government thus has no basis to argue that, a short delay now to permit this Court to determine whether Mr. Johnson has met the standards for the grant of a COA, would infringe its interests, particularly when Mr. Johnson can make a very strong showing that he is ineligible for execution.

## VI.    THE PUBLIC INTEREST FAVORS A STAY

The public's interest in ensuring that intellectually disabled persons are not executed has been expressed through two separate Acts of Congress—21 U.S.C. § 848(*l*) (repealed) and 18 U.S.C. § 3596(c). Congress, representing the will of the public, has determined that no intellectually disabled person should be executed on its watch for any violation of federal law. Congress must be presumed to have meant what it said, and, had it intended otherwise, it could have included that language. But it did not. *See Atkins*, 536 U.S. at 314 and n.10 (Congress expressly provided in both § 3596 and § 848(*l*) that a sentence of death shall not be carried out on a person who is intellectually disabled). The same principle governs the statutory bars Congress erected in § 3596 and § 848(*l*) protecting individuals with intellectual disability from execution. Where Congress plainly chose an expansive protection for individuals with intellectual disability from the government carrying

---

[8] Mem. Op. at 14, *In re the Federal Bureau of Prisons' Execution Protocol Cases*, No. 19-mc-145-TSC (D.D.C. Nov. 20,2019), ECF No. 50.

out their executions, the public interest weighs heavily in enforcing Congress' intent and staying Mr. Johnson's execution until the courts can fully consider his claims.

It is, therefore, in the public's interest that the government not be permitted to execute Mr. Johnson without giving him this opportunity to demonstrate, based on reliable science and a full record, that he is a person with an intellectual disability.

## VII.   MR. JOHNSON HAS NOT UNNECESSARILY DELAYED IN BRINGING HIS CLAIM

Finally, Mr. Johnson has not unnecessarily delayed bringing his claim. In fact, his claim is timely brought. Section 3596(c) establishes that the proper time to assert such a claim is after an execution date has been set. Mr. Johnson timely sought relief shortly after the Bureau of Prisons set his execution date.

## CONCLUSION

For the foregoing reasons, this Court should grant Mr. Johnson a stay of execution pending consideration of his Brief and request for a certificate of appealability.

Dated: January 8, 2021                    Respectfully submitted,


                                         /s/ David E. Carney

                                         David E. Carney
                                         Donald P. Salzman
                                         Jonathan Marcus
                                         Skadden, Arps, Slate, Meagher & Flom LLP
                                         1440 New York Avenue, NW
                                         Washington, DC 20005
                                         (202) 371-7246
                                         david.carney@skadden.com

                                         *Counsel for Corey Johnson*


## CERTIFICATE OF COMPLIANCE

1.     This motion contains 4157 words, excluding the parts exempted from the word count by Fed. R. App. P. Rule 27(d)(2) and Rule 32(f).

2.     This motion complies with the font, spacing, and type size requirements set forth in Fed. R. App. P. Rule 32(a)(5).

                                         /s/ David E. Carney

## CERTIFICATE OF SERVICE

I hereby certify that on the 8th day of January 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send notification of such filing to all parties and counsel included on the Court's Electronic Mail notice list.

/s/ David E. Carney
David E. Carney
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue, NW
Washington, DC 20005
(202) 371-7246
david.carney@skadden.com

19