**EXECUTION SCHEDULED FOR JANUARY 14, 2021**

No. 21-1

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

_____

**UNITED STATES OF AMERICA,**

**Plaintiff – Appellee,**

**v.**

**COREY JOHNSON, A/K/A O, A/K/A CO,**

**Defendant – Appellant.**

_____

**JOINT APPENDIX VOLUME II**

_____

Donald P. Salzman
Jonathan Marcus
David E. Carney
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue, NW
Washington, DC 20005
(202) 371-7983
donald.salzman@skadden.com
*Counsel for Appellant Corey Johnson*

PAGE(S)

## VOLUME I

### I.  DOCKET SHEET

E.D. Va. Docket Sheet, No. 92CR68 (1992-2019).............................................J.A.1

E.D. Va. Docket Sheet, No. 92CR68 (2020) ...................................................J.A.25


### II. RELEVANT INDICTMENT, ORDERS AND OPINIONS

Second Superseding Indictment, July 20, 1992.................................................J.A.33

Order (Dec. 15, 2020), ECF No 95.................................................................J.A.55

Memorandum Opinion (Dismissing § 2255 Petition) (Jan. 2, 2021), ECF
    No. 99.....................................................................................................J.A.58

Order (Granting Motion for Leave to File Supplemental Authority) (Jan.
    2, 2021), ECF No. 100............................................................................J.A.80

Order (Dismissing § 2255 Petition) (Jan. 2, 2021), ECF No. 102....................J.A.81


### III. OTHER RELEVANT FILINGS

Notice of Execution Date (Nov. 20, 2020), ECF No. 78..................................J.A.82

Motion Pursuant to 28 U.S.C. § 2255 Raising Claim of Ineligibility To Be
    Executed under 18 U.S.C. § 3596(c) (Dec. 14, 2020), ECF No. 86............J.A.84

Index of Exhibits to Motion Pursuant to 28 U.S.C. § 2255 Raising Claim
    of Ineligibility To Be Executed under 18 U.S.C. § 3596(c), ECF No.
    86-1 ......................................................................................................J.A.143

Ex. 1, Report of Daniel J. Reschly, Ph.D., Aug. 26, 2016, ECF No. 86-2.....J.A.148

Ex. 1a, Curriculum Vitae of Daniel J. Reschly, Ph.D., May 15, 2020,
    ECF No. 86-3 ........................................................................................J.A.199

Ex. 2, Report of J. Gregory Olley, Ph.D., Aug. 24, 2016, ECF No. 86-4 ......J.A.251

1

Ex. 2a, Curriculum Vitae of J. Gregory Olley, Ph.D., Oct. 2020,
ECF No. 86-5 ................................................................................... J.A.299

Ex. 3, Letter from Gary N. Siperstein, Ph.D. to Counsel for Corey
Johnson, Dec. 16, 2016, ECF No. 86-6 ...................................... J.A.318

Ex. 3a, Curriculum Vitae of Gary N. Siperstein, Ph.D., Sept. 2020,
ECF No. 86-7 ................................................................................... J.A.332

## VOLUME II

Ex. 4, Debra Nelson, Mitigation Report, Sept. 27, 2016, ECF No. 86-8 ....... J.A.355

Ex. 5, Report of Richard G. Dudley, Jr., M.D., Aug. 22, 2016,
ECF No. 86-9 ................................................................................... J.A.391

Ex. 6, Trial Tr., Feb. 3, 1993, ECF No. 86-10................................................. J.A.411

Notice of Submission of Exhibit 7, ECF No. 87 ............................................ J.A.426

## VOLUME III

Exs. 7-1 – 7-3, Trial Tr., Feb. 10, 1993, ECF Nos. 87-2 – 87-4...................... J.A.433

Notice of Submission of Exhibits, ECF No. 88............................................... J.A.519

Ex. 8, Cornell Mitigation Information and Report (Excerpt),
ECF No. 88-2 ................................................................................... J.A.526

Ex. 9, Trial Tr., Feb. 12, 1993, ECF No. 88-3................................................. J.A.546

## VOLUME IV

Ex. 10, Trial Tr., Feb. 15, 1993, ECF No. 88-4............................................... J.A.611

Ex. 11, Declaration of Kenneth Barish, Ph.D. (staff psychologist at
Pleasantville Cottage School), July 22, 2014, ECF No. 88-5.................... J.A.623

Ex. 12, Affidavit of Richard Benedict (special education teacher at
Pleasantville Cottage School), Dec. 5, 2011, ECF No. 88-6..................... J.A.635

Ex. 13, Affidavit of Darnell Brown (acquaintance in Trenton, NJ), Oct. 14, 2011, ECF No. 88-7 ........................................................................J.A.647

Ex. 14, Affidavit of Darold Brown (acquaintance in Trenton, NJ), June 15, 2011, ECF No. 88-8 ...................................................................J.A.652

Ex. 15, Affidavit of Craig S. Cooley (appointed counsel in 1992), Sept. 20, 2016, ECF No. 88-9...................................................................J.A.659

Ex. 16, Affidavit of Courtney Daniels (Corey's lifelong friend), May 21, 2011, ECF No. 88-10 ....................................................................J.A.669

Ex. 17, Declaration of Monica Dawkins (Corey's former girlfriend), July 16, 2012, ECF No. 88-11 ................................................................J.A.675

Notice of Submission of Exhibits, ECF No. 89...............................................J.A.678

Ex. 18 Declaration of Cary Gallaudet, Ph.D. (psychologist at Pleasantville Diagnostic Center), Mar. 19, 2012, ECF Nos. 89-2 – 89-3 ......................................................................J.A.685

Ex. 19, Declaration of Ann Harding (staff member at Pleasantville Cottage School), Nov. 21, 2011, ECF No. 89-4 .........................................J.A.696

Ex. 20, Affidavit of Minnie Hodges (Corey's maternal aunt), Apr. 30, 2011, ECF No. 89-5....................................................................J.A.699

Ex. 21, Affidavit of Priscilla Hodges (Corey's cousin), Apr. 30, 2011, ECF No. 89-6.............................................................................J.A.710

Ex. 22, Affidavit of Queenie Hodges (Corey's cousin), Apr. 30, 2011, ECF No. 89-7.............................................................................J.A.718

Ex. 23, Declaration of Esther Johnson (Corey's maternal grandmother), Apr. 30, 2011, ECF No. 89-8....................................................................J.A.722

Ex. 24, Affidavit of Robert Johnson (Corey's half-brother), June 29, 2011, ECF No. 89-9 ..............................................................J.A.728

Ex. 25, Affidavit of Antionette Daniels Joseph (the best friend of Corey's mother and Corey's godmother), May 21, 2011, ECF No. 89-10.............J.A.740

Ex. 26, Declaration of Leona Klerer (reading teacher at Mount Pleasant Cottage School), June 3, 2011, ECF No. 89-11 ........................................J.A.752

Ex. 27, Affidavit of Gerald Lefkowitz (unit administrator at Pleasantville Cottage Center), Dec. 5, 2011, ECF No. 89-12........................................J.A.760

Ex. 28, Affidavit of Odette Noble (social worker at Elmhurst), Dec. 1, 2011, ECF No. 89-13 ................................................................J.A.765

3

Ex. 29, Declaration of George Sakheim, Ph.D. (Chief of Psychological
    Services at Pleasantville Diagnostic Center), June 17, 2011,
    ECF No. 89-14 ...................................................................................... J.A.772

Ex. 30, Affidavit of David Washington (childcare worker at Elmhurst),
    Mar. 1, 2012, ECF No. 89-15 ............................................................... J.A.807

Notice of Submission of Exhibits, ECF No. 90 ............................................. J.A.811

Ex. 31, Gregory Judge, School Social Worker, Social History, Mar. 4,
    1977, ECF No. 90-2 .............................................................................. J.A.818

Ex. 32, Cheryl Spillane, Learning Consultant, Bureau of Pupil Personnel
    Services, Jersey City Public Schools, Learning Consultant Evaluation
    to Child Study Team, Mar. 18, 1977, ECF No. 90-3 .............................. J.A.822

Ex. 33, F.A. Figurelli, M.D., Chief Psychologist, Psychological
    Examination Record, Mar. 25, 1977, ECF No. 90-4 .............................. J.A.827

Ex. 34, Eleanor Glantz, Social Worker, Case Service, Dec. 11, 1978,
    ECF No. 90-5 ........................................................................................ J.A.830

Ex. 35, Committee on the Handicapped, Referral to the Committee on the
    Handicapped, Feb. 26, 1979, ECF No. 90-6 .......................................... J.A.832

Ex. 36, Committee on the Handicapped Records, May 21, 1979,
    ECF No. 90-7 ........................................................................................ J.A.837

## VOLUME V

Ex. 37, Washington Heights-West Harlem Community Mental Health
    Center, Child Assessment Evaluation Summary, Dec. 9, 1981,
    ECF No. 90-8 ........................................................................................ J.A.863

Ex. 38, Ernest H. Adams, Staff Psychologist, Psychodiagnostic
    Evaluation, Dec. 11, 1981, ECF No. 90-9 ............................................. J.A.865

Ex. 39, Cary Gallaudet, Psy.D., Pleasantville Cottage School,
    Psychological Evaluation, Feb. 1, 1982, ECF No. 90-10 ........................ J.A.868

Ex. 40, Leona Klerer, Mount Pleasant Cottage School Screening Upon
    Admission, Feb. 22, 1982, ECF No. 90-11 ............................................ J.A.872

Ex. 41, Amira Offer, Caseworker, Psychosocial Summary, Mar. 15,
    1982, ECF No. 90-12 ............................................................................ J.A.876

Ex. 42, Gloria Caro, Pleasantville Cottage School, Reassessment Summary, May 21, 1982 , ECF No. 90-13.................................................J.A.882

Ex. 43, Gloria Caro, Caseworker, Initial Conference, Current Assessment and Transfer Summary, June 9, 1982, ECF No. 90-14 ............................J.A.896

Ex. 44, Gayle Turnquest, Caseworker, Pleasantville Cottage School, Current Assessment, Jan. 31, 1983, ECF No. 90-15 .................................J.A.902

Notice of Submission of Exhibits, ECF No. 91................................................J.A.905

Ex. 45, Ken Barish, Ph.D., Psychologist, Pleasantville Cottage School, Psychological and Educational Evaluation, Apr. 29, 1983, ECF No. 91-2 .......................................................................................J.A.912

Ex. 46, John B. Stadler, M.D., Clinical Director, Pleasantville Cottage School, Psychiatric Evaluation, Aug. 26, 1983, ECF No. 91-3 ................J.A.916

Ex. 47, Lynda Coccaro, Speech and Language Pathologist, Donald R. Reed Speech Center, Inc., Phelps Memorial Hospital, Speech and Language Evaluation, Oct. 5, 1983, ECF No. 91-4...................................J.A.919

Ex. 48, Lynn Polstein, Jewish Child Care Association of New York, Pleasantville Cottage School, Change in Permanency Plan, Apr. 13, 1984, ECF No. 91-5.................................................................J.A.925

Ex. 49, Gerard Maier, Social Worker, Current Assessment, Sept. 4, 1984, ECF No. 91-6 ............................................................................................J.A.931

Ex. 50, Christine Aaron, MSW Intern, Jewish Child Care Association of New York, Pleasantville Cottage School, Visitation Plan, Dec. 12, 1984, ECF No. 91-7 ...............................................................J.A.935

Ex. 51, Kenneth Barish, Ph.D., Psychologist, Pleasantville Cottage School Psychological Evaluation, Apr. 15, 1985, ECF No. 91-8 .............J.A.949

Ex. 52, Gerard Maier, Pleasantville Cottage School, Discharge/Transfer Plan, May 28, 1985, ECF No. 91-9 .......................................................J.A.952

Ex. 53, Board of Education of the City of New York, Individualized Education Plan – Phase 1, July 1, 1985, ECF No. 91-10 ...........................J.A.966

Ex. 54, Odette Noble, Social Worker, Jewish Child Care Association of New York, Elmhurst Boys Residence, UCR Reassessment and Service Plan Review 6 Month, Nov. 21, 1985, ECF No. 91-11................J.A.974

Notice of Submission of Exhibits, ECF No. 92............................................J.A.986

Ex. 55, Odette Noble, Social Worker, Jewish Child Care Association of
New York, Elmhurst Boys Residence, UCR Reassessment and
Service Plan Review 6 Month, June 28, 1986, ECF No. 92-2 ..................J.A.993

Ex. 56, Odette Noble, Social Worker, Jewish Child Care Association of
New York, Elmhurst Boys Residence, UCR Plan Amendment: Form
D Trial Discharge, Feb. 23, 1987, ECF No. 92-3...................................J.A.1003

Ex. 57, Newtown High School, Scholastic Transfer Record,
Dec. 7, 1987, ECF No. 92-4 .......................................................................J.A.1008

Ex. 58, Janet Valentine, Child Care Worker, Pleasantville Diagnostic
Center, Outline for Cottage Report (undated), ECF No. 92-5..................J.A.1011

Ex. 59, Notice of the Intention of U.S.A. to Seek Death Penalty as to Mr.
Tipton, May 1, 1992, ECF No. 92-6.......................................................J.A.1015

Ex. 60, Notice of the Intention of U.S.A. to Seek Death Penalty as to Mr.
Roane, May 1, 1992, ECF No. 92-7 .......................................................J.A.1020

Ex. 61, Second Superseding Indictment, July 20, 1992, Dkt. 115,
ECF No. 92-8 ..........................................................................................J.A.1025

Ex. 62, Notice of the Intention of U.S.A. to Seek Death Penalty as to Mr.
Thomas, Oct. 28, 1992, ECF No. 92-9 ...................................................J.A.1048

Ex. 63, Verdict Form, Feb. 3, 1993, Dkt. 466, ECF No. 92-10....................J.A.1053

Ex. 64, Notice of the Intention of U.S.A. to Seek Death Penalty as to Mr.
Johnson, Feb. 8, 1993, ECF No. 92-11...................................................J.A.1060

Ex. 65, Special Findings, Feb. 16, 1993, Dkt. 508, ECF No. 92-12 ............J.A.1065

Ex. 66, Motion to Have Defendant Declared Mentally Retarded, *United
States v. Thomas*, No. 3:92CR68 (E.D. Va. Apr. 15, 1993),
ECF No. 92-13 ........................................................................................J.A.1078

Ex. 67, Memorandum in Support of Initial Petition for Writ of Habeas
Corpus Pursuant to 28 U.S.C. Section 2255, June 15, 1998, Dkt. 714
(Excerpt) , ECF No. 92-14....................................................................J.A.1093

## VOLUME VI

Ex. 68, Reply Memorandum in Support of Initial Petition for Writ of
Habeas Corpus Pursuant to 28 U.S.C. Section 2255, Mar. 15, 1999,
Dkt. 761 (Excerpt), ECF No. 92-15.......................................................J.A.1109

Ex. 69, Ex. 14 to Reply Memorandum in Support of Initial Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. Section 2255, Mar. 15, 1999, ECF No. 92-16 ............................................................... J.A.1125

Ex. 70, Ex. 15 to Reply Memorandum in Support of Initial Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. Section 2255, Mar. 15, 1999, ECF No. 92-17 ............................................................... J.A.1133

Notice of Submission of Exhibits, ECF No. 93 .......................................... J.A.1137

Ex. 71, Petitioners' Joint Motion for Leave to Take Discovery, June 24, 1999, Dkt. 770, ECF No. 93-2 ................................................... J.A.1144

Ex. 72, Memorandum Opinion, May 3, 2000, Dkt. 803, ECF No. 93-3 ...... J.A.1195

Ex. 73, Memorandum Opinion, May 1, 2003, Dkt. 896, ECF Nos. 93-4 – 93-5 ................................................................... J.A.1209

Ex. 74, Brief for Appellants Cory Johnson and Richard Tipton, *United States v. Johnson*, No. 03-13(L), 03-26, 03-27 (4th Cir. Feb. 17, 2004) (Excerpt), ECF No. 93-6 ............................................................. J.A.1336

Notice of Submission of Exhibits, ECF No. 94 .......................................... J.A.1359

## VOLUME VII

Ex. 75, American Association on Intellectual and Developmental Disabilities Definition Manual ("AAIDD-11") (Excerpt), ECF Nos. 94-2 – 94-3 ................................................................... J.A.1366

Ex. 76, AAIDD User's Guide to 11th Edition (Excerpt), ECF No. 94-4 ..... J.A.1392

Ex. 77, Diagnostic and Statistical Manual of Mental Disorders ("DSM-5") (Excerpt), ECF No. 94-5 ................................................. J.A.1405

Ex. 78, 134 Cong. Rec. 22,926 (1988) (Excerpt), ECF No. 94-6 ................ J.A.1418

Ex. 79, 136 Cong. Rec. S6873 (daily ed. May 24, 1990) (Excerpt), ECF No. 94-7 .................................................................................. J.A.1423

Government's Response to Court's December 15, 2020 Order (Dec. 21, 2020), ECF No. 96 ........................................................................ J.A.1435

Corey Johnson's Reply Pursuant to December 15, 2020 Order (Dec. 24, 2020), ECF No. 97 ........................................................................ J.A.1451

Exhibit 1, Amended Judgment in a Criminal Case, ECF No. 97-1 ............. J.A.1459

United States' Motion for Leave to File Supplemental Authority (Dec. 31, 2020), ECF No. 98 ..................................................................... J.A.1467

United States' Notice of Supplemental Authority (Jan. 2, 2021), ECF Nos. 98-1, 101 ................................................................................... J.A.1469

Notice of Appeal (Jan. 4, 2021), ECF No. 103 ............................................ J.A.1489

# EXHIBIT 4

**J.A.355**

**M E M O R A N D U M**

TO:           **JOHNSON TEAM**

FROM:        **DEBRA NELSON, MITIGATION SPECIALIST**

RE:           **COREY JOHNSON MITIGATION REPORT**

DATE:        **September 27, 2016**

### Introduction

Corey Johnson's challenges began even before his birth. He came from a family with a history of teenaged births, unfaithful relationships, domestic violence, substance abuse, learning challenges, and academic failure going back to his grandparents. His teenaged mother, Emma, struggled in school and with learning. A life-long drug addict whose addiction became more severe as she got older, she became pregnant with Corey while in high school. His mother died of a drug overdose in 1995, two years after Corey was sentenced to death. Corey's father was in prison when he was born and remained in prison for nearly all of Corey's childhood. His father was not involved in any significant way in Corey's life. Like Corey's mother, his father also abused drugs. Corey's father died earlier this year.

As a child, Corey, his younger half-brother, Robert, and their mother Emma moved frequently, living with Emma's family and with various of Emma's boyfriends. Corey and Robert were often left for weeks on end with friends and family while their mother used drugs. The frequent moves resulted in multiple school changes, and Corey rarely spent more than one year at any given school. Corey was physically and emotionally abused by his mother and by a number of her boyfriends with whom they lived.

When Corey started school, he struggled to learn at the outset and fell further and further behind his peers as he got older. At age seven, he could not read or do even simple math calculations. A number of times during Corey's childhood and adolescence, he received psychological testing that placed him in the intellectual disability range. But he was not found to be intellectually disabled, likely because of pressure not to stigmatize black children like Corey with that label and because it would not have affected the education he received.

When Corey was thirteen, his mother voluntarily surrendered him to foster care. At that time, during his screening for the residential foster care program, Corey tested at a second grade reading level and continued to struggle to perform basic math problems. Over the next three years, teachers in Corey's residential program tried various strategies to help him learn, but Corey had plateaued, never advancing beyond a second grade reading level and making minimal progress in math.

Corey was socially awkward, afraid as a young child to engage with other children and quiet and passive into his teens. As he got older, and became frustrated with his inability to learn, Corey became more assertive and acted out. Throughout his childhood, people who knew

J.A.356

Corey well consistently considered him a follower with extremely poor judgment. In fact, he would do dangerous things that people asked him to do, even at great personal risk to himself.

Corey was asked to leave his second residential program, a group home, at the age of eighteen for rule violations. After he left the group home, Corey returned to live with his mother (who was often absent) and his brother for approximately six months without any community supports in place. He failed to complete high school and soon began to sell drugs, which was the lifestyle he had seen his mother, many of her boyfriends, and his younger brother engage in. He joined a group selling drugs in Trenton, New Jersey. When the leaders of his group were arrested, Corey, and two others decided to go to Richmond, Virginia to continue selling drugs.

The Richmond drug group became embroiled in territorial disputes with rival drug dealers and became extremely violent. In 1992, Corey Johnson, two members of the his drug group who had gone to Virginia from New Jersey with him, and a number of other people were arrested and charged with drug racketeering and violent offenses arising out of their drug-selling activities in Richmond, Virginia. Corey and two other defendants were tried together in the U.S. District Court for the Eastern District of Virginia, convicted of capital offenses and sentenced to death.

**Corey's Family had a History of Single Parenting, Substance Abuse, Interfamily Violence[1]**

Corey Johnson's mother, Emma Johnson, was seventeen and his father, James Sykes, Sr., was nineteen when Corey was born. Corey's parents were never married and never lived together.[2] Corey was raised in poverty and experienced a harsh and traumatic childhood.

**A. Substance Abuse and Domestic Violence Ran in Corey's Family.**

Emma, Corey's mother, struggled for most of her life with substance abuse, including crack and powder cocaine. She was partying and experimenting with drugs before she became pregnant with Corey at age seventeen. Looking back, her sister, Minnie Hodges, believes that Emma may have continued her drug use while pregnant with Corey. Emma's drug abuse became progressively worse after she had her sons, Corey and his younger half-brother Robert Johnson, and particularly after Robert was born. Emma had good jobs at times, but lost them due to her drug use, and she was on and off welfare; during times of heavy drug use, she spent nearly all of her money on drugs. Emma left drug paraphernalia around their apartment and she spent time with drug users. When Emma got together with other drug users in their home, she would often play loud music late into the night, while her young children tried unsuccessfully to

---

[1] The information contained in this report is based on materials related to Corey Johnson that I reviewed. This report also is based on interviews I conducted and interviews conducted by mitigation specialists Melanie Carr and Laura McDonald.

[2] Aff. of James Sykes at ¶ 2; Newborn Identification Card of Corey Johnson.

2

**J.A.357**

sleep.[3]  In 1995, two years after Corey was sentenced to death, after many years of chronic drug use, Emma died of a cocaine overdose at the age of 45.[4]

Emma frequently appeared sad and depressed and cried often.[5]  A psychiatrist who interviewed her and Corey when he was thirteen wrote that Emma was preoccupied with her own problems and emotionally unavailable to her children.[6]

Corey's maternal grandparents were Love and Esther Johnson.  When Esther was seventeen years old, she had her first daughter, Minnie.  Love was Minnie's stepfather; her biological father died of pneumonia before Emma was born.  About two years after Minnie was born, Esther had a son, Amos Brunson, with a man named Jimmy Lee Brown.  A few years after that, Esther met Love, and they married, and Esther and Love had Esther's third child, Emma.[7]

Esther was "a wonderful, big-hearted woman" while Love drank alcohol heavily and had an awful temper.  Love was abusive to Esther, frequently yelling and cursing.  He was also unfaithful to Esther, seeing other women while they were married.[8]

Minnie, being the eldest child of Emma and Love, felt she had to protect her mother and would stay by Esther's side or try to get in between her mother and Love to prevent her mother from getting hurt.  Minnie remembers trying to protect her mother by hitting Love with anything she could find - a broom, her fists, a mop - to get him off her mother, especially when he was choking her.  Growing up, Minnie was scared to go to school because she did not want to leave her mother by herself.  Amos would also physically intervene when Love beat Esther, while Emma would cry over her parents' fighting.[9]

Corey's grandparents, Love and Esther, separated by the time Corey was born and eventually divorced.  Corey and his half-brother Robert lived with their grandmother, Esther, for various lengths of time when they were very young.[10]  At least once, Corey was also sent by his mother to stay with his grandfather, Love, for about six months.

## B. James Sykes was Incarcerated When Corey Was Born and Not Involved in Corey's Early Childhood and Corey was Raised by a Single Mother.

Due to his involvement in fighting and gang activity, James Sykes, Sr., Corey's father, was incarcerated at the time of Corey's birth on a robbery charge.  James began using heroin during his release from prison after Corey's birth (when James, Sr. was eighteen years old) and he continued to use drugs on and off for many years.  During a brief period home from prison,

---

[3] Decl. of Robert Butler at ¶ 14; Aff. of Minnie Hodges at ¶ 19.
[4] Death Certificate and Autopsy of Emma Johnson; Decl. of Robert Butler, Sr. at ¶ 14; Aff. of  Minnie Hodges  ¶¶ 8, 9, 13, 14; Aff. of Kevin Koger ¶ 16; Aff. of Antoinette Joseph at ¶¶ 14-18.
[5] Aff. of Minnie Hodges at ¶¶ 20-21.
[6] Pleasantville: Collimuttam Psychiatric Evaluation; Offer Psychosocial Summary; Special Services for Children (10) at pp. 34-46; Special Services for Children (3) at pp. 64-77.
[7] Decl. of Esther Johnson at ¶ ¶5-6; Aff. of Minnie Hodges at ¶ 4.
[8] Decl. of Robert Butler, Sr. at ¶¶ 7, 9; Decl. of Esther Johnson at ¶ 8.
[9] Aff. of Minnie Hodges at ¶ 6.
[10] Aff. of Minnie Hodges at ¶ 9; Decl. of Esther Johnson at ¶ 8; Aff. of Robert Johnson at ¶ 6.

3

**J.A.358**

James, Sr. met Corey when Corey was about eighteen months old but soon lost contact with him when James, Sr. was incarcerated again on a parole violation. James, Sr. did not interact with Corey again until Corey was about eleven years old.[11]

### C. Corey's Family has a History of Cognitive and Academic Challenges.

Corey's parents and two of his half-brothers had serious academic difficulties. Emma struggled with schoolwork, generally receiving grades in the 60s. In high school, Emma could not read well and eventually dropped out.[12]

Well into adulthood, Emma was described as a follower and easily influenced by others. For example, shortly after her friend Antoinette Joseph told Emma that she was pregnant, Emma became pregnant with Corey and told Antoinette that she had tried to become pregnant because Antoinette was pregnant.[13] Moreover, Emma was naïve, slow, and easy to manipulate.

Corey's father, James, Sr., dropped out of high school in the ninth grade. At the time, he was reading at a fifth grade level. As he got older, James, Sr. discovered that he had a learning disability and spatial deficits; he was diagnosed as learning disabled and dyslexic. As an adult, James, Sr. was evaluated by the Office of Vocational and Educational Services for Individuals with Disabilities (VESID) and was found to qualify for services. VESID is a program that helps people with disabilities secure employment and maintain independent lives.

Corey's maternal half-brother Robert Johnson, with whom Corey grew up, was administered intelligence tests in 1979 and 1983 at the ages of eight and twelve. He obtained IQ scores of 76 and 75, respectively.[14] Robert was placed in Special Education in the first grade, but "failed to make any progress in the Special classes."[15] At the age of eleven, he was still reading at a second grade level and was having problems relating to his peers and adult caretakers in an age-appropriate manner.[16] After two failed attempts, because of difficulties with the math section, Robert received his GED in 2002.[17]

Years after Corey's birth, his father, James Sykes, Sr., had a son, James Jr., with another woman. James Jr. was in special education classes growing up and never attended high school.[18]

### Corey Had a Volatile Home Life, Characterized by Abuse, Neglect, and Constant Disruptions

Corey Johnson was born in Brooklyn, New York on ███████████. Emma said different things about Corey's birth at different times. At one point, Emma reported to Corey's special education evaluators that Corey's delivery was by forceps and "he was not held during

---

[11] Newborn Identification Card of Corey Johnson; Aff. of James Sykes at ¶¶ 24-27, 30, 36.

[12] Aff. of Antoinette Joseph at ¶¶ 9-10, 13.

[13] Decl. of Robert Butler, Sr. at ¶ 25; Aff. of Antoinette Joseph at ¶ 10.

[14] Special Education Initiative pg. 112; Special Education Initiative pg. 8.

[15] Special Services for Children (9) at p. 32.

[16] Special Services for Children (9) at pp. 11-15, (10) at 8, 13-15.

[17] Aff. of Robert Johnson at ¶ 3.

[18] Aff. of James Sykes at ¶¶ 4-8; Aff. of Elizabeth Sykes at ¶ 8.

4

**J.A.359**

[the] first ten days after his birth because of infection, bronchitis."[19]  However at a different time Emma said that she had had "no complications in pregnancy or birth."[20]

Corey was a quiet child who did not give his caregivers much trouble; in contrast, Corey's brother Robert was hyperactive and required a lot of attention.[21]  Despite Robert's hyperactivity, Minnie, Corey's aunt, would spend more time with Corey than with Robert or her own children when he was staying with her because Corey was slower than the others.[22]

Corey often appeared sad because of the way Emma treated him, Emma's drug use, and the people with whom Emma associated.  Corey told Minnie he did not think his mother loved him.  At different points in his childhood, Corey asked to live with Minnie or his godmother, Antoinette Joseph, but ultimately he stayed with his mother.[23]

### A. Emma was Emotionally and/or Physically Abused by a Number of Men.

Corey spent the first few years of his life living in Brooklyn with Emma and his maternal grandmother, Esther.  When Corey was a toddler, Emma began to date Robert Butler, and when Corey was two years old, they had a son, Corey's half-brother, Robert Johnson.  Corey, his half-brother, their mother, and Robert Butler lived for a time with Emma's mother, Esther Johnson, and then moved into their own apartment in Manhattan together.[24]  Emma, Robert Butler, Corey, and Robert Johnson lived on 14th Street, which was known for its prevalence of panhandlers, drug addicts, and the homeless.

Robert Butler was emotionally abusive to Emma, and the children regularly witnessed their arguments.[25]  When Corey was about six years old, Robert Butler left Emma due to her drug use and her relationships with other men.  He then moved to California, though he maintained some involvement in Corey and Robert Johnson's lives.[26]  After the breakup with Robert Butler, Emma was using drugs heavily.  Antoinette Joseph remembers:

> Emma's drug addiction became significantly worse as soon as Robert was born, and continued to get progressively worse as her two sons were growing up . . . . After she and Robert Butler separated . . . I would frequently see Emma with large quantities of drugs on her person, leading me to believe she was a drug dealer. She was keeping company with drug dealers, hustlers, and pimps during this time.[27]

---

[19] Special Education Initiatives at p. 45.
[20] Pleasantville Cottage School: Social History Report (3-19-85) ¶ III.
[21] Decl. of Robert Butler, Sr. at ¶ 36; Decl. of Esther Johnson (dated Apr. 30, 2011) at ¶ 19; Aff. of Antoinette Joseph at ¶ 51.
[22] Aff. of Minnie Hodges (dated Apr. 30, 2011) at ¶ 10.
[23] Aff. of Minnie Hodges at ¶¶ 27, 33; Aff. of Antoinette Joseph at ¶¶ 29, 52, 53 54.
[24] Decl. of Robert Butler, Sr. at ¶¶ 5, 10.
[25] Aff. of Antoinette Joseph at ¶ 26.
[26] Decl. of Robert Butler, Sr. at ¶¶ 14-17.
[27] Aff. of Antoinette Joseph at ¶ 19.

**J.A.360**

After breaking up with Robert Butler, Emma moved frequently due to volatile relationships with men and her inability to hold a job. Between boyfriends and apartments in Manhattan or elsewhere, Emma, Corey and Robert Johnson stayed with Esther or Love Johnson in Brooklyn. Corey stayed with his grandfather, Love Johnson, in Brooklyn once for six months without his mother and for much of that time without his brother. At times, Corey and Robert stayed with other relatives and friends for prolonged periods.[28]

When Corey was seven, Emma moved with her sons to Jersey City, New Jersey to live with a boyfriend named Robert "Mitch" Mitchell for about two years. Mitch lived in public housing and was reportedly unemployed. Mitch was "a militant person" who was highly inflexible. Emma and Mitch's constant fighting made for an unsettled home environment for Corey and Robert.[29] When Corey was about nine, Emma left Mitch and moved back to New York City.

In Harlem, Emma met a new boyfriend named Bobby Koger, who was a violent and aggressive heroin addict, and she and her children moved in with Koger; Corey lived with Koger for four years, from the time he was nine until he was thirteen. Bobby did not hide his drug addiction from the children. Corey's brother Robert notes that he was confused by Bobby's behaviors: "I would wonder why [he] had a needle stuck in his arm, why blood was dripping down his arm, and why he was bouncing around the room naked. I saw him get high and pass out while the needle was still in his arm."[30]

Koger was "fierce with his words," and would "belittle [Emma], and then build her up, only to belittle her again."[31] Corey, Emma, and Robert were all targets of Bobby's emotional and physical abuse.[32] Other family members, including Corey's aunt Minnie, Corey's grandmother Esther, Corey's biological father James Sykes, Corey's godmother Antoinette, and Bobby's older son Kevin Koger saw bruises on Corey, Robert, and Emma on several occasions during Emma's relationship with Bobby.[33] Bobby inflicted injuries on Emma that required hospital visits.[34]

Later, after Emma placed her sons in foster care (when Corey was thirteen), she expressed concerns to the psychiatrists and social workers about Bobby's violent behavior. She acknowledged to social workers that Bobby was a violent heroin addict who was "abusive to the kids"[35] and that she and Bobby were prone to violent conflict.[36] One social worker noted:

> Mrs. Johnson stated that her home environment has been unstable and chaotic since she started living with Mr. Krager [sic]. He required numerous emergency

---

[28] Decl. of Esther Johnson at ¶ 16; Aff. of Minnie Hodges at ¶ 10; Aff. of Antoinette Joseph at ¶¶ 4, 23.
[29] Special Education records at pp. 11-13.
[30] Aff. of Robert Johnson at ¶¶ 27-28.
[31] Aff. of Kevin Koger at ¶¶ 10, 18.
[32] Aff. of Kevin Koger at ¶¶ 18-19; Aff. of Robert Johnson at ¶¶ 30-32.
[33] Aff. of Kevin Koger at ¶ 18; Aff. of Antoinette Joseph at ¶¶ 27-28; Decl. of Esther Johnson at ¶ 14; Aff. of Minnie Hodges at ¶¶ 25-27; Aff. of James Sykes at ¶¶ 41-46.
[34] Aff. of Robert Johnson at ¶ 30.
[35] Pleasantville: Collimuttam Psychiatric Evaluation.
[36] Special Services for Children (9) at p. 32; Special Services for Children (10) at pp. 34-35.

6

hospitalizations and Corey and his brother witnessed many fights and arguments between Mrs. Johnson and Mr. Krager [sic] . . . .  This has been a destructive and chaotic relationship and Mrs. Johnson who has been quite depressed over this relationship has not been able to extricate herself.  Mr. Krager [sic] has been drug addicted and has been involved with another woman over the past two years and this has been a very painful situation for Mrs. Johnson who feels trapped and, wants help to reorganize her life.[37]

At one point, Bobby tried to set fire to Emma's apartment.[38]  At another point, when a caseworker raised the possibility of Corey returning to the home, where she and Bobby Koger lived, Emma said that, "Corey [would be] at risk were he to return home" from his residential placement.

Corey's biological father, James Sykes, Sr., once learned from Emma's father that Bobby was physically abusing Corey.  James, Sr. confronted Bobby one day at Emma's father's house. They exchanged harsh words and Bobby claimed Corey was difficult and did not listen.  Bobby said that Corey needed to be put away due to his behavior; Bobby then made a comment that James Sykes, Sr. interpreted as a threat to kill Corey.  James, Sr. saw dark bruises on Corey's forehead that day.  Corey told his father that Bobby did not want Corey around, and that Corey felt that Emma was choosing Bobby over Corey.  Corey seemed scared of Bobby; he would refuse to look at Bobby and kept his head down.[39]

### B.  Emma Neglected her Children and Emotionally and Physically Abused Corey.

Emma was not only a domestic violence victim, she in turn was physically and emotionally abusive towards her children.  Emma was volatile and angry as a mother.  She screamed at her sons, hit them, and threw things around the apartment when she got mad.  She repeatedly said that she was going to kill them because they were getting on her nerves.  She said that she wanted to get rid of her sons because she was tired of them.[40]

Emma sometimes left young Corey and his brother, Robert, at home by themselves.  At times, she left her sons with family members, friends, and acquaintances for days on end.  She constantly shirked the responsibilities of motherhood and took little interest in her sons.[41]  Emma could frequently be cruel toward Corey, criticizing his intelligence, yelling at Corey that Robert (younger by two years) was "better than him," and often yelling in front of the kids to strangers that she wanted to "get rid of" her children.[42]

While she abused both her children, Emma was especially physically abusive of Corey. She would smack and hit him, sometimes on the head.  She particularly lashed out at Corey for

---

[37] Pleasantville: Offer Psychosocial Summary.

[38] Special Services for Children (4) at pp. 13, 15, 40.

[39] Aff. of James Sykes at ¶¶ 42-46.

[40] Aff. of Antoinette Joseph at ¶¶ 23, 47-50; Aff. of Minnie Hodges (dated Apr. 30, 2011) at ¶ 11.

[41] Decl. of Robert Butler, Sr. at ¶¶ 14, 28, 32-33, 37; Decl. of Esther Johnson  at ¶ 16; Aff. of Antoinette Joseph at ¶ 20; Aff. of Minnie Hodges at ¶¶ 10-12.

[42] Aff. of Antoinette Joseph at ¶¶ 36, 44-50.

**J.A.362**

wetting the bed, which he did fairly often up until age eleven, and also for losing control of his bowels and soiling his sheets, which he did from ages eight to twelve.[43]  Corey would hide the sheets in order to avoid Emma's rage.  When Emma found the soiled sheets, she screamed at Corey and beat him.  She would then refuse to wash the sheets, making Corey sleep in them.[44]

Once, when Corey was nine or ten years old, Emma beat Corey on the head with a high-heeled shoe.

> I saw Emma hit and smack Corey many times . . . [o]ne time, Emma and Corey told me that she had beaten Corey with her high heel shoe because he either got left back or failed in school.[45]

Corey still has scars from this beating.  After this incident, Corey lived with his godmother, Antoinette Joseph, for six or seven months because Emma realized her behavior was out of control.[46]

### Corey Struggled to Learn from the Beginning and Failed Academically Throughout his School Career

Between the time that Corey was born and when he turned thirteen, he lived in at least twelve different apartments and houses across New York City and New Jersey.[47]  According to her sister, Minnie Hodges, several times during Corey's childhood, Emma and the children were evicted due to her nonpayment of rent.

As a result of his mother's frequent moves, Corey attended at least six different elementary schools before he finished the second grade.[48]  Corey struggled in school from an early age.  Robert Butler would help Corey with his homework.  Corey often did not want to do his homework.  Consequently, Corey received poor grades and Emma was frequently called into school to discuss Corey's performance.  Emma became angry with Corey because of the frequent meetings.[49]

### A. Corey Was Referred for an Academic Evaluation after Moving to Jersey City, New Jersey.

Friends who knew Corey as a child said he stuttered until he was five years old, talked with a lisp and could not read well.[50]  In 1977, when Corey was eight years old, he was enrolled in P.S. No. 16 Elementary School in Jersey City, New Jersey.  He was referred for an academic

---

[43] Decl. of Robert Butler, Sr. at ¶¶ 29-31; Aff. of Antoinette Joseph at ¶ 42.

[44] Aff. of Antoinette Joseph at ¶¶ 42-44.

[45] Aff. of Antoinette Joseph at ¶¶ 45; Aff of Minnie Hodges at ¶24.

[46] Aff. of Antoinette Joseph at ¶¶ 46.

[47] *See* Exhibit 2.

[48] *See* Exhibit 3; Special Education records at p. 18.  Although detailed school records from his first few years of school in Manhattan and Brooklyn could not be located, some records have been found and later records have information that fills in some of the gaps.

[49] Decl. of Robert Butler, Sr. at ¶35.

[50] Pleasantville: Offer Psychosocial Summary 3/9/82; Aff. of Antoinette Joseph at ¶¶ 32, 34, 38.

J.A.363

evaluation because he "[c]ouldn't perform third grade work.  Being retained in second [grade].  Cannot follow directions.  No concept of number facts, low comprehension.  No reading skills.  Unable to retain sight vocabulary.  Hyperactive with a short attention span."[51]  As part of this evaluation he received his first IQ test.  His evaluator reported as follows:

> Test scatter indicates some form of neurological dysfunction.  Visual reception-the ability to gain meaning from visually presented symbols is deficient. Visual memory (which requires a motor sequential response[)] is also a deficit.  Corey has not learned many of the redundancies on the automatic level of language (grammatic closure).  He would try to say sentences with me then fill in the answer.  In summary, he does not have, at present, the abilities necessary to read.  Auditory Association (+7) would indicate that he has the ability to relate concepts presented orally but his short attention span would limit his ability.[52]

Corey was unable to give his birth date but knew his age, he did not know what month it was, and he struggled to say the alphabet but recognized letters.[53]

School psychologist Dr. Figurelli administered psychological testing to Corey.  She noted: "he is unable to do class work. He has [no] concept of numbers and no concept of reading skills.  He cannot retain sight vocabulary words.  He has no comprehension of silent or oral reading. He has difficulty following directions."  Dr. Figurelli gave the WISC-R IQ test to him, and Corey scored a Full Scale IQ of 73.  Corey's results on the Wide Range Achievement Test demonstrated that he was performing at the first grade level, though he was repeating second grade for the second time.  Despite being eight years old at the time of testing, Corey's developmental age was tested at age four years and nine months on one test and five years and five months on another.  Dr. Figurelli noted that Corey had difficulty writing his own name, did not know where he lived, and "had no understanding of his date of birth.  He thought he was born in March," although he was born in November.[54]

### B.  Corey Received More Evaluations because of his Academic Failures after Returning to New York City and was Placed in Special Education Classes

After about eighteen months, Emma and Mitch split up; Emma and her sons moved in with Emma's brother Amos and his family in Hollis, Queens.[55]  After a few months, Emma again moved with her sons, this time to Harlem, where they lived with Bobby Koger.

Corey continued to struggle both at school and at home. Corey had difficulty reading even short words and was not able to work out math problems that children his age and younger were able to do by themselves.[56]  Corey was embarrassed to read aloud because he could not recognize simple words.  Corey's cousin, Priscilla Hodges, and others tried to help him with his

---

[51] Special Education records at p. 6.
[52] Special Education records at p. 8.
[53] Special Education records at p. 8.
[54] Special Education records at p. 14-15.
[55] Aff. of Robert Johnson at ¶¶ 19-21.
[56] Aff. of Minnie Hodges at ¶ 42.

9

**J.A.364**

reading, but Corey's reading did not improve.  In addition to his reading problems, Corey's math skills were similarly poor and did not improve despite help he received.[57]  After he was told how to say a word or how to do a math problem, Corey would immediately forget what he had just learned.[58]

Consequently, he was referred to the Committee on the Handicapped for counseling and services in 1978 and again in 1979.  In 1979, his teacher referred him for evaluation by the Committee on the Handicapped due to "ongoing school failure with severe reading disability."[59]  At the time, Corey's younger brother Robert was experiencing serious behavioral and psychological difficulties.[60]  Corey was described by his evaluators as follows:

> Worried about school failure, embarrassed about being held over last year and worried about threat of holdover this year; feels responsible for Robert & says that if Robert is 'sent away', he would miss Robert more than Robert would miss him.  We discussed possibility of psychological testing & special class placement.  Corey seemed receptive & relieved that something would be done to help him.  Note: Mother insists 'Corey has no problems' & everything will be okay once she 'gets rid of Robert.' I encouraged her to have Corey evaluated so we can proceed with placement.[61]

In May 1979, Corey was evaluated by a psychologist named Nathalie Smith.  Dr. Smith administered an IQ test that was developed in 1949, rather than the then current test developed in 1974.  The outdated test was called the Wechsler Intelligence Scale for Children (WISC).  It was replaced in 1974 by the Wechsler Intelligence Scale for Children-Revised (WISC-R) five years before she administered it to Corey.   Dr. Smith's test data suggests that she did not administer the whole WISC IQ test to Corey (she failed to record a score for the object assembly subtest) and her report includes a notation that the scores might be "Prorated as necessary."  Corey's reported Full Scale IQ score was 91.  Dr. Daniel Reschly and Dr. Gregory Olley, who are experts on intellectual disability, have both concluded that Dr. Smith's test results have no validity because the test she gave Corey was so outdated.

Also in May 1979, Corey was given a speech, language, and education Evaluation by an examiner named Karen Price.  Ms. Price administered a series of standardized academic tests that are designed to show a student's grade level achievement or mental age.  The tests give scores in terms of grade level equivalents or age equivalents.  Corey's test scores showed that his vocabulary and psycholinguistic abilities were two to three years below his age level.  He received an age equivalent score of five years and nine months on a test of following oral directions, although he was ten and a half years old at the time.  Ms. Price summarized her findings as follows:

---

[57] Aff. of Priscilla Hodges at ¶¶ 11-12.
[58] Aff. of Minnie Hodges at ¶ 42.
[59] Special Education Records at p. 17.
[60] Special Services for Children (8) at pp. 1-2.
[61] Special Education records at p. 1.

J.A.365

Attentional difficulties impair his ability to process and interpret language meaningfully. Expressive language which is generally adequate becomes slurred at times with mild word transposition and retrieval difficulties noted. Reading is at a 1st grade level with visual discrimination and visual reversal frequently noted. Reversals are noted with writing task. He received an age of 5 [years] - 7 [months] on the Beery Test of Visual Motor Integration. Math is at a 3.9 grade level.[62]

The Committee on the Handicapped determined that Corey had special education needs and placed him in special education classes in August, 1979.[63]

Corey could not do ordinary things that the other children his age could do, like tell time.[64] When Corey was as old as thirteen, he could not prepare a meal or even a simple sandwich. He would make a mess pouring milk into cereal.[65] In addition, when he was about twelve or thirteen years old, unlike other children his age, Corey could not count small change without making mistakes, a problem that continued into his late teens. On most occasions, others, like his brother Robert, his cousin Priscilla Hodges or his friend (and godsister) Courtney Daniels would accompany Corey to the store and would have to tell Corey whether he received the proper amount of change.[66] When he went to the store alone, Corey's mother would yell at him for bringing back incorrect change.[67] People also took advantage of Corey because he would readily give his money away if anyone asked him for it.[68]

It would take a long time to explain things to Corey.[69] Corey had trouble following instructions and appeared puzzled when certain directions were given, requiring things to be repeated several times before understanding what was being said to him.[70] When Corey was about ten or eleven, he had to be reminded constantly about rules and expectations such as picking up after himself, doing regular household chores, and washing himself up.[71]

## C. Corey Struggled to Connect with His Peers, was Socially Awkward, and was Viewed as a Follower.

Growing up, Corey did not engage much with other children and did not make friends easily.[72] He was withdrawn socially both as a child and as a teenager and, even when he did have friends, he did not appear to be close to any of them. Although he would spend time with

---

[62] Special Education Initiatives at pp. 51-52, 54. The Beery Test of Visual Motor Integration is a neuropsychological test that screens for cognitive development disorders in young children through an analysis of visual construction skills.

[63] Special Education Initiatives at p. 61.

[64] Aff. of Minnie Hodges at ¶ 37.

[65] Aff. of Queenie Hodges at ¶ 10.

[66] Aff. of Priscilla Hodges at ¶ 10; Aff. of Antoinette Joseph at ¶¶ 39-40; Decl. of Esther Johnson at ¶ 26.

[67] Aff. of Priscilla Hodges at ¶ 10.

[68] Aff. of Antoinette Joseph at ¶ 39.

[69] Aff. of Minnie Hodges at ¶ 37.

[70] Aff. of Minnie Hodges at ¶¶ 34, 37; Decl. of Esther Johnson (dated Apr. 30, 2011) at ¶ 18.

[71] Aff. of Queenie Hodges at ¶¶ 8-9.

[72] Decl. of Esther Johnson at ¶ 21.

**J.A.366**

his godsister Courtney Daniels and her friends, sometimes he would retreat to another room when her friends would visit even though they were his own age.[73]

Due to his delays in academics, difficulty socializing, and the awkward way he spoke and dressed, Corey was often teased in school.[74]  Most people were aware that Corey was very slow.[75]  Corey spoke slowly and often would not understand things unless they were repeated to him several times.[76]  Corey was very quiet and withdrawn socially as a child.[77]  When he did speak, Corey was disorganized in his thought process and would frequently change topics.[78]  If he was asked a question, he would often answer about something else.[79]

Corey was a follower and would do anything that was asked of him.[80]  He was not a leader and did not take authority in social situations.  Instead, Corey was a "passive follower" who "just went with the flow."[81]  He was the type of unassertive child who always took the back seat of a car and let other people take the front seat.[82]

Corey often followed his half-brother Robert's lead.  In contrast to Corey, Robert was loud, aggressive and impulsive.[83]  Corey was also easily manipulated and taken advantage of by other children.[84]  He played by himself most of the time because the other children would tease him or try to take his ball, money, candy or other possessions.  If someone, such as Robert, did not intervene, the other children would be successful in taking Corey's things; he could not defend himself or stick up for himself.[85]  On more than one occasion, Corey returned home from school without a sweater or some other item that he had worn to school that day.  When questioned by his mother about the missing clothing, Corey told her that the boys from school took them from him.  Emma would go outside and look for the boys who took it and then physically beat and punish Corey for allowing the boys to take his clothes.[86]

### Emma Decided she Could Not Raise Her Children and Abandoned Them to Foster Care

Eventually, Corey's mother, Emma, decided she could not handle raising either of her two boys.  With no supervision or structure at home, and in response to tremendous conflict between Emma and her violent, drug addict boyfriend, Emma reported that Corey and Robert had begun to act out at home and at school.  When Corey was eleven years old, Emma sent him

---

[73] Aff. of Antoinette Joseph at ¶¶ 56- 58.
[74] Aff. of Minnie Hodgesat ¶ 41; Aff. of Antoinette Joseph at ¶ 32; Decl. of Esther Johnson at ¶ 21.
[75] Aff. of Minnie Hodges ¶ 34; Aff. of Antoinette Joseph at ¶ 31.
[76] Aff. of Elizabeth Sykes at ¶ 7.
[77] Aff. of Queenie Hodges at ¶ 5; Aff. of Antoinette Joseph at ¶ 56.
[78] Aff. of Queenie Hodges at ¶ 5.
[79] Aff. of Minnie Hodges at ¶ 39.
[80] Decl. of Ann Butler at ¶ 17.
[81] Aff. of Queenie Hodges at ¶ 11.
[82] Decl. of Esther Johnson  at ¶ 20.
[83] Aff. of Courtney Daniels at ¶ 13.
[84] Aff. of Kevin Koger at ¶ 15.
[85] Aff. of Minnie Hodges at ¶ 45; Aff. of Priscilla Hodges at ¶ 14; Decl. of Esther Johnson at ¶ 21.
[86] Decl. of Esther Johnson at ¶ 22.

**J.A.367**

away to live with her father, Love Johnson.  Love placed Corey in a Catholic school for a few months, and then him in a public school after that.[87]  Robert was also acting out and taking a lot of physical risks, including walking on a sixth floor window ledge, and feeling suicidal.[88]  Emma had him placed in a psychiatric facility as a result of the window ledge incident.[89]  Emma told social workers at the time that she "felt she could no longer cope" with Robert.[90]  She said that she "can no longer tolerate his behavior and needs a rest."[91]  As Robert was being evaluated for long-term placement in a psychiatric facility, Emma sought to have Corey evaluated as well.  In October of 1981, she brought Corey to the Council's Center for Problems of Living in West Harlem.[92]

### A. Corey's Preliminary Residential Placement Evaluation Concluded he had Severe Learning Disabilities and Corey was Placed in a Residential Facility.

The Council's Center was an outpatient treatment facility for adolescents and children.[93]  An evaluator there, Ernest Adams, M.S., reported that Emma "requested a complete evaluation of Corey so that she can place him outside of their current living situation."[94]  Dr. Adams was supervised by a psychologist named Mary Sitgraves, Ph.D.  Adams gave Corey a psychological battery, including the WISC-R, an IQ test described above.[95]  He received a Full Scale IQ of 78.[96]

Adams's report further showed that Corey was depressed, sad, and "terrified of the environment in which he lives… His general view is that people wantonly do harm to others with impunity… Corey presently fears his mother will abandon him, which exacerbates his negative self-image and low self-esteem.  He feels a lack of nurturance, support, and feels the circumstances in his life are out of his control, which increases his anxiety and depression."[97]  Upon later review of this report, Dr. Sitgraves concluded that Corey's presentation at the time indicated that he had endured trauma early in his life, and that his symptoms were consistent with Post-Traumatic Stress Disorder.[98]

In January 1982, Emma signed papers to voluntarily place both Corey and Robert in foster care; at the time, Corey was thirteen and Robert was eleven years old.[99]  Robert was sent to Children's Village, a long-term residential care facility in Dobbs Ferry, New York.  Corey was sent to a different foster care placement called the Pleasantville Cottage School, in Pleasantville,

---

[87] P.S. 92 records, St. Rita records at pp. 3-5.
[88] Pleasantville: Psychological Summary of Robert Johnson, p. 1.
[89] Special Services for Children (8) at pp. 1-2; Pleasantville reports by Offer and Collimuttam.
[90] Special Services for Children (9) at p. 32.
[91] ACS records (quoted in Fact Report) (internal quotation marks omitted).
[92] Adams 1981 report.
[93] Decl. of Mary Sitgraves at ¶ 3.
[94] Adams 1981 report.
[95] Aff. of Ernest Adams at ¶¶ 3-4.
[96] Adams 1981 report.
[97] Adams 1981 report.
[98] Decl. of Mary Sitgraves at ¶¶ 11-12.
[99] Special Services for Children (2) at pp. 45-47 and (11) at pp. 3-9.

13

**J.A.368**

New York.[100]  Pleasantville is a residential program for youth with troubled backgrounds, run by the Jewish Child Care Association ("JCCA").  Corey was assigned caseworkers employed by the Department of Special Services for Children, who supervised his placement at the JCCA facility.[101]

Children referred to the Pleasantville program are placed at the Pleasantville Diagnostic Center for a three month evaluation period.  The Pleasantville Diagnostic Center staffed an interdisciplinary team of evaluators—psychiatrists, psychologists, social workers and child care workers—who assessed each child and made recommendations for transfer to other components of the program.  Corey entered the Diagnostic Center on February 1, 1982, at the age of thirteen years and three months.[102]  Corey's deficits were evident during his initial evaluations.  Corey spoke with "markedly slurred speech" and would frequently ask the examiner irrelevant questions about toys, games, or other activities.[103]  Corey had very poor reading skills, a poor understanding of what he was reading and no understanding of how to read.  Barely able to write his own name and unable to recognize the sounds of many letters on the page, Corey was reading on a second grade level, indicating "a significant deficit in his abilities."  His evaluator was struck that Corey could not even read a simple word such as "hat" and believed he was dyslexic since he kept his fingers on each word when trying to read and had difficulty tracking the words in a sentence.[104]  Corey possessed minimal sight vocabulary and a lack of phonic skills that might enable him to sound out words.[105]  He was barely able to recognize the sounds of many letters he was showed, including the sounds of g, c, and sh, silent e and the sounds of short vowels.[106]  For instance, Corey would read the word "surprise" as "shock," indicating that while some part of his brain may have understood the meaning of the word "surprise," he was unable to read it aloud and would substitute another, somewhat similar word, like "shock."[107]

Corey also exhibited "much amalgamation and distortion of symbols," which means that when he wrote letters, he distorted them.  In addition, Corey was only able to tell time on the hour, and although he knew there were twelve months in the year, he could only recite the months in sequence up to August.[108]  He also could not multiply by three, divide a single digit by two, or read numbers of more than four digits.[109]  Leona Klerer, one of his evaluators, has worked with children with severe learning disabilities; those children, unlike Corey, all learned to read at a reading level higher than a second grade level.  Based on her assessment of Corey and the "unusual and significant" facts that he was in special education classes, was over thirteen years old and still was reading at a second grade level, Leona Klerer's contemporaneous report at the time concluded that Corey could be "mentally retarded."[110]

---

[100] Special Services for Children (8) at p. 5; Special Services for Children (2) at pp. 23-24.
[101] Special Services for Children records; Pleasantville records.
[102] Pleasantville: Offer Psychosocial Summary, p. 1.
[103] Pleasantville: Gallaudet Psychological Evaluation, 2/8/82.
[104] Decl. of Leona Klerer at ¶¶ 6-10.
[105] Pleasantville – Klerer 2-22-1982 testing report.
[106] Decl. of Leona Klerer at ¶ 7; Pleasantville – Klerer 2-22-1982 testing report.
[107] Decl. of Leona Klerer at ¶ 9.
[108] Decl. of Leona Klerer  at ¶¶ 9, 13; Pleasantville – Klerer 2-22-1982 testing report.
[109] Pleasantville – Klerer 2-22-1982 testing report.
[110] Decl. of Leona Klerer (dated Jun. 3, 2011) at ¶¶ 6, 12.

14

**J.A.369**

In February 1982, as part of his evaluation at Pleasantville and unaware of Dr. Adams's WISC-R test in October 1981, Dr. Cary Gallaudet administered the same WISC-R IQ test that Dr. Adams had administered only four months before. According to Dr. Olley and Dr. Reschly, Dr. Gallaudet's IQ results were distorted because of the phenomena known as the practice effect, which can artificially raise IQ scores when the same test is given more than once within a short time period, such as the four month interval in Corey's case. Corey's Full Scale IQ result on Dr. Gallaudet's test was 88.[111] Dr. Gallaudet diagnosed Corey with a learning disability, a label that Dr. Reschly, an intellectual disability and learning disability expert, has concluded was a mistake and that Corey should have been diagnosed as intellectually disabled. However, the learning disability label stuck with Corey, appearing in Corey's records in later evaluations throughout his adolescence and young adulthood.

**B. Despite Numerous Educational Strategies, Corey Could Not Learn and Failed Academically at Pleasantville.**

After spending three months in the Diagnostic Center, Corey was placed in the Pleasantville Cottage School program, which is made up of cottages that are supervised by resident staff members.[112] While living in the cottages, Corey attended the Mount Pleasant School, which is also part of the larger Pleasantville facility.[113]

Throughout the more than three years Corey spent at Pleasantville, he stood out as being particularly slow intellectually compared to the other residents.[114] Corey's initial adjustment to school at Pleasantville was problematic and he often wandered from class like "a frightened animal," unable to sit or pay attention.[115] By the beginning of 1983, Corey's teacher reported that his "progress in class ha[d] been very, very, very slow almost to the point where one might feel that he is not learning."[116] Even with special education and tutoring in reading, his academic skills did not progress and Corey kept falling further behind his peers as he failed to respond to any of Pleasantville's teaching methods.[117] Despite being placed in a small class setting, his academic performance did not improve, and his reading and math performances were consistently below his grade level.[118] Corey's reading ability plateaued at the second grade level. A psychiatrist noted in a report when Corey was fourteen that: "he needs very Special Education [sic], and I know of no methods to suggest to remediate his defects, beyond a great deal of individual attention and drill."[119]

Due to Corey's poor academic performance, his teachers at Pleasantville requested additional evaluations to provide clarification of the nature and extent of his learning difficulties. In March 1983, Dr. Kenneth Barish "confirm[ed] the presence of severe learning disabilities in reading, spelling and arithmetic" and "strongly suggest[ed] diffuse neurological dysfunction with

---

[111] Gallaudet Report, February 1982.
[112] Special Services for Children (10) at pp. 34-46.
[113] Pleasantville records, e.g. Pleasantville – Klerer 2-22-1982 testing.
[114] Aff. of Gerald Lefkowitz at ¶ 9.
[115] Pleasantville Caro Assessment 6-9-1982.
[116] Pleasantville Current Assessment - Turnquest 1/31/1983.
[117] Aff. of Gerald Lefkowitz at ¶ 10; Pleasantville: Stadler Psychiatric Evaluation, 8/23/1983.
[118] Aff. of George Sakheim at ¶ 41; Mt. Pleasant Cottage School reports 1982-1985.
[119] Psychiatric Evaluation, John B. Stadler, M.D, 8/23/83.

15

**J.A.370**

associated impairment in many aspects of cognitive functioning." Corey obtained a reading score and spelling score at the first percentile, or lowest one percent of the population, and an arithmetic score at the second percentile, or lowest two percent of the population. In his report, Dr. Barish noted, "Corey's learning difficulties result from wide spread cognitive deficits, including problems in attention and concentration, visual processing, and speech and sound discrimination and phonics." For instance, with regard to reading, Corey had great difficulty in analyzing words phonetically and Corey's attempts to spell even some simple words were unrecognizable.[120] After laboriously attempting to spell the word "arm," Corey spelled the word as "hme."[121] Dr. Barish also noted that Corey could not discriminate between vowel sounds, producing essentially the same sound for each vowel.[122] In three decades of clinical practice, Corey's deficit in phonological processing and his impairment in learning was so profound that it stood out in Dr. Barish's mind and remains the most profound impairment Dr. Barish has ever encountered.[123] In fact, Corey's language deficit was so profound that Dr. Barish has used it as a teaching example in his classes.[124]

Over the course of four days in September and October 1983, when he was fourteen years and eleven months old, Corey was seen at the Donald Reed Speech Center at Phelps Memorial Hospital for an evaluation of his speech and language skills. The clinician who evaluated Corey assessed his receptive language skills, learning aptitude, and expressive and oral language functioning. On nearly all of the tests he was given, Corey scored below the range for his age, with the most significant deficits noted with respect to his receptive and oral language functioning. The clinician's report assessed Corey with:

> A significant speech and language disorder of a receptive and expressive nature. Receptively, Corey demonstrated significant difficulty in the comprehension and interpretation of auditory/visual material as reflected in memory, processing and vocabulary. . . . Expressively, Corey's language was characterized by non-standard English . . . [and] [a]lthough Corey was able to discriminate between sounds, he evidenced a weakness when he had to synthesize sounds of unfamiliar words and thereby in pronunciation of these words.[125]

In addition, Corey displayed limitations in his ability to use language in an abstract manner, such as in making inferences, solving problems and reasoning. The clinician who conducted Corey's evaluation recommended placement in a structured learning environment that would be able to facilitate appropriate language-learning and social emotional skills.[126]

However, eight months later, Corey had received no speech and language therapy. A June 1984, psychiatric evaluation noted that Corey was extremely resentful about not receiving help for his language difficulties, which he found embarrassing, angrily stating that "Schoolwise

---

[120] Pleasantville: Barish 1983 Psychological Evaluation.
[121] Decl. of Kenneth Barish at ¶ 11.
[122] Pleasantville: Barish 1983 Psychological Evaluation.
[123] Decl. of Kenneth Barish at ¶¶ 4, 8, 11.
[124] Decl. of Kenneth Barish at ¶ 11.
[125] Pleasantville Coccaro Speech-language 1983.
[126] Pleasantville Coccaro Speech-language 1983.

**J.A.371**

[sic], they haven't done a thing for me . . . . They get my hopes up high and then you do [nothing]… Nobody has raised a finger."[127]

When he was discharged from Pleasantville in 1985 when he was sixteen years old, Corey still did not know enough simple arithmetic to figure out correct change so he could shop for himself.[128]  In March 1985, two months before he left Pleasantville, Corey was re-evaluated by Dr. Barish to assess his cognitive and emotional functioning.  Dr. Barish administered the WISC-R IQ test.[129]  Corey achieved a Full Scale IQ of 69-74.[130]  According to Dr. Reschly and Dr. Olley, Dr. Barish's IQ test result of 69-74 was within the range for mental retardation.[131]

Staff of Pleasantville interacting with Corey outside of the classroom environment observed that he was intellectually slower than the other residents.[132]  In fact, it was clear to anyone dealing with him for more than a few minutes that Corey was slow.[133]  To one child care worker who looked after the residents in Corey's cottage, Corey stood out as one of the slowest children with whom she had ever worked.[134]

### C.  Corey's Scars from his Traumatic Childhood were Apparent to Staff at Pleasantville.

Corey's abusive and chaotic childhood took a toll on him emotionally.  Corey's fear of his mother's violent boyfriend, Bobby Koger, made him distrustful of men in general.  When he arrived at Pleasantville, a case worker noted that: "The male staff seem to frighten him.  He doesn't like physical contact.  He feels most people are trying to hurt him.  He doesn't trust most adults."[135]  During his Pleasantville evaluation, staff also noted: "Corey does not have friends, he appears frightened of children and does not like any physical contact with them" and he seemed anxious, often isolated from the other children.[136]  Evaluators described Corey as a "depressed, dependent and frightened 13.3 year old" who felt "unable to make it on his own," often feeling "at the mercy of others' wishes."[137]

When he was placed in the Pleasantville Diagnostic Center, a psychiatrist evaluated Corey and his mother and produced a report that captures Corey's traumatic childhood:

---

[127] Special Education Initiatives at pp. 75, 77.

[128] Special Services for Children (4) at pp. 79-91.

[129] As noted above, the WISC-R is the Wechsler Intelligence Scale for Children-Revised.  The Wechsler is the gold-standard IQ test used by most psychologists.

[130] Special Education Initiatives at pp. 73-74.  According to Dr. Barish and his supervisor Dr. George Sakheim, the second set of scores reported are "alternate" scores that reflect improvements in Corey's performance when he was given more time and/or assistance from the examiner, beyond that allowed by the rules of test administration.  "Alternate" scores were presented only for consideration by other clinicians as to Corey's possible response to interventions and did not represent the true IQ score for Corey.

[131] Special Education Initiatives at pp. 73-74; Pleasantville: Barish Psychological Evaluation; Aff. of George Sakheim  at ¶ 45.

[132] Decl. of Ann Harding at ¶ 6; March 19, 2009 interview with Janet Valentine (Janet Valentine interview).

[133] Aff. of Gerald Lefkowitz at ¶ 11.

[134] Janet Valentine interview.

[135] Janet Valentine, Pleasantville Cottage Report (3/1/82).

[136] Pleasantville: Offer Psychosocial Summary, 3/15/82; Pleasantville Caro Assessment 6-9-1982.

[137] Pleasantville: Gallaudet Psychological Evaluation.

17

**J.A.372**

Corey believed his half-brother's father to be his natural father until early last year when his father unexpectedly came into the picture after being released from jail.

*     *     *

Corey's parents broke up when he was an infant and they lived with Robert's (his brother's) father until age 6 and with the mother's current boyfriend for the past four years who is described as being addicted to heroin and of being abusive toward the kids.  Corey's half-brother was hospitalized last summer following a suicide attempt (walking on a ledge) and is currently in Children's Village [a separate residential facility].

*     *     *

[Corey] doesn't want to return home for a while so that "I can straighten my head" and "my mother can straighten herself out. . . .  He wants to be a different person when he returns. Corey has been having problems for two years "since I turned 12."  He feels sad when his mother keeps telling him about his father being in jail.  He has felt at times like wanting to stab himself but has never done anything to hurt himself and doesn't think he will ever do it.  Corey talked about his brother trying to kill himself "because of my mother," and says that he feels very sad about it.  Corey blames his mother a great deal for asking him to do things at home and for the way she talks about his father.  "I hate him" referring to his mother's boyfriend who the family has been living with for the last four years. Corey says that he is on drugs and doesn't treat any of them right.

*     *     *

He wants to grow up to be a human being who people will look up to and trust.  If he were to go to a deserted island and could take one person with him he would take his brother along.  If he got lost in a forest he did not know who would come looking for him.

*     *     *

Life has been very chaotic for this family especially during the last four years with Corey's mother having had financial problems of being in debt, having difficulties with her job and her relationships.  Mother appears depressed and unavailable to the children emotionally.  There have been frequent moves, stays in the homes of relatives often with the mother and children being in different homes . . . .  Corey is a child who has been reacting to the chaotic life in the last four years.  He has the capacity to relate well and seems motivated toward improvement.[138]

---

[138] Sundar Collimuttam, M.D. Psychiatric Evaluation, Pleasantville Diagnostic Center 2/22/82.

18

**J.A.373**

In addition to his cognitive deficits, initial observation and evaluation at the Diagnostic Center noted that Corey's social functioning was also lacking. Corey acted like a younger child and appeared limited, often acting silly; he was viewed as the "cottage clown."[139]

Corey's biological father James Sykes, Sr. recalls going to see Corey's counselors at Pleasantville, and they told him that Corey was not doing well in school mainly because he could not read. Corey often felt embarrassed about the fact that he could not read and would act like a clown to distract from the fact that he struggled to read.[140] Corey tried hard at school, but could not improve academically. His struggles were very frustrating for him, intensified his feeling of low self-esteem and gave him a self-perception that he was stupid.[141]

**D. Corey's Social Impairments were also Obvious to Staff at Pleasantville.**

Despite the structured environment that Pleasantville offered, Corey still struggled significantly in understanding what the rules were and what was expected of him.[142] While he was able to follow very basic rules, e.g. return to Pleasantville at 9:00 p.m., Corey had problems with more detailed instructions.[143] Directions had to be repeated more than once in order to get him to follow them.[144] Due to his short attention span and inability to follow instructions, Corey required a lot of one-on-one attention from an aide. For example, the aide had to wait outside of the restroom for Corey, otherwise he would get lost and wander into other classrooms instead of returning to his class. When disciplined by staff members for his actions, Corey would listen but would soon repeat the same behavior because he did not have the capacity to apply the staff members' lessons to the real world.[145]

During his time at Pleasantville, Corey shied away from leadership positions and remained a follower who was easily influenced and taken advantage of by his peers.[146] Counselors at Pleasantville stated that Corey's tendency to follow others would get him in trouble.[147] Corey was perceived as someone who was so limited that he would always remain a follower.[148] He often required protection from the other children in his class because they "frequently scapegoated him."[149] Corey was desperate to be accepted by his peers and would do anything that someone told him to do.[150]

Throughout his youth and adolescence, including his time at Pleasantville, Corey was an impressionable follower who was easily influenced by others. Corey's friends knew they could

---

[139] Pleasantville: Offer Psychosocial Summary, 3/15/82.
[140] Aff. of James Sykes at ¶¶ 49-51.
[141] Pleasantville Aaron Assessment 3-10-1985.
[142] Aff. of Gerald Lefkowitz at ¶ 11; Janet Valentine interview.
[143] Aff. of Gerald Lefkowitz at ¶ 11.
[144] Aff. of Minnie Hodges at¶ 37; Janet Valentine interview.
[145] Aff. of Richard Benedict at ¶¶ 14-17.
[146] Janet Valentine interview; Decl. of Ann Harding at ¶¶ 10-11; Aff. of Gerald Lefkowitz at ¶ 14.
[147] Aff. of James Sykes at ¶ 50.
[148] Aff. of Richard Benedict at ¶¶ 12, 28.
[149] Pleasantville Caro Assessment 6-9-1982.
[150] Aff. of Richard Benedict at ¶ 12-13.

**J.A.374**

take advantage of him and would persuade him to do things that showed very poor judgment. Corey would do almost anything his 'friends' told him to do, going to great lengths to fit in with the crowd, including jeopardizing his own wellbeing by doing things that could get him injured or killed. Once, when he was a young teen, Corey roller skated down an incredibly steep hill that no one else would attempt because his friends told him to do it. He apparently accepted the dare to please his friends, which resulted in Corey falling and suffering a bruise and scrapes. On another occasion, around the same time as the roller skating incident, Corey was nearly hit by a car after his friends told him to ride his bike across a busy two-way street in the middle of traffic. A driver had to slam on his brakes to avoid hitting Corey.[151] At Pleasantville, Corey would do foolish acts because his peers asked him to do so, for example, he would knock a book out of another student's hands without any rationalization for why he had done it beyond the fact that someone had asked him to do so.[152]

Corey's intellectual limitations inhibited his ability to interact with other residents his own age.[153] Corey compensated for his limitations by teasing the other residents or acting like a clown, exhibiting behavior that was not "age-appropriate" and was "toddler-like at times." Although Corey would get scared when other residents would tease him in retaliation, he did not understand that it was his teasing that caused the other kids to tease him in return. Other than teasing or acting like a clown, Corey did not interact much with other residents, except for rare occasions where he appeared to do so on a "very superficial basis."[154] Corey seemed afraid of or uncomfortable with the other residents and male adults at his cottage, opting instead to spend time with the female adult caretakers.[155] At age fourteen, when he would visit his Aunt Minnie on the weekend, his only interest was watching cartoons and playing by himself.[156]

Corey's behavior issues, in the context of dozens of other troubled youth, were seen by Pleasantville staff as manageable. He was well-liked and seen as easy to get along with on the Pleasantville campus, by staff and youth alike. He was not seen as a "serious discipline problem."[157] One social worker noted that Corey was "not a management problem" and that he was friendly with his peers. While at Pleasantville, he worked in a summer employment program doing manual labor at a farm. His social worker saw his responsible work ethic as a strength.[158] He enjoyed carpentry work in his vocational classes at Pleasantville and hoped to work one day in carpentry. He enjoyed sports and participated in baseball and basketball teams on campus.[159]

---

[151] Aff. of Priscilla Hodges at ¶¶ 16-18.
[152] Aff. of Richard Benedict at ¶ 13.
[153] Aff. Minnie Hodges at ¶¶ 41, 45; Janet Valentine interview.
[154] Janet Valentine interview.
[155] Aff. of Ann Harding at ¶ 5; Janet Valentine interview.
[156] Aff. of Minnie Hodges at ¶ 42.
[157] Aff. of Richard Benedict at ¶ 19.
[158] Pleasantville: Maier Current Assessment, 8/31/84.
[159] Pleasantville Aaron Assessment 3-10-1985; Pleasantville: Maier Current Assessment, 8/31/84.

**J.A.375**

**E. Corey's Mother Showed Extreme Disinterest and Coldness toward Corey while he Resided at Pleasantville.**

Corey's mother did not visit Pleasantville often and only sporadically attended meetings with Pleasantville's staff related to Corey's development.[160]  Child care workers at Pleasantville noted that Corey's behavior deteriorated and he became very depressed when he had no contact with his mother for a period of time.[161]  When she did meet with staff members, Emma indicated that she was heavily in debt and trying to put her life back together, with little time or energy for her children.[162]

While at Pleasantville, Corey remained focused on his mother, though his mother was not focused on him.[163]  He longed for his mother and would fantasize that his mother would come to Pleasantville in a car and take him to Pizza Hut.[164]  Regardless of his desire to be with his mother and his love for her, Emma continued to be callous and unsupportive toward Corey.  Corey attributed his placement at Pleasantville to his misbehavior, denying there was anything wrong with his mother.[165]

Although Corey was allowed to return home every weekend, he remained on campus at Pleasantville during a great number of weekends.  Corey's brother Robert went home to visit Emma without Corey at least eight weeks in a six-month period in 1983.[166]  At one point, Emma expressed a desire to reduce weekend visits with Corey.  Sometimes Corey expressed resistance to returning from home and would return to Pleasantville in a deteriorated, agitated mood.[167]  On one occasion, Emma asked Corey for a $250 loan, which was about half of Corey's savings, and never paid him back.[168]  At a family therapy session, Emma lectured him about how insensitive he was to her effort to put her life together, and Corey stared at the ceiling.[169]  After Emma visited Corey for an entire day, child care workers observed how extremely rejecting she was toward Corey and that she had almost nothing positive to say about him.[170]  Throughout his time at Pleasantville, Emma was not accepting of Corey's limitations and placed a great emphasis on academics, despite it being an area fraught with frustration for Corey and one that he had no ability to address.[171]

Over the years that Corey and his brother Robert were in foster care placement, social workers offered services and support and tried to assist Emma in taking responsibility for her

---

[160] Aff. of Gerald Lefkowitz at ¶ 16; Pleasantville records, e.g. Pleasantville Aaron Assessment 3-10-1985; Pleasantville: Aaron Transfer Summary.
[161] Pleasantville Current Assessment – Turnquest 1/31/1983.
[162] Pleasantville Caro Assessment 6-9-1982.
[163] Aff. of Gerald Lefkowitz at ¶ 16.
[164] Pleasantville Current Assessment – Turnquest 1/31/1983.
[165] Pleasantville: Stadler Psychiatric Evaluation, 8/23/1983.
[166] Special Services for Children (11) at p. 39.
[167] Treatment Team Meeting Notes.
[168] Aff. of Gerald Lefkowitz at ¶ 16.
[169] Pleasantville Caro Assessment 6-9-1982.
[170] Pleasantville Turnquest Assessment 12-15-1983.
[171] Pleasantville: Aaron Transfer Summary 5/28/1985.

21

**J.A.376**

children.[172]  Corey and Robert's social workers created discharge plans to return them to Emma. Over time, the social workers stopped recommending returning Corey to his mother, not because of Corey's capabilities had improved, but because Emma was unable and unwilling to take him back.  Emma's abandonment of Corey was apparent to him and very distressing.[173]  In December 1983, Corey's social worker reported:

> Ms. [Emma] Johnson is not yet ready to have Corey home and Corey is not wanting to go home at this time. Ms. Johnson continues to be emotionally unavailable to Corey and Corey is able to recognize this on some level. Child is severely learning disabled and requires a specialized educational setting. If child were to return home severe familial problems and school truancy would erupt. Residential treatment is the modality of choice.[174]

In April 1984, Corey's social workers realized Emma "cannot provide Corey with the emotional support and attention he needs to overcome his severely impaired self-concept. Corey, who is severely learning disabled and barely able to read, feels inept and damaged.  His mother is a narcissistic and self-focused woman whose lack of empathy and sensitivity toward Corey, exacerbates his bad feelings."[175]  Consequently, Corey's permanency plan was changed to "Discharge to Independent Living."[176]  Despite changing the permanency plan, Corey's social workers would establish goals for Emma to make Corey feel included in family life even though he did not live with her and for Emma to support his achievements.[177]

### Because Corey's Mother was Unwilling and/or Unable to Care for Corey, He was Transferred to Elmhurst Boys Residence

In 1985, after three years at Pleasantville, because Corey was only sixteen years old and Emma was not willing to have him return to her care, he moved to a different JCCA residential program in New York City.[178]

Corey arrived at Elmhurst Boys' Residence in June of 1985.[179]  Elmhurst consisted of two apartments and housed up to eight boys at a time.  Staff lived in the apartment in three to four day shifts, and a social worker who worked offsite made periodic visits.[180]  House parents would shop and cook for the residents, and some leisure time would also be structured by the facility.[181]

---

[172] JCCA Records.
[173] Aff. of George Sakheim at Exhibit A p. 1.
[174] Special Services for Children (3) at pp. 64-77 and (6) at p. 40.
[175] Special Services for Children (6) at pp. 4-5.
[176] Special Services for Children (6) at p. 13.
[177] JCCA Book I at p. 27.
[178] JCCA Book I at p. 52.
[179] Special Services for Children (2) at p. 24.
[180] Aff. of David Washington at ¶ 4.
[181] Aff. of Odette Noble at ¶¶ 8, 27.

**J.A.377**

## A. Corey's Academic Failure Continued at Elmhurst.

Despite receiving three years of special education and remediation at Pleasantville, Corey, at age sixteen, was still functioning at second and third grade levels for reading and math.[182]  After arriving in Elmhurst, unlike most of the other boys in the residence who attended mainstream classes and were expected to move on to college, Corey was enrolled in Special Education at Newtown High School.[183]

To staff members and the social worker at Elmhurst, Corey stood out as having significant intellectual limitations and being cognitively slower than the other residents at the group home.[184]  His comprehension of what was being read to him was poor and his ability to read was very limited.[185]

At Newtown High School, Corey was well-liked, got along with everyone and portrayed characteristics of a follower, not a leader.[186]  While attending Newtown High School, Corey received help with his homework in all subjects from Courtney Daniels, his godsister.  They would work together from 3 p.m. to 6 p.m. several days a week because Corey needed step-by-step instructions given numerous times to be able to complete his math problems.[187]  Despite working hard to improve academically, Corey could not perform well in school.[188]  His report cards from Newtown High School contain many failing grades (grades that are 65 and below range).[189]  Corey's teachers noted his excessive absences and lateness, including being absent on test days.[190]  When caseworkers discussed Corey's progress with one of his teachers, it was pointed out that Corey would not be able to pass competency tests, but if he completed all of his classes he would be eligible for a certificate of completion.[191]  He attended remedial math and reading classes in summer school, but failed those classes.[192]

## B. Corey's Social Impairments were Obvious to Elmhurst Staff and Corey began to have Adjustment Problems.

Emma was almost nonexistent in Corey's life while he was at Elmhurst.[193] Notwithstanding the fact that she rarely visited him, Corey spoke of Emma as if she was terrific and rarely expressed any anger toward her.[194]  Emma did not call to arrange for Corey to come home on the weekends and during this period Corey seldom chose to visit his mother.[195]

---

[182] Special Education Initiatives at pp. 85-86, 92, 100.
[183] Aff. of Odette Noble at ¶¶ 8, 27; Special Services for Children (3) at pp. 8-16.
[184] Aff. of Odette Noble at ¶ 7; Aff. of David Washington at ¶¶ 7-8.
[185] Aff. of Odette Noble at ¶ 9.
[186] Aff. of Ammon Boone at ¶¶ 4-5.
[187] Aff. of Courtney Daniels at ¶ 16.
[188] Aff. of Odette Noble at ¶ 10.
[189] Newtown High School Report Cards.
[190] Newtown High School Report Card 10/29/1986.
[191] Special Services for Children (1) at p. 31.
[192] Newtown High records at p. 2.
[193] Aff. of Odette Noble at ¶¶ 22, 24.
[194] Aff. of Odette Noble at ¶ 25.
[195] JCCA Elmhurst 9-28-85 Noble; UCR Reassessment and Service Plan Review, 11/1985.

23

**J.A.378**

At Elmhurst, Corey did not initiate action but rather went along with what others did.[196] Consequently, Corey was known at Elmhurst as a follower and as someone who was very susceptible to peer pressure.[197]  Corey got along with people because he was very accommodating of others and would do almost anything that anyone asked him to do, without regard for his own well-being or perceiving any logical reason for doing so.[198]

> Corey did not have a good 'read' of situations or other people.  He was not very sensitive to social cues.  He had difficulty 'learning the rules of the game' and understanding who was in charge.[199]

In August 1986, when Corey was seventeen, records show that he was persuaded to go along with one resident's plan to rob another student of his paycheck.  Staff at Elmhurst was not surprised by Corey's behavior because he was so easily influenced into making poor social decisions and did not understand the consequences of his actions.  According to Elmhurst records, Corey was not the leader and his case worker noted that she believed he went along with the plan just so that he could be accepted and make friends; but he nevertheless participated in the incident and was arrested and charged as an adult with robbery.[200]  On August 19, 1986, Corey turned himself into the police after one other boy was arrested.[201]  Corey was bailed out of Rikers Island two days later by the JCCA on August 21, 1986.  He later pled guilty to robbery and was sentenced to twenty days in jail as a youthful offender and was placed on probation after actually serving about ten days.[202]  His Elmhurst case worker wrote after his return:

> I suspect that Corey will be at risk when it comes time to leave us and the security we have provided him all this time . . . [which] is necessary if he is going to be able to survive in the community and make constructive choices and not perpetuate the same patterns that he learned from his mother.[203]

## C. Corey Violated Elmhurst Rules and was Asked to Leave Temporarily but Never Returned.

To those interacting with Corey at Elmhurst, it was apparent that his cognitive deficits were not limited only to his schoolwork.[204]  Although Corey could understand the rules regarding group meetings well enough to follow them most of the time, he never understood their underlying purpose or reasoning.  Insensitive to social cues, Corey had difficulty understanding who was in charge, and toward the end of his time at Elmhurst, Corey ignored the instructions of house parents and the rules of the residence.[205]  On one occasion, he snuck out of

---

[196] Aff. of Odette Noble at ¶ 17.
[197] Aff. of David Washington at ¶¶ 12-13; Aff. of Odette Noble at ¶ 17.
[198] Aff. of Odette Noble at ¶ 20.
[199] Aff. of Odette Noble at 18.
[200] Aff. of Odette Noble at ¶ 21.
[201] JCCA book IV at p. 50.
[202] Special Services for Children (1) at p. 36.
[203] Odette Noble Three Month Conference Note 12/28/85.
[204] Aff. of Odette Noble at ¶ 11.
[205] Aff. of Odette Noble at ¶¶ 12, 18, 30.

24

**J.A.379**

the residence in the middle of the night.[206]  Also, the residence had some difficulty with Corey when he was given permission to travel over Christmas and returned four days late.[207]

Although less controlled than Pleasantville, Elmhurst provided a structured environment for Corey.[208]  However, due to his intellectual limitations, staff members were very worried about Corey's future when the time would come for him to leave Elmhurst, and had concerns regarding his ability to hold a job and perform even simple day-to-day tasks that independent living requires, such as paying bills, obtaining a driver's license or purchasing and maintaining a car.  More complex skills like planning a budget were clearly beyond Corey's abilities.[209]  As one social worker remarked while looking back on that time: "I doubted that Corey was equipped to make it on his own, to live independently as an adult.  Some people stay in a protected setting all of their lives and that may have been what was appropriate for Corey."[210]

In February 1987, Corey was asked to leave Elmhurst for violating house rules, because he refused to speak in a group session.[211]  Corey had been acting "belligerent, uncooperative and disrespectful and felt completely justified with this attitude and behavior."[212]  According to a Trial Discharge UCR Form, it was noted that Corey returned to his mother's home on February 3, 1987 for a ten day trial period to give him "an opportunity to consider his behavior and attitude in [the] residence" and "what he wanted and if he wanted to continue to live in [the] residence."[213]  In the view of his social worker, Odette Noble, the message the staff was trying to communicate to Corey was "you should go away and think about this for a while, and then come back."  However, Corey never returned to Elmhurst even though he was invited back to the residence by staff members.  When Corey was recently evaluated by a psychiatrist, he indicated that he would have done almost anything to be allowed to return to Elmhurst and said that he did not understand he was allowed to return.[214]

## Corey Left High School and Turned to
## Drug Dealing soon after Leaving Elmhurst

As predicted by the Elmhurst staff, Corey's life outside of the structure and stability that the group home provided began to rapidly deteriorate.  After leaving Elmhurst, Corey lived with his mother and brother for approximately six months.  Corey continued attending high school but, after returning to his mother's home, he started missing classes, began skipping school altogether at times, and failed most of his classes.[215]  Eventually, he was suspended for squirting

---

[206] JCCA Elmhurst 9-28-85 Noble.
[207] Special Services for Children (3) at pp. 1-4.
[208] Aff. of Odette Noble at ¶ 32.
[209] Aff. of Odette Noble at ¶¶ 37-38.
[210] Aff. of Odette Noble  ¶38.
[211] Aff. of David Washington at ¶¶ 14-15, 31.
[212] Special Services for Children (1) at pp. 33-34.
[213] Special Services for Children (1) at pp. 25, 29-30.
[214] Report by Dr. Richard G. Dudley, Jr., M.D.
[215] Special Services for Children (1) at pp. 23-24; Newtown High records at p. 2, Newtown grade report.

25

**J.A.380**

a teacher with a fire extinguisher during the last week of school and he did not receive a certificate of completion.[216]

## A.  Corey's Impairments were Obvious to his Drug Dealing Associates.

Effectively on his own and with no meaningful work history, Corey became involved in the sale of drugs, as he had seen his mother and his brother do (as did many of the men his mother had dated).[217]  While selling drugs, people readily took advantage of Corey because of his easy going nature and his inability to properly count money.[218]  On several occasions, Corey had problems obtaining the correct amount of money in exchange for drugs he was selling.[219]  Neighborhood dealers who supplied Corey with drugs to sell got angry with Corey, and some avoided dealing with him entirely, because he would not come back with the right amount of money after a drug deal.[220]  Even Robert Johnson would not give Corey drugs to sell because, one time, Robert sent Corey out with 50 vials of crack to sell for $5 each, and Corey sold all the vials but returned with only $50, not $250.[221]

On September 16, 1987, Corey was again arrested for robbery.  He eventually pled guilty and was sentenced to a year in jail at Rikers Island.  After being released from prison, Corey went to North Carolina for six months and lived with his mother's ex-boyfriend, Robert Butler (the father of Corey's half-brother) and Robert Butler's wife, Ann.[222]  Corey tried to study for a General Equivalency Diploma (GED) in North Carolina by attending adult education classes at a community college in Goldsboro, North Carolina, but was unsuccessful, as he continued to receive poor grades.  Over a weekend when Robert Butler and his wife were away and Corey was left in their home alone, he hosted a party at the house without their permission and some of their property was stolen by some of the partygoers.  Although the Butlers felt Corey "just passively went along with what they told him to do [by hosting the party]" and while they believed that Corey had been manipulated by others and had nothing to do with the theft, the Butlers sent Corey back to New York.[223]

Corey briefly returned to New York but soon moved to Trenton, New Jersey, where he lived with some of his friends from New York and some of their friends who sold drugs.  The drug-dealing group that Corey joined and lived with in Trenton was led by two brothers, Darnell and Darold Brown.[224]  Corey's group in Trenton operated like an informal family.[225]  Corey treated Darnell and Darold Brown like members of his family.[226]

---

[216] Trial Transcript, p. 3621.
[217] Aff. of Antoinette Joseph at ¶¶ 63-65; Aff. of Courtney Daniels at ¶ 18.
[218] Aff. of Antoinette Joseph at ¶  67.
[219] Aff. of Priscilla Hodges at ¶ 26.
[220] Aff. of Robert Johnson at ¶¶ 59; Aff. of Priscilla Hodges at ¶ 28.
[221] Aff. of Robert Johnson at ¶¶ 60-61.
[222] Decl. of Robert Butler, Sr. at ¶ 42; Decl. of Ann Butler at ¶ 13.
[223] Decl. of Robert Butler, Sr. at ¶¶ 42-43.
[224] Aff. of Darold Brown at ¶¶ 4-6.
[225] Aff. of Darnell Brown at ¶ 8.
[226] Aff. of Darnell Brown at ¶ 8.

**J.A.381**

Corey's role in selling drugs within the group was very limited; he was a "block hustler, worker or worker ant," which, according to the Browns, meant he had no rank, status or leadership function within the group. The Browns said that Corey always sold drugs paired up with someone else, taking orders from higher ranked members in the group's hierarchy and doing what he was told.[227]

Vernon Lance Thomas was one of Corey's friends from his Manhattan neighborhood. Lance became part of the Trenton group before Corey joined. Lance was very similar to Corey in his intellectual and social functioning and, like Corey, had a limited role in selling drugs for the Trenton group.[228] Corey and Lance were the quietest members of the group.[229] Although he also had to be told what to do, group members thought Lance was slightly more intellectually capable than Corey and more likely to analyze a situation before acting.[230]

While in Trenton, Corey got to know Richard Tipton.[231] Richard was also a "worker" and a follower but since he was considerably more outspoken and intelligent than Corey, Corey would follow Richard.[232] Whereas Corey would act based on nothing more than other people telling him to do something, Richard would at least analyze the situation first, even if he was eventually persuaded into going along.[233]

**B. Corey's Impairments in Every Day Living in Trenton were Significant.**

Other than selling drugs, Corey did not have a job. He would give any money he made from drug dealing to Monica, one of his girlfriends, who was able to take advantage of him. On at least one occasion, Corey could not account for his money and was incapable of explaining where his money went.[234]

One of the women Corey dated during the time he lived in Trenton was Rosemary Brooks, whom Corey met in 1989. Rosemary was nineteen, about the same age as Corey, and lived in the notorious Miller housing development, which at the time was riddled with poverty, drugs, and crime. They dated for about two years, although Corey also continued to see a couple of other women while he dated Rosemary. Unlike Corey's other girlfriends, Rosemary Brooks did not use drugs. She reports that Corey was a compassionate person but very much a loner who deferred to others. He often went along with others without question or comment.[235]

Rosemary met Corey's mother and visited her in her home in New York City with Corey. Once, when his mother called Corey after she had been beaten up by a boyfriend, Rosemary, Corey and a friend, Glenn Cain, went to New York City to help Corey's mother. According to Rosemary, Corey's "mother clearly looked 'high' or like a 'junkie' with bruises on her body. At

---

[227] Aff. of Darnell Brown at ¶ 5; Aff. of Darold Brown at ¶¶ 8-9.

[228] Aff. of Darold Brown at ¶ 30; Aff. of Darnell Brown at ¶ 11.

[229] Aff. of Darnell Brown at ¶ 11.

[230] Aff. of Darold Brown at ¶ 30; Aff. of Darnell Brown at ¶ 11.

[231] Aff. of Darold Brown at ¶¶ 30-31; Aff. of Darnell Brown at ¶¶ 11-12

[232] Aff. of Darold Brown at ¶ 33; Aff. of Darnell Brown at ¶ 12.

[233] Aff. of Darold Brown at ¶ 33.

[234] Aff. of Darold Brown at ¶¶ 26-27, 29.

[235] Interview with Rosemary Brooks 8/15/15.

**J.A.382**

Corey's request, Rosemary took his mother to her house in Trenton and cleaned her up and gave her a makeover, and Corey got his mother some new clothes.  However, his mother only stayed a few days and then left "without a word."[236]

During Rosemary's relationship with Corey, there was a period of time when Corey declined to have sex with her and seemed to be in serious physical discomfort, but Rosemary initially did not understand why.  Soon after that, Rosemary's appendix burst and she was rushed to the hospital. When Corey visited Rosemary in the hospital, he sat on her bed rocking back and forth in pain.  When she asked him what was wrong, Corey said nothing was wrong.  Her pelvic exam and lab tests revealed that Rosemary had gonorrhea that she had contracted from Corey. Rosemary realized that Corey had been walking around for some time with the symptoms of gonorrhea but did not say anything or seek medical help.  "He did not even have the common sense to find out what was wrong with him."  Rosemary had to tell Corey to go to a doctor to be treated for his gonorrhea.[237]

Corey was unassertive in his personal life.[238]  He had difficulty expressing himself and often remained quiet, especially around a group of housemates, because he had trouble following conversations.[239]  For instance, if a group of people were talking about the weather, Corey would abruptly start discussing a race car show.  Corey's friends who saw him try to read recognized how difficult it was for him.  Although he would appear to read books and the newspaper, Corey did not know the meanings of certain words and would not discuss the subjects in the paper or respond to questions about particular articles.[240]  He needed to be given directions to do anything and would always defer to someone else's leadership or directions.[241]  Corey rarely went anywhere or did anything without having someone with him, mostly using cabs to take him where he had to go if he did have to travel.[242]  Since he  appeared to them as incapable of making decisions on his own or coming up with his own ideas, Corey was labeled as a follower by the other group members and as someone who would go along with whatever someone else told him to do, rarely refusing to do something once asked, even if he did not seem to want to do it.[243] They also remarked that his poor judgment caused him to do anything for the people in the group without considering whether it was a good idea.  For instance, when there was a fight between Corey's friends and a different group of people at a party, Darold Brown had to prevent Corey from getting involved to protect his "family."[244]

---

[236] Interview with Rosemary Brooks 8/15/15; interview with Glenn Cain 10/5/15.  Mr. Cain accompanied Corey and Rosemary to pick up Corey's mom after she was beaten up and recalled that Corey's mother's boyfriend "Bobby" (likely Bobby Koger) was there and his mother was "definitely high" and Bobby was "nodded out" (also high).  He was not surprised that Corey's mom almost immediately returned to the "dope house" after they brought her to Trenton because "she was a junkie."
[237] Interview with Rosemary Brooks 8/15/15.
[238] Aff. of Darnell Brown at ¶ ¶ 10, 13.
[239] Aff. of Darold Brown at ¶ 19; Aff. of Darnell Brown at ¶ 15; Aff. of Sonya Hilton at ¶ 7.
[240] Aff. of Sonya Hilton at ¶ 7.
[241] Aff. of Darold Brown at ¶¶ 15-16.
[242] Aff. of Darold Brown at ¶ 21; Aff. of Darnell Brownat ¶ 10.
[243] Aff. of Darold Brown at ¶¶ 12-13; Aff. of Darnell Brown at ¶ 10; Aff. of Darryl Williams at ¶ 7.
[244] Aff. of Darold Brown at ¶¶ 12, 14.

28

**J.A.383**

### C. Corey and a Few Others Moved To Richmond after the Arrest of the Trenton Group Leaders, Engaged in a Turf Battle, and Resorted to Extreme Violence.

In 1991, Darnell and Darold Brown and many other members of the Trenton group were arrested after the police conducted a raid of the house where many of them lived, leaving the group with no leadership.[245]  Corey, Lance, and Richard were not at the house in the day of the raid and were not arrested in New Jersey.  Richard suggested to Corey and Lance (among the few who were not in jail) that they move to Richmond, Virginia, where he said they could make "big money" selling drugs.  Tipton said he had a friend, James Roane, who lived in Richmond.[246]

Corey, Richard, and Lance went to Virginia to sell drugs, and once there James Roane helped Richard recruit local residents to sell drugs with them.  The group got into a turf war with local drug dealers that led to extreme violence.  In early 1992, Corey, Richard, Lance and James Roane, whom Lance and Corey met in Virginia, were arrested and charged with engaging in a continuing criminal enterprise, conspiracy to distribute cocaine, distribution of cocaine, murder in furtherance of the continuing criminal enterprise and the use of firearms in committing murder.  In January and February 1993, Corey, Richard, and James were convicted and sentenced to death for committing a total of ten murders and wounding several other people.

### Corey's Positive Adjustment to Life in Prison

### A. Corey's Limitations were Apparent to Professionals who Observed him in Prison.

After Corey was sentenced to death in 1993, he was placed at the Mecklenburg Correctional Facility, a Virginia Department of Corrections (DOC) prison, with his co-defendants, James and Richard.  Bobby and Sarah West, volunteer prison chaplains, first met Corey in 1997 at the Mecklenburg.[247]  Bobby and Sarah visited with Corey every other week while he was at the Mecklenburg and at the Sussex County Correctional Centers and saw him both individually and as part of larger group meetings with the other men on the pod.[248]  In total, Bobby West estimates that he saw Corey approximately one hundred times while Corey was at the two Virginia facilities.[249]  In addition to the visits Bobby and Sarah jointly made, Sarah West met with Corey one-on-one five or six different times while Corey was in Virginia and probably met with him a total of about ten or eleven times.[250]  In Mecklenburg, Bobby and Sarah West had the opportunity to see Corey in the same setting as his co-defendants, James and Richard.[251]  Even in prison, compared to Richard and James, Corey appeared to be a follower.[252]  James and Richard had "strong personalities, unlike Corey.  Corey wanted to be accepted and could have been influenced by others."[253]  Corey was not as vocal and opinionated as his co-defendants and would just "go with the flow," always wanting to please and "say the right thing."  Bobby West

---

[245] Aff. of Darold Brown at ¶ 34.
[246] Trial Tr. 921:12-922:01, *United States v. Tipton*, No. 92CR68 (Jan. 15, 1993).
[247] Decl. of Bobby West at ¶ 5.
[248] Decl. of Sarah West at ¶ 3; Decl. of Bobby West at ¶ 5.
[249] Decl. of Bobby West at ¶ 5.
[250] Decl. of Sarah West at ¶ 3.
[251] Decl. of Bobby West at ¶ 6.
[252] Decl. of Bobby West at ¶ 14; Decl. of Sarah West at ¶ 6.
[253] Decl. of Sarah West at ¶ 6.

**J.A.384**

believed, based on his observations of Corey, James and Richard, that rather than being a leader, Corey was a follower, who "wanted to be considered a strong man who would have done what others told him to be more accepted in the group."[254]

While it is common for other death row inmates to raise deep or complex spiritual questions, Corey only had very basic spiritual discussions with the volunteer prison chaplains.[255] Additionally, while most of the prisoners on death row, including James and Richard, researched their cases in the law library and remained informed about the status of their legal cases, Corey was not knowledgeable about his case and relied completely on his lawyers.[256]

Julie McConnell, the Executive Director of the Virginia Association to Abolish the Death Penalty during the early 1990s, interacted with Corey, Richard and James on eight to ten different occasions while visiting inmates on death row in the Virginia DOC. Ms. McConnell noted that based on her interactions with Corey, his speech and thinking appeared "very simplistic," he seemed "quite childlike," and that he probably suffered "from mental retardation and a very low IQ." Ms. McConnell did not perceive Corey to be the leader." Indeed, James and Richard indicated to Ms. McConnell that Corey was the follower of the group and that they were aware that Corey was slow.[257]

King Salim Khalfani visited death row during his time as a staff person for the Virginia Association to Abolish the Death Penalty and met Corey in the 1990s when Corey was at Powhatan Correctional Center (PCC), a Virginia DOC facility. Mr. Khalfani estimated that he met with Corey about twenty times. Mr. Khalfani also met with Richard and James and kept in touch with James for a number of years after he was moved from PCC. Mr. Khalfani also noted that Corey's demeanor did not match his chronological age and that he appeared to have some issues related to maturation and cognitive ability. Mr. Khalfani kept his conversations with Corey simple as he would with a child and stated that Corey did not have an extensive vocabulary.[258]

After several years in prisons in Virginia, Corey was transferred to the Bureau of Prisons (BOP) and placed at the United States Penitentiary in Terre Haute, Indiana (USP Terre Haute). Bobby and Sarah West continued to visit Corey, traveling to Terre Haute four or five times, with their last visit taking place in 2006.[259] Another person who got to know Corey during his time in Terre Haute was, Mark Bezy, the USP Terre Haute Warden between 2004 and 2006. Warden Bezy made weekly "rounds" of death row each Wednesday afternoon and during these rounds, he would speak to each of the death row prisoners. Warden Bezy says he spoke to Corey on a weekly basis for over two years. According to Warden Bezy, Corey was never a problematic prisoner and did not have any disciplinary problems during Warden Bezy's time serving as prison warden. Corey did not make any requests of the prison staff and was generally cordial

---

[254] Decl. of Bobby West at ¶¶ 6, 10 15.
[255] Decl. of Bobby West at ¶ 11.
[256] Decl. of Bobby West at ¶¶ 7-8; Decl. of Sarah West at ¶ 5.
[257] Aff. of Julie McConnell at ¶¶ 4, 5, 7.
[258] Aff. of King Salim Khalfani at ¶¶ 2-3, 5.
[259] Decl. of Bobby West at ¶ 5; Decl. of Sarah West at ¶ 3.

30

**J.A.385**

and polite, even when read his notice of execution.[260]  Corey's conversations with Warden Bezy were also very simple in nature and based on his interactions with him, Warden Bezy indicated that Corey appeared to be a "special needs" person.  Corey's main interest was physical exercise.[261]  Warden Bezy believes that if Corey had his sentence reduced to life, he could function well in the general prison population and would not be a danger to other prisoners.

**B.  Corey has a Longstanding, Positive Prison Disciplinary History.**

Corey has had an excellent prison disciplinary history during the twenty-four years since his arrest.  Since he entered the BOP custody, he has had only one minor infraction for being found in a staff restroom without permission while working in the kitchen at USP Terre Haute in 2002.  He has had zero infractions in the past fourteen years.[262]

During the time he was awaiting trial and sentencing and for about three years after he was sentenced, Corey was held in state custody in Virginia.  Corey had some minor infractions during a two-year period between the summer of 1995 and the summer of 1997 while at PCC in the Virginia DOC.  Most of those infractions were for having unauthorized property in his cell, such as headphones and other electronic equipment and magazines.  He also struggled to comply with a new rule requiring inmates to place their meal trays back in the food slot rather than the previous permitted method of placing the food trays on the floor near the cell entrance, and he received a number of citations within a couple of weeks for that infraction.  He also spit on a correctional officer on one occasion and another time threw a bar of soap at a correctional officer but no one was injured in either incident.[263]  Throughout Corey's incarceration, he has never been in a fight, never had a weapon, and never engaged in any type of violence.  Corey is now forty-eight years old and is a well-adjusted inmate.

In prison, Corey has received positive work performance evaluations when he has been allowed to hold a job in the Virginia Department of Corrections and the federal BOP.  These jobs have been simple ones—working in the kitchen cleaning or as an orderly.[264]

**C.  Corey has Diligently but Unsuccessfully Worked to Obtain the GED.**

For at least 20 years, Corey has had one goal that he has set for himself and strived to achieve before he is ever executed, and that is to pass the GED Exam and earn his GED.  Corey has taken pre-GED classes, watched GED classes from his cell, been giving assignments by prison teachers, and studied on his own and done homework over the past two decades, devoting hundreds of hours (at least 500 hours according to BOP records) to that dream.  But Corey Johnson has not been able to pass the GED, despite entries in his prison records that compliment him on his hard work toward gaining his GED.[265]

---

[260] January 19, 2011 interview of Mark Bezy.
[261] January 19, 2011 interview of Mark Bezy.
[262] BOP records.
[263] Virginia DOC records.
[264] BOP and Virginia DOC records.
[265] BOP records.

**J.A.386**

**Exhibit 1:**

**List of Actors in Corey Johnson's Life**

**Corey's Family, Friends and Drug Associates:**

- Ammon Boone – Newtown High School classmate of Corey
- Darnell Brown – Brother to Darold Brown; co-leader of the Trenton drug-dealing group
- Darold Brown - Brother to Darnell Brown; co-leader of the Trenton drug-dealing group
- Amos Brunson – Corey's maternal uncle
- Ann Butler – Robert Butler Sr.'s wife
- Robert Butler Sr. – Emma Johnson's boyfriend and biological father to Robert Johnson
- Monica  Dawkins – Corey's girlfriend when he lived in Trenton; mother of Corey's daughter
- Courtney Daniels – Antoinette Joseph's daughter; Corey's childhood friend and godsister
- Aeisyha Harris – Corey's girlfriend when he lived in Trenton
- Sonya Hilton – Member of the drug-dealing group in Trenton
- Minnie Hodges – Corey's maternal aunt who took care of Corey and Robert at times when they were children
- Priscilla Hodges – Corey's cousin; Minnie Hodges's daughter
- Queenie Hodges – Corey's cousin; Minnie Hodges's daughter
- Emma Johnson – Corey's mother
- Esther Johnson – Corey's maternal grandmother with whom Corey lived at times during his childhood
- Love Johnson – Corey's maternal grandfather with whom Corey lived once during his childhood
- Robert Johnson – Corey's maternal half-brother who is two years younger than Corey
- Antoinette Daniels Joseph – Emma Johnson's best friend andCorey's godmother
- Bobby Koger – Emma Johnson's boyfriend  when Corey was 8 or 9 years old until Corey was a teenager
- Kevin Koger – Bobby Koger's son
- Robert "Mitch" Mitchell – Emma Johnson's partner when Corey was 7 years old
- James Roane – Corey's Richmond co-defendant who was tried together with Corey in capital case
- Holly Scott – Corey's girlfriend on and off from 13 to 21 years old and a friend of Courtney Daniels
- Elizabeth Sykes – Corey's paternal half-sister
- James Sykes Jr. – Corey's paternal half-brother
- James Sykes – Corey's biological father
- Vernon Lance Thomas – Corey's Richmond co-defendant who was tried separately
- Richard "Whitey" Tipton – Corey's Richmond co-defendant who was tried together with Corey in capital case
- Carl Weinberg – Lived with Corey at the Cottage School when both were 14 or 15 years old

32

**J.A.387**

**Psychiatric Specialist, Doctors, Social Workers, Child Care Workers, and Teachers**:

- Ernest Adams, M.S. – Psychologist at Council's Center in October 1981 when he evaluated Corey;
- Kenneth Barish, Ph.D. – Psychologist at Pleasantville who examined Corey in 1983 and administered Corey's IQ test in March 1985
- Richard Benedict – Corey's special education teacher 1984-1985
- Sundar Collimuttam, M.D. – Psychiatrist who evaluated Corey at Pleasantville Diagnostic Center in 1982
- Jennifer Figurelli, Ph.D. – School psychologist at P.S. No. 16 Elementary School in Jersey City; administered Corey's first known IQ test
- Cary Gallaudet, Ph.D. – Psychologist who administered Corey's IQ test in February 1982
- Ann Harding – Supervisor at the Cottage School's older boys cabin 1984-1985
- Leona Klerer – Corey's reading teacher at the Cottage School
- Odette Noble – Social worker at Elmhurst Boy's Residence
- Karen Price – Speech, Language and Education examiner; evaluated Corey in May 1979
- John Rios – Residential Supervisor at Elmhurst when Corey was seventeen
- George Sakheim, Ph.D. – Psychologist; supervised Drs. Gallaudet and Barish.
- Mary Sitgraves, Ph.D. – Psychologist; supervised Ernest Adams
- Nathalie Smith, Ph.D. – Psychologist Corey was referred to in March 1979
- Janet Valentine – Child care worker at the Pleasantville Diagnostic Center and at the Cottage School when Corey was there
- David Washington – Child care case worker in Residence at Elmhurst Boys' Residence
- Gerald Lefkowitz – Pleasantville administrator
- John Stadler – Psychiatrist at Pleasantville

**Individuals Who Have Known Corey in Prison**

- Mark Bezy – Prison Warden at Terre Haute, Indiana; spoke to Corey on a weekly basis from 2004 to 2006
- King Salim Khalfani – Staff person for the Virginia Association to Abolish the Death Penalty visited Corey in prison in Virginia
- Julie McConnell – Executive Director of the Virginia Association to Abolish the Death Penalty
- Bob West – Volunteer prison chaplain; visited Corey every other weeks in Virginia prison (about 100 visits) and occasionally in Indiana, his last visit was in 2006
- Sarah West - Volunteer prison chaplain, visited Corey every other weeks in Virginia Prison (about 100 visits) and occasionally in Indiana, her last visit was in 2006

**J.A.388**

**Exhibit 2**

**Homes Corey Johnson Lived In:**

- Born in Brooklyn. Lived with mom and maternal grandmother
- When toddler, moved with mom and brother to Manhattan apartment with Robert Johnson
- At about age 2 and a half Emma moved in with Robert Butler (where)
- At age 6, mom and Butler split and Corey stayed with maternal grandparents in Brooklyn
- Age 6, lives with Uncle Amos Brunson and Aunt Vonna Long, Long Island (6/75)
- At age 7, moved to Jersey City, NJ to live with Robert "Mitch Mitchell
- Approximately age 9, after splitting with Mitch, Emma and kids moved to Hollis, Queens with Bobby Kroger (2/78)
- Corey sent to live with maternal grandfather, Love Johnson, in Brooklyn several times, including once for six months
- Age 10, living at 335 Edgecombe Avenue, Manhattan (2/79)
- Age 10, living at 640 Riverside Drive, Manhattan (9/79)
- After a few months, Emma moved to Harlem and then moved in with Bobby Kroger at age 9 for almost 4 years (78 to 82)
- Riverside Drive, Manhattan at age 13 (12/81)
- Age 13, Corey sent to live with maternal grandfather, Love Johnson, in Brooklyn (12/81)
- Age 13, Corey enters Pleasantville (12/81)
- Age 14, Cottage School (7/83)

34

**J.A.389**

**Exhibit 3**
**Schools Corey Johnson Attended:**

- Age 5, enrolled in PS 103 in Woodlawn, Bronx (9/74)
- Age 6, enrolled in PS 309 in Bushwick, Brooklyn (3/75) (stays through second grade)
- Age 7, enrolled in PS 16, Cornelia Bradford School, Jersey City, NJ (9/76) (repeats second grade)
- Age 8..4, retained in second grade, PS 16 elementary school in Jersey City (3/77)
- Age 8, second grade, PS 16 (10/77)
- Age 9, enrolled in private school (12/77)
- Age 9, enrolled in PS 134 in Hollis, Queens, still in second grade (2/78)
- Age 9, enrolled in PS 76 in Central Harlem (5/78 to 6/78, still in second grade for third year in a row)
- Age 10, enrolled in PS 200 (9/78) third grade
- Age 10, third grade,. PS 200 (per Upper West Side Center) (2/79)
- Age 10, Corey referred to HC30 Program (Special Education classed) at PS 92, Mary McLeod Bethune School, Harlem (8/79)
- Age 11, Corey transfers to St. Rita's Catholic School in Brooklyn (9/90)
- Age 11, Corey suspended from St. Rita's (1/81)
- Age 12, Corey enrolls in PS 213 in Brooklyn (sometime before 4/81)
- PS 92, Seventh grade (prior to Pleasantville) (2/82)
- Pleasantville Cottage School (5/82 to 6/86)
- Newtown High School in Queens 1986 to 1988

35

**J.A.390**

# EXHIBIT 5

J.A.391

RICHARD G. DUDLEY, JR., M.D.

210 WEST 101ST STREET, SUITE 11K, NEW YORK, NEW YORK 10025
212-222-5122

22 August 2016
PSYCHIATRIC EVALUATION

## IN RE: COREY JOHNSON

Presenting Problem:

Corey Johnson (CJ) is a now 47 year old (DOB ██████████) African-American male, who is currently on the Federal Death Row in Terra Haute, Indiana.

It is the understanding of this psychiatrist that in 1993, CJ was convicted of first degree murder and sentenced to death for drug-related killings (i.e., perpetrated by a gang involved in the sale of drugs) that took place in Virginia in early 1992.

Based upon information gathered by CJ's current attorneys from the firm of Skadden, Arps, Slate, Meagher & Flom, his current attorneys began to question whether or not there was potential mental health evidence that wasn't adequately explored and therefore not reasonably considered for presentation at the time of his trial. Therefore, CJ's attorneys retained this psychiatrist to perform a psychiatric evaluation of CJ, focused on the question of whether or not CJ was suffering from any significant psychiatric and/or neuropsychiatric difficulties that could have been presented as mental health evidence at the time of his trial. The following is a report of that evaluation.

Sources of Information:

- Psychiatric examinations of CJ, performed by this psychiatrist on 5 & 6 November 2009 and 15 and 16 February 2011

1

J.A.392

- Psychiatric interview of CJ's maternal aunt, Minnie Johnson/Hodges, performed by this psychiatrist on 30 June 2010
- Psychiatric interview of CJ's mother's closest friend from childhood and CJ's godmother, Antionette Joseph, performed by this psychiatrist on 10 August 2010
- Psychiatric interview of CJ's half-brother, Robert Johnson, performed by this psychiatrist on 23 September 2010
- Information gathered from other interviews, records and documents, provided to this psychiatrist by CJ's current legal team (see attached list of sources)

Summary of Information:

As described in more detail below, during CJ's childhood and adolescent years, he experienced numerous, severe 'adverse childhood experiences', which are have been clearly shown to result in the development of both physical and mental health difficulties. In fact, he repeatedly experienced almost all of the adverse childhood experiences that have been identified and described in research studies, diagnostic manuals, and other clinical literature, including psychological and physical abuse; exposure in the home to other forms of domestic violence, substance abuse, mental illness and criminal activity; physical and emotional neglect; chaotic and unstable households; and ultimately, rejection and abandonment. In addition, CJ's family has a significant history of intellectual and developmental disabilities, and early on, it was clear that he also suffered from such disabilities.

The impact of the combination of CJ's extremely difficult childhood and his intellectual and developmental disabilities on his ability to function will also be described below. Most importantly, with regard to this matter, I will also describe how CJ's functional limitations resulted in his response to a drug gang that at least appeared to him to embrace him, thereby altering the course of his life.

With regard to the organization of this summary of information, I will start with information gathered directly from CJ, followed by information gathered from others who have known him and information contained in the various records and documents reviewed by this psychiatrist. In the context of capital litigation, the review of information from sources of information other than the defendant is critical to the performance of a competent and reliable psychiatric evaluation. Such other sources of information may help to confirm the credibility of the defendant's reports, or raise questions about the defendant's reports, or provide additional information that the defendant was unable or unwilling to provide. I have chosen to organize this summary as noted above because in so doing, it should become clear to reviewers of this report that CJ has an only very limited understanding of the magnitude of the problems he endured during his childhood and adolescent years, he was certainly not attempting to exaggerate his difficulties, and without the additional information provided by these other sources of information, an evaluator would be unable to obtain a full and accurate picture of CJ or the psychiatric difficulties he developed and his resultant functional limitations.

2

When CJ met with this psychiatrist, he reported that his earliest memory was that of living with his mother (Emma Johnson), the man he then believed to be his father (Robert Butler), and his younger brother (Robert Johnson). He noted that back then, it seemed to him that his mother was OK, and she seemed happy; it seemed to him that Robert Butler was a 'good guy' and he remembers riding around with him in the taxi cab that he drove; and his memory is that he and his brother Robert had the basic things that they needed.

CJ reported that then when he was about 7 or 8 years old, his mother and Robert Butler separated. Upon further exploration, he noted that he doesn't know why they separated and he never asked either of them why; but then he doesn't remember being surprised by the separation; and he noted it was just that one day Robert Butler wasn't in the house anymore, there was no warning given before that happened and no explanation given after the fact. CJ noted that after the separation he did see Robert Butler from time-to-time until he was about 10 years old, but he always assumed that Robert Butler was around if his mother needed him. Upon further exploration, he noted that if Robert Butler was there he was there; if he wasn't he wasn't; and although he was always happy when Robert Butler came around, he doesn't know how he felt when he didn't see him for long periods of time.

CJ reported that after the separation his mother moved him and his brother around a lot. At times, the 3 of them were in an apartment together; at times they, or at least he and his brother, were with their Aunt Minnie; he thinks they may have also spent time with other relatives; and then his mother moved them to New Jersey where they lived with his mother's boyfriend, Mitch. CJ described Mitch as 'OK'. He did note that he remembers that his mother and Mitch used to argue a lot; he could hear them in the next room; but since he couldn't see them he doesn't know whether their arguments ever became physical fights. Then after about a year in New Jersey, his mother and Mitch separated; he doesn't know why they separated and never asked; and after the separation, his mother moved them back to New York City.

CJ reported that when they returned to New York City they lived with his maternal uncle Amos and his family for a while; then they lived with his aunt Minnie and her kids for a while; and then they lived with his maternal grandfather, Love Johnson, and various other family members who were in his grandfather's home. CJ reported that then his mother became involved with and moved him and his brother in with Bobby Koger, who he described as a very smart and highly educated man. He reported that Bobby Koger was an IV-drug user; he remembers seeing the needles, the tracks in his arms and his swollen hands; and when he was high he would do 'all sorts of stupid things and then nod off'. Bobby Koger also used to argue with and beat his mother; he doesn't know what the arguments and fights were about; and Bobby Koger used to beat him and his brother as well. CJ reported that then at some point, he was sent back to his grandfather's home where he lived alone with his grandfather, while his brother remained with his mother and Robby Koger.

Upon further exploration, CJ noted that he never knew why his mother stayed with Bobby Koger despite the way he treated her; he presumes that his mother felt she was in love with him, but he never asked her why she stayed; and he noted that besides, there was nothing that he or his brother could do about his mother's decision to stay with him, and they were still too small to

3

J.A.394

protect her from him.  He noted that he also doesn't know why his mother didn't make more of an effort to protect him and his brother from Bobby Koger, and he noted that he never discussed that with his mother either and never talked about it with his brother.

CJ reported that he later learned that at some point in all of the above noted his mother started to use/abuse drugs; he doesn't know exactly when that started; and he noted that he doesn't remember a point where there was a change in her behavior that would have indicated that she had started using drugs.  However, upon further exploration, he acknowledged that by the time that his mother and Robert Butler separated, his mother didn't seem to be able to care for him and his brother on her own; he and his brother were constantly moved from place-to-place, and there were some long periods of time when they had little-to-no contact with their mother; and then he cried as he noted that he wishes that he had some positive memories of being with his mother, but he doesn't, and he guesses that she was just trying to get herself together.  He then noted that maybe she lived a much faster life than she was supposed to live; maybe she could have been more stable and taken better care of him and his brother like other mothers did; but he feels that any problems he has had were his own fault/due to his own stupidity, he still always loved his mother, and it hurts him that he wasn't there for her at the time of her death.

Upon further exploration, CJ noted that he was always afraid to question his mother about her relationships with the above noted men and the many other men she was involved with, their various moves, and/or the periods of time when they didn't see her.  He continued to cry as he explained that he was always afraid that her answer to such questions would be the wrong answer; so he just avoided such questions and tried to continue to believe that she loved him and wanted him; and he just accepted whatever situation he found himself in without questioning (i.e., 'if this is where my home is, OK'), even though some of the situations he found himself in should have made him seriously question whether or not his mother really cared about him.

When asked for an example of a situation that in retrospect should have made him question how his mother felt about him, CJ reported, for example, that when he was about 11 years old his mother kicked him out of the house for some stupid thing that he was doing, and as he was leaving, she even said 'and give me back my clothes'.  It was about 10:00 or 11:00 at night; he didn't know where to go and didn't know how to travel to anyone else's home; and so he just stayed around their building, and then after about a day he came back home.  CJ reported that after that incident he ran away several times and stayed out for 1 or 2 days; he still didn't know where to go and still didn't know how to travel; so he would always stay close to home and try to get food from his friends.  This continued until his mother sent him to live with his grandfather, which was when he was about 12 years old.

Other sources of information indicate that CJ's mother, Emma Johnson, met CJ's father, James Sykes, when she was about 15 years old; she eventually became pregnant by James Sykes, and CJ was born when she was 17 years old; and then James Sykes was incarcerated, Emma Johnson's family relocated, and so James Sykes had no meaningful contact with CJ until he was about 12 years old.  When CJ was still quite young, his mother became involved with Robert Butler; they had CJ's half-brother, Robert Johnson; and as noted above, during his childhood years, CJ believed that Robert Butler was his father as well.

4

Other sources of information also indicate that CJ's mother was always more focused on her social life than the care of her children; then, by the time that she and Robert Butler separated, she had developed what would become her life-long addiction to drugs; and at that point, the quality of her parenting of CJ and his brother Robert deteriorated even further. Various family members and friends, such as Minnie Johnson/Hodges and Antionette Joseph, acknowledged that CJ's mother repeatedly dropped CJ and his brother off at various different people's homes and then may or may not be seen or heard from for extended periods of time; they and others would try to take care of CJ and his brother because they were otherwise so worried about their welfare; and they noted that they knew that the domestic violence, drug abuse, parental neglect and other things that the children were exposed to when with their mother wasn't good for them. There was particular concern about the level of violence in the home while CJ's mother was living with Bobby Koger.

In addition, other sources of information indicate that CJ was always much slower than other children his age; with all of the moves he attended at least 10 different schools during his elementary school years, and so there was never any sustained educational program to help him with these difficulties; and various people who tried to help him with school work at various different points in time all reported that he had enormous difficulty learning. CJ was consistently described as a good kid; it was noted that he was often troubled by the problems his mother was having/the problems in his mother's home; and many described him as often nervous and/or reported that he was a bed wetter.

When CJ met with this psychiatrist, he noted that he doesn't even remember how many different elementary schools he attended. He noted however that he always had difficulty learning; he doesn't know why he had so much difficulty and no one ever told him why; but he does feel that he was trying to learn. He cried as he noted that he always wanted to fit in mentally; but no matter how hard he tried it always took him a long time to understand things, and there were many things that he never understood; and he was always embarrassed by the fact that there was so much that he didn't understand and couldn't seem to learn. He continued to cry as he noted that to this day, he is still trying to get his GED; he would like to do this before he is executed; but he doesn't know if he will ever be able to accomplish this.

CJ denied knowledge of any family history of serious physical health problems. When asked if he suffered from any serious physical health problems or injuries during his childhood years, CJ reported that at some point his mother told him that when he was born he was held in the hospital for a longer than normal period of time, but he doesn't know why; he had his appendix removed when he was a child; and he was hit by a car while riding his bike when he was living with Mitch in New Jersey, but he wasn't seriously hurt. When he was about 11 years old, his mother hit him in the head with a shoe, which opened up his head and so he required stiches; he noted that although she had pretty severely beaten him with a belt, etc. before that, she had never injured him so seriously before; and other sources of information confirm this event. He then described another incident where his mother had some type of episode where she ended up falling down on and breaking a glass coffee table; he cut his leg on the broken glass while trying to help her; and so they both ended up being taken to the hospital. Then when he was a teenager, he bumped his head on a concrete and/or steel beam in the train station; he remembers feeling very dizzy for a while; and he had to be stitched up after that incident as well.

5

CJ denied knowledge of any family history of serious mental health problems, including alcoholism or other substance abuse, other than that noted above. When asked if he had had any mental health difficulties besides the above noted problems learning, he reported being taken to a mental health center one time when he was a child, but he doesn't know why and he believes he only went once. Essentially, CJ minimized any emotional difficulties that he had as a child; he rather presented himself as just accepting his situation; and although he later stated that he doesn't know if he was particularly anxious or depressed during his childhood years, he was concerned about reports about his being a bed wetter because his memory is that he stopped wetting the bed when he was about 4 years old.

CJ reported that he believes that it was when he was about 12 years old and living with his grandfather that his biological father, James Sykes, found him and came to visit him. He noted that he was shocked to learn that this man, and not Robert Butler, was his father; neither his mother nor Robert Butler had ever given him any indication that Robert Butler wasn't his father; and he noted that the experience was very confusing. He noted that he then tried to build a father/son relationship with his father; but ultimately, he felt like an outsider in his father's life/with his father's new family, and so after a couple years of trying he let the relationship go; and he noted that since his father didn't make any effort after that to get back in touch with him, he guesses that his conclusion that having a relationship with him didn't really mean that much to his father was correct.

CJ reported that it was also when he was 12 years old that his mother placed him at Pleasantville Diagnostic Center; with that, he presumed that his mother just didn't want him anymore either; and she didn't visit him there, and he didn't write to or try to call her. He noted however that he did have this thought in his mind that if he could get it together maybe his mother would take him back; but he really didn't *know* if she wanted him back and he never asked her if she would take him back; and so when after he completed his time at the Diagnostic Center and was moved to "the cottages" (which was actually Children's Village, which is a residential treatment facility), he just tried to adjust to life in placement. He then noted that actually, he came to like the cottages and would have stayed there forever if he would have been allowed to stay there; in contrast to what he had always known, the counselors were like parents that you could talk to and the other guys there were like brothers; and his living situation was both comfortable and stable. He did do a couple home visits to his mother's while living at the cottages; but mostly he turned down the opportunity for home visits; and most of the home visits that he did do were during holidays, when most kids went home for visits/there was going to be no one left at the cottages.

CJ reported that then after about 3 years in the cottages (when he was about 15 years old), he was moved to a home for boys in Queens; during his 2 years there he attended Newton High School; and although during his time there he also had some opportunities to work, he failed to get into some of the better work and/or training programs because he couldn't figure out what he had to do to get into those programs. He noted that the counselors there were different and so he didn't feel as close to them; although there were a lot of programs there, he never understood how to get into the various programs; and so he ran away a lot because he wasn't comfortable there and thought that it might be better to be back home. CJ reported that then, when he was trying to

6

help some of the guys that were at the home with him, he got into trouble/was arrested and then kicked out of the home without being given an opportunity to give his side of the story; he would have apologized and/or done anything else he had to do to go back to the boys home, but they didn't ask him back; and he noted that that experience only made him feel all the more like he couldn't trust anyone to be there for him. He almost cried again as he noted that he couldn't believe that they never even tried to talk to him about what had happened; other guys at the home had been in trouble multiple times and were still allowed to stay there; but he was treated differently.

Other sources of information indicate that CJ's mother voluntarily placed CJ's brother Robert and then CJ; CJ's Aunt Minnie and others noted that if they had known that she had finally concluded that she couldn't take care of the boys, they would have taken them; but initially, they didn't know that the boys had been placed, then they thought that they were just away and enjoying the benefits of some special school, and it was only later that they realized that the boys had been placed.

When CJ was placed, his academic performance was significantly below grade level; his placement records indicate that although he clearly was willing to do anything to be liked, he lacked the social skills required to successfully do that in appropriate ways; and although in some ways he did well in the placement environment, there was little improvement in his academic functioning and he continued to be easily manipulated and led by the other children. Other sources of information confirm that CJ was always a follower, who was willing to do anything to be liked; he was always the clown, in an effort to ingratiate himself to others; and he would take very dangerous risks when dared. Family members and friends provided specific examples of how the combination of his need to be liked and his poor judgment often resulted in his taking risk that could have cost him his life.

CJ's placement records also indicate that his mother wasn't involved with him during the time that he was in placement; reportedly, this was painful for CJ; and he ended up being sent to Elmhurst Boys' Home (the 'home for boys' that CJ talked about) after his time at Children's Village because his mother didn't want him back home and Children's Village didn't feel that being with his mother was the best plan for CJ. With regard to his departure from Elmhurst Boys' Home, it is the understanding of this psychiatrist that they wanted CJ to return to the home if he was willing to comply with the rules, and so this was quite likely yet another example of how difficult it was for CJ to comprehend what exactly was going on around him.

CJ reported that when he returned to his mother's after being kicked out of the home for boys, things were not the same; the couple home visits that he had made were so brief that he hadn't really realized that things had changed so much; and he noted that things had changed so much that it wasn't home anymore. He cried as he reported that it was clear that his mother was on hard drugs and was totally unable to function; his brother was different too, in that his brother had become a drug dealer and was all out in the streets; and he noted that things were so bad at home that he should have begged to be let back into the home for boys. When asked if he had ever tried drugs, CJ reported that he had tried marijuana when he was about 13 or 14 years old, but he didn't like it and therefore only used it that one time. He reported that it wasn't until he was about 20 years old that he tried it again; he was different by then, he liked that marijuana put

7

J.A.398

him in his own world where he really didn't care about anything/wasn't really upset about things anymore; and although maybe he didn't fully understand what getting high was all about, he continued to use it. He then also tried alcohol and cocaine; but he didn't like the taste of alcohol and he was afraid of getting involved with cocaine; and so he just stayed with marijuana.

CJ reported that then, after being back home for about 6 months/in about August 1987, he was locked up. He reported that he had been arrested, but then those charges against him were dropped; but while detained, he agreed to just be one of the guys in a line-up, he was falsely identified and so therefore he got another charge; and then when he was late for court for that second charge he was remanded to jail. He described jail as a horrible experience, but he wouldn't provide any details about what happened to him during that incarceration that made the experience so horrible. CJ reported that then after his release from jail, he tried living with Robert Butler who had moved his family to North Carolina by then; but by then, his relationship with Robert Butler wasn't the same; and then he had a party where there were problems that really upset Robert Butler and his wife (some things were taken from their home), and so he had to leave there and return to New York City.

CJ reported that then for a while he lived here and there in New York City; and then he was offered the opportunity to try living in Trenton, New Jersey with a friend who had gone there; and he noted that at the time, he really didn't know where else to go because both his mother and brother were in jail, and he was just out there on his own. Although he discovered that his friend and the guys who his friend had become involved with in New Jersey were selling cocaine, he didn't really know about cocaine yet, he really didn't know what he was doing by getting involved with this group, and so he was pretty lost. When asked why he didn't seek the help of some of his family members who had tried to be there for him before, CJ noted that he kind of lost touch with everyone while he was in placement; he doesn't know why he didn't try to call them from placement/keep in touch with them; but by the time that he found himself with no place to go and moved to Trenton, it was like those family members and family friends were really no longer in his life. CJ then noted that there had just been so many problems in his life; he had always felt all alone and so he never really talked to anyone about those problems; and by then, all he could do was just focus on what was in front of him at any given moment. He then noted that maybe he was just looking for a short cut way to make it on his own; no one pushed him into moving to Trenton; and even though he really didn't know what he was doing when he got there, he just stayed there. He noted that he really didn't know how to plan for himself or develop a routine for himself or establish any rules for running his life; he noted that he was just never taught how to do any of that; and he noted that although he made some attempts to live a normal, working life, he just didn't know how to do that.

Upon further exploration, CJ noted that actually, he was always too ashamed to ask for help with anything; he noted that that goes back to elementary school when he was having so much difficulty learning; but then at the same time, he was always upset about his sense that no one was really trying to help him. He noted that no matter what the situation was, even when his mother left them alone or kept moving them around, he always felt he just had to adapt; he never said no to anyone or anything; even if he would have been asked he wouldn't have said no, probably because he wanted people to be happy with him; and he noted that actually, he always felt that he didn't have a choice anyway.

8

J.A.399

CJ reported that he was in Trenton from about 1989 to 1991; he met girls there, two of them got pregnant from him; and although his son died while still an infant, his daughter survived. He noted that he was surprised that girls would have any interest in him, and so he was like a kid in a candy store; he explained that he really hadn't had much in the way of experience with girls, he wasn't very good looking and he wasn't that smart; and he noted that the pregnancies were unplanned, he noted that he wasn't really thinking about the risk of pregnancy. He noted however that making a relationship with any of those girls was difficult; he really didn't know anything about love or relationships; and so ultimately he failed there and was often hurt. He then noted that he really didn't expect anything from relationships; he long ago had figured out that he was really out there on his own; and he noted that maybe if he really did or could have felt that he was really in a relationship with any one of those girls/women that he would have tried to stop being out in the street and settle down with her.

Other sources of information confirm CJ's report of returning home to find his mother addicted to drugs and his brother out in the street dealing drugs. CJ's brother reported that although he knew that CJ wasn't smart enough or street-wise enough to deal drugs, he gave CJ an opportunity to work with him; but CJ proved that he really couldn't manage this, and he had to replace the money that CJ had lost; and so after that one chance, he didn't let CJ work with him again. CJ's brother also reported that he knew some of the guys that CJ was going to live with in Trenton; he assumed or at least hoped that those guys would watch out for/take care of CJ, because he knew that CJ couldn't take care of himself out on the streets; and upon further exploration, he noted that by then, he wasn't in close enough contact with CJ to try to stop him from going to Trenton. Other sources of information indicate that CJ was never able to assume any real responsibility for taking care of himself; he always lived with this person or that person; and the guys who he was with in Trenton always viewed him as a follower, and never even considered giving him any real responsibility in their drug-dealing business. Then after the leaders of the group in Trenton were arrested, CJ followed a guy who he had meet in New Jersey to Virginia, and he continued to live the same type of life there.

CJ reported that he didn't really know the group of guys he became involved with in Virginia; the guy he traveled to Virginia with seemed to know them and thought they were OK; and since he felt that he could trust that guy, he believed what the guy was telling him about the possibilities in Virginia. He wasn't in Virginia very long before he was arrested in connection with this matter, and he noted that he didn't see these problems coming. Even once in trouble, he never really understood that he was at such serious risk of getting the death penalty until it happened.

CJ noted that it really upset him that his mother wasn't even there for him during his trial in this matter. (It is the understanding of this psychiatrist that CJ's trial attorneys did bring his mother in for the trial but she didn't attend the trial or visit with CJ.) He noted that he did love her; he noted that maybe he was just a 'mamma's boy'; but despite the fact that she didn't do more for him and his brother when they were growing up, it really hurt him that she didn't even make it to his trial. CJ noted that he hears guys talk about how when they became teenagers their mothers became their friends; but by the time he was a teenager his mother wasn't even available to him; and so as a teenager, all he could feel was more hurt. Now at times he feels angry at her; she

9

didn't provide him with any foundation; and then things moved to the point where she really wasn't there for him at all. He noted that he always just wanted to be with her and be happy with her; he was happy when with her and missed her when she wasn't there; but then, he must have always known there was a problem because he never, ever asked her why she kept leaving him/wasn't always there for him.

A mental status examination of CJ revealed that he was a then 42 year old (DOB 5 November 1968) African-American male of about average height and weight, who appeared to be somewhat younger than his stated age. He was dressed in a prison uniform and appeared to be physically healthy. His speech was clear, coherent and goal-directed; although his thinking was quite concrete, he appeared to make every effort to respond to questions asked; and he appeared to be very open and cooperative with the examination process.

- He was oriented to person, place and time
- His memory for short and long-term events appeared to be good, despite difficulties remembering how many places he had lived and how many schools he attended during his childhood years (i.e., this problem more likely related to the number of moves and the number of schools attended)
- His mood was severely depressed
- His affect was consistent with his depressed mood, and as noted above, he cried frequently during the course of the examinations
- There was no evidence of a thought process disorder
- His thinking was very concrete, and his intellectual capacity appeared to be well below average, and so clinically he presented as intellectually disabeled
- His insight was poor
- His judgment was poor

Summary & Discussion:

The information currently available to this psychiatrist indicates that CJ had an extremely difficult childhood and adolescence.

More specifically, CJ's mother (Emma Johnson) was never focused on the care and nurture of him and his younger half-brother Robert; then quite early in his life she also become addicted to drugs; and as a result, his mother never provided him with the care, nurture and stability required for healthy child development. Furthermore, given this and the fact that his mother was periodically totally absent from his life for extended periods of time, CJ was left with the question of whether or not his mother was there for him at all.

In addition, CJ's mother was involved with multiple different men during the course of his childhood years; some of these men psychologically and/or physically abused her; and at least one of these men also abused CJ and his half-brother. As a result, CJ was exposed to domestic

10

J.A.401

violence against his mother; he was also the victim of child abuse; and during all of this, there was no one who consistently protected him against or provided a safe respite from this violence and victimization, which is known to make such exposure to violence and victimization all the more damaging.

Furthermore, when CJ was about 7 or 8 years old, the man he believed to be his father (Robert Butler) left the home; then when he was about 12 years old, he discovered that that man really wasn't his father and another man (James Sykes) was his father; and then his efforts to establish a relationship with his 'real father' failed. Then also when he was about 12 years old his mother voluntarily placed him; she then failed to work with staff at the placement facility or even maintain contact with CJ while he was in placement; and then when staff attempted to return him to his mother, she refused to take him back, and so he was sent to yet another facility. As a result of all of this, CJ ultimately felt abandoned by both of his parents, and he lost contact with other family members and family friends who might have at least tried to be of assistance and support to him.

Based on the information currently available to this psychiatrist, CJ has also suffered from intellectual and possibly other cognitive difficulties that were more extensively explored by and will therefore be described in more detail by other experts retained in connection with this matter. However, it is important to note here that these intellectual difficulties made it much more difficult for CJ to understand and cope with the above described problems he endured during his childhood and adolescent years, *and* his awareness of his intellectual limitations impacted heavily on his feelings about himself.

Based on the information currently available to this psychiatrist, it is the opinion of this psychiatrist to within a reasonable degree of medical certainty that CJ suffers from multiple major psychiatric and neuropsychiatric difficulties.

First of all, as a direct result of the above described repeated exposure to violence during his childhood years, in the absence of the type of parental protection, nurture and support that might have helped mitigate the impact of such repeated exposure to violence, CJ began to exhibit clinically significant anxiety and depression. In the absence of treatment, he has continued to exhibit symptoms of anxiety and depression throughout the course of his life, such as a persistent dysphoric mood, being easily moved to ears, hopelessness, and a sense of worthlessness.

The extremely difficult childhood that CJ endured also directly resulted in other underlying developmental difficulties. More specifically, CJ exhibits a pattern of instability across multiple important areas of functioning, including with regard to interpersonal relationships, self-image, affects, and decision-making. His relational difficulties are evidenced by how his abandonment issues and resultant trust issues have resulted in unstable interpersonal relationships, in which he swings dramatically from a willingness to do anything to be accepted to quickly pulling out of a relationship out of a fear of being rejected again. Similarly, there have been times when his self-image has been enhanced by being with people who he believed liked and accepted him, only to be deflated to the point of feeling totally worthless when he realized that those people didn't really care about him. Severe mood reactivity to such changes going on around him are the

11

**J.A.402**

cause of the mood instability or the difficulties he has in regulating his mood, and the difficulties with decision-making are the result of an associated impulsivity.

By the time that CJ was becoming a young adult, he discovered that smoking marijuana 'put him in his own world where he really didn't care about anything/wasn't really upset about things anymore'. In other words, at least initially, he was using marijuana as self-medication for his above described psychiatric difficulties. However, as a result of the combination of his *need* to self-medicate away these difficulties and his family history of substance abuse that rendered him genetically and environmentally vulnerable to becoming substance addicted, he became a heavy smoker of marijuana, despite the negative impact that it was having on his life/his ability to function.

As noted above, other more specialized experts have explored CJ's intellectual and possibly also other cognitive difficulties and will present their findings separately. However, as noted above, clinically, CJ clearly evidences intellectual disabilities; these intellectual disabilities made it much more difficult for him to understand and cope with the problems that he endured during his childhood and adolescent years and the above noted psychiatric difficulties that resulted from those problems he endured; and, as also noted above, his awareness of his intellectual limitations further impacted on his feelings about himself and his relationships with others.

It is important to  note that although each of the above described psychiatric and neuropsychiatric difficulties have had their own direct impact on CJ's ability to function, they all exist in combination with each other, and they each exacerbate the effects of each other on CJ's ability to function within the environmental context in which CJ found himself. As a result, upon his release from placement, and in the absence of any family or  institutional support, CJ found himself alone and unable to take care of himself physically or emotionally; therefore, he accepted the help of a Trenton drug gang, thinking that they cared about him and unable to fully understand and assess what he was getting himself into; and so he was desperate to do whatever they wanted him to do in order to continue to be engaged with them. When the Trenton drug gang fell apart, he followed the only person that he thought would help him to Virginia; again, he was unable to fully understand and assess what he was getting himself into; and again, he was desperate to do whatever that guy wanted him to do in order to continue to be engaged with him.

CJ's above described major psychiatric and neuropsychiatric difficulties most certainly could have been identified and offered for consideration at the time of his trial. Based on the information currently available to this psychiatrist, it is the opinion of this psychiatrist that the difficulties he endured during his childhood and adolescent years could have been offered for consideration as mitigating mental health evidence in and of itself. However in addition, based on the information currently available to this psychiatrist, it is the opinion of this psychiatrist that it is the combination of psychiatric difficulties that CJ has been suffering from that resulted in his being in a position to be at all involved in this matter. More specifically, it is the opinion of this psychiatrist that as a result of the combination of CJ's above described major psychiatric difficulties, he is unable to develop a plan for taking care of himself; he is overly dependent on others; and he lacks the insight and judgment required to make a sound, adult decision about who he should depend on. Then when he makes a poor decision about who he should depend on, he is unable to quickly recognize that he has made a serious mistake in judgment; he is unable to

12

J.A.403

anticipate problems that others would be able to anticipate; and then when faced with problems, he is unable to quickly identify and/or assess options for extricating himself from a problematic situation.

Richard G. Dudley, Jr., M.D.
Psychiatrist
Diplomate, American Board of Psychiatry & Neurology

13

**List of Corey Johnson Case Materials**
**Received by Richard G. Dudley, Jr., M.D.**

**Affidavits, Declarations, and Interview Information**

- Affidavit of Ernest H. Adams, J.D, PhD, July 27, 2011
- Summary of June 26, 2009 phone interview with Clare Barabash, former psychologist with the New York City school system
- Summary of 6/18/2009 telephone interview of Reginald M. Barley, Esq. (co-counsel and appellate lawyer for Vernon Lance Thomas
- Declaration of Kenneth Barish, PhD., July 27, 2014
- Affidavit of Richard Benedict (with exhibits), December 5, 2011
- Affidavit of Ammon Boone, August 10, 2011
- Summary of June 18, 2009 interview report of Cary Bowen, Esq. (a lawyer for co-defendant Vernon Lance Thomas)
- Affidavit of Darnell Brown, October 14, 2011
- Affidavit of Darold Brown, June 15, 2011
- Summary of September 10, 2009 telephone interview of David Bruck, Esq. (who had advised Cary Bowen, co-counsel for Vernon Lance Thomas)
- Summary of January 22, 2009 telephone interview with Abraham Brunson, Corey's second cousin
- Interview report from meeting with Amos Brunson, Maternal Uncle of Corey Johnson, August 7, 2009
- Declaration of Ann Corey Butler, December 17, 2011
- Declaration of Robert Lee Butler, Sr. Dec. 17, 2011
- Memorandum following an April 3, 2009 phone interview with Dr. Sundar Collimutum, Medical Director at the Mount Pleasant Cottage School
- Affidavit of Courtney Daniels, May 21, 2011
- Declaration of Monica Dawkins, July 16, 2012
- Summary of phone interview with Jennifer Figuerelli, PhD, June 2, 2009
- Declaration of Cary Gallaudet, March 19. 2012 (with exhibits)
- Interview notes from phone interview with Dr. Murray Gordon, Consulting psychiatrist at Elmhurst, March 31, 2009
- Interview notes of telephonic meeting with Dr. Leigh Hagan, PhD, Forensic Psychologist in Richmond, VA area, not involved in this case, July 27, 2009
- Declaration of Ann Harding, November 21, 2011
- Interview notes from telephone interview with Aeisyha Harris, May 11, 2009
- Affidavit of Sonya Hilton, June 15, 2011
- Affidavit of Minnie Hodges, April 30, 2011
- Declaration of Minnie Hodges, April 30, 2011 describing and attaching a letter dated March 4, 2010 with envelope postmarked on March 9, 2010)
- Affidavit of Priscilla Hodges, April 30, 2011
- Affidavit of Queenie Hodges, April 30, 2011

**J.A.405**

- Interview notes from meeting with Minnie Hodges (Corey's aunt), her daughters Priscilla and Queenie Hodges, and her son, Timothy Hopewell, August 2, 2008
- Declaration of Esther Johnson, April 30, 2011
- Affidavit of Robert Johnson, June 29, 2011
- Interview notes from meeting with Sarah Johnson, paternal grandmother of Corey Johnson (mother of James Sykes), August 8, 2009
- Interview notes from meeting with Sarah Johnson, Corey's paternal grandmother (mother of James Sykes), October 9, 2008
- Interview notes from in-person meeting with Shirley Johnson (mothers of several witnesses) June 29, 2009
- Affidavit of Antoinette Daniels Joseph, May 21, 2011
- Summary of July 8, 2009 phone interview with Greg Judge (New Jersey public school social worker)
- Affidavit of King Salim Abdullah Khalfani, March 18, 2011
- Declaration of Leona Klerber, June 3, 2011 (with exhibits)
- Affidavit of Kevin Koger, May 26, 2011
- Summary of August 6, 2009 phone interview with Lisa Koger
- Affidavit of Gerald Lefkowitz, December 5, 2011
- Affidavit of Julie McConnell, March 23, 2011
- Interview notes June 8, 2009 meeting with John F. McGarvey, Esq. (co-counsel for Corey Johnson)
- Declaration of Ann Noble, November 21, 2011
- Affidavit of Odette Noble, December 1, 2011
- Interview notes from February 16, 2009 meeting with Karen Price, who had conducted a May 1979 Speech, Language, and Education Evaluation of Corey.
- Interview notes from November 21, 2008 meeting with John Rios, Resident Supervisor at Elmhurst Boys Residence
- Affidavit of George Sakheim, PhD, June 17, 2011 (with exhibits)
- Affidavit of Holly Scott, June 23, 2011
- Declaration of Mary Sitgraves, PhD, July 5, 2012 (with exhibits)
- Interview notes from telephone interview with John Stadler, Clinical Director at Pleasantville, February 20, 2009
- Affidavit of Elizabeth Sykes, October 15, 2011
- Affidavit of James Sykes, May 17, 2011
- Summary of June 26, 2009 interview with Vernon Lance Thomas, co-defendant
- Interview notes from telephone interview with Janet Valentine, childcare worker at Pleasantville Diagnostic Center, March 19, 2009
- Interview notes from June 5, 2009 meeting with Robert Wagner, Esq. (attorney for co-defendant Sandra Reavis)
- Affidavit of David Washington, March 1, 2012
- Declaration of Bobby H. West, March 24, 2011 (with exhibits)
- Declaration of Sarah Jane Woodson West, March 24, 2011
- Affidavit of Darryl Williams, June 15, 2011

**J.A.406**

- Interview notes from January 22, 2009 meeting with friends of Corey Johnson (Pernell Williams and Darnell Brown)
- Family Tree of Corey Johnson's family members
- List of Corey Johnson's Family Members
- Overview of the Chronology of Events in Corey Johnson's Life
- Summary Chart re: Adaptive Behavior
- Summary Chart re: Testing Information

### Materials Related to Corey Johnson's GED Study

- Math Lesson Material
- Math Hand Written Notes and Other Math Material
- Reading, Writing, Social Studies, and Science Lesson Material
- Adult Basic Learning Examination, Level 2

### Prison Records

- Corey Johnson Prison Records from the Federal Bureau of Prisons (released in response to FOIA Request No. 2009-05492)
- Corey Johnson Prison Records from the Federal Bureau of Prisons (released in response to FOIA Request No. 2001-03136)
- Corey Johnson Prison Records from the Virginia Department of Corrections

### School Testing and Assessments of Corey Johnson Prior to Pleasantville Placement

- Special Education Reports from NYC Department of Education-Includes New Jersey IQ Test by Dr. Figurelli (Full Scale IQ of 73)
- Evaluation by Cheryl Spillane-dated 3/18/77
- Speech, Language & Education Evaluation by Examiner Karen Price-Dated 5/79
- Psychological Report by West Manhattan Center Evaluation Unit-Dated 5/3/79
- Social History Notes by Natalie Smith, PhD of the Evaluation Unit of the West Manhattan Center-5/3/79 (Full Scale IQ of 91)
- Board of Education of the City of New York Individualized Education Program-Dated 5/8/79
- Board of Education of the City of New York Division of Special Education and Pupil Personnel Services Committee on the Handicapped Request for Placement-Dated 5/21/79
- Notice of Recommendation of the Committee on the Handicapped-dated 8/17/79
- Bureau of Disability Determinations notice on Application for Disability-dated 10/1/79
- The Council's Center for Problems of Living Psycho-Diagnostic Evaluation by Ernest Adams, M.S.-dated 12/11/81 Re: Test Administered Oct. '81 (full scale IQ of 78)

### Records from Pleasantville and Transfer to Elmhurst

- Pleasantville Intake Information, including background information and reports containing details on medical and family situation, dated 2/5/82 and 2/8/82

3

**J.A.407**

- Pleasantville Diagnostic Center Psychiatric Evaluation by Sundar Cullimuttum (Psychologist)-dated 2/8/82
- Mount Pleasant Cottage School Screening Upon Admission, including test results, commentary, and recommendations (tested by Leona Klearer and prepared 2/22/82)
- Pleasantville Diagnostic Center Psychosocial Summary by Amira Offer (Case Worker)-dated 3/9/82
- Petition in the Matter of the Review of Foster Care Status (JCCA/Pleasantville Cottage School, not signed)-Period of Foster Care between 4/26/82-10/85
- Initial Conference, Current Assessment and Transfer Summary by Gloria Caro (Case Worker)-dated 6/9/82
- Mount Pleasant Cottage School Speech Report, tested by Adele Janow-dated 11/17/82
- Pleasantville Cottage School Current Assessment (8th Grade) by Gayle Turnquest-dated 1/31/83
- Pleasantville Cottage School Psychological and Educational Evaluation by Kenneth Barish-dated March 15, 1983
- Pleasantville Cottage School Current Assessment (9th Grade) by Gale Turnquest-dated 12/15/83
- Jewish Child Care Inter Departmental Correspondence from Louise Sciaruto to Mr. D. Schwartz re: Corey Johnson (Speech/Language Evaluation)-dated 1/9/84
- Metropolitan Achievement Test Results, including literacy and math testing areas dated 5/1/84
- Comprehensive Service Plan by Lynn Polstein-dated 5/14/84
- Goal and Objective Review Completed by Lynn Polstein-dated 5/14/84
- Pleasantville Cottage School Psychiatric Summary by Elizabeth B. Clemmens, M.D.-dated 6/29/1984
- Pleasantville Cottage School Current Assessment by Gerard Maier-dated 8/31/84
- Treatment Team Meeting Notes-dated 03/85
- Pleasantville Cottage School Current Assessment (10th grade) written by Christine Aaron-dated 3/10/85
- Social history by Christine Aaron-dated 3/19/85
- Comprehensive Service Plan Family by Gerard Maier-dated 5/28/85
- Discharge/Transfer Plan by Gerard Maier-dated 5/28/85
- Goal and Objective Review, Family by Gerard Maier-dated 5/28/85
- Reassessment Summary by Gerard Maier-dated 5/28/85
- Request for Authorization and approval for Care and Services by Gerard Maier-dated 5/28/85
- Pleasantville Cottage School Transfer Summary by Christine Aaron-dated 5/29/85
- Notice of Evaluation and Recommendation of Program Placement-dated 7/5/85
- Final Notice of Recommendation (Change of Program/Service)-dated 8/18/85

**Elmhurst Records**

- UCR Reassessment and Service Plan Review 6 Month by Odette Noble-dated 11/21/85
- UCR Reassessment and service plan Review 6 Month by Odette Noble-Dated 6/28/86
- Caseworker Notes-dated 8/11/86 through 8/25/86
- Request for Authorization and Approval for Care and Services-dated 11/28/86

4

**J.A.408**

- UCR Reassessment and Service Plan Review 6 Month by Odette Noble-Dated 12/21/86
- Request for Authorization and Approval for Care and Services dated 2/6/87
- Request for Authorization and Approval for Care and Services dated 2/20/87
- UCR Plan Amendment: Form D Trial Discharge by Odette Noble-dated 2/23/87
- UCR Plan Amendment: Form E Trial Discharge by Odette Noble-dated 3/26/87
- Request for Authorization and Approval for Care and Services dated 3/26/87

**Newtown High School Records**

- Report to Parents from Newtown H.S. (2nd Report)-dated 12/12/85
- Report to Parents from Newtown H.S. (3rd Report)-dated 1/31/86
- Individualized Education Program Phase I-IEP Update-dated 4/24/86
- Report to Parents from Newtown H.S. (2nd Report)-dated 5/12/86
- Individualized Education Program Phase II-dated 06/86
- Notice of Absence (Newtown H.S.)-dated during the year 1986
- Report to Parents from Newtown H.S. (1st Report) dated 10/25/86
- Report Card from Newtown H.S. Grade 12-dated 10/29/86

**Materials Regarding Dr. Cornell's Evaluation and Testimony**

- Notes: Sources of Information
- Summary of Notes from Corey Johnson Interview: Dated 10/2/92
- Items to be Covered in Corey Johnson Interview and List of Victims
- Corey Johnson Interview Notes-dated 1/8/93
- Questions for Third Interview with Corey Johnson (referring to Cornell's 1/8/93 videotaped interview)
- Disc of Videotaped Interview with Corey Johnson, January 8, 1993 at the Richmond City Jail
- Interview with Emma Johnson: Corey Johnson's Mother-dated 11/6/92
- Notes on phone interviews between 11/22/92 and 1/29/93 with Various Social Workers, Therapists, and Psychologists who knew Corey Johnson
- Letter from Julie Goodwin to Dewey G. Cornell re: Addresses and Phone Numbers of Various People, dated 1/15/93
- List of addresses referenced by Dewey Cornell
- Dewey Cornell Test Results-dated 1992-1993
- Email from Dewey Cornell to Craig Cooley sent at Barbara Hartung's request, with corrected spelling-dated 12/3/05
- Evaluation by Dr. Edward  Peck-dated 1/6/93
- Neuropsychological Evaluation by Edward Peck (1993)
- Mitigation Report by Dewey Cornell-dated 2/1/93
- Partial trial transcript, regarding statements by Dr. Dewey Cornell (including Transcript Volume XX dated 2/10/93

5

**J.A.409**

**Post-Trial Decisions by Trial Judge**

- Decision, and Findings dated 2/16/93 re Juror's Certificate
- Memorandum Opinion from the Unites States District Court for the Eastern District of Virginia in Unites States of America v. Richard Tipton a/k/a "Whitey", Corey Johnson a/k/a "O", and James Roane a/k/a "J.R."

**Materials Related to Post-Trial Evaluations or Analysis of Corey Johnson Case**

- Richard Garnett Affidavit-Dated 1/23/06
- Letter from Jack Fletcher PhD to Richard Burr re: US V. Corey Johnson-Dated 5/30/07
- Lisa Greenman Notes re: Teleconference with Ken Barish-Dated 7/26/07
- Letter from Gary Siperstein, PhD to Lisa Greenman Esq. re: Review of Documents pertaining to Corey Johnson-Dated 1/11/08
- Letter from Kenneth Barish, PhD to Lisa Greenman Esq. re: Review of Psychological and Educational Evaluations-dated 2/7/08
- Email from Richard Bonnie to Richard Burr re: A Request from Dick Burr, 6/4/08

6

**J.A.410**

# EXHIBIT 6

J.A.411

```
             IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF VIRGINIA
                     RICHMOND DIVISION


-----------------------------------------

UNITED STATES OF AMERICA,



                        Plaintiff;

   v.                                   CRIMINAL ACTION
                                           92CR68
RICHARD TIPTON, CORY JOHNSON,
JAMES H. ROANE, JR., AND
SANDRA REAVIS,
                        Defendants.

-----------------------------------------
                     VOLUME XVII

                   February 3, 1993
                   Richmond, Virginia
                      9:30 a.m.

BEFORE:        HONORABLE JAMES R. SPENCER
               United States District Judge


APPEARANCES:   HOWARD C. VICK, JR., ESQ.
               WILLIAM H. PARCELL, III, ESQ.
               Office of the United States Attorney;
                   Counsel for Government;

               ROBERT P. GEARY, ESQ.
               ERIC D. WHITE, ESQ.
                   Counsel for Defendant Tipton;
               CRAIG S. COOLEY, ESQ.
               JOHN F. McGARVEY, ESQ.
                   Counsel for Defendant Johnson;
               DAVID P. BAUGH, ESQ.
               ARNOLD R. HENDERSON, V, ESQ.
                   Counsel for Defendant Roane;
               ROBERT J. WAGNER, ESQ.
                   Counsel for Defendant Reavis.
                 JEFFREY B. KULL
               OFFICIAL COURT REPORTER
```

THE CLERK:  Criminal Number 3:92CR68: United States of America versus Richard Tipton, Cory Johnson, James H. Roane, Jr., and Sandra Reavis.  The

J.A.412

seventeenth day of trial.  Are counsel ready to proceed?

MR. VICK:  Government is ready.

MR. WHITE:  Defendant Tipton is ready.

MR. COOLEY:  Defendant Johnson is ready.

MR. HENDERSON:  Defendant Roane is ready.

MR. WAGNER:  Defendant Reavis is ready.

THE COURT:  All right.  Let's bring in the jury.

(The jury entered the courtroom.)

All right, good morning to you.  We are going to allow you now to continue your deliberations.  All right.  Everyone remain seated while the jury leaves the courtroom.)

(The jury left the courtroom.)

All right, remove the defendants.

(The defendants were removed from the courtroom.)

All right.  We will recess to await the jury's call.

(Recess taken from 9:35 a.m. to 11:20 a.m.)

THE COURT:  All right, I got a note from

3248

the jury which reads as follows:  "Instruction 43, 44, and 45, please explain further, more clarification."  Those are, 43, the aiding and abetting; 44, on or about, knowingly, and willfully; and 45, caution, punishment not relevant, multiple defendants, multiple counts.

Now, I have passed out to you a supplemental I'm giving on aiding and abetting which I think will help.  The one about knowingly and willfully, I will give an example highlighting what knowingly and willfully are.  That's the best I can do on that.  It seems to me self-explanatory.  I don't know what the problem is with it.  But perhaps the example will help.  I'll explain to them the general purpose of the multiple defendants, multiple counts instruction.  The middle paragraph, which might be the problem, which reads "I caution you members of the jury that you are here to determine the guilt or innocence of the accused from the evidence in this case.  The defendant is not on trial for any act or conduct or offense not alleged in the indictment."  Now, this sentence:  "Neither are you called upon to return a verdict as to the guilt or innocence of any other person or persons not on trial as a defendant in this case."

3249

Taking the group of instructions that they wanted clarification on, they might be hung up on that particular language.  I don't know.  If a person is charged with aiding and abetting someone else in the commission of an offense, you would necessarily

have to look at the actions of another person in making that determination.  And it is likewise with conspiracy.  In order to have a conspiracy, you have to have agreement between at least two people, so they are necessarily looking at somebody else's action.  And that sentence to some extent might negate that understanding.  Does everybody see what I am saying?

MR. BAUGH:  Your Honor, I understand.  But on behalf of defendant Roane, I don't even mean to attempt to usurp your prerogative, but I would ask perhaps our first response to them would be a note back to them asking them what paragraphs in 44 and 45 are giving them problems.  We could zero in on it.

THE COURT:  No, I think I'll do this and ask them then if that solves their problem.  If it doesn't, they will let us know.

All right, bring in the jury.

(The jury entered the courtroom.)

All right, I received a note from the jury asking for clarification to Instructions 43, 44, and 45.  I'm going to give you some additional instruction on aiding and abetting in an effort to clarify.  And if you would listen to me, it is as follows:  A person may violate the law even though he or she does not personally do each and every act constituting the offense if that person aided and abetted the commission of the offense.  Section 2(a) of Title 18 of the United States Code provides whoever commits an offense against the United States, or aids, abets, counsels, commands, induces, or procures its commission, is punishable as a principal.  Before a defendant may be held responsible for aiding and abetting others in the commission of a crime, it is necessary that the government prove beyond a reasonable doubt that the defendant knowingly and deliberately associated himself or herself in some way with the crime charged, and participated in it with the intent to commit the crime.

In order to be found guilty of aiding and abetting the commission of the crime charged in the indictment, the government must prove beyond a reasonable doubt that the defendant knew that the crime charged was to be committed or was being committed; that the defendant knowingly did some act for the purpose of aiding, commanding, or encouraging the commission of that crime, and that the defendant acted with the intention of causing the crime charged to be committed.

Before a defendant may be found guilty as an aider or abettor to a crime, the government must also

prove beyond a reasonable doubt that someone committed each of the essential elements of the offense charged as detailed to you in the instructions.  Merely being present at the scene of the crime or merely knowing that a crime is being committed, or is about to be committed, is not sufficient for the jury to find that the defendant aided and abetted the commission of that crime.

The government must prove that the defendant knowingly and deliberately associated himself or herself with the crime in some way as a participant.  Someone who wanted the crime to be committed, not as a spectator.  One who aids, abets, counsels, commands, induces, or procures the commission of an act is as responsible for that act is if he committed it directly.  There may be some confusion as to the difference between conspiracy and aiding and abetting.

Conspiracy is, as I have instructed, an agreement to commit offenses of the character described in the substantive counts.  Aiding and abetting has a broader application.  It makes a defendant a principal when he consciously shares in any criminal act, whether or not there is a conspiracy.  And if a conspiracy is also charged, it makes no difference so far as aiding and abetting is concerned whether the substantive offense is done pursuant to the conspiracy.  Aiding and abetting rests on a broader base.  It states a rule of criminal responsibility for acts which one assists another in performing.

Now, you all have asked about Instruction Number 44, which talks about on or about, knowingly, and willfully.  The on or about, I think, should be crystal clear.  That simply means that the date charged in the indictment, the government need not prove the specific date.  They can prove that it happened on a date on or about or near the date actually charged.

Now, with these words knowingly and willfully: Again, they are both explained in the instruction.  But let me give you an example to try to help you understand knowingly and willfully.

Now, if I was out and about driving my car and pulled up to a friend's house and three guys got in my car and they were friends of mine, I knew them, and I was driving the car, and they asked me for a ride over to the bank, if I took them over to the bank not knowing what if anything they were going to do when they got there, and they subsequently robbed the bank, the act of driving the three people to the bank was done knowingly.  It was voluntary.  It was

**J.A.415**

intentional.  It was not a mistake.  I did it.  I meant to do it.  But not knowing what was going to happen at the bank, that would not be a criminal act.

Now, if I knew that they were going to rob the bank, and if I took them to the bank for the purpose of robbing the bank, this would be a willful act done not only knowingly, voluntarily, and intentionally, but with a specific intent to do something the law forbids.  And that would be a criminal act.  "Knowingly" as described in this instruction means just that, something that is done voluntarily and intentionally, not by mistake or accident.  "Willful," on the other hand, is something else again.  It requires that it not only be done voluntarily, which is the same as knowingly and purposefully, but with the specific intent to do something the law forbids.

Now, the last instruction you asked about is one that we give regarding multiple  --  when we have multiple defendants as well as multiple counts.  The primary purpose for this particular instruction is to emphasize that each defendant who is charged with a count or counts is to be given individual consideration as it relates to that count or counts.  It is that simple.  If you have four defendants, as we have in this case, each defendant deserves to be considered individually.  And that's why we give this kind of instruction.

Now, let me say this:  If a defendant is charged with aiding and abetting somebody else in the commission of a certain offense, you may have to look at the actions of that other person to determine if the defendant you are considering is indeed guilty of aiding and abetting a particular crime.  It still means he gets individual attention, but you have to look at the actions of somebody else to give him that individual attention.  The same may apply with conspiracy.  Conspiracy involves an agreement between at least two people.  So necessarily, you may have to consider the actions of another person when determining the guilt or innocence of a particular defendant on the conspiracy count.

All right.  Now, does this answer your question?  Okay?

(Affirmative response.)

All right.  Everyone remain seated while the jury leaves the courtroom.)

(The jury left the courtroom.)

You may remove the defendants.

(The defendants were removed from the courtroom.)

All right.  We will be in recess and await the jury's call.

(Recess awaiting jury verdict taken from 11 o'clock a.m. to 5:10 p.m.)

(In Open Court.)

THE COURT:  All right.  I understand we have a verdict.  Bring in the jury, please.

(The jury entered the courtroom.)

Will the Foreperson please rise?  I understand the jury has reached a verdict?

THE FOREPERSON:  Yes, it has.

THE COURT:  Would you give the forms to the Marshal, please?

(Verdict forms proffered to Court and Clerk.)

3256

All right.  The verdict forms appear to be in order and the Clerk will publish the verdicts.

THE CLERK:  Ladies and gentlemen of the jury, these are your verdicts.  If defendant Tipton will please stand.

(Defendant Tipton stood.)

Case number 3:92CR68-01:  United States of America versus Richard Tipton, also known as "Whitey."  We the jury find as follows:

Count One, conspiracy to distribute controlled substance.  Answer:  Guilty.

Question:  Do you find that the government has proven beyond a reasonable doubt that a Continuing Criminal Enterprise existed as charged in the indictment? Answer:  Yes.

Count Two, Continuing Criminal Enterprise.  Guilty.  Count Three, killing of Douglas A. Talley while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Guilty.

Count Four, killing of Douglas A. Talley to maintain or increase position in racketeering enterprise.  Guilty.

Count Five, killing of Douglas Moody while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Not guilty.

3257

Count Six, use of firearm in relation to killing of Douglas Moody.  Not guilty.

Count Seven, killing of Douglas Moody to maintain or increase position in racketeering enterprise.  Not guilty.

Count Fourteen, killing of Torrick Brown, Jr. to maintain or increase position in racketeering enterprise.  Not guilty.

Count Fifteen, use of firearm in relation to killing of Torrick Brown, Jr. and maiming of Martha McCoy.  Not guilty.

Count Sixteen, maiming of Martha McCoy to maintain or increase position in racketeering

J.A.417

enterprise.  Not guilty.

Count Seventeen, killing of Bobby Long while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Guilty.

Count Eighteen, killing of Anthony Carter while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Guilty.

Count Nineteen, killing of Dorothy Mae Armstrong while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Guilty.

Count Twenty, use of firearm in relation to killing of Bobby Long, Anthony Carter and Dorothy Mae Armstrong.  Guilty.

Count Twenty-one, killing of Bobby Long to maintain or increase position in racketeering enterprise.  Guilty.

Count Twenty-two, killing of Anthony Carter to maintain or increase position in racketeering enterprise.  Guilty.

Count Twenty-three, killing of Dorothy Mae Armstrong to maintain or increase position in racketeering enterprise.  Guilty.

Count Twenty-four, killing of Curtis Thorne while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Guilty.

Count Twenty-five, killing of Linwood Chiles while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Guilty.

Count Twenty-six, use of firearm in relation to killing of Curtis Thorne and Linwood Chiles and maiming of Priscilla Greene and Gwendolyn Greene.  Guilty.

Count Twenty-seven, killing of Curtis Thorne to maintain or increase position in rack racketeering enterprise.  Guilty.

Count Twenty-eight, killing of Linwood Chiles to maintain or increase position in racketeering enterprise.  Guilty.

Count 29, maiming of Priscilla Greene to maintain or increase position in racketeering enterprise.  Guilty.

Count Thirty, maiming of Gwendolyn Greene to maintain or increase position in racketeering enterprise.  Guilty.

Count Thirty-two, possession of controlled substance with intent to distribute on or about 2-2-92.  Guilty.

Count Thirty-three, possession of controlled substance with intent to distribute on or about 4-10-92.  Guilty.

So say we all dated 2-3-93.  Signed by the Foreperson, Margaret M. Griffiths.  You may be

J.A.418

seated.

(Defendant Tipton resumed his seat.)

If defendant Cory Johnson will please stand.

(Defendant Johnson stood.)

Case number 3:92CR68-02:  United States of America versus Cory Johnson, also known as "O," also known as "C.O."  We the jury find as follows:

Count One, conspiracy to distribute controlled substance.  Guilty.

Question:  Do you find that the government has proven beyond a reasonable doubt that a Continuing Criminal Enterprise existed as charged in the indictment?  Answer:  Yes.

Count Two, Continuing Criminal Enterprise.  Guilty.

Count Eight, killing of Peyton Maurice Johnson while engaged in or working in furtherance of Continuing Criminal Enterprise.  Guilty.

Count Nine, use of firearm in relation to killing of Peyton Maurice Johnson.  Guilty.

Count Ten, killing of Peyton Maurice Johnson to maintain or increase position in racketeering enterprise.  Guilty.

Count Eleven, killing of Louis J. Johnson, Jr. while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Guilty.

Count Twelve, use of firearm in relation to killing of Louis J. Johnson, Jr.  Guilty.

Count Thirteen, killing of Louis J. Johnson, Jr. to maintain or increase position in racketeering enterprise.  Guilty.

Count Fourteen, killing of Torrick Brown, Jr. to maintain or increase position in racketeering enterprise.  Guilty.

Count Fifteen, use of firearm in relation to killing of Torrick Brown, Jr. and maiming of Martha McCoy.  Guilty.

Count Sixteen, maiming of Martha McCoy to maintain or increase position in racketeering enterprise.  Guilty.

Count Seventeen, killing of Bobby Long while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Guilty.

Count Eighteen, killing of Anthony Carter while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Guilty.

Count Nineteen, killing of Dorothy Mae Armstrong while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Guilty.

Count Twenty, use of firearm in relation to killing of Bobby Long, Anthony Carter and Dorothy Mae Armstrong.  Guilty.

J.A.419

Count Twenty-one, killing of Bobby Long to maintain or increase position in racketeering enterprise.  Guilty.

Count Twenty-two, killing of Anthony Carter to maintain or increase position in racketeering enterprise.  Guilty.

Count Twenty-three, killing of Dorothy Mae Armstrong to maintain or increase position in racketeering enterprise.  Guilty.

Count Twenty-four, killing of Curtis Thorne while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Guilty.

Count Twenty-five, killing of Linwood Chiles while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Guilty.

Count Twenty-six, use of a firearm in relation to killing of Curtis Thorne and Linwood Chiles and maiming of Priscilla Greene and Gwendolyn Greene.  Guilty.

Count Twenty-seven, killing of Curtis Thorne to maintain or increase position in racketeering enterprise.  Guilty.

Count Twenty-eight, killing of Linwood Chiles to maintain or increase position in racketeering enterprise.  Guilty.

Count Twenty-nine, maiming of Priscilla Greene to maintain or increase position in racketeering enterprise.  Guilty.

Count Thirty, maiming of Gwendolyn Greene to maintain or increase position in racketeering enterprise.  Guilty.

Count Thirty-one, distribution of controlled substance, guilty.

Count Thirty-two, possession of controlled substance with intent to distribute it on or about 2-2-92.  Guilty.

So say we all, dated 2-3-93, signed by the Foreperson, Margaret M. Griffiths.

You may be seated.

(Defendant Johnson resumed his seat.

If defendant Roane will please stand.

(Defendant Roane stood.)

Case number 3:92CR68-03:  United States of America versus James H. Roane, Jr., also known as "J.R."  We the jury find as follows:

Count One, conspiracy to distribute controlled substance, guilty.

Question:  Do you find that the government has proven beyond a reasonable doubt that a Continuing Criminal Enterprise existed as charged in the indictment?  Answer:  Yes.

Count Two, Continuing Criminal Enterprise.

**J.A.420**

Guilty.

Count Five, killing of Douglas Moody while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Guilty.

Count Six, use of firearm in relation to killing of Douglas Moody.  Guilty.

3264

Count Seven, killing of Douglas Moody to maintain or increase position in racketeering enterprise.  Guilty.

Count Eight, killing of Peyton Maurice Johnson while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Guilty.

Count Nine, use of firearm in relation to killing of Peyton Maurice Johnson.  Guilty.

Count Ten, killing of Peyton Maurice Johnson to maintain or increase position in racketeering enterprise.  Guilty.

Count Eleven, killing of Louis J. Johnson, Jr. while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Guilty.

Count Twelve, use of firearm in relation to killing of Louis J. Johnson, Jr.  Guilty.

Count Thirteen, killing of Louis J. Johnson, Jr. to maintain or increase position in racketeering enterprise.  Guilty.

Count Fourteen, killing of Torrick Brown, Jr. to maintain or increase position in racketeering enterprise.  Guilty.

Count Fifteen, use of firearm in relation to killing of Torrick Brown, Jr. and maiming of Martha McCoy.  Guilty.

3265

Count Sixteen, maiming of Martha McCoy to maintain or increase position in racketeering enterprise.  Guilty.

Count Thirty-two, possession of controlled substance with intent to distribute on or about 2-2-92.  Guilty.

So say we all.  Dated 2-3-93, signed by the Foreperson, Margaret Griffiths.

You may be seated.

(Defendant Roane resumed his seat.)

If defendant Reavis will please stand.

(Defendant Reavis stood.)

Case number 3:92CR68-07:  United States of America versus Sandra Reavis.  We the jury find as follows:

Count One, conspiracy to distribute controlled substance.  Guilty.

So say we all dated 2-3-93, signed by the Foreperson, Margaret Griffiths.

You may be seated.

(Defendant Reavis resumed her seat.)

J.A.421

Ladies and gentlemen of the jury, are these your verdicts?

(Affirmative response.)

THE CLERK:  Do counsel wish the jury polled?

MR. BAUGH:  Yes.

THE CLERK:  Jurors, if these are your verdicts as I call your name please respond by answering yes.

Victor M. Catlett.

THE JUROR:  Yes.

John E. Coleman, Sr.

THE JUROR:  Yes.

Edward Cooke.

THE JUROR:  Yes.

Debra J. Dabney.

THE JUROR:  Yes.

Nina S. Eike.

THE JUROR:  Yes.

Bonita S. Faircloth.

THE JUROR:  Yes.

Margaret M. Griffiths.

THE JUROR:  Yes.

Charles V. Guthrie, Sr.

THE JUROR:  Yes.

Jerome Harrison.

THE JUROR:  Yes.

Connie E. Harvey.

THE JUROR:  Yes.

Frances P. Hodson.

THE JUROR:  Yes.

Thomas C. Jackson.

THE JUROR:  Yes.

THE COURT:  All right.  Ladies and gentlemen, I'm going to ask you to come back on next Monday morning at 10 o'clock.  We will get started with the sentencing phase of the trial.  You all may be excused now.  10 o'clock on Monday morning. Everyone remain seated while the jury leaves the courtroom.)

(The jury left the courtroom.)

MR. BAUGH:  Before the jury leaves the building, I have something I would like to say.

THE COURT:  Have Bill hold on to them.

(Bench conference held off the record per Mr. Baugh's request.)

All right, is anybody here from probation?

(Probation Officers Gill and Ault conferred with Court off the record.)

All right, I'm going to set a sentencing date for Ms. Reavis.  There is no need for the other three defendants to be held.  They can be removed at this

time.

MR. COOLEY:  Judge, has the counsel been

3268

given some opportunity to discuss with the Court, either with or without the defendants being present, the timing, scheduling for next week?

THE COURT:  Oh, sure.  Defendants other than Reavis can be removed.

MR. VICK:  Mr. White had filed a motion asking for the government's witness list as to the sentencing phase of this.  I don't know what the Court's pleasure is in that regard, but we can provide one by 5 o'clock tomorrow afternoon if necessary.

THE COURT:  Well, as soon as you can, get it to them.

MR. VICK:  We can probably even get it sooner than that.

MR. BAUGH:  Will we each have to file a motion?

THE COURT:  No.  Everybody should get one.

All right, Mr. Wagner, how about April 14th for sentencing?

MR. WAGNER:  That's fine, Your Honor.

THE COURT:  Mr. Vick, April 14th?

MR. VICK:  April 14th is fine with the government, Your Honor.

MR. PARCELL:  Will that be at ten?

3269

THE COURT:  No, we will do it at 9:30.

(Defendant and counsel executing sentencing documents.)

MR. PARCELL:  Judge, may we leave our stuff here in the next two days?

THE CLERK:  Judge Merhige has a docket here in the morning.

THE COURT:  I'm sorry, you have to clear it up.  Judge Merhige has something.

MR. GEARY:  Is there any gag order in effect from now until Monday?

MR. BAUGH:  That's a good idea.  We so move.

MR. GEARY:  Yes.

MR. VICK:  We don't intend to talk about the case at all.

MR. GEARY:  We have "reliable authority" reports all the time and it can only come from the United States Attorney's Office.

THE COURT:  I don't want members of the U.S. Attorney's Office or any of the lawyers to make any comments to the press about this.  We still have a very sensitive phase to go through and you should know better than that.  And I'm on record.

THE COURT:  All right.  Ms. Reavis, could

J.A.423

3270

you stand up a minute, please?

(Defendant Reavis stood.)

Ms. Reavis, your matter has been set for sentencing to commence at 9:30 a.m. on April 14th in this courtroom. In the interim, somebody from the Probation Office will be in touch with you. I urge you to cooperate with them as much as you possibly can. All right. That completes the matter. Ms. Reavis may be removed from the courtroom.

(The defendant was removed from the courtroom.)

All right, I'm going to adjourn Court. We can talk scheduling back here.

(In Chambers.).

THE COURT: All right, tell those folks to get in here.

(Counsel assembled in chambers.)

THE COURT: Somebody wanted to talk about scheduling?

MR. BAUGH: I was going to make the suggestion, Your Honor, that being as how it would give us one day apiece, if we break early. Ours looks like about a day, and we are number three.

MR. VICK: Judge, in aggravation, I would think that, and we will need to get together on this, but we have got a list of about six witnesses, none

3271

of whom will be very long.

THE COURT: You are talking about a day between each presentation?

MR. BAUGH: A day for each presentation.

MR. VICK: I expect we will be handing it to the defense mid-afternoon Monday, I would think.

MR. COOLEY: You are assuming opening statements?

MR. VICK: Well, that's right.

THE COURT: We will assume a full day.

MR. VICK: For us on Monday.

MR. WHITE: Because Judge, you know, we are bringing people down from New York and I just want to know, we are going to have them all here on Monday, but for purposes of making sure we are prepared and ready to go forward, we should count on Monday?

THE COURT: Tipton gets started on Tuesday. We do the openings, and if we fall short we will just put it over until Tuesday.

MR. COOLEY: How long for you?

MR. WHITE: I would say no more than a day, Judge. Six witnesses, tops.

MR. COOLEY: I think ours is three to five hours, probably, of testimony.

MR. BAUGH: Ours is a day.

3272

MR. VICK: Full day?

**J.A.424**

MR. BAUGH:  Yes.

THE COURT:  We are talking about maybe Thursday or Friday for closing up.

MR. WHITE:  Friday, probably, I would think.

THE COURT:  That's fine.  You know, if we fall short or if you go over, it is no problem.  We will adjust.  But it looks like Friday for closing.

MR. BAUGH:  Thank you.

(Proceedings adjourned at 5:35 p.m.)

**J.A.425**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **Case No. 3:92CR68 (DJN)** |
| | : | **CAPITAL CASE** |
| **COREY JOHNSON,** | : | **Execution Scheduled for** |
| | : | **January 14, 2021** |
| Defendant. | : | |

**NOTICE OF SUBMISSION OF EXHIBITS (SUBMISSION 1 OF 8)**

Corey Johnson hereby gives notice of the submission of Exhibit 7 – Part 1, Part 2, and

Part 3 as attachments to his Motion Pursuant to 28 U.S.C. § 2255 Raising Claim of Ineligibility

To Be Executed Under 18 U.S.C. § 3596(c). This is the first submission of eight.

Dated: December 14, 2020             Respectfully submitted,

/s/ David E. Carney
David E. Carney, VA Bar #: 43914
Donald P. Salzman (Admitted Pro Hac Vice)
Skadden, Arps, Slate, Meagher & Flom, LLP
1440 New York Avenue, NW
Washington, DC 20005
Telephone: (202) 371-7246
Fax: (202) 661-8295
Email: david.carney@skadden.com

*Counsel for Corey Johnson*

**J.A.426**

## CERTIFICATE OF SERVICE

I hereby certify that on December 14, 2020, I electronically filed the foregoing with the

Clerk of Court using the CM/ECF system, which will then send notification of such filing to all

parties and counsel included on the Court's Electronic Mail notice list.


/s/ David E. Carney
David E. Carney, VA Bar #: 43914
Skadden, Arps, Slate, Meagher & Flom, LLP
1440 New York Avenue, NW
Washington, DC 20005
Telephone: (202) 371-7246
Fax: (202) 661-8295
Email: david.carney@skadden.com

## INDEX OF EXHIBITS TO MOTION PURSUANT TO 28 U.S.C. § 2255 RAISING CLAIM OF INELIGIBILITY TO BE EXECUTED UNDER 18 U.S.C. § 3596(c)

**EXHIBIT NO.**

**SUBMISSION 1**

**EXPERT REPORTS**

Report of Daniel J. Reschly, Ph.D., Aug. 26, 2016 ........................................................................1

Curriculum Vitae of Daniel J. Reschly, Ph.D., May 15, 2020.................................................... 1(a)

Report of J. Gregory Olley, Ph.D., Aug. 24, 2016......................................................................2

Curriculum Vitae of J. Gregory Olley, Ph.D., Oct. 2020 .......................................................... 2(a)

Letter from Gary N. Siperstein, Ph.D. to Counsel for Corey Johnson, Dec. 16, 2016 ....................3

Curriculum Vitae of Gary N. Siperstein, Ph.D., Sept. 2020 ...................................................... 3(a)

Debra Nelson, Mitigation Report, Sept. 27, 2016.........................................................................4

Report of Richard G. Dudley, Jr., M.D., Aug. 22, 2016................................................................5

**TRIAL TRANSCRIPTS**

Trial Tr., Feb. 3, 1993 .................................................................................................................6

**SUBMISSION 2**

Trial Tr., Feb. 10, 1993 ...............................................................................................................7

**SUBMISSION 3**

Cornell Mitigation Information and Report (Excerpt).....................................................................8

Trial Tr., Feb. 12, 1993 ...............................................................................................................9

Trial Tr., Feb. 15, 1993 .............................................................................................................10

**AFFIDAVITS & DECLARATIONS**

Declaration of Kenneth Barish, Ph.D. (staff psychologist at Pleasantville Cottage School), July 22, 2014 ...........................................................................................................11

Affidavit of Richard Benedict (special education teacher at Pleasantville Cottage School), Dec. 5, 2011...............................................................................................................12

Affidavit of Darnell Brown (acquaintance in Trenton, NJ), Oct. 14, 2011 ..................................13

Affidavit of Darold Brown (acquaintance in Trenton, NJ), June 15, 2011 ...................................14

Affidavit of Craig S. Cooley (appointed counsel in 1992), Sept. 20, 2016 ..................................15

Affidavit of Courtney Daniels (Corey's lifelong friend), May 21, 2011 .......................................16

Declaration of Monica Dawkins (Corey's former girlfriend), July 16, 2012 ................................17

**SUBMISSION 4**

Declaration of Cary Gallaudet, Ph.D. (psychologist at Pleasantville Diagnostic Center), Mar. 19, 2012...................................................................................................18

**J.A.428**

EXHIBIT NO.

Declaration of Ann Harding (staff member at Pleasantville Cottage School), Nov. 21, 2011 ......................................................................................................................19

Affidavit of Minnie Hodges (Corey's maternal aunt), Apr. 30, 2011 ...........................20

Affidavit of Priscilla Hodges (Corey's cousin), Apr. 30, 2011 .....................................21

Affidavit of Queenie Hodges (Corey's cousin), Apr. 30, 2011 .....................................22

Declaration of Esther Johnson (Corey's maternal grandmother), Apr. 30, 2011 ..........23

Affidavit of Robert Johnson (Corey's half-brother), June 29, 2011................................24

Affidavit of Antionette Daniels Joseph (the best friend of Corey's mother and Corey's godmother), May 21, 2011) .........................................................................................25

Declaration of Leona Klerer (reading teacher at Mount Pleasant Cottage School), June 3, 2011 .................................................................................................................26

Affidavit of Gerald Lefkowitz (unit administrator at Pleasantville Cottage Center), Dec. 5, 2011 .................................................................................................................27

Affidavit of Odette Noble (social worker at Elmhurst), Dec. 1, 2011 ...........................28

Declaration of George Sakheim, Ph.D. (Chief of Psychological Services at Pleasantville Diagnostic Center), June 17, 2011 .......................................................29

Affidavit of David Washington (childcare worker at Elmhurst), Mar. 1, 2012..............30

SUBMISSION 5

CHILDHOOD & TESTING RECORDS

Gregory Judge, School Social Worker, Social History, Mar. 4, 1977 ...........................31

Cheryl Spillane, Learning Consultant, Bureau of Pupil Personnel Services, Jersey City Public Schools, Learning Consultant Evaluation to Child Study Team, Mar. 18, 1977.......................................................................................................................32

F.A. Figurelli, M.D., Chief Psychologist, Psychological Examination Record, Mar. 25, 1977.......................................................................................................................33

Eleanor Glantz, Social Worker, Case Service, Dec. 11, 1978 .......................................34

Committee on the Handicapped, Referral to the Committee on the Handicapped, Feb. 26, 1979.......................................................................................................................35

Committee on the Handicapped Records, May 21, 1979 ................................................36

Washington Heights-West Harlem Community Mental Health Center, Child Assessment Evaluation Summary, Dec. 9, 1981 ........................................................37

Ernest H. Adams, Staff Psychologist, Psychodiagnostic Evaluation, Dec. 11, 1981 ....38

Cary Gallaudet, Psy.D., Pleasantville Cottage School, Psychological Evaluation, Feb. 1, 1982.......................................................................................................................39

**J.A.429**

**EXHIBIT NO.**

Leona Klerer, Mount Pleasant Cottage School Screening Upon Admission, Feb. 22, 1982 ...................................................................................................................40

Amira Offer, Caseworker, Psychosocial Summary, Mar. 15, 1982 ..............................................41

Gloria Caro, Pleasantville Cottage School, Reassessment Summary, May 21, 1982 ...................42

Gloria Caro, Caseworker, Initial Conference, Current Assessment and Transfer Summary, June 9, 1982.................................................................................................43

Gayle Turnquest, Caseworker, Pleasantville Cottage School, Current Assessment, Jan. 31, 1983 ....................................................................................................................44

**SUBMISSION 6**

Ken Barish, Ph.D., Psychologist, Pleasantville Cottage School, Psychological and Educational Evaluation, Apr. 29, 1983 .........................................................................45

John B. Stadler, M.D., Clinical Director, Pleasantville Cottage School, Psychiatric Evaluation, Aug. 26, 1983 ..............................................................................................46

Lynda Coccaro, Speech and Language Pathologist, Donald R. Reed Speech Center, Inc., Phelps Memorial Hospital, Speech and Language Evaluation, Oct. 5, 1983 ................47

Lynn Polstein, Jewish Child Care Association of New York, Pleasantville Cottage School, Change in Permanency Plan, Apr. 13, 1984 ...................................................48

Gerard Maier, Social Worker, Current Assessment, Sept. 4, 1984 ..............................................49

Christine Aaron, MSW Intern, Jewish Child Care Association of New York, Pleasantville Cottage School, Visitation Plan, Dec. 12, 1984 ....................................50

Kenneth Barish, Ph.D., Psychologist, Pleasantville Cottage School Psychological Evaluation, Apr. 15, 1985 ..............................................................................................51

Gerard Maier, Pleasantville Cottage School, Discharge/Transfer Plan, May 28, 1985.................52

Board of Education of the City of New York, Individualized Education Plan – Phase 1, July 1, 1985 ...............................................................................................................53

Odette Noble, Social Worker, Jewish Child Care Association of New York, Elmhurst Boys Residence, UCR Reassessment and Service Plan Review 6 Month, Nov. 21, 1985.................................................................................................................................54

**SUBMISSION 7**

Odette Noble, Social Worker, Jewish Child Care Association of New York, Elmhurst Boys Residence, UCR Reassessment and Service Plan Review 6 Month, June 28, 1986.................................................................................................................................55

Odette Noble, Social Worker, Jewish Child Care Association of New York, Elmhurst Boys Residence, UCR Plan Amendment: Form D Trial Discharge, Feb. 23, 1987 ...............56

Newtown High School, Scholastic Transfer Record, Dec. 7, 1987 ..............................................57

3

**J.A.430**

|  | EXHIBIT NO. |
|---|---|

Janet Valentine, Child Care Worker, Pleasantville Diagnostic Center, Outline for Cottage Report (undated) ...................................................................58

**COURT RECORDS**

Notice of the Intention of U.S.A. to Seek Death Penalty as to Mr. Tipton, May 1, 1992..................................................................................................59

Notice of the Intention of U.S.A. to Seek Death Penalty as to Mr. Roane, May 1, 1992..............60

Second Superseding Indictment, July 20, 1992, Dkt. 115 .........................................61

Notice of the Intention of U.S.A. to Seek Death Penalty as to Mr. Thomas, Oct. 28, 1992..................................................................................................62

Verdict Form, Feb. 3, 1993, Dkt. 466....................................................................63

Notice of the Intention of U.S.A. to Seek Death Penalty as to Mr. Johnson, Feb. 8, 1993..................................................................................................64

Special Findings, Feb. 16, 1993, Dkt. 508............................................................65

Motion to Have Defendant Declared Mentally Retarded, *United States v. Thomas*, No. 3:92CR68 (E.D. Va. Apr. 15, 1993) ..............................................66

Memorandum in Support of Initial Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. Section 2255, June 15, 1998, Dkt. 714 (Excerpt) ...........................67

Reply Memorandum in Support of Initial Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. Section 2255, Mar. 15, 1999, Dkt. 761 (Excerpt)................68

Ex. 14 to Reply Memorandum in Support of Initial Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. Section 2255, Mar. 15, 1999 ...............................69

Ex. 15 to Reply Memorandum in Support of Initial Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. Section 2255, Mar. 15, 1999 ...............................70

**SUBMISSION 8**

Petitioners' Joint Motion for Leave to Take Discovery, June 24, 1999, Dkt. 770 ........................71

Memorandum Opinion, May 3, 2000, Dkt. 803 ..........................................................72

Memorandum Opinion, May 1, 2003, Dkt. 896 ..........................................................73

Brief for Appellants Cory Johnson and Richard Tipton at 146, *United States v. Johnson*, No. 03-13(L), 03-26, 03-27 (4th Cir. Feb. 17, 2004) (Excerpt) ...............74

**SUBMISSION 9**

**DIAGNOSTIC MATERIALS**

American Association on Intellectual and Developmental Disabilities Definition Manual ("AAIDD-11") (Excerpt)........................................................................75

AAIDD User Guide to 11th Edition (Excerpt) ........................................................76

Diagnostic and Statistical Manual of Mental Disorders ("DSM-5") (Excerpt)...........................77

**J.A.431**

**E**XHIBIT **N**O.

**C**ONGRESSIONAL **R**ECORDS

134 Cong. Rec. 22,926 (1988) (Excerpt)......................................................................................78

136 Cong. Rec. S6873 (daily ed. May 24, 1990) (Excerpt)...........................................................79

**J.A.432**