**EXECUTION SCHEDULED FOR JANUARY 14, 2021**

No. 21-1

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

_____

**UNITED STATES OF AMERICA,**

**Plaintiff – Appellee,**

**v.**

**COREY JOHNSON, A/K/A O, A/K/A CO,**

**Defendant – Appellant.**

_____

**JOINT APPENDIX VOLUME III**

_____

Donald P. Salzman
Jonathan Marcus
David E. Carney
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue, NW
Washington, DC 20005
(202) 371-7983
donald.salzman@skadden.com
*Counsel for Appellant Corey Johnson*

PAGE(S)

## VOLUME I

### I. DOCKET SHEET

E.D. Va. Docket Sheet, No. 92CR68 (1992-2019)..............................................J.A.1

E.D. Va. Docket Sheet, No. 92CR68 (2020) ....................................................J.A.25

### II. RELEVANT INDICTMENT, ORDERS AND OPINIONS

Second Superseding Indictment, July 20, 1992....................................................J.A.33

Order (Dec. 15, 2020), ECF No 95...............................................................J.A.55

Memorandum Opinion (Dismissing § 2255 Petition) (Jan. 2, 2021), ECF No. 99..............................................................................................J.A.58

Order (Granting Motion for Leave to File Supplemental Authority) (Jan. 2, 2021), ECF No. 100...................................................................J.A.80

Order (Dismissing § 2255 Petition) (Jan. 2, 2021), ECF No. 102....................J.A.81

### III. OTHER RELEVANT FILINGS

Notice of Execution Date (Nov. 20, 2020), ECF No. 78..................................J.A.82

Motion Pursuant to 28 U.S.C. § 2255 Raising Claim of Ineligibility To Be Executed under 18 U.S.C. § 3596(c) (Dec. 14, 2020), ECF No. 86............J.A.84

Index of Exhibits to Motion Pursuant to 28 U.S.C. § 2255 Raising Claim of Ineligibility To Be Executed under 18 U.S.C. § 3596(c), ECF No. 86-1 .........................................................................................J.A.143

Ex. 1, Report of Daniel J. Reschly, Ph.D., Aug. 26, 2016, ECF No. 86-2.....J.A.148

Ex. 1a, Curriculum Vitae of Daniel J. Reschly, Ph.D., May 15, 2020, ECF No. 86-3 ....................................................................................J.A.199

Ex. 2, Report of J. Gregory Olley, Ph.D., Aug. 24, 2016, ECF No. 86-4 ......J.A.251

Ex. 2a, Curriculum Vitae of J. Gregory Olley, Ph.D., Oct. 2020,
ECF No. 86-5 .................................................................................... J.A.299

Ex. 3, Letter from Gary N. Siperstein, Ph.D. to Counsel for Corey
Johnson, Dec. 16, 2016, ECF No. 86-6 ..................................................... J.A.318

Ex. 3a, Curriculum Vitae of Gary N. Siperstein, Ph.D., Sept. 2020,
ECF No. 86-7 .................................................................................... J.A.332

## VOLUME II

Ex. 4, Debra Nelson, Mitigation Report, Sept. 27, 2016, ECF No. 86-8 ....... J.A.355

Ex. 5, Report of Richard G. Dudley, Jr., M.D., Aug. 22, 2016,
ECF No. 86-9 .................................................................................... J.A.391

Ex. 6, Trial Tr., Feb. 3, 1993, ECF No. 86-10 ................................................... J.A.411

Notice of Submission of Exhibit 7, ECF No. 87 ............................................ J.A.426

## VOLUME III

Exs. 7-1 – 7-3, Trial Tr., Feb. 10, 1993, ECF Nos. 87-2 – 87-4 ..................... J.A.433

Notice of Submission of Exhibits, ECF No. 88 ............................................ J.A.519

Ex. 8, Cornell Mitigation Information and Report (Excerpt),
ECF No. 88-2 .................................................................................... J.A.526

Ex. 9, Trial Tr., Feb. 12, 1993, ECF No. 88-3 ................................................... J.A.546

## VOLUME IV

Ex. 10, Trial Tr., Feb. 15, 1993, ECF No. 88-4 ................................................ J.A.611

Ex. 11, Declaration of Kenneth Barish, Ph.D. (staff psychologist at
Pleasantville Cottage School), July 22, 2014, ECF No. 88-5 ................... J.A.623

Ex. 12, Affidavit of Richard Benedict (special education teacher at
Pleasantville Cottage School), Dec. 5, 2011, ECF No. 88-6 ................... J.A.635

Ex. 13, Affidavit of Darnell Brown (acquaintance in Trenton, NJ),
Oct. 14, 2011, ECF No. 88-7 ........................................................ J.A.647

Ex. 14, Affidavit of Darold Brown (acquaintance in Trenton, NJ),
June 15, 2011, ECF No. 88-8 ........................................................ J.A.652

Ex. 15, Affidavit of Craig S. Cooley (appointed counsel in 1992),
Sept. 20, 2016, ECF No. 88-9 ........................................................ J.A.659

Ex. 16, Affidavit of Courtney Daniels (Corey's lifelong friend),
May 21, 2011, ECF No. 88-10 ........................................................ J.A.669

Ex. 17, Declaration of Monica Dawkins (Corey's former girlfriend),
July 16, 2012, ECF No. 88-11 ........................................................ J.A.675

Notice of Submission of Exhibits, ECF No. 89 .................................. J.A.678

Ex. 18 Declaration of Cary Gallaudet, Ph.D. (psychologist at
Pleasantville Diagnostic Center), Mar. 19, 2012,
ECF Nos. 89-2 – 89-3 ........................................................ J.A.685

Ex. 19, Declaration of Ann Harding (staff member at Pleasantville
Cottage School), Nov. 21, 2011, ECF No. 89-4 ........................... J.A.696

Ex. 20, Affidavit of Minnie Hodges (Corey's maternal aunt),
Apr. 30, 2011, ECF No. 89-5 ........................................................ J.A.699

Ex. 21, Affidavit of Priscilla Hodges (Corey's cousin), Apr. 30, 2011,
ECF No. 89-6 ........................................................ J.A.710

Ex. 22, Affidavit of Queenie Hodges (Corey's cousin), Apr. 30, 2011,
ECF No. 89-7 ........................................................ J.A.718

Ex. 23, Declaration of Esther Johnson (Corey's maternal grandmother),
Apr. 30, 2011, ECF No. 89-8 ........................................................ J.A.722

Ex. 24, Affidavit of Robert Johnson (Corey's half-brother),
June 29, 2011, ECF No. 89-9 ........................................................ J.A.728

Ex. 25, Affidavit of Antionette Daniels Joseph (the best friend of Corey's
mother and Corey's godmother), May 21, 2011, ECF No. 89-10 ............. J.A.740

Ex. 26, Declaration of Leona Klerer (reading teacher at Mount Pleasant
Cottage School), June 3, 2011, ECF No. 89-11 ........................... J.A.752

Ex. 27, Affidavit of Gerald Lefkowitz (unit administrator at Pleasantville
Cottage Center), Dec. 5, 2011, ECF No. 89-12 ........................... J.A.760

Ex. 28, Affidavit of Odette Noble (social worker at Elmhurst),
Dec. 1, 2011, ECF No. 89-13 ........................................................ J.A.765

3

Ex. 29, Declaration of George Sakheim, Ph.D. (Chief of Psychological Services at Pleasantville Diagnostic Center), June 17, 2011, ECF No. 89-14 ..................................................................................... J.A.772

Ex. 30, Affidavit of David Washington (childcare worker at Elmhurst), Mar. 1, 2012, ECF No. 89-15 ................................................................... J.A.807

Notice of Submission of Exhibits, ECF No. 90 ............................................... J.A.811

Ex. 31, Gregory Judge, School Social Worker, Social History, Mar. 4, 1977, ECF No. 90-2 .......................................................................... J.A.818

Ex. 32, Cheryl Spillane, Learning Consultant, Bureau of Pupil Personnel Services, Jersey City Public Schools, Learning Consultant Evaluation to Child Study Team, Mar. 18, 1977, ECF No. 90-3 ............................. J.A.822

Ex. 33, F.A. Figurelli, M.D., Chief Psychologist, Psychological Examination Record, Mar. 25, 1977, ECF No. 90-4 .............................. J.A.827

Ex. 34, Eleanor Glantz, Social Worker, Case Service, Dec. 11, 1978, ECF No. 90-5 ..................................................................................... J.A.830

Ex. 35, Committee on the Handicapped, Referral to the Committee on the Handicapped, Feb. 26, 1979, ECF No. 90-6 .............................................. J.A.832

Ex. 36, Committee on the Handicapped Records, May 21, 1979, ECF No. 90-7 ..................................................................................... J.A.837

## VOLUME V

Ex. 37, Washington Heights-West Harlem Community Mental Health Center, Child Assessment Evaluation Summary, Dec. 9, 1981, ECF No. 90-8 ..................................................................................... J.A.863

Ex. 38, Ernest H. Adams, Staff Psychologist, Psychodiagnostic Evaluation, Dec. 11, 1981, ECF No. 90-9 .............................................. J.A.865

Ex. 39, Cary Gallaudet, Psy.D., Pleasantville Cottage School, Psychological Evaluation, Feb. 1, 1982, ECF No. 90-10 ......................... J.A.868

Ex. 40, Leona Klerer, Mount Pleasant Cottage School Screening Upon Admission, Feb. 22, 1982, ECF No. 90-11 ............................................. J.A.872

Ex. 41, Amira Offer, Caseworker, Psychosocial Summary, Mar. 15, 1982, ECF No. 90-12 ................................................................................ J.A.876

Ex. 42, Gloria Caro, Pleasantville Cottage School, Reassessment Summary, May 21, 1982 , ECF No. 90-13 .................................................. J.A.882

Ex. 43, Gloria Caro, Caseworker, Initial Conference, Current Assessment and Transfer Summary, June 9, 1982, ECF No. 90-14 ............................ J.A.896

Ex. 44, Gayle Turnquest, Caseworker, Pleasantville Cottage School, Current Assessment, Jan. 31, 1983, ECF No. 90-15 ................................. J.A.902

Notice of Submission of Exhibits, ECF No. 91 ............................................... J.A.905

Ex. 45, Ken Barish, Ph.D., Psychologist, Pleasantville Cottage School, Psychological and Educational Evaluation, Apr. 29, 1983, ECF No. 91-2 ......................................................................................... J.A.912

Ex. 46, John B. Stadler, M.D., Clinical Director, Pleasantville Cottage School, Psychiatric Evaluation, Aug. 26, 1983, ECF No. 91-3 ................ J.A.916

Ex. 47, Lynda Coccaro, Speech and Language Pathologist, Donald R. Reed Speech Center, Inc., Phelps Memorial Hospital, Speech and Language Evaluation, Oct. 5, 1983, ECF No. 91-4 .................................... J.A.919

Ex. 48, Lynn Polstein, Jewish Child Care Association of New York, Pleasantville Cottage School, Change in Permanency Plan, Apr. 13, 1984, ECF No. 91-5 .................................................................. J.A.925

Ex. 49, Gerard Maier, Social Worker, Current Assessment, Sept. 4, 1984, ECF No. 91-6 ......................................................................................... J.A.931

Ex. 50, Christine Aaron, MSW Intern, Jewish Child Care Association of New York, Pleasantville Cottage School, Visitation Plan, Dec. 12, 1984, ECF No. 91-7 ................................................................. J.A.935

Ex. 51, Kenneth Barish, Ph.D., Psychologist, Pleasantville Cottage School Psychological Evaluation, Apr. 15, 1985, ECF No. 91-8 ............. J.A.949

Ex. 52, Gerard Maier, Pleasantville Cottage School, Discharge/Transfer Plan, May 28, 1985, ECF No. 91-9 ........................................................ J.A.952

Ex. 53, Board of Education of the City of New York, Individualized Education Plan – Phase 1, July 1, 1985, ECF No. 91-10 ........................... J.A.966

Ex. 54, Odette Noble, Social Worker, Jewish Child Care Association of New York, Elmhurst Boys Residence, UCR Reassessment and Service Plan Review 6 Month, Nov. 21, 1985, ECF No. 91-11 ................ J.A.974

Notice of Submission of Exhibits, ECF No. 92 .............................................. J.A.986

Ex. 55, Odette Noble, Social Worker, Jewish Child Care Association of New York, Elmhurst Boys Residence, UCR Reassessment and Service Plan Review 6 Month, June 28, 1986, ECF No. 92-2 ..................J.A.993

Ex. 56, Odette Noble, Social Worker, Jewish Child Care Association of New York, Elmhurst Boys Residence, UCR Plan Amendment: Form D Trial Discharge, Feb. 23, 1987, ECF No. 92-3 ...................................J.A.1003

Ex. 57, Newtown High School, Scholastic Transfer Record, Dec. 7, 1987, ECF No. 92-4 ......................................................J.A.1008

Ex. 58, Janet Valentine, Child Care Worker, Pleasantville Diagnostic Center, Outline for Cottage Report (undated), ECF No. 92-5..................J.A.1011

Ex. 59, Notice of the Intention of U.S.A. to Seek Death Penalty as to Mr. Tipton, May 1, 1992, ECF No. 92-6.......................................J.A.1015

Ex. 60, Notice of the Intention of U.S.A. to Seek Death Penalty as to Mr. Roane, May 1, 1992, ECF No. 92-7 .......................................J.A.1020

Ex. 61, Second Superseding Indictment, July 20, 1992, Dkt. 115, ECF No. 92-8 ..........................................................................J.A.1025

Ex. 62, Notice of the Intention of U.S.A. to Seek Death Penalty as to Mr. Thomas, Oct. 28, 1992, ECF No. 92-9 ....................................J.A.1048

Ex. 63, Verdict Form, Feb. 3, 1993, Dkt. 466, ECF No. 92-10....................J.A.1053

Ex. 64, Notice of the Intention of U.S.A. to Seek Death Penalty as to Mr. Johnson, Feb. 8, 1993, ECF No. 92-11.......................................J.A.1060

Ex. 65, Special Findings, Feb. 16, 1993, Dkt. 508, ECF No. 92-12 ............J.A.1065

Ex. 66, Motion to Have Defendant Declared Mentally Retarded, *United States v. Thomas*, No. 3:92CR68 (E.D. Va. Apr. 15, 1993), ECF No. 92-13 ........................................................................J.A.1078

Ex. 67, Memorandum in Support of Initial Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. Section 2255, June 15, 1998, Dkt. 714 (Excerpt) , ECF No. 92-14................................................................J.A.1093

### VOLUME VI

Ex. 68, Reply Memorandum in Support of Initial Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. Section 2255, Mar. 15, 1999, Dkt. 761 (Excerpt), ECF No. 92-15.......................................................J.A.1109

Ex. 69, Ex. 14 to Reply Memorandum in Support of Initial Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. Section 2255, Mar. 15, 1999, ECF No. 92-16 ....................................................................... J.A.1125

Ex. 70, Ex. 15 to Reply Memorandum in Support of Initial Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. Section 2255, Mar. 15, 1999, ECF No. 92-17 ....................................................................... J.A.1133

Notice of Submission of Exhibits, ECF No. 93 ........................................... J.A.1137

Ex. 71, Petitioners' Joint Motion for Leave to Take Discovery, June 24, 1999, Dkt. 770, ECF No. 93-2 ....................................................... J.A.1144

Ex. 72, Memorandum Opinion, May 3, 2000, Dkt. 803, ECF No. 93-3 ...... J.A.1195

Ex. 73, Memorandum Opinion, May 1, 2003, Dkt. 896, ECF Nos. 93-4 – 93-5 ................................................................... J.A.1209

Ex. 74, Brief for Appellants Cory Johnson and Richard Tipton, *United States v. Johnson*, No. 03-13(L), 03-26, 03-27 (4th Cir. Feb. 17, 2004) (Excerpt), ECF No. 93-6 ................................................................ J.A.1336

Notice of Submission of Exhibits, ECF No. 94 ........................................... J.A.1359

## VOLUME VII

Ex. 75, American Association on Intellectual and Developmental Disabilities Definition Manual ("AAIDD-11") (Excerpt), ECF Nos. 94-2 – 94-3 ................................................................... J.A.1366

Ex. 76, AAIDD User's Guide to 11th Edition (Excerpt), ECF No. 94-4 ..... J.A.1392

Ex. 77, Diagnostic and Statistical Manual of Mental Disorders ("DSM-5") (Excerpt), ECF No. 94-5 ................................................ J.A.1405

Ex. 78, 134 Cong. Rec. 22,926 (1988) (Excerpt), ECF No. 94-6 ................ J.A.1418

Ex. 79, 136 Cong. Rec. S6873 (daily ed. May 24, 1990) (Excerpt), ECF No. 94-7 ........................................................................... J.A.1423

Government's Response to Court's December 15, 2020 Order (Dec. 21, 2020), ECF No. 96 ................................................................... J.A.1435

Corey Johnson's Reply Pursuant to December 15, 2020 Order (Dec. 24, 2020), ECF No. 97 ................................................................... J.A.1451

Exhibit 1, Amended Judgment in a Criminal Case, ECF No. 97-1 ............. J.A.1459

United States' Motion for Leave to File Supplemental Authority (Dec. 31, 2020), ECF No. 98 ................................................................ J.A.1467

United States' Notice of Supplemental Authority (Jan. 2, 2021), ECF Nos. 98-1, 101 ................................................................ J.A.1469

Notice of Appeal (Jan. 4, 2021), ECF No. 103 ............................................. J.A.1489

# EXHIBIT 7 - PART 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

------------------------------------------

UNITED STATES OF AMERICA,

                              Plaintiff;

      v.                              CRIMINAL ACTION
                                        92CR68
RICHARD TIPTON, CORY JOHNSON,
JAMES H. ROANE, JR., AND
SANDRA REAVIS,
                              Defendants.

------------------------------------------

                    VOLUME XX

                February 10, 1993
                Richmond, Virginia
                  10:00 a.m.

BEFORE:        HONORABLE JAMES R. SPENCER
               United States District Judge


APPEARANCES:   HOWARD C. VICK, JR., ESQ.
               WILLIAM H. PARCELL, III, ESQ.
               Office of the United States Attorney;
                   Counsel for Government;

               ROBERT P. GEARY, ESQ.
               ERIC D. WHITE, ESQ.
                   Counsel for Defendant Tipton;
               CRAIG S. COOLEY, ESQ.
               JOHN F. McGARVEY, ESQ.
                   Counsel for Defendant Johnson;
               DAVID P. BAUGH, ESQ.
               ARNOLD R. HENDERSON, V, ESQ.
                   Counsel for Defendant Roane;
               ROBERT J. WAGNER, ESQ.
                   Counsel for Defendant Reavis.
               JEFFREY B. KULL
               OFFICIAL COURT REPORTER

                  P-R-O-C-E-E-D-I-N-G-S
          THE CLERK:  Case Number 92CV68: United
States of America versus Richard Tipton, Cory

J.A.434

Johnson, and James H. Roane, Jr., the twentieth day of trial. Are counsel ready to proceed?

MR. VICK: Government is ready.

MR. McGARVEY: Defendant Johnson is ready.

MR. GEARY: Defendant Tipton is ready.

MR. BAUGH: Defendant Roane is ready.

THE COURT: All right. Let's bring in the jury.

(The jury entered the courtroom.).

THE COURT: All right. Mr. McGarvey?

MR. McGARVEY: Thank you, Your Honor. May it please the Court, co-counsel, ladies and gentlemen of the jury and of the prosecution: Folks, why are we here today? Well, I figured it would be easier to tell you why we are not here. We are not here to try to excuse the acts of Cory Johnson. There is no excuse for eight murders. That's not what this is about. We are not here to try to tell you that Mr. Johnson didn't know the difference between right or wrong. When you folks entered your verdict, you decided that Mr. Johnson knew the difference between right and wrong. We are not here today to ask you not to punish Mr. Johnson. The alternatives here are life in the penitentiary without possibility of parole, to die in the penitentiary. I should think that anyone would think that is punishment. What we are here today to do is to decide whether or not to kill Cory Johnson. That's what it boils down to.

Traditionally, the death penalty in this country is reserved for the most severe cases, the cases where the guilty person is completely and totally blameworthy, fully responsible for his actions. Those factors which tend to lessen blame, which indicate that a person is not fully and totally blameworthy, should indicate that that person does not merit the most severe punishment; i.e., to be killed.

This isn't my point of view. This is the law. And the law requires this hearing before anyone can be given the death penalty. The purpose of this hearing is to assure that you folks consider that the guilty person deserves the maximum sentence of death. That person is guaranteed the right to this hearing in order to present reasons from our point of view why he doesn't deserve the maximum punishment. These reasons are called mitigation. The government has already put on what they called the aggravating factors. This is our opportunity to put on what is called mitigation.

The law states that mentally retarded persons cannot be executed. And the reason that they are excluded is because the law recognizes that mentally

**J.A.435**

retarded persons are not totally and completely blameworthy. They are not fully responsible for their actions.

Now, I'm not intending to suggest at this juncture or any other juncture that Cory Johnson is mentally retarded. It doesn't suggest that mentally retarded persons aren't responsible for their actions. It just indicates that the law recognizes that they are not as fully and totally blameworthy as an individual who has all his faculties.

Mentally retarded people have capabilities. Most mentally retarded people can hold jobs, raise families, be educated. Mildly mentally remember retarded people can be educated to, say, a sixth-grade reading level. I'm not suggesting that that is the case in the most severe cases of mental retardation, but in mildly mentally retarded cases, they can be educated. They can be arrested and they can be held accountable for their actions. However, because of the limitations that mentally retarded people have, they are not as fully responsible, as I indicated, not as fully blameworthy.

In this case, Cory Johnson, as I said, is not mentally retarded. But he has substantial mental, intellectual deficits that he has been plagued with his entire life. His IQ is within two points of being classified by the law mentally retarded, and therefore, legally not executable. Two points. He has severe neuropsychological impairment, and he is severely learning-disabled. This was diagnosed back when he was 13 years old, and we will present evidence today by Dr. Cornell here, who has administered tests and neuropsychological tests that have verified this. He has an IQ of 77.

In listening to Mr. Tipton's presentation yesterday, I was struck by the fact that he indicated that these learning-disabled ADD-type people tend to group together. And I think ultimately that's what we are going to be able to show you folks; that they somehow gravitated to each other. And when Dr. Evans yesterday was talking about the fact that learning-disabled people and ADD people have great difficulty in problem-solving, that they are very narrow minded, very focused, inflexible, I believe we will be able to show you folks today that that is the case with Cory Johnson. I don't just believe it. It is going to be shown. That is coupled with this severe learning disability and an IQ of 77.

Cory's situation, Cory's physical impairment, which I can't overemphasize is not Cory's fault -- what Cory did is Cory's fault, but what Cory's physical problems are are not his fault -- as I said,

they don't meet the standard definition of mental retardation. But his condition is very, very similar. As I indicated, mentally retarded people, mildly mentally retarded people can learn to read up to a sixth-grade level. But from the age of six to seven, Cory has been in special education. At 13, as I indicated, he was diagnosed with this learning disability. And after years and years of special education and the like, he is still only able to read on a second to third-grade level. So when I say that his condition is very similar to the mildly mentally retarded, in some instances it is much more severe. I've just given you an example of that. And this is after years and years of special instruction.

Now, we couple that with severe emotional deprivation as well. Again, when I was listening to Mr. Tipton's presentation yesterday I was struck by the similarity in backgrounds. Cory Johnson had a family. And I use "family" in quotations. He met his father when he was 12 years old. In the course of his lifetime he has seen his father three to five times since he was 12 years old. From age one until he was 12 years old, Cory Johnson moved at least 12 times. He moved 12 times to some relatives, to some friends, lived principally with his mother. And again, I mean no disrespect to Mr. Johnson, but I use the term "mother" in quotes as well. His mother was a drug abuser. His mother was abusive emotionally and physically to Cory. And to make matters worse, his mother took up with a number of gentlemen who were also drug abusers and physically abusive to Cory and his younger brother.

When Cory was 12-and-a-half to 13 years old, the New York justice system took jurisdiction over Cory and his brother and placed him in a foster care situation; principally, not because Cory had done anything wrong, but because his mother was flat-out unable, to put it charitably, to take care of him.

When I talked about emotional abuse, I'd like to illustrate that. Principally, the emotional abuse from his mother came about as a result of expectations that once again Cory Johnson couldn't meet. And he couldn't meet those expectations not because of anything that he had done, but because he was born with this severe neurological impairment. Despite that, Cory tried. His mother, believe it or not, expected Cory to go to college. And try as Cory Johnson might have, Cory Johnson couldn't read beyond the second-grade level. When the New York justice system took jurisdiction of Cory, they placed him in a foster home situation. This was the Pleasantville Cottage Home. You will hear from two people who

J.A.437

worked with him in this, the Jewish Child Care Association of New York. And what you will hear from these people and from the reports that we are going to give you is that despite Cory's mental and physical limitations, Cory always wanted to please. Cory was not a mean-spirited person. Despite his background, Cory wanted to learn. He wanted to learn. And I would suggest to you folks it is going to be shown that he wanted to learn because he wanted to please his mother. But there wasn't a darn thing that Cory could do to please his mother.

The reports are rife with references to the fact that Cory was not visited by his mother; that his mother took no interest in the fact that he was trying; and that on the few occasions that his mother actually did visit him, the notes suggest that she was very rejective of him to the point that the staff there made comments about it; that she would get phone calls from the Home, and she wouldn't return the phone calls. She would call only to cancel an appointment, and not reschedule them. But despite this, Cory tended to treat his mother like a goddess.

There was a quote that you folks are going to have in front of you that I found particularly instructive and particularly touching, and I'd like to read it to you now. This is from a January, 1983 treatment review of Cory Johnson by Gail Turnquest, the caseworker at the Pleasantville Cottage School.

"Child care workers note that Cory's behavior deteriorates when he has no contact with his mother. He can also become quite depressed when he has not heard from or seen her for a period of time. It is the opinion of his child care workers that Pleasantville is good for him and that he is functioning fairly well here. Cory realizes his learning disabilities. However, he struggles to do his homework. He is truly motivated to do well and to succeed, and has not yet given up on himself.

"Cory presents with no real behavior problems. Within the last two weeks, there has been some decline. Cory fantasizes that his mother will come up in a car and take him to Pizza Hut. Child care workers report that Cory's mood is basically that of a depressed child. He longs for his mother and acts out his realization that in fact his mother is emotionally unavailable to him. However, he denies his feelings when confronted directly. He also struggles to involve his father --" his father who he had seen three to five times in his life "-- who also does not come through for him. Sundays can be very difficult for Cory because he usually doesn't

have any visitors."

From the age of twelve-and-a-half until he was 18, this basically was Cory Johnson's life: attempting to learn and not being able to learn; attempting to be accepted by the only family that he had, his mother, and to be continually rejected by his mother. And you couple that with a childhood that was -- if you can call it a childhood -- basically, Cory took care of himself since he was three years old because his mother was too busy doing drugs and taking care of herself and living with her boyfriends.

When you couple this background of abuse, depression, lack of acceptance, rejection by the one person who mattered most to him, along with the severe, and I'm talking severe, cognitive deficiencies in Cory, it might provide somewhat of an explanation of what happened. As I suggested to you, there is no excuse.

At the conclusion of this presentation, I would suggest to you folks that the question you have to ask yourself is not whether Cory is guilty, not whether he should be punished, not whether he knew what he was doing was right or wrong. Those have already been decided. But whether he is fully and completely blameworthy; whether he is totally responsible for his actions. This penalty phase is, as the Supreme Court says, a narrowing process. Because as I indicated, the death penalty is reserved for those who are totally and completely blameworthy in the most severe cases.

When you ask yourself that question, you have to ask whether or not, after this presentation, Cory is fully and totally blameworthy; whether he is completely responsible for his actions. Has he lived his life as the normal, average person, who might be totally and fully responsible? Or has he lived his life under these situations that I have described.

We will demonstrate to you today that Cory is not a normal young person. He is 24 years old now. He has severe neurological impairment. He is two points above being mentally retarded. And when you couple that with this abusive background, I think you are going to be able to see that he is not as totally and completely responsible as a person who doesn't have those deficits. And life in the penitentiary without possibility of parole is no bargain, either. Thank you, folks.

THE COURT: All right. Call your first witness.

MR. COOLEY: Our first witness will be Dr. Dewey Cornell.

DEWEY CORNELL,
called as a witness by and on behalf of defendant
Johnson, having been first duly sworn by the Clerk,
was examined and testified as follows:
                    DIRECT EXAMINATION
BY MR. COOLEY:
Q    Dr. Cornell, good morning to you.
A    Good morning.
Q    Would you please tell the ladies and gentlemen
of the jury your full name and your profession?
A    Dr. Dewey G. Cornell.  I'm a clinical
psychologist and associate professor.

3556

Q    And where are you employed?
A    University of Virginia.
Q    And is your title there associate professor?
A    I'm associate professor of education in the
programs in clinical and school psychology at the
University of Virginia.  I am also a faculty
associate of the Institute of Law, Industry and
Public Policy.
Q    And what are your professional duties as an
associate professor?
          MR. VICK:  We would stipulate as to his
expertise.
          MR. COOLEY:  I very much appreciate that,
Your Honor.  I would like for the jury to know
something about him.
          THE COURT:  Go ahead.
BY MR. COOLEY:
Q    Doctor, what are your professional duties as an
associate professor?
A    My principal duties are teaching, research, and
service at the University of Virginia.  I teach
graduate courses in our training program that trains
Ph.D.s in clinical and school psychology.  I teach
courses in personality assessment, in
psychopathology; that is, in mental disorders.  I am

3557

I am also the assistant director of our training
clinic, which is a clinic that provides psychological
assessments, and I'm in charge of the psychological
assessments that our university clinic provides.  I
also am involved in the training of psychologists and
psychiatrists who specialize in forensic mental
health, and I conduct research in those areas as
well.
Q    I see.  Doctor, can you describe briefly your
educational background and any training that you had
in clinical psychology?
A    My training in clinical psychology began at the
University of Michigan.  I obtained my Master's
degree in 1979 and my Ph.D. in 1981 at the University
of Michigan from the Department of Psychology, from

**J.A.440**

the training program in clinical psychology. As part of my doctoral training, I had course work in clinical psychology, in diagnosis assessment, treatment of individuals with mental and emotional disorders. I also had internship training, clinical practice training. I worked at the Yorkwood Center, which was a children's psychiatric hospital working with emotionally disturbed children and adolescents. I also worked at the University of Michigan psychological clinic, which is a psychotherapy clinic for young adults with emotional problems.

I also worked at the learning evaluation clinic by the School of Education in the University of Michigan, which is involved in the diagnosis and assessment of learning problems in children.

I completed those training experiences and my doctoral research in 1981, and at that point I accepted a post-doctoral position as a post-doctoral scholar in psychology in the Medical School at the University of Michigan, where I worked in the adult psychiatric hospital providing diagnosis assessment and treatment of individuals, of adults, with mental disorders. And I conducted research there on these same problems and disorders. I was there for two years.

Q    All right. Doctor, would you explain to the folks, the ladies and gentlemen of the jury, the distinction between clinical psychology and forensic clinical psychology?

A    Yes. Clinical psychology is the branch of psychology that is concerned with clinical practice, with working with individuals who have emotional disorders or problems in living that require treatment. Forensic clinical psychology is a subspecialty. It is the application of clinical psychology to legal matters. And it is an area in which the person may evaluate individuals who have been charged with crimes, or may assist the Court in some way in answering legal questions that require some psychological information. So it is a specialty of providing information in psychology that's relevant to legal questions.

Q    Doctor, have you had any special training in the field of forensic clinical psychology?

A    Yes, I have. Beginning in 1983, I began specialized training and practice in forensic clinical psychology. I was employed as a forensic clinical psychologist in Michigan at the Center for Forensic Psychiatry. This is a state institution, a hospital, which provides diagnosis and treatment to individuals who have been charged with serious crimes, individuals who are violent, who are either

**J.A.441**

not competent to stand trial, or who might be considered legally insane, or for other reasons cannot be managed in the legal system or in the prison system. And those individuals are treated at the forensic center. I completed six months of training at that agency and became a certified forensic examiner for the State of Michigan and worked and conducted research and provided treatment in that setting.

Q    Doctor, have you conducted forensic evaluations of criminal defendants?

A    Many. Hundreds of them.

Q    And did those include defendants charged with murder?

A    Yes.

Q    Have you treated individuals who have committed murder?

A    I have treated dozens of individuals who have committed murders of various kinds.

Q    Doctor, in terms of your professional background, are you licensed in clinical psychology?

A    Yes. I'm licensed in the State of Virginia as a psychologist and as a clinical psychologist.

Q    Are you a member of any professional organizations in psychology?

A    I am a member of the American Psychological Association, the Virginia Psychological Association, several divisions of the American Psychological Association, the Society for Personality Assessment, the American Orthopsychiatric Society, and several other professional organizations.

Q    Within your profession, have you presented any papers in the area of forensic clinical psychology, any conferences? And if so -- or professional meetings -- if so, briefly tell the ladies and gentlemen of the jury about them.

A    I am very actively involved in the forensic field and in conducting research and presenting the findings of my research at meetings of professional organizations. This would include presentations I've made at national conferences of the American Psychological Association, the American Psychiatric Association, as well as state and local conferences as well.

Q    And have you published any books or articles in the area of forensic clinical psychology?

A    I have published a number of articles, particularly in the area of homicide. I have published a book with Eliza Benedict on juvenile homicide, a series of articles on the origins and development of violent behavior in young persons. I have also conducted research on malingering, which is

the tendency of some individuals to present false symptoms or to try to deceive mental health professionals.  I have also published research on the assessment and diagnosis of mental disorders that are found commonly in individuals who are charged with violent crimes, such as depression, borderline personality disorder, other types of personality disorders.

Q     Your curriculum vitae indicates that you are a journal reviewer for national journals.  Would you tell the ladies and gentlemen of the jury what a journal reviewer is?

A     Scientific journals in the field publish research articles and theoretical articles only after an extensive review process.  Articles are submitted to the journal.  They are then reviewed anonymously by a panel of experts in the field, who evaluate and critique the articles, reject the majority of them, and accept a small number of them as acceptable for publication.  And I have had the opportunity to be selected as a journal reviewer for a number of journals in the forensic area:  Law and Human Behavior, Behavioral Sciences and the Law, for example.

Q     Have you received any grants to conduct research in forensic clinical psychology?

A     I received a series of grants to conduct research on violent behavior; on the family background, personality, and development of individuals who commit violent crimes.  I have received grants from the State of Michigan and national grants from the Guggenheim Foundation.

Q     Have you had any experience in training others to work in the field of forensic clinical psychology?

A     In my current position, which I've held since 1986, I have been involved in training individuals in the State of Virginia to be certified to conduct forensic evaluations.  That is, the state has a training program to train psychologists and psychiatrists to do court evaluations.  And those individuals come to our agency at the University of Virginia for training.  I'm a lecturer there, also a supervisor of the cases that we conduct there.

Q     You indicated a little earlier that you had personally conducted forensic evaluations, somewhere between 400 and 500 criminal defendants; is that correct?

A     Probably 400 to 500 criminal defendants that I have evaluated for forensic purposes, yes.

Q     Did the referrals requesting you to do those evaluations, did they come from the prosecution, or

**J.A.443**

do they come from the defense?

A     They come from both sides of the case.

Q     And when you were doing these in Michigan, where did the referrals come from?

**3564**

A     Michigan has a system whereby the referrals come from the court.  The referrals that I received were from the court, not from either one side or the other.  I would submit a report and then either the prosecution or the defense would call me depending on which side felt my testimony would be of value to them.

Q     How many times altogether, Doctor, have you been called to testify in court proceedings?

A     Including other states other than Michigan, probably 40 to 50 times.

Q     And during the course of that testimony, was it more often for the prosecution or more often for the defense?

A     I have been called many times by both sides.  I would guess that I have been called more by the prosecution than by the defense.

Q     And you have testified not only here in Virginia, but also in some other states; is that correct?

A     Yes.

Q     Those would include Maryland and Michigan and Wisconsin?

A     And Virginia, yes.  Those four states.

Q     And that would also include some experience

**3565**

being qualified as an expert in federal courts in Virginia; is that correct?

A     On one occasion I have testified in federal court in Virginia as well.

Q     If we can, let's turn to your role here today.  I'd like for you to help us clarify that for the ladies and gentlemen of the jury.  You are aware that Mr. Cory Johnson has been convicted of seven murders in the course of or in furtherance of a Continuing Criminal Enterprise; is that correct?

A     Yes.  I am very aware of the charges and his conviction on them.

Q     In addition, one other murder that was not related to the Continuing Criminal Enterprise for a total of eight; you are aware of that?

A     I am aware of eight, yes.

Q     All right.  Are you here today to testify that Cory Johnson is not responsible for his actions in committing those crimes?

A     No, I am not.

Q     Are you here to testify that Cory Johnson should be excused for the crimes for which he has been convicted?

**J.A.444**

A      Absolutely not.

Q      Now, if you believe that Mr. Johnson is responsible for his actions and shouldn't be excused for his crimes, tell the ladies and gentlemen of the jury what the basis of your testimony is today.

A      The basis of my testimony is very narrow.  That is, when a person is charged with a capital crime, there is a capital sentencing evaluation.  And the purpose of that evaluation is to provide the jury with as much information as possible that they would need to make a decision of mitigation.  And in this case, the decision on which my evaluation is based is whether there is information relevant to the jury's decision of receiving the death penalty or life in prison without parole.  And so all of my testimony and evaluation today is only intended to give the jury information on making that distinction, and I want to make that very clear: that it is not an issue of whether Cory should be excused for the actions or not considered responsible for the crimes that he has been convicted of.

Q      Now, Doctor, you have been asked to evaluate Cory in a number of capacities; is that correct?

A      There are three issues that I was asked to evaluate him for, one being mitigation, the capital sentencing evaluation that I am testifying about.  There are two prior issues that I also evaluated him for.  One was whether he was competent to stand trial, whether the trial could proceed because he was capable of doing that; and the other was whether he could be considered criminally responsible or not responsible -- that is, insane -- at the time of the offenses.  And so I did separate evaluations of him addressing  --  I addressed those questions separately, I should say.

Q      Now, Doctor, so let's take them individually.  As to the evaluation as to Cory's competence to stand trial, did you find that he was competent or incompetent?

A      Well, despite his intellectual limitations, I thought he met the very low standard for being considered competent to stand trial, minimally competent to stand trial.

Q      As to your evaluation relating to what would commonly be called sanity at the time of the offense, did you find that Cory was insane or not criminally responsible, or did you find that he was sane and criminally responsible?

A      I could not support a finding that he was insane or not responsible.

Q      Your testimony today relates only to the area of presenting to the ladies and gentlemen of the jury

3568

those elements and conditions which might be considered by them to be mitigating; is that correct?

A    That's right.

Q    If you would, let's focus on the mitigation evaluation. Would you describe for these folks what you did that constituted a mitigation evaluation?

A    Yes. Mitigation evaluation for capital sentencing should be a very thorough evaluation. And first of all, there are several parts to my evaluation. The first part of my evaluation was that I met with him individually and interviewed him. I met with him on three occasions. I spent approximately 15 hours with him, interviewing him and giving him psychological tests. I tested his intelligence, his school achievement, his personality. I also obtained from him a complete account of his life, from his earliest recollections up to the present time, in order to provide the jury with a complete account of who he is and how he became the person that he is today. That is the first part of my evaluation.

The second part of my evaluation is really to review as much collateral information, independent information, as I can to either confirm or disconfirm

3569

what Cory Johnson tells me, and also to add additional information that he did not touch upon. For that purpose, I had really extensive records that I received to evaluate him. I had records received from the prosecution --

MR. COOLEY: Judge, if I could, those would be the items that I am holding up here; is that correct?

THE WITNESS: That would be about the right size of it, yes.

BY MR. COOLEY:

Q    These were items supplied by whom?

A    My understanding is that they were supplied by the prosecution, describing the allegations and the offenses.

Q    I'm sorry to interrupt you.

A    I also received additional records, school records, from New York City Public Schools, records from the Jewish Child Care Association, where Cory spent time at a residential treatment center there for about four years. So there are about four years of records there. He also spent some time in a group home, over a year there, and I received records from them. He also spent some time in Riker's Island jail in New York City, and I received records from them.

3570

Q    Let me ask you, if I may, are those records

J.A.446

contained in these four notebooks?

A    I have a copy very much like that, four binders with those records in them.

Q    Quantity-wise, this would appear to be consistent with the records that were available to you and reviewed by you?

A    That's right.

Q    Were those records reviewed in depth?

A    Yes.  And they were well over 500 pages of records that I reviewed.

Q    In addition to your meetings with the defendant, with Cory, did you have occasion to interview anyone else relating to developing your mitigation testimony?

A    I conducted additional interviews.  I had the opportunity to meet and have a face-to-face interview with his mother.  I also conducted telephone interviews with individuals who worked with Cory when he was at the Pleasantville Cottage School in New York, and Elmhurst Boys' Home in New York.  There were about six individuals, staff members there, two psychiatrists, a psychologist, and several social workers that I interviewed as well.

Q    And two of those folks are here today; is that correct?

A    Yes.  I had the opportunity to meet them this morning face-to-face.

Q    I see.  Doctor, did you also refer Cory for any specialized testing which has been made a part of your evaluation?

A    Yes.  Based on my initial testing, I felt that there was strong evidence of brain impairment.  So I referred him for a more specialized testing, neuropsychological testing by a neuropsychologist, Dr. Edward Peck.  And I received a written report from Dr. Peck, and then I also spoke with him about his report and got an oral report as well from him.

Q    Doctor, based on all of the information that you had at your disposal and that was made available to you, you prepared a mitigation report; is that correct?

A    Yes.

Q    Did you prepare anything beyond that report?

A    In addition to the report itself, I also assembled together quotations from the records that I reviewed, quotations that I thought best summarized the mitigation reports, my mitigation report.  I also assembled Dr. Peck's report, a series of materials that I felt summarized the basis for my mitigation report; that is, the primary findings that I relied on, including some charts of my own psychological test results.

J.A.447

Q    All right.  And did you include certain things such as definitions of some of the conditions that Cory has?

A    Yes.  I also included the federal and accepted professional definitions for learning difficulties, learning disabilities, and mental retardation as well.

MR. COOLEY:  Your Honor, with the Court's permission, we have a copy of the full report and appendages for each member of the jury.  The government already has their copies, and also a copy for each defense counsel and the Court.

THE COURT:  All right.

(Documents proffered to Court, counsel, and jury.)

MR. COOLEY:  If I could be so bold as to request of those folks who have received a copy if they could try to follow along with us as we go through it rather than leafing through, which I think is a tendency, naturally.  We would appreciate that in presenting it in the form Dr. Cornell has set it up.

3573

THE COURT:  All right.

BY MR. COOLEY:

Q    Doctor, if you would, we would like to start with a review of Cory's life and ask you, based on your evaluation and various sources of information that you have described to the ladies and gentlemen of the jury and obtained during the course of your evaluation, did you formulate an opinion about the psychological background, development of Cory Johnson?

A    Yes, I did.

Q    Could you summarize for us what you concluded?

A    When I put all the information that I reviewed together, I think there are two primary factors that I felt the jury should be informed about for purposes of mitigation.  The first of these is Cory Johnson's upbringing in a severely unstable, neglectful, and abusive family environment, which had a devastating effect on his psychological development and his emotional maturity.

The second main factor that I felt was important was his degree of brain impairment, which is exhibited as a very severe learning disability, a speech impairment which he suffered during his childhood years and still has remnants of today, and

3574

his generally impaired intelligence, which places him just above the level of mental retardation.  Those two factors in combination, I feel, made Cory unprepared to function in society, unprepared to survive on his own when he left institutional care

and had no place to turn to, and made him unable to cope and adapt to society in a way that a normal individual would.

Q    I'd like for you to explain to me and to the ladies and gentlemen of the jury, if you would, how you came to those conclusions. Can you tell the Court what information about Cory's background led you to this, or these, conclusions?

A    This would take some time. First, regarding his upbringing, I looked at his life as being in three phases: the first phase being his life with his mother up until about age 13; and then the years that he spent in institutional settings; and then finally, the third phase, after he left the institutions and was out pretty much on his own.

During that first phase of time when he was with his mother, or at least mother had formal legal custody of him, he lived in an extremely unstable situation. He actually was under his grandmother's care initially as an infant. When I interviewed his mother, she had very poor recollection of his upbringing and was not very involved in his child care. That was either taken care of by her own mother, when she lived at home for a couple of years, or he was left basically unattended for long periods of time. The mother could not recall details of his life, basic things that most mothers can recall about their children, such as when they learned to walk and talk, and how they were potty-trained, and how they did when they were in school. Stories from their childhood.

She was not around very much during his upbringing. She was involved in jobs that she held. She was involved in relationships with a series of men. And as she said a number of times, he couldn't fit into her life, and neither could his half-brother, Robert. The father, of course, was not in the picture at all. He was in prison. He had no contact with Cory. Cory was led to believe by his mother that his father was actually a man named Robert Butler, who was actually father to Cory's brother. Cory only met his father, basically by coincidence, when he was 12 or 13 years old. And up until that time, he thought the man named Robert Butler was his father. This was a man that his mother lived with for a short period of time. He was abusive. They had a parting of the ways and he was one of a series of men that she lived with at various times who were abusive to her and to the children, and who were involved in drug abuse. And at various times, those individuals moved in and out of the residence.

Now, it was very difficult for me to determine where Cory lived and how many times he moved. I know that at least 12 times, his mother changed residence. But there were many more times in which Cory was sent back and forth to other relatives. He didn't have a stable place that was his home. He didn't have a single individual that he could regard as a parent in the sense of someone who is going to always be there, be there and take care of him. His mother nominally would be his parent, but his involvement with her was neglectful and abusive. And he and his brother had evidence of serious emotional problems well before they were teenagers.

He had troubles with enuresis, bedwetting, up until age 11; encopresis, fecal soiling of pants, when he was 10 and 11 years old, which are signs of quite serious emotional disturbance. His brother Robert, at a young age, I believe ten or eleven, made a suicide attempt and was hospitalized for five months in a psychiatric setting. So both these boys were quite emotionally troubled; understandably so, given the kind of extremely unstable environment that they grew up in.

And I mentioned also that there were abusive boyfriends. And the mother related to me a number of violent incidents in which either she or the boys were physically assaulted and threatened by various boyfriends. And Cory had quite serious difficulties with one boyfriend, to the point that she did not think it was safe for him to stay in her residence any longer. That is basically the first phase of Cory's life up until about age 13.

Q    If I could ask the ladies and gentlemen of the jury to go, and you as well, to the green tab and to turn that over to the chronology of events in Cory Johnson's life.

You have basically described what would be the top third of that chronology, I believe.

A    Yes.

Q    And he was, of course, born in Brooklyn, and his birthdate was in ▮▮▮▮▮▮▮▮▮. You have indicated a number of movements by Cory with his mother or without his mother during the time frame from birth to the age of 13, at which time he was committed by her to the state, and ultimately placed in foster care; is that correct?

A    That's correct. At approximately age 13, he was placed in the Pleasantville Diagnostic Center, a residential facility for diagnosis of children with emotional disturbance. He was there for two months of evaluation, and at that point they felt it was more appropriate for him to be placed in an

institutional setting.  It is called the Pleasantville Cottage School.  It is called Cottage School, but actually what it involves is that he lives in a home that's supervised  --  in a cottage with several other emotionally-disturbed boys on the grounds.  There is also a school that he would attend during the day.  And he was placed there basically because the Court determined that his mother was not appropriate, and that he could not be well-raised at home.  He remained there from about age 13 to 16.

Q     If I could refer the jury to the blue tab in your book, open that first document that is behind the blue tab.

Doctor, you have blown that up, I believe.  You have taken a quotation from the petition which removed Cory from the home and indicated -- and I don't want to belabor this because I know that each person who has this can read for themselves -- but in that petition, and this is the language from the Court itself, there was a determination that the child, Cory, had been removed from his home on February 1st, 1982, and that the parent was unable to make adequate provision for his care, maintenance, and supervision; is that correct?

A     That's correct.  And in this tab are the quotations that I selected.  Now, in order to give you the context for these quotations, the next tab has the report, the legal petition, for example, that the quote comes from.  So I'm going to focus on the quotation, but it is possible for anyone to look at where that quotation came from and to read what came before it and what came after it.  In addition, there are other reports as well.

Q     If I can, so that everyone can understand what we are doing, the volume that's behind the blue tab are quotations which you have drawn from reports from the child care agencies.

A     Right.

Q     The specific reports from which these quotations are drawn are behind the orange tab.

A     That's right.

Q     We do not intend to read all of those reports or to require you to read them, but they are there in case there was a concern that your quote had been taken out of context; is that correct?

A     That's correct.

Q     And the items that are behind the orange tab are excerpts from the reports that are contained in these volumes that were supplied by the child care agencies.

A     That's right.

Q     If you would, can you relate to the ladies and

gentlemen what occurred and how things were occurring once this second stage arrives in Cory's life, where he has been voluntarily, by his mother, removed from his home or her home and placed with the state?

A    Yes.  Once he was placed with the state he had a series of psychiatric, psychological, and educational evaluations.  He had those initially when he first came there so that they could decide what needed to be done, and then he had further evaluations repeatedly over the years that he was there as they tried to monitor his progress and refine their treatment to help him.

And what I have done is I've gone through all of those records page by page, and what I have selected here are the ones that I felt that were most influential to me in formulating my opinion, and which I think accurately reflect his time spent at this institution.  And then I follow that up by contacting the authors of most of these reports.  I talked to six individuals that I could identify, and spoke with them about the reports to make sure I understood what they were saying and that I had an appropriate interpretation of what was said.

First of all, from the very beginning, they assessed that he had serious emotional problems.  They reported emotional disturbance that he had prior to coming to the child agency, and then they described what he was like once he is there.

The first psychiatric evaluation, which actually is page six of these quotations, describe that he was cooperative, that he related well, but that he had a slurred speech, and he said he doesn't want to come home for awhile so that "I can straighten my head and my mother can straighten herself out."  Quotations that he made to the psychiatrist who saw him, Collimuttam.

Cory feels he has problems with learning and reading.  He likes the school and the counselor here.  Cory feels sad when his mother keeps telling him about his father being in jail.  He has felt at times like wanting to stab himself, but has never done anything to hurt himself and doesn't think he will ever do it.  Cory talked about his brother trying to kill himself, "because of my mother," he said, and says that he feels very sad about it.

Q    Cory's brother was younger?

A    His brother was two years younger.  He made a suicide attempt and was placed at another agency called Children's Village, and he was there for awhile and then later was switched to Pleasantville as well.

Dr. Collimuttam I thought, summarized well his

early impression on page seven.  He says, "life has been very chaotic for this family with Cory's mother having had financial problems, having difficulties with her job and her relationships.  Mother appears depressed and unavailable to the child emotionally.  There have been frequent moves, stays in the homes of relatives often with the mother and children being in different homes.  This was followed up with a period of being with the mother's boyfriend, who Cory did not get along with and would steel from to get back at home.  Cory is a child who has been reacting to the chaotic life in the last four years.  In addition, he has shown evidence of mild to moderate neurological deficits of dyslexia and speech impairment."

        And then Dr. Collimuttam gave him diagnoses using our standard diagnostic manual, the DSM-III.  He saw him as having an adjustment disorder, which means he was reacting to stressful events in his life with symptoms.  He was diagnosed as having a special developmental reading disorder.  It is another term for dyslexia.  It is another term for learning disability.  Those are all interchangeable terms.  He was also diagnosed as having positive soft neurological signs, which means that there was evidence that he had brain damage.

        He was then given a psychological evaluation by a psychologist.  This is a little bit out of order.  This is on page five.  Dr. Cary Gallaudet gave him a series of psychological tests.  He described serious problems, deficits in nonverbal abstract reasoning, perceptual organization, visual perception and perceptual motor functioning.  These weaknesses were also evident in his Bender-Gestalt test, which was characterized by rotations and distortions.  Performance was comparable to a child five years below his chronological age, an underlying neurological deficit.

Q    Cory was age 14 at this point in time.  Then he would have been operating at the level of a normal nine year old?

A    At the level of a 9 year old, yes.  Yes, in these areas where he showed brain impairment.  It says, "In summary, Cory is a sensitive and dependent boy who is struggling with issues revolving around independence.  An underlying organic component," that means brain damage, "serves to exacerbate the anxiety, dependence, affectional needs, and hostile impulses, and as a result, Cory has an extremely hard time trying to integrate emotional challenges.  Although evidence of a learning disability exists, he continues to be an ambitious boy who is motivated to

**J.A.453**

improve his situation and would benefit highly from both remediation in academic areas as well as psychotherapy."

What's surprising about this statement and other statements that follow is that Cory remained very motivated.  He remained cooperative, eager to learn, and willing to take on the challenge of his disability.  If any of you have had experience with learning-disabled youngsters, you know that even mildly disabled youngsters become discouraged.  They try to avoid their disability, understandably so.  What was unique about Cory was, first of all, that he had a very severe learning disability -- I'll talk more about that later -- but that he continued to be motivated to try to overcome it.  He had an educational evaluation.  That's page eight of the quotations, by an education specialist who again pointed out that he was reading on the second-grade level.  Third-grade level was too difficult to read.  His spelling was second-grade level.  His arithmetic was mid-third grade.  It said that he couldn't multiply by three.  He couldn't divide a number by two.  He couldn't read digits of more than four digits.  He could recite the months of the year only up to August.  He knew there were 12 months, but he couldn't say them all.  So this is when he is 13 years old.  And he doesn't know all the months in the year, he can't read and do arithmetic beyond about a second or third-grade level.  Of course, he has moved at least 12 times and had to change schools and classrooms, and I'm sure that he wasn't given much of an opportunity for teachers to work with him while he was in schools.

I also looked at part of this at what his mother was like at this time.  Because a very important part of any kind of treatment is to get the family involved and to work with them.  And I got very consistent descriptions of his mother, who was the only family member that they had any contact with.  This is on page nine, Gloria Caro, caseworker assigned to work with him, they have a conference report.  This conference involves a psychiatrist, a psychologist, teachers.  The mother is invited to come, although most of the time she did not come, and Cory participates in parts of these conversations.  But the caseworker -- he had a series of caseworkers --  the first one said, "Ms. Johnson is an attractive, stylishly-dressed woman who works as a receptionist.  She is an articulate woman who reacted to my statement with anger, indicating she is trying to put her life together.  She says right now she does not have too much energy or time for her kids.

She believes they will have to understand it.

"The message is, if her kids can live her life right now, okay. If not, she can't see them. She says she loves her kids, but putting her life together comes first.

"A joint interview with Cory elicited almost no comment from Cory, who stared at the ceiling while his mother pretty much lectured to him on how insensitive he was to 'where I am now and have to be.' It was not concern for him and his situation, being separated from family, being institutionalized."

She continues. She says, "It is difficult to see how Ms. Johnson can be engaged unless her needs are seen as primary. She refuses referral for treatment for herself. Further contact will reveal how fixed she is in this narcissistic, self-focused stand."

This is June. He has been in the setting for about four months. They are concerned that they cannot work with the mother, and this continued. In January of 1983, this is page ten, he now had a new caseworker, had a change in caseworker. He has now been in the institution almost a year. And here we have the quotation you may have heard before: "Child care workers note that Cory's behavior deteriorates when he has no contact with his mother. He can become quite depressed when he has not heard from or seen her for a period of time. It is the opinion of the child care workers that Pleasantville is good for him, that he is functioning fairly well here. Cory realizes his learning disabilities. However, he struggles to do his homework. He is truly motivated to do well and succeed, and he has not yet given up on himself. Within the last two weeks, there has been some decline. Cory fantasizes that his mother will come up in a car and take him to Pizza Hut. Child care worker reports that Cory's mood is basically that of a depressed child."

It continues to report that Cory wants to have contact with his mother, wants to have contact with his father. He tries to maintain the view that they are available to him. He cares about them, but not accepting that they are not available to him.

Q   If I might, obviously, these reports being written by his workers in 1982 and 1983, and for that matter, the remaining ones that you are going to comment on, obviously were not done in anticipation of a trial proceeding.

A   That's right.

Q   These are excerpts taken from the reports of evaluations being done of Cory in an effort to help

him adjust to the problems that he had; is that correct?

A    That's right.

Q    Different from, obviously, your report which has been prepared in anticipation of this trial.

A    That's right.

**3589**

Q    But these excerpts are not so.

A    That's correct.

Q    Go ahead.

A    These individuals had no inkling of what would happen in Cory's future.  In fact, when I interviewed them they were shocked at what had happened, very troubled by it.  As one of them said, "There is lots of boys that I work with here that I wouldn't have been so surprised if you told me what he was charged with," but they were very shocked to hear this about Cory.  Cory was one of the better-adjusted boys at this school.  But he was hampered because he was one of the most severely learning-disabled boys that they had seen.  And they reported that he worked and worked, and try as he might, he couldn't read above about a second or third-grade level.  And over a period of months and years he became extremely frustrated by that.  He was given some educational tests after he had been there one year.  They did a fairly comprehensive reevaluation of where is he, why isn't he learning, what is the problem here.  This was Dr. Barish, a clinical psychologist called in as a consultant to test him to try to find out why isn't Cory learning in school, why is it that he appears motivated but isn't able to learn.

**3590**

Q    I am going to ask if we could put the easel close enough for the jury to see.  This is a blow-up of what is already included on page 13.  The jury may want to make reference to that.

        (Easel displayed to jury.)

        The second psychological evaluation that's now before the jury on page 13, what did it show?

A    Well, it showed that he was severely learning disabled.  This psychologist gave him not only tests of his school achievement and found that after a year in this setting he still is reading at the first percentile, he has spelling at the first percentile, arithmetic at the second percentile.  That means compared to other children his age, he is in the bottom one percent.

Q    Is it possible under the testing that was available then, and I suspect available now, for one to test lower than the first percentile?

A    That's as low as you go.  He was at the bottom. That is, 99 percent of other kids were ahead of him despite his being in special education, despite his

good motivation.  He could not learn to read or spell.  He is a little bit better in arithmetic, and that turned out to be a little bit better for him later on.  He was also given neuropsychological tests similar to what Dr. Peck gave him this year, which also confirmed that there was brain impairment; that this was not a problem that he wasn't motivated, or was emotionally disturbed, but the brain was not functioning properly for him to learn.

"The present test findings confirm the presence of severe learning disabilities in reading, spelling and arithmetic.  There is an abundance of findings which strongly suggest diffuse neurological dysfunction with associated impairment in many aspects of cognitive functioning."

I spoke with the doctor.  He said this is the most severe case of learning disability that he has, up until now, ever encountered.

Q    For those of us who are not -- I'm certainly one -- not familiar with the phraseology, can you tell these folks what "diffuse neurological dysfunction with associated impairment" might mean?

A    Pardon me for just rushing over that.  Diffuse neurological dysfunction means that there is evidence of impairment in his nervous system in his brain.  It is diffuse, meaning that it occurs not in one specific area, but in a number of different areas in the brain.  So that this is one of the reasons he couldn't learn.  Many individuals with learning disabilities have local deficits, or specific deficits.  They can't process visual information very well.

They learn to compensate for that.  Most learning-disabled children can learn to compensate.  If they can't learn one way, they learn another way.  If they can't learn by reading something, they have it read to them.  Or, if they can't learn through writing, they learn orally.  They can learn a number of different ways and they compensate.  The problem with Cory is that his  --  his disability was so severe, so diffuse, he couldn't compensate.  There was no area that was unimpaired so that he could rely on that area.  These scores, they also have standard scores, 66, 64, 64.  Those are all in the mentally retarded range.  Scores in the 60's are in the mildly retarded range.

Q    On the chart that is before the ladies and gentlemen of the jury on the easel, as well as on page 13, not only was he testing in the lowest possible percentile on two of the three, and in the second percentile in arithmetic, but his standard test scores at that time would have put him

well-within the mentally retarded range?

A   Yes.

3593

Q   Is this the same point in time where those workers who were dealing with him and working with him were reporting that he remained highly motivated, was trying to learn, trying to do the best he could?

A   That's correct.

Q   Was there anything in these reports at that point in time that indicated in any manner that Cory was, for instance, faking or refusing to participate in these tests, trying to score low?

A   Well, not -- certainly not faking.  Certainly he tried his best whenever he was tested.  However, I think they report that there were times he was very frustrated by this.  And I don't want to give the impression that any 13-year-old is always motivated and always on task and always trying to learn.  I think there were undoubtedly times when Cory was less motivated, would give up on something he was trying to learn.  But what is most striking, very different from other records I've seen and other kids I've seen, is the level of motivation he showed at this time; that he was trying very hard.

Q   Psychologists, of course, are trained to watch for things which would suggest that the person was intentionally trying to do poorly.

A   Absolutely.

3594

Q   Is there any indication in any of these tests that they found these tests to be invalid?

A   No.  I don't have any concern about these test results.  They are very consistent.

Q   If I could ask you to refer back to Page 11. This remains under the blue tab.  Page 11 and 12 are the reports that indicate his treatment review and progress in school immediately preceding the testing that is currently sitting on the easel and also on page 13.

A   Yes.

Q   Would you comment as to those two pages, either read or clarify them?

A   The statement "His progress in class has been very, very, very slow, almost to the point where one might feel he is not learning.  He received remedial reading two to three times per week.  However, his reading and spelling is on a second-grade level."

This is why they did this kind of extensive evaluation.  The teachers were frustrated.  They were working with him, they saw him trying, and they saw no progress.  And so it was very mysterious to them how this could be, and why he wasn't performing better.  Because in many respects, Cory looks like a normal young man.  He can act like a normal young

3595

man.  So, you know, if he had been disfigured, if he had looked like someone who was maybe mentally retarded with a syndrome that involves facial abnormalities or something, then that would make some sense to them.  They would see evidence that he wasn't normal.  Instead, they don't see that.  All they see is a motivated boy who can't learn.

Q    The second paragraph on Page 11 makes reference to the fact that he had been referred to his speech therapist at that point in time.

A    Yes.

Q    Back on the quotation from page two in November of 1983, he had been early on -- there was a determination that he had significant speech disorder.

A    Yes.

Q    And can you comment briefly on what that would have involved?

A    Individuals with learning disabilities and with brain impairment may also have speech problems.  And they noticed slurred speech and other speech problems early on.  They referred him for speech therapy.  He was very eager to receive it, because in fact it was very embarrassing for a youngster to talk funny, as he would have put it.  And he was referred -- they

3596

did not have available staff to give him speech therapy.  Actually, he got a very extensive evaluation at an independent center, independent hospital, and had a very thorough evaluation which again confirmed a learning disability and speech impairment, quite serious speech impairment.  And they strongly recommended that he receive speech therapy.

And after several months, they did a follow-up, found out he still wasn't receiving speech therapy, and they wrote a rather heated letter saying, "What's happened here, why hasn't he received that speech therapy that he needs?"

Q    The third paragraph on Page 11, and this would have been the point in time where Cory, by age, would have been 14 years old  --

A    Yes.

Q     --  that paragraph indicates that he still was a well-related, but depressed, anxious, and severely learning-disabled boy.

A    Yes.

Q    And it also makes references to his continuing experience with his mother.

A    That's right.  This continues to be a problem, that they can't make contact with the mother.  They

3597

can't get the mother to be involved in treatment.  He

would go home to spend some weekends with her, but he wouldn't have much contact with her. She would go off and do her own thing and he would be on his own to do whatever he found that he could do on his own. She couldn't get her involved in treatment. They became concerned that she was verbally abusive of him. That is, she would deride him and castigate him because he couldn't do better in school.

And they tried repeatedly to explain to her that he had a learning disability, that this was not his fault, that he wanted to learn, and that there was no way, as they found out, that he could do better than he was doing. I mean, it is analogous to if a child had a handicap and couldn't walk and the mother says, "You have got to get up and walk," and there is no way he could. Because his disability was not visible, it wasn't tangible, the mother wouldn't accept it. She wanted him to go to college. She told him he was dumb. And Cory was very devastated by this, to have the only person, really, in his life, the only family member that he could have some connection to other than his brother, telling him to do something impossible.

Q    You indicated in your preliminary remarks to the jury that your conclusions, you had come to the conclusion that there were two factors that affected Cory's psychological development and his ability to adjust in society.

A    Right.

Q    And you indicated that one of those was the unstable family circumstances and rejection of his mother.

A    Yes.

Q    And the second was his severe learning disability.

A    That's right.

Q    And in January of 1983, when he was age 14, Ms. Turnquest's comment in that third paragraph on Page 11 is simply that, that Cory is a well related, depressed, anxious, severely learning-disabled boy who has experienced his mother's rejection and emotional unavailability."

A    Yes.

Q    So that diagnosis is certainly not a new one for Cory; is that correct?

A    That's right. This is not my retrospective diagnosis. This was written time and time again in the records. This is echoed later on in further records, too, that we can come to if you wish.

Q    On page 12, the December, 1983 treatment review, can you touch upon that?

A    Yes. "Cory readily states he does not want to

go home at this time and that he needs to work on his problems. Cory's primary concern is his learning difficulties. He is quite frustrated by his reading disabilities and worries about his future. Cory receives remedial reading three times weekly."

Then it says, "It is important to note that Ms. Johnson spent the entire day with Cory and child care workers observed how extremely rejecting his parent is towards Cory. In the cottage later in the day, she had almost nothing positive to say to him."

Consistently, when the child care workers saw Cory with his mother, they became discouraged and concerned, because she was so habitually negative and demeaning to him. And this just simply aggravated his low self-esteem, his sense of himself as not good enough, and uncapable.

Q   I don't want to take you out of an order that you want to follow, but if we could address the speech and language disorder problems and the testing which followed that.

A   Right. That was November of 1983 is when they sent him to Phelps Memorial Hospital Center and gave him a very extensive evaluation. That's on page two and three. It is out of order here.

Q   That is the initial diagnosis, and then was there a testing done of him, and is that contained on page three?

A   Page three are some of the test results from that November, 1983 evaluation. So he has been there a year-and-a-half now, and had this evaluation. Chronological age is 14 years, and on these tests he ranges from nine years to 12 years in his level of functioning on these speech and language-related tasks.

Q   The Peabody Picture Vocabulary Test, where he had a demonstrated standard score of 69 and that would equate to a roughly nine-and-a-half year old child --

A   That's right. That's in the mentally retarded range.

Q   That would have --

A   That's the performance of somebody 14 years old who is mildly mentally retarded. They did not view him as mildly retarded because they knew of his learning disability, but his function in that area was that low.

Q   Dr. Cornell, as Cory aged over a period of time to his current age, did he advance or did his abilities stay at this age level?

A   Well, they advanced somewhat, but he wasn't advancing at his chronological growth rate. That is, he was falling behind. And the older he gets, the

J.A.461

# EXHIBIT 7 - PART 2

further behind he would fall. In the area of reading, though, he has advanced very little if at all. In arithmetic, he advanced up to about the sixth-grade level, I found in my testing.

Q   On page four there is a reference that I think you mentioned earlier in your testimony. Did Cory want to be treated for this speech disorder?

A   He wanted treatment for it very much. He got increasingly frustrated that he did not get speech therapy. He was promised it, he looked forward to it. For him it was one of the reasons why he was agreeing to not be at home. No kid wants to live in an institution. But to his credit, he wanted to live there to get help. And he did not get this help while he was there. This was frustrating to him. It was also frustrating to the other staff, who were upset that he was not receiving it.

Q   The third paragraph down on page four indicates that Cory had a very intensive evaluation in September of that year.

A   Right. That's the scores that I just mentioned. Yes.

Q   It indicates that in those five appointments, he was most cooperative during this analysis and is anxious to start therapy.

A   That's right.

Q   And that pervades these reports; is that correct?

A   That's right. For a number of years, he kept up very high motivation and ambition to do well.

Q   That speech difficulty, did it also -- was there evidence of stuttering or such problems as that?

A   There had been stutterings, marked stuttering when he was real young, and then he continued to show some stuttering problems later.

Q   Is it normal for such disability as speech difficulty to affect one's self-esteem?

A   Absolutely. That's one of the most serious negative consequences. People who stutter or have other speech problems become acutely embarrassed. Other kids tease them about talking funny. And Cory was very sensitive about that.

MR. COOLEY: Now if I might, Your Honor, if we might, we still have a ways to go with Dr. Cornell. I don't know if the Court feels it is an appropriate time for a short break.

THE COURT: We will take a brief break. All right, everyone remain seated while the jury leaves the courtroom.

(The jury left the courtroom.)

THE COURT: All right, Mr. Marshal, you may

J.A.463

remove the defendants.

(Defendants removed from courtroom.)

All right.  We will take ten minutes.

(Recess taken from 11:35 a.m. to 11:57 a.m.)

THE COURT:  Let's bring in the jury, please.

(The jury entered the courtroom.)

BY MR. COOLEY:

Q    Dr. Cornell, I want to call your attention, if you could at this point, to page 14 behind the blue tab.  This is a point in time where Cory has had a second psychiatric evaluation, and a report is made as to his circumstances at that point in time.

A    Yes.  This evaluation is by Dr. John Stadler, who is a psychiatrist and who is the clinical director of the facility.

He says, "At the Cottage School Cory has a reputation of being a good boy, one who stays out of trouble, even though he lives in a cottage where there is a good deal of trouble.  He does not drink or smoke pot.  He does not run away.  I have never known him to be suspected of stealing.  On the other hand, his learning disorder is not responding to any of our teaching methods."

He did not give him an Axis I disorder, although he noted a history of parent/child problems and of conduct disorder which he says are not present now.  He did give him a diagnosis for the learning disabilities, that's Axis II, "Longstanding Developmental Reading and Arithmetic Disorders, Severe."  He also noted positive soft neurological signs and evidence on psychological testing of central neurologic dysfunction, diffuse.  I realize some of this is repetitious.  But my concern is that there was consistency across experts, across time, when people saw him.  And I spoke with Dr. Stadler and asked him about his evaluation.  He remembered Cory.  He remembered that he was very troubling to the staff because he was so well-adjusted, yet so impaired.  He also complained as the director of the agency that they had not had a speech therapist and sufficient remedial reading teachers to assist him as they wanted to, and that that was a chronic problem

which they still had to the present day.

Q    On the following page, page 15, that contains -- this, time-frame-wise, we are now at a point in time where Cory has just turned 16.  He remains at the school at that point in time.  He remains in a residential program rather than being at home, and he has been transferred at this point in time from a cottage that contained younger boys to a cottage called a senior cottage; is that correct?

A    That's right.
Q    That transfer was made in the summer of 1984.
A    They made the transfer, started giving him summer employment jobs, doing manual labor.  He held a variety of summer jobs.  He was proud of the fact when I spoke with him, Cory was, that he stuck out those jobs.  He worked at them even though he didn't particularly like the manual labor that he had to do.  He also was placed in a more vocational-oriented program called BOCES.  It is a special educational program in which he was learning carpentry and did reasonably well.  He tended to do best when he did things with his hands that did not involve language.  Anything that involved language, he had serious impairment in.
Q    The last sentence in that first paragraph on page 15?
A    Yes.  "He is supposed to receive remedial reading and speech therapy, but for reasons not clear, has had no one-to-one instruction for several months."  This is a report of another psychiatrist, Dr. Clemmens.  This is, I think, the third psychiatrist to see him.  And again, they had trouble providing him with the special services he needed, and for some reason these services lapsed at various times.
Q    And this certainly was in spite of his desire to be  --  to have this treatment, to address his problem; is that correct?
A    He voices it here.  I think now at 16, he has been there several years.  He says, "Cory was sarcastic and extremely resentful about receiving neither remedial reading or speech therapy."  The psychiatrist quotes him.  "'School-wise, they haven't done a thing for me.'  When I questioned the lack of remedial reading he answered angrily, 'They get my hopes up high and then you do no shit.  That's why I want to depend on nobody no more.  You are all full of shit, every one of you.  Nobody has raised a finger."
     He had an angry outburst to this psychiatrist over his frustration.  And then when I read that I thought well, he is now starting to really bad mouth the institution and show a more negative attitude.  I wondered what the staff think of him.  Dr. Clemmens in that report says  --  he agreed with him.  She said, "Outside of being raised in a problematic family he has to cope with a severe learning disability which is highly frustrating and embarrassing.  It is understandable that he feels bitter and resentful about not receiving adequate help.  In addition, it is difficult for him that he

J.A.465

had to relate to five different social workers within one year."

I spoke with Dr. Clemmens. She also remembered Cory well despite the passage of time, and she similarly expressed frustration. She was not offended at his criticism of his treatment. She agreed with him that he had not received the kind of treatment that he had been promised, and that he was very frustrated by that.

Q   On page 16, and what has just been placed before the jury, is a report of the fourth psychological evaluation of Cory, being done in March of 1985.

A   Right. He is sixteen-and-a-half. A psychologist who had seen him before who had first diagnosed the severe learning disability came back, did a second evaluation, and found a decline in his performance, found that his scores, his IQ scores, had dropped and were now in the mentally retarded range or close to the mentally retarded range, depending on the particular score. In the verbal area, his verbal IQ was 68 to 70. That is in what he calls "mentally deficient," same thing as mentally retarded borderline range. His performance IQ was slightly higher. His ability to form non-language, nonverbal tasks with his hands, 78 to 81. That's in the borderline to low average range. So he is better in that area. His full IQ, though, which combines those two, was 69 to 74, which is in the mildly retarded range. It is right on the edge, on the upper limit of the borderline mentally retarded range. But it falls into a range of mentally retarded individuals. Dr. Barish says these scores reflect a significant decline since Cory was tested in 1982. "This decline is difficult to account for. However, several factors may be involved. The current scores may reflect in part the increasing demands of the task presented..." that is, the tests are now harder because he is an older fellow, so he is getting harder questions, as well as Cory's failure to learn at an expected pace, that he is not learning at a regular pace. He is falling further behind.

He also says, "They also undoubtedly reflect the effects of Cory's severe discouragement and depression with respect to cognitive tasks." That is, he is starting to become discouraged and to give up. And elsewhere in this report, not quoted here, Dr. Barish points out that when he gave Cory some extra help and gave him some extra opportunity, he showed that he could do a little bit better. But he is becoming discouraged.

He also did personality testing, and this last

J.A.466

paragraph says that. "Personality assessment reveals a thoughtful, highly reflective, but affectively constricted adolescent. Cory expends considerable energy in his efforts to suppress anger. He appears vulnerable to periods of depression and frustration. There is also evidence of feelings of aloneness and a desire for help that is not being heard. Several responses suggest that Cory feels he is not being listened to. Cory's test responses also reveal an effort toward maturity that is particularly impressive considering his severe learning disabilities."

So they are noting mounting frustration, mounting difficulties, continued motivation, continued attempts to do well, but considerable stress that he is showing now.

Q    If you would continue on to the March, 1985 treatment conference. Paraphrase that, if you will.

A    They summarized, sort of did a summary of why he was there, what kind of problems he had when he came there. They point out in this quotation that it was arranged for him to have remedial education. They say, "However, due to Cory's reluctance to attend, and staff's miscommunications around the time of the appointment, sessions were infrequent, irregular, and this was not beneficial to Cory."

They shift some of the blame on to Cory for not showing up for some of the classes. They also do acknowledge, this person does, that there were some problems with arranging services. As I've mentioned before, I talked with Dr. Stadler and Dr. Clemmens about that, and they felt that they did not have the appropriate staff to give him services at those times.

Q    Now, on page 18 in the March treatment conference, March of 1985, they continue to see difficulties with the programs being able to have any meaningful contact or for Cory to have any meaningful contact with his mother; is that correct?

A    That's right. Now he has been there several years. This is a time ordinarily when you send people back to their home. And they have had very little contact with the mother. She has not been available. And in fact, she seems to withdraw more. They say, "Ms. Johnson withdrew more from Cory. She requested home weekend trips go back to two times a month. Cory had been going home weekly, and refused a visit at the last minute. Cory reacted with anger, and it was seen as a good sign that for the first time he was able to verbally state his anger with her. Cory regressed somewhat during this time period. He refused to attend school on several

J.A.467

days. He was despondent, depressed, acting inappropriately in the cottage, making animal noises, and he avoided sessions with the worker. Cory was able to mobilize self and pull out of the depression before acting out in any serious manner. This is seen as a positive progression for Cory."

As his mother pulls away from him, he becomes very upset and frustrated and his behavior deteriorates. He is still attached to her; he very much wants to be with her. She is someone that he admires.

Continuing this report: "Ms. Johnson continues to be surfacely involved with Cory and PCS. Though available to attend some meetings with the agency, she has frequently canceled appointments for apparently valid reasons. She does not visit Cory on campus. Ms. Johnson is a self-focused woman concerned primarily with her own needs. Though verbally expressing her concern for Cory, her actions continue to speak to her emotional unavailability to him."

This is very strong language for somebody to put in writing. I can tell you from working at agencies like that that you are very careful when you criticize a parent and you don't write things like this unless it is quite serious and you can back it up. So when I read this, I was quite impressed by this level of criticism of her.

Q     The Freedom of Information Act would allow her to get this and potentially file an action against these folks?

A     Absolutely.

Q     Could and probably would have. Whatever.

A     We are all concerned about this when we write these things.

Q     The petition that is shown on page 19, this involves a change of manner in which Cory is going to be held, or the type of facility that's going to be available for him?

A     Yes. The usual plan in Cory's situation and in all similar situations is to return home. Children are placed in institutions temporarily, and the goal is to return them to their parents. It is unusual for a change in that plan. They felt they had to change that plan; that Cory's mother was not capable or willing to take him back. The Court petition, Family Court of the State of New York, says, "Father is not involved. Mother is involved in her own personal problems and shows only minimal interest in child. She does not cooperate with agency in planning for child, and reveals only scant information about herself. Child is equally

secretive about his mother's lifestyle and will not discuss it. However, he has adjusted well in the group home and is on good terms with staff and peers."

This reference to the secretiveness is because they had concerns that she was involved in criminal activity and drug use. They could not prove it or establish it, although subsequently she was arrested, and although Cory revealed that he learned of it himself. But they worded that very carefully in this legal statement here.

Q    That petition placed Cory in a group home, occurred when he was 17 years old; is that correct? This came from June of 1986.

A    June of 1986. That's right. They decided that rather than send him back to his home, they would try to find a group home for him. Initially, they didn't have a place. They didn't know where he was going to go, but they felt he couldn't go to his home. And eventually an opening became available in an apartment in Queens, New York, in a large apartment building where they had several boys of his age living there with some foster parents who took care of him. So there was an opening and that became the goal, for him to go live there. This was, of course, quite disappointing to him. All along he had been planning to return to live at home. He had been making weekend visits home, and then that wasn't going to happen. He was going to have to go somewhere else, live in Queens.

Q    This additionally would have been a change in setting for this young man; is that correct?

A    A very big change. He is going to be living in a large apartment building, highrise, in an apartment in that building. He is not going to be in the Cottage School, which is basically a campus that has its own athletic facilities, own school, own residential area. There are comments not included in the record where he expressed apprehension about that; that he felt protected and safe in the Cottage School. He didn't want to go back into the streets of New York where he had  --  where he had been threatened, been assaulted, where he had seen a lot of violence take place. And he was none too happy to go live, not with his mother, but with strangers in an apartment there.

Q    The report there by Odette Noble, a social worker on page 20  --

A    Yes, this is a change. Odette Noble began to work with him when he went to the group home. That is, he left Pleasantville Cottage, went to the foster group home, Elmhurst Boys' Residence. It is an

apartment in a highrise. A social worker is assigned to meet with him weekly, to meet with the mother, and to continue to work towards Cory eventually going home. That's the plan. She expressed in this quotation her frustration.

"Ms. Johnson is extremely elusive. I have made numerous appointments with her and she has not kept them. She will call and cancel, but she will not follow up and make another appointment. She is also not terribly responsible about calling and arranging for Cory to come home over the weekend. Even though Ms. Johnson is quite irresponsible in her relationship to Cory, Cory talks about her as if she is a goddess and is terribly responsible in relation to her. It is as if he is compensating for her real neglect of him." This is stated several times in the records.

Q   Ms. Noble makes a second report in the group home conference report on page 21.

A   Right. It is now 1986, six months later or so. "On the whole, Cory continues to be using the residence well, and would seem to want to remain living there. He has made relationships with both the house parents and the boys, and is liked by both. Cory continues to be quite active and assertive in how he handles himself. And he can be a bit of a monopolizer. But the boys continue to take this in their stride and not seem to mind it. He talks a lot, apparently, in group meetings. Part of the boys' acceptance would seem to be related to Cory's ingenuousness and decency. Cory is very in earnest about succeeding and articulates that point of view to the other boys." At another place, they talk about him sort of almost like having a preacher quality. He is telling the other boys they have to do well.

MR. VICK:  The editorialization, I thought, was not appropriate. I object to it.

THE COURT:  The objection is overruled.

BY MR. COOLEY:

Q   That reference is not  --  that's coming out of the reports, isn't it?

A   I'm referring to portions of the report that I read, that are not in the quotation, to try to explain them. Let me just read verbatim what he says here. "One senses that periodically Cory might feel the wish to live with his mother, but he doesn't discuss it openly and, I think, deep down he knows that his mother is just not able to provide a stable, secure home for him. Cory is quite secretive about his mother's lifestyle and doesn't share with me and, I don't believe, with the house parents, some of his

chagrin at what his mother does. We only pick it up by his behavior and what he does not say."

Q    Finally, Doctor, the difficulties with his mother continued to be reported in the June, 1986

report. They had not seen her or had any contact with her at that point in time?

A    Right.

Q    And then Cory became aware of her own  --  of her, being his mother's, difficulties with the authorities.

A    That's right. It says at the beginning of March '86, Cory learned that she was arrested and was in jail in New Jersey. He told his house parent to inform me, and then Cory and I discussed it. I haven't heard from her or any other family member. Cory states he doesn't believe his mother is guilty and that she was framed. He acknowledged it had something to do with the use of credit cards. I suspect Cory knows the truth, but is keeping it from us."

Q    Doctor, let me ask you if you would to go back to the chronology, which is behind the green tab at the front of the book. At this point in time, you have brought him down through the summer of 1986.

A    Yes.

Q    In the summer of 1986, the entry there on chronology that shows his age, 17, he was involved in something that brought him into the criminal justice system.

A    Yes. That's right. During this time he became aware of his mother's increasing involvement in drug abuse, crack addiction. He was very upset by that. His attitude declined dramatically. And he became more involved with several of the other boys, Dwight and Mitch, who lived in the group home. And he related to me that he wanted very much to be accepted by these boys; they were his friends. He felt like they were  --  like he was loyal to them. And one fellow, Mitch, whom he looked up to, told him he was having trouble with another boy. He referred to him as a Hispanic young man. And Mitch encouraged Dwight and Cory to go with him to try to intimidate this other boy.

And Cory related to me that they in fact did go up to this boy and threatened him, and that this boy, somewhat to his surprise, pulled out his paycheck -- Mitch and this boy worked together -- and gave it to them. So in essence, they robbed him. He told me at first they hadn't intended to do that, but when they saw that this boy did it, they went back and did it a second time. And when that happened, the police were contacted. Mitch was arrested. Mitch then was

J.A.471

interviewed by the police and revealed that he was assisted by Cory and Dwight. Cory and Dwight then spoke with their foster care people and went down to the jail or to the police department and turned themselves in.

Q    He was, in fact, incarcerated at that time at Riker's Island?

A    He was put in jail initially. He was bailed out by the foster parents. He then pled guilty and received a sentence of, I think, ten to twelve days in Riker's Island, which is a rather well-known, rather rough jail in an island in New York City. And he was very distressed by that experience. That was a very troubling experience. He had never been exposed to quite that kind of environment before. But he had got involved with Dwight and Mitch, wanted to be accepted by them. Mitch wanted to take revenge on another boy, and Cory, who I don't think really knew this boy, wanted to be loyal to his friends and do what his friends did, and he got himself involved. He admitted this candidly do me.

Q    No disputing he was guilty of that?

A    No. He told me he was guilty. He told me what he did. He told me he was in jail.

Q    He continued after that to stay at Elmhurst for some months; is that correct?

A    Well, he came back to Elmhurst, after his time in jail. He showed a real decline in attitude. He seemed very uncooperative with the foster parents there. He expressed a lot of anger. They continued to press him about what was going on with his mother. He got angry. He was offended by that and he defended his mother. And at one point, I believe in February, several months after this arrest, he had an argument with the staff and they laid down the law to him. They told him "Look, if you aren't more cooperative, if you don't agree to follow our rules, you are going to have to leave." I checked into it carefully. He had not assaulted anyone. He had not broken laws there. But he was showing a bad attitude and they didn't accept boys there who didn't show that they wanted to be there. So they told him that he would have to temporarily go home until his attitude improved. And so he abruptly left, and he did not return.

Q    And thereafter, was there an occasion in which he was charged with an offense?

A    That's right. He returned home to his mother, continued going to school, was suspended from school for squirting a teacher with a fire extinguisher the last week of school, did not attend his graduation.

Q    Was he to receive a diploma if he graduated?

J.A.472

3622

A    Well, there is -- the mother couldn't tell me. She didn't know. My best understanding from the records and from what Cory told me is that he was to get a certificate of completion; that he couldn't get a full diploma because he was in the occupational training program and he could not pass the literacy test to get a diploma.

Q    Thereafter, he got into some trouble; is that correct?

A    Yes. After that time, he was arrested and accused of another robbery with several other young men. He was put in a police line-up and he was identified in the police line-up. He strongly indicated to me and also indicated in the record at that time that he was mistakenly identified; that he was not -- that he did not commit this offense.

Q    So as to that alleged attempted robbery, he denied that he was indeed the person who had committed that?

A    Yes. That's the only thing he ever denied to me.

Q    From the birth through age 21.

A    Ever.

Q    In discussing those items with him, he acknowledged guilt and wrongdoing at any point where

3623

it was raised.

A    Yes.

Q    But as to this issue he did not, and in fact adamantly proclaimed his innocence; is that right?

A    That's right. He acknowledged to me a number of extensive involvement in some drug dealing and illegal activity. This is the only incident of which he was accused which he told me he did not do and that he was falsely accused.

Q    In spite of his proclamation of innocence, based on one-on-one identification of Cory, he was indeed convicted.

MR. COOLEY:  And Judge, we would reference for the record, I believe it is Government Exhibit PP-1, which is the conviction for attempted robbery.

BY MR. COOLEY:

Q    And he received what penalty?

A    I don't know the exact penalty. He decided to plead guilty because he was told that he would receive several years in prison if he were convicted, and that he would be convicted. And he decided that if he pled guilty he would get a period of up to a year.

MR. COOLEY:  And indeed, Judge, if we can ask the Court to take judicial notice of that, that

3624

exhibit, there is a one-year sentence to Riker's

Island.

BY MR. COOLEY:

Q    And that is when he went to Riker's Island the second time; is that right?

A    That's right.

Q    During that period of time at Riker's Island, did Cory express to you any circumstances which concerned him?

A    Well, he was -- after he pled, he became distraught. He regretted his decision. He became upset. He had had some plans and hopes of entering into the military, of joining the Navy, and came to the belief that because of this conviction he would not be allowed to do that. I don't know whether that's true or not, but that was his belief. He also received a letter from his father which was very upsetting to him and he began to have nightmares and to be very troubled, appear very troubled in the jail.

He was seen by a chaplain in the jail who was sufficiently concerned about him to refer him to a psychologist, who then saw him weekly for, I think, about two months up until the time he was released. This psychologist reported that at that time, Cory was expressing regret that he had pled guilty to something that he didn't do, a great deal of emotional distress over what had happened to him, and he was seen as someone in need of psychological counseling for this time in jail. And subsequent to that, he finished out his time at Riker's Island and was released.

Q    Now, the first visit when he admits he got into the situation where he went down and turned himself in but spent some days at Riker's Island, he was 17 at that time. At the time when he receives this 12-month or one-year sentence at Riker's, he is 18 and serves during his 18th and 19th year; is that correct?

A    That's correct.

Q    In terms of his one year at Riker's Island, of what are you aware in terms of any visitation by family or others?

A    Well, the records indicate that he complained that he did not receive visitors during the lengthy time period that he was there, and he was quite despondent that he didn't have family contact while he was there.

Q    And based on your discussions with him during the course of that one year, did his mother or any other family member ever visit him?

A    He told me that she did not. His mother told me, quote, "I wasn't there for him." She said she

was too involved in her drug problems and her relationship with her boyfriend, and that she could not be available, and that she regretted that but she couldn't.

Q    Following release from Riker's, he went back to New York, or did he move to another area?

A    After he was released he went to North Carolina for several months and spent part of that time with his half-brother's father, I believe, Mr. Butler, a person that he had lived with when he was young who agreed to take him in for a period of time.  He spent several months there in North Carolina, and then subsequently returned to New York.

Q    All right.  He ultimately, after working for awhile with a warehouse job loading or unloading trucks, he then moved to New Jersey and became involved with drug distribution?

A    He met some young men while in New York whom he had met on the streets who told him that he could make a much better living selling drugs in New Jersey.  He had by this time already become involved in using marijuana, and had sold marijuana, he told me.  And he began to sell marijuana to support himself at this time.

Q    Ultimately, after that he moved back to New York for a brief period of time, and then came to Virginia in the fall of 1991 at the age of 22; is that correct?

A    That's correct.

Q    All right, sir.

MR. COOLEY:  Your Honor, in discussions with the government, and I will ask the Court for its preference in this, we have still more to produce through Dr. Cornell.  We have two witnesses, one of which we would like to call out of order.  I think the government does not object.

MR. VICK:  I have no objection.

MR. COOLEY:  We would like to call one of those witnesses before lunch, or if the Court prefers immediately after lunch.  The second witness we would like to put after lunch, and then finish with Dr. Cornell.  That witness I would anticipate being roughly 20 minutes.  Whatever the Court's preference is.

THE COURT:  I think we may have to put it off.

(Court conferring with Clerk.)

All right, let's say about 20 minutes.  Let's go ahead and try to get that in.

MR. COOLEY:  If we could excuse Dr. Cornell for just a moment and call Mr. Jerry Lefkowitz.

(Witness stood aside.)

GERALD LEFKOWITZ, called as a witness by and on behalf of defendant Johnson, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. COOLEY:

Q    Good afternoon to you.  If you would address your responses to the ladies and gentlemen of the jury.  Would you tell them, please, your full name?

A    My name is Gerald Lefkowitz.

Q    Your profession?

A    I am a social worker.

Q    And do you have any particular education or license, any background?

A    I have a Master's in social work degree from Adelphi University in Long Island.

Q    And you are employed by whom?

A    I am employed as the director of the Pleasantville Diagnostic Center, which is a branch of the Jewish Child Care Association.

3629

Q    How long have you been associated with the Jewish Child Care Association, and specifically, with the Pleasantville facility?

A    Eleven years.

Q    All right.  Can you tell the ladies and gentlemen of the jury, please, the components of the facility there at Pleasantville?

A    There are two basic programs in the residence. One is the Pleasantville Diagnostic Center, which is a short term two-month program where kids come for an evaluation.  And the second part of the program is a long term residential treatment center called the Pleasantville Cottage School.

Q    Now, the diagnostic center is associated with the Jewish Child Care Association?

A    Yes.

Q    And on the facility grounds, is there a school?

A    Yes.

Q    And what is the name of the school?

A    The Mt. Pleasant Cottage School.

Q    And is that school, that academic school, associated formally with the Jewish Child Care Association?

A    It is not part of the Jewish Child Care Association, although it is mandated to provide an

3630

education for all the children who are on the grounds of the Pleasantville Cottage School and the diagnostic center.

Q    Is it affiliated with and licensed by New York State?

A    Yes.

Q    Now, in your capacity there, the Pleasantville

Cottage School, does it involve a residential program for youth?

A    Yes.  The kids live there.

Q    And they are educated at, I take it, Mt. Pleasant Cottage School, they live at Pleasantville Cottage School, and before they are allowed entry to either of those they must pass through a diagnostic center called Pleasantville Diagnostic Center?

A    Not everyone comes through the diagnostic center.  Some of the kids come referred from the Family Court or from the Department of Social Services or from other agencies.

Q    I see.  The residential treatment center is set up with what type of residences?

A    The kids live in cottages.  There are about 14 kids to a cottage, four staff members working in taking care of the kids in the cottage.

Q    Are there potential goals once a youngster comes through or comes to the school, is placed at the residential facility?  Are there goals set up for that child?

A    There are goals that are set up immediately when we interview the child and the family upon admission.  Then there is an initial treatment plan in which goals are set up.  That's done two months after a child is there.  And then those goals and plans are evaluated every six months thereafter with the team, with the child, and with the family.

Q    Mr. Lefkowitz, the ultimate goal for any child who is brought into the program, are there indeed three ultimate goals, one of which must be selected?

A    Well --

Q    In terms of the ultimate placement of the child?

A    In the State of New York all children coming into foster care, and this is part of the foster care system, there can only be three possible goals for the child.  It is either return home or free the child for adoption, or when the child becomes fourteen, a goal can be for him to, or her, to go to independent living.  So those are the three possibilities, possible goals.

Q    Mr. Lefkowitz, during the mid-1980's, 1982 and 1983 and 1984 and 1985, did you have occasion to have contact with the young man seated over here, Cory Johnson?

A    Yes.

Q    And did Cory come into your facility by first passing through the diagnostic center?

A    Yes.

Q    And he was, I believe, placed there by a voluntary petition from his mother which would have

brought him into that circumstance; is that correct?

A    That's correct.

Q    You have reviewed --

MR. COOLEY:  And for the jury and the Court, I would make reference to page one under the blue tab.

BY MR. COOLEY:

Q    There is a petition that was entered, or a ruling entered by the Family Court of the State of New York which indicated that it had found and determined that Cory Johnson, said child, was removed from his home on February 1st, 1982; that the parent is unable to make adequate provision for the care, maintenance, and supervision of the child in her home, and it is determined to be in the best interests and welfare of Cory that  --  his interests would be promoted by removal of the child, Cory, from his home.  And in your discussions with me regarding that, what is the necessity of that finding by the Court?  Why was that made?

A    Those findings are applied to voluntary placements.  And shortly after a voluntary placement is made between the mother and the Department of Social Services or the parent and the Department of Social Services, the Court must review that that agreement was in fact something that the parent has knowledge of, understands, and is in agreement with. And that was the nature of that document.

Q    For a youngster, once they arrive there where a parent has voluntarily turned them over, even so, the state prefers that that child be returned to the home; and in order for the child to stay, a review must be made after two months to determine whether the family, or the mother in this case, is ready to take him back, able to take him back.  And if not, this ruling would allow the child to stay in foster care?

A    Not quite.  The purpose of that review was that the parent understood the nature of what the placement was going to be; that she agreed with it; that not only did she agree with it, but she understood what she was agreeing to.  And a Family Court Judge would oversee that.  That was the case.

Q    During those years I've described, 1982 to 1985, what was your role at Pleasantville?

A    I was unit administrator.

Q    And your duties would have involved what?

A    I was in charge of a unit that consisted of three living cottages and all the staff associated with those three cottages.  That's child care staff, social work staff, psychiatrist, psychologist.  I did the liaison work with the school people and

recreation and that kind of thing.

Q    You were the head man of that unit?

A    That's correct.

Q    And you were supervising these other folks and you also, I believe, were in charge of discipline; is that correct?

A    That's correct.

Q    All right.  Did you have occasion -- and I don't want to give the false impression by having asked you the question about discipline -- but did you have, in the course of your dealings with the staff and such and the children that were placed there, have occasion to see the students, to see the children who were in the care?

3635

A    I would see the kids in the course of a working day daily.  I would visit the cottages, see them at school.  When they came in for their social work appointments or testing, they would stop by and I would get a chance to see them.  And I would also see the kids when they were brought into me for disciplinary reasons.

Q    Now, in the course of your day-to-day functioning and supervising, did you have occasion on a daily basis, or near daily basis, to see Cory Johnson?

A    Yes.

Q    I take it that was not in a disciplinary mode on a daily basis?

A    No.

Q    Or anything like that; is that correct?

A    That's correct.

Q    Do you recall Cory during those years?

A    Yes.

Q    Can you give a brief description to the ladies and gentlemen of the jury of your impressions of Cory when he first came to the program?

A    When he first came to the program?

Q    Yes.

A    Anxious youngster, a good kid, a kid who was not

3636

a troublemaker, a kid who knew that he couldn't read, knew that he had learning problems, wanted to do something about it.

Q    Was he motivated to improve his skills?

A    He was motivated to learn.

Q    In the early years that he was there, was it your impression that Cory saw himself as ultimately being able to conquer these problems and to advance and to live the normal American life?

A    I believe that he felt that he could learn and that he wanted to learn, even though there was nothing in his experience that would lead him to believe that.  I think we held out the hope that he

could learn and he would learn.  And I think he wanted to.  He was one of the few kids who did not hide that fact from the other kids.  I think everybody knew that Cory had this problem because Cory let everybody know in those early years.

Q    That he couldn't read?

A    That he couldn't read, that that was a problem for him, and that he wanted to do something about it.

Q    And in terms of  --  let me ask you just briefly about his family.  There was a point in time where he had a younger brother that actually was placed as well at this institution; is that correct, this facility?

A    His brother, Robert, was placed at another facility before Cory came into placement, another institution, another residential treatment center similar to ours.  His brother was the first of the two boys to be placed.

Q    Did there ever come a point in time where Robert was transferred to Pleasantville as well?

A    Robert left that agency, went home, and within  --  I don't remember exactly how many months, but within a number of months he began to be problematic seriously at home and he went to the Pleasantville Diagnostic Center for an evaluation while Cory was in placement with us.

Q    Now, as relates to the goal for Cory, when Cory first came to Pleasantville the three goals you indicated of ultimately getting either back home, independent living, or adoption, which of those goals was set by the staff along with Cory?  What was designed for him ultimately when he left Pleasantville?

A    To return home.

Q    To return home.  Was that his desire?

A    That was his desire.

Q    And during the course of the time he was there, did there come a point in time where a change in his ultimate goal had to be made?

A    Well, I don't know if it had to be made.  We made the change.  At about the halfway point, for many reasons, we changed the stated goal from return home to independent living.

Q    For most of the kids who come through there, the goal is to return home; is that correct?

A    That's correct.

Q    For most of the kids that come through there, they do ultimately return home?

A    That's correct.

Q    But for Cory, that just never happened.

A    No, it didn't happen.  He didn't go home from

Pleasantville. He went, after three years, to a group home.

Q   And normally, before a final discharge, kids are allowed to start visiting with their home, go home for weekends and such; is that correct?

A   Well, right from the beginning, the kids go home. We have a calendar of visits, and it is about every other weekend. And Cory would go home most of the time every other weekend, and then there was a time when, upon his request and for many different reasons, we increased it to every weekend. I recall it because it was  --  there was contention in the team in that we had changed the goal to independent living, and yet we were sending him home every weekend. Some of the team felt that there was something incongruous about that.
     And those of us who prevailed felt that he needed to come to grips with the reality of his situation at home, and the more frequent visits would bring that home to him. Plus there was another advantage: that he would be able to negotiate the  --  become more independent with the traveling by himself, be able to do those things that would make him more independent.

Q   So at the same time the goal was changed to independent living, rather than to return home, he was asking to go home more often?

A   That's correct.

Q   That was allowed because he wanted it.

A   Right.

Q   And also, because of you all's hope would be that he would begin to recognize, as he matured, the facts of life at home; that he really wasn't wanted there, and that there were other problems. Is that fair to say?

A   Yes.

Q   All right. Now, in the course of things, do you recall having discipline problems with Cory?

A   Not many discipline problems, no. Not in the sense that he was a troublemaker or that he broke rules or that he fought a lot. Not in that sense. Where we would have some problems with him was when he would kind of like shut down. He would not go to school for a couple of days or not come to a conference or not come to his social work appointments. It was that kind of problem that you had to help him get through, rather than discipline problems of an acting out or a criminal nature.

Q   As he stayed for the second and third years there at Pleasantville, and it was not aiming at that point to go home, he still of course suffered from this severe learning disability; is that correct?

J.A.481

A    Well, he never really progressed much with it at all.

Q    And as the other kids got older and as Cory got older, did the disparity between what he should be able to do and what he could do increase?

A    Yes. Obviously, it increased. What also increased was his -- you know, I wouldn't say he gave up, that he really gave up, but he became terribly frustrated, terribly angry.

Q    As he got further and further behind, that frustration got more and more?

A    Yes.

Q    Obvious, I suppose.

A    Yes.

Q    Now, the mother's role in assistance there, was she ever a factor, a help, a benefit to you all?

A    That's a very complicated question.

Q    Let me break it down. Was she easy to contact for you all?

A    Well, let me say she didn't come up to the institution much. She didn't participate very much in our meetings. She would come to her appointments in the city. We have an office in the city, and the social workers would come to the city on a regular basis and she would come to those. But she was unpredictable in the way in which she worked with us.

Q    Do you recall a specific incident in which Ms. Johnson called upon Cory, while he was there as a child, for help, for him to help her?

A    Yes. I didn't know Ms. Johnson very well, because she didn't come up to the institution very much. I might have had contact with her three or four, maybe five times in the three years. But there was one time that I did, and that involved her asking Cory for a loan. And I remember this very well because I have a very, very firm policy that I never, ever altered. And that is that when kids had the opportunity of working and earning some money, I made them open up a bank account and save half their money. 50 percent of what they earned they had to put in the bank and they couldn't touch that. They couldn't touch that money, even though they always argued with me about the fact that it was their money. The other 50 percent they could do what they wanted with, within reason, but that 50 percent of the money, I was adamant that it was theirs when they left and they would have some kind of a stake when they left the Cottage School.

And I never varied from that except in this one instance, where I believe the mother asked Cory for the loan. Cory came to me and said she was going to

pay it back. And I vaguely recall that it was for the payment of rent, that she was falling behind. I think she always presented that she had financial problems, but this was, you know, unique. And I went with them to the bank to take out the money. And I went with them because I was afraid that if I didn't

3643

go, that the bank book would be wiped out. And I think it was a couple of hundred dollars, $250 maybe, maybe half of what he had earned over a couple of years. And I don't think he ever got that money back.

Q    She took the money from the bank?

A    Yes. She was going to pay it back.

Q    To the best of your knowledge, that was never returned.

A    No.

Q    There came a point in time where Cory aged out of one cottage and was placed in another. Was that an easy transition for him; was he anxious for change or did he resist change?

A    I don't think change was ever easy for Cory. In his first cottage he was comfortable. He was comfortable with the people there, comfortable with the routine. I think he understood that he had to move on, that he was older, you know. The kids in the older cottage were doing things that were more age-appropriate. With Cory, it kind of took longer to prepare him, to get him to accept moving on. He eventually did, eventually did okay.

Q    Now, Mr. Lefkowitz, he then ultimately was moved on to Elmhurst; is that correct? To the group home

3644

program?

A    Right.

Q    And was that because he was difficult to deal with or lacked motivation or what occurred when that time frame came?

A    It was time to move on. He had been there a couple of years. It didn't look like we could pin the mother down to plan with us to take him back, and then it was a question of what would happen to him. He was in a vocational program, doing okay in the vocational program. You know, there comes a point of diminishing returns and it seemed like that was happening for Cory. He was getting more frustrated with being here and being with us.

Q    And his inability to advance in terms of academics?

A    I think we were all kind of stuck. And he needed to move on. That's what we felt. Cory accepted it, you know. Cory was the kind of kid at that time who kind of accepted, you know, whatever you wanted to do for him. He would accept it.

MR. COOLEY: Mr. Lefkowitz, if you would, answer any questions that either counsel for the government might have.

THE COURT: Do you have any questions for

3645

this witness?

MR. PARCELL: Briefly, Judge.

CROSS-EXAMINATION

BY MR. PARCELL:

Q   Good morning, sir. Are you aware that I think it is the orange tab, that the young man was tested at your school in February of 1982; is that correct, given a psychological evaluation?

MR. COOLEY: I don't think he has this book.

MR. PARCELL: I will ask him to be given it.

(Document proffered to witness.)

BY MR. PARCELL:

Q   Just the fifth tab, sir. If you would go to the fourth page.

A   Yes, sir.

Q   And at the top it says, "In the verbal area Cory achieved his highest score in comprehension"; are you following me? Page two?

A   Yes.

Q   Would you read this first three lines, if you would?

A   "In the verbal area, Cory achieved his highest score on comprehension."

3646

Q   Next two lines, also.

A   "His average score here suggests that Cory has a maturing conscience and moral sense. His thinking is appropriate and his ability to use practical judgment in every-day social situations is a strength."

Q   And then you indicated he was doing well in school. And I would ask you to look at what's been given to the government labeled Mt. Pleasant Cottage School Report Card, 1983 through 1984. And would you please read the writing on periods three and four?

A   "Cory's attitude has greatly changed since the first two marking periods. He has become much more difficult behaviorially in class. He often comes without homework assignments. His overall academic development and personality suffered.

Q   Thank you, sir. Your facility is one that's funded and established by the State of New York?

A   It is a private agency that gets its funding from the New York City Department of Social Services.

Q   And you all try to have a very caring, supporting environment for the students?

A    Yes, we do.

Q    And the other gentlemen who testified before you

3647

has indicated that Mr. Johnson was better adjusted than most of your students; is that a fair statement?

A    I think he was less problematic in terms of antisocial behavior than most of the students, yes.

Q    And is it safe to say that his biggest problem at your school was his learning disability?

A    I think that was a major problem, yes.

Q    You understand he stands before this jury convicted of eight murders?

A    I understand that.

MR. PARCELL:  No further questions.  I will ask that that card be returned.

MR. COOLEY:  Could I see it, please?

THE COURT:  All right.  May the witness stand down, Mr. Cooley?

MR. COOLEY:  One question.

REDIRECT EXAMINATION

BY MR. COOLEY:

Q    Mr. Lefkowitz, from that 1982 form that you were asked to read from which is not yours, but the comment about his efforts at the beginning, did that change as his frustration level increased, as he began to lose ground over those next few years?

A    Are you referring to the conscious and moral

3648

sense?

Q    Yes, sir.

A    It is a hard question.  Cory for the most part kept away from some of the things that were going on, the kids -- some of the things that his friends were doing.  Whether they were smoking pot or they were sneaking out of the cottage or fighting with each other, he kept away, and for a period of time expressed contempt for that.  I had a sense that as he left, that was not as strong a position that he felt and took.

MR. COOLEY:  Thank you very much.

THE COURT:  All right.  You may stand down, sir.  Thank you very much.

(Witness stood aside.)

All right.  We will stop here for lunch and we will get started up at around 2 o'clock.  Everyone remain seated while the jury leaves the courtroom.

(The jury left the courtroom.)

All right, Mr. Marshal, you may remove the defendants.

(The defendants were removed from the courtroom.)

We will be in recess until 2 o'clock.

(Luncheon recess taken from 1:05 p.m. to 2

3649

o'clock p.m.)

(In Chambers.)

MR. GEARY: We requested an ex parte meeting with you.

THE COURT: All right, Mr. Vick, go outside. You may have to come back in.

MR. GEARY: We have asked for it, not to raise anything that the government would be required to be here, but simply to state what we perceive as a problem for the record for later on if that becomes necessary. In the joint penalty phase of the case, the problems are developing which we can't actually go to the other counsel with on the defense side or the prosecutors. Fingerprints, yesterday Mr. Baugh's cross-examination of Dr. Evans was totally unexpected. We sit there wondering what is going to open up. This morning, Mr. McGarvey's case for Cory Johnson will show that Johnson was a leader. The obvious question the jury -- excuse me, a follower. If he is the follower, whose the leader? That's replete with what he said in the opening and in their documentation. We just want to alert the Court to the fact that we are aware of these things and I think we have a duty to make it known in some shape or form to the Court. Eric and I discussed how

3650

you do this. You really can't be antagonistic to the other lawyers. But I think we need to preserve for the record, and I think that's the reason we have to come back here.

THE COURT: I understand what you are saying, especially about Mr. Baugh. I don't know what you can do about that. But I certainly was shocked to see him stand up to ask anything.

MR. GEARY: One thing off the record.

(Off the record discussion held with the Court, Mr. Geary, and Mr. White.)

THE COURT: All right, let's bring in the jury, please.

(The jury entered the courtroom.)

All right, call your next witness, please.

MR. McGARVEY: I call Odette Noble, Your Honor.

ODETTE NOBLE, called as a witness by and on behalf of defendant Johnson, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. McGARVEY:

Q    Good afternoon, ma'am. Would you tell the ladies and gentlemen of the jury your name, please?

3651

A    My name is Odette Noble.

**J.A.486**

Q    And what is your profession, ma'am?
A    I'm a social worker.
Q    And back in 1985, let's say 1985 through 1987,
were you employed as a social worker?
A    Yes, I was.
Q    Will you tell the folks your background,
educational?
A    I have my Master's in social work, which I
received in 1973, and I worked even before I got my
Master's as a social worker.  And then in 1973 I
started working at Jewish Child Care Association.
Q    And you were employed there from 1985 until
1987?
A    From 1973 to 1987.
Q    But you were employed there during that period
of time?
A    Right.
Q    Now, during that period of time, did you have an
association with Elmhurst Residential Home?
A    Yes, I did.
Q    Will you tell the folks what that residential
home was?
A    It was a group home in the community, in Queens,
where eight teen-aged boys lived who essentially were
not able to live with their families.  They went to
school in the community; they made friends in the
community.  And I as the social worker met with each
boy every week for an hour a week and also ran a
group meeting then with the boys and the house
parents every other week.
Q    How about physically the layout of the house?
Where was it situated?
A    It was in an apartment unit in Queens, in kind
of a shopping neighborhood, residential
neighborhood.  It was a residential community, Queens
is, about 40 minutes from my office in Manhattan.
Q    So in order to get to your office, the
individuals at the house had to take a bus or cab?
A    They took the subway.
Q    They took the subway.  Now, how was the house
set up?
A    It was two apartments made into one.  So there
was one room that had just one boy and then there
were, I think, two with three in them, so that eight
boys could live there all together.  The house
parents lived with the boys.
Q    Who were the house parents?  Not names, but
generally what were their duties?
A    They alternated sleeping in.  One would maybe
come on a Monday and stay until Wednesday; another
one would come Wednesday and stay until Thursday.
Sometimes there would be two people on at the same

**J.A.487**

time.  But only one house parent slept in with the eight boys.

Q     And always there was some house parent there for supervision?

A     Yes, always.

Q     Were they controlled by someone else or were they supervised by someone else?

A     Well, the agency was very involved because the people downtown like myself, we were very closely involved.  So they came down every other week, the house parents, for treatment team meetings with the psychiatrist and the psychologist and the director and myself.  They also came downtown every other week for group meetings with myself and the boys.  And they had their own staff meeting, so there was a lot of effort to try to help them be more successful in their relationships with the boys.

Q     Can you give us just an overall view of what kind of boys came to that group home?

A     Well, they were generally about 14 to 19, youngsters who for various reasons couldn't live with families.  And they had kind of come to the

3654

determination that while we wanted to help them maintain good relationships with their families, that living together was not something that was possible.  So that our goal with almost all the boys in the residence was that they would eventually be able to move into the community and function independently, get jobs, do what they needed to do.

Q     Now, do you know Cory?

A     Yes, I do.

Q     Can you tell the ladies and gentlemen of the jury when you met Cory and in what capacity?

A     He came to the Elmhurst Boys' Residence from Pleasantville Cottage School.  He moved in in June of 1985.  We had had a preparation process where he came to the residence and met the boys and then went back to Pleasantville and talked about it, and then he moved in in June of 1985.

Q     And how long was he there?

A     He left in February of 1987.

Q     And during that period of time, you were his only social worker; is that correct?

A     Yes.

Q     And you saw him on a weekly basis?

A     Yes, I did.

Q     Did you get to know Cory pretty well?

3655

A     Yes, I did.

Q     Will you characterize Cory for us during that period of time, that two-year period of time?  What kind of a boy was he?

A     Cory was a really sweet guy.  I mean, teenagers

# EXHIBIT 7 - PART 3

J.A.489

are never completely easy, but Cory was very -- I related to him very well. He could listen. He seemed to care about succeeding. He wanted to do well in school. But he had, you know, he had serious learning difficulties which mitigated against him, you know, doing as well as he wanted to do, and as well as maybe his mom would have liked him to do. But in fact, in looking back on my notes, I described him as ingenuous, not mean-spirited, certainly not one of the more difficult boys that I worked with in my years of working with teenagers.

Q   Compared to the other boys that were in the home at the time, was Cory aggressive?

A   Well, Cory was assertive, ingenuous. He could take a stand with the boys if he felt that it had to do with right, if it had to do with being decent. He certainly wasn't afraid to assert himself and stand up. But he generally stood up for what he perceived as good values and good things.

Q   From a physical standpoint, did you see any evidence of aggression outside of the arrest?

A   Well, I mean, he was arrested. But that was kind of to help a boy out in the residence who had gotten into a --

Q   We will get to that.

A   But we were very strict in the residence that there was no physical confrontations. And Cory and all the other boys abided by that. I mean, if he got into stuff in the street, I don't remember it being a problem.

Q   Anything major?

A   No.

Q   Would you characterize his relationship with the other boys as a leader or a follower?

A   Well, he was a follower in the sense that if they had an idea that he thought he would go with, he would go with it. But he was a leader in terms of his ingenuousness and his assertiveness and his kind of openness, you know. So the boys would look to that because they knew they could go to Cory if they had a plan or an idea, that he would be ready help out and do. So I mean, it was kind of mixed. He was both a leader and a follower.

Q   When you say he was a leader, I believe you gave me an example of like haircuts, things like that.

A   Yes. Cory was perhaps a little bit more street savvy in terms of street culture than some of the boys that lived in the residence. So that they, I mean, you know teenage boys, they love to -- it is good to be bad and that kind of philosophy. So he could, you know, he could lead the way in that sort of thing. But those were not substantial things.

Those were insubstantial.

Q   So are you saying that in terms of insubstantial things he was a leader; in terms of substantial things he was  --

A   He was, you know, it is hard for me to imagine  --  I mean, it is hard for me to imagine Cory doing the kinds of things that he has been convicted of. It is just not the Cory that I knew, certainly.

Q   Now, you made reference to a robbery, a robbery charge.  Will you tell the ladies and gentlemen of the jury when that happened and what that was about --

A   It was August of 1986.  One of the boys in the residence who was probably  --  Mitch was kind of maybe a bit more fast talking and a bit more, oh, I don't, know how you describe Mitch?  But anyway, Mitch was having trouble with one of the youngsters that he worked with in the neighborhood youth corps.

3658

And he had gotten into a confrontation because Mitch was somewhat grandiose and wanted to boss people around.  So he told the kid at work that "If you don't watch out," because the kid was bossing Mitch around, and nobody should boss Mitch around, so he told the kid at work that "I am going to get my guys after you."  So he got two boys in the residence, Cory and Dwight, to rob this kid on the way to work.

Well, of course the kid immediately went to work and said, "Mitch and two friends robbed me." Immediately they came after Mitch, and then Mitch immediately told on Cory and Dwight, the other kid, and so they were arrested.  It was kind of ridiculous, but it happened.

Q   With respect to that, you were telling me earlier about Mitch.  Do you recall what the story was that Mitch had told Cory?

A   Well, I mean, I think what Mitch said is that this guy at work was giving him a hard time, he didn't like it, and he must have embellished it enough that Cory and Dwight thought that Mitch had a just problem with this kid.  So they went to help Mitch out.

Q   And what happened as a result of that?

A   Well, Mitch was arrested first, and then the

3659

police came to the residence and arrested Cory and Dwight.

Q   How old was Cory at the time?

A   I think he must have been 18 at the time.

Q   18?

A   Yes.

Q   Where was he taken?

A   He was taken to Riker's Island, which is the prison that's used kind of as a  --

Q     For how long a period of time, do you recall?

A     He was taken to Riker's and then they went to court. Or maybe they held him in court. And then it was put off until November. The arrest was August 19th, and then he went back to Court in November 26th, and then he went to Riker's for eight days after that.

Q     Did you have occasion to visit him at Riker's?

A     Yes.

Q     Will you tell the ladies and gentlemen of the jury, what was that like? What was Riker's Island like?

A     It was awful. You had to go through the guards three times, you know. I had identification. And then you had to take the bus and then you had to go show your identification again. And they took their time bringing Cory out to see us, and then Cory, of course, had to take off his shoes, you know, go through the whole thing. It was very uncomfortable. I didn't even think the guards were very nice. But it was not a pleasant place.

Q     Did Cory have occasion to tell you any stories about what he saw at Riker's Island?

A     Yes. We talked about it afterwards because he came out and he was only there eight days. He said -- he admitted it was pretty awful, and that he saw guys having sex in the beds, and of course there was the searching, and you could never use the telephones. It was a pretty awful experience for him.

Q     During this period of time, when I was asking you earlier about his mother, you had difficulty in even remembering his mother. Was that unusual?

A     Oh, yes. It was highly unusual. In most of the boys, even though they couldn't live with their families, most of the boys that lived in the residence had families that I had sessions with or I would go in a home visit with the boy, or I would have contact with the family. In fact, the two boys that were with Cory, they had families that were very involved and very concerned. But Cory's mom was very elusive. I think I met her once or twice. I mean, I knew Cory cared about her, but I didn't get any -- she didn't work with us. She didn't really try to help us help Cory. And she was almost nonexistent in Cory's life, as far as I was concerned.

Q     How many times would you say during that two-year period did you actually see her?

A     I think twice.

Q     Twice?

A     Yes.

Q     Did you have occasion to contact her on the

telephone, or attempt to contact her on the telephone?

A    Absolutely.  Part of our program is to make sure that we do try to maintain relationships with the families, because long after we are out of the guys' life, we want them to have relationships with their family.  We did a lot of reaching out to Cory's mom, but she just didn't respond.

Q    You made reference to one of your quotes in here, that Cory talked about his mother as if she was a goddess.  Can you explain that to the ladies and gentlemen of the jury?

A    Well, it was hard for Cory, I think, to admit to himself, and furthermore to us, that his mom just wasn't there for him.  He wished that she would have been, but to admit it to himself and to us would have been hard.  So he acted as if his mother was terrific.  You know, and he and I would try to talk about it, but it was hard for him to admit much.  But you sensed by his behavior that he was really very hurt and that his mother wasn't all he said she was.  But she is attractive, and I think kind of interesting to be with when he was with her face-to-face, right?  So then you know, he would have those moments of being with her, and then when he wasn't with her, she was gone from him.  But it was not an area that was easy for Cory to discuss with me.  We tried, but I didn't want to push too hard.

Q    You have indicated that you were aware of a very severe learning disability with respect to Cory.  In terms of the other boys, how would you rate that or relate that?

A    Well, Cory was in a house where all the other kids went to regular classes.  So that Cory certainly was their peer when it came to the playground, playing basketball, doing things socially, but when it came to going to school they all went to Newtowne High School, but he went to special classes.  He wasn't their peer in terms of his educational level.

That was a source of distress for him.  All the other kids were mainstream, had mainstream classes.  I don't know if it is true here in Virginia, but there is also issues of kids in special ed, you know, in regular high school, and Cory was in special ed classes.

Q    At that point, would you characterize him as very susceptible to peer pressure?

A    Sure.

Q    In terms of his motivation, though, while he was at school or at the boys' residence, were you aware of a very severe learning disability?  Did he remain motivated to learn?

J.A.493

A    You know, it is hard.  He always tried.  But then I think when he got into  --  as you look back on the situation, maybe he was getting more and more discouraged, I think, as he was getting older.  And then the experience of Riker's in August, and then going to  --

Q    Let me stop you there.  Did you notice a change in Cory after he went to Riker's Island?

A    Well, yes.  Because then he left our residence two months after he got out of Riker's.

Q    Can you characterize that?  I mean in terms of the change, I understand he left, but did you notice

3664

a change in his attitude?

A    Well, I think he started being more difficult with the house parents and not wanting to abide by the expectations, because we had fairly clear expectations.  And so, I mean, he didn't verbalize it at the time, but looking back on it, I wonder if he didn't just say "I can't live up to these expectations, I can't do it," and so that ultimately when he left in February, it was, you know, that he didn't want to be in our residence anymore, didn't want to keep trying.

Q    Do you feel like he gave up after that?

A    Right.

Q    Threw up his hands and gave up?

A    Right.

Q    When he left, did you folks ask him to leave or did he leave on his own, or how did that happen?

A    Well, our residence was a program to help young people grow up.  We were not a rescue operation.  So if youngsters wanted our help, we would give as much as we could to help them.  And sometimes if one of the boys went home for awhile, they would come back with a renewed sense that "Hey, this is the lifestyle I want to live, this is the way I want to be."  So Cory was showing by his behavior that maybe it wasn't

3665

working out.  So he went home to his mother and we were hoping he would come back.  We wanted him to come back.

Q    Why did you feel he would come back if he went back to his mother?

A    Because then maybe he would begin to think about, well, our expectations weren't so hard, and that maybe he could build a life for himself, and that we were people who cared about him and this was a place where he could get his life together.  And so we wanted him to come back.  We were hoping he would come back.

Q    Personally, you wanted him to come back as well as the rest of the staff?

A    Absolutely.

**J.A.494**

Q    After he left, you haven't heard from him since; is that correct?

A    No.

Q    His mom, though, in fact registered a complaint against your school for sending him back home, didn't she?

A    Right.

MR. McGARVEY:  Thank you, Ms. Noble. Please answer the questions of the government.

THE COURT:  Any questions?

3666

MR. VICK:  Yes, sir.

CROSS-EXAMINATION

BY MR. VICK:

Q    It is fair to say that the environment you attempted to provide for Cory Johnson was a loving, care environment, supportive?  Correct?

A    Yes.

Q    That was your purpose.

A    Right.

Q    And Cory ultimately rejected that environment, didn't he?

A    Well, in a way, yes.

Q    Isn't it clear that that's what he did?  And I refer you to your letter of February 18th, 1987, to the Principal at Newtowne High School.  In your last two lines you say, "We felt Cory needed some time away from our residence to reconsider his behavior and attitude.  We have not heard from Cory, so it would appear he is not interested in changing his behavior and attitude and returning to the residence."  It is pretty clear when you wrote that that he had rejected that caring atmosphere that you were providing, correct?

A    I think maybe he was despairing that he couldn't do it, giving up.

3667

Q    But he walked away willingly?

A    Right.  Well, I don't know how willingly, but yes, he walked away.

Q    Did you force him out?

A    No.  Well, we said, "Your behavior has to change."

Q    But you told him he could come back, and he stayed away?

A    Yes.

Q    He didn't want what you had to offer, did he?

A    I have to say that.

Q    While he was there, he exhibited a great amount of street savvy?

A    Yes.

Q    He was socially very able with the other students, the other residents?

A    Yes.

Q    A leader of sorts?
A    Yes.  He was liked and cared about, and respected.
Q    And very interactive with them?
A    Yes.
Q    Very much able to express himself and his position?
A    Yes.

3668

Q    And very much aware of what was right and what was wrong?
A    Yes.
Q    You no indication whatsoever that he didn't know what was right as opposed to what was wrong?
A    No.  Cory knew right from wrong.
Q    In fact, he had a very good sense of what good values were, didn't he?
A    I think so, yes.
Q    Yet he was able on at least a couple of occasions there to commit robberies?
A    Well, just one occasion.
Q    Didn't he rob tennis shoes from another boy there?
A    Oh, no.  I don't think he  --
Q    I'll read you your report from September 28th, 1985.  "Cory is one of the first to speak up and was recently involved in an event in the community where his tendency to speak up caused a bit of a problem. One of the other boys ended up getting his sneakers stolen.  When we discussed this in an emergency meeting, Cory was able to acknowledge his responsibility and help contribute money to replace the man's sneakers."
A    That didn't mean he stole the sneakers.  He

3669

spoke up.  I can't remember the details of that.  I read that in preparing for this.  But I don't think that meant that Cory stole the sneakers.
Q    He indicated his responsibility?
A    Yes.  I think it was one of the kids.  I don't remember the details.
Q    But he did go on to rob another young man with Mitch, didn't he?
A    Robbery wasn't the motive.  It was to get even, to help Mitch.  They took a watch.  The kid didn't even have a lot of money.  It wasn't like he was wealthy.
Q    Ended up taking his paycheck, too?
A    Yes.  But it was a blank paycheck.  They couldn't cash it.
Q    But they tried to take it from him, didn't they?
A    Yes.
Q    They robbed him of it, didn't they?

A    Yes.

Q    But he knew the difference between right and wrong.

A    Yes.

MR. VICK:  No further questions.

BY MR. McGARVEY:

3670

Q    I hesitated to bring this up on direct, but Mr. Vick asked you about a loving, caring environment. You made reference in one of your reports to  --  you used the term "sadistic" in terms of the house parents or some of the house parents.  Can you explain what that meant?

A    Well, you know, child care  --  I mean, raising children is not easy.  And getting house parents who are really caring and loving and nurturing all the time is rough.  And Cory, I mean, the house parents that he had were not  --  I have worked with a lot of house parents through the years.  They were not the greatest.  They were okay, but they were not as good as many of the other cycles of house parents that I have.  So that a couple of his house parents I really didn't feel were real enlightened in terms of handling not only Cory, but some of the other boys, and could be a little bit mean and subtly sadistic in their approach to discipline and how they tried to teach the guys what was the proper way to handle a problem.

Q    Was that part of the  --  what was your responsibility with respect to the house parents vis-a-vis the kids?

A    Well, you have to be real careful not to split,

3671

you know, so if one of the boys would come and say, "Ms. Noble, John is," so on, complain, my role is to try to help them go back to the house parent and resolve it with the house parents.  Because even if I couldn't have a great relationship with the house parents, sometimes the youngsters themselves could find a way to work things out.  I would always send them back to the house parent and then maybe indirectly we would talk about it in a staff meeting, to try to get the house parent to see a different approach might work or something else might work. But as tempting as it was, I never could really take the side of the youngsters.  I would always have to send them back to the house parent to try to resolve whatever problem they might have, unless it was, you know, unless the house parent did something immoral or illegal.  Then it would be a different answer.

Q    So in terms of what Mr. Vick asked you about, the loving and caring environment, in fact Cory had voiced some displeasure, in fact a lot of displeasure with some of these house parents; and in fact, you

J.A.497

were constrained to side with the house parents. Is that correct?

A   Yes. For the sake of the guys.

Q   I understand that.

3672

MR. McGARVEY: Thank you.

THE COURT: You may stand down, ma'am.

(Witness stood aside.)

Call your next witness.

MR. COOLEY: We recall Dr. Cornell.

DR. DEWEY CORNELL,

recalled as a witness by and on behalf of defendant Johnson, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. COOLEY:

Q   Dr. Cornell, you obviously were previously sworn, and I would ask you to continue, if you would. I want to ask you about your reliance on Cory as a source of information for the report and the exhibits that you have prepared.

A   Okay.

Q   How much did you rely on what Cory told you?

A   Well, I never completely rely on what a defendant tells me. Defendants may well be motivated to present themselves in the most favorable light, so as much as is practically possible, I try to confirm or disconfirm whatever I am told through collateral sources of information.

Q   Did you have any doubts about the things when

3673

Cory talked with you? Did you have doubts about what he was telling you? And if so, can you be somewhat specific about them?

A   There were several points which I doubted what he was telling me. He told me he was very well adjusted while he was at the Pleasantville Cottage School, for example. And initially, I was skeptical of that. And I went to great lengths to try to confirm that and find out if in fact that was not the case. I found out that he was in fact telling me the truth. I also didn't think he was being completely forthcoming about his mother. He initially described her in very glowing terms, which also didn't seem plausible to me given the problems that he had.

Q   Did he tell you that she was very devoted and very loving?

A   Yes.

Q   That sort of thing?

A   Yes. Devoted, loving, responsible, always taking him places, doing things for him. He described her as a kind of an ideal mother. I mean, it didn't seem plausible to me.

Q   And when you began to check it, of course that

**J.A.498**

did not pan out.

A    That's right.  And I went back and talked with

him subsequently when I had records and further information, and he was willing to acknowledge a little bit, that there were areas in which his mother was a disappointment to him.  When I interviewed the mother, also, I also was able to confirm my impression of her.

Q    If we can, I'm going to turn your attention to the area of learning disability.  I'm going to ask you, if you would, to somewhat briefly describe to the ladies and gentlemen what is involved when we talk about a learning disability.  Make reference to this.

MR. COOLEY:  This will be, ladies and gentlemen and Your Honor, this will be the second green tab in the book.

BY MR. COOLEY:

A    In a nutshell, learning disability is a form of impairment in the brain that affects the person's ability to learn.  A person might have adequate intelligence, they might have adequate motivation, but because of some defect in their ability to use language or understand language, or process language, they are impaired in some academic area.  It may be one area or it may be multiple areas.  In Cory's case, reading and spelling were the main areas.  This term "learning disability" is a fairly broad term. It is used sometimes to describe pretty mild conditions.

In Cory's case, it is a severe learning disability.  Sometimes the term dyslexia is used for individuals who have a specific reading disability. Sometimes the term minimal brain dysfunction or developmental aphasia, those are all terms that are used somewhat interchangeably.  The federal definition of learning disability of 1977, which I included in here, is one that sort of pulls all those terms together and gives a more general definition of learning disability.  It also points out that this is not because the person is mentally retarded or has emotional disturbance or who has economic disadvantage.  It is a defect in the basic psychological process of using or interpreting or understanding language.  There is a second definition that's also used in the field on the next page.  The National Joint Committee for Learning Disabilities. It echoes very much the federal definition.  It also adds to it; that these individuals may have problems in their social behavior, not just in reading and writing, but they may not be able to perceive and interact socially in a normal fashion as well, even

**J.A.499**

3676

though that's not a learning disability by itself. But that seems to be a secondary problem.

It also points out that you can be learning disabled and mentally retarded and/or emotionally disturbed in addition. You can have more than one problem. Those two definitions are the definitions I use and that are the generally-accepted definitions in the field of learning disability.

Q    What causes a learning disability like Cory's?

A    Well, there are probably multiple causes of learning disability, anything that can damage the brain or impair the brain. This may be genetic. Certainly there is research which finds that learning disabilities run in families. Anything toxic to the brain, particularly drug use by a mother during pregnancy, can be a factor, or a head injury sustained at some point in life. But we don't know all of the different causes or the different ways in which the brain can be injured to produce a learning disability. And we don't know what was the cause in Cory's case.

Q    Certainly it is not a voluntary thing, not something one says "I want this," or "I don't want this." It is not something that can be discarded?

A    Right. Correct.

3677

Q    Now, when was Cory first diagnosed as learning disabled?

A    To my knowledge, when he was 13 when he went to the Pleasantville Diagnostic Center.

Q    I refer you to the yellow tab, the fifth page of your mitigation report, and I'm somewhat rapidly going to move you through that. But on page five of that report in the yellow tab, the last  --  the first yellow tab, pardon me. The last three paragraphs contain comments made by various psychiatrists or psychologists in his case. The first of those was from John Stadler. He stated Cory was a remarkably peaceful kid trying very hard to do better. And this is a quote:  "He had a terrible neurological impairment to learning and though he wanted to learn, he couldn't." And Dr. Stadler felt that Cory did very well in a structured setting, "but like many boys like him, I imagine he is very susceptible to his environment."

That is a quote from the reports; is that correct?

A    Yes. That's a quote that he said to me. He stated to me.

Q    Stated to you.

A    Yes.

3678

Q    All right. And he did express some regret that

Pleasantville didn't have some of the resources to address Cory's problems; is that correct?

A    Yes.  He expressed regret about that.

Q    You spoke with Dr. Elizabeth Clemmens; is that correct?

A    Yes.

Q    She described that Cory is a severely learning-disabled boy who became very frustrated when he did not receive the remedial help in speech therapy that he was promised?

A    Yes.

Q    She felt he was right to feel frustrated.

A    Yes.

Q    Because of the limitations and those things that were not being addressed.

A    Yes.

Q    You also spoke with Dr. Ken Barish, and he described to you and recalled Cory and described Cory to you as one of the most severe cases of learning disability he has ever encountered.

A    That's right.

Q    And that his impairment was so severe and so pervasive in his cognitive processes that Cory was unable to learn how to compensate for his problems like other learning-disabled children.

A    That's correct.

Q    In other words, that even other disabled children, learning disabled, could learn to do things Cory simply could not do and he was not able to compensate for that.

A    That's correct.

Q    Indeed, when he gives lectures, he cites Cory's case in his lectures as an example of that type of severe disability.

A    He, for example, recalled that when he asked Cory to spell the word arm, A-R-M, that Cory replied H-M-E as his spelling for arm.  And I have, too, in my evaluation found those kinds of spelling problems.

Q    And he also felt that there was absolutely no question in his mind that Cory's disability was a result of neurological impairment.

A    He had no question about that.

Q    You have testified now that Cory has this learning disability.  That's obvious from the reports that are before the ladies and gentlemen of the jury.

Is there further documentation of that coming from a more recent test?

A    As you might imagine, I'm trying to be thorough about this.  And in fact, I gave him my own set of tests to confirm that this learning disability was

still present and that I would arrive at the same diagnosis based on my own sources of information. So I went back and conducted my own psychological testing of Cory.

Q   Now, these would be found behind the white tab in the book; is that correct?

A   Yes.

Q   And there are some blown-up  --  Marshal, could you help me?

(Documents displayed on easel before jury.)

BY MR. COOLEY:

Q   Doctor, can you tell the ladies and gentlemen of the jury the results of your tests?  And they have before them in an expanded version, blown-up version, the graph.

A   Yes.  I'll try to be brief about this.  First, I wanted to document his level of intelligence.  I gave him the standard individual intelligence test called the Wechsler Adult Intelligence Scale-Revised Version.  It is a standard test for adults to assess their intelligence.  He had been previously given the children's version of that test when he was younger. This test is composed of a number of sub-tests that are listed here: information, digit span, vocabulary, and so on.  And those scores are combined to give you the person's IQ.  You expect that on each of these tests, the average score is a 10.  That is, the person right at the fiftieth percentile, right in the middle of the population in his age group, would attain a 10 sub-test score.  The average person gets a 10, sometimes you get a 9, 11, 12.  You vary a little bit around 10 as a big point.

Obviously, a very bright person gets scores over 10, and a less intelligent person gets scores much lower than 10.  In Cory's case, you will see he started off getting 5's and 6's in all of these first set of tests.  Those are consistent with someone who is mildly retarded.  That is, if he had continued to get that pattern of 5's and 6's on all his tests he would have scored in the retarded range.  Those initial tests, the first ones that are listed there where he got the 5's and 6's, are all of the verbal tests, the language tests, vocabulary, arithmetic, comprehension, all things that involve use of language.

The latter tests where he started to score higher are the nonverbal tests, sometimes called the performance tests.  These are tests that involve puzzles, blocks, things that he does with his hands. You will recall he had some carpentry training that probably enhanced his skills in that area.  And in those areas, he did better.  And actually, on one of

J.A.502

them he got a 10, which would be the average expected score for a normal individual.

Because these latter scores were higher, his overall IQ fell above the range of mental retardation, just above that range.

(Another document displayed on easel.)

BY MR. COOLEY:

Q    The next to the last page in that section is a bar graph that is entitled "Reading and Math Scores." Would you tell the ladies and gentlemen of the jury very briefly what that entails and what that shows us?

A    I gave him an intelligence test, but also gave him an achievement test. Again, I gave him the standard individually-administered achievement test, the Woodcock-Johnson Test of Achievement. This is a test. Actually, I didn't give him the entire test. There are 20-some parts to this test. But I gave him specifically the tests in reading, two tests in reading and two tests in math, identification, and comprehension. Identification is his ability to identify a word -- identify words. He is presented a word, has to be able to pronounce what that word is to show he can identify it. In Comprehension, he has to be able to comprehend the meaning of a sentence and choose the correct word to complete a sentence. Those turn out to be too easily objectively scored tests of reading ability. On both of those he scored at the second-grade level, a 2.4 means at the second-grade level, a 2.6 also is at the second-grade level.

In the area of mathematics. The first is calculation, which is ability to do arithmetic problems: addition, subtraction, division, multiplication. And there he scored at the sixth-grade level, 6.7. He also had applied problems, which are kind of common sense word problems, such as how much change should you get back if you are buying something that costs a certain amount of money, so forth. That's sort of a practical arithmetic skill. There he was at the fourth-grade level. So certainly, the second-grade scores in reading were very consistent with what he had obtained when he was a teenager. The somewhat higher scores reflect the fact that he was able to do somewhat better in arithmetic, although obviously still a very low level.

Q    Finally, the last bar graph, the last page of that section, is labeled "Intelligence and Achievement." Can you tell the ladies and gentlemen of the jury what that represents?

A    This bar puts together those two tests. That

is, we look at someone's intelligence and look at their achievement and see if they correspond.  We expect that a person's achievement should be commensurate with their intelligence.  That is, even if you have got low intelligence, you ought to achieve up to the level of your intelligence.  Now, if you look here on just the right-hand side, you will see where it says "Math."  The black bar graph where it says 100, that's the expected level that the average person at the 50th percentile would get in both intelligence and achievement.  So that's sort of our standard.  In intelligence he gets a 77.  That was his IQ result.  That's clearly well below average.  It is close to the level of mental retardation.  In math he gets a 77.  If I take those grade-level scores and I can look them up in a table and transform them into a standard score, he gets a 77.  So his math level is equivalent, exactly equivalent, to what his intellectual level is.  That to me is an indication that he is not learning disabled in math.  He is low in math, but he is at the level you would expect, given his intelligence.

    If we look on the left, those three bars are not even.  We have the 100 standard bar that's black on the left, and he has a 77, which is the same intelligence score.  But then his reading is 53.  That is, if you transform that second-grade reading level into a standard score, it is a standard score of 53.  And that is clearly in the mentally retarded range, in the moderately retarded range, actually.  So that we cannot only see in this graph that his general intelligence is low, but his ability to learn in the area of reading is lower still.  So a person can be both mentally retarded and learning disabled.  In his case, he is very low in general intelligence, although not retarded, and learning disabled.

Q    Doctor, also, I believe you did a test in the course of this relating to Cory's writing.

    (Document displayed on easel.)

A    I gave him a standard test of his ability to write, a test of written language, TOWL, the part of the test that is most commonly used.  The person is given a picture.  You see this outer-space scene.  And the young person is asked to make up a story to go with the picture.  They are given 15 minutes to write up a story.  Then you evaluate the story for its vocabulary, spelling, grammar, for its complexity of the themes that are presented, and this is the story that Cory gave me to this picture.  This was very striking to me because this story is very immature.  The writing is very immature.  The spelling is very immature, leaving aside the

penmanship.

Q    This is reprinted in the book before the ladies and gentlemen.  It is the fourth page back in behind the white tab.  And the third page back is your findings related to that; is that right?  And it also includes your typed-out interpretation of what Cory wrote.

A    Yes, I typed out what I thought he wrote.  There were a couple words I couldn't decipher, but I typed out the story which you can read and see is a very immature story.  And then below that, I have listed the scores that he received for this story, and the typical age level of someone who writes a story of that type.

Q    He begins his story with "Me and my mom."

A    You want me to read that?

3687

Q    Well  --

MR. VICK:  It is all in front of the jury.

MR. COOLEY:  I'm not going to use it.

THE COURT:  All right.  Go on.

BY MR. COOLEY:

Q    But the story was about Cory and his mother going to the moon?

A    That's right.  He chose to tell a story about he and his mother going on a trip together to see the rockets.

Q    And obviously there was more space, but he ended where he did.

A    Yes.  His story was a little short for someone of his age.

Q    Now, Doctor, you also had an opportunity to refer Cory for evaluation by Dr. Peck; you made some reference to that.  Dr. Peck is a neuropsychologist.  His report is found behind the pink tab in the book.  And I will ask you to somewhat rapidly summarize what the findings from Dr. Peck showed.

A    I gave intelligence and achievement.  I asked Dr. Peck to give him neuropsychological tests, which are sensitive to brain damage, to see if we could identify specific areas of brain impairment or dysfunction.  These tests are commonly given when

3688

someone has had a head injury or has  --  there is reason to believe that they have had some kind of brain impairment.  They are very technical tests.  There is a large number of them.  Nobody is expected to do poorly on all of them; that is, they tap as many areas of brain functioning as we have tests for, everything from abstract reasoning to fine motor coordination, visual motor coordination, auditory processing, lots of different areas.

And what Dr. Peck found is that Cory's performance indicated abnormal neuropsychological

functioning. That is, it did indicate impairment, brain impairment, in a number of areas. First of all, he found that he had impairment in visual memory, memory for things he sees, and visual sequencing. That is, the ability to keep things in proper order sequentially, visually. Now, if you think about reading, those are two critical skills. You have to keep the letters in the proper order and the words in the proper order, and you have to be able to remember what words are, how they are spelled and so forth, in order to read. He has deficits in both those areas.

In addition, Dr. Peck found that he had deficits in auditory processing. That is, often, if somebody can't read and they have visual problems, you try to teach them auditorily through the spoken word. But he has deficits in auditory discrimination; that is, the ability to listen and understand what is said to him. At the end of this complicated report that Dr. Peck has written, he points out that this kind of person could have difficulty understanding what people are saying, and that that could create social and interpersonal difficulties for him. He doesn't quite understand when people are arguing with him or talking with him, what they are saying and what their intention is, and he doesn't have good skills in that area. Abstract reasoning and judgment were poor. For example, on the category test, which is a highly sensitive test to brain impairment, he shows inflexible thinking; that is, kind of approach to problems where he cannot shift from one approach to another approach. He cannot, when he is making an error or making a mistake in solving a problem, he does not show the ability to recognize a mistake and to shift from that mistake to another strategy. He tends to persist in a poor strategy of solving problems.

So in a number of different areas, he shows neuropsychological impairment. Not all areas. Rarely does anyone show impairment in all areas. But he shows impairment in quite a number of them.

Q    If I could, I would move your attention to the concept of mental retardation. I would ask you to look at this last chart that's being displayed to the jury. Can you tell the ladies and gentlemen of the jury what they are being shown at this point? And this would be the last page behind the second green tab, the definition of mental retardation.

A    Yes.

Q    What does the term mean?

A    Mental retardation means that the person has significantly sub-average intelligence which can be

measured by a general intelligence test, as well as impairment in adaptive behavior. Adaptive behavior means their ability to sort of function in every day life; to have practical intelligence, if you will, and good survival skills. And you can measure the first part by giving them an intelligence test. Individuals that fall in the range of 70 to 75 can be considered in the range of mental retardation. And then of course, anything lower than that indicates mental retardation. In addition to having low intelligence, you need to show that the person has impaired adaptive behavior in any two of about ten areas that are listed there. Certainly functional academics, the ability to do academic work is one in which he has impairment. Also, communication deficits with his speech impairment and communication problems, he has some deficits there. Self care, social skills, work, the ability to maintain a job, to have good work habits, to use the kind of common sense you need to hold a job, all of those are possible areas in which his functioning is not at a normal level. As I said before, my conclusion was that he is just above the level of mental retardation.

Q    And Doctor, when you made that, reached that conclusion, you were aware that if he could be categorized as mentally retarded, that Cory would not be death-eligible under the statute; is that right?

A    Yes. I realized this was a very serious issue. The law states very specifically that if he were mentally retarded, we would not have this sentencing hearing for the death penalty. So I checked my scores, went back, and saw him a second time. I consulted with colleagues. I wanted to make very sure that this was an accurate score. Because the definition of mental retardation is not a hard and fast absolute. It is a gray area. And people have stereotypes of mental retardation as someone who looks very impaired and looks unusual and so forth. But in fact, many mentally-retarded people look very normal and can function fairly well in daily life. So I did not very easily reach this conclusion that he is just above the level of mental retardation.

Q    And exactly where is he? How close is he to being mentally retarded?

A    The IQ score I got was 77. If he had gotten a 75, he would be within the range that counts as mental retardation. 70 to 75 is kind of the gray area. If you are in that area, you can be mildly retarded. He was two points above that, which is a matter of one or two questions on an intelligence test that would make the difference there.

Q    Doctor, would it be fair to say that most mentally-retarded folks are only mildly retarded?

A    Yes.  There is a social stereotype we have of the retarded person that really is of the more seriously retarded person.  We used to think that everybody who was mentally retarded would have to be put in an institution and they could never live on their own or function or hold a job.  In fact, if you put people in institutions they will become institutionalized and sort of look and function that way.

We now know that a mildly retarded person can be educated up to about the sixth-grade level.  We know that a mildly retarded person can hold a job if they have good training, if it is a structured job, if they have good supervision.  We know that many mildly retarded people get married, live on their own, pay their bills, have families.  So we know that mild mental retardation doesn't mean that the person is completely dysfunctional, the way that you might characterize it on television, but has some capabilities.  And so I had to compare that to Cory.

Q    On some tests Cory was given by you and on some of the tests he was given by the folks at Pleasantville Cottage School back in his adolescent years, Cory in fact scored in the mentally retarded range, did he not?

A    Yes.

Q    And would it be fair to say that in some areas, Cory functions on the same level as someone who is mentally retarded?

A    That's correct.

Q    And is it fair to say that because of his intellectual limitations, that Cory Johnson has impaired ability to reason?

A    Yes.

Q    Would it be fair to say that Cory Johnson has an impaired ability to use good judgment to control his behavior?

A    Absolutely.

Q    Would it be fair to say that Cory Johnson has impaired ability to understand and foresee the consequences of his actions?

A    He has impairment in that area, yes.

Q    Is there anything in the scientific literature on mental retardation about individuals with these limitations committing illegal acts?

A    Yes.  It is not uncommon for individuals who are mildly retarded to commit illegal acts.  We find, in part of assessing their adaptive behavior, that very commonly they do break the law.  They use poor judgment.  They don't have good self control.  And

J.A.508

they do break the law.

Q    Is it the case that mentally retarded individuals are often very dependent on others and tend to rely on others in the decisions they make?

A    Yes.  That's one of the factors you have to consider, because part of the limitation is that the person then is more vulnerable to what other people tell them to do or suggest that they do, or look for cues in what other people are doing and try to fake it, emulate them.  And individuals with severe intellectual deficits are very susceptible to that kind of pressure.

Q    And while Cory Johnson is technically not mentally retarded, because he does have these similar intellectual limitations, would it be fair to say that he may be overly dependent on others and tend to rely on others for decisions?

A    Yes.

Q    Is it not the case that mentally retarded individuals are often overly susceptible to influence by others, doing what others direct them to do?

A    That's a standard part of when you evaluate anyone who is mentally retarded; you expect that that problem is going to be present to some degree, and it usually is.

Q    Part of their brain impairment is impairment in the ability to use independent judgment when somebody wants them to do something.

A    Yes.  And to foresee future consequences of actions.  That is, you can put a mildly retarded person and give them a very structured question, a very specific situation, and they can sort of give you the right answer.  But then you put them in a different situation when they are in a different emotional state and they don't give you the right answer anymore.  They don't use the same level of judgment.  They are variable in their level of functioning.

Q    Would it be fair to say with the limitations that Cory Johnson has, as you and the other professionals and the reports have indicated, would it be fair to say that he, too, could be lacking in independent judgment and susceptible to being influenced by others?

A    To some degree, yes.  He would have to be.

Q    Does learning ability only affect ability to read and write or to do other kinds of schoolwork?

A    No.  That term is used because that's where it is first identified, but there is more to it.

Q    Is that just your opinion?

A    No, it is not.  If you take any standard textbook on learning disability, Handbook of Learning

Disabilities, the Kaufmann textbook on learning disabilities, any standard textbook will have a chapter or chapters on the non-academic problems that learning-disabled children and young adults have. That is, they have social problems. They don't judge and reason well in social situations. They have very poor self-esteem. They are much more prone to get involved in delinquent activity. In fact, that's a whole research area. Delinquency and learning disability are linked.

Q    Why would learning disability have anything to do with someone getting involved with criminal behavior?

A    What you find is that the deficit that they have that affects their ability to learn also affects their judgment, their ability to control their behavior, and to foresee the consequences of their action. In my own research with violent delinquent youth, they consistently have verbal deficits. That is, their IQ is consistently lower in those verbal areas. They don't reason well. And we rely on language to a large extent to guide our behavior and to tell us right from wrong and to tell us "Wait a minute, think about this, consider some other course of action." If you have deficits in language, those whole steps in the reasoning process get aborted, get skipped.

Q    And your findings that folks with these learning disabilities may well gravitate to that or be more susceptible to that, is that also consistent with the other studies in the field?

A    Yes. There are a number of studies in the field which find that having a learning disability makes one at risk to become involved as a delinquent in anti-social and criminal behavior. And if you were to assess -- I'm doing a study right now in which we are assessing individuals at Staunton State Prison. There is a high incidence of learning disabilities in this general population.

Q    Now, Doctor, you have spent several hours here talking with these ladies and gentlemen describing Cory's learning disability and his background. I am going to ask you again, do the things that you have brought forward in your mind, was there an effort to excuse the acts for which Cory has been convicted?

A    No. And this is very important to me to make this distinction. I don't want any of my testimony to be construed that I am condoning what he is doing or minimizing what the crimes are that he has been convicted of. I am only here to inform the jury and address the very specific issue of whether he has complete blameworthiness that would indicate that he

would receive a death sentence as opposed to life in prison without parole. And I would be very uncomfortable presenting my testimony under any other basis than that, that narrow basis.

Q    Doctor, the factors that you have described, do they make -- do they, in fact, make Cory Johnson less responsible for his actions --

MR. VICK:  That's the jury's ultimate province.

THE COURT:  He can answer the question.

BY MR. COOLEY:

Q    -- than a person who has full cognitive skills?

A    I would have to say they make him less than normal. They make him substantially less than normal. They impair his judgment, his ability to control his actions, foresee the consequences of his actions. I don't think they excuse his behavior. I don't think that means he does not know that things are wrong, that killing is wrong, and that drug dealing is wrong. I have to leave it to the jury to make the value judgment of how much to weigh that and what to do with that. I believe it does make him not a normal individual, not as responsible as the ordinary citizen.

MR. COOLEY:  Thank you. Answer any questions of the government.

CROSS-EXAMINATION

BY MR. VICK:

Q    Good afternoon. As I understand your testimony, you have spent a total of some 15 hours, approximately, with Cory Johnson interviewing him concerning the subject of your testimony here this afternoon.

A    Yes.

Q    Indeed, you went into great detail with him concerning his involvement in crime.

A    Yes, I did.

Q    He detailed that to you in an open, candid manner?

A    Surprisingly open, yes.

Q    He detailed extensive criminal involvement on his part?

A    He detailed extensive drug dealing.

Q    Throughout this, it is clear, is it not, that he knew exactly what he was doing when he was dealing drugs?

A    He knew that it was wrong to deal drugs, yes.

Q    The ladies and gentlemen of the jury have heard several weeks of testimony which outlined a structure to this drug dealing; that is, Cory Johnson, other people involved here, maintained a level of supervision and organization and had people working

J.A.511

for them.  That indeed is inconsistent with someone who is mentally retarded, isn't it?

A    I don't think Cory was pulling strings and giving orders and directing people around.

Q    That's based upon your testing of him?

A    And the review of records.  My complete evaluation.

Q    You weren't out there on the street with him, so you really don't have any idea?

A    That's correct.  I wasn't out on the street with him.

Q    If the testimony was that indeed Cory was one of the people who organized and supervised people to distribute drugs, that's inconsistent with mild mental retardation, or close to it?

A    I would be very skeptical of that, yes.

Q    Indeed, when you gave these tests to Cory Johnson and you came up with a mental -- with an IQ, he knew he was being tested for this very testimony in Court, if indeed he happened to be found guilty and was facing the death penalty.

A    I don't think his understanding was as specific as that.

Q    He didn't know you were testing him in an effort -- so that you could testify for him in the death penalty phase of this case?

A    He did know that, yes.

Q    Very simply, he did know that.

A    Yes.

Q    All right.  The testing that had been done previously shows a different IQ than that for Mr. Cory Johnson, doesn't it?

A    As is always the case in testing, there are some scores higher and some lower.  Mine is in the middle.

Q    Indeed, Dr. Gallaudet, I believe, gave him a full scale IQ of 88, a performance IQ of 93, in 1982.

A    When he was 13 years old, yes.

Q    That's in the very normal range of IQ, isn't it?

A    No, that's in the low average.

Q    Average.

A    For some areas that were deficient, yes.

Q    Indeed, you have quoted here extensively the test given by Dr. Barish which resulted in his appearing to be mildly retarded in some categories, correct?

A    Yes.

Q    In that same report he goes on to say that Cory's very deficient score on the block design subtest is the result of several rotations of design

3703

that he easily corrected when his error was pointed out to him.  These scores should therefore not be taken as an indication of Cory's intellectual potential.

A    Of his potential, that's correct.  It is common for brain-damaged individuals to rotate the designs, and then after somebody else points out the rotation they say, "Oh, yes, it is rotated," and then fix it.

Q    But his --

MR. COOLEY:  I would ask he be allowed to finish.

THE COURT:  Sustained.

BY MR. VICK:

Q    Were you finished?

A    What I wanted to say about that, I think you are misinterpreting that particular sentence.  The fact that he was able to recognize that he had rotated the design is very commonly found in brain-damaged individuals.  It doesn't mean that he wasn't trying hard, and it doesn't mean that he actually is smarter than that.  What it means is that that was another indication that he had the kind of deficit of a brain-damaged person.

Q    Intellectual potential is another way of saying IQ, isn't it?

3704

A    Not really.

Q    What did the doctor mean when he said, "These scores should not therefore be taken as an indication of his intellectual potential"?

A    He is trying to be as optimistic as he can about a very difficult situation.

Q    IQ is only one of a number of factors that are to be considered when determining whether someone is mentally retarded or not?

A    That's probably the main one and first one, but it is not the only factor.

Q    In fact, before the jury, I believe, there are a number of other factors that go into that.

A    Adaptive behavior is the other.

Q    Socialization?  Is that another way of putting that?  His ability to get along with others?

A    No.  Not the ability to get along with other people, no.

Q    Did you happen to be in the courtroom during the testimony of Ms. Odette Noble?

A    I came in in the middle of her testimony.

Q    Did you hear the portion of her testimony that indeed Cory Johnson was a leader of sorts in the residence that she ran?

A    Well, not only did I hear that, but I asked her

3705

about it when I interviewed her over the phone, and

then talked with her about it again today to understand what she meant by that.

Q    Very able to express himself verbally to the others, very able to take care of himself?

A    They said he was a big talker, that he was the first one to adopt new styles on the street, such as hair styles and clothing styles.  I think trend-setter is probably a better term in terms of what she described.  I asked her specifically whether he was a leader in terms of ability to initiate and carry out criminal activity, because that's really the issue I'm concerned about.  And what she said, which I put in my report, I quoted her in my report because I thought that was important.  She said Cory wouldn't be the leader because he wouldn't have the brains, but he would be the point man.  He would be the one to stand up and do the speaking, he wanted to belong so much.  That was my impression.  That if somebody says, "Cory, go do something," he might be the first one to go do it, because he is trying so hard to do what the other person wants him to do.  That's a different sense of the term "leader" than I thought you had in mind.

Q    But he was able to socialize and express himself and tell the other people in the residence exactly what was going on in his mind, correct?

A    He would express himself, apparently, a lot in the group therapy meetings.

Q    In fact, throughout his Mt. Pleasant Cottage stay, that was a consistent theme.  He is able to handle himself very well verbally, isn't he?

A    He has speech articulation problems.  But he has no reluctance to express himself, to try to say what is on his mind.

Q    In fact, Dr. Peck found that he was in the superior range, structure, as to word fluency.  He scored at the 85th percentile.

A    He could come up with words and say a lot of words one after another, and was not reluctant at all to give a series of words.

Q    That's inconsistent with mental retardation, too, isn't it?

A    Not inconsistent with mental retardation.

Q    It would be a factor that would tend to make you think he was not mentally retarded, isn't it?

A    No.  It is not in the mentally retarded range.  But even someone who is mildly retarded is not retarded in every single area of their functioning.  And there are mentally retarded kids who are very verbal, who talk a lot, who talk and chatter all the time.  There are others who say very little.  It varies.

Q    There is no doubt Cory is able to express himself and tell you where he stands.

A    I would agree with that.

Q    And socialize to the point of being a peer in a group of people?

A    He is very talkative socially.

Q    If the testimony that this jury has heard over the last several weeks is that he has indeed been one of these people who organized others to work below him selling drugs, it is consistent with that, isn't it?

A    What do you mean by "organized others"?

Q    Just that.  Organized other people to sell drugs.

MR. COOLEY:  I am not sure he is correct. The government gave a very specific definition of "organized."  So to say it is in its normal sense --

THE COURT:  Mr. Vick, I don't know how helpful it is to tell this witness about all that we have heard and get his estimation of it.  Go ahead and ask your questions, but hurry up.

BY MR. VICK:

Q    His ability to verbalize himself is very consistent with an ability to organize people to work for him, wouldn't it be?

A    No.  I think he has the ability to abstractly decide what people should do and to give them commands and to foresee what the consequences are of their actions.  When you talk about organize and to be in a leadership position, I think you have got to be able to say, "I want you to do X, Y, and Z because I think this will happen or that will happen."  Now, just being able to talk to somebody and express your views to somebody, I think, is very short of that.

Q    You are saying he would be incapable of saying to someone, for example, "I want you to take me to a certain residence because there is something I want to do there"?

A    To that limited degree, I don't think that would be a problem.

Q    He could make those decisions?

A    He could say, "Take me somewhere, I want to go somewhere," sure.

Q    "I want to kill somebody because they bothered me"?

A    I think he could say that.

Q    He also could hold a job, couldn't he?

A    Well, I have doubts about that.

Q    Your own report indicates that he held a job and walked away from it.

A    He held jobs during the Summer Youth Corps.  He

also held a job apparently, for a brief time, at a grocery store, and apparently on a loading dock. But the fact that he could not maintain those jobs is why I'm not sure he can hold a job.

Q    People who have low intelligence don't necessarily all resort to criminal behavior, do they?

A    You are quite right about that.

Q    And people, you are certainly not excusing his -- you are not saying his low intelligence is an excuse for his resorting to criminal behavior?

A    That's correct.

Q    People who have low intelligence certainly don't resort, all of them, to violent activity, do they?

A    Well, more so than a normal person.

Q    My question is  --

A    But not the overwhelming majority.

Q    As I understand your testimony, he is very suggestible?

A    I would qualify that a little bit. But he is suggestible.

Q    And susceptible to pressure?

A    To his environment.

Q    If that has resulted in the past in his committing very violent acts, does that mean that that sort of pressure  --

        MR. McGARVEY:  I object.

        THE COURT:  The objection is sustained.

        MR. McGARVEY:  Thank you.

BY MR. VICK:

Q    In jail, do you think he will be susceptible to peer pressure?

        MR. McGARVEY:  Same objection.

        THE COURT:  Sustained.

        MR. VICK:  Beg the Court's indulgence.

    (Counsel conferring with co-counsel.)

    I have no further questions.

        THE COURT:  All right.  May the witness stand down?

        MR. COOLEY:  He may, Your Honor.

    (Witness stood aside.)

    Mr. Cooley, call your next witness.

        MR. COOLEY:  We don't have any more witnesses.  There is one matter we may want to seek regarding a potential stipulation.

    (At Bench.)

        MR. COOLEY:  The only other thing we have is we would want to put in as part of our case the stipulation that I believe Mr. Baugh has filed regarding Jerry Gaiters, the fact that he was not death-eligible under that conviction.

        MR. VICK:  We never sought the death

penalty against him, never intended to seek the death penalty against him prior to his pleading guilty.

MR. COOLEY:  I'm not disputing that.

MR. VICK:  I don't think this is the stipulation.  Jerry Gaiters was charged in the indictment, and we have ample evidence to argue that he was not death-eligible.

MR. BAUGH:  As we obviously tell the United States in the position that it did not qualify him to be, we would submit that the Court, as a matter of law, must acknowledge that it was not an issue in controversy that can be argued to the jury to decide one way or the other.  As a matter of law, Mr. Gaiters pled guilty to 848 death penalty charges, and they didn't move for the death penalty.  Therefore, he would not get the death penalty.  That's a matter of law.

THE COURT:  No.  It is just not something that I want to get involved in.  You all can argue that to the jury or Mr. Vick can state it.

MR. BAUGH:  We object.

THE COURT:  I understand.

MR. COOLEY:  Judge, respectfully, I would move into evidence the book, the mitigation book. And we will obviously have no objection if the Court wants to allow a sufficient number of copies to go to the jury.

THE COURT:  All right.

MR. COOLEY:  With the possible exception of wanting to join in and adopt the testimony of a witness relating to the discussion we just had at the bar conference, defendant Johnson rests at this time.

MR. VICK:  We obviously have no objection to that going in.

(In Open Court.)

THE COURT:  All right.

Ladies and gentlemen, that completes Mr. Johnson's mitigation presentation.  I need to give you all some direction about how things are going to proceed.  I need to tell you today so that you all can make some planning.  Some of you may not like this very much, but I have decided, in consultation with the lawyers, that this is the better course to proceed on and this is what we are going to do.

We now know that tomorrow we will hear from Mr. Roane, his mitigation case.  That should take up the better part of tomorrow.  Then we would have our instructions conference to go through, then we would have the arguments to you on the penalty phase, which would probably start on Friday morning.  And then, of course, I will give the instructions.

**J.A.517**

If that time line follows as we expect it to, you would then, therefore, get the case to start your deliberations in this phase Friday afternoon. Early, late, somewhere in the afternoon on Friday.

Now, once you start to deliberate on this phase, we are going to keep you until you have finished deliberating. What that means for you practically is when you come here on Friday, I want you to pack a little bag as though you may be staying for two or three days. Because we will keep you Friday night at a hotel, and we will bring you back in and start your deliberations again on Saturday. You would deliberate during the course of Saturday. And if your deliberations are not complete, we will keep you until it is over. So Friday when you come here, come prepared to stay for a couple of days. We will explain in more particularity through the Marshals how this all will be handled. But I wanted you to know that now so you can start to make your preparations. I've held off on this as long as I can.

All right, we will see you tomorrow morning at 10 o'clock.

(The jury left the courtroom.)

Mr. Marshal, you can remove the defendants.

(The defendants were removed from the courtroom.)

All right. We will be in adjournment until 10:00 a.m.

(Proceedings adjourned at 3:35 p.m.)

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | **Case No. 3:92CR68 (DJN)** |
| | **:** | **CAPITAL CASE** |
| **COREY JOHNSON,** | **:** | **Execution Scheduled for** |
| | **:** | **January 14, 2021** |
| Defendant. | **:** | |

**NOTICE OF SUBMISSION OF EXHIBITS (SUBMISSION 2 OF 8)**

Corey Johnson hereby gives notice of the submission of Exhibits 8-17 as attachments to

his Motion Pursuant to 28 U.S.C. § 2255 Raising Claim of Ineligibility To Be Executed Under

18 U.S.C. § 3596(c). This is the second submission of eight.

Dated: December 14, 2020                    Respectfully submitted,

                                            /s/ David E. Carney
                                            David E. Carney, VA Bar #: 43914
                                            Donald P. Salzman (Admitted Pro Hac Vice)
                                            Skadden, Arps, Slate, Meagher & Flom, LLP
                                            1440 New York Avenue, NW
                                            Washington, DC 20005
                                            Telephone: (202) 371-7246
                                            Fax: (202) 661-8295
                                            Email: david.carney@skadden.com

                                            *Counsel for Corey Johnson*

**J.A.519**

**CERTIFICATE OF SERVICE**

I hereby certify that on December 14, 2020, I electronically filed the foregoing with the

Clerk of Court using the CM/ECF system, which will then send notification of such filing to all

parties and counsel included on the Court's Electronic Mail notice list.


/s/ David E. Carney
David E. Carney, VA Bar #: 43914
Skadden, Arps, Slate, Meagher & Flom, LLP
1440 New York Avenue, NW
Washington, DC 20005
Telephone: (202) 371-7246
Fax: (202) 661-8295
Email: david.carney@skadden.com

## INDEX OF EXHIBITS TO MOTION PURSUANT TO 28 U.S.C. § 2255 RAISING CLAIM OF INELIGIBILITY TO BE EXECUTED UNDER 18 U.S.C. § 3596(c)

EXHIBIT NO.

**SUBMISSION 1**

**EXPERT REPORTS**

Report of Daniel J. Reschly, Ph.D., Aug. 26, 2016 .........................................................................1

Curriculum Vitae of Daniel J. Reschly, Ph.D., May 15, 2020....................................................1(a)

Report of J. Gregory Olley, Ph.D., Aug. 24, 2016........................................................................2

Curriculum Vitae of J. Gregory Olley, Ph.D., Oct. 2020 ..........................................................2(a)

Letter from Gary N. Siperstein, Ph.D. to Counsel for Corey Johnson, Dec. 16, 2016 ...................3

Curriculum Vitae of Gary N. Siperstein, Ph.D., Sept. 2020 ......................................................3(a)

Debra Nelson, Mitigation Report, Sept. 27, 2016........................................................................4

Report of Richard G. Dudley, Jr., M.D., Aug. 22, 2016................................................................5

**TRIAL TRANSCRIPTS**

Trial Tr., Feb. 3, 1993 .................................................................................................................6

**SUBMISSION 2**

Trial Tr., Feb. 10, 1993 ...............................................................................................................7

**SUBMISSION 3**

Cornell Mitigation Information and Report (Excerpt)...................................................................8

Trial Tr., Feb. 12, 1993 ...............................................................................................................9

Trial Tr., Feb. 15, 1993 .............................................................................................................10

**AFFIDAVITS & DECLARATIONS**

Declaration of Kenneth Barish, Ph.D. (staff psychologist at Pleasantville Cottage
    School), July 22, 2014 .........................................................................................................11

Affidavit of Richard Benedict (special education teacher at Pleasantville Cottage
    School), Dec. 5, 2011...........................................................................................................12

Affidavit of Darnell Brown (acquaintance in Trenton, NJ), Oct. 14, 2011 ..................................13

Affidavit of Darold Brown (acquaintance in Trenton, NJ), June 15, 2011 ...................................14

Affidavit of Craig S. Cooley (appointed counsel in 1992), Sept. 20, 2016 ..................................15

Affidavit of Courtney Daniels (Corey's lifelong friend), May 21, 2011 ......................................16

Declaration of Monica Dawkins (Corey's former girlfriend), July 16, 2012 ................................17

**SUBMISSION 4**

Declaration of Cary Gallaudet, Ph.D. (psychologist at Pleasantville Diagnostic
    Center), Mar. 19, 2012.........................................................................................................18

**J.A.521**

EXHIBIT NO.

Declaration of Ann Harding (staff member at Pleasantville Cottage School), Nov. 21, 2011 ................................................................................................................19

Affidavit of Minnie Hodges (Corey's maternal aunt), Apr. 30, 2011 ..........................20

Affidavit of Priscilla Hodges (Corey's cousin), Apr. 30, 2011 .....................................21

Affidavit of Queenie Hodges (Corey's cousin), Apr. 30, 2011 .....................................22

Declaration of Esther Johnson (Corey's maternal grandmother), Apr. 30, 2011 ..........23

Affidavit of Robert Johnson (Corey's half-brother), June 29, 2011...............................24

Affidavit of Antionette Daniels Joseph (the best friend of Corey's mother and Corey's godmother), May 21, 2011) ......................................................................................25

Declaration of Leona Klerer (reading teacher at Mount Pleasant Cottage School), June 3, 2011 ..............................................................................................................26

Affidavit of Gerald Lefkowitz (unit administrator at Pleasantville Cottage Center), Dec. 5, 2011 ............................................................................................................27

Affidavit of Odette Noble (social worker at Elmhurst), Dec. 1, 2011 ..........................28

Declaration of George Sakheim, Ph.D. (Chief of Psychological Services at Pleasantville Diagnostic Center), June 17, 2011 ........................................................29

Affidavit of David Washington (childcare worker at Elmhurst), Mar. 1, 2012..............30

SUBMISSION 5

CHILDHOOD & TESTING RECORDS

Gregory Judge, School Social Worker, Social History, Mar. 4, 1977 ..........................31

Cheryl Spillane, Learning Consultant, Bureau of Pupil Personnel Services, Jersey City Public Schools, Learning Consultant Evaluation to Child Study Team, Mar. 18, 1977.................................................................................................................32

F.A. Figurelli, M.D., Chief Psychologist, Psychological Examination Record, Mar. 25, 1977.................................................................................................................33

Eleanor Glantz, Social Worker, Case Service, Dec. 11, 1978 .......................................34

Committee on the Handicapped, Referral to the Committee on the Handicapped, Feb. 26, 1979.................................................................................................................35

Committee on the Handicapped Records, May 21, 1979 ...............................................36

Washington Heights-West Harlem Community Mental Health Center, Child Assessment Evaluation Summary, Dec. 9, 1981 ......................................................37

Ernest H. Adams, Staff Psychologist, Psychodiagnostic Evaluation, Dec. 11, 1981 ....38

Cary Gallaudet, Psy.D., Pleasantville Cottage School, Psychological Evaluation, Feb. 1, 1982.................................................................................................................39

2

**J.A.522**

**EXHIBIT NO.**

Leona Klerer, Mount Pleasant Cottage School Screening Upon Admission, Feb. 22, 1982 ................................................................................................................40

Amira Offer, Caseworker, Psychosocial Summary, Mar. 15, 1982 ...............................41

Gloria Caro, Pleasantville Cottage School, Reassessment Summary, May 21, 1982 ...................42

Gloria Caro, Caseworker, Initial Conference, Current Assessment and Transfer Summary, June 9, 1982 .............................................................................................43

Gayle Turnquest, Caseworker, Pleasantville Cottage School, Current Assessment, Jan. 31, 1983 ....................................................................................................44

**SUBMISSION 6**

Ken Barish, Ph.D., Psychologist, Pleasantville Cottage School, Psychological and Educational Evaluation, Apr. 29, 1983 ..........................................................45

John B. Stadler, M.D., Clinical Director, Pleasantville Cottage School, Psychiatric Evaluation, Aug. 26, 1983 ..............................................................................46

Lynda Coccaro, Speech and Language Pathologist, Donald R. Reed Speech Center, Inc., Phelps Memorial Hospital, Speech and Language Evaluation, Oct. 5, 1983 .................47

Lynn Polstein, Jewish Child Care Association of New York, Pleasantville Cottage School, Change in Permanency Plan, Apr. 13, 1984 ................................................48

Gerard Maier, Social Worker, Current Assessment, Sept. 4, 1984 ...............................49

Christine Aaron, MSW Intern, Jewish Child Care Association of New York, Pleasantville Cottage School, Visitation Plan, Dec. 12, 1984 ....................................50

Kenneth Barish, Ph.D., Psychologist, Pleasantville Cottage School Psychological Evaluation, Apr. 15, 1985 ..............................................................................51

Gerard Maier, Pleasantville Cottage School, Discharge/Transfer Plan, May 28, 1985.................52

Board of Education of the City of New York, Individualized Education Plan – Phase 1, July 1, 1985 ....................................................................................................53

Odette Noble, Social Worker, Jewish Child Care Association of New York, Elmhurst Boys Residence, UCR Reassessment and Service Plan Review 6 Month, Nov. 21, 1985 ....................................................................................................54

**SUBMISSION 7**

Odette Noble, Social Worker, Jewish Child Care Association of New York, Elmhurst Boys Residence, UCR Reassessment and Service Plan Review 6 Month, June 28, 1986 ....................................................................................................55

Odette Noble, Social Worker, Jewish Child Care Association of New York, Elmhurst Boys Residence, UCR Plan Amendment: Form D Trial Discharge, Feb. 23, 1987 ...............56

Newtown High School, Scholastic Transfer Record, Dec. 7, 1987 ...............................57

**J.A.523**

**EXHIBIT NO.**

Janet Valentine, Child Care Worker, Pleasantville Diagnostic Center, Outline for
Cottage Report (undated) ........................................................................................58

**COURT RECORDS**

Notice of the Intention of U.S.A. to Seek Death Penalty as to Mr. Tipton, May 1,
1992 .......................................................................................................................59

Notice of the Intention of U.S.A. to Seek Death Penalty as to Mr. Roane, May 1, 1992 .............60

Second Superseding Indictment, July 20, 1992, Dkt. 115 ..........................................................61

Notice of the Intention of U.S.A. to Seek Death Penalty as to Mr. Thomas, Oct. 28,
1992 .......................................................................................................................62

Verdict Form, Feb. 3, 1993, Dkt. 466 .........................................................................................63

Notice of the Intention of U.S.A. to Seek Death Penalty as to Mr. Johnson, Feb. 8,
1993 .......................................................................................................................64

Special Findings, Feb. 16, 1993, Dkt. 508 ..................................................................................65

Motion to Have Defendant Declared Mentally Retarded, *United States v. Thomas*,
No. 3:92CR68 (E.D. Va. Apr. 15, 1993) ..............................................................66

Memorandum in Support of Initial Petition for Writ of Habeas Corpus Pursuant to 28
U.S.C. Section 2255, June 15, 1998, Dkt. 714 (Excerpt) .....................................67

Reply Memorandum in Support of Initial Petition for Writ of Habeas Corpus Pursuant
to 28 U.S.C. Section 2255, Mar. 15, 1999, Dkt. 761 (Excerpt) ..............................68

Ex. 14 to Reply Memorandum in Support of Initial Petition for Writ of Habeas
Corpus Pursuant to 28 U.S.C. Section 2255, Mar. 15, 1999 ...................................69

Ex. 15 to Reply Memorandum in Support of Initial Petition for Writ of Habeas
Corpus Pursuant to 28 U.S.C. Section 2255, Mar. 15, 1999 ...................................70

**SUBMISSION 8**

Petitioners' Joint Motion for Leave to Take Discovery, June 24, 1999, Dkt. 770 ........................71

Memorandum Opinion, May 3, 2000, Dkt. 803 ...........................................................................72

Memorandum Opinion, May 1, 2003, Dkt. 896 ...........................................................................73

Brief for Appellants Cory Johnson and Richard Tipton at 146, *United States v.
Johnson*, No. 03-13(L), 03-26, 03-27 (4th Cir. Feb. 17, 2004) (Excerpt) ..............74

**SUBMISSION 9**

**DIAGNOSTIC MATERIALS**

American Association on Intellectual and Developmental Disabilities Definition
Manual ("AAIDD-11") (Excerpt)........................................................................75

AAIDD User Guide to 11th Edition (Excerpt) ............................................................................76

Diagnostic and Statistical Manual of Mental Disorders ("DSM-5") (Excerpt)...........................77

**J.A.524**

**EXHIBIT NO.**

**CONGRESSIONAL RECORDS**

134 Cong. Rec. 22,926 (1988) (Excerpt)......................................................................78

136 Cong. Rec. S6873 (daily ed. May 24, 1990) (Excerpt)..........................................79

**J.A.525**

# EXHIBIT 8

# MITIGATION INFORMATION
# COREY JAMES JOHNSON

## TABLE OF CONTENTS

**TAB**

1    Chronology of events in Corey Johnson's life

2    Mitigation report by Dr. Cornell

3    Neuropsychological report by Dr. Peck

4    Quotations excerpted from mental health records

5    Mental health records containing quotations
   Psychological report by Drs. Gallaudet and Sakheim
   Psychiatric evaluation by Dr. Collimuttam
   Educational screening report by Leona Klerer
   Order of Disposition, Family Court of the State of New York
   June 1982 Initial conference report
   January 1983 Current Assessment report
   Psychological/Educational Evaluation by Dr. Barish
   Psychiatric evaluation by Dr. Stadler
   Speech and Language Evaluation by Linda Coccaro
   December 1983 Current Assessment report
   January 1984 letter from Nurse Sciaruto
   Psychiatric summary by Dr. Clemmens
   Psychological Re-evaluation by Dr. Barish
   March 1985 Current Assessment report
   September 1985 Three Month Conference Note
   February 1986 Three Month Conference Note
   June 1986 Report
   June 1986 Notice of application and petition
      in Family Court of the State of New York

6    Test results from Dr. Cornell's psychological evaluation

7    Definitions
   Federal Register Definition of Learning Disability
   National Joint Committee for Learning Disabilities (NJCLD)
   AAMR Definition of Mental Retardation

8    Curriculum Vitae of Dr. Cornell

   Curriculum Vitae of Dr. Peck

J.A.527

**J.A.528**

# MITIGATION REPORT

| | |
|---|---|
| Defendant: | Corey James Johnson |
| Examining Psychologist: | Dr. Dewey G. Cornell |
| Date of Report: | February 1, 1993 |

· Corey James Johnson is a 24 year old African-American male charged with multiple counts of capital murder in U.S. District Court. This report is a summary of mitigation issues to be considered at sentencing.

This report is based on the following sources of information:

1.  Clinical interviewing and psychological testing of Mr. Johnson
    October 2, 1992 -- 6 hours
    October 9, 1992 -- 5 hours
    January 8, 1993 -- 4 hours

2.  Discovery Materials numbered 1-47
    Homicide worksheets, crime scene photographs, medical examiner reports and photographs for Douglas Talley, Douglas Moody, Peyton Maurice Johnson, Louis J. Johnson, Jr., Torrick Brown, Bobby Lee Long, Anthony Glasgow Carter, Dorothy Armstrong, Curtis Lee Thorne, Linwood Chiles, and Katrina Rozier. The Discovery Materials also included reports of fingerprint analysis, drug analysis, and ballistic analysis; documentation of rental receipts and a handgun purchase, line information and data sheet, a search warrant and affadavit for 1212 West Moore Street, and an affadavit of Richmond officer Ralph Fleming.

3.  Mr. Johnson's school records from Newtown High School and the New York City Board of Education

4.  Mr. Johnson's FBI Identification Record and records from the New York City Department of Health, Correctional Health Services

5.  Records from the Jewish Child Care Association of New York, including Pleasantville Cottage School and Elmhurst Boys Residence.

6.  Clinical interview with Mr. Johnson's mother Emmer Johnson
    November 6, 1992 -- 2 hours

1

J.A.529

Mitigation Report                                                    Corey Johnson

7.      Telephone interviews with:
                Pleasantville Cottage School supervisor Mr. Jerry Lefkowitz;
                Consulting psychiatrist Dr. Elizabeth Clemmons;
                Pleasantville Cottage School Clinical Director and psychiatrist
                    Dr. John Stadler;
                Pleasantville Cottage School psychologist Dr. Ken Barish;
                Elmhurst Boys Residence caseworker Odette Noble

8.      Report of neuropsychological evaluation by Dr. Edward Peck

### Principal Findings

There are two general factors which impaired Mr. Johnson's psychological development and ability to adjust in society.  The first factor is his upbringing in a unstable, abusive, and neglectful family environment.  The second factor is a severe learning disability, which is a form of brain impairment which affected Corey's intelligence, speech, and ability to read and write.

Upbringing in an unstable, abusive, and neglectful family environment.  Mr. Johnson was the child of Emmer Johnson and her boyfriend James Sykes.  Mr. Sykes reportedly was in prison during his son's early years, and had no contact with him until Corey was approximately 12 years old.  Ms. Johnson led Corey to believe that his father was Robert Butler, another boyfriend of Ms. Johnson who was father to Corey's half-brother.

During his early years, Corey lived in many different residences as his mother changed jobs and moved in with various relatives and boyfriends. Although neither Corey nor his mother have good recall of details, Corey made at least 12 moves before age 13.  Several of Ms. Johnson's boyfriends were violent drug abusers who were physically abusive of her and/or her two sons, Corey and Robert.  According to Ms. Johnson, her primary motive in eventually having her sons removed from her care and placed with social service agencies was to protect them from a particularly abusive boyfriend who was addicted to heroin.

Records of the Jewish Child Care Association of New York document emotional disturbance in both Corey and his brother prior to their teenage years. Corey was enuretic (bedwetting) until age 11 and encopretic (fecal soiling) between the ages of 8 and 12.  He was disobedient at home and school.  Corey's brother Robert was placed in a psychiatric hospital at age 10 after making a suicide attempt.

2

J.A.530

Mitigation Report                                                    Corey Johnson

In 1982 when Corey was 13, the New York Family Court determined that his mother was unable to provide adequate care and removed him from her home. He was placed under the care of the Pleasantville Cottage School, a residential treatment program operated by the Jewish Child Care Association. Corey remained in the residential school for approximately 4 years with visits home on some weekends and holidays. During his years in the school Corey was described consistently by staff as a child who adjusted well to the program. He was not considered to be an aggressive child or a management problem. On the contrary, he was viewed as a teenager who made good use of the program, and who attempted to discourage his peers from substance abuse and aggressive behavior. However, Corey was emotionally troubled by his longing for his mother and his disappointment in her unavailability and undependability. Ms. Johnson was described as a self-centered and unreliable individual who did not cooperate with the school or demonstrate consistent interest in Corey. The staff believed that she was engaged in illegal activities and was a negative influence on Corey.

When Corey was ready for discharge from the residential school, his mother was unwilling to accept him back into her care. Therefore, in 1985 at age 16, Corey was placed in a group home in the community and attended Newtown public high school. Initially Corey made a good adjustment in the group home, played varsity sports in school, and got along well with his peers. The staff at the group home reported continual difficulties working with Ms. Johnson, who failed to come to appointments and was secretive about her lifestyle. Corey was unwilling to describe his visits home and became angry when the group home staff expressed criticisms of his mother. However, during this time Corey's mother was abusing cocaine and was arrested for stealing. In his interview with Dr. Cornell, he acknowledged that he was extremely upset and confused by his mother's drug use and her lack of availability as a source of support and encouragement. Over time Corey's previously good behavior began to decline. He and two other boys in the home were arrested for robbing a peer. He was truant from school and resisted group home rules. In February of 1987, when Corey was 18 and still attending school, the staff decided that he was sufficiently uncooperative that they decided to send him home to his mother temporarily. Apparently the staff acted under the assumption that sending him to his mother would restore his positive attitude toward living in the group home. Corey failed to return to the group home and had no further contact with the Jewish Child Care Agency.

Severe learning disability. A learning disability is a disorder in one or more of the basic psychological processes necessary to understand or use language. There are various types of learning disabilities which impair reading, writing, speech, and other language-related activities. Although mild learning disabilities can be remediated with special education and training, severe learning disabilities result in

3

J.A.531

Mitigation Report                                                    Corey Johnson

a permanent impairment which handicaps the individual throughout life. At the time Corey was placed with the Jewish Child Care Agency it was already apparent that he had difficulty learning in school and that his speech was impaired. He received a series of evaluations by psychologists, psychiatrists, speech pathologists, and teachers who agreed that he had a severe learning disability. His reading, spelling, and arithmetic skills were at a 2nd to 3rd grade level. He exhibited difficulties in speech sound discrimination, visual-spatial abilities, and indications of diffuse brain impairment.

While at the Pleasantville School Corey received some educational services to remediate his learning disability, but apparently he failed to receive speech therapy and the full complement of special education services recommended for his condition. He was highly motivated to learn, but was extremely frustrated at his minimal progress in learning to read. After years of work, his reading was only slightly improved. He was embarrassed by his learning handicap, and frequently expressed negative feelings about himself and frustration at not receiving the kind of help he had been promised. Several of the staff were concerned about the failure of the school to provide the services he needed and felt that he was right to feel let down by the school.

Children with learning disabilities frequently experience intense feelings of frustration and disappointment, and develop poor self-esteem. The impact of Corey's handicap on his self-esteem was worsened by his mother's refusal to accept his limitations. She repeatedly insisted that he should attend college, and made him feel personally inadequate when he did not make suitable progress.

Psychological and educational testing conducted by Dr. Cornell confirmed the severity of Corey's learning disability. His reading abilities are still at approximately the 2nd grade level, with slightly higher but still deficient abilities in writing and arithmetic. His overall intelligence falls at the 6th percentile for his age group (i.e., lower than 94% of his age peers). This level of intellectual ability is in the Borderline range, slightly above the level of mild mental retardation. His speech contains mild articulation problems. Neuropsychological testing by Dr. Peck (see his report) confirmed that Corey has long-term neuropsychological impairment with deficiencies in several different areas of mental functioning.

There is no single cause or basis for all forms of learning disability. The present state of knowledge indicates that learning disabilities are a form of brain impairment which can be produced by brain injury and/or biological and genetic factors. Learning disabilities are recognized as handicapping conditions or disabilities under federal and state regulations.

4

J.A.532

Mitigation Report                                                    Corey Johnson

Summary of Interviews with Mental Health Professionals

    As listed above, I conducted telephone interviews with 5 professionals who worked with Corey while he was at Pleasantville Cottage School or the Elmhurst Boys Residence.  All five individuals expressed shock and disbelief over Corey's charges, because they did not know him as an aggressive individual.  On the contrary, staff supervisor Jerry Lefkowitz, who was responsible for disciplinary action at the school, described Corey as "not a troublemaker" and one of the more cooperative and motivated children in the school.  He saw Corey on almost a daily basis throughout his stay at Pleasantville Cottage School, and described him as someone who was a "positive influence" on other boys because he spoke out against drug use and acting out behavior.  Mr. Lefkowitz stated that he could imagine many boys from the School -- but not Corey -- who might become involved in violent crime.

    Psychiatrist and Clinical Director Dr. John Stadler stated that Corey was "a remarkably peaceful kid trying very hard to do better."  He "had a terrible neurological impairment to learning and though he wanted to learn, he couldn't." He felt that Corey "did well in a structured setting . . . but like many boys like him I imagine he is very susceptible to his environment."  He stated his observation that boys with severe learning disabilities like Corey are prone to aggressive and delinquent behavior because of their frustration and inability to function successfully in society.  He expressed regret that the Pleasantville Cottage School did not have more resources to treat speech difficulties and learning disabilities like Corey exhibited.

    Psychiatrist Dr. Elizabeth Clemmons evaluated Corey several times and concluded that he was a severely learning disabled boy who became very frustrated when he did not receive the remedial help and speech therapy he was promised.  She stated very directly that he was right to feel frustrated because funding limitations at the School prevented him from receiving help he needed.

    Psychologist Dr. Ken Barish described Corey as "one of the most severe cases of learning disability I have encountered."  He said that Corey's impairment was so severe and so pervasive in his cognitive processes that Corey was unable to learn how to compensate for his problems like other learning disabled children. Dr. Barish pointed out that he has given professional lectures on learning disabilities in the past and cited Corey's case as an example of severe disability. He stated that there was no question that Corey's disability was the result of neurological impairment.

5

**J.A.533**

Mitigation Report                                                          Corey Johnson

Social worker Odette Noble was Corey's therapist and caseworker for nearly two years after he left Pleasantville Cottage School and went to the Elmhurst Boys Residence. Her first comment was that he was "the one who had a very bad learning disability" and that "he tried hard to succeed." She recalled that she "had a good relationship with him. I didn't see him as a mean-spirited kid at all, he was a nice kid." She recalled when Corey was arrested and jailed at Riker's Island in New York City. She knew all three boys who were arrested for robbing another boy. Her account is instructive, because it seems to parallel in some respects Corey's involvement in the homicides. Ms. Noble recalls that Corey became involved in the robbery because he wanted to be accepted by an older boy named Mitch who had a personal dispute with the boy who was robbed. She saw Corey as a follower who was so eager to be accepted by his peers that he would act without thinking to help someone and gain his approval. When I asked her about the possibility that Corey would be a leader in committing a crime, she replied bluntly, "Corey wouldn't be the leader because he wouldn't have the brains, but he would be the point man. He would be the one to stand up and do the speaking, he wanted to belong so much."

## Conclusion

Corey Johnson suffered from a severe learning disability which impaired his intellectual development and prevented him from succeeding in school. He lacked a stable family environment and was neglected and rejected by his parents. Professional efforts to remediate his learning disability and to work constructively with his mother were unsuccessful. The combination of all these factors damaged Corey's self-image and left him discouraged and frustrated, alienated from society, and emotionally troubled. He was well-adjusted and non-aggressive in a structured setting, but in a less structured environment his behavior deteriorated and he was susceptible to negative influences. Although these factors do not excuse his criminal behavior, they contribute to an understanding of how this behavior evolved.

Respectfully submitted,

*Dewey Cornell*

Dewey G. Cornell, Ph.D.
Clinical Psychologist
Associate Professor of Education

6

J.A.535

USCA4 Appeal: 21-1      Doc: 8-5      Filed: 01/08/2021      Pg: 113 of 187

## 6 Month

| CASE NAME | CASE NUMBER | COMPLETED BY | UNIT/WORKER NUMBER |
|---|---|---|---|
| Johnson | S 4766716 | Odette Noble | 908-5 |

| AGENCY/DISTRICT | PLAN DATE |
|---|---|
| JCCA-NYC | 6/28/86 |

GENERAL INSTRUCTIONS:

This form is to be completed 6 months from Day 1 (CID) and every 6 months thereafter (refer to Section VII of the UCR Desk Aid)

**Bold type following questions indicate Utilization Review Regulatory Reminders.**

1. REASSESSMENT

Write a narrative reassessment which describes changes in family situation and summarizes family's current functioning. *If a Foster Care Placement* describe adjustment to foster care of any child in placement. *For Protective Services Cases* reassess the family's ability to protect and potential to harm the child. Conclude with a statement which provides the most significant service priorities and (re)evaluate the family's ability to benefit from these services. **Continuing Necessity for Placement or Mandated Preventive Services; Risk of Foster Care; Ability to Benefit from Services.**

Mrs. Johnson continues to be elusive and impossible to engage. On 12/16/85 she kept an appointment, and I spoke with her about the importance of keeping regular appointments and letting us know who she is, and/what her concerns for Corey are. She didn't understand why we needed to know anything about her, but she did agree to keep appointments. I have not seen her since or had any contact with her; although, she did sign and return a consent for Corey to have oral surgery.

At the beginning of March '86 Corey learned that she was arrested and was in jail in New Jersey. He told his houseparent who informed me, and then Corey and I discussed it. I haven't heard from her or any other family member. Corey states he doesn't believe his mother is guilty, and that she was framed. He acknowledged it had something to do with the use of Credit Cards. I suspect Corey knows the truth, but is keeping it from us. He visited family in the home at xmas, and returned with extremely expensive leather goods. He was defensive when we discussed this with him, and said he got them from his relatives. Corey has talked with his mom in jail, but he states he doesn't want to visit her.

Corey's brother has returned from the South. I don't think he is attending school. Corey doesn't like to discuss his brother. When I've encouraged him to have the brother visit the residence he has shrugged it off.

Corey continues to use our services well, and expresses satisfaction about being in placement. It wouldn't seem that there is another constructive place for him to live.

J.A.536

J.A.537

# WAIS-R RECORD FORM

WECHSLER ADULT TELLIGENCE SCALE— .EVISED

NAME: COREY JOHNSON

ADDRESS: 

SEX: M   AGE: 23   RACE: B   MARITAL STATUS: S

OCCUPATION: Unemp   EDUCATION: 11-12

PLACE OF TESTING: RICHMOND JAIL   TESTED BY: Dr Cornell

## TABLE OF SCALED SCORE EQUIVALENTS*

| Scaled Score | RAW SCORE | | | | | | | | | | | Scaled Score |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | VERBAL TESTS | | | | | | PERFORMANCE TESTS | | | | | |
| | Information | Digit Span | Vocabulary | Arithmetic | Comprehension | Similarities | Picture Completion | Picture Arrangement | Block Design | Object Assembly | Digit Symbol | |
| 19 | — | 28 | 70 | — | 32 | — | — | — | 51 | — | 93 | 19 |
| 18 | 29 | 27 | 69 | — | 31 | 28 | — | — | — | 41 | 91-92 | 18 |
| 17 | — | 26 | 68 | 19 | — | — | 20 | 20 | 50 | — | 89-90 | 17 |
| 16 | 28 | 25 | 66-67 | — | 30 | 27 | — | — | 49 | 40 | 84-88 | 16 |
| 15 | 27 | 24 | 65 | 18 | 29 | 26 | — | 19 | 47-48 | 39 | 79-83 | 15 |
| 14 | 26 | 22-23 | 63-64 | 17 | 27-28 | 25 | 19 | — | 44-46 | 38 | 75-78 | 14 |
| 13 | 25 | 20-21 | 60-62 | 16 | 26 | 24 | — | 18 | 42-43 | 37 | 70-74 | 13 |
| 12 | 23-24 | 18-19 | 55-59 | 15 | 25 | 23 | 18 | 17 | 38-41 | 35-36 | 66-69 | 12 |
| 11 | 22 | 17 | 52-54 | 13-14 | 23-24 | 22 | 17 | 15-16 | 35-37 | 34 | 62-65 | 11 |
| 10 | 19-21 | 15-16 | 47-51 | 12 | 21-22 | 20-21 | 16 | 14 | 31-34 | 32-33 | 57-61 | 10 |
| 9 | 17-18 | 14 | 43-46 | 11 | 19-20 | 18-19 | 15 | 13 | 27-30 | 30-31 | 53-56 | 9 |
| 8 | 15-16 | 12-13 | 37-42 | 10 | 17-18 | 16-17 | 14 | 11-12 | 23-26 | 28-29 | 48-52 | 8 |
| 7 | 13-14 | 11 | 29-36 | 8-9 | 14-16 | 14-15 | 13 | 8-10 | 20-22 | 24-27 | 44-47 | 7 |
| 6 | 9-12 | 9-10 | 20-28 | 6-7 | 11-13 | 11-13 | 11-12 | 5-7 | 14-19 | 21-23 | 37-43 | 6 |
| 5 | 6-8 | 8 | 14-19 | 5 | 8-10 | 7-10 | 8-10 | 3-4 | 8-13 | 16-20 | 30-36 | 5 |
| 4 | 5 | 7 | 11-13 | 4 | 6-7 | 5-6 | 5-7 | 2 | 3-7 | 13-15 | 23-29 | 4 |
| 3 | 4 | 6 | 9-10 | 3 | 4-5 | 2-4 | 3-4 | — | 2 | 9-12 | 16-22 | 3 |
| 2 | 3 | 3-5 | 6-8 | 1-2 | 2-3 | 1 | 2 | 1 | 1 | 6-8 | 8-15 | 2 |
| 1 | 0-2 | 0-2 | 0-5 | 0 | 0-1 | 0 | 0-1 | 0 | 0 | 0-5 | 0-7 | 1 |

*Clinicians who wish to draw a profile may do so by locating the subject's raw scores on the table above and drawing a line to connect them. See Chapter 4 in the Manual for a discussion of the significance of differences between scores on the tests.

Cooperative, worked hard
IG 77 = 6th percentile -- Borderline Range

| | Year | Month | Day |
|---|---|---|---|
| Date Tested | 92 | 10 | 9 |
| Date of Birth | | | |
| Age | 23 | 11 | 4 |

### SUMMARY

| | Raw Score | Scaled Score | |
|---|---|---|---|
| **VERBAL TESTS** | | | |
| Information | 8 | 5 | |
| Digit Span | 9 | 6 | |
| Vocabulary | 18 | 5 | |
| Arithmetic | 7 | 6 | |
| Comprehension | 8 | 5 | |
| Similarities | 11 | 6 | |
| **Verbal Score** | 33 | | |
| **PERFORMANCE TESTS** | | | |
| Picture Completion | 13 | 7 | |
| Picture Arrangement | 11 | 8 | |
| Block Design | 18 | 6 | |
| Object Assembly | 32 | 10 | |
| Digit Symbol | 48 | 8 | |
| **Performance Score** | 39 | | |

| | Sum of Scaled Scores | IQ |
|---|---|---|
| VERBAL | 33 | 75 |
| PERFORMANCE | 39 | 82 |
| FULL SCALE | 72 | 77 |

THE PSYCHOLOGICAL CORPORATION
HARCOURT BRACE JOVANOVICH, PUBLISHERS

Copyright © 1981, 1955, 1947 by The Psychological Corporation. Standardization Edition Copyright © 1976 by The Psychological Corporation. No part of this form may be copied by any process without permission. All rights reserved.
Printed in U.S.A.

9-991529



# Intelligence Test Scores
## Wechsler Adult Intelligence Scale (R)

| Subtest | Score |
|---|---|
| Information | 5 |
| Digit Span | 6 |
| Vocabulary | 5 |
| Arithmetic | 6 |
| Comprehension | 5 |
| Similarities | 6 |
| Picture Completion | 7 |
| Picture Arrangement | 8 |
| Block Design | 6 |
| Object Assembly | 10 |
| Digit Symbol | 8 |

Average adult score = 10

These scores are combined to give an overall IQ. Corey's IQ is 77, just above the level of mild mental retardation.

Corey Johnson tested by Cornell 10-9-92

J.A.539

## Test of Written Language-2 (TOWL)

Text of story (see attached photocopy) written by Corey Johnson
Tested by Dr. Cornell on January 8, 1993

*"me and my Mom went to the moon. when we got there there was people wroking they look like they was beilling something, but what I like the most is when this man show us what they was look for. I was thinking that they was beilding something but they was looking for something. what I don't no but it was fun. then when me an mom walks around we saw something like a space shipit. taking off now that was fun to see. when one left another one came back with more people. they was look around like they don't no what to do. then me and my mom saw some people dearying (?) when I ask what they was looking for they look at me like I was crazy. but when I saw this man he look like he had found something. what I don't know Just when I starte to have fun it was time to go."*

---

Corey Johnson was asked to write an imaginative story to accompany a standard picture of astronauts in an outer space setting. His story was scored using standard TOWL criteria for content, spelling, punctuation, grammar, etc. Corey's story was 159 words long, with 9 different words misspelled. Approximately 2/3 of the phrases were grammatically incorrect. The themes and imaginative ideas in his story were extremely immature for his age.

Scores on the TOWL are compared to average scores of children in different age groups. Since the oldest age group for the TOWL is 17, Corey's percentile scores are in comparison to 17 year olds. Corey's performance also was compared to different ages groups to determine the age group most typical of his own score. For example, Corey obtained a raw score of 8 in Thematic Maturity. This score is the 16th percentile for 17 year olds. It is also the typical score (50th percentile) for 8-9 year olds.

| Scores for story | Raw Score | Percentile | Typical Score for Age Group |
|---|---|---|---|
| Thematic Maturity | 8 | 16 | 8-9 years old |
| Contextual Vocabulary | 7 | 1 | 11 years old |
| Syntactic Maturity | 51 | 2 | 7-8 years old |
| Contextual Spelling | 150 | 25 | 12 years old |
| Contextual Style | 3 | 2 | 7-8 years old |

Spontaneous Writing Quotient for average 17 year old = 100
Spontaneous Writing Quotient for Corey Johnson = 67

Corey's percentile rank = lowest 2% of population

**J.A.540**

**STORY** TYBET OF WRITTEN LANGUAGE — COREY JOHNSON    1-8-93



me and my mom went to the moon. when we got there there was people makeing thy look like they was beilling something, but what I like the most is when this man show us what they was look for. I was thinking that they was beinling something but they was looking for something, what I dont ro but it was fun, then when me an mom walke around we saw something like a space shipet. takeing off now that was fun to see.

2

**J.A.541**

when one left with one came back with more people, they was look more like they don't no what to do. then me and my mom saw some people clearly when I ask what they was looking for they look at me like I was crazy. But when I saw this man he look like he had fand sonthing, what I don't no Just when I starte to have fun it was time to go.

(If more space is needed, ask for another sheet of paper.)

J.A.542

```
                    COMPUSCORE FOR THE WJ-R
                    01/14/1993    01:23 pm
                    Norms Based on Age
```

===============================================================================

Name: Corey J. Johnson                 ID:                              Page: 1

===============================================================================

Sex: M                                 School/Agency:
Examiner: Cornell                      Teacher/Dept:
Testing Date: 01/08/1993               City:                    State:
Birth Date: ██████████                 Adult Subjects
Age:  24 years  2 months                 Education:
Grade Placement:                         Occupation:
Years Retained:                        Other Info:
Years Skipped:                         Glasses: No              Used: No
Years of Schooling:                    Hearing Aid: No          Used: No

----------------------------------------------------------------------------------

| Test Name | Raw Score | W | Age Equiv. | Grade Equiv. | *Relative Mastery Index* RMI | | SS | PR |
|---|---|---|---|---|---|---|---|---|

===============================================================================

Form A was used to obtain Achievement Scores

===============================================================================

| Test Name | Raw Score | W | Age Equiv. | Grade Equiv. | RMI | | SS | PR |
|---|---|---|---|---|---|---|---|---|
| 22. Letter-Word Identification | 30 | 463 | 7-11 | 2.4 | 0/90 | | 50 | 0.1 |
| | | | | | | -1 SEM | 46 | 0.1 |
| | | | | | | +1 SEM | 54 | 0.1 |
| 23. Passage Comprehension | 15 | 473 | 8-1 | 2.6 | 1/90 | | 49 | 0.1 |
| | | | | | | -1 SEM | 44 | 0.1 |
| | | | | | | +1 SEM | 54 | 0.1 |
| 24. Calculation | 28 | 517 | 12-2 | 6.7 | 32/90 | | 83 | 12 |
| | | | | | | -1 SEM | 79 | 8 |
| | | | | | | +1 SEM | 87 | 19 |
| 25. Applied Problems | 33 | 499 | 10-4 | 4.9 | 7/90 | | 75 | 5 |
| | | | | | | -1 SEM | 71 | 3 |
| | | | | | | +1 SEM | 79 | 8 |
| BROAD READING | --- | 468 | 7-10 | 2.5 | 0/90 | | (53) | 0.1 |
| | | | | | | -1 SEM | 49 | 0.1 |
| | | | | | | +1 SEM | 57 | 0.2 |
| BROAD MATH (Gq) | --- | 508 | 11-3 | 5.9 | 16/90 | | (77) | 7 |
| | | | | | | -1 SEM | 74 | 4 |
| | | | | | | +1 SEM | 80 | 9 |

MATHEMATICS          Use scores from Test 25: Applied Problems
REASONING

**J.A.543**



# INTELLIGENCE AND ACHIEVEMENT
## COREY JOHNSON

STANDARD SCORE

READING AND MATH

■ Average Adult    ▨ Corey's Intelligence    ▨ Corey's Achievement

Corey's IQ of 77 is below the average adult IQ of 100.
His reading achievement is below his intellectual ability,    indicating a learning disability.

J.A.544



# READING AND MATH SCORES
## COREY JOHNSON ON 1-8-93

Corey is at the 2nd grade level in reading, and the 6th and 4th grade level in math.

Woodcock-Johnson Tests of Achievement

J.A.545

# EXHIBIT 9

J.A.546

```
              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF VIRGINIA
                       RICHMOND DIVISION


-----------------------------------------

UNITED STATES OF AMERICA,



                         Plaintiff;

     v.                                  CRIMINAL ACTION
                                            92CR68
RICHARD TIPTON, CORY JOHNSON,
JAMES H. ROANE, JR., AND
SANDRA REAVIS,
                         Defendants.

-----------------------------------------
                       VOLUME XXII

                    February 12, 1993
                    Richmond, Virginia
                       10:00 a.m.

BEFORE:        HONORABLE JAMES R. SPENCER
               United States District Judge


APPEARANCES:   HOWARD C. VICK, JR., ESQ.
               WILLIAM H. PARCELL, III, ESQ.
               Office of the United States Attorney;
                   Counsel for Government;

               ROBERT P. GEARY, ESQ.
               ERIC D. WHITE, ESQ.
                   Counsel for Defendant Tipton;
               CRAIG S. COOLEY, ESQ.
               JOHN F. McGARVEY, ESQ.
                   Counsel for Defendant Johnson;
               DAVID P. BAUGH, ESQ.
               ARNOLD R. HENDERSON, V, ESQ.
                   Counsel for Defendant Roane;
               ROBERT J. WAGNER, ESQ.
                   Counsel for Defendant Reavis.
                 JEFFREY B. KULL
               OFFICIAL COURT REPORTER
```

                    P-R-O-C-E-E-D-I-N-G-S
          THE CLERK:  Criminal Action Number 92CR68:
United States of America versus Richard Tipton, Cory

Johnson, and James H. Roane, Jr., the twenty-second day of trial. Are counsel ready to proceed?

MR. VICK: Government is ready.

MR. GEARY: Defendant Tipton is.

MR. McGARVEY: Johnson is prepared.

MR. BAUGH: Defendant Roane is ready. We submitted an instruction pursuant to ZANT v. STEPHENS. I gave the Clerk a draft of it this morning.

THE COURT: I've considered it. I'm not going to give it, but I'm going to make a slight change. I think what I have already decided to give takes care of that problem, but I'm going to add a sentence. Come up here.

(At Bench.)

THE COURT: At the end of instruction Number 18, I will add this language: "Also, remember that no cited mitigation factor can ever be used by you as a reason to impose the death penalty. Also, remember that no cited mitigation factor can ever be used by you as a reason to impose the death penalty."

3880

MR. BAUGH: Also, while we are here we wanted to object to the Court's substantial planning and premeditation. "Ample planning and deliberation," which is the language the Court used, it doesn't really narrow the range of murderers. We cite GODFREY v. GEORGIA. These definitions are all-encompassing. I believe the purpose the statute is to specifically narrow the field of people to whom the death penalty applied. There is too many murders.

MR. WHITE: If I could make one comment, what concerns me, the very last sentence on the first page of Instruction 9, where it says "Substantial planning means planning which is considerable or ample for the commission of the crime at issue." Where it starts with "or," it seems to lower the standard in terms of what we are talking about, just that enough to get through the crime itself. "Substantial" means more than that.

THE COURT: The objection will be overruled.

MR. BAUGH: We renew our severance request in light of -- we are all going to have to step on each other's toes today. In the alternative, we would ask the Court for sequential verdicts.

3881

THE COURT: Objection overruled.

MR. McGARVEY: Defendant Johnson would join in all motions.

THE COURT: All right.

(In Open Court.)

J.A.548

All right, let's bring in the jury, please.

(The jury entered the courtroom.)

All right, this morning we are going to have the closing arguments in the aggravation and mitigation phase. Mr. Vick?

MR. VICK: Thank you, Your Honor. Good morning again, ladies and gentlemen. First, I'd like to take the time very briefly to thank you for your attention throughout this five weeks of trial. Your attention this week has also been admirable, and I'm sure that you will go back and apply that same sort of diligence to the verdict that you render on this phase of trial.

Ladies and gentlemen, now it is your time. The lawyers have had their time. The evidence has all been presented. Now it is time for you to go back and do your duty.

Each of you during the voir dire, prior to your selection as members of this jury, stated that in the appropriate case, given the appropriate

circumstances, that you could indeed render a verdict of death against a defendant. Ladies and gentlemen, I submit that based upon the evidence that you have seen from this witness stand over the last five weeks, that this is the appropriate case to render a verdict of death as to each and every defendant.

You took an oath. It is an awesome responsibility. It is an awesome duty. But nonetheless, it is just that, a duty. Your duty, ladies and gentlemen of the jury, given the evidence that you have heard, requires no less verdict than death.

As I said in my opening this week, and as I remind you now, ladies and gentlemen, this is a case where you are deciding the fate of mass murderers. Each of these defendants has been convicted by you of being just that, a mass murderer. Each of these defendants comes before you for sentencing having killed a number of people.

The human cost of what these three men have done to support their drug dealing, to further their drug dealing, is immeasurable. Absolutely immeasurable. The evidence is clear, beyond a reasonable doubt, that they have laid waste to the lives of a number of people for their own personal gain, for their own

personal satisfaction, for their own personal machismo. They have left ten dead people on the streets of the City of Richmond. They have left two people so seriously wounded that they will never recover. They have left one other seriously wounded person. They have shot one person in front of her children.

Think of the immeasurable harm that has been done to the minds of Montez McCoy and his sisters, who saw their uncle brutally mowed down in front of them, and saw their mother shot by James Roane and Cory Johnson.  You can't quantify or qualify the amount of harm that has been caused by these people.

As I said at the beginning of this week and I remind you now, we have the burden -- that is, the United States, the government -- of proving the aggravating factors which need to be proven in order to impose the death penalty beyond a reasonable doubt.  I also told you that we would not put on a great deal of evidence this week.  And you saw.  We did not put on a great deal of evidence.  Our evidence came prior to this week, in the four weeks of testimony which led you to find these people guilty.  That evidence, as you know, has already been reintroduced and is in front of you in total this

3884

week.  That evidence is to be considered by you in total this week when rendering the appropriate sentence against these defendants.

The aggravating factors are listed in the jury's instructions, in the Court's instructions to you.  There are specific aggravating factors as to each and every defendant.  In most cases, they repeat themselves as to each defendant:

That the defendant intentionally killed the victim; that the defendant intentionally inflicted serious bodily injury which resulted in the death of a victim; that the defendant intentionally engaged in conduct intending that the victim be killed or that lethal force be employed against the victim which resulted in the death of the victim; that the defendant intentionally engaged in conduct which the defendant knew would create a grave risk of death to a person other than one of the participants in the offense and which resulted in the death of the victim.

Those four aggravating factors are repeated as to each and every defendant in this case.  And given the evidence that is presented to you, the government has shown beyond a reasonable doubt that each and every one of those factors has been satisfied.  Each

3885

and every murder committed in furtherance of the Continuing Criminal Enterprise satisfies all four of those aggravating factors.

Remember I told you at the beginning of the week that the aggravating factors are to a certain extent duplicative or overlapping?  But going back, applying your common sense, what you understand to be the normal meaning of those words, you will see that the government has proven each one of those aggravating

factors beyond a reasonable doubt as to each one of the defendants.

That is the first group of aggravating factors out of which you must find that at least one exists. I submit all four exist as to each and every defendant, each and every murder that they are being sentenced on here today.

In the second group of aggravating factors, defendant Cory Johnson and defendant Richard Tipton have been charged with, in the commission of the offenses enunciated in the indictment, the defendant knowingly created a grave risk of death to one or more persons in addition to the victims of the offense. Clearly they have done that in the case of Gwendolyn and "Pepsi" Greene. That has been proven to you beyond a reasonable doubt. You have already

found that aggravating factor beyond a reasonable doubt, as you have already found the other aggravating factors beyond a reasonable doubt, shown by the verdict you returned on the guilt phase of this case.

As to each one of the defendants, it is charged that the defendant committed the murders enunciated after substantial planning and premeditation. The Court will provide you instructions on that, and I submit to you that you have already found beyond a reasonable doubt that these murders were committed after substantial planning and premeditation. Each one of these murders was premeditated. You know that from the evidence that has been presented.

And I remind you just briefly of the evidence that indeed shows premeditation. Remind yourself of the clear testimony from the mouths of "J.R." and "Whitey" to Ronita Hollman and others in the Newtowne area. "We are going to take over up here." Remind yourself of that credo following them down here from New York, from New Jersey, with the New York Boyz, where they clearly intended to take over blocks in New Jersey. They brought that mind set, that modus operandi, that way of operating, to Richmond. And indeed, they implemented it in the most violent

fashion that they could. They laid waste the bodies that they promised they would lay waste in order to take over. Clear premeditation. But as to each one of the specific murders charged in the indictment, you also have clear premeditation based upon the evidence that you have heard, and substantial planning.

The Court's instruction to you as to substantial planning says that substantial planning means planning which is considerable, or ample, for the commission of the crime at issue. Ample for the

commission of the crime at issue.  Clearly, as to each one of the murders perpetrated by these defendants, they put in ample enough planning to carry it out.  Start with murder number one, the murder of Doug Talley by Richard Tipton and James Roane: 84 stab wounds, most of them to the head and upper body.  84 stab wounds where they clearly intended to plan that murder by taking him to South Richmond, by recovering the knife that was used to stab him 84 times.  They got out of the car and talked about it with each other, James Roane and "Whitey," got back in the car.  James Roane grabbed him around the neck, and "Whitey" began to stab him for four or five minutes.  They then took that knife, disposed of that knife by giving it to "Pepsi" Greene to hold.

And you have the lead-in to the clear premeditation and murder of the next victim, Douglas Moody.  They went and retrieved that knife.  Why did they retrieve that knife, ladies and gentlemen?  They retrieved that knife with one thought in mind: killing Doug Moody.  Clear premeditation, substantial planning.  They intended the consequences of their actions.  They intended to kill these people to clear their way for drug dealing in Newtowne.

Go next to the murder of Peyton Maurice Johnson.  They stalked that man.  "J.R." stalked that man.  They went and retrieved the weapons, which is further planning, further evidence of premeditation and planning, as indeed the purchase of the weapons themselves is evidence of premeditation and planning.  Why do you think they purchased those weapons?  To carry out their plan of taking over Newtowne.  And they used them beginning the day they got them, January 14th, 1992.  They stalked Peyton Maurice Johnson.  "J.R." found him.  "C.O." and "E.B." walked in that house and blew that man away like he was an animal.  They then took the guns and, planning and premeditating their next murder, gave them to "Papoose" to wipe down and hide.

They went and retrieved those guns and indeed killed Louis Johnson with those guns on January 29th.  Remember the statements of Sterling Hardy and Jerry Gaiters, where "J.R." told them "Keep him in the alley."  Keep Louis Johnson in the alley.  They pulled up clearly intending to kill that man.  They got out of the car, put the guns to his head, and blew him away like an animal in the street, also.  Clear planning and premeditation as to that murder.

The triple homicide in Church Hill, "Mousey" Armstrong, again hunted down like an animal by "C.O."  He made Jerry Gaiters take him and find "Mousey"

Armstrong.  Could there be any question in your mind as to the premeditation and planning of that.

Could there be any question in your mind as to the premeditation and planning of the killings on February 19th, 1992, where "C.O." and "Whitey" hunted down Linwood Chiles and Curt Thorne, found them with "Pepsi" and Gwen and mowed all of them down because they had received a telephone call from "V" in the jail indicating that they might be cooperating with the police?  How much more clear planning and premeditation could there be than that particular murder.

3890

The aggravating factors, ladies and gentlemen, have been proven to you already beyond a reasonable doubt.  Your jury verdict on the guilt phase of this trial establishes that.  There is listed, as to each of the defendants, other factors, non-statutory factors, that you can consider when rendering the proper verdict of sentence against these defendants: that the defendants committed multiple murders. Indeed, that they are mass murderers.  That the defendants have substantial criminal histories.  In the case of James Roane, you will see a series of convictions against him.  You will see two convictions against Cory Johnson.  No convictions of record have been introduced into evidence as to Richard Tipton, but I suggest to you that based upon the evidence you have heard, Richard Tipton, Cory Johnson, and James Roane were virtual crime waves in and of themselves.  Wherever they went, crime followed, be it New York, New Jersey, or Richmond. They were virtual crime waves with substantial criminal histories.  Remind yourself of Anthony Howlen and his mutilated face; the arrest of Richard Tipton by the police in New Jersey.  They are in and of themselves crime waves.

That the defendant, each of them, has been

3891

charged with seriously wounding individuals in the course of the murders outlined.  Remind yourself again of Gwen and "Pepsi," of Martha, and the woundings that they received because these people wanted to carry out their drug business.  And each of them has been charged in the statutory aggravating factor with knowingly and willfully being a member of a conspiracy which had as one of its goals the murder of individuals other than those for which the defendant has been charged.  And that's important. You need to remember that.

Now, you can find that a verdict of death should be entered as to each one of these defendants only on the CCE murders that they have been found guilty of. So for example, you could find that Richard Tipton

deserves to die for the murder of Doug Talley, or that Cory Johnson deserves to die for the murder of Linwood Chiles, or that James Roane deserves to die for the murder of Peyton Maurice Johnson.  You have got to decide that individually as to the murders charged in the indictment.

But in rendering that decision, you are free to remember all of the evidence of other murders and crimes that were carried out in furtherance of this conspiracy.  You are not constrained in making that decision as to what the appropriate punishment is for that CCE murder to limit yourself only to that murder.  You can consider the goals of the conspiracy.  You can consider the actions of other co-conspirators and what they did in furtherance of this conspiracy when rendering that.  You cannot kill James Roane, statutorily, because of his murder of Torrick Brown.  But you can indeed consider that when determining whether that's the appropriate verdict for him based upon his murder of Peyton Maurice Johnson.  You can consider the fact that he, in reptillian-like coldness went in and shot Torrick Brown.  That can all be considered by you.  It is in evidence.  It has been proven beyond a reasonable doubt.

You can consider the evidence that's been put on this week by the government concerning the fact that from jail, while incarcerated, these defendants continued to try to have people killed.  Specifically, you can consider that "Whitey" wanted C.T. Woody killed and wanted "Wildman" killed.  You can consider that Cory Johnson wanted C.T. Woody killed and wanted Valerie Butler killed.  You can consider that James Roane wanted Martha McCoy and Montez McCoy and the other witnesses killed, and was even going to take action against Doug Cunningham and the uncle of Martha McCoy if they testified at trial.  You can properly consider that in rendering the right verdict and deciding what is the proper verdict in this situation of mass murder.

Go back and look at what the government has to prove.  I submit to you each and every one of the aggravating factors has been proven to you beyond a reasonable doubt.  You have already found them in your guilt phase verdict.

The defense case this week -- let me back up a second.  In reaching your decision, what you need to do, and the Court will instruct you about this, what you need to do is take the government's aggravating factors that have been proven beyond a reasonable doubt, take the mitigating factors that you find to have been proven, and simply weigh them.  It is not a

mathematical formula.  You don't have to go back there and say the government has proven 16 aggravating factors and the defense has proven 83 based upon the Court's submission to me, so therefore, the defense evidence weighs more.  No. Any one aggravating factor can be found by you to outweigh the entire defense case as to the mitigating factors that you must decide.  It is a weighing decision that you must make.  Given what you saw in the first four weeks of trial concerning these men's actions as opposed to given what you have seen this week concerning the mitigation, what is the appropriate sentence?  What should these men be sentenced to?

And while we are speaking about that, let's talk about the evidence that you have heard this week in mitigation.  The evidence that you have heard in aggravation is clear, clear beyond a reasonable doubt.  What have you heard this week?  From defendant Tipton, you heard that it is not his fault. His bad youth made him do it.  His bad relationship with his mother made him do it.  It is not his fault.

We are sorry he has had an unfortunate youth. He is not the only child who has had an unfortunate youth.  Indeed, each one of these defendants has put on evidence this week about attention deficit problems, learning disabilities.  I suggest that each one of you on that jury knows someone who has a learning disability.  Is that an excuse for murder.

Each one of the defense counsel stood up and said to you, "We don't intend this as an excuse." That's a smokescreen, ladies and gentlemen.  That's exactly what it is intended as.  It is intended as a smokescreen.  It is intended as an excuse.  These people cannot be forgiven their actions because they had a hard time learning.  And that's in essence what you have been asked to do this week.  That would substantially negate all the hard work that has been done by all those other people with learning disabilities and bad backgrounds who overcome that. People with those learning disabilities and bad backgrounds don't have a license to kill.  Indeed, you remember Dr. Bright's testimony about Richard Tipton.  He has worked with thousands of children with learning disabilities.  Never before, ever, has he worked or seen one who has committed six murders. None of the doctors who testified here this week, despite their extensive involvement with children with these problems, has testified that they ever have seen anybody commit the amount of murders that these defendants have been found guilty of

**J.A.555**

committing. It is offered to you as an excuse. It is not an excuse.

Indeed, defendant Tipton had that loving environment in certain situations that he complained he didn't. His grandmother clearly loved him. He was welcome in that house in New York. He rejected that. He walked away from it. Brenda Williams came and testified as to the nice, loving environment she gave him. He rejected that and walked away. I'm not saying the man had a perfect upbringing. I'm not saying life couldn't have been easier or better for him. I'm just telling you that it does not excuse what he did. I would bet that if you looked at the lives of each one of the victims, you would find similarities in their background, too. Does that mean that they should be brutally mowed down in the streets? No.

Ask yourself about the story you heard from Richard Tipton's witnesses as to why it is if his background is so bad that each and every one of his cousins is productive, hold jobs. That background has produced productive people. He cannot be excused his actions because of his background.

The evidence is clear, too, presented by the defense witnesses this week, that Richard Tipton is set in his ways; that he has cognitive rigidity. He is impulsive and reacts violently to emotional stimuli. That evidence is clear, presented by the defense, that that is Richard Tipton. Given his unfortunate youth, given what went into making him what he is today is all unfortunate. But it has created a virtual killing machine. The doctors that have testified for Mr. Tipton have been clear in that regard. Ask yourself if it was a smokescreen when the defense argued that indeed perhaps he might be able to rehabilitate himself in jail, when not in a period of one year since his incarceration has one step been taken for him to change his behavior, to change the way he is. I submit to you he cannot. He is who he is.

I remind you of another important fact concerning the testimony that you have heard this week from Richard Tipton. A number of people have talked to him for hours. Hans Selvog talked to him, Dr. Evans talked to him. In fact, he has poured his heart out to these people concerning the deprivation of his youth, the unfortunate circumstances with his mother. He has gone into intimate detail in his life with these people and they have testified to you based upon what he has told them. I ask you, have you seen once from that witness stand this week an iota of remorsefulness from that man?

J.A.556

MR. GEARY:  I object.

THE COURT:  The objection is sustained. Mr. Vick, don't get stupid in the end of this, please.

MR. VICK:  Yes, sir.  As to Mr. Cory Johnson, he, too, says, "I've had a bad youth.  I've got a learning disability.  I should therefore be excused from blameworthiness for what I have done." You can't do that, ladies and gentlemen.  The testimony of the doctors who testified for him have made it clear that he knew right from wrong; that he had a clear moral compass.  Indeed, the testimony from the people from the New York Cottage School was clear:  that he had a strong moral compass; that he has at some point in his life rejected it.

MR. BAUGH:  I hesitate to rise, but we are going to have to object and approach the bench in the middle in light of that.  We have discussed it and it has to be raised.

THE COURT:  No, you don't have to come up. I'll do an instruction, cautionary instruction, after this is over.

MR. BAUGH:  Objection.

MR. VICK:  Remind yourself about the evidence presented from the experts in his defense. I would submit to you that that evidence was one-sided.  I'll give you an example.  In his testimony, the doctor said that he had an IQ of 77, two points above mentally retarded, and submitted that to you as if it were a fact.  That's two points above mental retardation.  He therefore is two points above where the law would not allow you to assess a penalty of death against him.

That's disingenuous, ladies and gentlemen.  By the very definition given you by that same expert, it is clear that IQ goes only as to one factor of a man's mental retardation.  And his ability to socialize and communicate is another factor, as are all the others.  Cory Johnson has had absolutely no problem, based upon the evidence you have heard here in the last four weeks, in maintaining himself and keeping care of himself and keeping a home and dressing himself, in socializing, in talking.  He is not mentally retarded.  He is not close to mentally retarded.  I submit to you the more accurate IQ test was given in 1982, where it was shown he had an IQ of 88.  Remember, the last IQ test done of Mr. Johnson by Dr. Cornell was done in anticipation of testimony for this trial, done by Cory Johnson knowing that this would be the subject of that man's testimony in the penalty phase of trial.  That is disingenuous, ladies and gentlemen.  That man is not nearly

mentally retarded. All the evidence you have heard this week rejects that. Dr. Cornell told you, in essence, that he could not have run a drug organization, he could not have organized and supervised that. You found that he had. The evidence is clear that he did. Contrasted by the testing that showed he was in the superior range in structure of word fluency. He knew enough math to know that "Mousey" Armstrong owed him $400 for crack cocaine. He certainly had no problem with that. He is not mentally retarded.

Again, he might have had a learning disability and an unfortunate youth. He was offered a structured environment. He was offered everything that the State of New York had to offer him in an effort to right him. And that was rejected by him. He is, too, given the doctor's testimony, who he is. He is, too, at this point, given his unfortunate youth, a killing machine.

As to defendant James Roane: His case this week has basically amounted to it is not his fault, it is society's fault. "They let me down. They didn't take care of me the way I should have been taken care of. Those four murders that I am charged with weren't really my fault; they are society's fault." You can't accept that, ladies and gentlemen. That is not an excuse for what he has done.

The doctors said clearly about James Roane that he is intelligent, that he knows right from wrong, that he can clearly premeditate. They have also clearly testified that he rejected the help that was given him. He did not do well in the Charlottesville school. He went away. The evidence is clear in their record. He did not adjust. He left Mr. Brunson, who tried to give him a loving environment.

MR. BAUGH: I object. That is not the record.

THE COURT: Overruled.

MR. VICK: And look at Mr. Brunson's last entry. He said that the last phone call he got was from a friend of James Roane, who said that James was back into drugs. It is the last time he heard from James Roane. It is clear that James Roane walked away from Mr. Brunson. You can't believe that Mr. Brunson would have cut him off and had no contact with him had James wanted continued contact with him.

Again the evidence is clear that in the last year he has been in jail he has made no efforts to change. They will ask you to find a mitigating factor that he will make a good adjustment to jail. There has been no evidence that he has attempted to

3902

change in any way over the last year.  Indeed, the evidence has shown that from jail he has tried to orchestrate murders.

The evidence has shown that he, too, is who he is.  He is impulsive and violent, with cognitive rigidity.  That is James Roane.  He, too, is a killing machine.

Some thoughts, ladies and gentlemen, about the propriety of the death penalty:  And I know each one of you have given a great deal of thought as to whether the death penalty is ever an appropriate sanction, and if indeed the death penalty is an appropriate sanction in this case.  I submit to you that the death penalty is an appropriate sanction for three reasons.  The first reason is that our laws act as a deterrence.

MR. BAUGH:  Objection.  They cannot argue deterrent effect in a capital case.  That's called billboard, and it is illegal.

THE COURT:  Sustained.

MR. BAUGH:  We would ask the jury be instructed that cannot be considered as an aggravator.

THE COURT:  The objection is sustained.

MR. VICK:  Is this the appropriate

3903

punishment given the actions of these defendants?  I submit to you, ladies and gentlemen, it is indeed the appropriate punishment.  As you know from the testimony that's come from that witness stand, people can get life, penitentiary terms, based only upon drug dealing.  Drug dealing alone could lead you to a life of incarceration.  And indeed, there are many people incarcerated for life from drug dealing alone.  These defendants have gone far further than simply dealing drugs.  They have killed ten people in furtherance of their drug-dealing operation.  They deserve a punishment greater than those other people who are in jail for life based upon drug dealing alone.

A sentence of life in the penitentiary by you will in essence tell them and other drug dealers that you can sell drugs and kill people and you will get punished no more severely  --

MR. BAUGH:  That's deterrent effect again.  That cannot be argued.

THE COURT:  Overruled.

MR. VICK:  -- than if you sell drugs only.  They deserve the maximum punishment, ladies and gentlemen, because in addition to their drug dealing, they chose to kill ten people.

3904

Ask yourself, should they be punished beyond

**J.A.559**

incarceration?  I'm not telling you incarceration is nice and a lifetime of incarceration is not punishment.  But think about each and every day of their existence in jail.  They will wake up, bathe, be fed.  They will be able to watch TV, read books. They will be able to use the telephone to talk to their loved ones.

MR. McGARVEY:  There is no evidence whatsoever of that in the record.

THE COURT:  Sustained.

MR. BAUGH:  Jesus.

MR. VICK:  They have sentenced Richard Tipton and Cory Johnson, have sentenced Gwen Greene to a life of less mobility than that.  Their punishment --

MR. BAUGH:  I thought you just sustained the objection.

THE COURT:  The objection is sustained.

MR. VICK:  Given their actions, ladies and gentlemen, the punishment in this case should indeed be the maximum punishment; that is, the death penalty.

These people have continued in jail to try to harm others.  Detective C.T. Woody, Valerie Butler, Martha McCoy, Doug Cunningham.  You can consider that when determining whether life in the penitentiary is the appropriate punishment, or whether the death penalty is the appropriate punishment.  And I suggest to you that it leads you to but one conclusion:  That in this case, given their actions, death is the only appropriate sanction for these people.

I began this by saying that this is an awesome duty that you have undertaken, and indeed it is an awesome duty you have undertaken.  But the law is clear that in certain cases, the death penalty should be imposed.  It is the will of Congress.  It is the law that you must follow.  What you must determine is, given the evidence that you have heard, is this one of those appropriate cases?  And I suggest to you, ladies and gentlemen, it is the appropriate case.  Remind yourself of the pictures that you have seen of the people that they have laid waste to. Remind yourself of the clear choices that they made on each and every occasion which led to these murders.  Each one of us make choices that could shorten our lives.  We smoke, we ride motorcycles at 80 miles an hour, hand-glide.  We make choices that might shorten our lives.  These people made ten clear choices to kill other people that should result in the shortening of their life given the law that you operate under.

Ladies and gentlemen, it is a strong duty you

have. But it is just that. It is a duty. This case warrants the imposition of the maximum punishment possible, the imposition of the death penalty as to each defendant: Cory Johnson, Richard Tipton, and James Roane. Thank you.

THE COURT: All right. Ladies and gentlemen, before we get started with the first defense argument, I have to give you a cautionary instruction. Mr. Vick, in the zeal of his argument, indicated that Mr. Tipton had spoken many times and openly to the defense experts and they took the stand and discussed that. He then followed that up with "But you haven't seen one iota of remorse from the witness stand."

You cannot, you will not, ever require a defendant to take the stand. The defendant doesn't have to testify. The defendant doesn't have any burden to prove that he should not be put to death. The burden is on the government to prove beyond a reasonable doubt that a defendant should be put to death.

As I will indicate to you in further instructions, as I've said to you earlier in the first part of the trial, the argument on the part of the counsel is just that. It is not evidence. And you must consider it in that light. But under no circumstances are you to take that kind of argument as indicating that the defendant has an obligation to take the stand and tell you something, even if to indicate remorse. Do you understand?

MR. BAUGH: Can we reserve our motion at this time?

THE COURT: All right.

MR. COOLEY: Also on that and another point.

THE COURT: All right. Mr. Tipton's counsel?

MR. GEARY: May it please the Court. Back in April of 1992, Eric White and I were appointed to represent Richard Tipton. And the point I didn't want to be at back then and through May, June, July, August, through January, February, was being here right now. That's the point where a defense lawyer doesn't want to have to be, where his client has been convicted of capital murder, where 12 members of the jury have just heard a moral-authority argument from the prosecutor to put his client to death and he has to stand up here and try to find words to convince you that you shouldn't do that.

I have had the privilege, in over 22 years of doing this, of seeing what I consider to be two classic closing arguments. One was in this Court

about seven years ago by a prosecutor in a murder case, and the other was about 15 years ago in Richmond Circuit Court by a defense lawyer in the first capital murder case brought in Central Virginia after the statute was changed in Virginia in 1978. I was co-counsel to that lawyer. And he made, he and the lawyer that I talked about before, made arguments that I can close my eyes and still see them. The other lawyer is now a judge in Richmond, and the prosecutor who made that closing argument was Judge Spencer here about six or seven years ago. I don't have that ability. I don't have that magic wand to wave to you to say, "Put him in prison for life." I don't know if I can do that. I don't know if David Baugh can do it, or John McGarvey can do it. The problem with having a case for eight months, ladies and gentlemen, is you get to know your client. I have been to the jail to see Richard Tipton anywhere from 70 to 90 times, and I've gotten to know him.

And this report that Mr. Selvog prepared tells you the bad background. And believe me, that's not a smokescreen. That's simply to tell you who that boy is over there. Because as he sits there, he is 22 years old. And I can tell you from what Mr. Selvog told me in here, from what Tina Wilkerson said, and Brenda Anderson, that he is about seven or eight years old. He has the maturity of a young, young boy because of what his mother and father did or didn't do to him.

When we started this case I thought if we could get the Marshal sitting here to move over and get Cory to move over a little bit, we should put two chairs next to Richard Tipton and put two people in there -- his father and mother -- and let them hear and find out what he did in the City of Richmond, the drug dealing he did before then, and to say to those two people, When you decide to bring a child into the world you must take care of that child. You must not abandon that child," like the Tipton family did. I mean exactly that: his father, paternal grandmother, Ruby Tipton, his uncles. They abandoned that boy to New York City to a very tiny apartment where a shooting gallery took place. His mother and her series of friends and junkies shot drugs day and night.

When you go through this report, take a look, for instance, at page 21 in the report. I'm going to read some of it to you, where Mr. Selvog interviewed Martrice, his sister, and Tina Wilkerson. And Tina on page 21 talks about when Martrice moved out of the house; she couldn't stand it anymore. She went across the street, and the video showed you where the

grandmother lived as opposed to Charlene Tipton. He quotes Tina saying, "I remember when Martrice moved out of Charlene and "Pimp's" apartment and came to live with us." She was 14 years old, meaning Richard Tipton was ten. She said, "Can I come and sleep on your floor? If not, I'll put myself in a home. I can't stand it there anymore."

She came across the street. There wasn't any room for Richard to come, so he stayed with this woman that uses the term "mother." On page 21, Tina is asked about him, what he was like when he was a young boy. And she said Manny understood from a very early age that all he had was himself to rely on. He would often comment on self-reliance by saying, quote, "I don't ask for anything, I'm not a burden on anyone. I don't ask for any money."

This particularly exacerbated when grandfather died, Tina said. Henry Wilkerson died in 1986, richard Tipton's grandfather. He was a longshoreman, mechanic, forklift operator. Probably the only male influence that Richard Tipton had in his life as a young boy who was in any way positive and of assistance to him. Certainly Richard Tipton, the father, was of absolutely no weight in his life. He was abandoned when he was two years old in Richmond when Charlene Tipton went back to New York. This is all to point out to you in every kind of graphic detail that you could ask for in this report, which is based, as Mr. Selvog said, on numerous consultations, interviews with a lot of people.

Again, I suggest to you we are not here to put up a smokescreen on you, which the government says we are trying to do. We are trying to show you his upbringing, that's all. Because you have to decide between two punishments. It is not that you are going to let him go, but two very severe punishments. Which one should this kid get.

He is a kid. I tell you that. He is a kid. Because he is a child. He may be, in fact he was, as your verdict suggested, in January and February of last year, because he was convicted of six capital murders, he may have been a killing machine, as Mr. Vick said. But that's not the issue here. The issue is not whether he was then. The issue is what sentence you should give him.

The doctors in this case are not here again to offer you any excuses for Richard's behavior, but simply to indicate what his processes were. He is learning disabled, has all these very difficult problems that existed along with the violence and drug abuse that were so integral a part of his life. And the doctors say to you with medication and the

proper structure, this kid can survive.  This 22-year-old kid can survive.  He needs to survive for another reason.  He needs to make redemption, needs to do penance.  "Papoose" had it right, Robert Davis, when he testified.  "What are you here for 'Papoose?'"  "I'm not here for revenge.  God's going to take care of that."  And that's what's going to happen.  And Richard Tipton needs redemption for what he did, his involvement in six murders.

You know what your judgments were on the six murders in regard to the Talley and Church Hill and Stony Run murders.  We don't know what degree of involvement you have found in the last series of murders.  That's something you have decided.  We don't know.  But I suggest to you when you go through these instructions and deliberation process,

3913

Instruction Number 6, you are going to have the aggravating factors that Mr. Vick talked about and then you will come to the mitigating factors which, for Richard Tipton, are about three-and-a-half pages long.  And again, I'd like to go over, talk about some of these, not again as an excuse for his behavior, because I don't excuse his behavior.  Eric White doesn't.

Judge Spencer on Instruction 14 has listed ten of these, Instruction 12 lists about eight or ten others.  I ask that you do what you did in the first portion of the case; that you take your time.  You have over here the exhibits that are going to be given to you in terms of Mr. Selvog's report.  There is also a very thick book which is not replicated, but which has the appendices to all the data that Mr. Selvog selected.  That list of appendix on the back of each one of your social histories is supported by the documentation over there that tells you something about Richard Tipton.

The ultimate decision, ladies and gentlemen, is yours, as Mr. Vick says.  You have to decide if the aggravator has been proven by the government beyond a reasonable doubt; decide whether these many mitigators have been shown by a preponderance of the

3914

evidence.  I suggest when you listen to the witnesses that we had and read the social history, you will find most if not all the mitigators were proven beyond a reasonable doubt.  You must go into the weighing process then.

I suggest if you weigh, you will weigh in favor of life without parole.  If you get past that point, if you have to go to the next stage, the 12 of you collectively do not act anymore.  You become 12 individual jurors.  As the instruction indicates, any one of you can then say for whatever reason that you

**J.A.564**

care to have -- whether that reason is published to the rest of the jury or not makes no difference -- you simply say, "I do not vote for the death penalty." It can be a reason that you can keep in your head for the rest of your life without telling anyone. You can tell the rest of the members of the jury. You can do whatever you want. Because the death penalty is never required.

In one of the many tributes paid to Arthur Ashe this week, there was an article in the Times Dispatch that dealt with a visit that he paid to a Richmond public school, I don't know, six months or a year ago. And he spoke to a group of students that were about nine or ten years old. And the focus of the article was that Arthur Ashe told them that the best thing he could tell them was to stay off the streets. I thought about this: Suppose Arthur Ashe was in a Harlem elementary school back in 1978 when Richard Tipton was 8 or 9 years old, if he went to that school and said to him and his class, "My best advice to you is to stay off the streets." I would suggest to you as good as that advice was when Mr. Ashe gave it to these schoolchildren in Richmond and as good as that advice would have been back in 1978 to the schoolchildren in New York, for Richard Manny Tipton, it would have been bad advice. Because the streets were a far better place than his home.

You heard the testimony from Tina, who has firsthand knowledge, 32-year-old cherubic woman who came here to testify about the box that her cousin lived in, an oversized closet, of being punched in the face almost daily by his mother, having heroin parties going on endlessly. That's the environment he grew up in. That's not a privileged environment by any stretch of the imagination. That's not a perfect environment. It is horrible. It is living absolute hell. I can't imagine anybody growing up the way he did. I'm not suggesting to you, as Mr. Vick tried to tell you that I would, that that means he is going to kill somebody. Because it doesn't. It indicates to you that he has obstacle after obstacle to overcome. He couldn't do it. He fell in with some other people who accepted him. He finally found a family. Those family that he found were not blood relatives. They were people like Cory Johnson, people that accepted him.

And you heard the evidence in the beginning of the case in the first phase of the case that they referred to each other and cousins and brothers. They weren't legally, but they did, because they became a family. They finally found somebody who could accept them for what they were. That's a

horrible commentary on growing up, that I would have to come to that stage, when Mr. Vick makes these absurd suggestions to you that Richard Tipton walked away from love and caring. He never did. He never had it. He never had the seat next to him where his father should have been, and he obviously didn't have a mother. If he had Brenda Williams, the lady who works for the Henrico County Tax Department, if he had her all his life, I'll guarantee he wouldn't be here. If he had had the father that Arthur Ashe had, he wouldn't be here. I guarantee you. It is a lot like the doctor said in answering Mr. Baugh. "It is a guarantee." If he had had C.T. Woody as a father, Richard Tipton wouldn't be here. C.T. Woody wouldn't let his children do things like that. He would have kicked butt. If he had John Thompson, the coach at Georgetown, he wouldn't be here. But he didn't. That's not to excuse him, but to tell you, "Hey, look, there is something in this little fellow here. There is something in this eight-year-old. There is redemption possible here." It is to tell you that the death penalty in this case is not the answer.

Eric White asked Tina when she was on the witness stand, the last question, he said to her, "Tina, why are you and your brother Henry here?" She said to you 12, you 15, "I'm not here to excuse my cousin. I'm here because I love him."

Where was his mother? What was her comment to Eric about Charlene Tipton? Charlene said to Tina Monday before Tina got on the train to come down here, Charlene said, "Tina, make me look good when you testify." Do you have to know anything more about the environment he had? When her son is on trial for capital murder, when he is facing the death penalty, his mother is concerned that she look good. Does that tell you why she wasn't here?

And Brenda Wilkerson, who has a very responsible position, who knows him for a six-month period as a son, she called him. He went to Highland Springs High School during that period of time, got a job. He didn't walk away from her. He felt the way she said, that things were getting to be a burden on her because she was having a bad financial problem. 16 years old, after his grandfather had died, after the Tiptons had virtually thrown him out again: "You are not staying with Vincent or your father." He did. Eric said to her, "Why did you come to this Court?" She said, "I'm a mother. I could not live with myself if I did not testify for Richard Tipton." Thank you.

THE COURT: All right. Just one brief thing before we get to the next argument. Mr. Geary

misspoke.  He was talking about considering the aggravating factors and then the mitigating factors, and he said before you have resolved what the mitigating factors are, found them beyond a reasonable doubt.  That is not the standard.  The standard that would relate to the mitigators is by a preponderance of the evidence.  I will explain this to you more in detail.  Go ahead.

MR. McGARVEY:  May it please the Court:  It has been an emotional five weeks.  And I'm going to

start with asking you folks to do something.  The law says that each one of our defendants are entitled to individualized consideration.  So I'm going to ask you good folks to draw a curtain here and a curtain here.  And I'm going to ask you folks to focus on this man, my client, Cory Johnson.  I am going to ask you to tune out everything else, and I'm going to ask you to consider my client, Cory Johnson.  Mr. Geary quite artfully put it:  That when you represent someone who has been charged, and at this point convicted, of the types of crimes that he has been convicted of, we as defense counsel live with that person continuously.  We have lived with Cory, Mr. Cooley and myself, it seems like forever.  And we know what he did, but we have gotten to know him as a person.  And that person, that man, in quotes, is a man with the mind of a gradeschool child.  And you have heard that from the stand.  And that's who Cory Johnson is.

I came up here with a semi-set pat thing to say to you folks, and I found that I can't do it.  I'm going to do it the best that I can.

At the outset, I feel constrained to reply to the prosecutor in terms of what he said about the aggravation here or the aggravating factors.

He talked about Cory Johnson trying to have Valerie Butler and C.T. Woody killed from the jail.  Do you folks remember Rodney Tucker?  When I stood up here in opening, I told you we are not trying to make excuses.  Cory is guilty of the crimes for which you have convicted him.  But to bring in a professional snitch in the aggravation stage to come in here and try to enhance the prosecution's case is beneath the prosecution.  Rodney Tucker was with Cory Johnson for a grand total of 14 days in the isolation section of the Richmond City Jail, the isolation section, with one cellblock in between them.  And supposedly, Cory Johnson is hollering across one cellblock to another individual one cellblock down, with guards and everybody else.  And the man, the man is a professional snitch.  There is no other way to put it.  He came in here, testified earlier in another

trial, got dispensation from the government, and came in here on the coattails and tried to enhance the government's story.  And by God, the government used him.  It is bad enough.  They didn't have to try to enhance it.

I told you, we are not trying to make Cory Johnson not responsible.  We are not trying to make excuses for Cory Johnson.  He talked about Dewey Cornell, Dr. Cornell, being disingenuous.  Dr. Cornell, by his own testimony, has testified more for the prosecution than he has for the defense.  He knew what the standard for mental retardation was.  75.  And that if Cory Johnson had an IQ of 75, then by law he could not be executed.  If he was coming in here to be disingenuous to you folks, do you think he couldn't hedge on two points?  But the prosecution has the gall to come in here and tell you folks that.  That mitigation isn't disingenuous.

If you look at Dr. Lordi's testimony, he indicated that IQ's with age, especially with someone who has a severe learning disability, diminish.  They diminish simply because that person has not been able to learn.  And so logically, of course, their IQ's diminish.  You couple that with severe brain dysfunction, you don't have to be a doctor, you don't have to be a rocket scientist to figure out that someone with a severe learning disability, who can't learn, and we are all dependent on what we can retain, obviously is going to have a diminishing IQ.  And I would suggest that it is beneath the prosecution to come in here and blow smoke at you folks like that.  As I said, it is bad enough, it is bad enough.  They don't need to try to enhance it.

Once again, Cory's fate is in the hands of strangers.  And I trust and I believe and I hope that they are compassionate strangers.  There is nothing new to Cory about that.  His fate has always been in the hands of strangers.

In January, early January of this year, in these batteries of tests that Cory was given by Dr. Cornell and Dr. Peck -- this is in your packet, folks -- he was asked to write a story.  And when he wrote the story, he started it like this:  "This is January of this year.  Me and my mom went to the moon."  This is the same mother who doesn't have the decency to even show up at this trial when her son's life hangs in the balance.  Cory Johnson is alone.  He is alone as he has been all his life.  Not one family member comes here.  Not one person, not even the mother who he spoke of as a goddess can come here when his life hangs in the balance.  And they want to make light of that?

Cory Johnson in January of this year is still waiting for his mom to take him to the Pizza Hut.

(Counsel turns to face defendant Johnson.)

Cory, she is never going to show up.  She is never going to show up.

Folks, you have heard a lot about mitigators and aggravators.  You will be submitted a list of mitigators.  The mitigation, as I indicated, was presented to you in the second phase of this trial.  The burden is on the defense to prove those mitigators by a preponderance of the evidence, 51 as opposed to 50 percent of the evidence.  I would respectfully suggest to you folks that that has happened here.  The government hasn't produced an iota of evidence rebutting any of the mitigation.  And as I indicated to you at the very beginning of this, the death penalty is a narrowing process by law, according to the Supreme Court of this nation.  It is to narrow the class of people who can be executed.  And I submitted to you folks earlier, and I submit to you again, that the death penalty is reserved for those who are totally blameworthy, who are fully responsible for those actions, for their actions.  Fully.

I didn't stand before you folks and tell you that Mr. Johnson wasn't blameworthy.  I didn't stand before you folks and tell you that he didn't know the difference between right or wrong.  I didn't stand before you folks and tell you that he wasn't responsible.  But I did stand and tell you that Cory Johnson, with that mind of a child, is not fully responsible.  He is not totally blameworthy.  There is mitigation before you folks that alleviates some of that responsibility.  And those are factors that Cory Johnson had no control over.  Cory Johnson was born into a family.  That family consisted of no father, a mother, a narcissistic, selfish mother, drug-addicted mother, a mother who actually gave up her own kids when Cory was 13 years old and when his brother, who had attempted to commit suicide at the ripe old age of ten, when he was 11 years old, gave them up, put them in foster homes.  She is a mother who expected of Cory to go to college.  Cory, to go to college.  Cory, who can't read beyond a second-grade level.  Cory, who tried and tried and tried to learn to please his mother.  But he couldn't do it.  And that wasn't his fault.  To be rejected by the only person who was family, the only semblance of family that he ever had, to be given up for adoption, what does that do to a normal, quote/unquote, person?  And ask yourselves, what does that do to a person with a severe, severe learning disability,

with severe brain damage, neurological impairment, with severe impairment in the way that he reasons, with severe problems in the area of problem-solving, logical thinking, severe problems in terms of understanding the consequences of what he does?  And you have heard that testimony from our disingenuous expert who testifies more for the prosecution than the defense.

What does it do to a person?  Well, I'll tell you what it did to Cory Johnson.  Cory Johnson didn't have a family.  The only family he had was his mother.  And just as Dr. Lordi said, people with disabilities don't shop in the mezzanine.  They shop in the basement.  They shop in the basement.  Cory Johnson found a family.  He found something he could do.  He could deal drugs.  He found a family.  Let me introduce you to them.  This is his cousin over here; this is James Roane.  This is his brother; this is Richard Tipton.  And Cory, with those impairments, would do anything, anything, including murder, to protect his family from a threat that he perceived, or that he was led to believe was real.

Odette Noble told you that Cory was not a leader.  Why?  Because he wasn't smart enough.  But he would have been the point man.  And within the family, he was the point man.

Don't go any further than that, folks.  That's what happened here.  That is exactly what happened here.  And is he responsible for those murders?  No two ways about it.  Absolutely he is responsible for those murders.  Did he know the difference between right and wrong?  We didn't try to come up here and throw any wool over your eyes.  Yes, he is responsible.  He knew the difference between right and wrong.  But is he totally and completely blameworthy?  Were there factors in his life that he had no control over that contributed to the actions, the ill-fated actions for all involved that he took?

I don't quite understand the dynamic here.  But I do know that if you look back on Cory's history, you see a kid who tried, despite all of those limitations.  You see a kid who wanted to please.  You see a kid who was a good-hearted kid by all accounts.  And then suddenly he finds a family and he changes.

Folks, with what we presented to you, that much compassion, that much mercy; because the difference we are talking about here is whether or not you are going to kill Cory or whether or not he is going to die in the penitentiary.  That much compassion.  Was he completely and totally blameworthy?  Or were there factors in his life over which he had no control that

contributed to this?  And I think when you look at that packet and you think about the evidence that was

3927

presented to you, the conclusion is inescapable. Certainly there were.  It doesn't excuse it.  It doesn't lessen the pain of the families who have lost people here.  It doesn't lessen anything.  But I would submit to you that if you follow the logic of the prosecution, and you don't show that much compassion and that much mercy (Counsel indicating with fingers.) then what separates the neurologically-impaired, learning-disabled Cory Johnson from us?

As I told you, once again, and maybe for the last time, Cory Johnson finds his life, his fate, his existence, in the hands of strangers.  Once again, he is alone.  I believe you are compassionate strangers and I believe that you will show that much compassion.  Don't kill Cory Johnson.  Don't kill him.  Thank you.

THE COURT:  Mr. Baugh?

MR. BAUGH:  May it please the Court, counsel:  The United States, the government, the crown, whatever you want to call them, they would have you determine the death penalty based solely upon one issue; and that is, were the acts committed by these people bad?  And they are.  And it is not disingenuous when we tell you we do not make any

3928

excuse for them.  They are bad.  The acts are bad.  A lawyer that I respect once told me the difference -- and I was a prosecutor; I prosecuted for five years, in this courtroom, in fact -- the difference between prosecutors and defense attorneys is that prosecutors prosecute acts.  They want you to look at what happened.  Defense attorneys defend people.  And therein lies the difference.

In this part of the trial, that's what you are supposed to be about.  I'm reading from what I anticipate the Judge will give you in Instruction 11.  A mitigating factor, instead, versus an aggravating factor, is intended to present extenuating facts about the defendant's life or character or the circumstances surrounding the capital crime for which he has been convicted that would suggest a sentence of death is not appropriate.

We are here in this stage of the trial, according to the jury instructions, according to what Congress gave you, to determine whether or not there is something about their lives and their individuality that should justify not killing them. We are not here to look at the acts again.  We are here to look at the people.  We are charged with

3929

putting on evidence about their character.  And the United States, if they wished, they can put on evidence about their character.  And they chose not to.  Instead, they go back to the act, the acts. Murder is horrible.  But under the law, and you have sworn an oath to follow the law.  All murderers cannot be sentenced to death.

Secondly, the United States, the prosecution, comes in here and they say they have left these bodies out in the street.  I'm going to tell you, we gave you these books yesterday.  And at the very least -- and first, you don't owe James Roane anything.  You have sworn an oath.  But you notice that Jeff, the court reporter, he doesn't go back there with you.  When you go in that room, you all can go back there and flip coins and no one will ever know.  So if you don't want to do anything, if you want to violate your oath, you can.  But for God's sake, don't sentence someone to death until you read about his life, understand him.  That's what this is about, understanding James Roane.

The United States gets up and says he never tried to get help for himself.  He was in Adventure Bound and he left.  I'll tab it for you.  First page behind Tab 1.  Up until approximately one-and-a-half

3930

years ago James Henry Roane was being regularly seen in the Lor-Berg Clinic.  The state, which was paying for these visits, terminated payment and James Roane's participation with Dr. Lordi ceased.  Did he walk away?  No.  His family didn't have the money, so they dropped him.

You read through, I think it is, page 74 of the chronology.  The United States, Mr. Vick, just got up here and told you that he walked away from Adventure Bound.  You read pages 74, 75, and 76.  No, he went and made application at the Job Corps because he wanted to be a heavy equipment operator.  And they told him, the people at Adventure Bound, said, "You go down there and make an application."  They helped him.  But he was told he couldn't get an interview for two months.  And they sent him home.  He tried.

In these records, and you heard Mr. Brunson, he asked to be kept on probation.  A youngster says, "Keep me under the restraint of the law because I need the supervision."  There is one statement here from his Probation Officer.  "It appears that James prefers jail to his home."  Is that lazy?  Now see, laziness is a nice thing because like I say, I used to prosecute.  That's a good thing.  You see, there was a time when we were less civilized, when we

3931

thought that all evil behavior was attributable to

the devil, you see.  Like for instance, epileptics.  There was a time when the treatment for epileptics was to tie them to a post and we beat them with sticks to beat the devil out of them.  Because they are not really sick, they are just possessed.  They are just wrong.  And if we hurt them enough, they can develop the strength to resist the temptation to commit crimes.  Oh, drug addicts don't have an illness.  No, no, no.  They are just weenies.  They are not strong like me.  If they could stand up and just say no, their drug addiction go away.  These people aren't the products of a horrible society.  No.  They are just morally lazy.  So therefore, let's just fry 'em.  And that will teach them a lesson.

We have gone beyond that.  Just like Dr. Semone yesterday said, 20 years ago we didn't know the stuff we know now.  And believe me, as an aside, nobody in this courtroom knows ADD better than I do.  Nobody knows better the difference between him and others.

The question for you now is, are the acts committed by James Roane the acts of a free and unimpaired mind, under the control of volition?  Or is it an attribute of something over which he had no control?  That's the question.  And I've got a question for you that he can't answer.  If it is a product of his free and unencumbered will, then how in the name of all that's good and holy could Lordi predict it 20 years ago.  Lordi says, "Unless he is treated he will have emotional and behavioral problems."  In there, it says, "Time is passing.  He is going to be dangerous to himself and to others."  It couldn't be a product of his brain.  It couldn't be a free and unencumbered act.  It has to arise out of the condition.  Because the people that recognized the condition predicted it.

I will tell you something else.  You have heard about the records of these young men.  And you have heard that they were violent.  But you know what's fascinating -- oh, and my client has assaultive behavior.  Yes, fights with girlfriends and all kinds of stuff.  The real violence doesn't begin in their lives until one or two of them get together.  Individually, it wasn't there.  Isn't that fascinating?

Now, does that mean that these doctors are right when they say that people with this problem gravitate to one another?  Yes, it does.  Now, one thing good about this trial is like most.  I went to law school in Texas.  We are real butch, you know.  My whole attitude toward the science of psychology and psychiatry has changed.

This was predicted.  Unless Dr. Lordi has a

**J.A.573**

crystal ball hidden in that locker of his, there is a science and there is predictability to this, and that's what caused this thing.  It is not because James Roane is not as strong as I am, or Mr. Vick.  No.  He is not weaker than we are.  He was born with a birth defect.  And you don't kill people because of birth defects.  They say, "No, we are not going to kill him because of the birth defect.  We are going to kill him because of the acts."  But the acts arose from the defect, because Dr. Lordi predicted it would.  Was he weak in receiving treatment?  No, he was broke.

"Wait a minute, everyone who has an ADD problem doesn't go out and kill."  You heard that.  And everyone from James Roane's environment doesn't go out and kill.  You heard that.  But then you heard me ask Dr. Semone, "A person with James Roane's mental impairment, his brain damage, and that environment, what is the likelihood he would end up this in courtroom today?"  He said you could make book on it.  You heard that.  And he didn't try to question it.  It was going to happen.

Now, one of the reasons I get emotional about this is that it was partially my fault.  Because I don't get upset when everybody doesn't get the education my kids get.  Yes, maybe I feel a little guilty.  Maybe I should have been his Big Brother.

The United States next argues that my client, our client, James Roane, is a killing machine.  I believe the term was "reptillian."  I love that.  A reptillian killing machine, incapable of formulating or making the moral judgments to constrain himself.  And then he turns around and says, "Not only is he like that, but we want you to make him your teacher.  We want you to suppress and repress your civilization and act like him to punish him."

Faith is hard.  It is real hard being civilized.  Because when you are civilized, sometimes you have to stand up to things you don't like and remind yourself by doing what I know is right, I will eventually win.  By doing what is right I will make a difference, even though the person I'm dealing with doesn't appreciate it.  I am a child of the 60's.  SCLC, NAACP, Legal Defense Fund, all that good stuff.  It was hard getting whipped during the national sit-ins, but we were told if we had faith and if we do this, it will get better, even though

these people don't deserve what we are doing.

MR. VICK:  This is objectionable.

THE COURT:  Sustained.  Quit personalizing the argument, please.

MR. BAUGH:  It is going to be very hard for

you all not to kill.  It is going to be hard. Because you are going to have to, as the law says, just think about the people.  In fact, if you sit back and say nothing in that room, if you have a feeling and you don't say it, you will probably hasten his execution.  The law says you should consider the aggravators and, if proven beyond a reasonable doubt, that weighs down on one side, the aggravators.  They already proved the aggravators. We proved them guilty.

Then you have to look at the mitigators by a preponderance, a very low standard.  51 percent? They offered no evidence in mitigation, so we must have won those.  But then the law goes on to say that once you find the existence of these, regardless of how they come out, if you have something new, even if you can't articulate it, that says, "I don't think they should die, or I don't think Mr. Roane should die," you should vote not to, even if you can't even recognize what it is yourself that you are feeling,

even if you can't articulate it to fellow jurors. And what could that feeling be?  Conscience?  I would submit it is not weakness.  And the law says in the instructions -- let's take a moment and find that. Excuse me.  It has been a long trial and I'm getting disorganized.  I can't begin to tell you how rough this is.

(Counsel perusing instructions.)

I believe the Judge will instruct you that if even one juror finds a mitigating factor present which in that juror's mind is not outweighed by the aggravating factors that you have agreed, the jury may not sentence that defendant to death.  If even one juror finds that a sentence of death is not justified, the jury cannot return a decision in favor of capital punishment.

I also remind you again that whatever the findings you make with respect to the aggravating and mitigating factors, you are never required, and it is underlined, to impose a death sentence.  For example, there may be something about this case or about one of the defendants that one or more of you are not able to identify as a specific mitigating factor, but that nevertheless creates a reasonable doubt that the death penalty is justified as to that defendant.

In such a case, the jury must, must, render a decision against the death penalty.  Moreover, even where a sentence of death is fully supported by the evidence, Congress has nevertheless given each of you the discretion to temper justice with mercy, to the high road, even for those who don't deserve it. That is going to be very hard.

J.A.575

It is remarkable when I sit here and realize I am asking on behalf of Mr. Roane and my co-counsel that you take a 26-year-old man and not give him death, but sentence him to life in prison without parole.  These youngsters don't even understand what they are going to miss if they win that.  Yesterday, Mr. Roane's seven-year-old daughter stood up.  He isn't going to be there for any of the decisions.  He is not going to be there when she comes home and says she met somebody.  He isn't going to be there for prom night.  He is not going to see that dress.  He has given all that up.

You know, sometimes in the morning when you wake up, no matter how long you have been there, you are in a fog.  "God, where am I?"  He is going to wake up the same day at the same place.  He is going to know it is never, ever, ever going to change.  It is never going to get better.  He will die in that room.  His life is wiped out.  And I don't want to say it is not his fault.  God, no, I don't want to say that.  Maybe it is Lordi's fault because Lordi wrote this down.

The United States also makes it sound as though my client -- and I want you to read this book.  Please.  If you are going to sentence somebody to death, if you are thinking about killing somebody, the least you can do is find out about them.  They give the impression that my client came into this idyllic neighborhood and brought with him death and destruction and terrorized the neighborhood.  My client was born of the death and destruction.

There are 30 death certificates, or about 30, in the back of this book: personal friends and acquaintances of my client, as testified to by Ms. Noakes.  Look at how they died.  In fact, these guys would have probably been killed in another year anyway.

To violently take their lives, to strap them into a chair and run electricity through them, is not going to bring these other people back.

I wish that I could show you, and I can't, to disassociate from the facts and talk about the things that our client wants.  You have heard these other attorneys talk about meeting their clients and talking with them, seeing them as human beings.  It is always easier to do things to people that we don't relate to, that are different from us.  And one of the purposes of prosecution is to make these people as different from you as possible.  They want you to view them as something else, because it is easier to give punishment.

We have to sit there.  We get one shot, because it is the government's burden, and then we have to

sit down. We don't get to get up here again and we don't get to rebut anything he comes up with this time. But I do want to remind you of one or two points, and perhaps I'm reemphasizing them. These reports are excerpts from reports that are in that book. Read them. Look at what was said.

I am convinced that we have proven to you that the acts that Mr. Roane committed were for foreseeable and predictable because they are a consequence of his birth defect. The birth defect is not his fault. In fact, the assignment of blame is for children.

I love the way the government always wants to figure out who is to blame. But really, it doesn't matter who is to blame. The bottom line is, did he suffer from it? I don't care who caused it. I know his mother tried hard with what she had. I know Dr. Lordi is not supposed to provide services for free. I don't know this young man's entitled to treatment. But the bottom line is, everything that he is here for was caused by his life experience coupled with his brain defect. We know of the seven siblings born in that house. Five have had drug problems. Is it coincidence, like the family got together and said, "My, why don't we all do drugs?" Or is it perhaps something about that environment that encourages that? We know that these three young men got together. Was it coincidence? Was it like the stars got crossed one day? Or is it as these doctors say, that they gravitated? It is a science. It was predictable.

I know that Mr. Vick is going to get up here and argue that everybody who is ADD, everybody who has brain damage, doesn't murder. And he is right. And everyone who comes from this environment doesn't murder. That is right. Absolutely. But Dr. Lordi said 50 percent of the people in the prison suffer from this disorder. And even though it is redundant, and if I have to be redundant in order to save my client's life, I will: There is only one person, or three people in this courtroom who have been found to have that environment and that birth defect. And we know what Dr. Semone said. You can make book on the fact they will end up in trouble with the law. You can take it to the bank.

It has been very hard during this argument not to be emotional. But according to these instructions, emotions are not weak. Emotions are to be applied. That's what the instructions say. I hope that when you as jurors go back, emotions aren't comfortable. I know when people get emotional, other people get uncomfortable. I hope that when you go

back there, you feel the emotion that the law has asked you to feel; that you apply those human -- don't be like what Mr. Vick says my client is like. No.  Be like someone who should teach them.  Don't use those values that my client has.

You have been very attentive, and I know you have worked hard.  And believe me, these people have worked hard, too.  It would be very simple for you to go back there and come back with an extremely efficient and extremely quick verdict, to go back there and not read these exhibits, not look at them. But I should remind you, we are not here for efficiency.  Democracy is inefficient.  The presumption of innocence is inefficient.  Everything that is beautiful is inefficient.  As my mother told me, Michaelangelo could have done the Sistine Chapel in three days with a roller, but it wouldn't be the same.  That's what you have to do here.  Look at these people.  Not about the acts.  Look at the people.  Ask yourself "Has the government rebutted what has been proven about the people?"  And I would submit to you that if you do  --

MR. VICK:  Your Honor, we don't need to rebut anything.

THE COURT:  Sustained.

MR. BAUGH:  Look at what evidence has been offered concerning their lives.  And we would submit that at the conclusion, you will find that life in prison without ever hope of release is significant enough punishment for James Henry Roane, Jr.  Thank you.

THE COURT:  All right.  Brief rebuttal?

MR. PARCELL:  Ladies and gentlemen, you have heard our colleagues once again telling you what they think their evidence was.  And we got through the first phase of this trial and in the rebuttal, I told you then my colleagues had done a good job of trying the government, police, and their witnesses. At the conclusion of phase two in rebuttal, I find myself once again realizing that they have once again tried in their phase two evidence the parents, society, the legal system, and the doctors and social workers who missed certain points in these young men's lives.  But that's not a defense.

They talk about their records, the things that led them to be where they are today.  Let's talk about that for a moment.  Because you know from what you have heard as far as Mr. Tipton that he and his friend, Cory Johnson, to his left, stabbed with razor blades a young man in New Jersey in 1989, 169 stitches' worth.  That is a choice and a decision they made.  They chased him down, as my colleague

said, like an animal in the street and with razor blades cut him in 1989.

Of course you are aware that Mr. Tipton had two other drug arrests in New Jersey in 1989 and 1990. They talk about their inability to think, their mental deficiencies. But what did Mr. Tipton tell them his name was? He told Officer McMillian it was Robert Baker. A lie. A deception. Why did he do that? To avoid getting caught again.

Then you had the second police officer, Keim, who arrested him. And what was his name that time? Manny Wilkerson. Another lie. Another deception. And they tried to get us to believe they don't have the abilities or facilities to make those decisions and plan ahead. Their actions have spoken louder than any words any doctor, any social worker, has told you.

Cory Johnson, you know he was convicted of a robbery and possession of a controlled substance before 1991 when he came to Richmond. And go back to his arrest in New York City at the transit station in February 29th, 1992 carrying a concealed weapon. What name did he give that police officer? Kevin West. A lie. A deception. Why did he do that? As he told Valerie Butler, "I wanted to get bonded before they realize that gun has heads on it," and that gun did have heads on it. It had four: two alive and two dead.

James Henry Roane, Jr. Mr. Baugh talks about the fact of the seven-year-old daughter not being able to see him when she meets someone in life. He talks about his record of assaults. Strangely enough, six of those assaults and trespasses are against the mother of his children. Six of them. He had an unlawful wounding, too.

These crimes were between 1989 and 1990. There are certified copies that the government introduced Monday. He wants you to believe he is this great family man. And the government asked the social worker yesterday who gave you the family tree, "Did you interview Iris Smith, the mother of his children?" No. "Did you interview Robin Cooper, the mother of his children?" No. And he has committed at least six acts of violence against those two women.

Then we graduate to where we are now and we have gone through things this week about choices and decisions. They are important. The decision-making process you folks are going to engage in is very important, too. Let's think about choices and decisions for a few moments. We have been together in this trial for five weeks, the same length of time

within a week that these three people killed ten  --
            MR. WHITE:  Objection as to "these" and the
amount of murders.
            THE COURT:  Sustained.
            MR. PARCELL:  Well, we will go over it.
Mr. Tipton started on January 5th, 1992, with the
assistance of James Henry Roane, Jr.  This gentleman
made a decision in the life of Douglas Talley, who
had a family, too, who missed him at Christmas just
like their families will.  They made a decision.

3946

They made 84 of those decisions, 84 stab wounds in a
human being.  That's a choice those two people made.
Then we go to "Little Doug" Moody, shot twice, and 18
more decisions by James Henry Roane, Jr., stab
wounds.  Then we go next to Peyton Maurice Johnson.
As Mr. Vick told you, he was stalked by Mr. Roane.
Cory Johnson and "E.B." came in and made 15 decisions
for him with their 9mm handguns.  That was their
choice, their premeditation.  And every expert told
you all three of these men, all three of these
killers, have the ability to make premeditated
decisions; they know right from wrong.  And these are
the choices, these are the decisions they made.
     Then we go to Louis Johnson.  They made seven
decisions in his life.
            MR. WHITE:  Objection to "they."
            THE COURT:  Sustained.
            MR. PARCELL:  That's Henry Roane and Cory
Johnson and Lance Thomas.  Those are decisions those
three people made that took another life.
     And Torrick Brown.  Mr. Roane, Mr. Johnson, and
Mr. Thomas made 16 decisions for him as they shot him
in front of his sister and her three children.  They
made six decisions for Martha McCoy.
            MR. GEARY:  I object to "they."  We are

3947

right back in the beginning of the trial.
            THE COURT:  Sustained.  Be specific.
            MR. PARCELL:  Thank you, Judge.  Roane,
Johnson, and Thomas made six decisions for her.  Then
we go to Dorothy Armstrong.  Cory Johnson made nine
decisions for her, after having left South Richmond
and killing someone else and shooting him sixteen
times, 16 decisions for another victim.  He made
three decisions for Bobby Long, that being Mr.
Johnson.  He made two for Anthony Carter.
     Then we go to Linwood Chiles, Curt Thorne,
"Pepsi" Greene, and Gwen Greene.  Mr. Johnson and Mr.
Tipton got their new Glocks on February 4th, 1992.
            MR. GEARY:  No evidence of that, Judge.
            THE COURT:  Objection overruled.
            MR. PARCELL:  And what did they do?  We
keep hearing this thing about decisions and ability

to think.  Before we discuss this last one, let's think a minute.  They had Pam Williams purchase their first three handguns, that being Roane, Johnson, Tipton, and Lance Thomas, purchased their first three handguns that the police seized on February 1st, 1992.  What did they tell her?  They gave her the money.  And what did they tell her when they got back from getting the guns?  They gave her an extra $30.

Mr. Roane and Mr. Johnson said, "Fake a breaking and entering, here is $30 to pay for your window, and tell the police somebody stole the guns so they can't be traced back to you or back to us."  Does that sound like the mental processes that these charts lead you to believe?  No.  They knew how to do these crimes.

MR. McGARVEY:  I object to "they" again.

MR. PARCELL:  Roane, Johnson, and Tipton, all three collectively, continued discussing, planning, making decisions.  Then after Roane was arrested on February 2nd, 1992, Mr. Johnson and Mr. Tipton were still on the loose, for lack of better terms.  Then Tipton and Roane make arrangements through Charlotte Denise Moore to purchase two more Glocks.

MR. BAUGH:  I have to object.  That's not true.  Mr. Roane was in jail at that time.

THE COURT:  Sustained.

MR. PARCELL:  I misspoke.  It was Mr. Johnson and Tipton.

MR. McGARVEY:  That's not the evidence, either.

THE COURT:  Mr. Baugh's objection will be sustained.

MR. PARCELL:  After the weapons were purchased, "Whitey" gave Charlotte Denise Moore $100 for purchasing two more guns for he and Cory Johnson.  And then we go to February 19th, 1992.  These people can't make decisions?  You heard the evidence of the phone call at 8:30 p.m.  "Whitey" gets back in the car and says "'C.O.' has got them."

MR. BAUGH:  Excuse me, wait, "they" again.  My client was in jail for all of this.

THE COURT:  Overruled.  That was clear.

MR. PARCELL:  And what happens at 10:17?  An independent witness goes down a highway and sees someone he describes dressed as Gwen told you he was --

MR. GEARY:  That is absolutely not the evidence.  That's a total misstatement of the evidence.

THE COURT:  Objection sustained.

MR. PARCELL:  He testified that the person

**J.A.581**

he saw was tall, thin, had on jeans and a brown coat, the same thing Gwendolyn Greene told you he had on, richard Tipton. He saw someone flying in front of the automobile. And what was that? A human body. That night, Tipton and Johnson made two decisions for Linwood Chiles, two for Curt Thorne, one for "Pepsi" Greene and one for Gwen Greene. We know the results of that decision.

The doctors and social workers have basically told you they have learning problems, low to moderate IQ's, bad upbringing, 10 to 20 percent of society has the same learning disability these folks have.

MR. McGARVEY: Once again, he is collectivizing, and that is not the evidence with respect to Mr. Johnson at all.

THE COURT: The objection will be sustained. Mr. Parcell, if you are going to refer to somebody, do it individually, please.

MR. PARCELL: But they told you Roane, Tipton, and Johnson all had opportunities as they grew up for structured environments. Mr. Tipton left his. Mr. Johnson left his. Mr. Roane left his.

Roane, Tipton, and Johnson, all three then, all three now, know the difference between right and wrong.

Tipton, Johnson, and Roane, all three are responsible for their activities or their actions. And once again, Tipton, Johnson, and Roane all had the ability then and now to premeditate their crimes. I'm sure they have taken cheap shots at the government. Two weeks ago Rodney Tucker was called as a witness for Sandra Reavis, the defense. You heard no one call him a snitch then, did you?

MR. McGARVEY: That is a mischaracterization. Ms. Reavis' counsel called her, not the rest of us.

THE COURT: The objection is sustained.

MR. PARCELL: And today, he is the snitch of the world. Take that for what it is worth.

As I said before, you do not have an easy responsibility. But contrary to what Mr. Baugh told you, you are not killing these people. You are making a decision based on the law and the evidence. And you have a choice: the death penalty or life in prison. Once again, the government would urge you to come back with a death penalty verdict, and don't let them insinuate you are making some --

MR. BAUGH: Objection to "them."

MR. PARCELL: Don't let Mr. Baugh make you believe you are making some immoral or uncivilized decision. Because that's an oath, an obligation you made to all of us five weeks ago.

I will leave you with this thought.  And as you go through your deliberations, remember:  No longer should the innocent suffer a punishment greater than the person who caused that injury.  Thank you.

3952

THE COURT:  All right.  I think we will stop now for lunch.  The next thing is instructions, and that's going to take awhile.  We have heard a lot of talking this morning, and I'll give you a break before we hear some more.  I need to say this before you go, though.  I will emphasize it in my instructions, but I need to say it over and over again, and I'm sure you know it by now.  This is argument that you have heard.  The lawyers are putting the facts before you as they recall them and in the light that reflects best on their case.  Your recollection controls in regard to the evidence, and you are to take argument in that way.

I believe your food will probably be arriving around 12:30.

THE CLERK:  Yes.

THE COURT:  So we will say 1 o'clock, and we will get back in and finish up.  Everyone remain seated while the jury leaves the courtroom.)

(The jury left the courtroom.)

All right.  I'll hear your motions.

MR. BAUGH:  First, on behalf of the defendant, James Roane, we have a motion for mistrial because of the United States' comment upon a defendant's failure to testify.  As the Court

3953

adequately indicated, it was a stupid statement to make.  I'm not asking the Court to declare  --  I'm asking the Court to declare the mistrial, but the act was not committed by the Court.  The United States, after a five-week trial, makes a comment on the most basic constitutional right there is to the point where the Court has to give an instruction.  And the Court is well aware that when you have to do that, not only are you clearing it up, but at the same time mentioning it again.  It has to be done that way.  And this is a capital case.

For that reason we move for mistrial.  Additionally, we move for mistrial again on the issue of severance.  Mr. Parcell just got up and said that because these attorneys did not object to Mr. Wagner's witness, who was gone, because we didn't call him names and attack him on cross-examination, that in some kind of way we were accepting or condoning his credibility.  He did not offer testimony against our clients.  If it had been an individual trial, it would not have been an issue.  And all of us had to suffer as a consequence of that.

For those reasons, Your Honor, we have urged

**J.A.583**

severance all along.  We knew this was going to be a problem, and it was.  Lastly on severance, the word

3954

they was said so often, and we have had to object to it often, and we have emphasized it inadvertently or we have to emphasize it every time we object.  As the Court pointed out during opening, "Counsel, your butt wasn't nailed to the seat."  That's what you told us.  We have to object to preserve it.  We had to.  Your Honor, we would move for a mistrial and reurge our severance.

THE COURT:  All right.  Mr. Geary?

MR. GEARY:  On the point that Mr. Vick involved Mr. Tipton, it is quite unbelievable to me that a prosecutor with his experience didn't do that intentionally.  He brought up two factors which the jury was not to consider.  One, that Tipton didn't testify.  Two, he brought up an aggravating factor that the government, for whatever reason -- probably neglect, since they didn't pay that much attention to the case -- failed to put that in as an aggravator, that a defendant failed to show remorse.  Rather than give that up or ask you for cause to amend that, they do it knowingly and intentionally to let the jury know that Tipton didn't testify and that there has been no remorse by the defendant.  Clearly, that was done because they wanted the jury to know that.  This is in the fifth week of trial, in the closing

3955

arguments on a death case.  I think the Court knows the way the appeal courts and the United States Supreme Court go over these death penalty cases from the states.  To have a prosecutor who has done as many conspiracy cases as he has done, and who knowingly violates the Code of Ethics like that, is reprehensible.

MR. COOLEY:  I would join in the comments and arguments made by both co-counsel.  And I would add to that that in the course of the opening summation by Mr. Vick, he commented throughout that "they" have killed ten people.  And "These people have to die."  Or "These people deserve to die."  That flies in the face of the mandate of this statute: that we have individual consideration.

It was continued in the final summation to the point that every other sentence had to be objected to.  And the sustaining of those objections does not cure it in the eyes or in the minds of the jury.  Just as Mr. Baugh said, in the opening statement, when a prosecutor stands and comments upon the failure of a defendant to testify and breaches the very gravamen of the Fifth Amendment right of each of these young men to that right, to remain where they are seated and not take the stand, and the Court's

only ability to cure that is to give a cautionary instruction which exacerbates the condition which the prosecutor has thrust upon the jury, is simply fundamentally unfair.

Respectfully, Your Honor, for all of those reasons, those mentioned by co-counsel and my comments, on behalf of defendant Johnson we respectfully move for a mistrial.

MR. BAUGH:  We adopt the eloquent arguments of both counsel.

MR. VICK:  Your Honor, I did not say  --  I made it very clear in my closing.  I said that the doctors had come and talked to each one of these defendants.  That's the clear evidence in front of the jury.  These defendants, each one of them, spoke through those doctors on repeated occasions about their background, about what they were involved in. As to Mr. Johnson, his expert said that he talked to him extensively about his criminal involvement.  I predicated what I said very clearly upon they spoke to the doctors about their involvement.  And not once was a bit of remorse indicated through the doctors. I didn't comment on their inability to take the stand.  In the case of UNITED STATES v. CHISEM, C-H-I-S-E-M, Fifth Circuit, 1982, the Fifth Circuit addressed an issue similar to this where an attorney had made arguments and the prosecutor said, "You know, you have to believe the defendant's story as told by the attorney," which is exactly what I have done, and that was held to be proper comment upon the evidence in front of the Court, and that's what I was commenting on.

As to the "they," Your Honor, this is repeated, but they have been found guilty of Count One, conspiring together to kill all these people.

THE COURT:  All right.  Let me make it crystal clear, Mr. Vick, that I do not buy your argument at all.  It was astonishing to me that you would even come close to making this kind of fundamental error.  I have every faith that this jury -- I've been watching them closely, they are a profoundly proficient group -- that they will listen to the instructions and follow them just as they did at the first phase of the case.  Therefore, I believe that any error can be relieved by the cautionary instructions.

The motion for mistrial based on the comment of the prosecutor and the motion for severance will be denied.  We will be back at 1 o'clock.

MR. BAUGH:  We also preserved our right to raise the motion concerning the deterrent.  Do you

want it now?

THE COURT:  Might as well deal with that now.

MR. BAUGH:  Your Honor, we preserved our right.  We would also urge the motion for mistrial. The United States twice during their opening on the punishment phase -- well, when they opened they tried to bring up deterrent effect at that time.  We objected and it was sustained.  Again, we come in here today and the United States again raises deterrent effect in the presence of the jury, which, as the Court is well aware, is not an applicable standard for justifying the death penalty under available case law.  It is calculated solely to prejudice the minds of the jurors at a critical phase of a critical trial.  In fact, I believe the language is something to the effect of "It is like justification by billboard."  "If we kill this guy, your life will be better."  That is improper.  And the United States was on notice because they did it in the opening portion.  And just like the United States fascinatingly comes in today on the comment on the failure of the defendants to testify -- and by coincidence has the case law -- we would submit this was also done intentionally.  There were several significant objections made during that argument on pivotal constitutional issues.  And this is another one for which mistrial is required.

MR. WHITE:  We join.

MR. COOLEY:  We join.

MR. VICK:  Your Honor, the Court, as I understand your instructions to me in opening when that was sustained, said "This is opening.  This is your beginning."  This is not closing.  And that's why that was sustained.  I believe, and I still believe -- and obviously the Court does not believe that it is proper to address such things with a jury that is going to be the ultimate sentencer for these people based upon the law -- it is as if I was addressing the Court.  And certainly I would properly address that to the Court.

THE COURT:  All right.  The objection was made and the objection was sustained, and I will not grant a mistrial based on that.  The fact is, as I read the law, there are two kinds of deterrence, general deterrence and specific deterrence.  Within the range of discussion regarding general deterrence, one might be able to make an argument that could stand up.  I had, at that point, not enough confidence in Mr. Vick to think that he would make the appropriate argument, and that's why I sustained the objection.  I will not grant a mistrial based on

that.  Let's come back at 12:15.
     (Luncheon recess taken from 12:15 p.m. to 1:20 p.m.)
          THE COURT:  Mr. Baugh, I understand you wanted to reurge your  --
          MR. BAUGH:  The full text of it.
          THE COURT:  It is there.  You can give it to the Clerk.  I'm going to do what I said I was going to do.
          MR. BAUGH:  The other one was on the, even though we wrote it, on the verdict form as to 9-A, we would like to urge this in the disjunctive, take out the word "and" and put in "or," that defendant James Roane was subjected to emotional and physical sexual abuse, abandonment.  It sounds like unless you find all of them, it doesn't count.  I know we submitted it that way.  It is not your Clerk's fault.  We know that.  If the Court could pencil in "or" over the "and."
          THE COURT:  I would have to change it everywhere it appears.
          MR. BAUGH:  I'll do it.

3961

          THE COURT:  No, that's all right.  I'll do it.
          MR. WHITE:  If the Court please, just making sure that the record accurately reflects the nature of our objection to the N1 findings, it is our position that with regard to special findings on statutory aggravators that the jury should be instructed to pick one of the four and shouldn't be allowed to pick all of the four.  The last three, we would take the position, are lesser-included to the nature of the first.  We don't believe they should be allowed to do all four.
          THE COURT:  Your position is noted.
     All right.  Let's bring in the jury.
     (The jury entered the courtroom.)
     Members of the jury, you have now heard all of the evidence in this case as well as the final arguments of the lawyers for the parties.  It again becomes my duty, therefore, to instruct you on the rules of law that you must follow and apply in arriving at your decision as to the very serious question of whether or not Richard Tipton, Cory Johnson, and James H. Roane, Jr. should be sentenced to death.
     Regardless of any opinion you may have as to

3962

what the law may be or should be, it would be a violation of your oaths as jurors to base your verdict upon any other view of the law than that which I give you in these instructions.
     Some of the legal principles that you must apply

to this sentencing decision duplicate those you followed in reaching your verdict in the first phase of the trial.  Others are different.  I have prepared a full set of instructions on the applicable law in order to insure that you are clear in your duties at this stage of the case.  I have also prepared forms that detail special findings you are asked to make in this case, and four possible decisions you can render as to each of the capital crimes for which each defendant has been convicted.

By law, Congress has expressly provided that any person who intentionally kills another while engaging in or working in furtherance of a Continuing Criminal Enterprise may be sentenced to death.  Because you have found Richard Tipton, Cory Johnson, and James H. Roane, Jr. guilty beyond a reasonable doubt of intentionally killing certain individuals while engaged in or working in furtherance of a Continuing Criminal Enterprise, you must now consider whether justice requires imposition of the death penalty for

3963

those crimes.

This is a decision left exclusively to the jury.  I will not be able to change any decision you reach in this regard.  You and you alone will decide whether or not Mr. Tipton, Mr. Johnson, or Mr. Roane should be executed.  Thus, I again stress the importance of your giving careful and thorough consideration to all evidence before you.  I also remind you of your obligation to follow strictly the applicable law.

Although Congress has left it to you to decide whether any or all of these defendants should be executed, it has narrowed and channeled your discretion in specific ways, particularly by asking you to consider and weigh any aggravating and mitigating factors present in this case.  These factors have to do with the circumstances of the crime and the personal traits, character, and background of the defendants.

Aggravating factors are those that would tend to support imposition of the death penalty as to a particular defendant and a particular capital offense.  Mitigating factors, of course, are those that suggest that some punishment less than execution is sufficient to do justice with respect to a

3964

particular defendant and offense.

Your task is not simply to decide whether aggravating and mitigating factors exist in this case.  Rather, you are called upon to evaluate any such factors and to make a unique, individualized judgment about the appropriateness of the death penalty as a punishment for each capital offense and

J.A.588

each defendant.  In short, the law does not assume that every defendant found guilty of committing murder while engaged in or working in furtherance of a Continuing Criminal Enterprise should be sentenced to death.  The law does not assume that Mr. Tipton, Mr. Johnson, or Mr. Roane, as each sits before you, should be sentenced to death.  The burden of proving that a defendant should be sentenced to death rests at all times with the government.  It must satisfy that burden beyond a reasonable doubt.

While the government's burden of proof is a strict or heavy burden, it is not necessary that the government prove beyond all possible doubt that a defendant should be sentenced to death.  It is only required that the government's proof exclude any reasonable doubt.

If, after fair and impartial consideration of all the evidence in this case, any one of you has a

3965

reasonable doubt as to whether justice mandates a defendant's execution, then you must return a decision against capital punishment for that defendant.

In this regard, this second phase of the trial differs from the first.  In the first phase, I instructed you to deliberate with the goal of reaching a unanimous decision one way or the other as to whether the government had proven each defendant guilty beyond a reasonable doubt of the crimes charged against them.  In this phase, I instruct you that unanimity beyond a reasonable doubt is required for you to sentence a defendant to death.  But if any of you, even a single juror, is not persuaded beyond a reasonable doubt that a defendant's execution is justified in this case, then the entire jury must render a decision against his being put to death.

In short, if you find after thorough deliberation that you are not unanimous in your views, you have, nevertheless, reached a decision: namely, that the government has not met its burden of proof as to the death penalty.

Now, the defendants at this hearing do not have to present any evidence.  The defendant does not have to prove to you that he should be permitted to live.

3966

Each defendant was, however, entitled to present any mitigating facts to you.

Let me now discuss with you the deliberative steps you should follow in considering as to each individual defendant the very serious issue before you.

First, you must consider whether the government has proven beyond a reasonable doubt and to your unanimous satisfaction at least one aggravating

**J.A.589**

factor for each of the two statutory categories established by Congress as to any of the killings of which a defendant stands convicted. I will discuss these categories further in a moment.

Second, you must consider whether any non-statutory aggravating factors cited by the government are proven to your unanimous satisfaction beyond a reasonable doubt. I'll discuss this more in a minute, too.

Third, you must consider whether any of you think that mitigating factors have been established by a preponderance of the evidence.

Fourth, you must decide whether the aggravating factors which have been proven as to a particular capital crime outweigh the mitigating factors, and whether they are sufficiently serious to support a unanimous finding beyond a reasonable doubt that justice requires imposition of the death penalty as to that crime and that defendant.

Fifth, you must individually decide for yourselves whether you choose not to impose the death penalty in this case. For even if you make all of the above findings relating to aggravation or mitigation adverse to a defendant, you are never required to impose the sentence of death upon a defendant. Absent the unanimous findings as to certain aggravating factors that I have just discussed, however, you cannot vote for a defendant's execution.

You must first consider whether you are unanimously persuaded beyond a reasonable doubt that the government has proven at least one aggravating factor in each of two statutory categories established by Congress. In this case, as to each defendant and each capital offense, the government cites four aggravating factors from the first statutory category. One, that the defendant intentionally killed the victim. Two, that the defendant intentionally inflicted serious bodily injury which resulted in the death of the victim. Three, that the defendant intentionally engaged in conduct intending that the victim be killed, or that lethal force be employed against the victim which resulted in the death of the victim. And four, that the defendant intentionally engaged in conduct which the defendant knew would create a grave risk of death to a person other than one of the participants in the offense, and that such conduct resulted in the death of the victim.

Now, as you will recall, you are required to find that the killings in this case were intentional as a precondition to your finding Mr. Tipton, Mr.

Johnson, and Mr. Roane guilty of each of the capital crimes in the first phase of this trial. In order to insure that this factor was considered by you at the first phase, or guilt phase, I ask you to indicate on the verdict forms that will be provided for you whether you are or are not unanimously persuaded beyond a reasonable doubt that each of the capital murders for which you convicted Mr. Tipton, Mr. Johnson, and Mr. Roane were committed intentionally within the meaning of at least one of the four aggravating factors that I have just discussed with you.

Now, that is the first statutory category. You must find at least one from the first statutory category of aggravators.

Now, moving to the second category: From this second statutory category, the government cites three possible aggravating factors. Note, however, that not all of these aggravating factors are alleged against each of the three defendants, or in reference to each capital offense for which the defendants have been convicted. The verdict forms will specify which statutory aggravating factors are alleged as to each individual defendant and each individual capital offense.

Now, aggravating factors that are cited: One, that in the commission of a capital offense, the defendant knowingly created a grave risk of death to one or more persons in addition to the victim of the offense.

Two, that the defendant committed a capital offense after substantial planning and premeditation.

And three, that the defendant committed a capital offense in an especially heinous, cruel, or depraved manner in that it involved serious physical abuse to the victim.

The government must prove at least one of the statutory aggravating factors in this second category to your unanimous satisfaction beyond a reasonable doubt, as well as one of the factors from the first statutory category, for a defendant to be eligible for the death penalty for a particular capital offense.

Let me therefore explain in more detail what you must find proven with respect to these aggravating factors in the second category.

The first cited factor requires proof that in committing a murder, the defendant knowingly created a grave risk of death to one or more persons in addition to the victim. A grave risk of death is a risk that is very serious and dangerous to life.

**J.A.591**

The second cited factor requires proof that a murder was committed after substantial planning and premeditation.  A premeditated murder is one committed upon deliberation and prior design.  In short, the government must prove that a defendant killed the victim only after thinking the matter over and deliberating whether to act.  There is no requirement that the government prove that the defendant deliberated for any particular period of time in order to show premeditation.  It must, however, show that the defendant had some period of time to become fully aware of what he intended to do and to think it over before he acted.

Now, the government must also establish beyond a reasonable doubt that the murder was committed after substantial planning for you to find this factor proved.  The words "substantial planning" should be given their ordinary, every day meaning.  "Planning" refers to the creation or development of a method of doing something or achieving some end.  "Substantial planning" means planning which is considerable, or ample, for the commission of the crime at issue in this case: murder.

The third cited factor requires proof beyond a reasonable doubt that the defendant killed the victim in an especially heinous, cruel, and depraved manner in that the killing involved serious physical abuse to the victim.  What you must recognize about this factor is that Congress has specifically limited the meaning of heinous, cruel, or depraved conduct.  It is this limiting language, "serious physical abuse," that must be the focus of your consideration.

Serious physical abuse means harm to the victim while he is alive and conscious; that is, significantly more than that necessary to accomplish an act of murder.  The evidence must persuade you beyond a reasonable doubt that such abuse was deliberately inflicted; that is, inflicted intentionally by the defendant for the express purpose of seriously abusing the victim physically while he or she was still alive.

Put another way, you must find that the defendant had as his purpose more than just committing a homicide.  As you can tell from these instructions, in considering this factor, you may look only to conduct occurring while the victim was still alive and conscious, and not to evidence of conduct occurring after death.

Section 1 of your verdict form inquiries as to your findings with respect to these statutory aggravating factors.  First, under the heading "Category 1," you are asked if you are unanimously

persuaded beyond a reasonable doubt that each crime was intentional within the meaning of the first four factors that I have explained to you.  Under Category 2, you are asked whether you are unanimously persuaded beyond a reasonable doubt that one of the second group of aggravating factors is applicable to each capital offense.  You must find both: one factor at least from Category 1, and one factor at least from Category 2, proven beyond a reasonable doubt as to the same capital offense -- that is, the same victim's murder -- for you to proceed in your deliberations as to the death penalty for that offense.  If you do not find a factor from each category proven beyond a reasonable doubt as to a particular murder, you cannot consider the death penalty with regard to that capital offense.  In such a case, you will, on the decision forms that you will be receiving, relating to that defendant and that victim, complete the decision section labeled "A."

If you do find both a Category 1 and a Category 2 aggravating factor proved beyond a reasonable doubt as to a particular capital offense, you must then consider whether any other aggravating factors cited by the government have been proven to your unanimous satisfaction beyond a reasonable doubt with respect to that defendant.

I instruct you that the law permits you to consider only those aggravating factors specifically cited by the government with respect to each defendant.  The jury is not free to consider any other facts or factors in aggravation.  The government alleges the following non-statutory aggravating factors in this case.  Note again, however, that some of these factors are not alleged against all three of these defendants.  Again, your verdict forms will specify which non-statutory factors are alleged against each defendant.

Now, the non-statutory factors:  That the defendant committed multiple murders.  Two:  That the defendant had a substantial criminal history.  Three: That the defendant seriously wounded an individual in the course of committing the murders for which he has been convicted. And four:  That the defendant was knowingly and willfully a member of a conspiracy which had as one of its goals the murder of individuals other than those for which the defendant has been convicted.

I emphasize again that because these are the only non-statutory aggravating factors cited by the government, they are by law the only additional aggravating factors you may consider.  This aspect of the law may strike you as odd, but your oath compels

J.A.593

you to follow the law.  For example, you may not consider the effect of the murders on the victims' families.  It simply is not a cited aggravating factor.

Section 2 of your verdict form asks whether you are unanimously persuaded that the government has proven these non-statutory aggravating factors beyond a reasonable doubt.  I note that even if you are not so persuaded, a unanimous jury finding that the government has proven at least one aggravating factor in each of the two statutory categories which I've just discussed with you does permit you to consider the death penalty.  In short, you may only consider the death penalty if the required statutory factors have been proven.  But if you so find, you may then consider the death penalty, even in the absence of any proof of the non-statutory aggravating factors.

You must next consider any mitigating factors that may be present in this case as to each defendant.  A mitigating factor is not offered to justify or excuse a defendant's conduct.  Indeed, if the homicide was justifiable or excusable, a defendant would not be guilty of murder.  A mitigating factor, instead, is intended to present extenuating facts about the defendant's life or character or the circumstances surrounding the capital crimes for which he has been convicted that would suggest that a sentence of death is not appropriate.

It is the defendant's burden to establish any mitigating factors by a preponderance of the evidence.  This is a lesser standard of proof under the law than proof beyond a reasonable doubt.  It means that the defendant has to produce evidence which, considered in the light of all of the facts, leads you to believe that what the defendant claims is more likely true than not.  To put it differently:  If you were to put the defendant's evidence and the government's evidence as to a mitigating factor on opposite sides of the scales, the defendant would have to make the scales tip slightly to his side.  If the defendant fails to meet this burden, he has not proven that mitigating fact,

Congress has designed a number of specific mitigating factors.  And the defendants in this case may have attempted to prove some or all of these mitigating factors with respect to their individual circumstances.  These statutory mitigating factors are as follows:  One, that the defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired, regardless of whether the

capacity was so impaired as to constitute a defense to the charge against him; Two, that the defendant is punishable as a principal in an offense which was committed by another, but the defendant's participation was relatively minor regardless of whether the participation was so minor as to

constitute a defense to the charge; Three, that the defendant could not reasonably have foreseen that his conduct in the course of the commission of the murders would cause or would create a grave risk of causing death to any person; Four, that the defendant is youthful, although not under the age of 18; Five, that the defendant does not have a significant prior criminal record; Six, that the defendant committed the offense under severe mental or emotional disturbance; Seven, that another defendant or defendants equally culpable in the crime will not be punished by death, and, Eight, that the victims consented to the criminal conduct that resulted in their death.

Now, in addition to these specific statutory factors which are outlined by Congress or defined by Congress, the law also permits you to consider whether other factors in the defendant's background or character mitigate against imposition of a death penalty. Indeed, you may consider any other factor, whether specifically argued by defense counsel or not, that you believe to be mitigating if such a factor has been established by a preponderance of the evidence.

In short, your discretion in considering mitigating factors is much broader than your discretion in considering aggravating factors. This was a choice expressly made by Congress in enacting the capital punishment statute at issue in this case.

Now, each defendant has submitted to the Court a list of additional mitigating factors which they have endeavored to prove through the evidence that they put on at this hearing. I will discuss these factors as to each defendant with you now, and they will also appear on your verdict form for each defendant.

Now, with respect to the defendant, Richard Tipton, the additional mitigating factors that he has attempted to prove are the following: First, that defendant Tipton, if not sentenced to death, will be sentenced to life in prison without any possibility of parole. I now instruct you that this is factually correct; that is, you must consider this factor to be proven. The weight you give to this fact as a mitigating factor is, of course, up to each of you individually.

Second, that defendant Tipton was subjected to emotional and physical abuse and neglect as a child and was deprived of the parental guidance and protection that he needed.

Third, that defendant Tipton suffers from Attention Deficit Disorder and Hyperactivity Disorder that was untreated when he was a child.

Fourth, that defendant Tipton suffers from frontal lobe brain dysfunction that was untreated when he was a child.

Fifth, that defendant Tipton has a history of birth complications, illness, disease, and head injury, and suffers brain dysfunction which has affected his ability to function and his behavior.

Six, that defendant Tipton was introduced to addictive drugs and alcohol while still a child.

Seven, that defendant Tipton is impulsive and is impaired in thinking about the consequences of his actions, and in adjusting his thinking to changing events.

Eight, that defendant Tipton's full-scale IQ is 85.

Nine, that defendant Tipton grew up in an impoverished, violent and brutal environment and was exposed to extreme violence as a child and throughout his life.

And ten, that other factors in defendant Tipton's childhood background or character mitigate against imposition of the death penalty.

Now, the non-statutory mitigating factors as they relate to Cory Johnson:  First, that defendant Johnson, if not sentenced to death, will be sentenced to life in prison without the possibility of parole. Again, I instruct you as I indicated before that this is factually correct.  Of course, the weight due this fact as a mitigating factor is left to each of you individually.

Two, that defendant Johnson was subjected to emotional and physical abuse, abandonment, and neglect as a child and was deprived of the parental guidance and protection that he needed.

Third, that defendant Johnson suffers from neurological impairments which were identified and which were not adequately treated or addressed when he was a child or adolescent.

Fourth, that defendant Johnson suffers from brain dysfunction which has gravely impaired his ability to function in the absence of strong support and guidance.

Fifth, that defendant Johnson was introduced to addictive drugs and alcohol while still a child.

Six, that defendant Johnson has responded well

to structured environments and would likely make a reasonable adaptation to prison if he was sentenced to life in prison.

Seven, that defendant Johnson's full scale IQ is 77.

Eight, that defendant Johnson grew up in an impoverished and violent environment and was exposed to extreme violence as a child and throughout his life.

Nine, that defendant Johnson suffers from an extremely severe learning disability which impairs his ability to use good judgment, to control his behavior, and to understand and foresee the consequences of his actions.

Ten, that defendant Johnson suffers from a neurological impairment of brain damage that impairs his ability to exercise good judgment, to control his behavior, and to understand and foresee the consequences of his actions.

Eleven, that defendant Johnson was brought up in an extremely unstable, abusive, and neglectful family.

Twelve, that defendant Johnson's severe learning disability affected his intelligence, his speech, and his ability to read, write, and learn. Those limitations impaired his ability to exercise good judgment and to control his behavior.

Thirteen, that defendant Johnson had no parental involvement or support from or by his father.

Fourteen, that other factors in defendant Johnson's childhood background or character mitigate against imposition of the death penalty.

Now, the non-statutory mitigating factors as they relate to defendant James H. Roane, Jr.

First, that defendant Roane, if not sentenced to death, will be sentenced to life in prison without any possibility of parole. I have already told you that is factually correct. The weight which you will give to this fact is up to each individual juror.

Second, that defendant Roane was subjected to emotional, physical, and sexual abuse, abandonment, and neglect as a child, or was deprived of the parental guidance and protection that he needed.

Third, that defendant Roane suffers from neurological impairments which were identified and which could have been treated when he was a child or adolescent.

Fourth, that defendant Roane suffers from brain dysfunction which has gravely impaired his ability to function in the absence of strong support and guidance.

Fifth, that defendant Roane has developed a

3983

paranoid mental disorder as a result of his untreated neurological impairment.

Six, that defendant Roane has responded well to structured environments and would likely make an adaptation to prison if he were sentenced to life imprisonment.

Seven, that defendant Roane's full scale IQ is 85.

Eight, that defendant Roane grew up in an impoverished, violent, brutal environment and was exposed to extreme violence as a child and throughout his life.

And nine, that other factors in defendant Roane's childhood background or character mitigate against imposition of the death penalty.

Now, on the verdict form you are asked to identify any additional mitigating factors outside of those I have discussed that any one of you considers. If, however, you think that there is some other mitigating factor present that you are simply not able to articulate it with any specificity, you may still give that factor your full consideration.

Now, any evidence relating to the mitigating factors should be fully discussed by all of you to insure that each juror considers the matter

3984

carefully. It is important to note, however, that unlike aggravating factors, which you must unanimously find proven beyond a reasonable doubt for you to consider them in your deliberations, the law does not require unanimity with regard to mitigating factors. If any one of you is persuaded of the existence of a mitigating factor by a preponderance of the evidence, even if the rest of the jurors disagree, that juror may still consider it in reaching his or her individual decision in this case. For that reason, on the section of the verdict forms relating to mitigating factors, you are asked to report the number of jurors that find each mitigating factor to have been established.

Now, once you have decided upon the aggravating and mitigating factors present in this case, the law requires you to evaluate these factors and decide whether you are unanimously persuaded beyond a reasonable doubt that the aggravating factors sufficiently outweigh any mitigating factors to justify a sentence of death. Even if you determine that no mitigating factors have been proven to exist, you must consider whether the aggravating factors that have been proven are themselves sufficient to justify a sentence of death. Passion, prejudice, and

3985

arbitrary considerations have no role to play in your

J.A.598

efforts to reach a just result in this case.

In carefully weighing the various factors at issue in this case, you are called upon to make a unique, individualized judgment about the appropriateness of executing each of these individual defendants. This is not a mechanical process. Neither is it determined by raw numbers. You do not simply count factors. Instead, you must consider them qualitatively. Any one aggravating factor proven by the government, if sufficiently serious in your mind, may outweigh several mitigating factors. Thus, even if you were to find only the two required statutory aggravating factors proven to a particular defendant, and no other aggravating factor, you will still have to weigh those two aggravating factors carefully against the mitigating factors.

On the other hand, you must also recognize that a single mitigating factor may outweigh several aggravating factors. In short, what is called for in weighing the various factors is not mathematical skills. You must use your careful, considered, judgment. At this final stage in the weighing process you are not simply called upon to find relevant factors. You are called upon to decide whether each individual defendant shall live or die. Only if you are unanimously persuaded beyond a reasonable doubt that the aggravating factors outweigh the mitigating factors sufficiently that a sentence of death is justified may you return a decision in favor of capital punishment.

Each individual juror must decide whether the law requires that each defendant be put to death for a particular capital crime. If even one juror finds a mitigating factor present which in that juror's mind is not outweighed by the aggravating factors that you have agreed were proven, then the jury may not sentence the defendant to death. If even one juror finds that a sentence of death is not justified, the jury cannot return a decision in favor of capital punishment.

I also remind you again that whatever the findings you make with respect to the aggravating and mitigating factors, you are never required to impose a death sentence. For example, there may be something about this case or about one of the defendants that one or more of you are not able to identify as a specific mitigating factor, but that nevertheless creates a reasonable doubt that the death penalty is justified as to that defendant. In such a case the jury must render a decision against the death penalty.

Moreover, even where a sentence of death is

fully supported by the evidence, Congress has nevertheless given each of you the discretion to temper justice with mercy.  Also remember that no cited mitigation factor can ever be used by you as a reason to impose the death penalty.

You are instructed that in your consideration of whether the sentence of death is justified as to each of these defendants, you shall not consider the race, color, religious belief, national origin, or sex of the defendant or of the victims.  You are not to recommend a sentence of death unless you have concluded that you would recommend a sentence of death for the crimes in question no matter what the race, color, religious belief, national origin or sex of the defendant or the victims may have been.  Whatever decision you return, each of you is required by law to sign a certificate as to each defendant attesting to the fact that you have followed this instruction.

I recognize that these instructions are complex and provide you with a variety of conclusions that you can reach as to each defendant.  Because your

3988

decisions in this phase of the case, unlike the first, cannot be reported by pronouncing as simple a conclusion as guilty or not guilty, I have prepared with respect to each defendant a form on which your Foreperson will report your findings as to the existence of aggravating and mitigating factors, a form which each of you must sign, certifying that you have reached your decision without considering unlawful discriminatory factors, and several alternative decision forms that you will complete depending upon your findings.  Now, let me go through this verdict form.  And they are more involved.

Now, the first thing that you will see, they will come to you in three packets, one for each defendant.  At the top of the packet is a document entitled "Special Findings."  And you have to go through this.  Just to give you an example, special findings, the first part of it has to do with the statutory aggravating factors.  It says, "We the jury find as follows:  That defendant Richard Tipton," using Tipton as an example, "intentionally killed the victim of a capital crime proven to the jury's satisfaction beyond a reasonable doubt."  And below that would be the name of each victim of a capital offense.  And you would have to answer Question 1-A

3989

as it relates to each victim.  That is, "That defendant, Richard Tipton, intentionally killed the victim of a capital crime."  The answer is yes or no.  That he intentionally killed the victim of a capital crime is one of the first categories of

statutory aggravators.  And you would go through this as it relates to all of the first category statutory aggravators.  When you finish that, the Category 1 statutory aggravators, you will see these words at the bottom of that consideration:  "At this point, review your findings on the Category 1, aggravating factors, as to each individual victim.  Each victim represents a separate capital crime.  If as to any victim you have not found one of the Category 1 aggravating factors proven to your unanimous satisfaction beyond a reasonable doubt, you must now complete Section A of the decision form for defendant Richard Tipton that relates to that victim."

In other words, since you are required to find at least one aggravating factor from Category 1, and one aggravating factor from Category 2, if you find none from Category 1, by definition, you could not find that defendant guilty  --  find that the death penalty should be imposed as it relates to that defendant.  That's simply what that's telling you.

If you do find a Category 1 statutory aggravator, you would then move on to Category 2, and they would be handled in the same way.  Category 2 aggravators are laid out, and you are to answer yes or no as it relates to each individual victim.

Again, when you finish that, you will find at the end of that similar advice:  "Review your findings.  Here again, if you don't find any statutory aggravators out of Category 2, that would be the end of the matter in terms of the death penalty as it relates to a particular victim and a particular defendant.  You would not be able to impose the death penalty."

Now, if in fact you find one out of each of the Category 1 and Category 2, then you can go on.  Next would be the non-statutory aggravating factors.  Here again, they are outlined, what the government has cited as non-statutory aggravating factors as it relates to that defendant.  And again, for instance, that defendant Richard Tipton committed multiple murders.  You would answer yes or no, decide that.

After you finish the non-statutory aggravating factors, then you would come to the mitigating factors.  And here again, you would  --  there is a difference here.  You have the consideration of the following mitigating factors specifically provided by statute.  And then they are outlined.  After each one of these, instead of having yes or no, you have a number.  It says, "Number of jurors who so find by a preponderance of the evidence."  And the difference is obvious, because with the aggravating factors you have to find them unanimously beyond a reasonable

doubt.  So the answer would be yes or no.  With the mitigating factors, one person who finds a mitigating factor by a preponderance of the evidence, then that's fine, you put that in.  If it is one person, six people, how many care to find a particular mitigating factor, you simply plug in the number.

Now, a second category of mitigating factors, non-statutory; it describes them and it would be the same process.  You simply look at them again.  For example, "That defendant Richard Tipton was subjected to emotional and physical abuse and neglect as a child and he was deprived of the parental guidance and protection that he needed."  And then, "Number of jurors who so find by a preponderance of the evidence."  Again, you would plug in a number.  It could be 12, it could be one, if any member find by a preponderance of the evidence.  Then after you have dealt with non-statutory mitigating factors, you come

3992

to another page which gives the juror or jurors or jury an opportunity to consider any additional mitigating factors that you might find, perhaps not argued or cited by the defense lawyers.  But if there is something that you find to be a mitigating factor in addition to what was cited, then again, any juror who makes such a finding by a preponderance of the evidence can say so.  "I think X is a mitigating factor."  And you write it down.  X, mitigating factor, number of people who agree.  All right.

When you have gone through all of that, the Foreperson will sign and date these special findings.

Now, after you have completed the special findings, you have to make a decision regarding each defendant and each capital case.  So there will be a decision form relating to each victim, the decision form relating to Douglas Talley, Bobby Long, Anthony Carter, Dorothy Mae Armstrong, Curtis Thorne, Linwood Chiles.  Now you will start out, you pick one of these decision forms up and it has to do with Douglas A. Talley.  "As to the crime of killing Douglas A. Talley while engaged in or in furtherance of a Continuing Criminal Enterprise," and you have got options.  A: "We the jury do not unanimously find

3993

proven beyond a reasonable doubt the existence of the statutory aggravating factors required by law as prerequisites to the imposition of capital punishment, and therefore, do not consider the death penalty as to this capital crime for which defendant Richard Tipton has been convicted."  If that's what you find, based on your earlier findings, then you would fill that in.  B:  "We the jury unanimously find beyond a reasonable doubt that the aggravating

factors required by law as prerequisites for the imposition of capital punishment have been proven by the government as to this capital crime.  We further find unanimously and beyond a reasonable doubt that the aggravating factors proven in this case as to this crime and this defendant sufficiently outweigh any mitigating factors and are themselves so serious that justice mandates the sentence of death.  We vote unanimously that Richard Tipton," or the named defendant, "shall be sentenced to death for this capital crime."  That's one option.

C:  "We the jury do not unanimously find that the aggravating factors proven in this case as to this capital crime and this defendant so outweigh the mitigating factors that justice mandates the sentence of death.  We therefore return a decision that Richard Tipton not be sentenced to death for this capital crime."

The final option:  "We the jury, having considered and evaluated the evidence presented in light of the instructions of the Court are not unanimously persuaded that a death sentence should be imposed for this capital crime.  We therefore return the decision that Richard Tipton not be sentenced to death."  Let me explain this.  Option A would mean that you did not find the statutory aggravating factors that are required, and that would result in a finding that the death penalty is not in order.  B would be a finding that you have found the statutory aggravating factors as necessary; that you have found mitigating factors; that you have gone through the weighing process, and you find that the aggravating factors outweigh the mitigating factors; and thus, you unanimously find a sentence of death is appropriate.

In C, you will be indicating that you have again found aggravating factors, mitigating factors, gone through the weighing process, and find that the aggravating factors do not outweigh the mitigating factors, which would lead to a sentence that does not impose the sentence of death.

And finally, the last option which also leads to a finding by the jury that the sentence of death is not appropriate, that last option would come about if you had considered other factors and decided that you are not going to impose the death penalty.  If one of your number came to that conclusion, you could use Option D to indicate that conclusion.

As I say, there will be a decision form for every victim.  The Foreperson will just have to sign and date the appropriate option.

Now the final thing is a certificate indicating

the non-discriminatory consideration of the case, certifying that you haven't considered race, color, sex, religion, or national origin of the victim or the defendants in coming to your decision.  Each juror will have to sign that no matter what you decide.  That certificate has to be signed by each juror.

All right.  We have got a few more instructions that I have to give you.

As was the case in the first phase, in reaching your decisions in this sentencing here, you must consider only the evidence I have admitted in the case.  The term "evidence" includes the sworn testimony of the witnesses, the exhibits admitted in

3996

the record at both phases of the trial.  Remember that any statements, objections, or arguments made by the lawyers are not evidence.  The function of the lawyers is to point out those things that are most significant or most helpful to their side of the case, and in so doing, to call your attention to certain facts or inferences that might otherwise escape your notice.

In the final analysis, however, it is your own recollection and interpretation of the evidence that controls in the case.  What the lawyers say is not binding upon you.  Also, during the course of this hearing I occasionally may have made comments to the lawyers or asked questions of a witness or admonished a witness or a lawyer, for that matter.  Do not assume from anything I may have said that I have any opinion concerning any of the issues in this case.  Except for my instructions to you on the law, you should disregard anything I may have said during the hearing in arriving at your decisions.

Also, as before, you should not be concerned about whether the evidence is direct or circumstantial.  Direct evidence is the testimony of one who asserts actual knowledge of the fact, such as an eyewitness.  Circumstantial evidence is proof of a

3997

chain of facts and circumstances indicating that a certain fact is true.  The law makes no distinction between the weight you may give to either direct or circumstantial evidence.

Now, I have said that you must consider all the evidence.  This does not mean, however, that you must accept all of the evidence as true or accurate.  You are the sole judges of the credibility or believability of each witness and the weight to be given to his testimony.  In weighing the testimony of a witness, you should consider his or her relationship to the government or defendant; his or her interest, if any, in the outcome of the case; his

**J.A.604**

or her manner of testifying; his or her opportunity to observe or acquire knowledge concerning the facts about which he or she testified; his or her candor, fairness, and intelligence, and the extent to which he or she has been supported or contradicted by other credible evidence.

You may, in short, accept or reject the testimony of any witness in whole or in part.  Also, the weight of the evidence is not necessarily determined by the number of witnesses testifying as to the existence or nonexistence of any fact.  You may find that the testimony of a smaller number of witnesses as to any fact is more credible than the testimony of a larger number of witnesses to the contrary.

A witness may be discredited or impeached by contradictory evidence by showing that he or she testified falsely concerning a material matter or by evidence that at some other time the witness has said or done something or has failed to do or say something which is inconsistent with the witness' present testimony.  If you believe that any witness has been so impeached, then it is your exclusive province to give the testimony of that witness such credibility or weight, if any, as you may think it deserves.

The fact that a witness has previously been convicted of a felony or a crime involving dishonesty or false statement is also a factor you may consider in weighing the credibility of that witness.  The fact of such a conviction does not necessarily destroy the witness' credibility, but is one of the circumstances you may take into account in determining the weight to be given to his testimony.

In the guilt phase of this case, the government called as one of its witnesses an alleged accomplice named as a co-defendant in the indictment with whom the government has entered into a plea agreement providing for the dismissal of some charges or providing that the government may in its discretion file a motion informing the Court that the witness has provided substantial assistance to the government in its investigation or prosecution of the defendants in this case or of other persons.  If such a motion is filed by the government, the court may elect to impose a lesser sentence than the witness would otherwise have received for the offense to which he pled guilty.  Such plea bargaining, as it is called, has been approved as lawful and proper and is expressly provided for in the rules of this Court. An alleged accomplice, including one who has entered into a plea agreement with the government, is not

prohibited from testifying.  On the contrary, the testimony of such a witness alone may be sufficient, be of sufficient weight, to sustain a verdict of guilty.  However, the jury should keep in mind that such testimony is always to be received with caution and weighed with great care.  In sum, you should look at all of the evidence in deciding whether to believe an accomplice witness and what weight, if any, his or her testimony deserves.

The testimony of an alleged accomplice and the testimony of one who provides evidence against the defendant as an informer for pay or for immunity from punishment or for personal advantage or vindication must always be examined and weighed by the jury with greater care and caution than the testimony of ordinary witnesses.  You the jury must decide whether the witness' testimony has been affected by any of these circumstances or by the witness' interest in the outcome of the case, or by prejudice against the defendant, or by the benefits that the witness has received, either financially or as a result of being immunized from prosecution.  You should keep in mind that such testimony is always to be received with caution and weighed with great care.

The testimony of a drug or alcohol abuser must be examined and weighed by the jury with greater care than the testimony of a witness who does not abuse drugs or alcohol.  The jury must determine whether the testimony of a drug or alcohol abuser has been affected by the drug or alcohol abuse or the need for drugs or alcohol.

In this case, you have also heard testimony from various expert witnesses.  An expert is a witness allowed to express an opinion on matters about which he or she has a special knowledge and training.

Expert testimony is presented to you on the theory that someone who is experienced in a particular field may assist you in understanding the evidence or in reaching an independent decision on the facts.  In weighing expert testimony, you may consider the expert's qualifications, the opinion given, the witness' reason for testifying, as well as all the other considerations that ordinarily apply when you are deciding whether or not to believe a witness.  You may give expert testimony whatever weight, if any, you find it deserves in light of all the other evidence before you.  You should not, however, accept a witness' testimony merely because he or she is an expert in her field, nor should you substitute for your own judgment, reason, and common sense.  The determination of the facts in this case rests solely with you.

Remember that a defendant has an absolute right not to testify or offer evidence. The fact that the defendant did not testify or offer any evidence should not be considered by you in any way, or even discussed in your deliberation. I remind you that it is up to the government at this stage in the proceedings to prove beyond a reasonable doubt the existence of aggravating factors sufficient to justify the death penalty. It is not up to the defendant to prove that he should not receive the death penalty.

In making your determinations regarding the existence or nonexistence of aggravating and mitigating factors, each defendant should be given separate and individual consideration. Likewise, in determining whether any defendant should be sentenced to death or to life imprisonment without possibility of parole, you must consider each defendant as an individual. The fact that one defendant was sentenced to death by you may not provide any reason to sentence any other defendant to death.

As was the case in the first phase of this trial, your Foreperson will preside over your deliberations and will speak for you here in open Court. The importance of your deliberations should be obvious. I remind you that you can return a decision sentencing a defendant to death, only if you are unanimously persuaded after weighing the aggravating and mitigating factors that such a sentence is justified. Even if one juror is not so persuaded, if any one of you concludes that the death penalty is not justified, you must return a decision against the death penalty.

It is your duty as jurors to consult with one another and to deliberate with one another with a view towards reaching an agreement if you can do so without violence to individual judgment. Each of you must decide the issues for yourself, but do so only after an impartial consideration of the evidence in the case with your fellow jurors. In the course of your deliberations, do not hesitate to re-examine your own views and change your opinion if convinced it is erroneous. Do not surrender your honest conviction, however, solely because of the opinion of fellow jurors. Remember at all times that you are not partisans. You are judges, judges of the facts. Your sole interest is to seek the truth from the evidence you have heard and to weigh those facts carefully in reaching your decisions.

As before, if during your deliberations you desire to communicate with me, please reduce your message or question to writing signed by the

**J.A.607**

Foreperson and summon the Marshal, who would then bring it to my attention. I will then respond as promptly as possible, either in writing or by bringing you back into the courtroom to address you orally. When you have reached your decisions as to the death penalty with respect to all defendants, send me a note signed by your Foreperson that you have completed your deliberations.

As before, the Marshal and Bailiff will be outside, right outside the jury room.

Now, we have a number of exhibits, and some of it is extensive. It will be coming in, all of these books. I believe we have enough for everybody. I think so. In any event, you take your time, go through all of the exhibits, and have your deliberations and discussions. When you have completed those, let us know and the matter will be resolved and your findings will be, or at least the decisions, will be called out in open court.

Now, are there any objections other than those previously made?

(No response.)

Apparently not. All right.

It is now 2:30. I will send you out to begin your deliberations. The lawyers will take a few minutes to look through the exhibits, make sure everything is there, and the exhibits will come in with the verdict form. Madam Forewoman, remember, three packets of verdict forms, one for each defendant, and you have got to kind of keep control of these. They are to be held together so you can get through them completely.

All right, ladies and gentlemen, we are going to release you now to start your deliberations. I am going to excuse the alternates, again, not quite permanently. We won't do that until the base jury has returned with their deliberations. We will still keep you available just in case. What we will do is call you and let you know the result. In the interim, you are still a juror; you cannot discuss this matter with anyone. And again, thank you very, very much. "Thank you" is just hollow under these circumstances. I cannot begin to express the gratitude that we have for your service. Thank you so very, very much. And you three may now be excused.

(The alternate jurors left the courtroom.)

Now, another word. If you have not completed your deliberations somewhere between 5:00 and 5:30, the Marshals will come, we will go out of session, then the Marshals will assist you in getting your cars and getting those secure, and then will take you

**J.A.608**

in for dinner and lodging.

All right, everyone remain seated while the jury leaves the courtroom.

(The jury left the courtroom.)

MR. COOLEY:  Your Honor, this may or may not be appropriate, but before we get to the conclusion of the case, I think at least from our point of view it would be appropriate for us to commend to the Court the outstanding work that the Clerk's Office and the Marshal's Service has done throughout this trial and in preparation for trial, particularly Ms. McDonald.

THE COURT:  Thank you.

MR. GEARY:  We would say the same except for one exception in the Clerk's Office, which we all know about.

THE COURT:  All right.  Okay, you all check your exhibits and make sure everything gets in there, and we will be in recess to await the jury's call.  Mr. Marshal, remove the defendants.

MR. BAUGH:  While we are still on the record, my co-counsel would like to have these go back.  Is it permissible?

THE COURT:  That's fine with me.

(Counsel referring to blow-up charts displayed to experts.)

(The defendants were removed from the courtroom.)

All right.  We will be in recess and await the jury's call.

(Recess taken from 2:35 p.m. to 5:20 p.m.)

THE COURT:  All right.  I am going to stop the jury's deliberation at this point and bring them back tomorrow morning.  Bill, bring in the jury.

(The jury entered the courtroom.)

All right.  We are going to adjourn for the evening and I'm going to have the Marshals bring you back tomorrow at 9:30.  And we will do it as we did before in the first phase.  When you come in, don't start deliberating until I've brought you into Court and then sent you back out to start your deliberations again.  When you leave now, go back to the jury room.  The Marshals will come by and explain to you how we are going to deal with the cars, get that taken care of, and you will be in their hands for the rest of the evening.

All right.  Everyone remain seated while the jury leaves the courtroom.  Let me say this before you go, just out of an abundance of caution:  Continue to adhere to my admonitions.  Do not discuss the case with anyone else; don't let anyone else discuss it with you; and do not deliberate until you

J.A.609

are brought into Court and given the go-ahead on that.  Do not listen to any television or radio that has any coverage of this.  Do not read any newspaper articles that might relate to this trial.

All right.  Everyone remain seated while the jury leaves the courtroom.

(The jury left the courtroom.)

All right, Mr. Marshal, you can remove the defendants.

(The defendants were removed from the courtroom.)

All right, Mr. Marshal, the jury is in your hands.  Make sure that they get the cars, get them secured, and take care of them.  We will be in adjournment until tomorrow morning at 9:30.

(Proceedings adjourned at 5:25 p.m.)

**J.A.610**