No. 21-1

In the
## United States Court of Appeals
### for the Fourth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

COREY JOHNSON,

*Defendant-Appellant.*

On Appeal from the United States District Court for the
Eastern District of Virginia, Case No. 3:92-cv-00068-DJN
Hon. David J. Novak, *District Judge*

**BRIEF OF THE CONSTITUTION PROJECT AT THE PROJECT ON
GOVERNMENT OVERSIGHT AS AMICUS CURIAE IN SUPPORT OF
DEFENDANT-APPELLANT AND REVERSAL**

Meir Feder
JONES DAY
250 Vesey Street
New York, NY  10281
Telephone: 1-212-326-3939
mfeder@jonesday.com

Parker A. Rider-Longmaid
 *Counsel of Record*
Amelia A. DeGory
JONES DAY
51 Louisiana Avenue, NW
Washington, DC  20001-2113
Telephone: 1-202-879-3939
priderlongmaid@jonesday.com
adegory@jonesday.com

*Counsel for Amicus Curiae*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __21-1____      Caption: _United States v. Corey Johnson_____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_The Constitution Project at the Project On Government Oversight_____
(name of party/amicus)

_____

who is _____amicus_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO

2.  Does party/amicus have any parent corporations?                              ☐YES ☑NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                                              ☐YES ☑NO
    If yes, identify all such owners:

12/01/2019 SCC                                - i -

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?     ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)     ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?     ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?     ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Parker A. Rider-Longmaid          Date:     01/08/2021

Counsel for: The Constitution Project at the Project On Government Oversight

**Print to PDF for Filing**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................ iii

STATEMENT OF IDENTITY AND
    INTEREST OF AMICUS CURIAE ......................................... 1

SUMMARY OF ARGUMENT .......................................................... 2

ARGUMENT ................................................................................... 8

    A.   The FDPA's plain text forbids executing a person who "is" intellectually disabled under standards applicable at the time the execution will be "carried out." ........................... 8

        1.   Congress' deliberate use of the present tense precludes execution of someone who "is mentally retarded" as assessed at the time of execution ................................ 8

        2.   Fundamental interpretive principles confirm that Congress deliberately used present-tense language ............... 11

    B.   The FDPA's structure and context confirm that Congress intended a present-tense assessment of intellectual disability under current standards ................................................... 14

        1.   Congress distinguished between imposition and implementation of a death sentence throughout the FDPA ............................................................................. 14

        2.   Congress' re-enactment of the ADAA's intellectual-disability prohibition in the FDPA against the backdrop of *Penry* v. *Lynaugh* confirms that Congress intended a present-tense prohibition ........................................... 16

        3.   The FDPA's design and purpose reflect Congress' desire to ensure that capital punishment would be administered fairly ................................................... 19

    C.   By amending the FDPA after *Atkins* v. *Virginia*, Congress indicated that it expected intellectual disability to be assessed under current standards ...................................... 21

## TABLE OF CONTENTS
(continued)

Page

D.  Constitutional avoidance principles likewise support construing the FDPA according to its plain language ....................26

E.  Given the proper construction of the FDPA, the District Court here erred in concluding that Mr. Johnson should have pressed his intellectual-disability claim earlier ......................27

CONCLUSION ................................................................................................33

CERTIFICATE OF COMPLIANCE ...............................................................34

CERTIFICATE OF SERVICE .........................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Atkins* v. *Virginia*,
　536 U.S. 304 (2002)..............................................................................*passim*

*Barrett* v. *United States*,
　423 U.S. 212 (1976)......................................................................................9, 10

*Bostock* v. *Clayton County*,
　140 S. Ct. 1731 (2020)..................................................................................7, 8

*Bourgeois* v. *Watson*,
　977 F.3d 620 (7th Cir. 2020).....................................................................27, 28

*Carr* v. *United States*,
　560 U.S. 438 (2010)..............................................................................*passim*

*Comcast Corp.* v. *Nat'l Ass'n of African Am.–Owned Media*,
　140 S. Ct. 1009 (2020)...................................................................................12

*Culbertson* v. *Berryhill*,
　139 S. Ct. 517 (2019)......................................................................................14

*Ford* v. *Wainwright*,
　477 U.S. 399 (1986).......................................................................4, 11, 12, 13

*Forest Grove Sch. Dist.* v. *T.A.*,
　557 U.S. 230 (2009)........................................................................................21

*Furman* v. *Georgia*,
　408 U.S. 238 (1972) (per curiam) ...............................................................15

*Gwaltney of Smithfield, Ltd.* v. *Chesapeake Bay Found., Inc.*,
　484 U.S. 49 (1987)......................................................................................8, 10

*Hall* v. *Florida*,
　572 U.S. 701 (2014)..............................................................................*passim*

*K Mart Corp.* v. *Cartier, Inc.*,
　486 U.S. 281 (1988)........................................................................................14

*Kansas* v. *Crane*,
　534 U.S. 407 (2002)........................................................................................23

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Lagos* v. *United States*,
138 S. Ct. 1684 (2018)........................................................................11

*Lorillard* v. *Pons*,
434 U.S. 575 (1978)............................................................................21

*Merck & Co.* v. *Reynolds*,
559 U.S. 633 (2010)..............................................................12, 19, 21

*Moore* v. *Texas*,
137 S. Ct. 1039 (2017)................................................................*passim*

*Moore* v. *Texas*,
139 S. Ct. 666 (2019) (per curiam) ......................................................1

*Nijhawan* v. *Holder*,
557 U.S. 29 (2009)..............................................................................13

*Penry* v. *Lynaugh*,
492 U.S. 302 (1989)...................................................................*passim*

*Porter* v. *Nussle*,
534 U.S. 516 (2002)......................................................................15, 16

*Russello* v. *United States*,
464 U.S. 16 (1983)........................................................................29, 31

*Shoop* v. *Hill*,
139 S. Ct. 504 (2019) (per curiam) .............................................30, 31

*Trop* v. *Dulles*,
356 U.S. 86 (1958)..............................................................................18

*United States* v. *Briggs*,
141 S. Ct. 467 (2020).........................................................................28

*United States* v. *Stitt*,
552 F.3d 345 (4th Cir. 2008)............................................................31

*United States* v. *Texas*,
507 U.S. 529 (1993)......................................................................12, 13

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

STATUTES

18 U.S.C. § 3591...............................................................................25, 29

18 U.S.C. § 3592.................................................................................*passim*

18 U.S.C. § 3593.................................................................................*passim*

18 U.S.C. § 3594.....................................................................................4, 14

18 U.S.C. § 3595.........................................................................................16

18 U.S.C. § 3596.................................................................................*passim*

18 U.S.C. § 3597.........................................................................................31

28 U.S.C. § 2254.........................................................................................30

28 U.S.C. § 2255......................................................................................3, 27

Adam Walsh Child Protection and Safety Act of 2006,
    Pub. L. No. 109-248, 120 Stat. 587 (2006)......................................25

Anti–Drug Abuse Act of 1988,
    Pub. L. No. 100-690, 102 Stat. 4390, 21 U.S.C. § 848(*l*) ........................*passim*

Criminal Law Technical Amendments Act of 2002,
    Pub. L. No. 107-273, 116 Stat. 1758  (2002)..................................24

Dictionary Act, 1 U.S.C. § 1 ......................................................................3, 8, 9

OTHER AUTHORITIES

American Psychiatric Association,
    *Diagnostic and Statistical Manual of Mental Disorders (DSM-5)*.....................2

4 W. Blackstone, *Commentaries* ..................................................................12

134 Cong. Rec. 22,993 (1988) ....................................................................20

H.R. Rep. No. 103-467 (1994) ....................................................................19

Oxford English Dictionary............................................................................15

**STATEMENT OF IDENTITY AND INTEREST OF AMICUS CURIAE**

The Constitution Project at the Project On Government Oversight (TCP) seeks consensus-based solutions to contemporary constitutional issues, including by working to ensure due process in the criminal justice system. TCP is deeply concerned with the preservation of our fundamental constitutional guarantees and ensuring that those guarantees are respected and enforced by all three branches of government, particularly when the government seeks to impose an irrevocable punishment like the death penalty. Accordingly, TCP regularly files amicus briefs in cases, like this one, that implicate its nonpartisan positions on constitutional or statutory issues, *see, e.g., Moore* v. *Texas*, 137 S. Ct. 1039 (2017); *Moore* v. *Texas*, 139 S. Ct. 666 (2019) (per curiam), in order to better apprise courts of the importance and broad consequences of those issues. TCP takes no position on the abolition or maintenance of the death penalty. Rather, it focuses on forging solutions aimed at achieving the common objectives of justice for victims of crimes and protecting the constitutional rights of the accused.[1]

---

[1] Both parties have consented to the filing of this brief. No counsel for a party authored this brief in whole or in part, and no such counsel or party, or other person, contributed money intended to fund preparing or submitting this brief.

## SUMMARY OF ARGUMENT

The Federal Death Penalty Act of 1994 (FDPA) commands that "[a] sentence of death shall not be carried out upon a person who is mentally retarded." 18 U.S.C. § 3596(c). That present-tense language—focusing on the time of execution rather than the time the sentence is imposed—means what it says: The federal government may not execute a defendant if he is intellectually disabled when the sentence will be "carried out." That language—as the structure and history of the statute, plus constitutional avoidance principles, confirm—requires an assessment of intellectual disability under current legal and diagnostic standards. *Id.*[2]

The District Court here disagreed, reasoning that because intellectual disability is a "permanent condition," it need be assessed only once notwithstanding any changes to prevailing standards. Op. 18-19. Because this Court addressed in 2004 an intellectual-disability claim brought by Mr. Johnson in 1998, the District Court reasoned, the intellectual-disability claim Mr. Johnson seeks to bring here under § 3596(c) would be barred by "res judicata."

---

[2] Except when quoting, this brief uses the term "intellectually disabled" rather than the term "mentally retarded," consistent with the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders (DSM-5).*

Op. 14. Consequently, in the court's view, his 28 U.S.C. § 2255 motion is successive and requires this Court's advance authorization. *Id.* The District Court is mistaken. The claim Mr. Johnson brings today under § 3596(c) is not the same claim he brought in 1998. The legal and diagnostic standards for assessing intellectual disability have advanced significantly since that time. And § 3596(c) requires a present-tense assessment of disability at the time of execution—an assessment under current legal and diagnostic standards.

Start with the statute's text. The very first provision of the U.S. Code "ascribes significance to verb tense." *Carr* v. *United States*, 560 U.S. 438, 448 (2010) (discussing the Dictionary Act, 1 U.S.C. § 1). Present-tense language is especially telling where it contrasts with past-tense language appearing elsewhere in a statute. *See id.* at 450. And here, although Congress used the past tense to refer to numerous past-tense determinations under the FDPA, *see, e.g.*, 18 U.S.C. § 3592(a)(2) ("defendant *was* under unusual and substantial duress" (emphasis added)); *id.* § 3592(b)(3) ("defendant knowingly *created* a grave risk of death to another person" (emphasis added)), it prohibited "*carry[ing] out*" the execution of "a person who *is* mentally retarded," *id.* § 3596(c) (emphases added). That plain language prohibits executing a person who is—at the time the execution is carried out—intellectually disabled.

Consider too the other prohibitions on execution that accompany the intellectual-disability prohibition. Section 3596 also provides that "[a] sentence of death shall not be carried out upon a woman while she is pregnant," *id.* § 3596(b), or "upon a person who, as a result of mental disability, lacks the mental capacity to understand the death penalty and why it *was imposed* on that person," *id.* § 3596(c) (emphasis added). Pregnancy can be evaluated *only* in the present; likewise, mental competence *must* be assessed in the present under both Supreme Court precedent and the common law, even if the defendant was competent when the death sentence was imposed. *Ford* v. *Wainwright*, 477 U.S. 399, 406-08 (1986). By placing those similarly worded provisions side-by-side, Congress indicated that it expected congruous present-tense assessments at the time of execution for all three conditions.

The FDPA's structure confirms that Congress' use of present-tense language was intentional. The intellectual-disability prohibition appears in a section entitled "*Implementation* of a sentence of death." 18 U.S.C. § 3596 (emphasis added). But "*Imposition* of a sentence of death" is the subject of an earlier provision, *id.* § 3594 (emphasis added), as is the "Special hearing to

- 4 -

determine whether a sentence of death is justified," *id.* § 3593, based on "Mitigating and aggravating factors to be considered in determining whether a sentence of death is justified," *id.* § 3592.

Congress' choice to require the intellectual-disability assessment at implementation was no accident. Even before the FDPA, the Anti–Drug Abuse Act of 1988 (ADAA), Pub. L. No. 100-690, § 700(*l*), 102 Stat. 4390, 21 U.S.C. § 848(*l*), contained what would become the FDPA's intellectual-disability prohibition, and likewise paired it with a present-tense bar on execution of mentally incompetent prisoners. 21 U.S.C. § 848(*l*) (1988). Intellectual disability was *not* a mitigating factor at sentencing. *See id.* § 848(m). In *Penry* v. *Lynaugh*, 492 U.S. 302, 324-30 (1989), however, the Supreme Court held that the Eighth Amendment required consideration of intellectual disability merely as mitigating evidence weighing against imposition of the death penalty. Congress responded in the FDPA by staying its course, readopting § 848(*l*)'s language verbatim in § 3596(c).

Congress' choice to require a time-of-execution assessment matters. Although the underlying impairments are permanent, the intellectual-disability inquiry is not. The Supreme Court's decisions leave no doubt on that

- 5 -

score. And Congress endorsed that understanding of advancing standards by amending the FDPA against the backdrop of Supreme Court precedent.

Specifically, beginning with *Atkins* v. *Virginia*, 536 U.S. 304, 321 (2002), the Supreme Court's decisions have established that the test for assessing intellectual disability will evolve as the clinical authorities continue to refine the relevant diagnostic standards and the Court continues to provide guidance on the law. *See also Moore* v. *Texas*, 137 S. Ct. 1039, 1049-53 (2017); *Hall* v. *Florida*, 572 U.S. 701, 710-14, 721-23 (2014). In *Atkins*, the Court held that executing persons with intellectual disability violates the Eighth Amendment. The Court noted that the FDPA "prohibited any individual with mental retardation from being sentenced to death *or executed*." *Atkins*, 536 U.S. at 314 n.10 (emphasis added). It further relied on national consensus, with definitions that "generally conform to the clinical definitions" set out by clinical authorities. *Id.* at 308 n.3, 317 n.22. Having established the importance of focusing on standards "that currently prevail," as informed by ever-advancing clinical guidelines, the Court left "to the State[s] the task of developing appropriate ways to enforce the constitutional restriction." *Id.* at 311, 317.

Congress amended the FDPA twice after *Atkins*. But it never revisited its prohibition on "carr[ying] out" a death sentence on "a person who is mentally retarded." 18 U.S.C. § 3596(c). That is because Congress had already made its choice, consistent with the Supreme Court's understanding of intellectual disability and the FDPA's time-of-execution prohibition. As "the words on the page" provide, *Bostock* v. *Clayton County*, 140 S. Ct. 1731, 1738 (2020), the federal government may not execute someone who is intellectually disabled under standards prevailing when the execution will "be carried out."

Constitutional avoidance principles bolster that reading. The Eighth Amendment prohibits the execution of "*any* intellectually disabled individual." *Moore*, 137 S. Ct. at 1048 (quoting *Atkins*, 536 U.S. at 321). And it requires attention to "[t]he medical community's current standards." *Id.* at 1053. Failing to assess intellectual disability under standards current at the time of execution "creat[es] an unacceptable risk that persons with intellectual disability will be executed." *Id.* at 1051 (quoting *Hall*, 572 U.S. at 704). That is true even if the defendant has previously litigated an intellectual-disability claim under outdated standards, so long as he can show the pos-

sibility of a different result of a new intellectual-disability claim under current, materially advanced standards. Reading § 3596(c) according to its plain language avoids those constitutional difficulties.

## ARGUMENT

**A.    The FDPA's plain text forbids executing a person who "is" intellectually disabled under standards applicable at the time the execution will be "carried out."**

Courts interpret statutes "in accord with the ordinary public meaning of [their] terms," because "only the words on the page constitute the law adopted by Congress and approved by the President." *Bostock*, 140 S. Ct. at 1738. Here, those words provide that "[a] sentence of death shall not be carried out upon a person who is mentally retarded." 18 U.S.C. § 3596(c). As interpretive canons confirm, that language prohibits the federal government from executing someone who "is" intellectually disabled under standards applicable at the time of execution.

**1.    Congress' deliberate use of the present tense precludes execution of someone who "is mentally retarded" as assessed at the time of execution.**

Verb tense matters. The Dictionary Act requires courts to "look[] to Congress' choice of verb tense to ascertain a statute's temporal reach." *Carr*, 560 U.S. at 448 (citing *Gwaltney of Smithfield, Ltd.* v. *Chesapeake Bay Found.*,

*Inc.*, 484 U.S. 49, 57 (1987); *Barrett* v. *United States*, 423 U.S. 212, 216 (1976)). The Dictionary Act provides both that "words used in the present tense include the future as well as the present," 1 U.S.C. § 1, and that "the present tense generally does not include the past," *Carr*, 560 U.S. at 448. That principle tracks "the typical understanding of the present tense in either normal discourse or statutory construction." *Id.* at 448 n.5.

In *Carr*, for example, the Court held that a sex-offender registration statute applying to anyone who "is required to register" applied to only post-enactment conduct. *Id.* at 441-42. "Had Congress intended preenactment conduct to satisfy" that provision, the Court reasoned, "it presumably would have varied the verb tenses." *Id.* at 450. Indeed, "numerous federal statutes use" past-tense constructions "when coverage of preenactment events is intended." *Id.*

Those plain-meaning principles apply here too. Had Congress intended to permit the execution of any defendant who had litigated an intellectual-disability claim—even though he is intellectually disabled under current standards—it could have "varied the verb tenses" to say so. *Id.* For example, Congress could have provided that "a sentence of death shall not be carried out upon a person adjudicated to be mentally retarded." Such a past-

tense formulation would focus on a defendant's opportunity to raise an intellectual-disability claim earlier rather than—as Congress provided—on whether he "is" intellectually disabled as assessed at the time the execution will "be carried out." 18 U.S.C. § 3596(c).

Such care with language is not too much to expect. Congress "knows how to avoid … prospective implication by using language that explicitly targets" the past. *Gwaltney*, 484 U.S. at 57; *see Barrett*, 423 U.S. at 216 (present-perfect tense "denot[ed] an act that has been completed"). Indeed, Congress did just that elsewhere in the FDPA, when addressing facts occurring or adjudicated in the past. *See, e.g.*, 18 U.S.C. § 3592(b) (sentencer may consider "any other aggravating factor *for which notice has been given*" (emphasis added)); *id.* § 3592(c)(2) (aggravating factor if "the defendant *has previously been convicted* of" a felony (emphasis added)). And, perhaps most significantly, alongside the prohibition on executing someone "who is mentally retarded," Congress prohibited executing someone who "lacks the mental capacity to understand the death penalty and why it *was imposed* on that person." *Id.* § 3596(c) (emphasis added). When Congress wanted the decisionmaker to look to the past, it simply said so.

- 10 -

### 2. Fundamental interpretive principles confirm that Congress deliberately used present-tense language.

"[S]tatutory context" likewise "strongly supports a forward-looking construction." *Carr*, 560 U.S. at 449. Words are known by the company they keep (*noscitur a sociis*). *E.g.*, *Lagos* v. *United States*, 138 S. Ct. 1684, 1688-89 (2018). And here, Congress grouped the intellectual-disability prohibition with two other prohibitions necessarily requiring present-tense, time-of-execution assessment: a sentence of death "shall not be carried out upon a woman while she *is* pregnant"; "upon a person who, as a result of mental disability, *lacks* the mental capacity to understand the death penalty and why it was imposed"; or "upon a person who *is* mentally retarded." 18 U.S.C. § 3596(b), (c) (emphases added). Pregnancy obviously must be assessed at the time of execution. The same is true for mental incompetence, because a defendant competent at sentencing may deteriorate and become incompetent before execution. *Ford*, 477 U.S. at 401-02; *infra* pp. 12-13. By grouping together these present-tense prohibitions, Congress provided "powerful evidence," *Carr*, 560 U.S. at 450, that it intended intellectual disability to be treated the same way, and assessed at execution.

- 11 -

History and precedent reinforce that point. Courts "presume that Congress legislates against the backdrop of the common law," *Comcast Corp.* v. *Nat'l Ass'n of African Am.–Owned Media*, 140 S. Ct. 1009, 1016 (2020), expecting common-law principles to apply absent contrary provisions, *United States* v. *Texas*, 507 U.S. 529, 534 (1993). They also presume that Congress is aware of "relevant judicial precedent." *Merck & Co.* v. *Reynolds*, 559 U.S. 633, 648 (2010). Here, the common law prohibited the execution of pregnant women. *See, e.g.*, 4 W. Blackstone, *Commentaries* *395. It also "stayed" execution of mentally incompetent defendants, even those sentenced to death while competent and "becom[ing] of nonsane memory" only "after judgment." *Ford*, 477 U.S. at 406-07 (quoting 4 W. Blackstone, *Commentaries* *24-25). The Eighth Amendment rule is the same. In *Ford*, the Supreme Court held that "[t]he Eighth Amendment prohibits the State from *inflicting* the penalty of death upon a prisoner who is insane." *Id.* at 408, 410 (emphasis added). Although Ford was not "incompetent at the time of his offense, at trial, or at [capital] sentencing," his behavior subsequently changed and "became more serious over time." *Id.* at 401-02. *Ford* thus requires an assessment of "the prisoner's ability to comprehend the nature of the [death] penalty" at the time of execution. *Id.* at 417. The question centers not on *imposition* of

- 12 -

the death penalty, but rather on the government's "ability to *execute* its sentences." *Id.* at 409 (emphasis added); *see infra* pp. 14-16.

When Congress enacted the ADAA, containing the intellectual-disability prohibition on which § 3596(c)'s prohibition was modeled, *see infra* pp. 18-19, it did so against the backdrop of *Ford* and the common law. Congress' placement of a prohibition on executing individuals who are intellectually disabled alongside common-law prohibitions requiring time-of-execution assessments is strong evidence that Congress "expect[ed] that the common law [timing] principle [would] apply" across the board. *Texas*, 507 U.S. at 534 (cleaned up).

\*    \*    \*

"Where, as here, Congress uses similar statutory language in two adjoining provisions, it normally intends similar interpretations." *Nijhawan* v. *Holder*, 557 U.S. 29, 39 (2009). By grouping together three prohibitions with parallel present-tense verbs prohibiting the government from "carr[ying] out" a death sentence, Congress indicated that it intended for all three prohibitions to be assessed under standards applicable at the time of execution.

- 13 -

**B.**   **The FDPA's structure and context confirm that Congress intended a present-tense assessment of intellectual disability under current standards.**

The FDPA's structure and context reinforce what its plain text commands: Congress expected a present-tense intellectual-disability assessment under the governing standards when the execution would be "carried out." 18 U.S.C. § 3596(c).

**1.**   **Congress distinguished between imposition and implementation of a death sentence throughout the FDPA.**

Reading § 3596(c)'s prohibition on executing individuals who are intellectually disabled to require a present-tense assessment also best accords with "the structure of the [FDPA] and its other provisions." *Culbertson* v. *Berryhill*, 139 S. Ct. 517, 522 (2019) (quotation marks omitted); *see K Mart Corp.* v. *Cartier, Inc.*, 486 U.S. 281, 291 (1988) ("language and design of the statute as a whole"). The FDPA's design shows that Congress intended the intellectual-disability determination to be made under standards prevailing at *implementation*, rather than *imposition*, of a death sentence.

Congress devoted separate provisions to imposition and implementation of a death sentence. *See* 18 U.S.C. § 3594 (entitled "Imposition of a sentence of death"); *id.* § 3596 (entitled "Implementation of a sentence of

- 14 -

death"); *see also Porter* v. *Nussle,* 534 U.S. 516, 527-28 (2002) ("[T]he title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute."). "Impose" means "to put or subject … to a penalty," *Impose,* Oxford English Dictionary, https://oed.com/view/Entry/92591, whereas "Implement" means "to complete, perform, carry into effect … ; to fulfil," *Implement,* Oxford English Dictionary, https://oed.com/view/Entry/92452. Having drawn that distinction, Congress ranked intellectual disability as a reason not to *implement* a sentence. *Id.* § 3596(c). It did not make intellectual disability a reason not to *impose* a death sentence.

That choice is significant, because it tells prosecutors, defendants, and judges that the intellectual-disability question can be conclusively resolved against a defendant only under the legal and clinical standards applicable when the execution is to be completed, performed, or, in Congress' words, "carried out." "[T]he imposition and carrying out of the death penalty," *Furman* v. *Georgia,* 408 U.S. 238, 239 (1972) (per curiam), are two different things.

The distinction between imposition and implementation pervades the FDPA. As noted, § 3596 contains prohibitions that must by their very nature be assessed at implementation. *Supra* pp. 11-13. In addition, the imposition

- 15 -

stage is guided by other provisions that do not mention intellectual disability at all: "Mitigating and aggravating factors to be considered in determining whether a sentence of death is justified," 18 U.S.C. § 3592, at a "Special hearing to determine whether a sentence of death is justified," *id.* § 3593, with appellate "Review of a sentence of death" to follow, *id.* § 3595. That scheme reflects Congress' expectation that, on a sufficient showing, intellectual disability would be assessed at implementation under current legal and diagnostic standards, regardless of what transpired earlier.

Beyond all that, § 3596 itself distinguishes between imposition and implementation. "A sentence of death shall not be carried out upon a person who, as a result of mental disability, lacks the mental capacity to understand the death penalty and why it *was imposed* on that person." *Id.* § 3596(c) (emphasis added); *supra* pp. 8-10.

**2.** **Congress' re-enactment of the ADAA's intellectual-disability prohibition in the FDPA against the backdrop of *Penry* v. *Lynaugh* confirms that Congress intended a present-tense prohibition.**

Congress' decision to place the intellectual-disability prohibition at implementation is particularly significant given the Supreme Court's decision just several years earlier in *Penry* v. *Lynaugh*, 492 U.S. 302 (1989). *Cf. Porter*,

534 U.S. at 528 ("Congress expects its statutes to be read in conformity with th[e] Court's precedents."). The Court in *Penry* viewed intellectual disability not as a per se bar on execution but as a non-dispositive factor relevant to whether a death sentence should be imposed in the first place. 492 U.S. at 340. Congress had already rejected that approach in the ADAA, providing that "[a] sentence of death shall not be carried out upon a person who is mentally retarded," and pairing that prohibition with a present-tense bar on execution of mentally incompetent prisoners, 21 U.S.C. § 848(*l*) (1988); *see supra* pp. 5-6. After *Penry*, Congress doubled down on that approach in the FDPA, adopting the ADAA's intellectual-disability prohibition verbatim. 18 U.S.C. § 3596(c).

In *Penry*, the Supreme Court rejected the argument, which it later accepted in *Atkins*, that "the Eighth Amendment prohibits the execution of mentally retarded persons." 492 U.S. at 329; *see infra* pp. 21-23. The Court thus declined to limit the states' and federal government's "power to impose" the death penalty. *Penry*, 492 U.S. at 329-30. Instead, the Court held that the Eighth Amendment required an instruction at sentencing that the jury could consider and "give mitigating effect to Penry's evidence of mental retardation" "as relevant evidence that might cause it to *decline to impose* the

- 17 -

death sentence." *Id.* at 324, 327 (emphasis in original). The Court added that "mental retardation" was potentially "a two-edged sword: it may diminish [Penry's] blameworthiness for his crime even as it indicates that there is a probability that he will be dangerous in the future." *Id.* at 324. In short, the Court's reasoning and holding located "mental retardation" as a non-dispositive consideration in the decision whether to *impose* a death sentence, not whether to *implement* one.

In reaching that result as to Penry's Eighth Amendment claim, however, the Court noted that federal law already provided a contrary rule. In evaluating Penry's argument that there was "an emerging national consensus against the execution of the mentally retarded, reflecting the 'evolving standards of decency that mark the progress of a maturing society,'" *id.* at 333-34 (quoting *Trop* v. *Dulles*, 356 U.S. 86, 101 (1958)), the Court noted that the ADAA already "prohibits execution of a person who is mentally retarded." *Id.* at 334 (citing 21 U.S.C. § 848(*l*) (1988)).

Congress affirmed its commitment to that approach when it readopted the ADAA's intellectual-disability provision verbatim after *Penry* in the FDPA. Not only did Congress provide that an intellectually disabled individual cannot be executed, but it did so in a new section centering on the

- 18 -

implementation of a death sentence, 18 U.S.C. § 3596(c). Just as Congress had declined to make intellectual disability a mitigating factor under the ADAA in 21 U.S.C. § 848(m), Congress refused to make it a mitigator under the FDPA in 18 U.S.C. §§ 3592 and 3593, where intellectual disability would be found had Congress followed the Court's approach in *Penry*. That choice was not accidental. Congress is presumed to be "aware of relevant judicial precedent." *Merck*, 559 U.S. at 648.

### 3. The FDPA's design and purpose reflect Congress' desire to ensure that capital punishment would be administered fairly.

The FDPA's design and purpose likewise support a present-tense assessment of intellectual disability because they show Congress' concern for fairly administering the death penalty and avoiding executing individuals who are in fact intellectually disabled.

Given strong public and political support for the death penalty, Congress passed the FDPA to help ensure fair administration of the ultimate punishment. *See* H.R. Rep. No. 103-467, at 1 (1994) ("The purpose of this Act is to establish constitutional procedures for the imposition of the Federal death penalty."). Congress pursued that goal by designing separate phases

- 19 -

before implementation of a death sentence and providing additional protec-
tions against unlawful executions. *See supra* pp. 14-16.

Members of Congress were aware of the consequences of a slapdash
scheme. Congress first enacted in 1988 the ADAA provision on which the
FDPA's intellectual-disability provision was modeled precisely because
Georgia had recently executed an intellectually disabled person. *See* 134
Cong. Rec. 22,993 (1988) (Rep. Bartlett). The prohibition's sponsor made clear
that "[t]he purpose of this [amendment] is very much confined to prohibit
*execution* of those who are mentally retarded." *Id.* (Rep. Levin) (emphasis
added). And another Representative underscored that "the *execution* of a
mentally retarded person" "becomes a cruel and excessive response" be-
cause "a mentally retarded person" "has insufficient cognitive capacity to
appreciate the length between his prior action and *such belated punishment*."
*Id.* at 22,994 (Rep. Ravenel) (emphases added).

When Congress imported the ADAA's intellectual-disability prohibi-
tion into the FDPA, it was even more explicit. As noted, rather than placing
the prohibition in an "imposition" section, Congress added the prohibition
to a *new* section on "implementation." *Supra* pp. 18-19. That choice reflects

- 20 -

Congress' judgment that, regardless of its imposition, a death sentence should not be implemented on someone who is intellectually disabled.

### C. By amending the FDPA after *Atkins* v. *Virginia*, Congress indicated that it expected intellectual disability to be assessed under current standards.

Congress' amendments to the FDPA—which changed other provisions while leaving untouched the prohibition on executing someone "who is mentally retarded"—further demonstrate Congress' expectation that intellectual disability would be assessed under standards prevailing at the time the sentence is to be "carried out." 18 U.S.C. § 3596(c). Congress is presumed to be aware of the Supreme Court's precedents, *Merck*, 559 U.S. at 648, and to adopt the Court's construction of a statute "when it re-enacts a statute without change," *Forest Grove Sch. Dist.* v. *T.A.*, 557 U.S. 230, 239-40 (2009) (quoting *Lorillard* v. *Pons*, 434 U.S. 575, 580 (1978)). Here, those canons make clear that when Congress amended the FDPA after *Atkins* v. *Virginia*, it accepted the Court's conclusions both that the FDPA prohibits implementation of a death sentence on someone who is intellectually disabled under standards "that currently prevail," 536 U.S. at 311, and that the standards for evaluating intellectual disability advance over time, *id.* at 311-12, 321.

- 21 -

**1.    a.**    In *Atkins*, the Court held that the execution of criminals with intellectual disabilities offends our society's "evolving standards of decency" and violates the Eighth Amendment's prohibition on excessive punishment. 536 U.S. at 321. The Court noted that "when Congress enacted legislation reinstating the federal death penalty, it expressly provided that a 'sentence of death shall not be carried out upon a person who is mentally retarded.'" *Id.* at 314. The Court read the FDPA to "prohibit[] any individual with mental retardation from being sentenced to death *or executed*." *Id.* at 314 n.10 (emphasis added).

The Court noted that its holding implicated disagreement about "which offenders are in fact retarded." *Id.* at 317. And the Court left "to the State[s] the task of developing appropriate ways to enforce the constitutional restriction." *Id.* Even so, the Court explained that there is a "range of mentally retarded offenders about whom there is a national consensus," *id.*, and that States' definitions "generally conform to the clinical definitions" set out by the American Association on Mental Retardation and the American Psychiatric Association, *id.* at 308 n.3, 317 n.22. Earlier that year, the Court had noted that "the science of psychiatry, which informs but does not control

ultimate legal determinations, is an ever-advancing science." *Kansas* v. *Crane*, 534 U.S. 407, 413 (2002).

*Atkins* put Congress on notice that the definition of intellectual disability is subject to an ever-advancing understanding informed by national consensus and current clinical guidelines. That was clear from the holding itself: The Court had found no such consensus against capital punishment of individuals with intellectual disabilities just 13 years earlier in *Penry*. *Atkins*, 536 U.S. at 310, 314; *see supra* pp. 16-19. The Court changed course in *Atkins* in large part because of "the dramatic shift in the state legislative landscape" and the FDPA. 536 U.S. at 310, 314. The Court further observed that "this legislative judgment reflects a much broader social and professional consensus," with "organizations with germane expertise" and religious communities both expressing opposition to executing offenders with intellectual disability. *Id.* at 316 n.21.

The Court also distinguished between imposition and implementation of a death sentence. "[E]ven in those States that allow the execution of mentally retarded offenders, the practice is uncommon." *Id.* at 316. While some states "continue to authorize executions, … none have been *carried out* in decades." *Id.* (emphasis added).

- 23 -

**b.**    Since *Atkins*, the intellectual-disability inquiry has continued to advance. In *Hall*, the Supreme Court held that a court cannot bar a defendant from introducing evidence of intellectual disability just because he has an IQ score above 70. 572 U.S. at 722-23. The Court reiterated that "[t]he legal determination of intellectual disability" must be "informed by the medical community's diagnostic framework" and expertise, on which the Court has "placed substantial reliance." *Id.* at 721-22. And in *Moore*, the Court repeated its instruction that courts may not ignore the "medical community's current standards" or diagnostic manuals, which "offer 'the best available description of how mental disorders are expressed and can be recognized by trained clinicians.'" 137 S. Ct. at 1053. A defendant's underlying impairments do not change, but the legal and diagnostic standards do.

**2.**    Congress twice amended the FDPA after *Atkins*. Yet it never revisited the intellectual-disability prohibition.

*First*, later in 2002, Congress corrected a cross-reference in 18 U.S.C. § 3593, "Special hearing to determine whether a sentence of death is justified," without addressing any question of executing individuals with intellectual disabilities. Criminal Law Technical Amendments Act of 2002, Pub. L. No. 107-273, tit. IV, § 4002(e)(8), 116 Stat. 1758, 1810 (2002). Congress also

- 24 -

didn't change 18 U.S.C. § 3592, "Mitigating and aggravating factors to be considered in determining whether a sentence of death is justified," and § 3591, "Sentence of death." If Congress viewed an assessment at time of imposition as sufficient, it could have placed an intellectual-disability prohibition at imposition (as § 3591 provides for juveniles).

*Second*, in 2006, Congress again amended the FDPA without addressing any question of intellectual disability. This time, Congress added an aggravating factor to § 3592 to be considered by capital sentencers. Adam Walsh Child Protection and Safety Act of 2006, Pub. L. No. 109-248, tit. II, § 206(a)(4), 120 Stat. 587, 614 (2006).

Congress' choice not to alter § 3596(c) when it amended the FDPA in the wake of *Atkins* shows that it intended courts to assess intellectual disability under legal and diagnostic standards current at the time of execution. While *Atkins* "le[ft] to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences," 536 U.S. at 317, Congress had already made the choice with the language of § 3596(c) to require a present-tense assessment for federal defendants. *Supra* pp. 8-10. And Congress chose to retain that language—which the Court in *Atkins* had interpreted to prohibit the *execution* of an intellectually disabled

- 25 -

person, *see* 536 U.S. at 314 n.10—even though the Court in *Atkins* made the intellectual-disability inquiry turn on ever-advancing standards reflecting national consensus and clinical guidance, *see id.* at 311-12, 321.

**D.    Constitutional avoidance principles likewise support construing the FDPA according to its plain language.**

Constitutional avoidance principles too support a present-tense assessment of intellectual disability under current legal and diagnostic standards. The Eighth Amendment restricts the government's "'power to take the life of' *any* intellectually disabled individual." *Moore*, 137 S. Ct. at 1048 (quoting *Atkins*, 536 U.S. at 321). And the government may not "disregard" the "constraint" supplied by "current medical standards," which "[r]eflect improved understanding over time." *Id.* at 1049, 1053. The Court has come to recognize, for instance, that IQ scores must be understood "not as a single fixed number but as a range" with a standard error of measurement, that individuals with IQ scores above 70 may be intellectually disabled if they have limitations in adaptive functioning, *Hall*, 572 U.S. at 712-14, and that courts, like clinicians, must not rely on "lay stereotypes of the intellectually disabled," *Moore*, 137 S. Ct. at 1051-52. Reading the FDPA to permit execution of a defendant "who is mentally retarded," 18 U.S.C. § 3596(c), under

- 26 -

current standards just because an earlier assessment under outdated standards reached a different result would "creat[e] an unacceptable risk that persons with intellectual disability will be executed," in violation of the Eighth Amendment. *Moore*, 137 S. Ct. at 1044 (quoting *Hall*, 572 U.S. at 704).

> **E.      Given the proper construction of the FDPA, the District Court here erred in concluding that Mr. Johnson should have pressed his intellectual-disability claim earlier.**

The District Court here wrongly concluded that Mr. Johnson's § 2255 motion was second or successive because Mr. Johnson had "already raised his claim that his intellectual disability precludes his execution in his First § 2255 Petition." Op. 14. The claim Mr. Johnson presses here is not the same intellectual-disability claim he raised in 1998. Here, Mr. Johnson claims that he is intellectually disabled under *current* legal and diagnostic standards, which did not govern in 1998.

The District Court disagreed, observing that "[i]ntellectual disability is a permanent condition that must manifest before the age of 18." Op. 14 (quoting *Bourgeois* v. *Watson*, 977 F.3d 620, 637 (7th Cir. 2020), *cert denied*, 141 S. Ct. 507 (2020)). Thus, its reasoning went, intellectual disability is unlike "incompetency, which may come and go," and therefore must be assessed anew at execution. *Id.* (quoting *Bourgeois*, 977 F.3d at 637). And because Mr.

- 27 -

Johnson's "intellectual disability ripened years ago, and the courts rejected it years ago," the District Court concluded, "res judicata would bar the claim" that he is intellectually disabled under current standards. *Id.* at 14, 16.

That reasoning misses the point. It is not the defendant's *condition* that changes, but the *standard for determining* that condition. "[W]hile a prisoner's intellectual disability may not change, the medical standards used to assess that disability constantly evolve as the scientific community's understanding grows." *Bourgeois*, 141 S. Ct. at 508-09 (Sotomayor, J., joined by Kagan, J., dissenting from denial of cert. and application for stay); *see also United States* v. *Briggs*, 141 S. Ct. 467, 472 (2020) (acknowledging that under the Court's Eighth Amendment cases, "the evolving-standards test could later lead to a different result … at some point in the future"). And the FDPA's "text and structure" track that understanding. *Bourgeois*, 141 S. Ct. at 508 (Sotomayor, J., dissenting); *see supra* pp. 8-16. The District Court's atextual distinction between intellectual disability and incompetency, in contrast, produces "incongruity among neighboring verbs" and provisions, *Carr*, 560 U.S. at 449, that provide, in parallel, that "[a] sentence of death shall not be carried out upon a person who is mentally retarded" or "lacks the mental capacity to understand the death penalty." 18 U.S.C. § 3596(c).

By focusing on the permanency of intellectual disability as a condition, the District Court also overlooked the way the FDPA treats the fixed condition of youth at the time of the criminal offense. The FDPA provides in its "Sentence of death" provision "that no person may be *sentenced* to death who was less than 18 years of age at the time of the offense," *id.* § 3591(a), (b) (emphasis added). That language makes clear that youth at the time of an offense bars not just implementation, but also imposition, of a death sentence, and, as such, must be assessed at the outset. But no such language appears in § 3596. This Court must presume Congress' choice to prohibit executing someone "who is mentally retarded" using present-tense language in a section on implementation to be deliberate. "[W]here Congress "includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello* v. *United States*, 464 U.S. 16, 23 (1983).

The District Court's observation that the FDPA was enacted before *Atkins*, Op. 17, fares no better. It ignores Congress' adoption of evolving standards for assessing intellectual disability when it modified the FDPA without altering § 3596(c). It also ignores the Supreme Court's acknowledgment even

- 29 -

years earlier in *Penry* that the ADAA's prohibition on executing "a person who is mentally retarded, 21 U.S.C. § 848(*l*) (1988), was potential evidence of "evolving standards of decency" "prohibit[ing] execution of a person who is mentally retarded." 492 U.S. at 333-34. *See supra* pp. 16-19, 21-26.

None of this means that "a fresh intellectual-disability claim … arise[s] every time the medical community updates its literature." Op. 20. To the contrary, a defendant must be able to show that current legal and diagnostic standards have materially advanced—*i.e.*, that he is intellectually disabled under current standards even if he had an intellectual-disability claim denied earlier under outdated standards. Because that showing is likely to be demanding, there is little reason to worry that interpreting § 3596(c) according to its plain text will lead to "repeated litigation." Op. 19.

Even so, different standards matter. In *Shoop* v. *Hill*, 139 S. Ct. 504, 505-09 (2019) (per curiam), for example, the Supreme Court recognized that assessing an intellectual-disability claim solely under *Atkins* (as required on habeas review of a state-court decision) could lead to a different outcome than assessing an intellectual-disability claim under the current standards in *Moore*. The difference between this case and *Shoop* is that whereas 28 U.S.C. § 2254(d) requires a federal habeas court to review a state court decision

"based strictly on legal rules that were clearly established in the decisions of th[e Supreme] Court" at the time of the state court's decision, *Shoop*, 139 S. Ct. at 509, § 3596(c) requires application of current standards.

The District Court also suggested that Mr. Johnson cannot raise a § 3596(c) claim because he was sentenced "to death under the now-repealed sentencing provisions of 21 U.S.C. § 848, rather than the FDPA." Op. 9-10 n.5. But § 3596(c) provides that "[a] sentence of death," without qualification, "shall not be carried out upon a person who is mentally retarded," or upon someone who is mentally incompetent. 18 U.S.C. § 3596(c). Section 3596(a), in contrast, addresses the method of execution for "[a] person who has been sentenced to death *pursuant to this chapter*." *Id.* § 3596(a) (emphasis added). Congress' omission of such limiting language in § 3596(c) (and other FDPA provisions, *e.g.*, § 3597) must be presumed intentional, *see, e.g.*, *Russello*, 464 U.S. at 23. This Court's decisions are consistent with that understanding. In *United States* v. *Stitt*, 552 F.3d 345, 352-53 (4th Cir. 2008), for example, the Court concluded that an FDPA provision did not apply to a defendant sentenced under § 848 because it applied only to "imposition of a sentence *under this section*," 18 U.S.C. § 3593(b)(2)(D) (emphasis added). Regardless, as the

- 31 -

District Court noted, "§ 848(*l*) and § 3596(c) contain identically worded prohibitions on executing intellectually disabled individuals," Op. 10 n.5; *see supra* pp. 18-19, so § 848(*l*) too bars execution of an individual who is intellectually disabled under current legal and diagnostic standards.

*    *    *

Statutory text, structure, purpose, and history, plus constitutional avoidance principles, all point in the same direction. Congress provided in the present tense, in a section devoted to the death penalty's implementation rather than its imposition, that "[a] sentence of death shall not be carried out upon a person who is mentally retarded." 18 U.S.C. § 3596(c). Congress grouped that prohibition with other present-tense prohibitions that indisputably must be assessed at the time the execution is to "be carried out." *Id.* § 3596(b), (c). And Congress adhered to that choice after *Atkins* made clear that the standards for assessing intellectual disability are continually advancing to reflect national and professional consensus informed by clinical guidelines. Congress' evident purpose—consistent with the Supreme Court's Eighth Amendment precedents—was to avoid the intolerable risk of executing people with intellectual disability.

This Court should honor Congress' intent.

- 32 -

## CONCLUSION

The Court should reverse the judgment of the District Court and re-mand for further proceedings.

Dated: January 8, 2021

Meir Feder
JONES DAY
250 Vesey Street
New York, NY 10281
Telephone: 1-212-326-3939
mfeder@jonesday.com

Respectfully submitted,

*/s/ Parker A. Rider-Longmaid*
Parker A. Rider-Longmaid
Amelia A. DeGory
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001-2113
Telephone: 1-202-879-3939
priderlongmaid@jonesday.com
adegory@jonesday.com

*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this amicus brief complies with (1) the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) because, as calculated by Microsoft Word 2016, it contains 6,494 words, excluding the items exempted by Federal Rule of Appellate Procedure 32(f); and (2) the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in a 14-point Book Antiqua font.

Dated: January 8, 2021                    */s/ Parker A. Rider-Longmaid*
                                          Parker A. Rider-Longmaid

## CERTIFICATE OF SERVICE

I hereby certify that on January 8, 2021, I filed the foregoing brief with the Clerk of Court for the United States Court of Appeals for the Fourth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: January 8, 2021                    */s/ Parker A. Rider-Longmaid*
                                          Parker A. Rider-Longmaid