**<span style="color:red">EXECUTION SCHEDULED FOR JANUARY 14, 2021</span>**

No. 21-1

_____

# IN THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

_____

## UNITED STATES OF AMERICA,

### Plaintiff – Appellee,

### v.

## COREY JOHNSON, A/K/A O, A/K/A CO,

### Defendant – Appellant.

_____

## JOINT APPENDIX VOLUME IV

_____

Donald P. Salzman
Jonathan Marcus
David E. Carney
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue, NW
Washington, DC 20005
(202) 371-7983
donald.salzman@skadden.com
*Counsel for Appellant Corey Johnson*

PAGE(S)

## VOLUME I

### I. DOCKET SHEET

E.D. Va. Docket Sheet, No. 92CR68 (1992-2019)..............................................J.A.1

E.D. Va. Docket Sheet, No. 92CR68 (2020) ....................................................J.A.25

### II. RELEVANT INDICTMENT, ORDERS AND OPINIONS

Second Superseding Indictment, July 20, 1992....................................................J.A.33

Order (Dec. 15, 2020), ECF No 95...................................................................J.A.55

Memorandum Opinion (Dismissing § 2255 Petition) (Jan. 2, 2021), ECF
No. 99............................................................................................................J.A.58

Order (Granting Motion for Leave to File Supplemental Authority) (Jan.
2, 2021), ECF No. 100..................................................................................J.A.80

Order (Dismissing § 2255 Petition) (Jan. 2, 2021), ECF No. 102....................J.A.81

### III. OTHER RELEVANT FILINGS

Notice of Execution Date (Nov. 20, 2020), ECF No. 78..................................J.A.82

Motion Pursuant to 28 U.S.C. § 2255 Raising Claim of Ineligibility To Be
Executed under 18 U.S.C. § 3596(c) (Dec. 14, 2020), ECF No. 86............J.A.84

Index of Exhibits to Motion Pursuant to 28 U.S.C. § 2255 Raising Claim
of Ineligibility To Be Executed under 18 U.S.C. § 3596(c), ECF No.
86-1 ..............................................................................................................J.A.143

Ex. 1, Report of Daniel J. Reschly, Ph.D., Aug. 26, 2016, ECF No. 86-2.....J.A.148

Ex. 1a, Curriculum Vitae of Daniel J. Reschly, Ph.D., May 15, 2020,
ECF No. 86-3 ................................................................................................J.A.199

Ex. 2, Report of J. Gregory Olley, Ph.D., Aug. 24, 2016, ECF No. 86-4 ......J.A.251

Ex. 2a, Curriculum Vitae of J. Gregory Olley, Ph.D., Oct. 2020,
ECF No. 86-5 ................................................................................... J.A.299

Ex. 3, Letter from Gary N. Siperstein, Ph.D. to Counsel for Corey
Johnson, Dec. 16, 2016, ECF No. 86-6 .................................................. J.A.318

Ex. 3a, Curriculum Vitae of Gary N. Siperstein, Ph.D., Sept. 2020,
ECF No. 86-7 ................................................................................... J.A.332

## VOLUME II

Ex. 4, Debra Nelson, Mitigation Report, Sept. 27, 2016, ECF No. 86-8 ....... J.A.355

Ex. 5, Report of Richard G. Dudley, Jr., M.D., Aug. 22, 2016,
ECF No. 86-9 ................................................................................... J.A.391

Ex. 6, Trial Tr., Feb. 3, 1993, ECF No. 86-10 ................................................. J.A.411

Notice of Submission of Exhibit 7, ECF No. 87 ......................................... J.A.426

## VOLUME III

Exs. 7-1 – 7-3, Trial Tr., Feb. 10, 1993, ECF Nos. 87-2 – 87-4 ..................... J.A.433

Notice of Submission of Exhibits, ECF No. 88 ........................................... J.A.519

Ex. 8, Cornell Mitigation Information and Report (Excerpt),
ECF No. 88-2 ................................................................................... J.A.526

Ex. 9, Trial Tr., Feb. 12, 1993, ECF No. 88-3 ................................................. J.A.546

## VOLUME IV

Ex. 10, Trial Tr., Feb. 15, 1993, ECF No. 88-4 ........................................... J.A.611

Ex. 11, Declaration of Kenneth Barish, Ph.D. (staff psychologist at
Pleasantville Cottage School), July 22, 2014, ECF No. 88-5 ..................... J.A.623

Ex. 12, Affidavit of Richard Benedict (special education teacher at
Pleasantville Cottage School), Dec. 5, 2011, ECF No. 88-6 ..................... J.A.635

Ex. 13, Affidavit of Darnell Brown (acquaintance in Trenton, NJ),
Oct. 14, 2011, ECF No. 88-7 ..........................................................................J.A.647

Ex. 14, Affidavit of Darold Brown (acquaintance in Trenton, NJ),
June 15, 2011, ECF No. 88-8 ..........................................................................J.A.652

Ex. 15, Affidavit of Craig S. Cooley (appointed counsel in 1992),
Sept. 20, 2016, ECF No. 88-9..........................................................................J.A.659

Ex. 16, Affidavit of Courtney Daniels (Corey's lifelong friend),
May 21, 2011, ECF No. 88-10 ..........................................................................J.A.669

Ex. 17, Declaration of Monica Dawkins (Corey's former girlfriend),
July 16, 2012, ECF No. 88-11 ..........................................................................J.A.675

Notice of Submission of Exhibits, ECF No. 89..............................................J.A.678

Ex. 18 Declaration of Cary Gallaudet, Ph.D. (psychologist at
Pleasantville Diagnostic Center), Mar. 19, 2012,
ECF Nos. 89-2 – 89-3 ..........................................................................J.A.685

Ex. 19, Declaration of Ann Harding (staff member at Pleasantville
Cottage School), Nov. 21, 2011, ECF No. 89-4..........................................J.A.696

Ex. 20, Affidavit of Minnie Hodges (Corey's maternal aunt),
Apr. 30, 2011, ECF No. 89-5..............................................................................J.A.699

Ex. 21, Affidavit of Priscilla Hodges (Corey's cousin), Apr. 30, 2011,
ECF No. 89-6..........................................................................................................J.A.710

Ex. 22, Affidavit of Queenie Hodges (Corey's cousin), Apr. 30, 2011,
ECF No. 89-7 ........................................................................................................J.A.718

Ex. 23, Declaration of Esther Johnson (Corey's maternal grandmother),
Apr. 30, 2011, ECF No. 89-8..............................................................................J.A.722

Ex. 24, Affidavit of Robert Johnson (Corey's half-brother),
June 29, 2011, ECF No. 89-9 ..............................................................................J.A.728

Ex. 25, Affidavit of Antionette Daniels Joseph (the best friend of Corey's
mother and Corey's godmother), May 21, 2011, ECF No. 89-10.............J.A.740

Ex. 26, Declaration of Leona Klerer (reading teacher at Mount Pleasant
Cottage School), June 3, 2011, ECF No. 89-11 ........................................J.A.752

Ex. 27, Affidavit of Gerald Lefkowitz (unit administrator at Pleasantville
Cottage Center), Dec. 5, 2011, ECF No. 89-12........................................J.A.760

Ex. 28, Affidavit of Odette Noble (social worker at Elmhurst),
Dec. 1, 2011, ECF No. 89-13 ..............................................................................J.A.765

3

Ex. 29, Declaration of George Sakheim, Ph.D. (Chief of Psychological
     Services at Pleasantville Diagnostic Center), June 17, 2011,
     ECF No. 89-14 ................................................................................... J.A.772

Ex. 30, Affidavit of David Washington (childcare worker at Elmhurst),
     Mar. 1, 2012, ECF No. 89-15 ....................................................... J.A.807

Notice of Submission of Exhibits, ECF No. 90 ............................................ J.A.811

Ex. 31, Gregory Judge, School Social Worker, Social History, Mar. 4,
     1977, ECF No. 90-2 ....................................................................... J.A.818

Ex. 32, Cheryl Spillane, Learning Consultant, Bureau of Pupil Personnel
     Services, Jersey City Public Schools, Learning Consultant Evaluation
     to Child Study Team, Mar. 18, 1977, ECF No. 90-3 ............................. J.A.822

Ex. 33, F.A. Figurelli, M.D., Chief Psychologist, Psychological
     Examination Record, Mar. 25, 1977, ECF No. 90-4 .............................. J.A.827

Ex. 34, Eleanor Glantz, Social Worker, Case Service, Dec. 11, 1978,
     ECF No. 90-5 ................................................................................. J.A.830

Ex. 35, Committee on the Handicapped, Referral to the Committee on the
     Handicapped, Feb. 26, 1979, ECF No. 90-6 ..................................... J.A.832

Ex. 36, Committee on the Handicapped Records, May 21, 1979,
     ECF No. 90-7 ................................................................................. J.A.837

**VOLUME V**

Ex. 37, Washington Heights-West Harlem Community Mental Health
     Center, Child Assessment Evaluation Summary, Dec. 9, 1981,
     ECF No. 90-8 ................................................................................. J.A.863

Ex. 38, Ernest H. Adams, Staff Psychologist, Psychodiagnostic
     Evaluation, Dec. 11, 1981, ECF No. 90-9 ......................................... J.A.865

Ex. 39, Cary Gallaudet, Psy.D., Pleasantville Cottage School,
     Psychological Evaluation, Feb. 1, 1982, ECF No. 90-10 ....................... J.A.868

Ex. 40, Leona Klerer, Mount Pleasant Cottage School Screening Upon
     Admission, Feb. 22, 1982, ECF No. 90-11 ....................................... J.A.872

Ex. 41, Amira Offer, Caseworker, Psychosocial Summary, Mar. 15,
     1982, ECF No. 90-12 ..................................................................... J.A.876

Ex. 42, Gloria Caro, Pleasantville Cottage School, Reassessment Summary, May 21, 1982 , ECF No. 90-13 .................................................... J.A.882

Ex. 43, Gloria Caro, Caseworker, Initial Conference, Current Assessment and Transfer Summary, June 9, 1982, ECF No. 90-14 ............................. J.A.896

Ex. 44, Gayle Turnquest, Caseworker, Pleasantville Cottage School, Current Assessment, Jan. 31, 1983, ECF No. 90-15 .................................. J.A.902

Notice of Submission of Exhibits, ECF No. 91 ................................................ J.A.905

Ex. 45, Ken Barish, Ph.D., Psychologist, Pleasantville Cottage School, Psychological and Educational Evaluation, Apr. 29, 1983, ECF No. 91-2 ....................................................................................... J.A.912

Ex. 46, John B. Stadler, M.D., Clinical Director, Pleasantville Cottage School, Psychiatric Evaluation, Aug. 26, 1983, ECF No. 91-3 ................ J.A.916

Ex. 47, Lynda Coccaro, Speech and Language Pathologist, Donald R. Reed Speech Center, Inc., Phelps Memorial Hospital, Speech and Language Evaluation, Oct. 5, 1983, ECF No. 91-4 .................................... J.A.919

Ex. 48, Lynn Polstein, Jewish Child Care Association of New York, Pleasantville Cottage School, Change in Permanency Plan, Apr. 13, 1984, ECF No. 91-5 .................................................................. J.A.925

Ex. 49, Gerard Maier, Social Worker, Current Assessment, Sept. 4, 1984, ECF No. 91-6 ......................................................................................... J.A.931

Ex. 50, Christine Aaron, MSW Intern, Jewish Child Care Association of New York, Pleasantville Cottage School, Visitation Plan, Dec. 12, 1984, ECF No. 91-7 ................................................................. J.A.935

Ex. 51, Kenneth Barish, Ph.D., Psychologist, Pleasantville Cottage School Psychological Evaluation, Apr. 15, 1985, ECF No. 91-8 ............. J.A.949

Ex. 52, Gerard Maier, Pleasantville Cottage School, Discharge/Transfer Plan, May 28, 1985, ECF No. 91-9 ........................................................ J.A.952

Ex. 53, Board of Education of the City of New York, Individualized Education Plan – Phase 1, July 1, 1985, ECF No. 91-10 ........................... J.A.966

Ex. 54, Odette Noble, Social Worker, Jewish Child Care Association of New York, Elmhurst Boys Residence, UCR Reassessment and Service Plan Review 6 Month, Nov. 21, 1985, ECF No. 91-11 ................ J.A.974

Notice of Submission of Exhibits, ECF No. 92 ............................................. J.A.986

Ex. 55, Odette Noble, Social Worker, Jewish Child Care Association of New York, Elmhurst Boys Residence, UCR Reassessment and Service Plan Review 6 Month, June 28, 1986, ECF No. 92-2 ...................J.A.993

Ex. 56, Odette Noble, Social Worker, Jewish Child Care Association of New York, Elmhurst Boys Residence, UCR Plan Amendment: Form D Trial Discharge, Feb. 23, 1987, ECF No. 92-3 ...................J.A.1003

Ex. 57, Newtown High School, Scholastic Transfer Record, Dec. 7, 1987, ECF No. 92-4 ...................J.A.1008

Ex. 58, Janet Valentine, Child Care Worker, Pleasantville Diagnostic Center, Outline for Cottage Report (undated), ECF No. 92-5...................J.A.1011

Ex. 59, Notice of the Intention of U.S.A. to Seek Death Penalty as to Mr. Tipton, May 1, 1992, ECF No. 92-6...................J.A.1015

Ex. 60, Notice of the Intention of U.S.A. to Seek Death Penalty as to Mr. Roane, May 1, 1992, ECF No. 92-7 ...................J.A.1020

Ex. 61, Second Superseding Indictment, July 20, 1992, Dkt. 115, ECF No. 92-8 ...................J.A.1025

Ex. 62, Notice of the Intention of U.S.A. to Seek Death Penalty as to Mr. Thomas, Oct. 28, 1992, ECF No. 92-9 ...................J.A.1048

Ex. 63, Verdict Form, Feb. 3, 1993, Dkt. 466, ECF No. 92-10...................J.A.1053

Ex. 64, Notice of the Intention of U.S.A. to Seek Death Penalty as to Mr. Johnson, Feb. 8, 1993, ECF No. 92-11...................J.A.1060

Ex. 65, Special Findings, Feb. 16, 1993, Dkt. 508, ECF No. 92-12 ...................J.A.1065

Ex. 66, Motion to Have Defendant Declared Mentally Retarded, *United States v. Thomas*, No. 3:92CR68 (E.D. Va. Apr. 15, 1993), ECF No. 92-13 ...................J.A.1078

Ex. 67, Memorandum in Support of Initial Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. Section 2255, June 15, 1998, Dkt. 714 (Excerpt) , ECF No. 92-14...................J.A.1093

## VOLUME VI

Ex. 68, Reply Memorandum in Support of Initial Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. Section 2255, Mar. 15, 1999, Dkt. 761 (Excerpt), ECF No. 92-15...................J.A.1109

Ex. 69, Ex. 14 to Reply Memorandum in Support of Initial Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. Section 2255, Mar. 15, 1999, ECF No. 92-16 ...................................................................J.A.1125

Ex. 70, Ex. 15 to Reply Memorandum in Support of Initial Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. Section 2255, Mar. 15, 1999, ECF No. 92-17 ...................................................................J.A.1133

Notice of Submission of Exhibits, ECF No. 93 ..........................................J.A.1137

Ex. 71, Petitioners' Joint Motion for Leave to Take Discovery, June 24, 1999, Dkt. 770, ECF No. 93-2 .......................................................J.A.1144

Ex. 72, Memorandum Opinion, May 3, 2000, Dkt. 803, ECF No. 93-3 ......J.A.1195

Ex. 73, Memorandum Opinion, May 1, 2003, Dkt. 896, ECF Nos. 93-4 – 93-5 .................................................................J.A.1209

Ex. 74, Brief for Appellants Cory Johnson and Richard Tipton, *United States v. Johnson*, No. 03-13(L), 03-26, 03-27 (4th Cir. Feb. 17, 2004) (Excerpt), ECF No. 93-6 ...........................................................J.A.1336

Notice of Submission of Exhibits, ECF No. 94 ..........................................J.A.1359

## VOLUME VII

Ex. 75, American Association on Intellectual and Developmental Disabilities Definition Manual ("AAIDD-11") (Excerpt), ECF Nos. 94-2 – 94-3 .................................................................J.A.1366

Ex. 76, AAIDD User's Guide to 11th Edition (Excerpt), ECF No. 94-4 .....J.A.1392

Ex. 77, Diagnostic and Statistical Manual of Mental Disorders ("DSM-5") (Excerpt), ECF No. 94-5 ...................................................J.A.1405

Ex. 78, 134 Cong. Rec. 22,926 (1988) (Excerpt), ECF No. 94-6 ................J.A.1418

Ex. 79, 136 Cong. Rec. S6873 (daily ed. May 24, 1990) (Excerpt), ECF No. 94-7 ......................................................................J.A.1423

Government's Response to Court's December 15, 2020 Order (Dec. 21, 2020), ECF No. 96 ...............................................................J.A.1435

Corey Johnson's Reply Pursuant to December 15, 2020 Order (Dec. 24, 2020), ECF No. 97 ...............................................................J.A.1451

Exhibit 1, Amended Judgment in a Criminal Case, ECF No. 97-1 ..............J.A.1459

United States' Motion for Leave to File Supplemental Authority (Dec. 31, 2020), ECF No. 98 ...................................................................... J.A.1467

United States' Notice of Supplemental Authority (Jan. 2, 2021), ECF Nos. 98-1, 101 ....................................................................... J.A.1469

Notice of Appeal (Jan. 4, 2021), ECF No. 103 ............................................. J.A.1489

# EXHIBIT 10

J.A.611

                    IN THE UNITED STATES DISTRICT COURT
                  FOR THE EASTERN DISTRICT OF VIRGINIA
                          RICHMOND DIVISION

-------------------------------------------

UNITED STATES OF AMERICA,


                            Plaintiff;

        v.                              CRIMINAL ACTION
                                            92CR68
RICHARD TIPTON, CORY JOHNSON,
JAMES H. ROANE, JR., AND
SANDRA REAVIS,
                            Defendants.

-------------------------------------------
                          VOLUME XXIV

                      February 15, 1993
                      Richmond, Virginia
                          9:30 a.m.

BEFORE:         HONORABLE JAMES R. SPENCER
                United States District Judge


APPEARANCES:    HOWARD C. VICK, JR., ESQ.
                WILLIAM H. PARCELL, III, ESQ.
                Office of the United States Attorney;
                    Counsel for Government;

                ROBERT P. GEARY, ESQ.
                ERIC D. WHITE, ESQ.
                    Counsel for Defendant Tipton;
                CRAIG S. COOLEY, ESQ.
                JOHN F. McGARVEY, ESQ.
                    Counsel for Defendant Johnson;
                DAVID P. BAUGH, ESQ.
                ARNOLD R. HENDERSON, V, ESQ.
                    Counsel for Defendant Roane;
                ROBERT J. WAGNER, ESQ.
                    Counsel for Defendant Reavis.
                    JEFFREY B. KULL
                OFFICIAL COURT REPORTER

                      P-R-O-C-E-E-D-I-N-G-S
              THE CLERK:  92CR68:  United States of
America versus Richard Tipton, Cory Johnson, and

James H. Roane, Jr., the twenty-fourth day of trial. Are counsel ready to proceed?

MR. VICK:  The government is ready.

MR. GEARY:  Defendant Tipton is ready.

MR. COOLEY:  Defendant Johnson is ready.

MR. BAUGH:  Defendant Roane is ready, Your Honor.

THE COURT:  All right.  Let's bring in the jury, please.

(The jury entered the courtroom.)

All right.  The Court is once again in session and the jury may commence its deliberations again. Everyone remain seated while the jury leaves the courtroom.

(The jury left the courtroom.)

All right, Mr. Marshal, you may remove the defendants.

(The defendants were removed from the courtroom.)

All right.  We inquired of the jury whether it was comfortable in the jury room and they have indicated that it is.  So they are all right.

(Recess taken from 9:39 a.m. to 5:25 p.m.)

THE COURT:  Bring in the jury, please.

(The jury entered the courtroom.)

All right.  We are going to stop here.  It is 5:30 or thereabouts.  And we will have you come back in tomorrow at 9:30 to start your deliberations again.  Remember all of my previous admonitions. They continue.  Abide by them.  Do not discuss the matter with anyone outside the jury and do not deliberate outside of the Court being called in session.  We will see you tomorrow morning at 9:30 a.m.  Everyone remain seated while the jury leaves the courtroom.

(The jury left the courtroom.)

Mr. Marshal, you can remove the defendants.

(The defendants were removed from the courtroom.)

All right.  We will be in adjournment until 9:30 tomorrow morning.

(Proceedings adjourned at 5:30 p.m.)

J.A.613

4021

```
               IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF VIRGINIA
                       RICHMOND DIVISION

-----------------------------------------

UNITED STATES OF AMERICA,


                        Plaintiff;

     v.                                   CRIMINAL ACTION
                                             92CR68
RICHARD TIPTON, CORY JOHNSON,
JAMES H. ROANE, JR., AND
SANDRA REAVIS,
                        Defendants.

-----------------------------------------
                       VOLUME XXV

                   February 16, 1993
                   Richmond, Virginia
                      9:30 a.m.

BEFORE:        HONORABLE JAMES R. SPENCER
               United States District Judge


APPEARANCES:   HOWARD C. VICK, JR., ESQ.
               WILLIAM H. PARCELL, III, ESQ.
               Office of the United States Attorney;
                   Counsel for Government;

               ROBERT P. GEARY, ESQ.
               ERIC D. WHITE, ESQ.
                   Counsel for Defendant Tipton;
               CRAIG S. COOLEY, ESQ.
               JOHN F. McGARVEY, ESQ.
                   Counsel for Defendant Johnson;
               DAVID P. BAUGH, ESQ.
               ARNOLD R. HENDERSON, V, ESQ.
                   Counsel for Defendant Roane;
               ROBERT J. WAGNER, ESQ.
                   Counsel for Defendant Reavis.
                  JEFFREY B. KULL
               OFFICIAL COURT REPORTER
```

4022

                       P-R-O-C-E-E-D-I-N-G-S

THE CLERK:  Criminal Action Number 92CR68: United States of America versus Richard Tipton, Cory

Johnson, and James H. Roane, Jr., the twenty-fifth day of trial.  Are counsel ready to proceed?

MR. VICK:  The government is ready to proceed.

MR. GEARY:  Defendant Tipton is ready.

MR. McGARVEY:  Defendant Johnson is ready, Your Honor.

MR. BAUGH:  Defendant Roane is ready, Your Honor.

THE COURT:  All right.  Bring in the jury, please.

(The jury entered the courtroom.)

All right.  The Court is once again in session, and the jury may continue its deliberations.  Everyone remain seated while the jury leaves the courtroom.)

(The jury left the courtroom.)

Mr. Marshal, you may remove the defendants.

(The defendants were removed from the courtroom.)

(Recess taken from 9:35 a.m. to 1:30 p.m.)

THE COURT:  All right.  I am informed the jury has reached a decision.  Bring in the jury, please.

(The jury entered the courtroom.)

All right.  Will the Foreperson please rise?  I understand that you all have reached a decision?

THE FOREPERSON:  Yes, we have.

(Document proffered to Court and Clerk for publication.)

(Court perusing document.)

All right.  I've reviewed the findings.  The special findings are in order.  The Clerk will read the decision forms.  The special findings will be available to counsel after the decisions have been indicated.

THE CLERK:  Ladies and gentlemen of the jury, these are your verdicts:  If the defendant Tipton will please stand.

(The defendant stood.)

Criminal Action Number 92CR68-01:  United States of America versus Richard Tipton, also known as "Whitey."  As to the crime of killing Douglas A. Talley while engaged in or in furtherance of a Continuing Criminal Enterprise, we the jury unanimously find beyond a reasonable doubt that the aggravating factors required by law as prerequisites for the imposition of capital punishment have been proven by the government as to this capital crime.  We further find unanimously and beyond a reasonable doubt that the aggravating factors proven in this case as to this crime and this defendant sufficiently

**J.A.615**

outweigh any mitigating factors, and are themselves so serious that justice mandates a sentence of death.  We vote unanimously that Richard Tipton shall be sentenced to death for this capitol crime.  Signed by the Foreperson, Margaret Griffiths, 2-13-93.

As to the crime of killing Bobby Long while engaged in or in furtherance of a Continuing Criminal Enterprise:  D.  We the jury, having considered and evaluated the evidence presented in light of the instructions of the Court, are not unanimously persuaded that a death sentence should be imposed for this capital crime.  We therefore return a decision that Richard Tipton not be sentenced to death for this capital crime.  Signed by the Foreperson, Margaret Griffiths, dated 2-13-93.

As to the crime of killing Anthony Carter while engaged in or in furtherance of a Continuing Criminal Enterprise:  D.  We the jury, having considered and evaluated the evidence presented in light of the instructions of the Court, are not unanimously persuaded that a death sentence should be imposed for this capital crime.  We therefore return a decision that Richard Tipton not be sentenced to death for this capital crime.  Signed by the Foreperson, Margaret Griffiths, 2-13-93.

As to the killing of Dorothy Mae Armstrong while engaged in or in furtherance of a Continuing Criminal Enterprise:  D.  We the jury, having considered and evaluated the evidence presented in light of the instructions of the Court, are not unanimously persuaded that a death sentence should be imposed for this capital crime.  We therefore return a decision that Richard Tipton not be sentenced to death for this capital crime.  Signed by the Foreperson, Margaret Griffiths, dated 2-13-93.

As to the crime of killing Curtis Thorne while engaged in or in furtherance of a Continuing Criminal Enterprise: B.  We the jury unanimously find beyond a reasonable doubt that the aggravating factors required by law as prerequisites for the imposition of capital punishment have been proven by the government as to this capital crime.  We further find unanimously and beyond a reasonable doubt that the aggravating factors proven in this case as to this crime and this defendant sufficiently outweigh any mitigating factors, and are themselves so serious that justice mandates a sentence of death.  We vote unanimously that Richard Tipton shall be sentenced to death for this capital crime.  Signed by the Foreperson, Margaret Griffiths, dated 2-13-93.

As to the crime of killing Linwood Chiles while engaged in or in furtherance of a Continuing Criminal

J.A.616

Enterprise:  B.  We the jury unanimously find beyond a reasonable doubt that the aggravating factors required by law as prerequisites for the imposition of capital punishment have been proven by the government as to this capital crime.  We further find unanimously and beyond a reasonable doubt that the aggravating factors proven in this case as to this crime and this defendant sufficiently outweigh any mitigating factors and are themselves so serious that justice mandates a sentence of death.  We vote unanimously that Richard Tipton shall be sentenced to death for this capital crime.  Signed by the Foreperson, Margaret Griffiths, dated 2-13-93.

The certificate has been executed by the jurors and will be on file with the Court.

(The defendant resumed his seat.)

If defendant Cory Johnson will please stand.

(The defendant stood.)

4027

Criminal Case Number 3:92CR68-02:  United States of America versus Cory Johnson, also known as "O," also known as "C.O."  As to the crime of killing Peyton Maurice Johnson while engaged in or in furtherance of a Continuing Criminal Enterprise:  B.  We the jury unanimously find beyond a reasonable doubt that the aggravating factors required by law as prerequisites for the imposition of capital punishment have been proven by the government as to this capital crime.  We further find unanimously and beyond a reasonable doubt that the aggravating factors proven in this case as to this crime and this defendant sufficiently outweigh any mitigating factors, and are themselves so serious that justice mandates a sentence of death.  We vote unanimously that Cory Johnson shall be sentenced to death for this capital crime.  Signed by the Foreperson, Margaret Griffiths, dated 2-15-93.

As to the crime of killing Louis J. Johnson, Jr. while engaged in or in furtherance of a Continuing Criminal Enterprise:  B.  We the jury unanimously find beyond a reasonable doubt that the aggravating factors required by law as prerequisites for the imposition of capital punishment have been proven by the government as to this capital crime.  We further

4028

find unanimously and beyond a reasonable doubt that the aggravating factors proven in this case as to this crime and this defendant sufficiently outweigh any mitigating factors, and are themselves so serious that justice mandates a sentence of death.  We vote unanimously that Cory Johnson shall be sentenced to death for this capital crime.  Signed by the Foreperson, Margaret Griffiths, dated 2-15-93.

As to the crime of killing Bobby Long while

engaged in or in furtherance of a Continuing Criminal Enterprise:  B.  We the jury unanimously find beyond a reasonable doubt that the aggravating factors required by law as prerequisites for the imposition of capital punishment have been proven by the government as to this capital crime.  We further find unanimously and beyond a reasonable doubt that the aggravating factors proven in this case as to this crime and this defendant sufficiently outweigh any mitigating factors, and are themselves so serious that justice mandates a sentence of death.  We vote unanimously that Cory Johnson shall be sentenced to death for this capital crime.  Signed by the Foreperson, Margaret Griffiths, dated 2-15-93.

As to the crime of killing Anthony Carter while engaged in or in furtherance of a Continuing Criminal

4029

Enterprise:  B.  We the jury unanimously find beyond a reasonable doubt that the aggravating factors required by law as prerequisites for the imposition of capital punishment have been proven by the government as to this capital crime.  We further find unanimously and beyond a reasonable doubt that the aggravating factors proven in this case as to this crime and this defendant sufficiently outweigh any mitigating factors, and are themselves so serious that justice mandates a sentence of death.  We vote unanimously that Cory Johnson shall be sentenced to death for this capital crime.  Signed by the Foreperson, Margaret Griffiths, dated 2-15-93.

As to the crime of killing Dorothy Mae Armstrong while engaged in or in furtherance of a Continuing Criminal Enterprise:  B.  We the jury unanimously find beyond a reasonable doubt that the aggravating factors required by law as prerequisites for the imposition of capital punishment have been proven by the government as to this capital crime.  We further find unanimously and beyond a reasonable doubt that the aggravating factors proven in this case as to this crime and this defendant sufficiently outweigh any mitigating factors, and are themselves so serious that justice mandates a sentence of death.  We vote

4030

unanimously that Cory Johnson shall be sentenced to death for this capital crime.  Signed by the Foreperson, Margaret Griffiths, dated 2-15-93.

As to the crime of killing Curtis Thorne while engaged in or in furtherance of a Continuing Criminal Enterprise:  B.  We the jury unanimously find beyond a reasonable doubt that the aggravating factors required by law as prerequisites for the imposition of capital punishment have been proven by the government as to this capital crime.  We further find unanimously and beyond a reasonable doubt that the

aggravating factors proven in this case as to this crime and this defendant sufficiently outweigh any mitigating factors, and are themselves so serious that justice mandates a sentence of death.  We vote unanimously that Cory Johnson shall be sentenced to death for this capital crime.  Signed by the Foreperson, Margaret Griffiths, dated 2-15-93.

As to the crime of killing Linwood Chiles while engaged in or in furtherance of a Continuing Criminal Enterprise:  B.  We the jury unanimously find beyond a reasonable doubt that the aggravating factors required by law as prerequisites for the imposition of capital punishment have been proven by the government as to this capital crime.  We further find unanimously and beyond a reasonable doubt that the aggravating factors proven in this case as to this crime and this defendant sufficiently outweigh any mitigating factors and are themselves so serious that justice mandates a sentence of death.  We vote unanimously that Cory Johnson shall be sentenced to death for this capital crime.  Signed by the Foreperson, Margaret Griffiths, dated 2-15-93.

The certificate has been completed and will be on file with the Court.

You may be seated.

(The defendant resumed his seat.)

If defendant Roane will please stand.

(The defendant stood.)

Criminal Case Number 3:92CR68-03:  United States of America versus James H. Roane, Jr., also known as "J.R."  As to the crime of killing Douglas Moody while engaged in or in furtherance of a Continuing Criminal Enterprise:  B.  We the jury unanimously find beyond a reasonable doubt that the aggravating factors required by law as prerequisites for the imposition of capital punishment have been proven by the government as to this capital crime.  We further find unanimously and beyond a reasonable doubt that the aggravating factors proven in this case as to this crime and this defendant sufficiently outweigh any mitigating factors, and are themselves so serious that justice mandates a sentence of death.  We vote unanimously that James H. Roane, Jr. shall be sentenced to death for this capital crime.  Signed by the Foreperson, Margaret Griffiths, dated 2-16-93.

As to the crime of killing Peyton Maurice Johnson while engaged in or in furtherance of a Continuing Criminal Enterprise:  D.  We the jury, having considered and evaluated the evidence presented in light of the instructions of the Court, are not unanimously persuaded that a death sentence should be imposed for this capital crime.  We

**J.A.619**

therefore return a decision that James H. Roane, Jr. not be sentenced to death for this capital crime. Signed by the Foreperson, Margaret Griffiths, dated 2-16-93.

As to the crime of killing Louis J. Johnson, Jr. while engaged in or in furtherance of a Continuing Criminal Enterprise: D. We the jury, having considered and evaluated the evidence presented in light of the instructions of the Court, are not unanimously persuaded that a death sentence should be imposed for this capital crime. We therefore return a decision that James H. Roane, Jr. not be sentenced

4033

to death for this capital crime. Signed by the Foreperson, Margaret Griffiths, dated 2-16-93.

The certificate has been completed and will be on file with the Court.

You may be seated.

(The defendant resumed his seat.)

Ladies and gentlemen of the jury, are these your verdicts?

(Affirmative response.)

THE CLERK: Do counsel wish the jury polled?

MR. WHITE: On behalf of defendant Tipton, yes, sir.

THE CLERK: Ladies and gentlemen of the jury, if these are your verdicts, as I call your name, please respond by answering yes:

Victor M. Catlett.

JUROR CATLETT: Yes.

John E. Coleman, Sr.

JUROR COLEMAN: Yes.

Edward Cooke.

JUROR COOKE: Yes.

Debra J. Dabney.

JUROR DABNEY: Yes.

Nina S. Eike.

4034

JUROR EIKE: Yes.

Bonita S. Faircloth.

JUROR FAIRCLOTH: Yes.

Margaret M. Griffiths.

JUROR GRIFFITHS: Yes.

Charles V. Guthrie, Sr.

JUROR GUTHRIE: Yes.

Jerome Harrison.

JUROR HARRISON: Yes.

Connie E. Harvey.

JUROR HARVEY: Yes.

Francis P. Hodson.

JUROR HODSON: Yes.

Thomas C. Jackson.

JUROR JACKSON: Yes.

**J.A.620**

USCA4 Appeal: 21-1    Doc: 10-1    Filed: 01/08/2021    Pg: 20 of 261

Case 3:92-cr-00068-DJN   Document 88-4   Filed 12/14/20   Page 11 of 12 PageID# 2803

THE COURT:  All right.  Ladies and gentlemen, before I release you, I just want to make some comment on your efforts that you put out over the course of the last few weeks.  You carried out your awesome responsibility with diligence, intelligence, and courage.  And I don't think in all of my 20 years as a lawyer, as a defense lawyer, a prosecutor, and a Judge, that I have seen a jury that was more attentive.  I must say, if I could paraphrase the hymn:  If I had a thousand tongues, I would be unable to adequately express our gratitude.  All I can say is thank you very much.

You all may be excused.

(The jury left the courtroom.)

What about May 18th?

MR. VICK:  That's fine with the government, Your Honor.

MR. BAUGH:  That's fine, Your Honor.

MR. GEARY:  That's fine.

THE COURT:  Hearing no objection, we will set it for 9 o'clock.

(Sentencing Documents proffered to counsel and defendants and executed.)

MR. BAUGH:  May we approach?

(Conference held off the record at the request of Mr. Baugh.)

(Sentencing Documents proffered to Court.)

All right.  The matters of United States versus Richard Tipton, James H. Roane, Jr., and Cory Johnson have been set for sentencing to commence at 9 o'clock a.m. on May 18th, 1993.  We will be in adjournment.

Mr. Marshal, remove the defendants, and everybody stand in place while they do.

(The defendants were removed from the courtroom.)

Court stands adjourned.

(Proceedings adjourned at 2:10 p.m.)

CERTIFICATE OF REPORTER

I, Jeffrey B. Kull, CP, RPR, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____
JEFFREY B. KULL, CP, RPR

_____
DATE

J.A.621

J.A.622

# EXHIBIT 11

J.A.623

# DECLARATION

I, KENNETH BARISH, Ph.D., hereby affirm the following:

1.    My professional address is 280 North Central Avenue, Hartsdale, New York, 10530.

2.    By way of background, I have been a psychologist licensed to practice in the State of New York since 1981. I have held faculty positions in psychology at Weill Medical College of Cornell University, the Westchester Center for the Study of Psychoanalysis and Psychotherapy, and the William Alanson White Institute's Child and Adolescent Psychotherapy Training Program. I also have maintained a private practice in child and adolescent psychology that includes the evaluation of learning and emotional disorders in children and adolescents. During the course of my thirty-two years of practice, I have conducted hundreds of psychological and educational evaluations of children and adolescents.

3.    During the early 1980s, I was a staff psychologist at Pleasantville Cottage School, a residential treatment facility located in Pleasantville, New York. From approximately 1982 to 1985, Corey Johnson was in residence at Pleasantville.

4.    During Corey's stay at Pleasantville, I conducted two evaluations of him: the first in 1983 and the second in 1985. Each evaluation lasted between two and four hours. For reasons explained below, although decades have passed since my last interaction with Corey, I continue to have a strong independent recollection of Corey – and my meetings with him – to this day.

5.    I make the statements in this declaration based upon my independent recollection of Corey and review of my own written evaluations – as well as, to the limited

J.A.624

extent indicated below, my review of materials recently brought to my attention by Mr. Johnson's current legal counsel.

6.      A true and correct copy of the report of my March 1983 psychological and educational evaluation of Corey is attached as Exhibit 1 to this declaration.

7.      A true and correct copy of the report of my March 1985 psychological evaluation of Corey is attached as Exhibit 2 to this declaration.

8.      Nearly 30 years after I met and evaluated him, Corey still stands out in my mind due to his profound impairment in learning.

9.      Corey's deficit in phonological processing remains the most profound impairment of this kind I have encountered in three decades of clinical practice.

10.     For example, when I saw him in 1983, when he was 14 years old, Corey laboriously attempted to spell the word "arm." Instead, Corey spelled this word: "hme."

11.     So profound was Corey's deficit that I have used it over the past 30 years as a teaching example in my classes. Corey had effectively no ability to discriminate between vowel sounds.

12.     Overall, the severity of Corey's impairment in reading, spelling and math skills remains striking to me even today.

13.     As set forth more fully in the attached reports, at the times I evaluated Corey, I identified widespread and highly significant cognitive deficits, indications of diffuse neurological dysfunction, and severe learning disabilities in reading, spelling and arithmetic.

14.     For example, in 1983, Corey's scores for reading and spelling were at the 1st percentile, that is, at the lowest 1% of the population for his age. His score for arithmetic achievement was at the 2nd percentile (at the lowest 2% of the population for his age). Also

3

present in Corey in 1983 were highly significant impairments of attention and concentration, visual-spatial analysis, and visual-motor coordination.

15.    As part of my evaluation of Corey in 1985, I administered the WISC-R test.  Corey was 16 years old at the time this test was administered.  I reported a Full Scale IQ score of 69 for Corey.  I also reported an "alternate" score of 74.  It is important to note that, consistent with my assessment practice at that time and as set forth in the evaluation report, I reported "alternate" scores that reflected improvements in a child's performance when the child was given more time and/or assistance from the examiner, beyond that allowed by the rules of test administration.  I presented such "alternate" scores only for consideration by other clinicians as to the child's possible response to interventions.  Such "alternate" scores did not represent the true IQ score for Corey or any child for whom I reported an "alternate" score.

16.    The true Full Scale IQ score for Corey Johnson, that is, the score Corey obtained under standard administration conditions, was 69.  A score of 69 falls in the Mentally Deficient range of intellectual functioning.

17.    At the time I conducted the 1985 evaluation, because of previous cognitive test results which are noted in the evaluation, I did not consider a diagnosis of mental retardation for Corey.

18.    However, I was not aware at the time (in 1985) that approximately four to five months before Dr. Cary Gallaudet administered the WISC-R to Corey, Corey had been administered the WISC-R in October 1981 by Ernest Adams, and had scored 10 points lower than when Dr. Gallaudet administered it to Corey.

4

J.A.626

19.    If I had been aware in 1985 of this earlier WISC-R test administered to Corey by Mr. Adams, I would not have given weight to Dr. Gallaudet's testing and likely would have considered a diagnosis of mental retardation.

20.    In my opinion, my diagnosis as of 1985 can reasonably be re-considered by experts in the field of mental retardation and learning disability. Although I have extensive experience in the evaluation of attention and learning disorders and have training and experience in the specific psychological and educational evaluations that I administered to Corey, I am not a specialist or expert in the diagnosis of mental retardation, particularly the differentiation of mental retardation from profound learning disabilities.

I declare the above is true and correct.

Dated:  July 22, 2014

KENNETH BARISH, Ph.D.

City of Hartsdale
State of New York

5

**J.A.627**

PLEASANTVILLE COTTAGE SCHOOL

Name of Child:  COREY JOHNSON      Date of Testing: 3/83
Date of Birth:                     By:   Ken Barish, Ph.D.
Date of (PCS) Adm:                 Social Worker: Gayle Turnquest

### PSYCHOLOGICAL AND EDUCATIONAL EVALUATION

#### Referral:

Corey was evaluated at Pleasantville Diagnostic Center in February
1982.  At that time Corey achieved a Full Scale I.Q. of 88, with a
Verbal I.Q. of 85 and a Performance I.Q. of 93.  Indications of
diffuse neurological dysfunction were evident as well as very strong
depressive tendencies and an emphasis on denial as a defense.  Corey
remained ambitious, however, with a strong conscience and capacity
for empathy.

In conference it was reported by Corey's teacher that his academic
skills are very poor.  This evaluation was requested to provide addi-
tional clarification of the nature and extent of Corey's learning
difficulties and to make recommendations for remedial strategies.

#### Tests Administered:

>    Wide Range Achievement Test
>    Neuropsychological Screening Tasks
>    Bender-Gestalt
>    Benton Visual Retention Test
>    Spreen-Benton Aphasia Tests
>    Raven's Progressive Matrices
>    Purdue Pegboard
>    Gilmore Oral Reading Test
>    Human Figure Drawings

#### Observations:

Corey was cooperative throughout the evaluation and demonstrated gener-
ally good frustration tolerance despite the very real difficulty he en-
countered on many of the tasks presented to him.  Corey's willingness
to continue to put forth effort on academic tasks without impulsivity
or withdrawal is an impressive strength, particularly considering the
severity of his learning disabilities.

#### Test Findings:

The present test findings confirm the presence of severe learning dis-
abilities in reading, spelling and arithmetic.  There is an abundance
of findings which strongly suggest diffuse neurological dysfunction
with associated impairment in many aspects of cognitive functioning.
Difficulties in attention and concentration are a prominent factor
in Corey's learning difficulties.  In addition, Corey demonstrates
specific language deficits (i.e. speech sound discrimination, phonic
associates, sound blending) and also deficits in visual-spatial
analysis, visual-motor and fine motor coordination and perhaps also
visual memory.  These findings will be discussed below.

**J.A.629**

Corey Johnson                                                    -2-

On the Wide Range Achievement Test Corey obtained a Reading Score
at the 1st percentile (SS 62), a Spelling Score at the 1st percentile
(SS 64) and an Arithmetic Score at the 2nd percentile (SS 68).  Corey
understands basic arithmetic operations including borrowing and carry-
ing but has difficulty with division and more complex operations.
Some of Corey's errors seem to result from inability to sustain at-
tention on problems, and also from some confusion in the spatial
analysis on arithmetic problems.  With regard to reading, Corey has
a small sight vocabulary but has great difficulty in analyzing words
phonetically.  Reversals were occasionally noted in Corey's naming
of letters and sound sequencing errors were common in his reading.
Attentional errors also appeared to impair Corey's reading.  Corey
can spell only a few simple words.  His ability to read. or spell
using a phonetic approach is severely limited, and Corey's attempt
to spell even some simple words (e.g. "arm") are unrecognizable.
Also apparent is some difficulty in the formation of letters and
numbers, perhaps also some difficulty in discriminating letters of
similar shape.

Corey's reproductions of the Bender designs reveals a significant
deficit in visual-motor coordination.  His performance on the Benton
Visual Retention Test strongly suggests a deficit in visual memory
or visual-motor functioning.  A significant problem in visual-spatial
analysis was evident on the Raven's Progressive Matrices.  Attentional
difficulties also contribute to Corey's poor performance on this task.
Corey's performance on the Purdue Pegboard reveals significant prob-
lems also in fine motor coordination.  Corey is right dominant in
hand, foot and eye preference.  Left-right awareness is well establish-
ed on self, but not for mirror rotation; Corey consistently misplaced
right and left on an examiner facing him.  Finger recognition is un-
impaired.  Corey showed no difficulty with tongue and mouth movements.

Several tests of language functions were also administered.  Language
comprehension (Token Test) is unimpaired, except for occasional in-
attention.  Naming of colors, body parts, and common objects was also
unimpaired.  Corey's immediate memory for digits, although improved
over previous testing remains poor.  Mild articulation errors were
noted.

A specific deficit in speech sound discrimination was apparent.  Corey
knows the names of all the letters of the alphabet and the consonant
sounds.  Discrimination of vowel sounds, however, is very poor.  When
asked to say the sounds of different vowels, Corey produced essential-
ly the same sound for each vowel.  When asked to blend sounds into
nonsense words, Corey would blend adequately but often misprounced
the vowel sounds.

Conclusions and Recommendations:

This evaluation confirms the presence of severe learning disabilities
in reading, spelling and arithmetic.  Corey's learning difficulties
result from wide spread cognitive deficits, including problems in

J.A.630

Corey Johnson                                                                    -3-

attention and concentration, visual processing, and speech sound dis-
crimination and phonics.  It is probably because of this that Corey
has been unable to find compensations that would enable him to achieve
a higher level of academic skill.  With regard to remediation, it
would appear that a whole word sight vocabulary approach, bypassing
phonics and sound blending would be more productive in improving
Corey's reading and spelling.  Corey and his family should be counsel-
led regarding the nature of his learning difficulties and a school
program with less focus on academic skills should be considered.
        Ken Barish, Ph.D.:ww D-4/11/83    T-4/29/83

                              Ken Barish, Ph.D.
                              Psychologist

J.A.631

PLEASANTVILLE COTTAGE SCHOOL

Name of Child:  COREY JOHNSON                     Date Tested: 3/15/85
Date of Birth:  ███████████                       By:  Kenneth Barish, Ph.D.
Date of (PCS) Adm:                                Social Worker: Christine Aaron

PSYCHOLOGICAL EVALUATION

Referral:

Corey was referred for re-evaluation to assess his current cognitive
and emotional functioning.  Corey was last tested in March 1983, by
this examiner, and in February 1982 at Pleasantville Diagnostic
Center.  These evaluations reveal severe learning disabilities in
Reading, Spelling and Arithmetic, associated with impairment of
attention and concentration, visual-spatial skills and specific
language deficits; significant depressive tendencies were also
noted.

Tests Administered:

                    WISC-R
                    Rorschach
                    TAT

Test Findings:

On the WISC-R Corey achieved a Verbal I.Q. of 68-70 (Mentally De-
ficient-Borderline range), a Performance I.Q. of 78-81 (Borderline-
Low Average range), and a Full Scale I.Q. of 69-74 (Deficient-Border-
line range).  Subtest scaled scores are presented below:

| | | | |
|---|---|---|---|
| Information | 4 | Picture Completion | 8(9) |
| Similarities | 5(6) | Picture Arrangement | 9 |
| Arithmetic | 6(7) | Block Design | 1(5) |
| Vocabulary | 5 | Object Assembly | 5(6) |
| Comprehension | 4 | Coding | 6 |
| (Digit Span | 6) | | |

(Alternate scores reflect improvement in performance with addition-
al time and/or assistance from the examiner.)

These scores reflect a significant decline in both Verbal and Per-
formance I.Q. since Corey was tested in 1982.  At that time a Ver-
bal I.Q. of 85, a Performance I.Q. of 93 and a Full Scale I.Q. of
88 were reported.  There is also some difference in a pattern of
subtest scores.  Corey achieved significantly lower scores on the
current testing on both the Comprehension and Object Assembly sub-
tests.  This decline in I.Q. scores is difficult to account for.
However, several factors may be involved.  The current scores
may reflect in part, the increasing demands that the tasks pre-
sented as well as Corey's failure to learn at an expected pace.

**J.A.633**

Corey Johnson                                                    -2-

They also undoubtedly reflect the effects of Corey's severe dis-
couragement and depression with respect to cognitive tasks. For
example, with minimal assistance, Corey was able to improve his
performance considerably in many instances. This was evident on
the Similarities, Arithmetic, Block Design and Object Assembly sub-
tests. Corey's very deficient score on the Block Design subtest
is the result of several rotations of designs that he easily cor-
rected when his error was pointed out to him. These scores, should,
therefore, not be taken as an indication of Corey's intellectual
potential. Corey's intellectual difficulties remain clearly evident,
however, and my recommendation now, even more strongly than two years
ago, is that Corey needs a highly vocationally oriented school pro-
gram. Some efforts should be made to help Corey achieve a level
of literacy that will enable him to function in the working world,
however, Corey is unlikely to improve significantly in this area.

Personality Functioning:

Personality assessment reveals a thoughtful, highly reflective, but
affectively constricted adolescent. Corey expends considerable
energy in his efforts to suppress anger. He appears vulnerable to
periods of depression and frustration. There is also evidence of
feelings of aloneness and a desire for help, that is not being
heard. Several responses suggest that Corey feels that he is not
being listened to.

Corey's test responses also reveal an effort toward maturity that
is particularly impressive, considering his severe learning dis-
abilities. Corey's TAT stories reveal, for example, an awareness
that life has trials and tribulations that must be coped with and
an acceptance of the reality that life is sometimes painful, for
example, that there are painful separations. Corey's stories empha-
size his concerns regarding the future and his constructive and
mature goals. For example, he tells a story about a young man
"wondering if he's going to have a job and a nice life, maybe some
kids and a wife to support and help him move on in life." This
effort towards maturity is at the cost of a constriction of Corey's
emotional life, particularly a suppression of anger and rebellious-
ness and an overly compliant attitude towards authority. Corey
also tends towards extremes of either/or, good/bad in his thinking
about himself and his life. Corey could benefit from greater ac-
knowledgement and acceptance of his anger, integrating anger into
his identity along with a less narrow definition of maturity.

Recommendations:

As indicated earlier, Corey needs a vocational school program with
some remediation in literacy skill. He could also benefit from
counselling and supportive psychotherapy both in regard to prob-
lems of self-esteem related to his learning disabilities and also
supporting and broadening his efforts to become a mature adult.
        Kenneth Barish, Ph.D.:ww  D-4/15/85      T-4/15/85

                        Kenneth Barish, Ph.D.
                        Psychologist

# EXHIBIT 12

## AFFIDAVIT

State of New York            )
                             ) ss:
County of Westchester        )

RICHARD BENEDICT, being duly sworn, deposes and says:

1. I am currently 63 years of age and reside at 799-D Heritage Hills, Somers, NY 10589.

2. I worked full time as a special educator for 34 years. I am now retired and work part time as a welfare fund administrator and President of Heritage Hills Society.

3. I was Corey Johnson's special education teacher during the 1984-1985 academic school year at Pleasantville, during which he was 16 and 17 years old. During that time period, I saw Corey on a regular basis and had the opportunity to observe him interact with his peer students as well as staff. I also recently reviewed Corey's Individual Education Plan ("IEP") for the above-referenced school year, a true and correct copy of which is attached as Exhibit 1. I make this affidavit based on my independent recollections of Corey Johnson, as well as on my review of the IEP.

4. Corey was part of the BOCES program, which meant that he attended occupational education classes for a portion of the school day. These classes attempted to teach the students "survival skills," such as reading train schedules and making change. As discussed below, Corey struggled even with such basic skills.

5. Based on my interaction with him, Corey appeared to have emotional as well as other disabilities. Corey lacked the necessary support to help him through these challenges—it was evident that his mother was never there for him.

6. Corey was very limited from an intellectual standpoint and I believe it frustrated him. Corey sometimes referred to himself as "stupid."

1

**J.A.636**

7. For example, Corey exhibited minimal reading comprehension abilities. Asking Corey to read and respond with his interpretation of what he had read was like asking a painting on the wall to do so. Indeed, the diagnostic testing that created the basis for Corey's IEP (the results of which are reported in the IEP) shows that at age 16, Corey had a 2nd grade reading level equivalency.

8. Likewise, Corey's mathematics skills were also very poor and far below his grade level at the time I was teaching him.

9. While the diagnostic testing results are generally consistent with my personal experience teaching Corey, I believe that, if anything, the results may have somewhat overstated Corey's abilities. Corey performed worse in an uncontrolled environment. Thus, while the diagnostic testing of Corey at age 16 shows that he had a 4th grade math level equivalency, in my experience, Corey (at ages 16 and 17) performed at about a 2nd grade level in math.

10. For example, if Corey was able to sit down alone in a quiet room (under conditions similar to a controlled testing environment), he could *sometimes* correctly count an amount of change. However, in a regular classroom setting with other students and distractions, Corey's performance suffered. Based on my experience, I believe that, out in the world, if Corey were to receive incorrect change after buying a soda, he would not know it.

11. As a general matter, I did not concern myself with labeling students. It was my job as a teacher to try to help Corey and my other students grow academically and socially. However, based on my experiences with Corey, I believe he was mentally retarded.

12. Socially, Corey was a follower who desperately sought the acceptance of peers. I believe Corey acted this way in part to try to compensate for his limitations.

**J.A.637**

13. Corey often engaged in foolish acts simply because a peer asked him to do so.   For example, if a peer told Corey, "Go down the hall and knock the book out of that student's hands," Corey would do it.  If I asked him after the fact why he had done it, he would shrug.  He did not have the mental capacity to rationalize his actions.

14. Corey certainly did not appear to have the ability to apply lessons to his future behavior.  After the type of incident described in paragraph 13, I would sit down with Corey and try to explain to him why what he had done was foolish and wrong.  In that moment, Corey would seem to listen and understand what he had done and why it was unacceptable (he would say he understood) but then, an hour or a day later, would do something similar.

15.  Corey lacked self-control and an appreciation of the consequences of his actions, and, as result, these experiences described above occurred on almost an everyday basis.

16. We tried to give Corey structure and as much one-on-one attention as was feasible.

17. For example, we assigned an aide to accompany Corey to the bathroom and waited outside when Corey was using it.  Previously, when no aide was assigned to do so, Corey would get lost on his way back to our class and wander into other classrooms.

18. Also, when outside the school setting, on field trips, for example, I would tell Corey to stay close to me, knowing that needed external controls to avoid getting himself trouble.

19. Despite these behaviors, I did not consider Corey to be a serious discipline problem.  In fact, Corey was generally liked by both staff and students at Pleasantville.

20. In reviewing the IEP, I believe that many of the IEP annual/long term goals and short term instructional objectives were completely unrealistic for someone with Corey's

3

J.A.638

academic and intellectual limitations, including but not limited to the following: (1) "the student will tell, read, write, and/or estimate time"; (2) "identify author's purpose, given 4th grade reading material with at 75% accuracy rate"; and (3) "the student will select and write words to be capitalized in context".

21. I tried to help Corey reach one specific goal- to identify the laws of the state and understand how to comply with them. I remember that although Corey would agree with such statements as, "it is against the law to speed," or "it is against the law to kill," he did not have the capacity to apply these mental concepts.

22. In my experience, people who do not frequently interact with individuals who have serious disabilities may perceive these individuals as higher functioning than they actually are. Consequently, some might not have recognized that Corey was emotionally disabled and had other disabilities.

23. Corey functioned at his optimal level in a controlled setting (such as at Pleasantville) because it provided buffers and structure.

24. After Corey left Pleasantville and, later, Elmhurst, I believe that the challenges that confronted him would be difficult because Corey needed external structure to function. He was incapable of providing the structure for himself.

25. I had heard about Corey's conviction many years ago.

26. I believe that at the time those crimes were committed, Corey was a very emotionally troubled and intellectually limited kid in an adult's body.

27. Based on my experience with Corey, he does not have the capacity to lead. Corey could not assemble a group of people to do anything in a coordinated way. I also find

4

**J.A.639**

it very difficult to believe that he is capable of buying or selling large volumes of drugs.

28. On the other hand, it is very easy for me to believe that Corey may have gotten involved with a group of people and done anything they asked in order to be accepted by them. As I stated above, Corey was a follower who desperately sought the approval of his peers. Moreover, Corey did not have the mental capacity or self-control to extricate himself from a bad situation.

29. I was told that, in prison, Corey studies for his GED. My reaction to being told that information is that I am not surprised. Based on my experience with him and other students like him, I believe that he is unwilling to admit his limitations to himself.

RICHARD BENEDICT

Sworn before me on this
5 day of December, 2011

Notary Public

MARY LOU MARTELLI
NOTARY PUBLIC STATE OF NEW YORK
WESTCHESTER COUNTY
LIC. #01MA5071758
COMM. EXP. 4/17/2015

5

**J.A.640**

MT PLEASANT—COTTAGE U.F.S.

1/02/84          1984/85 INDIVIDUAL EDUCATIONAL PLAN FOR          0001069
                        COREY   JOHNSON                           58
                                                                 PAGE   1

CURRENT PLACEMENT                     PREVIOUS PLACEMENT
  COTTAGE SCHOOL                        COTTAGE SCHOOL
  BENEDICT RICHARD                      MINCH BERNARD

PERSONAL DATA:                        PARENT/GUARDIAN ADDRESS

D.O.B. ███████    AGE 16 YRS   MOS          PLSNTVLECTGE
ENROLLMENT DATE   04/26/82
TELEPHONE

               *** PRESENT LEVEL OF PERFORMANCE ***


METRO INSTR TEST — MATH    (78)            INTER

                                    05/84
     SUB-TEST                   NCE  G.E.  PCT

   TOTAL INSTRUCT BATTERY       67   4.7   2.0

METRO INSTR TEST — READ   (78)           ELEMENTARY

                                    05/84
     SUB-TEST                   NCE  G.E.  PCT

   RATE OF COMPREHENSION        131        4.0
   READING COMPREHENSION         10   2.0  1.0
   VOCABULARY IN CONTEXT         10        1.0


               *** EDUCATIONAL PLAN ***

                   SOCIAL STUDIES
ANNUAL/LONG TERM GOALS:                    BENEDICT RICHARD

A003  STUDENT WILL IDENTIFY THE POLITICAL STRUCTURE AND LAWS OF THE STATE
      SETTING WITH OBSERVATION AND PRACTICE OF THOSE LAWS

A004  STUDENT WILL IDENTIFY THE POLITICAL STRUCTURE OF THE FEDERAL GOV'T
      AND THE IMPACT OF ITS LAWS IN THE PRACTICE OF GOOD CITIZENSHIP

A005  STUDENT WILL READ, USE AND INTERPRET MAP SYMBOLS TO LOCATE GIVEN
      POINTS AND/OR OBTAIN INFORMATION OF MAPS

A006  STUDENT WILL BE ABLE TO IDENTIFY AND LOCATE SPECIFIC POINTS ON THE
      MAP OR GLOBE AND DEFINE GEOGRAPHICAL TERMS

SHORT TERM INSTRUCTIONAL OBJECTIVES:

A003  A0105-17      P  STATE SERVICES: PURPOSE OF LICENCES, COMPULSORY ED

      A0105-22      P  STATE LAWS: CONSUMER PROTECTION, PUB SERVICE COM.

A004  A0105-24      P  DEMOCRACY: NEED FOR 2 OR MORE PARTY SYSTEM

      A0105-27      P  LEGISLATIVE BRANCH: CONGRESS AND HOW IT WORKS

J.A.642

```
                        MT PLEASANT-COTTAGE U.F.S.

11/02/84              1984/85 INDIVIDUAL EDUCATIONAL PLAN FOR        0001069
                                                                    58
                            COREY  JOHNSON                           PAGE  2
```

| | | | |
|---|---|---|---|
| A005 | A0203-07 | P | IDENTIFY TYPES OF MAPS: WHAT DOES THIS MAP TELL |
| | A0204-07 | P | NAME THIS MAP AND TELL WHY WE USE THIS |
| | A0205-07 | P | WHAT TYPE OF MAP AND WHAT INFO CAN WE GET FROM IT |
| A006 | A0204-09 | P | POINT & NAME CLIMACTIC ZONES, LATITUDE, LONGITUDE |
| | A0205-09 | P | EXPLAIN THE PURPOSE OF THE GRID ON GLOBE/MAP |

## PERSONAL-SOCIAL

ANNUAL/LONG TERM GOALS:                              BENEDICT RICHARD

B009 THE STUDENT WILL BE ACCEPTING TOWARDS OTHERS.

B015 THE STUDENT WILL EXHIBIT CONTROL OF EMOTIONAL SYMPTOMATIC BEHAVIOR.

SHORT TERM INSTRUCTIONAL OBJECTIVES:

| | | | |
|---|---|---|---|
| B009 | B0414-03 | P | ACCEPT CRITICISM FROM OTHERS EXHIBIT NON-AGGRESSIVE RESPONSE, GIVEN SITUATION 60% OF TIME |
| B015 | B0412-23 | P | BEHAVE AGE APPROP/UNDER STRESS, GIVEN VAR SCHL SET 50% OF TIME |
| | B0412-24 | P | RESPOND APPROPRIATELY TO NEW SITUATIONS, GIVEN SETTINGS 75% OF TIME |

## MATHEMATICS

ANNUAL/LONG TERM GOALS:                              BENEDICT RICHARD

M007 THE STUDENT WILL COMPUTE IN WRITING 1-5 DIGIT ADD PROB WITH REGROUP AND WITHOUT REGROUP INCLUDING IDENT OF PLACE VALUE ACCORD TO SPEC LVL

M011 THE STUDENT WILL COMPUTE ORALLY AND IN WRITING DIVISION EXAMPLES AND WORD PROBLEMS WITH AND WITHOUT REMAINDERS.

M015 THE STUDENT WILL BE ABLE TO IDENTIFY, MEASURE, AND COMPARE WEIGHTS.

M016 THE STUDENT WILL TELL, READ, WRITE AND/OR ESTIMATE TIME.

M018 THE STUDENT WILL BE ABLE TO IDENTIFY, MEASURE AND COMPARE LIQUID MEASUREMENTS.

SHORT TERM INSTRUCTIONAL OBJECTIVES:

| | | | |
|---|---|---|---|
| M007 | M0102-44 | P | WRITE NUMBER SENTENCE BASED ON WORD PROBLEM WITH REGR GIVEN ORAL PROB W/1-2 DIGIT ADDEND 80% ACC |
| M011 | M0104-80 | P | WRITE NUMBER SENTENCE FROM WORD PROB W/1 DIGIT DIVISOR, GIVEN WORD PROBLEM 75% ACC |
| M015 | M0203-15 | P | TELL NUMBER OF OUNCES IN 1/2 LB, 1 LB, 2 LB, GIVEN QUESTION 80% ACC |
| | M0203-16 | P | TELL NUMBER OF POUNDS IN A TON, GIVEN QUESTION 90% ACC |

**J.A.643**

.1/02/84          1984/85 INDIVIDUAL EDUCATIONAL PLAN FOR          CC01069
                                                                   58
                          COREY  JOHNSON                           PAGE  3

1016   M0204-24    P   ESTIMATE PASSAGE OF TIME REPRESENTED BY PICTURES,
                       GIVEN 2 PICTURES 80% ACC

1018   M0203-28    P   IDENTIFY EQUIVALENT MEASURE OF 1/2 GALLON AND
                       GALLON, GIVEN MANIPULATIVES AND VERB QUES 80% ACC

       M0204-29    P   IDENTIFY EQUIV MEAS OF OUNCES IN CUP, 1/2 CUP, 1/2
                       PINT, PINT, GIV MANIPULATIVES AND VERB QUES 80% AC


                              READING
ANNUAL/LONG TERM GOALS:                          BENEDICT RICHARD

 R026  THE STUDENT WILL SELECT AND/OR SEQUENCE DETAILS FROM PICTURES,
       STORIES OR DIRECTIONS.

 R027  THE STUDENT WILL EXPRESS ORALLY AND/OR IN WRITING RELATIONSHIPS
       DERIVED FROM THE CONTENT OF READING MATERIAL.

 R052  THE STUDENT WILL IDENTIFY (ORALLY AND/OR IN WRITING) ELEMENT

 R053  THE STUDENT WILL IDENTIFY ORALLY AND/OR IN WRITING, ELEMENTS OF STYLE
       AND LITERARY DEVICES CONTAINED IN THE CONTENT OF READING MATERIAL

 R054  THE STUDENT WILL EXPAND WRITTEN AND/OR SPOKEN VOCABULARY THROUGH THE
       USE OF CONTEXTUAL CUES AND STRUCTURAL ANALYSIS.

SHORT TERM INSTRUCTIONAL OBJECTIVES:

R026   R0704-03    P   IDENTIFY SETTING OF 4TH GRADE MATERIAL, GIVEN
                       STORY TO READ 75% ACC

       R0704-04    P   EXPLAIN ACT/SITUATION SHOWN IN ILLUSTRATED STORY,
                       GIVEN 4TH GR LEVEL READING MATERIAL 75% ACC

       R0704-05    P   EXPLAIN ACT/SITUATION INFERRED BY ILLUS STORY,
                       GIVEN 4TH GR LEVEL READING MATERIAL 75% ACC

       R0704-06    P   IDENT TIME CONCEPT PRESENT/PAST/FUTURE, GIVEN 4TH
                       GRADE LEVEL READING MATERIAL 90% ACC

       R0702-07    P   FORMULATE TITLE BASED ON MAIN IDEA, GIVEN
                       ILLUSTRATED STORY AND QUESTIONS 80% ACC

       R0704-07    P   FORMULATE TITLE BASED ON MAIN IDEA GIVEN
                       ILLUSTRATED STORY ON 4TH GRADE LEVEL 80% ACC

       R0704-08    P   PREDICT OUTCOME OF STORY, GIVEN 4TH GRADE LEVEL
                       READING MATERIAL 75% ACC

       R0704-09    P   RETELL STORY IN SEQUENCE, GIVEN 4TH GRADE LEVEL
                       READING MATERIAL 80% ACC

       R0704-12    P   INDEPENDENTLY FOLLOW A WRITTEN DIRECTION, GIVEN
                       DIRECTION (RELATED GRADE 4) 100% ACC

R027   R0704-14    P   SELECT MAIN IDEAS FROM FICT/NON-FICT, GIVEN 4TH
                       GRADE LEVEL READING MATERIAL 75% ACC

       R0704-16    P   COMPLETE PHRASE W/SIMILE/METAPHOR PARA, GIVEN 4TH
                       GRADE LEVEL PARAGRAPH/SENTENCES 75% ACC

       R0704-17    P   SELECT WORDS/PHRASES THAT DESCRIBE CHARACTERS,
                       GIVEN 4TH GRADE LEVEL READING MATERIAL 75% ACC

**J.A.644**

USCA4 Appeal: 21-1    Doc: 10-1    Filed: 01/08/2021    Pg: 44 of 261

MT PLEASANT-COTTAGE U.F.S.

11/02/84             1984/85 INDIVIDUAL EDUCATIONAL PLAN FOR          G001069
                                                                      58
                           COREY   JOHNSON                            PAGE  4

> R0704-18    P  EVALUATE FACT OR OPINION, GIVEN 4TH GRADE LEVEL
>                READING MATERIAL 65% ACC

1052  R0704-19   P  IDENTIFY AUTHOR'S POINT OF VIEW, GIVEN 4TH GRADE
>                READING MATERIAL 75% ACC

> R0704-21    P  IDENTIFY AUTHOR'S PURPOSE, GIVEN 4TH GRADE
>                READING MATERIAL 75% ACC

1053  R0704-15   P  RESTATE MEAN OF IDIOMATIC EXPRESS PARAGRAPH,
>                GIVEN 4TH GR. LEVEL READING MATERIAL 70% ACC

> R0704-24    P  IDENTIFY ALL FIGURATIVE LANGUAGE, GIVEN 3RD GRADE
>                LEVEL READING MATERIAL CONTAIN. FIG/LANG 75% ACC

054   R0704-29   P  USE CONTEXT CLUES TO DEFINE UNFAMILIAR WDS, GIVEN
>                4TH GR. READING MATERIAL W/NEW WDS 75% ACC

## WRITING

ANNUAL/LONG TERM GOALS:                       BENEDICT RICHARD

W032 THE STUDENT WILL IDENTIFY AND WRITE PUNCTUATION SYMBOLS, APPLYING
THEM IN ORAL READING AND IN WRITTEN FORM.

W033 THE STUDENT WILL SELECT AND WRITE WORDS TO BE CAPITALIZED IN CONTEXT.

W034 THE STUDENT WILL WRITE SENTENCES AND PARAGRAPHS USING SPECIFIC
CONTENT AND STRUCTURE.

W035 THE STUDENT WILL CONSTRUCT SENTENCES AND PARAGRAPHS OBSERVING RULES
OF HYPHENATION, INDENTATION AND FORMAT.

W036 THE STUDENT WILL WRITE AND/OR TELL A STORY USING OUTLINE, SPECIFIC
CONTENT AND STRUCTURE.

SHORT TERM INSTRUCTIONAL OBJECTIVES:

032  W0901-01   P  RESPOND TO PUNCTUATION MARKS, ORAL READING-PERIOD,
>                QUESTION MK, GIVEN SENTENCE TO READ 100% ACC

> W0901-02   P  WRITE APPROP PUNC MARKS IN CONTEXT-PERIOD,QUESTION
>                MK, GIVEN SENTENCE 90% ACC

> W0905-02   P  WRITE/USE APOSTROPHE IN CONTEXT BETWEEN PLURAL/
>                GIVEN WRITTEN SAMPLE TO COMPLETE 75% ACC

033  W0901-07   P  WRITE CAPITAL LETTER FOR PRONOUNS, NAMES, GIVEN
>                SENTENCES TO ADJUST 90% ACC

034  W0901-08   P  WRITE COMPLETE SENTENCE FROM PICTURE/NOUN/VERB
>                AGREEMENT, GIVEN PICTURE 75% ACC

> W0902-08   P  WRITE COMPLETE SENTENCE ABOUT EVENT PRESENT/FUTURE
>                TENSES, GIVEN DIRECTION 80% ACC

> W0903-08   P  WRITE COMPLETE SENTENCE ON SPECIFIC TOPIC, GIVEN
>                TOPIC AND DIRECTIONS 80% ACC

> W0904-08   P  IDENTIFY SUBJECT/PREDICATE OF SENTENCE, GIVEN
>                SENTENCE 80% ACC

J.A.645

MT PLEASANT-COTTAGE U.F.S.

.1/02/84         1984/85 INDIVIDUAL EDUCATIONAL PLAN FOR          0001069
                                                                 58
                        COREY   JOHNSON                           PAGE  5

1035  W0902-11      P   WRITE SENTENCES -3 CONTINOUS FASHION ON LINE,
                        GIVEN PICTURE/DIRECTIONS 90% ACC.

1036  W0901-14      P   DICTATE STORY -2 IDEAS BASED ON PICTURE, GIVEN
                        PICTURE 90% ACC

      W0902-15      P   WRITE STORY-2 IDEAS BASED ON HOLIDAY PICTURE,
                        GIVEN PICTURE 60% ACC.

J.A.646

# EXHIBIT 13

## AFFIDAVIT

State of New York        )
                            ) ss:
County of New York      )

DARNELL BROWN, being duly sworn, deposes and says:

1. I was born in 1970. I currently live at 411 Broad Street Northfield, NJ 08225.

2. I grew up in Manhattan and moved to Trenton in or about 1987. In Trenton, in or about 1989, my brother Darryl Brown introduced me first to Corey Johnson's brother Robert Johnson and then, also in or about 1989, to Corey Johnson.

3. After I met Corey, I started hanging out with him and ended up spending more time with Corey than with Robert. I played basketball with Corey and we also went to parties together. Corey was much quieter and more laid back than Robert.

4. In or around 1988 my brother Darryl, some friends and I started to spend time at a house at 203 Locust Street in East Trenton. After I met Corey he also started to spend time at that house. Corey did not live there; he lived at the places of various girlfriends but came to the house regularly.

5. The males who spent time at the house took part in selling drugs to support ourselves – although as I discuss later in this statement, Corey's role in the selling of drugs was very limited.

6. Those guys spending time at the house who had money would pay the bills. Corey was never one of those guys. Any money Corey ever had seemed to go to his girlfriend Monica or other girlfriends.

1

J.A.648

7. The women who came to the house did the laundry, cooked the meals, and did other household chores. They looked out for the men who came to the house, in terms of personal things.

8. Our group in Trenton was an informal family. We all had to trust each other for it to work. I considered Corey family – a cousin (even though he was not related to me). Corey treated me and my brother as if we were important members of his family. For example, he gave us money when we needed it, or he helped us when we needed a ride.

9. In our group in New Jersey, there was a hierarchy of responsibilities. The officers were the leaders in the group; they made the decisions. My brother Darryl and I were both officers. The workers were followers.

10. Corey was a worker and a follower. He sold drugs, but he never did so on his own. He never went anywhere or did anything without having someone with him. Corey's assignments when it came to selling drugs never required much. He was not given assignments that required much because Corey did not appear capable of making decisions on his own. He had to be told what to do. Corey did not refuse to do something once asked. Even if he did not seem to want to do something, he would do it.

11. Corey comprised the lowest level of the worker/follower group. He and Vernon Lance Thomas, who we called "V" and was also at a low level, were the quietest guys in the group. Compared to Corey, V was more likely to try to analyze something. But, as with Corey, V had to be told what to do.

12. "Whitey" (Richard Tipton) was also of our group in New Jersey. Whitey was also a worker. But within the worker group, Whitey was at a higher level than Corey or V. Whitey was more outgoing, outspoken and intelligent than either Corey or V.

2

903464.05-New York Server 4A - MSW

13. Corey also seemed incapable of taking any initiative on his own in other aspects of his life. He was very unassertive in his personal life and never appeared to have any confidence in himself. He had several girlfriends, but other than Monica, I thought they looked like men.

14. If a girl liked Corey, she would have to take the initiative to approach him, because he would not approach her.

15. Corey did not talk much, especially when he was among a group of housemates. It was as though he did not want to be put on the spot. Corey went along with what everyone else was doing and did not come up with his own ideas.

16. I never knew Corey to have a job (aside from his lowest level involvement in the drug selling activity). I never knew Corey to have a car, and never saw him drive.

17. I never saw Corey read a book or a newspaper.

18. In my experience, Corey was a good person when it came to helping others. He gave food to people to who did not have any, and was generally willing to help people in need.

19. Sometimes, Corey would go along with me New York to visit his mother. I saw her a few times and she always appeared to be on drugs. Corey would never talk about his mother to me.

20. In 1991, my brother Darryl and I were both arrested and sent to prison.

21. Thereafter, some of the other guys from our New Jersey group went to Virginia.

22. I don't know which of them had the idea to go there, or what reason that person or person had for that idea.

3

**J.A.650**

23. The people from our group who went to Virginia – Whitey (Tipton), CO (Corey) and V (Thomas) – had all been workers in New Jersey.

24. Based on their statuses in our group, I would have expected Whitey, rather than Corey or V, to be the leader of the group in Virginia.

25. Corey unfortunately ended up in a situation in which those whom he was following were not as skilled at leadership as my brother and I had been.

DARNELL BROWN

Sworn before me on this

14th day of October, 2011

Notary Public

Susie Ng
NOTARY PUBLIC, State of New York
No. 01NG4948150
Qualified in Nassau County
Certificate Filed in New York County
Commission Expires March 6, 2012

4

903464.05-New York Server 4A - MSW

**J.A.651**

# EXHIBIT 14

## AFFIDAVIT

State of New Jersey     )
                        ) ss:
County of _Mercer_     )

DAROLD BROWN, being duly sworn, deposes and says:

1. I live at 873 Parkside Avenue, Trenton, NJ, 08618.

2. I was born in New York City on ▮▮▮▮▮▮▮▮▮ I grew up on 155th Street in New York City.

3. I first met Corey in New York through some mutual friends. Corey and I are the same age. But when I first met Corey, I had the impression that Corey was younger than I because Corey tended to hang out with guys who were younger. I was surprised when I later found out that we were the same age. I spent some time with Corey while in New York but did not really begin hanging out with him until we had both moved to New Jersey.

### Trenton Group Generally

4. Around 1986, I moved to Trenton, New Jersey with some friends and my brother, Darnell. Corey soon followed. We rented a house at 203 Locust Street in East Trenton.

5. In Trenton, Darnell and I formed a group that sold drugs.

6. I was generally in charge of our group. If I was not there, the group would listen to my brother Darnell. If Darnell was not there, they would listen to the next person in charge. Everyone in the group knew who was in charge and what the pecking order was.

7. Looking back, nothing that the group did showed good judgment. But within our group, my brother and I were the closest to having good judgment, which is why we were in charge.

1

J.A.653

8. The group also included guys we called "block hustlers," "workers," or "worker ants." These terms, which we used interchangeably, were used to describe guys who had no rank or status within the group. They worked for someone else. They did not save money from drug sales and did not pay bills. They did not have cars or anything expensive. They did not have a plan for the future.

### Corey and His Role in Trenton Group

9. Corey was what we referred to as a block hustler, worker or worker ant.

10. Corey didn't have a level or rank in the organization. Corey was not someone that anyone in the group saw as a leader and no one would have listened to him.

11. Moreover, Corey was not capable of giving instructions to others. He would let others make decisions and go along with what someone else was doing just to please the other person.

12. Corey was a follower. Corey would go along with anything anyone in the family – our group – would say. If, hypothetically, you would say to Corey "let's rob a bank," Corey would be there with you. He wouldn't analyze whether it was a good idea. Corey's view was that he'd do anything for the people he considered his family.

13. Indeed, Corey would go along with whatever someone else was doing no matter who he was or what his status was within our group. If someone in the group said, "let's do something," Corey would automatically do it, no questions asked. Corey had poor judgment.

14. One time, some other friends of mine went to a party with Corey. I didn't attend, but heard that there was an argument between my other friends and a different group of guys. I rushed over to the party to prevent Corey from getting involved in any fight that might

2

J.A.654

unfold. Corey would go along with the crowd unless someone told him not to go along. Corey tended to listen to me when I spoke to him.

15. One of Corey's limitations was that he would always defer to someone else's leadership – even if the someone else was exhibiting what I would have recognized to be poor judgment.

16. Corey would even defer leadership to younger people, even if they seemed predisposed to defer to him because he was older than they.

17. Corey was trustworthy and loyal. He was respected by everyone in the group. Corey considered our group to be his family and was very protective of the group.

18. I don't believe Corey had the capacity to walk away from the group. Everyone he considered to be his family was in Trenton.

19. Based on the way Corey expressed himself, his intellect seemed very low to me. Corey had difficulties expressing himself. When Corey spoke, he was never very assertive and spoke of everyday things. He rarely initiated conversations. He seemed to have trouble following along in conversations and would often stay quiet. You had to spend time around Corey in order to fully understand his limitations, which were significant.

20. Because of his lack of leadership and intellectual abilities, Corey did not venture out on his own when it came to selling drugs. He always sold drugs for others and did what they told him to do.

21. If he had to travel, Corey would usually rely on a cab to take him and would rarely go out alone. I never saw Corey drive a car (and do not know if he even was able to).

22. Corey lived with us in the house in New Jersey for about a year before he moved out to live with a girl. I believe this girl's nickname was "Mudda" or something similar.

3

J.A.655

23. Corey generally did not share much information about his relationships.

24. The house we lived in Trenton (in which, as I have said, Corey lived for about a year) was occupied at times by as many as 15-20 guys. Many of the people who stayed there would move in and out and often stay at hotel, motels, or with various women. No one in the group talked about whatever families they may have had. The house was never very clean. We mostly ate out and Chinese take-out boxes would be strewn all over the house.

25. Corey sometimes gave one of the other roommates money to pay the bills, but I never saw Corey pay an actual bill himself or even count money on his own.

26. I never saw Corey count money. In one situation, Corey could not account for his money and had no way of explaining where his money went.

27. Corey never had any real money. When he was involved with a woman named Monica, he would give any money he made to her. I felt that she took advantage of Corey.

28. I thought Corey would remain at the same level – block hustler, worker or worker ant – as long as he sold drugs because he never figured out how to make it on his own.

29. I don't know whether Corey ever had a job besides his involvement in our group. If Corey had not been with our group, the only other job I could have believed Corey to be able to perform would have been a job requiring manual labor, like on an assembly line, where the work is repetitive and a supervisor would have been available to tell Corey what to do. Corey could not handle a job where unexpected problems came up, as he would not know what to do. Corey was not a problem solver.

4

J.A.656

### Roles of Thomas and Tipton in Trenton Group

30. Vernon Lance Thomas was also a block hustler, worker or worker ant, without rank or status in our group. He was very similar to Corey, just a hair above Corey in all of his capabilities.

31. Tipton, who we called "Whitey," was a block hustler, worker or worker ant, too. He had no rank in our group. Whitey was active, hyper, and rowdy.

32. Corey and Whitey were like yin and yang – Whitey was very loud, while Corey was quiet and laid back.

33. Both Whitey and Corey were followers, but between the two, Corey would follow Whitey. Corey would not even stop to analyze a situation before doing something; he would act based on nothing more than other people telling him to. On the other hand, Whitey would analyze a situation first, even if he would eventually be persuaded to do what you were asking him to do. Whitey was considerably more intelligent than Corey.

### My Brother and My Arrests in 1991, and Later Events

34. In 1991, my brother Darnell and I were arrested. Our arrests left the group without its leaders.

35. Corey's options were limited after our arrests. If Corey had gone back to New York, he would have had no friends there, only whatever family he had. As I mentioned earlier, the only job he could have done would have been rote manual labor. Corey needed to be told what to do.

36. I still found it amazing that guys who were workers or block hustlers in our group in New Jersey – Tipton, Thomas and Corey – went to Virginia to try to make a go of it without those who had led our group.

5

37. It was not surprising to me that they had trouble in Virginia. None of them had good judgment – least of all, Corey. None of them had to do any planning while they were part of our group in New Jersey. In Trenton, my brother and I were around to handle any problems and we did so diplomatically.

38. If those who went to Virginia encountered others trying to sell drugs in Richmond, I can understand how the situation could have quickly escalated to violence. None of those guys – least of all Corey – had the leadership or other skills to resolve a situation like that.

39. Because of Corey's always deferring to others (including to Tipton), and because he was felt that those in our group were his family, I would have been particularly afraid for how he would have reacted in any situation in which there was no one with good leadership skills involved and if he felt that his "family" was in danger.

_Darold Brown_
DAROLD BROWN

Sworn to before me on this

15 day of June, 2011

_Helen Simm_
Notary Public

Sworn to and subscribed
before me this
15 day of June, 20 11

6

USCA4 Appeal: 21-1    Doc: 10-1    Filed: 01/08/2021    Pg: 58 of 261

# EXHIBIT 15

J.A.659

Case 3:92-cr-00068-DJN   Document 88-9   Filed 12/14/20   Page 2 of 19 PageID# 2842

## Affidavit of Craig S. Cooley

I hereby affirm under the penalty of perjury that the following information is true and accurate to the best of my knowledge, recollection, and belief:

1. I am an attorney licensed to practice in the Commonwealth of Virginia and, among other courts, in the United States District Court for the Eastern District of Virginia.

2. In 1992, I was appointed by Judge James R. Spencer of the United States District Court for the Eastern District of Virginia as lead counsel representing Corey Johnson, who was facing the death penalty in a multi-co-defendant case. John McGarvey was appointed as my co-counsel. Two other co-defendants also charged with capital crimes, Richard Tipton and James Roane, were tried jointly with Corey Johnson, along with a fourth co-defendant who was not facing the death penalty; another co-defendant, Vernon Lance Thomas, was also charged with capital murder but I understand that after Mr. Johnson's trial and sentencing, the Government withdrew its death notice against Mr. Thomas sometime after he presented evidence that he was intellectually disabled.

3. The capital charges that Mr. Tipton, Mr. Roane, and Corey Johnson faced stemmed from an alleged Continuing Criminal Enterprise drug conspiracy during the course of which the Government alleged that the three men and other conspirators committed a total of ten murders and, in addition, committed a number of shootings in which victims were injured, all of which occurred in Richmond, Virginia. Mr. Tipton, Mr. Roane and Corey Johnson had a joint capital sentencing hearing after the jury returned guilty verdicts on the capital counts in their case.

4. This was my first and only federal capital case. However, by 1992, I had substantial experience as lead trial counsel on death penalty cases in state courts in the Commonwealth of Virginia.

**J.A.660**

Case 3:92-cr-00068-DJN   Document 68-9   Filed 12/14/20   Page 3 of 10 PageID# 2844

5.  John McGarvey and I did not retain a defense fact investigator to conduct an investigation into the guilt phase evidence at trial.  My memory is that we relied exclusively on disclosures received from the Government and on attempted (and generally uninformative) interviews with Government witnesses held in the presence of the prosecutors.

6.  Before I represented Corey Johnson, I do not recall representing any capital defendants who had grown up outside of Virginia or who had spent most of their lives up until shortly before the crimes for which they were charged outside of Virginia (as Corey Johnson had).  For this reason, I had never before conducted a mitigation investigation to locate out-of-state records or witnesses related to my previous capital clients.

7.  In my experience, Commonwealth of Virginia judges would not approve funds for mitigation specialists in state death penalty cases, and I had never sought approval for nor did I ever use a mitigation specialist to conduct a mitigation investigation in any of my prior capital cases before I represented Corey Johnson.

8.  About ten or 15 years before I represented Corey Johnson, I represented one person who had mental retardation (which was the term used for that impairment when I represented Mr. Johnson but which is now called intellectual disability).  He was a juvenile charged as an adult in a capital case in Virginia and we introduced evidence of his intellectual disability as one of the mitigating factors we presented to the jury during his capital sentencing hearing.  That client received a life sentence from the jury.  At the time I tried that case, intellectual disability was not a bar to the imposition of the death penalty in Virginia.  Other than that juvenile client, I do not recall representing anyone in a case involving the question of whether my client had intellectual disability before I represented Corey Johnson, and I did not have expertise in intellectual disability when I represented Corey Johnson on his capital case.

**J.A.661**

9. Shortly after Judge Spencer appointed me to represent Mr. Johnson, I filed a motion seeking court-authorized funds to hire Dr. Dewey Cornell, an experienced forensic psychologist. In my motion, I sought authorization to hire Dr. Cornell to evaluate Corey Johnson for competency to stand trial, to determine whether he was criminally responsible for his alleged crimes, and to conduct a general mitigation evaluation of Corey Johnson's background and mental health. Judge Spencer approved my request and I retained Dr. Cornell to conduct those evaluations. When I retained Dr. Cornell, I had met with Corey Johnson a few times but, as I explain below, I did not suspect that Corey Johnson might be intellectually disabled at that time.

10. I do not know whether Dr. Cornell would have been considered to be an expert in intellectual disability in 1992. I had worked with Dr. Cornell on a previous triple homicide case involving a juvenile defendant, and I found him in that case to be thorough, prepared, assertive, and an effective witness on the witness stand. The previous case on which I had worked with Dr. Cornell did not involve any issues related to intellectual disability. When I contacted Dr. Cornell to request that he conduct an evaluation of Corey Johnson as to competency, criminal responsibility, and to perform a general mitigation evaluation, I did not discuss in any way with Dr. Cornell the possibility that Corey Johnson was intellectually disabled.

11. In addition to seeking authorization to retain Dr. Cornell, I asked Judge Spencer to authorize funds to hire an assistant, Julie Goodwin, to help the Mr. Johnson's defense team request records related to Corey Johnson. Ms. Goodwin was not a trained mitigation specialist and her role was not to conduct a mitigation investigation. Instead, she wrote letters on my behalf to various organizations and government agencies seeking records related to Corey Johnson, and followed up with phone calls when necessary, in the search for records. Ms. Goodwin did the same when Dr. Cornell identified witnesses that he wanted to locate. Ms.

3

**J.A.662**

Case 3:92-cr-00068-DJN   Document 88-9   Filed 12/14/20   Page 5 of 10 PageID# 3945

Goodwin had a good manner with people, which is why I retained her to assist with locating records and witnesses related to Mr. Johnson's mitigation case.

12. I never considered requesting court-approved funds to hire a separate mitigation specialist to assist me and John McGarvey with our representation of Corey Johnson. I do not know whether the court would have approved court funds to retain a mitigation specialist if I had made such a request.

13. Because of my prior experience with Dr. Cornell, John McGarvey and I requested that Dr. Cornell take the lead on the mitigation investigation in Corey Johnson's case, and Dr. Cornell did so. Our expectation and practice was for Dr. Cornell to reach out to potential witnesses, including school teachers, mental health professionals, and Corey Johnson's family, among others.

14. During the course of our representation, neither John McGarvey, Julie Goodwin, nor I (nor anyone else on Corey Johnson's legal team), ever traveled to New York or New Jersey, where Corey Johnson had lived before he came to Richmond, Virginia, in order to conduct any investigation into Corey Johnson's background by searching for records related to him and interviewing witnesses who knew him. Similarly, I do not believe that Dewey Cornell traveled out of Virginia in order to conduct his mitigation investigation into and evaluation of Corey Johnson's background, or to find records related to his background or to interview witnesses who knew him. I believe Dr. Cornell conducted his mitigation investigation from his office at the University of Virginia. Dr. Cornell also met with Corey Johnson in jail to interview him and to conduct psychological testing.

15. The only member of Corey Johnson's family that anyone on our defense team, including Dr. Cornell, met with prior to Mr. Johnson's trial was his mother, Emma Johnson. Julie

4

**J.A.663**

Goodwin spoke briefly by telephone with Mr. Johnson's aunt and his grandmother. But she did not ask them detailed questions about his childhood or about Mr. Johnson's mother, Emma Johnson and gathered very limited information. No one else on the defense team spoke with any other members of Mr. Johnson's family and no one ever spoke with any family friends about him. I understand from Dr. Cornell that he spoke with a handful of professional staff at two of Corey Johnson's residential placements during the course of his evaluation.

16. After Dr. Cornell completed some psychological testing of Corey Johnson, Dr. Cornell reported to me that Mr. Johnson's IQ was 77 and that he just missed being mentally retarded. Dr. Cornell told me that Corey Johnson's IQ is within two points of the borderline for mental retardation. Dr. Cornell told me that Corey Johnson instead had a severe learning disability. He said that Mr. Johnson's substantial intellectual deficits made him "almost mentally retarded" and that "his condition is similar" to mental retardation and "involves the same kinds of deficits that a person with mental retardation has."

17. As a result of Dr. Cornell's evaluation of Corey Johnson and in reliance upon his conclusion that Mr. Johnson was not intellectually disabled, John McGarvey and I decided that we could not argue that Corey Johnson was intellectually disabled and could not argue that he was barred from eligibility for the death penalty under the statutory prohibition on the imposition of the death penalty upon the intellectually disabled. Instead, we presented Dr. Cornell's testimony during the sentencing phase hearing that Corey Johnson was not "mentally retarded" but instead was learning disabled. Similarly, during the sentencing phase of Mr. Johnson's trial, John McGarvey told the jury during his argument that while Corey Johnson is not "mentally retarded," his severe learning disability was a mitigating factor that the jury should rely upon to choose not to sentence Mr. Johnson to death.

J.A.664

18. I have recently learned that Corey Johnson's current lawyers and mitigation specialists have located school records from elementary schools that Corey Johnson attended in New York, New York and Jersey City, New Jersey, that the defense team (John McGarvey, Julie Goodwin, Dewey Cornell, and I) did not have in our possession and were not aware of during the time we represented Corey Johnson. I have also recently learned that Mr. Johnson's current defense team has located mental health records, including several prior IQ test results, that our defense team did not have in our possession during the time we represented Corey Johnson. Finally, I understand that Mr. Johnson's current defense team has interviewed numerous family members, friends of Corey Johnson, teachers, and mental health professionals who knew Corey Johnson during his childhood and adolescence that  no member of our trial defense team had interviewed, as well as a few drug associates from the time he lived in New Jersey.

19. From my understanding of the contents of the new records located and witness interviews by the current defense team after I represented Corey Johnson, I believe this information would have been significant mitigating evidence that would have strengthened the mitigation case we presented to the jury.

20. I understand that among the records for Corey Johnson that the current defense team has located is an IQ test given to him when he was 8 years old which produced an IQ score of 73. Corey Johnson's original trial team did not locate this IQ test and were not aware of its existence. I also understand that Corey Johnson's current defense team has located another IQ test, when he was 12 years old, that was given to Mr. Johnson just four months before he was given the exact same IQ test at age 13 by Dr. Cary Gallaudet that produced an IQ score of 88. We were aware of the Gallaudet IQ test but were not aware of the IQ test given four months before.

J.A.665

21. I understand that research has shown that if an IQ test is given to an individual shortly after the same IQ test was given, the results of the second IQ test can be artificially inflated and would not accurately reflect the person's IQ.

22. If I had known about Corey Johnson's prior IQ test when he was 8 years old that produced a score of 73 and if I had known that Dr. Gallaudet's IQ results may have been artificially inflated and may have not been an accurate measure of Corey Johnson's IQ, I would have discussed those facts with Dr. Cornell because they are evidence that we could have used to show that Corey Johnson was intellectually disabled and was statutorily ineligible for the death penalty.

23. During the time I represented Corey Johnson, I was not aware that after IQ tests are published, there is a slow but measurable increase over time in the IQ scores of populations to whom the IQ tests are administered, which I now understand is a scientifically proven phenomena known as the "Flynn effect." I was not aware at the time of Corey Johnson's case that correcting the IQ test that Dr. Cornell administered to Corey Johnson for the Flynn effect would lower Mr. Johnson's IQ score from 77 (which Dr. Cornell told me and testified was just above the intellectual disability range) to approximately 73 (which I understand is within the range considered to be consistent with intellectual disability).

24. During the time that I represented Corey Johnson, I do not recall if Dr. Cornell discussed with me the Flynn effect or the concept that IQ scores rise slowly over time. In retrospect, knowing what I know now, I would have sought to use evidence related to the Flynn effect to show that Corey Johnson was intellectually disabled and was statutorily ineligible for the death penalty if I was aware of it at the time.

7

**J.A.666**

Case 3:92-cr-00068-DJN    Document 639    Filed 12/14/20    Page 9 of 90 PageID# 2845

25. John McGarvey and I met with Corey Johnson at the jail many times during the course of our representation of him. Mr. Johnson was always pleasant and cooperative with us, but he was also very passive and rarely asked us any questions. For these reasons, we rarely wrote things to Mr. Johnson but instead we discussed almost everything verbally with him when we discussed his case with Mr. Johnson. We often had to explain legal concepts or terms to Mr. Johnson in order for him to understand, and this occurred more frequently than I had experienced with other clients. Mr. Johnson would shake his head as if he understood what we were telling him, but often we realized later that he did not understand what we were discussing or explaining.

26. Because I had only met with Corey Johnson a few times before I decided to retain Dr. Cornell to assist in Mr. Johnson's case and because I did not have any expertise in intellectual disability, I did not suspect that he might be intellectually disabled when I asked Judge Spencer to approve funds to retain Dr. Cornell. I have since come to understand that individuals with intellectual disability can appear to observers untrained in intellectual disability to be more intellectually capable than their actual abilities. I also have come to learn that individuals with intellectual disability can nevertheless have strengths in areas of functioning alongside their disability.

27. The only member of Corey Johnson's family that I ever met was his mother, Emma Johnson. Ms. Johnson was a very difficult person; in fact, I can only recall one other family member of any client during my career who was equally difficult. We paid for Ms. Johnson to travel to Richmond for her son's trial and we paid for her hotel in a nice, safe section of Richmond about five miles outside of downtown. We also gave her money for meals during the time she was in Richmond. Ms. Johnson complained repeatedly about the quality of her

8

**J.A.667**

Richmond hotel and about the food at the Olive Garden restaurant next to the hotel, and she insisted that we give her money so that she could take taxis downtown and eat in more expensive restaurants. Ms. Johnson never went to see her son at the jail during the whole time she was in Richmond.

28. After the jury sentenced Mr. Johnson to death, Judge Spencer held a sentencing hearing on a later date to officially enter the jury's sentence. A class of high school students was present during that sentencing hearing. Neither Mr. Johnson's defense lawyers nor Mr. Johnson knew in advance of the hearing that the students would be present. When Judge Spencer asked Mr. Johnson whether he had anything to say before the Court imposed its sentence, Mr. Johnson stood up and turned to address the students in the courtroom, which came as a surprise to me and Mr. McGarvey and was not something we or anyone else discussed or suggested to Mr. Johnson. In an extremely sincere, powerful, and moving moment, Mr. Johnson urged the high school students not to commit crimes in any way or make the mistakes he had in his life.

Craig Cooley

Sworn before me on this
20th day of September, 20016

Notary Public
Commission expires: 1/31/2019
222897

9

J.A.668

# EXHIBIT 16

J.A.669

## AFFIDAVIT

State of New York          )
                           ) ss:
County of New York         )

COURTNEY DANIELS, being duly sworn, deposes and says:

1.      I reside at 819 FDR Drive, Apt. 10H, New York, NY 10009.

2.      I knew Corey Johnson since we were babies.  We were both born in 1968.  Corey is only a few months younger than I.  When we were children, my mother, Antoinette Daniels (now Antoinette Daniels Joseph), and Corey's mother, Emma Lee Johnson, had already been best friends for a long time.  My mother Antoinette is Corey's godmother and I have always referred to Corey as my godbrother.

3.      When we were growing up, Corey was like a brother to me.  Corey would frequently spend the night at my house when we in middle school and high school. We would play together and go on family outings with our mothers.   When Corey and I were able to go outside together, we generally traveled around the local neighborhood where one or both of us lived, never going very far.

4.      Corey and Robert did not stay at their mother's house very often when we were young.  They were usually over at my house or over at someone else's house.

5.      My mother was often upset about Corey's mother, Emma Johnson, using drugs and about the types of friends with whom Emma spent time when Corey and Robert around.  My mother was really worried about the things that Emma would do when Corey and Robert were around.  This was around the time when I was in elementary school.

1

J.A.670

6.     I saw Corey less frequently once he began living in a group setting in Pleasantville. But I did see him when he sometimes during those years when he would spend time away from Pleasantville.

7.     Later, when Corey was at the Elmhurst group home, some of the others who lived with him there were friends of some of my friends. So, we would all go out together. Corey was the calmest one of this group of friends.

8.     Since I can remember, Corey has been quiet and passive. He was a cautious observer, rather than an active participant. Sometimes, I would wrestle with Corey and hit him when we were play fighting, but Corey never hit back.

9.     Corey rarely talked about himself or shared if he was upset by something. Instead, Corey always asked me how I was doing and whether or not anyone was bothering me. He wanted to know which guys I was going out with and how I was being treated. Corey acted like my big brother. For example, in high school, if I wanted to go to Coney Island with a friend, Corey would go with us, to protect us. He was also very protective of his cousins, Priscilla and Queenie.

10.     It took a lot to get Corey angry, but one thing that would upset him was if people with whom he felt close, particularly females, were in his view in need of protection. He was very protective of anyone he regarded as his family. And in particular, he was always protective of females with whom he felt close.

11.     Corey was generally very quiet around girls. I never saw him approach a girl on his own. Corey would ask me to talk to girls for him. Sometimes, girls would talk to him first, but Corey would not initiate the conversation.

12.     Corey developed a relationship with one of my best friends, Holly Scott. Holly loved Corey and her face would light up every time Corey's name was

2

**J.A.671**

mentioned. Corey and Holly dated on and off for many years, starting when they were about 14 years old. I never witnessed Corey disrespect Holly in any way. Holly lived across the street from me, so when Corey came to visit my mother and me, he would spend time with Holly as well. Sometimes, Corey would spend the night at Holly's house.

13. Corey spoke with a lisp and had difficulty communicating. I never saw Corey telling other people what to do. In fact, I would often convince Corey to do something or go somewhere even if he did not really want to do what I persuaded him to do. In contrast, Corey's brother Robert was loud, aggressive and impulsive. Robert seemed hyperactive at times and would do dumb things.

14. Through all the years that I knew Corey, Corey and I did not have serious conversations, even when we were in high school. We would mainly talk about routine activities or our plans to do something. Corey would not tell me anything about what was going on in his own home. Corey never talked about his father or his father's other children. I do not know if he ever met his father. Corey never told me about any problems that he may have had with the law. Whenever Corey would visit my house, we would laugh and have fun.

15. When we were younger (until the time he went away to Pleasantville), Corey and I would do our homework together. Many times, I would have to go over his homework with Corey five times before he could "get" it. Other times, no matter how many times I tried to help, Corey simply could not "get" the schoolwork. It seemed like school was not for him.

16. Later, when he was attending Newtown High School, Corey would telephone me and ask me to help him with his homework. Corey needed help in all of his

3

subjects, not just one or two. Corey would come over to my house several times a week so that I could help him with his homework. We would work from 3 PM until 6 PM. He always needed a lot of help in math, and he had difficulties grasping the concept of certain math problems. I would have to give him step-by-step instructions numerous times before he would be able to come up with the answer to a math problem. Generally, Corey did not perform very well in school.

17. When Corey was about 19 years old, he would come to my house to visit by himself. He would either take a cab or public transportation. I do not believe that Corey had a driver's license, and I do not remember ever seeing him drive a car. Corey would sleep on the couch in our living room when he spent the night.

18. Corey began to engage what I understood to be "hustling," he did not bring me around any of the people with whom he hustled. He wanted to protect me from that lifestyle. I believe this behavior began about the time Corey left high school.

19. After Corey turned 20, I saw him less often than before after he moved to New Jersey. When living in New Jersey, he would come to visit me at least once a month and he would give me money, usually between $100 and $200. He was very clear about keeping the New Jersey part of his life separate from his family. He would not talk about drugs or his lifestyle. He would say that he knew what he was doing wasn't right, but he had no plan about how to change his life.

20. Once, after Corey had moved to New Jersey, I had a boyfriend who was abusive. I deliberately did not tell Corey about this relationship as I believed it would greatly upset Corey.

21. I haven't seen Corey since he was in his early 20s.

J.A.673

22. I know that Corey had a daughter, and that Corey wanted his daughter to know his family. I saw pictures of Corey's daughter when she was young but I never met her in person. I do not know very much about the mother of Corey's daughter.

23. I am still very upset by the crimes for which Corey was convicted.

24. When I speak to Corey on the telephone, he still sounds the same as he did when we were growing up – calm and quiet.

STATE OF ___
COUNTY OF NEW YORK
SWORN TO BEFORE ME THI.
MAY 21 2011

Sworn to before me on this
____ day of May, 2011

_____
Notary Public

COURTNEY DANIELS

IRA MARK LIPPELL
Notary Public, State of New York
No. 60-4652304
Qualified in Westchester County
Certificate filed in New York County
Commission Expires March 30, 2015

5

J.A.674

# EXHIBIT 17

**J.A.675**

## <u>DECLARATION</u>

I, MONICA DAWKINS, hereby affirm the following:

1.      I am over 18 years old and a resident of the State of New Jersey.

2.      Corey Johnson and I dated for about two and a half years.

3.      I met Corey around the neighborhood in Trenton in about 1989 or 1990. I first used to see him out and about in the neighborhood. Eventually, we met and then started dating. I dated him because I thought he was fun to be around and outgoing.

4.      As we began to date and spent time together, I realized that there were certain things Corey could not do. This indicated to me that he had a really low learning ability. He was, without question, very slow. There were certain tasks – simple things – that he could just not manage to do. I had sympathy for him as, over time, I realized how little he could learn and do.

5.      One time, I asked Corey to go into downtown Trenton and pay the phone bill because I had to go to school. He went downtown, but when I saw him at the end of the day, he had not paid the bill. He claimed it was because he had forgotten, but it seemed to me that he did not pay the bill because he was not able to figure out how to do so.

6.      Corey did not have the skills to be a leader because there were simple tasks he could not do. It wasn't like he had no mind of his own, but he had to be given directions to do even simple tasks. He was a total follower. He would follow directions, whether they were good or bad.

7.      Corey was a good and loyal friend.

8.      I only lived together with Corey very briefly – for two or three months – during the years we were dating. He seemed to be moving around a lot during that time.

**J.A.676**

9.      After dating for two and a half years, we split up after first separating.  I moved to Delaware after we separated, and he was in Virginia. We stayed in communication for a little while, and then officially broke up.

10.      I had three children before I met Corey.

11.      I met Corey's mother, Emma, on two occasions, but I do not have much memory of those meetings. I did get the feeling that Corey was trying to hide his mother from me.  The first time we met, Corey told me his mother was dead.

I declare the above is true and correct.

Dated:  July 16, 2012

_MONICA DAWKINS_

City of Trenton
State of New Jersey

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **Case No. 3:92CR68 (DJN)** |
| | : | **CAPITAL CASE** |
| **COREY JOHNSON,** | : | **Execution Scheduled for** |
| | : | **January 14, 2021** |
| Defendant. | : | |

**NOTICE OF SUBMISSION OF EXHIBITS (SUBMISSION 3 OF 8)**

Corey Johnson hereby gives notice of the submission of Exhibits 18-30 as attachments to his Motion Pursuant to 28 U.S.C. § 2255 Raising Claim of Ineligibility To Be Executed Under 18 U.S.C. § 3596(c). This is the third submission of eight.

Dated: December 14, 2020

Respectfully submitted,

/s/ David E. Carney
David E. Carney, VA Bar #: 43914
Donald P. Salzman (Admitted Pro Hac Vice)
Skadden, Arps, Slate, Meagher & Flom, LLP
1440 New York Avenue, NW
Washington, DC 20005
Telephone: (202) 371-7246
Fax: (202) 661-8295
Email: david.carney@skadden.com

*Counsel for Corey Johnson*

**J.A.678**

## CERTIFICATE OF SERVICE

I hereby certify that on December 14, 2020, I electronically filed the foregoing with the

Clerk of Court using the CM/ECF system, which will then send notification of such filing to all

parties and counsel included on the Court's Electronic Mail notice list.


/s/ David E. Carney
David E. Carney, VA Bar #: 43914
Skadden, Arps, Slate, Meagher & Flom, LLP
1440 New York Avenue, NW
Washington, DC 20005
Telephone: (202) 371-7246
Fax: (202) 661-8295
Email: david.carney@skadden.com


**J.A.679**

## INDEX OF EXHIBITS TO MOTION PURSUANT TO 28 U.S.C. § 2255 RAISING CLAIM OF INELIGIBILITY TO BE EXECUTED UNDER 18 U.S.C. § 3596(c)

**EXHIBIT NO.**

**SUBMISSION 1**

**EXPERT REPORTS**

Report of Daniel J. Reschly, Ph.D., Aug. 26, 2016 ........................................................................1

Curriculum Vitae of Daniel J. Reschly, Ph.D., May 15, 2020 ..................................................... 1(a)

Report of J. Gregory Olley, Ph.D., Aug. 24, 2016 ........................................................................2

Curriculum Vitae of J. Gregory Olley, Ph.D., Oct. 2020 .......................................................... 2(a)

Letter from Gary N. Siperstein, Ph.D. to Counsel for Corey Johnson, Dec. 16, 2016 ....................3

Curriculum Vitae of Gary N. Siperstein, Ph.D., Sept. 2020 ...................................................... 3(a)

Debra Nelson, Mitigation Report, Sept. 27, 2016 ..........................................................................4

Report of Richard G. Dudley, Jr., M.D., Aug. 22, 2016 ................................................................5

**TRIAL TRANSCRIPTS**

Trial Tr., Feb. 3, 1993 ..................................................................................................................6

**SUBMISSION 2**

Trial Tr., Feb. 10, 1993 ................................................................................................................7

**SUBMISSION 3**

Cornell Mitigation Information and Report (Excerpt) ....................................................................8

Trial Tr., Feb. 12, 1993 ................................................................................................................9

Trial Tr., Feb. 15, 1993 ..............................................................................................................10

**AFFIDAVITS & DECLARATIONS**

Declaration of Kenneth Barish, Ph.D. (staff psychologist at Pleasantville Cottage
    School), July 22, 2014 ..........................................................................................................11

Affidavit of Richard Benedict (special education teacher at Pleasantville Cottage
    School), Dec. 5, 2011 ...........................................................................................................12

Affidavit of Darnell Brown (acquaintance in Trenton, NJ), Oct. 14, 2011 ..................................13

Affidavit of Darold Brown (acquaintance in Trenton, NJ), June 15, 2011 ...................................14

Affidavit of Craig S. Cooley (appointed counsel in 1992), Sept. 20, 2016 ..................................15

Affidavit of Courtney Daniels (Corey's lifelong friend), May 21, 2011 .......................................16

Declaration of Monica Dawkins (Corey's former girlfriend), July 16, 2012 ................................17

**SUBMISSION 4**

Declaration of Cary Gallaudet, Ph.D. (psychologist at Pleasantville Diagnostic
    Center), Mar. 19, 2012 ........................................................................................................18

**J.A.680**

**EXHIBIT NO.**

Declaration of Ann Harding (staff member at Pleasantville Cottage School), Nov. 21, 2011..................................................................................................................................19

Affidavit of Minnie Hodges (Corey's maternal aunt), Apr. 30, 2011 ...........................20

Affidavit of Priscilla Hodges (Corey's cousin), Apr. 30, 2011 .....................................21

Affidavit of Queenie Hodges (Corey's cousin), Apr. 30, 2011 .....................................22

Declaration of Esther Johnson (Corey's maternal grandmother), Apr. 30, 2011 ..........23

Affidavit of Robert Johnson (Corey's half-brother), June 29, 2011...............................24

Affidavit of Antionette Daniels Joseph (the best friend of Corey's mother and Corey's godmother), May 21, 2011) ..............................................................................25

Declaration of Leona Klerer (reading teacher at Mount Pleasant Cottage School), June 3, 2011 ....................................................................................................26

Affidavit of Gerald Lefkowitz (unit administrator at Pleasantville Cottage Center), Dec. 5, 2011 .......................................................................................................27

Affidavit of Odette Noble (social worker at Elmhurst), Dec. 1, 2011 ...........................28

Declaration of George Sakheim, Ph.D. (Chief of Psychological Services at Pleasantville Diagnostic Center), June 17, 2011 ..................................................29

Affidavit of David Washington (childcare worker at Elmhurst), Mar. 1, 2012...............30

**SUBMISSION 5**

**CHILDHOOD & TESTING RECORDS**

Gregory Judge, School Social Worker, Social History, Mar. 4, 1977...........................31

Cheryl Spillane, Learning Consultant, Bureau of Pupil Personnel Services, Jersey City Public Schools, Learning Consultant Evaluation to Child Study Team, Mar. 18, 1977.................................................................................................32

F.A. Figurelli, M.D., Chief Psychologist, Psychological Examination Record, Mar. 25, 1977.................................................................................................................33

Eleanor Glantz, Social Worker, Case Service, Dec. 11, 1978 .......................................34

Committee on the Handicapped, Referral to the Committee on the Handicapped, Feb. 26, 1979.................................................................................................................35

Committee on the Handicapped Records, May 21, 1979 ...............................................36

Washington Heights-West Harlem Community Mental Health Center, Child Assessment Evaluation Summary, Dec. 9, 1981 ....................................................37

Ernest H. Adams, Staff Psychologist, Psychodiagnostic Evaluation, Dec. 11, 1981 ....38

Cary Gallaudet, Psy.D., Pleasantville Cottage School, Psychological Evaluation, Feb. 1, 1982.................................................................................................................39

**J.A.681**

EXHIBIT NO.

Leona Klerer, Mount Pleasant Cottage School Screening Upon Admission, Feb. 22, 1982......................................................................................................................40

Amira Offer, Caseworker, Psychosocial Summary, Mar. 15, 1982 .............................41

Gloria Caro, Pleasantville Cottage School, Reassessment Summary, May 21, 1982 ...................42

Gloria Caro, Caseworker, Initial Conference, Current Assessment and Transfer Summary, June 9, 1982........................................................................................43

Gayle Turnquest, Caseworker, Pleasantville Cottage School, Current Assessment, Jan. 31, 1983 .......................................................................................................44

SUBMISSION 6

Ken Barish, Ph.D., Psychologist, Pleasantville Cottage School, Psychological and Educational Evaluation, Apr. 29, 1983 ...............................................................45

John B. Stadler, M.D., Clinical Director, Pleasantville Cottage School, Psychiatric Evaluation, Aug. 26, 1983 .................................................................................46

Lynda Coccaro, Speech and Language Pathologist, Donald R. Reed Speech Center, Inc., Phelps Memorial Hospital, Speech and Language Evaluation, Oct. 5, 1983 .................47

Lynn Polstein, Jewish Child Care Association of New York, Pleasantville Cottage School, Change in Permanency Plan, Apr. 13, 1984 ................................................48

Gerard Maier, Social Worker, Current Assessment, Sept. 4, 1984 ..............................49

Christine Aaron, MSW Intern, Jewish Child Care Association of New York, Pleasantville Cottage School, Visitation Plan, Dec. 12, 1984 ..................................50

Kenneth Barish, Ph.D., Psychologist, Pleasantville Cottage School Psychological Evaluation, Apr. 15, 1985 .................................................................................51

Gerard Maier, Pleasantville Cottage School, Discharge/Transfer Plan, May 28, 1985................52

Board of Education of the City of New York, Individualized Education Plan – Phase 1, July 1, 1985.....................................................................................................53

Odette Noble, Social Worker, Jewish Child Care Association of New York, Elmhurst Boys Residence, UCR Reassessment and Service Plan Review 6 Month, Nov. 21, 1985.........................................................................................................................54

SUBMISSION 7

Odette Noble, Social Worker, Jewish Child Care Association of New York, Elmhurst Boys Residence, UCR Reassessment and Service Plan Review 6 Month, June 28, 1986.........................................................................................................................55

Odette Noble, Social Worker, Jewish Child Care Association of New York, Elmhurst Boys Residence, UCR Plan Amendment: Form D Trial Discharge, Feb. 23, 1987 ...............56

Newtown High School, Scholastic Transfer Record, Dec. 7, 1987.............................57

**J.A.682**

EXHIBIT NO.

Janet Valentine, Child Care Worker, Pleasantville Diagnostic Center, Outline for Cottage Report (undated)................................................................................................58

**COURT RECORDS**

Notice of the Intention of U.S.A. to Seek Death Penalty as to Mr. Tipton, May 1, 1992................................................................................................................................59

Notice of the Intention of U.S.A. to Seek Death Penalty as to Mr. Roane, May 1, 1992..............60

Second Superseding Indictment, July 20, 1992, Dkt. 115 ............................................................61

Notice of the Intention of U.S.A. to Seek Death Penalty as to Mr. Thomas, Oct. 28, 1992................................................................................................................................62

Verdict Form, Feb. 3, 1993, Dkt. 466...........................................................................................63

Notice of the Intention of U.S.A. to Seek Death Penalty as to Mr. Johnson, Feb. 8, 1993................................................................................................................................64

Special Findings, Feb. 16, 1993, Dkt. 508....................................................................................65

Motion to Have Defendant Declared Mentally Retarded, *United States v. Thomas*, No. 3:92CR68 (E.D. Va. Apr. 15, 1993) ...................................................................66

Memorandum in Support of Initial Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. Section 2255, June 15, 1998, Dkt. 714 (Excerpt) ..........................................67

Reply Memorandum in Support of Initial Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. Section 2255, Mar. 15, 1999, Dkt. 761 (Excerpt)................................68

Ex. 14 to Reply Memorandum in Support of Initial Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. Section 2255, Mar. 15, 1999 ...................................69

Ex. 15 to Reply Memorandum in Support of Initial Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. Section 2255, Mar. 15, 1999 ...................................70

**SUBMISSION 8**

Petitioners' Joint Motion for Leave to Take Discovery, June 24, 1999, Dkt. 770 ........................71

Memorandum Opinion, May 3, 2000, Dkt. 803 ............................................................................72

Memorandum Opinion, May 1, 2003, Dkt. 896 ............................................................................73

Brief for Appellants Cory Johnson and Richard Tipton at 146, *United States v. Johnson*, No. 03-13(L), 03-26, 03-27 (4th Cir. Feb. 17, 2004) (Excerpt) ...............................74

**SUBMISSION 9**

**DIAGNOSTIC MATERIALS**

American Association on Intellectual and Developmental Disabilities Definition Manual ("AAIDD-11") (Excerpt)..............................................................................75

AAIDD User Guide to 11th Edition (Excerpt) ..............................................................................76

Diagnostic and Statistical Manual of Mental Disorders ("DSM-5") (Excerpt)............................77

4

**J.A.683**

EXHIBIT NO.

**CONGRESSIONAL RECORDS**

134 Cong. Rec. 22,926 (1988) (Excerpt).................................................................78

136 Cong. Rec. S6873 (daily ed. May 24, 1990) (Excerpt)..........................................79

**J.A.684**

# EXHIBIT 18 - PART 1

## DECLARATION

I, CARY GALLAUDET, hereby affirm the following:

1.  My address is 11 Foot Hill Road, Bronxville, NY 10708.

2.  I hold a Ph.D. in psychology and became licensed to practice psychology by the State of New York in February 1984.

3.  From November 1981 through May 1983, I was employed at the Pleasantville Diagnostic Center (the "Center") in Pleasantville, New York. I left the Center in May 1983 for a six-month period while I was on maternity leave and then returned and remained through most of 1985. One of my responsibilities at the Center was to conduct psychological evaluations and assessments of children for purposes of admission to Pleasantville Cottage School.

4.  In February 1982, approximately three months after joining the Center, I conducted a psychological evaluation of Corey Johnson. As part of my evaluation, I administered various tests to Corey, including Bender-Gestalt, Figure Drawings, Sentence Completion, TAT, Rorschach, and the WISC-R, which is an IQ test.

5.  At the time I evaluated and administered tests to Corey, I had earned my Ph.D. but was not yet licensed to practice psychology by the state. Accordingly, I consulted with a licensed psychologist, George Sakheim, with respect to Corey's evaluation and testing.

6.  Attached hereto as Exhibit 1 is a true and correct copy of my report of my psychological evaluation of Corey Johnson, conducted on February 5 and 8, 1982.

7.    As set forth in my report, I assessed Corey with a Verbal IQ of 85, a Performance IQ of 93 and a Full Scale IQ of 88 based on my administration of the WISC-R.

8.    On the WISC-R, Corey performed very poorly on the block design test, which requires flexibility of thought and non-verbal abstract reasoning (a developmental level of functioning that cannot be taught).

9.    Corey's block design score also reflected deficits in non-verbal abstract reasoning, perceptual organization, visual perception and perceptual motor functioning.

10.    Corey's very poor results in this area were consistent with Corey having a developmental disability.

11.    His weaknesses in this area were also evident in his Bender-Gestalt performance, which was comparable to a child five years below his chronological age and which suggested the presence of an underlying neurological deficit.

12.    In addition, on the WISC-R, Corey scored very poorly on the digit span test (a memory test), with the results falling in the "Mentally Deficient" range, as noted in the report.

13.    At the time I administered the WISC-R to Corey in early February 1982, I was not aware that a different examiner with another institution (Ernest Adams) had previously administered the identical test to Corey just a few months earlier, in October 1981.

2

J.A.687

14.    As a result of Corey having taken the WISC-R test only a few months before I administered that same test to him, it is likely that Corey Johnson's score on my examination was artificially elevated due to a "practice effect."

15.    If I had known about such a recent WISC-R test having been administered to Corey, I likely would not have administered that same test in February 1982 because of a concern that the scores would be tainted by a "practice effect."

16.    In connection with making this affidavit, I have also come to understand that Dr. Barish subsequently administered the WISC-R test to Corey Johnson in March 1985.

17.    I have reviewed Dr. Barish's report regarding his 1985 testing, which is attached hereto as Exhibit 2.

18.    Dr. Barish was a staff psychologist at the Pleasantville Cottage School, where Corey was evidently placed after completing three months at the Diagnostic Center.

19.    Having reviewed Corey's scores on Dr. Barish's IQ examination, I believe that, in addition to my unknowingly having given Corey the WISC-R just months after it had been administered to him, I may have made errors in my scoring of Corey's WISC-R.

20.    While I cannot be sure of the latter, because I do not have the raw data from my IQ testing of Corey, I believe that Dr. Barish's evaluation likely was more accurate than mine, for at least two reasons.

21.    First, unlike me, Dr. Barish did not administer the WISC-R only a few months after Corey had taken that same test.

3

22.     Second, I was conducting a large volume of evaluations at the time I administered the WISC-R to Corey and, therefore, may have had a greater-than-usual chance of making an error.

I declare the above is true and correct.

Dated: March 1, 2012

_____
CARY GALLAUDET, PH.D.

City of Bronxville
State of New York

4

J.A.689

# EXHIBIT 18 - PART 2

PLEASANTVILLE COTTAGE SCHOOL

Name of Child: COREY JOHNSON
Date of Birth: ███████████
CA:                     13.3
Date of (PCS) Adm:   2/1/82

Dates Evaluated: 2/5, 2/8/82
By:  Cary Gallaudet, Psy. D.
Worker:  Amira Offer

PSYCHOLOGICAL EVALUATION

Corey was referred to the Pleasantville Diagnostic Center (2/1/82)
on a PINS Petition.  Background history revealed long standing school
problems culminating in Corey's truancy since September of 1981.

Behavioral Observations:

Corey was a tall, slender and friendly 13.3-year old boy who spoke
with markedly slurred speech.  Although his face was a bit scarred
Corey impressed as a good looking boy.  He entered the testing easily
yet his affect initially seemed depressed and flat.  He was a co-
operative boy who complied readily with all the examiner's requests.
As the evaluation proceeded, and rapport developed Corey became
more spontaneous and talkative.  He seemed ambivalent about the
testing; enjoying the individual attention he was receiving, but
unsure about the actual assessment.  At times Corey impressed as
in immature boy whose playful and friendly nature often interfered
with his performance.  Frequently Corey would interrupt his own
work with irrelevant questions about toys, games and other activit-
ies, and at those times, the examiner would have to help him refocus
on the task at hand.  Corey was always agreeable and pleasant, and
while expressing concern over "the tests" he never seemed resistant
to anything that was asked of him.

Tests Administered:

                        Bender-Gestalt
                        Figure Drawings
                        WISC-R
                        Sentence Completion
                        TAT
                        Rorschach

Intellectual Evaluation:

On the WISC-R Corey achieved a Verbal I.Q. of 85 (Low Average),
a Performance I.Q. of 93 (Average) and a Full Scale I.Q. of 88
placing him within the Low Average range of intellectual function-
ing.  Average potential is suggested by his Performance I.Q., which
was slightly higher than his Verbal I.Q.  There was no variability
within the verbal area, however, performance tests were character-
ized by signficant variability.  Subtest scores were as follows:

J.A.691

Corey Johnson                                                      -2-

| Verbal Tests | | Performance Tests | |
|---|---|---|---|
| Information | 7 | Picture Completion | 11 |
| Similarities | 7 | Picture Arrangement | 9 |
| Arithmetic | 7 | Block Design | 6 |
| Vocabulary | 7 | Object Assembly | 13 |
| Comprehension | 10 | Coding | 7 |
| Digit Span | 2 | | |

In the verbal area Corey achieved his highest score on Comprehension.
His average score here suggests that Corey has a maturing conscience
and moral sense. His thinking is appropriate and his ability to
use practical judgment in every day social situations is a strength.
On the other hand, a significant weakness was evidenced in his short
term auditory memory. Corey's score on Digit Span fell in the Men-
tally Deficient range, indicating a severe deficit in his auditory
attention for nonmeaningful material. Emphasis is made on nonmean-
ingful because, when using the same skill (short term auditory mem-
ory) with arithmetic problems, Corey was able to function within
the Low Average range. Significant too is the fact that Corey demon-
strated considerable more difficulty with Digits reversed than for-
ward. A performance such as this, characterizes concrete rigid
thinking, with a corresponding inability to shift the frame of re-
ference from digits forward to digits reversed.

In the performance area Corey achieved his highest score on Ob-
ject Assembly. His High Average score here reflects a strength
with the following: the ability to anticipate part/whole relations,
synthesize concrete visual forms, and assemble materials drawn from
life into a meaningful whole. Significantly lower and falling with-
in the Low Average range was Corey's score on Block Design. His
score here reflects deficits in non-verbal abstract reasoning, per-
ceptual organization, visual perception and perceptual motor func-
tioning. Corey demonstrated real difficulty here, nearly rotating
designs early on, and finally failing later designs for the same
reason (rotation). These weaknesses were also evident in his
Bender-Gestalt performance which was characterized by a number of
rotations and distortions. He made three scorable errors, producing
a Bender performance which was comparable to a child five years be-
low his chronological age, and of those errors made two suggested
the presence of an underlying neurological deficit. Visual recall
was adequate but 6 out of the 9 designs reproduced were marked by
severe rotations - again suggesting that a perceptual motor deficit
interferes with Corey's functioning.

Personality Dynamics:

Corey is a depressed, dependent and frightened 13.3-year old who
is struggling with independent strivings at this time in his life
and feels immobilized as a result. This struggle presents a real
conflict for Corey because on the one hand he is an ambitious boy
who is searching for independence, but on the other he feels de-
ficient, dependent and frightened. Essentially he feels unable
to make it on his own and while he knows he needs help it conflicts

J.A.692

Corey Johnson                                                                    -3-

with his reach for independence.  While depressive tendencies are pervasive (many references to dying and killing one's self) Corey offsets these tendencies with fantasies whereby he feels if he tries hard enough he will fulfill his ambition.  He is an ambitious boy who feels caught in the middle - being pushed and pulled - and while his independence is critical to him there is also a longing for nurturance and affection.  These needs stir up considerable anxiety which he initially tries to deal with through denial.  Denial is ineffective, however, and as Corey becomes more anxious he eventually regresses to an earlier stage where he is an immature boy with strong dependency needs.  Hostile impulses also emerge at this time and serve to overwhelm the boy even more.  Object relations are developing and Corey is an empathic and sensitive boy who can relate in a mature manner.  A sensitive boy, with genuine emotional responsiveness, Corey often feels at the mercy of others' wishes, and his strong conscience causes him to respond accordingly.  These conflicts are exacerbated by an organic component which clearly interferes with Corey's ability to function successfully in school. While abstracting abilities are being more and more emphasized at this time Corey falls further and further behind.  It is an area of weakness for him and when challenges are not concrete and meaningful Corey is unable to integrate the experience and becomes easily overwhelmed.

Summary and Recommendations:

In summary, Corey is a sensitive and dependent boy who is struggling with issues revolving around independence.  An underlying organic component serves to exacerbate the anxiety, dependence, affectional needs and hostile impulses and as a result Corey has an extremely hard time trying to integrate emotional challenges.  Although evidence of a learning disability exists he continues to be an ambitious boy who is motivated to improve his situation and would benefit highly from both remediation in academic areas as well as psychotherapy. Corey needs to gain greater insight into his struggle over his ambitions, his reading deficits and his willingness to accept help. From an academic standpoint it is important that if Corey is to learn more effectively that the material be presented in the most concrete and meaningful way.

Cary Gallaudet:ww  D-2/1/82        T-232/82

Cary Gallaudet, Psy. D.

Supervised by:
George A. Sakheim, Ph.D.
Chief of Psychological Services

J.A.693

## PLEASANTVILLE COTTAGE SCHOOL

Name of Child: COREY JOHNSON
Date of Birth: ████████████
Date of (PCS) Adm: _____

Date Tested: 3/15/85
By: Kenneth Barish, Ph.D.
Social Worker: Christine Aar○

### PSYCHOLOGICAL EVALUATION

**Referral:**

Corey was referred for re-evaluation to assess his current cognitive and emotional functioning. Corey was last tested in March 1983, by this examiner, and in February 1982 at Pleasantville Diagnostic Center. These evaluations reveal severe learning disabilities in Reading, Spelling and Arithmetic, associated with impairment of attention and concentration, visual-spatial skills and specific language deficits; significant depressive tendencies were also noted.

**Tests Administered:**

WISC-R
Rorschach
TAT

**Test Findings:**

On the WISC-R Corey achieved a Verbal I.Q. of 68-70 (Mentally Deficient-Borderline range), a Performance I.Q. of 78-81 (Borderline-Low Average range), and a Full Scale I.Q. of 69-74 (Deficient-Borderline range). Subtest scaled scores are presented below:

| | | | |
|---|---|---|---|
| Information | 4 | Picture Completion | 8(9) |
| Similarities | 5(6) | Picture Arrangement | 9 |
| Arithmetic | 6(7) | Block Design | 1(5) |
| Vocabulary | 5 | Object Assembly | 5(6) |
| Comprehension | 4 | Coding | 6 |
| (Digit Span | 6) | | |

(Alternate scores reflect improvement in performance with additional time and/or assistance from the examiner.)

These scores reflect a significant decline in both Verbal and Performance I.Q. since Corey was tested in 1982. At that time a Verbal I.Q. of 85, a Performance I.Q. of 93 and a Full Scale I.Q. of 88 were reported. There is also some difference in a pattern of subtest scores. Corey achieved significantly lower scores on the current testing on both the Comprehension and Object Assembly subtests. This decline in I.Q. scores is difficult to account for. However, several factors may be involved. The current scores may reflect in part, the increasing demands that the tasks presented as well as Corey's failure to learn at an expected pace.

**J.A.694**

Corey Johnson                                                        -2-

They also undoubtedly reflect the effects of Corey's severe dis-
couragement and depression with respect to cognitive tasks.  For
example, with minimal assistance, Corey was able to improve his
performance considerably in many instances.  This was evident on
the Similarities, Arithmetic, Block Design and Object Assembly sub-
tests.  Corey's very deficient score on the Block Design subtest
is the result of several rotations of designs that he easily cor-
rected when his error was pointed out to him.  These scores, should,
therefore, not be taken as an indication of Corey's intellectual
potential.  Corey's intellectual difficulties remain clearly evident,
however, and my recommendation now, even more strongly than two years
ago, is that Corey needs a highly vocationally oriented school pro-
gram.  Some efforts should be made to help Corey achieve a level
of literacy that will enable him to function in the working world,
however, Corey is unlikely to improve significantly in this area.

Personality Functioning:

Personality assessment reveals a thoughtful, highly reflective, but
affectively constricted adolescent.  Corey expends considerable
energy in his efforts to suppress anger.  He appears vulnerable to
periods of depression and frustration.  There is also evidence of
feelings of aloneness and a desire for help, that is not being
heard.  Several responses suggest that Corey feels that he is not
being listened to.

Corey's test responses also reveal an effort toward maturity that
is particularly impressive, considering his severe learning dis-
abilities.  Corey's TAT stories reveal, for example, an awareness
that life has trials and tribulations that must be coped with and
an acceptance of the reality that life is sometimes painful, for
example, that there are painful separations.  Corey's stories empha-
size his concerns regarding the future and his constructive and
mature goals.  For example, he tells a story about a young man
"wondering if he's going to have a job and a nice life, maybe some
kids and a wife to support and help him move on in life."  This
effort towards maturity is at the cost of a constriction of Corey's
emotional life, particularly a suppression of anger and rebellious-
ness and an overly compliant attitude towards authority.  Corey
also tends towards extremes of either/or, good/bad in his thinking
about himself and his life.  Corey could benefit from greater ac-
knowledgement and acceptance of his anger, integrating anger into
his identity along with a less narrow definition of maturity.

Recommendations:

As indicated earlier, Corey needs a vocational school program with
some remediation in literacy skill.  He could also benefit from
counselling and supportive psychotherapy both in regard to prob-
lems of self-esteem related to his learning disabilities and also
supporting and broadening his efforts to become a mature adult.
Kenneth Barish, Ph.D.:ww  D-4/15/85      T-4/15/85

Kenneth Barish, Ph.D.
Psychologist

J.A.695

# EXHIBIT 19

J.A.696

## DECLARATION

I, ANN HARDING, hereby affirm the following:

1.      I live at 2120 Carrell Road, Apt 210, Fort Myers, FL 33901.

2.      For 22 years, I was a staff member at Pleasantville Cottage School ("Pleasantville" or "the school"), a residential treatment center for emotionally troubled youth run by the Jewish Child Care Association.

3.      I knew Corey Johnson from 1982-1985 while Corey was living at Pleasantville. We both lived in the older boys' cottage. When I was placed there he was already there. I had a supervisory role at the school and saw him on a daily basis.

4.      Corey was a sweet boy and a good kid. He was always very quiet and respectful, and did whatever I asked him to do. Corey obeyed all of the school's rules, as far as I knew. I cannot think of any instance where Corey violated the school's rules or behaved disobediently. Some kids were quiet, some were loud, it depended on the child.

5.      I had a good relationship with Corey. I frequently used to work the night shift, and Corey would come downstairs to my post when he could not sleep. Sometimes he said he was having nightmares because of a scary movie he had seen that day. He would ask if he could sit with me, and we would watch television together and talk until he was ready to go back to bed again. I was the only female staff member at Pleasantville at that time, and I believe Corey thought of me as a maternal figure.

6.      Corey was very slow intellectually. I knew this by the way he would talk to me. I do not remember anyone else at Pleasantville who was similarly slow intellectually.

J.A.697

7. Corey never discussed his "slowness" with me.

8. I did not work with Corey on identifying and achieving his goals, as I did with other children at the school. Our conversations were basic and did not involve school or other residents at Pleasantville.

9. Corey participated in social activities and got along well with his peers. Corey was generally friendly, nice, slow to anger, easygoing and respectful.

10. I do not think Corey possessed leadership qualities. To the contrary, he was more of a follower than a leader in his interactions.

11. I believe that Corey was probably taken advantage of by the other students occasionally.

12. Corey understood and complied with basic requirements of the daily routine at Pleasantville. Very little changed at the school during the time that Corey was there, and I cannot remember any situation in which Corey had to adapt to new circumstances.

I declare the above is true and correct.

Dated: November 21, 2011

_Annie Harding_
ANN HARDING

City of Fort Myers
State of Florida

2

J.A.698

# EXHIBIT 20

## AFFIDAVIT

State of New York      )
                         ) ss:
County of New York    )

MINNIE HODGES, being duly sworn, deposes and says:

1. I reside at 2133 Madison Avenue, Apartment 5C, New York, New York 10037.

2. I am Corey Johnson's aunt. My younger sister, Emma Lee Johnson, who is now deceased, was Corey's mother.

3. I have known Corey Johnson since he was born. I regularly cared for Corey as a child. He often spent long periods of time at my home.

### My Background

4. I was born on ▮▮▮▮▮▮▮▮ in Sumpter, South Carolina. I am the oldest of three children. My younger sister, Emma Lee Johnson, was Corey Johnson's mother. My biological father died of pneumonia when I was very young, long before Emma was born. My mother remarried, and Emma's father was my stepfather. I lived with my mother and stepfather, Love Johnson, in South Carolina until I was about 9-10 years old, when they left South Carolina and came to New York to work. Emma was about 3 years old at that time.

5. After my mother and stepfather left South Carolina, Emma, my brother, and I lived with our grandmother in South Carolina. My mother and stepfather visited us in South Carolina and when in New York, they sent us boxes of clothing and belongings, as well as money to take care of ourselves.

6. I, along with Emma and my brother, were reunited with my mother and stepfather when I was a teenager. My stepfather had a drinking problem which was

**J.A.700**

exacerbated when they moved to New York, and eventually caused my mother to separate from him. Before my mother left him, he was physically abusive to her and was violent towards her in front of me and my siblings. Being the eldest, I felt I had to protect my mother and would stay by her side or try to get in between them to prevent her from getting hurt when they fought. I remember trying to protect my mother by hitting Love with a broom, my fists, a mop- anything I could find to get him off her, especially when he was choking her. I was often scared to go to school because I did not want to leave my mother by herself with Love. My brother would also physically intervene in their fights. Emma would just cry when our parents were fighting.

### Corey's Childhood

7.    I was close with my sister Emma since she was born.

8.    Emma started abusing drugs, particularly crack and cocaine, when she was a teenager. I now believe that she was using drugs while she was pregnant with Corey and her younger son Robert, although I did not know of her drug abuse until after she gave birth to Corey.

9.    Emma lived with our mother when Corey was born, but then moved out and lived with Robert Butler, the father of her younger son, Robert. She worked and had good jobs, but would always eventually lose her jobs due to her drug use.

10.    I took care of Corey and Robert a great deal when they were babies and on and off during their pre-teen lives. Emma would initially ask me to watch them for a day and this would turn into an overnight, the weekend, and sometimes the entire summer.

11.    In addition to the many occasions where I took care of Corey and Robert at their house when Emma would leave for undetermined amounts of time, Corey

2

J.A.701

and Robert often used to sleep over at my house when they were young children. Emma would call me and ask if I wanted to take care of my nephews, and would ask me to come and get them or else Emma would bring them to my house herself. I would always volunteer to take Corey and Robert because I knew Emma did not have patience with them and did not provide them with the attention they needed. When Corey and Robert would come over, the two boys would sleep in my daughters' room in twin beds, and my daughters would sleep in the living room. I noticed that both Corey and Robert were nervous most of the time, and they behaved differently from my children.

12. In addition to leaving Corey and Robert with me, Emma did not spend much time with her sons. She would ask me and others, such as her friend Antoinette Joseph, to come to her house to watch Corey and Robert when she left to use drugs and be on her own, or else she would ask me and others to take her sons for sleepovers or weekends. Emma started doing this almost immediately after Robert was born, and this behavior lasted until Corey was old enough to take care of himself.

13. I witnessed behavior that led me to believe Emma was often getting high while caring for her children. The first time I witnessed Emma using drugs was shortly after Corey was born. I saw Emma sniffing white powder, and afterwards, she was behaving strangely and had bloodshot eyes.

14. Emma's drug addiction became significantly worse as soon as Robert was born, and continued to get progressively worse as her two sons were growing up. I used to go to Emma's house to baby-sit Corey and Robert, and Emma's eyes would be bloodshot and she would be behaving strangely.

3

J.A.702

15.   Moreover, Emma often used drugs with a friend named Carol. Carol would bring her son over to play with Corey and Robert, and Emma and Carol would get high together in the other room.

16.   On many occasions, my mother and I would speak to Emma about her drug addiction and try to convince her to get help.

17.   When Emma's drug use escalated, she spent even less time with her sons and became more and more frustrated with taking care of them.  Her main interest was in getting high and running around with different men.

18.   Emma lived with different men.  She was on and off of welfare, but during her times of heavy drug use, she was unable to hold on to her money.  She would try to take care of her children, but there were many times when she was not providing them with care.

19.   Corey told me that Emma always had visitors in their apartment and music would be played so loudly that Corey could not sleep at night.  He said that he was tired at school during the day and couldn't concentrate on his schoolwork.

20.   She would sometimes show up at our mother's house high on drugs. We were very worried about her and about how she was treating Corey and Robert.

21.   On a number of occasions, Emma would call me, crying, and I would go over to her apartment to care for her.  Her mood was always very sad and depressed.

22.   I continued to have Corey and Robert stay over at my house often, particularly for weekends, and was worried when they would return back to their home with Emma.

4

**J.A.703**

23.    Emma did not have much patience with Corey and Robert and she hit them and cursed and yelled at them quite often.  I was particularly worried about Emma's treatment of Corey.  I saw Emma hit and smack Corey many times.  Corey also told me on many occasions how his mother beat him and hit him on the head.  I would tell Emma not to hit Corey on the head.

24.    One time, Emma and Corey separately told me that she had beaten Corey with her high heel shoe because he either got left back in school or failed in school.  I was very furious with Emma for having hit Corey with her shoe, and my mother and I told her never to hit Corey again.

25.    I had a feeling that one of Emma's boyfriends, Bobby Koger, also was hitting Corey and Robert, but when I asked Emma, she immediately denied it.  I saw bruises on the boys' bodies when they spent the night at my house, but they told me that these were bruises from when they were playing.  I was very concerned that the boys were being abused, and I told my mother about it.  Emma continued to deny that anything was wrong.  I also saw bruises on Emma, who would wear shades to cover bruises on her face.  On one occasion, I went over to Emma's apartment after she called me and I remember almost getting into a fight with Bobby for hitting Emma.  I felt bad for my sister but was angry with her for subjecting her sons to such a bad environment.

26.    When I asked Corey and Robert how Bobby Koger treated them, they told me that he was very mean.  I believed that Emma or Bobby (or both of them) instructed the boys not to say anything more than that about how they were being treated.

27.    I was very concerned when Emma would take Corey and Robert back to their apartment, as I did not know whether they would be taken care of, and I worried about them having food to eat and being in a safe environment.  Corey appeared

5

**J.A.704**

sad a great deal of the time. Sometimes when I would ask him why he was so sad, he would tell me that he did not like his mother around "those kind of people." He would also tell me how it upset him to see his mother using drugs.

28.    Corey and Robert would often get locked out of their apartment because they didn't have a key and Emma would not be at home when they came back from school. They would usually hang around the neighborhood until she returned home.

29.    Sometimes when at my house, Corey would not go outside with the other children, but wanted to stay in the house with me. Corey appeared so sad that I figured something must have happened at home prior to his coming over to my house. When he would first arrive at my home at the beginning of a weekend, he would remain very quiet and look very sad. Towards the end of the weekend, his mood would lighten because my children would engage him in playing and going outside.

30.    Even so, I cannot recall ever seeing Corey genuinely happy.

31.    He would cry when his mother left him at my house, and Emma would tell him that if he did not stop she would spank him, or she would hit him on the hand and tell him to be quiet. Robert would also cry, and sometimes he would wake up in the middle of the night from crying in his sleep.

32.    I tried to keep them at my house as much as possible so they wouldn't have to stay with Emma while she was using drugs and creating a bad environment for them.

33.    Corey used to tell me that he didn't think his mother loved him. He would say this to me quite often – at least every other time he visited me. I would reassure him that Emma did love him, but Corey would overhear conversations when Emma would complain to me about how her children didn't listen and she wanted to put

6

them away. I told Emma that neither Corey nor Robert behaved badly or gave me a hard time, and that they generally listened to me. Corey used to ask to live with me, but he also told me that he was concerned about his mother's well being and did not want to be away from her. He told me that he didn't like the people his mother associated with. He seemed very conflicted and depressed when he thought about his mother.

### Corey was slower than other children

34.    When Corey and Robert would stay with me, I spent more time with Corey because he appeared slower than Robert and my two daughters, Queenie and Pricilla. When my daughters read books, they were able to read better than Corey even though Priscilla was the same age as Corey and Queenie was younger. Corey had difficulty reading and my daughters would help him to figure out how to read the words. Priscilla would tell me how Corey did not know how to read little words. Corey was also not able to work out math problems that my daughters were able to do by themselves. It would take much longer to explain things to Corey than to the rest of the children, and he could not do ordinary things that the others did, such as telling the time. Even when Corey first started walking, he was not on the same level as the other children his own age.

35.    I told Emma to take him to the doctor when he was younger to have him evaluated. Emma told me that she took Corey to the pediatrician and was told he was fine. I explained to Emma that she had to disclose to the doctor what she observed in Corey, or the doctor would not know to look for the symptoms.

36.    From the time Corey was a young child until he was about ten years old, Corey would wet the bed in his sleep. His clothing and the bed would be wet in the morning. He would come to me in the morning with an embarrassed look on his face,

7

J.A.706

and I would reassure him that it was okay. I would remind him not to drink too many fluids before going to bed, and I started to wake him up in the middle of the night to use the bathroom. Corey's mother would yell at Corey and complain about his bedwetting. I repeatedly told my sister not to yell at him, and that yelling would only make the problem worse. I tried to remind her that the doctor told us that Corey would eventually grow out of this problem, but my sister continued to yell at him. I never knew whether the sheets were washed at Corey's house after he wet the bed. My sister was not fond of housework or cooking, and I am not sure whether Corey washed the bed sheets himself or continued to sleep in the soiled bedding.

37. Corey had difficulty following certain instructions, and I would have to repeat myself many times before he could comprehend what I was directing him to do. Sometimes he appeared to be puzzled or mixed up when I would tell him certain things.

38. At age 10-13, he couldn't prepare a meal or even a simple sandwich. By age 15, he only improved a little in that he didn't make as much of a mess when preparing simple meals. I didn't give him much to do because he couldn't do it. I pampered him a lot because he needed more attention. Even when he made a sandwich, I'd have to stand there and check.

39. In early adolescence, he would switch topics during a conversation, so if you asked him a question, he would answer about something else.

40. When he was about 12-13 years old, I would send him to the store either by himself of with my children to buy snacks such as cookies, potato chips, soda or juice. I never gave him more than $5.00. I would usually give him change or dollar bills. Sometimes I told him exactly how much change he was supposed to get back from the

8

J.A.707

clerk, and other times I didn't tell him anything. Sometimes he would count the change in front of me, and he would always make mistakes and be a few cents short. I would correct him, even though I noticed that the other children who were the same age were able to count small change all the time without making any mistakes. Corey struggled and always made mistakes.

41.    Corey used to tell me that the children in school teased him a great deal about his academic abilities. He would often look very sad when he told me about this. I told him that some children cannot do as well as others, but he should keep trying to do the best he could.

42.    At age 14, his only interest was watching cartoons on television and playing by himself. He would bring his homework with him when he spent the weekends at my house, but my children would get frustrated when they tried to help him because he struggled with his work. My daughters would tell Corey how to say a word and he would immediately forget when he was shown the word again. My daughters were frustrated that they would have to repeat the same thing to Corey over and over again. They would show him how to do something, but if they moved on to something else, he would forget what he previously learned. They complained that he had difficulty reading even the small words, and was not able to work out math problems that they were able to do on their own. Sometimes Corey overheard my daughters complaining, or they would tease him for being slow to his face, and he would feel really badly about himself.

43.    Corey could not keep up academically with the other children, and I felt very sorry for him.

9

**J.A.708**

44.    Other people took advantage of him, such as taking his lunch money.  People found it easy to take advantage of him all throughout his childhood and teen years.  He wouldn't understand others but didn't want to look bad, so other children easily tricked and manipulated him.

45.    Corey would get very frustrated or upset, and almost have a tantrum.  He could not express himself in a mature fashion.  He would cry much longer than the other children.  He would get very upset when he was teased by the other children.  When Corey would interact with the other children, he would mainly play by himself, but the other children would tease him and try to take his ball away from him.  If my children or Robert didn't intervene, the children in the neighborhood would bully him and take his ball or candy away from him.  He could not defend himself or stick up for himself without protection, and chose to play by himself most of the time instead.

46.    Based on my relationship and observations of Corey since he was a young child through elementary school, I believe that Corey was seriously disabled and slower than others.  He was always embarrassed by his slowness, and wanted to be considered a strong man who would have done what others told him to be more accepted in the group.

<em>Minnie Hodges</em><br>
MINNIE HODGES

Sworn to before me on this
30th day April, 2011

<em>Delores Green</em>
Notary Public

DELORES GREEN
Notary Public, State of New York
No. 31-4527811
Qualified in New York County
Commission Expires Aug. 31, 2014

10

J.A.709

# EXHIBIT 21

J.A.710

## AFFIDAVIT

State of New York )
) ss:
County of New York )

**PRISCILLA HODGES, being duly sworn, deposes and says:**

1.  My address is 400 East 105th Street, Apt. 3F, New York, NY 10029.

2.  I was born ███████████

3.  I am currently 43 years old.

4.  Corey Johnson is my first cousin. Corey and his half-brother, Robert, are the sons of my mother's younger sister. My mother is Minnie Hodges. Her younger sister was Emma Johnson, who passed away in 1995. Corey is about 8 months younger than me. I have known Corey as long as I can remember.

5.  We grew up together, and Corey and I were always very close. We played, skated, and went to the movies together. When we were children, I visited Corey's house, and more often, Corey would spend time at my house where he visited at least once a week. Corey frequently stayed the night at my house when he was a child.

6.  My mother Minnie practically raised him since he was a baby.

7.  I spent time with Corey not only when he was a child, but also when he was a teenager and a young adult in his early twenties. I also have maintained some contact with Corey since he has been in prison.

8.  Even when we were both children, I could tell that Corey was slow.

9.  For example, Corey wet his bed when he was as old as ten. Aunt Emma complained to my mother about Corey wetting the bed, saying he was too old to be doing so.

1

Corey also wet the bed when staying at our house. Whenever Corey wet the bed at our house, he would try to cover the wet sheets with a comforter, but my sister Queenie and I could tell that he had wet the bed. I do not remember if we teased him, but we might have. My mother said that he was too old to be wetting the bed.

10. Corey was slow in other ways, too – ways that involved his ability to do things that required thinking and knowing about things. For example, Corey had significant problems counting change from the time he was a child until at least his late teens. On many occasions, I accompanied Corey to the store where he would pay for an item and receive change, and then ask me how much change he should have received and if he had in fact gotten the proper amount of change. He did not know how to calculate the proper amount of change or even how to count change, mechanically. Often times when Corey went to the store alone, Corey's mother would yell at him for bringing back incorrect change.

11. In addition, Corey always had great difficulty reading. He was embarrassed to read aloud because he would mispronounce words and would not know the meaning of even very simple words. I and others tried to help him with his reading. Despite the help he received, I did not see much improvement in Corey's reading even as he got older.

12. More generally, Corey did not do well in school. In addition to his reading problems, Corey's math skills were poor and also did not seem to improve despite his receiving help from me and others.

13. Indeed, Corey struggled with all of his classes. Corey needed help in all of his subjects and I regularly helped him with his homework in elementary. Corey also received regular homework help from his godsister, Courtney. Despite our efforts, I believe Corey continued to struggle in school throughout the time he attended.

2

14.    As a child, Corey complained that other kids bothered him and would take his money, ball, or other possessions.  Corey would not assert himself with these other kids.  Sometimes, Robert (who was two years younger than Corey) would confront them.  At other times, my sister Queenie or I would confront the neighborhood children whom Corey had accused of bothering him.

15.    Corey was a follower, rather than a leader, first as a child and then as a teenager.  Corey was easily influenced by others and could be persuaded to do things that, in my view, showed very poor judgment.  He would go to great lengths – and jeopardize his own well-being – just to fit in with the crowd.

16.    Once, when Corey was in his early teenage years, his "friends" dared him to roller skate down an incredibly steep hill, an act that no one else would attempt.  I told him not to do it, but his friends insisted.  He ended up falling and suffering a bruise and scrapes.  I believe he accepted the dare only to please his "friends."

17.    On another occasion when Corey was also a young teen, Corey's "friends" told him to ride his bike across a busy two-way street in the middle of traffic.  I warned Corey not to do it, but he did it anyway.  He made it across but was nearly hit by a car.  The driver had to slam on his brakes to avoid hitting Corey.

18.    Corey would do whatever his "friends" told him to do, even if it could have killed or seriously hurt him.

19.    Corey has always been very private and reserved; in my experience, he rarely volunteers information unless you ask him a specific question.  Even though we spent a lot of time together, Corey did not often talk about his feelings.

3

J.A.713

20.    However, at various times when Corey was between 11 and 16 years old, he expressed to me feelings of hurt and sadness about his relationships with both his father and mother. For example, around the age of 11 or 12, Corey told me that he felt like his father did not want to be bothered with him because his father would go months or even a year between contacting (much less visiting) Corey. In addition, Corey would talk about his father breaking promises to visit him. At other times, Corey mentioned that he disliked his mother's boyfriends and questioned why she was even with them. Corey seemed to feel unloved by his parents.

21.    As a teenager, Corey was extremely shy, especially in approaching girls. On several occasions, I talked to my friends for him because he was too shy or afraid to talk to them on his own. He worried that girls would not like him.

22.    I know of three girls with whom Corey was friends during his teenage years. Two of them were also my friends. In both of those cases, I know that there was no romantic or sexual relationship between Corey and the girl. I do not know the nature of Corey's relationship with the third girl.

23.    Although Corey never directly admitted it to me, I am aware that both he and Robert were involved in the sale of drugs. I believe Robert started selling drugs when he was about 16 years old, and Corey began his involvement with the sale of drugs when he was a teenager. I think their mother Emma's involvement with drugs (using and possibly selling) played a role in each of her sons being involved in selling drugs. I encouraged them to stop their involvement in selling drugs.

24.    Robert appeared to have some success in selling drugs. He had a lot of money and nice clothes, which he appeared to acquire through drug selling.

4

**J.A.714**

25. As compared to Robert, Corey seemed much less successful in his involvement in selling drugs. Corey had considerably less money and clothes. Sometimes, Robert (who was two years younger) would give Corey money or clothes to help him get by. I had the sense that Corey was trying to keep up with Robert but would always fall short.

26. On several occasions, Corey had problems obtaining the correct amount of money in exchange for drugs he was selling.

27. Once, I saw Robert get upset with Corey for coming up short on money in a drug sale. In fact, Robert's complaining about Corey's mishandling of money is how I first became aware that Corey was involved in the sale of drugs.

28. Men in the neighborhood whom I understood were supplying Corey with drugs to sell also got angry with Corey (and some would avoid dealing with him entirely) because Corey would come up short on money in drug deals.

29. Corey's trouble dealing with money in this context was not surprising to me because I already knew about Corey's change-counting problems.

30. During this period, Corey was no longer attending school and I encouraged him to return, if only to learn how to count change.

31. When they were in their late teenage years, Corey and Robert acted completely differently at my mother's house than when they were at home with Aunt Emma. When they came to my house, they did not talk about drug sales or making money. Nor did they bring their "friends" to my mother's house. My mother was religious, and Corey and Robert knew that they could not expose her to their street life.

32. During the same period, because I knew Aunt Emma lived with what I considered to be a negative lifestyle that involved heavy drug use, I visited Corey and Robert at

5

J.A.715

Aunt Emma's house frequently to make sure they were okay. When I visited Corey at his mother's house, Aunt Emma often seemed "out of it," that is, under the influence of drugs or alcohol. She would complain of being tired, and would get very easily frustrated and angry with Corey and Robert. She often told Corey to get out of the house, and Corey would sometimes leave and not return until the next day. I do not know where Corey went or where he spent the night on those occasions.

33. From an early age (as reflected the incidents I mentioned above in paragraphs 16 and 17 above) and continuing into his adulthood, Corey was very susceptible to others' influence and his "friends" knew they could take advantage of him.

34. When Corey was 18 or 19, he went to live with his stepfather, Robert Butler, in North Carolina. I heard about an incident in which Mr. Butler's house was robbed after Corey had held a party at the house. It was my understanding that Corey's "friends" had convinced Corey to have a party and then used the party as a set-up to later rob the house.

35. Later, I saw Corey once or twice when he was living in New Jersey. I think he was about 20 years old. I met some of his friends there, including a guy they called "Whitey" (who was later one of Corey's co-defendants). I didn't know them well, but they seemed like tough guys. The males who Corey surrounded himself with in New Jersey did not seem like good people, but Corey considered them friends.

36. Throughout his life, from when he was very young up until when I visited him in New Jersey when he was in his early twenties, Corey struck me as directionless.

37. I am unaware of his ever having had a job.

38. I still keep in contact with Corey on the phone and through letters.

6

J.A.716

39.     Corey's letters are extremely disorganized and incoherent.  There are always misspellings, words used incorrectly, and he jumps from topic from topic.  I become extremely frustrated reading Corey's letters.  Sometimes I have to put the letters down and return to them at a later time.

_____
                              PRISCILLA HODGES

Sworn to before me on this
30th day April, 2011

_____
Notary Public

DELORES GREEN
Notary Public, State of New York
No. 31-4527811
Qualified in New York County
Commission Expires Aug. 31, 2014

7

**J.A.717**

# EXHIBIT 22

## AFFIDAVIT

State of New York     )
                 ) ss:
County of New York    )

QUEENIE HODGES, being duly sworn, deposes and says:

1.     I live at 50 West 139th Street, Apartment 5O, New York, New York.

2.     I was born on ▮▮▮▮▮▮▮

3.     I have known Corey Johnson since when I can remember. Corey is my cousin; he is the son of my mother's younger sister. My mother's name is Minnie Hodges, and Corey's mother was Emma Johnson. Corey is about two years older than me.

4.     Corey and his brother Robert spent a great deal of time at my house when we were children, because my mother Minnie would often take care of them for Emma. They were almost like brothers to me.

5.     My impression of Corey is that he has trouble with reading and trouble communicating both through speaking and writing. He was very quiet as a child, so it was difficult for me to assess his speaking skills. However, whenever he talked, he was disorganized in his speaking and would frequently change topics. Over the past 19 years, I have seen a number of letters Corey has written. The letters he writes are similarly disorganized; the letters are almost nonsensical.

6.     Although he was two years older than me, ever since I started school, he was always behind me with regard to reading skills. I tried to help him with his reading, but he was not interested in my help. He might have been embarrassed by his lack of reading skills.

1

J.A.719

7. As a child, Corey enjoyed playing basketball and watching cartoons on television. He had friends; people enjoyed being around him. His friends seemed nice, while I think his brother Robert had loud and rowdy friends.

8. When Corey was about 10 or 11, my mother, Minnie, had to constantly remind Corey about her rules and expectations, such as picking up after himself and doing regular house chores.

9. Up until the age of ten, Corey wet the bed when other children his age were not doing so. He also needed reminders to wash up.

10. Everything was structured for Corey, and in my experiences with him, he never had to care for his own health or safety. He did not need to know his way around town because there was always someone with him to direct him, such as me and my sister. His mother would pick him up from Pleasantville while he was staying there. I do not remember him ever preparing a meal for himself. In fact, he would make a mess pouring milk into cereal, so my mother would just do it for him.

11. Corey was definitely not a leader and he never took authority over anything. He was a passive follower, he just went with the flow. I am not aware of his ever having a job. I do not remember him ever voicing goals for his life.

12. And even at age eleven or twelve, he could not tell time. Even when he was sixteen or seventeen, he had trouble counting change.

J.A.720

13.     Corey still spells my name wrong. When he wants to communicate with me, he writes to my mother, Minnie Hodges. He can remember her address but seems unable to remember mine.

_Queenie Hodges_
QUEENIE HODGES

Sworn to before me on this
30th day April, 2011

_Delores Green_
Notary Public

DELORES GREEN
Notary Public, State of New York
No. 31-4627811
Qualified in New York County
Commission Expires No. 31-__/14

3

**J.A.721**

# EXHIBIT 23

J.A.722

# DECLARATION

I, ESTHER JOHNSON, hereby affirm the following:

1. I live at 10 West 138th Street, Apartment 4K, New York, New York 10037.

2. I am Corey Johnson's maternal grandmother. The youngest of my three children, Emma Lee Johnson (who is no longer alive), was Corey's mother.

3. I was born on ████████████ in Sumpter, South Carolina. My parents were Julius and Emma Brunson.

4. My parents worked hard and were very strict with me. I tried to avoid getting in trouble because when I did, I would receive a "whooping" from my parents.

5. While in South Carolina, when I was about 17 years old, I had my eldest daughter, Minnie Hodges. About two years later, my son Amos Brunson was born. His father was a man named Jimmy Lee Brown.

6. A few years later, I met and later married Love Johnson, with whom I had my third child, Emma, Corey Johnson's mother.

7. Love Johnson and I lived with my three children in South Carolina for a short period before relocating to New York. We moved to New York without bringing my children with us, leaving them with my parents. The children joined us some time later.

8. Love and I were married for many years. He drank a lot and ran around with many other women, which is why we eventually divorced. He would also occasionally hurt me when he was drunk. While I drank alcohol in excess when I was younger, after I stopped, I found it very difficult to be around Love when he was drinking because he behaved badly.

9. I lived in Brooklyn, New York in 1968, when Corey was born.

1

**J.A.723**

10.    Corey's father, James Sykes, was a nice man who treated me and Emma with respect when he was dating Emma.  At the beginning of their relationship, he spent a lot of time at our house.  Emma got along well with him.  I remember that there was a discussion about Emma and James getting married.  I wanted them to get married.

11.    Corey was born at Brooklyn Jewish Hospital.  I was with Corey's mother, Emma, at the hospital during his delivery.

12.    After it became clear that Emma and James would marry, Emma wanted to see other people after Corey was born.  Emma began spending time with the type of people that I did not like, because they were pushing her around and did not treat her properly.  I think these people also hit Emma and used drugs but this never happened in front of me.

13.    While Corey was growing up, Emma dated a number of different men.  She first dated Robert Butler, with whom she had her younger son, Robert Johnson.  She later dated a man she called "Mitch," with whom she lived in Jersey City.  He was a very nice man, who treated Corey well and wanted to adopt him.  However, Mitch was killed in a dispute following card game.  Corey and Robert were with me when they learned that Mitch had been killed.

14.    Emma later became involved with a man named Bobby Koger, who treated Emma, Corey and Robert very badly.  He never hurt her in front of me, but I could tell that he was bad for her and told her that I did not think that he was right for her.  Bobby also used to drink a lot.  He was not a good person.

15.    Emma also had some friendships with women of whom I did not approve.  In particular, I did not like her friend Carol because I thought she was a bad influence on Emma.  Carol talked about people behind their backs.  She used to take Emma's clothes and talk rudely

2

to people. She wanted me to be like a mother to her, but I told her that she would need to change her ways for me to do that. She never did that.

16.    During Corey's and Robert's childhoods, Emma and the children lived with me at various times. Even when they were not living in my house with me, Emma often left Corey and Robert with me on nights and weekends. Corey and Robert even had a bedroom at my house. Emma was working and could not take care of them as much as I could. I fed them, clothed them and watched over them when they went outside. I did not let them go too far from the house and I gave them a curfew when they went outside. I always talked to them about right about wrong, and they attended church with me on most Sundays. I treated them as if they were my own children.

17.    Corey was a good boy, while Robert could be mischievous at times. I treated them strictly, the way that I was raised.

18.    In general, they did not give me a hard time. They showed me respect. They usually obeyed when I told them to do something (although sometimes Corey needed things repeated to him before he would understand what I was saying).

19.    Corey was a quiet child, while Robert liked to talk a lot. Even though he was two years younger than Corey, Robert was better at standing up for himself, and Corey was more likely to be taken advantage of.

20.    Corey was the kind of child that always took the back seat and let other people take the front seat. If he had money, children would not need to steal it from him because he would give it away.

21.    Corey did not engage much with other children and did not make friends easily. I do not think that Corey got into fights at school, but my understanding was that he was

3

**J.A.725**

teased a lot by the other children. Robert often told me that the children picked on Corey at school, although I am not sure what the children teased him about.

22. On more than one occasion, Corey came home from school without the sweater that he had worn to school that day. When his mother, Emma, questioned him after this had happened, he told her that boys from school had taken his sweater from him. Emma not only became very angry with Corey but physically beat him for allowing the boys to take his sweater.

23. While I do not recall what prompted Emma to do so, I recall another incident in which Emma beat Corey with a shoe on the head. I asked her not to do it again.

24. I specifically remember talking to Emma about the physical beatings she gave Corey and Robert and encouraging her to talk to them instead of hitting them.

25. Throughout his childhood and teenage years, Corey seemed to be slower than Robert, even though he was two years older.

26. For example, Corey had problems dealing with money and I did not feel comfortable trusting Corey with money. If I wanted Corey to buy something for me from the store across the street where the owner knew both me and Corey, I would send Corey's younger brother Robert to accompany Corey, to make sure that the purchase was done right and that Corey received the proper change. I did not want to send Robert alone, however, because he would spend the entire amount. Therefore sending them together was the best solution.

27. I recall that Corey had problems in school, although I do not know the full extent of his problems. I heard to he had difficulties studying and succeeding in school. Also, I believe that he had problems with reading. Even now, when he writes me letters from prison as

4

J.A.726

an adult, I have trouble reading his letters. His spelling is not very good and the letters contain a lot of grammatical errors.

28. I was sick quite often with diabetes and in and out of hospital a lot when Corey approached his teenage years and in his early teen years. I think that the family kept a lot of problems from me back then because they were concerned about my health and did not want to worry me. For instance, I remember hearing that Corey had been sent away to school north of New York City, but Emma did not tell me much about it. I do not know much about what happened with him while he was there.

29. I was not aware that Emma was using drugs until my daughter, Minnie Hodges, told me so shortly after Corey was born. However, I think that I may have been in denial, because I didn't want to believe that Emma was using drugs.

30. After I learned about her drug use, I frequently told her that she needed to stop. Because of this, she never used drugs in front of me, and she put on an act as if she was not using drugs when she was around me.

31. Shortly before Emma died, I knew that she had boils underneath her arms and was too weak and sick to the go the doctor. However, I do not know the details of her death.

32. The last time I saw Corey was on Mother's Day many years ago, while his mother was still alive. He brought me some decorative flowers.

I declare the above is true and correct.

Dated: April 30, 2011.

ESTHER JOHNSON

New York, New York

5

**J.A.727**

# EXHIBIT 24

J.A.728

## AFFIDAVIT

State of New York            )
                             ) ss:
County of New York           )

ROBERT JOHNSON, being duly sworn, deposes and says:

1.      I am currently 40 years old and live at 550 West 125th Street, apt. 2C, New York, NY 10027.

2.      Corey Johnson is my half brother.  Corey is about two years older than I. Emma Johnson, who is now deceased, was our mother.  My father is Robert Butler, Sr.  From the time I was born until I was about 10, I generally lived in the same household with Emma and Corey.  After that, Corey and I each were placed in separate group homes for periods of time, although we still saw each other on the weekends.  Later, in our late teens, Corey and I again lived together with our mother for a brief time and saw each other regularly.  I have not seen Corey since in or about 1990.

3.      By way of background, I am now married and have a young son.  I obtained my GED in 2002.  I failed it twice before due to difficulties with the math section.  In the past, I have spent time in prison on charges related to drug sales.

### General Family Background

4.      My mother, Emma Johnson, had Corey when she was about 17 years old and had me when she was about 19 years old.  Throughout our childhoods, Emma moved us from place to place and was involved with different men (some of whom were verbally and physically abusive both to her and to Corey and me).  When Corey and I were still young children, I witnessed her using drugs.  Our mother was not very stable and seemed to have difficulty dealing with Corey and me.  She yelled at us, hit us, and often left us to stay with other

**J.A.729**

family members or friends for days, weekends, and sometimes even weeks and months because of her frustration with us.

5. My dad, Robert Butler, Sr., drove a taxi and did a few other things to earn a living. My father was smooth, laid back, proud to be a black man, and proud to have sons. During the brief time he and my mother were together, they were young and went out a lot together at night. They would go to night clubs and juke joints. When they went out, Corey and I would stay with my grandmother, Esther. My mother and father lived together only briefly.

6. Esther Johnson, Emma's mother and my and Corey's maternal grandmother, was the matriarch of our family. My grandmother took care of us a lot. She was very strict and took good care of us. We stayed with her at times during our childhood. During these times, she was separated from my grandfather, Love Johnson.

7. Corey and I had a good relationship with our grandfather, Love. I even used to call him "dad." Love would take me and Corey to work with him. He used to drive trucks; he would take us with him in the truck sometimes. We would hang out all day. Love was very close to our mother, and he loved her very much.

### Living with My Mother and Father

8. My parents were together for a very short period of time.

9. It is my understanding that we all lived in Brooklyn with my grandmother for a short period when I was very young.

10. We then moved into Manhattan, and my mother, father, Corey and I all lived together in an apartment on 14th Street.

11. My parents broke up when I was around 3 or 4, and my father moved to California to take advantage of a job opportunity.

12. My dad asked my mom to come with him to California, but she wanted to remain in New York.

13. I didn't see my father regularly again until I was around age 8. Although he didn't live in New York, he would keep in touch by phone calls and short visits to New York. When he came, I would meet him in Brooklyn or Central Park.

14. While I am my father's only biological child, my father always treated Corey like his own son. He never showed any favoritism to either of us. Corey never talked about his biological father, or how he felt about him; I think my dad (Robert Butler) was the only real father to Corey.

15. When my dad moved to California and my parents broke up, our mother moved us to various places – Jersey City, Brooklyn, Queens, and, finally back to Manhattan. We lived in each place for a short period.

**Moving from Place to Place with My Mother and Corey**

16. While in New Jersey, we lived in Jersey City in the Gregory Park Apartments with my mother's boyfriend, Mitch.

17. Mitch was pretty cool.

18. Corey and I both attended school in Jersey City, but I don't remember much about it.

19. After leaving Jersey City, we moved to Queens and lived with my uncle Amos (who is my mother Emma's brother) and his wife, Vonna.

20. During the time we lived there, my uncle was hardly ever home because he was always working. Meanwhile, Vonna was very mean and always yelling.

21. I did not like living there.

## Living with Bobby Koger in Manhattan

22.    We eventually settled in Harlem.

23.    My mother had met Bobby Koger, and we lived with him at 150th St. and Edgecombe.

24.    My mom got involved with Bobby Koger when I was around 7 years old, and he was in the picture until I was in my early teens.

25.    Things changed for the worse when my mother got involved with Bobby Koger. She became less concerned with us, and was not involved with our schooling. From an early age, Corey and I were pretty much on our own. When I was 7 (and Corey was about 9), we would go to school alone. After she became involved with Bobby, our mother was not affectionate with us. As discussed below, during this time, I witnessed my mother using drugs. She was always losing her job, and a lot of different people were going in and out of the house.

26.    I had never met anyone like Bobby Koger, and I disliked him. He was sick – he had diabetes and was a heroin addict. He was very bitter and violent.

27.    As a young boy, I was confused by Bobby's behaviors.

28.    When I was between the ages 8 and 10, I would wonder why Bobby had a needle stuck in his arm, why blood was dripping down his arm, and why he was bouncing around the room naked. I saw him get high and pass out while the needle was still in his arm.

29.    Bobby was violent towards my mother, me, and Corey.

30.    Bobby was verbally abusive to us as well as his own children. He was most aggressive when he was either having a drug binge or when he would find his money missing. He would have verbal and physical fights with my mother. He would usually hit her

4

and then leave the house. After their fights, I would see the bruises he left on her. Sometimes she had to go to the hospital to have her injuries treated.

31.  During the fights between Bobby and Emma, Corey and I would sometimes go into our room and play video games on our Atari, just to escape the mayhem.

32.  Often, when I was as young as 10, I would try and jump in to stop Bobby from hitting my mother.

33.  Corey, then about 12 years old, did not jump in. He would just stand still and cry. I think he was afraid.

34.  We would never call the police. I didn't think too much about the fights between my mother and Bobby – I used to visit a friend down the hall, and his parents often fought physically but would then be back together soon afterwards, as if the fighting had never happened.

35.  I would steal money from Bobby every chance I got because I didn't like him. When I got caught, Bobby would strike me with an open hand. Sometimes, my mother intervened to protect me, but other times she wouldn't because, after all, I was wrong for stealing his money.

36.  It was during the time that we were living with Bobby Koger that I witnessed drug use by my mother. I was shocked when I first saw her use drugs, but after a while, Corey and I got used to it.

37.  I blame Bobby for my mother's drug use.

38.  At first, she smoked marijuana and would drink Harvey's Bristol Cream. I didn't notice heavier drug use until my early teens. My mom could have been using heavier drugs when I was younger, but I didn't become aware until I was older.

39. Later, when I was out in the streets at age 12 or 13 and I saw what cocaine users looked like, I realized my mom was one of them.

40. When I was 13 or 14, I saw my saw my mom with a crack pipe in her bedroom.

41. I believe that my mother continued to use drugs until her death in 1995.

### Corey Was Slow

42. Even though he was two years older, throughout our lives, Corey was slower than I.

43. Corey was unable to grasp a lot of things. He also didn't pick up on things as quickly.

44. Corey had difficulty in school. By the time Corey was in about second grade, he had trouble in all of his subjects. I often helped him with reading, writing, and penmanship.

45. Corey's handwriting was (and still is) like chicken scratch. Corey would ask me to show him how to write like me. I would do hand over hand with him to show him how to write better, but he never caught on to it.

46. I don't know how Corey got promoted to higher grades. Perhaps his teachers just passed him along without requiring that he be able to do the work.

47. In general, I felt like I was more like the big brother than Corey. I got involved in the drug world long before Corey – I was about 13. Corey would not even attempt to get involved in selling drugs until several years later.

**J.A.734**

48.     I enjoyed hustling on the streets. I liked the lifestyle and the money I made. I wore a lot of nice clothes and jewelry, and I had a motorcycle. Even though I was younger, I would give Corey money to buy things, or else I would just give him things.

49.     A lot of the guys that hung around me thought that I was the oldest sibling, because I was the one showing Corey the ropes.

50.     Corey would brag to others about the way I dressed and the things I had.

51.     Corey took a while to catch on to some things. For example, when I started hustling on the streets, I used to buy a lot of footwear and clothes. I kept them in the bedroom I shared with Corey. Corey would see the items and ask me where I got them. Corey never appeared to make the connection between me being out in the streets and selling drugs and me having money to buy the items.

52.     Corey also had a hard time finding his way around. In terms of travelling, I would be able to pick up on a route the first time just by paying close attention. But Corey needed a lot more training in that area. Around the ages of eight to ten, my mother would choose me rather than Corey to go to my grandfather's house in Brooklyn because she knew that Corey would get lost.

53.     Corey was unable to keep up an in-depth conversation. He would usually just stay quiet during those times.

**Corey Was a Follower**

54.     When I was about seven or eight years old, Corey would sometimes get in trouble because of me – I would encourage or influence him to do mischievous things with me. For instance, I would ask Corey to steal money from Bobby Koger. I would just tell Corey, "Do

it with me, because either way, if I get caught, I am going to tell mom that you were involved." Corey would very often go along with me and do what I asked.

55.     I heard from my father about an incident that happened when Corey was living in North Carolina that also shows how susceptible Corey was, even as an older teenager. My dad and his wife were out of the house, and Corey was convinced to throw a party.  I think Corey had it because he saw it as a way to meet and attract girls.  The house ended up getting robbed and trashed by the friends that Corey had over.  My father was very angry, because he had a lot of nice things in the home.  If I had been in North Carolina with Corey, that incident would not have happened.

### Corey's Failed Attempt at the "Street Life" in New York

56.     Corey was not a street person. He was a ball player, and liked girls. He would play basketball all day long. He was well known for playing basketball and messing around with girls.

57.     Corey got involved in the street life at the relatively late age of about 19.

58.     I didn't want Corey to get involved in selling drugs for several reasons. First, he didn't know anything about selling drugs.  Also, it didn't fit his character or skills. Corey really didn't have what it took to be successful; he was not street smart enough. He didn't have "follow-through," wasn't "hip enough," and wasn't tough enough.

59.     The guys I was involved with selling drugs wouldn't let him participate.  I believe that they could see that he just wasn't capable, as shown by the one experience I had with Corey attempting to sell drugs.

60.     Once, Corey approached me about selling drugs. He told me he wanted to be down with me and make money, too.  I did him a favor and gave him 50 vials of crack to sell.

Corey was supposed to sell one vial of crack for $5, and bring back $250 from the sales of 50 vials.

61.     After Corey finished his sales, he was extremely short on the money – he only brought back $50.

62.     I think Corey just could not calculate or count the amounts of money he was supposed to receive in each transaction.

63.     I had to take money out of my own pocket to make up the difference for Corey.  I never sent him out to sell drugs after that.  That was the first and last time I had Corey sell drugs with me.

### Corey's Time Living in New Jersey

64.     I saw Corey a few times when he was living in New Jersey in 1989 and 1990.

65.     When Corey first moved to Trenton, he lived in a house with girls and guys.  He lived in several different places while in Trenton, always with others.  Corey never lived by himself.

66.     I knew some other guys who were originally from New York who went to New Jersey, and with whom Corey was involved in New Jersey.   Darold Brown and Aldon Mitchell, were my friends before they were friends with Corey.  I hoped that Corey was in good hands with those guys and that they were looking out for him.  I thought they knew what they were doing – I had contact with a few of them from New York.  I felt like they had a well-run operation, which is why I didn't understand how Corey fit in.  Then again, I didn't know the structure of the operation.  Maybe their operations didn't require as much toughness or street smarts, maybe they gave Corey a role he could do.

67.    When I witnessed Corey on the streets in New Jersey, his only role was to collect money from the guys who were actually selling and give them more drugs to sell. I didn't see him do anything more than transport money and drugs. He was definitely not a ring leader. He wasn't dealing with the drug buyers. I can't see any set-up other than one in which Corey only had to perform the simple task of transporting money or drugs to and from the real dealers working for Corey. Even in the slower-paced New Jersey, Corey's limited role in selling drugs was somewhat surprising to me, given the disastrous experience I had with him selling drugs in New York.

68.    In New Jersey, I met two of the guys who would later go to Virginia and become co-defendants in Corey case, Richard Tipton and Vernon Lance Thomas. I cannot see Corey being the boss in Virginia. The others were more street smart and also more headstrong than Corey.

69.    Corey was very loyal to his family or anyone he believed to be his family. If Corey considered the guys with whom he was involved in selling drugs in Virginia to be his family, then it isn't surprising to me that he would be protective of them if he thought they were being threatened.

70.    For some of the time Corey lived in Trenton, he lived with a woman called "Mudda." She was much younger than Corey. They lived in a "shack" that appeared to be a crack house. It was a real hovel. I would never have lived there because everything was old, dark, and dirty. I was surprised Corey would live in such a filthy house because we were young we were raised to be clean and tidy. There were a lot of wild, small children living in the home.

71.    While in New Jersey, Corey was also involved with a girl named Monica, who I believe to be the mother of Corey's daughter. I last spoke to Monica in 1996. I had called

J.A.738

about seeing my niece.  Monica said she was with a family member and would call me back.
She never called back and we lost contact.

### My Recent Contact with Corey

72.    I speak to Corey on a regular basis, at least once a week.  I would like to
visit him in prison.

73.    I once had a conversation over the phone with Corey about our mother.
Corey raised the topic.  He asked if I had visited her gravesite.  I told him that I hadn't, and that I
was not ready to visit it.  I have this picture of our mother in my mind, and I don't want to see
her any other way.  This was the first time we spoke over the phone about our mother's death.

_Robert Johson 6-29-11_
ROBERT JOHNSON

Sworn to before me on this
29th day of June, 2011

_Delores Green_
Notary Public
DELORES GREEN
Notary Public, State of New York
No. 31-4827811
Qualified in New York County
Commission Expires Aug. 31, 2014

J.A.739

# EXHIBIT 25

**J.A.740**

# AFFIDAVIT

| | |
|---|---|
| State of New York | ) |
| | ) ss: |
| County of New York | ) |

ANTOINETTE DANIELS JOSEPH, being duly sworn, deposes and says:

1.  I reside at 819 FDR Drive, Apt. 10H, New York, NY 10009.

2.  I was born on ████████████

3.  I am Corey Johnson's godmother, and have known him since his birth. I knew Corey's mother, Emma Lee Johnson, for more than 30 years, from the time we met when we were both about 12 years old until Emma's death in 1995. For most of that time, we were very close friends.

4.  Corey and my daughter Courtney are about the same age. During his childhood and adolescence, Corey would often spend time at my house, which was a "hang out" for neighborhood children and teenagers. When Corey was a child, Emma frequently asked me to care for Corey at my house when she wanted to go out and party and use drugs or when she could not handle taking care of Corey, often leaving him overnight or entire weekends.

5.  I visited Corey and his mother at their home on many different occasions.

6.  Corey also lived with me and my children during several summers in his youth.

1

J.A.741

## Early Relationship with Emma Johnson

7.      I first met Corey's mother Emma when I was in the fifth or sixth grade at PS 64, located on 9th Street and Avenue B in Manhattan. Emma attended an elementary school located nearby on Avenue A. Soon after we met Emma and I became very close friends. We both attended the same junior high school, JHS 71, located on 6th Street and Avenue B, and the same high school, Brandeis High School, located on 84th Street between Amsterdam and Columbus, both in Manhattan.

8.      Emma and I were very close throughout our school years. Emma's sister Minnie was much older than she. Emma and I acted more like sisters than friends. We would frequently dress alike and wear the same hairstyle. We had the same friends. In fact, people thought we were sisters. Even though we grew apart at times in our lives as we grew older, we always knew we could count on each other.

9.      Throughout school, Emma was a low average student who received grades in the 60s, while I received higher grades, generally in the 80s. I helped Emma with her schoolwork throughout school. Emma did not read very well, even as a high school student. Neither Emma's parents nor her sister Minnie seemed to be well-educated people.

10.     Emma was a follower and was easily influenced by others. When I would occasionally play hooky from school, Emma would too. As another example, I became pregnant when I was 17 years old. Shortly after I told Emma that I was pregnant, Emma became pregnant. Emma told me that she had tried to become pregnant because I was pregnant. I was surprised Emma had become pregnant, because she was from a very strict family.

2

J.A.742

11.    In June 1968, I gave birth to my daughter Courtney.

12.    About four months later, in November 1968, Emma gave birth to Corey.

13.    I completed high school after the birth of my daughter but, to my knowledge, Emma dropped out of high school after giving birth to Corey and never graduated.

### Emma Johnson's Alcohol and Drug Use, and Impact on Her Parenting

14.    In our teenage years, Emma, I, and our friends all partied and experimented with alcohol and drugs.  However, Emma did not seem to recognize the same limits that I did.

15.    Whereas we all would go to dance clubs, Emma would frequently stay out to go to "after hour spots" – bars that remained open for her and some other patrons after they were closed to the general public for the night.

16.    We all experimented with alcohol and some drugs.  However, while I was sometimes called "chicken" because I did not try as many drugs as the others, Emma began to get heavily involved with alcohol and drugs.

17.    My pregnancy indicated to me that I needed to get my life together. Emma's pregnancy with Corey did not seem to give her the same indication.

18.    Indeed, Emma became very wild around the time she met Robert Butler, shortly after Corey was born.  She was continuing to party and use drugs even after the birth of her second child, Robert.

19.    After she and Robert Butler separated, Emma appeared to be using drugs heavily.  In addition, at that time, I would frequently see Emma with large

3

quantities of drugs on her person, leading me to believe that she was a drug dealer. She was keeping company with drug dealers, hustlers, and pimps during this time. In my view, Corey and Robert could not have been unaware of Emma's involvement with drugs during this time.

20. Emma's partying, drinking and drug use left her with little time to care for her children. As a mother, she provided the basics for her children but not much more. She would provide clothes and food for them but did not have time to talk to them or provide emotional support.

### Emma's Involvement in Volatile and Abusive Relationships

21. Emma did not provide a stable home life for Corey or her younger son, Robert.

22. During Corey's childhood, Emma was involved in relationships with several different men, many (if not all) of whom were verbally or physically abusive to her.

23. Emma also moved around from place to place frequently when Corey and Robert were young children.

24. Emma's relationship with Corey's father, James Sykes, was short and, for a long time after that, James seemed not to be around Corey very much.

25. Shortly after Corey was born, Emma became involved with Robert Butler, with whom she later had her son Robert. Emma was still in a relationship with Robert Butler as of 1973 (the year I got married) and I believe their relationship continued for several more years.

J.A.744

26. During the course of their relationship, Emma and Robert Butler had arguments to which Corey and Robert were exposed. While Robert Butler treated both Corey and Robert well, he was verbally abusive to Emma.

27. Later, near the end of the 1970s, Emma became involved for several years with a man named Bobby Koger, who was physically abusive towards her.

28. Some time after Emma started dating Bobby, Emma came to stay with me for about a month in order to escape from Bobby Koger. Bobby was very abusive—both physically and verbally. I even saw bruises on her when she came to stay with me.

29. As a teenager, Corey told me that he did not like the men with whom his mother was keeping company. Robert was tougher, had thicker skin, and was better able than Corey to cope with Emma's men and the life she lived. Corey appeared to have more difficulty dealing with the situation.

30. The last time I saw Emma, shortly before her death at about 45 years old, she had visible bruises on her body.

### Corey Has Always Been "Slow" and his Abilities Limited

31. My impression of Corey during the entire time I knew him was that he was very slow.

32. His slowness cut across different parts of his life. He had a general inability to learn, reading problems, and difficulty socializing at times and, as a result of all of these problems, was teased by other children at school. I also remember Corey stuttering. He never seemed to get the help he needed to deal with any of these problems.

5

J.A.745

33. When he was as old as 8 or 9, Corey had a problem with bedwetting. Corey's mother Emma would complain to me that Robert (who was two years younger than Corey) was not wetting the bed, while Corey was. I would try to reassure her that Corey would grow out of it eventually.

34. Corey had a lisp when he was younger and children would tease him about it.

35. Corey's was very slow in learning when he attended school. Even though his brother Robert was younger than Corey, Robert always seemed more advanced than Corey while they were growing up. Emma also would frequently remark that Robert was smarter than Corey, even though he was younger.

36. While Emma would criticize Corey's intelligence and abilities in school, I never witnessed her try to help Corey with his school work. As I mentioned above, Emma was not a very good student in school either and perhaps she did not really know how to help him.

37. My daughter Courtney would frequently help Corey with his homework. In high school, Courtney would help him in Math, English and the rest of his subjects. I particularly recall that Corey would become frustrated when he was not able to understand Math problems.

38. During all the time I spent with Corey, I never saw him read anything. My understanding was that his reading ability was very poor.

39. Whenever Corey went to the store in my neighborhood (as a child and even later as a teenager), he always went with Courtney. I am not at all confident that he could have handled even relatively simple transactions on his own. Indeed,

6

J.A.746

people took advantage of him because he would readily give his money away. If someone asked Corey for money, he would not hesitate to give away the money he had on him or do whatever he could to help.

40.     Emma's Physical Abuse and Other Mistreatment of Corey

41.     Emma was physically abusive with Corey and Robert. There were several occasions when Emma would lose her temper and hit Corey.

42.     For example, as I mentioned above, Corey would sometimes wet the bed at his home, even as an older child of 8 or 9. Emma would usually not even change the sheet and simply let Corey sleep in the soiled sheets.

43.     To avoid Emma getting angry, Corey would sometimes try to hide the wet sheets. Emma would become angry when she discovered his soiled sheets in the closet and would then yell and beat Corey.

44.     Emma struck Corey several other times as well.

45.     When Corey was 9 or 10, Emma once became so angry with Corey that she hit him on his head with a high heel shoe. Emma called me on the phone after she hit Corey; she still seemed very angry with Corey and said she was going to "kill" him.

46.     After that incident, Corey came to live with me for six or seven months because Emma realized that she was out of control. But Corey would always insist on going back to his mother, because he wanted to be with her.

47.     Emma also said hurtful things to and about Corey.

7

**J.A.747**

48.    On more than one occasion, Emma told me that she was going to kill both Corey and Robert because they were getting on her nerves. I was concerned enough about her seriousness that I asked Emma to bring the children to my house.

49.    Emma would also frequently tell me she wanted to get rid of both Corey and Robert because she was tired of them. I believe that Corey overheard these conversations.

50.    There were times when Emma would also yell at Corey and tell him that Robert was doing better than him.

51.    Throughout his childhood and teenage years, Corey was generally very meek, mild, and calm. By contrast, his brother Robert appeared to me to be tough and mean.

52.    Corey seemed very unhappy as a child. I could see the unhappiness in Corey when I went to visit him at Emma's house.

53.    Part of Corey's unhappiness seemed came from his mother's treatment of him, as well as her general instability, drug use and involvement with abusive men.

54.    Corey was very upset when Emma went to jail and blamed her boyfriend at the time for getting her arrested. Around this time he told me that he wished I was his mother.

55.    I believe that Corey's unhappiness also stemmed from his father not being much of a presence in his life. Corey's brother Robert spent time with his father, Robert Butler. Indeed, Robert's father seemed to be around more, while Corey's father

8

J.A.748

James seemed to be constantly in and out of prison and absent for long periods of time. I believe that Corey may have been jealous of Robert's relationship with his father.

## Corey's Difficulties in Social Situations

56.    Both as a child and as a teenager, Corey was withdrawn socially.

57.    He would have friends but did not appear to be close with any of them.

58.    As a teenager, Corey spent a lot of time with Courtney and her friends. But sometimes, when Courtney's friends would visit the house while Corey was there, Corey would retreat to my room, as opposed to hanging out with the others – even though they were his own age.

## Corey's Being Turned Over to the Administration for Children's Services

59.    When Corey was 13, Emma turned him over to the Administration of Children Services. I believe this was due to her drug use and inability to care for her children.

60.    During the period that followed Corey's placement, I lost contact with both Emma and Corey for awhile, although I eventually regained contact with both of them.

## Corey's Late High School Years and Subsequent Involvement in Hustling

61.    When Corey was attending high school in Queens, I was living in Queens and reconnected with him.

62.    During this time, I could see that Corey lacked confidence, especially around girls he did not know well. He would mainly spend time with my daughter Courtney and her friends.

9

63.     Corey began hustling in the streets at the time he started attending high school in Queens.  After he left high school, he began spending more time on the streets.  Corey would sometimes stay with Emma, but Emma was moving around a lot and living with different people, so Corey was effectively on his own after he turned 18.

64.     I believe Corey turned to a life of hustling on the streets because his options were limited and he needed money to feed and clothe himself, not because he liked it.

65.     I think that Corey did not know any other path – his mother, the men with whom she kept company, and his brother Robert had all been involved with hustling drugs.  I tried to tell Corey that hustling was not right for him.  While I could imagine Robert doing it, I thought Corey was too soft.

66.     When both were in their late teens, Robert was, in my impression, smarter, tougher and more of a bully than Corey.  Corey was more gentle and therefore less well able to function on the street.

67.     On the streets, people readily took advantage of Corey because of his easygoing nature and the fact that he had difficulty dealing with money.

68.     Corey was easily influenced by his brother, even as an adult.  Robert would get Corey to do things or go to certain places even if he did not want to. For example, I had the feeling that Robert would have Corey act as his backup when they were buying drugs.

69.     The last time I had contact with Corey was when he was about 19 and living in New Jersey.

10

70.   I am not aware of Corey ever having a job.  I believe that he would have had difficulty in filling out a job application or passing a job test.

### Corey's Demeanor in My Presence

71.   I remember Corey as always being respectful and calm despite his difficult and unstable home life, including the family's moving from place to place, his constantly changing schools, his mother's drug use, his mother's physical and emotional abuse by boyfriends, and his own physical abuse at his mother's hands, as well as his later being sent away by his mother.

72.   Corey always showed love and affection towards me with hugs and kisses.  He was never angry or violent in my presence.  He was very pleasant and gentle. I have never had a problem with Corey.

STATE OF NEW YORK
COUNTY OF NEW YORK
SWORN TO BEFORE ME THIS
MAY 21 2011

Sworn to before me on this
_____ day of May, 2011

_____
Notary Public

ANTOINETTE DANIELS JOSEPH

IRA MARK LIPPELL
Notary Public, State of New York
No. 60-4652304
Qualified in Westchester County
Certificate filed in New York County
Commission Expires March 30, 2015

11

# EXHIBIT 26

J.A.752

## DECLARATION

I, LEONA KLERER, hereby affirm the following:

1.    I reside at 71 Strawberry Hill Avenue, Apartment 907, Stamford, Connecticut 06902.

2.    I was born on ▮▮▮▮▮▮▮ in New York City.

3.    I was a reading teacher at Mount Pleasant Cottage School for nineteen years, from 1973 until I retired in 1992.

4.    I conducted an assessment of Corey Johnson on February 1, 1982 (a true and correct copy of my report of which is attached hereto as Exhibit A). Although I have no current recollection of meeting Corey Johnson, based on my review of my report, I am able to testify to the following information and conclusions.

5.    Corey was in the school's care for a month before I conducted my assessment of him.

6.    Corey Johnson had very poor reading skills and poor understanding of what he was reading. At the time of my assessment of him, Corey was 13 years and 3 months old. He was barely able to write his name or recognize the sounds of many of the letters on the page. Corey had not advanced past the second grade level in reading, which indicates a significant deficit in his abilities. I have worked with children with terrible learning disabilities, and those children – unlike Corey Johnson -- all learned to read at a higher reading level than a second grade level.

7.    Corey was unable to identify words on the chart I gave him and did not know the multiple sounds of some letters in the alphabet.

1

J.A.753

8.   In my assessment of Corey, I was struck that he could not read even read short single syllable vowel words in isolation with vowel combinations.

9.   In my report, I noted that Corey exhibited "much angulation and distortion of symbols," which means that when he wrote letters, he distorted them. I found it notable that he would read the word "surprise" to be the word "shock." This indicated to me that while some part of his brain may have understood the meaning of the word "surprise," he was unable to read it aloud and would substitute it for another, somewhat similar word, like "shock."

10.   I believed he was dyslexic, since he kept his fingers on each word when trying to read, and could not track the words in a sentence well.

11.   I did not administer the very long Woodcock test because I knew his reading level, and I didn't think Corey could concentrate and sit through the entire duration of the long test.

12.   My assessment of Corey stated that Corey could be mentally retarded. The reading tests indicated that, at the age of 13 years and 3 months old, Corey did not know how to use phonics in reading. The facts that Corey was in special education classes, was over 13 years old, and still was reading at a second grade level were quite unusual and significant.

13.   Corey could tell time only on the hour. I recommended that Corey try to learn how to tell time, because I believed it would increase his low self-esteem. I thought he felt badly about his low reading ability and I believed that teaching him how to tell time would give him much needed confidence and self-assurance that he could at least do something right.

2

J.A.754

14. Teaching at Mount Pleasant was a difficult experience. Many of the children there had been terribly abused and had serious psychological problems.

15. Some of the teachers there were excellent, fought for their children and really tried to meet their needs, while others were not as good. Whether an individual student's needs were met depended on the teacher. The social workers at Mount Pleasant Cottage School were generally good.

16. In my experience, because of the limited resources of the school and the sheer numbers of students with emotional and learning difficulties, children who exhibited serious disabilities at a relatively older age (such as 13) were perceived by some faculty as beyond help or hopeless. Sometimes, such students did not receive proper education or treatment.

17. Given Corey's age at the time he arrived at the diagnostic center and his limited abilities, it is possible that Corey could have been perceived by some faculty as one of these "hopeless" students.

I declare the above is true and correct.

Dated: June 3, 2011

_Leona Klerer_
LEONA KLERER

Stamford, Connecticut

3

**J.A.755**

## EXHIBIT A

MOUNT PLEASANT COTTAGE SCHOOL
SCREENING UPON ADMISSION

A.  Name:        Corey Johnson                    Date Of Testing:        2/22/82
    Birthdate:   ▉▉▉▉▉                             Tested By:    Leona Klerer
    Chrono. Age:        13-3                       Grade:              7
    Date Of Admission:                             Teacher:       Lily Jones
    Admitted From:   Man. S.S.C.                   Social Worker:    A.Offer
    Current Placement:     Diagnostic Ctr.

B.  Information From Student's Record:

C.  Behavior During Testing:

        Cooperative and tried to do his best.

D.  Handwriting:

        Right handed with fairly legible manuscript. He can write his
        first name only clearly in cursive.

E.  Test Results:

| Tests | Areas Examined | Grade Level |
|---|---|---|
| Wide Range Achievement Test Level 1 | Word Recognition | |
| | Spelling | |
| | Arithmetic | |
| Gray Oral Reading Test Form B | Oral Reading | |
| Comprehension 100 % at the 2nd Grade Level | | |
| Roswell-Chall Diag. Rdg. Test of Word Analysis Skills | Decoding Skills No score obtained Test given for analysis only | |
| Nelson Reading Skills Test Form ___ | Vocabulary Reading Comprehension Total Reading | |

| Woodcock Reading Mastery Tests Form ___ | Independ. Lev. | Instruct. L |
|---|---|---|
| Letter Identification | | |
| Word Identification | | |
| Word Attack | | |
| Word Comprehension | | |
| Passage Comprehension | | |
| Total Reading | | |

J.A.757

Page 2                                             Corey Johnson

<u>Visual - Snellen eye chart</u>       Right eye   20-30
                                        Left eye    20-30

F.    <u>Comments on Test Results:</u>

The Gray oral test indicates Corey is reading with compre-
hension on a second grade level. He has evidences of some
learning disabilities. He exhibited much angulation and
distortion of symbols (WRAT) which indicates some visual
motor difficulty. He is a better context reader and sub-
stitutes similar words for unread words, e.g. "shock for
surprise". He was unable to read single syllable short
vowel words in isolation. He could not name the sounds of
the short vowels. When reading, Corey had to keep his
finger on the words to keep from skipping. In reading
the Snellen Eye Chart, he was not able to read the letters
consecutively but omitted several.

The third grade level (Gray) was too difficult to read. He
is a word by word reader but seems to comprehend material
on a concrete level.

His phonic knowledge is lacking: he did not know the sounds
of g and c. He was not sure of the consonant sound of m and
y. He was able to blend consonants with difficulty but he
did not know the consonant digraph sh. He did not know the
rule of silent e. He could not read any words in isolation
with vowel combinations. He was able to determine the
number of syllables in a word presented with 50% accuracy.

Spelling subtest (WRAT) yielded a beginning second grade
score.

Arithmetic (WRAT subtest) yielded a mid-third grade score.
This score is somewhat inflated as Corey could not multiply
by 3, divide a single digit by 2, or read numbers of more
than 4 digits. He could multiply a single digit by 2 and
add with renaming but not subtract with borrowing.

G.    <u>Summation:</u>

Corey, 13-3, is currently placed in the Diagnostic Center.
This examiner has determined that he is reading on a
second grade level. Although he achieved 100% compre-
hension, some unknown words were guessed on this level.

The three tests given indicate a lack of phonic skills
which might enable him to sound out words. He also has a
minimal sight vocabulary. He has difficulty blending.

USCA4 Appeal: 21-1    Doc: 10-1    Filed: 01/08/2021    Pg: 158 of 261

Page 3                                          Corey Johnson

G.    Summation:(cont.)

      These factors combined make reading very difficult for
      Corey.

      His serial memory is not as expected.  He could recite the
      months of the year in sequence only up to Aug. although he
      knew there were 12 months in the year.

      Corey would tell time on the hour only but seemed to feel
      that he could learn in a short time.

      A trial lesson in reading digits indicated a potential
      for learning concrete material.


H.    Recommendations:

      1.    Teach how to tell time for utilization reasons and
            for effect on self esteem.

      2.    Use Glass Analysis Technique for key into reading and
            phonics.

      3.    Math - basic math laws of subtracting, division and
            multiplication..

LK:jj                                        L. Klerer

cc:D.Schwarz,A.Richmond,A.Offer,L.Jones,B.Kramer

J.A.759

# EXHIBIT 27

## AFFIDAVIT

State of New York      )

               ) ss:

County of Westchester    )

GERALD LEFKOWITZ, being duly sworn, deposes and says:

1.    I live at 52c Heritage Hills, Somers, NY 10589.

2.    For 16 years, I was a Unit Administrator at the Pleasantville Cottage School (the "Center"), an evaluation and short-term residential treatment center for emotionally troubled youth run by the Jewish Child Care Association. I was responsible for disciplinary issues and overseeing the staff at three residential cottages within the Pleasantville Cottage School (the "Cottage", and together with the Center, "Pleasantville"), which is an affiliate of the Center that provides long-term residential care.

3.    I knew Corey Johnson from 1982-1985 while Corey was treated at the Center and then while he was living at the Cottage. I did not see Corey formally on a regular basis, as we only had semi-annual meetings.  However, I did see him on a near daily basis informally when I would visit the Cottage and Corey would have appointments with other staff members in offices near mine.

4.    I testified at the sentencing phase of Corey's trial on February 10, 1993.

5.    I am aware of at least one other individual at Pleasantville who saw Corey on a considerably more regular basis and spent considerably more time with him than I did, and therefore likely knew Corey considerably better than I did:  Richard

J.A.761

Benedict, who was Corey's special education teacher during the 1984-85 school year. Mr. Benedict may have been able to provide additional or different information regarding Corey than I did at his trial.

6.    I personally could have provided considerably more information than I testified to at trial had I been questioned in more detail. Having more recently been questioned in more detail about Corey than I was prior to or during his trial, I now provide information that is consistent with, but in a number of respects in addition to, what I testified about at the trial.

7.    Corey did not generally misbehave, so I did not see him much in a disciplinary capacity. Corey was not perceived as a threat by his peers or as a troublemaker by the staff, and I cannot remember a single instance of Corey having problems with anyone. The instances in which Corey exhibited disobedience were related to missed appointments or school days.

8.    Corey got along with me but he did not confide in me. In fact, I believe that Corey did not generally confide in any staff members. He often seemed anxious but was a good kid.

9.    Corey stood out as being particularly slow intellectually compared to the other residents at the Cottage.

10.    Corey was very motivated to learn but could only read at about a first- or second- grade level, which was frustrating for him. In fact, I do not think Corey even knew all the letters in the alphabet. Even with special education and tutoring in reading from hardworking teachers who were all certified in special education, his

2

J.A.762

reading skills were still very low. He grew increasingly frustrated as his academic skills did not progress and he fell further behind his peers.

11. Corey was able to follow basic rules (for example, to return to Pleasantville at 9:00 pm) but he had problems with more detailed instructions. Corey was slower in understanding what was expected of him than his peers, and sometimes did not understand what was expected of him at all. Although Corey could give the appearance of being competent, it was very clear to anyone dealing with him for more then a few minutes that Corey was "slow."

12. I did not have sufficient expertise to assess the accuracy of any IQ tests he was administered or to give an opinion was to whether he had mental retardation.

13. Compared to his peers at the Cottage, Corey had average social skills in that setting and had several friends, but (as I have repeatedly said), he was at the lower end academically.

14. Corey was more easily influenced than the other children at the Cottage and was a follower.

15. Corey constantly wanted his mother to come visit him and wished to live with his maternal grandmother.

16. I felt that he was extremely focused on his mother because she seemed so unloving. His mother did not visit the Cottage very much, and only sporadically attended meetings related to Corey's development with Cottage staff. One time, Corey's mother asked Corey for a loan. I went with them to the bank because I wanted to make sure Corey's mother did not convince Corey to withdraw all of his

3

J.A.763

savings. Corey lent his mother $250, which was about half of his savings, and as far as I am aware his mother never paid him back.

17.    It had become apparent to the Cottage staff that his mother was not capable of or interested in providing a supportive home from Corey.

18.    In 1985, we decided to transfer Corey to Elmhurst Boys Residence in Queens, New York. Corey accepted this decision, as he was the sort of person who accepted whatever you wanted to do for him.

_____
GERALD LEFKOWITZ

Sworn before me on this
5 day of December, 2011

_____
Notary Public

MARY LOU MARTELLI
NOTARY PUBLIC STATE OF NEW YORK
WESTCHESTER COUNTY
LIC. #01MA5071756
COMM. EXP. 1/17/2015

4

**J.A.764**

# EXHIBIT 28

J.A.765

## AFFIDAVIT

State of New York      )
                             ) ss:
County of New York     )

ODETTE NOBLE, being duly sworn, deposes and says:

1. I reside at 101 W. 85th St. Apt. 6-1, New York, New York.

2. I received my master's degree in social work in 1973. From approximately 1973 until 1987, I was a caseworker for the Jewish Child Care Association (JCCA). During some of that period, as part of my work for JCCA, I ran therapy sessions for boys who lived at Elmhurst Boys Residence in Queens, New York (Elmhurst).

3. Elmhurst was a group home located in an apartment unit. The residence housed eight boys – typically between 14 and 19 years of age – who, for various reasons, were not able to live with their families. Several individuals acted as house parents and provided supervision at the home. One house parent slept at the residence each night.

4. As a social worker with responsibilities for Elmhurst, I met with each of the resident boys individually for an hour each week. I also conducted a group session with the boys and the house parents every other week.

5. I met Corey Johnson when he was 16 years old, shortly after he moved into Elmhurst in June 1985. For approximately the next 20 months, until February 1987, when Corey left Elmhurst when he was age 18, Corey regularly attended my weekly individual therapy sessions as well as my bi-weekly group therapy sessions. In total, I met with Corey more than 100 times, either individually or in a group setting.

6. After Corey left Elmhurst in 1987, I did not see Corey again until 1993, when I saw him in the court room as I testified at his trial in Richmond, Virginia. I have not seen Corey since the trial in 1993.

**J.A.766**

7.    Compared to virtually all of the other boys I encountered at Elmhurst, Corey was much weaker cognitively.

8.    While living at Elmhurst, Corey attended special education classes at Newtown High School in Queens. Most of the other boys in the residence attended mainstream classes at high schools in the area and were expected to go on to college. I believe that this upset Corey.

9.    Corey had real intellectual limitations. During our sessions, I sometimes read to him and his comprehension of what I had read was poor. His own ability to read was very limited.

10.    Corey worked very hard, but because of these limitations, could just not perform well in school.

11.    Based on my regular interactions with Corey, I believe that Corey's cognitive problems were not limited to his school work.

12.    For example, even though he could understand the rules regarding group meetings well enough to follow those rules most of the time, he never understood the purpose or reasoning behind the rules.

13.    Corey did not pose any serious behavior problems for me. He was a very sweet kid -- not mean-spirited. He generally got along with and was liked by the other boys in the residence. Corey certainly was not one of the more difficult boys that I worked with in my years of working with teenagers.

14.    The residence had a strict policy against physical confrontations and, to my knowledge, Corey abided by that policy.

15.    During the time I knew Corey (from ages 16 to 18), he was "girl crazy" and we often spoke of him trying to develop close relationships.

2

**J.A.767**

16.    In my view, Corey was not capable of "consequential" thinking. Thus, I believe, he lacked the ability to understand the consequences that his actions could have.

17.    In social settings, he did not initiate action, but rather went along with what others did.  He was very susceptible to peer pressure.

18.    Corey did not have a good "read" of situations or other people.  He was not very sensitive to social cues.  He had difficulty learning "the rules of the game" and understanding who was in charge.

19.    In counseling him, I spoke with him about making good decisions and trying to judge who was trustworthy and who was not, but Corey seemed unable to apply our discussions to his actions.

20.    Corey was a poor social decisionmaker.  When it came to making decisions, Corey seemed to live in the moment.  As a result, Corey could be easily influenced into doing what his peers wanted him to do.  If some of his more intellectually developed peers convinced Corey to do something, he would go along with it even if he did not perceive any logical reason for doing so.  He would act in this way in circumstances in which, if he had been more intelligent, he would have realized that his actions could get him into difficulty.

21.    I believe that Corey's arrest for robbery in August of 1986 is an example of such a circumstance. Corey was arrested for robbery, along with two other teenagers, Mitch and Dwight.  Mitch worked in the Youth Corps and apparently had a bossy co-worker against whom he wanted to retaliate.  It is my understanding that Mitch enlisted the help of Dwight and Corey to rob the co-worker.  I believe Mitch may have explained the situation to Dwight and Corey in a way that was intended to make it seem

3

J.A.768

as if Mitch had somehow been wronged. Mitch was clearly the leader in this robbery. I believe Mitch may have chosen Corey as an accomplice due to Corey's known susceptibility to peer pressure. True to form, Corey went along with Mitch's plan.

22. Corey's mother very rarely visited him at Elmhurst. I met Corey's mother only once or twice during Corey's nearly two-year stay at Elmhurst, which was an unusually low number. By contrast, I met other boys' families much more frequently.

23. I frequently tried to contact Corey's mother by telephone, but she did not respond.

24. In short, Corey's mother was almost non-existent in his life while he was living at Elmhurst.

25. Whenever we talked about his mother, Corey could not discuss or consciously express any anger towards her. He would always talk about her as if she were terrific.

26. In my experience, Elmhurst gave a chance to youths who were coming out of bad, controlling situations to get their lives on track if they could honestly deal with their emotions. Corey did not confront his emotions with respect to his mother, and in my view, Corey's inability to do so was a problem for his development.

27. Elmhurst provided a structured environment for its residents. For example, the house parents shopped and cooked for the boys and even some of the leisure time was structured by the program.

28. That said, there was somewhat less structure at Elmhurst than at Pleasantville, where Corey had previously resided.

29. Corey may have needed more structure and support than Elmhurst provided.

4

J.A.769

30. Towards the end of his time at Elmhurst, Corey began to ignore the instructions of house parents and the house rules.

31. In or about February of 1987, there was a meeting at which Corey was asked to leave Elmhurst for violating house rules. In my view, the message we were trying to communicate to Corey was "you should go away and think about this for awhile, and then come back."

32. However, Corey left Elmhurst permanently. We tried to invite Corey back to the residence, which we felt provided a structured and loving setting for him, especially compared to life with his mother or life on the streets. I, personally, as well as the rest of the staff wanted Corey to come back.

33. I believe that Corey's decisions to move out and stay out of the Elmhurst residence despite the staff's desire to have him back was an example of Corey's inability to think about the consequences of his actions and plan for his future.

34. I and my colleagues worried greatly for his future after he left Elmhurst.

35. As I mentioned above, while most of the boys living at Elmhurst were expected to (and did) go on to college, neither I nor my colleagues believed that Corey would be able to do so, because of his limited cognitive abilities.

36. Because of Corey's intellectual limitations, I had concerns that Corey would not be able to hold a job.

37. Beyond that, I questioned Corey's ability to negotiate even the simple, day-to-day tasks that community life requires, such as paying bills, obtaining a driver's license, or purchasing and maintaining a car. Somewhat more complex skills – like planning a budget – were clearly beyond Corey's abilities, in my view.

5

**J.A.770**

38.    In short, I doubted that Corey was equipped to make it on his own, to live independently as an adult.  Some people stay in a protected setting their entire lives and that may have been what was appropriate for Corey.

_____
ODETTE NOBLE

Sworn before me on this
1st  day of December, 2011

Patricia Terranova-Geraci
Notary Public

PATRICIA TERRANOVA-GERACI
NOTARY PUBLIC, State of New York
No. 01TE5063454
Qualified in New York County
Commission Expires July 22, 2014

6

**J.A.771**

# EXHIBIT 29

J.A.772

## AFFIDAVIT

State of Pennsylvania        )
                             ) ss:
County of Montgomery         )

**GEORGE SAKHEIM, PH.D., being duly sworn, deposes and says:**

1.    My address is 1614 Foulkeways, Gwynedd, PA 19436-1033.

2.    I was born on ███████████ in Hamburg, Germany.

3.    I am currently retired. I hold a Ph.D. in psychology, and became a licensed psychologist in 1966.

4.    From 1972 through 1990, I was Chief of Psychological Services for the Pleasantville Diagnostic Center and Pleasantville Cottage School (collectively referred to as "Pleasantville"), both located in Pleasantville, New York. I was responsible to the director of the Pleasantville Cottage School as Chief Psychologist and Director of Psychological Services of the Jewish Childcare Association of New York. My responsibilities included hiring psychologists, supervising them, and evaluating their performance individually on testing. I conducted therapy and carried a caseload of therapy patients at Pleasantville. I also conducted in-service training for the psychologist staff and interns.

5.    During my time with Pleasantville, Corey Johnson was evaluated on several occasions by psychologists and psychiatrists there, including, but not limited to, Cary Gallaudet, Ph.D., Ken Barish, Ph.D., and John Stadler, M.D.

6.    In evaluations conducted by Dr. Gallaudet in February 1982 and by Dr. Barish in March 1985, Corey was administered IQ testing.

**J.A.773**

7. I was familiar with Dr. Gallaudet, including her experience, expertise, and evaluation style in or about the time she conducted her evaluation of Corey Johnson in 1982. In fact, at the time she conducted the evaluation, I was her supervisor. Likewise, I was familiar with Dr. Barish, including his experience, expertise, and evaluation style in or about the time he conducted his evaluation of Corey Johnson in 1985. I was familiar with Dr. Stadler, who was my supervisor during some of the period I worked at Pleasantville. I was familiar with Dr. Clemmens, who was a psychiatrist at Pleasantville.

8. I have reviewed the following materials:

a) Psychodiagnostic Evaluation by Ernest Adams, MS staff psychologist at the Council's Center for Problems of Living, dated December 11, 1981 (attached hereto as Exhibit A);

b) Psychological Evaluation by Dr. Cary Gallaudet, dated February 5 and 8, 1982 (attached hereto as Exhibit B);

c) Psychiatric Evaluation by John Stadler, M.D., dated September 23, 1983 (attached hereto as Exhibit C);

d) Psychiatric Summaries by Elizabeth Clemmens, M.D., dated June 29, 1984 and December 27, 1984 (attached hereto as Exhibit D);

e) Psychological and Educational Evaluation by Ken Barish, Ph.D., dated March 1983 (attached hereto as Exhibit E);

f) Psychological Evaluation by Ken Barish, Ph.D., dated March 15, 1985 (attached hereto as Exhibit F); and

g) Current Assessment, dated August 10, 1984 (attached hereto as Exhibit G).

9. I submit this affidavit based on my training and experience and my review of the materials identified above.

2

**J.A.774**

## Dr. Barish's IQ Testing of Corey is More Reliable Than That of Dr. Gallaudet and Is Consistent with a Diagnosis of Mental Retardation

10.    On February 5 and 8, 1982, Dr. Gallaudet evaluated Corey Johnson. As part of her evaluation, Dr. Gallaudet administered, among other tests, the WISC-R, an IQ test.  As reflected in her report, Corey's summary scores were as follows:  Verbal IQ 85, Performance IQ 93, and Full Scale IQ 88.

11.    Approximately three years later, on March 15, 1985, Dr. Barish also administered the WISC-R to Corey, as part of an evaluation that included other testing. Dr. Barish's report reflects Corey's summary scores on the WISC-R, which were substantially lower than in Dr. Gallaudet's testing:  Verbal IQ 68-70, Performance IQ 78-81, and Full Scale IQ 69-74.  For the reasons explained below, I interpret Corey's actual full scale IQ score on the test administered by Dr. Barish to have been a 69.

12.    As set forth more fully below, I agree with Dr. Barish's manner of assessing Corey Johnson's IQ and recommend relying on Dr. Barish's findings rather than those of Dr. Gallaudet -- for a number of reasons.

13.    First, at the time Dr. Gallaudet conducted her evaluation of Corey Johnson, she was a young and very inexperienced psychologist.

14.    Dr. Gallaudet joined the Diagnostic Center in November 1981 and therefore had only approximately three months of experience at Pleasantville at the time she evaluated and administered tests to Corey.

15.    In my experience, younger and less-experienced psychologists sometimes have a tendency to be overly helpful to examinees when conducting tests.

16.    While I did not directly witness Dr. Gallaudet provide assistance to Corey during testing, her report suggests that she may have provided such assistance.

3

J.A.775

That is, her report states: "Frequently Corey would interrupt his own work with irrelevant questions about toys, games and other activities, and at those times, the *examiner would have to help him* refocus on the task at hand." Ex. B at 1 (emphasis added).

17. In addition, Dr. Gallaudet's limited experience and her friendly personality and desire to be helpful were consistent with the profile of a test administrator who might assist a distracted examinee.

18. Part of what an IQ test like the WISC-R is designed to measure is an examinee's ability to focus and perform certain tasks independently and within a fixed time period – absent any guidance or assistance from a test administrator or extra time.

19. While it is not uncommon for a psychologist administering an IQ test to provide some help or extra time as an experiment designed to evaluate the possible effect of academic or clinical intervention, it is customary and appropriate for a tester conducting such an experiment to segregate the results obtained under those different, experimental conditions from the results obtained under the defined testing conditions -- the latter being the true results.

20. To the extent that an examinee is provided assistance or extra time, and the results obtained under those conditions are not segregated from the true results, the test's findings are compromised.

21. I believe that the results from Dr. Gallaudet's 1982 testing may have been so compromised.

22. In contrast, Dr. Barish's results from the 1985 testing do not appear to be compromised.

**J.A.776**

Case 3:92-cr-00068-DJN   Document 89-14   Filed 12/14/20   Page 6 of 35 PageID# 2959

23. As an initial matter, Dr. Barish was a more experienced psychologist at the time he conducted his evaluation in 1985 than Dr. Gallaudet was in 1982.

24. Dr. Barish had a few years of experience at Pleasantville at the time of his evaluation of Corey whereas, as mentioned above, Dr. Gallaudet had only a few months' experience when she evaluated Corey.

25. Moreover, even apart from experience, I believe Dr. Barish was a more objective psychologist at the time he conducted his examination of Corey than Dr. Gallaudet was when she conducted hers.

26. Further, I believe Dr. Barish was stricter in his construction of the test than Dr. Gallaudet had been three years earlier.

27. As noted above, Dr. Barish's report indicates a range of scores.

28. Importantly, Dr. Barish appeared to acknowledge engaging in the very type of experiment I describe in paragraph 18 above.

29. Dr. Barish reported two sets of subtest scores for certain categories and explained that "[a]lternate scores reflect improvement in performance with additional time and/or assistance from the examiner." Ex. F at 1.

30. As mentioned above, such an experiment is entirely appropriate and such alternate scores may provide clinically useful information – as long as they are segregated from the results obtained under the defined testing conditions.

31. Appropriately, Dr. Barish segregated the alternate subtest scores.

32. Further, the ranges of summary scores Dr. Barish reported appear to account for the fact that there were alternate subtest scores.

5

J.A.777

33.     Thus, for example, I interpret Corey's Full Scale IQ score of "69-74" as follows.   Corey's actual Full Scale IQ score obtained under the defined testing conditions was 69.  The range above 69 (up to 74) appears to me to reflect what the full scale IQ score *would have been* if the some or all of the alternate subtest scores – obtained outside the scope of the defined testing conditions – were used in lieu of the actual subtest scores.

34.     The second reason I recommend relying on Dr. Barish's testing relates to the timing of the testing.

35.     I understand that, in October 1981, approximately three to four months prior to Dr. Gallaudet's administration of the WISC-R test in February 1982, Corey had been given the identical test, the WISC-R, in connection with another evaluation.

36.     It is well-recognized that an examinee can demonstrate a "practice effect" on a second test when that test is the same one that was given in the recent past.

37.     While Mr. Adams' very proximate, prior administration of the WISC-R would not have impacted all areas of Corey's scoring on Dr. Gallaudet's administration of the test, the practice effect very likely had a significant impact on Corey's scores, in particular by (artificially) increasing his scoring in the performance area of the test.

38.     I note that Corey scored very poorly on the comprehension portion of Dr. Barish's test.  Comprehension is a test of judgment that consists of questions such as, "Why do we have laws?"  Corey scored terribly low in this area, revealing significant

6

J.A.778

cognitive deficiencies. This would have implications for his judgment in social situations.

39. Based on all of the foregoing, Corey's testing while at Pleasantville indicates to me that his IQ fell within the mentally retarded range.

## Corey's Evaluations Reflect Notable Deficiency in Intellectual Functioning

40. Corey also showed notable deficiency in intellectual functioning.

41. As reflected in the attached evaluations, Corey was given every opportunity through the Pleasantville Cottage School to improve academically. He was placed in a small class setting with a number of advantages. However, Corey's academic performance did not improve. See Exhibit C.

## Other Limitations Noted in the Evaluations Are Relevant to Corey's Behavior

42. As Dr. Stadler observed in his evaluation (see Exhibit C at 1), there was a neurological basis for Corey's cognitive difficulties. Corey was neurologically handicapped and thus could not control his impulses as well as a normal person.

43. Additionally, based on the evaluations, Corey clearly profiled as a "follower" and by no means as a leader.

44. Corey's lower capacity for inhibiting his emotions, his being a follower, and his wanting to please someone he was following were all qualities that would have affected Corey's decision making.

7

J.A.779

Case 3:92-cr-00068-DJN   Document 89-14   Filed 12/14/20   Page 9 of 35 PageID# 2962

## Summary Description of Corey

45.    Ultimately, in my view, the results of his evaluations indicate that Corey was a very intellectually handicapped person with emotional difficulties, organic neurological deficits and an IQ consistent with his having mental retardation.

## Corey's Placement in the Pleasantville Cottage School versus Edenwald Center

46.    The Jewish Child Care Association (JCCA) had a number of facilities in which children would be placed based on their emotional and cognitive capacities.

47.    When and where a student was placed occurred at intake with the JCCA.

48.    The intake division would meet with families at intake and determine where the child would be placed.

49.    If a child was diagnosed with mental deficiency, the child would be placed in the Edenwald Center, a placement within the Pleasantville Cottage facility designed for young people with emotional and cognitive deficiencies. Other children were placed in the Pleasantville Cottage School.

50.    Based on my memory, at the time Corey was evaluated for placement, an IQ score of 65 was generally considered the upper limit of mental deficiency, for purposes of placement within Edenwald by the JCCA.

51.    Thus, only a child whose IQ score was 65 or lower was placed in Edenwald.

52.    During my tenure (but after Corey was placed), the JCCA – appropriately, in my view – began to move away from looking exclusively at an

J.A.780

individual's IQ scores below 65 when making placement decisions, and instead incorporated in its analyses considerations of somewhat higher IQ scores as well as the general adaptive behavior of the child.

53.     Therefore, in this later time frame, if an individual had an IQ score of 72 or 73, combined with low scores on other tests or other indications of adaptive behavior deficits consistent with a diagnosis of mental retardation, the child would be eligible for placement at Edenwald – although, for reasons I discuss next, such a placement may still not have taken place.

54.     During my tenure at Pleasantville, it appeared that many experienced social work administrators were reluctant to diagnose children with IQ scores in or around 70 and other cognitive deficiencies as mentally retarded. This was because, at the time, many in the social work profession were sensitive to the risk of stigmatizing youth.

55.     As a result, if a child did not have IQ test scores well below 70, notwithstanding indications of adaptive behavior deficits or other characteristics of mental retardation, there was likely some avoidance of diagnosing a child as mentally retarded.

_GEORGE SAKHEIM, PH.D._

Sworn to before me on this
17 th day of June, 2011

_Lori A Schmidt_
NOTARY PUBLIC

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Lori A. Schmidt, Notary Public
Lower Gwynedd Twp., Montgomery County
My Commission Expires May 29, 2014
Member, Pennsylvania Association of Notaries

9

**Exhibit A**

THE COUNCIL'S CENTER FOR PROBLEMS OF LIVING

C M H C

PSYCHODIAGNOSTIC EVALUATION

| | | |
|---|---|---|
| Name of Client: | Corey Johnson | **TESTS ADMINISTERED** |
| Address of Client: | 640 Riverside Drive | Westchester Intelligence Scale for |
| | New York, N. Y. 10031 | Children — Revised (WISC-R) |
| Examiner: | Ernest H. Adams, M.S. | Thermatic Apperception Test (TAT) |
| | Staff Psychologist | Rorschach Ink Blot Test |
| | | Draw-A-Person |
| Supervisor: | Mary Sitgraves, Ph.D. | Bender Visual Motor Gestalt |
| Date: | December 11, 1981 | Testing Date:  October, 1981 |

IDENTIFYING BIOGRAPHICAL INFORMATION AND REFERRAL QUESTION:

Corey Johnson is a 13-year-old average size, black boy.  He was referred by his mother, Emma Johnson, who is employed as a receptionist.  Ms. Johnson has requested a complete evaluation of Corey so that she can place him outside of their current living situation.  Corey will be placed by Special Children's Services (BCW) which intends to place Corey in Children's Village, a residential treatment center in Dobbs Ferry, New York.  A complete psychological battery was given to assess his current level of intellectual and emotional functioning.

CLINICAL TEST BEHAVIOR:

During our initial session Corey was warm and friendly, even though he was quite anxious with nervous gestures.  He recurrently pulled his hair, face, and spoke with a quiver in his voice.  Corey appeared to be somewhat depressed, needy and quite frightened.  The balance of the sessions Corey was less anxious, the nervous gestures ceased, and the quiver in his voice disappeared.  Overall, Corey was warm, friendly, cooperative, and seemd to have a ready capacity for interpersonal relatedness.  Corey appeared to have tried his best.

PERSONALITY ORGANIZATION AND DYNAMICS:

Corey presents as a somewhat depressed and sad boy who is terrified of the environment in which he lives.  A primary conflict is his fear of people versus his desire for interpersonal relatedness.  His general view is that people wantonly do harm to others with impunity.  In novel situations or in meeting new people he will experience a great deal of anxiety and discomfort until he can determine whether it's a safe place to be.  Notwithstanding, his fearful perception of people, Corey still maintains an active desire and capacity to establish and develop interpersonal relatedness.  Moreover, he still retains the ability to navigate through the social world in a warm and friendly manner.  Corey presently fears his mother will abandon him, which exacerbates his negative self image and low self esteem.  He feels a lack of nurturance, support, and feels the circumstances in his life are out of his control, which increases his anxiety and depression.  Corey is fearful of losing control and becoming emotionally aroused.  His chief defense, which is slowly being eroded, is to distance himself from his associations when stimulated and aroused.  That is, he attempts to cut off or suppress his feelings.  The use of such

(Continued)

J.A.783

Client:  Corey Johnson                    - 2 -                    December 11, 1981

an internal defense means his reality testing has the potential to degenerate unless
his concerns, fears, and feelings are allowed to be expressed and explored.  In
summary, Corey's strength is his "social intelligence", i.e., his ability to com-
municate in a warm and friendly manner with the capacity and desire for mutual
exchange.  He's somewhat depressed with low self-esteem and negative self-image.  In
general he views people as hurtful but maintains a ready capacity to relate on an
individual basis.

INTELLECTUAL FUNCTIONING:

Summary of WISC-R

| Verbal Tests | Scale |
|---|---|
| Information | 6 |
| Similarities | 3 |
| Arithmetic | 7 |
| Vocabulary | 7 |
| Comprehension | 8 |

| Performance Tests | |
|---|---|
| Picture Completion | 10 |
| Picture Arrangement | 9 |
| Block Design | 5 |
| Object Assembly | 10 |
| Coding | 4 |

| Verbal IQ | 77 | Borderline |
|---|---|---|
| Performance IQ | 84 | Dull Normal |
| Full Scale IQ | 78 | Borderline |

RECOMMENDATIONS:

Individual insight oriented psychotherapy is recommended (twice weekly) so Corey may
begin to express and explore his concerns, fears, and feelings.  A small classroom
situation is recommended with individual tutoring.  It's highly recommended that
Corey be allowed to develop an individual relationship with one of the Children's
Village volunteers.  This should enhance Corey's development and increase his self-
esteem.

Ernest H. Adams
Staff Psychologist

Mary Sitgraves, Ph.D.
Coordinator
Children/Adolescent Services

EHA/mla

J.A.784

**Exhibit B**

PLEASANTVILLE COTTAGE SCHOOL

Name of Child:  COREY JOHNSON            Dates Evaluated: 2/5, 2/8/82
Date of Birth:  ▓▓▓▓▓                    By:  Cary Gallaudet, Psy. D.
CA:             13.3                     Worker:  Amira Offer
Date of (PCS) Adm: 2/1/82

PSYCHOLOGICAL EVALUATION

Corey was referred to the Pleasantville Diagnostic Center (2/1/82)
on a PINS Petition.  Background history revealed long standing school
problems culminating in Corey's truancy since September of 1981.

Behavioral Observations:

Corey was a tall, slender and friendly 13.3-year old boy who spoke
with markedly slurred speech.  Although his face was a bit scarred
Corey impressed as a good looking boy.  He entered the testing easily
yet his affect initially seemed depressed and flat.  He was a co-
operative boy who complied readily with all the examiner's requests.
As the evaluation proceeded, and rapport developed Corey became
more spontaneous and talkative.  He seemed ambivalent about the
testing; enjoying the individual attention he was receiving, but
unsure about the actual assessment.  At times Corey impressed as
in immature boy whose playful and friendly nature often interfered
with his performance.  Frequently Corey would interrupt his own
work with irrelevant questions about toys, games and other activit-
ies, and at those times, the examiner would have to help him refocus
on the task at hand.  Corey was always agreeable and pleasant, and
while expressing concern over "the tests" he never seemed resistant
to anything that was asked of him.

Tests Administered:

                    Bender-Gestalt
                    Figure Drawings
                    WISC-R
                    Sentence Completion
                    TAT
                    Rorschach

Intellectual Evaluation:

On the WISC-R Corey achieved a Verbal I.Q. of 85 (Low Average),
a Performance I.Q. of 93 (Average) and a Full Scale I.Q. of 88
placing him within the Low Average range of intellectual function-
ing.  Average potential is suggested by his Performance I.Q., which
was slightly higher than his Verbal I.Q.  There was no variability
within the verbal area, however, performance tests were character-
ized by signficant variability.  Subtest scores were as follows:

J.A.786

Corey Johnson                                                    -2-

Verbal Tests                      Performance Tests

Information        7              Picture Completion    11
Similarities       7              Picture Arrangement    9
Arithmetic         7              Block Design           6
Vocabulary         7              Object Assembly       13
Comprehension     10              Coding                 7
Digit Span         2

In the verbal area Corey achieved his highest score on Comprehension.
His average score here suggests that Corey has a maturing conscience
and moral sense.  His thinking is appropriate and his ability to
use practical judgment in every day social situations is a strength.
On the other hand, a significant weakness was evidenced in his short
term auditory memory.  Corey's score on Digit Span fell in the Men-
tally Deficient range, indicating a severe deficit in his auditory
attention for nonmeaningful material.  Emphasis is made on nonmean-
ingful because, when using the same skill (short term auditory mem-
ory) with arithmetic problems, Corey was able to function within
the Low Average range.  Significant too is the fact that Corey demon-
strated considerable more difficulty with Digits reversed than for-
ward.  A performance such as this, characterizes concrete rigid
thinking, with a corresponding inability to shift the frame of re-
ference from digits forward to digits reversed.

In the performance area Corey achieved his highest score on Ob-
ject Assembly.  His High Average score here reflects a strength
with the following: the ability to anticipate part/whole relations,
synthesize concrete visual forms, and assemble materials drawn from
life into a meaningful whole.  Significantly lower and falling with-
in the Low Average range was Corey's score on Block Design.  His
score here reflects deficits in non-verbal abstract reasoning, per-
ceptual organization, visual perception and perceptual motor func-
tioning.  Corey demonstrated real difficulty here, nearly rotating
designs early on, and finally failing later designs for the same
reason (rotation).  These weaknesses were also evident in his
Bender-Gestalt performance which was characterized by a number of
rotations and distortions.  He made three scorable errors, producing
a Bender performance which was comparable to a child five years be-
low his chronological age, and of those errors made two suggested
the presence of an underlying neurological deficit.  Visual recall
was adequate but 6 out  of the 9 designs reproduced were marked by
severe rotations  - again suggesting that a perceptual motor deficit
interferes with Corey's functioning.

Personality Dynamics:

Corey is a depressed, dependent and frightened 13.3-year old who
is struggling with independent strivings at this time in his life
and feels immobilized as a result.  This struggle presents a real
conflict for Corey because on the one hand he is an ambitious boy
who is searching for independence, but on the other he feels de-
ficient, dependent and frightened.  Essentially he feels unable
to make it on his own and while he knows he needs help it conflicts

J.A.787

Corey Johnson                                                    -3-

with his reach for independence.  While depressive tendencies are
pervasive (many references to dying and killing one's self) Corey
offsets these tendencies with fantasies whereby he feels if he tries
hard enough he will fulfill his ambition.  He is an ambitious boy
who feels caught in the middle - being pushed and pulled - and while
his independence is critical to him there is also a longing for
nurturance and affection.  These needs stir up considerable anxiety
which he initially tries to deal with through denial.  Denial is
ineffective, however, and as Corey becomes more anxious he eventual-
ly regresses to an earlier stage where he is an immature boy with
strong dependency needs.  Hostile impulses also emerge at this time
and serve to overwhelm the boy even more.  Object relations are
developing and Corey is an empathic and sensitive boy who can re-
late in a mature manner.  A sensitive boy, with genuine emotional
responsiveness.  Corey often feels at the mercy of others' wishes,
and his strong conscience causes him to respond accordingly.  These
conflicts are exacerbated by an organic component which clearly in-
terferes with Corey's ability to function successfully in school.
While abstracting abilities are being more and more emphasized at
this time Corey falls further and further behind.  It is an area of
weakness for him and when challenges are not concrete and meaningful
Corey is unable to integrate the experience and becomes easily over-
whelmed.

Summary and Recommendations:

In summary, Corey is a sensitive and dependent boy who is struggling
with issues revolving around independence.  An underlying organic
component serves to exacerbate the anxiety, dependence, affection-
al needs and hostile impulses and as a result Corey has an extremely
hard time trying to integrate emotional challenges.  Although evidence
of a learning disability exists he continues to be an ambitious boy
who is motivated to improve his situation and would benefit highly
from both remediation in academic areas as well as psychotherapy.
Corey needs to gain greater insight into his struggle over his ambi-
tions, his reading deficits and his willingness to accept help.
From an academic standpoint it is important that if Corey is to
learn more effectively that the material be presented in the most
concrete and meaningful way.
          Cary Gallaudet:ww  D-2/1/82        T-232/82

                                   Cary Gallaudet, Psy. D.

Supervised by:
George A. Sakheim, Ph.D.
Chief of Psychological Services

**Exhibit C**

PLEASANTVILLE COTTAGE SCHOOL

Name of Child:  COREY JOHNSON                Date of Evaluation: 9/23/83
Date of Birth:  ▮▮▮▮▮▮                        By:  John B. Stadler, M.D.
Date of (PDC) Adm: 2/1/82                    Social Worker:  Gayle Turnquest
Date of (PCS) Adm: 4/26/82

PSYCHIATRIC EVALUATION

The family consists of Corey, his mother and his two years younger
half-brother.  About two years ago the mother placed the brother,
and a few months later brought Corey to SSC, which led to his admis-
sion to PDC and PCS.  She said that he had been stealing from her
(and her live-in boyfriend) and he ran away a lot, was truant and in
particular he had a long standing learning problem.  At the present
time, therefore, both boys are in placement and the mother lives
essentially alone.  Corey says she is going to school, studying
business in college.

At the Cottage School Corey has a reputation of being a good boy,
one who stays out of trouble, even though he lives in a cottage
where there is a good deal of trouble.  He does not drink or smoke
pot.  He does not run away.  I have never known him to be suspected
of stealing.  On the other hand his learning disorder is not respond-
ing to any of our teaching methods.  He seems absolutely refractory
to phonics.  His math abilities are a little bit better than his
reading ability (approximately mid-3rd grade compared to approximate-
ly beginning 2nd grade).  Psychological examinations performed by
Dr. Gallaudet in February 1982 and Dr. Barish in March 1983 indicate
a neurologic basis for his learning disorder, but no specific educa-
tional method was suggested.  PDC psychiatrist, Dr. Sundar, also
found evidence of neurologic disease.

Seen today Corey is his usual cooperative self.  He is tall (68 3/4"),
good looking, modest, self-effacing somewhat, and he still has some
remnants of his previous speech defect.

He described in a simple but descriptive way, the adventure of meet-
ing his natural father after almost thirteen years of absence.  Af-
fects would appear to be intact, judging by this experience (and
throughout the interview).  He described the reasons for his place-
ment and his brother's placement, as entirely due to "the stupid
things we do" the stealing, the running away, etc.  When I asked if
there was anthing wrong with the mother, both of whose children were
in placement, he quickly denied it, and attributed everything to the
boys' misbehavior.  The referral material says that for four years
she lived with a drug addicted, abusive man, but Corey does not have
anything to say about this person, who has since moved out of her
life.

He is well oriented, his sense of reality is good, he has a diminished
sense of the future.  Caught in a conflict between a mother who wants
him to go to college and an educational experience which has been a
hundred percent negative, he still says he thinks he should try to
find a job in computers or some other kind of professional work.  How-
ever, this is clearly rather an embarrassing subject for him.

J.A.790

Corey Johnson                                        -2-

A kinetic family drawing was done in a very light hand.  The people
are drawn as stick figures in the lower left hand corner of the page,
about one-and-a-half inches high.  He drew himself and his mother play-
ing paddle ball, while his brother "is playing with his car."

Diagnosis:

Axis I.     No Diagnosis
            (History of running away and stealing, with Differential
            Diagnosis between Conduct Disorder, Socialized, Non-Aggressive
            and Parent-Child Problem, Severe; however, these are not
            present now.)

Axis II.    Long Standing Developmental Reading and Arithmetic Disorders,
            Severe.

Axis III.   Positive Soft Neurological Signs (and evidence on psychologic;
            testing of central neurologic dysfunction, diffuse).

Within the structure of this institution, Corey's behavior is quite
adequate.  He needs very Special Education, and I know of no methods
to suggest to remediate his defects, beyond a great deal of individual
attention and drill.  I leave these questions to experts of Special
Education.  It would seem, however, that with his attitudes, work
skills and behavior, he should be considered for both an on-grounds job
and vocational education at B.O.C.E.S., as soon as possible.
      John B. Stadler, M.D.:ww  D-8/23/83   T-8/26/83

                                    John B. Stadler, M.D.
                                    Clinical Director

J.A.791

Sec. 392 SSL                                          State Case No. _____

FAMILY COURT OF THE STATE OF NEW YORK – COUNTY OF __Manhattan_____

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     PETITION

In the Matter of the Review of the Foster Care Status of     (Authorized Agency)

__Corey Johnson_____     Docket No. _____

Pursuant to Section 392 of the Social Services Law

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

The petitioner herein respectfully alleges upon information and belief that:

1. Petitioner is an authorized agency with offices at 250 Church Street, Borough of Manhattan, City and State of New York.

2. The above-named child is a (fe)male child born on or about ___███████___. The names of the natural parents of said child and their residence addresses are as follows:

Emma Lee Johnson
640 Riverside Dr., #AE
New York, New York 10031

3. Petioner is charged with the care, custody and guardianship of said child, in that
Parents signed Vol. placement papers 4/26/82

4. Said child was placed in the foster care of the person(s)/institution named at the residence address set forth below and has remained in such foster care for a continuous period of at least twenty-four months:

| Name of Foster Parent/Institution | Address | Period of Foster Care |
|---|---|---|
| JCCA/Pleasantville Cottage School, | P.O. Box 237, Pleasenatville, N.Y. 10570 | 4-26-82 to present |

5. There are no persons interested in this proceeding other than those hereinbefore specified, except

6. That it would be in the best interest of the child to continue in foster care because
Child has severe learning disabilities and emotional problems. He receives special education, Casework counseling and therapy. Mother maintains interest in child, but has not formulated plans for his return. Child visits home regularly. Agency is going to counsel child toward educational and vocational planning. Continued care is recommended until discharged to own responsibility.

WHEREFORE, petitioner prays for a review of the foster care status of said child, pursuant to Section 392 of the Social Services Law, and that the Court enter an order of disposition continuing the present foster care of the above-named child and granting such other and further relief as to the Court may seem just and proper.

SSC #4766716-28
Agency #567
Team #
Expir. 10/85                        Commissioner of Social Services of the City of New York

                                   BY _____
                                                        Attorney

Form W-864B
Rev. 4/21/80

**J.A.792**

**Exhibit D**

PLEASANTVILLE COTTAGE SCHOOL

Name of Child:  COREY JOHNSON          Date of Evaluation:  6/29/84, 12/27/8
Date of Birth:  ▆▆▆▆▆▆                 By:  Elizabeth B. Clemmens, M.D.
Date of Adm:    4/26/82                Social Worker:  Christine Aaron

## PSYCHIATRIC SUMMARY

Corey was placed at PCS over 2½ years ago, after having spent two months
at the Pleasantville Diagnostic Center.  His mother felt unable to take
care of his problems while she was apparently struggling with her own.
Corey had serious academic deficits in addition to problems with his
behavior.  He fought in school, was often truant, and stole from the
family.  A half-brother was in placement at Children's Village at that
time; a few weeks ago, he was admitted to our Diagnostic Center. The
family's home life has been unstable and often chaotic with much
violence and abuse.

For historical details, the reader is referred to the Psychosocial
Summary of 3/82.

The psychiatrist at the Diagnostic Center diagnosed an adjustment disord
and a special developmental reading disorder.  A later psychiatric
examination (9/83) found him to have a developmental reading and arith-
metic disorder.  The psychologist found Corey to have an I.Q. of 88.
More important though, Corey has severe learning disabilities in
reading, spelling and arithmetic, but adequate comprehension.  The
psychologist recommended teaching him with a whole word sight vocabulary
approach, bypassing phonics.

In June of 1984, Corey was transferred to a Senior Cottage.  He made an
easy transition and        has not been a management problem.  During the
summer, he worked at the Pace Farm as part of the Youth Employment
Summer Program, doing manual labor.  In September, he continued classes
at BOCES where he learns carpentry and apparently is doing well.  Corey
has made only slow progress in academics.  He is supposed to receive
remedial reading and speech therapy but, for reasons not clear, has
had no one-to-one instruction for several months.

In my office, Corey has been friendly and polite, and has answered
questions in a relevant way but with few words and without spontaneous
comment, with a few exceptions.  Last June, when I asked him about his
father, he replied that he saw him when he was 13 at his grandfather's
home.  He then added, "We see each other then and there, like father
and son do," a very evasive answer.

Corey's goals have become more realistic since his last evaluation.
He enjoys carpentry work and would like some day to be a carpenter or
a construction worker.  At our last meeting, Corey was sarcastic and
extremely resentful about receiving neither remedial reading nor
speech therapy:  "Schoolwise, they haven't done a thing for me.  They
helped me with home."  When I questioned the lack of remedial teaching,
he answered angrily, "They get my hopes up high and then you do no
shit.  That's why I want to depend on nobody no more...You are all
full of shit, everyone of you...Nobody has raised a finger."  Corey

COREY JOHNSON                                                    -2-

made all these comments after he had told me that he did not want to talk about academics. He denied having a girlfriend (I think she left), which might have contributed to his bad mood. He worries about receiving "young adult" status which would give him special privileges.

Corey is now 16 years old. He is tall, cooperative and mostly polite. Today, though, he was resentful and sarcastic. He grew up in a disorganized and at times chaotic home. Outside of being raised in a problematic family          he has to cope with a severe learning disability which is highly frustrating and embarrassing. It is understandable that he feels bitter and resentful about not receiving adequate help. In addition, it is difficult for him that he had to relate to five different social workers within one year. Corey's vocational training seems to be satisfactory. His psychological testing gives evidence of organic symptomatology with an overlay of emotional problems. The latter, though, have considerably improved during the past 2½ years. The former is a permanent handicap Corey has to learn to live with. Much encouragement and praise for his motivation and good manual skills will help him face up to reality.

## DIAGNOSIS

Axis I      1. Conduct Disorder, Socialized, Nonaggressive, in remission
            2. Parent/child problem

Axis II     Mixed Specific Developmental Disorder, Severe

Axis III    Evidence of diffuse neurological dysfunction (see psychological testing and positive soft neurological signs)

## RECOMMENDATIONS

1. Continue vocational training and prepare for independent living.

2. Continue remedial reading and speech therapy as recommended by the psychologist.

3. Psychotherapy to encourage him and help him cope with reality.

4. Discharge to a group residence.
   Dr. Clemmens:ww  D-1/18/85 T-1/31/85


                        Elizabeth B. Clemmens, M.D.
                        Psychiatrist

J.A.795

Case 3:92-cr-00068-DJN   Document 89-14   Filed 12/14/20   Page 25 of 35 PageID# 2978

**<u>Exhibit E</u>**

≈7

## PLEASANTVILLE COTTAGE SCHOOL

Name of Child: COREY JOHNSON          Date of Testing: 3/83
Date of Birth: ▮▮▮▮▮▮          By:  Ken Barish, Ph.D.
Date of (PCS) Adm: ▮▮▮          Social Worker: Gayle Turnquest

### PSYCHOLOGICAL AND EDUCATIONAL EVALUATION

### Referral:

Corey was evaluated at Pleasantville Diagnostic Center in February
1982.  At that time Corey achieved a Full Scale I.Q. of 88, with a
Verbal I.Q. of 85 and a Performance I.Q. of 93.  Indications of
diffuse neurological dysfunction were evident as well as very strong
depressive tendencies and an emphasis on denial as a defense.  Corey
remained ambitious, however, with a strong conscience and capacity
for empathy.

In conference it was reported by Corey's teacher that his academic
skills are very poor.  This evaluation was requested to provide addi-
tional clarification of the nature and extent of Corey's learning
difficulties and to make recommendations for remedial strategies.

### Tests Administered:

Wide Range Achievement Test
Neuropsychological Screening Tasks
Bender-Gestalt
Benton Visual Retention Test
Spreen-Benton Aphasia Tests
Raven's Progressive Matrices
Purdue Pegboard
Gilmore Oral Reading Test
Human Figure Drawings

### Observations:

Corey was cooperative throughout the evaluation and demonstrated gener-
ally good frustration tolerance despite the very real difficulty he en-
countered on many of the tasks presented to him.  Corey's willingness
to continue to put forth effort on academic tasks without impulsivity
or withdrawal is an impressive strength, particularly considering the
severity of his learning disabilities.

### Test Findings:

The present test findings confirm the presence of severe learning dis-
abilities in reading, spelling and arithmetic.  There is an abundance
of findings which strongly suggest diffuse neurological dysfunction
with associated impairment in many aspects of cognitive functioning.
Difficulties in attention and concentration are a prominent factor
in Corey's learning difficulties.  In addition, Corey demonstrates
specific language deficits (i.e. speech sound discrimination, phonic
associates, sound blending) and also deficits in visual-spatial
analysis, visual-motor and fine motor coordination and perhaps also
visual memory.  These findings will be discussed below.

Corey Johnson                                                          -2-

On the *Wide Range Achievement Test* Corey obtained a Reading Score
at the 1st percentile (SS 62), a Spelling Score at the 1st percentile
(SS 64) and an Arithmetic Score at the 2nd percentile (SS 68).  Corey
understands basic arithmetic operations including borrowing and carry-
ing but has difficulty with division and more complex operations.
Some of Corey's errors seem to result from inability to sustain at-
tention on problems, and also from some confusion in the spatial
analysis on arithmetic problems.  With regard to reading, Corey has
a small sight vocabulary but has great difficulty in analyzing words
phonetically.  Reversals were occasionally noted in Corey's naming
of letters and sound sequencing errors were common in his reading.
Attentional errors also appeared to impair Corey's reading.  Corey
can spell only a few simple words.  His ability to read or spell
using a phonetic approach is severely limited, and Corey's attempt
to spell even some simple words (e.g. "arm") are unrecognizable.
Also apparent is some difficulty in the formation of letters and
numbers, perhaps also some difficulty in discriminating letters of
similar shape.

Corey's reproductions of the Bender designs reveals a significant
deficit in visual-motor coordination.  His performance on the Benton
Visual Retention Test strongly suggests a deficit in visual memory
or visual-motor functioning.  A significant problem in visual-spatial
analysis was evident on the Raven's Progressive Matrices.  Attentional
difficulties also contribute to Corey's poor performance on this task.
Corey's performance on the Purdue Pegboard reveals significant prob-
lems also in fine motor coordination.  Corey is right dominant in
hand, foot and eye preference.  Left-right awareness is well establish-
ed on self, but not for mirror rotation; Corey consistently misplaced
right and left on an examiner facing him.  Finger recognition is un-
impaired.  Corey showed no difficulty with tongue and mouth movements.

Several tests of language functions were also administered.  Language
comprehension (Token Test) is unimpaired, except for occasional in-
attention.  Naming of colors, body parts, and common objects was also
unimpaired.  Corey's immediate memory for digits, although improved
over previous testing remains poor.  Mild articulation errors were
noted.

A specific deficit in speech sound discrimination was apparent.  Corey
knows the names of all the letters of the alphabet and the consonant
sounds.  Discrimination of vowel sounds, however, is very poor.  When
asked to say the sounds of different vowels, Corey produced essential-
ly the same sound for each vowel.  When asked to blend sounds into
nonsense words, Corey would blend adequately but often misprounced
the vowel sounds.

Conclusions and Recommendations:

This evaluation confirms the presence of severe learning disabilities
in reading, spelling and arithmetic.  Corey's learning difficulties
result from wide spread cognitive deficits, including problems in

J.A.798

Corey Johnson                                                                    -3-

attention and concentration, visual processing, and speech sound dis-
crimination and phonics.  It is probably because of this that Corey
has been unable to find compensations that would enable him to achieve
a higher level of academic skill.  With regard to remediation, it
would appear that a whole word sight vocabulary approach, bypassing
phonics and sound blending would be more productive in improving
Corey's reading and spelling.  Corey and his family should be counsel-
led regarding the nature of his learning difficulties and a school
program with less focus on academic skills should be considered.
     Ken Barish, Ph.D.:ww D-4/11/83     T-4/29/83


                              Ken Barish, Ph.D.
                              Psychologist


**J.A.799**

**Exhibit F**

PLEASANTVILLE COTTAGE SCHOOL

Name of Child: COREY JOHNSON        Date Tested: 3/15/85
Date of Birth: ▉▉▉▉▉▉            By: Kenneth Barish, Ph.D.
Date of (PCS) Adm: ▉▉▉▉▉         Social Worker: Christine Aaron

## PSYCHOLOGICAL EVALUATION

### Referral:

Corey was referred for re-evaluation to assess his current cognitive and emotional functioning. Corey was last tested in March 1983, by this examiner, and in February 1982 at Pleasantville Diagnostic Center. These evaluations reveal severe learning disabilities in Reading, Spelling and Arithmetic, associated with impairment of attention and concentration, visual-spatial skills and specific language deficits; significant depressive tendencies were also noted.

### Tests Administered:

WISC-R
Rorschach
TAT

### Test Findings:

On the WISC-R Corey achieved a Verbal I.Q. of 68-70 (Mentally Deficient-Borderline range), a Performance I.Q. of 78-81 (Borderline-Low Average range), and a Full Scale I.Q. of 69-74 (Deficient-Borderline range). Subtest scaled scores are presented below:

| | | | |
|---|---|---|---|
| Information | 4 | Picture Completion | 8(9) |
| Similarities | 5(6) | Picture Arrangement | 9 |
| Arithmetic | 6(7) | Block Design | 1(5) |
| Vocabulary | 5 | Object Assembly | 5(6) |
| Comprehension | 4 | Coding | 6 |
| (Digit Span | 6) | | |

(Alternate scores reflect improvement in performance with additional time and/or assistance from the examiner.)

These scores reflect a significant decline in both Verbal and Performance I.Q. since Corey was tested in 1982. At that time a Verbal I.Q. of 85, a Performance I.Q. of 93 and a Full Scale I.Q. of 88 were reported. There is also some difference in a pattern of subtest scores. Corey achieved significantly lower scores on the current testing on both the Comprehension and Object Assembly subtests. This decline in I.Q. scores is difficult to account for. However, several factors may be involved. The current scores may reflect in part, the increasing demands that the tasks presented as well as Corey's failure to learn at an expected pace.

J.A.801

Corey Johnson                                                          -2-

They also undoubtedly reflect the effects of Corey's severe dis-
couragement and depression with respect to cognitive tasks. For
example, with minimal assistance, Corey was able to improve his
performance considerably in many instances. This was evident on
the Similarities, Arithmetic, Block Design and Object Assembly sub-
tests. Corey's very deficient score on the Block Design subtest
is the result of several rotations of designs that he easily cor-
rected when his error was pointed out to him. These scores, should,
therefore, not be taken as an indication of Corey's intellectual
potential. Corey's intellectual difficulties remain clearly evident,
however, and my recommendation now, even more strongly than two years
ago, is that Corey needs a highly vocationally oriented school pro-
gram. Some efforts should be made to help Corey achieve a level
of literacy that will enable him to function in the working world,
however, Corey is unlikely to improve significantly in this area.

Personality Functioning:

Personality assessment reveals a thoughtful, highly reflective, but
affectively constricted adolescent. Corey expends considerable
energy in his efforts to suppress anger. He appears vulnerable to
periods of depression and frustration. There is also evidence of
feelings of aloneness and a desire for help, that is not being
heard. Several responses suggest that Corey feels that he is not
being listened to.

Corey's test responses also reveal an effort toward maturity that
is particularly impressive, considering his severe learning dis-
abilities. Corey's TAT stories reveal, for example, an awareness
that life has trials and tribulations that must be coped with and
an acceptance of the reality that life is sometimes painful, for
example, that there are painful separations. Corey's stories empha-
size his concerns regarding the future and his constructive and
mature goals. For example, he tells a story about a young man
"wondering if he's going to have a job and a nice life, maybe some
kids and a wife to support and help him move on in life." This
effort towards maturity is at the cost of a constriction of Corey's
emotional life, particularly a suppression of anger and rebellious-
ness and an overly compliant attitude towards authority. Corey
also tends towards extremes of either/or, good/bad in his thinking
about himself and his life. Corey could benefit from greater ac-
knowledgement and acceptance of his anger, integrating anger into
his identity along with a less narrow definition of maturity.

Recommendations:

As indicated earlier, Corey needs a vocational school program with
some remediation in literacy skill. He could also benefit from
counselling and supportive psychotherapy both in regard to prob-
lems of self-esteem related to his learning disabilities and also
supporting and broadening his efforts to become a mature adult.
          Kenneth Barish, Ph.D.:ww  D-4/15/85     T-4/15/85

                                    Kenneth Barish, Ph.D.
                                    Psychologist

J.A.802

**Exhibit G**

PLEASANTVILLE COTTAGE SCHOOL

CURRENT ASSESSMENT

Name of Child:  COREY JOHNSON
Date of Birth:  ███████
School Grade:  Ungraded
Nature of Place-
        ment:  Voluntary

Date of Admission (PCS):
                4/26/82
Date of Adm. (PDC): 2/1/82
Date of Conference: 8-10-84

Conference Participants:

  Jerry Lefkowitz, Unit Administrator; Gordon Hilton, Child Care
Worker; Gerard Maier, Social Worker; Corey Johnson, Mrs. Johnson
did not attend the conference.

PRESENTING PROBLEM:

Corey Johnson was initially placed at Pleasantville Cottage School
due to truancy, acting out in school and at home.  An emotionally
disturbed boy with organic deficits, he was raised in an unstable
and chaotic environment.  His mother was unavailable to him, unable
to provide structure and support.  Corey's developmental history
included stuttering until age five and encopresis from age eight
to twelve.  He was left back in school in the 3rd and 4th grade.
He was placed in a special class in 1980.  He has severe learning
disabilities, has never progressed beyond the 2nd grade reading
level.  Upon admission he was seen as a depressed youngster with
soft neurological signs, was reacting to the family's chaotic situatio:
and to his mother's unavailability.

CURRENT FUNCTIONING:

  Child:

Corey was transferred into Cottage 7 in June.  It was felt that
this was an appropriate placement for him due to his age and the
fact that many of the boys in Cottage 7 are moving towards independent
living, a plan that seems appropriate for Corey.  He was reluctant
to make this change but had several months to work it through.
He's made the transition to the older cottage easily.  Corey is
not a management problem.  He's had no difficulty learning the
routine of the cottage, following cottage expectations.  A good
athlete, Corey enjoy's sports particularly baseball and basketball.
He's friendly with the other boys and appears to be developing a particu
friendship with Larney Hunter.  He's friendly and related to all
the cottage staff.  Corey does not draw attention to himself.
It would seem that he could become "lost" in the cottage with attentio
being deferred to the more verbal or acting out boys.  Corey has
spent the summer working at the Pace Farm as part of the Youth
Employment summer program.  This is difficult manual labor.

J.A.804

Corey Johnson                                                    -2-

As with his previous job Corey worked in a responsible and consistent
way.  It is seen as a real strength for him that he is able to
take the responsibility for a job and follow through with it.

School as always      is a major concern for Corey and an important
part of his treatment plan.  This fall he will again attend the
B.O.C.E.S. Program.  He will also receive Speech Therapy once a
week.  Corey puts a great deal of pressure on himself to do well
in school.  As noted, he is handicapped with severe learning dis-
abilities.  Educational goals are geared towards helping him achieve
some competency with the work to enable him to gain a functional
literacy.  The plan is to work towards a G.E.D. diploma and vocationa:
experience.  Corey has appeared less depressed and upset with his
functioning in school.  The team feels that he will benefit from
another year in the B.O.C.E.S. Program.  Corey is also interested
in taking a part-time job at Caldor's in Elmsford.  Considering
his learning handicaps  and his competency on the job, it would
seem that such a plan would be beneficial to this boy.  In the
fall we will investigate the possibility of combining the school
and a part-time work program for him.

During the Spring, in individual and family meetings
        Corey chose to remain at Pleasantville Cottage School for
another year.  It is questionable that he will ever return home
permanently.  Visits, however, were increased to provide him with
more contact in the community to enable him to function more independ
in the community, (i.e. to learn how to travel and to plan for
himself) and to help him to "test out the waters" regarding
his home situation.  Home visits have gone without incident.  Corey
claims he ejoys  them.

Mrs. Johnson continues to be available to attend some meetings
with the agency and                            plan's on having
Corey returned to her.  She is unable, however, to name a specific
time.  The treatment team does not believe that such a plan will
work.  Mrs. Johnson is experiencing serious problems with her
youngest son Robert who has just been returned to her care from
Children's Village.  She describes Robert as difficult to manage
in the home and acting out in the community.  Children's Village
has referred Robert to several day treatment programs in the communit
however, Mrs. Johnson is not satisfied with these referrals and
is interested in re-placing her son.  She continues to deny any
conflict and any ambivalence regarding Corey.  However, what is
currently going on with Robert can be seen as a reflection of
what will happen if Corey were _ to return to her care.  Our major
goal in the upcomming months is to work with Mrs. Johnson on the
                                  reality of the situation
possibly help    her maintain regular contact with Corey (i.e.
through home visits)                                  and encourage
move towards some type of Group Residence.

Corey Johnson                                                        -3-

In sessions Corey is related and quite verbal. He's anxious to
make a good impression and seeks approval. Early meetings have
centered on his loss and the confusion he's experienced over changing
cottages as well as having several social workers over the past
few months. He's enthusiastically discussed plans for the upcomming
school year. As noted he's interested in working off campus and
achieving a young-adult status. Corey is very comfortable with
the structure and support of Pleasantville Cottage School. Home
and family issues are presented as conflict-free. This is consistent
with the way Corey has presented his home situation since placement
with us. He's unable to express any ambivalence regarding his
unavailable though outwardly conforming mother. Corey states
that he would like to return home, however he is also considering
the possibility of a Youth Residence Center or a Group Residence.
                                    . problem solving, encouraging his planning
for himself and encouraging strives towards growth and individuation.
The issue of where he will go in the future and when is closely
tied to dynamics of this boy and his family. The difficulty with
denial is demonstrated by both Mrs. Johnson and her son.

History and Present Functioning
                                            indicates that it would not
be in Corey's interest to return home. Mrs. Johnson has consistently
demonstrated ambivalence regarding him. The situation with Robert
indicates her difficulty in being available and also settting
limits. Both parties will need help in maintaining some separation
while continuing          contact. Living in a Group Residence
will provide the structure and a less conflictual environment
that will enable Corey to grow and develop.

CONFERENCE RECOMMENDATIONS:

1. Corey will continue in the B.O.C.E.S. Program as well as in
Speech Therapy.

2. The team will investigate the possibility of including a part-time
job in his daily activities.

3. Caseworker will focus on providing support and encouragement
to individuate.

4. As noted, the focus must be kept on the discharge planning
for this boy. In May we applied for and received an approval
for a plan of discharge to self. The treatment team considers
this the most appropriate plan for this boy. Work must be done
with Mrs. Johnson as well as Corey in accepting the concept of
Corey living in a Residence but maintaining regular contact with
his family.
     Gerard Maier:ww    D-8/31/84          T-9/4/84

                              Gerard Maier
                              Social Worker

# EXHIBIT 30

**J.A.807**

## AFFIDAVIT

State of New York          )
                           ) ss:
County of Bronx            )

DAVID WASHINGTON, being duly sworn, deposes and says:

1.     I am currently 61 years old and reside at 4347 Furman Avenue, Bronx, New York.

2.     I worked for Jewish Child Care Association (the "JCCA") for 23 years. While working for the JCCA, I worked in various capacities, including about half this period at various group homes in New York City that were a part of the JCCA network.

3.     From about 1987 through 1989, I was a child care worker at Elmhurst Boys Residence in Elmhurst, New York, a foster care residence for youth operated by the JCCA.

4.     The residence consisted of two apartments, and housed up to eight boys at a time. I and other staff members alternated living in the apartment in three to four day shifts. In addition, a social worker who worked offsite would pay periodic visits to the apartment.

5.     I met and interacted with Corey Johnson during the approximately year-and-a-half period that I worked at the Elmhurst Boys Residence. As far as I remember, Corey was between 16 and 18 years old at the time.

6.     At the time that Corey was at Elmhurst Boys Residence, most of the other boys were black males of about the same age.

J.A.808

7.     My impression was that while there were many boys with below normal intellectual ability and various levels of functioning, almost all of the other boys there were more intelligent than Corey.

8.     My impression was that Corey sensed he was not as bright as the other residents.  As a consequence, Corey would often not express his opinion and chose to remain quiet.  For example, Corey would not join staff and residents during group conversations at meal time, and also did not join other residents to play games or for other recreational activities.

9.     While I do not know whether Corey understood all the rules that he was expected to follow at the Elmhurst Boys Residence, I do recall one instance in which Corey repeatedly turned on the television when he was not supposed to do so.  This prompted me to unplug the television. I asked him to try to explain why he was disobeying rules, but he did not or could not articulate his reason for keeping the television on.

10.    Corey was very quiet, kept to himself and (although he was athletically built) never picked on anyone.  During the year and a half that I knew Corey, he did not confide in me.

11.    Corey seemed outwardly sad much of the time I observed him.  I very rarely saw him laugh or express happiness.

12.    Corey was a follower in that he would generally go along with what others wanted to do.

13.    In fact, Corey was known at the Elmhurst Boys Residence as someone who could be convinced to do what you asked him to do.

2

14. I recall an occasion when Odette Noble, a social worker at Elmhurst Boys Residence, asked Corey to speak in a group session and Corey refused.

15. As I recall, subsequently Corey was told to "leave." As I recall, this incident led to Corey's leaving Elmhurst Boys Residence, and I do not remember Corey returning to Elmhurst Boys Residence again.

16. This incident sticks out in my mind because I remember questioning whether Odette's reaction to Corey's refusal to speak was excessive, and also whether Corey understood what Odette intended when she told Corey to "leave."

*David Washington*

DAVID WASHINGTON

Sworn before me on this
1st day of March, 2012

NOTARY PUBLIC

CLARENCE PYNE
Notary Public, State of New York
No. 5026495
Qualified in Bronx & Westchester County
Commission Expires 7-1-14

3

J.A.810

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **Case No. 3:92CR68 (DJN)** |
| | : | **CAPITAL CASE** |
| **COREY JOHNSON,** | : | **Execution Scheduled for** |
| | : | **January 14, 2021** |
| Defendant. | : | |

**NOTICE OF SUBMISSION OF EXHIBITS (SUBMISSION 4 OF 8)**

Corey Johnson hereby gives notice of the submission of Exhibits 31-44 as attachments to

his Motion Pursuant to 28 U.S.C. § 2255 Raising Claim of Ineligibility To Be Executed Under

18 U.S.C. § 3596(c). This is the fourth submission of eight.

Dated: December 14, 2020                  Respectfully submitted,

                                          /s/ David E. Carney
                                          David E. Carney, VA Bar #: 43914
                                          Donald P. Salzman (Admitted Pro Hac Vice)
                                          Skadden, Arps, Slate, Meagher & Flom, LLP
                                          1440 New York Avenue, NW
                                          Washington, DC 20005
                                          Telephone: (202) 371-7246
                                          Fax: (202) 661-8295
                                          Email: david.carney@skadden.com

                                          *Counsel for Corey Johnson*

**J.A.811**

**CERTIFICATE OF SERVICE**

I hereby certify that on December 14, 2020, I electronically filed the foregoing with the

Clerk of Court using the CM/ECF system, which will then send notification of such filing to all

parties and counsel included on the Court's Electronic Mail notice list.

/s/ David E. Carney
David E. Carney, VA Bar #: 43914
Skadden, Arps, Slate, Meagher & Flom, LLP
1440 New York Avenue, NW
Washington, DC 20005
Telephone: (202) 371-7246
Fax: (202) 661-8295
Email: david.carney@skadden.com

**J.A.812**

## INDEX OF EXHIBITS TO MOTION PURSUANT TO 28 U.S.C. § 2255 RAISING CLAIM OF INELIGIBILITY TO BE EXECUTED UNDER 18 U.S.C. § 3596(c)

**EXHIBIT NO.**

**SUBMISSION 1**

**EXPERT REPORTS**

Report of Daniel J. Reschly, Ph.D., Aug. 26, 2016 .......................................................................1

Curriculum Vitae of Daniel J. Reschly, Ph.D., May 15, 2020 ..................................................... 1(a)

Report of J. Gregory Olley, Ph.D., Aug. 24, 2016 .......................................................................2

Curriculum Vitae of J. Gregory Olley, Ph.D., Oct. 2020 ........................................................... 2(a)

Letter from Gary N. Siperstein, Ph.D. to Counsel for Corey Johnson, Dec. 16, 2016 ....................3

Curriculum Vitae of Gary N. Siperstein, Ph.D., Sept. 2020 ....................................................... 3(a)

Debra Nelson, Mitigation Report, Sept. 27, 2016 .........................................................................4

Report of Richard G. Dudley, Jr., M.D., Aug. 22, 2016 ...............................................................5

**TRIAL TRANSCRIPTS**

Trial Tr., Feb. 3, 1993 ..................................................................................................................6

**SUBMISSION 2**

Trial Tr., Feb. 10, 1993 ................................................................................................................7

**SUBMISSION 3**

Cornell Mitigation Information and Report (Excerpt) .....................................................................8

Trial Tr., Feb. 12, 1993 ................................................................................................................9

Trial Tr., Feb. 15, 1993 ..............................................................................................................10

**AFFIDAVITS & DECLARATIONS**

Declaration of Kenneth Barish, Ph.D. (staff psychologist at Pleasantville Cottage
      School), July 22, 2014 ..........................................................................................................11

Affidavit of Richard Benedict (special education teacher at Pleasantville Cottage
      School), Dec. 5, 2011 ...........................................................................................................12

Affidavit of Darnell Brown (acquaintance in Trenton, NJ), Oct. 14, 2011 ...................................13

Affidavit of Darold Brown (acquaintance in Trenton, NJ), June 15, 2011 ....................................14

Affidavit of Craig S. Cooley (appointed counsel in 1992), Sept. 20, 2016 ...................................15

Affidavit of Courtney Daniels (Corey's lifelong friend), May 21, 2011 .......................................16

Declaration of Monica Dawkins (Corey's former girlfriend), July 16, 2012 .................................17

**SUBMISSION 4**

Declaration of Cary Gallaudet, Ph.D. (psychologist at Pleasantville Diagnostic
      Center), Mar. 19, 2012 .........................................................................................................18

**J.A.813**

**EXHIBIT NO.**

Declaration of Ann Harding (staff member at Pleasantville Cottage School), Nov. 21, 2011.................................................................................................................................19

Affidavit of Minnie Hodges (Corey's maternal aunt), Apr. 30, 2011 ...........................................20

Affidavit of Priscilla Hodges (Corey's cousin), Apr. 30, 2011 .....................................................21

Affidavit of Queenie Hodges (Corey's cousin), Apr. 30, 2011 .....................................................22

Declaration of Esther Johnson (Corey's maternal grandmother), Apr. 30, 2011 ..........................23

Affidavit of Robert Johnson (Corey's half-brother), June 29, 2011...............................................24

Affidavit of Antionette Daniels Joseph (the best friend of Corey's mother and Corey's godmother), May 21, 2011) ...................................................................................................25

Declaration of Leona Klerer (reading teacher at Mount Pleasant Cottage School), June 3, 2011 ...........................................................................................................................26

Affidavit of Gerald Lefkowitz (unit administrator at Pleasantville Cottage Center), Dec. 5, 2011 ..........................................................................................................................27

Affidavit of Odette Noble (social worker at Elmhurst), Dec. 1, 2011 ...........................................28

Declaration of George Sakheim, Ph.D. (Chief of Psychological Services at Pleasantville Diagnostic Center), June 17, 2011 .....................................................................29

Affidavit of David Washington (childcare worker at Elmhurst), Mar. 1, 2012..............................30

**SUBMISSION 5**

**CHILDHOOD & TESTING RECORDS**

Gregory Judge, School Social Worker, Social History, Mar. 4, 1977..........................................31

Cheryl Spillane, Learning Consultant, Bureau of Pupil Personnel Services, Jersey City Public Schools, Learning Consultant Evaluation to Child Study Team, Mar. 18, 1977.......................................................................................................................32

F.A. Figurelli, M.D., Chief Psychologist, Psychological Examination Record, Mar. 25, 1977.......................................................................................................................33

Eleanor Glantz, Social Worker, Case Service, Dec. 11, 1978 .......................................................34

Committee on the Handicapped, Referral to the Committee on the Handicapped, Feb. 26, 1979.......................................................................................................................35

Committee on the Handicapped Records, May 21, 1979 ...............................................................36

Washington Heights-West Harlem Community Mental Health Center, Child Assessment Evaluation Summary, Dec. 9, 1981 ...................................................................37

Ernest H. Adams, Staff Psychologist, Psychodiagnostic Evaluation, Dec. 11, 1981 ....................38

Cary Gallaudet, Psy.D., Pleasantville Cottage School, Psychological Evaluation, Feb. 1, 1982.........................................................................................................................39

**J.A.814**

EXHIBIT NO.

Leona Klerer, Mount Pleasant Cottage School Screening Upon Admission, Feb. 22, 1982.................................................................................................................................40

Amira Offer, Caseworker, Psychosocial Summary, Mar. 15, 1982 ...............................41

Gloria Caro, Pleasantville Cottage School, Reassessment Summary, May 21, 1982 ...................42

Gloria Caro, Caseworker, Initial Conference, Current Assessment and Transfer Summary, June 9, 1982......................................................................................................43

Gayle Turnquest, Caseworker, Pleasantville Cottage School, Current Assessment, Jan. 31, 1983 ..............................................................................................................44

**SUBMISSION 6**

Ken Barish, Ph.D., Psychologist, Pleasantville Cottage School, Psychological and Educational Evaluation, Apr. 29, 1983 ...............................................................45

John B. Stadler, M.D., Clinical Director, Pleasantville Cottage School, Psychiatric Evaluation, Aug. 26, 1983 .......................................................................................46

Lynda Coccaro, Speech and Language Pathologist, Donald R. Reed Speech Center, Inc., Phelps Memorial Hospital, Speech and Language Evaluation, Oct. 5, 1983 .................47

Lynn Polstein, Jewish Child Care Association of New York, Pleasantville Cottage School, Change in Permanency Plan, Apr. 13, 1984 ...................................................48

Gerard Maier, Social Worker, Current Assessment, Sept. 4, 1984 ...............................49

Christine Aaron, MSW Intern, Jewish Child Care Association of New York, Pleasantville Cottage School, Visitation Plan, Dec. 12, 1984 ..................................................50

Kenneth Barish, Ph.D., Psychologist, Pleasantville Cottage School Psychological Evaluation, Apr. 15, 1985 .......................................................................................51

Gerard Maier, Pleasantville Cottage School, Discharge/Transfer Plan, May 28, 1985.................52

Board of Education of the City of New York, Individualized Education Plan – Phase 1, July 1, 1985....................................................................................................53

Odette Noble, Social Worker, Jewish Child Care Association of New York, Elmhurst Boys Residence, UCR Reassessment and Service Plan Review 6 Month, Nov. 21, 1985..............................................................................................................54

**SUBMISSION 7**

Odette Noble, Social Worker, Jewish Child Care Association of New York, Elmhurst Boys Residence, UCR Reassessment and Service Plan Review 6 Month, June 28, 1986..............................................................................................................55

Odette Noble, Social Worker, Jewish Child Care Association of New York, Elmhurst Boys Residence, UCR Plan Amendment: Form D Trial Discharge, Feb. 23, 1987 ...............56

Newtown High School, Scholastic Transfer Record, Dec. 7, 1987.............................57

J.A.815

EXHIBIT NO.

Janet Valentine, Child Care Worker, Pleasantville Diagnostic Center, Outline for Cottage Report (undated) ................................................................................................58

**COURT RECORDS**

Notice of the Intention of U.S.A. to Seek Death Penalty as to Mr. Tipton, May 1, 1992 ..........................................................................................................................59

Notice of the Intention of U.S.A. to Seek Death Penalty as to Mr. Roane, May 1, 1992 .............60

Second Superseding Indictment, July 20, 1992, Dkt. 115 .........................................................61

Notice of the Intention of U.S.A. to Seek Death Penalty as to Mr. Thomas, Oct. 28, 1992 ..........................................................................................................................62

Verdict Form, Feb. 3, 1993, Dkt. 466 ........................................................................................63

Notice of the Intention of U.S.A. to Seek Death Penalty as to Mr. Johnson, Feb. 8, 1993 ..........................................................................................................................64

Special Findings, Feb. 16, 1993, Dkt. 508 ................................................................................65

Motion to Have Defendant Declared Mentally Retarded, *United States v. Thomas*, No. 3:92CR68 (E.D. Va. Apr. 15, 1993) ...................................................................66

Memorandum in Support of Initial Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. Section 2255, June 15, 1998, Dkt. 714 (Excerpt) ..........................................67

Reply Memorandum in Support of Initial Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. Section 2255, Mar. 15, 1999, Dkt. 761 (Excerpt) ................................68

Ex. 14 to Reply Memorandum in Support of Initial Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. Section 2255, Mar. 15, 1999 ...................................69

Ex. 15 to Reply Memorandum in Support of Initial Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. Section 2255, Mar. 15, 1999 ...................................70

**SUBMISSION 8**

Petitioners' Joint Motion for Leave to Take Discovery, June 24, 1999, Dkt. 770 ........................71

Memorandum Opinion, May 3, 2000, Dkt. 803 .........................................................................72

Memorandum Opinion, May 1, 2003, Dkt. 896 .........................................................................73

Brief for Appellants Cory Johnson and Richard Tipton at 146, *United States v. Johnson*, No. 03-13(L), 03-26, 03-27 (4th Cir. Feb. 17, 2004) (Excerpt) ...............................74

**SUBMISSION 9**

**DIAGNOSTIC MATERIALS**

American Association on Intellectual and Developmental Disabilities Definition Manual ("AAIDD-11") (Excerpt) ..........................................................................75

AAIDD User Guide to 11th Edition (Excerpt) ...........................................................................76

Diagnostic and Statistical Manual of Mental Disorders ("DSM-5") (Excerpt) ..........................77

4

**J.A.816**

**EXHIBIT NO.**

**CONGRESSIONAL RECORDS**

134 Cong. Rec. 22,926 (1988) (Excerpt)........................................................................................78

136 Cong. Rec. S6873 (daily ed. May 24, 1990) (Excerpt)............................................................79

**J.A.817**

# EXHIBIT 31

## SOCIAL HISTORY

I.   **IDENTIFYING DATA-**

    Name:   Corey Johnson
    Address:  280 Henderon Street, Apt. 8I.        Sex- Male
    Telephone: 332-3191                    School: P.S.NO.
    Home Visit Date: 3/4/77

    **Informant-** Mother and Husband

II.   **SOURCE OF REFERRAL-** Corey was referred to the Child Study Team by the In-School-Team at P.S.NO. 16.

III.   **REASON FOR REFERRAL-** Corey has no concept of number  facts, no reading skills, cannot retain sight vocabulary words and is very disruptive in class.

IV.   **FAMILY COMPOSITION AND BACKGROUND-** Emmalle Johnson lived with Robert Butler for 5 years since the birth of Corey.  He is the father of Corey.  She is presently living with Mr. Mitchell (the two Johnson children live with them).

    Robert Butler, born ▮▮▮▮▮ in Georgia and attended 11 years of school.  He had been employed as a cab driver for 5 years.  He has not been seen or heard from for the past year, and His relationship with the children was poor, as he was absentee fath

    Robert Mitchell (stepfather) is presently living with the mother They are not married. He has two children by a previous marriage He was defensive and evasive as to the type of employment he performed.  It is believed that he is collecting unemployment compensation.  His health is good and he is described as a militant type person and is lacking flexibility.  This is in complete contrast with the mother's philosophy.

    Emmalle Johnson, ▮▮▮▮▮ was born in South Carolina.  She completed 11 years of schooling and has always been a housewife. Her disposition is described as moody.  She can normally be very easy going, but changes to a  loud aggressive person.  She is also a nervous person.  Mother's health is fair and she suffers from a bad heart.  No remarkable medical problems reported on th maternal side of the family.

    Siblings are: Corey Johnson, ▮▮▮▮▮, attends P.S.NO. 16 School, Grade 2; and Robert Johnson, born ▮▮▮▮▮, attends P.S.NO. 16 School, Grade-Kindergarten.

    Family lives on the 8th floor of a 160 family apartment complex. They have three large rooms.  The immediate area is residential in the downtown section of Jersey City.  The area is of a mixed ethnic nature and is considered fairly an expensive apartment complex.

    (CONTINUED)                           page 1 of 10

-2-                                    COREY  JOHNSON

Corey sleeps in the same room as brother Robert.  The atmosphere
at home is very upsetting with much conflict between mother and
father.  They seem to disagree on how the children should be
raised.

Mrs. Johnson  had a good relationship with father during her
pregnancy  Her health was fair as she is an anemic person at
that time. She was 18 years old at time of Corey's birth.

V.    CHILD- Corey was 6 lbs, 4 oz, a 9 month, full term, head first
      presentation, born in the Margaret Hague Maternity Hospital.
      Instruments were used in the delivery and mother was put to slee
      Corey's eating and sleeping habits were good.  There were no
      birth defects noted.

      All milestones were developed within normal limits with the
      possibility of a speech defect.  He is not in speech classes.

      There are no remarkable problems with Corey's medical history.
      He has had the measles and the chicken pox.  No reported acciden
      or hospitalization.  He has received all of his inoculations.

      **Corey's friends** are mostly females about his own age. He is an
      outward person who is also moody.  Corey is very attached to
      his mother, and gets along well with his brother.  His stepfathe
      feels Corey should be more obedient and responsive to the
      stepfather. Mother sides with Corey in areas of disagreement.
      This is an area of conflict that Corey has dealt with for the
      past 3 years.

      Corey has been known to steal and lie. He can be easily led into
      doing bad things. He enjoys sports.

VI.   COLLATERAL SOURCES- None.

VII.  IMPRESSIONS- Corey is respectful at home and of average size
      who has a good self image of himself. He is a sensitive child
      who becomes very upset if he is teased.  He has done poorly in
      school.  There appears to be underlying emotional problems that
      could cause Corey's academic difficulties.

      There is total disagreement between parents on how child should
      be brought up.

VIII. SUMMARY- Corey comes from a broken home with a substitute
      father present.  His natal history indicates that instruments
      were used during the delivery.  No birth defects noted.
      Developmental milestones achieved within normal limits.  No
      remarkable problems with medical history. Parent have become
      more cooperative with school authorities.

      (CONTINUED)

                                              page 2 of 10

J.A.820

-3-                                          COREY JOHNSON

IX.  RECOMMENDATIONS-
     1.  Complete evaluation by the Child Study Team.
     2.  Parents should be urged to seek counseling in order to
         better deal together with child's problems.
     3.  Refer to speech teacher for speech evaluation.
     4.  Counseling for child.


                                    GREGORY F. JUDGE,
                                    School Social Worker

js
8/1/77.

                                                    page 3 of 10

**J.A.821**

# EXHIBIT 32

7&H
9/23/7

## BUREAU OF PUPIL PERSONNEL SERVICES
### JERSEY CITY PUBLIC SCHOOLS
#### JERSEY CITY, NEW JERSEY

### LEARNING CONSULTANT EVALUATION
### TO
### CHILD STUDY TEAM

#### CONFIDENTIAL INFORMATION -- NOT TO BE RELEASED

| | | | |
|---|---|---|---|
| **Name of Student:** | COREY JOHNSON | **Sex:** | M (2) |
| **Address:** | 280 Henderon Street | **School:** | P.S.NO. 16. |
| **Date of Birth:** | ████████ | **Grade:** | 2 |
| **Age:** | 8-4 | **Date of Test:** | 3/18/77 |

**Reason for Referral:** Couldn't perform third grade work. Being retained in second. Cannot follow directions. No concept of number facts, low comprehens No reading skills. Unable to retain sight vocabulary. Hyperactive with a short attention span.

**Tests Administered:**
Peabody Picture Vocabulary Test
Illinois Test of Psycholinguistic Abilities
Slosson Oral Reading Test (Attempted)
Jan Test of Visual Discrimination
Beery-Developmental Test of Visual Motor Integration
California Test of Fine Motor Abilities
Informal Examiner Made Tests

**Test Results and Observations:** Corey is a friendly, nice looking 8 year old boy of average height and weight. He came willingly for testing and enjoyed the individual attention it seemed. His responses were expressive, he was relaxed but gradually became more fidgety as testing continued He is impulsive and had difficulty following more than one direction at a time. When asked his address he said, "Oh you mean my phone Number?". Correct response was obtained after explaining the question

He is a very likable boy who knows he is failing. Corey was pleased with this successful testing situation and appears anxious to learn. He was so pleased with approval that he said "I didn't know I could do all this!"

The following tests were used in the assessment of Corey's academic and perceptual abilities:

page 4 of 10

J.A.823

-2-

COREY JOHNSON
D.O.B. ███████
D.O.T. 3/18/77

## Significant Medical Information
Auditory Acuity:  adequate for testing but needs evaluation.
Visual Acuity:  R 20/20 L 20/25.

## Cerebral Dominance
Right-sided consistent

Speech- At times quality is unclear, expressive ability is fair.
Quantity is fair. Says v for b sometimes. Needs further investigation.

## Directionality and Motor Development
directionality- knows right from left, in front/in back, on under,
up down.
gross motor ability- good, runs, hops, jumps, skips, throws and
catches a ball.
balance- fair although he says he rides a bike. He could stand on 1 foot
but wasn't too steady.
fine motor ability- poor, cutting skills fair.

## CALIFORNIA TEST OF FINE MOTOR ABILITY
Possible Score-20
Raw Score-6 (turned paper sideways)
Rating-poor

Handwriting- Copying skills poor. Omissions, spacial quality poor.
Legibility-fair, immature letter formation. Confuses m/n reversed B.

## PEABODY PICTURE  VOCABULARY TEST (receptive language) form A
Raw Score-62
I.Q. -93
M.A. 7-3
Corey often had to be reminded to look at all 4 pictures (one page
presented)before responding. He would point impulsively.

## SLOSSON ORAL READING TEST (word recognition)
attempted. Recognized up and is from a primer list of 20 words.

## ILLINOIS TEST OF PSYCHOLINGUISTIC ABILITIES

| Subtest | Raw Score | Age Score | Scaled Score | Deviation Mean SS. |
|---|---|---|---|---|
| Auditory Reception | 18 | 4-10 | 19 | -5 |
| Visual Reception | 11 | 4-7 | 13 | -9 |
| Visual Memory | 8 | 3-10 | 15 | -7 |
| Auditory Association | 25 | 7-0 | 29 | +7 |
| Auditory Memory | 19 | 5-3 | 28 | +6 |
| Visual Association | 17 | 5-3 | 23 | +1 |
| Visual Closure | 18 | 5-10 | 25 | +3 |
| Verbal Expression | 22 | 6-2 | 28 | +6 |
| Grammatic Closure | 7 | 4-2 | 4 | -18 |
| Manual Expression | 28 | 8-8 | 37 | +15 |

Composite PLA 5-6        (C.A. 8-4)  Binet Estimate 5-8
Mean SS-22

page 5 of 10

J.A.824

-3-

COREY JOHNSON
D.O.B. ████
D.O.T. 3/18/77

Interpretation

Test scatter indicates some form of neurological dysfunction. Visual reception-the ability to gain meaning from visually presented symbols is deficient.  Visual memory (which requires a motor sequential respon is also a deficit. Corey has not learned many of the redundancies on t automatic level of language (grammatic closure). He would try to say sentences with me then fill in theanswer.

In summary, he does not have, at present, the abilities necessary to read Auditory Association (+7) would indicate that he has the ability to relate concepts presented orally but his short attention span would limit his ability.

JAN TEST OF VISUAL DISCRIMINATION
Possible Score-14
Raw Score-9
Rating-Poor

Had difficulty performing independently.

BEERY-TEST OF VISUAL MOTOR INTEGRATION
Raw Score-9
VMI Age Equivalent 5-3

Informal Examiner Made Tests and Observations-Corey knew his shapes and colors. He could count orally by 1's to 50 but had difficulty counting concrete and pictured objects corresponding one to one. He had difficulty saying the alphabet but recognized letters.  He was unable to give his birth date but knew his age. He said the days of the week; had no idea what month it is but knew the day. He talked about the weather and was able to tell appropriate clothing to wear.

Corey drew  a "girl and her sister" when asked to draw a person. Although his body image is good his drawings are immature. Throughout testing his impulsiveness was apparent. He listened to a short story (5 sentences) when I asked him simple questions relating to the story at first he said anything then he thought more and responded correctly.

RECOMMENDATIONS:
I.   A neuro- psychiatric examination.
II.  Refer for a speech evaluation.
III. Development of the motor skills and visual motor integration abili
     a. cutting
     b. working with clay·
     c. stringing bead design i.fingerpaint
     d. follow-the-dow exercises i. painting
     e. card sewing
     f. tracing
     g. use of templates
     h. coloring inside lines.
     i. finger paint
     j. painting

*page 6 of 10*

**J.A.825**

-4-

COREY JOHNSON
D.O.B. ▮▮▮▮
D.O.T. 3/18/77

IV. Gross motor development in an adaptive physical education program emphasizing
   a. rhythmic exercises
   b. following game rules
   c. basket-ball or bean bag toss
   d. jump rope
   e. hopping-skipping-running relay races
   f. directional skills-"Simon Says", "Giant Step".
   g. positions in space-imitative

V. Language Development through a meaningful auditory-visual-tactile (when possible) approach.
   a. Develop responsiveness by having him imitate actions, sit down, touch nose, clap hands.
   b. Show animal pictures and make sounds.
   c. Collect common objects and request names. Write names-eventually match.
   d. Label things around room. Have child"read" names. Remove . Have him replace.
   e. Have pupil cut out pictures for vocabulary picture card file. Use index cards to paste picture, write name. Extend to abstract words (love, help, made) with picture assocations and discussions of meaning.
   f. Encourage self-expressive.
   g. Review alphabet.
   h. Follow directions.

VI. To improve numberical concepts:
   a. Reinforce concepts of more/less, big/little, many/few.
   b. Use M & M's arrange in groups ask how many? more/less....
   c. Use pegboard and marble board or any concrete objects to count and arrange in groups.
   d. Include number words.
   e. Give seatwork and matching problems, with pictures and correct number.
   f. Drill rote counting by 1's.
   g. Review and reinforce numbers 1 to 5.

_____

CHERYL SPILLANE,
Learning Consultant

js
8/1/77.

page 7 of 10

J.A.826

# EXHIBIT 33

J.A.827

Form 606

## BOARD OF EDUCATION, JERSEY CITY, N. J.
### BUREAU OF SPECIAL SERVICE

### PSYCHOLOGICAL EXAMINATION RECORD

### CONFIDENTIAL INFORMATION — NOT TO BE RELEASED

NAME    COREY JOHNSON                     DATE OF BIRTH    ▓▓▓▓▓▓▓

ADDRESS    203 Henderson Street           NO. OF YEARS SCHOLASTICALLY RETARDED

SCHOOL    P.S. NO.16, Grade 2.            SEX    M (2)   C.A. 8-4

REFERRED BY In-School-Team P.S.NO. 16.    DATE EXAMINED    3/25/77

REFERRAL REASON:

TESTS ADMINISTERED: Corey has become quite disruptive in the class, because he is unable to do class work. He has concept of numbers and no concept of reading skills. He cannot retain sight vocabulary words. He has no comprehension of silent or oral reading. He has difficulty following directions.

EVALUATION PROCEDURE:

Wechsler Intelligence Scale for Children-Revised (WISC-R)
  Verbal Score - 67
  Performance Score - 84
  Full Scale Score - 73

Wide Range Achievement Test (WRAT)
  Word Recognition Grade Level-Kg. .7
  Arithmetic Grade Level-1.4

Goodenough Draw-A-Person
VALUATION Developmental Age  4-9

Bender Visual Motor Gestalt Test
Developmental Age 5-0 to 5-5

Conferences with classroom teacher, school nurse and school social worker, and classroom observations.

RESULTS: Corey is one of two children. When he entered P.S.NO. 16 School he was placed in the 3rd grade but it became apparent that he could not function in the 3rd grade, so he was placed in the second grade.

Conferences with his classroom teacher indicated that Corey is inattentive, quarrelsome and immature in the classroom. He likes to push and shove other children. He is a solitary figure within the classroom structure.

Corey was asked to write his name and he had a lot of difficulty in doing so. He did not know where he lived. His appearance was very neat. He showed facility in verbalizing. He had a good comprehension of the instructions and would look at the model presented to him. He verbalized criticism of his work with correction. He appeared to be an impulsive careful worker. He did not give up easily and would persist on various tasks. He showed quick motor execution. He had no understanding of his date of birth, he thought he was born in March.
(CONTINUED)

J.A.828

-2-

COREY JOHNSON
D.O.B. ███████

He says that he sometimes has trouble throwing a ball. He claims that sometimes he cannot see the beginning letters or the end letters of words. He can only see the middle portion of the word.

His performance on the [Goodenough?] shows [a considerable?] amount of immaturity. He was unable to [draw any?] hands on his figures. To show a lot of body anxiety and there was [an indication?] of possible underlying disturbance. Corey's performance on the [Bender Visual-Motor Gestalt?] showed poor [maturation ability?] and [emulsive?] [tendencies?]. He had considerable [difficulty with?] the [figures?]. [As?] [changed?] in distortion of angles [and?] [problems?] of [integration?]. [These?] [seem?] to be indications that he has [difficulty controlling?] impulsivity. [Corey?] achieved on the WISC-R a verbal score in the [retarded?] range, a performance score within the slow [normal?] range, and a full scale score within the borderline range. There [was?] a significant difference [between?] his verbal and performance test scores, the performance [score?] was elevated 17 points above the verbal [mean?]. There was a significant amount of intersubtest scatter suggesting that he is not functioning to his fullest potential at this time. His scores were both elevated and depressed. Most of the depressed scores were found within the verbal subtests. Some of his responses [suggest?] an [impoverished?] early environment which would have effected his early learning. He has difficulty with abstract reasoning. His non-linguistic test of general information is within the average range. His planning ability and his ability to comprehend a total complex situation is within the retarded range. His visual organization ability is also within the average range. There seems to be indications of underlying emotionality that appears to be interfering with his present level of intellectual functioning. He seems to have poor impulse control.

SUMMARY: Corey's present level of intellectual functioning is within the borderline range. There are indications that he is not functioning to his fullest potential at this time. He seems to have problems with impulsivity and there are [indications?] of an underlying anxiety. He has difficulty coping with his present environment. In addition he might have [some?] [visual?] [problems?].

RECOMMENDATIONS:
1.  [Refer?] for an opthalmological examination [to rule out?] possibility of vision problems.
2.  Refer for a psychiatric evaluation because of the possibility of underlying anxiety interfering with his present level of functioning in the school environment.
3.  Intensive remediation in fundamental subjects.

*page 9 of 10*

[JUDITH?] [C.?] [WRIGHT?], [M.A.?]
[School?] Psychologist

js
7/12/77

# EXHIBIT 34

No. R

**BUREAU OF CHILD GUIDANCE**
**UPPER WEST SIDE CENTER**

NOT ON ROLLS

Child's Name  Corey Johnson

School  PS 200 - 3 $^{3/3}$          Age  10

Date  12/11/78          Worker  EGlantz

CASE SERVICE

Corey was seen on 12/11/78 having been referred by teacher because of disruptive classroom behavior, poor academic performance + poor peer relations. His brother, Robert, in the 2nd grade, is an active case who was referred for similar behavior + learning difficulties.

Corey is a tall, intense boy who assumes much of the responsibility for Robert in + out of school. The single mother presently works + constantly reminds Corey that he's "a man now". Corey appears angry at mother, and at father for leaving the family.

Corey thinks he can do better in school, but "worries" alot about mother + Robert, as well as potential violence (mother being killed). The family has moved often in the past year and Corey does not like "the moving around," + he has no friends

Case will be opened when consent from mother is obtained.

EGlantz social worker

**J.A.831**

# EXHIBIT 35

J.A.832

AND PUPIL PERSONNEL SERVICES

**COMMITTEE ON THE HANDICAPPED**
District 5
P.S. 36 - 123 Morningside Drive
New York, N. Y. 10027
Tel: 222-6051
Virginia Pepe
Chairperson

DR. CHARLES I. SCHONHAUT
EXECUTIVE DIRECTOR (ACTING)
GRACE R. CAVANAGH
CHIEF ADMINISTRATOR
PUPIL CERTIFICATION PROCESS

JOEL S. ROSENSHEIN, PH.D.
DIRECTOR
Sidney Marks, Ph.D.
Borough Supervisor

DATE: 2/26/79

## REFERRAL TO THE COMMITTEE ON THE HANDICAPPED

1. Student's Name _COREY JOHNSON_ Date of Birth [redacted]

2. Address _335 Edgecomb Ave '2B_ Zip ___ Apt. _2B_ Tel. _None_

3. Current School _PS 200_ Grade _3_ Address _2589 7th Ave NYC_ Zip _10039_

4. Parents' Name or Guardian's Name _JOHNSON   EMMA_
                                        (Last)        (First)

5. Address _335 Edgecomb Ave_ Zip ___ Apt. _2B_ Tel.(Home) _None_
                                                  (Business) _None_

   With whom is pupil residing currently? _MOTHER_

6. Please indicate any physical or health problems: _None_
   (Attach any documentation) ___

7. Primary Language of the Home:

   English [X]   Other [ ]   Specify ___

8. SPECIFIC REASONS FOR REFERRAL - Please indicate the specific reasons
   which make you feel an evaluation is needed.
   _Ongoing school failure with severe reading disability. Hyperactive,_
   _disruptive, fighting behavior. Inattention. Temper outbursts._

ATTEMPTS TO RESOLVE - Please indicate all attempts to resolve the
above reasons within the current educational program. Please be
specific.
   _Ongoing remediation. Parent conferences._

J.A.833

....., hospitals, and/or community
........., etc.: Describe these services and attach available
materials.

| Agency | Contact Person | Address and/or Telephone |
|---|---|---|
| Bureau of Child Guidance | E. Slantz, Social Worker | 660 W 183 St NYC |
| | | 781-8500 |
| | | |
| | | |

11. Schools Attended:

| Dates | Boro School-Grade | Dates | School-Grade |
|---|---|---|---|
| 10/4/74 - 2/6/75 | M - P.S. 63  Y st | 5/9/78 - 6/29/78 | K - P.S. 76 - 2nd |
| 3/10/75 - 6/28/76 | K - P.S. 309 - 2nd | 9/79 - Present | M - P.S. 200 - 3rd |
| 2/13/78 - 5/17/78 | Q - P.S. 134 - 2nd | | |

Indicate absence patterns, or please submit copy of child's
cummulative record card.  *Record show low absence rate.*

2. Achievement Scores (most recent testing)

| | Date of Test | Name of Test | Grade Level Score | Level on whi[ch] Pupil Functi[on] |
|---|---|---|---|---|
| Reading | no Scores | | | / |
| Arithmetic | Excused from testing 4/78 | | | 2' |

### TEACHER REPORT

Following are questions designed to give us information about the
student who is being referred for evaluation. Please circle the
appropriate word or words that describe the student and add any
additional comments in the space provided. The more specific and
pertinent your replies, the more we will know about the student and
his/her needs. In answering these questions, please compare the
student to the rest of your class, rather than comparing to an ideal.

HEALTH   (You may circle one or more appropriate words in each item)

Is the student's health adequate for regular school attendance and
full participation in school activities?  (Yes)    No
If no, please explain:

Are there any recurrent health problems that worry you?   Yes   (No)
If yes, please explain:

Does the student come to school looking well cared for (clean, rested,
well fed)?  (Yes)   No
If no, describe:

J.A.834

device?    Yes    No    glasses, hearing aid, and/or other prosthetic

CURRENT SCHOOL PROGRESS   (Please circle the appropriate words)

1. How does the student perform in gym and playground activities?
   -clumsy-graceful-skillful-stays by him/herself-daredevil-a leader-
   avoids physical activities-very competitive-frightened-

2. Does the student have adequate manual dexterity to manipulate
   classroom materials (Crayons, pencils, pens, scissors, ruler)
   easily?   Yes    No
   -neat-messy-precise-awkward-slow-rushes through-careless

3. Does the student reproduce what he/she sees accurately when writing.
   or drawing?   Yes   No   Somewhat
   If no, please describe:

4. Does the student comprehend information which is presented visually
   (as in pictures, charts, maps, or filmstrips)?   Yes    No
   Some

5. Does the student recognize similarities and differences in sounds when
   he/she hears them (especially speech sounds like final consonants,
   vowel blends)?   Yes    Not   very well
   If no, please specify problem areas:
   e for a — ai for ea —

6. How well does the student understand spoken language, such as stories,
   oral instruction, explanations, classroom discussions?
   -poorly-just about average-very well

7. How does the student express him/herself in oral language?
   -clearly-haltingly-just about average-minimally-likes to talk-
   uses correct grammar-an effective speaker-hard to understand-shy

8. Does the student appear to have an adequate fund of information
   for his/her age?   below average-just about average-above average

9. Does the student generally remember what you have taught?
   immediately: below average-average-above average
   over the long term: below average-average-above average

10. Does the student seem to understand abstract concepts when they
    are presented?   below average-average-above average

11. Does the student draw logical conclusions from information?   (How
    well does he/she solve problems, answer why? questions?) below average-
    average-above average

12. Is the student's performance reasonably consistent from day to day?
    Yes    No    From one part of the day to another?   Yes    No
    From one activity to another?   Yes    No   If no, please describe:
    It appears that when the pupil stops
    playing around sits quietly and tries, the
    harder he tries the better his work.

J.A.835

Please give teacher estimates of instructional levels.

|  | General Level | Book(s) Used |
|---|---|---|
| Reading - word attack skills | 1 | |
| comprehension | 1 | |
| Spelling - | 2nd | |
| Mathematics - computation | 2nd | |
| problem solving | 1.5? | |
| functional math (money, time, measurement) | 2nd | |
| Writing - handwriting | 1st | |
| composition | None | |

14. How does the student figure out unfamiliar words when he/she reads or spells? (trial and error) don't know-phonetic analysis-by using contex clues-(inconsistently)

15. Does the student have any special interests or talents? Please describe: *I am not aware of them.*

BEHAVIOR

1. Is the student able to attend to tasks in the classroom?  Yes ·  No
If no, what seems to keep him/her from attending? *Some noise-looking around-(fooling around)*

2. When the student is not paying attention, what does he/she do? Please be specific: *Playing jokes, or fighting other pupils, sharpening pencils, talking to neighbors*

3. How does the student react to frustration or failure? *May frown a bit but seems to soon forget it.*

4. How does the student get along with classmates?  What role does he/she play? (leader-isolate-clown-(troublemaker)) *Depending on whom he affects.*

5. How does the student get along with adults, such as teacher, principal other school workers, authority figures? *Depends upon who the adult is. Shows phony respect for so...* 

6. Does the student accept responsibility and conform to limits imposed i the classroom?  Yes  (No)
If no, what does he/she do? *Does not come on class line up in morning. Fights in lunchroom. Eats candy. Shouts ou...*

7. Does the student work independently on assignments on his/her own iniative?  Yes  (No)   Please describe:

8. Does the student appear to feel good about school?  (Yes)  No
*When he is playing pranks*

9. Please check the words that describe behaviors that this student exhibits to a greater extent than most children of this age:
distractible ✓  daydreaming____  short attention span ✓
hyperactive ✓ unusual speech patterns____ temper outbursts____
unusual behaviors (Please specify)_____

Name of person completing teacher report *Gwendolyn Gilyard T...*
Please include copies of all clinical          (Signature and position)
material and other pertinent information.
COPY OF CUMULATIVE AND SCHOOL MEDICAL RECORD MUST BE INCLUDED.

Other_____

OR-3

J.A.836

# EXHIBIT 36

J.A.837

*NEW # 5416*

BOARD OF EDUCATION OF THE CITY OF NEW YORK
DIVISION OF SPECIAL EDUCATION AND PUPIL PERSONNEL SERVICES
COMMITTEE ON THE HANDICAPPED
DISTRICT 5
P. S. 36-123 Morningside Dr.
NEW YORK, N. Y. 10027
Virginia Pepe, Chairperson
Phone: 222-6051

Date: May 21, 1979

TO: Miss. Ellen Dines
    COH Chairperson   Dist. 6

Name: Corey Johnson   District   6
Present School PS-200    Grade   3rd.
Parents
Name: Mr.
      Ms.   Emma Johnson
Address:   640 Riverside Drive
           8-E        10031   C/O Coger
           Apt.        Zip
Telephone:          283-7183
           Home        Business

The Committee on the Handicapped has completed the evaluation of the above named child.  As a result of the evaluation the following program has been recommended HC-30 Ancillary Counseling Services to be explored with parent.

_____ The name of this child has been called in to the Administrative Unit.  Once we have received a special class site placement from the Administrative Unit we will send the parent a Choice Letter.

___X___ We have forwarded the records to the above indicated special education supervisor who is responsible for arranging placement for this child.  This supervisor must fill in the Request for Site Placement form below and return it to us.  Once we receive the special class site location we will send the parent a "Choice Letter".

## REQUEST FOR SITE PLACEMENT

To:  Committee on the Handicapped
     District 5
     P. S. 36-123 Morningside Dr.
     New York, N. Y. 10027

Name: Corey Johnson  Dob: ███████

Address   640 Riverside Drive
          C/O Coger
          Apt. 8-E, N.Y.C.,   Dist.   6
          10031

This is to acknowlege that I have received materials on the above named child, and the following placement is available:

Check and complete appropriately:

(  ) CHILD IS ASSIGNED TO:

    Program  HC-30

    Type class_____
    School_____
    Dist._____
    Date assigned_____

(   )CHILD CANNOT BE PLACED AT
     THIS TIME
(   ) Waiting list(please indicate
     how long until a placement will
     be available)_____

(   )Class is not available
     (specify reason)_____

_____

Title_____Date:_____

**J.A.838**

BOARD OF EDUCATION OF THE CITY OF NEW YORK
DIVISION OF SPECIAL EDUCATION AND PUPIL PERSONNEL SERVICES
COMMITTEE ON THE HANDICAPPED
DISTRICT 5
P. S. 36-123 Morningside Dr.
New York, N Y. 10027
Virginia Pepe, Chairperson
Phone: 222-6051

COMMITTEE ON THE HANDICAPPED
CONFERENCE SUMMARY

Date: May 21,1979

NAME· Corey Johnson
DOB:

ADDRESS· 640 Riverside Drive - C/O Coger Apt. 8-E, N.Y.C., NY 10031

TELEPHONE: 283-7183

PARENT'S NAME: Mrs. Emma Johnson

---

**PRESENTING PROBLEM·**

Corey is a 10 1/2 year old boy who was referred for an evaluation due to learning difficulties as well as poor school adjustment. He currently attends the 3rd. grade at P. S. 200.

**SOCIAL HISTORY:** ( J. Williams )

Corey lives with his mother and younger brother Robert. Developmental history indicates a somewhat stressful birth as well as an early episode with infections bronchitis. He is subject to occasional nightmares and is a nail biter.

**PSYCHOLOGICAL EVALUATION:** ( N. SMith )

Corey was spontaneous, lively and interested. Intellectual functioning was average. Learning appears impeded by organic factors and by emotional conflicts and preoccupations.

**INDIVIDUAL EDUCATION EVALUATION:** ( K. Price )

Attentional difficulties impair ability to process and interpret language meaningfully. Expressive language is generally adequate but mild word transpositions and/or retrieval problems are noted at times. Reading is at a 1st. grade level with visual discrimination and reversals noted. Listening comprehension is at a 3rd. grade level. Reversals noted with writing tasks. An age of 5-7 achieved of the Beery Test of Visual Motor Integration.

COMMITTEE ON THE HANDICAPPED
CONFERENCE SUMMARY
PAGE 2
NAME·      Corey Johnson
DATE:      May 21, 1979

(ADDITIONAL TEST ADMINISTERED)

**CLASSIFICATION**:

Symptoms similar to those youngsters with known minimal brain
dysfunction.

**PROGRAM PLACEMENT**:   HC-30
(BRIEF DESCRIPTION OF PROGRAM)

Primarily for children with symptoms of minimal brain dysfunction,
such as hyperactivity, visual perceptual problems, auditory language
problems, and poor academic functioning with borderline or higher
intelligence.

**RELATED SERVICES REQUIRED**:

Individual and family counseling services to be explored
with parent.

THE DISTRICT 5 C. O. H. BELIEVES THAT THIS RECOMMENDATION IS
APPROPRIATE FOR THE FOLLOWING REASONS:

Corey demonstrates at least average intellectual functioning;
however, academic skills remain significantly limited.  Perceptual
confusions, perceptual-motor difficulties as well as considerable
attentional deficiencies appear to be the primary factors hampering
this youngster's ability to perform.
It is felt that Corey would benefit from small class placement
where he may receive more individualized attention as well as remedial
instruction.  Corey further appears to evidence some emotional conflict
which would appear to respond to ancillary counselling services.

COH-8

L.O.

J.A.840

Social History
Jane William

Johnson, Corey – b. ███████ (10 yrs
335 Edgecombe Ave – Apt 2B – NYC 10039
663 – 6600 (School phone – 7:30–4 pm)
P.S 200 – Grade # 2

Source & Reason For Referral
      Corey was referred to C.O.H.
for evaluation along with his brother
Robert by NYC B.C.W. because of ongoing
school failure with severe reading
disability; hyperactive, disruptive and
fighting behavior. Corey is further described
as inattentive and too having temper
outbursts.

Developmental History
      Ms Johnson describes her pregnancy, and
labor and Corey's developmental milestones as
normal except that the delivery was by
forceps.
      Ms Johnson reports that Corey was not
held during first ten days after his
birth because of infectious bronchitis.
There were no other early illness, injuries
or accidents.

**J.A.841**

2

Corey is more irritable once in a while, talks in his sleep loudly, grits his teeth and complains of night mares once awhile. Corey is a nail biter according to his mother.

Mrs. Johnson reports that her frequent changes of address recently has been, due to inadequate, a series of inadequate housing accommodations and changes necessary to improve her housing.

J.A.842

Evaluation Unit
West Manhattan Center

Name: Corey Johnson

DOB: ███████    Age: 10:5

Date: 5/3/79

Psychologist: Nathalie Smith

PSYCHOLOGICAL REPORT

Tests Administered:

✓   Interview

✓   Wechsler Intelligence Scale for Children

✓   Bender Gestalt

✓   Figure Drawings

✓   Rorschach

✓   ~~T.A.T.~~ Levy Animal Drawing / Story Test.

Corey was a good-looking, lively boy of 10½ who was a pleasure to work with. He was spontaneous and interested and worked hard. He was somewhat restless, but this did not negatively affect his performance or relating.

On the WISC he received a Verbal IQ of 91, a Performance IQ of 93, and a Full Scale IQ of 91, indicating average intellual ability.

WISC

2

|  | Scaled Score |
|---|---|
| ...sis | 7 |
| ...on | 10 |
| ... | 7 |
| Similarities | 11 |
| Vocabulary | 8 |

| | IQ |
|---|---|
| Verbal Scale | *91 |
| Performance Scale | *83 |
| Full Scale | 91 |
| *Prorated if necessary | |

PERFORMANCE TESTS

| | |
|---|---|
| Picture Completion | 9 |
| Picture Arrangement | 12 |
| Block Design | 6 |
| Object Assembly | - |
| Coding | 9 |

Bender Gestalt replications were drawn rapidly and carelessly. When asked to try harder he did so and still had difficulty. There is marked difficulty in the angulation and results are indicative of organicity.

Figure Drawings were suggestive both of organicity and of anxious preoccupations connected with early puberty.

His Criminal Story and Rorschack responses indicate ambivalence between being an adult and a child and between being fierce and brave and being 'nice' & good.

J.A.844

Corey would like to be a police-
man when he grows up. His
range of interests appeared very limited
in view of his intelligence, as if
his mind were being "tethered"
by inhibitions and preoccupations.
Corey does not feel altogether in
control of himself and admits that
he cannot control his temper
and does things he is later sorry
about.

An HC-30 class is recommended.
Counseling would appear helpful to
help him accept his feelings and
be more in touch with the sources
of his angers & frustrations. He
would appear a good candidate for
therapy, as he spontaneous and verbal.

Speech, Language & Education

Corey Johnson
DOB: ███████████
DATE: 5/79
CA: 142
EXAMINER: Karen Price

Background Information

Corey Johnson, an 10 year 2 month old male, was referred by BCC for school failure. He currently attends PS 220 3rd grade, where a his teacher reports that he is distractible and evidences reading and writing disability. He had resided in Jersey City and had been seen by the Child Study Team (3/18/77) at which time unclear speech and fair expressive language were noted. At this time Corey was noted to be a handsome boy, who had significant difficulty with attending and constantly fidgeted in his chair. He is polite and cooperative.

Speech and Language

Oro-motor functioning appeared to be within normal limits. Excessive saliva did, at times, collect in the mouth.

He passed an audiometric screening bilaterally at 500, 1000, 2000, 4000 Hz    and 25 dB HL. Hearing is

J.A.846

②

adequate for the development of speech and language.
Auditory discrimination was generally adequate
when attending skills were maximized.

General impression is that attentional difficulties
significantly interfer with Corey's abilities to process
and interpret language in a meaningful manner.
He speaks in sentences displaying appropriate gram-
matical structure. At times language becomes
poorly related to the stimulus, and appears to reflect
possibly disjointed ability to follow and interpret
events. His speech becomes slurred at times
with subtle word transpositions and possible
word-retrieval difficulties.  All formal testing
done reflects Corey's attending difficulties within the
constraints of formal evaluation. It is possible
that has these tasks been administered in
several short session, formal levels might have
been closer to his actual age.

On the PPVT, a test of receptive vocabulary,
he achieved a Mental Age of 7-7. Impulsivity
was significant. Selected subtests of the ITPA
were administered and the following results were
obtained:

Auditory Reception - age equivalent - 7-9;
Visual Reception                    9-3;
Auditory Association                7-8;
Auditory Sequential Memory          8-8; and
Visual Association                  9-10.

**J.A.847**

③

The subtest for Oral Directions from the Detroit Test of Learning Aptitudes was administered and an age equivalent of 5-9 was achieved. This test uses oral directions with a grapho-motor output. This test substantiates the examiners view that difficulty in storing and retrieving information for tasks such as found in the regular classroom setting present learning difficulties for Corey.

Expressive language is functional for general communication purposes. However there are occasional word transpositions and possible retrieval problems that give language an unusual quality. For instance when shown a picture of a tree growing with several kinds of fruit on it he said as follows:

"It got apple, grapes and pear.
I never saw a tree go funny thing like that
Altogether with one tree."

Articulation is adequate for specific phoneme production, although inconsistent misarticulations are heard in connected speech. These errors appear to reflect the mild expressive difficulty with symbol formation for language.

J.A.848

④

## General Information

Corey was able to provide the name of his street and the city. He knew his birthdate. He could recall the days sequentially and recalled the months but omitted Nov. and Dec. He counts by 1's, 2's, 5's, and 10's. He does not recite the alphabet appropriately. He could name the mayor and the President.

## Educational Assessment

On the PIAT Reading Recognition subtest he achieved a grade level of 1.3. He read the 2nd grade passage of the Durrell Oral Reading subtest with 7 errors and good comprehension. Visual discrimination and reversals are noted throughout assessment. While on a letter recognition letter he can usually discrimination between d-b, confusion with words is noted. A tendency toward reversals is also noted as the words saw is read as was, now is read as are. Many other examples of this were noted. The Durrell Listening Comprehension was completely correct at the 3rd grade level with 5 out of 7 answers correct at the 4th grade level.

Writing skills evidence perceptual motor difficulties. He wrote the alphabet without a model upon request. He had to begin the task

(5)

a 2nd time when he constructed a combined "b" figure for the "d". He reversed the letter "L" and varied between cases. Numbers one through 10 were written with similar difficulties. Copying sample was correct, although letters floated off the lines and punctuation was omitted. On the Beery Test of Visual Motor Integration he received an age equivalent of 5-7 with integration and part-whole difficulties noted. He is right dominant.

On the WRAT (Level I) Arithmetic subtest he received a grade equivalent of 3-9. He adds with carrying, subtracts but needs review of borrowing, and is beginning multiplication.

Summary

Attentional difficulties impair his ability to process and interpret language meaningfully. Expressive language which is generally adequate becomes slurred at times with mild word transposition and retrieval difficulties noted. Reading is at a 1st grade level with visual discrimination and visual reversal frequently noted. Reversals are noted with writing task. He received an age of 5-7 on the Beery Test of Visual Motor Integration. Math is at a 3.9 grade level.

USCA4 Appeal: 21-1   Doc: 10-1   Filed: 01/08/2021   Pg: 249 of 261   JA850

⑥

Recommendations
① Information in class should be given in small chunks and repeated when necessary so that he can maximize processing for language in a positive way.
② Special training for visual discrimination and perceptual - motor tasks.

J.A.851

BOARD OF EDUCATION OF THE CITY OF NEW YORK
DIVISION OF SPECIAL EDUCATION AND PUPIL PERSONNEL SERVICES

COMMITTEE ON THE HANDICAPPED
District 5
P.S. 36 - 123 Morningside Drive
New York, N. Y.  10027
Tel: 222-6051
Virginia Pepe
Chairperson

DR. CHARLES I. SCHONHAUT
EXECUTIVE DIRECTOR (ACTING)

GRACE R. CAVANAGH
CHIEF ADMINISTRATOR
PUPIL CERTIFICATION PROCESS

JOEL S. ROSENSHEIN, PH.D.
DIRECTOR
Sidney Marks, Ph.D.
Borough Supervisor

### PARENTAL CONSENT AND WAIVER OF CONFIDENTIALITY

I give permission to have my child _Cory Johnson_
evaluated for possible special education services.

I understand the evaluation process may include a social history and any or all of the following examinations:  psychological, psychiatric, educational, neurological, and speech/language.  I have also had the purpose of each of these examinations explained to me.

As part of the evaluation process,  I authorize the Committee on the Handicapped to obtain and to review the reports and materials available concerning my child.

In the event that special education placement is recommended, I also authorize the appropriate special education program or bureau to review the relevant information in order to facilitate the delivery of educational services to my child.  If there is no Board of Education program appropriate to the needs of my child, I further authorize the Committee on the Handicapped to release clinical information regarding my son/daughter to appropriate non-public schools or facilities.

I have been advised of the rights of due process, guaranteed by law, to my child and me.  I understand that I will have an opportunity to meet with the Committee on the Handicapped to discuss its recommendations.

Name (please print)_Emma L. Johnson_    _Emma L. Johnson_
(Parent's or Guardian's Signature)

Address _335 Edgecombe Ave_
_N.Y.    10039_    _4-6-79_
(Date)

Telephone _____

COH-6

BOARD OF EDUCATION OF THE CITY OF NEW YORK
110 Livingston Street, Brooklyn, N.Y. 11201
DIVISION OF SPECIAL EDUCATION AND
PUPIL PERSONNEL SERVICES

## INDIVIDUALIZED EDUCATION PROGRAM

Check one:   Initial I.E.P. ☐     Revised I.E.P. ☐

I.D. # _____                            Date  5/8/79

**I.**  Pupil's Name  Corey,  Johnson   Sex M   D.O.B. ████████
(LAST)      (FIRST)

Pupil's Address  ~~235 Edgecomb Pl.~~  640 Riverside Dr.   NY   NY   10031
(STREET)                          (CITY)   (STATE)   (ZIP CODE)

Telephone ~~████~~   Home District  6   Current Placement  PS 200
283-7183

**II.  PARTICIPANTS IN COH PLANNING CONFERENCE**

Name                        Relationship/Service                    Signature
1. Karen Price, Educational Evaluator
2. Nathalie Smith, Psychologist
3. Jane Williams, Soc. Wker
4. Ethel Elman, Asst to Supervisor
5.

**III.  PLANNING DATA:**

A.  Special alerts  Attentional deficits significantly affect processing and interpretation of language

B.  Learning Mode _____

C.  Skill Areas

| | Present Level Age/Gr. | Reg. Cl: | Comments |
|---|---|---|---|
| 1. Academics | | | |
| a. Language: Receptive | M.A. 7-7 | | PPVT: Expressive language adequate |
| Expressive | | | although mildly impaired |
| b. Reading | grade 1.3 | | PIAT |
| | 1.2 | | Oral Reading |
| | beginning 4th | | Listening Comprehension |
| c. Math | Grade 3.4 | | WRAT |
| d. Subject areas (Special Curr.) | | | |
| 2. Psychomotor Skills Gross | | | |
| Fine | age 5-7 | | Beery Test of Visual Motor Integration |
| 3. Social/Emotional Devel. | | | |
| 4. Activities of Daily Living | | | |
| 5. Career/Vocational Skills | | | |
| 6. Speech Skills | | | |
| 7. Health Education | | | |
| 8. Physical Education | | | |

D.  LONG-TERM (annual) GOALS

① Special reading program to teach visual discrimination of letters and words. Improve reading level.

② Perceptual motor training to improve writing skills.

③ Maximize auditory processing by giving small chunks of information which Corey can act upon in a meaningful way.

AFTER COMPLETING THIS SIDE REMOVE CARBON BEFORE WRITING ON OTHER SIDE

PARENT COPY

J.A.853

*(margin labels: C.O.H. / TO BE COMPLETED BY EVALUATION UNIT)*

Board of Education of the City of New York
DIVISION OF SPECIAL EDUCATION AND PUPIL PERSONNEL SERVICES
DATA BANK CONTROL GROUP    RM 314    596-9822    **BUREAU OR PROGRAM**
**110 Livingston Street, Brooklyn, N.Y. 11201**

E.U. COORD./
SUPERVISOR _____    DISTRICT _____
EVAL. UNIT _____ TEL. _____
ADDRESS _____

## CREATE/EVALUATION FORM

DATA BANK STUDENT ID NUMBER

MAINTENANCE CODE
A-NEW ADMISSION
R-REVISION

DATE LOGGED IN
MONTH DAY YEAR
(CREATE DATE)

(1)    (9)    (10) 2 1    (14)

NAME OF STUDENT    LAST    FIRST    M.I.
(20)    (34)    (45)

SEX
M-MALE
F-FEMALE
(46)

DATE OF BIRTH
MONTH DAY YEAR
(47)

ADDRESS (NEW OR CHANGED)
(53)    NUMBER
(59)    STREET
(71)    APT. NUMBER
(75)    BOROUGH
M-MANHATTAN
X-BRONX
K-BROOKLYN
Q-QUEENS
R-RICHMOND

(76)    ZIP CODE
(81)    HOME DISTRICT
(83)    PHONE

PLACEMENT PRIOR TO ADMISSION TO SPECIAL EDUCATION
1-REGULAR GRADES    4-PRIVATE SCHOOL
2-HOME    5-PAROCHIAL SCHOOL
3-INSTITUTION    8-OTHER
0-DON'T KNOW
(90)
(91)    NAME OF SCHOOL (PUBLIC, PRIVATE OR PAROCHIAL) OR INSTITUTION STUDENT IS COMING FROM

DATA BANK STUDENT ID NUMBER

MAINTENANCE CODE
A-NEW ADMISSION
R-REVISION

(1)    (9)    (10) 2 2

NAME OF FATHER    LAST    FIRST    M.I.
(12)    (26)    (37)

NAME OF MOTHER    LAST    FIRST    M.I.
(38)    (52)    (63)

NAME OF AGENCY OR PERSON CHILD IS LIVING WITH IF OTHER THAN PARENT
(64)    (78)    (89)

STUDENT LIVING WITH (ENTER A MAXIMUM OF THREE CODE NUMBERS IN THE BOXES PROVIDED)
1-MOTHER    4-LEGAL GUARDIAN    7-CHILDREN'S SHELTER
2-FATHER    5-OTHER RELATIVES    8-OTHER
3-GRANDPARENT    6-FOSTER PARENTS    0-DON'T KNOW
(90)    (91)    (92)

STUDENT'S LEGAL GUARDIAN
1-PARENT    4-STATE
2-GRANDPARENT    5-FOSTER AGENCY
3-OTHER RELATIVES    8-OTHER
0-DON'T KNOW
(93)

LANGUAGE SPOKEN IN HOUSEHOLD
(94)
LANGUAGE IN WHICH CHILD IS FLUENT
(96)

01-ENGLISH    06-GREEK    11-VIETNAMESE    16-GERMAN    97-DOES NOT SPEAK
02-SPANISH    07-YIDDISH    12-SIGNING    17-INDIAN (AMER.)    98-OTHER
03-ITALIAN    08-HEBREW    13-FRENCH CREOLE    18-JAPANESE    00-DON'T KNOW
04-FRENCH    09-RUSSIAN    14-ALBANIAN    19-POLISH
05-CHINESE    10-KOREAN    15-ARABIC    20-SWEDISH

RECOMMENDED FOR LAU/ASPIRA CLASS
Y = YES
N = NO
(98)

## EXAMINATION RESULTS

DATA BANK STUDENT ID NUMBER

MAINTENANCE CODE
A-NEW ADMISSION
R-REVISION

C.O.H./E.U. FILE NO.

EXAM ADMINISTERED BY

(1)    (9)    (10) 2 3    (13)    (22)    FOR CODES SEE REVERSE SIDE

TYPE OF EXAMINATION    DATE MONTH YEAR
(24)    (26)    FOR CODES SEE REVERSE SIDE

TYPE OF EXAMINATION    DATE MONTH YEAR
(30)    (32)

TYPE OF EXAMINATION    DATE MONTH YEAR
(36)    (38)

TYPE OF EXAMINATION    DATE MONTH YEAR
(42)    (44)

TYPE OF EXAMINATION    DATE MONTH YEAR
(48)    (50)

TYPE OF EXAMINATION    DATE MONTH YEAR
(54)    (56)

## INTELLIGENCE TEST DATA

TEST ADMINISTERED BY
(60)    (62)    NAME OF IQ TEST
FOR CODES SEE REVERSE SIDE

## INTELLIGENCE TEST SCORES

VERBAL    PERFORMANCE    TOTAL OR FULL SCALE
(63)    (66)    (69)
NEXT RECOMMENDED RETEST DATE IF EARLIER THAN 3 YEARS
MONTH YEAR
(72)
IF SPECIFIC IQ IS NOT USED REFER TO SCALE ON REVERSE SIDE FOR IQ RANGES AND SCORES

## HANDICAP OR DISABLING CONDITION

DIAGNOSIS PRIMARY
(76)
DIAGNOSIS - SECONDARY
(78)    (80)    (82)
FOR CODES SEE REVERSE SIDE

RECEIVING MEDICATION
1-YES
2-NO
0-DON'T KNOW
(84)

ESTIMATED WEEKS OF TREATMENT
(85)

NEXT MEDICAL REVIEW DATE
MONTH YEAR
(87)

AMBULATION
1-NO DIFFICULTY IN WALKING
2-SOME DIFFICULTY IN WALKING
3-CANNOT CLIMB STEPS
4-USES WHEELCHAIR
8-OTHER
0-DON'T KNOW
(91)

APPLIANCES
1-HEARING AID    4-CRUTCHES
2-ORTHOPEDIC BRACES    5-MILWAUKEE (BODY) BRACE
3-WHEEL CHAIR    6-EYE GLASSES
0-OTHER
(92)

## RECOMMENDED PROGRAM
(93)
SEE REVERSE SIDE FOR CODES

## RECOMMENDED ITINERANT OR RESOURCE-ROOM SERVICE
COMPLETE THIS PART ONLY IF CHILD IS IN SPECIAL EDUCATION FULL-TIME
(95)
SEE REVERSE SIDE FOR CODES

15M 6/78

**J.A.854**

Board of Education of the City of New York
DIVISION OF SPECIAL EDUCATION AND PUPIL PERSONNEL SERVICES
DATA BANK CONTROL GROUP     RM 314     596-9822
110 Livingston Street, Brooklyn, N.Y. 11201     **ADMITTING SCHOOL**

E.U. COORD./
SUPERVISOR_____ DISTRICT _____
EVAL. UNIT _____ TEL. _____
ADDRESS_____

## CREATE/EVALUATION FORM

(1) DATA BANK STUDENT ID NUMBER    (9)    MAINTENANCE CODE
A-NEW ADMISSION
R-REVISION    (10) [2][1]    (14) DATE LOGGED IN — MONTH DAY YEAR (CREATE DATE)

(20) NAME OF STUDENT — LAST    (34) FIRST    (45) M.I.

(46) SEX
M-MALE
F-FEMALE    (47) DATE OF BIRTH — MONTH DAY YEAR

(53) ADDRESS (NEW OR CHANGED) — NUMBER    (59) STREET    (71) APT. NUMBER    (75) BOROUGH
M-MANHATTAN
X-BRONX
K-BROOKLYN
Q-QUEENS
R-RICHMOND

(76) ZIP CODE    (81) HOME DISTRICT    (83) PHONE

(90) PLACEMENT PRIOR TO ADMISSION TO SPECIAL EDUCATION
1-REGULAR GRADES    4-PRIVATE SCHOOL
2-HOME    5-PAROCHIAL SCHOOL
3-INSTITUTION    8-OTHER
0-DON'T KNOW
(91) NAME OF SCHOOL (PUBLIC, PRIVATE OR PAROCHIAL) OR INSTITUTION STUDENT IS COMING FROM

(1) DATA BANK STUDENT ID NUMBER    (9)    MAINTENANCE CODE
A-NEW ADMISSION
R-REVISION    (10) [2][2]

(12) NAME OF FATHER — LAST    (26) FIRST    (37) M.I.

(38) NAME OF MOTHER — LAST    (52) FIRST    (63) M.I.

(64) NAME OF AGENCY OR PERSON CHILD IS LIVING WITH IF OTHER THAN PARENT    (78)    (89)

(90) STUDENT LIVING WITH (ENTER A MAXIMUM OF THREE CODE NUMBERS IN THE BOXES PROVIDED)
(91)    (92)
1-MOTHER    4-LEGAL GUARDIAN    7-CHILDREN'S SHELTER
2-FATHER    5-OTHER RELATIVES    8-OTHER
3-GRANDPARENT    6-FOSTER PARENTS    0-DON'T KNOW
(93) STUDENT'S LEGAL GUARDIAN
1-PARENT    4-STATE
2-GRANDPARENT    5-FOSTER AGENCY
3-OTHER RELATIVES    8-OTHER
0-DON'T KNOW

(94) LANGUAGE SPOKEN IN HOUSEHOLD    (96) LANGUAGE IN WHICH CHILD IS FLUENT

01-ENGLISH    06-GREEK    11-VIETNAMESE    16-GERMAN    97-DOES NOT SPEAK
02-SPANISH    07-YIDDISH    12-SIGNING    17-INDIAN (AMER.)    98-OTHER
03-ITALIAN    08-HEBREW    13-FRENCH CREOLE    18-JAPANESE    00-DON'T KNOW
04-FRENCH    09-RUSSIAN    14-ALBANIAN    19-POLISH
05-CHINESE    10-KOREAN    15-ARABIC    20-SWEDISH

(98) RECOMMENDED FOR LAU/ASPIRA CLASS
Y = YES
N = NO

## EXAMINATION RESULTS

(1) DATA BANK STUDENT ID NUMBER    (9)    MAINTENANCE CODE
A-NEW ADMISSION
R-REVISION    (10) [2][3]    (13) C.O.H./E.U. FILE NO.    (22) EXAM ADMINISTERED BY
FOR CODES SEE REVERSE SIDE

(24) TYPE OF EXAMINATION    (26) DATE MONTH YEAR    (30) TYPE OF EXAMINATION    (32) DATE MONTH YEAR    (36) TYPE OF EXAMINATION    (38) DATE MONTH YEAR
FOR CODES SEE REVERSE SIDE

(42) TYPE OF EXAMINATION    (44) DATE MONTH YEAR    (48) TYPE OF EXAMINATION    (50) DATE MONTH YEAR    (54) TYPE OF EXAMINATION    (56) DATE MONTH YEAR

## INTELLIGENCE TEST DATA

(60) TEST ADMINISTERED BY    (62) NAME OF IQ TEST
FOR CODES SEE REVERSE SIDE

## INTELLIGENCE TEST SCORES

(63) VERBAL    (66) PERFORMANCE    (69) TOTAL OR FULL SCALE    (72) NEXT RECOMMENDED RETEST DATE IF EARLIER THAN 3 YEARS — MONTH YEAR
IF SPECIFIC IQ IS NOT USED REFER TO SCALE ON REVERSE SIDE FOR IQ RANGES AND SCORES

## HANDICAP OR DISABLING CONDITION

(76) DIAGNOSIS PRIMARY    (78) DIAGNOSIS - SECONDARY (80) (82)    (84) RECEIVING MEDICATION
1-YES
2-NO
0-DON'T KNOW    (85) ESTIMATED WEEKS OF TREATMENT    (87) NEXT MEDICAL REVIEW DATE — MONTH YEAR
FOR CODES SEE REVERSE SIDE

(91) AMBULATION
1-NO DIFFICULTY IN WALKING
2-SOME DIFFICULTY IN WALKING
3-CANNOT CLIMB STEPS
4-USES WHEELCHAIR
8-OTHER
0-DON'T KNOW
(92) APPLIANCES
1-HEARING AID    4-CRUTCHES
2-ORTHOPEDIC BRACES    5-MILWAUKEE (BODY) BRACE
3-WHEEL CHAIR    6-EYE GLASSES
0-OTHER

## RECOMMENDED PROGRAM

(93)
SEE REVERSE SIDE FOR CODES

## RECOMMENDED ITINERANT OR RESOURCE-ROOM SERVICE
COMPLETE THIS PART ONLY IF CHILD IS IN SPECIAL EDUCATION FULL-TIME

(95)
SEE REVERSE SIDE FOR CODES

15M 6/78

J.A.855

110 LIVINGSTON STREET, BROOKLYN, N. Y. 11201
DIVISION of SPECIAL EDUCATION and PUPIL PERSONNEL SERVICES

DR. CHARLES I. SCHONHAUT    COMMITTEE ON THE HANDICAPPED
EXECUTIVE DIRECTOR (ACTING)

District 6
GRACE R. CAVANAGH          I.S. 233 - 601 West 183rd Street
CHIEF ADMINISTRATOR        New York, New York  10033          JOEL S. ROSENSHEIN,
PUPIL CERTIFICATION PROCESS     Telephone: 923 - 0111              DIRECTOR
                           Ellen T. Dines                    Sidney Marks, Ph.D.
                           Chairperson                        Borough Supervisor

PARENTAL CONSENT FORM

Re: Corey Johnson
    (child's name)

Date of Birth: █████████

Dear Ms. Dines:

I accept the recommendation of the Committee on the

Handicapped.

_Emma L. Johnson_
(Parent's signature)

8-18-79
(date)

Classification _____

Program/Placement HC30
School and Address P.S. 92 222 W 134 St NYC 10030
Related Services _____

Please sign and return

J.A.856

DIVISION of SPECIAL EDUCATION and PUPIL PERSONNEL SERVICES

CHARLES I. SCHONHAUT   COMMITTEE ON THE HANDICAPPED
ACTING DIRECTOR (ACTING)                    District 6
                        I.S. 233 – 601 West 183rd Street
GRACE R. CAVANAGH       New York, New York  10033        JOEL S. ROSENSHEIN
CHIEF ADMINISTRATOR        Telephone: 923 – 0111              DIRECTOR
PUPIL CERTIFICATION PROCESS   Ellen T. Dines           Sidney Marks, Ph.D.
                           Chairperson                Borough Supervisor

NOTICE OF RECOMMENDATION OF THE
COMMITTEE ON THE HANDICAPPED

Child's Name **Corey Johnson**

Date of Birth ▆▆▆▆▆▆

Case # _____

Social Worker _____

Date ___8/17/19___

Dear **Mrs. Emma Johnson**

The District **6**, Committee on the Handicapped has reviewed the results of your child's evaluation.

A summary of this evaluation is enclosed.  It is the opinion of the Committee that your child has special education needs.  In order to provide these services the Committee is recommending the following:

Classification _____
Program Placement __HC30 PS92 222 W134St NYC 10030__
Related Services _____
School and Address _____

Before this recommendation is finalized you may, if you wish, meet with the Committee to discuss it.  If after meeting with the Committee on the Handicapped you still do not agree with its recommendations, you may request an Impartial Hearing.  Do not hesitate to call the social worker, or Committee Chairperson, to answer any questions you may have.

Please sign either for Choice A or B and return this notice in the self-addressed, stamped, envelope by __August 31__, 19__79__.

Sincerely,

**Ellen Dines (Ch.B.)**
Chairperson

*************   *************   *************   *************

A.  I am the parent/guardian of __Corey Johnson__
I have read this letter and agree with the recommendation of the Committee. I wish to have these services made available to my child.

_Emma L. Johnson_
(Parent or Guardian's signature)

_8-18-99_
(Date)

B.  I am the parent/guardian of _____
I have read this letter and wish to meet with the Committee to discuss its recommendation.

_____
(Parent or Guardian's signature)

_____
(Date)

COH-7

**J.A.857**

COH

**Board of Education of the City of New York**

DIVISION OF SPECIAL EDUCATION

DATA BANK CONTROL GROUP    RM 314

DATE_____

110 Livingston Street, Brooklyn, N.Y. 11201

## ADMIT/READMIT/TRANSFER/INTERCLASS/DISCHARGE/ADDRESS AUTHORIZATION

STUDENT NAME: _____   DATE OF BIRTH ███████
            LAST          FIRST          M.I.

PREVIOUS BOROUGH, DISTRICT, SCHOOL, CLASS

OLD ADDRESS: _____
            NUMBER        STREET        BOROUGH      ZIP CODE    OLD HOME DISTRICT

PARENTS' OR GUARDIANS' NAME: _____

Student I D Number
(1) A 1 2 4 6 1 9

Maintenance Code
(9) A

(10) 3 1

Transfer Code
(13) 5

Month Day Year
(14) _____
Effective Date

A–Initial Admit/Readmit
R–For Revision
C–For Correction

0–Discharge
5–Placement in class (Admit, Transfer)
9–Change of address only

NOTES: _____

FOR NEW PLACEMENT OR TRANSFER TO CLASS

SENDING SITE SUPERVISOR: _____ PROGRAM _____ DISTRICT _____

RECEIVING SITE SUPERVISOR: _____ PROGRAM _____ DISTRICT _____

CLASS ROOM TEACHER: _____ ROOM NO. _____

Borough      School District      School      Class      Program      Level
(20)         (21)                 (23)         (27)       (30)         (32)

M–Manhattan
X–Bronx
K–Brooklyn
Q–Queens
R–Richmond

P–Public School
I–Intermediate School
J–Junior High School
H–High School

For class, program and level see list
of codes on the reverse side of this page.

FOR DISCHARGE

Reason for Discharge

FOR DISCHARGE

(40)

01–Graduation
02–Return to Grades
04–Home Instruction
05–Moved out of City
06–Private Day School
07–Legal Discharge Age
    (Over 22)

08–Employment
09–Not in a Data Bank Program
10–Exemption
11–Cyesis
12–Conclusion of Service (Proficiency)
13–Deceased
14–Parent Withdrawal

15–Not Found
16–Armed Forces
17–OVR
18–Not Attending
98–Other_____
00–Unknown

ADDRESS (NEW OR CHANGED)

(44)       (50)                  (62)       (66) (67)
Number     Street/Road/Ave./Etc.           Apt. Number  Borough   Zip Code

(72)       (74)                  (81)       (85)
Home District  Home Phone         Affiliated School
                                  (For Home Instruction)

Transportation To School
1–Walks          5–Hydraulic School Bus–W.C.
2–Private Trans  6–Hydraulic School Bus–N.W.C.
3–Public Trans
4–School Bus

## ➡ REFER TO INSTRUCTIONS ON BACK OF FORM

J.A.858

DIVISION of SPECIAL EDUCATION and PUPIL PERSONNEL SERVICES

R. CHARLES I. SCHONHAUT    COMMITTEE ON THE HANDICAPPED
EXECUTIVE DIRECTOR (ACTING)                District 6

RACE R. CAVANAGH                  I.S. 233 – 601 West 183rd Street
HIEF ADMINISTRATOR                New York, New York  10033          JOEL S. ROSENSHEIN
UPIL CERTIFICATION PROCESS          Telephone: 923 – 0111                    DIRECTOR
                                      Ellen T. Dines                  Sidney Marks, Ph.D.
                                      Chairperson                     Borough Supervisor


PARENTAL CONSENT FORM


                                            Re: _Corey Johnson_____
                                                  (child's name)

                                            Date of Birth: ██████████


Dear _Ms. Dines_____ :

        I accept the recommendation of the Committee on the

Handicapped.


                                      _____
                                            (Parent's signature)


                                      _____
                                                 (date)


Classification _____

Program/Placement _HC30_____
School and Address _PS92 222 W134 St NYC 10030_
Related Services _____

_Please sign and return_

J.A.859

CHARLES I. SCHOENAUT    COMMITTEE ON THE HANDICAPPED
(ACTING)                District 6
                        I.S. 233 - 601 West 163rd Street
R. CAVANAGH             New York, New York  10033         JOEL S. ROSENSWEI
ADMINISTRATOR             Telephone: 923 - 0111             DIRECTOR
CERTIFICATION PROCESS     Ellen T. Pierce                 Sidney Marks, Ph.D.
                          Chairperson                     Borough Supervisor

NOTICE OF RECOMMENDATION OF THE
COMMITTEE ON THE HANDICAPPED

Child's Name  Corey Johnson

Date of Birth  ████████

Case #

Social Worker

8/17/79

Dear Mrs Emma Johnson

The District 6 Committee on the Handicapped has reviewed the results of your child's evaluation.

A summary of this evaluation is enclosed.  It is the opinion of the Committee that your child has special education needs.  In order to provide these services the Committee is recommending the following:

Classification
Program Placement   MC32 TSPd 222W1345 MVc co80
Related Services
School and Address

Before this recommendation is finalized you may, if you wish, meet with the Committee to discuss it.  If after meeting with the Committee on the Handicapped you still do not agree with its recommendation, you may request an Impartial Hearing.  Do not hesitate to call the social worker, or Committee Chairperson, to answer any questions you may have.

Please sign either for choice A or B and return this notice in the enclosed, stamped, envelope by  August 31 , 19 79 .

Sincerely,

Ellen Dines (L.B.)
Chairperson

A.   I am the parent/guardian of
I have read this notice and agree with the recommendation of the Committee.
I wish to have a conference held to consider my child.

Parent or Guardian Signature

(Date)

B.   I am the parent/guardian of
I have read this notice and do not agree with the Committee's recommendation.

(Date)

**J.A.860**

U-14



STATE OF NEW YORK

DEPARTMENT OF SOCIAL SERVICES

### BUREAU OF DISABILITY DETERMINATIONS

TWO WORLD TRADE CENTER
NEW YORK, N. Y. 10047

BARBARA B. BLUM
COMMISSIONER

Telephone - Area Code 212 - 488 - 2525    OCT 1 1979

*Comm. on Handicapped*
*District 6*
*I.S. 233*
*601 W. 183 St*
*NY NY 10033*
*Atten: Ellen Dines*
*Chairperson*

Claimant: *Corey Johnson*
Address: *640 Riverside*
SS No.: ███████████
Date of Birth: ███████████
Patient No.: ███████████

The above-named claimant has filed an application for disability benefits under the Social Security Act and it is the responsibility of this Bureau to make the determination of disability.  Enclosed is a copy of the claimant's written consent for us to request information from your records.

We would appreciate your furnishing a copy from your records of the reports checked below:

- ☐ Physical Examination
- ☒ Psychiatric Evaluation
- ☒ Psychological Testing
- ☒ Other *any material related to disability*

- ☐ Sputum Culture
- ☐ Eye Examination
- ☐ Audiometric Testing

Your cooperation will enable us to make a prompt decision on this claim.

Sincerely yours,

*Harry R. Pace, M.D.*

Harry R. Pace, M.D.
Chief Medical Consultant

Enclosure

*mailed 10/12/79*

| PLEASE RETURN ONE COPY OF THIS LETTER WITH YOUR REPLY IN THE ENCLOSED PRESTAMPED ENVELOPE

DF-253.3 (5/79)

J.A.861

FOR SSA USE
WITH NAME OF ___ CoRey JOHNSON
SOCIAL SECURITY NUMBER

NONE
PATIENT/CLAIMANT

## GENERAL AUTHORIZATION FOR MEDICAL INFORMATION

INFORMATION FOR THE MEDICAL SOURCE

NAME AND ADDRESS OF SOURCE

IDENTIFYING PATIENT INFORMATION

| NAME AND ADDRESS AT TIME OF ADMISSION OR TREATMENT | BIRTH DATE | |
|---|---|---|
| | | ☐ IN-PATIENT |
| | | ☐ OUT-PATIENT |

| ADMISSION DATE(S) | DISCHARGE DATE(S) | CLINIC/PATIENT NO. | OTHER PERTINENT INFORMATION (BLDG., CLINIC, ETC.) |
|---|---|---|---|
| | | | |

CLAIMANT'S AUTHORIZATION

☐ If this block is checked, see authorization on reverse

I hereby authorize the above-named medical source to disclose medical records or other information regarding my treatment, hospitalization and/or outpatient care for my condition (including psychological or psychiatric impairments) during the period(s) identified above to the Social Security Administration or State Agency that may review my application. I also hereby authorize that a photocopy of this authorization be accepted with the same authority as this original. The information disclosed will be used in connection with my claim for disability benefits under the Social Security Act.

I understand that this authorization, except for action already taken, is subject to revocation by me at any time. In the absence of my prior revocation, this authorization will automatically expire when my application for disability benefits is finally decided.

| Signature of Claimant (or person acting on behalf of Claimant) | Relationship to Claimant | Date |
|---|---|---|
| Emma L. Johnson | MOTHER | 9/13/79 |

| STREET ADDRESS | | PHONE |
|---|---|---|
| 640 Riv. Dr. #8E | | 283-7183 |

| CITY | STATE | ZIP CODE |
|---|---|---|
| NY | NY | 10031 |

I.D.
CoRey James JoHNSON
MMN    Emma JoHNSON
FN     James Sykes
DOB
POB    BRooKlyN, NY

FORM SSA-827b (12-77) (DESTROY PRIOR EDITIONS)                                    ( over )

J.A.862