**<span style="color:red">EXECUTION SCHEDULED FOR JANUARY 14, 2021</span>**

No. 21-1

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

_____

**UNITED STATES OF AMERICA,**

**Plaintiff – Appellee,**

**v.**

**COREY JOHNSON, A/K/A O, A/K/A CO,**

**Defendant – Appellant.**

_____

**JOINT APPENDIX VOLUME V**

_____

Donald P. Salzman
Jonathan Marcus
David E. Carney
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue, NW
Washington, DC 20005
(202) 371-7983
donald.salzman@skadden.com
*Counsel for Appellant Corey Johnson*

PAGE(S)

**VOLUME I**

**I.  DOCKET SHEET**

E.D. Va. Docket Sheet, No. 92CR68 (1992-2019).............................................J.A.1

E.D. Va. Docket Sheet, No. 92CR68 (2020) ...................................................J.A.25

**II. RELEVANT INDICTMENT, ORDERS AND OPINIONS**

Second Superseding Indictment, July 20, 1992.................................................J.A.33

Order (Dec. 15, 2020), ECF No 95................................................................J.A.55

Memorandum Opinion (Dismissing § 2255 Petition) (Jan. 2, 2021), ECF
    No. 99........................................................................................................J.A.58

Order (Granting Motion for Leave to File Supplemental Authority) (Jan.
    2, 2021), ECF No. 100................................................................................J.A.80

Order (Dismissing § 2255 Petition) (Jan. 2, 2021), ECF No. 102....................J.A.81

**III. OTHER RELEVANT FILINGS**

Notice of Execution Date (Nov. 20, 2020), ECF No. 78..................................J.A.82

Motion Pursuant to 28 U.S.C. § 2255 Raising Claim of Ineligibility To Be
    Executed under 18 U.S.C. § 3596(c) (Dec. 14, 2020), ECF No. 86............J.A.84

Index of Exhibits to Motion Pursuant to 28 U.S.C. § 2255 Raising Claim
    of Ineligibility To Be Executed under 18 U.S.C. § 3596(c), ECF No.
    86-1 .........................................................................................................J.A.143

Ex. 1, Report of Daniel J. Reschly, Ph.D., Aug. 26, 2016, ECF No. 86-2.....J.A.148

Ex. 1a, Curriculum Vitae of Daniel J. Reschly, Ph.D., May 15, 2020,
    ECF No. 86-3 ...........................................................................................J.A.199

Ex. 2, Report of J. Gregory Olley, Ph.D., Aug. 24, 2016, ECF No. 86-4 ......J.A.251

Ex. 2a, Curriculum Vitae of J. Gregory Olley, Ph.D., Oct. 2020, ECF No. 86-5 ......................................................................................... J.A.299

Ex. 3, Letter from Gary N. Siperstein, Ph.D. to Counsel for Corey Johnson, Dec. 16, 2016, ECF No. 86-6 ..................................................... J.A.318

Ex. 3a, Curriculum Vitae of Gary N. Siperstein, Ph.D., Sept. 2020, ECF No. 86-7 ......................................................................................... J.A.332

## VOLUME II

Ex. 4, Debra Nelson, Mitigation Report, Sept. 27, 2016, ECF No. 86-8 ....... J.A.355

Ex. 5, Report of Richard G. Dudley, Jr., M.D., Aug. 22, 2016, ECF No. 86-9 ......................................................................................... J.A.391

Ex. 6, Trial Tr., Feb. 3, 1993, ECF No. 86-10 ................................................ J.A.411

Notice of Submission of Exhibit 7, ECF No. 87 ............................................ J.A.426

## VOLUME III

Exs. 7-1 – 7-3, Trial Tr., Feb. 10, 1993, ECF Nos. 87-2 – 87-4 ..................... J.A.433

Notice of Submission of Exhibits, ECF No. 88 ............................................. J.A.519

Ex. 8, Cornell Mitigation Information and Report (Excerpt), ECF No. 88-2 ......................................................................................... J.A.526

Ex. 9, Trial Tr., Feb. 12, 1993, ECF No. 88-3 ................................................ J.A.546

## VOLUME IV

Ex. 10, Trial Tr., Feb. 15, 1993, ECF No. 88-4 .............................................. J.A.611

Ex. 11, Declaration of Kenneth Barish, Ph.D. (staff psychologist at Pleasantville Cottage School), July 22, 2014, ECF No. 88-5 ................... J.A.623

Ex. 12, Affidavit of Richard Benedict (special education teacher at Pleasantville Cottage School), Dec. 5, 2011, ECF No. 88-6 ..................... J.A.635

Ex. 13, Affidavit of Darnell Brown (acquaintance in Trenton, NJ), Oct. 14, 2011, ECF No. 88-7 ........................................................................ J.A.647

Ex. 14, Affidavit of Darold Brown (acquaintance in Trenton, NJ), June 15, 2011, ECF No. 88-8 ...................................................................... J.A.652

Ex. 15, Affidavit of Craig S. Cooley (appointed counsel in 1992), Sept. 20, 2016, ECF No. 88-9 ..................................................................... J.A.659

Ex. 16, Affidavit of Courtney Daniels (Corey's lifelong friend), May 21, 2011, ECF No. 88-10 ...................................................................... J.A.669

Ex. 17, Declaration of Monica Dawkins (Corey's former girlfriend), July 16, 2012, ECF No. 88-11 ..................................................................... J.A.675

Notice of Submission of Exhibits, ECF No. 89 ............................................. J.A.678

Ex. 18 Declaration of Cary Gallaudet, Ph.D. (psychologist at Pleasantville Diagnostic Center), Mar. 19, 2012, ECF Nos. 89-2 – 89-3 ..................................................................... J.A.685

Ex. 19, Declaration of Ann Harding (staff member at Pleasantville Cottage School), Nov. 21, 2011, ECF No. 89-4 ......................................... J.A.696

Ex. 20, Affidavit of Minnie Hodges (Corey's maternal aunt), Apr. 30, 2011, ECF No. 89-5.................................................................... J.A.699

Ex. 21, Affidavit of Priscilla Hodges (Corey's cousin), Apr. 30, 2011, ECF No. 89-6 ....................................................................................... J.A.710

Ex. 22, Affidavit of Queenie Hodges (Corey's cousin), Apr. 30, 2011, ECF No. 89-7 ....................................................................................... J.A.718

Ex. 23, Declaration of Esther Johnson (Corey's maternal grandmother), Apr. 30, 2011, ECF No. 89-8.................................................................... J.A.722

Ex. 24, Affidavit of Robert Johnson (Corey's half-brother), June 29, 2011, ECF No. 89-9 ...................................................................... J.A.728

Ex. 25, Affidavit of Antionette Daniels Joseph (the best friend of Corey's mother and Corey's godmother), May 21, 2011, ECF No. 89-10 ............. J.A.740

Ex. 26, Declaration of Leona Klerer (reading teacher at Mount Pleasant Cottage School), June 3, 2011, ECF No. 89-11 ........................................ J.A.752

Ex. 27, Affidavit of Gerald Lefkowitz (unit administrator at Pleasantville Cottage Center), Dec. 5, 2011, ECF No. 89-12........................................ J.A.760

Ex. 28, Affidavit of Odette Noble (social worker at Elmhurst), Dec. 1, 2011, ECF No. 89-13 ..................................................................... J.A.765

3

Ex. 29, Declaration of George Sakheim, Ph.D. (Chief of Psychological Services at Pleasantville Diagnostic Center), June 17, 2011, ECF No. 89-14 ................................................................................J.A.772

Ex. 30, Affidavit of David Washington (childcare worker at Elmhurst), Mar. 1, 2012, ECF No. 89-15 ...................................................................J.A.807

Notice of Submission of Exhibits, ECF No. 90...............................................J.A.811

Ex. 31, Gregory Judge, School Social Worker, Social History, Mar. 4, 1977, ECF No. 90-2...........................................................................J.A.818

Ex. 32, Cheryl Spillane, Learning Consultant, Bureau of Pupil Personnel Services, Jersey City Public Schools, Learning Consultant Evaluation to Child Study Team, Mar. 18, 1977, ECF No. 90-3 ...............................J.A.822

Ex. 33, F.A. Figurelli, M.D., Chief Psychologist, Psychological Examination Record, Mar. 25, 1977, ECF No. 90-4...............................J.A.827

Ex. 34, Eleanor Glantz, Social Worker, Case Service, Dec. 11, 1978, ECF No. 90-5 ...........................................................................................J.A.830

Ex. 35, Committee on the Handicapped, Referral to the Committee on the Handicapped, Feb. 26, 1979, ECF No. 90-6..............................................J.A.832

Ex. 36, Committee on the Handicapped Records, May 21, 1979, ECF No. 90-7 ...........................................................................................J.A.837

## VOLUME V

Ex. 37, Washington Heights-West Harlem Community Mental Health Center, Child Assessment Evaluation Summary, Dec. 9, 1981, ECF No. 90-8 ...........................................................................................J.A.863

Ex. 38, Ernest H. Adams, Staff Psychologist, Psychodiagnostic Evaluation, Dec. 11, 1981, ECF No. 90-9................................................J.A.865

Ex. 39, Cary Gallaudet, Psy.D., Pleasantville Cottage School, Psychological Evaluation, Feb. 1, 1982, ECF No. 90-10..........................J.A.868

Ex. 40, Leona Klerer, Mount Pleasant Cottage School Screening Upon Admission, Feb. 22, 1982, ECF No. 90-11 .............................................J.A.872

Ex. 41, Amira Offer, Caseworker, Psychosocial Summary, Mar. 15, 1982, ECF No. 90-12..................................................................................J.A.876

Ex. 42, Gloria Caro, Pleasantville Cottage School, Reassessment
Summary, May 21, 1982 , ECF No. 90-13.................................................J.A.882

Ex. 43, Gloria Caro, Caseworker, Initial Conference, Current Assessment
and Transfer Summary, June 9, 1982, ECF No. 90-14 ............................J.A.896

Ex. 44, Gayle Turnquest, Caseworker, Pleasantville Cottage School,
Current Assessment, Jan. 31, 1983, ECF No. 90-15 .................................J.A.902

Notice of Submission of Exhibits, ECF No. 91.................................................J.A.905

Ex. 45, Ken Barish, Ph.D., Psychologist, Pleasantville Cottage School,
Psychological and Educational Evaluation, Apr. 29, 1983,
ECF No. 91-2.........................................................................................J.A.912

Ex. 46, John B. Stadler, M.D., Clinical Director, Pleasantville Cottage
School, Psychiatric Evaluation, Aug. 26, 1983, ECF No. 91-3 ................J.A.916

Ex. 47, Lynda Coccaro, Speech and Language Pathologist, Donald R.
Reed Speech Center, Inc., Phelps Memorial Hospital, Speech and
Language Evaluation, Oct. 5, 1983, ECF No. 91-4....................................J.A.919

Ex. 48, Lynn Polstein, Jewish Child Care Association of New York,
Pleasantville Cottage School, Change in Permanency Plan,
Apr. 13, 1984, ECF No. 91-5...................................................................J.A.925

Ex. 49, Gerard Maier, Social Worker, Current Assessment, Sept. 4, 1984,
ECF No. 91-6........................................................................................J.A.931

Ex. 50, Christine Aaron, MSW Intern, Jewish Child Care Association of
New York, Pleasantville Cottage School, Visitation Plan,
Dec. 12, 1984, ECF No. 91-7 ................................................................J.A.935

Ex. 51, Kenneth Barish, Ph.D., Psychologist, Pleasantville Cottage
School Psychological Evaluation, Apr. 15, 1985, ECF No. 91-8 .............J.A.949

Ex. 52, Gerard Maier, Pleasantville Cottage School, Discharge/Transfer
Plan, May 28, 1985, ECF No. 91-9 ........................................................J.A.952

Ex. 53, Board of Education of the City of New York, Individualized
Education Plan – Phase 1, July 1, 1985, ECF No. 91-10 ..........................J.A.966

Ex. 54, Odette Noble, Social Worker, Jewish Child Care Association of
New York, Elmhurst Boys Residence, UCR Reassessment and
Service Plan Review 6 Month, Nov. 21, 1985, ECF No. 91-11................J.A.974

Notice of Submission of Exhibits, ECF No. 92.............................................J.A.986

Ex. 55, Odette Noble, Social Worker, Jewish Child Care Association of
New York, Elmhurst Boys Residence, UCR Reassessment and
Service Plan Review 6 Month, June 28, 1986, ECF No. 92-2 .................. J.A.993

Ex. 56, Odette Noble, Social Worker, Jewish Child Care Association of
New York, Elmhurst Boys Residence, UCR Plan Amendment: Form
D Trial Discharge, Feb. 23, 1987, ECF No. 92-3 ................................... J.A.1003

Ex. 57, Newtown High School, Scholastic Transfer Record,
Dec. 7, 1987, ECF No. 92-4 ...................................................................... J.A.1008

Ex. 58, Janet Valentine, Child Care Worker, Pleasantville Diagnostic
Center, Outline for Cottage Report (undated), ECF No. 92-5 ................. J.A.1011

Ex. 59, Notice of the Intention of U.S.A. to Seek Death Penalty as to Mr.
Tipton, May 1, 1992, ECF No. 92-6 ....................................................... J.A.1015

Ex. 60, Notice of the Intention of U.S.A. to Seek Death Penalty as to Mr.
Roane, May 1, 1992, ECF No. 92-7 ........................................................ J.A.1020

Ex. 61, Second Superseding Indictment, July 20, 1992, Dkt. 115,
ECF No. 92-8 .......................................................................................... J.A.1025

Ex. 62, Notice of the Intention of U.S.A. to Seek Death Penalty as to Mr.
Thomas, Oct. 28, 1992, ECF No. 92-9 ................................................... J.A.1048

Ex. 63, Verdict Form, Feb. 3, 1993, Dkt. 466, ECF No. 92-10 .................... J.A.1053

Ex. 64, Notice of the Intention of U.S.A. to Seek Death Penalty as to Mr.
Johnson, Feb. 8, 1993, ECF No. 92-11 ................................................... J.A.1060

Ex. 65, Special Findings, Feb. 16, 1993, Dkt. 508, ECF No. 92-12 ............ J.A.1065

Ex. 66, Motion to Have Defendant Declared Mentally Retarded, *United
States v. Thomas*, No. 3:92CR68 (E.D. Va. Apr. 15, 1993),
ECF No. 92-13 ........................................................................................ J.A.1078

Ex. 67, Memorandum in Support of Initial Petition for Writ of Habeas
Corpus Pursuant to 28 U.S.C. Section 2255, June 15, 1998, Dkt. 714
(Excerpt) , ECF No. 92-14 ...................................................................... J.A.1093

## VOLUME VI

Ex. 68, Reply Memorandum in Support of Initial Petition for Writ of
Habeas Corpus Pursuant to 28 U.S.C. Section 2255, Mar. 15, 1999,
Dkt. 761 (Excerpt), ECF No. 92-15 ....................................................... J.A.1109

Ex. 69, Ex. 14 to Reply Memorandum in Support of Initial Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. Section 2255, Mar. 15, 1999, ECF No. 92-16 ....................................................................... J.A.1125

Ex. 70, Ex. 15 to Reply Memorandum in Support of Initial Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. Section 2255, Mar. 15, 1999, ECF No. 92-17 ....................................................................... J.A.1133

Notice of Submission of Exhibits, ECF No. 93 ......................................... J.A.1137

Ex. 71, Petitioners' Joint Motion for Leave to Take Discovery, June 24, 1999, Dkt. 770, ECF No. 93-2 ..................................................... J.A.1144

Ex. 72, Memorandum Opinion, May 3, 2000, Dkt. 803, ECF No. 93-3 ...... J.A.1195

Ex. 73, Memorandum Opinion, May 1, 2003, Dkt. 896, ECF Nos. 93-4 – 93-5 .................................................................... J.A.1209

Ex. 74, Brief for Appellants Cory Johnson and Richard Tipton, *United States v. Johnson*, No. 03-13(L), 03-26, 03-27 (4th Cir. Feb. 17, 2004) (Excerpt), ECF No. 93-6 ...................................................... J.A.1336

Notice of Submission of Exhibits, ECF No. 94 ......................................... J.A.1359

## VOLUME VII

Ex. 75, American Association on Intellectual and Developmental Disabilities Definition Manual ("AAIDD-11") (Excerpt), ECF Nos. 94-2 – 94-3 ................................................................... J.A.1366

Ex. 76, AAIDD User's Guide to 11th Edition (Excerpt), ECF No. 94-4 ..... J.A.1392

Ex. 77, Diagnostic and Statistical Manual of Mental Disorders ("DSM-5") (Excerpt), ECF No. 94-5 .................................................. J.A.1405

Ex. 78, 134 Cong. Rec. 22,926 (1988) (Excerpt), ECF No. 94-6 ................ J.A.1418

Ex. 79, 136 Cong. Rec. S6873 (daily ed. May 24, 1990) (Excerpt), ECF No. 94-7 ...................................................................... J.A.1423

Government's Response to Court's December 15, 2020 Order (Dec. 21, 2020), ECF No. 96 ............................................................. J.A.1435

Corey Johnson's Reply Pursuant to December 15, 2020 Order (Dec. 24, 2020), ECF No. 97 ............................................................. J.A.1451

Exhibit 1, Amended Judgment in a Criminal Case, ECF No. 97-1 ............. J.A.1459

United States' Motion for Leave to File Supplemental Authority (Dec. 31, 2020), ECF No. 98 ...................................................................... J.A.1467

United States' Notice of Supplemental Authority (Jan. 2, 2021), ECF Nos. 98-1, 101 ...................................................................... J.A.1469

Notice of Appeal (Jan. 4, 2021), ECF No. 103 ............................................ J.A.1489

# EXHIBIT 37



# WASHINGTON HEIGHTS-WEST HARLEM COMMUNITY MENTAL HEALTH CENTER

## CHILD ASSESSMENT EVALUATION SUMMARY

NAME  JOHNSON, COREY            DATE OF BIRTH �indetectable AGE 13 Yrs. SEX  M

DATE OF EVALUATION   12/9/81    CHART #

LANGUAGE USED DURING EVALUATION _____  LANGUAGE SPOKEN IN HOME _____
Primary Case Worker-Sola-Gomez
EVALUATED BY

Corey was brought to our Clinic by his mother due to academic failure and behavior problems. He steals, misbehaves and stays out of the home without the mother knowing his location.

### PSYCHOSOCIAL:

This behavior became significant since about 4 years ago, when the parents became separated. The brother was placed in a psychiatric institution after he attempted suicide. Corey was sent to live with the maternal grandfather and was enrolled in a private school but this did not work for Corey. The mother decided to place him through foster care agency since she lacks effectiveness in controlling hime.

### PSYCHOLOGICAL EVALUATION:

Corey was administered the WIDC R TEST where he scored 77 in the verbal area (boderline) and 84 in the performance area (dulle normal). The overall score was 78 borderline. He was found to have ability to negotiate with the social world, to relate and reach out but had the capacity, to get disorganized. The projective tests suggested that he was depressed.

### EDUCATIONAL EVALUATION:

Corey was administered the Peabody Test. The age equivalent for mathematics was 9 yr 10 Mo for reading recognition was 7 yr 6 Mo. During this evaluation he was cooperative and tried his best to perform well.

### MEDICAL EVALUATION:

Corey's physical growth was normal. He was found to have dental cavities and gingivritis (inflamation of gums). He was found to be delayed in the neuromafunctional area (neurologic soft signes) that could suggest a learning disability.

### RECOMMENDATIONS:

Corey would benefit from stimulation in an age appropriate social group and individual educational tutoring or a special education class. He needs counselling to work out his emotional problems.

Complete evaluation available upon request.

J.A.864

# EXHIBIT 38

**J.A.865**

USCA4 Appeal: 21-1    Doc: 10-2    Filed: 01/08/2021    Pg: 13 of 255

C M H C

PSYCHODIAGNOSTIC EVALUATION

| | | TESTS ADMINISTERED |
|---|---|---|
| Name of Client: | Corey Johnson | |
| Address of Client: | 640 Riverside Drive | Westchester Intelligence Scale for |
| | New York, N. Y. 10031 | Children - Revised (WISC-R) |
| Examiner: | Ernest H. Adams, M.S. | Thermatic Apperception Test (TAT) |
| | Staff Psychologist | Rorschach Ink Blot Test |
| | | Draw-A-Person |
| Supervisor: | Mary Sitgraves, Ph.D. | Bender Visual Motor Gestalt |
| Date: | December 11, 1981 | Testing Date: October, 1981 |

IDENTIFYING BIOGRAPHICAL INFORMATION AND REFERRAL QUESTION:

Corey Johnson is a 13-year-old average size, black boy. He was referred by his mother, Emma Johnson, who is employed as a receptionist. Ms. Johnson has requested a complete evaluation of Corey so that she can place him outside of their current living situation. Corey will be placed by Special Children's Services (BCW) which intends to place Corey in Children's Village, a residential treatment center in Dobbs Ferry, New York. A complete psychological battery was given to assess his current level of intellectual and emotional functioning.

CLINICAL TEST BEHAVIOR:

During our initial session Corey was warm and friendly, even though he was quite anxious with nervous gestures. He recurrently pulled his hair, face, and spoke with a quiver in his voice. Corey appeared to be somewhat depressed, needy and quite frightened. The balance of the sessions Corey was less anxious, the nervous gestures ceased, and the quiver in his voice disappeared. Overall, Corey was warm, friendly, cooperative, and seemd to have a ready capacity for interpersonal relatedness. Corey appeared to have tried his best.

PERSONALITY ORGANIZATION AND DYNAMICS:

Corey presents as a somewhat depressed and sad boy who is terrified of the environment in which he lives. A primary conflict is his fear of people versus his desire for interpersonal relatedness. His general view is that people wantonly do harm to others with impunity. In novel situations or in meeting new people he will experience a great deal of anxiety and discomfort until he can determine whether it's a safe place to be. Notwithstanding, his fearful perception of people, Corey still maintains an active desire and capacity to establish and develop interpersonal relatedness. Moreover, he still retains the ability to navigate through the social world in a warm and friendly manner. Corey presently fears his mother will abandon him, which exacerbates his negative self image and low self esteem. He feels a lack of nurturance, support, and feels the circumstances in his life are out of his control, which increases his anxiety and depression. Corey is fearful of losing control and becoming emotionally aroused. His chief defense, which is slowly being eroded, is to distance himself from his associations when stimulated and aroused. That is, he attempts to cut off or suppress his feelings. The use of such

(Continued)

J.A.866

Client:  Corey Johnson                    - 2 -                    December 11, 1981

an internal defense means his reality testing has the potential to degenerate unless his concerns, fears, and feelings are allowed to be expressed and explored.  In summary, Corey's strength is his "social intelligence", i.e., his ability to communicate in a warm and friendly manner with the capacity and desire for mutual exchange.  He's somewhat depressed with low self-esteem and negative self-image.  In general he views people as hurtful but maintains a ready capacity to relate on an individual basis.

INTELLECTUAL FUNCTIONING:

Summary of WISC-R

| Verbal Tests | Scale |
|---|---|
| Information | 6 |
| Similarities | 3 |
| Arithmetic | 7 |
| Vocabulary | 7 |
| Comprehension | 8 |

| Performance Tests | |
|---|---|
| Picture Completion | 10 |
| Picture Arrangement | 9 |
| Block Design | 5 |
| Object Assembly | 10 |
| Coding | 4 |

| | | |
|---|---|---|
| Verbal IQ | 77 | Borderline |
| Performance IQ | 84 | Dull Normal |
| Full Scale IQ | 78 | Borderline |

RECOMMENDATIONS:

Individual insight oriented psychotherapy is recommended (twice weekly) so Corey may begin to express and explore his concerns, fears, and feelings.  A small classroom situation is recommended with individual tutoring.  It's highly recommended that Corey be allowed to develop an individual relationship with one of the Children's Village volunteers.  This should enhance Corey's development and increase his self-esteem.

Ernest H. Adams
Staff Psychologist

Mary Sitgraves, Ph.D.
Coordinator
Children/Adolescent Services

EHA/mla

J.A.867

# EXHIBIT 39

J.A.868

PLEASANTVILLE COTTAGE SCHOOL

Name of Child:  COREY JOHNSON       Dates Evaluated: 2/5, 2/8/82
Date of Birth:  ████████           By:  Cary Gallaudet, Psy. D.
CA:             13.3                Worker:  Amira Offer
Date of (PCS) Adm:  2/1/82

### PSYCHOLOGICAL EVALUATION

Corey was referred to the Pleasantville Diagnostic Center (2/1/82)
on a PINS Petition.  Background history revealed long standing school
problems culminating in Corey's truancy since September of 1981.

### Behavioral Observations:

Corey was a tall, slender and friendly 13.3-year old boy who spoke
with markedly slurred speech.  Although his face was a bit scarred
Corey impressed as a good looking boy.  He entered the testing easily
yet his affect initially seemed depressed and flat.  He was a co-
operative boy who complied readily with all the examiner's requests.
As the evaluation proceeded, and rapport developed Corey became
more spontaneous and talkative.  He seemed ambivalent about the
testing; enjoying the individual attention he was receiving, but
unsure about the actual assessment.  At times Corey impressed as
in immature boy whose playful and friendly nature often interfered
with his performance.  Frequently Corey would interrupt his own
work with irrelevant questions about toys, games and other activit-
ies, and at those times, the examiner would have to help him refocus
on the task at hand.  Corey was always agreeable and pleasant, and
while expressing concern over "the tests" he never seemed resistant
to anything that was asked of him.

### Tests Administered:

> Bender-Gestalt
> Figure Drawings
> WISC-R
> Sentence Completion
> TAT
> Rorschach

### Intellectual Evaluation:

On the WISC-R Corey achieved a Verbal I.Q. of 85 (Low Average),
a Performance I.Q. of 93 (Average) and a Full Scale I.Q. of 88
placing him within the Low Average range of intellectual function-
ing.  Average potential is suggested by his Performance I.Q., which
was slightly higher than his Verbal I.Q.  There was no variability
within the verbal area, however, performance tests were character-
ized by signficant variability.  Subtest scores were as follows:

J.A.869

Corey Johnson                                                    -2-

| Verbal Tests | | Performance Tests | |
|---|---|---|---|
| Information | 7 | Picture Completion | 11 |
| Similarities | 7 | Picture Arrangement | 9 |
| Arithmetic | 7 | Block Design | 6 |
| Vocabulary | 7 | Object Assembly | 13 |
| Comprehension | 10 | Coding | 7 |
| Digit Span | 2 | | |

In the verbal area Corey achieved his highest score on Comprehension. His average score here suggests that Corey has a maturing conscience and moral sense. His thinking is appropriate and his ability to use practical judgment in every day social situations is a strength. On the other hand, a significant weakness was evidenced in his short term auditory memory. Corey's score on Digit Span fell in the Mentally Deficient range, indicating a severe deficit in his auditory attention for nonmeaningful material. Emphasis is made on nonmeaningful because, when using the same skill (short term auditory memory) with arithmetic problems, Corey was able to function within the Low Average range. Significant too is the fact that Corey demonstrated considerable more difficulty with Digits reversed than forward. A performance such as this, characterizes concrete rigid thinking, with a corresponding inability to shift the frame of reference from digits forward to digits reversed.

In the performance area Corey achieved his highest score on Object Assembly. His High Average score here reflects a strength with the following: the ability to anticipate part/whole relations, synthesize concrete visual forms, and assemble materials drawn from life into a meaningful whole. Significantly lower and falling within the Low Average range was Corey's score on Block Design. His score here reflects deficits in non-verbal abstract reasoning, perceptual organization, visual perception and perceptual motor functioning. Corey demonstrated real difficulty here, nearly rotating designs early on, and finally failing later designs for the same reason (rotation). These weaknesses were also evident in his Bender-Gestalt performance which was characterized by a number of rotations and distortions. He made three scorable errors, producing a Bender performance which was comparable to a child five years below his chronological age, and of those errors made two suggested the presence of an underlying neurological deficit. Visual recall was adequate but 6 out of the 9 designs reproduced were marked by severe rotations - again suggesting that a perceptual motor deficit interferes with Corey's functioning.

Personality Dynamics:

Corey is a depressed, dependent and frightened 13.3-year old who is struggling with independent strivings at this time in his life and feels immobilized as a result. This struggle presents a real conflict for Corey because on the one hand he is an ambitious boy who is searching for independence, but on the other he feels deficient, dependent and frightened. Essentially he feels unable to make it on his own and while he knows he needs help it conflicts

J.A.870

Corey Johnson                                                    -3-

with his reach for independence.  While depressive tendencies are
pervasive (many references to dying and killing one's self) Corey
offsets these tendencies with fantasies whereby he feels if he tries
hard enough he will fulfill his ambition.  He is an ambitious boy
who feels caught in the middle - being pushed and pulled - and while
his independence is critical to him there is also a longing for
nurturance and affection.  These needs stir up considerable anxiety
which he initially tries to deal with through denial.  Denial is
ineffective, however, and as Corey becomes more anxious he eventual-
ly regresses to an earlier stage where he is an immature boy with
strong dependency needs.  Hostile impulses also emerge at this time
and serve to overwhelm the boy even more.  Object relations are
developing and Corey is an empathic and sensitive boy who can re-
late in a mature manner.  A sensitive boy, with genuine emotional
responsiveness, Corey often feels at the mercy of others' wishes,
and his strong conscience causes him to respond accordingly.  These
conflicts are exacerbated by an organic component which clearly in-
terferes with Corey's ability to function successfully in school.
While abstracting abilities are being more and more emphasized at
this time Corey falls further and further behind.  It is an area of
weakness for him and when challenges are not concrete and meaningful
Corey is unable to integrate the experience and becomes easily over-
whelmed.

Summary and Recommendations:

In summary, Corey is a sensitive and dependent boy who is struggling
with issues revolving around independence.  An underlying organic
component serves to exacerbate the anxiety, dependence, affection-
al needs and hostile impulses and as a result Corey has an extremely
hard time trying to integrate emotional challenges.  Although evidence
of a learning disability exists he continues to be an ambitious boy
who is motivated to improve his situation and would benefit highly
from both remediation in academic areas as well as psychotherapy.
Corey needs to gain greater insight into his struggle over his ambi-
tions, his reading deficits and his willingness to accept help.
From an academic standpoint it is important that if Corey is to
learn more effectively that the material be presented in the most
concrete and meaningful way.
          Cary Gallaudet:ww  D-2/1/82        T-232/82

                                    Cary Gallaudet, Psy. D.


Supervised by:
George A. Sakheim, Ph.D.
Chief of Psychological Services

J.A.871

# EXHIBIT 40

J.A.872

MOUNT PLEASANT COTTAGE SCHOOL
SCREENING UPON ADMISSION

**A.** Name: Corey Johnson
Birthdate: ▮▮▮▮▮
Chrono. Age: 13-3
Date Of Admission: 2/1/82
Admitted From: Man. S.S.C.
Current Placement: Diagnostic Ctr.

Date Of Testing: 2/22/82
Tested By: Leona Klerer
Grade: 7
Teacher: Lily Jones
Social Worker: A. Offer

**B.** Information From Student's Record:

**C.** Behavior During Testing:

Cooperative and tried to do his best.

**D.** Handwriting:

Right handed with fairly legible manuscript. He can write his first name only clearly in cursive.

**E.** Test Results:

| Tests | Areas Examined | Grade Level |
|---|---|---|
| Wide Range Achievement Test Level 1 | Word Recognition | 2.1 |
| | Spelling | 2.2 |
| | Arithmetic | 3.7 |
| Gray Oral Reading Test Form B | Oral Reading | 2nd |
| Comprehension 100 % at the 2nd Grade Level | | |
| Roswell-Chall Diag. Rdg. Test of Word Analysis Skills | Decoding Skills No score obtained Test given for analysis only. | |
| Nelson Reading Skills Test Form ___ | Vocabulary Reading Comprehension Total Reading | |

| Woodcock Reading Mastery Tests Form | Independ. Lev. | Instruct. Lev. |
|---|---|---|
| Letter Identification | | |
| Word Identification | | |
| Word Attack | | |
| Word Comprehension | | |
| Passage Comprehension | | |
| Total Reading | | |

J.A.873

Page 2                                                    Corey Johnson

Visual – Snellen eye chart      Right eye   20-30
                                Left eye    20-30

F.    Comments on Test Results:

The Gray oral test indicates Corey is reading with compre-
hension on a second grade level. He has evidences of some
learning disabilities. He exhibited much angulation and
distortion of symbols (WRAT) which indicates some visual
motor difficulty. He is a better context reader and sub-
stitutes similar words for unread words, e.g. "shock for
surprise". He was unable to read single syllable short
vowel words in isolation. He could not name the sounds of
the short vowels. When reading, Corey had to keep his
finger on the words to keep from skipping. In reading
the Snellen Eye Chart, he was not able to read the letters
consecutively but omitted several.

The third grade level (Gray) was too difficult to read. He
is a word by word reader but seems to comprehend material
on a concrete level.

His phonic knowledge is lacking: he did not know the sounds
of g and c. He was not sure of the consonant sound of m and
y. He was able to blend consonants with difficulty but he
did not know the consonant digraph sh. He did not know the
rule of silent e. He could not read any words in isolation
with vowel combinations. He was able to determine the
number of syllables in a word presented with 50% accuracy.

Spelling subtest (WRAT) yielded a beginning second grade
score.

Arithmetic (WRAT subtest) yielded a mid-third grade score.
This score is somewhat inflated as Corey could not multiply
by 3, divide a single digit by 2, or read numbers of more
than 4 digits. He could multiply a single digit by 2 and
add with renaming but not subtract with borrowing.

G.    Summation:

Corey, 13-3, is currently placed in the Diagnostic Center.
This examiner has determined that he is reading on a
second grade level. Although he  achieved 100% compre-
hension, some unknown words were guessed on this level.

The three tests given indicate a lack of phonic skills
which might enable him to sound out words. He also has a
minimal sight vocabulary. He has difficulty blending.

**J.A.874**

Page 3                                                    Corey Johnson

G.   Summation:(cont.)

These factors combined make reading very difficult for
Corey.

His serial memory is not as expected.  He could recite the
months of the year in sequence only up to Aug. although he
knew there were 12 months in the year.

Corey would tell time on the hour only but seemed to feel
that he could learn in a short time.

A trial lesson in reading digits indicated a potential
for learning concrete material.


H.   Recommendations:

1.   Teach how to tell time for utilization reasons and
     for effect on self esteem.

2.   Use Glass Analysis Technique for key into reading and
     phonics.

3.   Math - basic math laws of subtracting, division and
     multiplication.

LK:jj                                           L. Klerer

cc:D.Schwarz,A.Richmond,A.Offer,L.Jones,B.Kramer

J.A.875

# EXHIBIT 41

**J.A.876**

PLEASANTVILLE DIAGNOSTIC CENTER

PSYCHOSOCIAL SUMMARY

Name of Child:   COREY JOHNSON
Date of Birth:   ▉▉▉▉▉
Date of Adm:     2/1/82

## I. IDENTIFYING INFORMATION:

Corey is a 13-year old Black boy who was admitted to PDC on 2/1/82 on a Voluntary basis. His mother, Mrs. Johnson, requested   that Corey be evaluated to determine whether placement at Children's Village would be feasible, as his brother Robert is in placement there. Mrs. Johnson is currently unemployed and resides with her drug addicted common-law husband in a Brooklyn apartment.

## II. REASON FOR REFERRAL:

Corey's mother, a depressed, dependent woman is seeking placement for Corey because she is struggling with taking charge of her own life and is therefore unable to cope with Corey's problems at the present time. Upon admission Mrs. Johnson reported that Corey had been truant since September 1981. Corey's academic deficits have been a serious problem and he has been left back twice in 3rd and 4th grade. His behavior has reportedly been disruptive in school, he gets into fights and does not learn. He currently reads on 2nd grade level and has not improved in quite some time. Corey lived with his maternal grandfather at times that his mother could not cope with his behavior. During his last stay with his grandfather, while he was attending Catholic School, Corey was suspended from school for fighting. Mrs. Johnson stated that Corey had been stealing from her and her boyfriend, items such as tape recorders, radios and she feels that this was done in anger or revenge. As noted above, Mrs. Johnson has been living with a drug addicted, unemployed man for the past four years and she noted that although Corey's school problems have always been there, they have intensified since she has been living with Mr. Krager (with whom she is still living at the present time).

Until a year ago, Corey believed that his younger half-brother's father was his real father. Corey's natural father unexpectedly came into the picture after he was released from jail for armed robbery. Corey has been visiting his father and his wife (who is expecting a baby) regularly but feels that his father is uninvolved in his life and is wary about approaching him.

Mrs. Johnson stated that her home environment has been unstable and chaotic since she started living with Mr. Krager. He required numerous emergency hospitalizations and Corey and his brother witnessed many fights and arguments between Mrs. Johnson and Mr. Krager. Mrs. Johnson is aware that she has been unable to provide a calmer more stable and consistent home environment for her children and noted that she is in the process of finding a job and seeking new residence so that she can provide a better home for her children.

J.A.877

Corey Johnson                                              -2-

## III. FAMILY BACKGROUND:

Mrs. Johnson comes from a chaotic and unstable home environment as
well.  She noted that her father drank heavily and was abusive with
her mother, "they fought all the time."  She is the youngest of three,
her two older siblings had different fathers.  Mrs. Johnson is "very
close" to her father who left the family during her adolescence but
continued to be supportive to her.  He supports her financially and
emotionally when she is needy.  Her father took care of Corey when-
ever Mrs. Johnson was emotionally unavailable.

Mrs. Johnson said that she became pregnant at age 17 in order to "get
away from home" but returned to live with her mother after Corey was
born.  Mrs. Johnson went to work and Corey's maternal grandmother
cared for him.  Subsequently Mrs. Johnson got pregnant with Robert
and was living with Robert's father for several years.  Mrs. Johnson
reported that he was a good father to both children and a good provider, how-
ever, he used money to gamble.  He apparently became a compulsive
gambler and although Mrs. Johnson believed that he had been paying
the bills she one day came home and discovered that the family had
been evicted from their apartment because their rent was not paid.
Mrs. Johnson subsequently left Robert's father and returned to her
mother's home.  As noted above, she started living with Mr. Krager
four years ago.  This has been a destructive and chaotic relation-
ship and Mrs. Johnson who has been quite depressed over this relation-
ship has not been able to extricate herself.  Mr. Krager has been drug
addicted and has been involved with another woman over the past two
years and this has been a very painful situation for Mrs. Johnson
who feels trapped and wants help to reorganize her life.

## IV. DEVELOPMENTALLY HISTORY OF CHILD:

There were no complications in pregnancy or birth.  Corey weighed
7.4 at birth and was described as having been a "cheerful baby."
His early developmental milestones were normal, he walked and talked
at 1-year.  Mrs. Johnson said that Corey was hyperactive and at age 2
she reported that he fell down a staircase and was admitted to Kings
County.  He was released with no significant findings, and there were no neurological
tests.                            Corey stuttered until age 5 and he
continues to have a slight lisp.  He was enuretic until age 11 and
encopretic occasionally between ages 8 and 12.  Mrs. Johnson said
that Corey talks to an imaginary friend especially when he is angry
at her.  She does not know how long he has been doing this.  She noted
that Corey becomes defiant especially when he is jealous of his broth-
er Robert.  Robert was hospitalized last summer at the Psychiatric
Institute following a suicidal attempt, (he walked on a ledge). Robert
became more of a problem for Mrs. Johnson during the last year with
significant increase in his aggressive unsocialized behavior.  Robert's
behavior was seen as risk taking behavior and that has also increased
recently.  Robert reportedly hates Corey and there was intense sibling
rivalry.  Robert has been referred to Children's Village
following            a five month stay at the Psychiatric Institute.

## V. CHILD AT PDC:

    Cottage

In our cottage, Corey is seen as an easy child to care for.  He is

J.A.878

Corey Johnson                                                         -3-

generally cooperative and challenges adults in a playful, immature,
way.  He relates like a younger child and appears limited.  He very
often acts silly and is seen as the cottage clown.  This seems to stem
from his low self-esteem.  Corey does not have friends, he appears
frightened of children and does not like any physical contact with
them.  He also doesn't like to be teased by children and he gets very
verbal and loud when he is teased.  He seeks adult intervention in
those situations and is calmed easily by adults.  Corey seems to be
afraid of the dark but there has been no history of bedwetting or
nightmares during his stay at DC.  Overall, he is a child who main-
tains a low profile in the cottage and has not been difficult to
care for.

### Casework

Initially, in our sessions, Corey was anxious and appeared to have a
great deal of discomfort especially around discussion related to his
mother and her drug addicted, common-law husband.  With time Corey
appeared less anxious, spoke with greater ease and appropriately ex-
pressed anger at his mother for placing him away from home.  He also
became more depressed and teary, in joint sessions with his mother,
when she told him that he can't come home for visits at the present
time.  Mrs. Johnson, a depressed, dependent woman tearfully and pain-
fully told Corey that she doesn't want him to come home now for visits
and witness struggles, fights and drug abuse.  She does not want him
to live in a "depressing" environment and said she is unavailable to
deal with Corey's emotional needs because of her own problems.  She
noted that she would like to protect Corey and have him in placement
while she attempts to take charge of her life by seeking employment
and a new residence.  Corey seemed to be more accepting of his mother's
current state of depression and views placement as a temporary option
because of his mother's current inability to cope.  There are also
feelings of anger and rejection around this issue which surface from
time to time and need to continue to be addressed.

### School

Corey has had many failures in school and is reading on a 2nd grade
level.  Testing indicated a lack of phonic skills which might enable
him to sound out words.  He also has a minimal sight vocabulary.  He
has difficulty blending and these combined factors make reading very
difficult for Corey.  He could recite the month of the year in sequence
only up to August although he knew that there were twelve months in
the year.  Corey could tell time on the hour only but seemed to feel
that he could learn in a short time.  He is essentially seen as a co-
operative child in school who has great academic deficits and needs
individualized instruction.

VI. FAMILY'S RESPONSE TO PDC:

Mrs. Johnson has kept all scheduled appointments and welcomed inter-
vention.  She has visited Corey regularly with one exception when
she was expected to have lunch with him at the cottage and did not
keep this appointment.  Corey was quite upset and disappointed and

J.A.879

Corey Johnson                                                    -4-

when Mrs. Johnson was called she said she was too depressed to come
Mrs. Johnson added that whe would contact Corey in the future if this should happen
again to let him know that she can't come. In order to enhance her self-esteem and
help her begin to feel like Corey's mother, arrangements were made to have her visit
him in the cottage and have lunch with him there. She has been quite
responsive to this plan and expresses gratefulness for the help that
she is getting here.

VII. DIAGNOSTIC APPRAISAL AND RECOMMENDATIONS:

Since Corey's admission to PDC on February 1, 1982 he has had psychiatri
and psychological testing, medical and dental examinations, the social
worker has completed the social history and met several times with his
mother and regularly with the boy. In addition, he has been evaluated
in our school and cared for in our cottage. On February 25, 1982 a
Multi-Disciplinary Conference was held with representatives of clinic-
al, child care and educational personnel. The findings and recommenda-
tions of that conference are contained in the Psychosocial.

Our psychologist found Corey to be a sensitive and dependent boy who
is struggling with issues revolving around independence. There was
an underlying organic component which serves to exacerbate the anxiety,
dependence, affectional needs and hostile impulses. As a result, Corey
has an extremely hard time trying to integrate emotional challenges.
He is motivated to improve his situation and would benefit from both
remediation in academic areas as well as psychotherapy. For a complete
report please refer to Dr. Gallaudet's evaluation.

Our psychiatrist sees Corey as a child who has the capacity to relate
well. He is happy with his mother and reaches out to her. His be-
havior is seen as reactive to a very chaotic home situation especial-
ly during the last four years with Mrs. Johnson having had great fin-
ancial problems and difficulties with her job and in her relationship.
For complete evaluation please see Dr. Collimuttam's report.

Our psychosocial formulation is that Corey is a likeable, related,
youngster whose depression is seen as reactive to an unstable family
situation within the past 4 years and to maternal rejection. Corey's mother
is depressed and unavailable emotionally. For the last four years
she has been living with an umemployed, drug addicted man who mis-
treated her and her children. Mrs. Johnson has had great financial
difficulties as she is unemployed and in debt (having supported her
boyfriend's addiction as well). Furthermore she is stressed in this
relationship as her common-law husband is involved with another woman
and Mrs. Johnson, who is quite dependent on this man, feels trapped,
unable to extricate herself from this relationship. Corey's acting
out behavior is reactive to her emotional absence and her common-law
husband's abusive and destructive behavior.

We, therefore, with reluctance, recommend placement in a residential
treatment center at the present time while Mrs. Johnson takes a better
hold of her life. Although Corey has great educational deficiencies
and needs intensive remedial work, we believe that he could have re-
turned home and residential treatment placement is only a viable op-

J.A.880

<u>Corey Johnson</u>                                                    -5-

tion because Mrs. Johnson is depressed and overwhelmed with diffi-
culties in her own life at the present time. Mrs. Johnson will benefit from treatment
to help her cope with her problems, reorganize her life and then
become more available to her children so that they may return home.
She has agreed to contact Robert's former therapist at Psychiatric
Institute and will seek counselling. We have tried to schedule an
appointment, during her recent visit to Corey, but have been unsuccess-
ful. Mrs. Johnson stated that she will contact Robert's therapist
and will resume treatment.
        Amira Offer, CSW:ww  D-3/9/82     T-3/15/82

                              Amira Offer, CSW
                              Caseworker

J.A.881

# EXHIBIT 42

J.A.882

| DSS-3402 (3/81) NYC | CASE NAME | | CHILD'S NAME | | Date of Birth |
|---|---|---|---|---|---|
| **VISITATION PLAN** | Emma Lee Johnson | | Corey Johnson | | |
| | COMPLETED BY | DATE | SSC NUMBER: | | |
| | Gloria Caro | 5/21/82 | 4766716-28 | | |
| | AGENCY/DISTRICT | | LOCAL DISTRICT/AGENCY USE | | |
| | JCCA/PCS | | | | |

- Complete a Visitation Plan for each child placed or to be placed in foster care.
- Complete according to the time requirements for the Initial Service Plan and revise at each Service Plan Review.

| PERMANENCY GOAL | ANT. COMP. DATE |
|---|---|
| Return to parent. | 8/83 |

**1. VISITATION SINCE LAST PLAN (If child has been in placement).**

| DATE | LOCATION | PARTICIPANTS | DATE | LOCATION | PARTICIPANTS |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | PLEASE SEE CALENDAR OF CONTACTS | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**2. DESCRIBE QUALITY OF VISITS,** highlighting positive and negative factors. If family is not meeting visitation goals, explain reasons and efforts to encourage visiting.

Child has visited once since entering Pleasantville Cottage School on May 7 to May 9, 1982.

Mother states that Corey can only visit maternal grandfather's home because of her own highly problematic living situation. She states that the man she lives with is drug addicted and involved in a drug scene which would be detrimental to Corey.

**3. PLAN FOR VISITATION IN NEXT PERIOD.** Include name of participants, frequency and location. Explain any changes in visitation plan.

Corey will visit mother according to our visiting calendar twice a month. Visits will take place at maternal grandfather's, Mr. Lou Johnson, 727 Schneider Avenue, Brooklyn.

He has lived with his grandfather on and off during difficulties at home. Mother states grandfather is functioning well and that she will spend time with Corey there.

*(Use reverse if additional space is required)*

**J.A.883**

| DSS-3403-F (3/81) NYC | CASE NAME | | LOCAL DISTRICT/AGENCY USE |
|---|---|---|---|
| **GOAL AND OBJECTIVE** | Emma Lee Johnson | | |
| **REVIEW** | COMPLETED BY | DATE | |
| **FAMILY** | Gloria Caro | 5/21/82 | |
| ☒ 90 Days    ☒ 6 Months | AGENCY/DISTRICT | | |
| ☐ Change in Program Status | JCCA/PCS | | |

Complete a Family Goal and Objective Review for the family of each child receiving foster care, preventive services for children, adoption or Child Protective Services at the time of the Service Plan Review. Service Plan Reviews occur as follows:
- 1st Service Plan Review 60 days from establishment of the Initial Service Plan.
- 2nd Service Plan Review 6 months from application for service for non-placement Child Protective Service case, 6 month from an indicated case determination.
- Subsequent Service Plan Reviews every 6 months thereafter.
- Change in Service Status - Prior to the status change.

LIST DATE, PLACE AND PARTICIPANTS FOR ALL FACE-TO-FACE CONTACTS WITH NATURAL FAMILY DURING REVIEW PERIOD. Stat Client's response to contacts with case planner, if unsatisfactory, state efforts to further involve family.

We met with ;Mrs. Johnson on Corey's admission date and on May 4, 1982.  She cancelled on May 18, 1982.  Mrs. Johnson appears to be cooperative.  States she wishes to keep appointments in the office not in home.  She is a chronically depressed and dependent woman who is currently overwhelmed by being unable to extricate herself from a relationship with a drug addicted man.  She has incurred many debts and now works two jobs, finding little time to visit her children.  She has a younger son, Robert, age 11, who is in placement at Children's Village.

| Goal No. | Objective No. | Include services given and client's response to services, client progress toward meeting goal and reason for major changes or deletions in goal or service. |
|---|---|---|
| 1 | CCRS CODES / Client Goal / OBJ. OBJ. OBJ. / Serv. Serv. Serv. | **Goal:** Mrs. Johnson will work at making decisions in her relationship with Mr. Kraeger to be less destructive or to extricate herself from it.<br><br>Mrs. Johnson has stated that her relationship with Mr. Kraeger is destructiv to her and her children.  She states Corey cannot visit her in her home because he is drug addicted, part of the drug scene and at times violent, she takes little responsibility herself.  Casework service will explore referral for individual treatment. |

| Goal No. | Objective No. | Include services given and client's response to services, client progress toward meeting goal and reason for major changes or deletions in goal or service. |
|---|---|---|
| 2 | CCRS CODES / Client Goal / OBJ. OBJ. OBJ. / Serv. Serv. Serv. | **Goal:** Mrs. Johnson will be consistent in her contact with Corey.<br><br>Mrs. Johnson states she now works at two jobs, has little time to visit PCS, but will allow home visits to her father.  It is early in our contact.  However, Mrs. Johnson has placed many obstacles to visiting Corey.  Worker will offer flexible schedule and transportation and funds to cover cost of visits. |

Page

| DSS-3403-F(3/81) NYC GOAL AND OBJECTIVE REVIEW FAMILY | CASE NAME. Emma Lee Johnson | LOCAL DISTRICT/AGENCY USE |
| --- | --- | --- |
| | COMPLETED BY Gloria Caro | DATE 5/21/82 | |

**Goal No.** 3
**Objective No.**

CCRS CODES
Client Goal
OBJ. OBJ. OBJ.
Serv. Serv. Serv.

Include services given and client's response to services, client progress toward meeting goal and reason for major changes or deletions in goal or service.

Goal:  Mrs. Johnson will understand importance of having regular contact with Corey.

She has parcelled out responsibility for each of her children. Robert, Corey's brother, visits his own father. Corey is to visit grandfather. Casework contact will establish whether Mrs. Johnson can be more available to her children.

**Goal No.** **Objective No.**

CCRS CODES
Client Goal
OBJ. OBJ. OBJ.
Serv. Serv. Serv.

Include services given and client's response to services, client progress toward meeting goal and reason for major changes or deletions in goal or service.

**Goal No.** **Objective No.**

CCRS CODES
Client Goal
OBJ. OBJ. OBJ.
Serv. Serv. Serv.

Include services given and client's response to services, client progress toward meeting goal and reason for major changes or deletions in goal or service.

**Goal No.** **Objective No.**

CCRS CODES
Client Goal
OBJ. OBJ. OBJ.
Serv. Serv. Serv.

Include services given and client's response to services, client progress toward meeting goal and reason for major changes or deletions in goal or service.

J.A.885

| DSS-3403-C (3/81) NYC **GOAL AND OBJECTIVE REVIEW CHILD** | CASE NAME Emma Lee Johnson | | CHILD'S NAME Corey Johnson | Date of Birth |
|---|---|---|---|---|
| | COMPLETED BY Gloria Caro | DATE 5/21/82 | SSC NUMBER: 4766716-28 | |
| ☒ 90 Days   ☒ 6 Months   ☐ Change in Program Status | AGENCY/DISTRICT JCCA/PCS | | LOCAL DISTRICT/AGENCY USE | |

Complete a Child Goal and Objective Review for each child receiving foster care, preventive services for children, adoption or Child Protective Service at the time of the Service Plan Review. Service Plan Reviews occur as follows:
- 1st Service Plan Review - 60 days from establishment of the Initial Service Plan.
- 2nd Service Plan Review - 6 months from application for services or from an indicated case determination for non-placement Child Protective Service cases.
- Subsequent Service Plan Reviews - every 6 months thereafter.
- Change in Service Status - prior to the status change.

**PERMANENCY GOAL PROGRESS REPORT**

| | YES | NO |
|---|---|---|
| PERMANENCY GOAL CHANGED | | X |

Describe the effect progress in the achievement of the family's and child's goals and objectives has had on the accomplishment of this child's permanency goal.

Child will return to mother. Caseworker will explore Mrs. Johnson's ability to offer consistent care and take responsibility for Corey. At our Diagnostic Center Mrs. Johnson was believed to be overwhelmed by her problems and unavailable to Corey emotionally at this time. Corey's problems of severe learning deficiencies, truancy and depressed affect would be aided by institutional care with an on-grounds school until his mother is able to take better hold of her life.

For child in foster boarding home or agency operated boarding home, list date, place and participants for all face-to-face contacts between child and caseworker during review period.

Corey is seen once a week for casework services.

| Goal No. | Objective No. | Include services given and client's response to services, client progress towards meeting goal and reason for major changes or deletions in goal or service. |
|---|---|---|
| 1 | | Goal: Corey will attend school every day and will improve academic functioning. |
| CCRS CODES | | |
| Client Goal | | Corey is a 13 year old boy who is reading on a 2nd grade level and has severe learning deficiencies and some organic impairment. He will attend our on-grounds special school in a class of 8 children and receive special remediation in reading and math. Class attendance will be monitored. Close communication between school and cottage is maintained. |
| OBJ. OBJ. OBJ. | | |
| Serv. Serv. Serv. | | |

**J.A.886**

Page 2

DSS-3403-C (3/81) NYC
**GOAL AND OBJECTIVE REVIEW CHILD**

CASE NAME. Emma Lee Johnson

COMPLETED BY Gloria Caro   DATE 5/21/82

LOCAL DISTRICT/AGENCY USE

---

Goal No. 2 | Objective No.

CCRS CODES
Client Goal
OBJ. | OBJ. | OBJ.
Serv. | Serv. | Serv.

Include services given and client's response to services, client progress toward meeting goal and reason for major changes or deletions in goal or service.

Goal:  Corey will feel safe at Cottage School.

Corey has had a chaotic home life for the past four years.  He is slow to understand things.  Cottage staff will make special effort to acclimate him to routine and provide a predictable environment for him.

---

Goal No. 3 | Objective No.

CCRS CODES
Client Goal
OBJ. | OBJ. | OBJ.
Serv. | Serv. | Serv.

Include services given and client's response to services, client progress toward meeting goal and reason for major changes or deletions in goal or service.

Goal:  Corey will discuss and come to understand his family history.

Corey is confused about relationships in his family since he was recently told that his brother's father was not his.

Joint casework discussion with mother to help clarify these issues.

---

Goal No. 4 | Objective No.

CCRS CODES
Client Goal
OBJ. | OBJ. | OBJ.
Serv. | Serv. | Serv.

Include services given and client's response to services, client progress toward meeting goal and reason for major changes or deletions in goal or service.

Goal:  Corey will understand his reasons for placement.

Corey believes he was bad and does not fully understand his mother's inability to cope with the many complicated aspects of her life.

Casework after Corey has developed some beginnings of a relationship will help him clarify these issues.

---

Goal No. | Objective No.

CCRS CODES
Client Goal
OBJ. | OBJ. | OBJ.
Serv. | Serv. | Serv.

Include services given and client's response to services, client progress toward meeting goal and reason for major changes or deletions in goal or service.

**J.A.887**

| COMPREHENSIVE SERVICE PLAN FAMILY | CASE NAME Emma Lee Johnson | | LOCAL DISTRICT/AGENCY USE |
|---|---|---|---|
| | COMPLETED BY Gloria Caro | DATE 5/21/82 | |
| ☒ 90 Days  ☒ 6 Months ☐ Change in Program Status | AGENCY/DISTRICT JCCA/PCS | | |

| CCRS CODE | Goal No. | GOAL | ANT. COMP. DATE 10/ |
|---|---|---|---|
| | 1 | Mrs. Johnson will work at making decisions in her relationship with Mr. Kraeg | |

| | OBJECTIVE/CLIENT TASK | | METHOD/SERVICE TASK |
|---|---|---|---|
| CCRS CODE | Obj. No. A | Mrs. Johnson will consider individual treatment to help resolve relationship conflicts. | CCRS CODE — Caseworker will offer referral for individual treatment. |
| CCRS CODE | Obj. No. | | CCRS CODE |
| CCRS CODE | Obj. No. | | CCRS CODE |

| CCRS CODE | Goal No. | GOAL | ANT. COMP. DATE 10/82 |
|---|---|---|---|
| | 2 | Mrs. Johnson will be consistent in her contact with Corey. | |

| | OBJECTIVE/CLIENT TASK | | METHOD/SERVICE TASK |
|---|---|---|---|
| CCRS CODE | Obj. No. A | Mrs. Johnson will plan specific times she can see Corey. | CCRS CODE — Caseworker will help her arrange visits to suit her work schedule. |
| CCRS CODE | Obj. No. B | Mrs. Johnson will be available when Corey visits his grandfather. | CCRS CODE — Casework discussion with mother. |
| CCRS CODE | Obj. No. | | CCRS CODE |

J.A.888

| DSS-3404-F (3/81) NYC **COMPREHENSIVE SERVICE PLAN FAMILY** | CASE NAME Emma Lee Johnson | | LOCAL DISTRICT/AGENCY USE | Pa |
|---|---|---|---|---|
| | COMPLETED BY Gloria Caro | DATE 5/21/82 | | |

| CCRS CODE | Goal No. | GOAL | ANT. COMP. DATE 9/8 |
|---|---|---|---|
| | 3 | Mrs. Johnson will understand importance of having regular contact with Corey. | |

| OBJECTIVE/CLIENT TASK | | | METHOD/SERVICE TASK | |
|---|---|---|---|---|
| CCRS CODE | Goal No. | | CCRS CODE | |
| CCRS CODE | Goal No. | | CCRS CODE | |
| CCRS CODE | Goal No. | | CCRS CODE | |

**DESCRIBE THE FAMILY'S AND CHILD(REN)'S PARTICIPATION IN FORMULATING THE SERVICE PLAN AND, IF APPLICABLE, THE VISITATION PLAN**

Corey and Mrs. Johnson have participated in formulating service plan and visiting in a joint interview.

**AGENCY CONTACT PLAN WITH NATURAL PARENTS.** Include frequency and location of planned interviews.

We shall see Mrs. Johnson at our New York City office.  She states she is working at two jobs and feels home visits in her home would not be feasible.

**CLIENT CONCURRENCE (Optional)**

I understand that all information pertaining to my case, including this Plan for Service developed by my worker and me. is confidential.

I have been informed of the procedures by which I may express and seek remedy for any dissatisfaction, including the opportunity for an Administrative Review and Fair Hearing.

My worker and I will review this Plan for Services on a regular basis to evaluate my progress toward my goal.

I have jointly developed this Plan for Service with my caseworker and understand its content and purpose.
Goals and objective review and formulation of comprehensive service plan for family and child took place at treatment conference in which the unit administrator, psychiatrist, psychologist, child care workers, and school representative participated.

| SIGNATURE OF CLIENT, Parent or Guardian X | DATE | LOCAL DSS/SSC SIGNATURE X | DATE |
|---|---|---|---|
| CASE PLANNER'S SIGNATURE X *Gloria Caro* | DATE 5/24/52 | SUPERVISOR'S SIGNATURE X *Bernard Ford* | DATE |

**J.A.889**

| DSS-3404-C (3/81) NYC **COMPREHENSIVE SERVICE PLAN CHILD** ⬜ 90 Days ☒ 6 Months ⬜ Change in Program Status | CASE NAME Emma Lee Johnson | | | CHILD'S NAME Corey Johnson | Date of Birth ▮ |
|---|---|---|---|---|---|
| | COMPLETED BY Gloria Caro | | DATE 5/21/82 | SSC NUMBER: 4766716-28 | |
| | AGENCY/DISTRICT JCCA/PCS | | | LOCAL DISTRICT/AGENCY USE | |

| CCRS CODE | PERMANENCY GOAL Return to parent. | ANT. COMP. DATE 8/83 |
|---|---|---|

| CCRS CODE | GOAL NO. | GOAL | ANT. COMP. DATE 10/82 |
|---|---|---|---|
| | 1 | Corey will attend school every day and improve academic functioning. | |

| CCRS CODE | OBJ. NO. | OBJECTIVE/CLIENT TASK | CCRS CODE | METHOD/SERVICE TASK |
|---|---|---|---|---|
| | A | Corey will not wander out of class. | | Close monitoring will be maintained between on-grounds school and cottage. |
| | B | Corey will improve reading level. | | Corey reads on 2nd grade level. One-to-one remediation will be provided at our on-grounds school. |
| | | | | |

| CCRS CODE | GOAL NO. | | ANT. COMP. DATE 10/82 |
|---|---|---|---|
| | 2 | Corey will feel safe at Cottage School. | |

| CCRS CODE | OBJ. NO. | OBJECTIVE/CLIENT TASK | CCRS CODE | METHOD/SERVICE TASK |
|---|---|---|---|---|
| | A | Corey will come to understand that he will be cared for. | | Corey has had a very unstable life. Cottage staff will acclimate him to structured routine. |
| | | | | |
| | | | | |

J.A.890

Page 2

| DSS-3404-C (3/81) NYC COMPREHENSIVE SERVICE PLAN CHILD | CASE NAME Emma Lee Johnson | | CHILD'S NAME Corey Johnson | Date of Birth |
| --- | --- | --- | --- | --- |
| | COMPLETED BY Gloria Caro | DATE 5/21/82 | SSC NUMBER: 4766716-28 | |

| CCRS CODE | Goal No. | GOAL | | ANT. COMP. DATE 10/82 |
| --- | --- | --- | --- | --- |
| | 3 | Corey will discuss and understand family relationships. | | |

| | OBJECTIVE/CLIENT TASK | | METHOD/SERVICE TASK |
| --- | --- | --- | --- |

| CCRS CODE | Goal No. | | CCRS CODE | |
| --- | --- | --- | --- | --- |
| | A | Corey will discuss his family. | | Casework sessions with Corey and mother will be directed toward clarifying family relationships. |
| | B | Corey will understand reasons for placement. | | Joint casework sessions with mother and Corey to discuss why he cannot visit or remain at home. |
| | | | | |

DESCRIBE THE FAMILY'S AND CHILD(REN)'S PARTICIPATION IN FORMULATING THE SERVICE PLAN AND, IF APPLICABLE, THE VISITATION PLAN.

Mrs. Johnson and Corey were seen together and to formulate service plan and visiting.

BRIEFLY DESCRIBE ANY COURT INVOLVEMENT in this case and indicate services which are being provided pursuant to a remand or court order.

N/A

For Child in Foster Boarding Home or Agency Operated Boarding Home, DESCRIBE THE AGENCY PLAN OF CONTACT BETWEEN THE CASE-WORKER AND CHILD IN NEXT PERIOD. INCLUDE FREQUENCY AND LOCATION.

Goals and objective review and formulation of comprehensive service plan for family and child took place at treatment conference in which the unit administrator, psychiatrist, psychologist, child care workers, and school representative participated.

CLIENT CONCURRENCE (Optional)

I understand that all information pertaining to my case, including this Plan for Service developed by my worker and me, is confidential.

I have been informed of the procedures by which I may express and seek remedy for any dissatisfaction, including the opportunity for an Administrative Review and Fair Hearing.

My worker and I will review this Plan for Services on a regular basis to evaluate my progress toward my goal.

I have jointly developed this Plan for Service with my caseworker and understand its content and purpose.

| SIGNATURE OF CLIENT, Parent or Guardian | DATE | LOCAL DSS/SSC SIGNATURE | DATE |
| --- | --- | --- | --- |
| X | | X | |
| CASE PLANNER'S SIGNATURE X Gloria Caro | DATE 5/24/82 | SUPERVISOR'S SIGNATURE X Bernell Peek | DATE 5/24/82 |

J.A.891

| DSS-3407-S(3/81)NYC | CASE NAME | | LOCAL DISTRICT/AGENCY USE |
|---|---|---|---|
| **REASSESSMENT SUMMARY** | Emma Lee Johnson | | |
| | COMPLETED BY<br>Gloria Caro | DATE<br>5/21/82 | |
| | AGENCY/DISTRICT<br>JCCA/PCS | | |

4 / 26 / 82    DATE FAMILY BEGAN TO RECEIVE SERVICES FROM YOUR AGENCY

| Yes | No | |
|---|---|---|
| X | | A. This Reassessment Summary is being completed as part of a Service Plan Review. |

UPDATE changes, that have occurred since the last assessment summary, by answering each checklist item. The items on the checklist correspond to sections 1 through 8 of this form.

| Yes | No | |
|---|---|---|
| ☐ | ☒ | Has there been a change in the level of risk to the child if he/she returns home or remains at home? (If yes complete question 1.) |
| ☐ | ☒ | Has there been a change in the family's ability to benefit from the provision of preventive services? (If yes complete question 2.) |
| ☐ | ☒ | Has there been a change in service needs? ( If yes complete question 3.) |
| ☐ | ☒ | Has there been a change in program choice? (If yes complete Sect. B & questions 1 - 8.) |
| ☐ | ☒ | Has there been a change in the factors justifying placement and or preventive services? (If yes complete question 5. |
| ☒ | ☐ | Has there been a change in the child's location? (If yes complete question 6. |
| ☐ | ☒ | Has this child been transferred to a more restrictive placement? (If yes complete Sect. B & questions 1 - 8.) |
| ☐ | ☐ | Has this child been in placement for 18 months or more and his/her permanency goal is return to home? (If yes complete question 8.) |

| Yes | No | |
|---|---|---|
| | | B. This Reassessment Summary is being completed as the result of a PROGRAM STATUS change and requires the completion of the checklist below. For any change indicated in Section B, complete sections 1 through 8 of this form. |

☐ Case Closing                                  ☐ Change in Permanency Goal

☐ Change in Level of Foster Care

☒ Change in Program choice

- Preventive Non-mandated
- Preventive Mandated
- Placement/Preventive Mandated
- Placement/Preventive Non-mandated
- Placement
- Child Protective Non-placement

☒ Movement Between Agencies or District   Transfer from PDC to PCS.

1. CONSIDERING IDENTIFIED PROBLEMS AND ASSETS; EVALUATE THE RISK TO THE CHILD IF SHE/HE RETURNS HOME, OR REMAINS AT HOME. Evaluate the areas of parental functioning or child's behavior which limit the family's ability to provide a safe and supportive environment for the child. According to mother, Mr. Kraeger, with whom she lives, is a violent, drug addicted man. Corey is at risk were he to return home. Mother feels unable to extricate or change the quality of her relationship at this time.

2. ASSESS THE FAMILY'S ABILITY TO BENEFIT FROM THE PROVISION OF FAMILY SUPPORT SERVICES AND TO MAINTAIN THE CHILD IN THE HOME. Support services at this time would not lessen risk to child. Child needs closely structured setting with on-grounds school to assure school attendance.

J.A.892

**DSS-3407-S**(3/81) NYC

**REASSESSMENT SUMMARY**

Pa

| CASE NAME Emma Lee Johnson | | | LOCAL DISTRICT/AGENCY USE |
|---|---|---|---|
| COMPLETED BY Gloria Caro | | DATE 5/21/82 | |

**3. Complete the following service needs information:**

| A. NAME OF PERSON(S) NEEDING SERVICE | B. CCRS CODE | SERVICE NEEDS | C. CCRS CODE | AVAILABLE/ ACCEPTED* | D. PRIMARY/SECONDARY SERVICE NEED CCI COI |
|---|---|---|---|---|---|
| Corey Johnson | 12 | Special Ed | C | Provided | |
| | 11 | Ed. Testing | C | Provided | |
| | 9 | Remedial Ed | C | Provided | |
| | 14 | Recreation | C | Provided | |
| | 24 | Medical/Dental | C | Provided | |
| | 30 | Casework Counseling | C | Provided | |
| | 29 | Psych/Psychological | C | Provided | |
| | 42 | Institution | C | Provided | |
| Mrs. Johnson | 30 | Casework Counseling | C | Provided | |
| Corey | | Family Planning | | Planned | |
| | | | | | |
| | | | | | |
| | | | | | |

\* **A. NOT AVAILABLE** - The required service is currently not being delivered to other clients in your service community.
**B. REFUSED** - the client has not agreed to participate in the needed service.
**C. PLANNED** - provision of the needed service is being planned; specific arrangements are being made or services are currently being provided.
**D. PLANNED, AWAITING OPENING** - the needed service is available, but currently there are no openings for this client.

| 4. Based on the assessment of Problems, Assets and Service Needs, indicate which of the following Program Choices is most appropriate for the child- (ren) in this case. | Program Choice CCRS code | NAME OF CHILD IN NEED OF SERVICE |
|---|---|---|
| | E | Corey Johnson |
| A. PREVENTIVE SERVICES (non-mandated): Preventive Services are needed by this child and family. In their absence out-of-home placement would NOT be necessary within the next 60 days. Placement may be necessary for the child in the future. | | |
| B. PREVENTIVE SERVICES (mandated): Preventive Services are needed by this child and family. In their absence out-of-home placement would be necessary for the child within the next 60 days. | | |
| C. PLACEMENT/PREVENTIVE (mandated): This child is currently in placement. The provision of preventive services will enable him or her to return home within the next 90 days. | | |
| D. PLACEMENT/PREVENTIVE (non-mandated): This child is currently in placement. Preventive Services are also needed. However, these services will NOT enable the client to return home within the next 90 days. | | |
| E. PLACEMENT SERVICES: Out-of-home placement is needed for this child within the next 60 days. Also include children surrendered for adoption. | | |
| F. CHILD PROTECTIVE SERVICES (non-placement): Community based services are needed which are not preventive in nature. | | |

J.A.893

DSS-3407-S(3/81) NYC

| REASSESSMENT SUMMARY | CASE NAME Emma Lee Johnson | | LOCAL DISTRICT/AGENCY USE |
|---|---|---|---|
| | COMPLETED BY Gloria Caro | DATE 5/21/82 | |

5. For each child whose program choice is Preventive Services (mandated), Placement/Preventive (non-mandated or mandated) or Placement S (see question 4, B,C,D and E) check the factors which describe the reason(s) why placement services and/or preventive services are needed.

**CHILD'S NAME**

1. Corey Johnson
2. Robert Johnson
3.
4.

**FACTORS**

Check all that apply.

| (✔) | (✔) | (✔) | (✔) | |
|---|---|---|---|---|
| X | X | | | A. Caretaker expresses unwillingness to maintain the child in the home. |
| | | | | B. Parent(s) have voluntarily surrendered the child for adoption. |
| | | | | C. Child has been adjudged neglected in a Family Court proceeding. |
| | | | | D. Child has been adjudged abused in a Family Court proceeding. |
| | | | | E. Alleged abuse or neglect by parent or caretaker, in the caseworker's judgement, places the child imminent danger of serious physical or emotional harm. |
| | | | | F. Child has been placed in the custody of the Commissioner of Social Services under Article 7 or 10 of Family Court Act and foster care placement has been recommended or ordered by the court. |
| | | | | G. Parents or caretakers are unavailable due to arrest, detainment, imprisonment, or other situations volving the law. |
| | | | | H. Parents or caretakers are temporarily unable to maintain the child at home due to a housing or financ emergency, acute physical illness, or other emergency situation. |
| | | | | I. Parents or caretakers are incapable of providing proper care due to chronic or permanent conditio such as diagnosed mental illness, diagnosed developmental disability, alcohol or drug abuse, physic disability or illness or other comparable condition. |
| | | | | J. Continuous, serious conflict between parent and child. |
| | | | | K. Parents are dead or missing. |
| | X | | | L. Child's behavior presents a serious danger to other people or to the child's own well being. |
| | | | | M. Child's behavior results in damage to property or a criminal act related to property. |
| | | | | N. Child's behavior, although not dangerous, results in severe management problems and constant disrup tion of group activities in at least two of the following three settings: home, school, and community. |
| X | | | | O. Child's behavior caused by a serious emotional, physical or development disability is characterized by severe deficits in adaptive behavior. |
| | | | | P. Other, describe: |

(use additional sheets as needed)

DSS-3407-S(3/81) NYC

| REASSESSMENT SUMMARY | CASE NAME Emma Lee Johnson | | LOCAL DISTRICT/AGENCY USE |
|---|---|---|---|
| | COMPLETED BY Gloria Caro | DATE 5/21/82 | |

**6A. IF INITIAL OR SUBSEQUENT PLACEMENT IS OUT OF PARENTS' COUNTY/BOROUGH OR RESIDENCE, EXPLAIN REASON.**

Appropriate placement not available in home borough.

**B. IF INITIAL OR SUBSEQUENT PLACEMENT DOES NOT MEET THE PARENT(S)' EXPRESSED RELIGIOUS PREFERENCE, PLEASE EXPLAIN.**

Religious instruction in Corey's faith is being provided.

**C. IF THE CHILD'S PHYSICAL LOCATION HAS CHANGED SINCE LAST REVIEW, EXPLAIN EACH CHANGE.**

**7. IF THE CHILD HAS BEEN TRANSFERRED TO A MORE RESTRICTIVE PLACEMENT,** state why previous placement could not be continued with additional services.

Child has been transferred from Diagnostic Unit to regular part of our institution.

**8. Answer question 8 for all children whose PERMANENCY GOAL IS DISCHARGE TO PARENT(S) OR GUARDIAN(S) AND WHO HAVE BEEN IN PLACEMENT 18 MONTHS OR MORE.**

A. Is discharge planned within the next 6 months?     ☐ Yes     ☐ No

B. If **No**, what specific barriers prevent this course of action, and explain what alternatives to the original Comprehensive Service Plan are being considered, or have been tried to achieve discharge to parent(s) or legal guardian(s).

| CASE PLANNER'S SIGNATURE | DATE | LOCAL DSS/SSC SIGNATURE | DATE |
|---|---|---|---|
| x Gloria Caro | | X | |
| | | SUPERVISOR'S SIGNATURE X Bernice Jack | DATE 5/24/82 |

J.A.895

# EXHIBIT 43

J.A.896

PLEASANTVILLE COTTAGE SCHOOL

Name of Child:   COREY JOHNSON          Date of Conference:  6/9/82
█████████████████████                   Worker:  Gloria Caro

Adm. to PDC:     2/1/82
Adm. to PCS:     4/26/82

### INITIAL CONFERENCE, CURRENT ASSESSMENT AND TRANSFER SUMMARY

CONFERENCE PARTICIPANTS:

Walter Coords, A. Collegian, both cottage parents, teacher Ms. Judy
Moss, Psychiatrist Dr. Elizabeth Clemmens, Psychologist Dr. Ken
Barish, Assistant Director Ms. Bernice Falk, Unit Administrator
J. Lefkowitz and Social Worker Gloria Caro.

Mrs. Johnson was invited to the conference but did not attend.
Please see Social History and Assessment done at PDC for background.

In brief, Corey Johnson, age 13½, came to PCS about three months ago
from PDC on a direct referral from SSC. He had been truant from
public school from September, 1981. He was suspended from Catholic
school in January of 1980 because of fighting and being disruptive
in class. At home, according to his mother, he stole things such as
money and broke her other son's toys.

Corey's developmental history included stuttering until age five
and encopesis from age eight to twelve. He had been left back in
school in the third and fourth grade. In 1980 he was placed in a
committee of a handicapped class. He had never progressed beyond
second grade reading level. His mother states that he has had
school problems and behavioral problems since first grade. Corey
has a low average I.Q. of 88 and with wide test scatter. Psychi-
atrically he was seen as a depressed youngster with soft neurological
signs, who was reacting to the family's chaotic situation and to his
mother's unavailability. He was felt by PDC to have had a capacity
to relate.

FAMILY BACKGROUND:

Corey is the older of two children of Mrs. Johnson. Corey's brother
Robert is 2½ years younger and is now placed at Childrens Village.
Mrs. Johnson states that she herself comes from a troubled family. Sh
became pregnant when she was 17. Her mother cared for Corey until
he was 2½ when she began living with Mr. Butler, the father
of her younger child. Corey lived, up to the age of 6, with Mrs.
Johnson and Mr. Butler until their separation at that time. Early
last year, after believing that Mr. Butler was his father, Corey
met his father for the first time. He had just come out of jail.
For the past four years Mrs. Johnson and her two children have lived
with Mr. Crager, a drug addicted man. She states that she has been

J.A.897

Corey Johnson                                                                    -2-

trying to extricate herself from this union. She has described the
home and the relationship as being exceedingly difficult. The boys
are highly combative and were unmanageable. She felt that they did
not get along. Corey's brother Robert was engaging in dangerous
behavior and had to be hospitalized at PI and was subsequently placed
at Childrens Village. At PDC Corey was seen as an immature, but easy
child to manage. He was amiable and looking for nurturance and
guidance from the staff. He was frequently isolated from the other
children.

Mrs. Johnson was seen by the PDC social worker as a depressed woman
who was trying to put her own life together. She was regular in
her visits at PDC and only once disappointed Corey. It was the
feeling that she wished to have Corey placed after having placed
Robert and was active in facilitating this plan.

ADJUSTMENT TO PLACEMENT:

  Cottage Report:

Corey is seen as a likeable, well mannered boy, open to staff
direction. He frequently asks for a lot of physical contact. His
self care is good. He is neat and clean. There has been no evidence
of bed wetting. He does not appear ready to engage with other childre
but participates in group activities.

  School Report - Mrs. Moss - 7th Grade:

Corey's school adjustment has been problematic. He often wandered
from class, could not sit or pay attention. He seemed to Mrs. Moss
to be like a frightened animal who wandered because he was scared
and anxious. Mrs. Moss used many techniques to make him feel more
comfortable. She does not believe that he can function in a public
school. She felt that he required protection from the other youngster
in the class who frequently scapegoated him. He requires constantly
focusing in class. When he perceives failure, which is very quick
when he tries something, his tendency is to want to flee. His readin(
level is not quite up to second grade. He has some sight words and
those words he frequently uses. In his speech he uses words out of
context. He does not seem to get the idea of phonics. At 13, he
is a severely educationally impaired youngster.

PSYCHOLOGICAL EVALUATION:

Dr. Barish confirmed that Corey has a significant organic component,
the wide tests scatter and his ability to relate would make you feel
hopeful about his prognosis. He impressed the test examiner as am-
bitious and he felt that he would respond best to a one-to-one teachi.
situation. It was felt important to start remediation for him.

J.A.898

Corey Johnson                                              -3-

TREATMENT:

   Child:

Corey resisted individual appointments and needs to be found each time
When he enters my office he exhibits high anxiety and does not make
contact and frequently asks to leave.  His speech is slow and slurred.
He appears preoccupied and depressed, communicating a hopelessness abo·
himself.  His grooming is very good and that appears to be hopeful sig:
He responds to recognition of this and seems proud that he can look ni·

Corey has cancelled a number of home visits, telling me he does not
want to go "ever".  He had difficulty telling me just why he did not
   visit.  Of his mother he says "she doesn't care about me".  This
is said quite blandly and without coaxing a bit.  He will tell of
his mother's frenetic schedule and that he has to go to a lot of place
where he doesn't want to be.  The person he cares about most is not
his mother but his grandfather with whom he lived for a period of time
He says he likes being next to his grandfather.  He likes being with
Robert's father.  He said that Robert gets first choice because it
it his father, but Corey wants to be liked by Mr. Butler as well
and feels that his grandfather is too busy right now but that Mr.
Butler may be able to pay more attention to him.

He describes the relationship between himself and his brother as
problematic.  He says it's "the worst".  He tries to control him
and he fights with him and he says that his brother always gets
his way more than he does.

Every once in a while Corey's statements are disjointed, not
psychotic in flavor, but nevertheless peculiar.  On questioning,
he tries to correct for it.  It is just as though it didn't come
out straight.

Corey impresses as an organically impaired, highly anxious, almost
schizoid youngster who still wants to relate.  He is frightened
and expects to be rebuffed.  He will need a good deal of experience
and contact before he will be ready to engage.  He does not cut off
from the possibility of a relationship and this appears to be very

hopeful.

   Family:

I have met with Mrs. Johnson four times and made a home visit on
6/14/82. She resisted each contact but has tuned into my saying
we will not be able to adequately treat Corey if she is not
available.  In fact without contact would move to determine
whether she can be a responsible caring mother on his behalf.

J.A.899

Corey Johnson                                              -4-

Her contacts since have been far more regular.

Mrs. Johnson is an attractive, sylishly dressed woman who
works for the Ann Klein clothing manufacturing as a reception-
ist.  She is an articulate woman who reacted to my statement
with anger, indicating she is trying to put her "life together".
She says right now she does not have too much energy or time
for her kids.  She believes they will have to understand it.
She is in debt - she now works three jobs - as receptionist,
night telephone operator and on weekends in a flea market.

Although she shares the details of her life, she allows for
little emotional impact or expression.  The message is if her
kids can live her life right now, okay - if not, she can't see
them.  She says she loves her kids but putting her life together
comes first.

A joint interview with Corey elicited almost no comment from
Corey who stared at the ceiling while his mother pretty much
lectured him on how insensitive he was to "where I am now and
have to be".

It is difficult to see how Mrs.Johnson can be engaged unless her
needs are seen as primary.  She refuses referral for treatment
for herself.  Further contact will reveal how fixed she is in
this narcisstic, self-focused stand.  This is different than
she was seen by the worker in PDC, where she was seen as a
depressed, overwhelmed woman who was responsive and caring
on behalf of her children.

CONTACT WITH CHILDREN'S VILLAGE WORKER:

I contacted Mrs. Oxley, Robert's social worker at Children's
Village.  She revealed that she has met with Mrs. Johnson
twice since Robert's placement.  Mrs. Johnson will talk with
her only on the telephone in arranging visits to Robert's
father.  They have had more contact with Robert's father with
whom Robert visits every other weekend.  Recently the father's
telephone has been disconnected.  Robert has been visiting his
mother.  Mrs. Oxley speculates that Robert's regular visits
were too much for Mr. Butler.  Mrs. Johnson said she expected
that regular visits would lead to Robert living with his father.

Robert is described by Mrs. Oxley much like Corey.  He separated
easily from his mother and appears to be thriving in placement.
Mrs. Oxley shares our concern that Mrs. Johnson seems to have
little interest in accomodating her children at this point.
It will be important to determine whether she can be more actively
involved on her children's behalf.

PSYCHODYNAMIC EVALUATION:

Corey is a 13½ year old organically impaired boy who has had a
chaotic life with many shifts in caretakers.  His dependency
needs were poorly met by a mother who has been periodically

J.A.900

Corey Johnson                                                                -5-

unavailable and was striving to put her own life in order.
Corey's compliance and acting out appears to be in response
to having little attention and being inadequately cared for.
Corey's organic deficits along with his emotional problems
have interferred with optimum learning and he is severely
impaired in this area.  His frustration and expectation of
failure cause him to wander and withdraw from the stress of
anxiety.  He is a poorly defended, highly anxious youngster
who at this time could not utilize a community school and
requires the structure and facilities  of a residential
treatment center.  Corey's mother's ability to provide for
Corey will have to be monitored closely after a consistant
effort has been made to involve her in planning and treatment
on Corey's behalf.

TRANSFER:

Corey will be transferred to a new worker by the end of
August due to reorganization in the unit.  Corey will require
consistant outreach since he already experienced a shift
from diagnostic to a new worker.  Mrs. Johnson's contact
with Corey will also require considerable imput to put her
more realistically in touch with her responsibilities and
commitment in planning and providing for Corey.

                                              Gloria Caro
                                              Caseworker

J.A.901

# EXHIBIT 44

J.A.902

PLEASANTVILLE COTTAGE SCHOOL

## CURRENT ASSESSMENT

Name of Child:  COREY JOHNSON                Date of Admission: 4/26/82
Date of Birth:  ████████  Age:              Date of Assessment: 1/31/83
School Grade:   8th                          Date of Conference: 1/12/83

### CHILD:

Child care workers note that Corey's behavior deteriorates when he
has no contact with his mother.  He can also become quite depressed
when he has not heard from or seen her for a period of time.  It is
the opinion of his child care workers that Pleasantville is good for
him and that he is functioning fairly well here.  Corey realizes
his learning disabilities, however, he struggles to do his homework.
He is truly motivated to do well and to succeed and has not yet
given up on himself.  Corey presents with no real behavior problems.
Within the last two weeks there has been some decline.  Corey fan-
tasizes that his mother will come up in a car and take him to Pizza
Hut.  Child care worker reports that Corey's mood basically is not
that of a depressed child.

Mr. Greenstone reports that Corey's progress in his class has been
very, very, very slow almost to the point where one might feel that
he is not learning.  He received remedial reading two to three times
per week, however, Corey's reading and spelling is on a 2nd grade
level, math is on a 3rd grade level.  Mr. Greenstone states that
Corey can understand on an 8th grade level but he cannot read it.
B.O.C.E.S. is being considered as a possibility for this child.

### Response to Treatment:

Corey resists individual appointments.  There is no eye contact.  He
appears depressed and hopeless about his situation.  He longs for
his mother and acts out his realization that in fact his mother is
emotionally unavailable to him.  However, he denies his feelings
when confronted directly.  He also struggles to involve his father
who also does not come through for him.  Sundays can be very diffi-
cult for Corey because he usually does not have visitors.  This
worker will consider seeing Corey in a group.

Ms. Johnson keeps regular appointments in the New York City Office
with this worker.  She is seen jointly with Corey.  Focus has been
around Corey's need to see her and Corey's need to have her involved.
She gives clear messages in joint sessions that she is in the process
of getting her life together and that she really is not emotionally
available.  She is preoccupied with her own situation, her own financia
struggle, is trying to get an additional job which will make her even
more unavailable to Corey.  She expresses concern about his welfare
and wishes him well but is not willing to become more active on his
part at this time.

Corey is not on any medication at this time.

J.A.903

Corey Johnson                                                    -2-

### Psychological:

Psychologist reports that Corey has a poor memory, that he also has visual problems and language problem and has conflicting dependency needs.  In attempting to get a better understanding of Corey's learning difficulties, recommendations have been made that 1) psychologist will exam Corey's reading and writing, 2) clarify his deficits, 3) offer recommendations for teaching, 4) meet with Mr. Kosha.

### Speech Therapy:

This worker has made a referral to the speech therapist for Corey. He was seen once for an evaluation.  Followup reveals that Corey is on the waiting list but she is not able to see him at the present time.

### Mother's Concerns:

Ms. Johnson presents that she wonders where Corey will go from here if he does not reach his grade level.  She expresses a great deal of concern around his difficulty learning and wonders about the possibility of vocational training for him.  She sees changes in Corey. She feels that he is more verbal and truly a pleasure to be around. He presents with no problems at home, however, earlier on Corey lied, stole and stayed out late.

Corey states that after he leaves Pleasantville he would like to go to a group home.  He would like to stay at Pleasantville Cottage School for another year and would like to get his head straight for his mother Corey feels that he and his brother get along better now.

### PSYCHODYNAMIC EVALUATION:

Corey is a well related depressed, anxious, severely learning disabled boy who has experienced his mother's rejection and emotional unavailability.  Ms. Johnson is an upwardly mobile intelligent and articulate woman who was self-involved and who struggles to get her life in order. She has not provided him with the care he needed in early years and is not able to provide him with the attention he so badly craves for.
    Gayle Turnquest:ww  D-1/31/83    T-2/9/83


                                        Gayle Turnquest
                                        Caseworker

J.A.904

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **Case No. 3:92CR68 (DJN)** |
| | : | **CAPITAL CASE** |
| **COREY JOHNSON,** | : | **Execution Scheduled for** |
| | : | **January 14, 2021** |
| Defendant. | : | |

**NOTICE OF SUBMISSION OF EXHIBITS (SUBMISSION 5 OF 8)**

Corey Johnson hereby gives notice of the submission of Exhibits 45-54 as attachments to

his Motion Pursuant to 28 U.S.C. § 2255 Raising Claim of Ineligibility To Be Executed Under

18 U.S.C. § 3596(c). This is the fifth submission of eight.


Dated: December 14, 2020                Respectfully submitted,

                                        /s/ David E. Carney
                                        David E. Carney, VA Bar #: 43914
                                        Donald P. Salzman (Admitted Pro Hac Vice)
                                        Skadden, Arps, Slate, Meagher & Flom, LLP
                                        1440 New York Avenue, NW
                                        Washington, DC 20005
                                        Telephone: (202) 371-7246
                                        Fax: (202) 661-8295
                                        Email: david.carney@skadden.com

                                        *Counsel for Corey Johnson*

**J.A.905**

## CERTIFICATE OF SERVICE

I hereby certify that on December 14, 2020, I electronically filed the foregoing with the

Clerk of Court using the CM/ECF system, which will then send notification of such filing to all

parties and counsel included on the Court's Electronic Mail notice list.


/s/ David E. Carney
David E. Carney, VA Bar #: 43914
Skadden, Arps, Slate, Meagher & Flom, LLP
1440 New York Avenue, NW
Washington, DC 20005
Telephone: (202) 371-7246
Fax: (202) 661-8295
Email: david.carney@skadden.com

**J.A.906**

## INDEX OF EXHIBITS TO MOTION PURSUANT TO 28 U.S.C. § 2255 RAISING CLAIM OF INELIGIBILITY TO BE EXECUTED UNDER 18 U.S.C. § 3596(c)

EXHIBIT NO.

**SUBMISSION 1**

**EXPERT REPORTS**

Report of Daniel J. Reschly, Ph.D., Aug. 26, 2016 ........................................................................1

Curriculum Vitae of Daniel J. Reschly, Ph.D., May 15, 2020 ................................................... 1(a)

Report of J. Gregory Olley, Ph.D., Aug. 24, 2016 ........................................................................2

Curriculum Vitae of J. Gregory Olley, Ph.D., Oct. 2020 ........................................................ 2(a)

Letter from Gary N. Siperstein, Ph.D. to Counsel for Corey Johnson, Dec. 16, 2016 ....................3

Curriculum Vitae of Gary N. Siperstein, Ph.D., Sept. 2020 .................................................... 3(a)

Debra Nelson, Mitigation Report, Sept. 27, 2016 ........................................................................4

Report of Richard G. Dudley, Jr., M.D., Aug. 22, 2016 ...............................................................5

**TRIAL TRANSCRIPTS**

Trial Tr., Feb. 3, 1993 ..................................................................................................................6

**SUBMISSION 2**

Trial Tr., Feb. 10, 1993 ................................................................................................................7

**SUBMISSION 3**

Cornell Mitigation Information and Report (Excerpt) ...................................................................8

Trial Tr., Feb. 12, 1993 ................................................................................................................9

Trial Tr., Feb. 15, 1993 ..............................................................................................................10

**AFFIDAVITS & DECLARATIONS**

Declaration of Kenneth Barish, Ph.D. (staff psychologist at Pleasantville Cottage School), July 22, 2014 ..............................................................................................................11

Affidavit of Richard Benedict (special education teacher at Pleasantville Cottage School), Dec. 5, 2011 ..............................................................................................................12

Affidavit of Darnell Brown (acquaintance in Trenton, NJ), Oct. 14, 2011 .................................13

Affidavit of Darold Brown (acquaintance in Trenton, NJ), June 15, 2011 .................................14

Affidavit of Craig S. Cooley (appointed counsel in 1992), Sept. 20, 2016 .................................15

Affidavit of Courtney Daniels (Corey's lifelong friend), May 21, 2011 .....................................16

Declaration of Monica Dawkins (Corey's former girlfriend), July 16, 2012 ..............................17

**SUBMISSION 4**

Declaration of Cary Gallaudet, Ph.D. (psychologist at Pleasantville Diagnostic Center), Mar. 19, 2012 ..............................................................................................................18

**J.A.907**

**EXHIBIT NO.**

Declaration of Ann Harding (staff member at Pleasantville Cottage School), Nov. 21, 2011.......................................................................................................................19

Affidavit of Minnie Hodges (Corey's maternal aunt), Apr. 30, 2011 ..........................20

Affidavit of Priscilla Hodges (Corey's cousin), Apr. 30, 2011 .....................................21

Affidavit of Queenie Hodges (Corey's cousin), Apr. 30, 2011 .....................................22

Declaration of Esther Johnson (Corey's maternal grandmother), Apr. 30, 2011 ..........23

Affidavit of Robert Johnson (Corey's half-brother), June 29, 2011...............................24

Affidavit of Antionette Daniels Joseph (the best friend of Corey's mother and Corey's godmother), May 21, 2011) ...................................................................................25

Declaration of Leona Klerer (reading teacher at Mount Pleasant Cottage School), June 3, 2011 ............................................................................................................26

Affidavit of Gerald Lefkowitz (unit administrator at Pleasantville Cottage Center), Dec. 5, 2011 .........................................................................................................27

Affidavit of Odette Noble (social worker at Elmhurst), Dec. 1, 2011 ..........................28

Declaration of George Sakheim, Ph.D. (Chief of Psychological Services at Pleasantville Diagnostic Center), June 17, 2011 ....................................................29

Affidavit of David Washington (childcare worker at Elmhurst), Mar. 1, 2012..............30

**SUBMISSION 5**

**CHILDHOOD & TESTING RECORDS**

Gregory Judge, School Social Worker, Social History, Mar. 4, 1977..........................31

Cheryl Spillane, Learning Consultant, Bureau of Pupil Personnel Services, Jersey City Public Schools, Learning Consultant Evaluation to Child Study Team, Mar. 18, 1977.................................................................................................................32

F.A. Figurelli, M.D., Chief Psychologist, Psychological Examination Record, Mar. 25, 1977.................................................................................................................33

Eleanor Glantz, Social Worker, Case Service, Dec. 11, 1978 ......................................34

Committee on the Handicapped, Referral to the Committee on the Handicapped, Feb. 26, 1979.................................................................................................................35

Committee on the Handicapped Records, May 21, 1979 ..............................................36

Washington Heights-West Harlem Community Mental Health Center, Child Assessment Evaluation Summary, Dec. 9, 1981 ...................................................37

Ernest H. Adams, Staff Psychologist, Psychodiagnostic Evaluation, Dec. 11, 1981 ....38

Cary Gallaudet, Psy.D., Pleasantville Cottage School, Psychological Evaluation, Feb. 1, 1982.................................................................................................................39

**J.A.908**

**EXHIBIT NO.**

Leona Klerer, Mount Pleasant Cottage School Screening Upon Admission, Feb. 22,
1982 ..................................................................................................................................40

Amira Offer, Caseworker, Psychosocial Summary, Mar. 15, 1982 ...............................41

Gloria Caro, Pleasantville Cottage School, Reassessment Summary, May 21, 1982 ...................42

Gloria Caro, Caseworker, Initial Conference, Current Assessment and Transfer
Summary, June 9, 1982 ...................................................................................................43

Gayle Turnquest, Caseworker, Pleasantville Cottage School, Current Assessment,
Jan. 31, 1983 ..................................................................................................................44

**SUBMISSION 6**

Ken Barish, Ph.D., Psychologist, Pleasantville Cottage School, Psychological and
Educational Evaluation, Apr. 29, 1983 .........................................................................45

John B. Stadler, M.D., Clinical Director, Pleasantville Cottage School, Psychiatric
Evaluation, Aug. 26, 1983 .............................................................................................46

Lynda Coccaro, Speech and Language Pathologist, Donald R. Reed Speech Center,
Inc., Phelps Memorial Hospital, Speech and Language Evaluation, Oct. 5, 1983 ...................47

Lynn Polstein, Jewish Child Care Association of New York, Pleasantville Cottage
School, Change in Permanency Plan, Apr. 13, 1984 .....................................................48

Gerard Maier, Social Worker, Current Assessment, Sept. 4, 1984 ...............................49

Christine Aaron, MSW Intern, Jewish Child Care Association of New York,
Pleasantville Cottage School, Visitation Plan, Dec. 12, 1984 ......................................50

Kenneth Barish, Ph.D., Psychologist, Pleasantville Cottage School Psychological
Evaluation, Apr. 15, 1985 .............................................................................................51

Gerard Maier, Pleasantville Cottage School, Discharge/Transfer Plan, May 28, 1985 ................52

Board of Education of the City of New York, Individualized Education Plan – Phase
1, July 1, 1985 ................................................................................................................53

Odette Noble, Social Worker, Jewish Child Care Association of New York, Elmhurst
Boys Residence, UCR Reassessment and Service Plan Review 6 Month, Nov. 21,
1985 ................................................................................................................................54

**SUBMISSION 7**

Odette Noble, Social Worker, Jewish Child Care Association of New York, Elmhurst
Boys Residence, UCR Reassessment and Service Plan Review 6 Month, June 28,
1986 ................................................................................................................................55

Odette Noble, Social Worker, Jewish Child Care Association of New York, Elmhurst
Boys Residence, UCR Plan Amendment: Form D Trial Discharge, Feb. 23, 1987 ...............56

Newtown High School, Scholastic Transfer Record, Dec. 7, 1987 ...............................57

**J.A.909**

EXHIBIT NO.

Janet Valentine, Child Care Worker, Pleasantville Diagnostic Center, Outline for
Cottage Report (undated) ...........................................................................................58

**COURT RECORDS**

Notice of the Intention of U.S.A. to Seek Death Penalty as to Mr. Tipton, May 1,
1992............................................................................................................................59

Notice of the Intention of U.S.A. to Seek Death Penalty as to Mr. Roane, May 1, 1992.............60

Second Superseding Indictment, July 20, 1992, Dkt. 115 .............................................61

Notice of the Intention of U.S.A. to Seek Death Penalty as to Mr. Thomas, Oct. 28,
1992............................................................................................................................62

Verdict Form, Feb. 3, 1993, Dkt. 466...........................................................................63

Notice of the Intention of U.S.A. to Seek Death Penalty as to Mr. Johnson, Feb. 8,
1993............................................................................................................................64

Special Findings, Feb. 16, 1993, Dkt. 508.....................................................................65

Motion to Have Defendant Declared Mentally Retarded, *United States v. Thomas*,
No. 3:92CR68 (E.D. Va. Apr. 15, 1993) ..................................................................66

Memorandum in Support of Initial Petition for Writ of Habeas Corpus Pursuant to 28
U.S.C. Section 2255, June 15, 1998, Dkt. 714 (Excerpt) .........................................67

Reply Memorandum in Support of Initial Petition for Writ of Habeas Corpus Pursuant
to 28 U.S.C. Section 2255, Mar. 15, 1999, Dkt. 761 (Excerpt)................................68

Ex. 14 to Reply Memorandum in Support of Initial Petition for Writ of Habeas
Corpus Pursuant to 28 U.S.C. Section 2255, Mar. 15, 1999 ....................................69

Ex. 15 to Reply Memorandum in Support of Initial Petition for Writ of Habeas
Corpus Pursuant to 28 U.S.C. Section 2255, Mar. 15, 1999 ....................................70

**SUBMISSION 8**

Petitioners' Joint Motion for Leave to Take Discovery, June 24, 1999, Dkt. 770 ........71

Memorandum Opinion, May 3, 2000, Dkt. 803 ............................................................72

Memorandum Opinion, May 1, 2003, Dkt. 896 ............................................................73

Brief for Appellants Cory Johnson and Richard Tipton at 146, *United States v.
Johnson*, No. 03-13(L), 03-26, 03-27 (4th Cir. Feb. 17, 2004) (Excerpt) ..............74

**SUBMISSION 9**

**DIAGNOSTIC MATERIALS**

American Association on Intellectual and Developmental Disabilities Definition
Manual ("AAIDD-11") (Excerpt).............................................................................75

AAIDD User Guide to 11th Edition (Excerpt) ..............................................................76

Diagnostic and Statistical Manual of Mental Disorders ("DSM-5") (Excerpt)............77

**J.A.910**

**EXHIBIT NO.**

**CONGRESSIONAL RECORDS**

134 Cong. Rec. 22,926 (1988) (Excerpt)...................................................................................78

136 Cong. Rec. S6873 (daily ed. May 24, 1990) (Excerpt)..........................................................79

**J.A.911**

# EXHIBIT 45

## PLEASANTVILLE COTTAGE SCHOOL

Name of Child:  COREY JOHNSON                    Date of Testing: 3/83
Date of Birth:  ▮▮▮▮▮▮▮▮                        By:   Ken Barish, Ph.D.
Date of (PCS) Adm:                              Social Worker: Gayle Turnquest

### PSYCHOLOGICAL AND EDUCATIONAL EVALUATION

Referral:

Corey was evaluated at Pleasantville Diagnostic Center in February
1982.  At that time Corey achieved a Full Scale I.Q. of 88, with a
Verbal I.Q. of 85 and a Performance I.Q. of 93.  Indications of
diffuse neurological dysfunction were evident as well as very strong
depressive tendencies and an emphasis on denial as a defense.  Corey
remained ambitious, however, with a strong conscience and capacity
for empathy.

In conference it was reported by Corey's teacher that his academic
skills are very poor.  This evaluation was requested to provide addi-
tional clarification of the nature and extent of Corey's learning
difficulties and to make recommendations for remedial strategies.

Tests Administered:

>           Wide Range Achievement Test
>           Neuropsychological Screening Tasks
>           Bender-Gestalt
>           Benton Visual Retention Test
>           Spreen-Benton Aphasia Tests
>           Raven's Progressive Matrices
>           Purdue Pegboard
>           Gilmore Oral Reading Test
>           Human Figure Drawings

Observations:

Corey was cooperative throughout the evaluation and demonstrated gener-
ally good frustration tolerance despite the very real difficulty he en-
countered on many of the tasks presented to him.  Corey's willingness
to continue to put forth effort on academic tasks without impulsivity
or withdrawal is an impressive strength, particularly considering the
severity of his learning disabilities.

Test Findings:

The present test findings confirm the presence of severe learning dis-
abilities in reading, spelling and arithmetic.  There is an abundance
of findings which strongly suggest diffuse neurological dysfunction
with associated impairment in many aspects of cognitive functioning.
Difficulties in attention and concentration are a prominent factor
in Corey's learning difficulties.  In addition, Corey demonstrates
specific language deficits (i.e. speech sound discrimination, phonic
associates, sound blending) and also deficits in visual-spatial
analysis, visual-motor and fine motor coordination and perhaps also
visual memory.  These findings will be discussed below.

J.A.913

Corey Johnson                                                    -2-

On the Wide Range Achievement Test Corey obtained a Reading Score
at the 1st percentile (SS 62), a Spelling Score at the 1st percentile
(SS 64) and an Arithmetic Score at the 2nd percentile (SS 68).  Corey
understands basic arithmetic operations including borrowing and carry-
ing but has difficulty with division and more complex operations.
Some of Corey's errors seem to result from inability to sustain at-
tention on problems, and also from some confusion in the spatial
analysis on arithmetic problems.  With regard to reading, Corey has
a small sight vocabulary but has great difficulty in analyzing words
phonetically.  Reversals were occasionally noted in Corey's naming
of letters and sound sequencing errors were common in his reading.
Attentional errors also appeared to impair Corey's reading.  Corey
can spell only a few simple words.  His ability to read or spell
using a phonetic approach is severely limited, and Corey's attempt
to spell even some simple words (e.g. "arm") are unrecognizable.
Also apparent is some difficulty in the formation of letters and
numbers, perhaps also some difficulty in discriminating letters of
similar shape.

Corey's reproductions of the Bender designs reveals a significant
deficit in visual-motor coordination.  His performance on the Benton
Visual Retention Test strongly suggests a deficit in visual memory
or visual-motor functioning.  A significant problem in visual-spatial
analysis was evident on the Raven's Progressive Matrices.  Attentional
difficulties also contribute to Corey's poor performance on this task.
Corey's performance on the Purdue Pegboard reveals significant prob-
lems also in fine motor coordination.  Corey is right dominant in
hand, foot and eye preference.  Left-right awareness is well establish-
ed on self, but not for mirror rotation; Corey consistently misplaced
right and left on an examiner facing him.  Finger recognition is un-
impaired.  Corey showed no difficulty with tongue and mouth movements.

Several tests of language functions were also administered.  Language
comprehension (Token Test) is unimpaired, except for occasional in-
attention.  Naming of colors, body parts, and common objects was also
unimpaired.  Corey's immediate memory for digits, although improved
over previous testing remains poor.  Mild articulation errors were
noted.

A specific deficit in speech sound discrimination was apparent.  Corey
knows the names of all the letters of the alphabet and the consonant
sounds.  Discrimination of vowel sounds, however, is very poor.  When
asked to say the sounds of different vowels, Corey produced essential-
ly the same sound for each vowel.  When asked to blend sounds into
nonsense words, Corey would blend adequately but often misprounced
the vowel sounds.

Conclusions and Recommendations:

This evaluation confirms the presence of severe learning disabilities
in reading, spelling and arithmetic.  Corey's learning difficulties
result from wide spread cognitive deficits, including problems in

J.A.914

Corey Johnson                                                    -3-

attention and concentration, visual processing, and speech sound dis-
crimination and phonics.  It is probably because of this that Corey
has been unable to find compensations that would enable him to achieve
a higher level of academic skill.  With regard to remediation, it
would appear that a whole word sight vocabulary approach, bypassing
phonics and sound blending would be more productive in improving
Corey's reading and spelling.  Corey and his family should be counsel-
led regarding the nature of his learning difficulties and a school
program with less focus on academic skills should be considered.
        Ken Barish, Ph.D.:ww D-4/11/83      T-4/29/83

                        Ken Barish, Ph.D.
                        Psychologist

J.A.915

# EXHIBIT 46

J.A.916

PLEASANTVILLE COTTAGE SCHOOL

Name of Child:  COREY JOHNSON
Date of Birth: ███████
Date of (PDC) Adm: 2/1/82
Date of (PCS) Adm: 4/26/82

Date of Evaluation: 9/23/83
By:  John B. Stadler, M.D.
Social Worker:  Gayle Turnquest

### PSYCHIATRIC EVALUATION

The family consists of Corey, his mother and his two years younger
half-brother.  About two years ago the mother placed the brother,
and a few months later brought Corey to SSC, which led to his admis-
sion to PDC and PCS.  She said that he had been stealing from her
(and her live-in boyfriend) and he ran away a lot, was truant and in
particular he had a long standing learning problem.  At the present
time, therefore, both boys are in placement and the mother lives
essentially alone.  Corey says she is going to school, studying
business in college.

At the Cottage School Corey has a reputation of being a good boy,
one who stays out of trouble, even though he lives in a cottage
where there is a good deal of trouble.  He does not drink or smoke
pot.  He does not run away.  I have never known him to be suspected
of stealing.  On the other hand his learning disorder is not respond-
ing to any of our teaching methods.  He seems absolutely refractory
to phonics.  His math abilities are a little bit better than his
reading ability (approximately mid-3rd grade compared to approximate-
ly beginning 2nd grade).  Psychological examinations performed by
Dr. Gallaudet in February 1982 and Dr. Barish in March 1983 indicate
a neurologic basis for his learning disorder, but no specific educa-
tional method was suggested.  PDC psychiatrist, Dr. Sundar, also
found evidence of neurologic disease.

Seen today Corey is his usual cooperative self.  He is tall (68 3/4"),
good looking, modest, self-effacing somewhat, and he still has some
remnants of his previous speech defect.

He described in a simple but descriptive way, the adventure of meet-
ing his natural father after almost thirteen years of absence.  Af-
fects would appear to be intact, judging by this experience (and
throughout the interview).  He described the reasons for his place-
ment and his brother's placement, as entirely due to "the stupid
things we do" the stealing, the running away, etc.  When I asked if
there was anthing wrong with the mother, both of whose children were
in placement, he quickly denied it, and attributed everything to the
boys' misbehavior.  The referral material says that for four years
she lived with a drug addicted, abusive man, but Corey does not have
anything to say about this person, who has since moved out of her
life.

He is well oriented, his sense of reality is good, he has a diminished
sense of the future.  Caught in a conflict between a mother who wants
him to go to college and an educational experience which has been a
hundred percent negative, he still says he thinks he should try to
find a job in computers or some other kind of professional work.  How-
ever, this is clearly rather an embarrassing subject for him.

J.A.917

Corey Johnson                                                          -2-

A kinetic family drawing was done in a very light hand.  The people
are drawn as stick figures in the lower left hand corner of the page,
about one-and-a-half inches high.  He drew himself and his mother play-
ing paddle ball, while his brother "is playing with his car."

Diagnosis:

Axis I.      No Diagnosis
             (History of running away and stealing, with Differential
             Diagnosis between Conduct Disorder, Socialized, Non-Aggressive
             and Parent-Child Problem, Severe; however, these are not
             present now.)

Axis II.     Long Standing Developmental Reading and Arithmetic Disorders,
             Severe.

Axis III.    Positive Soft Neurological Signs (and evidence on psychologic
             testing of central neurologic dysfunction, diffuse).

Within the structure of this institution, Corey's behavior is quite
adequate.  He needs very Special Education, and I know of no methods
to suggest to remediate his defects, beyond a great deal of individual
attention and drill.  I leave these questions to experts of Special
Education.  It would seem, however, that with his attitudes, work
skills and behavior, he should be considered for both an on-grounds job
and vocational education at B.O.C.E.S., as soon as possible.
        John B. Stadler, M.D.:ww  D-8/23/83   T-8/26/83

                                        John B. Stadler, M.D.
                                        Clinical Director

J.A.918

# EXHIBIT 47

J.A.919

SPEECH AND LANGUAGE EVALUATION

Johnson, Corey
███████████
Referred by: Pleasantville Cottage School
Problem: Speech-Language Deficits
Clinician: Lynda R. Coccaro
9/14,20,21,10/5/83

### Statement of Problem

Corey Johnson, age 14.11 year old male, was seen at the Donald Reed Speech Center on 9/14, 9/20, 9/21 and 10/5/83 for an evaluation of his speech and language skills.  The child was referred to this Center due to articulation deficits noted by the psychologist at the school.

### Pertinent History

Information on the child's developmental history is limited. It was reported in the psychological evaluation that birth and early developmental history were within normal limits except for enuresis until age 11 and occasional encopresis between ages 8-12.  A dysfluent behavior was reported until age 5 and a slight lisp was still evident.

Corey attends the Pleasantville Cottage School.  Educational history and other pertinent background history can be obtained from his school records.

### Subjective Impressions

Corey presented himself as an alert, friendly and cooperative child.  He maintained an active role and was socially interactive during the entire evaluation.  He freely engaged in conversation and was not fearful to ask questions.

Corey responded to all tasks presented to him and appeared motivated to perform otimally.  Throughout the evaluation, it was observed that Corey reauditorizes information presented to him.  This appears to be a strategy that he utilizes to facilitate his understanding and recall of material.

Speech and language abilities were assessed through standardized and nonstandardized procedures.

### Objective Data
Peripheral Speech Mechanism: An oral peripheral examination was administered.  Structural appearance of the lips, tongue, and mandible were un-

DONALD R. REED SPEECH CENTER, INC.
PHELPS MEMORIAL HOSPITAL
NORTH TARRYTOWN, NEW YORK 10591

J.A.920

Johnson, Corey                    -2-          Speech/Lang. Evaluation

remarkable. Lingual movement in the form of protrusion, elevation and lateralization were adequate for speech. It was observed that Corey occasionally lateralized his lips towards the left side, but it did not interfere with overall intelligibility. Diadochokinetic rate was adequate in isolation, but was labored in rapid succession.

Parameters of voice, namely, rhythm, intonation, intensity and pitch were observed to be adequate.

Auditory Functioning: A pure tone air conduction screening test was performed. Results indicated normal hearing acuity for 250, 500, 1000, 4000 and 8000 Hz bilaterally, but a mild hearing loss at 2000 Hz bilaterally.

Receptive Language: The Peabody Picture Vocabulary Test was administered. Corey achieved a raw score of 102, a receptive vocabulary age of 9.4 years, and a standard score of 69. This places him 5.7 years below his chronological age (C.A.) and significantly below the average range for his C.A.

Performance on the Token Test for Children was marked by self-repetitions and self-corrections which appeared to facilitate his recall and understanding as the linguistic structures became more complex in nature. Corey scored within the average range.

In contrast, performance on the Oral Directions subtest of the Detroit Test of Learning Aptitude (DTLA) were adversely affected by the length, content and linguistic complexity of the auditory stimulus. Corey achieved a raw score of 11.9 years, which is 2.2 years below his C.A. It was evident that a multi-modality approach (ie. visual, auditory, tactile) enhances his performance.

Similarly, the client's performance on the Oral Directions and Spoken Paragraphs subtest of the Clinical Evaluation of Language Functions (CELF) were marked by self-repetitions and longer response latencies as the task required recall of material from a paragraph. Corey indicated that he often has difficulty recalling information from more complex material. Thus, as a multimodality approach was used, it facilitated his comprehension and recall of material. When presented with oral paragraphs without visual input, Corey had significant difficulty and his performance deteriorated. However, as a visual-auditory-kinesthetic approach was employed, his responses were more accurate.

Administration of the Word and Sentence Structure, and Word Classes subtests of the CELF were characterized by longer response latencies and self-repetitions when only an auditory stimulus was used. The use of a visual representation in conjunction with the auditory stimulus improved his responses. Corey scored within the average range for the first subtest, but below the average range for the later subtest.

J.A.921

Johnson, Corey                     -3-              Speech/Lang. Evaluation

Particular difficulty was observed in the comprehension of vocabulary
phrases that dealt with verbal opposites (eg. rough-smooth).

Performance on the Processing Relationships and Ambiguities sub-
test of the CELF revealed a raw score of 53 and is considered within
the average range for his C.A.  Although responses appeared appropriate,
the client exhibited difficulty in comprehending and interpreting idioms,
metaphors, and proverbs.  Examiner repetitions and self-repetitions of
longer phrases was necessary to further facilitate his performance.

In general, Corey was able to follow and engage in conversational
activities.  Receptive performance on varied structured tasks indicated
weaknesses in comprehension as reflected in auditory memory, auditory
processing, and vocabulary.  Reduced attention span during auditory pre-
sentation of material was positively influenced by a multi-modality
approach.

Expressive Language
    Articulation:  Profile-The Goldman-Fristoe Test of Articulation was
administered.  Results indicated speech sound production of single words
to be within normal limits.  A f/th substitution was noted in the medial
position, but is considered characteristic of non-standard English as
opposed to an articulatory weakness.

Administration of the Processing Speech Sounds subtest of the
CELF revealed the ability to auditorily discriminate between words.
However, the nature of the task did not require Corey to verbalize.
It was observed that when he was requested to imitate or repeat an un-
familiar word, he experienced some difficulty in pronunciation.

Conversational Pattern-Spontaneous discourse was intelligible.
Occasional distortions in conversation appeared to be associated with
the child's pronunciation difficulties.

Oral Language: Performance on the Verbal Opposites subtest of the DTLA
revealed an age equivalency of 9.9 years.  This is considered 5.2 years
below his C.A.  Administration of the Likenesses and Differences subtest
of the DTLA indicated an age equivalency of 12.9.  This is considered
2.2 years below his C.A.  Although improvement was noted when Corey had
to describe the items as opposed to providing a single word, he exper-
ienced considerable difficulty in contrasting word pairs.  He often pro-
vided associations with the words, which indicated an understanding,
but had difficulty providing an indepth description of the words.

Performance on the Verbal Absurdities subtest of the DTLA in-
dicated an age equivalency of 10.0 years.  Corey demonstrated significant
difficulty in comprehending and thereby interpreting information pre-
sented through the auditory modality.  During the course of this partic-

J.A.922

Johnson, Corey                    -4-           Speech/Lang. Evaluation

ular task Corey was observed to utilize self-repetitions, oral re-
hearsals, and examiner repetitions to facilitate his responses.

Informal observation of oral expressive language skills in-
dicated that Corey's syntactical pattern is of a non-standard English
characteristic of a black dialect.  Corey was able to sequence his
ideas in an organized manner.  Throughout our discussions, it was
apparent that he occasionally used an inappropriate word.  However,
he was very aware of this behavior.  He was able to appropriately
sequence the days of the week, months and seasons of the year.

## Appraisal

Corey evidences a significant speech and language disorder
of a receptive and expressive nature.  Receptively, Corey demonstrated
significant difficulty in the comprehension and interpretation of aud-
itory/visual material as reflected in memory, processing and vocabulary.
The use of a multimodality approach appeared to enhance his performance.
In addition, Corey was observed to reauditorize and/or orally rehearse
material prior to providing a response as strategies to enhance his
behavior.  Expressively, Corey's language was characterized by non-
standard English, which did not appear to inhibit his verbalizations.
Phonological development appeared intact.  Although Corey was able to
discriminate between sounds, he evidenced a weakness when he had to
synthesize sounds of unfamiliar words and thereby in pronunciation of
these words.  In general, Corey was able to engage in conversation with
the presentation of his ideas in an organized and sequential manner.
However, limitations in lexical usage and the ability to use language
in a more abstract manner (ie. inferences, problem solving, reasoning
skills) inhibited his behavior.

The nature of the language deficits suggests the need for a
structured learning placement that would be amenable to the development
of appropriate language-learning and social emotional skills.  It is
further evident that the speech and language weaknesses can significantly
affect learning and performance within the classroom.  Overall commun-
ication function appears to be amenable to therapeutic intervention.

Diagnostic Impression: Receptive and expressive language disorder.

## Plan

The following recommendations are made:

1. An intensive speech and language program in coordination with
classroom and academic goals is highly recommended.
2. Anticipated goals:
   a) improvement in auditory-visual recall/retrieval
      skills by use of a multimodality approach.
   b) improvement in receptive and expressive vocab-
      ulary at the word level and for incorporation

J.A.923

Johnson, Corey        -5-        Speech/Lang. Evaluation

       into spontaneous conversation.

   c) improvement in the ability to imitate and produce a variety of multisyllabic words in an integrated and sequential manner.

   d) expansion of expressive language skills through improvement of reasoning skills (ie. problem solving, inferences, drawing conclusions).

3. Request a school conference to discuss the evaluation and Corey's academic performance.

Lynda R. Coccaro,
Speech/Lang. Pathologist

J.A.924

# EXHIBIT 48

| DISCHARGE/TRANSFER CHANGE IN PERMANENCY PLAN | JOHNSON . | | COREY JOHNSON | ▮ |
|---|---|---|---|---|
| ☐ DISCHARGE | COMPLETED BY  Lynn Polstein | DATE 4/13/84 | SSC NUMBER  4766716-28 | |
| ☐ TRANSFER | AGENCY/DISTRICT  JCCA/PCS | | LOCAL DISTRICT/AGENCY USE | |

- Complete a Discharge Plan for child in foster care 6 months prior to discharge or at the time the decision to discharge is made.

- Complete a Transfer Plan for child in foster care prior to transfer between Child Caring Agencies or Districts.

PLAN

We are requesting a change in permanency plan, from discharge to parent to discharge to self.

During the course of placement it has become clear that Ms. Johnson cannot provide Corey with the emotional support and attention he needs to overcome his severely impaired self-concept. Corey, who is severely learning disabled and barely able to read, feels inept and damaged. His mother is a narcissistic and self-focused woman whose lack of empathy and sensitivity toward Corey, exacerbates his bad feelings. When he is feeling depressed, he resorts to anti-social behavior to avoid this feeling.

JUSTIFICATION OF DISCHARGE GRANT to parent, relative or child when essential to effectuate discharge.

ANTICIPATED LENGTH OF TRIAL DISCHARGE:

**J.A.926**

| COMPREHENSIVE SERVICE PLAN CHILD | CASE NAME JOHNSON, EMMA | CHILD'S NAME COREY JOHNSON | Date of Birth ▓▓▓▓ |
|---|---|---|---|
| ☐ 90 Days  ☐ 6 Months  ☐ Change in Program Status | COMPLETED BY LYNN POLSTEIN | DATE 4/13/84 | SSC NUMBER: 4766716-28 |
| | AGENCY/DISTRICT JCCA/PCS | | LOCAL DISTRICT/AGENCY USE |

| CCRS CODE | PERMANENCY GOAL | ANT. COMP. DATE |
|---|---|---|
| | DISCHARGE TO SELF | |

| CCRS CODE | GOAL NO. | GOAL | ANT. COMP. DATE |
|---|---|---|---|
| | 1 | COREY WILL CONTINUE TO PARTICIPATE IN THE INTENSIVE REMEDIATION PROGRAM. | |

| CCRS CODE | OBJ. NO. | OBJECTIVE/CLIENT TASK | CCRS CODE | METHOD/SERVICE TASK |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

| CCRS CODE | GOAL NO. | GOAL | ANT. COMP. DATE |
|---|---|---|---|
| | 2 | COREY WILL USE OPPORTUNITIES OFFERED HIM TO LEARN INDEPENDENT LIVING SKILLS. | |

| CCRS CODE | OBJ. NO. | OBJECTIVE/CLIENT TASK | CCRS CODE | METHOD/SERVICE TASK |
|---|---|---|---|---|
| | A | Corey will explore the possibilities of an off-campus job. | | A cottage parent will help Corey read ads and apply for a job. |
| | B | Corey will learn how to handle money so that he can begin to shop for himself. | | Teacher will help Corey learn enough simple arithmetic that he will be able to figure out correc change. |
| | | | | |

**J.A.927**

| DSS-3404-C (3/81) NYC **COMPREHENSIVE SERVICE PLAN CHILD** | CASE NAME JOHNSON, EMMA | CHILD'S NAME COREY JOHNSON | Date of Birth |
|---|---|---|---|
| | COMPLETED BY LYNN POLSTEIN | DATE 4/13/84 | SSC NUMBER: 4766716-28 |

| CCRS CODE | Goal No. | GOAL | COREY WILL USE TREATMENT TO RESOLVE HIS FEARS THAT HE WILL LOSE HIS MOTHER THROUGH CONTINUED PLACEMENT. | ANT. COMP. DATE 10/8 |
|---|---|---|---|---|
| | 3 | | | |

| OBJECTIVE/CLIENT TASK | METHOD/SERVICE TASK |
|---|---|
| CCRS CODE / Goal No. | CCRS CODE |
| CCRS CODE / Goal No. | CCRS CODE |
| CCRS CODE / Goal No. | CCRS CODE |

**DESCRIBE THE FAMILY'S AND CHILD(REN)'S PARTICIPATION IN FORMULATING THE SERVICE PLAN AND, IF APPLICABLE, THE VISITATION PLAN.**

MEETING HELD 4/12/84.

**BRIEFLY DESCRIBE ANY COURT INVOLVEMENT** in this case and indicate services which are being provided pursuant to a remand or court order.

For Child in Foster Boarding Home or Agency Operated Boarding Home, **DESCRIBE THE AGENCY PLAN OF CONTACT BETWEEN THE CASE WORKER AND CHILD IN NEXT PERIOD. INCLUDE FREQUENCY AND LOCATION.**

**CLIENT CONCURRENCE (Optional)**

I understand that all information pertaining to my case, including this Plan for Service developed by my worker and me, is confidential.

I have been informed of the procedures by which I may express and seek remedy for any dissatisfaction, including the opportunity for an Administrative Review and Fair Hearing.

My worker and I will review this Plan for Services on a regular basis to evaluate my progress toward my goal.

I have jointly developed this Plan for Service with my caseworker and understand its content and purpose.

| SIGNATURE OF CLIENT, Parent or Guardian | DATE | LOCAL DSS/SSC SIGNATURE | DATE |
|---|---|---|---|
| X | | X | |
| CASE PLANNER'S SIGNATURE X *Lynn Polster* | DATE 4/16/84 | SUPERVISOR'S SIGNATURE X *Bernice Falk* ( *by LP* ) | DATE 4/16/ |

**J.A.928**

USCA4 Appeal 21-1    Doc: 10-2    Filed: 01/08/2021    Pg: 76 of 255
Case 3:92-cr-00068-DCK    Document 91-5    Filed 12/14/20    Page 5 of 6 PageID# 3511

| COMPREHENSIVE SERVICE PLAN FAMILY | CASE NAME JOHNSON | | LOCAL DISTRICT/AGENCY USE |
|---|---|---|---|
| ☐ 90 Days  ☐ 6 Months  ☐ Change in Program Status | COMPLETED BY LYNN POLSTEIN | DATE 4/13/84 | |
| | AGENCY/DISTRICT | | |

| CCRS CODE | Goal No. 1 | GOAL MS. JOHNSON WILL REMAIN CONSISTENT IN HER CONTACTS WITH COREY DESPITE THEIR DECISION TO LIVE APART. | ANT. COMP. DATE 10/ |
|---|---|---|---|

| | | OBJECTIVE/CLIENT TASK | | | METHOD/SERVICE TASK |
|---|---|---|---|---|---|
| CCRS CODE | Obj. No. A | Ms. Johnson will encourage Corey's regular visits. | CCRS CODE | | Social worker will continue regular meetings with Ms. Johnson around the issue of her continued involvement with Corey and the importance to him of feeling like family member even though he live apart from the family. |
| CCRS CODE | Obj. No. B | Ms. Johnson will include Corey in all family celebrations and occasions. | CCRS CODE | | SAME AS ABOVE |
| CCRS CODE | Obj. No. C | Ms. Johnson will not withdraw from Corey in response to her perceived belief that he is withdrawing from her. | CCRS CODE | | SAME AS ABOVE |

| CCRS CODE | Goal No. 2 | GOAL MS. JOHNSON WILL LEARN TO SUPPORT COREY'S STRENGTHS AND ACCEPT HIS WEAKNESSES. | ANT. COMP. DATE 10/8 |
|---|---|---|---|

| | | OBJECTIVE/CLIENT TASK | | | METHOD/SERVICE TASK |
|---|---|---|---|---|---|
| CCRS CODE | Obj. No. A | Ms. Johnson will demonstrate approval of Corey's athletic abilities. | CCRS CODE | | Social worker will work with Ms. Johnson around giving Corey approval for what he does well an making less important those areas in which he has poor success. |
| CCRS CODE | Obj. No. B | Ms. Johnson will de-emphasize Corey's academic abilities. | CCRS CODE | | SAME AS ABOVE |
| CCRS CODE | Obj. No. | | CCRS CODE | | |

J.A.929

| DSS-3404-F (3/81) NYC | CASE NAME | | LOCAL DISTRICT/AGENCY USE |
|---|---|---|---|
| **COMPREHENSIVE SERVICE PLAN FAMILY** | JOHNSON | | |
| | COMPLETED BY | DATE | |
| | LYNN POLSTEIN | 4/13/84 | |

| CCRS CODE | Goal No. | GOAL | ANT. COMP. DATE |
|---|---|---|---|
| | 3 | MS. JOHNSON WILL ENCOURAGE COREY'S ATTEMPTS TO LEARN SKILLS SUCH AS COOKING, SHOPPING. | 10, |

| OBJECTIVE/CLIENT TASK | | METHOD/SERVICE TASK | |
|---|---|---|---|
| CCRS CODE | Goal No. | CCRS CODE | |
| | | | |
| CCRS CODE | Goal No. | CCRS CODE | |
| | | | |
| CCRS CODE | Goal No. | CCRS CODE | |
| | | | |

**DESCRIBE THE FAMILY'S AND CHILD(REN)'S PARTICIPATION IN FORMULATING THE SERVICE PLAN AND, IF APPLICABLE, THE VISITATION PLAN**

Meeting held 4/12/84 with treatment team. Participants included Unit Administrator, acting as Independent Reviewer, Social Worker, Child Care Worker, Ms. Johnson and Corey.

**AGENCY CONTACT PLAN WITH NATURAL PARENTS.** Include frequency and location of planned interviews.

At least quarterly.

**CLIENT CONCURRENCE (Optional)**

I understand that all information pertaining to my case, including this Plan for Service developed by my worker and is confidential.

I have been informed of the procedures by which I may express and seek remedy for any dissatisfaction, including th opportunity for an Administrative Review and Fair Hearing.

My worker and I will review this Plan for Services on a regular basis to evaluate my progress toward my goal.

I have jointly developed this Plan for Service with my caseworker and understand its content and purpose.

| SIGNATURE OF CLIENT, Parent or Guardian | DATE | LOCAL DSS/SSC SIGNATURE | DATE |
|---|---|---|---|
| X | | X | |
| CASE PLANNER'S SIGNATURE | DATE | SUPERVISOR'S SIGNATURE | DATE |
| X _Lynn Polstein_ | 4/16/84 | X _Bernice Falk_ | 4/16 |

J.A.930

# EXHIBIT 49

J.A.931

PLEASANTVILLE COTTAGE SCHOOL

CURRENT ASSESSMENT

Name of Child:  COREY JOHNSON

Date of Admission (PCS):
4/26/82
Date of Adm. (PDC): 2/1/82
Date of Conference: 8-10-84

School Grade:   Ungraded
Nature of Place-
       ment:  Voluntary

Conference Participants:

Jerry Lefkowitz, Unit Administrator; Gordon Hilton, Child Care Worker; Gerard Maier, Social Worker; Corey Johnson, Mrs. Johnson did not attend the conference.

PRESENTING PROBLEM:

Corey Johnson was initially placed at Pleasantville Cottage School due to truancy, acting out in school and at home. An emotionally disturbed boy with organic deficits, he was raised in an unstable and chaotic environment. His mother was unavailable to him, unable to provide structure and support. Corey's developmental history included stuttering until age five and encopresis from age eight to twelve. He was left back in school in the 3rd and 4th grade. He was placed in a special class in 1980. He has severe learning disabilities, has never progressed beyond the 2nd grade reading level. Upon admission he was seen as a depressed youngster with soft neurological signs, was reacting to the family's chaotic situation and to his mother's unavailability.

CURRENT FUNCTIONING:

Child:

Corey was transferred into Cottage 7 in June. It was felt that this was an appropriate placement for him due to his age and the fact that many of the boys in Cottage 7 are moving towards independent living, a plan that seems appropriate for Corey. He was reluctant to make this change but had several months to work it through. He's made the transition to the older cottage easily. Corey is not a management problem. He's had no difficulty learning the routine of the cottage, following cottage expectations. A good athlete, Corey enjoy's sports particularly baseball and basketball. He's friendly with the other boys and appears to be developing a particular friendship with Larney Hunter. He's friendly and related to all the cottage staff. Corey does not draw attention to himself. It would seem that he could become "lost" in the cottage with attention being deferred to the more verbal or acting out boys. Corey has spent the summer working at the Pace Farm as part of the Youth Employment summer program. This is difficult manual labor.

J.A.932

Corey Johnson                                                    -2-

As with his previous job Corey worked in a responsible and consistent
way.  It is seen as a real strength for him that he is able to
take the responsibility for a job and follow through with it.

School as always       is a major concern for Corey and an important
part of his treatment plan.  This fall he will again attend the
B.O.C.E.S. Program.  He will also receive Speech Therapy once a
week.  Corey puts a great deal of pressure on himself to do well
in school.  As noted, he is handicapped with severe learning dis-
abilities.  Educational goals are geared towards helping him achieve
some competency with the work to enable him to gain a functional
literacy.  The plan is to work towards a G.E.D. diploma and vocational
experience.  Corey has appeared less depressed and upset with his
functioning in school.  The team feels that he will benefit from
another year in the B.O.C.E.S. Program.  Corey is also interested
in taking a part-time job at Caldor's in Elmsford.  Considering
his learning handicaps  and his competency on the job, it would
seem that such a plan would be beneficial to this boy.  In the
fall we will investigate the possibility of combining the school
and a part-time work program for him.

During the Spring, in individual and family meetings
         Corey chose to remain at Pleasantville Cottage School for
another year.  It is questionable that he will ever return home
permanently.  Visits, however, were increased to provide him with
more contact in the community to enable him to function more independent
in the community, (i.e. to learn how to travel and to plan for
himself) and to help him to "test out the waters" regarding
his home situation.  Home visits have gone without incident.  Corey
claims he ejoys them.


Mrs. Johnson continues to be available to attend some meetings
with the agency and                          plan's on having
Corey returned to her.  She is unable, however, to name a specific
time.  The treatment team does not believe that such a plan will
work.  Mrs. Johnson is experiencing serious problems with her
youngest son Robert who has just been returned to her care from
Children's Village.  She describes Robert as difficult to manage
in the home and acting out in the community.  Children's Village
has referred Robert to several day treatment programs in the community,
however, Mrs. Johnson is not satisfied with these referrals and
is interested in re-placing her son.  She continues to deny any
conflict and any ambivalence regarding Corey.  However, what is
currently going on with Robert can be seen as a reflection of
what will happen if Corey were _ to return to her care.  Our major
goal in the upcomming months is to work with Mrs. Johnson on the
                              reality of the situation
possibly help    her maintain regular contact with Corey (i.e.
through home visits)                                    and encourage Cc
move towards some type of Group Residence.

J.A.933

Corey Johnson                                                          -3-

In sessions Corey is related and quite verbal. He's anxious to
make a good impression and seeks approval. Early meetings have
centered on his loss and the confusion he's experienced over changing
cottages as well as having several social workers over the past
few months. He's enthusiastically discussed plans for the upcomming
school year. As noted he's interested in working off campus and
achieving a young-adult status. Corey is very comfortable with
the structure and support of Pleasantville Cottage School. Home
and family issues are presented as conflict-free. This is consistent
with the way Corey has presented his home situation since placement
with us. He's unable to express any ambivalence regarding his
unavailable though outwardly conforming mother. Corey states
that he would like to return home, however he is also considering
the possibility of a Youth Residence Center or a Group Residence.
                            problem solving, encouraging his planning
for himself and encouraging strives towards growth and individuation.
The issue of where he will go in the future and when is closely
tied to dynamics of this boy and his family. The difficulty with
denial is demonstrated by both Mrs. Johnson and her son.

History and Present Functioning
                            indicates that it would not
be in Corey's interest to return home. Mrs. Johnson has consistently
demonstrated ambivalence regarding him. The situation with Robert
indicates her difficulty in being available and also settting
limits. Both parties will need help in maintaining some separation
while continuing          contact. Living in a Group Residence
will provide the structure and a less conflictual environment
that will enable Corey to grow and develop.

CONFERENCE RECOMMENDATIONS:

1. Corey will continue in the B.O.C.E.S. Program as well as in
Speech Therapy.

2. The team will investigate the possibility of including a part-time
job in his daily activities.

3. Caseworker will focus on providing support and encouragement
to individuate.

4. As noted, the focus must be kept on the discharge planning
for this boy. In May we applied for and received an approval
for a plan of discharge to self. The treatment team considers
this the most appropriate plan for this boy. Work must be done
with Mrs. Johnson as well as Corey in accepting the concept of
Corey living in a Residence but maintaining regular contact with
his family.
       Gerard Maier:ww    D-8/31/84          T-9/4/84

                              Gerard Maier
                              Social Worker

# EXHIBIT 50

J.A.935

| DSS-3402 (3/81) NYC | CASE NAME Johnson | | CHILD'S NAME Corey Johnson | Date of Birth ▉▉▉ |
|---|---|---|---|---|
| **VISITATION PLAN** | COMPLETED BY C. Aaron | DATE 12/3/84 | SSC NUMBER: ▉▉▉▉ | |
| | AGENCY/DISTRICT JCCA/PCS | | LOCAL DISTRICT/AGENCY USE | |

- Complete a Visitation Plan for each child placed or to be placed in foster care.
- Complete according to the time requirements for the Initial Service Plan and revise at each Service Plan Review.

| PERMANENCY GOAL | ANT. CON DATE |
|---|---|
| Discharge to self | 11/8 |

### 1. VISITATION SINCE LAST PLAN (If child has been in placement).

| DATE | LOCATION | PARTICIPANTS | DATE | LOCATION | PARTICIPANTS |
|---|---|---|---|---|---|
| | | | | | |
| | | PLEASE SEE CALENDAR OF | CONTACTS | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

### 2. DESCRIBE QUALITY OF VISITS, highlighting positive and negative factors. If family is not meeting visitation goals, explain reasons and efforts to encourage visiting.

As of 6/84 Corey began weekly visits home. Until recently, Corey never refused visits. Within last 2 months Corey has refused 3 visits. This seems related to the fact that his younger brother, Robert has bee a behavior problem at home, and much of Mrs. Johnson's attention has be devoted to dealing with this issue (Robert will probably be placed at PDC for diagnostic assessment within the month). Corey is very attached to his mother and is in need of her support. Previous visits imply that Corey does not spend much time with his mother. The recent events with Robert, and Mrs. Johnson's decreased attention in Corey seem to ha exacerbated Corey's low self-esteem and feelings of separation.

### 3. PLAN FOR VISITATION IN NEXT PERIOD. Include name of participants, frequency and location. Explain any changes in visitation plan.

Corey will continue weekly visiting at home. Corey will be allowed to refuse visits when he feels they will be too stressful for him. His mother occasionally visits him on grounds. This contact will be encouraged.

(Use reverse if additional space is requi.

J.A.936

| DSS-3403-F (3/81) NYC | CASE NAME | | LOCAL DISTRICT/AGENCY USE |
|---|---|---|---|
| **GOAL AND OBJECTIVE REVIEW FAMILY** | Johnson | | |
| | COMPLETED BY | DATE | |
| ☐ *90 Days*  ☒ *6 Months* | C. Aaron | 12/13/84 | |
| ☐ Change in Program Status | AGENCY/DISTRICT  JCCA/PCS | | |

Complete a Family Goal and Objective Review for the family of each child receiving foster care, preventive services for children, adoption or Child Protective Services at the time of the Service Plan Review.  Service Plan Reviews occur as follows:
- 1st Service Plan Review 60 days from establishment of the Initial Service Plan.
- 2nd Service Plan Review 6 months from application for service for non-placement Child Protective Service case, 6 month from an indicated case determination.
- Subsequent Service Plan Reviews every 6 months thereafter.
- Change in Service Status - Prior to the status change.

**LIST DATE, PLACE AND PARTICIPANTS FOR ALL FACE-TO-FACE CONTACTS WITH NATURAL FAMILY DURING REVIEW PERIOD.** State Client's response to contacts with case planner. If unsatisfactory, state efforts to further involve family.

Ms. Johnson has kept all but one of the scheduled appointments which take place approximately once per month. In addition, she has attended COH meetings and conferences. Ms. Johnson has been visited at home as well.  The worker assigned to this case has changed several times in the last 6 months due to several circumstances (Corey's switch to Cottage 7, health of one worker, etc.). Therefore, though Mrs. Johnson has been seen on a regular basis, work with her has lacked some continuity.  As such, the following goals need to be continued since change of workers has somewhat limited work on these goals to this poin

---

| Goal No. | Objective No. | Include services given and client's response to services, client progress toward meeting goal and reason for major changes or deletions in goal or service. |
|---|---|---|
| 1 | | Goal:  Ms. Johnson will remain consistent in her contacts with Corey despite their decision to live apart. |

In working with Ms. Johnson, focus has been on helping her to recognize how important it is for Corey to feel that he is a of the family.  Ms. Johnson has been able to follow through on this, including Corey in all family celebrations and occasions.

This goal should be continued, particularly in view of currer situation with Robert which has commanded much of Mrs. Johnso time and attention.

---

| Goal No. | Objective No. | Include services given and client's response to services, client progress toward meeting goal and reason for major changes or deletions in goal or service. |
|---|---|---|
| 2 | | Goal:  Ms. Johnson will learn to support Corey's strengths and accept his weaknesses. |

—One ongoing aim of treatment with Ms. Johnson has been to help her to see that Corey has enormous need for her approval whicl means that she must find areas of his functioning to praise and support.  His academic deficiencies must be down-played. There seems to be some movement by Ms. Johnson to do so. Howe it remains important to help her see Corey's continued need for her acceptance-as it seems that Mrs. Johnson withdraws attention from Co when she perceives he is "allright"-and turns attention to Robert wh is now having difficulties.  This goal should be continued in order to help prevent the possibility of Corey acting out in order to gain Ms. Johnson's attention.

J.A.937

| DSS-3403-F(3/81) NYC | CASE NAME. Johnson | | LOCAL DISTRICT/AGENCY USE |
|---|---|---|---|
| GOAL AND OBJECTIVE REVIEW FAMILY | COMPLETED BY C. Aaron | DATE 12/3/84 | |

| Goal No. | Objective No. |
|---|---|
| 3 | |

**CCRS CODES**

| Client Goal | | |
|---|---|---|
| OBJ. | OBJ. | OBJ. |
| Serv. | Serv. | Serv. |

Include services given and client's response to services, client progress toward meeting goal and reason for major changes or deletions in goal or service.

Goal:  Ms. Johnson will encourage Corey's attempts to learn independent living skills, such as cooking, shopping.

Ms. Johnson is both able and willing to encourage Corey's learning to function in a more independent way. Future sessions with Ms. Johnson can focus on specific skills that can be encouraged on home visits and how Ms. Johnson can help Corey to learn such skills.

---

| Goal No. | Objective No. |
|---|---|
| | |

**CCRS CODES**

| Client Goal | | |
|---|---|---|
| OBJ. | OBJ. | OBJ. |
| Serv. | Serv. | Serv. |

Include services given and client's response to services, client progress toward meeting goal and reason for major changes or deletions in goal or service.

---

| Goal No. | Objective No. |
|---|---|
| | |

**CCRS CODES**

| Client Goal | | |
|---|---|---|
| OBJ. | OBJ. | OBJ. |
| Serv. | Serv. | Serv. |

Include services given and client's response to services, client progress toward meeting goal and reason for major changes or deletions in goal or service.

---

| Goal No. | Objective No. |
|---|---|
| | |

**CCRS CODES**

| Client Goal | | |
|---|---|---|
| OBJ. | OBJ. | OBJ. |
| Serv. | Serv. | Serv. |

Include services given and client's response to services, client progress toward meeting goal and reason for major changes or deletions in goal or service.

J.A.938

| DSS-3403-C (3/81) NYC | CASE NAME Johnson | | CHILD'S NAME Corey Johnson | | Date of Birth |
|---|---|---|---|---|---|
| **GOAL AND OBJECTIVE REVIEW CHILD** | COMPLETED BY C. Aaron | DATE 12/3/84 | SSC NUMBER: | | |
| ☐ 90 Days  ☒ 6 Months  ☐ Change in Program Status | AGENCY/DISTRICT JCCA/PCS | | LOCAL DISTRICT/AGENCY USE | | |

Complete a Child Goal and Objective Review for each child receiving foster care, preventive services for children, adoption or C Protective Service at the time of the Service Plan Review. Service Plan Reviews occur as follows:

- 1st Service Plan Review - 60 days from establishment of the Initial Service Plan.
- 2nd Service Plan Review - 6 months from application for services or from an indicated case determination for non-placement Child Protective Service cases.
- Subsequent Service Plan Reviews - every 6 months thereafter.
- Change in Service Status - prior to the status change.

### PERMANENCY GOAL PROGRESS REPORT

Describe the effect progress in the achievement of the family's and child's goals and objectives has had on the accomplishment of this child's permanency goal.

| | YES | NO |
|---|---|---|
| PERMANENCY GOAL CHANGED | | X |

Goal had been changed to discharge to independent living, based on Ms. Johnson's inability to provide Corey with the emotional support and attention he needs to overcome his severely devalued self-concept. Corey is a depressed youngster and his mother's self-focus exacerbates his bad feelings and encourages his acting-out behavior to avoid these feelings. There is no extended family who can be resources for Corey.

It is currently expected that Corey will be able to be referred to a group living situation by 6/85.

For child in foster boarding home or agency operated boarding home, list date, place and participants for all face-to-face contact between child and caseworker during review period.

| Goal No. | Objective No. | Include services given and client's response to services, client progress towards meeting goal and reason for major changes or deletions in goal or service. |
|---|---|---|
| 1 | | Goal: Corey will continue to participate in the school's intensive remediation program. |
| **CCRS CODES** | | Corey has been able to stay with his remediation program. However, he has made very minimal progress. He has begun to feel extremely discouraged by his inability to read. He thinks he is "dumb" and this is beginning to influence his former good motivation. Goal to be continued. |
| Client Goal | | |
| OBJ. OBJ. OBJ. | | |
| Serv. Serv. Serv. | | |

J.A.939

Page

| DSS-3403-C (3/81) NYC | CASE NAME | | LOCAL DISTRICT/AGENCY USE |
|---|---|---|---|
| **GOAL AND OBJECTIVE** | Johnson | | |
| **REVIEW** | COMPLETED BY | DATE | |
| **CHILD** | C. Aaron | 12/3/84 | |

**Goal No. 2**

CCRS CODES

Client Goal

OBJ. OBJ. OBJ.

Serv. Serv. Serv.

Include services given and client's response to services, client progress toward meeting goal and reason for major changes or deletions in goal or service.

Goal:  Corey will use opportunities offered him to learn independent living skills.

Staff have been working with Corey to help him make use of opportunities to learn to function more independently.  He is being encouraged to seek a part time job in the community

**Goal No. 3**

CCRS CODES

Client Goal

OBJ. OBJ. OBJ.

Serv. Serv. Serv.

Include services given and client's response to services, client progress toward meeting goal and reason for major changes or deletions in goal or service.

Goal:  Corey will use treatment to resolve his fears that he will lose his mother through continued placement.

Corey is beginning to talk more freely within the treatment relationship and has come to some awareness of his conflict re: wanting independence and wanting to remain his mother's little boy.

**Goal No. 4**

CCRS CODES

Client Goal

OBJ. OBJ. OBJ.

Serv. Serv. Serv.

Include services given and client's response to services, client progress toward meeting goal and reason for major changes or deletions in goal or service.

Goal:  Corey will use opportunities to prepare for discharg from PCS to a group living situation in the community.

It is expected that Corey will be discharged to a group hom by 6/85. Corey needs to begin addressing his fears about leaving PCS, and begin to prepare for a return to the community. Corey is able to discuss some of these fears and is becoming aware of the conflict he feels about going to a group home.

**Goal No.**

CCRS CODES

Client Goal

OBJ. OBJ. OBJ.

Serv. Serv. Serv.

Include services given and client's response to services, client progress toward meeting goal and reason for major changes or deletions in goal or service.

J.A.940

DSS-3404-F (3/81) NYC

**COMPREHENSIVE**
**SERVICE PLAN**
**FAMILY**

☐ 90 Days  ☒ 6 Months
☐ Change in Program Status

| CASE NAME | | LOCAL DISTRICT/AGENCY USE |
|---|---|---|
| Johnson | | |
| COMPLETED BY | DATE | |
| C. Aaron | 12/3/84 | |
| AGENCY/DISTRICT | | |

| CCRS CODE | Goal No. | GOAL | ANT. COMP. DATE |
|---|---|---|---|
| | 1 | Ms. Johnson will remain consistent in her contacts with Corey despite their decision to live apart. | 6/8 |

| | | OBJECTIVE/CLIENT TASK | | | METHOD/SERVICE TASK |
|---|---|---|---|---|---|
| CCRS CODE | Obj. No. A | Ms. Johnson will encourage Corey's regular visits. | CCRS CODE | | Social worker will continue regul meetings with Ms. Johnson around issue of her continued involvemen with Corey and the importance to him of feeling included as a fami member. |
| CCRS CODE | Obj. No. B | Ms. Johnson will include Corey in all family celebrations and occasions. | CCRS CODE | | 'Same as above' |
| CCRS CODE | Obj. No. C | Ms. Johnson will not withdraw from Corey in response to her perceived belief that he is withdrawing from her. | CCRS CODE | | Same as above |

| CCRS CODE | Goal No. | GOAL | ANT. COMP DATE |
|---|---|---|---|
| | 2 | Ms. Johnson will learn to support Corey's strengths and accept his weaknesses. | 6/85 |

| | | OBJECTIVE/CLIENT TASK | | | METHOD/SERVICE TASK |
|---|---|---|---|---|---|
| CCRS CODE | Obj. No. A | Ms. Johnson will demonstrate approval of Corey's athletic abilities. | CCRS CODE | | Social worker will work with Ms. Johnson around giving Corey approval for what he does well and making less important the areas in which he has poor success. |
| CCRS CODE | Obj. No. B | Ms. Johnson will de-emphasize Corey's academic ability | CCRS CODE | | Same as above |
| CCRS CODE | Obj. No. | | CCRS CODE | | |

J.A.941

USCA4 Appeal: 21-1    Doc: 10-2    Filed: 01/08/2021    Pg: 89 of 255
Case 3.92-cr-00068-DJN   Document 91-7   Filed 12/14/20   Page 8 of 14 PageID# 3124

Page 2

DSS-3404-F (3/81) NYC

**COMPREHENSIVE SERVICE PLAN FAMILY**

| CASE NAME | | LOCAL DISTRICT/AGENCY USE |
|---|---|---|
| Johnson | | |
| COMPLETED BY C. Aaron | DATE 12/3/84 | |

| CCRS CODE | Goal No. | GOAL | ANT. COMP. DATE 6/85 |
|---|---|---|---|
| | 3 | Ms. Johnson will encourage Corey's efforts to learn skills such as cooking, shopping. | |

| | OBJECTIVE/CLIENT TASK | | METHOD/SERVICE TASK |
|---|---|---|---|
| CCRS CODE / Goal No. | | CCRS CODE | |
| A | Ms. Johnson will provide opportunity on visiting weekends for Corey to practice new skills. | | Social worker will discuss wi Ms. Johnson the importance tc Corey of knowing how to manage  daily living skills. |
| CCRS CODE / Goal No. | | CCRS CODE | |
| CCRS CODE / Goal No. | | CCRS CODE | |

**DESCRIBE THE FAMILY'S AND CHILD(REN)'S PARTICIPATION IN FORMULATING THE SERVICE PLAN AND, IF APPLICABLE, THE VISITATION PLAN**

Meeting held 4/12/84. Participants included Unit Administrator, acting as Independent Reviewer, Social Worker, Child Care Worker, Ms. Johnson and Corey.

**AGENCY CONTACT PLAN WITH NATURAL PARENTS. Include frequency and location of planned interviews.**

At least quarterly.

**CLIENT CONCURRENCE (Optional)**

I understand that all information pertaining to my case, including this Plan for Service developed by my worker and me. is confidential.

I have been informed of the procedures by which I may express and seek remedy for any dissatisfaction, including the opportunity for an Administrative Review and Fair Hearing.

My worker and I will review this Plan for Services on a regular basis to evaluate my progress toward my goal.

I have jointly developed this Plan for Service with my caseworker and understand its content and purpose.

| SIGNATURE OF CLIENT, Parent or Guardian | DATE | LOCAL DSS/SSC SIGNATURE | DATE |
|---|---|---|---|
| X | | X | |
| CASE PLANNER'S SIGNATURE MSW  X Christine Aaron Intern | DATE 12/12/84 | SUPERVISOR'S SIGNATURE  X Donald Mauer | DATE 12/12/8 |

J.A.942

USCA4 Appeal: 21-1 Doc: 10-2 Filed: 01/08/2021 Pg: 90 of 255
Case 3:92-cr-00068-DJN Document 91-7 Filed 12/14/20 Page 9 of 14 PageID# 3125

| COMPREHENSIVE SERVICE PLAN CHILD | CASE NAME Johnson | | Corey Johnson |
|---|---|---|---|
| ☐ 90 Days  ☒ 6 Months ☐ Change in Program Status | COMPLETED BY C. Aaron | DATE 12/3/84 | SSC NUMBER: ▓▓▓▓ |
| | AGENCY/DISTRICT JCCA/PCS | | LOCAL DISTRICT/AGENCY USE |

| CRS CODE | PERMANENCY GOAL | ANT. COMP. DATE 11/8 |
|---|---|---|
| ▓ | Discharge to self | |

| CCRS CODE | GOAL NO. | GOAL | ANT. COMP. DATE 6/85 |
|---|---|---|---|
| ▓ | 1 | Corey will continue to participate in the intensive remediation program. | |

| | OBJECTIVE/CLIENT TASK | | | METHOD/SERVICE TASK |
|---|---|---|---|---|

| CCRS CODE | OBJ. NO. | OBJECTIVE/CLIENT TASK | CCRS CODE | METHOD/SERVICE TASK |
|---|---|---|---|---|
| ▓ | A | Corey will continue to attend remedial classes despite his upset over poor progress. | ▓ | Teacher will encourage Corey to keep working and help him to understand that his difficulties do not reflect upon his intelligence. |
| ▓ | B | Corey will discuss his learning disability in treatment. | ▓ | Social worker will work with Corey towards understanding the implicati of his learning disability. |
| ▓ | | | ▓ | |

| CCRS CODE | GOAL NO. | GOAL | ANT. COMP. DATE 6/8 |
|---|---|---|---|
| ▓ | 2 | Corey will use opportunities offered him to learn independent living skills. | |

| CCRS CODE | OBJ. NO. | OBJECTIVE/CLIENT TASK | CCRS CODE | METHOD/SERVICE TASK |
|---|---|---|---|---|
| ▓ | A | Corey will explore the possibilities of an off campus job. | ▓ | A cottage parent will help Corey read ads and apply for a j |
| ▓ | B | Corey will learn how to handle money so that he can shop for himself. | ▓ | Teacher will help Corey learn enough simple arithmetic th he will be able to figure out correct change. |
| ▓ | | | ▓ | |

J.A.943

USCA4 Appeal: 21-1    Doc: 51-2    Filed: 01/08/2021    Pg: 91 of 255

CHILD                 Johnson              12/3/84

| CCRS CODE | Goal No. | GOAL | ANT. COMP. DATE 6/8 |
|---|---|---|---|
| | 4 | Corey will use opportunities to prepare for discharge from PCS to a group living situation in the community. | |

**OBJECTIVE/CLIENT TASK** | **METHOD/SERVICE TASK**

| CCRS CODE | Goal No. A | Corey will discuss discharge plans for a group home in treatment. | CCRS CODE | Social worker will work with Corey towards understanding his feelings about discharge. |
|---|---|---|---|---|
| CCRS CODE | Goal No. | Corey will visit several group homes. | CCRS CODE | Social worker will arrange for Corey to see several group livi situation. |
| CCRS CODE | Goal No. | | CCRS CODE | |

**DESCRIBE THE FAMILY'S AND CHILD(REN)'S PARTICIPATION IN FORMULATING THE SERVICE PLAN AND, IF APPLICABLE, THE VISITATION PLAN.**

**BRIEFLY DESCRIBE ANY COURT INVOLVEMENT** in this case and indicate services which are being provided pursuant to a remand or court order.

**For Child in Foster Boarding Home or Agency Operated Boarding Home, DESCRIBE THE AGENCY PLAN OF CONTACT BETWEEN THE WORKER AND CHILD IN NEXT PERIOD. INCLUDE FREQUENCY AND LOCATION.**

**CLIENT CONCURRENCE (Optional)**

I understand that all information pertaining to my case, including this Plan for Service developed by my worker and is confidential.

I have been informed of the procedures by which I may express and seek remedy for any dissatisfaction, including the opportunity for an Administrative Review and Fair Hearing.

My worker and I will review this Plan for Services on a regular basis to evaluate my progress toward my goal.

I have jointly developed this Plan for Service with my caseworker and understand its content and purpose.

| SIGNATURE OF CLIENT, Parent or Guardian | DATE | LOCAL DSS/SSC SIGNATURE | DATE |
|---|---|---|---|
| X | | X | |
| CASE PLANNER'S SIGNATURE  Christine d Aaron MSW Intern | DATE 12-12-84 | SUPERVISOR'S SIGNATURE  Jerold Mann | DATE 10 |

J.A.944

| REASSESSMENT SUMMARY | COMPLETED BY C. Aaron | DATE 12/3/84 |
|---|---|---|
| | AGENCY/DISTRICT JCCA/PCS | |

CHILD'S NAME Johnson

**4 / 26 / 82** DATE FAMILY BEGAN TO RECEIVE SERVICES FROM YOUR AGENCY

| Yes | No |
|---|---|
| X | |

A. This Reassessment Summary is being completed as part of a Service Plan Review.

UPDATE changes, that have occurred since the last assessment summary, by answering each checklist item. The items on the checklist correspond to sections 1 through 8 of this form.

| Yes | No | |
|---|---|---|
| ☐ | ☒ | Has there been a change in the level of risk to the child if he/she returns home or remains at home? (If yes complete question 1.) |
| ☐ | ☒ | Has there been a change in the family's ability to benefit from the provision of preventive services? (If yes complete question 2.) |
| ☐ | ☒ | Has there been a change in service needs? ( If yes complete question 3.) |
| ☐ | ☒ | Has there been a change in program choice? (If yes complete Sect. B & questions 1 - 8.) |
| ☐ | ☒ | Has there been a change in the factors justifying placement and or preventive services? (If yes complete question 5. |
| ☐ | ☒ | Has there been a change in the child's location? (If yes complete question 6. |
| ☐ | ☒ | Has this child been transfered to a more restrictive placement? (If yes complete Sect. B & questions 1 - 8.) |
| ☐ | ☒ | Has this child been in placement for 18 months or more and his/her permanency goal is return to home? (If yes complete question 8.) |

| Yes | No |
|---|---|
| | x |

B. This Reassessment Summary is being completed as the result of a PROGRAM STATUS change and requires the completion of the checklist below. For any change indicated in Section B, complete sections 1 through 8 of this form.

☐ Case Closing                                    ☐ Change in Permanency Goal
☐ Change in Level of Foster Care
☐ Change in Program choice
  • Preventive Non-mandated
  • Preventive Mandated
  • Placement/Preventive Mandated
  • Placement/Preventive Non-mandated
  • Placement
  • Child Protective Non-placement
☐ Movement Between Agencies or District

1. CONSIDERING IDENTIFIED PROBLEMS AND ASSETS, EVALUATE THE RISK TO THE CHILD IF SHE/HE RETURNS HOME, OR REMAINS AT HOME. Evaluate the areas of parental functioning or child's behavior which limit the family's ability to provide a safe and supportive environment for the child.

Corey is an emotionally deprived, learning disabled boy with severely impaired self-concept. Without the support and structure he receives in residential treatment, he resorts to anti-social activity to avoid feelings of depression and lack of self-worth.

2. ASSESS THE FAMILY'S ABILITY TO BENEFIT FROM THE PROVISION OF FAMILY SUPPORT SERVICES AND TO MAINTAIN THE CHILD IN THE HOME.

Support services would not enable Ms. Johnson to provide the emotional support and acceptance Corey needs. .

J.A.945

**REASSESSMENT SUMMARY**

| | |
|---|---|
| COMPLETED BY | C. Aaron |
| DATE | 12/3/84 |

DISTRICT/AGENCY USE

3. Complete the following service needs information:

| A. NAME OF PERSON(S) NEEDING SERVICE | B. CCRS CODE | SERVICE NEEDS | C. CCRS CODE | AVAILABLE/ ACCEPTED | D. PRIMARY/SECONDA SERVICE NEED |
|---|---|---|---|---|---|
| Corey Johnson | | 12 Special Ed. | | C  Provided | |
| | | 9  Remedial Ed. | | C    " | |
| | | 14 Recreation | | C    " | |
| | | 24 Medical/Dental | | C | |
| | | 30 Casework Counseling | | C    " | |
| | | 29 Psychol/Psych. | | C    " | |
| | | 42 Instit. | | C    " | |
| | | 16 Family Planning | | C    " | |
| Ms. Johnson | | 30 Casework Counseling | | C    " | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

* A. NOT AVAILABLE - The required service is currently not being delivered to other clients in your service community.
B. REFUSED - the client has not agreed to participate in the needed service.
C. PLANNED - provision of the needed service is being planned; specific arrangements are being made or services are currently being provided.
D. PLANNED, AWAITING OPENING - the needed service is available, but currently there are no openings for this client.

4. Based on the assessment of Problems, Assets and Service Needs, indicate which of the following Program Choices is most appropriate for the child-(ren) in this case.

| Program Choice CCRS code | NAME OF CHILD IN NEED OF SERVICE |
|---|---|
| E | Corey Johnson |
| F | ROBERT JOHNSON |
| | |
| | |
| | |
| | |
| | |

A. PREVENTIVE SERVICES (non-mandated): Preventive Services are needed by this child and family. In their absence out-of-home placement would NOT be necessary within the next 60 days. Placement may be necessary for the child in the future.

B. PREVENTIVE SERVICES (mandated): Preventive Services are needed by this child and family. In their absence out-of-home placement would be necessary for the child within the next 60 days.

C. PLACEMENT/PREVENTIVE (mandated): This child is currently in placement. The provision of preventive services will enable him or her to return home within the next 90 days.

D. PLACEMENT/PREVENTIVE (non-mandated): This child is currently in placement. Preventive Services are also needed. However, these services will NOT enable the client to return home within the next 90 days.

E. PLACEMENT SERVICES: Out-of-home placement is needed for this child within the next 60 days. Also include children surrendered for adoption.

F. CHILD PROTECTIVE SERVICES (non-placement): Community based services are needed which are not preventive in nature.

J.A.946

DSS-3407-S(3/81) NYC

**REASSESSMENT SUMMARY**

| CASE NAME | LOCAL DISTRICT/AGENCY USE |
|---|---|
| Johnson | |

| COMPLETED BY | DATE |
|---|---|
| C. Aaron | 12/3/84 |

5. For each child whose program choice is Preventive Services (mandated), Placement/Preventive (non-mandated or mandated) or Placement Servi (see question 4, B,C,D and E) check the factors which describe the reason(s) why placement services and/or preventive services are needed.

CHILD'S NAME

1. Corey Johnson
2. ROBERT JOHNSON
3.
4.

**FACTORS**

Check all that apply.

| (✓) | (✓) | (✓) | (✓) | | |
|---|---|---|---|---|---|
| | | | | A. | Caretaker expresses unwillingness to maintain the child in the home. |
| | | | | B. | Parent(s) have voluntarily surrendered the child for adoption. |
| | | | | C. | Child has been adjudged neglected in a Family Court proceeding. |
| | | | | D. | Child has been adjudged abused in a Family Court proceeding. |
| | | | | E. | Alleged abuse or neglect by parent or caretaker, in the caseworker's judgement, places the chil imminent danger of serious physical or emotional harm. |
| | | | | F. | Child has been placed in the custody of the Commissioner of Social Services under Article 7 or 10 of Family Court Act and foster care placement has been recommended or ordered by the court. |
| | | | | G. | Parents or caretakers are unavailable due to arrest, detainment, imprisonment, or other situation volving the law. |
| | | | | H. | Parents or caretakers are temporarily unable to maintain the child at home due to a housing or fina emergency, acute physical illness, or other emergency situation. |
| | | | | I. | Parents or caretakers are incapable of providing proper care due to chronic or permanent condit such as diagnosed mental illness, diagnosed developmental disability, alcohol or drug abuse, phy disability or illness or other comparable condition. |
| x | ✗ | | | J. | Continuous, serious conflict between parent and child. |
| | | | | K. | Parents are dead or missing. |
| | | | | L. | Child's behavior presents a serious danger to other people or to the child's own well being. |
| | | | | M. | Child's behavior results in damage to property or a criminal act related to property. |
| x | ✗ | | | N. | Child's behavior, although not dangerous, results in severe management problems and constant d tion of group activities in at least two of the following three settings: home, school, and commu |
| | | | | O. | Child's behavior caused by a serious emotional, physical or development disability is characteriz severe deficits in adaptive behavior. |
| | | | | P. | Other, describe: |

(use additional sheets as n

J.A.947

| DSS-3407-S(3/81) NYC | CASE NAME | | LOCAL DISTRICT/AGENCY USE |
|---|---|---|---|
| **REASSESSMENT SUMMARY** | Johnson | | |
| | COMPLETED BY C. Aaron | DATE 12/3/84 | |

**6A. IF INITIAL OR SUBSEQUENT PLACEMENT IS OUT OF PARENTS' COUNTY/BOROUGH OR RESIDENCE, EXPLAIN REASON.**

Child placed out-of-borough because there are no appropriate residential treatment facilities in child's borough.

**B. IF INITIAL OR SUBSEQUENT PLACEMENT DOES NOT MEET THE PARENT(S)' EXPRESSED RELIGIOUS PREFERENCE, PLEASE EXPLAIN.**

Child has weekly religious instruction

**C. IF THE CHILD'S PHYSICAL LOCATION HAS CHANGED SINCE LAST REVIEW, EXPLAIN EACH CHANGE.**

**7. IF THE CHILD HAS BEEN TRANSFERRED TO A MORE RESTRICTIVE PLACEMENT, state why previous placement could not be continued with additional services.**

**8. Answer question 8 for all children whose PERMANENCY GOAL IS DISCHARGE TO PARENT(S) OR GUARDIAN(S) AND WHO HAVE BEEN IN PLACEMENT 18 MONTHS OR MORE.**

A. Is discharge planned within the next 6 months?   ☐ Yes   ☐ No

B. If **No**, what specific barriers prevent this course of action, and explain what alternatives to the original Comprehensive Service Plan are being considered, or have been tried to achieve discharge to parent(s) or legal guardian(s).

| CASE PLANNER'S SIGNATURE | DATE | LOCAL DSS/SSC SIGNATURE | DATE |
|---|---|---|---|
| X Christine Aaron MSW Intern | 12/12/84 | X SUPERVISOR'S SIGNATURE X David Meyer | 12/16 |

J.A.948

# EXHIBIT 51

J.A.949

## PLEASANTVILLE COTTAGE SCHOOL

Name of Child:  COREY JOHNSON
Date of Birth:  ███████
Date of (PCS) Adm: _____

Date Tested: 3/15/85
By:  Kenneth Barish, Ph.D.
Social Worker: Christine Aar⟨

### PSYCHOLOGICAL EVALUATION

#### Referral:

Corey was referred for re-evaluation to assess his current cognitive and emotional functioning.  Corey was last tested in March 1983, by this examiner, and in February 1982 at Pleasantville Diagnostic Center.  These evaluations reveal severe learning disabilities in Reading, Spelling and Arithmetic, associated with impairment of attention and concentration, visual-spatial skills and specific language deficits; significant depressive tendencies were also noted.

#### Tests Administered:

WISC-R
Rorschach
TAT

#### Test Findings:

On the WISC-R Corey achieved a Verbal I.Q. of 68-70 (Mentally Deficient-Borderline range), a Performance I.Q. of 78-81 (Borderline-Low Average range), and a Full Scale I.Q. of 69-74 (Deficient-Borderline range).  Subtest scaled scores are presented below:

| | | | |
|---|---|---|---|
| Information | 4 | Picture Completion | 8(9) |
| Similarities | 5(6) | Picture Arrangement | 9 |
| Arithmetic | 6(7) | Block Design | 1(5) |
| Vocabulary | 5 | Object Assembly | 5(6) |
| Comprehension | 4 | Coding | 6 |
| (Digit Span | 6) | | |

(Alternate scores reflect improvement in performance with additional time and/or assistance from the examiner.)

These scores reflect a significant decline in both Verbal and Performance I.Q. since Corey was tested in 1982.  At that time a Verbal I.Q. of 85, a Performance I.Q. of 93 and a Full Scale I.Q. of 88 were reported.  There is also some difference in a pattern of subtest scores.  Corey achieved significantly lower scores on the current testing on both the Comprehension and Object Assembly subtests.  This decline in I.Q. scores is difficult to account for. However, several factors may be involved.  The current scores may reflect in part, the increasing demands that the tasks presented as well as Corey's failure to learn at an expected pace.

Corey Johnson                                                            -2-

They also undoubtedly reflect the effects of Corey's severe dis-
couragement and depression with respect to cognitive tasks.  For
example, with minimal assistance, Corey was able to improve his
performance considerably in many instances.  This was evident on
the Similarities, Arithmetic, Block Design and Object Assembly sub-
tests.  Corey's very deficient score on the Block Design subtest
is the result of several rotations of designs that he easily cor-
rected when his error was pointed out to him.  These scores, should,
therefore, not be taken as an indication of Corey's intellectual
potential.  Corey's intellectual difficulties remain clearly evident,
however, and my recommendation now, even more strongly than two years
ago, is that Corey needs a highly vocationally oriented school pro-
gram.  Some efforts should be made to help Corey achieve a level
of literacy that will enable him to function in the working world,
however, Corey is unlikely to improve significantly in this area.

Personality Functioning:

Personality assessment reveals a thoughtful, highly reflective, but
affectively constricted adolescent.  Corey expends considerable
energy in his efforts to suppress anger.  He appears vulnerable to
periods of depression and frustration.  There is also evidence of
feelings of aloneness and a desire for help, that is not being
heard.  Several responses suggest that Corey feels that he is not
being listened to.

Corey's test responses also reveal an effort toward maturity that
is particularly impressive, considering his severe learning dis-
abilities.  Corey's TAT stories reveal, for example, an awareness
that life has trials and tribulations that must be coped with and
an acceptance of the reality that life is sometimes painful, for
example, that there are painful separations.  Corey's stories empha-
size his concerns regarding the future and his constructive and
mature goals.  For example, he tells a story about a young man
"wondering if he's going to have a job and a nice life, maybe some
kids and a wife to support and help him move on in life."  This
effort towards maturity is at the cost of a constriction of Corey's
emotional life, particularly a suppression of anger and rebellious-
ness and an overly compliant attitude towards authority.  Corey
also tends towards extremes of either/or, good/bad in his thinking
about himself and his life.  Corey could benefit from greater ac-
knowledgement and acceptance of his anger, integrating anger into
his identity along with a less narrow definition of maturity.

Recommendations:

As indicated earlier, Corey needs a vocational school program with
some remediation in literacy skill.  He could also benefit from
counselling and supportive psychotherapy both in regard to prob-
lems of self-esteem related to his learning disabilities and also
supporting and broadening his efforts to become a mature adult.
            Kenneth Barish, Ph.D.:ww  D-4/15/85       T-4/15/85


                                    Kenneth Barish, Ph.D.
                                    Psychologist

# EXHIBIT 52

J.A.952

| DSS-3405 (3/81) NYC | CASE NAME Johnson | | | CHILD'S NAME Corey Johnson | Date of Birth ▮ |
|---|---|---|---|---|---|
| **DISCHARGE/TRANSFER PLAN** | COMPLETED BY G. Maier | | DATE 5/28/85 | SSC NUMBER ▮ | |
| ☐ DISCHARGE | AGENCY/DISTRICT JCCA/PCS | | | LOCAL DISTRICT/AGENCY USE | |
| XX TRANSFER | | | | | |

- Complete a Discharge Plan for child in foster care 6 months prior to discharge or at the time the decision to discharge is made.

- Complete a Transfer Plan for child in foster care prior to transfer between Child Caring Agencies or Districts.

**PLAN**

We are transferring Corey to a JCCA group residence in NYC following his completion of school. Corey has demonstrated the necessary controls, judgement, ability to relate and motivation to move to a less restrictive setting. This has been evidenced in his behavior in an off-campus school program as well as his activities at PCS. Mrs. Johnson is not willing to have him return to her care. She has expressed agreement with this transfer.

Details have yet to be worked out. At this point there is no opening so we are uncertain as to which home he will be in. He will have a summer job through the Neighborhood Youth Corps.

He is being referred for a special education placement as well as some non-academic vocational programs.

**JUSTIFICATION OF DISCHARGE GRANT** to parent, relative or child when essential to effectuate discharge.

**ANTICIPATED LENGTH OF TRIAL DISCHARGE:**

J.A.953

**DSS-3402** (3/81) NYC

## VISITATION PLAN

| CASE NAME | | CHILD NAME | Date of Birth |
|---|---|---|---|
| Johnson | | Cory Johnson | ▮ |
| **COMPLETED BY** | **DATE** | **SSC NUMBER:** | |
| G. Maier | 5/28/85 | ▮ | |
| **AGENCY/DISTRICT** | | **LOCAL DISTRICT/AGENCY USE** | |
| JCCA/PCS | | | |

- Complete a Visitation Plan for each child placed or to be placed in foster care.
- Complete according to the time requirements for the Initial Service Plan and revise at each Service Plan Review.

| PERMANENCY GOAL | ANT. COMP. DATE |
|---|---|
| Discharge to self | 6/87 |

### 1. VISITATION SINCE LAST PLAN (If child has been in placement).

| DATE | LOCATION | PARTICIPANTS | DATE | LOCATION | PARTICIPANTS |
|---|---|---|---|---|---|
| | | | | | |
| | PLEASE SEE CALENDAR OF CONTACTS | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

### 2. DESCRIBE QUALITY OF VISITS, highlighting positive and negative factors. If family is not meeting visitation goals, explain reasons and efforts to encourage visiting.

Visits have been erratic. At Mrs. Johnson's request, Corey returned to two visits per month. He missed some of these. The decrease in contact and the lack of involvement when he is at home speaks to the isolation and emotional unavailability between Mrs. J. and Corey.

Please note that Corey's brother Robert was placed at Pleasantville Diagnostic Center. However, Mrs. Johnson has subsequently sent him to live with his father in North Carolina.

### 3. PLAN FOR VISITATION IN NEXT PERIOD. Include name of participants, frequency and location. Explain any changes in visitation plan.

Corey will visit twice a month.

*(Use reverse if additional space is required)*

**J.A.954**

| DSS-3403-F (3/81) NYC<br>**GOAL AND OBJECTIVE**<br>**REVIEW**<br>**FAMILY** | CASE NAME<br>Johnson | | LOCAL DISTRICT/AGENCY USE |
|---|---|---|---|
| ☐ *90* Days   ☒ 6 Months<br>☐ Change in Program Status | COMPLETED BY<br>G. Maier | DATE<br>5/28/85 | |
| | AGENCY/DISTRICT<br>JCCA/PCS | | |

Complete a Family Goal and Objective Review for the family of each child receiving foster care, preventive services for children, adoption or Child Protective Services at the time of the Service Plan Review. Service Plan Reviews occur as follows:
- 1st Service Plan Review 60 days from establishment of the Initial Service Plan.
- 2nd Service Plan Review 6 months from application for service for non-placement Child Protective Service case, 6 month from an indicated case determination.
- Subsequent Service Plan Reviews every 6 months thereafter.
- Change in Service Status - Prior to the status change.

LIST DATE, PLACE AND PARTICIPANTS FOR ALL FACE-TO-FACE CONTACTS WITH NATURAL FAMILY DURING REVIEW PERIOD. State Client's response to contacts with case planner, If unsatisfactory, state efforts to further involve family.

Mrs. Johnson missed several planned meetings. She is erratic in her response to casework sessions which seem to be a reflection of her ambivalence re Corey. She will verbalize a desire to be consistent and stay involved in planning for him, then withdraw.

| Goal No. | Objective No. | Include services given and client's response to services, client progress toward meeting goal and reason for major changes or deletions in goal or service. |
|---|---|---|
| 1 | | GOAL: Mrs. Johnson will remain consistent in her contacts with Corey despite their decision to live apart. |

In working with Mrs. Johnson, focus has been on helping her to recognize how important it is for Corey to feel that he is a part of the family. Mrs. Johnson has been able to follow through on this, including Corey in all family celebrations and occasions.

However, recently she has requested decreased visits. She will be encouraged to maintain a consistent approach with him.

Goal continues.

| Goal No. | Objective No. | Include services given and client's response to services, client progress toward meeting goal and reason for major changes or deletions in goal or service. |
|---|---|---|
| 2 | | GOAL: Mrs. Johnson will learn to support Corey's strengths and accept his |

WEAKNESSE A

One ongoing aim of treatment with Mrs. Johnson has been to help her to see that Corey has enormous need for her approval which means that she must find areas of his functioning to praise and support. His academic deficiencies must be down-played. There seems to be some movement by Mrs. Johnson to do so. However, it remains important to help her see Corey's continued need for her acceptance-as it seems that Mrs. Johnson withdraws attention from Corey when she perceives he is "alright"-and turns attention to Robert who is having difficulties. This goal should be continued in order to help prevent the possibility of Corey acting out in order to gain Mrs. Johnson's attention.

This came into special focus around Corey's school plans for next year. The Team met with Mrs. Johnson to give her a clear understanding of the serious deficits he has, but also the strengths that he can make use of. She appeared to be able to accept the assessment.

Page 2

| DSS-3403-F(3/81) NYC **GOAL AND OBJECTIVE REVIEW FAMILY** | CASE NAME. Johnson | | LOCAL DISTRICT/AGENCY USE |
|---|---|---|---|
| | COMPLETED BY G. Maier | DATE 5/28/85 | |

| Goal No. | Objective No. | Include services given and client's response to services, client progress toward meeting goal and reason for major changes or deletions in goal or service. |
|---|---|---|
| 3 | | **Goal:** Mrs. Johnson will encourage Corey's attempts to learn independent living skills, such as cooking, shopping. Mrs. Johnson is both able and willing to encourage Corey's learning to function in a more independent way. Future sessions with Mrs. Johnson can focus on specific skills that can be encouraged on home visits and how Mrs. Johnson can help Corey to learn such skills. |
| 4 | | **GOAL:** Mrs. Johnson will accept Corey's transfer to a group home. To this point she has mentioned some tentative plans to have Corey move to North Carolina to be with his half-brother Robert and his father. This seems unrealistic and certainly causes Corey confusion. She has also expressed agreement with the plan of moving him to the residence. I will work at helping her understand the advantages of his moving into the community. |
| | | Include services given and client's response to services, client progress toward meeting goal and reason for major changes or deletions in goal or service. |
| | | Include services given and client's response to services, client progress toward meeting goal and reason for major changes or deletions in goal or service. |

J.A.956

| DSS-3403-C (3/81) NYC | CASE NAME | | | CHILD'S NAME | Date of Birth |
|---|---|---|---|---|---|
| **GOAL AND OBJECTIVE** | Johnson | | | Corey Johnson | ▇ |
| **REVIEW** | COMPLETED BY | | DATE | SSC NUMBER: | |
| **CHILD** | G. Maier | | 5/28/85 | ▇ | |
| ☐ 90 Days  ☒ 6 Months | AGENCY/DISTRICT | | | LOCAL DISTRICT/AGENCY USE | |
| ☐ Change in Program Status | JCCA/PCS | | | | |

Complete a Child Goal and Objective Review for each child receiving foster care, preventive services for children, adoption or Child Protective Service at the time of the Service Plan Review. Service Plan Reviews occur as follows:
- 1st Service Plan Review - 60 days from establishment of the Initial Service Plan.
- 2nd Service Plan Review - 6 months from application for services or from an indicated case determination for non-placement Child Protective Service cases.
- Subsequent Service Plan Reviews - every 6 months thereafter.
- Change in Service Status - prior to the status change.

**PERMANENCY GOAL PROGRESS REPORT**  Describe the effect progress in the achievement of the family's and child's goals and objectives has had on the accomplishment of this child's permanency goal.

| | YES | NO |
|---|---|---|
| **PERMANENCY GOAL CHANGED** | | X |

Goal had been changed to discharge to independent living, based on Mrs. Johnson's inability to provide Corey with the emotional support and attention he needs to overcome his severely devalued self-concept.  Corey is a depressed youngster and his mother's self-focus exacerbates his bad feelings and encourages his acting-out behavior to avoid these feelings.  There is no extended family who can be resources for Corey.
The Team is planning on transferring him to a group residence in the city after the completion of his school program.  We believe that he would benefit from this move to a less restrictive setting.  He has demonstrated the necessary controls, judgement and motivation to succeed and grow in such a setting.

For child in foster boarding home or agency operated boarding home, list date, place and participants for all face-to-face contacts between child and caseworker during review period.

| Goal No. | Objective No. | Include services given and client's response to services, client progress towards meeting goal and reason for major changes or deletions in goal or service. |
|---|---|---|
| 1 | | Goal:  Corey will continue to participate in the school's intensive remediation program.<br>Corey tends to avoid the remediation program.  It is a confirmation of his severe handicap and a serious blow to his self-image.<br>Work continues, encouraging him to continue, helping him recognize his strengths as well as his limitations. |

J.A.957

Page 2

| DSS-3403-C (3/81) NYC **GOAL AND OBJECTIVE REVIEW CHILD** | CASE NAME. Johnson | | LOCAL DISTRICT/AGENCY USE |
|---|---|---|---|
| | COMPLETED BY G. Maier | DATE 5/28/85 | |

| Goal No. | Objective No. | Include services given and client's response to services, client progress toward meeting goal and reason for major changes or deletions in goal or service. |
|---|---|---|
| 2 | | |
|  | | Goal:  Corey will use opportunities offered him to learn independent living skills.<br><br>Staff have been working with Corey to help him make use of opportunities to learn to fuction more independently.  He was encouraged to seek a part-time job in the community, and did work for a few weeks in a grocery store.  He was not able to maintain this, an indication of how much work needs to be done in this area.<br><br>Goal continued. |

| Goal No. | Objective No. | Include services given and client's response to services, client progress toward meeting goal and reason for major changes or deletions in goal or service. |
|---|---|---|
| 3 | | |
| | | Goal:  Corey will use treatment to resolve his fears that he will lose his mother through continued placement.<br><br>Corey is beginning to talk more freely within the treatment relationship and has come to some awareness of his conflict, re: wanting independence and wanting to remain his mother's little boy. |

| Goal No. | Objective No. | Include services given and client's response to services, client progress toward meeting goal and reason for major changes or deletions in goal or service. |
|---|---|---|
| 4 | | |
| | | Goal:  Corey will use opportunities to prepare for discharge from PCS to a group living situation in the community.<br><br>Corey is involved in this process, using casework to explore what leaving means to him.  He has been interviewed by the group residence staff and is currently awaiting an opening. |

| Goal No. | Objective No. | Include services given and client's response to services, client progress toward meeting goal and reason for major changes or deletions in goal or service. |
|---|---|---|
| | | |
|  | | |

J.A.958

DSS-3404-F (3/81) NYC

**COMPREHENSIVE SERVICE PLAN FAMILY**

☐ 90 Days    ☒ 6 Months
☐ Change in Program Status

| CASE NAME | | LOCAL DISTRICT/AGENCY USE |
|---|---|---|
| Johnson | | |
| COMPLETED BY | DATE | |
| G. Maier | 5/28/85 | |
| AGENCY/DISTRICT | | |

| Goal No. | GOAL | |
|---|---|---|
| 1 | Mrs. Johnson will remain consistent in her contacts with Corey despite their decision to live apart. | |

| Obj. No. | OBJECTIVE/CLIENT TASK | METHOD/SERVICE TASK |
|---|---|---|
| A | Mrs. Johnson will encourage Corey's regular visits. | Social worker will continue regular meeting with Mrs. Johnson around the issue of her continued involvement with Corey and the importance to him of feeling included as a family member. |
| B | Mrs. Johnson will include Corey in all family celebrations and occasions. | 'Same as above' |
| C | Mrs. Johnson will not withdraw from Corey in response to her perceived belief that he is withdrawing from her. | 'Same as above' |

| Goal No. | GOAL | |
|---|---|---|
| 2 | Mrs. Johnson will learn to support Corey's strengths and accept his weaknesses. | |

| Obj. No. | OBJECTIVE/CLIENT TASK | METHOD/SERVICE TASK |
|---|---|---|
| A | Mrs. Johnson will demonstrate approval of Corey's athletic abilities. | Social worker will work with Mrs. Johnson around giving Corey approval for what he does well and making less important the areas in which he has poor success. |
| B | Mrs. Johnson will de-emphasize Corey's academic ability. | 'Same as above' |
| C | Mrs. Johnson will support the the plan of vocational training for Corey. | 'Same as above' |

J.A.959

Page 2

| DSS-3404-F (3/81) NYC | CASE NAME | | LOCAL DISTRICT/AGENCY USE |
|---|---|---|---|
| **COMPREHENSIVE SERVICE PLAN FAMILY** | Johnson | | |
| | COMPLETED BY | DATE | |
| | G. Maier | 5/28/85 | |

| | GOAL | |
|---|---|---|
| | Mrs. Johnson will encourage Corey's efforts to learn skills such cooking, shopping. | DATE 11/85 |

| | OBJECTIVE/CLIENT TASK | METHOD/SERVICE TASK |
|---|---|---|
| | Mrs. Johnson will provide opportunity on visiting weekends for Corey to practice new skills. | Social worker will discuss with Mrs. Johnson the importance to Corey of knowing how to manage daily living skills. |
| | Goal: Mrs. Johnson will accept Corey transfer to group home. | Ant. Comp. Date --9/85 |
| | a.) Mrs. Johnson will talk about plans to move Corey to a residence. | In casework sessions. |
| | b.) She will understand the benefits of this transfer. | In casework sessions. |
| | She will explore the true possibilities of Corey's living with Robert's father in Carolina. | In casework sessions. |

DESCRIBE THE FAMILY'S AND CHILD(REN)'S PARTICIPATION IN FORMULATING THE SERVICE PLAN AND, IF APPLICABLE, THE VISITATION PLAN

Meeting held 5/1/85. Participants included Unit Administrator, acting as Independent Reviewer, Social Worker, Child Care Worker, Psychologist, Mrs. Johnson and Corey.

AGENCY CONTACT PLAN WITH NATURAL PARENTS. Include frequency and location of planned interviews.

At least quarterly.

CLIENT CONCURRENCE (Optional)

   I understand that all information pertaining to my case, including this Plan for Service developed by my worker and me. is confidential.

   I have been informed of the procedures by which I may express and seek remedy for any dissatisfaction, including the opportunity for an Administrative Review and Fair Hearing.

   My worker and I will review this Plan for Services on a regular basis to evaluate my progress toward my goal.

   I have jointly developed this Plan for Service with my caseworker and understand its content and purpose.

| SIGNATURE OF CLIENT, Parent or Guardian | DATE | LOCAL DSS/SSC SIGNATURE | DATE |
|---|---|---|---|
| X | | X *Margarita Parish* | 7/10/85 |
| CASE PLANNER'S SIGNATURE | DATE | SUPERVISOR'S SIGNATURE | DATE |
| X *Gerard Maier* | 5/29/85 | X *Rena Bernstein* | 5/29/85 |

J.A.960

**DSS-3404-C (3/81) NYC**

**COMPREHENSIVE SERVICE PLAN CHILD**

☐ 90 Days  ☒ 6 Months  ☐ Change in Program Status

| CASE NAME | CHILD'S NAME | |
|---|---|---|
| Johnson | Corey Johnson | ▮▮▮ |

| COMPLETED BY | DATE | SSC NUMBER |
|---|---|---|
| G. Maier | 5/28/85 | ▮▮▮ |

| AGENCY/DISTRICT | LOCAL DISTRICT/AGENCY USE |
|---|---|
| JCCA/PCS | |

| CCRS CODE | PERMANENCY GOAL | ANT. COMP. DATE |
|---|---|---|
| | Discharge to self | 6/87 |

| CCRS CODE | GOAL NO. | GOAL | ANT. COMP. DATE |
|---|---|---|---|
| | 1 | Corey will continue to participate in the intensive remediation program. | 6/87 |

| CCRS CODE | OBJ. NO. | OBJECTIVE/CLIENT TASK | CCRS CODE | METHOD/SERVICE TASK |
|---|---|---|---|---|
| | A | Corey will continue to attend remedial classes despite his upset over poor progress. | | Teacher will encourage Corey to keep working and help him to understand that his difficulties do not reflect upon his intelligence. |
| | B | Corey will discuss his learning disability in treatment. | | Social worker will work with Corey towards understanding the implications of his learning disability. |
| | | | | |

| CCRS CODE | GOAL NO. | | ANT. COMP. DATE |
|---|---|---|---|
| | 2 | Corey will use opportunities offered him to learn independent living skills. | 11/85 |

| CCRS CODE | OBJ. NO. | OBJECTIVE/CLIENT TASK | CCRS CODE | METHOD/SERVICE TASK |
|---|---|---|---|---|
| | A | Corey will explore the possibilities of an off campus job. | | A cottage parent will help Corey read ads and apply for a job. |
| | B | Corey will learn how to handle money so that he can shop for himself. | | Teacher will help Corey learn enough simple arithmetic that he will be able to figure out correct change. |
| | | | | |

J.A.961

| | | | | | Page 2 |
|---|---|---|---|---|---|
| **DSS-3404-C (3/81) NYC** | CASE NAME | | | CHILD'S NAME | Date of Birth |
| **COMPREHENSIVE** | Johnson | | | Corey Johnson | |
| **SERVICE PLAN** | COMPLETED BY | | DATE | SSC NUMBER: | |
| **CHILD** | G. Maier | | 5/28/85 | | |

| CCRS CODE | Goal No. | GOAL | |
|---|---|---|---|
| | 4 | Corey will use opportunities to prepare for discharge from PCS to a group living situation in the community. | |

| OBJECTIVE/CLIENT TASK | | METHOD/SERVICE TASK | |
|---|---|---|---|

| CCRS CODE | Goal No. | | CCRS CODE | |
|---|---|---|---|---|
| | A | Corey will discuss discharge plans for a group home in treatment. | | Social worker will work with Corey towards understanding his feelings about discharge. |

| CCRS CODE | Goal No. | | CCRS CODE | |
|---|---|---|---|---|
| | | Corey will visit several group homes. | | Social worker will arrange for Corey to see several group living situation |

| CCRS CODE | Goal No. | | CCRS CODE | |
|---|---|---|---|---|
| | | | | |

**DESCRIBE THE FAMILY'S AND CHILD(REN)'S PARTICIPATION IN FORMULATING THE SERVICE PLAN AND, IF APPLICABLE, THE VISITATION PLAN.**

Meeting held on 5/1/85 included Unit Administrator (independent reviewer), Social Worker, Psychologist, Child Care Worker, Mrs. Johnson and Corey.

**BRIEFLY DESCRIBE ANY COURT INVOLVEMENT** in this case and indicate services which are being provided pursuant to a remand or court order.

None - voluntary placement.

For Child in Foster Boarding Home or Agency Operated Boarding Home, **DESCRIBE THE AGENCY PLAN OF CONTACT BETWEEN THE CASE-WORKER AND CHILD IN NEXT PERIOD. INCLUDE FREQUENCY AND LOCATION.**

**CLIENT CONCURRENCE (Optional)**

    I understand that all information pertaining to my case, including this Plan for Service developed by my worker and me, is confidential.

    I have been informed of the procedures by which I may express and seek remedy for any dissatisfaction, including the opportunity for an Administrative Review and Fair Hearing.

    My worker and I will review this Plan for Services on a regular basis to evaluate my progress toward my goal.

    I have jointly developed this Plan for Service with my caseworker and understand its content and purpose.

| SIGNATURE OF CLIENT, Parent or Guardian | DATE | LOCAL DSS/SSC SIGNATURE | DATE |
|---|---|---|---|
| X | | X _Margarita Pardi_ | 7/10/85 |
| CASE PLANNER'S SIGNATURE | DATE | SUPERVISOR'S SIGNATURE | DATE |
| X _Susan Maier_ | 5/29/85 | X _Lynn Polstein_ | 5/29/85 |

J.A.962

**DSS-3407-S(3/81)NYC**

## REASSESSMENT SUMMARY

| CASE NAME | | LOCAL DISTRICT/AGENCY USE |
|---|---|---|
| Johnson | | |

| COMPLETED BY | DATE |
|---|---|
| G. Maier | 5/28/85 |

| AGENCY/DISTRICT |
|---|
| JCCA/PCS |

| 4 | 26 | 82 | DATE FAMILY BEGAN TO RECEIVE SERVICES FROM YOUR AGENCY |
|---|---|---|---|

| Yes | No |
|---|---|
| X | |

A. This Reassessment Summary is being completed as part of a Service Plan Review.

UPDATE changes, that have occurred since the last assessment summary, by answering each checklist item. The items on the checklist correspond to sections 1 through 8 of this form.

| Yes | No | |
|---|---|---|
| ☐ | ☒☒ | Has there been a change in the level of risk to the child if he/she returns home or remains at home? (If yes complete question 1.) |
| ☐ | ☒ | Has there been a change in the family's ability to benefit from the provision of preventive services? (If yes complete question 2.) |
| ☐ | ☒ | Has there been a change in service needs? ( If yes complete question 3.) |
| ☒ | ☐ | Has there been a change in program choice? (If yes complete Sect. B & questions 1 - 8.) |
| ☐ | ☒ | Has there been a change in the factors justifying placement and or preventive services? (If yes complete question 5. |
| ☐ | ☒ | Has there been a change in the child's location? (If yes complete question 6. |
| ☐ | ☒ | Has this child been transfered to a more restrictive placement? (If yes complete Sect. B & questions 1 - 8.) |
| ☐ | ☒ | Has this child been in placement for 18 months or more and his/her permanency goal is return to home? (If yes complete question 8.) |

| Yes | No |
|---|---|
| X | |

B. This Reassessment Summary is being completed as the result of a PROGRAM STATUS change and requires the completion of the checklist below. For any change indicated in Section B, complete sections 1 through 8 of this form.

☐ Case Closing                   ☐ Change in Permanency Goal

☒☒ Change in Level of Foster Care

☐ Change in Program choice

- Preventive Non-mandated
- Preventive Mandated
- Placement/Preventive Mandated
- Placement/Preventive Non-mandated
- Placement
- Child Protective Non-placement

☐ Movement Between Agencies or District

1. CONSIDERING IDENTIFIED PROBLEMS AND ASSETS, EVALUATE THE RISK TO THE CHILD IF SHE/HE RETURNS HOME, OR REMAINS AT HOME. Evaluate the areas of parental functioning or child's behavior which limit the family's ability to provide a safe and supportive environment for the child. Corey is an emotionally deprived, learning disabled boy with severely impaired self-concept. Without the support and structure he received, he resorts to anti-social activity to avoid feelings of depression and lack of self-worth. He continues to need a supportive; structured setting but one that is less restrictive. He has demonstrated enough controls and motivation to warrant a transfer to a group home. Mrs. Johnson is not interested in having him returned to her care.

2. ASSESS THE FAMILY'S ABILITY TO BENEFIT FROM THE PROVISION OF FAMILY SUPPORT SERVICES AND TO MAINTAIN THE CHILD IN THE HOME. Support services would not enable Mrs. Johnson to provide the emotional support and acceptance Corey needs.

**J.A.963**

**DSS-3407-S**(3/81) NYC

**REASSESSMENT SUMMARY**

Page 2

| CASE NAME | | LOCAL DISTRICT/AGENCY USE |
|---|---|---|
| Johnson | | |

| COMPLETED BY | DATE |
|---|---|
| G. Maier | 5/28/84 |

3. Complete the following service needs information:

| A. NAME OF PERSON(S) NEEDING SERVICE | B. SERVICE NEEDS | C. AVAILABLE/ ACCEPTED* | | D. PRIMARY/SECONDARY SERVICE NEED |
|---|---|---|---|---|
| Corey Johnson | 12  Special Ed. | C | Provided | |
| | 9  Remedial Ed. | C | " | |
| | 14  Recreation | C | " | |
| | 24  Medical/Dental | C | " | |
| | 30  Casework Counseling | C | " | |
| | 29  Psychol/Psych. | C | " | |
| | 16  Family Planning | C | " | |
| Mrs. Johnson | 30  Casework Counseling | C | " | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

\* A. NOT AVAILABLE - The required service is currently not being delivered to other clients in your service community.
B. REFUSED - the client has not agreed to participate in the needed service.
C. PLANNED - provision of the needed service is being planned; specific arrangements are being made or services are currently being provided.
D. PLANNED, AWAITING OPENING - the needed service is available, but currently there are no openings for this client.

| 4. Based on the assessment of Problems, Assets and Service Needs, indicate which of the following Program Choices is most appropriate for the child-(ren) in this case. | NAME OF CHILD IN NEED OF SERVICE |
|---|---|
| | Corey Johnson |

A. PREVENTIVE SERVICES (non-mandated): Preventive Services are needed by this child and family. In their absence out-of-home placement would NOT be necessary within the next 60 days. Placement may be necessary for the child in the future.

B. PREVENTIVE SERVICES (mandated): Preventive Services are needed by this child and family. In their absence out-of-home placement would be necessary for the child within the next 60 days.

C. PLACEMENT/PREVENTIVE (mandated): This child is currently in placement. The provision of preventive services will enable him or her to return home within the next 90 days.

D. PLACEMENT/PREVENTIVE (non-mandated): This child is currently in placement. Preventive Services are also needed. However, these services will NOT enable the client to return home within the next 90 days.

E. PLACEMENT SERVICES: Out-of-home placement is needed for this child within the next 60 days. Also include children surrendered for adoption.

F. CHILD PROTECTIVE SERVICES (non-placement): Community based services are needed which are not preventive in nature.

J.A.964

| DSS-3407-S (3/81) NYC | | | | | Page 3 |
|---|---|---|---|---|---|

**REASSESSMENT SUMMARY**

| CASE NAME | LOCAL DISTRICT/AGENCY USE |
|---|---|
| Johnson | |

| COMPLETED BY | DATE | |
|---|---|---|
| G. Maier | 5/28/85 | |

5. For each child whose program choice is Preventive Services (mandated), Placement/Preventive (non-mandated or mandated) or Placement Services (see question 4, B,C,D and E) check the factors which describe the reason(s) why placement services and/or preventive services are needed.

CHILD'S NAME

1. Corey Johnson
2.
3.
4.

**FACTORS**

Check all that apply.

| (✔) | (✔) | (✔) | (✔) | |
|---|---|---|---|---|
| | | | | A. Caretaker expresses unwillingness to maintain the child in the home. |
| | | | | B. Parent(s) have voluntarily surrendered the child for adoption. |
| | | | | C. Child has been adjudged neglected in a Family Court proceeding. |
| | | | | D. Child has been adjudged abused in a Family Court proceeding. |
| | | | | E. Alleged abuse or neglect by parent or caretaker, in the caseworker's judgement, places the child in imminent danger of serious physical or emotional harm. |
| | | | | F. Child has been placed in the custody of the Commissioner of Social Services under Article 7 or 10 of the Family Court Act and foster care placement has been recommended or ordered by the court. |
| | | | | G. Parents or caretakers are unavailable due to arrest, detainment, imprisonment, or other situations involving the law. |
| | | | | H. Parents or caretakers are temporarily unable to maintain the child at home due to a housing or financial emergency, acute physical illness, or other emergency situation. |
| | | | | I. Parents or caretakers are incapable of providing proper care due to chronic or permanent conditions such as diagnosed mental illness, diagnosed developmental disability, alcohol or drug abuse, physical disability or illness or other comparable condition. |
| X | | | | J. Continuous, serious conflict between parent and child. |
| | | | | K. Parents are dead or missing. |
| | | | | L. Child's behavior presents a serious danger to other people or to the child's own well being. |
| | | | | M. Child's behavior results in damage to property or a criminal act related to property. |
| X | | | | N. Child's behavior, although not dangerous, results in severe management problems and constant disruption of group activities in at least two of the following three settings: home, school, and community. |
| | | | | O. Child's behavior caused by a serious emotional, physical or development disability is characterized by severe deficits in adaptive behavior. |
| | | | | P. Other, describe:                                   (use additional sheets as needed) |

J.A.965

# EXHIBIT 53

J.A.966

Page No. _____

BOARD OF EDUCATION OF THE CITY OF NEW YORK
110 LIVINGSTON STREET, BROOKLYN, N.Y. 11201
DIVISION OF SPECIAL EDUCATION

OSIS # _____
DATA BANK # _____
DATE OF PHASE I CONFERENCE __7/1/85__

## INDIVIDUALIZED EDUCATION PROGRAM — PHASE I

Student's Name (last) __Johnson__ (first) __Corey__ ▮▮▮▮ Sex __M__

Address __640 Riverside Drive *__ Apt _____

__New York, N.Y.__ Zip Code __10031__ Home District _____

Name of Parent/Guardian __Mrs. Emma Johnson__

Language of notices and conferences __English__

Home Phone __(212) 281-0884__ Business Phone _____

Language(s) student speaks __English__

Special Alerts __Corey needs a Speech & Language Evaluation to__
__determine if he can receive Speech therapy__

**RECOMMENDATIONS**

Classification __Learning Disabled__

Program(s) (e.g., special class, related services, etc.) __MIS I (Vocational)__

Service Category (Specify language if service is bilingual e.g., bilingual counseling - Spanish) __Counseling__

Resource Room: Days per week _____ Periods per day _____

Class Size and Staffing _____ Projected Date of Initiation of Service _____

**RELATED SERVICES RECOMMENDED BY SBST/COH** (If none, so indicate)

| Services(s) Recommended | Sessions Per Week | Minutes Per Session | Maximum Group Size |
|---|---|---|---|
| on site Counseling | 1 | 30 | 3:1 |

**TRANSPORTATION REQUIRED** (Check if required)

☐ Special transportation—Specify:

__* child is residing at Pleasantville Cottage School__
__Pleasantville, N.Y. 10570__

9/83

COPY 1-COMMITTEE ON THE HANDICAPPED

**J.A.967**

Page No. 2

OSIS # _____

Student's Name _Corey Johnson_

Date of Phase I Conference _7/1/85_

**REGULAR CLASS SCHEDULING** (If none, so indicate. If High School indicate Fall or Spring semester.)

Area/Subject                                                    Periods Per Day/Days Per Week

physical education,

~~assembly~~

lunch, assembly,

Physical Education, Lunch, Assembly (delete if not applicable)

---

**TESTING CATEGORY** (Category must be indicated)

| Category (circle one) | Testing Modifications (if category B) |
|---|---|
| A. Participates in all city and state testing<br>(B) Participates in all city and state testing with modifications<br>C. Excluded from citywide testing program*<br><br>*(H.S. students will not earn a diploma if in this category) | – small group setting (for testing at his level)<br>– time extended |

---

**SPECIALIZED EQUIPMENT/ADAPTIVE DEVICES** (If none, so indicate)

---

| **OTHER PROGRAMS/SERVICE CATEGORIES CONSIDERED**<br>List other programs/ service categories considered in selecting least restrictive environment<br><br>SIE II or<br>O.T.C. | Indicate the reasons these options were rejected.<br><br>Corey's intellectual functioning was too high for O.T.C. + he needs more vocational training than SIE II can offer |
|---|---|

Participants in Phase I Conference  EPC / COH review

7/1/85

Relationship/Title                              Signatures

R. Kamu- School Psychologist

B. Penna  Ed. Eval.

S. McClain  BL. Social Worker

Was a translator present?  Yes ☐  No ☒

Projected Date of Annual Review _3/86_    Projected Date of Triennial Re-evaluation _3/88_

9/83

COPY 1-COMMITTEE ON THE HANDICAPPED

**J.A.968**

Page No. 3

## INDIVIDUALIZED EDUCATION PROGRAM — PHASE I

OSIS # _____

Name of Student _Corey Johnson_

Date of Phase I Conference _7/1/85_

**ACADEMIC/EDUCATION ACHIEVEMENT AND LEARNING RATE** (e.g., intellectual/cognitive functioning, reading, mathematics, expressive language, receptive language, written language, speech, self help, occupational education, vocational education) (Attach as many pages as necessary.)

| Date Admin. | Area and Type of Instrument Used | Test Scores/ Results | Functional Description of Performance (include strengths and weaknesses) | Annual Goal Number | Annual Goals (Include all areas for which special education is indicated.) |
|---|---|---|---|---|---|
| 6/11/85 | Reading Brigance - Comp. | 40% at 3rd grade level | Corey is reading below grade level expectancy. | ① | To learn to read to at the very least acquire more functional literacy. |
| | Gray Oral Reading Comprehension | 75% at 2nd + 3rd grade | | | |
| | Sight Vocabulary WRAT | GE = 3.7 | | ①A | To improve sight vocabulary. |
| | Arithmetic WRAT | GE = 3.4 | Math skills are below grade level expectancy. | ② | To improve arithmetic skills in basic areas of addition, subtraction, multiplication, division, time, money + measurement + word problems. |
| | Vocational woodworking | Most Satisfactory | progress reported in area of woodworking on all school reports | ③ | To continue to learn a vocational skill, such as woodworking + further develop the work ethic. |

9/83

COPY 1-COMMITTEE ON THE HANDICAPPED

J.A.969

Page No. 3

## INDIVIDUALIZED EDUCATION PROGRAM — PHASE I

OSIS # _____

Name of Student  _Corey Johnson_  EPC/COH Review

Date of Phase I Conference  _7-1-85_

**ACADEMIC/EDUCATION ACHIEVEMENT AND LEARNING RATE** (e.g., intellectual/cognitive functioning, reading, mathematics, expressive language, receptive language, written language, speech, self help, occupational education, vocational education) (Attach as many pages as necessary.)

| Date Admin. | Area and Type of Instrument Used | Test Scores/ Results | Functional Description of Performance (include strengths and weaknesses) | Annual Goal Number | Annual Goals (Include all areas for which special education is indicated.) |
|---|---|---|---|---|---|
| 3/15/85 | WISC-R | Verbal IQ = Borderline | Corey has a very low fund of general information | (4) | Corey will learn to incorporate facts from the world around him into academics |
| | | | Corey's verbal comprehension and reasoning are poor | (5) | Corey will improve his verbal comprehension and reasoning |
| | | | Corey's specific word knowledge is far below average | | |
| | | | Corey's arithmetic reasoning skills are better than verbal skills but still below age level. | (6) | Corey will be able to perform mathematic skills necessary to daily living |
| | | Performance IQ = low average | Corey has good sequential reasoning with non-verbal materials | (7) | Corey will improve his ability to pay attention to visual cues and details |
| | | Full Scale IQ = Borderline | Corey's serious visual motor deficits interfere with perceptual organization | (8) | Corey will learn problem solving strategies. i.e. trial and error-recognizing an error and correcting it |

COPY 1-COMMITTEE ON THE HANDICAPPED

9/83

Page No. 4

## INDIVIDUALIZED EDUCATION PROGRAM — PHASE I

OSIS # _____

Name of Student _Corey Johnson_

Date of Phase I Conference _EPC/COH REVIEW  7-1-75_

| Date Admin. | Area and Type of Instrument Used | Test Scores/ Results | Functional Description of Performance (include strengths and weaknesses) | Annual Goal Number | Annual Goals (Include all areas for which special education is indicated.) |
|---|---|---|---|---|---|
| **SOCIAL DEVELOPMENT** (e.g., peer relationships, adult relationships, response to learning situations, self help, self concept) (Attach as many pages as necessary) | | | | | |
| 3/15/85 | Projective Testing. | Peer relationships | Corey has developed positive and appropriate interpersonal relationships. | ⑨ | Corey will continue to take a positive leadership role. |
| | | Response to learning. | Corey responded very well to carpentry. He is too frustrated by academics | ⑩ | Corey will be allowed to develop vocational skills |
| | | Self-concept | Corey expends a great deal of energy to suppress anger. Prone to depression | ⑪ | Corey will learn to appropriately express his anger and not turn it inward. |
| **PHYSICAL DEVELOPMENT** (e.g., vision, hearing, health/vitality, mobility, manual dexterity, manipulative skills, Adaptive Physical Education) (Attach as many pages as necessary) | | | | | |
| 3/15/85 | Block Design | Serious organic deficits | Corey rotated several designs. | ⑫ | Corey will learn to recognize his errors and then correct them |

**MANAGEMENT NEEDS** Human and material resources necessary to assist the student in attaining program goals as stated in Academic, Social, and Physical Development.

~~Systematic~~ Small structured class to learn academic and vocational training / employment experiences.

**COPY 1-COMMITTEE ON THE HANDICAPPED**

9/83

J.A.971

Page No. 4

## INDIVIDUALIZED EDUCATION PROGRAM — PHASE I

OSIS # _____

Name of Student _Corey Johnson_

Date of Phase I Conference _7/1/85_

| Date Admin. | Area and Type of Instrument Used | Test Scores/ Results | Functional Description of Performance (include strengths and weaknesses) | Annual Goal Number | Annual Goals (Include all areas for which special education is indicated.) |
|---|---|---|---|---|---|
| | | | **SOCIAL DEVELOPMENT** (e.g., peer relationships, adult relationships, response to learning situations, self help, self concept) (Attach as many pages as necessary) | | |
| 3/19/85 | Parent Int. Done by C. Aaron. Renewed by G. Millán | | Corey is a 16.8 year old boy currently residing at Pleasantville Cottage School because of truancy and acting out behavior in school & home. The Johnson family consist of Mrs Emma Johnson (mother) Corey and a 14 year old half brother. Corey visits home twice a month. Corey is really learning disable and as a result he has a low self esteem. He requires much support and reassurance. One of Corey' strengths is his ability to interact with others. | | |
| | | | **PHYSICAL DEVELOPMENT** (e.g., vision, hearing, health/vitality, mobility, manual dexterity, manipulative skills, Adaptive Physical Education) (Attach as many pages as necessary) | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**MANAGEMENT NEEDS** Human and material resources necessary to assist the student in attaining program goals as stated in Academic, Social, and Physical Development.

_____

_____

_____

**COPY 1-COMMITTEE ON THE HANDICAPPED**

9/83

J.A.972

# NAME Johnson, Corey     DOB: ▨

IFICATION Learning Disabled     REC.PROG. MISI-Vocational     STAFF.RATIO 12:1

STREAMING: YES ✓ NO ___     SUBJECT AREAS Phys.Ed; Lunch; Assembly

ING: TESTING 3.5     MATH: TESTING 3.4

FUNCTIONAL ___ (Teach. Est.)     FUNCTIONAL ___ (Teach. Est.)

| | Below | Average | Above | | | Yes | No |
|---|---|---|---|---|---|---|---|
| UAGE: RECEPTIVE | ✓ | | | BEHAVIOR NEEDS | | | ✓ |
| EXPRESSIVE | ✓ | | | WITHDRAWN | | | ✓ |
| ORAL | ✓ | | | AGGRESSIVE | | | ✓ |
| WRITTEN | ✓ | | | DISTRACTIBLE | | | |
| L MOTOR SKILLS | ✓ | | | | | | |
| MOTOR SKILLS | | ✓ | | | | | |
| MOTOR | ✓ | | | | | | |

COMMENTS: Corey assumes leadership role appropriately. Controls anger

STUDENT PROFILE

ING STRATEGIES: (e.g. multi-modality, multi-sensory approaches) Multi-modality - Vocational skills

ICAL ALERTS: None

AL NEEDS: (health aide, toileting, adaptive devices, etc.) None

SPORTATION: REQUIRES OPT BUSING ___ TRAVEL TRAINER ✓ TRAVELS INDEPENDENTLY ___
LIFT BUS
ENTS: Corey needs travel training until he is familiar with route and new neighborhood.

J.A.973

# EXHIBIT 54

J.A.974

DSS-3627-1(12/84)

## UCR REASSESSMENT AND SERVICE PLAN REVIEW
### 6 Month

| CASE NAME | CASE NUMBER | COMPLETED BY | UNIT/WORKER NUMBER |
|---|---|---|---|
| Johnson | S 4766716 | Odette Noble | 9085 |

| AGENCY/DISTRICT | | PLAN DATE |
|---|---|---|
| | | 11/31/85 |

**GENERAL INSTRUCTIONS:**

This form is to be completed 6 months from Day 1 (CID) and every 6 months thereafter (refer to Section VII of the UCR Desk Aid).

**Bold type following questions indicate Utilization Review Regulatory Reminders.**

1. REASSESSMENT

Write a narrative reassessment which describes changes in family situation and summarizes family's current functioning. *If a Foster Care Placement* describe adjustment to foster care of any child in placement. *For Protective Services Cases* reassess the family's ability to protect and potential to harm the child. Conclude with a statement which provides the most significant service priorities and (re)evaluate the family's ability to benefit from these services. **Continuing Necessity for Placement or Mandated Preventive Services; Risk of Foster Care; Ability to Benefit from Services.**

Mrs. Johnson remains elusive and almost impossible to engage. So far she has missed all appointments. She is also sporadic in keeping in touch with Corey. However, he talks about her as if she is a goddess and most reliable in relation to him. I have been unable to discern her life style, the kind of friends she has and what she does to support herself. Corey reports having many god sisters in the community. Recently the mother telephoned and wanted Corey to attend the funeral of her godfather. Corey was allowed to do so which meant missing a day of school. Corey subsequently informed us this was a god father.

Corey appears to be quite comfortable in the residence and expresses no wish to return home to live. This would seem to be in Corey's best interest since mother lives such a chaotic lifestyle and does appear to be able to give Corey sufficient nurturance, support and guidance.

(Reassessme

J.A.975

DSS-3627-2(12/84)

| CASE NAME | CASE NUMBER |
|---|---|
| Johnson | S 4766716 |

## 2. CASEWORK CONTACTS

Summarize the nature of the interaction between the participants during the casework contacts. Indicate any barriers to such contacts and steps planned or taken to overcome those barriers. Include in the summary the frequency and location of the contacts. (If the Casework Contact Grid is completed, it is not necessary to include the frequency and location of contacts in the summary.) **Required Casework Contacts with Child, Child's Caretaker, Parents and In-Home Contacts.**

Caseworker is seen in weekly casework sessions and participates in bi-weekly group sessions with caseworker, houseparents and other boys.

Mother was seen around intake, but has not kept an appointment since.

## 3. COURT INVOLVEMENT

a) Has there been any court related or legal activity since the last Plan?

☐ Yes    ☒ No

If Yes, complete the following:*

| Date Of Event | Court | Event (Petition filed, hearing held, referral) | Type (ex. Neglect, Abuse JD, PINS, criminal court, etc.) | Child(ren) Involved | Outcome (Adjudication, Disposition, Court Orders, other) |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

*For cases tracked in CCRS encode appropriate legal activities on Services Activity Log.

(Reassessm

J.A.976

DSS-3627-3(12/84)

| CASE NAME | CASE NUMBER |
|---|---|
| Johnson | S 4766716 |

3. b) What effect did the legal activity have on the plan and the child's Permanency Planning Goal?

4. PROGRAM CHOICE AND PERMANENCY PLANNING GOAL

a) List the names of each child for whom services are authorized and identify the program choice(s), permanency planning goal (PPG) and the anticipated completion date(ACD) for the PPG.

| CHILD'S NAME | PROGRAM CHOICE* (Choose all that apply) | PPG*ACD* | | | CHILD'S NAME | PROGRAM CHOICE* (Choose all that apply) | PPG*ACD* | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Goal | Mo. | Yr. | | | Goal | Mo. | Y |
| Carey | C | 03 | 11 | 89 | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

**PROGRAM CHOICE CODES**

A Preventive Non-Mandated
B Preventive Mandated
C Placement
D Protective

**PERMANENCY PLANNING GOALS**

01 Discharge to Parents
02 Discharge to Primary Resource Person(s)/Relative(s)
03 Discharge to Independent Living
04 Discharge to Adoption
05 Discharge to Adult Residential Care

06 Prevent Placement
07 Prevent Return to Placement
10 Independent Living -Unaccompanied Refugee Only
11 Protect Child (No PPG for CCRS)

b) If there has been a change in PPG since the previous plan, explain the reason.

*For cases tracked in CCRS encode the Program Choice, Reasons, PPG and Anticipated Completion Date on Assessment Plan Grid (turnarou

(Reassessm

J.A.977

**DSS-3627-4**(12/84)

| CASE NAME | CASE NUMBER |
|---|---|
| Johnson | S  4766716 |

5. PERMANENCY PROGRESS (for Placement Cases only)

Check (✔) each question "YES" or "NO." If "YES" is checked then give the requested information in the space provided. List the children involved in the righthand column.

| YES | NO | | WHICH CHILD |
|---|---|---|---|
| | X | A. Is any child with a permanency goal of return to parents or relatives expected to remain in placement another 6 months or more? If so, specify barriers preventing discharge, and what alternatives are being considered or have been tried.* | |
| | X | B. Has any child who is not legally free had a permanency goal of adoption 6 months or more? If so, specify the actions taken to free the child and any barriers to freeing. | |
| | X | C. Is any legally free child with a permanency goal of adoption not in adoptive placement? If so, specify the actions taken to place the child into an adoptive home and barriers to placement.** | |
| | X | D. Has any child been in an adoptive placement 6 months or more? If so, specify the barriers preventing legal adoption in this home and actions taken to overcome these. | |
| | X | E. Is any child expected to be discharged to Independent Living or Adult Residential Care within 24 months? If so, describe the services needed to permit discharge, and to support the child after discharge. Specify barriers to their provision. | |

USE SPACE BELOW to provide information requested for any "YES" answer given in Question 5. Be sure to indicate child(ren) involved.

*If such a child will be in care with a permanency goal of return home for 24 months, a UR exception is required.
**If a legally free child with a PPG of adoption will be free 12 months and not in adoptive placement, a UR exception is required.

FOLLOW LOCAL PROCEDURES FOR UR EXCEPTION CASES.

(Reassessment)

J.A.978

DSS-3627-5(12/84)

| CASE NAME | CASE NUMBER | SCR NUMBER |
|---|---|---|
| Johnson | S 4766716 | |

6. PLAN REVIEW: GOAL REVIEW AND SETTING

Review all goals from previous plan (including any Plan Amendment). Restate each goal and explain the extent of goal achievement. If a previous goal is to be retained, complete the block by entering the date the goal is expected to be achieved, the tasks and the family member(s) and/or service providers(s) expected to carry out the tasks. If a goal is to be discontinued, complete all parts except target date and tasks. After reviewing previous goals, list any new goals set, omitting the question about goal achievement. **Services Consistent with Needs**

The Goal below is: New _____    Retained __X__    Target Date __11/87__    Discontinued _____

(Re)State Goal: ___Mrs. Johnson will remain consistent in her contacts with Corey___
___despite their decision to live apart.___

Explain level of goal achievement: ___Mrs. Johnson remains inconsistent and hard to engage.___
___She is secretive about her lifestyle and we have little idea as to how she___
___lives and supports herself.___

**TASKS**

CHILD/FAMILY (list names)

Mrs. Johnson will encourage Corey's regular visits.

Mrs. Johnson will include Corey in all family celebrations and occasions.

Mrs. Johnson will not withdraw from Corey in response to her perceived belief that he is withdrawing from her.

SERVICE PROVIDERS (list names)

Social worker will continue regular meetings with Mrs. Johnson around the issue of her continued involvement wi Corey and the importance to him of feeling included as a family.

same as above

sa,e as above

The Goal below is: New _____    Retained __X__    Target Date _____    Discontinued _____

(Re)State Goal: __Mrs. Johnson will learn to support Corey's strengths and accept his__
__weaknesses.__

Explain level of goal achievement: __As long as others are raising Corey, Mrs. Johnson appears__
__to be more accepting of Corey. However, this remains an area of concern.__

**TASKS**

CHILD/FAMILY (list names)

Mrs. Johnson will demonstrate approval of Corey's athletic abilities.

Mrs. Johnson will de-emphasize Corey's academic ability.

Mrs. Johnson will support the plan of vocational training for Corey.

SERVICE PROVIDERS (list names)

Social worker will work with Mrs. Johnso around giving Corey approval for what he does well and making less important the areas in which he has poor success.

Same as above.

Same as above.

*For cases tracked in CCRS encode Child and Family Service Needs and Service Status on Assessment Plan Grid (turnaround).

(Reassessmen

J.A.979

DSS-3627-6(12/84)

| CASE NAME | CASE NUMBER | SCR NUMBER |
|---|---|---|
| Johnson | S 4766716 | |

The Goal below is: New __X__   Retained _____   Target Date __6/88__   Discontinued _____

(Re)State Goal: __Corey will attend Newtown High School Special Education program__
__daily and on time.__

Explain level of goal achievement: __Carey was extremely pleased with his first report card__
__and appears to be working hard to achieve and do well.__

**TASKS**

**CHILD/FAMILY (list names)**

Corey will continue to attend specialized classes.

Corey will discuss his learning disability in treatment.

**SERVICE PROVIDERS (list names)**

Teacher will encourage Corey to keep working and help him to understand that his difficulties do not reflect upon his intelligence.

Social worker will work with Corey towards understanding the implications of his learning disability.

---

The Goal below is: New _____   Retained __X__   Target Date __11/87__   Discontinued _____

(Re)State Goal: __Corey will use opportunities offered him to learn independent living__
__skills.__

Explain level of goal achievement: __Corey wants very much to be able to care for himself__
__in the community.  The biggest obstacle will be for him to find a way to support__
__himself.  We will continue to work with him toward this end.__

**TASKS**

**CHILD/FAMILY (list names)**

Corey will explore the possibilities of a part time job.

Corey will learn how to handle money so that he can shop for himself.

**SERVICE PROVIDERS (list names)**

Houseparents will help Corey read ads and apply for a job.

Caseworker, houseparents and teachers will help Corey learn enough simple arithmetic that he will be able to figure out correct change.

(Reassessmer

**J.A.980**

DSS-3627-7(12/84)

| CASE NAME | CASE NUMBER | SCR NUMBER |
|---|---|---|
| Johnson | S  4766716 | |

The Goal below is: New __x__    Retained _____    Target Date __11/86__    Discontinued _____

(Re)State Goal: Corey will find a place for himself in the residence, make positive attachment to boys, houseparents and caseworker and learn to trust staff.

Explain level of goal achievement: _____

Corey seems to be gradually moving in, feeling comfortable and learning to trust staff.

## TASKS

| CHILD/FAMILY (list names) | SERVICE PROVIDERS (list names) |
|---|---|
| Corey will keep weekly casework appointments. | Caseworker will see Corey weekly and establish a trusting, warm relationship with her. |

The Goal below is: New _____    Retained _____    Target Date _____    Discontinued _____

(Re)State Goal: _____

Explain level of goal achievement: _____

## TASKS

| CHILD/FAMILY (list names) | SERVICE PROVIDERS (list names) |
|---|---|
| | |

(Reassessmen

J.A.981

DSS-3627-8(12/84)

| CASE NAME | CASE NUMBER |
|---|---|
| Johnson | S 4766716 |

* FAMILY/CHILD VISITING PLAN (for Placement Cases only)

a) For each child in foster care, summarize the nature of the interaction between the child and parent(s) and/or relative(s) during the visits, highlighting positive and negative factors. Include in this summary the frequency and location of the visits. (If the Family/Child Visiting Grid is completed, it is not necessary to include the frequency and location of visits in the summary.)

As indicated, Corey talks about his mother as if she were responsible and related to his needs. However, he isn't anxious to visit home and one suspects that deep down he is not unaware of her inadequacy but defends against admitting them to himself and others.

b) For each child in foster care, describe the visiting plan for the next period. Include who will visit, how often, and where. Indicate any changes from the previous visiting plan and the reason for the changes. **Facilitate Bi-Weekly Visiting.**

Corey is allowed a weekend visit a month and a day visit a month, but he seldom chooses to visit and Mother doesn't follow through re arranging visits.

(Reassessmen

J.A.982

DSS-3627-9(12/84)

| CASE NAME | CASE NUMBER | SCR NUMBER |
|---|---|---|
| Johnson | **S** 4766716 | |

8. PLAN DEVELOPMENT

a) Discuss the level of involvement of parent(s) and children in the development of the service plan. **Parent/Child Participation.**

Corey came to the treatment team meeting on September 20th.
He is also seen in weekly casework appointments.

b) List all participants in the planning conference with their title or role and state date of conference. **Service Plan Review. Third Party Reviewer/Foster Care.**

Murray Gordon, M.D. Consulting Psychiatrist-Third Party Reviewer
Diane Yarborough - Child Care Coordinator
Shari Siegal - Nurse
John Rios - Residence Supervisor
Marvin Hunt, Connie Carrasquillo, Joe Rivera - Houseparents.

| | SIGNATURES | DATE SIGNED |
|---|---|---|
| Case Planner | | 11/21/85 |
| Case Planner's Supervisor | | 11/21/85 |
| Case Manager | | |
| CPS Monitor | | |
| | | |
| | | |

I have read and I understand the Service Plan.

| | | |
|---|---|---|
| Parent | | |
| Parent | | |
| Child | | |
| Child | | |

Parent/Child signatures are optional)

(Reassessment)

J.A.983

**DSS-3627-10**(12/84)

| CASE NAME | | CASE NUMBER |
|---|---|---|
| Johnson | | S  4766716 |

### Casework Contact Grid (Local District Option)

#### CONTACTS SINCE LAST PLAN

| DATE | LOCATION | PARTICIPANTS |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

**DSS-3627-10**(12/84)

| CASE NAME | | CASE NUMBER |
|---|---|---|
| Johnson | | S  4766716 |

(Reassessment)

J.A.984

DSS-3627-11(12/84)

| CASE NAME | CASE NUMBER |
|---|---|
| Johnson | S  4766716 |

## Family/Child Visiting Grid (Local District Option)

### VISITING SINCE LAST PLAN (If child has been in placement).

| DATE | LOCATION | PARTICIPANTS |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

(Reassessme

J.A.985

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **Case No. 3:92CR68 (DJN)** |
| | : | **CAPITAL CASE** |
| **COREY JOHNSON,** | : | **Execution Scheduled for** |
| | : | **January 14, 2021** |
| Defendant. | : | |

**NOTICE OF SUBMISSION OF EXHIBITS (SUBMISSION 6 OF 8)**

Corey Johnson hereby gives notice of the submission of Exhibits 55-70 as attachments to

his Motion Pursuant to 28 U.S.C. § 2255 Raising Claim of Ineligibility To Be Executed Under

18 U.S.C. § 3596(c). This is the sixth submission of eight.


Dated: December 14, 2020                    Respectfully submitted,

                                            /s/ David E. Carney
                                            David E. Carney, VA Bar #: 43914
                                            Donald P. Salzman (Admitted Pro Hac Vice)
                                            Skadden, Arps, Slate, Meagher & Flom, LLP
                                            1440 New York Avenue, NW
                                            Washington, DC 20005
                                            Telephone: (202) 371-7246
                                            Fax: (202) 661-8295
                                            Email: david.carney@skadden.com

                                            *Counsel for Corey Johnson*

**J.A.986**

**CERTIFICATE OF SERVICE**

I hereby certify that on December 14, 2020, I electronically filed the foregoing with the

Clerk of Court using the CM/ECF system, which will then send notification of such filing to all

parties and counsel included on the Court's Electronic Mail notice list.

/s/ David E. Carney
David E. Carney, VA Bar #: 43914
Skadden, Arps, Slate, Meagher & Flom, LLP
1440 New York Avenue, NW
Washington, DC 20005
Telephone: (202) 371-7246
Fax: (202) 661-8295
Email: david.carney@skadden.com

**J.A.987**

## INDEX OF EXHIBITS TO MOTION PURSUANT TO 28 U.S.C. § 2255 RAISING CLAIM OF INELIGIBILITY TO BE EXECUTED UNDER 18 U.S.C. § 3596(c)

EXHIBIT NO.

**SUBMISSION 1**

**EXPERT REPORTS**

Report of Daniel J. Reschly, Ph.D., Aug. 26, 2016 ........................................................1

Curriculum Vitae of Daniel J. Reschly, Ph.D., May 15, 2020.................................... 1(a)

Report of J. Gregory Olley, Ph.D., Aug. 24, 2016...........................................................2

Curriculum Vitae of J. Gregory Olley, Ph.D., Oct. 2020 .......................................... 2(a)

Letter from Gary N. Siperstein, Ph.D. to Counsel for Corey Johnson, Dec. 16, 2016 ....................3

Curriculum Vitae of Gary N. Siperstein, Ph.D., Sept. 2020 ..................................... 3(a)

Debra Nelson, Mitigation Report, Sept. 27, 2016...........................................................4

Report of Richard G. Dudley, Jr., M.D., Aug. 22, 2016...................................................5

**TRIAL TRANSCRIPTS**

Trial Tr., Feb. 3, 1993 .....................................................................................................6

**SUBMISSION 2**

Trial Tr., Feb. 10, 1993 ...................................................................................................7

**SUBMISSION 3**

Cornell Mitigation Information and Report (Excerpt).....................................................8

Trial Tr., Feb. 12, 1993 ...................................................................................................9

Trial Tr., Feb. 15, 1993 .................................................................................................10

**AFFIDAVITS & DECLARATIONS**

Declaration of Kenneth Barish, Ph.D. (staff psychologist at Pleasantville Cottage School), July 22, 2014 .............................................................................................11

Affidavit of Richard Benedict (special education teacher at Pleasantville Cottage School), Dec. 5, 2011........................................................................................12

Affidavit of Darnell Brown (acquaintance in Trenton, NJ), Oct. 14, 2011 ..................13

Affidavit of Darold Brown (acquaintance in Trenton, NJ), June 15, 2011 ..................14

Affidavit of Craig S. Cooley (appointed counsel in 1992), Sept. 20, 2016 ..................15

Affidavit of Courtney Daniels (Corey's lifelong friend), May 21, 2011 ......................16

Declaration of Monica Dawkins (Corey's former girlfriend), July 16, 2012 ...............17

**SUBMISSION 4**

Declaration of Cary Gallaudet, Ph.D. (psychologist at Pleasantville Diagnostic Center), Mar. 19, 2012.........................................................................................18

J.A.988

**EXHIBIT NO.**

Declaration of Ann Harding (staff member at Pleasantville Cottage School), Nov. 21, 2011......................................................................................................................19

Affidavit of Minnie Hodges (Corey's maternal aunt), Apr. 30, 2011 ...........................20

Affidavit of Priscilla Hodges (Corey's cousin), Apr. 30, 2011 ....................................21

Affidavit of Queenie Hodges (Corey's cousin), Apr. 30, 2011 ....................................22

Declaration of Esther Johnson (Corey's maternal grandmother), Apr. 30, 2011 .........23

Affidavit of Robert Johnson (Corey's half-brother), June 29, 2011..............................24

Affidavit of Antionette Daniels Joseph (the best friend of Corey's mother and Corey's godmother), May 21, 2011) .........................................................................25

Declaration of Leona Klerer (reading teacher at Mount Pleasant Cottage School), June 3, 2011 ................................................................................................................26

Affidavit of Gerald Lefkowitz (unit administrator at Pleasantville Cottage Center), Dec. 5, 2011 ................................................................................................................27

Affidavit of Odette Noble (social worker at Elmhurst), Dec. 1, 2011 ..........................28

Declaration of George Sakheim, Ph.D. (Chief of Psychological Services at Pleasantville Diagnostic Center), June 17, 2011 .....................................................29

Affidavit of David Washington (childcare worker at Elmhurst), Mar. 1, 2012..............30

**SUBMISSION 5**

**CHILDHOOD & TESTING RECORDS**

Gregory Judge, School Social Worker, Social History, Mar. 4, 1977.............................31

Cheryl Spillane, Learning Consultant, Bureau of Pupil Personnel Services, Jersey City Public Schools, Learning Consultant Evaluation to Child Study Team, Mar. 18, 1977...................................................................................................................32

F.A. Figurelli, M.D., Chief Psychologist, Psychological Examination Record, Mar. 25, 1977...................................................................................................................33

Eleanor Glantz, Social Worker, Case Service, Dec. 11, 1978 .......................................34

Committee on the Handicapped, Referral to the Committee on the Handicapped, Feb. 26, 1979...................................................................................................................35

Committee on the Handicapped Records, May 21, 1979 ...............................................36

Washington Heights-West Harlem Community Mental Health Center, Child Assessment Evaluation Summary, Dec. 9, 1981 ....................................................37

Ernest H. Adams, Staff Psychologist, Psychodiagnostic Evaluation, Dec. 11, 1981 ....38

Cary Gallaudet, Psy.D., Pleasantville Cottage School, Psychological Evaluation, Feb. 1, 1982...................................................................................................................39

**J.A.989**

EXHIBIT NO.

Leona Klerer, Mount Pleasant Cottage School Screening Upon Admission, Feb. 22, 1982 ............................................................................................................................40

Amira Offer, Caseworker, Psychosocial Summary, Mar. 15, 1982 ...............................41

Gloria Caro, Pleasantville Cottage School, Reassessment Summary, May 21, 1982 ...................42

Gloria Caro, Caseworker, Initial Conference, Current Assessment and Transfer Summary, June 9, 1982..........................................................................................43

Gayle Turnquest, Caseworker, Pleasantville Cottage School, Current Assessment, Jan. 31, 1983 ...................................................................................................44

**SUBMISSION 6**

Ken Barish, Ph.D., Psychologist, Pleasantville Cottage School, Psychological and Educational Evaluation, Apr. 29, 1983 ........................................................45

John B. Stadler, M.D., Clinical Director, Pleasantville Cottage School, Psychiatric Evaluation, Aug. 26, 1983 ...................................................................................46

Lynda Coccaro, Speech and Language Pathologist, Donald R. Reed Speech Center, Inc., Phelps Memorial Hospital, Speech and Language Evaluation, Oct. 5, 1983 ..................47

Lynn Polstein, Jewish Child Care Association of New York, Pleasantville Cottage School, Change in Permanency Plan, Apr. 13, 1984 ...................................................48

Gerard Maier, Social Worker, Current Assessment, Sept. 4, 1984 ...............................49

Christine Aaron, MSW Intern, Jewish Child Care Association of New York, Pleasantville Cottage School, Visitation Plan, Dec. 12, 1984 ...................................................50

Kenneth Barish, Ph.D., Psychologist, Pleasantville Cottage School Psychological Evaluation, Apr. 15, 1985 ...................................................................................51

Gerard Maier, Pleasantville Cottage School, Discharge/Transfer Plan, May 28, 1985................52

Board of Education of the City of New York, Individualized Education Plan – Phase 1, July 1, 1985......................................................................................................53

Odette Noble, Social Worker, Jewish Child Care Association of New York, Elmhurst Boys Residence, UCR Reassessment and Service Plan Review 6 Month, Nov. 21, 1985........................................................................................................................54

**SUBMISSION 7**

Odette Noble, Social Worker, Jewish Child Care Association of New York, Elmhurst Boys Residence, UCR Reassessment and Service Plan Review 6 Month, June 28, 1986........................................................................................................................55

Odette Noble, Social Worker, Jewish Child Care Association of New York, Elmhurst Boys Residence, UCR Plan Amendment: Form D Trial Discharge, Feb. 23, 1987 ...............56

Newtown High School, Scholastic Transfer Record, Dec. 7, 1987 ...............................57

**J.A.990**

| | Exhibit No. |
|---|---|

Janet Valentine, Child Care Worker, Pleasantville Diagnostic Center, Outline for Cottage Report (undated) ........................................................................................58

**Court Records**

Notice of the Intention of U.S.A. to Seek Death Penalty as to Mr. Tipton, May 1, 1992 ..............................................................................................................................59

Notice of the Intention of U.S.A. to Seek Death Penalty as to Mr. Roane, May 1, 1992..............60

Second Superseding Indictment, July 20, 1992, Dkt. 115 .........................................................61

Notice of the Intention of U.S.A. to Seek Death Penalty as to Mr. Thomas, Oct. 28, 1992 ..............................................................................................................................62

Verdict Form, Feb. 3, 1993, Dkt. 466........................................................................................63

Notice of the Intention of U.S.A. to Seek Death Penalty as to Mr. Johnson, Feb. 8, 1993 ..............................................................................................................................64

Special Findings, Feb. 16, 1993, Dkt. 508................................................................................65

Motion to Have Defendant Declared Mentally Retarded, *United States v. Thomas*, No. 3:92CR68 (E.D. Va. Apr. 15, 1993) ..............................................................66

Memorandum in Support of Initial Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. Section 2255, June 15, 1998, Dkt. 714 (Excerpt) ........................................67

Reply Memorandum in Support of Initial Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. Section 2255, Mar. 15, 1999, Dkt. 761 (Excerpt)................................68

Ex. 14 to Reply Memorandum in Support of Initial Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. Section 2255, Mar. 15, 1999 ..............................................69

Ex. 15 to Reply Memorandum in Support of Initial Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. Section 2255, Mar. 15, 1999 ..............................................70

**Submission 8**

Petitioners' Joint Motion for Leave to Take Discovery, June 24, 1999, Dkt. 770 ........................71

Memorandum Opinion, May 3, 2000, Dkt. 803 .........................................................................72

Memorandum Opinion, May 1, 2003, Dkt. 896 .........................................................................73

Brief for Appellants Cory Johnson and Richard Tipton at 146, *United States v. Johnson*, No. 03-13(L), 03-26, 03-27 (4th Cir. Feb. 17, 2004) (Excerpt) ..............................74

**Submission 9**

**Diagnostic Materials**

American Association on Intellectual and Developmental Disabilities Definition Manual ("AAIDD-11") (Excerpt)..............................................................................75

AAIDD User Guide to 11th Edition (Excerpt) .........................................................................76

Diagnostic and Statistical Manual of Mental Disorders ("DSM-5") (Excerpt)..........................77

**J.A.991**

EXHIBIT NO.

**CONGRESSIONAL RECORDS**

134 Cong. Rec. 22,926 (1988) (Excerpt)........................................................................78

136 Cong. Rec. S6873 (daily ed. May 24, 1990) (Excerpt)............................................79

J.A.992

# EXHIBIT 55

J.A.993

USCA4 Appeal: 21-1    Doc: 10-2    Filed: 01/08/2021    Pg: 141 of 255
Case 3.92-cr-00068 Document 10-2 Filed 12/29/2010 Page 6 of 10 PageID# 3176

DSS-3627-1 (12/84)

# UCR REASSESSMENT AND SERVICE PLAN REVIEW
## 6 Month

| CASE NAME | CASE NUMBER | COMPLETED BY | UNIT/WORKER NUMBER |
|---|---|---|---|
| Johnson | S 4766716 | Odette Noble | 908-5 |

| AGENCY/DISTRICT | PLAN DATE |
|---|---|
| JCCA-NYC | 6/28/86 |

**GENERAL INSTRUCTIONS:**

This form is to be completed 6 months from Day 1 (CID) and every 6 months thereafter (refer to Section VII of the UCR Desk Aid)

**Bold type following questions indicate Utilization Review Regulatory Reminders.**

1. REASSESSMENT

Write a narrative reassessment which describes changes in family situation and summarizes family's current functioning. *If a Foster Care Placement* describe adjustment to foster care of any child in placement. *For Protective Services Cases* reassess the family's ability to protect and potential to harm the child. Conclude with a statement which provides the most significant service priorities and (re)evaluate the family's ability to benefit from these services. **Continuing Necessity for Placement or Mandated Preventive Services; Risk of Foster Care; Ability to Benefit from Services.**

Mrs. Johnson continues to be elusive and impossible to engage. On 12/16/85 she kept an appointment, and I spoke with her about the importance of keeping regular appointments and letting us know who she is, and what her concerns for Corey are. She didn't understand why we needed to know anything about her, but she did agree to keep appointments. I have not seen her since or had any contact with her; although, she did sign and return a consent for Corey to have oral surgery.

At the beginning of March '86 Corey learned that she was arrested and was in jail in New Jersey. He told his houseparent who informed me, and then Corey and I discussed it. I haven't heard from her or any other family member. Corey states he doesn't believe his mother is guilty, and that she was framed. He acknowledged it had something to do with the use of Credit Cards. I suspect Corey knows the truth, but is keeping it from us. He visited family in the home at xmas, and returned with extremely expensive leather goods. He was defensive when we discussed this with him, and said he got them from his relatives. Corey has talked with his mom in jail, but he states he doesn't want to visit her.

Corey's brother has returned from the South. I don't think he is attending school. Corey doesn't like to discuss his brother. When I've encouraged him to have the brother visit the residence he has shrugged it off.

Corey continues to use our services well, and expresses satisfaction about being in placement. It wouldn't seem that there is another constructive place for him to live.

(Reassessment)

J.A.994

DSS-3627-20

| CASE NAME | CASE NUMBER |
|---|---|
| Johnson | S 4766716 |

## 2. CASEWORK CONTACTS

Summarize the nature of the interaction between the participants during the casework contacts. Indicate any barriers to such contacts and steps planned or taken to overcome those barriers. Include in the summary the frequency and location of the contacts. (If the Casework Contact Grid is completed, it is not necessary to include the frequency and location of contacts in the summary.) **Required Casework Contacts with Child, Child's Caretaker, Parents and In-Home Contacts.**

Corey is seen for weekly casework sessions. He has put up some resistance to appointments both verbally and by not keeping appointments. He also attends biweekly group meetings with caseworker houseparents and other boys. His attitude towards group is often negative, but he never misses.

Treatment Team Staff including GHD Director, Psychiatrist, Child Care Coordinator, Nurse, Houseparents and Caseworker meet on a biweekly basis.

Mother has resisted involvement (See Section 1).

## 3. COURT INVOLVEMENT

a) Has there been any court related or legal activity since the last Plan?

☐ Yes    ☒ No

If Yes, complete the following:*

| Date Of Event | Court | Event (Petition filed, hearing held, referral) | Type (ex. Neglect, Abuse JD, PINS, criminal court, etc.) | Child(ren) Involved | Outcome (Adjudication, Disposition, Court Orders, other) |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |

*For cases tracked in CCRS encode appropriate legal activities on Services Activity Log.

(Reassessment)

J.A.995

DSS-362 (Rev. 8/84)

| CASE NAME | CASE NUMBER |
|---|---|
| Johnson | S 4766716 |

**3. b) What effect did the legal activity have on the plan and the child's Permanency Planning Goal?**

**4. PROGRAM CHOICE AND PERMANENCY PLANNING GOAL**

a) List the names of each child for whom services are authorized and identify the program choice(s), permanency planning goal (PPG) an the anticipated completion date(ACD) for the PPG.

| CHILD'S NAME | PROGRAM CHOICE* (Choose all that apply) | PPG*ACD* | | | CHILD'S NAME | PROGRAM CHOICE* (Choose all that apply) | PPG*ACD* | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Goal | Mo. | Yr. | | | Goal | Mo. | Yr. |
| Corey | C | 03 | 11 | 89 | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

**PROGRAM CHOICE CODES**

**A** Preventive Non-Mandated
**B** Preventive Mandated
**C** Placement
**D** Protective

**PERMANENCY PLANNING GOALS**

01 Discharge to Parents
02 Discharge to Primary Resource Person(s)/Relative(s)
03 Discharge to Independent Living
04 Discharge to Adoption
05 Discharge to Adult Residential Care

06 Prevent Placement
07 Prevent Return to Placement
10 Independent Living -Unaccompanied Refugee Only
11 Protect Child (No PPG for CCRS)

b) If there has been a change in PPG since the previous plan, explain the reason.

*For cases tracked in CCRS encode the Program Choice, Reasons, PPG and Anticipated Completion Date on Assessment Plan Grid (turnaround).

(Reassessment)

J.A.996

DSS-3627-4(12/84)

| CASE NAME | CASE NUMBER |
|---|---|
| Johnson | S 4766716 |

**6. PERMANENCY PROGRESS (for Placement Cases only)**

Check (✓) each question "YES" or "NO." If "YES" is checked then give the requested information in the space provided. List the children involved in the righthand column.

| YES | NO | | WHICH CHILD |
|---|---|---|---|
| | X | A. Is any child with a permanency goal of return to parents or relatives expected to remain in placement another 6 months or more? If so, specify barriers preventing discharge, and what alternatives are being considered or have been tried.* | |
| | X | B. Has any child who is not legally free had a permanency goal of adoption 6 months or more? If so, specify the actions taken to free the child and any barriers to freeing. | |
| | X | C. Is any legally free child with a permanency goal of adoption not in adoptive placement? If so, specify the actions taken to place the child into an adoptive home and barriers to placement.** | |
| | X | D. Has any child been in an adoptive placement 6 months or more? If so, specify the barriers preventing legal adoption in this home and actions taken to overcome these. | |
| | X | E. Is any child expected to be discharged to Independent Living or Adult Residential Care within 24 months? If so, describe the services needed to permit discharge, and to support the child after discharge. Specify barriers to their provision. | |

**USE SPACE BELOW** to provide information requested for any "YES" answer given in Question 5. Be sure to indicate child(ren) involved.

*If such a child will be in care with a permanency goal of return home for 24 months, a UR exception is required.
*If a legally free child with a PPG of adoption will be free 12 months and not in adoptive placement, a UR exception is required.

**FOLLOW LOCAL PROCEDURES FOR UR EXCEPTION CASES.**

(Reassessment)

J.A.997

DSS-3627-5(12/84)

| CASE NAME | CASE NUMBER | SCR NUMBER |
|---|---|---|
| Johnson | S 4766716 | |

**8. PLAN REVIEW: GOAL REVIEW AND SETTING**

Review all goals from previous plan (including any Plan Amendment). Restate each goal and explain the extent of goal achievement. If a previous goal is to be retained, complete the block by entering the date the goal is expected to be achieved, the tasks and the family member(s) and/or service providers(s) expected to carry out the tasks. If a goal is to be discontinued, complete all parts except target date and tasks. After reviewing previous goals, list any new goals set, omitting the question about goal achievement. **Services Consistent with Needs***

The Goal below is: New _____    Retained __X__    Target Date __11/87__                    Discontinued _____

(Re)State Goal: __Mrs. Johnson will remain consistent in her contacts with Corey despite__
__their decision to live apart.__

Explain level of goal achievement: __Mrs. Johnson remains inconsistent and hard to engage.__
__(See Section 1)__

**TASKS**

| CHILD/FAMILY (list names) | SERVICE PROVIDERS (list names) |
|---|---|
| Mrs. Johnson will encourage Corey's regular visits. | Social worker will continue regular meetings with Mrs. Johnson around the issue of her continued involvement with Corey and the importance to him of feeling included as a family. |
| Mrs. Johnson will include Corey in all family celebrations and occasions. | Same as above. |
| Mrs. Johnson will not withdraw from Corey in response to her perceived belief that he is withdrawing. | Same as above. |

The Goal below is: New _____    Retained __X__    Target Date __11/89__                    Discontinued _____

(Re)State Goal: __Mrs. Johnson will learn to support Corey's strengths and accept his__
__weaknesses.__

Explain level of goal achievement: __As long as others are raising Corey, Mrs. Johnson appears__
__to be more accepting of Corey. However, this remains an area of concern.__

**TASKS**

| CHILD/FAMILY (list names) | SERVICE PROVIDERS (list names) |
|---|---|
| Mrs. Johnson will demonstrate approval of Corey's athletic abilities. | Social worker will work with Mrs. Johnson around giving Corey approval for what he does well and making less important the areas in which he has poor success. |
| Mrs. Johnson will de-emphasize Corey's academic ability. | Same as above. |
| Mrs. Johnson will support the plan of vocational training for Corey. | Same as above. |

*For cases tracked in CCRS encode Child and Family Service Needs and Service Status on Assessment Plan Grid (turnaround).

(Reassessment)

J.A.998

SS-3627-7(12/84)

| CASE NAME | CASE NUMBER | SCR NUMBER |
|---|---|---|
| Johnson | S 4766716 | |

The Goal below is: New __X__    Retained _____    Target Date __11/86__    Discontinued _____

(Re)State Goal: ___Corey will find a place for himself in the residence, make positive attachment to boys, houseparents and caseworker and learn to trust staff.___

Explain level of goal achievement: ___Corey has established quite a positive leadership place for himself.___

## TASKS

**CHILD/FAMILY (list names)**

Corey will participate constructively in biweekly group meetings.

**SERVICE PROVIDERS (list names)**

Caseworker will help Corey see the purpose of biweekly group meetings.

---

The Goal below is: New __X__    Retained _____    Target Date __11/89__    Discontinued _____

(Re)State Goal: ___Corey will learn to face up to his mother's limitations and establish a separate identity.___

Explain level of goal achievement: ___Corey remains quite identified with his mother and her life style; even though, he would seem to have some awareness of its destructiveness.___

## TASKS

**CHILD/FAMILY (list names)**

Corey will learn to trust the JCCA staff, and share some of his conflicts about his mother's life style with them.

Corey will identify with a more constructive life style.

**SERVICE PROVIDERS (list names)**

Caseworker and houseparents will establish a trusting nurturing relationship with Corey.

Caseworker and houseparents will be constructive role models.

(Reassessment)

J.A.999

DSS-3627-7(12/84)

| CASE NAME | | CASE NUMBER | SCR NUMBER |
|---|---|---|---|
| Johnson | | S 4766716 | |

The Goal below is: New __X__    Retained _____    Target Date __6/88__    Discontinued _____

(Re)State Goal: __Corey will attend Newtown High School Special Education program daily and on time.__

Explain level of goal achievement: __Corey continues to be pleased with his report cards and__ ... __is quite committed to school.__

### TASKS

**CHILD/FAMILY (list names)**

Corey will continue to attend specialized classes.

Corey will discuss his learning disability in treatment.

Corey will use nightly study hour constructively.

**SERVICE PROVIDERS (list names)**

Teacher will encourage Corey to keep working and help him to understand that his difficulties do not reflect upon his intelligence.

Social worker will work with Corey towards understanding the implication of his learning disability.

Houseparents will organize a nightly study hour.

---

The Goal below is: New _____    Retained __X__    Target Date __11/87__    Discontinued _____

(Re)State Goal: __Corey will use opportunities offered him to learn independent living skills.__

Explain level of goal achievement: __Corey wants very much to be able to care for himself in the community. The biggest obstacle will be for him to find a way to support himself. We will continue to work with him toward this end. He will again work for Neighborhood Youth Corp this summer.__

### TASKS

**CHILD/FAMILY (list names)**

Corey will explore the possibilities of a part time job.

Corey will learn how to handle money so that he can shop for himself.

**SERVICE PROVIDERS (list names)**

Houseparents will help Corey read ads and apply for a job.

Caseworker, houseparents and teachers will help Corey learn enough simple arithmetic that he will be able to figure out correct change.

(Reassessment)

J.A.1000



DSS-3627 (Rev. 2)

| CASE NAME | CASE NUMBER |
|---|---|
| Johnson | S 4766716 |

7. FAMILY/CHILD VISITING PLAN (for Placement Cases only)

a) For each child in foster care, summarize the nature of the interaction between the child and parent(s) and/or relative(s) during the visits, highlighting positive and negative factors. Include in this summary the frequency and location of the visits. (If the Family/Child Visiting Grid is completed, it is not necessary to include the frequency and location of visits in the summary.)

Corey went home with his grandfather at xmas. However, he returned late missing two days of school. He was not very communicative re. visit. Corey is allowed to visit his mother when she calls to arrange it, but she doesn't do so very often. While he states these visits go well, one wonders what really happens.

b) For each child in foster care, describe the visiting plan for the next period. Include who will visit, how often, and where. Indicate any changes from the previous visiting plan and the reason for the changes. **Facilitate Bi-Weekly Visiting.**

Corey is allowed a weekend visit a month and a day visit a month.



(Reassessment)

J.A.1001

DSS-3627-9 (1984)

| CASE NAME | CASE NUMBER | SCR NUMBER |
|---|---|---|
| Johnson | S 4766716 | |

**8. PLAN DEVELOPMENT**

a) Discuss the level of involvement of parent(s) and children in the development of the service plan. **Parent/Child Participation.**

Corey was involved in developing service plan in regular discussions with houseparents and weekly caseworker meetings.

b) List all participants in the planning conference with their title or role and state date of conference. **Service Plan Review. Third Party Reviewer/Foster Care.**

Gilbert Gordon - Director GHD
Murray Gordon - Clinical Director - Third Party Reviewer
Diane Yarborough - Child Care Coordinator
Shari Siegel - Nurse
Odette Noble - Caseworker
John Rios - Residence Supervisor
Marvin Hunt - Houseparent
Carmen Carrasquillo - Houseparent
Joe Rivera - Houseparent

| | SIGNATURES | DATE SIGNED |
|---|---|---|
| Case Planner | *Odette Noble* | 5/8/86 |
| Case Planner's Supervisor | *Gilbert Gordon* | 5/1/86 |
| Case Manager | | |
| CPS Monitor | | |
| | | |
| | | |

I have read and I understand the Service Plan.

| | | |
|---|---|---|
| Parent | | |
| Parent | | |
| Child | | |
| Child | | |

(Parent/Child signatures are optional)

(Reassessment)

J.A.1002

# EXHIBIT 56

J.A.1003

**FORM DSS-3628-NYC-D1**
**4/85**

HUMAN RESOURCES ADMINISTRATION
SPECIAL SERVICES FOR CHILDREN

## UCR PLAN AMENDMENT: FORM D
## TRIAL DISCHARGE

| CASE NAME<br>Johnson | CASE NUMBER<br>S 4766716 | COMPLETED BY<br>Odette Noble | UNIT/WORKER NUMBER<br>908-5 |
|---|---|---|---|
| AGENCY/DISTRICT<br>JCCA-NYC | | | |

GENERAL INSTRUCTIONS:

Complete this form at least 30 days prior to the child's planned trial discharge or immediately after an unplanned trial discharge date has been established

**Bold type following questions indicate Utilization Review Regulatory Reminders**

### SECTION I: CASE REVIEW

| CHILD'S NAME | ANTICIPATED DATE<br>OF TRIAL DISCHARGE |
|---|---|
| Corey Johnson | 2/13/87 |
| | |
| | |

*If additional space is required, please attach another sheet.*

1. Discuss why trial discharge is now appropriate. What services or supervision will be provided to the family including the child, during the trial discharge period and by whom? Evaluate the risk of harm if the child returns home.* (If preventive services are being requested at this time, complete Form G, in addition to this Plan Amendment Form.)

As per 853C 2/6/87 Corey returned to his mother's home on 2/3/87 to give him an opportunity to consider his behavior and attitude in our residence. If he was willing to change it, we would be most willing to consider his returning to the residence. As you know Corey was offered a follow up appointment which he refused, and we have not heard from him or his mother. Newtown High School has been informed that he is now living with his mother. He is continuing to attend school. We have written to Corey and his mother offering further servcies. If we hear from them,we will make every effort to try to help.

For cases tracked in CCRS encode appropriate movement activities on Services Activity Log.

(Amendment D)

**J.A.1004**

**FORM DSS-3628-NYC-D2**
**4/85**

| CASE NAME | CASE NUMBER |
|-----------|-------------|
| Johnson | s 4766716 |

2. Are you requesting a discharge grant?

☒ Yes                                                    CHIILD

□ No

IF YES, PLEASE INCLUDE A JUSTIFICATION BELOW.

Mrs. Johnson lives in a run  down building and would seem to have chronic financial difficulty, although, she would seem to have money from questionable sources at times and spends extravagantly.  As you know she spent 4 months in jail for credit card fraud.  From our point of view Corey could use the help and if he asks for it even though he left on a bad note, we would give him every consideration.  If we don't hear from him in the next few weeks in response to my letters, we will not make the request, however, I will make the request if I hear from him.

(Amendment D2)

J.A.1005

**FORM DSS-3628-NYC D3**
**4/85**

| CASE NAME | CASE NUMBER |
|---|---|
| Johnson | S  4766716 |

### SECTION II: NEW GOALS

Review the plan for the child and family. Indicate any goals, target dates, tasks or activities which will be altered in light of the status change. Use additional sheets as necessary. **SERVICES CONSISTENT WITH NEEDS.**

The Goal below is: New _____ Retained _X_ Target Date 6/88 Discontinued _____

(Re) State Goal: Corey will attend Newtown High School Special Education program daily and on time.

Explain level of goal achievement: On 1/31/87 I met with Corey and Newtown teacher Mrs. Rosen, re: Corey's progress. It was pointed out that it is unlikely that he will be able to pass competency tests, but if he completes all his classes, he should be able to receive a certificate of completion in 6/87.   It is painful of Corey to face his dyslexia but at the same time there are other opportunities available to him.  He is involved with an OVR counselor, Mr. Gloekner, who is willing to help Corey explore programs in carpentry etc.

**TASKS**

| CHILD/FAMILY (LIST NAMES) | SERVICE PROVIDERS (LIST NAMES) |
|---|---|
| Corey will attend Newtown and on time. | Caseworker will continue to be available to Newtown and Corey if they should ask. |

· · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · ·

The Goal below is: New _____ Retained _X_ Target Date 11/89 Discontinued _____

(Re) State Goal: Corey will learn to face up to his mother's limitations and extablish a separate identity.

Explain level of goal achievement: It would seem that Corey wanted this opportunity to live with his mother, but he just didn't know how to do it constructively.  Hopefully he will get a better sense of his mother and begin to see her more realistically.  If that happens at another point, he might be more willing to accept appropriate help from either JCCA or other agencies in the community.

**TASKS**

| CHILD/FAMILY(LIST NAMES) | SERVICE PROVIDERS (LIST NAMES) |
|---|---|
| Corey will hopefully remember that JCCA staff is available. | Caseworker and houseparents will remain available to Corey if he should ask. |

(Amendment 22)

FORM DSS-3628-NYC D4
4/85

| CASE NAME | CASE NUMBER |
|-----------|-------------|
| Johnson | S 4766716 |

## SECTION III: PLAN AMENDMENT PARTICIPATION

Discuss the level of involvement of parent(s) and children in the development of the service plan amendment. Specify how and when the the trial discharge plan was conveyed to the parent(s) and/or child(ren), if applicable. **PARENT/CHILD PARTICIPATION.**

Mrs. Johnson has not responded to our hand delivery letter. Corey met with Director, Mr. Gordon, Child Care Coordinator, Miss Yarborough and Senior Caseworker, Miss Noble on 2/3/87. He refused a follow up appointment and we have not heard from him since, although, he does telephone the other boys.

| SIGNATURES | DATE SIGNED |
|------------|-------------|
| Case Planner _Odette Noble_ | 2/20/87 |
| Case Planner's Supervisor _Gilbert Gordon_ | 2/23/87 |
| Case Manager | |
| Case Manager's Supervisor | |
| CPS Monitor | |
| | |
| | |
| | |
| I have read and I understand the Service Plan. | |
| Parent | |
| Parent | |
| Child | |
| Child | |
| (Parent/Child signatures are optional) | |

(Amendment D4)

**J.A.1007**

# EXHIBIT 57

**J.A.1008**

NEWTOWN HIGH SCHOOL IS A MEMBER OF THE PUBLIC SCHOOL SYSTEM OF THE CITY OF NEW YORK

## SCHOLASTIC TRANSFER RECORD

MR. MISS: **Johnson** (Last Name) **Corey** (First Name) (Middle Name)

ADDRESS ON RECORD: 94-30 58 Ave
Elmhurst NY 11373

NAME OF PARENT OR GUARDIAN:

| | |
|---|---|
| DATE OF BIRTH | ▮ |
| ADMITTED | 8-9-1985 |
| DISCHARGED | 12-7-1987 |
| GRADUATED | NO |
| COURSE | |
| AVERAGE | |
| RANK IN CLASS | |
| QUARTILE | |
| NO. IN CLASS | |

| AREA | SUBJECT & GRADE | YEAR FR. | YEAR TO | TERM 1 | TERM 2 | REGENTS % | REGENTS DATE | AREA | SUBJECT & GRADE | YEAR FR. | YEAR TO | TERM 1 | TERM 2 | REGENTS % | REGENTS DATE | AREA | SUBJECT & GRADE | YEAR FR. | YEAR TO | TERM 1 | TERM 2 | REGE % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ENGLISH | 1ST YR. | | | | | | | COMMERCIAL | BUS. MATH | | | | | | | DRAFTING | MECH. DR. 1 | | | | | |
| | 2ND YR. | | | | | | | | ACCT'G. 1 | 9/85 | 1/86 | 80 | X | | | | MACHINE DESIGN 2 | | | | | |
| | 3RD YR. 5/6 | 1/85 | 6/86 | 75 | 65 | | | | 2 | | | | | | | | ARCH. DRAW. 3 | | | | | |
| | 4TH YR. 7/8 | 9/86 | 6/87 | 55 | 55 | | | | 3 | | | | | | | | | | | | | |
| | Reading | 9/85 | 6/86 | 80 | 70 | | | | LAW | | | | | | | HOME EC. | CLOTHING 1 | | | | | |
| SOCIAL STUDIES | WORLD STUD. | | | | | | | | BUS. MACH. | | | | | | | | FOODS 1 | | | | | |
| | MODERN WORLD HIS. | | | | | | | | DIST. ED. 1 | | | | | | | | 2 | | | | | |
| | AMER. STUD. | 9/86 | 6/87 | 50 | 55 | | | | 2 | | | | | | | | HOME NURSING | | | | | |
| | ECONOMICS | | | | | | | | 3 | | | | | | | OTHER | | | | | | |
| | CIVICS | 7/86 | 6/86 | X | 65 | | | | STENO. 1 | | | | | | | | | | | | | |
| MATHEMATICS | 1 YR. | | | | | | | | 2 | | | | | | | | | | | | | |
| | 2 YR. | | | | | | | SECRETARIAL | SEC. PRAC. | | | | | | | | | | | | | |
| | 3 YR. | | | | | | | | TYPE 1 58½ | 9/85 | 6/86 | 70 | 65 | | | | REQUIRED MUSIC 1 | 9/86 | 6/87 | 55 | 55 | |
| | 4 YR. | | | | | | | | TYPE 2 | | | | | | | | THEORY | | | | | |
| | 1 YR. | | | | | | | | CLERICAL PRACTICE 1 | | | | | | | | HARMONY 1 | | | | | |
| | 2 YR. | | | | | | | | 2 | | | | | | | | 2 | | | | | |
| | 3 YR. | | | | | | | | RECORD KEEPING | | | | | | | | HISTORY & APPREC. | | | | | |
| | ELEM. ALG. | | | | | | | | | | | | | | | | VOCAL TRAIN. 1 | | | | | |
| | 10TH YR. | | | | | | | ART | ART APP'N | | | | | | | MUSIC | 2 | | | | | |
| | 11TH YR. | | | | | | | | BASIC ART | | | | | | | | INSTRUM. TRAIN. | | | | | |
| | INT. ALG. | | | | | | | | REPRES. 1 | | | | | | | | BAND | | | | | |
| | TRIGONOM. | | | | | | | | 2 | | | | | | | | ORCH. | | | | | |
| | ANAL · CALC. | | | | | | | | COM. DES. 1 | | | | | | | | CHORUS | | | | | |
| | ADV. ALG. | | | | | | | | 2 | | | | | | | | PHYSICAL ED. 1 | | | | | |
| | FUND. OF MATH | 9/85 | 6/86 | 65 | 70 | | | | FASHION 1 | | | | | | | | 2 | | | | | |
| | | 9/86 | 6/87 | 65 | 55 | | | | 2 | | | | | | | | PE/field | 9/85 | 6/86 | 80 | 65 | |
| | | | | | | | | | | | | | | | | | PE | 2/87 | 6/87 | X | 55 | |
| SCIENCE | GENERAL SCIENCE | | | | | | | SHOPS | ELECTRIC SHOP | | | | | | | | HEALTH | 9/86 | 1/87 | 65 | X | |
| | BIOLOGY | 9/86 | 6/87 | 75 | 65 | | | | AUTO MECH. | 9/86 | 1/87 | 70 | X | | | FAILURES | | | | | | |
| | BOTANY | | | | | | | | WOOD | | | | | | | | Math RCT | 6/86 | 1/87 | 32 | 28 | |
| | CHEMISTRY | | | | | | | | MACHINE SHOP | | | | | | | | Reading RCT | 6/86 | 1/87 | 20 | 12 | |
| | PHYSICS | | | | | | | | PATTERN MAKING | | | | | | | | writ. RCT | | 1/87 | | 55 | |
| | EARTH SCI. | | | | | | | | GRAPH. ARTS | 2/87 | 6/87 | X | 40 | | | | | | | | |
| | | | | | | | | | SHEET METAL | | | | | | | | | | | | | |

| 45 MINUTE PERIODS | PASSING MARK 65 | ASTERISK INDICATES WORK IN PROGRESS | NO. OF DAYS ABSENT BY TERMS |
|---|---|---|---|
| 5 PERIODS PER WEEK | COLLEGE CERT. MK. 75 | | 1 2 3 4 5 6 7 8 9 |
| 20 WEEKS PER TERM | "N" = MODIFIED COURSE | CHECK INDICATES CREDIT FROM OTHER SCHOOLS | |
| UNLESS OTHERWISE NOTED | HONORS MARK 85 | | |

TRANSCRIBED BY: Maria T. Fuente    DATE 8-14-2008

AUTHORIZED SIGNATURE: Maria T. Fuente

Board of Education — City of New York
NEWTOWN HIGH SCHOOL
48-01 90th Street
Elmhurst, N. Y. 11373

**J.A.1009**

NEWTOWN HIGH SCHOOL IS A MEMBER OF THE PUBLIC SCHOOL SYSTEM OF THE CITY OF NEW YORK

## SCHOLASTIC TRANSFER RECORD

MR./MISS: Johnson Corey
LAST NAME / FIRST NAME / MIDDLE NAME

ADDRESS ON RECORD: 94-30 58 Ave
Elmhurst NY 11373

NAME OF PARENT OR GUARDIAN

| | |
|---|---|
| DATE OF BIRTH | ▮ |
| ADMITTED | 8-9-1985 |
| DISCHARGED | 12-7-1987 |
| GRADUATED | NO |
| COURSE | |
| AVERAGE | |
| RANK IN CLASS | |
| QUARTILE | |
| NO. IN CLASS | |

| SUBJECT & GRADE | YEAR FR. | YEAR TO | TERM 1 | TERM 2 | REGENTS % | REGENTS DATE |
|---|---|---|---|---|---|---|
| 1ST YR. | | | | | | |
| 2ND YR. | | | | | | |
| 5/L 3RD YR. | 7/85 | 6/86 | 75 | 65 | | |
| 7/8 4TH YR. | 9/86 | 6/87 | 55 | 55 | | |
| Reading | 7/85 | 6/86 | 80 | 70 | | |
| WORLD STUD. | | | | | | |
| MODERN WORLD HIS. | | | | | | |
| AMER. STUD. | 9/86 | 6/87 | 50 | 55 | | |
| ECONOMICS | | | | | | |
| Civics | 2/86 | 6/86 | × | 65 | | |
| 1 YR. | | | | | | |
| 2 YR. | | | | | | |
| 3 YR. | | | | | | |
| 4 YR. | | | | | | |
| 1 YR. | | | | | | |
| 2 YR. | | | | | | |
| 3 YR. | | | | | | |
| ELEM. ALG. | | | | | | |
| 10TH YR. | | | | | | |
| 11TH YR. | | | | | | |
| INT. ALG. | | | | | | |
| TRIGONOM. | | | | | | |
| ANAL. - CALC. | | | | | | |
| ADV. ALG. | | | | | | |
| FUND. OF MATH | 9/85 | 6/86 | 65 | 70 | | |
| | 9/86 | 6/87 | 65 | 55 | | |
| GENERAL SCIENCE | | | | | | |
| BIOLOGY | 9/86 | 6/87 | 75 | 65 | | |
| BOTANY | | | | | | |
| CHEMISTRY | | | | | | |
| PHYSICS | | | | | | |
| EARTH SCI. | | | | | | |

| SUBJECT & GRADE | YEAR FR. | YEAR TO | TERM 1 | TERM 2 | REGENTS % | REGENTS DATE |
|---|---|---|---|---|---|---|
| BUS. MATH | | | | | | |
| ACCT'G. 1 | 9/85 | 1/86 | 80 | × | | |
| 2 | | | | | | |
| 3 | | | | | | |
| LAW | | | | | | |
| BUS. MACH. | | | | | | |
| DIST. ED. 1. | | | | | | |
| 2 | | | | | | |
| 3 | | | | | | |
| STENO. 1 | | | | | | |
| 2 | | | | | | |
| SEC. PRAC. | | | | | | |
| TYPE. 1 RB½ | 9/85 | 6/86 | 70 | 65 | | |
| TYPE. 2 | | | | | | |
| CLERICAL PRACTICE 1 | | | | | | |
| 2 | | | | | | |
| RECORD KEEPING | | | | | | |
| ART APP'N | | | | | | |
| BASIC ART | | | | | | |
| REPRES. 1 | | | | | | |
| 2 | | | | | | |
| COM. DES. 1 | | | | | | |
| 2 | | | | | | |
| FASHION 1 | | | | | | |
| 2 | | | | | | |
| ELECTRIC SHOP | | | | | | |
| AUTO MECH. | 9/86 | 1/87 | 70 | × | | |
| WOOD | | | | | | |
| MACHINE SHOP | | | | | | |
| PATTERN MAKING | | | | | | |
| GRAPH. ARTS | 2/87 | 6/87 | × | 40 | | |
| SHEET METAL | | | | | | |

| SUBJECT & GRADE | YEAR FR. | YEAR TO | TERM 1 | TERM 2 |
|---|---|---|---|---|
| MECH. DR. 1 | | | | |
| MACHINE DESIGN 2 | | | | |
| ARCH. DRAW. 3 | | | | |
| CLOTHING 1 | | | | |
| FOODS 1 | | | | |
| 2 | | | | |
| HOME NURSING | | | | |
| REQUIRED MUSIC 1 | 9/86 | 6/87 | 55 | 55 |
| THEORY | | | | |
| HARMONY 1 | | | | |
| 2 | | | | |
| HISTORY & APPREC. | | | | |
| VOCAL TRAIN. 1 | | | | |
| 2 | | | | |
| INSTRUM. TRAIN. | | | | |
| BAND | | | | |
| ORCH. | | | | |
| CHORUS | | | | |
| PHYSICAL ED. 1 | | | | |
| 2 | | | | |
| PE / field | 9/85 | 6/86 | 80 | 65 |
| PE | | 9/87 | 6/87 | × | 55 |
| HEALTH | 9/86 | 1/87 | 65 | × |

### Failures

| | YEAR FR. | YEAR TO | TERM 1 | TERM 2 |
|---|---|---|---|---|
| Math RCT | 6/86 | 1/87 | 32 | 28 |
| Reading RCT | 6/86 | 1/87 | 20 | 12 |
| Writ. RCT | | 1/87 | | 55 |

45 MINUTE PERIODS
5 PERIODS PER WEEK
20 WEEKS PER TERM
UNLESS OTHERWISE NOTED

PASSING MARK 65
COLLEGE CERT. MK. 75
"N" = MODIFIED COURSE
HONORS MARK 85

ASTERISK INDICATES WORK IN PROGRESS
CHECK INDICATES CREDIT FROM OTHER SCHOOLS

NO. OF DAYS ABSENT BY TERMS

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

TRANSCRIBED BY: Maria P. Punta    DATE: 8-14-2008
AUTHORIZED SIGNATURE: Maria P. Punta

Board of Education — City of New York
NEWTOWN HIGH SCHOOL
48-01 90th Street
Elmhurst, N. Y. 11373

2008 / 08 / 19

**J.A.1010**

# EXHIBIT 58

J.A.1011

*Corey Johnson*
*By Janet Valentine*

PLEASANTVILLE DIAGNOSTIC CENTER

OUTLINE FOR COTTAGE REPORT

Visitors

Who came?  How often?  General tone of visits.

Eating    *Eats well, not hard to please.*
Quantity   *Consumes a good amount of food.*
Is he generally a good eater, a fussy eater, an over-eater?

Frustration Behavior

What upsets him?    *He doesn't like to be teased by peers.*
*or haveing jokes played on him)*
How does he behave when upset?   *(Becomes verbal (loud)*
How can he be helped through upsets?   *Usually can be calmed quickly*
What has been tried and worked?  Did not work?   ~~Some~~ *Mostly anything*
*well work. His anger is short lasting. Usually)*
*turns into an ~~joke~~ unappreciated joke.*
Relationships with Adults

Does he seek attention?  *Yes, by acting silly and ~~infantile~~*
  by clinging, silly, damaging behavior?  *infantile.*
  by conversation or games?   *clinging and babish with me.* *He can be*
  by misbehavior?   what?

Does he withdraw from adults?   *The male staff seem to frighten*
*him. He doesn't like physical*
What has been tried to involve him?   *contact. He feels most people*
*are trying to hurt him.*
What seems to work?
*He doesn't trust most adults.*

**J.A.1012**

-2-

Relationships with Adults (continued)

Does he challenge the authority of adults? *Most of the time he's very cooperative. But will challenge adults in a playful way.*

In what way?

Is it gradual?

Is it an impulsive blow-up?

What follows the challenge - *At times staff is to busy to play with Corey. Then he is sullen for short periods of time. Nothing lasts long with this child.*
sullenness?
grudge?
hurt or crying?

What helps to resolve the situation? *Constantly telling Corey thats its important to be appropriate and act his age there's a time for playing.*

Relationships with Peers

Does he have friends? *Not really.*

Does he relate as an equal, as a bully, as a competitor, as an underdog, as a cooperator *Most of the time he stays by himself. He scareed of the other kids.*
How does he handle differences -
verbal?
physical?
Turn to adults, others? *Usually he comes to staff with complaints. Again he doesn't want physical contact with peers.*

Sleeping Pattern

Attitude at bedtime - *It takes awhile for him to settle*

Is he tense, restless, unable to get to sleep? If so, what helps him to relax? *Usually he's tense and game for acting silly*

Sleep throughout the night? *Yes.*

Awaken early? *Yes.*

Awaken with difficulty?

Is he enuretic? *No*

J.A.1013

-3-

<u>Sleeping Pattern (Continued)</u>

Have nightmares or other sleep disturbance? *Doesn't complain*
What helps him to manage? *But, I sometimes feel, he's afraid of the dark.*

<u>Self-care Habits</u>

Hygiene    *Relatively clean, doesn't like to take care of his hair.*
Routines of dressing

Management of belongings
*He doesn't seem to care about his belongings.*

<u>Cottage Duties</u>    *Low self esteem.*

Attitude toward work    *Is capable and will do his chores.*
Ability to carry out job

<u>Areas of Skills</u>

What is he good at?    *He is a limited child and he realizes*
What does he enjoy?    *that many things are hard for him. He trys to cover up his limitations by acting silly. He is considered the cottage clown*

*J. Valentine*
Child Care Worker

J.A.1014

# EXHIBIT 59

J.A.1015

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | )     CRIMINAL NO. 3:92CR68 |
| | ) |
| RICHARD TIPTON aka Whittey | ) |

**FILED MAY - 1 1992**
CLERK, U.S. DISTRICT COURT
RICHMOND, VA

### NOTICE OF THE INTENTION OF THE UNITED STATES OF AMERICA TO SEEK THE DEATH PENALTY

COMES NOW the United States of America, by and through the undersigned, and pursuant to the dictates of Title 21, United States Code, Section 848(h)(1), provides notice to this court and defendant TIPTON that the government, in the event of a conviction on the counts specified below, will seek the sentence of death. Specifically, the government will seek the sentence of death for each of the following counts charged in the indictment, each of which provides for a sentence of death upon a finding of guilt: Counts 3, 5, 11, 17, 18, 19, 24, and 25.

The following aggravating factors, as delineated in Title 21, United States Code, Section 848(n), will be proven as a basis for the death penalty.

    1.    The defendant intentionally killed the victim.

    2.    The defendant intentionally inflicted serious bodily injury which resulted in the death of a victim.

**J.A.1016**

3.    The defendant intentionally engaged in conduct intending that the victim be killed or that lethal force be employed against the victim, which resulted in the death of the victim.

4.    The defendant intentionally engaged in conduct which the defendant knew would create a grave risk of death to a person, other than one of the participants in the offense, and which resulted in the death of a victim.

5.    In the commission of the offenses enunciated in the indictment, the defendant knowingly created a grave risk of death to one or more persons in addition to the victims of the offense.

6.    The defendant committed the offenses charged in the indictment after substantial planning and premeditation.

7.    The defendant committed one of the murders enunciated in the indictment in a heinous, cruel, or depraved manner, in that it involved serious physical abuse to the victim.

In addition to the aggravating factors outlined above which are contained in Title 21, United States Code, Section 848(n), the following aggravating factors will be proven by the United States as a basis for the death penalty.

1.    That the defendant committed multiple murders.

2.    That the defendant has a substantial criminal history.

3.    That the defendant recruited a minor to participate with him in the murders.

J.A.1017

4.      That the defendant seriously wounded three individuals in the course of committing the murders outlined in the indictment.

5.      That the defendant committed a rape during the course of the conspiracy against a person whose home the defendant had taken over to facilitate the distribution of narcotics.

6.      That the defendant was knowingly and willfully a member of a conspiracy which had as one of its goals the murder of individuals other than those for which defendant has been charged.

Respectfully Submitted,

Richard Cullen
UNITED STATES ATTORNEY

Howard C. Vick, Jr.
Assistant United States Attorney
Suite 1800, Main Street Centre
600 E. Main Street
Richmond, Virginia  23219
Bar # 18872

3

J.A.1018

CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing Notice of the Intention

of the United States of America to Seek the Death Penalty was mailed this _1st_ day

May, 1992, to the following:

Robert P. Geary, Esq.
2026 E. Main Street
Richmond, VA  23223

Eric D. White, Esq.
9 E. Franklin Street
Richmond, VA  23219

_____
Howard C. Vick, Jr.
Assistant United States Attorney

4

# EXHIBIT 60

J.A.1020

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

UNITED STATES OF AMERICA   )
   )
v.   )   CRIMINAL NO. 3:92CR68
   )
JAMES H. ROANE, JR., aka J.R.   )

**NOTICE OF THE INTENTION OF THE UNITED
STATES OF AMERICA TO SEEK THE DEATH PENALTY**

COMES NOW the United States of America, by and through the undersigned, and pursuant to the dictates of Title 21, United States Code, Section 848(h)(1), provides notice to this court and defendant ROANE that the government, in the event of a conviction on the counts specified below, will seek the sentence of death. Specifically, the government will seek the sentence of death for each of the following counts charged in the indictment, each of which provides for a sentence of death upon a finding of guilt: Counts 5, 8, and 11.

The following aggravating factors, as delineated in Title 21, United States Code, Section 848(n), will be proven as a basis for the death penalty.

       1.    The defendant intentionally killed the victim.

       2.    The defendant intentionally inflicted serious bodily injury which resulted in the death of a victim.

**J.A.1021**

3.    The defendant intentionally engaged in conduct intending that the victim be killed or that lethal force be employed against the victim, which resulted in the death of the victim.

4.    The defendant intentionally engaged in conduct which the defendant knew would create a grave risk of death to a person, other than one of the participants in the offense, and which resulted in the death of a victim.

5.    In the commission of the offenses enunciated in the indictment, the defendant knowingly created a grave risk of death to one or more persons in addition to the victims of the offense.

6.    The defendant committed the offenses charged in the indictment after substantial planning and premeditation.

In addition to the aggravating factors outlined above which are contained in Title 21, United States Code, Section 848(n), the following aggravating factors will be proven by the United States as a basis for the death penalty.

1.    That the defendant committed multiple murders.

2.    That the defendant has a substantial criminal history.

3.    That the defendant recruited a minor to participate with him in the murders.

4.    That the defendant seriously wounded an individual in the course of committing the murders outlined in the indictment.

2

J.A.1022

5.    That the defendant was knowingly and willfully a member of a conspiracy which had as one of its goals the murder of individuals other than those for which the defendant has been charged.

Respectfully Submitted,

Richard Cullen
UNITED STATES ATTORNEY

Howard C. Vick, Jr.
Assistant United States Attorney
Suite 1800, Main Street Centre
600 E. Main Street
Richmond, Virginia  23219
Bar # 18872

3

J.A.1023

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing Notice of the Intention of the United States of America to Seek the Death Penalty was mailed this _1ST_ day May, 1992, to the following:

> David P. Baugh, Esq.
> P. O. Box 12137
> Richmond, VA  23220
>
> Arnold R. Henderson, Esq.
> 2509 E. Broad Street
> Richmond, VA  23223

Howard C. Vick, Jr.
Assistant United States Attorney

4

J.A.1024

# EXHIBIT 61

J.A.1025



IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

JUL 2 0 1992

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)<br>RICHARD TIPTON aka Whittey )<br>(Counts 1-7, 11-30, 32-33) )<br>)<br>CORY JOHNSON aka "O" aka "CO" )<br>(Counts 1, 2, 8-32) )<br>)<br>JAMES H. ROANE, JR., aka "J.R." )<br>(Counts 1, 2, 5-16, 32) )<br>)<br>VERNON LANCE THOMAS )<br>aka Anthony Mack aka "V" )<br>(Counts 1, 2, 11-16, 24-30, 32) )<br>)<br>JERRY R. GAITERS )<br>(Counts 1, 17-23, 32) )<br>)<br>STERLING HARDY )<br>(Counts 1, 14-16, 32) )<br>)<br>SANDRA REAVIS )<br>(Count 1) )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CRIMINAL NO. 3:92CR68<br><br>21 USC § 846<br>Conspiracy<br>(Count 1)<br><br>21 USC § 848<br>Continuing Criminal Enterprise<br>(Count 2)<br><br>21 USC § 848(e)(1)(A) & 18 USC § 2<br>Murder in Furtherance of CCE<br>(Counts 3,5,8,11,17,18,19,24,25)<br><br>18 USC § 924(c)<br>Use of Firearm in Relation to Crime of<br>Violence or Drug Trafficking Crime<br>(Counts 6,9,12,15,20,26)<br><br>18 USC §§ 1959 & 2<br>Violent Crimes in Aid of Racketeering<br>(Counts 4,7,10,13,14,16,21-23,27-30)<br><br>21 USC § 841(a)(1)<br>Distribution of Crack<br>(Count 31)<br><br>21 USC § 841(a)(1) & 18 USC § 2<br>Possession w/Intent to Distribute Crack<br>(Counts 32-33) |

00085

J.A.1026

405a

## SECOND SUPERSEDING INDICTMENT

### JULY 1992 TERM - At Richmond

### COUNT ONE

THE GRAND JURY CHARGES that from on or about January, 1989, the exact date being unknown to the grand jury, and continuously thereafter up to and including the filing of this indictment, in the Eastern District of Virginia, and elsewhere, the defendants, RICHARD TIPTON, aka Whittey, CORY JOHNSON, aka "O," aka "CO", VERNON LANCE THOMAS, aka Anthony Mack, aka "V", JAMES H. ROANE, JR., aka "J.R.", JERRY GAITERS, STERLING HARDY, and SANDRA REAVIS, did unlawfully, knowingly, and intentionally combine, conspire, confederate, and agree with each other and with other persons, both known and unknown to the grand jury to commit the following offenses against the United States of America:

1.    To knowingly, intentionally, and unlawfully possess with the intent to distribute, and to distribute, a Schedule II narcotic controlled substance, that is, at least fifty (50) grams or more of a mixture or substance described in Title 21, United States Code, Section 841(b)(1)(A)(ii), which contains cocaine base, in violation of Title 21, United States Code, Section 841(a)(1).

### WAYS, MANNERS, AND MEANS OF THE CONSPIRACY

The ways, manners, and means by which the conspirators carried out the purpose of the conspiracy includes, but are not limited to, the following:

1.    It was part of the conspiracy that defendants and co-conspirators would cause cocaine to be purchased in New York City, and elsewhere, and transported to Richmond, Virginia, where the cocaine was to be distributed.

2

00086

406a

J.A.1027

2.    It was further part of the conspiracy that once the defendants and co-defendants would receive cocaine in Richmond, Virginia, they would cook the cocaine in such a way to make it cocaine base ("crack" or "cook-em-up"), which cocaine was intended to be distributed on the streets of Richmond, Virginia.

3.    It was further part of the conspiracy that the defendants and co-defendants would induce other individuals to work for them selling the crack cocaine on the streets of Richmond, Virginia.

4.    It was further part of the conspiracy to engage in a pattern of violent activity, including murder, assaults, and threats of violence to further the goals of the conspiracy.  To that end, members of the conspiracy bought, possessed, and transferred firearms, which firearms were used in their violent activities.

**OVERT ACTS**

In furtherance of this conspiracy, and to bring about the objects and goals of the conspiracy, the defendants, co-conspirators, and unindicted co-conspirators committed overt acts in the Eastern District of Virginia and elsewhere, including, but not limited to, the following:

1.    In or about December, 1991, defendants RICHARD TIPTON, aka Whittey, and CORY JOHNSON, aka "O," aka "CO", assaulted an individual known to the grand jury over a cocaine debt.

2.    On or about January 5, 1992, RICHARD TIPTON, aka Whittey, murdered Douglas A. Talley.

3

00087

407a

J.A.1028

3. On or about January 13, 1992, RICHARD TIPTON, aka Whittey, and JAMES H. ROANE, JR., aka "J.R." murdered Douglas Moody.

4. On or about January 13, 1992, an individual known to the grand jury, disposed of the knife used by JAMES ROANE, JR., aka "J.R.", to kill Doug Moody.

5. On or about January 14, 1992, members of the conspiracy caused an individual known to the grand jury to purchase one Glock handgun and two Tech 9mm handguns from Southern Gun World in Richmond, Virginia.

6. On or about January 14, 1992, JAMES ROANE, JR., aka "J.R." and CORY JOHNSON, aka "O;" aka "CO", murdered Peyton Maurice Johnson.

7. On or about January 15, 1992, CORY JOHNSON, aka "O," aka "CO", distributed a certain amount of cocaine base ("crack" or "cook em up") in Richmond, Virginia.

8. On or about January 29, 1992, RICHARD TIPTON aka Whittey, JAMES ROANE, JR., aka "J.R.", and CORY JOHNSON, aka "O," aka "CO", VERNON LANCE THOMAS, aka Anthony Mack, aka "V", murdered Louis J. Johnson, Jr., in Richmond, Virginia.

9. On or about January 31, 1992, CORY JOHNSON, aka "O," aka "CO", assaulted an individual known to the grand jury over a drug debt, and solicited that individual to kill Dorothy Armstrong.

10. On or about February 1, 1992, JAMES ROANE, JR., aka "J.R.", RICHARD TIPTON aka Whittey, CORY JOHNSON, aka "O," aka "CO", VERNON

4

00088

408a

J.A.1029

LANCE THOMAS, aka Anthony Mack, aka "V",and STERLING HARDY murdered Torrick Brown and shot Martha McCoy in Richmond, Virginia.

11. On or about February 1, 1992, RICHARD TIPTON aka Whittey, CORY JOHNSON, aka "O," aka "CO", and JERRY GAITERS murdered Bobby Long, Anthony Carter, and Dorothy Mae Armstrong aka Mousey, in Richmond, Virginia.

12. On or about February 2, 1992, defendants RICHARD TIPTON aka Whittey, CORY JOHNSON, aka "O," aka "CO", STERLING HARDY, VERNON LANCE THOMAS, aka Anthony Mack, aka "V", JAMES H. ROANE, JR., aka "J.R.", and JERRY GAITERS possessed with the intent to distribute crack cocaine.

13. On or about February 13, 1992, STERLING HARDY solicited the murders of certain individuals.

14. On or about February 19, 1992, RICHARD TIPTON, aka Whittey, CORY JOHNSON, aka "O," aka "CO", and VERNON LANCE THOMAS, aka Anthony Mack, aka "V", murdered Curtis Thorne, Linwood Chiles, and shot, seriously wounding, Gwendolyn Green and Priscilla Green, in Richmond, Virginia.

15. On or about April 10, 1992, RICHARD TIPTON, aka Whittey, possessed with the intent to distribute crack cocaine in Richmond, Virginia.

(In violation of Title 21, United States Code, Section 846).

## COUNT TWO

THE GRAND JURY FURTHER CHARGES that from at least January, 1991, and continuously thereafter up to and including the date of the filing of this indictment, in the Eastern District of Virginia, and elsewhere, the defendants RICHARD TIPTON,

5

00089

409a

J.A.1030

aka Whittey, CORY JOHNSON, aka "O", aka "CO," JAMES H. ROANE, JR., aka "JR," and VERNON LANCE THOMAS, aka Anthony Mack, aka "V", unlawfully, intentionally, and knowingly, did engage in a Continuing Criminal Enterprise, that is, they did violate Title 21, United States Code, Section 841 and 846, including, but not limited to, those violations alleged in the instant indictment, which are realleged and incorporated by reference herein, and did commit other violations of said statutes, which violations were part of a continuing series of violations of said statutes undertaken by RICHARD TIPTON, aka Whittey, CORY JOHNSON, aka "O", aka "CO," JAMES H. ROANE, JR., aka "JR," and VERNON LANCE THOMAS, aka Anthony Mack, aka "V", in concert with at least five other persons with respect to whom they occupied positions of organizer, supervisor, and manager, and from which continuing series of violations the defendant, RICHARD TIPTON aka Whittey, CORY JOHNSON, aka "O", aka "CO," JAMES H. ROANE, JR., aka "JR," and VERNON LANCE THOMAS, aka Anthony Mack, aka "V", obtained substantial income and resources.

(In violation of Title 21, United States Code, Section 848.)

## COUNT THREE

THE GRAND JURY FURTHER CHARGES that on or about January 5, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendant RICHARD TIPTON aka Whittey, while engaged in and working in furtherance of a Continuing Criminal Enterprise, 21 USC § 848(a), knowingly, intentionally, and unlawfully killed and counseled, commanded, induced, procured, and caused the intentional killing of Douglas A. Talley, and such killing resulted.

6

00090

410a

J.A.1031

(In violation of Title 21, United States Code, Section 848(e)(1)(A) and Title 18, United States Code, Section 2.).

## COUNT FOUR

THE GRAND JURY FURTHER CHARGES that on or about January 5, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendant, RICHARD TIPTON aka Whittey, did knowingly, intentionally, and unlawfully cause the murder of Douglas Talley, as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value from an enterprise engaged in racketeering activity, and for the purpose of gaining entrance to and maintaining and increasing position in an enterprise engaged in racketeering activity, said racketeering activity being dealing in narcotic or other dangerous drugs.

(In violation of Title 18, United States Code, Sections 1959 and 2.)

## COUNT FIVE

THE GRAND JURY FURTHER CHARGES that on or about January 13, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants RICHARD TIPTON aka Whittey, and JAMES H. ROANE, JR., aka "J.R.", while engaged in and working in furtherance of a Continuing Criminal Enterprise, 21 USC § 848(a), knowingly, intentionally, and unlawfully killed and counseled, commanded, induced, procured, and caused the intentional killing of Douglas Moody, and such killing resulted.

(In violation of Title 21, United States Code, Section 848(e)(1)(A) and Title 18, United States Code, Section 2.).

7

00091

411a

J.A.1032

## COUNT SIX

THE GRAND JURY FURTHER CHARGES that on or about January 13, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants RICHARD TIPTON, aka Whittey, and JAMES H. ROANE, JR., aka "J.R.", did knowingly, willfully, and unlawfully use a firearm, during and in relation to a crime of violence or a drug trafficking crime, which is a felony prosecutable in a court of the United States, that is, a violation of Title 21, United States Code, Section 846 and 848, and Title 18, United States Code, Section 1959, as set forth in Counts One, Five and Seven of this Indictment. (In violation of Title 18, United States Code, Sections 924(c) and 2.)

## COUNT SEVEN

THE GRAND JURY FURTHER CHARGES that on or about January 13, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON, aka Whittey, and JAMES H. ROANE, JR., aka "J.R.", did knowingly, intentionally, and unlawfully cause the murder of Douglas Moody, as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value from an enterprise engaged in racketeering activity, and for the purpose of gaining entrance to and maintaining and increasing position in an enterprise engaged in racketeering activity, said racketeering activity being dealing in narcotic or other dangerous drugs.

(In violation of Title 18, United States Code, Sections 1959 and 2.)

8

00092

412a

J.A.1033

## COUNT EIGHT

THE GRAND JURY FURTHER CHARGES that on or about January 14, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants JAMES H. ROANE, JR., aka "J.R.", CORY JOHNSON, aka "O," aka "CO", and while engaged in and working in furtherance of a Continuing Criminal Enterprise, 21 USC § 848(a), knowingly, intentionally, and unlawfully killed and counseled, commanded, induced, procured, and caused the intentional killing of Peyton Maurice Johnson, and such killing resulted.

(In violation of Title 21, United States Code, Section 848(e)(1)(A) and Title 18, United States Code, Section 2.).

## COUNT NINE

THE GRAND JURY FURTHER CHARGES that on or about January 14, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants JAMES H. ROANE, JR., aka "J.R.", and CORY JOHNSON, aka "O," aka "CO", did knowingly, willfully, and unlawfully use a firearm, during and in relation to a crime of violence or a drug trafficking crime, which is a felony prosecutable in a court of the United States, that is a violation of Title 21, United States Code, Sections 846 and 848, and Title 18, United States Code, Section 1959, as set forth in Counts One, Eight and Ten of this Indictment.

(In violation of Title 18, United States Code, Sections 924(c) and 2.)

9

00093

413a

J.A.1034

## COUNT TEN

THE GRAND JURY FURTHER CHARGES that on or about January 14, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, JAMES H. ROANE, JR., aka "J.R." and CORY JOHNSON, aka "O," aka "CO", did knowingly, intentionally, and unlawfully cause the murder of Peyton Maurice Johnson, as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value from an enterprise engaged in racketeering activity, and for the purpose of gaining entrance to and maintaining and increasing position in an enterprise engaged in racketeering activity, said racketeering activity being dealing in narcotic or other dangerous drugs.

(In violation of Title 18, United States Code, Sections 1959 and 2.)

## COUNT ELEVEN

THE GRAND JURY FURTHER CHARGES that on or about January 29, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants RICHARD TIPTON aka Whittey, JAMES H. ROANE, JR., aka "J.R.", CORY JOHNSON, aka "O," aka "CO", and VERNON LANCE THOMAS, aka Anthony Mack, aka "V", while engaged in and working in furtherance of a Continuing Criminal Enterprise, 21 USC § 848(a), knowingly, intentionally, and unlawfully killed and counseled, commanded, induced, procured, and caused the intentional killing of Louis J. Johnson, Jr., and such killing resulted.

(In violation of Title 21, United States Code, Section 848(e)(1)(A) and Title 18, United States Code, Section 2.).

10

00094

414a

J.A.1035

## COUNT TWELVE

THE GRAND JURY FURTHER CHARGES that on or about January 29, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON aka Whittey, JAMES H. ROANE, JR., aka "J.R.", CORY JOHNSON, aka "O," aka "CO", and VERNON LANCE THOMAS, aka Anthony Mack, aka "V", did knowingly, willfully, and unlawfully use a firearm, during and in relation to a crime of violence or a drug trafficking crime, which is a felony prosecutable in a court of the United States, that is a violation of Title 21, United States Code, Sections 846 and 848, and Title 18, United States Code, Section 1959, as set forth in Counts One, Eleven and Thirteen of this Indictment.

(In violation of Title 18, United States Code, Sections 924(c) and 2.)

## COUNT THIRTEEN

THE GRAND JURY FURTHER CHARGES that on or about January 29, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON aka Whittey, JAMES H. ROANE, JR., aka "J.R.", CORY JOHNSON, aka "O," aka "CO", and VERNON LANCE THOMAS, aka Anthony Mack, aka "V", did knowingly, intentionally, and unlawfully cause the murder of Louis J. Johnson, Jr., as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value from an enterprise engaged in racketeering activity, and for the purpose of gaining entrance to and maintaining and increasing position in an enterprise engaged in racketeering activity, said racketeering activity being dealing in

11

narcotic or other dangerous drugs.

(In violation of Title 18, United States Code, Sections 1959 and 2.)

## COUNT FOURTEEN

THE GRAND JURY FURTHER CHARGES that on or about February 1, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON aka Whittey, JAMES H. ROANE, JR., aka "J.R.", CORY JOHNSON, aka "O," aka "CO", VERNON LANCE THOMAS, aka Anthony Mack, aka "V", and STERLING HARDY, did knowingly, intentionally, and unlawfully cause the murder of Torrick Brown, Jr., as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value from an enterprise engaged in racketeering activity, and for the purpose of gaining entrance to and maintaining and increasing position in an enterprise engaged in racketeering activity, said racketeering activity being dealing in narcotic or other dangerous drugs.

(In violation of Title 18, United States Code, Sections 1959 and 2.)

## COUNT FIFTEEN

THE GRAND JURY FURTHER CHARGES that on or about February 1, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON aka Whittey, JAMES H. ROANE, JR., aka "J.R.", CORY JOHNSON, aka "O," aka "CO", VERNON LANCE THOMAS, aka Anthony Mack, aka "V", and STERLING HARDY, did knowingly, willfully, and unlawfully use a firearm, during and in relation to a crime of violence or a drug trafficking crime, which is a felony prosecutable in a court

12

00096

416a

J.A.1037

of the United States, that is a violation of Title 21, United States Code, Section 846, and Title 18, United States Code, Section 1959, as set forth in Counts One, Fourteen and Sixteen of this Indictment.

(In violation of Title 18, United States Code, Sections 924(c) and 2.)

## COUNT SIXTEEN

THE GRAND JURY FURTHER CHARGES that on or about February 1, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON aka Whittey, JAMES H. ROANE, JR., aka "J.R.", CORY JOHNSON, aka "O," aka "CO", VERNON LANCE THOMAS, aka Anthony Mack, aka "V", and STERLING HARDY, did knowingly, intentionally, and unlawfully commit assault resulting in serious bodily injury to Martha McCoy, as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value from an enterprise engaged in racketeering activity, and for the purpose of gaining entrance to and maintaining and increasing position in an enterprise engaged in racketeering activity, said racketeering activity being dealing in narcotic or other dangerous drugs.

(In violation of Title 18, United States Code, Sections 1959 and 2.)

## COUNT SEVENTEEN

THE GRAND JURY FURTHER CHARGES that on or about February 1, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants RICHARD TIPTON aka Whittey, CORY JOHNSON, aka "O," aka "CO", and JERRY GAITERS, while engaged in and working in furtherance of a Continuing Criminal Enterprise, 21

13

00097

417a

J.A.1038

USC § 848(a), knowingly, intentionally, and unlawfully killed and counseled, commanded, induced, procured, and caused the intentional killing of Bobby Long, and such killing resulted.

(In violation of Title 21, United States Code, Section 848(e)(1)(A) and Title 18, United States Code, Section 2.).

## COUNT EIGHTEEN

THE GRAND JURY FURTHER CHARGES that on or about February 1, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants RICHARD TIPTON aka Whittey, CORY JOHNSON, aka "O," aka "CO", and JERRY GAITERS, while engaged in and working in furtherance of a Continuing Criminal Enterprise, 21 USC § 848(a), knowingly, intentionally, and unlawfully killed and counseled, commanded, induced, procured, and caused the intentional killing of Anthony Carter, and such killing resulted.

(In violation of Title 21, United States Code, Section 848(e)(1)(A) and Title 18, United States Code, Section 2.).

## COUNT NINETEEN

THE GRAND JURY FURTHER CHARGES that on or about February 1, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants RICHARD TIPTON aka Whittey, CORY JOHNSON, aka "O," aka "CO", and JERRY GAITERS, while engaged in and working in furtherance of a Continuing Criminal Enterprise, 21 USC § 848(a), knowingly, intentionally, and unlawfully killed and counseled, commanded,

14

00098

418a

J.A.1039

induced, procured, and caused the intentional killing of Dorothy Mae Armstrong, and such killing resulted.

(In violation of Title 21, United States Code, Section 848(e)(1)(A) and Title 18, United States Code, Section 2.).

## COUNT TWENTY

THE GRAND JURY FURTHER CHARGES that on or about February 1, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON aka Whittey, CORY JOHNSON, aka "O," aka "CO", and JERRY GAITERS, did knowingly, willfully, and unlawfully use a firearm, during and in relation to a crime of violence or a drug trafficking crime, which is a felony prosecutable in a court of the United States, that is a violation of Title 21, United States Code, Sections 846 and 848, and Title 18, United States Code, Section 1959, as set forth in Counts One, Seventeen, Eighteen & Nineteen and Twenty-One through Twenty-Three of this Indictment.

(In violation of Title 18, United States Code, Sections 924(c) and 2.)

## COUNT TWENTY-ONE

THE GRAND JURY FURTHER CHARGES that on or about February 1, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON aka Whittey, CORY JOHNSON, aka "O," aka "CO", and JERRY GAITERS, did knowingly, intentionally, and unlawfully cause the murder of Bobby Long, as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value from an enterprise engaged in racketeering activity,

15

00099

419a

J.A.1040

and for the purpose of gaining entrance to and maintaining and increasing position in an enterprise engaged in racketeering activity, said racketeering activity being dealing in narcotic or other dangerous drugs.

(In violation of Title 18, United States Code, Sections 1959 and 2.)

## COUNT TWENTY-TWO

THE GRAND JURY FURTHER CHARGES that on or about February 1, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON aka Whittey, CORY JOHNSON, aka "O," aka "CO", and JERRY GAITERS, did knowingly, intentionally, and unlawfully cause the murder of Anthony Carter, as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value from an enterprise engaged in racketeering activity, and for the purpose of gaining entrance to and maintaining and increasing position in an enterprise engaged in racketeering activity, said racketeering activity being dealing in narcotic or other dangerous drugs.

(In violation of Title 18, United States Code, Sections 1959 and 2.)

## COUNT TWENTY-THREE

THE GRAND JURY FURTHER CHARGES that on or about February 1, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON aka Whittey, CORY JOHNSON, aka "O," aka "CO", and JERRY GAITERS, did knowingly, intentionally, and unlawfully cause the murder of Dorothy Mae Armstrong, as consideration for the receipt of, and as consideration for a promise and

16

agreement to pay, something of pecuniary value from an enterprise engaged in racketeering activity, and for the purpose of gaining entrance to and maintaining and increasing position in an enterprise engaged in racketeering activity, said racketeering activity being dealing in narcotic or other dangerous drugs.

(In violation of Title 18, United States Code, Sections 1959 and 2.)

## COUNT TWENTY-FOUR

THE GRAND JURY FURTHER CHARGES that on or about February 19, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants RICHARD TIPTON, aka Whittey, VERNON LANCE THOMAS, aka Anthony Mack, aka "V", and CORY JOHNSON, aka "O," aka "CO", while engaged in and working in furtherance of a Continuing Criminal Enterprise, 21 USC § 848(a), knowingly, intentionally, and unlawfully killed and counseled, commanded, induced, procured, and caused the intentional killing of Curtis Thorne, and such killing resulted.

(In violation of Title 21, United States Code, Section 848(e)(1)(A) and Title 18, United States Code, Section 2.).

## COUNT TWENTY-FIVE

THE GRAND JURY FURTHER CHARGES that on or about February 19, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants RICHARD TIPTON, aka Whittey, VERNON LANCE THOMAS, aka Anthony Mack, aka "V", and CORY JOHNSON, aka "O," aka "CO", while engaged in and working in furtherance of a Continuing Criminal Enterprise, 21 USC § 848(a), knowingly,

17

00101

421a

J.A.1042

intentionally, and unlawfully killed and counseled, commanded, induced, procured, and caused the intentional killing of Linwood Chiles, and such killing resulted.

(In violation of Title 21, United States Code, Section 848(e)(1)(A) and Title 18, United States Code, Section 2.).

## COUNT TWENTY-SIX

THE GRAND JURY FURTHER CHARGES that on or about February 19, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON, aka Whittey, VERNON LANCE THOMAS, aka Anthony Mack, aka "V", and CORY JOHNSON, aka "O," aka "CO", did knowingly, willfully, and unlawfully use a firearm, during and in relation to a crime of violence or a drug trafficking crime, which is a felony prosecutable in a court of the United States, that is a violation of Title 21, United States Code, Section 846 and 848, and Title 18, United States Code, Section 1959, as set forth in Counts One, Twenty-Four, Twenty-Five and Twenty-Seven through Thirty of this Indictment.

(In violation of Title 18, United States Code, Sections 924(c) and 2.)

## COUNT TWENTY-SEVEN

THE GRAND JURY FURTHER CHARGES that on or about February 19, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON, aka Whittey, VERNON LANCE THOMAS, aka Anthony Mack, aka "V", and CORY JOHNSON, aka "O," aka "CO", did knowingly, intentionally, and unlawfully cause the murder of Curtis Thorne, as consideration for the receipt of, and as

18

00102

422a

J.A.1043

consideration for a promise and agreement to pay, something of pecuniary value from an enterprise engaged in racketeering activity, and for the purpose of gaining entrance to and maintaining and increasing position in an enterprise engaged in racketeering activity, said racketeering activity being dealing in narcotic or other dangerous drugs.

(In violation of Title 18, United States Code, Sections 1959 and 2.)

## COUNT TWENTY-EIGHT

THE GRAND JURY FURTHER CHARGES that on or about February 19, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON, aka Whittey, VERNON LANCE THOMAS, aka Anthony Mack, aka "V", and CORY JOHNSON, aka "O," aka "CO", did knowingly, intentionally, and unlawfully cause the murder of Linwood Chiles, as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value from an enterprise engaged in racketeering activity, and for the purpose of gaining entrance to and maintaining and increasing position in an enterprise engaged in racketeering activity, said racketeering activity being dealing in narcotic or other dangerous drugs.

(In violation of Title 18, United States Code, Sections 1959 and 2.)

## COUNT TWENTY-NINE

THE GRAND JURY FURTHER CHARGES that on or about February 19, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON, aka Whittey, VERNON LANCE THOMAS, aka Anthony Mack, aka "V", and CORY JOHNSON, aka "O," aka "CO", did knowingly, intentionally, and

19

00103

423a

J.A.1044

unlawfully cause the maiming of Priscilla Green, as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value from an enterprise engaged in racketeering activity, and for the purpose of gaining entrance to and maintaining and increasing position in an enterprise engaged in racketeering activity, said racketeering activity being dealing in narcotic or other dangerous drugs.

(In violation of Title 18, United States Code, Sections 1959 and 2.)

## COUNT THIRTY

THE GRAND JURY FURTHER CHARGES that on or about February 19, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON, aka Whittey, VERNON LANCE THOMAS, aka Anthony Mack, aka "V", and CORY JOHNSON, aka "O," aka "CO", did knowingly, intentionally, and unlawfully cause the maiming of Gwendolyn Green, as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value from an enterprise engaged in racketeering activity, and for the purpose of gaining entrance to and maintaining and increasing position in an enterprise engaged in racketeering activity, said racketeering activity being dealing in narcotic or other dangerous drugs.

(In violation of Title 18, United States Code, Sections 1959 and 2.)

## COUNT THIRTY-ONE

THE GRAND JURY FURTHER CHARGES that on or about January 15, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendant, CORY

20

JOHNSON, aka "O," aka "CO", did knowingly and intentionally distribute a Schedule II narcotic controlled substance, that is, a mixture and substance described in Title 21, United States Code, Section 841(b)(1)(A)(ii), which contains cocaine base, commonly known as "crack," or "cook em up."

(In violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.)

## COUNT THIRTY-TWO

THE GRAND JURY FURTHER CHARGES that on or about February 2, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON aka Whittey, CORY JOHNSON, aka "O," aka "CO", STERLING HARDY, VERNON LANCE THOMAS, aka Anthony Mack, aka "V", JAMES ROANE, JR., aka "J.R.", and JERRY GAITERS, did knowingly and intentionally possess with the intent to distribute a Schedule II narcotic controlled substance, that is, more than fifty (50) grams of a mixture and substance described in Title 21, United States Code, Section 841(b)(1)(A)(ii), which contains cocaine base, commonly known as "crack," or "cook em up."

(In violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.)

## COUNT THIRTY-THREE

THE GRAND JURY FURTHER CHARGES that on or about April 10, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD

21

00105

425a

J.A.1046

TIPTON aka Whittey, did knowingly and intentionally possess with the intent to

distribute a Schedule II narcotic controlled substance, that is, more than fifty (50) grams

of a mixture and substance described in Title 21, United States Code, Section

841(b)(1)(A)(ii), which contains cocaine base, commonly known as "crack," or "cook em

up."

(In violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United

States Code, Section 2.)

A TRUE BILL:

ISI *Christopher F. Snead*
FOREPERSON

RICHARD CULLEN
UNITED STATES ATTORNEY

By:

Howard C. Vick, Jr.
Assistant United States Attorney

William Parcell
Special Assistant U.S. Attorney

22

00106

426a

J.A.1047

# EXHIBIT 62

J.A.1048

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division



OCT 28 1992

D-PNB

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

UNITED STATES OF AMERICA ) 
                                     )
      v.                         )     CRIMINAL NO. 3:92CR68
                                     )
VERNON LANCE THOMAS        )

## NOTICE OF THE INTENTION OF THE UNITED
## STATES OF AMERICA TO SEEK THE DEATH PENALTY

COMES NOW the United States of America, by and through the undersigned

Assistant United States Attorney, and pursuant to the dictates of Title 21, United States

Code, Section 848(h)(1), provides notice to this Court and defendant THOMAS that the

government, in the event of a conviction on the counts specified below, will seek the

sentence of death. Specifically, the government will seek the sentence of death for each

of the following counts charged in the indictment, each of which provides for a sentence

of death upon a finding of guilt: Counts 11, 24, and 25.

The following aggravating factors, as delineated in Title 21, United States Code,

Section 848(n), will be proven as a basis of the death penalty.

        1.     The defendant intentionally killed the victim.

        2.     The defendant intentionally inflicted serious bodily injury which

resulted in the death of a victim.

185

**J.A.1049**

3. The defendant intentionally engaged in conduct intending that the victim be killed or that lethal force be employed against the victim, which resulted in the death of the victim.

4. The defendant intentionally engaged in conduct which the defendant knew would create a grave risk of death to a person, other than one of the participants in the offense, and which resulted in the death of a victim.

5. In the commission of the offenses enunciated in the indictment, the defendant knowingly created a grave risk of death to one or more persons in addition to the victims of the offense.

6. The defendant committed the offenses charged in the indictment after substantial planning and premeditation.

In addition to the aggravating factors outlined above which are contained in Title 21, United States Code, Section 848(n), the following aggravating factors will be proven by the United States as a basis for the death penalty.

1. That the defendant committed multiple murders.

2. That the defendant has a substantial criminal history.

3. That the defendant recruited a minor to participate in the murders.

4. That the defendant seriously wounded certain individuals in the course of committing the murders outlined in the indictment.

2

**J.A.1050**

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing Notice of Intention of the United States of America to Seek the Death Penalty was mailed this 28th day of October, 1992, to:

> Reginald M. Barley, Esq.
> 2025 East Main St., Suite 210
> Richmond, VA  23223

Howard C. Vick, Jr.
Assistant United States Attorney

**J.A.1051**

USCA4 Appeal: 21-1    Doc: 10-2    Filed: 01/08/2021    Pg: 199 of 255

Case 3:92-cr-00068-DJN   Document 92-9   Filed 12/14/20   Page 5 of 5 PageID# 3234

5.    That the defendant was knowingly and willfully a member of the conspiracy which had as one of its goals the murders of individuals other than those for which the defendant has been charged.

Respectfully Submitted,

RICHARD CULLEN
UNITED STATES ATTORNEY

By:    Howard C. Vick, Jr.
Assistant United States Attorney
Suite 1800, Main Street Centre
600 E. Main Street
Richmond, Virginia  23219
Bar # 18872

3

**J.A.1052**

# EXHIBIT 63

J.A.1053

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA | ) |
| v. | ) Criminal Case No. 3:92CR68-02 |
| CORY JOHNSON<br> a.k.a. "O," a.k.a. "CO" | ) |



**VERDICT**

WE, THE JURY, FIND as follows:

Count 1:        Conspiracy to Distribute Controlled Substance

            _____Guilty_____
            (Guilty or Not Guilty)

Count 2:        Continuing Criminal Enterprise

        Question:  Do you find that the government has proven, beyond
        a reasonable doubt, that a Continuing Criminal Enterprise
        existed as charged in the indictment?

        Yes: ___Yes___            No: _____

        If you indicated above that a Continuing Criminal Enterprise
        did not exist, you must find the defendant, CORY JOHNSON, Not
        Guilty as to Count 2.

        If you indicated that a Continuing Criminal Enterprise
        did exist, you must now determine whether defendant CORY
        JOHNSON is Guilty or Not Guilty of the crime of engaging
        in that continuing criminal enterprise as charged in
        Count 2, and enter your finding below:

            _____Guilty_____
            (Guilty or Not Guilty)

20a

J.A.1054

Defendant CORY JOHNSON is not charged in Counts 3-7 of the indictment.

Count 8:            Killing of Peyton Maurice Johnson while Engaged In or Working in Furtherance of a Continuing Criminal Enterprise

(If you indicated, in response to the Question set forth under Count 2 above, that a Continuing Criminal Enterprise did <u>not</u> exist, you must find the defendant Not Guilty as to this Count).

                    _____Guilty_____
                    (Guilty or Not Guilty)

Count 9:            Use of Firearm in Relation to Killing of Peyton Maurice Johnson

                    _____Guilty_____
                    (Guilty or Not Guilty)

Count 10:           Killing of Peyton Maurice Johnson to Maintain or Increase Position in Racketeering Enterprise

                    _____Guilty_____
                    (Guilty or Not Guilty)

Count 11:           Killing of Louis J. Johnson, Jr., while Engaged In or Working in Furtherance of a Continuing Criminal Enterprise

(If you indicated, in response to the Question set forth under Count 2 above, that a Continuing Criminal Enterprise did <u>not</u> exist, you must find the defendant Not Guilty as to this Count).

                    _____Guilty_____
                    (Guilty or Not Guilty)

21a

J.A.1055

Count 12:        Use of Firearm in Relation to Killing of Louis J.
                 Johnson, Jr.

                 _____Guilty_____
                     (Guilty or Not Guilty)

Count 13:        Killing of Louis J. Johnson, Jr., to Maintain or
                 Increase Position in Racketeering Enterprise

                 _____Guilty_____
                     (Guilty or Not Guilty)

Count 14:        Killing of Torrick Brown, Jr., to Maintain or
                 Increase Position in Racketeering Enterprise

                 _____Guilty_____
                     (Guilty or Not Guilty)

Count 15:        Use of Firearm in Relation to Killing of Torrick
                 Brown, Jr., and Maiming of Martha McCoy

                 _____Guilty_____
                     (Guilty or Not Guilty)

Count 16:        Maiming of Martha McCoy to Maintain or Increase
                 Position in Racketeering Enterprise

                 _____Guilty_____
                     (Guilty or Not Guilty)

Count 17:        Killing of Bobby Long while Engaged In or Working
                 in Furtherance of a Continuing Criminal Enterprise

        (If you indicated, in response to the Question set forth under
        Count 2 above, that a Continuing Criminal Enterprise did not
        exist, you must find the defendant Not Guilty as to this
        Count).

                 _____Guilty_____
                     (Guilty or Not Guilty)

J.A.1056

Count 18:    Killing of Anthony Carter while Engaged In or Working in Furtherance of a Continuing Criminal Enterprise

(If you indicated, in response to the Question set forth under Count 2 above, that a Continuing Criminal Enterprise did <u>not</u> exist, you must find the defendant Not Guilty as to this Count).

_____Guilty_____
(Guilty or Not Guilty)

Count 19:    Killing of Dorothy Mae Armstrong while Engaged In or Working in Furtherance of a Continuing Criminal Enterprise

(If you indicated, in response to the Question set forth under Count 2 above, that a Continuing Criminal Enterprise did <u>not</u> exist, you must find the defendant Not Guilty as to this Count).

_____Guilty_____
(Guilty or Not Guilty)

Count 20:    Use of Firearm in Relation to Killing of Bobby Long, Anthony Carter and Dorothy Mae Armstrong

_____Guilty_____
(Guilty or Not Guilty)

Count 21:    Killing of Bobby Long to Maintain or Increase Position in Racketeering Enterprise

_____Guilty_____
(Guilty or Not Guilty)

Count 22:    Killing of Anthony Carter to Maintain or Increase Position in Racketeering Enterprise

_____Guilty_____
(Guilty or Not Guilty)

23a

J.A.1057

Count 23:       Killing of Dorothy Mae Armstrong to Maintain or Increase Position in Racketeering Enterprise

Guilty
_____
(Guilty or Not Guilty)

Count 24:       Killing of Curtis Thorne while Engaged In or Working in Furtherance of a Continuing Criminal Enterprise

(If you indicated, in response to the Question set forth under Count 2 above, that a Continuing Criminal Enterprise did not exist, you must find the defendant Not Guilty as to this Count).

Guilty
_____
(Guilty or Not Guilty)

Count 25:       Killing of Linwood Chiles while Engaged In or Working in Furtherance of a Continuing Criminal Enterprise

(If you indicated, in response to the Question set forth under Count 2 above, that a Continuing Criminal Enterprise did not exist, you must find the defendant Not Guilty as to this Count).

Guilty
_____
(Guilty or Not Guilty)

Count 26:       Use of Firearm in Relation to Killing of Curtis Thorne and Linwood Chiles and Maiming of Priscilla Green and Gwendolyn Green

Guilty
_____
(Guilty or Not Guilty)

Count 27:       Killing of Curtis Thorne to Maintain or Increase Position in Racketeering Enterprise

Guilty
_____
(Guilty or Not Guilty)

24a

J.A.1058

Count 28:    Killing of Linwood Chiles to Maintain or Increase
Position in Racketeering Enterprise

_____Guilty_____
(Guilty or Not Guilty)

Count 29:    Maiming of Priscilla Green to Maintain or Increase
Position in Racketeering Enterprise

_____Guilty_____
(Guilty or Not Guilty)

Count 30:    Maiming of Gwendolyn Green to Maintain or Increase
Position in Racketeering Enterprise

_____Guilty_____
(Guilty or Not Guilty)

Count 31:    Distribution of Controlled Substance

_____Guilty_____
(Guilty or Not Guilty)

Count 32:    Possession of Controlled Substance with Intent to
Distribute  (on or about 2/2/92)

_____Guilty_____
(Guilty or Not Guilty)

Defendant CORY JOHNSON is not charged in Count 33 of the
indictment.

SO SAY WE ALL.

_____    2/3/93
FOREPERSON'S SIGNATURE                DATE

25a

J.A.1059

# EXHIBIT 64

J.A.1060

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

UNITED STATES OF AMERICA )
)
v. )  CRIMINAL NO. 3:92CR68
)
CORY JOHNSON aka "O" aka "CO" )

**F I L E D**

FEB - 8 1993

D-PHB

CLERK, U.S. DISTRICT COURT
RICHMOND VA

## NOTICE OF THE INTENTION OF THE UNITED STATES OF AMERICA TO SEEK THE DEATH PENALTY

COMES NOW the United States of America, by and through the undersigned Assistant United States Attorney, and pursuant to the dictates of Title 21, United States Code, Section 848(h)(1), provides notice to this Court and defendant JOHNSON that the government, in the event of a conviction on the counts specified below, will seek the sentence of death. Specifically, the government will seek the sentence of death for each of the following counts charged in the indictment, each of which provides for a sentence of death upon a finding of guilt: Counts 8, 11, 17, 18, 19, 24, and 25.

The following aggravating factors, as delineated in Title 21, United States Code, Section 848(n), will be proven as a basis of the death penalty.

1.    The defendant intentionally killed the victim.

2.    The defendant intentionally inflicted serious bodily injury which resulted in the death of a victim.

00218

**J.A.1061**

3. The defendant intentionally engaged in conduct intending that the victim be killed or that lethal force be employed against the victim, which resulted in the death of the victim.

4. The defendant intentionally engaged in conduct which the defendant knew would create a grave risk of death to a person, other than one of the participants in the offense, and which resulted in the death of a victim.

5. In the commission of the offenses enunciated in the indictment, the defendant knowingly created a grave risk of death to one or more persons in addition to the victims of the offense.

6. The defendant committed the offenses charged in the indictment after substantial planning and premeditation.

In addition to the aggravating factors outlined above which are contained in Title 21, United States Code, Section 848(n), the following aggravating factors will be proven by the United States as a basis for the death penalty.

1. That the defendant committed multiple murders.

2. That the defendant has a substantial criminal history.

3. That the defendant recruited a minor to participate in the murders.

4. That the defendant seriously wounded certain individuals in the course of committing the murders outlined in the indictment.

2

00219

**J.A.1062**

5.    That the defendant was knowingly and willfully a member of the conspiracy which had as one of its goals the murders of individuals other than those for which the defendant has been charged.

Respectfully Submitted,

RICHARD CULLEN
UNITED STATES ATTORNEY

By: _____
Howard C. Vick, Jr.
Assistant United States Attorney
Suite 1800, Main Street Centre
600 E. Main Street
Richmond, Virginia  23219
Bar # 18872

3

00220

**J.A.1063**

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing Notice of Intention of the United States of America to Seek the Death Penalty was hand delivered this 11th day of August, 1992, to CORY JOHNSON and his counsel.

Howard C. Vick, Jr.
Assistant United States Attorney

00221

J.A.1064

# EXHIBIT 65

J.A.1065



## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA | ) |
|  | ) |
| v. | ) Criminal Case No. 3:92CR68-02 |
|  | ) |
| CORY JOHNSON | ) |
|   a.k.a. "O," a.k.a. "CO" | ) |

### SPECIAL FINDINGS

### I.  Statutory Aggravating Factors:

**Category One:**  (21 U.S.C. § 848(n)(1))

WE, THE JURY, FIND as follows:

1A.  That defendant CORY JOHNSON intentionally killed the victim of the capital crime.

    Proven to the jury's unanimous satisfaction, beyond a reasonable doubt:

As to Peyton Maurice Johnson .........  _____Yes_____
                                    (Yes or No)

As to Louis J. Johnson, Jr. ..........  _____Yes_____
                                    (Yes or No)

As to Bobby Long .....................  _____Yes_____
                                    (Yes or No)

As to Anthony Carter .................  _____Yes_____
                                    (Yes or No)

As to Dorothy Mae Armstrong ..........  _____Yes_____
                                    (Yes or No)

As to Curtis Thorne ..................  _____Yes_____
                                    (Yes or No)

As to Linwood Chiles .................  _____Yes_____
                                    (Yes or No)

J.A.1066

1B. That defendant CORY JOHNSON intentionally inflicted serious bodily injury which resulted in the death of the victim of the capital crime.

Proven to the jury's unanimous satisfaction,
    beyond a reasonable doubt:

As to Peyton Maurice Johnson .........   _____Yes_____
                                          (Yes or No)

As to Louis J. Johnson, Jr. ..........   _____Yes_____
                                          (Yes or No)

As to Bobby Long .....................   _____Yes_____
                                          (Yes or No)

As to Anthony Carter .................   _____Yes_____
                                          (Yes or No)

As to Dorothy Mae Armstrong ..........   _____Yes_____
                                          (Yes or No)

As to Curtis Thorne ..................   _____Yes_____
                                          (Yes or No)

As to Linwood Chiles .................   _____Yes_____
                                          (Yes or No)

1C. That defendant CORY JOHNSON intentionally engaged in conduct intending that the victim of the capital crime be killed, or that lethal force be employed against the victim, which resulted in the death of the victim.

Proven to the jury's unanimous satisfaction,
    beyond a reasonable doubt:

As to Peyton Maurice Johnson .........   _____Yes_____
                                          (Yes or No)

As to Louis J. Johnson, Jr. ..........   _____Yes_____
                                          (Yes or No)

As to Bobby Long .....................   _____Yes_____
                                          (Yes or No)

As to Anthony Carter .................   _____Yes_____
                                          (Yes or No)

As to Dorothy Mae Armstrong ..........   _____Yes_____
                                          (Yes or No)

As to Curtis Thorne ..................   _____Yes_____
                                          (Yes or No)

As to Linwood Chiles .................   _____Yes_____
                                          (Yes or No)

2

J.A.1067

1D.   That defendant CORY JOHNSON intentionally engaged in conduct which defendant JOHNSON knew would create a grave risk of death to a person, other than one of the participants in the offense, and that such conduct resulted in the death of the victim of the capital crime.

Proven to the jury's unanimous satisfaction,
     beyond a reasonable doubt:

As to Peyton Maurice Johnson ......... _____Yes_____
                                        (Yes or No)

As to Louis J. Johnson, Jr. .......... _____Yes_____
                                        (Yes or No)

As to Bobby Long ..................... _____Yes_____
                                        (Yes or No)

As to Anthony Carter ................. _____Yes_____
                                        (Yes or No)

As to Dorothy Mae Armstrong .......... _____Yes_____
                                        (Yes or No)

As to Curtis Thorne .................. _____Yes_____
                                        (Yes or No)

As to Linwood Chiles ................. _____Yes_____
                                        (Yes or No)

Jurors:   At this point, review your findings on the Category One aggravating factors as to each individual victim. Each victim represents a separate capital crime. If, as to any victim, you have not found one of the Category One aggravating factors proven to your unanimous satisfaction, beyond a reasonable doubt, you must now complete Section A of the Decision Form for defendant CORY JOHNSON that relates to that victim.

          If, as to one or more victims, you have found a Category One aggravating factor proven to your unanimous satisfaction, continue to the Category Two factors on the following page.

3

J.A.1068

**Category Two**:  (21 U.S.C. §§ 848(n)(2)-(12))


WE, THE JURY, find as follows:


2A.  That defendant CORY JOHNSON committed the killing of the victim of the capital crime after substantial planning and premeditation.

Proven to the jury's unanimous satisfaction,
      beyond a reasonable doubt:

As to Peyton Maurice Johnson .........    <u>Yes</u>
                                          (Yes or No)

As to Louis J. Johnson, Jr. ..........    <u>Yes</u>
                                          (Yes or No)

As to Bobby Long .....................    <u>Yes</u>
                                          (Yes or No)

As to Anthony Carter .................    <u>Yes</u>
                                          (Yes or No)

As to Dorothy Mae Armstrong ..........    <u>Yes</u>
                                          (Yes or No)

As to Curtis Thorne ..................    <u>Yes</u>
                                          (Yes or No)

As to Linwood Chiles .................    <u>Yes</u>
                                          (Yes or No)


2B.  That, in the commission of the capital crime, defendant CORY JOHNSON knowingly created a grave risk of death to one or more persons in addition to the victim of the capital crime.

Proven to the jury's unanimous satisfaction,
      beyond a reasonable doubt:

As to Curtis Thorne ..................    <u>Yes</u>
                                          (Yes or No)

As to Linwood Chiles .................    <u>Yes</u>
                                          (Yes or No)


4


430a


**J.A.1069**

Jurors:    At this point, again review your findings as to each
individual victim.  If, as to any victim, you now have
not found proven, to your unanimous satisfaction, both
one of the Category One factors <u>and</u> one of the Category
Two factors, you must complete Section A of the Decision
Form for defendant CORY JOHNSON that relates to that
victim, if you have not already done so.

If, however, you have found both a Category One factor
and a Category Two factor proven to your unanimous
satisfaction as to one or more victims (i.e., one or more
capital crimes), continue your deliberations with regard
to those particular capital crimes by proceeding to the
section on the next page dealing with nonstatutory
aggravating factors.

5

431a

J.A.1070

## II.  Nonstatutory Aggravating Factors:

WE, THE JURY, FIND as follows:


1.  That defendant CORY JOHNSON committed multiple murders.

   Proven to the jury's unanimous satisfaction,
         beyond a reasonable doubt:

   _____Yes_____
   (Yes or No)


2.  That defendant CORY JOHNSON has a substantial criminal history.

   Proven to the jury's unanimous satisfaction,
         beyond a reasonable doubt:

   _____Yes_____
   (Yes or No)


3.  That defendant CORY JOHNSON seriously wounded two individuals in the course of committing the CCE murders for which he has been convicted.

   Proven to the jury's unanimous satisfaction,
         beyond a reasonable doubt:

   _____Yes_____
   (Yes or No)


4.  That defendant CORY JOHNSON was knowingly and willfully a member of a conspiracy which had as one of its goals the murder of individuals other than those for which the defendant was charged.

   Proven to the jury's unanimous satisfaction,
         beyond a reasonable doubt:

   _____Yes_____
   (Yes or No)


Jurors:  Regardless of your findings as to these nonstatutory aggravating factors, proceed to the next section concerning mitigating factors.


6

**J.A.1071**

### III.  Mitigating Factors:

WE, THE JURY, FIND as follows:


<u>Jurors</u>:    Consideration of the following mitigating factors is specifically provided for by statute.


1.    That defendant CORY JOHNSON's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, regardless of whether the capacity was so impaired as to constitute a defense to the charge(s).

Number of jurors who so find,
by a preponderance of the evidence:
(Number)

2.    That defendant CORY JOHNSON is punishable as a principal (as defined in section 2 of Title 18 of the United States Code) in the offense(s), which was (were) committed by another, but defendant CORY JOHNSON's participation was relatively minor, regardless of whether the participation was so minor as to constitute a defense to the charge(s).

Number of jurors who so find,
by a preponderance of the evidence:
(Number)

3.    That defendant CORY JOHNSON could not reasonably have foreseen that his conduct in the course of the commission of the murder(s) would cause, or would create a grave risk of causing, death to any person.

Number of jurors who so find,
by a preponderance of the evidence:
(Number)

4.    That defendant CORY JOHNSON was youthful, although not under the age of 18.

Number of jurors who so find,
by a preponderance of the evidence:
(Number)

7

433a

J.A.1072

5.    That defendant CORY JOHNSON did not have a significant prior criminal record.

Number of jurors who so find,
by a preponderance of the evidence:    _____9_____
                                          (Number)

6.    That defendant CORY JOHNSON committed the offense(s) under severe mental or emotional disturbance.

Number of jurors who so find,
by a preponderance of the evidence:    _____0_____
                                          (Number)

7.    That another defendant or defendants, equally culpable in the crime(s), will not be punished by death.

Number of jurors who so find,
by a preponderance of the evidence:    _____12_____
                                          (Number)

8.    That the victim(s) consented to the criminal conduct that resulted in his (her) (their) deaths.

Number of jurors who so find,
by a preponderance of the evidence:    _____12_____
                                          (Number)

9.    That the following other factors in the defendant's background or character mitigate against imposition of a death sentence:

      Jurors:    The following are nonstatutory mitigating factors.

a)    That defendant CORY JOHNSON was subjected to emotional and physical abuse, abandonment and neglect as a child, and was deprived of the parental guidance and protection that he needed.

Number of jurors who so find,
by a preponderance of the evidence:    _____12_____
                                          (Number)

b)    That defendant CORY JOHNSON suffers from neurological impairments which were identified and which were not adequately treated or addressed when he was a child or adolescent.

Number of jurors who so find,
by a preponderance of the evidence:    _____12_____
                                          (Number)

8

434a

J.A.1073

c)   That defendant CORY JOHNSON suffers from brain dysfunction which has gravely impaired his ability to function in the absence of strong support or guidance.

Number of jurors who so find,
by a preponderance of the evidence:     _____8_____
                                          (Number)

d)   That defendant CORY JOHNSON was introduced to addictive drugs and alcohol while still a child.

Number of jurors who so find,
by a preponderance of the evidence:     _____12_____
                                          (Number)

e)   That defendant CORY JOHNSON has responded well to structured environments, and would likely make a reasonable adaptation to prison if he were sentenced to life imprisonment.

Number of jurors who so find,
by a preponderance of the evidence:     _____7_____
                                          (Number)

f)   That defendant CORY JOHNSON's full scale I.Q. is 77.

Number of jurors who so find,
by a preponderance of the evidence:     _____8_____
                                          (Number)

g)   That defendant CORY JOHNSON grew up in an impoverished and violent environment, and was exposed to extreme violence as a child and throughout his life.

Number of jurors who so find,
by a preponderance of the evidence:     _____12_____
                                          (Number)

h)   That defendant CORY JOHNSON suffers from an extremely severe learning disability which impairs his ability to use good judgment to control his behavior, and to understand and foresee the consequences of his actions.

Number of jurors who so find,
by a preponderance of the evidence:     _____0_____
                                          (Number)

9

435a

J.A.1074

i) That defendant CORY JOHNSON suffers from a neurological impairment (brain damage) that impairs his ability to exercise good judgment, to control his behavior and to understand and foresee the consequences of his actions.

Number of jurors who so find,
by a preponderance of the evidence: _____2_____
(Number)

j) That defendant CORY JOHNSON was brought up in an extremely unstable, abusive and neglectful family.

Number of jurors who so find,
by a preponderance of the evidence: _____12_____
(Number)

k) That defendant CORY JOHNSON's severe learning disability affected his intelligence, his speech, and his ability to read, write and learn. Those limitations impaired his ability to exercise good judgment and to control his behavior.

Number of jurors who so find,
by a preponderance of the evidence: _____5_____
(Number)

l) That defendant CORY JOHNSON had no parental involvement or support from or by his father.

Number of jurors who so find,
by a preponderance of the evidence: _____12_____
(Number)

m) That defendant CORY JOHNSON, if not sentenced to death, will be sentenced to life in prison without any possibility of parole.

Number of jurors who so find,
by a preponderance of the evidence: _____12_____
(Number)

Jurors: If any juror or jurors find(s) that a mitigating factor not listed above has been proven to exist by a preponderance of the evidence, please identify that mitigating factor on the following page, together with the number of jurors who so find. Remember, however, that you need not be able to articulate a mitigating factor with specificity to consider it in your deliberations.

10

436a

J.A.1075

If additional space is needed, use the back of this page.

Factor: ~~The~~ The defendants eagerness to be accepted by ~~the~~ others ~~the~~ he was easily manipulated.

Number of jurors who so find,
by a preponderance of the evidence: _____11_____
(Number)

Factor: That the defendant's severe Leaning Disability, based on neurological impairment (brain damage) Could impair his ability to exercise good Judgem.

Number of jurors who so find,
by a preponderance of the evidence: _____12_____
(Number)

Factor: _____

_____

Number of jurors who so find,
by a preponderance of the evidence: _____
(Number)

Factor: _____

_____

Number of jurors who so find,
by a preponderance of the evidence: _____
(Number)

Jurors: You have completed the Special Findings as to defendant CORY JOHNSON, and must now begin the process of weighing the aggravating and mitigating factors to determine if the death penalty is justified as to each capital crime for which this defendant has been convicted. Remember, you are now considering only those capital crimes for which you have not already completed Section A of the Decision Form. Upon completing your deliberations as to the remaining capital crimes charged to this defendant, complete Section B, C or D of the Decision Form for each crime as appropriate.

11

The date and your foreperson's signature should appear below, certifying that these are your Special Findings as to defendant CORY JOHNSON.


_____          _____
    FOREPERSON'S SIGNATURE                        2/15/93
                                                    DATE

12

438a

J.A.1077

# EXHIBIT 66

J.A.1078

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

UNITED STATES OF AMERICA,     }
                              }
v.                            }     *Criminal No. 3:92CR68*
                              }
VERNON LANCE THOMAS.          }

## MOTION TO HAVE DEFENDANT DECLARED MENTALLY RETARDED

**COMES NOW** the defendant, Vernon Lance Thomas, by and through his counsel, Cary B. Bowen, Attorney at Law, and requests that the defendant be declared mentally retarded, and to that end states as follows:

1. That the defendant, Vernon Lance Thomas, stands charged herein with capital murder, as well as other related charges, currently scheduled for a jury trial on April 26, 1993.

2. That Henry L. Dee, Ph.D., P.A., has evaluated and tested the defendant and has determined him to be mentally retarded. (A copy of said evaluation is attached hereto as Exhibit "A" as well as a copy of Dr. Dee's CV as Exhibit "B").

3. That the American Association on Mental Retardation has defined "mental retardation" as follows:

> Mental retardation consists of substantial limitations in present functioning characterized by significantly sub-average intellectual functioning (i.e. an I.Q. of 70 - 75 or below), existing concurrently with related limitations in two or more of the following adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work.

4. That the accused's performance on the Wechsler Adult Intelligence Scale - Revised Edition fell into the retarded range with a full scale I.Q. of 71.

J.A.1079

5. That the Wechsler Adult Intelligence Scale - Revised Edition is generally considered to be the most reliable and valid test to determine mental levels and is used throughout the country.

6. That the accused had a score of 60 on the Stanford - Binet Verbal Reasoning sub tests.

7. That the accused not only performs in the retarded range on the I.Q. testing but that he also shows significant adaptive impairments which further define and reinforce the fact that he is mentally retarded.

8. That the United States does not allow anyone determined to be mentally retarded to be executed.

**WHEREFORE**, premises considered, defendant herein should be declared mentally retarded.

Respectfully submitted,

**VERNON LANCE THOMAS**

By_____
                              Counsel

Reginald M. Barley, Esquire
2025 East Main Street
Richmond, Virginia 23219
(804) 783-8468

Cary B. Bowen, Esquire
**Bowen and Bowen, Attorneys at Law, P.C.**
304 West Broad Street
Richmond, Virginia 23220-4219
(804) 648-7400

J.A.1080

## CERTIFICATE

I hereby certify that a true and exact copy of the foregoing Motion was mailed, postage prepaid, this 15th day of April, 1993, to Howard C. Vick, Jr., Assistant United States Attorney, Office of the United States Attorney, Main Street Centre, 600 East Main Street, Suite 1800, Richmond, Virginia 23219.

_____
**CARY B. BOWEN, Esquire**

*Henry L. Doe, Ph. D., P.A.*

CLINICAL AND CONSULTING PSYCHOLOGY

1509 SOUTH FLORIDA AVENUE
LAKELAND, FLORIDA 33802
(813) 688-6477

<u>United States</u> v. <u>Vernon Lance Thomas</u>
Criminal No. 3:92CR68
EXHIBIT "A"

April 9, 1993

Resume' of Neuropsychological Evaluation

Re:  Vernon Thomas

Test Battery:  Wechsler Adult Intelligence Scale - Revised;
Selected Subtests of the Stanford-Binet: Fourth Edition;
Selected Subtests of the Woodcock-Johnson Tests of
Achievement - Revised; Minnesota Multiphasic Personality
Inventory; 16 PF Test Profile; Denman Neuropsychology Memory
Scale; Multilingual Aphasia Examination: Controlled Word
Association, Sentence Repetition, Oral Language Token Test,
Visual Naming; Benton Visual Retention Test; Finger
Localization; Right/Left Orientation; Stereognosis Test;
Judgment of Line Orientation; Facial Recognition Test; Visual
Form Discrimination; Clinical Interview and Interpretation

J.A.1082

VERNON THOMAS

REASON FOR REFERRAL AND BACKGROUND INFORMATION

Vernon Thomas is a twenty-five year old, African-American male who was referred for evaluation by Cary Bowen, Esquire, appointed counsel. According to Mr. Thomas, he is charged with, among other things, murder and conspiracy to commit murder in a continuing criminal enterprise.

He reports that the crime allegedly occurred on February 1, 1992, although he is unable to supply the time of day or night that it is supposed to have occurred. He reports that the prosecutor alleges that he shot two people on February 1 He is alleged to be the person who was actually involved in the shooting and is also alleged to have "masterminded" the operation and ordered the murder of others.

He reports that he is accused of having conspired with his co-defendants to distribute drugs and to murder.

With regard to his Competence to Proceed, Mr. Thomas apparently understands the function of his attorney, the prosecution, the role of the jury, and the judge. He understands the nature of a Plea Bargain.

HISTORY

Mr. Thomas was born on ███████████████, at St. Luke's Hospital in New York, to Illona Miller Thomas and Richard Thomas. Mrs. Thomas is currently forty-six years of age and disabled with heart problems. Mr. Thomas reports that his father, Richard Thomas, lives in Chicago and he denies any knowledge of what he does, and indeed, reports that since his parents separated when he was approximately eight or nine years of age, he rarely ever saw his father.

Further evidence revealed that Mr. Thomas believed that his father fled New York with a homosexual lover and took up residence in Chicago, which has led to some of his bitter comments about the fact that "It's like I don't have any father", etc.

Mr. Thomas reports that he went through eleven years of schooling and left because "I was getting too old", and revealed that he had "reading problems" in school. While he reports that he learned these skills afterwards "on the street", there is good reason to question this statement because of his present abilities (see below).

J.A.1083

Henry L. Dee, Ph.D., P. A.
Page 2

It would appear from his school record that by the time he was roughly twelve years of age, Mr. Thomas was placed in special education.  According to the report of Jerry Kulba, who was in charge of the special education program at the time Vernon was in PS 143 in New York City, Vernon was seen as a "very low functioning" child.  Even in this special education program, he was in the low functioning group and Mr. Kulba estimated his IQ at that time to be roughly 60.  At first, he was classified as CRMD (children with retarded mental development).  Later, the labels in the school system were changed and he was classified as EMR or educable mentally regarded.  At that time, the perameters for EMR were an IQ between 50 and 75.  At that time, his estimated IQ was well below 70 and his achievement scores were very low.  Mr. Kulba also described Mr. Thomas as being "a follower.....easily swayed......could be drawn by the promise of anything....friendship.....not necessarily money."

Phyllis Williams, the principal at PS 143, was at that time a special education teacher while Mr. Thomas attended school. She describes him as "limited....very limited."  She had him in her Social Studies class and describes his writing as "very poor and his reading ability very limited."  Indeed, she describes his attempts at reading as "painful to watch...".  She too reported that his IQ was clearly below 75.  She described him as "not well cared for.....disheveled", and also describes him as having been easily led.  She felt he had grave difficulties in premeditating or planning anything and stated that he needed "simple, clear directions from others."

While his high school records have been diligently searched for, his special education records have somehow been lost or destroyed.

Rodney Lofton, the supervisor of special education at Mr. Thomas' middle school IS 143 notes that Mr. Thomas had "learning disabilities with attention and concentration problems", and that while very extensive efforts had been made to locate the special education records, they simply cannot be found anywhere in the city school system.

Mr. Thomas' brother, Ralph Miller, notes that he recalls that Vernon had problems in school and that other children frequently made fun of him.  He reported that it was difficult for Vernon to admit that he couldn't do the work and couldn't understand what he was reading.  While he was allegedly somewhat better with math, his reading was always a serious impediment. Ralph recalled that Vernon would try to look for jobs after leaving high school, but was unable to

Henry L. Dee, Ph.D., P. A.
Page 3

obtain work.  He had not completed high school, had no job
training or skills and frequently asked his brother for
money.  Indeed, the only job that he apparently successfully
carried on for any period of time was that with a messenger
service for roughly six months, and a  Federally Funded
summer youth job funded by the city.  It involved delivering
mail to different buildings.  The only other work that he
apparently was able to do was clean-up work at the U. S.
Tennis Open, a job that was obtained for him by others.

Fran Leichter, Vernon's home room teacher, noted that he was
a lad who "could be swayed.....not very bright."  She too
felt that he was probably retarded and described the family
as dysfunctional. She described Vernon as a person who wanted
to please other people.  He would frequently comply with the
requests of other people.

Mr. Thomas lived at home with his mother until age twenty-
one, apparently because he could not maintain employment and
a home of his own.  He did get an apartment with a Nicole
Bishop at age twenty-four, but never really lived on his own.
Ms. Bishop reports that while Vernon talked about wanting to
find a job, he really did not know how to go about looking
for work and had no idea of what he could do.  She reports
that he never had a checking or savings account and would
carry only small amounts of cash.  He occasionally could give
her $50.00 or $60.00 for groceries.

He was and is lacking in the skills required to seek out
employment and certainly has no vocational training.  His
lack of formal education is clearly a bar to gainful
employment, particularly with his academic limitations (see
below).

As much of his school records as could be found were
reviewed.  As of the time that he left school in the eleventh
grade, he was still failing in reading and math, as he
frequently had in school previously.  On the California Test
of Basic Skills at that time, he was reading some place
between Grade Level 3 and 3.6, which is, of course, not
functional literacy for someone of his age or educational
level.  It certainly would not allow him to do high school
work, something that he alluded to when he said that he was
leaving school in part because he was getting too old, and it
was implied, that it was also in part because he was learning
nothing.  Consistent with this, throughout his school
history, he seems to most of the time not met the criteria
for promotion and nowhere could I find evidence that he read
above Grade Level 3.5 or 3.6 or that any of his general
educational development exceeded this.

J.A.1085

Henry L. Dee, Ph.D., P. A.
Page 4

His early school records contain frequent comments about his
behavior which suggests that he suffered an Attention Deficit
Disorder with Hyperactivity.  He rarely completed his work
and needed constant attention even though interestingly, he
was frequently noted to be "courteous".  As he grew older, he
apparently began to outgrow the hyperactivity and was able to
sit and do more of his work but continued to require constant
support and attention.

Information gathered by Jill Miller, MSSW, indicated that
besides the rather distressing loss of his father at age
nine, there was apparently significant neglect of he and his
five siblings.  His mother attempted to raise the children
alone, but also tried to carry on some life of her own and
apparently indulged in some alcohol abuse.  On one occasion,
when Vernon was but seventeen months of age, she left the
children alone and the family apartment caught fire.  The
firemen, after pulling the children from the blaze, found it
necessary to resuscitate Vernon twice, suggesting potential
for possible brain damage from lack of oxygen. The possible
etiology of his later educational and mental handicaps.


INTELLECTUAL AND NEUROPSYCHOLOGICAL FACTORS

Wechsler Adult Intelligence Scale - Revised

| Area Measured | Approximate Percentile | Rating |
|---|---|---|
| Information | 1 | Very Low |
| Digit Span | 5 | Low |
| Vocabulary | 1 | Very Low |
| Arithmetic | 16 | Low |
| Comprehension | 1 | Very Low |
| Similarities | 0.4 | Very Low |

        Verbal Abilities:  1st Percentile

| Picture Completion | 9 | Low |
|---|---|---|
| Block Design | 5 | Low |
| Digit Symbol | 37 | Average |

        Performance Abilities:  7th Percentile


        General Intellectual Functioning:  3rd Percentile

Mr. Thomas' performance on the Wechsler Adult Intelligence
Scale - Revised Edition, fell into the retarded range, with a

J.A.1086

Henry L. Dee, Ph.D., P. A.
Page 5

Full Scale IQ of 71. Mental retardation, as defined by the American Association on Mental Retardation, consists of substantial limitations in present functioning characterized by significantly sub-average intellectual functioning (i.e. an IQ of 70 - 75 or below), existing concurrently with related limitations in two or more of the following adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work.  It is also a condition that is manifest before age eighteen, and this is clearly the case in Mr. Thomas as can be seen from the history and the history of his testing.

The Wechsler Adult Intelligence Scale - Revised Edition, is generally considered the most reliable and valid test of mental level, being in absolutely standard use throughout the country.  It is the standard which other tests are compared because of its superior norms, construction, and validity.

The Woodcock-Johnson Tests of Achievement - Revised Edition, is similarly regarded as an absolutely objective, standard measure of practical academic skills, and is once again, probably the most frequently used test of these abilities. On these tests, his performance indicated broad written language capacities at Grade Level 2.1, letter-word identification at Grade Level 4.7, passage comprehension at Grade Level 4.6, dictation skills at Grade Level 2.5 and writing samples at Grade Level 2.4.  He, thus, has little in the way of reading or writing skills, which is consistent with his previous history and general mental level.

In the area of self-direction, one indication that can be gained (aside from the above testimony of those that knew him) is his performance on the verbal reasoning subtests of the Stanford-Binet, which yield a Verbal Reasoning score of 60, which is well below two standard deviations below the mean, indicating little capacity for competent verbal reasoning to assist him in handling situations requiring judgment and ability to make appropriate decisions.

On the Denman Neuropsychology Memory Scale, a clinical assessment of immediate recall, short term memory, and long term memory in both verbal and nonverbal areas, his performance yielded a Full Scale Memory Quotient of 75, which may be compared to his Full Scale Intelligence Quotient of 71, which indicates that his memory is about at the same level as his compromised general mental level, i.e. severely impaired.

On the Multilingual Aphasia Examination, a clinical

J.A.1087

Henry L. Dee, Ph.D., P. A.
Page 6

assessment of linguistic skills, he showed basically intact
verbal fluency and auditory verbal language comprehension,
but defective immediate verbal repetition and very marginal
capacity to name a variety of common visual objects, his
performance falling at the 5th percentile.

His performance on tests of finger localization and
right/left orientation were broadly intact.

His performance on a test of stereognosis (crossmodal spatial
perception) was basically intact.

The same may be said of his performance on a test of facial
recognition, although his performance was done in such a slow
fashion that it was apparent that it was an extremely
difficult task for him.

On a test of judgment of line orientation, he shows severely
defective performance.

These findings are consistent with a diagnosis of mental
retardation.  He shows an IQ in the retarded range, with
significant adaptive impairments in the area of academic
skills, capacity to seek and maintain employment,
difficulties with self-direction and planning, limited social
skills (see below) and the fact that this retardation has
apparently been an aspect of his life that has been constant
throughout his life.  Like most individuals who are retarded,
and this examiner has seen thousands of them, Mr. Thomas has
acquired certain ways of interacting and behaving which allow
him to "pass" as a nonretarded individual, particularly to
the casual observer.  Nonetheless, careful intellectual
assessment certainly confirms this examiner's clinical
impression of mental retardation.

He has needed support and direction for all of his life and
will probably continue to need it for the rest of his life.

Looking at Mr. Thomas from a neuropsychologist's point of
view, which is, of course, the purpose of this examiner, it
is clear that Mr. Thomas suffers an Organic Brain Syndrome
based on his performance on the Wechsler (which is actually a
neuropsychological instrument) and other scattered cognitive
deficits, including memory impairment, difficulties with
spatial orientation and certain personality features (see
below).

PERSONALITY FACTORS

Mr. Thomas' performance on the personality tests indicate

J.A.1088

Henry L. Dee, Ph.D., P. A.
Page 7

that he is a person who feels lonely, misunderstood, and not a part of his social environment. This is apparently based upon a lifelong history of mild to moderate rejection by his peers because of his mental retardation, something of which he is acutely aware.

His profile also indicates that he is likely to be overactive and impulsive as well as undercontrolled. This is, of course, not surprising, since people who have cerebral involvment of whatever etiology show most frequently two behavioral characteristics: memory impairment and increased impulsivity and an incapacity to control their impulses. Such people frequently show poor social judgment, and all of these characteristics are clear in Mr. Thomas' case.

Parenthetically, it might be added that the same is true of people who show mental retardation, but after all, mental retardation and cerebral damage or disease are but two sides of the same coin, i.e. two ways of looking at the same phenomenon.

He is an extremely concrete-thinking person who has difficulty reasoning through things. The notion of abstract reasoning or analogies is almost totally foreign to him.

Interestingly enough, he does appear on the psychological tests to be a person who is somewhat easily led and who tends to go along with others in order to win their approval and support. Once again, this probably has its origin in his feelings of alienation and rejection by his peers, i.e. a general desire to want to be "one of the guys".

SUMMARY IMPRESSION

1 - Mental Retardation, with multiple deficits in adaptive functioning.

2 - Organic Brain Syndrome with Mixed Features, i.e. generally lowered intellectual capacity, memory, and difficulties in impulse control and judgment.

Henry L. Dee, Ph.D., P. A.

HLD/ab

J.A.1089

United States v. Vernon Lance Thomas
minal No. 3:92CR68

EXHIBIT "B"

CURRICULUM VITAE

## HENRY L. DEE

**BORN:**

▮▮▮▮▮▮▮▮▮▮
Chattanooga, Tennessee

**DEGREES:**

| | |
|---|---|
| B.A. | University of South Florida, 1964 |
| M.A. | University of Iowa, 1966 |
| Ph.D. | University of Iowa, 1969 |

**APPOINTMENTS:**

| | |
|---|---|
| 1964-65 | Research Assistant in Psychological Psychology, University of Iowa |
| 1965-66 | Graduate Assistant in Psychology, University of Iowa |
| 1966-67 | Intern in Psychology, Connecticut Valley Hospital |
| 1967-68 | Graduate Assistant in Psychology, Scott County Mental Health Center, Davenport, Iowa |
| Summer, 1968 | Lecturer in Psychology, University of Iowa |
| 1968-70 | Research Associate in Neurology and Psychology, University of Iowa |
| 1970-73 | Consultant in Psychology, Veterans Administration Hospital, Iowa City, Iowa |
| 1973-77 | Consulting Psychologist, Byron Harless, Reid and Associates, Inc., Lakeland, Florida |
| 1977- | Consulting Psychologist, independent practice Lakeland, Florida |
| 1988- | Supervising and Consulting Psychologist for the Child Protection Team, Lakeland, Florida (Polk Highland, and Hardee counties) |
| 1988- | Consulting Psychologist, Vocational Rehabilitation, Winter Haven, Florida (Polk and Highlands counties) |

**MEMBERSHIP IN PROFESSIONAL ORGANIZATIONS:**

American Psychological Association
American Adademy of Neurology
Academy of Aphasia
Society of Neuroscience
American Association for the Advancement of Science
Sigma Xi
Iowa Academy of Science

CURRICULUM VITAE

**HENRY L. DEE**                                    Page Two

Publications:

Dee, H. L. & Fontenot, D. J. Use of the non-preferred hand in graphomotor performance: a methodological study. Confinia Neurologica, 1969, 31, 273-280

Dee, H.L. Visuoconstructive and visuoperceptive deficit in patients with unilateral cerebral lesions. Neuropsychologia, 1970, 8, 305-314.

Dee, H. L. & Benton, A. L. A crossmodal investigation of spatial performances in patients with unilateral cerebral lesions. Cortex, 1970, 6, 261-272.

Dee, H.L., Benton, A.L. & Van Allen, M. W. Apraxia in relation to hemispheric locus of lesion and aphasia. Transactions of the American Neurological Association, 1970, 95, 147-150.

Dee, H.L. Auditory asymmetry and strength of manual preference Cortex, 1971, 7, 236-245.

Dee, H.L. & Van Allen, M. W. Simple and choice reaction time and motor strength in unilateral cerebral disease. Acta Psychiatrica Scandinavica, 1971, 47, 315-323.

Dee, H.L. Mental Retardation and brain damage. Paper presented at the 1972 meeting of the American Association on Mental Deficiency.

Dee, C. K. & Dee, H.L. Objective assessment of the characteristics of parents of children with developmental problems: Journal of Consulting & Clinical Psychology, 1972, 38, 464.

Dee, H.L. & Van Allen, M. W. Psychomotor testing as an aid in the recognition of cerebral disease. Neurology, 1972, 22, 845-848.

Dee, H.L. & Van Allen, M. W. Hemispheric differences in complex reaction time. Transactions of the American Neurological Association, 1972, 97.

Dee, H.L. & Van Allen, M. W. Speed of decision-making processes in patients with unilateral cerebral disease. Archives of Neurology, 1972, 29, 163-166.

J.A.1091

<u>CURRICULUM VITAE</u>

<u>HENRY L. DEE</u>                                          Page Three

Publications:  (Continued)

Dee, H. L. & Fontenot, D.J. Cerebral dominance and lateral differences in perception and memory.  <u>Neuropsychologia</u>, 1973, 2, 167-173.

Dee, H. L. & Hannay, H. J. Asymmetry in perception: attention vs. other determinants. <u>Acta Psychologia</u>, 1973, 37, 241-247.

Dee, H. L. & Hannay, H. J. Asymmetry in Perception:  Familization and labeling as determinants (two papers in preparation).

Dee. H. L. & Hannay, H. J. Asymmetry in perception: attention vs. other determinants.  Acta Psychologica, 1973, 37, 241-247.

Dee, H. L. & Hannay, H. J. Reversal of Asymmetry in Human Perceptual Performance as a function in labeling, Mode of Response, and Familiarity.  In press, <u>Cortex</u>

Dee, H. L. & Hannay, H. J. Experimental REversal of a Left Visual Field Superiority for Forms.  In press, <u>Percept. Mot. Skills</u>

J.A.1092

# EXHIBIT 67

J.A.1093

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division



FILED

JUN 15 1998

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

| | |
|---|---|
| CORY JOHNSON, ) | |
| ) | |
| Petitioner, ) | Crim. No. 3:92CR68 |
| v. ) | |
| ) | Civil No. 3:97CV895 |
| SAMUEL PRUETT, WARDEN, ) | |
| ) | |
| Mecklenburg Correctional ) | |
| Center, Boydton, Virginia, ) | |
| Respondent. ) | |

## MEMORANDUM IN SUPPORT OF

## INITIAL PETITION FOR WRIT OF HABEAS CORPUS

## PURSUANT TO 28 U.S.C. SECTION 2255

BARBARA L. HARTUNG
VSB 38062
1001 East Main Street
Suite 504
Richmond, VA  23219
(804) 649-1088

EDWARD E. SCHER
VSB 23064
Thorsen Marchant &
  Scher, LLP
316 West Broad Street
Richmond, VA  23220-4219
(804) 644-0711

Counsel for Cory Johnson

June 15, 1998

J.A.1094

TABLE OF CONTENTS

Page

A.  JURISDICTIONAL STATEMENT . . . . . . . . . . .        1

B.  PARTIES  . . . . . . . . . . . . . . . . . . .        1

C.  PROCEDURAL HISTORY . . . . . . . . . . . . . .        2

D.  OVERVIEW OF GROUNDS COMPELLING
    THE ISSUANCE OF THE WRIT  . . . . . . . . . . .        4

    1.  No Pretrial Investigation  . . . . . . . .        4

    2.  Ineffective Voir Dire and Prejudicial Publicity    5

    3.  Insufficient Proof of CCE Supervision  . .        6

    4.  Prosecutorial Misconduct . . . . . . . . .        7

    5.  Counsels' Errors At Penalty Phase  . . . .        9

E.  GROUNDS FOR RELIEF . . . . . . . . . . . . . .       12

  I. THE PROSECUTION KNOWINGLY OR NEGLIGENTLY USED
     FALSE EVIDENCE TO CREATE THE ILLUSION THAT
     JOHNSON AND HIS CO-DEFENDANTS WERE LEADERS OF
     A HIGHLY ORGANIZED CONTINUING CRIMINAL
     ENTERPRISE HAVING ITS ROOTS IN NEW YORK
     AND/OR NEW JERSEY  . . . . . . . . . . . . . .      12

     A.  The Government's Strategy . . . . . . . .       14

     B.  Greg Scott's Trial Testimony Linking Johnson
         And His Co-defendants To The New York Boyz Was
         False, And The Government Knew Or Should Have
         Known It Was False . . . . . . . . . . . .      17

     C.  Maurice Saunders' Trial Testimony Linking
         Tipton To "Light" And To Large Sums Of Money Was
         False, And The Government Knew Or Should Have
         Known It Was False . . . . . . . . . . . .      26

 II. THE EVIDENCE WAS LEGALLY INSUFFICIENT TO CONVICT
     JOHNSON AS A SUPERVISOR OF A CONTINUING CRIMINAL
     ENTERPRISE UNDER 21 U.S.C. SECTION 848 . . . . .    31

     A.  The CCE Supervision Element: Governing
         Principles  . . . . . . . . . . . . . . .       33

**J.A.1095**

1.    The Fourth Circuit Does Not Require Proof Of Management By The CCE  Defendant In All Cases, While Other Circuits Always Require Proof Of A Management Relationship . . .    34

2.    Proof Of A Buyer-Seller Relationship In A Drug Distribution System Does Not Establish The Supervision Element . . .    36

3.    The Government Was Required To Prove That Johnson Himself Satisfied the Supervision Element . . . . . . . . . . .    38

4.    A CCE Conviction Must Be Vacated Where (As Happened Here) The Court Does Not Properly Instruct The Jury After The Government Introduces Evidence Of Individuals Who, As A Matter Of Law, Are Incapable Of Counting As "Supervisees." .    39

B.    The Government's Effort To Prove The Supervision Element . . . . . . . . . . .    42

1.    Many Of Alleged "Supervisees" Were Individuals Who, As A Matter Of Law, Were Not Capable Of Being Supervisees, And Proper Jury Instructions Were Not Given; Under *Barona* and *Jerome*, The CCE Convictions Must Be Vacated . . . . . . .    43

2.    There Is No Admissible Evidence Demonstrating That Johnson Supervised Five Individuals Within The Meaning Of The CCE Statute  . . . . . . . . . . .    49

a.    The Government Relied Principally On The Conclusory Terms "Worker" and "Employee" To Prove Supervision; Such Terms Misled The Jury And Prejudiced Johnson And The Other Defendants . . .    49

b.    The So-Called Evidence Of "Supervision" Was Largely Without A Foundation Of Personal Knowledge And Was Inadmissible Under FRE 602 . . . .    56

c.    Even The Evidence Cited By The Government On Appeal Does Not Establish That Johnson Supervised Five Individuals . . . . . . . . . . .    56

ii

J.A.1096

C.  Habeas Claims Related To the CCE
    Supervision Element . . . . . . . . . . . . . . .  61

    1.  The Jury Was Not Properly Instructed As
        To The Supervision Element . . . . . . . . .  61

        a.  Buyer-seller relationship . . . . . .  61

        b.  Individuals not capable of
            being CCE supervisees   . . . . . . .  61

        c.  Management requirement  . . . . . . .  62

    2.  There Was Insufficient Evidence To
        Support The Supervision Element  . . . . .  62

    3.  Prosecutorial Misconduct Relating To
        The Supervision Element . . . . . . . . .  62

        a.  Improper use of unsupported,
            ambiguous testimony . . . . . . . . .  63

        b.  Improper argument concerning the
            supervision element . . . . . . . . .  63

    4.  Ineffective Assistance Of Counsel At Trial
        And Appeal . . . . . . . . . . . . . . . .  64

        a.  Counsel Could Have And Should Have
            Shown That Johnson Was Incapable Of
            Being A Supervisor Or At Least Not
            Likely To Be A Supervisor . . . . . .  65

        b.  Counsel Failed To Object To Repeated,
            Improper Evidence . . . . . . . . . .  66

        c.  Counsel Failed To Demonstrate That
            The Proof Against Johnson Did Not
            Establish Five Supervisees . . . . .  71

        d.  Counsel Failed To Object To The
            Prosecutor's Closing Argument On The
            Supervision Element . . . . . . . . .  71

        e.  Counsel Failed To Request Proper Jury
            Instructions On The Supervision Element
            Of The CCE Statute . . . . . . . . .  71

        f.  Trial Counsel Failed To Stop The
            Onslaught Of Prosecutorial Misconduct . 72

J.A.1097

g. Counsel Failed To Seek Relief Available
Under *Barona* and *Jerome* . . . . . . . . 72

h. Counsel Should Have Pursued Each Of
The CCE Supervision Issues Above . . . 72

III. JOHNSON IS ACTUALLY INNOCENT OF THE CCE CONVICTIONS . 73

IV. TRIAL AND APPELLATE COUNSEL PROVIDED
INEFFECTIVE ASSISTANCE IN VIOLATION
OF THE SIXTH AMENDMENT . . . . . . . . . . . . . . . . 75

A. GUILT PHASE INEFFECTIVENESS . . . . . . . . . . 77

1. Defense Counsel Failed To Request The
Appointment Of An Investigator Pursuant
To 21 U.S.C. Section 848(q) And Failed
To Conduct An Adequate Factual
Investigation . . . . . . . . . . . . . . . . 77

2. Defense Counsel Failed To Move For A
Change Of Venue Despite Inflammatory
Media Coverage About The Charges
And The Defendants . . . . . . . . . . . . . 81

3. Defense Counsel Failed to Request <u>Voir Dire</u>
Pursuant to *Morgan v. Illinois*,
504 U.S. 719 (1992) . . . . . . . . . . . . 88

4. Defense Counsel Failed To Object
To The Prosecution's Strikes
Against Women Jurors . . . . . . . . . . . 95

5. Defense Counsel Failed To Object To
Johnson's Absence From <u>Voir Dire</u>
And Johnson Lost His Right To
Participate In Jury Selection . . . . . . . 96

6. Defense Counsel Failed To Challenge The
Government's Evidence That Johnson Was
A Supervisor Of A CCE . . . . . . . . . . 105

7. Defense Counsel Failed To Object To Or
Ask For Proper Jury Instructions On The
Substantive Counts Charged . . . . . . . . 106

a. Defense Counsel Failed To Request A
Unanimity Instruction On The CCE
Elements . . . . . . . . . . . . . . . 106

iv

**J.A.1098**

b.    The Jury Was Not Properly Instructed
As To The Supervision Element Of
The CCE Charges . . . . . . . . . . . . . 106

8.    Defense Counsel Failed To Object To Improper
And Highly Prejudicial Conduct And Arguments
By The Prosecutors Throughout Johnson's
Capital Trial . . . . . . . . . . . . . . 107

B.    COUNSEL PROVIDED INEFFECTIVE ASSISTANCE
AT THE SENTENCE PHASE . . . . . . . . . . . . 108

1.    Defense Counsel Failed To Argue That
Johnson's Mental Ability Was Not
Accurately Reflected By His
I.Q. Test And, In Fact, Was Below 77 . . . . 108

2.    Defense Counsel Failed To Present
Evidence Of Johnson's Prison
Conditions If Sentenced To Life . . . . . . 111

C.    INEFFECTIVE ASSISTANCE ON APPEAL . . . . . . . . . 114

D.    THE CUMULATIVE EFFECT OF COUNSELS' ERRORS
PREJUDICED JOHNSON UNDER STRICKLAND . . . . . . . 116

V.   PROSECUTORIAL MISCONDUCT DEPRIVED JOHNSON OF HIS
RIGHTS TO DUE PROCESS AND A FAIR TRIAL . . . . . . . . 120

A.    The prosecutors misled the jury by vouching,
in inflammatory terms, to their personal
belief in Johnson's guilt and the veracity
of witnesses . . . . . . . . . . . . . . . . . 121

B.    The prosecutors introduced inadmissible
evidence suggesting that Johnson and the
other defendants threatened
the lives of witnesses . . . . . . . . . . . . 125

C.    The prosecutors misled the jury into
believing it had a *duty* to convict and to
impose a death sentence . . . . . . . . . . . 126

D.    The prosecutors misled the jury by making
misleading and inflammatory arguments to
the jury, unsupported by the evidence,
regarding the conditions Johnson would
face if given a life sentence . . . . . . . . 128

v

**J.A.1099**

E.  The prosecutors improperly emphasized
    that Johnson and the other defendants
    did not testify . . . . . . . . . . . . . . . . . .  129

F.  Prosecutors suggested that a Government
    witness had passed a polygraph test . . . . . . .  132

G.  The Government prosecutors improperly
    treated Johnson and the other defendants
    as a group, rather than as individuals . . . . . .  132

H.  The Prosecutors Improperly Argued That
    Sentencing Should Be Based On Deterrence . . . . .  135

I.  Misconduct relating to testimony
    without foundation . . . . . . . . . . . . . . . .  135

J.  The prosecutors misled the jury by suggesting
    that they had not influenced witnesses to use
    the terms "partner," "worker," and "employee." . .  141

K.  The Government Excluded Women From The Jury
    In Violation of *J.E.B. v. Alabama*,
    114 S. Ct. 1419 (1994) . . . . . . . . . . . . . .  141

L.  Misconduct relating to the CCE
    supervision element  . . . . . . . . . . . . . . .  141

VI.  THE PROSECUTION IMPROPERLY DISCRIMINATED AGAINST
     WOMEN IN SELECTING THE JURY   . . . . . . . . . . . . . .  142

VII. JUROR MISCONDUCT VIOLATED JOHNSONS' RIGHTS
     TO AN IMPARTIAL JURY AND TO DUE PROCESS OF LAW . . . .  144

VIII. JOHNSON WAS DENIED HIS STATUTORY AND CONSTITUTIONAL
      RIGHT TO JUSTICE WITHOUT DISCRIMINATION . . . . . . . .  145

IX.  SECTION 848'S DELEGATION OF AUTHORITY TO
     PROSECUTORS TO CREATE NON-STATUTORY AGGRAVATORS
     IS AN UNCONSTITUTIONAL DELEGATION OF AUTHORITY
     THAT VIOLATES THE SEPARATION OF POWERS . . . . . . . .  147

X.   JOHNSON ADOPTS BY REFERENCE THOSE CLAIMS
     PRESENTED BY HIS CO-PETITIONERS, TIPTON AND ROANE,
     TO THE EXTENT THAT THEY ARE APPLICABLE TO HIM  . . . .  161

RELIEF REQUESTED  . . . . . . . . . . . . . . . . . . . . . .  162

**J.A.1100**

prejudiced as there was a reasonable probability of a different result at the guilt phase.

> 8.  Defense Counsel Failed To Object To Improper And Highly Prejudicial Conduct And Arguments By The <u>Prosecutors Throughout Johnson's Capital Trial</u>

During the course of Johnson's trial, the prosecutors engaged in a variety of improper and highly prejudicial conduct. The prosecutors misled the jury by vouching, in inflammatory terms, as to their personal belief in Johnson's guilt and the veracity of witnesses.  They introduced inadmissible evidence suggesting that Johnson and the other defends had threatened the lives of witnesses.  The prosecutors misled the jury into believing it had a duty to convict and to impose death sentences. The prosecutors misled the jury by making misleading and inflammatory arguments, unsupported by the evidence, regarding the conditions Johnson would face if given a life sentence.  The prosecutors improperly emphasized that Johnson and the other defendants did not testify.  They suggested that a Government witness passed a polygraph test.  The prosecutors improperly treated Johnson and the other defendants as a group, rather than as individuals.  They improperly argued that sentencing should be based on deterrence.  The prosecutors presented testimony lacking proper foundation.  They presented improper testimony about the CCE supervision element and the use of key terms.  The prosecutors excluded women from the jury.  This misconduct is set forth in detail at Claim V, <u>infra</u>, and is incorporated by

reference herein.  With few exceptions, defense counsel failed to object to the prosecutors' repeated, improper behavior.  Defense counsel's performance in this regard was well below that of a reasonably competent counsel, and Johnson was prejudiced, for the reasons set forth in Claim V, as there was a reasonable probability of a different result at the guilt and sentence phases.

    B.    <u>COUNSEL PROVIDED INEFFECTIVE ASSISTANCE AT THE SENTENCE PHASE</u>

    1.    <u>DEFENSE COUNSEL FAILED TO ARGUE THAT JOHNSON'S MENTAL ABILITY WAS NOT ACCURATELY REFLECTED BY HIS I.Q. TEST AND, IN FACT, WAS BELOW 77.</u>

Johnson's scores during his teen years placed him within the mentally retarded range, and he scored only slightly higher in tests prior to his capital trial.  Under federal law, a mentally retarded defendant cannot be executed.  21 U.S.C. sec. 848(l); 18 U.S.C. sec. 3596(c)[Added 9/13/94].  In his opening statement at the sentencing phase, defense counsel harmed Johnson's mitigation case by conceding that Johnson was not mentally retarded.  Counsel stated:

> The law states that mentally retarded persons cannot be executed.  And the reasons that they are excluded is because the law recognizes that mentally retarded persons are not totally and completely blameworthy.  They are not fully responsible for their actions.
>
> Now, I'm not intending to suggest at this juncture or any other juncture that Cory Johnson is mentally retarded.

JA. at 4372.

> In this case, Cory Johnson, as I said is not mentally retarded.  But he has substantial mental, intellectual deficits that he has been plagued with his entire life.

108

J.A.1102

> His IQ is within two points of being classified by the
> law [as] mentally retarded, and therefore, legally not
> executable. . . . He has an IQ of 77.

JA. at 4374.

Contrary to counsel's concessions to the jury, Johnson's intelligence was probably lower than his test scores indicated. Studies demonstrate that IQ determination has significant variables. Defense counsel and his expert could have and should have used widely accepted studies to argue that Johnson in fact had a lower IQ than the pretrial testing revealed. Such evidence and argument would have created a reasonable doubt in the minds of the jurors. This argument would likely have persuaded one or more jurors that a life sentence, not death, was the appropriate punishment where the execution of the mentally retarded is prohibited under federal law. Instead, counsel wrongly conceded a critical fact issue.

The Wechler Adult Intelligence Scale Revised (WAIS-R) is one of the most widely used IQ tests. This was the test given to Johnson. Studies reveal that IQ measurement on this test increases over time. The phenomenon of "IQ inflation" is explained as follows:

> Work by James Flynn (1984, 1988) has indicated that there
> is a real phenomenon of IQ gains over time. Individuals
> appear to gain approximately 3-5 IQ points over a 10 year
> period. Since the WAIS-R was published in 1981 and the
> data was collected a year prior to the publication, this
> inflation factor could mean that the average IQ could be
> as high as 105-107 points rather than the accepted value
> of 100.

See Ex. 7 at 2.

109

**J.A.1103**

Dr. Dewey Cornell, an expert assigned by the court, administered the WAIS-R to Johnson on October 1992. Johnson's overall IQ score was 77 which placed him in the 6th percentile and in the borderline mentally retarded range. The test Johnson took was published in 1981 and was based on data collected one year before. Thus, the normative data was twelve years old when Johnson took the test in 1992. Johnson's score of 77 was therefore inflated by at least 3-5 points and possibly more. Allowing for the inflation effect, Johnson's score was actually in the 72-74 range or lower, placing him within the recognized range of mental retardation. JA at 4515, 4517 (Dr. Cornell: 70-75 I.Q. can be considered in the range of mental retardation). This adjusted score would be consistent with his prior, lower test results during his teens.

Low intelligence was a mitigating factor found by the jurors. Eight jurors found that Johnson's IQ was 77. JA. 433. This was one of eighteen mitigating factors found by the jurors. Given the wealth of mitigating evidence found by the jurors, defense counsel missed a critical chance to create reasonable doubt in the minds of the jurors concerning Johnson's mental capabilities. If only one juror concluded that Johnson was in fact mentally retarded, then that juror may well have concluded that a sentence of life rather than death was appropriate. Counsel was ineffective for failing to present this evidence. See Emerson v. Gramley, 91 F.3d 898 (7th Cir. 1996)(counsel ineffective for failing to present mitigation evidence, including

110

**J.A.1104**

fact that defendant had diminished IQ); Henricks v. Calderon, 70 F.3d 1032 (9th Cir. 1995), cert. denied, 116 S. Ct. 1335 (1996)(counsel ineffective for failure to adequately prepare and present statutory mitigation evidence even where defense expert was presented); Jones v. Thigpen, 788 F.2d 1101 (5th Cir. 1986), cert. denied, 479 U.S. 1087 (1987)(counsel ineffective during sentencing phase where he failed to present evidence that defendant was mentally retarded).

Johnson was certainly prejudiced given the wealth of mitigation evidence found by the jurors. There was a reasonable probability of a different result at sentencing if the jurors had heard this additional evidence. See Blanco v. Singletary, 943 F.2d 1477, 1505 (11th Cir. 1991)(where some jurors inclined to mercy absent any mitigating evidence and such evidence was available but not presented, there was a reasonable probability of a life sentence); Jackson v. Herring, 42 F.3d 1350 (11th Cir. 1995)(counsel failed to present persuasive mitigation evidence). The writ should be granted on the sentence.

2.    DEFENSE COUNSEL FAILED TO PRESENT EVIDENCE OF JOHNSON'S PRISON CONDITIONS IF SENTENCED TO LIFE

The public, and jurors, assume that prison conditions are unduly comfortable for inmates. Effective capital counsel must provide jurors with accurate information. The jurors were presented with two alternative punishments -- death or life without parole. While the jurors clearly understood the first alternative, they received no evidence concerning the second.

111

Defense counsel failed to portray the bleak existence facing Johnson if the jurors sentenced him to life imprisonment. Counsels' omission was particularly harmful in light of the prosecutor's summation at the sentencing phase. Accurate information is essential in any capital case. It was especially so here as the prosecutor argued without any basis in fact:

> Ask yourself, should they be punished beyond incarceration? I'm not telling you incarceration is nice and a lifetime of incarceration is not punishment. But think about each and every day of their existence in jail. They will wake up, bathe, be fed. They will be able to watch TV, read books. They will be able to use the telephone to talk to their loved ones.

JA. 4729 (Tr. 3904). Johnson's counsel objected on the grounds that these facts were not in the record, and the Court sustained the objection. Id. However, the jury was never told about the realities of a life sentence.

Trial counsel should have demonstrated this point in at least two different ways. First, they should have called an inmate who was serving a life sentence in a maximum security prison to testify about the day to day living conditions. See Ex. 8. That inmate could have described the small cell used to house two inmates, and the minimal furnishings. Jurors would have learned that inmates spend much of their time locked in their cell, that "lockdowns" can last for days, that searches (including strip searches) occur at random, and that inmates have no privacy in any aspect of prison life. Ordinary events such as bathing are strictly limited and regulated, and many prisons have no air conditioning. Access to television is restricted. Some

112

reading materials are prohibited. The jurors would have heard about prison violence, gangs, and the constant threats to personal safety.

Second, counsel should have called a corrections expert, such as a former or current warden or prison administrator. Ex. 9. A corrections expert could describe the conditions in a maximum security prison including the limitations on recreation, personal visits, medical care, and personal correspondence. In some "super" maximum prisons, inmates spend 23 hours a day in their cells and never see the outside.

Testimony on life in a maximum security prison would have refuted the prosecution's argument that Johnson would be facing a relatively easy life if given a life sentence. The jurors should have heard about the realities of prison life. Where only one vote could defeat a death sentence, counsels' failure to present testimony about actual prison conditions constituted ineffective assistance of counsel and Johnson was prejudiced. In any event, after the prosecutor made his improper statements to the jury, trial counsel should have sought leave to introduce evidence that would correct the false impression created by the prosecutor.

Johnson was prejudiced by these omissions as there was a reasonable probability of a different result on sentencing if this testimony had been presented.

113

J.A.1107

<u>CERTIFICATION</u>

I hereby certify that one copy of the attached Memorandum In Support Of Initial Petition For Writ Of Habeas Corpus Pursuant To 28 U.S.C. Section 2255 was mailed on June 15, 1998, to counsel for the Respondent:

> Robert J. Erickson
> United States Department of Justice
> Room 6102, Patrick Henry Building
> 601  D. Street, N.W.
> Washington, DC  20530
> (202) 514-2841

_____
Barbara L. Hartung

J.A.1108