**<span style="color:red">EXECUTION SCHEDULED FOR JANUARY 14, 2021</span>**

No. 21-1

_____

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

_____

**UNITED STATES OF AMERICA,**

**Plaintiff – Appellee,**

**v.**

**COREY JOHNSON, A/K/A O, A/K/A CO,**

**Defendant – Appellant.**

_____

**JOINT APPENDIX VOLUME VI**

_____

Donald P. Salzman
Jonathan Marcus
David E. Carney
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue, NW
Washington, DC 20005
(202) 371-7983
donald.salzman@skadden.com
*Counsel for Appellant Corey Johnson*

PAGE(S)

## VOLUME I

### I.  DOCKET SHEET

E.D. Va. Docket Sheet, No. 92CR68 (1992-2019)..............................................J.A.1

E.D. Va. Docket Sheet, No. 92CR68 (2020) ....................................................J.A.25


### II. RELEVANT INDICTMENT, ORDERS AND OPINIONS

Second Superseding Indictment, July 20, 1992...................................................J.A.33

Order (Dec. 15, 2020), ECF No 95...................................................................J.A.55

Memorandum Opinion (Dismissing § 2255 Petition) (Jan. 2, 2021), ECF
    No. 99........................................................................................................J.A.58

Order (Granting Motion for Leave to File Supplemental Authority) (Jan.
    2, 2021), ECF No. 100................................................................................J.A.80

Order (Dismissing § 2255 Petition) (Jan. 2, 2021), ECF No. 102....................J.A.81


### III. OTHER RELEVANT FILINGS

Notice of Execution Date (Nov. 20, 2020), ECF No. 78..................................J.A.82

Motion Pursuant to 28 U.S.C. § 2255 Raising Claim of Ineligibility To Be
    Executed under 18 U.S.C. § 3596(c) (Dec. 14, 2020), ECF No. 86............J.A.84

Index of Exhibits to Motion Pursuant to 28 U.S.C. § 2255 Raising Claim
    of Ineligibility To Be Executed under 18 U.S.C. § 3596(c), ECF No.
    86-1 ........................................................................................................J.A.143

Ex. 1, Report of Daniel J. Reschly, Ph.D., Aug. 26, 2016, ECF No. 86-2.....J.A.148

Ex. 1a, Curriculum Vitae of Daniel J. Reschly, Ph.D., May 15, 2020,
    ECF No. 86-3 ..........................................................................................J.A.199

Ex. 2, Report of J. Gregory Olley, Ph.D., Aug. 24, 2016, ECF No. 86-4 ......J.A.251

1

Ex. 2a, Curriculum Vitae of J. Gregory Olley, Ph.D., Oct. 2020,
ECF No. 86-5 ..................................................................................... J.A.299

Ex. 3, Letter from Gary N. Siperstein, Ph.D. to Counsel for Corey
Johnson, Dec. 16, 2016, ECF No. 86-6 ................................................. J.A.318

Ex. 3a, Curriculum Vitae of Gary N. Siperstein, Ph.D., Sept. 2020,
ECF No. 86-7 ..................................................................................... J.A.332

## VOLUME II

Ex. 4, Debra Nelson, Mitigation Report, Sept. 27, 2016, ECF No. 86-8 ....... J.A.355

Ex. 5, Report of Richard G. Dudley, Jr., M.D., Aug. 22, 2016,
ECF No. 86-9 ..................................................................................... J.A.391

Ex. 6, Trial Tr., Feb. 3, 1993, ECF No. 86-10 ................................................. J.A.411

Notice of Submission of Exhibit 7, ECF No. 87 ........................................... J.A.426

## VOLUME III

Exs. 7-1 – 7-3, Trial Tr., Feb. 10, 1993, ECF Nos. 87-2 – 87-4 ..................... J.A.433

Notice of Submission of Exhibits, ECF No. 88 ............................................. J.A.519

Ex. 8, Cornell Mitigation Information and Report (Excerpt),
ECF No. 88-2 ..................................................................................... J.A.526

Ex. 9, Trial Tr., Feb. 12, 1993, ECF No. 88-3 ................................................. J.A.546

## VOLUME IV

Ex. 10, Trial Tr., Feb. 15, 1993, ECF No. 88-4 ............................................. J.A.611

Ex. 11, Declaration of Kenneth Barish, Ph.D. (staff psychologist at
Pleasantville Cottage School), July 22, 2014, ECF No. 88-5 ................... J.A.623

Ex. 12, Affidavit of Richard Benedict (special education teacher at
Pleasantville Cottage School), Dec. 5, 2011, ECF No. 88-6 ................... J.A.635

Ex. 13, Affidavit of Darnell Brown (acquaintance in Trenton, NJ), Oct. 14, 2011, ECF No. 88-7 ........................................................................ J.A.647

Ex. 14, Affidavit of Darold Brown (acquaintance in Trenton, NJ), June 15, 2011, ECF No. 88-8 ........................................................................ J.A.652

Ex. 15, Affidavit of Craig S. Cooley (appointed counsel in 1992), Sept. 20, 2016, ECF No. 88-9 ........................................................................ J.A.659

Ex. 16, Affidavit of Courtney Daniels (Corey's lifelong friend), May 21, 2011, ECF No. 88-10 ........................................................................ J.A.669

Ex. 17, Declaration of Monica Dawkins (Corey's former girlfriend), July 16, 2012, ECF No. 88-11 ........................................................................ J.A.675

Notice of Submission of Exhibits, ECF No. 89 ............................................ J.A.678

Ex. 18 Declaration of Cary Gallaudet, Ph.D. (psychologist at Pleasantville Diagnostic Center), Mar. 19, 2012, ECF Nos. 89-2 – 89-3 ........................................................................ J.A.685

Ex. 19, Declaration of Ann Harding (staff member at Pleasantville Cottage School), Nov. 21, 2011, ECF No. 89-4 ........................................ J.A.696

Ex. 20, Affidavit of Minnie Hodges (Corey's maternal aunt), Apr. 30, 2011, ECF No. 89-5 .................................................................... J.A.699

Ex. 21, Affidavit of Priscilla Hodges (Corey's cousin), Apr. 30, 2011, ECF No. 89-6 .................................................................................... J.A.710

Ex. 22, Affidavit of Queenie Hodges (Corey's cousin), Apr. 30, 2011, ECF No. 89-7 .................................................................................... J.A.718

Ex. 23, Declaration of Esther Johnson (Corey's maternal grandmother), Apr. 30, 2011, ECF No. 89-8 .................................................................... J.A.722

Ex. 24, Affidavit of Robert Johnson (Corey's half-brother), June 29, 2011, ECF No. 89-9 ........................................................................ J.A.728

Ex. 25, Affidavit of Antionette Daniels Joseph (the best friend of Corey's mother and Corey's godmother), May 21, 2011, ECF No. 89-10 ............. J.A.740

Ex. 26, Declaration of Leona Klerer (reading teacher at Mount Pleasant Cottage School), June 3, 2011, ECF No. 89-11 ........................................ J.A.752

Ex. 27, Affidavit of Gerald Lefkowitz (unit administrator at Pleasantville Cottage Center), Dec. 5, 2011, ECF No. 89-12 ........................................ J.A.760

Ex. 28, Affidavit of Odette Noble (social worker at Elmhurst), Dec. 1, 2011, ECF No. 89-13 ................................................................. J.A.765

3

Ex. 29, Declaration of George Sakheim, Ph.D. (Chief of Psychological Services at Pleasantville Diagnostic Center), June 17, 2011, ECF No. 89-14 ................................................................................. J.A.772

Ex. 30, Affidavit of David Washington (childcare worker at Elmhurst), Mar. 1, 2012, ECF No. 89-15 ................................................................. J.A.807

Notice of Submission of Exhibits, ECF No. 90 .............................................. J.A.811

Ex. 31, Gregory Judge, School Social Worker, Social History, Mar. 4, 1977, ECF No. 90-2 ...................................................................... J.A.818

Ex. 32, Cheryl Spillane, Learning Consultant, Bureau of Pupil Personnel Services, Jersey City Public Schools, Learning Consultant Evaluation to Child Study Team, Mar. 18, 1977, ECF No. 90-3 ............................... J.A.822

Ex. 33, F.A. Figurelli, M.D., Chief Psychologist, Psychological Examination Record, Mar. 25, 1977, ECF No. 90-4 .............................. J.A.827

Ex. 34, Eleanor Glantz, Social Worker, Case Service, Dec. 11, 1978, ECF No. 90-5 .................................................................................. J.A.830

Ex. 35, Committee on the Handicapped, Referral to the Committee on the Handicapped, Feb. 26, 1979, ECF No. 90-6.............................................. J.A.832

Ex. 36, Committee on the Handicapped Records, May 21, 1979, ECF No. 90-7 .................................................................................. J.A.837

## VOLUME V

Ex. 37, Washington Heights-West Harlem Community Mental Health Center, Child Assessment Evaluation Summary, Dec. 9, 1981, ECF No. 90-8 .................................................................................. J.A.863

Ex. 38, Ernest H. Adams, Staff Psychologist, Psychodiagnostic Evaluation, Dec. 11, 1981, ECF No. 90-9................................................ J.A.865

Ex. 39, Cary Gallaudet, Psy.D., Pleasantville Cottage School, Psychological Evaluation, Feb. 1, 1982, ECF No. 90-10.......................... J.A.868

Ex. 40, Leona Klerer, Mount Pleasant Cottage School Screening Upon Admission, Feb. 22, 1982, ECF No. 90-11 ............................................. J.A.872

Ex. 41, Amira Offer, Caseworker, Psychosocial Summary, Mar. 15, 1982, ECF No. 90-12.................................................................... J.A.876

Ex. 42, Gloria Caro, Pleasantville Cottage School, Reassessment Summary, May 21, 1982 , ECF No. 90-13.................................................J.A.882

Ex. 43, Gloria Caro, Caseworker, Initial Conference, Current Assessment and Transfer Summary, June 9, 1982, ECF No. 90-14 ............................J.A.896

Ex. 44, Gayle Turnquest, Caseworker, Pleasantville Cottage School, Current Assessment, Jan. 31, 1983, ECF No. 90-15 ..................................J.A.902

Notice of Submission of Exhibits, ECF No. 91................................................J.A.905

Ex. 45, Ken Barish, Ph.D., Psychologist, Pleasantville Cottage School, Psychological and Educational Evaluation, Apr. 29, 1983, ECF No. 91-2 ........................................................................................J.A.912

Ex. 46, John B. Stadler, M.D., Clinical Director, Pleasantville Cottage School, Psychiatric Evaluation, Aug. 26, 1983, ECF No. 91-3 ................J.A.916

Ex. 47, Lynda Coccaro, Speech and Language Pathologist, Donald R. Reed Speech Center, Inc., Phelps Memorial Hospital, Speech and Language Evaluation, Oct. 5, 1983, ECF No. 91-4...................................J.A.919

Ex. 48, Lynn Polstein, Jewish Child Care Association of New York, Pleasantville Cottage School, Change in Permanency Plan, Apr. 13, 1984, ECF No. 91-5................................................................J.A.925

Ex. 49, Gerard Maier, Social Worker, Current Assessment, Sept. 4, 1984, ECF No. 91-6.........................................................................................J.A.931

Ex. 50, Christine Aaron, MSW Intern, Jewish Child Care Association of New York, Pleasantville Cottage School, Visitation Plan, Dec. 12, 1984, ECF No. 91-7 ................................................................J.A.935

Ex. 51, Kenneth Barish, Ph.D., Psychologist, Pleasantville Cottage School Psychological Evaluation, Apr. 15, 1985, ECF No. 91-8 .............J.A.949

Ex. 52, Gerard Maier, Pleasantville Cottage School, Discharge/Transfer Plan, May 28, 1985, ECF No. 91-9 .......................................................J.A.952

Ex. 53, Board of Education of the City of New York, Individualized Education Plan – Phase 1, July 1, 1985, ECF No. 91-10 ...........................J.A.966

Ex. 54, Odette Noble, Social Worker, Jewish Child Care Association of New York, Elmhurst Boys Residence, UCR Reassessment and Service Plan Review 6 Month, Nov. 21, 1985, ECF No. 91-11................J.A.974

Notice of Submission of Exhibits, ECF No. 92............................................J.A.986

Ex. 55, Odette Noble, Social Worker, Jewish Child Care Association of
New York, Elmhurst Boys Residence, UCR Reassessment and
Service Plan Review 6 Month, June 28, 1986, ECF No. 92-2 .................. J.A.993

Ex. 56, Odette Noble, Social Worker, Jewish Child Care Association of
New York, Elmhurst Boys Residence, UCR Plan Amendment: Form
D Trial Discharge, Feb. 23, 1987, ECF No. 92-3 .................................. J.A.1003

Ex. 57, Newtown High School, Scholastic Transfer Record,
Dec. 7, 1987, ECF No. 92-4 ........................................................ J.A.1008

Ex. 58, Janet Valentine, Child Care Worker, Pleasantville Diagnostic
Center, Outline for Cottage Report (undated), ECF No. 92-5 ................. J.A.1011

Ex. 59, Notice of the Intention of U.S.A. to Seek Death Penalty as to Mr.
Tipton, May 1, 1992, ECF No. 92-6 ................................................ J.A.1015

Ex. 60, Notice of the Intention of U.S.A. to Seek Death Penalty as to Mr.
Roane, May 1, 1992, ECF No. 92-7 ................................................ J.A.1020

Ex. 61, Second Superseding Indictment, July 20, 1992, Dkt. 115,
ECF No. 92-8 ........................................................................... J.A.1025

Ex. 62, Notice of the Intention of U.S.A. to Seek Death Penalty as to Mr.
Thomas, Oct. 28, 1992, ECF No. 92-9 ............................................ J.A.1048

Ex. 63, Verdict Form, Feb. 3, 1993, Dkt. 466, ECF No. 92-10 .................... J.A.1053

Ex. 64, Notice of the Intention of U.S.A. to Seek Death Penalty as to Mr.
Johnson, Feb. 8, 1993, ECF No. 92-11 ............................................ J.A.1060

Ex. 65, Special Findings, Feb. 16, 1993, Dkt. 508, ECF No. 92-12 ............ J.A.1065

Ex. 66, Motion to Have Defendant Declared Mentally Retarded, *United
States v. Thomas*, No. 3:92CR68 (E.D. Va. Apr. 15, 1993),
ECF No. 92-13 ......................................................................... J.A.1078

Ex. 67, Memorandum in Support of Initial Petition for Writ of Habeas
Corpus Pursuant to 28 U.S.C. Section 2255, June 15, 1998, Dkt. 714
(Excerpt) , ECF No. 92-14 ........................................................... J.A.1093

## VOLUME VI

Ex. 68, Reply Memorandum in Support of Initial Petition for Writ of
Habeas Corpus Pursuant to 28 U.S.C. Section 2255, Mar. 15, 1999,
Dkt. 761 (Excerpt), ECF No. 92-15 ................................................ J.A.1109

Ex. 69, Ex. 14 to Reply Memorandum in Support of Initial Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. Section 2255, Mar. 15, 1999, ECF No. 92-16 ............................................................... J.A.1125

Ex. 70, Ex. 15 to Reply Memorandum in Support of Initial Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. Section 2255, Mar. 15, 1999, ECF No. 92-17 ............................................................... J.A.1133

Notice of Submission of Exhibits, ECF No. 93 ........................................... J.A.1137

Ex. 71, Petitioners' Joint Motion for Leave to Take Discovery, June 24, 1999, Dkt. 770, ECF No. 93-2 ..................................................... J.A.1144

Ex. 72, Memorandum Opinion, May 3, 2000, Dkt. 803, ECF No. 93-3 ...... J.A.1195

Ex. 73, Memorandum Opinion, May 1, 2003, Dkt. 896, ECF Nos. 93-4 – 93-5 .................................................................. J.A.1209

Ex. 74, Brief for Appellants Cory Johnson and Richard Tipton, *United States v. Johnson*, No. 03-13(L), 03-26, 03-27 (4th Cir. Feb. 17, 2004) (Excerpt), ECF No. 93-6 ........................................................ J.A.1336

Notice of Submission of Exhibits, ECF No. 94 ........................................... J.A.1359

## VOLUME VII

Ex. 75, American Association on Intellectual and Developmental Disabilities Definition Manual ("AAIDD-11") (Excerpt), ECF Nos. 94-2 – 94-3 .............................................................. J.A.1366

Ex. 76, AAIDD User's Guide to 11th Edition (Excerpt), ECF No. 94-4 ..... J.A.1392

Ex. 77, Diagnostic and Statistical Manual of Mental Disorders ("DSM-5") (Excerpt), ECF No. 94-5 .................................................. J.A.1405

Ex. 78, 134 Cong. Rec. 22,926 (1988) (Excerpt), ECF No. 94-6 ................ J.A.1418

Ex. 79, 136 Cong. Rec. S6873 (daily ed. May 24, 1990) (Excerpt), ECF No. 94-7 ............................................................................ J.A.1423

Government's Response to Court's December 15, 2020 Order (Dec. 21, 2020), ECF No. 96 ................................................................. J.A.1435

Corey Johnson's Reply Pursuant to December 15, 2020 Order (Dec. 24, 2020), ECF No. 97 ................................................................. J.A.1451

Exhibit 1, Amended Judgment in a Criminal Case, ECF No. 97-1 .............. J.A.1459

United States' Motion for Leave to File Supplemental Authority (Dec. 31, 2020), ECF No. 98 ..................................................................J.A.1467

United States' Notice of Supplemental Authority (Jan. 2, 2021), ECF Nos. 98-1, 101 ...................................................................J.A.1469

Notice of Appeal (Jan. 4, 2021), ECF No. 103 ..........................................J.A.1489

# EXHIBIT 68

J.A.1109

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

MAR 15 1999

| | | |
|---|---|---|
| CORY JOHNSON, | ) | |
| | ) | |
| Petitioner, | ) | Crim. No. 3:92CR68 |
| v. | ) | |
| | ) | Civil No. 3:97CV895 |
| SAMUEL PRUETT, WARDEN, | ) | |
| | ) | |
| Respondent. | ) | |

## REPLY MEMORANDUM IN SUPPORT OF

## INITIAL PETITION FOR WRIT OF HABEAS CORPUS

## PURSUANT TO 28 U.S.C. SECTION 2255

Barbara L. Hartung (VSB No. 38062)
1001 East Main Street
Suite 504
Richmond, VA 23219
(804) 649-1088

Edward E. Scher (VSB No. 23064)
Thorsen Marchant & Scher, L.L.P.
316 W. Broad Street
Richmond, VA 23220-4219
(804) 644-0711
(804) 643-3702 (Fax)

Counsel for Cory Johnson

March 15, 1999

761

Table Of Contents

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Summary of Argument And Note Concerning The Government's Shifting Positions . . . . . . 1

    A.    Summary Of Argument . . . . . . . . . . . . . . . . . . . . . . . . 1

    B.    The Government's Position On Many Issues Is A Moving Target . . . . . . . . 3

I.    THE PROSECUTION KNOWINGLY OR NEGLIGENTLY USED FALSE EVIDENCE TO CREATE THE ILLUSION THAT JOHNSON AND HIS CO-DEFENDANTS WERE LEADERS OF A HIGHLY ORGANIZED CONTINUING CRIMINAL ENTERPRISE HAVING ITS ROOTS IN NEW YORK AND/OR NEW JERSEY . . . . . . . . . . . . . . . . . . . . . . . . 6

II.    THE EVIDENCE WAS LEGALLY INSUFFICIENT TO CONVICT JOHNSON AS A SUPERVISOR OF A CONTINUING CRIMINAL ENTERPRISE . . . . . . . . 6

    A.    The CCE Supervision Element: Governing Principles, *Jerome,* and *Barona* . . 7

    B.    The Government Does Not Challenge Johnson's Analysis of *Jerome;* instead, the Government incorrectly asserts that Johnson has already raised this argument on appeal . . . . . . . . . . . . . . . . . . . . . . . . 10

    C.    The Government Cannot Distinguish This Case From *Barona* . . . . . . . . . . 14

        1.    The Government misstates the jury instruction given in Johnson's case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        2.    The jury instruction given in *Barona* is not materially different from the one this Court gave . . . . . . . . . . . . . . . . . . . . 17

        3.    Even if this Court's instruction had suggested that management was required for CCE supervision, that instruction would still not satisfy *Barona* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    D.    Prejudice arising out of the *Barona/Jerome* problem is beyond dispute . . . . 20

    E.    More Than 40 Individuals Identified By The Government As CCE Supervisees Were Not Capable, As A Matter Of Law, Of Being CCE Supervisees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

F.    Johnson Did Not Supervise Five Individuals . . . . . . . . . . . . . . . . . . . 24

        1.    This issue was not raised on Johnson's behalf on appeal in a competent manner . . . . . . . . . . . . . . . . . . . . . . . . . 25

        2.    The Government continues to be unable to identify 5 persons who were Johnson's CCE supervisees . . . . . . . . . . . . . . . . . . 27

G.    The Government Relied Principally On The Conclusory Terms "Worker" And "Employee" To Prove Supervision; Such Terms Misled The Jury And Prejudiced Johnson And The Other Defendants . . . . . . . . . . . . . . . . . 36

        1.    Failure to raise this previously . . . . . . . . . . . . . . . . . . . . 36

        2.    The meaning of "worker" and "employee"; FRE 701 . . . . . . . . . 37

        3.    Prejudice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

III.    JOHNSON IS ACTUALLY INNOCENT OF THE CCE CONVICTIONS . . . . . . 41

IV.    JOHNSON WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE SIXTH AMENDMENT . . . . . . . . . . . . . . . . . . . . 42

A.    Guilt Phase Ineffectiveness . . . . . . . . . . . . . . . . . . . . . . . . . . 44

        1.    Defense Counsel Failed To Request The Appointment Of An Investigator Pursuant To 21 U.S.C. Section 848(q) and Failed To Conduct An Adequate Factual Investigation . . . . . . . . . . . . . . . . 44

        2.    Defense Counsel Failed To Move For A Change Of Venue Despite Inflammatory Media Coverage About The Charges And The Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

        3.    Defense Counsel Failed To *Voir Dire* The Jury Pursuant To Morgan v. Illinois . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

        4.    Defense Counsel Failed To Object To The Prosecution's Strikes Against Women Jurors . . . . . . . . . . . . . . . . . . . . . . . . 55

        5.    Defense Counsel Failed To Object To Johnson's Absence From *Voir Dire* And Johnson Lost His Right To Participate In Jury Selection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

        6.    Defense Counsel Failed To Challenge The Government's Evidence That Johnson Was A Supervisor Of A CCE . . . . . . . . . . . . . . . 62

7.      Defense Counsel Failed to Object To Or Ask For Proper Jury Instructions On The Substantive Counts Charged . . . . . . . . . . . . . 64

8.      Defense Counsel Failed To Object To The Prosecutor's Barter of Favorable Treatment For Witness Testimony . . . . . . . . . . . . . . . 64

B.     COUNSEL PROVIDED INEFFECTIVE ASSISTANCE AT THE SENTENCE PHASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

1.      Defense Counsel Failed To Argue That Johnson's Mental Ability Was Not Accurately Reflected By His I.Q. Test And, In Fact, His I.Q. Was Below 77 . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

2.      Defense Counsel Failed To Present Evidence Of The Prison Conditions Johnson Would Endure If Given A Life Sentence . . . . . . 74

C.     INEFFECTIVE ASSISTANCE ON APPEAL . . . . . . . . . . . . . . . . . . . . 76

V.    PROSECUTORIAL MISCONDUCT DEPRIVED JOHNSON OF HIS RIGHTS TO DUE PROCESS AND A FAIR TRIAL . . . . . . . . . . . . . . . . . . . . . . . 76

A.     The prosecutors misled the jury by vouching, in inflammatory terms, to their personal belief regarding Johnson's guilt and the veracity of witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

B.     The prosecutors introduced inadmissible evidence showing that Johnson and the other defendants threatened the lives of witnesses . . . . . . . . . . . . . . 81

C.     The prosecutors misled the jury into believing it had a *duty* to convict and to impose death sentence . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

D.     The prosecutors misled the jury by making misleading and inflammatory arguments to the jury, unsupported by the evidence, regarding the conditions Johnson would face if given a life sentence . . . . . . . . . . . . . . 90

E.     The Government prosecutors misled the jury by improperly emphasizing that Johnson and the other defendants did not testify . . . . . . . . . . . . . . 92

F.     The prosecutors improperly suggested that a Government witness passed a polygraph test . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

G.     The Government prosecutors misled the jury by treating Johnson and the other defendants as a group, rather than the defendants as individuals . . . . . 98

**J.A.1113**

H.   The Prosecutors Improperly Argued That Sentencing Should Be Based On Deterrence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

I.   Misconduct relating to testimony without foundation . . . . . . . . . . . . . 98

J.   The Prosecutors misled the jury by suggesting that they had not influenced witnesses to use the terms "partner," "worker," and "employee." . . . . . . 98

K.   The Government Excluded Women From the Jury In Violation of *J.E.B. v. Alabama*, 114 S.Ct. 1419 (1994). . . . . . . . . . . . . . . . . . . . . . . 99

L.   Misconduct relating to the CCE supervision element . . . . . . . . . . . . . 99

M.   The Prosecutors Violated 18 U.S.C. Section 201(c)(2) When Obtaining and Presenting The Testimony Of Several Cooperating Witnesses At Johnson's Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

VI.   THE PROSECUTION IMPROPERLY DISCRIMINATED AGAINST WOMEN IN SELECTING THE JURY . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

VII.   JUROR MISCONDUCT VIOLATED JOHNSON'S RIGHTS TO AN IMPARTIAL JURY AND TO DUE PROCESS OF LAW . . . . . . . . . . . . . . . 104

VIII.   JOHNSON WAS DENIED HIS STATUTORY AND CONSTITUTIONAL RIGHT TO JUSTICE WITHOUT DISCRIMINATION . . . . . . . . . . . . . . . . . . . 108

IX.   SECTION 848'S DELEGATION OF AUTHORITY TO PROSECUTORS TO CREATE NON-STATUTORY AGGRAVATOR IS AN UNCONSTITUTIONAL DELEGATION OF AUTHORITY THAT VIOLATES THE SEPARATION OF POWERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

X.   JOHNSON ADOPTS BY REFERENCE THOSE CLAIMS PRESENTED BY HIS CO-PETITIONERS, TIPTON AND ROANE, TO THE EXTENT THAT THEY ARE APPLICABLE TO HIM . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

J.A.1114

Johnson was prejudiced by counsel's failure to object. The testimony of the "bought" witnesses[56] was central to his conviction on all counts and to his death sentences. While Johnson might not have succeeded at the trial level, counsel would have preserved an important issue for appellate review. The ultimate outcome of the *Singleton* case is yet to be determined. Defense counsel does not render effective assistance when he strips his client of viable appellate issues prior to reaching the appellate court. The claim should not be dismissed.

B.    COUNSEL PROVIDED INEFFECTIVE ASSISTANCE AT
       THE SENTENCE PHASE.

1.    Defense Counsel Failed To Argue That Johnson's Mental Ability Was Not Accurately Reflected By His I.Q. Test And, In Fact, His I.Q. Was Below 77. (Johnson Memo. at 108-111; Government Response at 224-229.)

Under federal law, a mentally retarded defendant cannot be executed. 21 U.S.C. §848(1); 18 U.S.C. §3596(c) [Added 9/13/94]. Moreover, as a matter of common sense, the actual or near mental retardation of a defendant can be an important mitigating factor to a jury.

Substantial evidence indicated that Johnson's I.Q. score at the time of trial was not an accurate measure of his intelligence. Defense counsel had the results of three separate I.Q. tests available to them. The three tests documented a wide variation in Johnson's scores over a period of time. In February 1982 when he was 13 years old, Johnson was given the WISC-R, a test designed to measure a child's I.Q., and achieved a full scale I.Q. score of 88. The test evaluator described this score as within the low average range of intellectual functioning. (Johnson Ex.14).

---

[56] Greg Scott, Robert Davis, Dennis Moody, Stanley Smithers, Valerie Butler, Sterling Hardy, and Jerry Gaiters all received some benefit in exchange for their testimony. See Johnson's First Amendment at 12-13.

J.A.1115

A second WISC-R was given in March 1985, only three years later, when Johnson was 16 years old. This time Johnson achieved a full scale I.Q. of only 69-74, placing him in the mentally retarded range (JA 4433), and was described by the evaluator as "Deficient-Borderline range." (Johnson Ex. 14). Shortly prior to Johnson's capital trial, he took the WAIS-R intelligence test, which is the adult version of the WISC-R. JA. 4505. He was then 23 years old and in October 1992 achieved a full scale I.Q. score of 77. (Johnson Ex. 14). The evaluator, Dr. Dewey Cornell, concluded that Johnson was in the "borderline mentally retarded range." (JA 4515, 4517: 70-75 I.Q. can be considered in the range of mental retardation).

This wide variation in his scores, without more, should have suggested to counsel that further inquiry was required. The disparate scores were known to defense counsel and required no special training to realize that they would very likely be significant for Johnson's defense. Defense counsel, in fact, included the testing information in the evidence presented to the jury at the sentencing phase but failed to recognize and to argue its significance.

Defense counsel had, at the time of trial, substantial evidence suggesting that (1) Johnson was mentally retarded, and (2) his I.Q. test taken just before trial either was inaccurate or potentially supportive of a finding of mental retardation. This evidence was obvious and impossible for a reasonably diligent lawyer to miss. Nevertheless, defense counsel either missed it or ignored it. Counsel failed to investigate the evidence further or present it to the jury in a meaningful way. Had Johnson's counsel explored, developed, and used the evidence at trial, substantial doubt would have been raised about Johnson's mental capacity. Had the evidence been presented at trial, there is a high probability that at least one juror would have declined to vote for the death sentence based on a reasonable doubt about Johnson's actual mental capacity.

**J.A.1116**

There is no case law defining the meaning of "mental retardation" under the applicable statutes. In *Penry v. Linaugh*, 492 U.S. 302, 109 S. Ct. 2934 (1989), which involved issues not directly relevant here,[57] the Supreme Court reflected on the vagueness of the term "mental retardation":

> Persons who are mentally retarded are described as having "significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the developmental period." American Association on Mental Deficiency (now Retardation) (AAMR), Classification in Mental Retardation 1 (H. Grossman ed. 1983). *To be classified as mentally retarded, a person **generally** must have an IQ of 70 or below.* Id., at 11. Under the AAMR classification system, individuals with IQ scores between 50-55 and 70 have "mild" retardation. Individuals with scores between 35-40 and 50-55 have "moderate" retardation. "Severely" retarded people have IQ scores between 20-25 and 35-40, and "profoundly" retarded people have scores below 20 or 25. Id., at 13. Approximately 89% of retarded persons are "mildly" retarded. Ellis & Luckasson, Mentally Retarded Criminal Defendants, 53 Geo. Wash. L. Rev. 414, 423 (1985).

492 U.S. at 308, n.1, 109 S. Ct. 2941 (emphasis added). The outer boundaries of mental retardation were not identified in *Penry*. The Supreme Court did not suggest that there was an absolute maximum I.Q. score that defined mental retardation. Rather, it suggested only that there are "general" criteria. Indeed, the George Washington University law review article cited in

---

[57]    In *Penry,* the Supreme Court considered two specific issues:

> First, was Penry sentenced to death in violation of the Eighth Amendment because the jury was not adequately instructed to take into consideration all of his mitigating evidence and because the terms in the Texas special issues were not defined in such a way that the jury could consider and give effect to his mitigating evidence in answering them? Second, is it cruel and unusual punishment under the Eighth Amendment to execute a mentally retarded person with Penry's reasoning ability?

*Penry,* 109 S. Ct. at 2944.

J.A.1117

*Penry* specifically states that there is no absolute rule regarding the meaning of I.Q. tests. That article states that the American Association On Mental Deficiency ("AAMD") reports that the "upper limit [of 70 as a standard for retardation] is intended as a guideline; *it could be extended upward through IQ 75 or more*, depending on the reliability of the intelligence test used." Ellis & Luckasson, Mentally Retarded Criminal Defendants, 53 Geo. Wash. L. Rev. 414, 422 n. 44 (1985). Significantly, the Supreme Court recognizes the AAMD as "the country's oldest and largest organization of professionals working with the mentally retarded." *Id.* at 2955.

The absence of governing legal standards, and the recognized vagueness inherent in the term "mental retardation," should have led defense counsel to use care in analyzing and exploring the evidence, and determining what should and could be presented to the jury and the Court.

According to the generally accepted definition of mental retardation in the mental health field, a person is deemed mentally retarded if three conditions are satisfied. First, the person must have impaired adaptive functioning. J.A. at 4515-16. Second, the person must have an I.Q. test score in the mental retardation range before the age of 18. DSM-IV at 39.[58] Third, the person must have a current I.Q. test score in the mental retardation range. As discussed below, Johnson indisputably satisfied the first two conditions. Whether or not Johnson satisfied the third condition was not fully considered by trial counsel, who should have investigated the matter further and

---

[58]     Dr. Cornell testified:

> Individuals that fall in the range of 70-75 can be considered in the range of mental retardation. And then of course, anything lower than that indicates mental retardation.

J.A. at 4515; DSM-IV (4th ed. 1994) at 39-40 (mental retardation may include those with IQ of 70-75 when coupled with significant deficits in adaptive behavior).

**J.A.1118**

should have presented his findings to the jury and to the Court.

The first condition of mental retardation is impaired adaptive functioning. As to that issue, although Dr. Cornell's final conclusion was that Johnson was "just above the level of mental retardation," he testified:

> [Y]ou need to show that the person has impaired adaptive behavior in any two of about ten areas that are listed there. Certainly functional academics, the ability to do academic work is one in which he has impairment. Also, communication deficits with his speech impairment and communication problems, he has some deficits there. Self care, social skills, work, the ability to maintain a job, to have good work habits, to use the kind of common sense you need to hold a job, all of those are possible areas in which *his functioning is not at a normal level*.

J.A. at 4515-16 (emphasis added). There is no question that Johnson suffered from the requisite impaired adaptive functioning. For example, a school report from 1986 when Johnson was 17 years old set forth as one of his goals learning to "handle money so he can shop for himself" and "learn enough simple arithmetic that he will be able to figure out correct change." See Johnson Ex. 15. Thus, Johnson possessed the first characteristic of mental retardation.

The second factor in determining mental retardation is an intelligence test score in the mental retardation range before the age of 18. DSM-IV at 39. There is no question that Johnson was mentally retarded under this factor, as he had tested in the I.Q. range of 69-74 in 1985 when he was 16 years old.

The third factor is a current I.Q. test in the mental retardation range. Given that the first two factors were easily satisfied, this third one was essential to Johnson's defense. As to that factor, in October 1992 (shortly prior to his capital trial), Johnson took the WAIS-R intelligence test, which is the adult version of the WISC-R. JA. 4505. He was then 23 years old and achieved a full scale I.Q. score of 77. (Johnson Ex. 14). The evaluator, Dr. Cornell, concluded

70

that Johnson was in the borderline mentally retarded range. JA 4515, 4517. He testified:

> Individuals that fall in the range of 70-75 can be considered in the range of mental retardation. And then of course, anything lower than that indicates mental retardation.

J.A. at 4515 (testimony of Dr. Dewey Cornell); DSM-IV (4th ed. 1994) at 39-40 (mental retardation may include those with IQ of 70-75 when coupled with significant deficits in adaptive behavior).

In short, counsel was presented with the situation where only a single fact suggested that Johnson was not mentally retarded: an IQ score he received in 1992. That score was demonstrably suspect for several reasons, but counsel failed to investigate further.

First, as Johnson has explained in this proceeding, [59] the disparity between Johnson's scores, combined with the known phenomenon of I.Q. inflation, plainly suggest that the 1992 score was suspect and suggestive of artificially high intelligence. (Even the Government acknowledges that reports demonstrate "the need to develop sub-tests that more accurately measure the abilities of persons with very low intellectual functioning." Government Response at 226. ) Second, as discussed above, the AAMD reports that the "upper limit [of 70 as a standard for retardation] is intended as a guideline; *it could be extended upward through IQ 75 or more*, depending on the reliability of the intelligence test used." The disparity in Johnson's I.Q. test scores, the phenomenon of I.Q. inflation, and the AAMD's recognition that a test above 75 can be consistent with mental retardation, should have alerted trial counsel to develop these issues with his expert and present evidence of these matters to the jury.

---

[59]*See* Johnson Memo at 108.

71

**J.A.1120**

Even minimal inquiry by counsel into the law of mental retardation, I.Q. testing, and the mental health profession's criteria of mental retardation would have produced sufficient information to alert trial counsel to these issues and the potential unreliability of the 1992 test. All of the necessary information was readily available to trial counsel. In response to Johnson's argument in this proceeding, the government asserts that the report provided by Johnson in this proceeding as evidence of I.Q. score inflation was published in 1996, after Johnson's trial. But that report relied on studies by Prof. James Flynn that were published in 1984 and 1988 and that are well-known within the field. See Johnson's Ex. 7 at 14 (section entitled "References"). This was not new information at the time of trial. As for the AAMD's report indicating that I.Q. scores above 75 can be consistent with mental retardation, that information was located by habeas counsel within thirty minutes of Lexis research on the subject of mental retardation. As noted above, that information is set forth in the very first footnote of *Penry*.

While trial counsel was altogether unaware of these issues due to their neglect, other issues were actually known to counsel and simply not followed up. For example, defense expert Cornell testified:

> The IQ score I got was 77. If he had gotten a 75, he would be within the range that counts as mental retardation. 70 to 75 is kind of the gray area. If you are in that area, you can be mildly retarded. *He was two points above that, which is a matter of one or two questions on an intelligence test that would make the difference there.*

J.A. 4517 (emphasis added). Here, Cornell handed defense counsel an excellent basis to attack the 1992 test result. Defense counsel should have been explored, and presented to the jury, how it was that Johnson's answer to a single question made the difference between a "retarded" finding and otherwise. Could a single question -- especially in view of his adaptive impairment and

previous low I.Q. test result -- push Johnson above the mental retardation line? This issue, combined with the other information available to counsel, should have explored, analyzed, and argued to the jury. A competent lawyer would have had a field day attacking the 1992 I.Q. test and the conclusion that it showed that Johnson was not mentally retarded. *Rather than do anything like this, defense counsel simply conceded to the jury that Johnson was **not** mentally retarded.* JA. 4372, 4374.

Prejudice is obvious. As the government acknowledges, Johnson cannot be executed if he is mentally retarded. A jury presented with evidence that cast doubt on the accuracy of the 1992 I.Q. score very likely would have decided that the death penalty could not, and should not, be imposed on Johnson. As a death sentence must be unanimous, persuading only one juror of the unreliability of the 1992 I.Q. score could have resulted in a life sentence.

The government asserts Johnson is now attacking the performance of his expert Dr. Cornell. Government Response at 225. The Government is wrong. Johnson's claim concerns trial counsel's performance. Counsel, not Dr. Cornell, was responsible for determining whether the legal standard for mental retardation was subject to question; for determining whether authority existed (such as the AAMD report) from a source deemed reputable by the courts that could be used to support a finding of mental retardation and argued to the Court and the jury; and for marshalling the facts and the law and arguing them to the jury, rather than simply conceding the issue away. Counsel alone was responsible for each of these duties. Counsel alone was responsible for failing to perform these duties and for causing prejudice to Johnson.

Trial counsel simply accepted, without challenge, the preposterous conclusion that a mere two I.Q. points on the 1992 test -- possibly only one question -- meant that Johnson was not

mentally retarded.  Despite Johnson's previous low I.Q. test result, despite his adaptive impairment, despite I.Q. inflation, despite the AAMR report indicating that the 77 I.Q. could be consistent with mental retardation, counsel never questioned this result.  Trial counsel accepted that proposition,  knowing that a finding of mental retardation would have protected Johnson from a death sentence, and never argued these facts to the Court or to the jury.

Even short of a finding of actual retardation, trial counsel knew that the issue could have been argued to the jury in mitigation.  As poor as counsel's effort was, eight jurors concluded that Johnson's low I.Q. was a mitigating factor.  There is a substantial probability of a different verdict at the sentencing phase if the jurors had been presented with evidence that Johnson was actually more impaired than his 1992 scores indicated.  Given the importance to Johnson of an accurate evaluation of his admittedly deficient abilities and of a complete explanation of those abilities to the court and the jury, counsel provided deficient representation in this area.  This claim should not be dismissed.  Further discovery and an evidentiary hearing are required.

2.     Defense Counsel Failed To Present Evidence Of The Prison Conditions Johnson Would Endure If Given A Life Sentence.
(Johnson's Memo. at 111-114; Government Response at 221-224.)

The jurors never learned about the harsh conditions facing a prisoner sentenced to a life term. Based on this omission, Johnson has alleged ineffective assistance of counsel.  The government has responded with a strawman.  The government argues first that such evidence is not "mitigating" since it does not deal with any aspect of a defendant's character, record, or the circumstances of the offense. Johnson never contended that this evidence was "mitigating" in that sense.  The government argues second that such evidence is relevant only to rebutting future

74

## CERTIFICATE OF SERVICE

I certify that on March _15_, 1999 a copy of this document was mailed to:

> Robert J. Erickson, Deputy Chief
> Criminal Division
> Appellate Section
> U.S. Department of Justice
> Room 6102, Patrick Henry Bldg.
> 601 D. Street, N.W.
> Washington, D.C. 20530
>
> Donald R. Lee, Jr., Esquire
> Frederick R. Gerson, Esquire
> McCauley, Lee & Powell
> 1015 E. Main Street, 4th Floor
> Richmond, VA 23219
>
> Scott L. Nelson, Esquire
> Paul F. Enzinna, Esquire
> Michael J. Barta, Esquire
> Miller, Cassidy, Larroca & Lewin
> 2555 M Street, N.W.
> Washington, D.C. 20037.

_Edward Esher_

J.A.1124

# EXHIBIT 69

PLEASANTVILLE COTTAGE SCHOOL

Name of Child:  COREY JOHNSON        Dates Evaluated: 2/5, 2/8/82
Date of Birth:  ███████             By:  Cary Gallaudet, Psy. D.
CA:             13.3                 Worker:  Amira Offer
Date of (PCS) Adm:  2/1/82

## PSYCHOLOGICAL EVALUATION

Corey was referred to the Pleasantville Diagnostic Center (2/1/82)
on a PINS Petition.  Background history revealed long standing school
problems culminating in Corey's truancy since September of 1981.

### Behavioral Observations:

Corey was a tall, slender and friendly 13.3-year old boy who spoke
with markedly slurred speech.  Although his face was a bit scarred
Corey impressed as a good looking boy.  He entered the testing easily
yet his affect initially seemed depressed and flat.  He was a co-
operative boy who complied readily with all the examiner's requests.
As the evaluation proceeded, and rapport developed Corey became
more spontaneous and talkative.  He seemed ambivalent about the
testing; enjoying the individual attention he was receiving, but
unsure about the actual assessment.  At times Corey impressed as
in immature boy whose playful and friendly nature often interfered
with his performance.  Frequently Corey would interrupt his own
work with irrelevant questions about toys, games and other activit-
ies, and at those times, the examiner would have to help him refocus
on the task at hand.  Corey was always agreeable and pleasant, and
while expressing concern over "the tests" he never seemed resistant
to anything that was asked of him.

### Tests Administered:

> Bender-Gestalt
> Figure Drawings
> WISC-R
> Sentence Completion
> TAT
> Rorschach

### Intellectual Evaluation:

On the WISC-R Corey achieved a Verbal I.Q. of 85 (Low Average),
a Performance I.Q. of 93 (Average) and a Full Scale I.Q. of 88
placing him within the Low Average range of intellectual function-
ing.  Average potential is suggested by his Performance I.Q., which
was slightly higher than his Verbal I.Q.  There was no variability
within the verbal area, however, performance tests were character-
ized by signficant variability.  Subtest scores were as follows:



Corey Johnson                                                    -2-

| Verbal Tests | | Performance Tests | |
|---|---|---|---|
| Information | 7 | Picture Completion | 11 |
| Similarities | 7 | Picture Arrangement | 9 |
| Arithmetic | 7 | Block Design | 6 |
| Vocabulary | 7 | Object Assembly | 13 |
| Comprehension | 10 | Coding | 7 |
| Digit Span | 2 | | |

In the verbal area Corey achieved his highest score on Comprehension. His average score here suggests that Corey has a maturing conscience and moral sense.  His thinking is appropriate and his ability to use practical judgment in every day social situations is a strength. On the other hand, a significant weakness was evidenced in his short term auditory memory.  Corey's score on Digit Span fell in the Mentally Deficient range, indicating a severe deficit in his auditory attention for nonmeaningful material.  Emphasis is made on nonmeaningful because, when using the same skill (short term auditory memory) with arithmetic problems, Corey was able to function within the Low Average range.  Significant too is the fact that Corey demonstrated considerable more difficulty with Digits reversed than forward.  A performance such as this, characterizes concrete rigid thinking, with a corresponding inability to shift the frame of reference from digits forward to digits reversed.

In the performance area Corey achieved his highest score on Object Assembly.  His High Average score here reflects a strength with the following: the ability to anticipate part/whole relations, synthesize concrete visual forms, and assemble materials drawn from life into a meaningful whole.  Significantly lower and falling within the Low Average range was Corey's score on Block Design.  His score here reflects deficits in non-verbal abstract reasoning, perceptual organization, visual perception and perceptual motor functioning.  Corey demonstrated real difficulty here, nearly rotating designs early on, and finally failing later designs for the same reason (rotation).  These weaknesses were also evident in his Bender-Gestalt performance which was characterized by a number of rotations and distortions.  He made three scorable errors, producing a Bender performance which was comparable to a child five years below his chronological age, and of those errors made two suggested the presence of an underlying neurological deficit.  Visual recall was adequate but 6 out  of the 9 designs reproduced were marked by severe rotations  - again suggesting that a perceptual motor deficit interferes with Corey's functioning.

Personality Dynamics:

Corey is a depressed, dependent and frightened 13.3-year old who is struggling with independent strivings at this time in his life and feels immobilized as a result.  This struggle presents a real conflict for Corey because on the one hand he is an ambitious boy who is searching for independence, but on the other he feels deficient, dependent and frightened.  Essentially he feels unable to make it on his own and while he knows he needs help it conflicts

J.A.1127

Corey Johnson                                                    -3-

with his reach for independence.  While depressive tendencies are
pervasive (many references to dying and killing one's self) Corey
offsets these tendencies with fantasies whereby he feels if he tries
hard enough he will fulfill his ambition.  He is an ambitious boy
who feels caught in the middle - being pushed and pulled - and while
his independence is critical to him there is also a longing for
nurturance and affection.  These needs stir up considerable anxiety
which he initially tries to deal with through denial.  Denial is
ineffective, however, and as Corey becomes more anxious he eventual-
ly regresses to an earlier stage where he is an immature boy with
strong dependency needs.  Hostile impulses also emerge at this time
and serve to overwhelm the boy even more.  Object relations are
developing and Corey is an empathic and sensitive boy who can re-
late in a mature manner.  A sensitive boy, with genuine emotional
responsiveness, Corey often feels at the mercy of others' wishes,
and his strong conscience causes him to respond accordingly.  These
conflicts are exacerbated by an organic component which clearly in-
terferes with Corey's ability to function successfully in school.
While abstracting abilities are being more and more emphasized at
this time Corey falls further and further behind.  It is an area of
weakness for him and when challenges are not concrete and meaningful
Corey is unable to integrate the experience and becomes easily over-
whelmed.

Summary and Recommendations:

In summary, Corey is a sensitive and dependent boy who is struggling
with issues revolving around independence.  An underlying organic
component serves to exacerbate the anxiety, dependence, affection-
al needs and hostile impulses and as a result Corey has an extremely
hard time trying to integrate emotional challenges.  Although evidence
of a learning disability exists he continues to be an ambitious boy
who is motivated to improve his situation and would benefit highly
from both remediation in academic areas as well as psychotherapy.
Corey needs to gain greater insight into his struggle over his ambi-
tions, his reading deficits and his willingness to accept help.
From an academic standpoint it is important that if Corey is to
learn more effectively that the material be presented in the most
concrete and meaningful way.
        Cary Gallaudet:ww  D-2/1/82      T-232/82

                                Cary Gallaudet, Psy. D.


Supervised by:
George A. Sakheim, Ph.D.
Chief of Psychological Services

J.A.1128

PLEASANTVILLE COTTAGE SCHOOL

Name of Child:  COREY JOHNSON                  Date Tested:  3/15/85
Date of Birth:  ▮▮▮▮▮▮▮                         By:  Kenneth Barish, Ph.D.
Date of (PCS) Adm:  _____                Social Worker: Christine Aar▮

### PSYCHOLOGICAL EVALUATION

#### Referral:

Corey was referred for re-evaluation to assess his current cognitive
and emotional functioning.  Corey was last tested in March 1983, by
this examiner, and in February 1982 at Pleasantville Diagnostic
Center.  These evaluations reveal severe learning disabilities in
Reading, Spelling and Arithmetic, associated with impairment of
attention and concentration, visual-spatial skills and specific
language deficits; significant depressive tendencies were also
noted.

#### Tests Administered:

WISC-R
Rorschach
TAT

#### Test Findings:

On the WISC-R Corey achieved a Verbal I.Q. of 68-70 (Mentally De-
ficient-Borderline range), a Performance I.Q. of 78-81 (Borderline-
Low Average range), and a Full Scale I.Q. of 69-74 (Deficient-Border-
line range).  Subtest scaled scores are presented below:

| | | | |
|---|---|---|---|
| Information | 4 | Picture Completion | 8(9) |
| Similarities | 5(6) | Picture Arrangement | 9 |
| Arithmetic | 6(7) | Block Design | 1(5) |
| Vocabulary | 5 | Object Assembly | 5(6) |
| Comprehension | 4 | Coding | 6 |
| (Digit Span | 6) | | |

(Alternate scores reflect improvement in performance with addition-
al time and/or assistance from the examiner.)

These scores reflect a significant decline in both Verbal and Per-
formance I.Q. since Corey was tested in 1982.  At that time a Ver-
bal I.Q. of 85, a Performance I.Q. of 93 and a Full Scale I.Q. of
88 were reported.  There is also some difference in a pattern of
subtest scores.  Corey achieved significantly lower scores on the
current testing on both the Comprehension and Object Assembly sub-
tests.  This decline in I.Q. scores is difficult to account for.
However, several factors may be involved.  The current scores
may reflect in part, the increasing demands that the tasks pre-
sented as well as Corey's failure to learn at an expected pace.

**J.A.1129**

Corey Johnson                                                      -2-

They also undoubtedly reflect the effects of Corey's severe dis-
couragement and depression with respect to cognitive tasks.  For
example, with minimal assistance, Corey was able to improve his
performance considerably in many instances.  This was evident on
the Similarities, Arithmetic, Block Design and Object Assembly sub-
tests.  Corey's very deficient score on the Block Design subtest
is the result of several rotations of designs that he easily cor-
rected when his error was pointed out to him.  These scores, should,
therefore, not be taken as an indication of Corey's intellectual
potential.  Corey's intellectual difficulties remain clearly evident,
however, and my recommendation now, even more strongly than two years
ago, is that Corey needs a highly vocationally oriented school pro-
gram.  Some efforts should be made to help Corey achieve a level
of literacy that will enable him to function in the working world,
however, Corey is unlikely to improve significantly in this area.

## Personality Functioning:

Personality assessment reveals a thoughtful, highly reflective, but
affectively constricted adolescent.  Corey expends considerable
energy in his efforts to suppress anger.  He appears vulnerable to
periods of depression and frustration.  There is also evidence of
feelings of aloneness and a desire for help, that is not being
heard.  Several responses suggest that Corey feels that he is not
being listened to.

Corey's test responses also reveal an effort toward maturity that
is particularly impressive, considering his severe learning dis-
abilities.  Corey's TAT stories reveal, for example, an awareness
that life has trials and tribulations that must be coped with and
an acceptance of the reality that life is sometimes painful, for
example, that there are painful separations.  Corey's stories empha-
size his concerns regarding the future and his constructive and
mature goals.  For example, he tells a story about a young man
"wondering if he's going to have a job and a nice life, maybe some
kids and a wife to support and help him move on in life."  This
effort towards maturity is at the cost of a constriction of Corey's
emotional life, particularly a suppression of anger and rebellious-
ness and an overly compliant attitude towards authority.  Corey
also tends towards extremes of either/or, good/bad in his thinking
about himself and his life.  Corey could benefit from greater ac-
knowledgement and acceptance of his anger, integrating anger into
his identity along with a less narrow definition of maturity.

## Recommendations:

As indicated earlier, Corey needs a vocational school program with
some remediation in literacy skill.  He could also benefit from
counselling and supportive psychotherapy both in regard to prob-
lems of self-esteem related to his learning disabilities and also
supporting and broadening his efforts to become a mature adult.
         Kenneth Barish, Ph.D.:ww   D-4/15/85       T-4/15/85


                                   Kenneth Barish, Ph.D.
                                   Psychologist

J.A.1130

# WAIS-R RECORD FORM

WECHSLER ADULT
TELLIGENCE SCALE—
.EVISED

NAME _Corey Johnson_

ADDRESS _____

SEX _M_ AGE _23_ RACE _B_ MARITAL STATUS _S_

OCCUPATION _Unemp_   EDUCATION _11-12_

PLACE OF TESTING _Richmond Jail_   TESTED BY _Dr Cornell_

| | Year | Month | Day |
|---|---|---|---|
| Date Tested | 92 | 10 | 9 |
| Date of Birth | ▓▓ | ▓▓ | ▓▓ |
| Age | 23 | 11 | 4 |

## TABLE OF SCALED SCORE EQUIVALENTS*

| Scaled Score | Information | Digit Span | Vocabulary | Arithmetic | Comprehension | Similarities | Picture Completion | Picture Arrangement | Block Design | Object Assembly | Digit Symbol | Scaled Score |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 19 | — | 28 | 70 | — | 32 | — | — | — | 51 | — | 93 | 19 |
| 18 | 29 | 27 | 69 | — | 31 | 28 | — | — | — | 41 | 91-92 | 18 |
| 17 | — | 26 | 68 | 19 | — | — | 20 | 20 | 50 | — | 89-90 | 17 |
| 16 | 28 | 25 | 66-67 | — | 30 | 27 | — | — | 49 | 40 | 84-88 | 16 |
| 15 | 27 | 24 | 65 | 18 | 29 | 26 | — | 19 | 47-48 | 39 | 79-83 | 15 |
| 14 | 26 | 22-23 | 63-64 | 17 | 27-28 | 25 | 19 | — | 44-46 | 38 | 75-78 | 14 |
| 13 | 25 | 20-21 | 60-62 | 16 | 26 | 24 | — | 18 | 42-43 | 37 | 70-74 | 13 |
| 12 | 23-24 | 18-19 | 55-59 | 15 | 25 | 23 | 18 | 17 | 38-41 | 35-36 | 66-69 | 12 |
| 11 | 22 | 17 | 52-54 | 13-14 | 23-24 | 22 | 17 | 15-16 | 35-37 | 34 | 62-65 | 11 |
| 10 | 19-21 | 15-16 | 47-51 | 12 | 21-22 | 20-21 | 16 | 14 | 31-34 | (32-33) | 57-61 | 10 |
| 9 | 17-18 | 14 | 43-46 | 11 | 19-20 | 18-19 | 15 | 13 | 27-30 | 30-31 | 53-56 | 9 |
| 8 | 15-16 | 12-13 | 37-42 | 10 | 17-18 | 16-17 | 14 | (11-12) | 23-26 | 28-29 | (48-52) | 8 |
| 7 | 13-14 | 11 | 29-36 | 8-9 | 14-16 | 14-15 | (13) | 8-10 | 20-22 | 24-27 | 44-47 | 7 |
| 6 | 9-12 | (9-10) | 20-28 | (6-7) | 11-13 | (11-13) | 11-12 | 5-7 | (14-19) | 21-23 | 37-43 | 6 |
| 5 | (6-8) | 8 | (14-19) | 5 | (8-10) | 7-10 | 8-10 | 3-4 | 8-13 | 16-20 | 30-36 | 5 |
| 4 | 5 | 7 | 11-13 | 4 | 6-7 | 5-6 | 5-7 | 2 | 3-7 | 13-15 | 23-29 | 4 |
| 3 | 4 | 6 | 9-10 | 3 | 4-5 | 2-4 | 3-4 | — | 2 | 9-12 | 16-22 | 3 |
| 2 | 3 | 3-5 | 6-8 | 1-2 | 2-3 | 1 | 2 | 1 | 1 | 6-8 | 8-15 | 2 |
| 1 | 0-2 | 0-2 | 0-5 | 0 | 0-1 | 0 | 0-1 | 0 | 0 | 0-5 | 0-7 | 1 |

*Clinicians who wish to draw a profile may do so by locating the subject's raw scores on the table above and drawing a line to connect them. See Chapter 4 in the Manual for a discussion of the significance of differences between scores on the tests.

## SUMMARY

| | Raw Score | Scaled Score |
|---|---|---|
| **VERBAL TESTS** | | |
| Information | 8 | 5 |
| Digit Span | 9 | 6 |
| Vocabulary | 18 | 5 |
| Arithmetic | 7 | 6 |
| Comprehension | 8 | 5 |
| Similarities | 11 | 6 |
| Verbal Score | | 33 |
| **PERFORMANCE TESTS** | | |
| Picture Completion | 13 | 7 |
| Picture Arrangement | 11 | 8 |
| Block Design | 18 | 6 |
| Object Assembly | 32 | 10 |
| Digit Symbol | 48 | 8 |
| Performance Score | | 39 |

| | Sum of Scaled Scores | IQ |
|---|---|---|
| VERBAL | 33 | 75 |
| PERFORMANCE | 39 | 82 |
| FULL SCALE | 72 | 77 |

Cooperative, worked hard
IQ 77 = 6th percentile — Borderline Range

(L) THE PSYCHOLOGICAL CORPORATION
HARCOURT BRACE JOVANOVICH, PUBLISHERS

Copyright © 1981, 1955, 1947 by The Psychological Corporation. Standardization Edition Copyright © 1976 by The Psychological Corporation. No part of this form may be copied by any process without permission. All rights reserved.
Printed in U.S.A.

9-991529

J.A.1131

# Intelligence Test Scores
## Wechsler Adult Intelligence Scale (R)



Information — 5
Digit Span — 6
Vocabulary — 5
Arithmetic — 6
Comprehension — 5
Similarities — 6
Picture Completion — 7
Picture Arrangement — 8
Block Design — 6
Object Assembly — 10
Digit Symbol — 8

1 2 3 4 5 6 7 8 9 10 11 12 13 14 15 16 17 18 19

Average adult score ▪ 10

These scores are combined to give an overall IQ. Corey's IQ is 77, just above the level of mild mental retardation.

Corey Johnson tested by Cornell 10-9-92

J.A.1132

# EXHIBIT 70

J.A.1133

DSS-3627-7 (12/84)

| CASE NAME | | CASE NUMBER | SCR NUMBER |
|---|---|---|---|
| Johnson | | S 4766716 | |

The Goal below is: New __X__    Retained _____    Target Date __6/88__                                    Discontinued _____

(Re)State Goal: __Corey will attend Newtown High School Special Education program__

_____ daily and on time.__

Explain level of goal achievement: __Corey continues to be pleased with his report cards and _____

__is quite committed to school.__

## TASKS

**CHILD/FAMILY (list names)**

Corey will continue to attend specialized classes.

Corey will discuss his learning disability in treatment.

Corey will use nightly study hour constructively.

**SERVICE PROVIDERS (list names)**

Teacher will encourage Corey to kee working and help him to understand that his difficulties do not reflec upon his intelligence.

Social worker will work with Corey towards understanding the implicati of his learning disability.

Houseparents will organize a nightl study hour.

---

The Goal below is: New _____    Retained __X__    Target Date __11/87__                                    Discontinued _____

(Re)State Goal: __Corey will use opportunities offered him to learn independent living__

_____ skills.__

Explain level of goal achievement: __Corey wants very much to be able to care for himself in the__

__community.  The biggest obstacle will be for him to find a way to support himself.__

__We will continue to work with him toward this end.  He will again work for Neighborhood__

__Youth Corp this summer.__

## TASKS

**CHILD/FAMILY (list names)**

Corey will explore the possibilities of a part time job.

Corey will learn how to handle money so that he can shop for himself.

**SERVICE PROVIDERS (list names)**

Houseparents will help Corey read a and apply for a job.

Caseworker, houseparents and teache will help Corey learn enough simple arithmetic that he will be able to figure out correct change.



EXHIBIT

(Reassessmen

J.A.1134

DSS-3627-8(12/84)

| CASE NAME | | CASE NUMBER |
|---|---|---|
| Johnson | | S  4766716 |

**7. FAMILY/CHILD VISITING PLAN (for Placement Cases only)**

a) For each child in foster care, summarize the nature of the interaction between the child and parent(s) and/or relative(s) during the visits, highlighting positive and negative factors. Include in this summary the frequency and location of the visits. (If the Family/Child Visiting Grid is completed, it is not necessary to include the frequency and location of visits in the summary.)

```
Corey went home with his grandfather at xmas.  However, he returned late  missing
two days of school.  He was not very communicative re. visit.  Corey is allowed
to visit his mother when she calls to arrange it, but she doesn't do so very often.
While he states these visits go well, one wonders what really happens.
```

b) For each child in foster care, describe the visiting plan for the next period. Include who will visit, how often, and where. Indicate any changes from the previous visiting plan and the reason for the changes. **Facilitate Bi-Weekly Visiting.**

```
Corey is allowed a weekend visit a month and a day visit a month.
```

(Reassessme

J.A.1135

DSS-3627-91

| CASE NAME | | CASE NUM | SCR NUMBER |
|---|---|---|---|
| Johnson | | S 4766716 | |

**8. PLAN DEVELOPMENT**

a) Discuss the level of involvement of parent(s) and children in the development of the service plan. **Parent/Child Participation.**

Corey was involved in developing service plan in regular discussions with houseparents and weekly caseworker meetings.

b) List all participants in the planning conference with their title or role and state date of conference. **Service Plan Review. Third Party Reviewer/Foster Care.**

Gilbert Gordon - Director GHD
Murray Gordon - Clinical Director - Third Party Reviewer
Diane Yarborough - Child Care Coordinator
Shari Siegel - Nurse
Odette Noble - Caseworker
John Rios - Residence Supervisor
Marvin Hunt - Houseparent
Carmen Carrasquillo - Houseparent
Joe Rivera - Houseparent

| | SIGNATURES | DATE SIGNED |
|---|---|---|
| Case Planner | *Odette Noble* | 5/8/86 |
| Case Planner's Supervisor | *[signature]* | 5/8/86 |
| Case Manager | | |
| CPS Monitor | | |
| | | |

I have read and I understand the Service Plan.

| Parent | | |
|---|---|---|
| Parent | | |
| Child | | |
| Child | | |

'Parent/Child signatures are optional)

(Reassessment)

J.A.1136

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| v. | **:** | **Case No. 3:92CR68 (DJN)** |
| | **:** | **CAPITAL CASE** |
| **COREY JOHNSON,** | **:** | **Execution Scheduled for** |
| | **:** | **January 14, 2021** |
| Defendant. | **:** | |

**NOTICE OF SUBMISSION OF EXHIBITS (SUBMISSION 7 OF 8)**

Corey Johnson hereby gives notice of the submission of Exhibits 71-74 as attachments to

his Motion Pursuant to 28 U.S.C. § 2255 Raising Claim of Ineligibility To Be Executed Under

18 U.S.C. § 3596(c). This is the seventh submission of eight.


Dated: December 14, 2020

Respectfully submitted,

/s/ David E. Carney
David E. Carney, VA Bar #: 43914
Donald P. Salzman (Admitted Pro Hac Vice)
Skadden, Arps, Slate, Meagher & Flom, LLP
1440 New York Avenue, NW
Washington, DC 20005
Telephone: (202) 371-7246
Fax: (202) 661-8295
Email: david.carney@skadden.com

*Counsel for Corey Johnson*

**J.A.1137**

**CERTIFICATE OF SERVICE**

I hereby certify that on December 14, 2020, I electronically filed the foregoing with the

Clerk of Court using the CM/ECF system, which will then send notification of such filing to all

parties and counsel included on the Court's Electronic Mail notice list.

/s/ David E. Carney
David E. Carney, VA Bar #: 43914
Skadden, Arps, Slate, Meagher & Flom, LLP
1440 New York Avenue, NW
Washington, DC 20005
Telephone: (202) 371-7246
Fax: (202) 661-8295
Email: david.carney@skadden.com

**J.A.1138**

## INDEX OF EXHIBITS TO MOTION PURSUANT TO 28 U.S.C. § 2255 RAISING CLAIM OF INELIGIBILITY TO BE EXECUTED UNDER 18 U.S.C. § 3596(c)

EXHIBIT NO.

**SUBMISSION 1**

**EXPERT REPORTS**

Report of Daniel J. Reschly, Ph.D., Aug. 26, 2016 ........................................................1

Curriculum Vitae of Daniel J. Reschly, Ph.D., May 15, 2020...................................... 1(a)

Report of J. Gregory Olley, Ph.D., Aug. 24, 2016.........................................................2

Curriculum Vitae of J. Gregory Olley, Ph.D., Oct. 2020 ............................................ 2(a)

Letter from Gary N. Siperstein, Ph.D. to Counsel for Corey Johnson, Dec. 16, 2016 ....................3

Curriculum Vitae of Gary N. Siperstein, Ph.D., Sept. 2020 .......................................... 3(a)

Debra Nelson, Mitigation Report, Sept. 27, 2016...........................................................4

Report of Richard G. Dudley, Jr., M.D., Aug. 22, 2016.................................................5

**TRIAL TRANSCRIPTS**

Trial Tr., Feb. 3, 1993 .....................................................................................6

**SUBMISSION 2**

Trial Tr., Feb. 10, 1993 ...................................................................................7

**SUBMISSION 3**

Cornell Mitigation Information and Report (Excerpt)....................................................8

Trial Tr., Feb. 12, 1993 ...................................................................................9

Trial Tr., Feb. 15, 1993 ..................................................................................10

**AFFIDAVITS & DECLARATIONS**

Declaration of Kenneth Barish, Ph.D. (staff psychologist at Pleasantville Cottage
    School), July 22, 2014 ................................................................................11

Affidavit of Richard Benedict (special education teacher at Pleasantville Cottage
    School), Dec. 5, 2011.................................................................................12

Affidavit of Darnell Brown (acquaintance in Trenton, NJ), Oct. 14, 2011 ...................................13

Affidavit of Darold Brown (acquaintance in Trenton, NJ), June 15, 2011 ...................................14

Affidavit of Craig S. Cooley (appointed counsel in 1992), Sept. 20, 2016 ..................................15

Affidavit of Courtney Daniels (Corey's lifelong friend), May 21, 2011 ......................................16

Declaration of Monica Dawkins (Corey's former girlfriend), July 16, 2012 ...............................17

**SUBMISSION 4**

Declaration of Cary Gallaudet, Ph.D. (psychologist at Pleasantville Diagnostic
    Center), Mar. 19, 2012..................................................................................18

**J.A.1139**

**EXHIBIT NO.**

Declaration of Ann Harding (staff member at Pleasantville Cottage School), Nov. 21, 2011...................................................................................................................................19

Affidavit of Minnie Hodges (Corey's maternal aunt), Apr. 30, 2011 ...........................................20

Affidavit of Priscilla Hodges (Corey's cousin), Apr. 30, 2011 ....................................................21

Affidavit of Queenie Hodges (Corey's cousin), Apr. 30, 2011 ....................................................22

Declaration of Esther Johnson (Corey's maternal grandmother), Apr. 30, 2011 .........................23

Affidavit of Robert Johnson (Corey's half-brother), June 29, 2011..............................................24

Affidavit of Antionette Daniels Joseph (the best friend of Corey's mother and Corey's godmother), May 21, 2011) ...............................................................................................25

Declaration of Leona Klerer (reading teacher at Mount Pleasant Cottage School), June 3, 2011 ....................................................................................................................26

Affidavit of Gerald Lefkowitz (unit administrator at Pleasantville Cottage Center), Dec. 5, 2011 ...................................................................................................................27

Affidavit of Odette Noble (social worker at Elmhurst), Dec. 1, 2011 ..........................................28

Declaration of George Sakheim, Ph.D. (Chief of Psychological Services at Pleasantville Diagnostic Center), June 17, 2011 ....................................................................29

Affidavit of David Washington (childcare worker at Elmhurst), Mar. 1, 2012.............................30

**SUBMISSION 5**

**CHILDHOOD & TESTING RECORDS**

Gregory Judge, School Social Worker, Social History, Mar. 4, 1977...........................................31

Cheryl Spillane, Learning Consultant, Bureau of Pupil Personnel Services, Jersey City Public Schools, Learning Consultant Evaluation to Child Study Team, Mar. 18, 1977.................................................................................................................................32

F.A. Figurelli, M.D., Chief Psychologist, Psychological Examination Record, Mar. 25, 1977...................................................................................................................................33

Eleanor Glantz, Social Worker, Case Service, Dec. 11, 1978 ......................................................34

Committee on the Handicapped, Referral to the Committee on the Handicapped, Feb. 26, 1979.................................................................................................................................35

Committee on the Handicapped Records, May 21, 1979 ..............................................................36

Washington Heights-West Harlem Community Mental Health Center, Child Assessment Evaluation Summary, Dec. 9, 1981 ....................................................................37

Ernest H. Adams, Staff Psychologist, Psychodiagnostic Evaluation, Dec. 11, 1981 ...................38

Cary Gallaudet, Psy.D., Pleasantville Cottage School, Psychological Evaluation, Feb. 1, 1982...................................................................................................................................39

**J.A.1140**

EXHIBIT NO.

Leona Klerer, Mount Pleasant Cottage School Screening Upon Admission, Feb. 22, 1982....................................................................................................................40

Amira Offer, Caseworker, Psychosocial Summary, Mar. 15, 1982 ...............................41

Gloria Caro, Pleasantville Cottage School, Reassessment Summary, May 21, 1982 ..................42

Gloria Caro, Caseworker, Initial Conference, Current Assessment and Transfer Summary, June 9, 1982..................................................................................................43

Gayle Turnquest, Caseworker, Pleasantville Cottage School, Current Assessment, Jan. 31, 1983 ..................................................................................................................44

**SUBMISSION 6**

Ken Barish, Ph.D., Psychologist, Pleasantville Cottage School, Psychological and Educational Evaluation, Apr. 29, 1983 .......................................................................45

John B. Stadler, M.D., Clinical Director, Pleasantville Cottage School, Psychiatric Evaluation, Aug. 26, 1983 ...........................................................................................46

Lynda Coccaro, Speech and Language Pathologist, Donald R. Reed Speech Center, Inc., Phelps Memorial Hospital, Speech and Language Evaluation, Oct. 5, 1983 .................47

Lynn Polstein, Jewish Child Care Association of New York, Pleasantville Cottage School, Change in Permanency Plan, Apr. 13, 1984 ..................................................48

Gerard Maier, Social Worker, Current Assessment, Sept. 4, 1984 ...............................49

Christine Aaron, MSW Intern, Jewish Child Care Association of New York, Pleasantville Cottage School, Visitation Plan, Dec. 12, 1984 ..................................50

Kenneth Barish, Ph.D., Psychologist, Pleasantville Cottage School Psychological Evaluation, Apr. 15, 1985 ...........................................................................................51

Gerard Maier, Pleasantville Cottage School, Discharge/Transfer Plan, May 28, 1985................52

Board of Education of the City of New York, Individualized Education Plan – Phase 1, July 1, 1985.................................................................................................................53

Odette Noble, Social Worker, Jewish Child Care Association of New York, Elmhurst Boys Residence, UCR Reassessment and Service Plan Review 6 Month, Nov. 21, 1985....................................................................................................................................54

**SUBMISSION 7**

Odette Noble, Social Worker, Jewish Child Care Association of New York, Elmhurst Boys Residence, UCR Reassessment and Service Plan Review 6 Month, June 28, 1986....................................................................................................................................55

Odette Noble, Social Worker, Jewish Child Care Association of New York, Elmhurst Boys Residence, UCR Plan Amendment: Form D Trial Discharge, Feb. 23, 1987 ...............56

Newtown High School, Scholastic Transfer Record, Dec. 7, 1987 ..............................57

3

**J.A.1141**

EXHIBIT NO.

Janet Valentine, Child Care Worker, Pleasantville Diagnostic Center, Outline for Cottage Report (undated) ...........................................................................................58

**COURT RECORDS**

Notice of the Intention of U.S.A. to Seek Death Penalty as to Mr. Tipton, May 1, 1992.............................................................................................................................59

Notice of the Intention of U.S.A. to Seek Death Penalty as to Mr. Roane, May 1, 1992..............60

Second Superseding Indictment, July 20, 1992, Dkt. 115 ...........................................................61

Notice of the Intention of U.S.A. to Seek Death Penalty as to Mr. Thomas, Oct. 28, 1992.............................................................................................................................62

Verdict Form, Feb. 3, 1993, Dkt. 466..........................................................................................63

Notice of the Intention of U.S.A. to Seek Death Penalty as to Mr. Johnson, Feb. 8, 1993.............................................................................................................................64

Special Findings, Feb. 16, 1993, Dkt. 508...................................................................................65

Motion to Have Defendant Declared Mentally Retarded, *United States v. Thomas*, No. 3:92CR68 (E.D. Va. Apr. 15, 1993) .................................................................66

Memorandum in Support of Initial Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. Section 2255, June 15, 1998, Dkt. 714 (Excerpt) .........................................67

Reply Memorandum in Support of Initial Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. Section 2255, Mar. 15, 1999, Dkt. 761 (Excerpt).................................68

Ex. 14 to Reply Memorandum in Support of Initial Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. Section 2255, Mar. 15, 1999 ..................................69

Ex. 15 to Reply Memorandum in Support of Initial Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. Section 2255, Mar. 15, 1999 ..................................70

**SUBMISSION 8**

Petitioners' Joint Motion for Leave to Take Discovery, June 24, 1999, Dkt. 770 ........................71

Memorandum Opinion, May 3, 2000, Dkt. 803 ...........................................................................72

Memorandum Opinion, May 1, 2003, Dkt. 896 ...........................................................................73

Brief for Appellants Cory Johnson and Richard Tipton at 146, *United States v. Johnson*, No. 03-13(L), 03-26, 03-27 (4th Cir. Feb. 17, 2004) (Excerpt) ..............................74

**SUBMISSION 9**

**DIAGNOSTIC MATERIALS**

American Association on Intellectual and Developmental Disabilities Definition Manual ("AAIDD-11") (Excerpt)..........................................................................75

AAIDD User Guide to 11th Edition (Excerpt) .............................................................................76

Diagnostic and Statistical Manual of Mental Disorders ("DSM-5") (Excerpt)............................77

**J.A.1142**

EXHIBIT NO.

**CONGRESSIONAL RECORDS**

134 Cong. Rec. 22,926 (1988) (Excerpt)...................................................................................78

136 Cong. Rec. S6873 (daily ed. May 24, 1990) (Excerpt)...........................................................79

**J.A.1143**

# EXHIBIT 71

J.A.1144

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

FILED

JUN 24 1999

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

COREY JOHNSON,              )
                           )
            Petitioner,    )
                           )
    v.                     )        Criminal No. 92CR68
                           )
SAMUEL PRUETT, WARDEN,     )        Civil No. 97CV895
                           )
            Respondent.    )
_____)

RICHARD TIPTON, III,       )
                           )
            Petitioner,    )
                           )
    v.                     )        Criminal No. 92CR68
                           )
RONALD ANGELONE, WARDEN,   )        Civil No. 98CV361
                           )
            Respondent.    )
_____)

UNITED STATES OF AMERICA,  )
                           )
            Plaintiff,     )
                           )
    v.                     )        Criminal No. 92CR68
                           )
JAMES H. ROANE, Jr.        )        Civil No. 98CV360
                           )
            Defendant.     )
_____)

## PETITIONERS' JOINT MOTION FOR LEAVE TO TAKE DISCOVERY

**J.A.1145**

Pursuant to Rule 6 of the Rules Governing Section 2255 Proceedings For the United States District Courts, petitioners Richard Tipton, Corey Johnson and James Roane respectfully request leave of the Court to take discovery. The grounds for this motion are stated below.

## INTRODUCTION

On June 1, 1998, Petitioners moved this Court for post-conviction relief pursuant to 28 U.S.C. § 2255. Petitioners also filed memoranda of law detailing their compelling claims for post conviction relief, including, *inter alia,* claims that in its zeal to convict, the government (1) presented false testimony and misrepresented evidence; (2) concealed exculpatory evidence; (3) misled the Court in order to avoid its obligation to disclose the addresses of its witnesses; (4) improperly purchased testimony in violation of 18 U.S.C. § 201(c); and (5) improperly discriminated against women in selecting the jury. Petitioners also raised claims of ineffective assistance of counsel, possible jury taint and failure of proof of participation in a CCE. Petitioner Tipton presented his claim that the evidence before the jury was insufficient to support his murder convictions or his death sentences, and Petitioner Johnson also presented his claim that his execution is barred due to mental impairments.

Petitioner Tipton's motion and opening memorandum included a request for discovery and an evidentiary hearing, in which petitioners Johnson and Roane joined. Petitioners' filings with the Court have established that they are entitled to discovery and an evidentiary hearing on certain claims , while on other claims, they are entitled to relief without discovery or an evidentiary hearing. Presently, petitioners seek the Court's leave to take discovery pursuant to the Rules Governing Section 2255 Proceedings for the United States District Courts ("Section 2255 Rules").

- 2 -

**J.A.1146**

## ARGUMENT

### 1.    Legal Standards[1]

Upon a showing of "good cause," a petitioner under Section 2255 is entitled "to invoke the processes of discovery available under the Federal Rules of Criminal Procedure or the Federal Rules of Civil Procedure or elsewhere in the usages and principles of law."  Section 2255 Rule 6(a).  Although "good cause" is not defined in the Rule, courts have applied a standard for granting habeas discovery that first was articulated by the United States Supreme Court in *Harris v. Nelson*, 394 U.S. 286 (1969).[2]

In *Harris*, the Court held that federal courts have inherent power to grant discovery in habeas cases, despite the absence of legislation expressly providing for it.  Specifically, the Court noted that the All Writs Act, 28 U.S.C. § 1651, gave federal courts the power to "fashion appropriate modes of procedure," including discovery, to dispose of habeas petitions "where necessary to accomplish the objective of the proceedings."  394 U.S. at 299-300.  The Court then concluded that:

> [W]here specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is confined illegally and is therefore entitled to relief, it is the ***duty*** of the court to provide the necessary facilities and procedures for an adequate inquiry.

*Harris*, 394 U.S. at 300 (emphasis added).

---

[1] *See also* Reply Memorandum in support of Motion of Richard Tipton, III to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. Section 2255 at 29-39.

[2] Although *Harris* was decided before enactment of Rule 6, the Advisory Committee Notes to Rule 6 make it clear that the rule is intended, at a minimum, to codify *Harris*.

J.A.1147

Although the Advisory Committee note to Rule 6 embraces the Supreme Court's decision in *Harris*, the rule in fact authorizes **broader** discovery than *Harris*. For example, while *Harris* suggested that a petitioner might have to establish a "prima facie case for relief" as a prerequisite to discovery, *Harris*, 394 U.S. at 290, the Advisory Committee's discussion of *Harris* omits the "prima facie case" language used by the Court in the decision, *see* Advisory Committee Section 2255 Rule 6, indicating that Rule 6(a) permits **the use of discovery to establish** a prima facie case for relief.

The Supreme Court's decision in *Blackledge v. Allison*, 431 U.S. 63 (1977), decided just after the adoption of Rule 6, supports this broad interpretation of "good cause." In *Blackledge*, the Court held that the district court should not have dismissed a petition summarily and without further factual inquiry. The Court cited with approval the Advisory Committee's suggestion that federal judges use pre-hearing discovery as one means of determining, without resort to an evidentiary hearing, whether there is a factual basis for the petitioner's claims. The Court ruled that habeas petitions should not be dismissed without discovery or an evidentiary hearing unless the allegations themselves are so ("vague [or] conclusory . . . " as to warrant dismissal for that reason alone." 431 U.S. at 75. The Court explained that:

> The critical question is whether these allegations . . . [are] so palpably incredible, so patently frivolous or false as to warrant summary dismissal. In light of the nature of the record of the proceeding at which the guilty plea was accepted, and of the ambiguous status of the process of plea bargaining at the time the guilty plea was made, we conclude that Allison's petition should not have been summarily dismissed.

431 U.S. at 76 (citation omitted). The Court noted that even if, in the end, a full evidentiary hearing might not be required upon remand, a habeas petitioner is entitled to careful consideration and plenary processing of [his claim,] including full opportunity for a presentation

- 4 -

of the relevant facts. *Id.* at 82-83. (alteration in original) (citing *Harris v. Nelson*, 394 U.S. at 298).

The Supreme Court recently affirmed that discovery should be the rule, and not the exception, for well-pled habeas claims. In *Bracy v. Gramley*, 520 U.S. 899 (1997), the Supreme Court underscored that Rule 6(a) is intended, in essence, to weed out frivolous claims, and to allow development of well-pled claims.

Petitioner Bracy had been tried and convicted of capital murder by a judge who had bribed other judges as a defense lawyer, and accepted bribes after ascending to the bench. The judge tried Bracy's case between cases that he had fixed after accepting bribes. The judge had appointed one of his former partners to represent Bracy, and Bracy was tried quickly and sentenced to death. Bracy theorized that to avoid detection, the judge balanced his leniency in fixed cases with undue harshness in others.

The Seventh Circuit agreed that this theory was "plausible", but found it not "sufficiently compelling [an] empirical proposition" to justify presuming actual bias in Bracy's case. 520 U.S. at 903 (*quoting Bracy v. Gramley*, 81 F.3d 684, 689-90 (7th Cir. 1996)). The Seventh Circuit also held that Bracy had not shown "good cause" for discovery to prove his claim, as is required by Rule 6(a). The Circuit Court reasoned that, even if Bracy were able to uncover evidence that the judge sometimes "came down hard" on defendants who did not bribe him, that would not demonstrate that this bias infected Bracy's trial. 81 F.3d at 690-91.

In a unanimous decision, the Supreme Court reversed, and held that Bracy was entitled to develop his claim in federal district court. The Court noted that Bracy's claims were "quite speculative," "only a theory at this point," and were "not supported by any solid evidence of petitioner's trial lawyer's participating in any such plan." Nevertheless, the Court remanded for

J.A.1149

further proceedings because "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he . . . is entitled to relief, it is the duty of the courts to provide the necessary facilities and procedures for an adequate inquiry." *Bracy,* 520 U.S. at 908-09 (quoting *Harris v. Nelson*, 394 U.S. at 299). The Court put "difficulties of proof aside," permitting discovery despite the recognized possibility that Bracy would not uncover the evidence he sought. 520 U.S. at 905, 907. The Court's unanimous decision in *Bracy* underscores the federal district court's **duty** to permit discovery if a petitioner has pled a claim upon which relief **may** be granted.

Thus, Rule 6(a) does not impose a high hurdle intended to make habeas discovery the exception, rather than the rule. Instead, it serves a gatekeeper function, weeding out obviously specious claims. *See Harris*, 394 U.S. at 300. Petitioners' claims are anything but specious, and where, as here, a petitioner presents specific allegations demonstrating that, if the facts are fully developed, he may be entitled to relief, it is the duty of the Court to provide appropriate discovery.

Petitioners' claims are precisely the types of claims for which Court-ordered discovery is **essential**. Several of these claims involve, either directly or indirectly, allegations of Government misconduct. For obvious reasons, such claims rarely, if ever, can be developed fully without access to documents not otherwise available to petitioners, and witnesses who otherwise are unwilling to cooperate, as is the case here.

In *Machibroda v. United States*, 368 U.S. 487 (1962), the Supreme Court explained why claims of prosecutorial misconduct typically cannot be resolved on the pleadings and summarily dismissed. Petitioner Machibroda claimed that his guilty plea was induced by a prosecutor's unkept promise, and the district court, believing reasonable inferences suggested the claim was

- 6 -

**J.A.1150**

false, and crediting a prosecutor's affidavit denying the allegations, dismissed the claim without an evidentiary hearing. *Id.* at 491-93.

The Supreme Court found the claim "improbable," but reversed because it was not "incredible." 368 U.S. at 495. The Court held that Section 2255 requires an evidentiary hearing "unless the motion and the files and records of the case conclusively show the prisoner is entitled to no relief," and that "[t]his was not a case where the issues raised by the motion were conclusively determined either by the motion itself or by the 'files and records' in the trial court." *Id.* at 494. Rather, the claims "related primarily to purported occurrences outside the courtroom and upon which the record could, therefore, cast no real light," and could not be resolved by the judge "drawing upon his own personal knowledge or recollection." *Id.* at 494-95. The Court concluded:

> Not by the pleadings and the affidavits, but by the whole of the testimony, must it be determined whether the petitioner has carried his burden of proof and shown his right to a discharge. The government's contention that his allegations are improbable and unbelievable cannot serve to deny him an opportunity to support them by evidence. On this record it is his right to be heard.

*Id.* at 495 (citation omitted); *see also United States v. Banks*, 1998 WL 808408 (4th Cir. 1998) (noting that, despite the discretion afforded the district court, there is "a category of petitions, usually involving credibility, that will require an evidentiary hearing in open court") (quoting *Raines v. United States*, 423 F.2d 526, 530 (4th Cir. 1970); *Blackmon v. Scott*, 22 F.3d 560, 565-66 (5th Cir. 1994) (requiring evidentiary hearing on claim that prosecutor used perjured testimony, to determine both falsity of testimony and materiality, where state vigorously denied allegations made by petitioner, creating an issue of material fact). Similarly, the court cannot resolve petitioners' claims by the counter-allegations contained in the government's

-7-

memorandum seeking to dismiss their Section 2255 motions.  Petitioners are entitled to discovery, and it would be an abuse of discretion to deny their requests.

## 2. Prosecutorial Misconduct

### a. Perjured Testimony

A prosecutor's knowing use of false testimony violates the Due Process Clause. *Napue v. Illinois*, 360 U.S. 264, 269 (1959).  A conviction must be set aside if there is any reasonable likelihood that the false evidence could have affected the judgment of the jury.  *Kyles v. Whitley*, 514 U.S. 419 (1995).  Reversal is "virtually automatic" where the government knowingly permits the introduction of false testimony, *United States v. Stofsky*, 527 F.2d 237, 243 (2d Cir. 1975), but a conviction procured with such testimony should also be set aside if the government *should have known* it was false, or merely allows false testimony to pass uncorrected.  *United States v. Kelly*, 35 F.3d 929, 933 (4th Cir. 1994).

### (1) Factual Background

### (a) Maurice Saunders

As Tipton's opening and reply memoranda make clear, government witness Maurice Saunders gave material false testimony when he claimed to have traveled to New York on two occasions to buy large quantities of powder cocaine for Tipton.  Tipton Mem. at 58-60; Tipton Reply at 39-45.  Saunders' materially false testimony was critical to the government's case for a number of reasons.  First, the government used Saunders' testimony as evidence that the alleged Newtowne CCE had its origins in New Jersey and New York.  Second, Saunders' testimony also provided evidence that the Newtowne CCE was an extension of the New York Boyz conspiracy. The government also established a nexus between the alleged New York Boyz conspiracy and

J.A.1152

the Newtowne CCE by highlighting the consistency between Greg Scott's and Saunders' testimony.

The third critical aspect of Saunders' testimony was his statement to the jury that Tipton and his co-defendants sold substantial quantities of cocaine. Similarly, his testimony provided evidence that the CCE generated substantial income. Finally, the government used Saunders' testimony to rebut one of the defense's major themes – that the prosecution orchestrated its case against Tipton and his co-defendants. The Government used Saunders' testimony to argue they could not have orchestrated the case because Saunders' and Scott's testimony was consistent.

The allegations contained in this claim are specific and serious. Moreover, petitioners have substantiated them to the best of their ability through the efforts of their investigator, who has interviewed and taken statements from persons with first-hand knowledge about these events. Petitioners require discovery on this claim, in order to permit them to develop fully the facts showing that Saunders' trial testimony was false, that the prosecutors knew it was false, should have known it was false, or let it pass uncorrected.

### (b)  Greg Scott

Greg Scott gave material false testimony concerning the allegedly highly organized, violent drug organization he referred to as the New York Boyz. Petitioners' allegations are set forth in detail in Tipton's opening and reply memoranda. Memorandum of Law in Support of Tipton's Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255 ["Tipton Mem."] at 62-69. Scott's testimony was critical to the government's case because his testimony established the conspiracy that formed the roots of the CCE. The government orchestrated Scott's and Saunders' testimony to create the illusion of a continuing connection between the New York Boyz and the alleged Newtowne Gang. Without Scott's testimony, the government

- 9 -

J.A.1153

could not prove the murders in this case occurred in furtherance of a CCE, in which case petitioners could not have received death sentences.

In the course of post-conviction investigation, petitioners have interviewed several members of the alleged New York Boyz conspiracy. These individuals, although they admit they were friends and did deal drugs, dispute that they operated as a highly organized, violent drug operation. Most importantly, post-conviction investigation has revealed that "Light,"[3] the supposed leader of the New York Boyz and the Newtowne Gang's purported supplier of bulk cocaine, was incarcerated in New Jersey during the entire existence of the alleged Newtowne Gang. *Id.* at 59-60. It is therefore clear that Scott's testimony was false, and petitioners are entitled to discovery to determine whether the government knew it, should have known it, or allowed it to pass uncorrected.

### (c)   Hussone Jones

At trial, Hussone Jones gave devastating and detailed testimony that he witnessed Tipton murder Douglas Talley and saw first-hand the events preceding and following Talley's murder. Tipton's opening and reply memoranda assert that Jones' testimony was a lie and violated Tipton's right to due process. Tipton Mem. at 69-71; Tipton Reply at 49-50. Tipton's claim is supported by evidence contained in the record and by Tipton's post-conviction investigation that includes the sworn statement of "Wildman," a.k.a. Marcus Tyler Stevens, that Jones' testimony was false. In his affidavit, Wildman makes three critical statements. He states that he never saw Tipton with a knife and that Tipton never gave him a knife to wash. These sworn statements clearly contradict Jones' trial testimony that Tipton gave a knife to Wildman. Finally, Wildman states that he

---

[3] "Light's" real name and other aliases are defined in Exhibit A.

J.A.1154

spoke to and provided information to lead prosecutor Vick, who asked Wildman many questions.

Tipton has produced evidence supporting this claim. See Reply Memorandum in Support of Motion of Richard Tipton, III to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255 ["Tipton Reply"] at 49. Mr. Vick's affidavit, Memorandum for the United States in Response to Petitioners' Motions for Collateral Relief ["Gov't Mem."] Exh. B, stating that his notes contain no exculpatory materials merely creates an issue of material fact pursuant to *Machibroda*, *supra*, and therefore makes this claim ripe for discovery. A failure to allow discovery on this claim would be an abuse of discretion.

### (d)    Priscilla Greene

Priscilla "Pepsi" Greene provided testimony at Roane's trial that was crucial to James Roane's conviction and death sentence. Her claim that Douglas Moody was killed "because [Johnson] and [Tipton] and them didn't want . . . [Moody] to work in that area . . . [s]elling cocaine," Tr. at 2553, was the *only* evidence that Moody was killed in furtherance of the CCE, and thus the only evidence supporting his death sentence. However, it is clear that Ms. Greene lied at Roane's trial regarding her role as a drug seller, see Richard Tipton's First Amendment to Initial Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2255 and to Memorandum in Support of Petition at 4-7, but more importantly, concerning the murder of Douglas Moody. It also seems clear that the prosecution knew or should have known that her testimony was false or, at a minimum, allowed it to pass uncorrected.

The government theorized that Moody was shot in an apartment at the back of a house, and that he then leapt through a window, after which Roane stabbed him. "Pepsi" Greene testified at Roane's trial that on the night of the murder, she was on the corner across the street,

- 11 -

when she heard gun shots, after which Roane and Tipton came out of the house.  Tr. 2548-49.

She testified that she then went back in the house from which Moody, Tipton and Roane had just

come, to "straighten up."  She claimed that Roane then came in the house and asked her for a

knife.  Tr. 2550.  According to Ms. Greene, she then went back outside, and after Roane

"finished killing" Mr. Moody,[4] he asked her to dispose of the knife.  Tr. 2548, 2551.

However, Ms. Greene's testimony in the subsequent trial of Vernon Lance Thomas

reveals that her testimony against James Roane was not true.  Ms. Greene testified at Thomas'

trial that prior to the killing, she was in fact *inside* the apartment in which Moody allegedly was

shot.  *See* Amended Motion of James H. Roane, Jr. to Vacate, Set Aside or Correct Sentence

Pursuant to 28 U.S.C. § 2255, Exh. A at 426.  In addition, she revealed in Thomas' trial what she

had concealed in Roane's – that her boyfriend and drug-selling partner, Curt Thorne, was also in

the apartment at the time Moody was shot.  Ms. Greene claimed that "they excused [her] out of

the house," and she went out to the corner.  She then heard gunshots, after which *Thorne* ran out

of the house, followed by Roane, who "ran up the street." *Id.*  Then, she claimed, Moody

jumped out the window, and lay on the porch, while Ms. Greene returned to the apartment to

"clean up." *Id.* at 426-27.

The discrepancies in Ms. Greene's accounts are critical.  Her testimony at Thomas' trial

regarding her own and Curt Thorne's presence in the apartment where Moody was shot would

have further undermined her already shaky credibility in James Roane's trial.  Thorne was Ms.

Greene's boyfriend, Tr. 2544, and, as Ms. Greene finally revealed in the Thomas trial, she sold

drugs with him.  Exh. A at 421-22.  Ms. Greene's obvious motive to lie – to prevent exposure of

Thorne's and, possibly, her own role in the murder – was hidden from the defense in Roane's

_____

[4]  Despite her claim that Roane "finished killing" Mr. Moody, Greene admitted

- 12 -

**J.A.1156**

trial. Ms. Greene's credibility is all the more important in light of the fact that an eyewitness to the Moody murder has come forward to say that James Roane did not commit the killing. See Declaration of Paul F. Enzinna, Exhibit B to Reply Memorandum in Support of Motion of James H. Roane, Jr. to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255.

Ms. Greene testified in Mr. Thomas' trial on April 28, 1993. It simply strains credulity to believe that, when she testified at Roane's trial barely three months earlier, the government was unaware of her drug selling activities, or that she and her boyfriend/drug-selling partner Curt Thorne were in the apartment where Douglas Moody allegedly was shot.[5] Moreover, James Roane was sentenced to death *after* Ms. Greene's testimony in the Thomas case, and after prosecutors unquestionably knew of the discrepancies in her testimony.

"The government violates its duty to deal fairly with a defendant where it either solicits testimony it knew or should have known to be false or allows such testimony to pass uncorrected." *United States v. Ellis*, 121 F.3d 908, 927 (4th Cir. 1997); *United States v. Kelly*, 35 F.3d 929, 933 (4th Cir. 1994). Reversal is required where "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Ellis*, 121 F.3d at 927 (*quoting United States v. Agurs*, 427 U.S. 97, 103 (1976)).

There can be no question that Ms. Greene's false testimony "could have" affected the judgment of the jury in this case. Ms. Greene claimed that James Roane killed Moody after he

---

that she did not see Roane use the knife on Mr. Moody. Tr. 2551.

[5] In any event, James Roane is entitled to discovery to determine whether the prosecution in fact knew at the time she testified that Ms. Greene's testimony at his trial was false. See Bracy v. Gramley, 520 U.S. 899, 908 (1997) ("where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief, it is the duty of the courts to provide the necessary facilities and procedures for an adequate inquiry" (citation omitted)).

J.A.1157

and Tipton emerged from the apartment where Moody was shot. Had the jury known that, as Greene testified in the *Thomas* trial, Greene and her boyfriend – with whom Greene sold cocaine – were in the apartment prior to the killing, and that Greene's boyfriend emerged from the apartment after the shooting, the jury likely would have discounted her testimony in its entirety. Granted, Denise Berkeley also claimed that Roane stabbed Douglas Moody, but as noted, Ms. Greene's testimony that "[Johnson] and [Tipton] and them didn't want . . . [Moody] to work in that area . . . selling cocaine," Tr. 2553, was the *only* evidence that Moody had been killed "in furtherance" of the alleged CCE. Had the jury known of her changing story, it is at least "reasonably likely" the jury would have found no evidence sufficient to support James Roane's death sentence for this murder.

### (e)    Misconduct Regarding Proof of the CCE

Johnson has presented claims of prosecutorial misconduct related to the evidence supporting the CCE convictions. He has alleged that the government improperly influenced its witnesses to use the terms "partner," "worker," and "employee" during pretrial interviews and then during their trial testimony. He has also presented claims of insufficient evidence and actual innocence based on the government's failure to satisfy the supervision element of the CCE statute.

Discovery is necessary on this claim in order to permit petitioner to develop fully the facts showing that he never exercised the CCE supervisory or management role alleged by the government, that he was no more than a drug supplier (who, as a matter of law, is not a CCE supervisor), that persons interviewed by government agents gave statements negating any inference that Johnson was a CCE supervisor or manager, and that government agents

- 14 -

improperly influenced trial witnesses to use those terms which indicated Johnson had a supervisory or management role in the alleged CCE.

### (2)    Requested Discovery[6]

Discovery is necessary on these claims in order to permit petitioners to develop fully the facts showing that trial testimony was false, that prosecutors knew it was false, should have known it was false, or let it pass uncorrected. Petitioners request leave to take the following discovery:

### Interrogatories

1.    Please identify any person with any knowledge relating to any statements concerning this case made by any trial witness to:

    a.    any agent of government;

    b.    the prosecution in this case;

    c.    any agent of the Commonwealth of Virginia; or

    d.    any person who provided the government or the prosecution in this case with information concerning any statement made by any witness in this case.

2.    Please identify any person with any knowledge that relates to, or any document that relates to, the trial testimony of

    a.    Maurice Saunders concerning his alleged trips to New York with Tipton;

    b.    Greg Scott;

    c.    Hussone Jones concerning the murder of Douglas Talley; or

    d.    Priscilla "Pepsi" Greene concerning her own involvement in drug sales or the murder of Douglas Moody.

---

[6] The discovery requests contained herein should be read to incorporate the definitions and instructions contained in Exhibit A.

J.A.1159

3.       Please identify all persons with any knowledge that relates to, and any documents that relate to, any plea agreement between the government and any trial witness in this case.

4.       Please describe the government's efforts to prepare the following trial witnesses for their trial testimony, including, without limitation, an identification of the individuals who performed this task:

>             Denise Berkeley
>             Anita Bracey
>             Antwoine Brooks
>             Valerie Butler
>             Johnny Lee Byrd
>             Robert Davis
>             Jerry Gaiters
>             Gwendolyn Greene
>             Priscilla Greene
>             Sterling Hardy
>             Ronita Hollman
>             Anthony Howlen
>             Hussone Jones
>             Martha McCoy
>             Montez McCoy
>             Dennis Moody
>             Charlotte Moore
>             Greg Noble
>             Jeannette Pauley
>             Maurice Saunders
>             Gregory Scott
>             Leroy Slater
>             Stanley Smithers
>             Charles Townes
>             Pamela Williams

5.       Please identify all agents of the government who obtained any information about "Light" from the date of the beginning of the Newtowne investigation to the present, and describe this information.

6.       Please identify all documents in the custody, control or possession of the government that relate to or discuss Light, the murder of Douglas Talley, or the murder of Douglas Moody.

7.       Please identify all documents in the custody, control or possession of the government that relate to or discuss the testimony of any trial witness for the government in this case.

- 16 -

J.A.1160

## Production of Documents[7]

1.      All documents consisting of or relating to any statements concerning this case made by any trial witnesses to:

      a.      any agent of the government;

      b.      the prosecution in this case;

      c.      any agent of the Commonwealth of Virginia; or

      d.      any person who provided the government or the prosecution in this case with information concerning any statement made by any witness in this case.

2.      All documents identified in response to any interrogatory answers.

## Request for Depositions

1.      The following trial witnesses:

        Denise Berkeley
        Anita Bracey
        Antwoine Brooks
        Valerie Butler
        Johnny Lee Byrd
        Robert Davis
        Jerry Gaiters
        Gwendolyn Greene
        Priscilla Greene
        Sterling Hardy
        Ronita Hollman
        Anthony Howlen
        Hussone Jones
        Martha McCoy
        Montez McCoy
        Dennis Moody

---

[7] The terms "document" or "documents" are used throughout this motion and memorandum in support as defined in Exhibit A. This motion assumes that all documents petitioners seek are in the possession of the government. To the extent the documents are not in the possession of the government, however, the court should construe any document request contained in this motion as a request for the issuance of a subpoena *duces tecum* to the party in possession, custody or control.

J.A.1161

> Charlotte Moore
> Greg Noble
> Jeannette Pauley
> Maurice Saunders
> Gregory Scott
> Leroy Slater
> Stanley Smithers
> Charles Townes
> Pamela Williams

2.      Any and all agents of the government who participated in any way in preparing any of the above witnesses for their trial testimony.

3.      William H. Parcell, III
        Howard C. Vick, Jr.

### Request for Admissions

1.      Admit that at the time of trial, the government knew that "Light" was an alias for John Matthews .

2.      Admit that at the time of trial, the government should have known that "Light" was an alias for John Matthews.

3.      Admit that at the time of trial, that the government knew that John Matthews was also known as "Rufus Alvarez".

4.      Admit that at the time of trial, the government should have known that John Matthews was also known as "Rufus Alvarez".

5.      Admit that at the time of trial, the government knew that John Matthews, a.k.a., "Light" and/or "Rufus Alvarez", was incarcerated in the State of New Jersey's correctional system from 1991 through 1995.

6.      Admit that at the time of trial, the government should have known that John Matthews, a.k.a., "Light" and/or "Rufus Alvarez", was incarcerated in the State of New Jersey's correctional system from 1991 through 1995.

J.A.1162

**b.    Suppression of Exculpatory Evidence**

**(1)    Factual Background**

**(a)    Hussone Jones**

Tipton has asserted a claim under *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny, based on the same facts set forth in his claim that Hussone Jones testified falsely about the murder of Douglas Talley.  In addition to what is sought below, this *Brady* claim requires the same discovery as the false testimony claim.  Moreover,  petitioners have requested by letter that the government disclose any materials relevant to either guilt or punishment that have not been disclosed thus far. *See Imbler v. Pachtman*, 424 U.S. 409, 427 n.25 (1976) (prosecutor's obligation to disclose all significant evidence suggestive of innocence or mitigation continues after conviction); *Thomas v. Goldsmith*, 979 F.2d 746, 749-50 (9th Cir. 1992) (*Brady* obligation continues throughout federal habeas proceedings). *See* Exhibit B.

**(b)    John Knight and "Studie" Green**

The claim that the government possessed, but failed to disclose, the exculpatory statements of John Knight and Thomas "Studie" Green is set forth in detail in Tipton's opening and reply memoranda.  Tipton Mem. at 74-75; Tipton Reply at 51-52.  In summary, these individuals told the government that they were with Tipton when he received a telephone call from Johnson.  Knight and Green told the government that during this phone conversation Johnson told Tipton that he had murdered Linwood Chiles and Curt Thorne, and injured the Greene sisters.  Tipton discovered this evidence in the course of his post-conviction investigation when his investigator interviewed Knight and

- 19 -

J.A.1163

Green. Knight's and Green's statements are attached to his reply memoranda as an Exhibit.

### (2)    Discovery Requested[8]

### Interrogatories

1.    Please identify any person with any knowledge relating to any statements concerning this case made to any person by Hussone Jones, John Knight or "Studie" Green.

2.    Please identify all agents of the government who obtained any information about Hussone Jones, John Knight or Studie Green from the date of the beginning of the Newtowne investigation to the present, and describe this information.

### Production of Documents

1.    All documents consisting of or relating to any statements concerning this case made to any person by Hussone Jones, John Knight or Studie Green.

2.    All documents in the custody, control or possession of the government that relate to or discuss Hussone Jones, John Knight or Studie Green.

### c.    Witness List

### (1)    Factual Background

The prosecution in this case clearly violated the command of 18 U.S.C. § 3432 by failing to provide petitioners with the "place of abode" of each of the witnesses against them. The only excuse ever offered by the government for its refusal to obey the statute was that it had "placed these witnesses in the witness protection program because of fear for their safety." This Court excused the government's failure to comply with the statute on this basis, holding that it was "consistent . . . with the letter and intent" of the federal Witness Protection Program.

With all due respect, this Court erred in permitting the government to refuse to comply with Section 3432. *See* Petitioner Roane's Reply Memorandum in Support of his Motion to Set

- 20 -

J.A.1164

Aside, Vacate or Correct Sentence at 1-7. But putting that error aside, there is strong reason to believe the government misled the Court with respect to its treatment of the witnesses at issue.

The statute establishing the Witness Protection Program imposes strict limits on its use. An individual may participate in the program only if it is determined that a crime of violence is "likely to be committed" with respect to the individual as a result of their testimony. 18 U.S.C. § 3521(a)(1). Each participant must also agree to undertake certain responsibilities, 18 U.S.C. § 3521 (d)(1), and must be found "suitab[le]" for participation. 18 U.S.C. § 3521(c). Of critical importance is the fact that the statute requires the Attorney General to make these determinations, and limits her authority to delegate that task to five specific Justice Department employees. 18 U.S.C. § 3521(d)(3).

Some of the witnesses for whom the defense was given no address were identified on the government's witness list as participating in the federal Witness Protection Program, but others – including critical prosecution witnesses – were simply listed as "In Protection" (Priscilla Greene, Gwendolyn Greene, Swain Ball, Gregory Scott ) or in "Protective Custody" (Jerry Gaiters, Sterling Hardy ). The statutory requirements of the Witness Protection Program were evidently not followed with regard to these latter witnesses. Instead, the line prosecutors in this case simply decided not to obey the statute, leading the Court to believe that the decision was grounded in the formal analysis and review contemplated by the Witness Protection Program, rather than simply a desire for a tactical edge in the instant case. In fact, it may well be that the *only* step the government took to "protect" these witnesses was to refuse to provide their addresses, as required by Section 3432.

---

- 21 -

J.A.1165

(2)     **Discovery Requested**

Discovery is necessary on this claim in order to allow petitioners to determine whether the prosecution misled the Court with regard to its witness list. Defendants respectfully request leave to take the following discovery:

**Interrogatories**

1.      Identify all individuals included in the Government's List of Proposed Witnesses filed in this matter on January 11, 1993 (the "Witness List") who were at any time placed in the Witness Protection Program ("WPP"). For each, state:

    a.      the reason(s) why they were placed in the WPP;

    b.      the date on which they were placed in the WPP.

2.      Identify any of the individuals listed in your response to Interrogatory 1 who were not in the WPP as of January 11, 1993.

3.      For each individual described in the Witness List as in "Protective Custody" or "In Protection," (*i.e.*, Priscilla Greene, Jerry Gaiters, Sterling Hardy, Gwendolyn Greene, Swain Ball Gregory Scott), identify:

    a.      the reason(s) why they were placed in "Protective Custody" or "In Protection;"

    b.      the dates on which they were in "Protective Custody" or "In Protection;" and

    c.      describe any and all the measures taken to safeguard each of these individuals while in "Protective Custody" or "In Protection."

4.      Identify all individuals included in the government's witness list that at any time were denied placement in the WPP. For each, state (a) the reason(s) why they were denied placement and (b) the date on which they were denied placement.

**Document Requests**

1.      Documents sufficient to show that each individual listed in the Witness List as participating in the WPP was, in fact, a participant in the WPP as of January 11, 1993.

2.      Any and all documents related to the decision to place Priscilla Greene, Jerry Gaiters, Sterling Hardy, Gwendolyn Greene, Swain Ball Gregory Scott in "Protective Custody" or "In Protection."

- 22 -

J.A.1166

3.      Any and all documents related to the measures taken to safeguard Priscilla Greene, Jerry Gaiters, Sterling Hardy, Gwendolyn Greene, Swain Ball Gregory Scott while in "Protective Custody" or "In Protection."

4.      Any and all documents related to decisions refusing placement of potential witnesses in the WPP.

### Depositions

At the present time, petitioners propose to depose the following individuals in connection with this claim:

> Priscilla Greene
> Jerry Gaiters
> Sterling Hardy
> Gwendolyn Greene
> Swain Ball
> Gregory Scott
> Howard C. Vick, Jr.
> William H. Parcell, III

### d.      Violations of 18 U.S.C. § 201(C)(2)

#### (1)      Factual Background

Section 201(c)(2) of Title 18 of the United States Code punishes whoever:

> [D]irectly or indirectly, gives, offers or promises anything of value to any person, for or because of the testimony under oath or affirmation given or to be given by such person as a witness upon a trial, hearing or other proceeding, before any court . . . .

Petitioners' convictions and death sentences rest squarely upon testimony purchased by the prosecution in violation of this statute, and must therefore be set aside. *United States v. Singleton*, (10th Cir.), 144 F.3d 1343, *vacated*, 144 F.3d 1361 (10th Cir.), *decision of District Court affirmed*, No. 97-3178 (10th Cir. Jan. 8, 1999); *United States v. Fraguela*, Cr. No. 96-0339 1998 U.S. Dist. LEXIS 14347(E.D. La. Aug. 27, 1998), *vacated on procedural grounds*, 1998 U.S. Dist. LEXIS 22060 (E.D. La. Oct. 6, 1998); *United States v. Lowery*, 15 F. Supp.2d 1348

- 23 -

**J.A.1167**

(S.D. Fla. 1998); *rev'd*, 166 F.3d 1119 (11th Cir. 1999); *but see United States v. Reid*, 19 F. Supp. 2d 534 (E.D. Va. 1998).

Nearly every fact witness against petitioners received a "thing of value" from the government in exchange for his or her testimony. We know from their testimony that some witnesses were immunized, some were placed in the Witness Protection Program, and some received governmental assistance in obtaining reduced sentences. The following are merely examples of the tainted testimony.

The statute pursuant to which petitioners were sentenced to death, 21 U.S.C. § 848(e)(1), requires a finding that they committed a murder while "engaging in or working in furtherance of a continuing criminal enterprise." The government's claim that petitioners engaged in such a highly-organized "continuing criminal enterprise" turned largely upon the testimony of Greg Scott, concerning events occurring in New York and New Jersey. At the trial's outset, the government told the jury that its CCE case would be proved by evidence of those events. For example, in his opening statement, Mr. Vick promised that Scott would testify that the "New York Boyz":

> [S]at around in New Jersey, in Trenton, and had meetings and
> discussed what physical acts of retaliation they should take against
> people who had wronged them and decided whether it would hurt
> business to hit this person or whether it would not hurt business.

Tr. 789-90. In closing, the government made explicit its theory that "the New York Boyz continued their actions here in the City of Richmond." Tr. 2962. To prove the required element of supervision, the government turned to Greg Scott's testimony, asking the jury to superimpose the New York/New Jersey organization on the Richmond events. Tr. 2983. Prosecutors also turned to Scott's testimony to connect Torrick Brown's murder to racketeering, arguing that

- 24 -

other "New York Boyz" joined James Roane in a domestic killing in order to maintain their position in the CCE:

> Remind yourself again of the testimony of Greg Scott. Remember what he told you about the New York Boyz? . . . [W]hen they got together for protection, each and every member of the New York Boyz had to go in on a crime of violence or they were no longer a member of the New York Boyz.

Tr. 3004; see also Tr. 3005, 3007.

In addition, the *only* evidence supporting the claim that Douglas Moody was killed in furtherance of the CCE was "Pepsi" Greene's bald assertion – unsupported by any facts – that the killing was drug-related. Tr. 2553. In closing, the government buttressed that testimony with Scott's:

> Remember, Doug Moody worked for Peyton Maurice Johnson. They didn't want anyone else operating in their territory, *consistent with the testimony of Greg Scott.*

Tr. 2995 (emphasis added). In the penalty phase, there was no evidence that James Roane had ever expressed an intention to kill Moody prior to the murder. In fact, Denise Berkley testified for the government that she heard that *Moody* instigated the confrontation, and that Moody had been purchasing drugs from Corey Johnson. Tr. 1700-02. In order to bolster its case that Moody was murdered after "substantial planning and premeditation" – an aggravating factor necessary to the death penalty – the government again turned to Scott:

> Remind yourself of that credo following them down here from New York, from New Jersey, with the New York Boyz, where they clearly intended to take over blocks in New Jersey. They brought that mind set, that modus operandi, that way of operating, to Richmond. And indeed, they implemented it in the most violent fashion that they could. They laid waste the bodies that they promised they would lay waste in order to take over. Clear premeditation.

Tr. 3886-87. ). Thus, Roane's death sentence in particular hinges on Scott's testimony.

J.A.1169

That testimony was bought and paid for by the government. Scott himself testified that the government agreed to seek a sentencing departure in exchange for his testimony. Tr. 897-98. Petitioners seek discovery with regard to any other benefits provided to Scott in return for testimony favorable to the government's case.

Sterling Hardy also provided critical, inflammatory testimony, including testimony that James Roane shot Louis Johnson, Tr. 2171, because he "didn't like the guy." Tr. 2174. He also testified that after Martha McCoy and Torrick Brown were shot, and Anthony Mack said that Martha McCoy had not been killed, James Roane assured him that "'[t]he bitch is dead' because he knows he can shoot." Tr. 2184. Hardy also testified to supposed jailhouse conversations in which the killing of witnesses was discussed. Tr. 2191. These allegations regarding Martha McCoy and "the fact that from jail, while incarcerated, these defendants continued to try to have people killed" became a centerpiece of the government's argument for the death penalty. Tr. 3892. Hardy testified that he "anticipate[d]" a reduction in sentence in return for his testimony, Tr. 2228, and petitioners seek discovery with regard to any other inducements provided Hardy by the government.

Jerry Gaiters' testimony was similarly damning. Gaiters provided critical evidence regarding the necessary "supervision" element of the CCE allegations. Tr. 2324. He also tied Roane to the murders of Louis Johnson, Tr. 2334, and Peyton Maurice Johnson. Tr. 2328. Finally, Gaiters testified that Roane told him that Roane, Tipton and Johnson were "planning on taking over" the Newtowne area. Tr. 2330. Like Scott's and Hardy's, Gaiters' testimony was purchased by the government -- Gaiters admitted that he testified in exchange for a downward departure. Tr. 2192.

- 26 -

This kind of bartering for favorable testimony is illegal. Section 201(c)(2), by its terms, expressly forbids it. By its use of the unmodified term "[w]hoever," the statute's broad language clearly applies to the actions of prosecutors, and this Court is "bound to take Congress at its word." *Oubre v. Entergy Operations, Inc.*, 522 U.S. 422, 427 (1998). As the Supreme Court has stated:

> [I]t is not, and cannot be, our practice to restrict the unqualified language of a statute to the particular evil that Congress was trying to remedy – even assuming that it is possible to identify that evil from something other than the text of the statute itself. . . . Courts may not create their own limitations on legislation, no matter how alluring the policy arguments for doing so.

*Brogan v. United States,* 522 U.S. 398, 403, 408 (1998).

Section 201(c)(2) "could not be more clear." *Singleton, supra,* 144 F.3d at 1345. Moreover, the statute is to be broadly construed to further its purpose of deterring corruption. *United States v. Hernandez,* 731 F.2d 1147, 1149 (5th Cir. 1984); *United States v. Evans,* 572 F.2d 455, 480 (5th Cir. 1978).

Section 201(c)(2) operates "to prevent fraud upon the federal courts in the form of inherently unreliable testimony." *Singleton, supra,* 144 F.3d at 1346. To do so, the statute must govern not only the actions of the defendant, but also those of the prosecution. The statute "indicates Congress's belief that justice is undermined by giving, offering, or promising anything of value for testimony. If justice is perverted when a criminal defendant seeks to buy testimony from a witness, it is no less perverted when the government does so." *Id.*

There can be no serious dispute that leniency is a "thing of value." Again, the statutory term "anything of value" is unmodified, and "has consistently been given a broad meaning" to carry out the status' purpose. *United States v. Williams,* 705 F.2d 603, 622-23 (2d Cir. 1983). Courts have consistently rejected arguments that the term "anything of value" is limited to

- 27 -

**J.A.1171**

tangible things of monetary value. *United States v. Marmolejo*, 89 F.3d 1185, 1191 (5th Cir. 1996); *Williams*, 705 F.2d at 622-23. In fact, "[i]t is difficult to imagine a greater motivation to lie than the inducement of a reduced sentence." *United States v. Cervantes-Pacheco*, 826 F.2d 310, 315 (5th Cir. 1987); *see also United States v. Meinster*, 619 F.2d 1041, 1045 (4th Cir. 1980) ("[w]e think it obvious that promises of immunity or leniency premised on cooperation in a particular case may provide a strong inducement to falsify in that case").

### (2)    Discovery Requested

For the foregoing reasons, petitioners seek discovery with regard to any inducements the government promised or provided to witnesses in this case in exchange for their testimony, and any effects those inducements had on the testimony. This discovery includes:

### Interrogatories

1.      Identify each and every "thing of value" provided by the government to any trial witness in this case in exchange for, or because of, any testimony given in this case, including, without limitation, immunity, recommendations with regard to sentencing, and any financial or other material incentives.

### Document Requests

1.      All documents consisting of or relating to any statements made by any witness in this case to (1) any agent of the United States government, (2) the prosecution in this case, (3) any agent of the Commonwealth of Virginia, or (4) any individual interviewed by any agent of the United States government, or by the prosecution in this case, or who otherwise provided the United States or the prosecution in this case with information concerning any statement made by any witness in this case.

2.      All documents relating to any statements made by (1) the prosecution in this case; (2) any agent of the United States government, or (3) any agent of the Commonwealth of Virginia, to any witness in this case concerning any benefit that might be obtained by any witness testifying in this case.

J.A.1172

## Depositions

Petitioners seek leave to depose the following individuals in connection with this claim:

Denise Berkeley
Anita Bracey
Antwoine Brooks
Johnny Lee Byrd
Robert Davis
Jerry Gaiters
Gwendolyn Greene
Priscilla Greene
Sterling Hardy
Ronita Hollman
Anthony Howlen
Hussone Jones
Martha McCoy
Montez McCoy
Dennis Moody
Charlotte Moore
Greg Noble
William H. Parcell, III
Jeannette Pauley
Maurice Saunders
Gregory Scott
Leroy Slater
Stanley Smithers
Charles Townes
Pamela Williams
Howard C. Vick, Jr.

**3.     Impermissible Discrimination by Prosecutors in Jury Selection**

Petitioners have alleged a *prima facie* case of improper discrimination against women in the prosecution's exercise of peremptory strikes. *See* Petitioner Roane's Reply Memorandum in Support of his Motion to Set Aside, Vacate or Correct Sentence at 9-13. Assuming the government is able to offer non-discriminatory reasons for its strikes, petitioners will be required to demonstrate that those proffered reasons are pretextual. *United States v. Lewis*, 117 F.3d 980, 983 (7th Cir.), *cert denied*, 118 S. Ct. 642 (1997). To do so, petitioners respectfully seek leave to conduct discovery concerning the government's use of peremptory strikes. The evidence

- 29 -

J.A.1173

relating to this claim is uniquely in the government's possession and control, and denial of

discovery would an abuse of discretion. *See Toney v. Gammon*, 79 F.3d 693, 700 (8th Cir.

1996)(reversing district court's denial of discovery pursuant to Rule 6 where physical evidence

was in possession of state); *East v. Scott*, 55 F.3d 996, 1001-02 (5th Cir. 1995) (reversing district

court's denial of discovery pursuant to Rule 6 where district attorney and his staff were pertinent

witnesses and petitioner had not obtained access to witnesses or their files). Petitioners

respectfully request leave to take the following discovery:

## Interrogatories

1.      Identify each and every individual involved in or consulted with regard to the
government's exercise of peremptory challenges in this case including, without limitation,
attorneys, paralegals, and jury consultants.

2.      Identify the reason(s) for the government's exercise of peremptory strikes to exclude
from the petit jury in this case each woman struck by the government.

## Document Requests

1.      Any and all documents, including, without limitation, notes, memos, and correspondence,
concerning the government's exercise of peremptory strikes in this case.

2.      Any and all documents, including, without limitation, notes, memos, manuals, policies
and correspondence, prepared or circulated between 1984 and 1993 by the United States
Attorney's Office for the Eastern District of Virginia, or prepared by the United States
Department of Justice and circulated to the United States Attorney's Office for the Eastern
District of Virginia concerning the use of peremptory strikes against women.

3.      Any and all documents prepared for or provided to the United States Attorney's Office
for the Eastern District of Virginia by any other person or entity between 1984 and 1993
concerning the performance of women on criminal juries.

## Depositions

Howard C. Vick, Jr.
William H. Parcell, III

- 30 -

J.A.1174

4.    **The Jury**

On June 10, 1998, this Court denied petitioners' motion for leave to interview the trial jurors.  For the reasons stated in that motion, petitioners respectfully request that the Court reconsider its order, and allow the Juror Questionnaire attached as Exhibit C hereto to be provided to each juror in this case, with instructions that each juror complete the questionnaire and return it to the Court for distribution to the parties.

Petitioners also note that in addition to their claim of jury taint, discovery regarding the jury also affects their claims of ineffective assistance.  On direct appeal, the Fourth Circuit rejected petitioners' claim that their convictions and sentences must be reversed because they were denied their right to be present during voir dire.  *United States v. Tipton*, 90 F.3d 861, 873-74 (1996), *cert. denied*, 520 U.S. 1253 (1997).  The Fourth Circuit held that petitioners' failure to object at trial required that this claim be reviewed under the plain error standard of *United States v. Olano*, 507 U.S. 725 (1993), which required petitioners to  show "actual prejudice," for example, that, had they been present, petitioners would have insisted on striking jurors who were "demonstrably biased."  *Tipton, supra*, 90 F.3d at 876.

Petitioners now claim that their trial counsel provided ineffective assistance by allowing them to be excluded from voir dire.  The showing of prejudice required for a claim of ineffective assistance differs from *Olano*'s, requiring only "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *E.g., Pruett v. Thompson*, 771 F. Supp. 1428, 1445 (E.D. Va. 1991), *aff'd*, 996 F.2d 1560 (4th Cir. 1993).  However, a showing that a "demonstrably biased" juror was seated as a result of trial counsel's failure to protect petitioners' right to presence would clearly establish a "reasonable probability" that, but for trial counsel's error, the juror would have been struck and the result of the

- 31 -

J.A.1175

proceeding would have been different. Petitioners therefore respectfully request leave to take the depositions (subject to any limits the Court may deem necessary) of those jurors whom petitioners would have struck had they been present for voir dire, including Frances Hodson, Bonita Faircloth and Jerome Harrison.

**5.     Johnson's Execution Is Barred Due To Mental Impairments**

In the second amendment to his petition, Johnson argued that his execution was barred under 18 U.S.C. § 3596(c) and 21 U.S.C. § 848(1), which prohibit the execution of a mentally retarded defendant. As set forth in that amendment, in his original petition, and at the sentencing phase of his trial, Johnson has severe, well documented, and long standing mental deficiencies. However, the guidelines for the application of the relevant statutes have not been interpreted by the courts.

Discovery is necessary on this claim so Johnson may determine what guidelines the Department of Justice has employed when deciding whether to pursue or carry out a capital sentence against a defendant, including the petitioners in this case.

### Document Requests

1.     All Department of Justice guidelines and policy statements concerning the interpretation and application of 18 U.S.C. §3596(c) and 21 U.S.C. §848(1).

2.     All reports and memoranda concerning the application of 18 U.S. C. sec. 3596(c) and 21 U.S.C. §848(1) to all defendants, including the petitioners, indicted in this case.

3.     All cases where the Department of Justice declined to seek or carry out the death penalty in light of 18 U.S.C. §3596(c) and 21 U.S.C. §848(1).

4.     Any documents showing the government's knowledge of Johnson's mental impairments.

**6.     Tipton Received Ineffective Assistance of Counsel**

Tipton's trial and appellate counsel failed to provide effective assistance of counsel to the government's charge that Tipton murdered Douglas Talley. Tipton's

- 32 -

J.A.1176

allegations are set forth in detail in his opening and reply memoranda. Tipton Mem. at 122-26, 136-37; Tipton Reply at 99-102, 107. In summary, counsel was ineffective because, first, they failed to argue that Dr. Fierro's testimony conflicted with Hussone Jones' testimony. Dr. Fierro stated that it was unlikely that a right-handed person inflicted the stab wounds that killed Talley. Tipton is right-handed and Jones testified that Tipton stabbed Talley. Second, counsel failed to locate "Wildman"—who was found, with little difficulty, by habeas counsel--to challenge the government's evidence and the testimony of Jones about the alleged events immediately following the Talley murder. Third, counsel failed to test a knife found at the murder scene in Talley's car inside Johnny Lee Byrd's jacket pocket to see if it was the murder weapon. The government in its reply to this ineffective assistance of counsel claim chides habeas counsel for failing to subject the knife to forensic testing. This is the reason discovery is required: Without this court's order providing for discovery, habeas counsel does not have access to the knife to subject it to testing. For this claim Tipton requires the following discovery:

- 33 -

## Production of Documents and Things

1.      Any and all documents concerning of or relating to the knife discovered in Johnny Lee Byrd's jacket pocket, which jacket the government discovered by in Talley's car.

2.      Produce the knife itself so that habeas counsel may subject it to independent forensic testing.

Respectfully submitted,

RICHARD TIPTON, III

By:     _____
        Donald R. Lee, Jr., VSB #25235
        Frederick R. Gerson, VSB #39968
        Macaulay Lee & Powell, P.C.
        1015 E. Main St., 4th Floor
        Richmond, VA 23219
        (804) 649-4009

        *Counsel for Richard Tipton, III*

COREY JOHNSON

By:     _____
        Barbara L. Hartung, VSB # 38062
        1001 E. Main St., #504
        Richmond, VA 23219
        (804) 649-1088

        Edward E. Scher, VSB #23064
        Thorsen Marchant & Scher, L.L.P.
        316 West Broad Street
        Richmond, VA 23220
        (804) 644-0711

        *Counsel for Corey Johnson*

- 34 -

J.A.1178

JAMES H. ROANE, Jr.

By: _____

Scott L. Nelson
Paul F. Enzinna
Michael J. Barta (VSB # 30706)
MILLER, CASSIDY, LARROCA
    & LEWIN, L.L.P.
2555 M Street, N.W.
Washington, D.C. 20037
(202) 293-6400

DATED: 6/24, 1999      *Counsel for James H. Roane, Jr.*

- 35 -

J.A.1179

## EXHIBIT A

### INSTRUCTIONS AND DEFINITIONS

1.      "Government" is intended to mean the United States, as it is the real party in interest, but shall also include all departments, offices, officers, employees, and other representatives of the United States, including but not limited to, the United States Attorney's Office for the Eastern District of Virginia, the Federal Bureau of Investigation, the Department of the Treasury's Division of Alcohol, Tobacco and Firearms, as well as the Virginia State Police, Richmond Police Department, the Chesterfield County Police Department, the Henrico County Police Department, the Office of the Commonwealth Attorney for the City of Richmond, the Office of the Commonwealth Attorney for Henrico County, the Office of the Commonwealth Attorney for Chesterfield County, the Office of the Chief Medical Examiner, the Virginia Division of Forensic Science.

2.      The name "John Matthews" or "Matthews", unless otherwise specified, includes his aliases, "Light" and "Rufus Alvarez." Use of any alias for Matthews also includes his real name and any other of his other alias.

3.      The name "Jorge Delao" or "Delao", unless otherwise specified, includes his aliases, "James Wilkerson" and "Hess." Use of any alias for Delao also includes his real name and any other of his other alias.

4.      The name "Thomas Green" or "Green", unless otherwise specified, includes his alias, "Studie." Use of Green's alias also includes his real name.

5.      "Identify" shall mean

   a.     with respect to a natural person:

          (1)     to state his or her full name;

          (2)     to state his or her home telephone number and home address with sufficient specificity to permit service of process thereon;

          (3)     to state his or her business telephone number and business address with sufficient specificity to permit service of process thereon; and

          (4)     to state his or her present or last known position, job title, and job description;

   b.     with respect to a company, corporation, association, partnership, joint venture, other business, government entity, or any legal entity other than a natural person:

- 36 -

**J.A.1180**

(1)   to state the full name and type of organization or entity;

(2)   to state such entity's president, general partners, owners, or officers;

(3)   to state such entity's business address; and

(4)   to identify the individual(s) at the entity with whom you or representatives of the respondent have had contact or communication.

c.   with respect to a document, as defined *infra*:

(1)   to state the date of origin, type of document, and the document's title;

(2)   to state the document's present location and custodian;

(3)   to state the persons to whom the document has been sent; and

(4)   to otherwise describe the document with sufficient specificity to form the basis for a request for production of documents.

6.   As used herein, the term "person" means, unless otherwise specified, the plural as well as the singular, and includes any natural person, corporation, joint venture, partnership, proprietorship, association, organization or group of natural persons, and every other form of entity cognizable at law.

7.   "You" or "Your" refers to the respondent.

8.   The term "document" or "documents" has the same definition as that set forth in the Federal Rules of Civil Procedure and shall mean and include without limitation any and all:

a.   correspondence, memoranda, records, reports, notes, drafts, work papers, minutes of meetings, books, papers, computations, tabulations, schedules, summaries, contracts, agreements, lists, preproposals, proposals, diagrams, invoices, receipts, reports, accounting books, ledgers, journals, purchase orders, invoices, vouchers, drawings, schedules, telegrams, books of account, catalogues, checks, check stubs, audio recordings or written memoranda of conversations or interrogations, diaries, appointment books, calendars, drawings, blueprints, photostats, motion pictures, slides, photographs, sketches, charts, graphs, instructions and other similar objects; written statements by witnesses or other persons having knowledge of the pertinent facts; any other written or printed matter or tangible thing on which any words, or phrases are affixed, such

- 37 -

**J.A.1181**

as computer tapes or diskettes, magnetic tapes, punch cards, computer printouts, microfilms, video tapes, and all other records and data compilations kept by electronic, photographic, or mechanical means; and any things similar to any of the foregoing however denominated by you, whether a draft or final version, and whether or not such documents were intended to be internal, interoffice or intra-office and whether or not such documents are claimed to be privileged against discovery on any grounds.

    b.    Copies of such documents upon which appear any initialing, notation, handwriting, or revision of any kind not appearing on the original;

    c.    All such documents, whether prepared by you, your agents, representatives, attorneys, or employees, for their own use or for transmittal in any manner;

    d.    Documents wherever located, whether in the files of any agent, attorney, representative, or employee of the respondent, or in any file whatsoever in the possession, direction, custody, or control of the respondent.

9.    The term "relate(s)" or "related to" shall be defined to mean discuss, describe, refer to, reflect, substantiate, evidence, or be in any way logically or factually connected with the matter discussed.

10.    If you cannot provide an exact answer to an interrogatory, please provide your best estimate of the information requested. If you cannot provide an estimate, please identify the person or entity that can provide said information.

11.    If you object to any interrogatory or request and/or withhold information or documents under any claim of privilege please do the following:

    a.    If you provide an answer subject to or "without waiving" your objection or claim or privilege, state whether you are

        (1)    providing all responsive documents or information anyway, or

        (2)    withholding documents or information.

    b.    If you withhold any documents covered by a request, identify each document for which the privilege is claimed, together with the following information, where appropriate, with respect to each such document; date, author, recipient, persons to whom copies were furnished, basis on which the privilege is claimed, the paragraph or subparagraph of this request to which each document responds, and sufficient description of the subject matter of the document (without disclosing its contents) to allow its description to the court for a ruling on the claim of privilege.

- 38 -

J.A.1182

12.    For each requested document that is no longer in existence or which cannot be located, identify the document, state when and how it passed out of existence or why it can no longer be located and the reasons therefor, and identify each person having knowledge concerning such document and what has happened to it.

13.    The interrogatories and requests set forth herein are continuing in nature and you are to provide supplementary responses upon receipt of any information or documents by you or your counsel that would permit you to respond to requests not answered or to alter or to add to responses already answered. Supplementary responses are to be provided as soon as they become known to you or your counsel and in all events before any evidentiary proceeding that may be ordered by the Court.

J.A.1183

E X H I B I T   B

BARBARA L. HARTUNG
ATTORNEY AT LAW

1001 EAST MAIN STREET
SUITE ~~no~~ 504
RICHMOND, VIRGINIA 23219
(804) 649-1088

May 12, 1999

Robert J. Erickson, Deputy Chief
Criminal Division, Appellate Section
U.S. Department of Justice
Room 6102, Patrick Henry Building
601 D Street, N.W.
Washington, D. C  20530

RE: <u>Cory Johnson v. Samuel Pruett</u>
Civil No. 3:97 CV 895 (E.D. Va., Richmond)

Dear Mr. Erickson:

As you know, I have been assigned along with Edward
Scher, Esq. by the district court to represent Cory Johnson in
federal habeas.  Mr. Johnson was convicted of seven capital
murders charged under 21 U.S.C. section 848(e), engaging in a
continuing criminal enterprise under 21 U.S.C. sec. 848(a), and
related offenses and sentenced to death in June, 1992, after a
jury trial in Richmond before the Hon. James R. Spencer.  The
convictions and sentence were affirmed on appeal, <u>United States
v. Tipton</u>, 90 F.3d 861 (4th Cir. 1996), and his petition for
certiorari was denied.

I write to request any materials favorable to Mr.
Johnson relevant to either guilt or punishment that have not been
disclosed thus far.  The attorneys who prosecuted this case,
Howard C. Vick and William H. Parcell, III, are no longer with
the U.S. Attorney's Office.  Hence, this letter is sent to your
attention for distribution to the appropriate party.

The United States Supreme Court in <u>Kyles v. Whitley</u>,
115 S. Ct. 1555 (1995), a capital case, stated no new law but
rather reaffirmed the prosecutorial obligations of disclosure set
forth in a series of cases: <u>Brady v. Maryland</u>, 373 U.S. 83
(1963), <u>United States v. Agurs</u>, 427 U.S. 97 (1976), and <u>United
States v. Bagley</u>, 473 U.S. 667 (1985).  The basic <u>Brady</u> princi-
ples include the following.  1)  There is no distinction between
exculpatory and impeachment evidence for <u>Brady</u> purposes.  2)  The
duty of disclosure exists irrespective of any request by the
defendant.  3)  All favorable evidence relative to guilt or
punishment is material, and error occurs "if there is a reason-
able probability" that with disclosure to the defense the result
would have been different.  In <u>Kyles</u> the Court explicitly stated
that proof of materiality does <u>not</u> require proof by a preponder-
ance of the evidence that disclosure would result in <u>acquittal</u>.
Nor does it require the defendant to demonstrate that the evi-
dence would be insufficient to convict once the inculpatory
evidence affected by the nondisclosure is removed from the case,
i.e., materiality is not determined by a sufficiency of the

evidence test.  Moreover, materiality is to be judged by viewing all nondisclosed evidence collectively rather than item by item.

While reaffirming these basic principles, the Kyles court also emphasized the obligations imposed on prosecutors to weigh the net effect of all nondisclosed evidence, to learn of favorable evidence known to government agents (including police), and to make disclosure "when the point of 'reasonable probability is reached.'"  A prosecutor cannot avoid learning about evidence which may affect confidence in the outcome of the trial or the punishment.

Moreover, a prosecutor has a continuing duty of disclosure.  See Imbler v. Pachtman, 424 U.S. 423, 427 n. 25 (1976) (prosecutor's obligation to disclose all significant evidence suggestive of innocence or mitigation continues after conviction); Mooney v. Holohan, 294 U.S. 103, 108 (1935).  The government's obligation to produce exculpatory and impeachment material does not end with the trial.  See also Thomas v. Goldsmith, 979 F.2d 746, 749-50 (9th Cir. 1992)(Brady obligation continues throughout federal habeas proceedings).

The Rules of the Supreme Court of Virginia address these same concerns.  DR 8-102(4) specifically requires the prosecutor or other government lawyer to "make timely disclosure . . . of the existence of evidence . . . that tends to negate the guilt of the accused, mitigate the degree of the offense, or reduce the punishment."  The Rules in EC 8-10 address the responsibilities of the prosecutor and include the following:  "The prosecutor should make timely disclosure to the defense of all information required by law.  Further, a prosecutor should not intentionally avoid pursuit of evidence merely because he believes it will damage the prosecution's case or aid the accused."

Against this background, I am now requesting that you inspect and review all materials and evidence in the possession, custody or control of the government or its agents and disclose all previously nondisclosed and/or newly discovered materials and evidence known to the government or its agents pursuant to the principles of Kyles/Brady that are material to the issues of Mr. Johnson's guilt or sentence. These materials may include, but are not limited to, the following:

1.  All reports of physical or mental examinations, scientific tests, or experiments conducted in connection with the investigation of the offense, including but not limited to:

a)  All fingerprint and palmprint exemplars, fingerprint samples, comparisons and opinions of fingerprint experts, and all documents relating to those opinions;
b)  All psychological tests or polygraph examinations performed upon any prosecution witness and all documents

2

**J.A.1186**

referring or relating to such tests;

c) All ballistic tests and/or examinations conducted on any weapon or ammunition or portion thereof connected to the offense.

2. Any and all records and information revealing prior criminal convictions or guilty verdicts or juvenile adjudications, including but not limited to the "rap sheet" of each prosecution witness through the current date.

3. Any and all records and information revealing prior or subsequent misconduct, criminal acts, or bad acts of each prosecution witness, including without limitation allegations of criminal conduct of which the prosecution knows or through reasonable diligence should have reason to know.

4. Any and all considerations or offers of consideration given during the course of the investigation and trial of this case by any law enforcement officials, including prosecutors or agents, police, or informers, to or on behalf of any witness the prosecutor called at trial, or any such consideration or promises expected or hoped for by any such witness at any future time. Such consideration refers to anything which arguably could be of value or use to a witness, including, but not limited to formal or informal, direct or indirect, promises of immunity, leniency, favorable treatment, or recommendations or other assistance with respect to any pending or potential criminal, parole, probation, pardon, clemency, civil, administrative or other matter involving state or federal government, any other authority or other parties; payments of money, rewards or fees, witness's fees, and special witness's fees; provisions of food, clothing, transportation, legal services, or other benefits; placement in a special protection program, informer status of the witness, and letters to anyone informing the recipient of the witness's cooperation; recommendations concerning employment; and anything else which arguably could reveal an interest, motive, or bias in the witness in favor of the prosecution or against Johnson or act as an inducement to testify or to color the witness's testimony.

5. Any and all statements - formal and informal, oral or written - by the prosecution, its agents and representatives to any person (including counsel for such person) whom the prosecution called as a witness at trial pertaining in any way to the possibility, likelihood, course, or outcome of any government action - state or federal, criminal or civil - against the witness or anyone related by blood or marriage to the witness.

6. All proffers made by a witness in the course of

3

negotiating a cooperation agreement.

7.  Any and all threats, express or implied, direct or indirect, or other coercion directed against any witness the prosecutor called at trial; criminal prosecutions, investigations, or potential prosecutions pending or which could be brought against such witnesses, any probationary, parole, deferred prosecution, or custodial status of any such witness; and any other pending or potential legal disputes or transactions involving any such witness and the state or federal government, or over which the state or federal government had real, apparent or perceived influence.

8.  A list of any and all requests, demands, or complaints made to the prosecution by any witness which arguably could have been developed on cross-examination to demonstrate any hope or expectation on the part of the witness for favorable government action in his behalf (regardless of whether or not the government had agreed to provide any favorable action).

9.  Any material not otherwise listed which reflects or evidences the motivation of the witness either to cooperate with the prosecution or any bias or hostility against Johnson.

10.  A copy of all medical and psychiatric reports known to the government concerning any witness the prosecutor called at trial which arguably address the witness's credibility, ability to perceive, or to relate or recall events.

11.  The existence and identification of each occasion on which a witness has testified before any court, grand jury, or other tribunal or body, or otherwise officially narrated in relation to Johnson, his co-defendants, the investigation, or the facts of this case.

12.  Identification of all judicial proceedings in any criminal cases involving (as a witness, unindicted co-conspirator, aider or abettor, or defendant) any person who was a prosecution witness at the trial in this action;

13.  The existence and identification of each occasion on which a witness who is or was an informer, accomplice, or co-conspirator, has testified before any court, grand jury, or other tribunal or body;

14.  A full and complete statement of any and all criminal conduct of which the government has knowledge that has been committed by any witness the government called in its case-in-chief at trial or pre-trial hearing regarding

4

J.A.1188

which there has been no conviction, whether or not these crimes were or are presently the subject of a promise, reward, or inducement, and whether or not these crimes are presently the subject of a pending criminal charge;

15.    A statement whether or not the government requested or authorized the payment of any sums of money to any informant or cooperating witness who agreed to testify for the government, who participated in the investigation which generated the indictment and charges of conviction, or to any other propective witness;

16.    Any logs, records, or other documents relating to the payment of any sums of money to any individual set forth in the preceding paragraph and the source of such payment;

17.    Any written or oral statement, whether or not reduced to writing, made by any prosecution witness which in any way contradicted or was inconsistent with or different from other oral or written statements made by that witness, or in which that witness admits poor memory, and any such statements made by any person, whether a witness or not, which in any way contradicted, was inconsistent with, or different from any statements made by a prosecution witness.

18.    A statement as to whether any prosecution witness, including any informant, made any misleading statements, misrepresentations by omission, or provided any other information during the course of the investigation or trial which proved to be false.  If any such statements or omissions were made, or any false information provided, identify that false statement, omission or false information.

19.    The names and addresses of all persons whom the prosecution, its agents and representatives believed at any time during the investigation of this matter had relevant knowledge and/or information with reference to the offense of conviction but whom the prosecution did not call as witnesses at trial.

20.    Any requests prepared by the government for permission to grant immunity or leniency for any witness, whether or not such request was granted;

21.    Copies of any and all records of law enforcement agencies reflecting intradepartmental disciplinary action taken against any law enforcement official who testified in this trial or participated in the investigation.

For your convenience, a list of the individuals who testified for the government in either the guilt or sentencing

5

J.A.1189

phases of the trial is attached.

I explicitly request that all files, records, evidence, and any materials related to this case be preserved whether those materials are now in your possession or in the possession of your agents.

I am authorized to represent that Mr. Johnson's co-defendants, Richard Tipton and James H. Roane, Jr., join in these requests on behalf of their clients.

Very truly yours,

Barbara L. Hartung
1001 E. Main Street, #504
Richmond, VA  23219
(804) 649-1088

Edward E. Scher
Thorsen, Marchant & Scher, LLP
316 W. Broad Street
Richmond, VA  23220-4219

Attorneys for Mr. Johnson

cc:    Donald R. Lee, Jr.
       Macaulay, Lee & Powell, LC
       1015 East Main Street
       Richmond, VA  23219
       Attorney for Richard Tipton

       Paul F. Enzinna, Esq.
       Miller, Cassidy, Larroca & Lewin, LLP
       2555 M Street, N.W.
       Washington, D.C.  20037-1302
       Attorney for James H. Roane, Jr.

6

**J.A.1190**

UNITED STATES v. CORY JOHNSON, ET AL.
Crim. No. 3:92CR68

Prosecution Witnesses

Gregg T. Scott
Dennis P. Malone
Anthony Howlen
Richard E. Bice
James E. McMillian, Jr.

William Thomas
Antwoine Brooks
R.T. Fleming
Charles Townes
Jeanne Keim

Maurice Saunders
Jeanette Pauley
A. D. Merz
Fred Bolling
Johnny L. Byrd

Sherry L. Gay
Wayne Hines
Richard Farmer
George Wynn
Rebecca Talley

Hussone C. Jones
Denise R. Berkley
Rodney Rodriquez
Ralph Fleming
John Dorman

Paul Tuttle
Pamela D. Williams
Robert Davis
Ronita Hollman
David Burt

Thomas Searles
Anne D. Jones
Dennis K. Moody
Stanley Smithers
Mary Johnson

William C. Brereton
Gary Brunelli
Sterling R. Hardy
Martha J. McCoy
Montez Z. McCoy

**J.A.1191**

Jerry Gaithers, Jr.
C.T. Woody, Jr.
Marcella F. Fierro
James Keefer
Charlotte D. Moore

Santo Gutierres
Cynthia Riley
Walter Tuck
Gwendolyn Greene
Nellie Pulley

Carolyn Chiles
David S. Tweedie
Greg Noble
Leroy Slater
Valerie Butler

Thomas P. Leonard
Douglas W. Cunningham
Paris L. Robinson
Willie Seward

### E X H I B I T   C

<u>JURY QUESTIONNAIRE</u>

1.  During the course of the trial (including jury deliberations), did any person who was not connected with the trial speak to you about the trial or attempt to question you about the trial?  If yes, give the person's name, approximate date of the contact, and substance of the conversation.

2.  During the course of the trial (including jury deliberations), did any person who was connected with the trial (for example, a court officer, witness, attorney, or court clerk) speak to you about the trial or attempt to question you about the trial?  If yes, give the person's name, approximate date of the contact, and substance of the conversation.

3.  During the course of the trial (but prior to deliberations), did any fellow juror discuss the trial or testimony with you or make comments about the substance of the trial or testimony?

4.  During the trial and jury deliberations (both guilt phase or sentence phase), did any fellow juror mention or discuss news coverage of the trial (including TV and press coverage)?  If so, give the juror's name and substance of the conversation.

5.  During the course of the trial and deliberations, did you or any other juror visit any of the locations discussed by the witnesses during their testimony?  If so, describe the circumstances, approximate date of visit, and name of juror.

6.  During the course of the trial and deliberations, did any juror reveal information about one or more of the defendants or about the crimes charged?  If so, give the juror's name and give the substance of the conversation.

7.  During the trial and deliberations, did any juror state that he knew one or more of the witnesses who testified or any of attorneys involved in the trial?  If so, give juror's name and the substance of the conversation.

8.  During jury deliberations, did the jurors consult any materials that were not part of the trial evidence (for example, books, articles, newspapers)?  Describe what happened.

9.  During the trial or deliberations, did you overhear any conversation about the defendants, the witnesses, the charges, or the possible sentences?  Describe what happened.

10. Did anything occur during the trial or the deliberations that you would like to bring to the court's attention?  Describe.

J.A.1193

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 24, 1999, a copy of the foregoing Petitioner's Joint Motion For Leave To Take Discovery was mailed to:

Robert J. Erickson, Deputy Chief
Criminal Division
Appellate Section
U.S. Department of Justice
Room 6102, Patrick Henry Bldg.
601 D Street, N.W.
Washington, D.C.  20530

Donald R. Lee, Jr., Esq.
Frederick R. Gerson, Esq.
McCauley, Lee & Powell
1015 E. Main Street, 4th Floor
Richmond, VA  23219

Scott L. Nelson, Esq.
Paul F. Enzinna, Esq.
Michael J. Barta, Esq.
Miller, Cassidy, Larroca & Lewin
2555 M Street, N.W.
Washington, D.C. 20037

_____
Barbara L. Hartung

**J.A.1194**

# EXHIBIT 72

J.A.1195

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION



MAY - 3 2000

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

| | |
|---|---|
| CORY JOHNSON | |
| Petitioner. | Civil Action Number 3:97CV895 |
| v. | Criminal Action Number 3:92CR68 |
| SAMUEL PRUETT, WARDEN | |
| Respondent. | |

| | |
|---|---|
| RICHARD TIPTON | |
| Petitioner. | Civil Action Number 3:98CV361 |
| v. | Criminal Action Number 3:92CR68 |
| RONALD ANGELONE | |
| Respondent. | |

| | |
|---|---|
| JAMES H. ROANE, JR. | |
| Petitioner. | Civil Action Number 98CV360 |
| v. | Criminal Action Number 3:92CR68 |
| UNITED STATES | |
| Respondent. | |

## MEMORANDUM OPINION

Richard Tipton, Cory Johnson, and James Roane each have filed a motion to vacate, set

aside or correct sentence under 28 U.S.C. § 2255, and in conjunction therewith, have filed a joint

1

803

**J.A.1196**

motion for leave to take discovery. For the reasons stated herein, the Court GRANTS in part and DENIES in part Petitioners' Joint Motion for Leave to Take Discovery.

## I. BACKGROUND

In 1993, Petitioners were tried by a jury on a 33-count indictment charging them with numerous federal crimes, most prominently, murder while engaged in a continuing criminal enterprise ("CCE"). The jury returned verdicts of guilty and, after a separate penalty hearing, recommended that Tipton, Johnson, and Roane receive the death penalty. This Court sentenced each to death in accordance with the jury's instructions. Petitioners appealed, and the United States Court of Appeals for the Fourth Circuit affirmed in all relevant respects. United States v. Tipton, et al., 90 F.3d 861 (4th Cir. 1996). The United States Supreme Court denied certiorari. Petitioners filed timely motions for relief under 28 U.S.C. § 2255 arguing, among other things, that the Government committed numerous acts of prosecutorial misconduct by (1) offering testimony that it knew to be false or should have known to be false, (2) misrepresenting evidence, (3) concealing exculpatory evidence, (4) improperly purchasing testimony in violation of 18 U.S.C. § 201(c), and (5) improperly discriminating against women in selecting the jury. Additionally, Petitioners contend that they received constitutionally ineffective assistance of counsel, the evidence at trial was insufficient to support their continuing criminal enterprise ("CCE") convictions, and that there was possible jury taint.

Petitioners also filed a Joint Motion for Leave to Take Discovery, in which they seek this Court's permission to conduct discovery because, as they contend, their filings with the Court establish that Petitioners are entitled to discovery and an evidentiary hearing on certain claims.

2

## II. LEGAL STANDARD

Federal habeas relief exists to correct constitutional defects. Royal v. Taylor, 188 F.3d 239, 243 (4ᵗʰ Cir. 1999). In submitting a petition for habeas relief under 28 U.S.C. § 2255, 28 U.S.C. § 2254 Rule 6(a) provides:

> A party shall be entitled to invoke the processes of discovery available under the Federal Rules of Civil Procedure if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise.

The Supreme Court determined, in Harris v. Nelson, 394 U.S. 286, 89 S.Ct. 1082, 22 L.Ed. 2d 281 (1969), and in its progeny, Bracy v. Gramley, 520 U.S. 599, 117 S.Ct. 1793 (1997), that "good cause" for discovery exists when a petition for habeas corpus establishes a prima facie case for relief. See Harris v. Nelson, 394 U.S. at 290, 117 S. Ct. at 1086. Specifically, discovery is warranted "[w]here specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief." Bracy v. Gramley, 520 U.S. at 908-909, 117 S.Ct. at 1799 (citing Harris v. Nelson, 394 U.S. at 299, 117 S. Ct. at 1091). In such cases it is the duty of the courts to provide the necessary facilities and procedures for an adequate inquiry. Id. The district court has discretion to decide whether to grant discovery, and likewise, has discretion to determine the scope and extent of such discovery. Id.

Here, Petitioners argue that they have alleged facts in their Section 2255 petitions to the extent that discovery of facts to further establish their claims is warranted. The issue before this Court is, therefore, whether or not Petitioners have established good cause for discovery with respect to each of the claims; that is, have they made specific allegations before the Court demonstrating that they may be entitled to relief, or are their assertions purely speculative.

3

## III. DISCUSSION

Before determining whether or not Petitioners are entitled to discovery under Rule 6(a), the Court must first identify the essential elements of their claims. Id. at 904 (citing United States v. Armstrong, 517 U.S. 456, 469, 116 S.Ct. 1480, 1488, 134 L.Ed. 2d 687 (1996)).

### A. Alleged Instances of Prosecutorial Misconduct

#### 1. The Government's Alleged Presentation of Perjured Testimony

Petitioners request discovery to permit them to fully develop facts to show that the Government knowingly presented the perjured trial testimony of Maurice Saunders, Gregg Scott, Hussone Jones, and Priscilla Greene. A conviction acquired by the prosecution's knowing use of perjured testimony violates due process when there is any reasonable likelihood that the false testimony could have affected the jury's judgment. Boyd v. Frency, 147 F.3d 319, 329-330 (4th Cir. 1998) (internal citations omitted). This is true whether the prosecution solicited testimony it knew to be false or simply allowed such testimony to pass uncorrected. Id. (citing Giglio v. United States, 405 U.S. 150, 153, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972)). To prevail on such a claim of prosecutorial misconduct, Petitioners must affirmatively demonstrate (1) that the testimony in question was false; (2) that the Government knew or reasonably should have known that it was false; and (3) that the false testimony was material because there was a reasonable probability that the false testimony could have affected the verdict. Id.

##### (a) Maurice Saunders and Gregg Scott

Petitioners' key allegations concerning Maurice Saunders' and Gregg Scott's testimony involve statements concerning Petitioners' participation in a CCE. To prove a CCE charge, the Government must show that the defendant engaged in a "continuing series" of drug violations "in

4

**J.A.1199**

concert with five or more other persons with respect to whom [the defendant] occupie[d] a position of organizer, a supervisory position, or any other position of management . . . ." 21 U.S.C. § 848(c) (Supp. 1999).

Several members of the alleged New York Boyz conspiracy interviewed by Petitioners in post-conviction investigations admit that the New York Boyz were friends and dealt drugs, but dispute that they were a highly organized, violent drug operation. Petitioners contend that this evidence both contradicts Scott's testimony and proves that the details he provided at trial regarding the New York Boyz' activity were patently false.

Petitioners' same post-conviction investigations also allegedly reveal that Government witness Maurice Saunders gave material false testimony when he claimed that he accompanied "Hess" and Tipton to New York to buy large quantities of powder cocaine from "Light." Their findings indicate that "Light," the alleged leader of the New York Boyz and the Newtowne Gang's purported supplier of bulk cocaine, was incarcerated in New Jersey during the entire existence of the Newtowne Gang.

There is, however, no concrete evidence indicating that either Scott's or Saunders' testimony is false. Even if the Court assumes that the testimony is false, Petitioners have alleged nothing that indicates that the Government knew or should have known this. Further, Petitioners fail to show that the false testimony was material. An abundance of other evidence at trial indicated that there was a CCE; thus, assuming that Scott's and Saunders' testimony was false, there is no reasonable probability that such false testimony could have affected the verdict.

(b)  Hussone Jones

At trial, Jones testified that he witnessed Tipton murder Douglas Talley and that he saw

5

**J.A.1200**

the events preceding and following Talley's murder. In his post-conviction investigation, Petitioner Tipton obtained a sworn statement from Marcus Tyler "Wildman" Stevens that contradicts Jones' testimony. Jones testified that Tipton gave Stevens a knife, but Stevens says he never saw Tipton with a knife and that Tipton never gave him a knife to wash. According to Petitioners, the Government was aware of such "false testimony" because other agents of the Government may have interviewed Stevens and learned that Jones' testimony was false.

Petitioners fail to establish good cause for discovery because on these facts, they have not shown that they could make out a claim of prosecutorial misconduct. Stevens has offered nothing to indicate that he has knowledge about the murder itself, and Tipton has presented no evidence from the post-conviction interview that would tend to exculpate him. Combined with the fact that other evidence at trial overwhelmingly corroborates the events surrounding Talley's murder as Jones described them, even if his statement were false, it is immaterial. Finally, that other agents may have interviewed Stevens, or that Vick may have failed to take notes from his meeting with Stevens amounts to pure speculation and is not an adequate grounds for discovery.

(c) Priscilla Greene

Greene testified that Douglas Moody was killed "because [Johnson] and [Tipton] and them didn't want . . . [Moody] to work in that area . . . [s]elling cocaine." This testimony at Petitioners' trial regarding the circumstances surrounding Moody's murder differed slightly from Greene's testimony at Vernon Lance Thomas' trial three months later. Petitioners contend that such discrepancies indicate that Greene lied at their trial.

"[A] defendant seeking to vacate a conviction based on perjured testimony must show that the testimony was, indeed, perjured." United States v. Griley, 814 F.2d 967, 971 (4th

6

Cir.1987).  Mere inconsistencies in testimony by government witnesses do not establish the government's knowing use of false testimony.  See Overton v. United States, 450 F.2d 919, 920 (5th Cir.1971);  Hall v. United States, 30 F.Supp.2d 883, 891 (E.D. Va. 1998), appeal dismissed, 187 F.3d 632, 1999 WL 587893 (4th Cir.(Va.)).  Not only have Petitioners alleged no facts to establish that Greene's inconsistent testimony reaches the level of false, perjured testimony, but other evidence supports the central thrust of Greene's testimony: that is, Roane retrieved a large, black-handled knife from Greene, and fatally attacked Moody in the alleyway outside the apartment building.  Greene's inconsistencies regarding various details are minor discrepancies that do not establish a reasonable probability that this witness committed perjury.

2. Misconduct Regarding Proof of the CCE

Tipton and Johnson next contest the Government's use of the "conclusory" terms "worker" and "employee" to establish that they were supervisors in the alleged CCE.  On direct appeal in this case, "each of the [petitioners] challenge[d] the sufficiency of the evidence to support the requisite finding under the CCE count that he acted as an organizer, supervisor, or manager with respect to five or more persons," Tipton, 90 F.3d at 890, and the circuit court summarily rejected this argument after thoroughly considering it.  A defendant may not use § 2255 as a vehicle to reargue issues that were fully considered on direct appeal.  Boeckenhaupt v. United States, 537 F.2d 1182, 1183 (4th Cir.1976).  Accordingly, Tipton and Johnson may not pursue this claim on collateral review, since the argument is a slightly modified version of their insufficiency argument.  They are thus not entitled to discovery showing that neither Johnson nor Tipton had a supervisory or management role in the CCE.

7

**J.A.1202**

3. <u>The Government's Alleged Failure to Disclose *Brady* Material</u>

In <u>Brady v. Maryland</u>, the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963), <u>cited in</u> <u>Strickler v. Greene</u>, 119 S.Ct. 1936, 1948 (1999). The prosecution has the duty to disclose such evidence even though the accused has not requested it to do so, <u>United States v. Agurs</u>, 427 U.S. 97, 107, 96 S.Ct. 2392, 2399, 49 L.Ed.2d 342 (1976), and the duty encompasses impeachment evidence as well as exculpatory evidence. <u>Strickler v. Greene</u>, 119 S.Ct. at 1948 (citing <u>United States v. Bagley</u>, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985)). Such evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." <u>Id.</u>

Mere speculation that some exculpatory material may have been withheld is unlikely to establish good cause for a discovery request on collateral review, <u>id.</u> at 1950-1951, and there is never a real "*Brady* violation" unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict. <u>Id.</u> at 1948.

Petitioners argue that the Government breached its duty under <u>Brady</u> by not disclosing exculpatory evidence.

(a) <u>Jones' Testimony</u>

Tipton submits that pursuant to <u>Brady</u> the Government had a duty to disclose the exculpatory evidence regarding Jones' false testimony about the murder of Douglas Talley. The Government counters that it produced <u>Brady</u> material, including prosecutor Vick's

8

**J.A.1203**

contemporaneous notes of his interview with Stevens. As previously noted, the notes reveal no exculpatory information. Petitioners' submission about what "Wildman" Stevens said to the Government regarding events described by Jones are thus totally speculative and do not provide adequate justification for discovery.

### (b) John Knight and "Studie" Green

Tipton discovered, in the course of a post-conviction investigation interview with John Knight and Thomas "Studie" Green, that Knight and Green told the Government that they were with Tipton when he received a telephone call from Johnson. They also told the Government that during this phone conversation Johnson told Tipton that he had committed the Stoney Run murders by killing Linwood Chiles and Curt Thorne, and that he had injured the Greene Sisters. Petitioners posit that suppressed evidence lends support to additional evidence verifying Tipton's interpretation of Townes' statement where Johnson revealed that he committed the murders, and corroborates Hussone Jones' testimony that Tipton told him that Johnson committed the murders. Such evidence, according to Petitioners, would have created reasonable doubt for the jury as to whether Tipton was involved in the murders.

Defense counsel, however, was also aware of Green's and Knight's presence in the car. Since Green was actually present at trial on defense subpoena, but ultimately was not called as a witness, whatever exculpatory evidence that existed was available to the defense with the reasonable exercise of diligence.

Moreover, Green's disclosures do not provide Tipton with an alibi. Although Green and Knight could provide an alibi for Tipton at the time the telephone call was made, neither Green nor Knight could provide an alibi for Tipton at the time the murders were actually committed.

9

**J.A.1204**

The Court will thus not grant Petitioners discovery on this matter.

    4. <u>Witness list</u>

The prosecution, according to Petitioners, violated 18 U.S.C. § 3432 by failing to provide petitioners with the "place of abode" of each of the witnesses against them, and this Court erred by permitting the Government to refuse to comply with Section 3432 based on its representation that it had placed the witnesses in the Witness Protection Program.

The Government correctly notes that these issues were litigated on direct appeal and resolved against petitioners by the Fourth Circuit. <u>See</u> <u>Tipton</u>, 90 F.3d at 888-889. Petitioners are not permitted to relitigate issues that were previously decided against them. <u>See generally</u>, <u>Parker v. Angelone</u>, 959 F. Supp. 319, 320 (E.D. Va. 1997). Thus this matter is inappropriate for relitigation on a §2255 motion and discovery will not be granted.

    5. <u>Violation of 18 U.S.C. § 201(c)(2)</u>

18 U.S.C. § 201(c)(2) punishes whoever:

> [D]irectly or indirectly, gives, offers, or promises anything of value to any person, for or because of the testimony under oath or affirmation given or to be given by such person as a witness upon a trial, hearing, or other proceeding, before any court . . . .

The Fourth Circuit has held that 201(c)(2) does not prohibit the United States from acting in accordance with its statutory authority to use immunity, leniency, and plea agreements to obtain truthful testimony, nor does it require the exclusion of such evidence. <u>See</u> <u>United States v. Richardson</u>, 195 F.3d 192, 196-197 (4th Cir. 1999). Thus, Petitioners' contention that the Government violated this statute because nearly every fact witness against them received a "thing of value" from the Government in exchange for his or her testimony is without merit. The Government immunized some witnesses, and helped others obtain reduced sentences, which the

10

**J.A.1205**

statute does not prohibit. Accordingly, Petitioners have no claim, and thus cannot conduct discovery.

    6. <u>Impermissible Discrimination by Prosecutors in Jury Selection</u>

The Government used eight of its ten peremptory strikes to remove female jurors. The use of gender-based peremptory strikes is forbidden and would require the Court to set aside Petitioners' convictions. <u>J.E.B. v. Alabama</u>, 114 S.Ct. 1419, 1430 (1994); <u>see</u> <u>Batson v. Kentucky</u>, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Petitioners thus argue that they have alleged a *prima facie* case of the prosecution's improper discrimination against women in its exercise of peremptory strikes, and they request leave to conduct discovery concerning the Government's use of such strikes.

Numbers alone do not establish a <u>prima facie</u> case of discrimination. As the Fourth Circuit noted, "the bare showing of gender discrimination first attempted on this direct appeal does not suffice either to allow first instance consideration by this court (as appellants concede), nor to warrant a remand for first instance consideration by the district court." <u>Tipton</u>, 90 F.3d at 881.

That aside, Petitioners procedurally defaulted on this claim by not raising at jury selection a contemporaneous objection regarding the Government's use of peremptory challenges. The failure to object to the use of a peremptory challenge forever denies the Government the opportunity to provide fresh explanation for the challenge. Because of the procedural model contemplated by <u>Batson/J.E.B. v. Alabama</u>, i.e., objection, explanation, and ruling by the court, it is not likely that retroactive application would be appropriate. Finally, whatever the reason for the Government's use of their peremptory challenges, it cannot be described as newly discovered evidence that would have produced a different verdict.

11

B. Potential Juror Misconduct Claim

Petitioners request that the Court reconsider its Order denying Petitioners' motion for leave to interview the trial jurors is denied.

C. Johnson's Execution Is Barred Due to Mental Impairments

Johnson argues that his execution is barred by a statute prohibiting the execution of the mentally retarded, and seeks discovery of internal Department of Justice guidelines employed in deciding whether to pursue or carry out a capital sentence against a defendant.

To be classified as mentally retarded, a person generally must have an I.Q. of 70 or below. Penry v. Lynaugh, 492 U.S. 302, 308, 109 S.Ct. 2934, 2941, 106 L.Ed.2d 256 n. 1 (1990) (citing American Association on Mental Deficiency (now Retardation) (AAMR), Classification in Mental Retardation 1 (H. Grossman ed. 1983)). Evidence at trial indicated that Johnson's I.Q. is 77, and he is therefore not mentally retarded. Without addressing other issues regarding Petitioners' access of Department of Justice internal memoranda, clearly Johnson cannot prevail on this claim in light of the evidence presented at trial. Accordingly discovery is unnecessary.

D. Tipton Received Ineffective Assistance of Counsel Regarding the Talley Murder

Tipton requests access to a knife found at the murder scene in Talley's car inside Johnny Lee Byrd's jacket pocket, to determine whether or not it was the murder weapon. The Court hereby GRANTS Petitioner leave to test the knife. If Petitioner finds evidence establishing that the knife is connected to the Talley murder, he may petition the Court for leave to conduct further discovery and access documents related to the knife.

12

## IV. Conclusion

For the reasons stated herein, Tipton may only conduct discovery with respect to the knife. All other requests are hereby DENIED.

Let the Clerk send a copy of this Memorandum Opinion to all counsel of record.

And it is SO ORDERED.

_____
UNITED STATES DISTRICT JUDGE

**MAY   3 2000**
_____
DATE

13

**J.A.1208**

# EXHIBIT 73 - PART 1

FILE COPY



F I L E D
MAY – 1 2003
CLERK, U.S. DISTRICT COURT
RICHMOND, VA

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

UNITED STATES OF AMERICA    )
                            )
v.                          )          CASE NO. 3:92CR68
                            )
RICHARD TIPTON a/k/a "WHITEY"  )
CORY JOHNSON a/k/a "O"       )
JAMES ROANE. a/k/a "J.R."    )

## ORDER

In accordance with the accompanying Memorandum Opinion, it is ordered that:

1.    The United States' motion for summary judgment is granted in part and denied in part.

2.    Johnson and Tipton's grounds for § 2255 relief are dismissed and their motions pursuant to 28 U.S.C. § 2255 are denied.

3.    All of Roane grounds for § 2255 relief will be dismissed except for his claim that he was denied effective assistance of counsel in conjunction with the charges pertaining to the murder of Douglas Moody (Claim IV.B.2) and his claim that he is actually innocent of the murder of Moody (Claim VIII).

4.    Tipton's request to conduct additional discovery is denied.

The Clerk is directed to send a copy of this Memorandum Opinion and Order to counsel of record and counsel for the United States.

It is so ORDERED.

_James R. Spencer_
United States District Judge

Richmond, Virginia
Date: 5-1-03

**J.A.1210**

F I L E D

MAY - 1 2003

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

UNITED STATES OF AMERICA    )
    )
v.    )    CASE NO. 3:92CR68
    )
RICHARD TIPTON a/k/a "WHITEY"    )
CORY JOHNSON a/k/a "O"    )
JAMES ROANE. a/k/a "J.R."    )

### MEMORANDUM OPINION

The matter is before the Court on the 28 U.S.C. § 2255 motions filed by Tipton, Johnson, and Roane (collectively "the Defendants") and the United States' motions for summary judgment.[1] Tipton, Johnson and Roane's grounds for relief are set forth in appendices A, B, and C respectively. For the reasons set forth below, the Court finds that the United States is entitled to summary judgment on all claims except for a portion of Roane's claim that he was denied effective assistance of counsel in conjunction with the charges pertaining to the murder of Douglas Moody (Claim IV.B.2) and Roane's claim that he is actually innocent of the murder of Moody (Claim VIII).

### I.    STANDARD FOR SUMMARY JUDGEMENT

It is the responsibility of the party seeking summary judgment to inform the Court of the basis for its motion, and to identify the parts of the record which it believes demonstrate the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "[O]nce the moving party has met its burden under Rule 56(c), the adverse party 'may not rest upon the mere

---

[1] The general facts that led to the Defendants' convictions and sentences of death are set forth in United States v. Tipton, 90 F.3d 861 (4th Cir. 1996) and will not be repeated here. References to the "record" in this opinion do not include the evidence introduced at the evidentiary hearing conducted on June 21, 2002.

1

J.A.1211

allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.'" Catawaba Indian Tribe v. South Carolina, 978 F.2d 1334, 1339 (4th Cir. 1992)(quoting Fed. R. Civ. P. 56(e)). In determining whether a particular claim is subject to summary judgment the Court "must view the evidence presented through the prism of the substantive evidentiary burden." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986).

The Defendants contend that summary judgment is premature because they need to conduct further discovery. The Defendants' unsworn arguments regarding discovery (which already have been rejected by this Court in denying their motions for discovery) do not provide an adequate basis for forestalling a decision on the motion for summary judgment. See Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 961 (4th Cir. 1996). A demand for additional "discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for a Rule 56(f) affidavit . . . and the failure to file an affidavit under Rule 56(f) is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate." Id. (quoting Paddington Partners v. Bouchard, 34 F.3d 1132, 1137 (2d Cir. 1994)). Because the Defendants have not met the burden of demonstrating that they are entitled to discovery, see Rule 6(a) Governing § 2255 Proceedings, and have not complied with the requirements of Fed. R. Civ. P. 56(f), the Defendants' request to forestall summary judgment until they can conduct additional discovery will be denied.

## II.    PROCEDURAL STANCE OF THE DEFENDANTS' CLAIMS

Review of many of the Defendants' claims is precluded because the claim was rejected on direct appeal, see Boeckenhaupt v. United States, 537 F.2d 1182 (4th Cir. 1976)(intervening change

2

in the law is required to relitigate issues in § 2255 motion that were rejected on direct appeal), or the claim could have been raised at trial and direct appeal, but was not. United States v. Frady, 456 U.S. 152, 168-69 (1982). Specifically, the following claims will be dismissed because they were rejected on direct appeal and the Defendants failed to direct the Court to a change in the law that requires the Court to revisit the claim: Tipton Claims V.B.3.b, V.G, V.H; Johnson Claims II.C.2, VIII, IX; and Roane Claim V, and those aspects of the juror misconduct claims relating to mid-trial publicity and juror Cooke, Tipton Claim V.A, Johnson Claim VII, and Roane Claim III.[2]  See United States v. Wiley, 245 F.2d 750, 752-53 (8th Cir. 2001)(concluding new facts do not require review of claims rejected on direct appeal), cert. denied, 122 S. Ct. 818 (2002).

The Government correctly notes that the Defendants have defaulted the following claims by failing to raise the claim either at trial or on direct appeal:   Tipton Claims V.B.3.a.i, V.B.3.a.ii-iv, V.B.3.c, V.E. 1-15, V.J, V.K, V.L; Johnson Claims II.C.1.a-c, II.C.3.a, II.C.3.b, V.A-V.M, VI, XII, XIII; Roane Claims I.a, I.d, II, VII. Frady, 456 U.S. at 168-69.  The Court may grant relief on the foregoing claims only if the Defendant demonstrates that either cause and actual prejudice, or actual innocence excuse his default. See Bousley v. United States, 523 U.S. 614, 622 (1998).  Hence, with respect to these defaulted claims, if the Defendant fails to demonstrate that either novelty, or ineffective assistance of counsel, or actual innocence, or some other cause, excuses his default, the claim will be dismissed without further discussion.  As discussed below, except for part of Roane's Claim VIII, the Defendants' proffered excuses are unconvincing and are rejected.

_____

[2] The Government also is correct that the new facet of the Defendants' juror misconduct claim, is defaulted because it could have been raised at trial and on direct appeal but was not. Frady, 456 U.S. at 168-69.  The Defendants fail to demonstrate any cause to excuse the new aspect of the juror misconduct claim.   See Order entered June 10, 1998 and infra Sec. XII and XIII.

3

**J.A.1213**

III.   **RELIEF BASED ON <u>APPRENDI v. NEW JERSEY</u>**
        Johnson Defaulted Claim XIII
        Tipton Defaulted Claim V.L
        Roane Defaulted Claim VII

Title 21 U.S.C. § 848(e) provides that any person who, while engaged in or working in

furtherance of a continuing criminal enterprise ("CCE"), "intentionally kills or counsels, commands,

induces, procures, or causes the intentional killing of an individual" may be sentenced to death or

a term of imprisonment from twenty years to life.   However, before the death penalty may be

imposed, the jury is required to find the presence of certain aggravating factors enumerated in 21

U.S.C. § 848(n).  In <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000), the Supreme Court held that

"[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the

prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt."

<u>Id.</u> at 490.  The Court also explained that "the indictment must contain an allegation of every fact

which is legally essential to the punishment to be inflicted." <u>Id.</u> at 489 n. 15 (quoting <u>United States</u>

<u>v. Reese</u>, 92 U.S. 214, 232-33 (1875)).  Relying on the foregoing statement from <u>Apprendi</u>, the

Defendants contend that their convictions and sentences of death are unconstitutional because the

indictment failed to charge the aggravating factors that were essential to the imposition of a death

sentence.

The United States responds that such a claim is defaulted, barred by the new rule doctrine

of <u>Teague v. Lane</u>, 489 U.S. 288 (1989), and lacks merit.  <u>See</u> <u>United States v. Sanders</u>, 247 F.3d

139, 144-46 (4th Cir.), <u>cert. denied</u>, 122 S. Ct. 573 (2001).  Because the United States' procedural

arguments carry the day, it is unnecessary to address the merits of the Defendants' substantive claim.

A.     **Novelty As Cause**

4

The Defendants assert that their failure to raise the claim on direct appeal should be excused because the legal basis for their claim was not available at the time of direct appeal. In Reed v. Ross, 468 U.S. 1 (1984), the Supreme Court held that a claim that "is so novel that its legal basis is not reasonably available to counsel" may constitute cause to excuse a procedural default. Id. at 16. While novelty continues to be a valid cause for excusing a procedural default, the Supreme Court has narrowed the reach of Reed by expanding the interpretation of when a claim may be reasonably available. See United States v. Bousley, 523 U.S. 614, 622 (1998). In Bousley the Court rejected the petitioner's assertion that a Bailey-type challenge to his § 924(c) conviction prior to the decision in Bailey v. United States, 516 U.S. 137 (1995) was not reasonably available, because the "Federal Reporters were replete with cases involving challenges to the notion that 'use' is not synonymous with mere 'possession'." Id. at 622. The Court then explained that, even if it appears "futile" to attempt a particular legal argument, that perceived futility "cannot constitute cause if it means simply that a claim was 'unacceptable to that particular court at that particular time.'" Id. at 623 (quoting Engle v. Isaac, 456 U.S. 107, 130 n. 35 (1982)).

Following this refined view of novelty, the Fourth Circuit rejected a defendant's assertion that his Apprendi claim was not reasonably available at the time of his sentencing in 1998. See United States v. Sanders, 247 F.3d 139, 145 (4th Cir.), cert. denied, 122 S. Ct. 573 (2001). The court explained that the Apprendi claim was available in 1998, because

> the germ of Sander's Apprendi claim had sprouted at the time of his conviction and there is no reason why he could not have raised it then. Although the court may not have been likely to accept Sanders' argument, Sanders plainly had at his disposal the essential legal tools with which to construct his claim.

Id. at 146(citing United States v. Smith, 241 F.3d 546, 548 (7th Cir.), cert. denied, 122 S. Ct. 267

5

**J.A.1215**

(2001)).

The Supreme Court's decision in McMillan v. Pennsylvania, 477 U.S. 79 (1986), provided Tipton, Johnson and Roane with the necessary tools to construct their Apprendi claim. "No one can read McMillan without learning that the Court was open to the argument that the Constitution requires a fact which does increase the available sentence to be treated as an element of the crime." Almendarez-Torres v. United States, 523 U.S. 224, 256 (1998)(Scallia, J.)(dissenting). Thus, because "the foundation for Apprendi was laid long before 1992," the Defendants cannot assert the claim was not reasonably available at the time of their trial and appeal. Sanders, 247 F.3d at 145(quoting Smith, 241 F.3d at 548). The Defendants' assertion of novelty as cause is rejected.

The Defendants assert that they are actually innocent of all their convictions under 21 U.S.C. § 848 and thus this Court is permitted to review their defaulted claims. As discussed below at Section VI, such an assertion, with the exception of Roane's claims pertaining to the murder of Douglas Moody, is utterly without merit. Nevertheless, even though Roane's assertion of innocence regarding that murder is meritorious, this Court is still foreclosed from granting Roane, Tipton, or Johnson relief on their Apprendi related claim because of the new rule doctrine.

**B.      Apprendi Created A New Rule Of Constitutional Procedure That Is Not Retroactive To Cases On Collateral Review**

New rules of constitutional criminal procedure are generally not applied retroactively on collateral review. See Teague v. Lane, 489 U.S. 288, 312 (1989). Apprendi's requirement that any fact, (other than a prior conviction) that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt, constitutes a new rule of criminal procedure that is not retroactive to cases on collateral review. United States

6

v. Sanders, 247 F.3d 139, 146-48 (4th Cir.), cert. denied, 122 S. Ct. 573 (2001). The Defendants counter that the extension of Apprendi they seek - that all facts necessary to the imposition of a capital sentence must be found by the grand jury and charged in the indictment–is a new rule of substantive, rather than procedural, criminal law. See United States v. Bousely, 523 U.S. 614, 620 (1998)(concluding Teague analysis is not applicable where the Court simply decides the meaning of a criminal statute). The Defendants are wrong. Sanders, 247 F.3d at 147(holding that Apprendi "constitutes a procedural rule because it dictates what fact-finding procedure must be employed to ensure a fair trial" and that it "is certainly a new rule of criminal procedure"); United States v. Sanchez, 269 F.3d 1250, 1268 (11th Cir. 2001), cert. denied, 122 S. Ct. 1327 (2002).

Next, the Defendants assert that the new rule they seek is retroactive because it falls within Teague's second exception to non-retroactivity. In order to qualify under that exception, the new rule must be such that, without it, "'the likelihood of an accurate conviction is seriously diminished'" and the rule must "'alter our understanding of the bedrock procedural elements essential to the fairness of a proceeding.'" Sanders, 247 F.3d at 148 (quoting Teague, 489 U.S. at 313 and Sawyer v. Smith, 497 U.S. 227, 242 (1990) respectively)). In Sanders, the Fourth Circuit assumed that a "rule that certain sentencing factors must be proven beyond a reasonable doubt will promote marginally more accurate results." 247 F.3d at 149-50. However, the court then concluded that such a rule lacked the trappings of a truly "watershed" rule because it would not impact all criminal defendants, it would not taint a defendant's entire conviction, and it did not contribute significantly to the core fundamental rights such as the right to counsel, trial by jury, and a finding of guilt beyond a reasonable doubt, but merely answered a subsidiary question about one of those core rights. Id. at 150-51; see O'Dell v. Netherland, 521 U.S. 151, 167 (1997)(noting that qualifying rule should

**J.A.1217**

be a "sweeping" change that applies to a large swath of cases rather than a "narrow right" that applies only to a "limited class" of cases); United States v. Mandanici, 205 F.3d 519, 529 (2d Cir.)(discussing eleven new rules or proposed new rules which the Supreme Court has declined to apply retroactively), cert. denied, 531 U.S. 879 (2000).

It logically follows that, if the necessity of a petit jury finding beyond a reasonable doubt on all factors that increase a defendant's maximum sentencing exposure are not of sufficient primacy and centrality to satisfy Teague's second exception, then the narrower rule that the Defendants demand, which merely requires a grand jury finding by a preponderance of the evidence on the aggravating factors necessary for the imposition of capital sentence factors, is not. See United States v. Cotton, 122 S. Ct. 1781, 1784-86 (2002)(concluding omission from the indictment of certain facts necessary to imposition of a particular sentence did not deprive court of jurisdiction to impose that sentence); Basden v. Lee, 290 F.3d 602, 619 (4th Cir. 2002)(concluding Apprendi based challenges to an indictment are not retroactive to cases on collateral review), cert. denied, 123 S. Ct. 446 (2002). Unlike the straightforward application of Apprendi rejected in Sanders, the extension the Defendants seek would contribute little or nothing toward ensuring an accurate conviction or sentence; the aggravating factors ultimately are found by a jury, beyond a reasonable doubt, before the imposition of a capital sentence. See Jones v. Smith, 231 F.3d 1227, 1238 (9th Cir. 2000)(holding that "the Apprendi rule, at least as applied to the omission of certain necessary elements from the state court information, is neither implicit in the concept of ordered liberty nor an absolute prerequisite to a fair trial"); United States v. Moss, 252 F.3d 993, 998 (11th Cir. 2001)(stating that "we do not believe Apprendi's rule recharacterizing certain facts as offense elements that were previously thought to be sentencing factors resides anywhere near that central core of fundamental rules that are absolutely

8

necessary to insure a fair trial"), <u>cert.</u> <u>denied</u> 122 S. Ct. 848 (2002).  Accordingly, the Defendants'

<u>Apprendi</u> based claims are barred by the new rule doctrine and will be dismissed.

## IV.    ISSUES RELATED TO THE SELECTION OF THE JURY

### A.    Counsel Failed To Move For A Change of Venue
Johnson Claim IV.A.2
Tipton Claim V.F.1.a
Roane Claim IV.A

The Defendants assert that counsel were deficient for failing to move for a change of venue

in light of the pretrial publicity.  In order to demonstrate he was denied his right to the effective

assistance of counsel, a defendant must show that counsel's representation was deficient and that the

deficient performance prejudiced the defense.  <u>Strickland v. Washington,</u> 466 U.S. 668, 687 (1984).

The deficient performance facet of the <u>Strickland</u> test "requires showing that counsel made errors

so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth

Amendment." <u>Id.</u>  To satisfy this facet of <u>Strickland,</u> the defendant must demonstrate that "counsel's

representation fell below an objective standard of reasonableness." <u>Id.</u> at 687-88.  Furthermore, in

order to avoid the distorting effects of hindsight, the Court is required to evaluate "the

reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the

time of counsel's conduct." <u>Strickland,</u> 466 U.S. at 690.

In order to carry a motion for a change of venue prior to trial, counsel is required to

demonstrate that the publicity is so inherently prejudicial that trial proceedings must be presumed

to be tainted. <u>See</u> <u>United States v. Baker,</u> 925 F.2d 728, 732 (4th Cir. 1991).  However, "[o]nly in

extreme circumstances may prejudice be presumed from the existence of pretrial publicity itself."

<u>Id.</u> (qouting <u>Wells v. Murray,</u> 831 F.2d 468, 472 (4th Cir. 1987)).  Instead, "a trial court customarily

should take the second step of conducting a voir dire of prospective jurors to determine if actual prejudice exists." Baker, 925 F.2d at 732. A defendant would then be entitled to a change of venue if "voir dire reveals that an impartial jury cannot be impaneled." Id.

In assessing whether a change of venue is warranted, not only the volume, but the character and timing of media coverage are critical factors. See Murphy v. Florida, 421 U.S. 794, 801 n. 4 (1975) (important to distinguish between factual and inflammatory publicity); Baker, 925 F.2d 732-33. "The recency of alleged prejudicial publicity is important because '[o]bviously where considerable time has elapsed since publication, the probability or likelihood of impact is appreciably lessened.'" Baker, 925 F.2d 732-33(quoting Wansley v. Slayton, 487 F.2d 90, 93 (4th Cir. 1973)). The Defendants rely on fourteen newspaper articles to support their claim that a motion for change of venue was warranted. Of those articles, eleven were printed at least five months prior to the start of the trial in January of 1993. The twelfth article appeared on January 10, 1993, the day that jury selection began, and was largely factual. The thirteenth article concerned a shot fired at detectives carrying witnesses and was printed on January 23, 1993. The final article was the article that appeared on February 9, 1993. With only a single, largely factual article appearing in the five months preceding their trial, counsel reasonably eschewed pursuing a motion for a change of venue based on pretrial publicity. See Mu'Min v. Pruett, 125 F.3d 192, 199 (4th Cir. 1997)(concluding the 47 articles published over three months prior to defendant's trial did not create a presumption that the court could not select an impartial jury).

Nor did the actual voir dire suggest that it would be necessary to change venue in order to obtain a fair and impartial jury. Of the four jurors, and one alternate juror, who had been exposed to pretrial publicity, each unequivocally stated that nothing in the media coverage would prevent him

10

or her from being a fair and impartial juror. Additionally, the Court's opening instructions further reassured counsel that a change of venue was not necessary to avoid any inflammatory media coverage. At the beginning of the trial, the Court instructed the jury "not to read or listen to anything touching on this case in any way." Tr. at 762. "Now as I said –and this is very important, so I am going to repeat it . . . .You should be insulated from outside forces. And what happens in this courtroom should be what makes up the body of knowledge that will bring you to your conclusions and determinations." Tr. 766. In light of the foregoing, the Defendants have failed to demonstrate that counsel was constitutionally deficient for not moving for a change of venue or that they were prejudiced by counsel's failure to do so. The above listed claims will be dismissed.

B.    **The Prosecution's Purported Use of Peremptory Strikes Against Women in Violation of J.E.B. v. Alabama ex. rel. T.B., 511 U.S. 127 (1994).**
Johnson defaulted Claim V.K, VI
Tipton defaulted Claim V.E.1&12
Roane defaulted Claim II

The prosecution used two peremptory challenges to remove men and eight peremptory challenges to remove women. The Defendants did not raise any objection at trial to the prosecution's purportedly improper use of peremptory challenges. Subsequent to the Defendant's trial, the Supreme Court held that intentional discrimination on the basis of gender by the use of peremptory strikes in jury selection violates the Equal Protection Clause. J.E.B. v. Alabama ex. rel. T.B., 511 U.S. 127 (1994). When the Defendants sought to raise the issue on appeal based on the disproportionate number of challenges the prosecution exercised against women, the Fourth Circuit concluded that, "the bare showing of gender discrimination first attempted on this direct appeal does not suffice either to allow first instance consideration by this court (as appellants concede), nor to warrant a remand for first instance consideration by the district court." United States v. Tipton, 90

11

**J.A.1221**

F.3d 861, 881 (4th Cir. 1996).

Each of the Defendants asserts that the prosecutor engaged in misconduct by using his peremptory strikes to remove women from the jury. These claims are defaulted because counsel failed to make a contemporaneous objection. The Defendants rely on the constitutionally deficient performance of trial counsel, see Tipton Claim V.F.1.c and Johnson Claim IV.A.4, and novelty to establish cause to excuse their default.

1.    **Purported Deficient Performance of Counsel for Failing to Raise J.E.B. Or Prosecutorial Misconduct Claim**
      Tipton Claim V.F.1.c
      Johnson Claim IV.A.4

At the time of the Defendants' trial, the Supreme Court had yet to grant certiorari in J.E.B., and the Ninth Circuit was the only Federal Circuit court to extend Batson to strikes based on gender. See United States v. De Gross, 913 F.2d 1417 (9th Cir. 1990), and 960 F.2d 1433, 1437-1443 (1992) (en banc) (extending Batson v. Kentucky, 476 U.S. 79 (1986), to prohibit gender-based peremptory challenges in both criminal and civil trials). The Fourth Circuit had explicitly rejected attempts to extend Batson to peremptory challenges based on gender and the language of that decision hardly encouraged counsel to continue to raise the issue. See United States v. Hamilton, 850 F.2d 1038, 1042 (4th Cir. 1988). "[W]e find no authority to support an extension of Batson to instances other than racial discrimination." Id. (emphasis in original); see also id. at 1042-43; United States v. Mitchell, 886 F.2d 667 (4th Cir. 1989)(rejecting defendants attempt to extend Batson to peremptory challenges based on age).[3] In light of the Fourth Circuit's explicit rejection of attempts to extend

_____

[3] At the time of the Defendants' trial, the Seventh Circuit agreed with the Fourth Circuit. United States v. Nichols, 937 F.2d 1257, 1262-1264 (7th Cir. 1991) (declining to extend Batson to gender), cert. denied, 502 U.S. 1080 (1992); see also United States v. Broussard, 987 F.2d 215, 218-220 (5th Cir. 1993) (same).

12

**J.A.1222**

Batson to gender, the Defendants cannot demonstrate that the failure of counsel to object to the prosecution's strikes of female jurors fell below the wide range of professionally competent performance. See United States v. McNamara, 74 F.3d 514, 517 (4th Cir. 1996)(concluding counsel is not deficient for following the controlling circuit law at the time of trial); Kornahrens v. Evatt, 66 F.3d 1350, 1360 (4th Cir. 1995); Honeycutt v. Mahoney, 698 F.2d 213, 216-17 (4th Cir. 1983). Accordingly, the Defendants' claims that they were denied effective assistance by counsel's failure to object at trial to the prosecution's use of peremptory strikes against female jurors will be dismissed.

### 2. Novelty As Cause For Failure to Raise the J.E.B claims

The Defendants next suggest that, if counsel was not deficient for failing to raise the J.E.B. claim, then surely its novelty must constitute cause excusing their default. This is not so. See Kornahrens v. Evatt, 66 F.3d 1350, 1360 (4th Cir. 1995)(rejecting a similar argument and concluding that "a necessarily stringent procedural hurdle, coupled with a similarly important deference to attorney performance" precluded petitioner from raising challenge for the first time on habeas).

The Defendants contend that the absence of a contemporaneous objection is excused because the claim was not reasonably available in light of the Fourth Circuit's position in United States v. Hamilton, 850 F.2d 1038, 1042 (4th Cir. 1988). As discussed in conjunction with the Defendants' Apprendi claim, "a claim that 'is so novel that its legal basis is not reasonably available to counsel' may constitute cause for a procedural default." Bousley v. United States, 523 U.S. 614, 622 (1998)(quoting Reed v. Ross, 468 U.S. 1, 16 (1984)). However, novelty or "futility cannot constitute cause if it means simply that a claim was unacceptable to that particular court at that particular time." Bousely, 523 U.S. at 623(internal citations and quotations omitted)(rejecting petitioner's assertion

13

J.A.1223

that his Bailey claim was not reasonably available at the time of his trial). Here, the Defendants had at their disposal not only the Batson decision, but also a federal circuit court decision and several state court decisions that had concluded that Batson extended to strikes based on gender.[4] Such authorities provided the Defendants with sufficient tools to challenge any improper gender based exercise of peremptory challenges. See United States v. Sanders, 247 F.3d 139, 145 (4th Cir.), cert. denied, 122 S. Ct. 573 (2001). Hence, the Defendants' assertion that the legal basis for their J.E.B. claim was not reasonably available must fail. The Defendants' assertions of cause are rejected. The substantive prosecutorial misconduct claims are defaulted and will be dismissed.

**C.      Trial Counsels' Errors Resulted In The Defendants' Exclusion From Voir Dire And The Loss Of The Right To Participate In Jury Selection**
Tipton Claim V.F.1.d
Johnson Claim IV.A.5
Roane IV.C.

On direct appeal the Defendants asserted that their absence from portions of voir dire violated their rights under the Confrontation Clause of the Sixth Amendment, the Due Process Clause of the Fifth Amendment, and their right to be present under Fed. R. Crim. P. 43(a). Because the Defendants did not raise a contemporaneous objection at trial, the Fourth Circuit reviewed for plain error. The Fourth Circuit concluded that in order to obtain relief on such a claim, the Defendants would be required to demonstrate "'actual prejudice, i.e., that their absences ' affected the outcome of the [trial],' or 'probably influenced the verdict[s]' against them either on the guilt or sentencing phases." United States v. Tipton, 90 F.3d 861, 875 (4th Cir. 1996)(qouting United States v. Olano, 507 U.S. 725, 734-35 (1993)). The court then concluded that the Defendants could not meet this

---

[4] Di Donato v. Santini, 283 Cal.Rptr. 751 (1991), review denied (Cal., Oct. 2, 1991); People v. Mitchell, 593 N.E.2d 882 (Ill App. 1992), aff'd in part and vacated in relevant part, 614 N.E.2d 1213 (Ill. 1993); People v. Irizarry, 165 App.Div.2d 715, 560 N.Y.S.2d 279 (1990) .

14

burden simply by suggesting that if they had been present, the panel would have been composed of different jurors.

> If no more is shown, for example, than that jurors 1, 3, and 5 would have been excluded, this could not suffice to show that their presence caused the finally unfavorable "outcome." Something more, for example, that jurors 1, 3, and 5 in the above hypothetical were demonstrably biased, surely must be shown, and even that might not, under all the circumstances, suffice.

Tipton, 90 F.3d at 876.

Johnson and Tipton assert that had they been present for the entire voir dire, they would have insisted that three of the seated jurors be excused or struck: (1) Frances Hodson, because her husband had killed their son then committed suicide; (2) Bonita Faircloth because her best friend's mother had recently been raped and murdered; and (3) Jerome Harrison, because his brother was a patrolman on the Richmond police force. On direct appeal, Roane suggested that he would have struck these same jurors, to which the Fourth Circuit responded that "even if this were accepted as fact, it would not suffice as a showing of actual prejudice. Nor would the stated bases for his challenges--relationships to law enforcement officers and to the victim of a rape-murder--suffice without more to tip the balance." Id. at 876 n. 7. The Defendants have not supplemented their § 2255 motions with any additional evidence that jurors Harrison, Hodson or Faircloth, or any of the other jurors that sat, had any demonstrable bias. Nor have the Defendants presented any compelling argument as to why the Court should doubt the jurors' sworn assurance that they could render a fair and impartial judgment. Cf. Williams v. Netherland, 181 F. Supp.2d 604, 613-15 (E.D. Va. ) (finding juror had implied bias based on her repeated failure to answers questions in an objectively truthful manner), aff'd, 39 Fed.Appx 830 (4th Cir. 2002). Hence, the suggestion that the Defendants

15

**J.A.1225**

were prejudiced by the presence of above listed jurors is rejected.

Next, the Defendants suggest that the jurors might have drawn negative inferences regarding their absence from particular portions of the voir dire. See United States v. Camacho, 955 F.2d 950, 955-56 (4th Cir. 1992). Here, unlike Camacho, the Defendants were not absent for the entirety of voir dire. Each of the Defendants was personally and immediately present during some portions of the overall voir dire from whom all of the regular and alternate jurors were ultimately selected. Furthermore, since the Defendants were present during some portions of the voir dire, there is no reason the jurors would believe the Defendants absence from certain portions of voir dire was any different from a bench conference. Finally, unlike Camacho the burden is on the Defendants to demonstrate prejudice, which they have not done;[5] the Defendants failed to explain how the result of their trial might have been different if they had been present for all of voir dire. The above described claims will be dismissed.

4.    **Defense Counsel Failed To Request Voir Dire Pursuant To Morgan v. Illinois, 504 U.S. 719 (1992).**
      Johnson Claim IV.A.3
      Tipton Claim V.F.1.b

Capital defendants have a "right to an inquiry sufficient to ensure--within the limits of reason and practicality--a jury none of whose members would 'unwaveringly impose death after a finding of guilt' and hence would uniformly reject any and all evidence of mitigating factors, no matter how instructed on the law." United States v. Tipton, 90 F.3d 861, 878 (4th Cir. 1996)(quoting Morgan

---

[5] Nor can the Defendants satisfy the prejudice component simply by alleging the lack of an objection forced their direct appeal of the issue to be subjected to a more stringent standard of review. See Smith v. Yago, 888 F.2d 399, 405 (6th Cir. 1989)(holding that "the district court applied an improper standard of prejudice by looking only to the outcome of Smith's direct appeal and not to the outcome of the entire criminal proceeding").

16

**J.A.1226**

v. Illinois, 504 U.S. 719, 733-34 (1992)). Tipton and Johnson contend that counsel were deficient and they were prejudiced because counsel failed to ensure that every juror was specifically asked whether he or she would always impose a sentence of death if they found the defendant guilty of capital murder. As recounted by the Fourth Circuit on direct appeal, the record forecloses Tipton and Johnson's unsupported speculation that omissions by counsel resulted in a jury that might have contained individuals who would have been subject to removal under Morgan. Tipton, 90 F.3d at 878-79. "[T]he district court's inquiry into death penalty attitudes was sufficient to cull out any prospective juror who would always vote for the death penalty." Tipton, 90 F.3d at 879.

Undeterred, Tipton and Johnson argue that prejudice is self-evident because the jury sentenced them to death despite the fact that it found twelve mitigating factors as to Tipton and eighteen mitigating factors as to Johnson. To the contrary, the jury's verdicts demonstrate that its members were not automatically predisposed to impose the death penalty after finding a defendant guilty of a capital crime: the jury failed to recommend the death penalty for three of the six capital counts on which Tipton was convicted and for two of the three capital counts on which Roane was convicted. See Stamper v. Muncie, 944 F.2d 170, 177 (4th Cir. 1991)(concluding jury's verdict refuted suggestion that jury would automatically impose the death penalty). The Defendants cannot demonstrate any prejudice flowing from the purported omissions of counsel, hence their claims will be dismissed.

## V.    CLAIMS OF ERROR RELATED TO THE CCE CONVICTION

In order to convict a defendant of engaging in a continuing criminal enterprise the government must prove:

> (1)[the] defendant committed a felony violation of the federal drug
> laws;  (2) such violation was part of a continuing series of violations

17

**J.A.1227**

of the drug laws;  (3) the series of violations were undertaken by defendant in concert with five or more persons;  (4) defendant served as an organizer or supervisor, or in another management capacity with respect to these other persons; and (5) defendant derived substantial income or resources from the continuing series of violations.

United States v. Ricks, 882 F.2d 885, 890-91 (4th Cir. 1989).  As on appeal, the Defendants'

challenges are focused on the second, third, and fourth elements.

### A.    Counsel Failed To Demand A Unanimity Instruction On The Predicate Acts That Constitute CCE Continuing Series Element

| | |
|---|---|
| Johnson Claim IV.A.7.a | Defaulted Claim XII |
| Tipton Claim V.F.1.g.4 | Defaulted Claim V.K |
| Roane | Defaulted Claim VI |

After the Defendants were convicted and sentenced, the Supreme Court held in Richardson

v. United States, 526 U.S. 813 (1999), that in a prosecution for engaging in a CCE under 21 U.S.C.

§ 848, the jury "must agree unanimously about which three crimes the defendant committed," to

satisfy the statutory requirement that the defendant's behavior is "part of a continuing series of

violations" described in 21 U.S.C. § 848(c)(2). Id. at 818-24.  Although they had not requested such

an instruction at trial, on appeal the Defendants asserted that the failure to give a special unanimity

instruction constituted plain error.  United States v. Tipton, 90 F.3d 861, 884 (4th Cir. 1996).  The

claim was rejected:

> the record plainly indicates that appellants could have suffered no actual prejudice from the lack of a special unanimity instruction on the predicate violation element . . . . By its verdict, it is clear that the jury unanimously found each guilty of at least five predicate violations:  the conspiracy charged in Count 1, the drug possession charged in Count 32, and at least three of the § 848(e) murders as variously charged to them.  Assuming, without deciding, that unanimity on at least three predicate violations is required to convict, it is clear that unanimity occurred here as to each appellant so that no actual prejudice from the failure so to instruct could be shown.  See United States v. Olano, 507 U.S. 725, 734 (1993) (burden is on defendant to show actual prejudice from forfeited error).

18

Id. at 885.

In their present motions, the Defendants assert that they were deprived of the effective assistance of counsel by counsel's failure to demand a unanimity instruction on the predicate violation element. However, in order to prevail on such a claim, the Defendants must demonstrate that they were prejudiced by that omission. United States v. Stitt, 250 F.3d 878, 883 (4th Cir. 2001)(rejecting assertion that Richardson error is a structural defect), cert. denied,122 S. Ct. 153 (2002). And, as discussed above, the verdict forecloses the Defendants' assertion that they were prejudiced by counsels' omission. Accordingly, because the Defendants have not demonstrated any prejudice their claims will be dismissed.

### B.      Instructions On The Supervision Element

The Defendants' direct challenges to the jury instructions are defaulted. Therefore, the following discussion is primarily confined to assessing whether the failure to raise a particular challenge constitutes ineffective assistance of counsel sufficient to excuse the default.

1.      **Counsel Was Deficient For Failing To Demand That The Court Instruct The Jury That The Government Must Prove The Element Of Management As Part Of The Element of Supervision For A CCE Organizer**

| | |
|---|---|
| Johnson Claim II.C.4.e | Defaulted Claim II.C.1.c |
| Tipton Claim V.B.3.d.iv, V.F.1.g.3 | Defaulted Claim V.B.3.a.iv |

The Court instructed the jury that in order to convict the Defendants on the CCE Count, the Government must prove beyond a reasonable doubt that "the defendant was an organizer of these five or more other persons, or occupied a position of management or a supervisory position with respect to these five or more other persons." Tr. at 3209. The Court then explained that:

> The term "organizer" and the term "supervisory position" and "position of management" are to be given their usual and ordinary meanings. These words imply the exercise of power or authority by

19

**J.A.1229**

a person who occupies some position of management or supervision.

An organizer can be defined as a person who puts together a number of people engaged in separated activities and arranges them in their activities and in one essentially orderly operation or enterprise.

A supervisory position can be defined as one who manages or directs or oversees the activities of others.

Tr. at 3212.

The Defendants contend that the given instructions were insufficient because under the syntax of the statute, the jury must be instructed that even an organizer must exercise managerial authority over those whom he organizes. See United States v. Lindsey, 123 F.3d 978, 986 (7th Cir. 1997); United States v. Jerome, 942 F.3d 1328, 1332 (9th Cir. 1991)("We read the statutory language 'or any other position of management' to indicate that an 'organizer' must exercise some sort of managerial responsibility."). However, at the time of the Defendants' trial, the Fourth Circuit had concluded that "while proof of a supervisory or managerial relationship requires a showing of some degree of control by the defendant over the other persons, such proof is not required to show that a defendant acted as an organizer." United States v. Butler, 885 F.2d 195, 201 (4th Cir. 1989). Despite this authority, the Defendants were able to obtain the above described instruction which stated that the term organizer "impl[ied] the exercise of power or authority by a person who occupies some position of management or supervision." Tr. at 3212. Counsel was not deficient for obtaining an instruction more favorable than the law in the Fourth Circuit demanded. Accordingly, the above described claims will be dismissed.

### 2.    Counsel Failed To Demand a Buyer-Seller Instruction
Johnson Claim II.C.4.e.                    Defaulted II.C.1.a
Tipton Claim V.B.3.d.iv; V.F.1.g.3         Defaulted Claim V.B.3.a.(i)

The "mere showing of a buyer-seller relationship, without more, is not sufficient under 21

20

**J.A.1230**

U.S.C. § 848" to demonstrate that a Defendant acted as a supervisor, manager, or organizer. <u>United States v. Butler</u>, 885 F.2d 195, 201 (4th Cir. 1988). Thus, Johnson and Tipton fault counsel for not demanding an instruction which stated that individuals who had only buyer-seller relationships with them were not supervised or organized by them.

In <u>United States v. Hall</u>, 93 F.3d 126 (4th Cir. 1996), the court had instructed the jury that "the term organizer and the term supervisory position and position of management are to be given their usual and ordinary meanings. These words imply the exercise of power or authority by a person who occupies some position of management or supervision." <u>Id.</u> at 130. Hall asserted that the jury should have further been told that "individuals who had only buyer-seller relationships with Hall were not supervised or organized by him." <u>Id.</u> In rejecting that assertion the Fourth Circuit concluded,

> [t]he instructions plainly allowed the jury to understand the supervisory requirement. The 'usual and ordinary' meaning of manager or supervisor does not include a mere buyer-seller relationship. Buyer-seller relationships are not characterized by 'the exercise of power or authority.' Jurors are competent to understand and apply ordinary concepts like organizer, supervisor and management.

<u>Id.</u> at 130-31. This Court gave instructions identical to the instructions approved by the Fourth Circuit in <u>Hall</u>. Tr. at 3212. Accordingly, Tipton and Johnson have failed to demonstrate that counsel were deficient or they were prejudiced by the lack of a buyer-seller instruction and their claims suggesting the same will be dismissed.

### 3. Counsel Was Deficient For Failing To Demand Additional Instructions On the Identity of the Five Supervisees

| | |
|---|---|
| Johnson Claim II.C.4.g, IV.A.7.b | Defaulted Claim II.C.1.b.(i&ii) |
| Tipton V.B.3.d.vi; V.F.1.g.1, | Defaulted V.B.3.a.ii,V.B.3.a.iii |

Tipton and Johnson assert that the prosecution presented the jury with numerous individuals

21

who as a matter of law could not count as supervisees. Therefore, Tipton and Johnson contend that counsel were deficient for failing to demand that the Court (1) instruct the jurors that certain of the named individuals could not count as supervisees, see United States v. Barona, 56 F.3d 1087, 1096-7 (9th Cir. 1995), and (2) instruct the jurors that they must unanimously agree on the identities of the five individuals supervised by each defendant, see United States v. Jerome, 942 F.2d 1331 (9th Cir. 1991)[6] . Tipton and Johnson's claims in this regard are meritless because (1) they erroneously assume that the given instructions permitted the jury to select people who could not qualify as supervisees; (2) contrary to Jerome's and Barona's fixation, the supervision element of the CCE statue is concerned with the number of supervisees rather than the identities of those individuals; and (3) they cannot demonstrate a reasonable probability that they each supervised less than five individuals.

First, Tipton and Johnson's demand for additional instructions, particularly the Barona instruction, rests on the flawed assumption that the given instructions would permit the jurors to choose as supervisees individuals who could not be supervisees. The given instructions did not permit the jurors to select as supervisees individuals who could not legally qualify as supervisees. If the evidence was insufficient to prove that any of the alleged individuals was in fact a supervisee, then reasonable counsel would assume that a jury following the Court's instructions would discard

---

[6] In Jerome, the government had referred in closing argument to individuals for whom defendant's organization/supervision would have been logically impossible--they were only "the suppliers of his suppliers" in the drug distribution chain. 942 F.2d at 1330. The Ninth Circuit concluded that because the government had presented the jury with a confusing array of individuals, some of whom could be counted as persons managed by a CCE defendant and some of whom, as a matter of law, could not be counted toward the supervision element, "the jurors had to be instructed that they must unanimously agree as to the identity of each of the five people Jerome organized, managed or supervised." Id. at 1331.

22

that individual from its count. See United States v. Griffin, 502 U.S. 46, 59 (1991)(concluding that lay juries can be presumed to have rejected factually unsupported grounds, but not legally inadequate ones such as, e.g., one that "fails to come within the statutory definition of the crime").[7] Nor can counsel be faulted for not demanding additional instructions on the possibility that the jury would disregard those instructions in favor of the prosecution's argument because the Court repeatedly instructed the jury that "your source as to the law is the Court", not the lawyers. Tr. at 887. See Tr. 3193-95; United States v. Tapia, 738 F.2d 18, 21 (1st Cir. 1984) (prosecutor's rendition of his version of controlling legal principles not prejudicial when "the judge made clear to the jury that it was the judge's description of the law--not that of either counsel--that was to control").

Second, Tipton and Johnson's assertion that counsel were not acting competently because they failed to demand relief pursuant to Barona and Jerome ignores the legal landscape at the time of Defendants' trial in February of 1993.   See United States v. McNamara, 74 F.3d 514, 517 (4th Cir. 1996). Although Jerome had been decided by the date of the Defendants' trial, every other Court of Appeals that had addressed the issue had concluded that, "the requirement of action in concert with five or more other persons . . . aims the statute at enterprises of a certain size, so the identity of the individual supervisees is irrelevant."[8]  Richardson v. United States, 526 U.S. 813, 829

_____

[7] Tipton and Johnson contend that the Government presented the jury with individuals, who "could not as a matter of law be supervisees." However, their arguments as to the vast majority of these individuals rest on the premise that the evidence was insufficient to prove that the individual was a supervisee rather than that it was logically/legally impossible for the individual to be a supervisee.

[8] Indeed, the Fourth Circuit affirmed that view in this very case. On direct appeal the Defendants argued that, because the prosecution presented the jury with some individuals who could not be counted as supervisees, it was plain error not to instruct the jurors that they must unanimously agree as to the identity of each of the five people each Defendant organized, managed or supervised. See Roane's Reply Brief at 27(citing United States v. Jerome); see also

23

J.A.1233

(1999)(Kennedy, J., dissenting)(citing cases). See United States v. Cole, 857 F.2d 971, 973 n.1 (4th Cir. 1988)(rejecting defendant's assertion that the jury was required to return a special interrogatory on the CCE count that listed the individuals which he supervised); cf. United States v. Chaklias, 971 F.2d 1206, 1215 (6th Cir. 1992)(concluding it was not plain error for court to fail to instruct jury as to identity of persons whom defendant could not have been considered to have been managing when court gave instructions very similar to those given here).   Accordingly, counsel were not deficient for failing to demand the instructions demanded here by Tipton and Johnson.

Tipton and Johnson also assert that the propriety of a unanimity instruction regarding the supervisees must be reevaluated in light of the decision in Richardson v. United States, 526 U.S. 813 (1999), which held that unanimity is required for the three predicate crimes element.   They are wrong.  United States v. Stitt, 250 F.3d 878, 886 (4th Cir. 2001), cert. denied, 122 S. Ct. 153 (2002). Even after Richardson, the "identity of individual supervisees is irrelevant." Id.  Stitt teaches that Tipton and Johnson cannot demonstrate prejudice in conjunction with their challenges to the supervision element simply by suggesting that the jurors were confused about who could be counted as a supervisee.

> Precise details, like the identities of the underlings supervised by the defendant, are not essential elements of the CCE but rather "merely historical facts as to which the jurors could have disagreed without undermining their substantial agreement as to the ultimate and essential fact of whether the requisite size and level of control existed."

Stitt, 250 F.3d at 887(quoting United States v. Jackson, 879 F.2d 85, 89 (3d Cir. 1989)).  Rather,

---

Roane's Opening Brief at 87(citing Jerome).  The Fourth Circuit rejected that claim and concluded that the focus of "this element is on the size of the enterprise . . . rather than the identities of those who make up the requisite number." United States v. Tipton, 90 F.3d 861, 886 (4th Cir. 1996).

24

it is incumbent upon the Defendants to demonstrate that absent the purportedly improper conduct of counsel or the Government, there is a reasonable probability that the jury would not have concluded that each Defendant supervised or organized the requisite floor of five individuals.  This they cannot do.  See infra Section V.C.  Hence, the above listed claims will be dismissed because the Defendants have demonstrated neither deficiency nor prejudice.

### C.    Claims Pertaining To Proof Of The Supervision Element

As a prelude to their challenges pertaining to the sufficiency of evidence on the CCE count, the Defendants assert that the prosecution engaged in misconduct in the manner in which it proved the CCE count.  The Defendants assert that these defaulted claims of misconduct are excused by the ineffective assistance of counsel.  Specifically, the Defendants fault counsel (1) for not objecting to the witnesses' use of the terms "partner" and "worker" as violating Fed. R. Evid. 701 and (2) for not objecting to the testimony by numerous witnesses that was not based on a foundation of personal knowledge.

#### 1.    Counsel Failed To Object To Testimony That Purportedly Violated Fed. R. Evid. 602.

| | | |
|---|---|---|
| Johnson II.C.4.b. | Defaulted | II.C.3.a, V.I |
| Tipton V.B.3.d.(i) | Defaulted | V.B.3.c.(i), V.E.11 |

The Federal Rules of Evidence provide that "[a] witness may not testify about a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Fed. R. Evid. 602. However, the "threshold of Rule 602 is low", United States v. Hickey, 917 F.2d 901, 904 (6th Cir. 1990), thus, a Court may accept a witness's unelaborated assertion of personal knowledge "when other evidence indicates that the witness had a personal connection to the subject matter, there is nothing to suggest that the witness likely did not have or could not have had such knowledge, and its probable absence could be easily shown."

25

**J.A.1235**

United States v. Davis, 792 F.2d 1299, 1304-05 (5th Cir. 1986).  Furthermore, "[b]ecause most knowledge is inferential, personal knowledge includes opinions and inferences grounded in observations or other first-hand experiences."  United States v. Joy, 192 F.3d 761, 767 (7th Cir. 1999), cert. denied, 530 U.S. 1250 (2000).

Johnson and Tipton list numerous instances where they allege the prosecutor elicited or sought to elicit testimony from a witness that violated Fed. R. Evid. 602.  The vast majority of these instances simply did not warrant an objection by counsel because there was a foundation for the testimony or the witness could likely provide one.  For example, Johnson and Tipton assert that Denise Berkley testified without any basis of personal knowledge that each Defendant supported himself by selling cocaine. Tr. at 1674-75.  However, Berkley previously had testified that she saw Johnson and Tipton selling drugs, Tr. at 1667-68, and "every day" for a couple of months the Defendants would give her crack 4 or 5 times for performing chores, Tr. at 1669-70.  Additionally, in faulting counsel for failing to object to the admission of testimony, Tipton and Johnson fail to acknowledge that "the personal knowledge requirement of Rule 602 does not apply to statements of a co-conspirator admissible as non-hearsay under Rule 801(d)(2)(E)."  United States v. Goins, 11 F.3d 441, 444 (4th Cir. 1993).  Thus, Tipton and Johnson unreasonably chide counsel for not objecting each time one of their lackeys testified regarding the position or function of the Defendants and other individuals in their drug enterprise.  The witnesses could readily supply the necessary foundation for testimony that the Defendants were "partners," or that certain individuals were "workers" because these witnesses were themselves members of the drug conspiracy and the record reflects that the conspirators regularly referred to each other in such terms.  See Goins, 11 F.3d at 444; Davis, 792 F.2d at 1304; see also United States v. Cantu, 167 F.3d 198, 204 (5th Cir.

26

J.A.1236

1999)(permitting witness to testify that individual "worked" for the defendant).

Only in the following few instances does the transcript suggest the propriety of an objection pursuant to Fed. R. Evid. 602 would be well-grounded in law:

> Stanley Smithers' testimony that the Defendants purchased drugs when they were not in his presence and his testimony that Keith Ross and Mousey Armstrong were selling cocaine which they obtained from Johnson; Papoose Davis' testimony that Nat Rozier used to bring people by to purchase crack; Priscilla a/k/a "Pepsi" Greene's testimony that Talley and Chiles used to drive the Defendants to New York to pick up drugs; and Pepsi Greene's testimony regarding the motivation for the Moody murder.

However, with the exception of Pepsi Greene's testimony regarding the Moody murder, the aforedescribed testimony was cumulative of other testimony and was not crucial to the case against the Defendants.

Tipton and Johnson correctly note that Pepsi Greene did not provide a full foundation for her testimony that Little Doug Moody and Peyton Maurice Johnson were killed because Tipton and Johnson "didn't want Maurice and Little Doug to work in that area." Tr. at 2553. However, it is one thing to demonstrate an objection would have been feasible, and quite another to demonstrate the objection would preclude the admission of the testimony which in turn would alter their convictions and sentences. The record reflects that Greene had intimate knowledge of the workings of the CCE and of the events preceding the Moody murder and thus could likely have provided a foundation for her statement. Additionally, as discussed infra at Section VII, there was ample evidence which linked the Moody murder to the plan of Tipton, Johnson and Roane to take over the drug traffic in the Newtowne area. Hence, Tipton and Johnson have not demonstrated that Pepsi Greene could not have supplied a foundation for the testimony described above, much less that if that single remark was excluded there is a reasonable probability their convictions and sentences would have been any

27

different. In summary, the majority of this ineffective assistance claim will be dismissed because counsel was not deficient and as to remaining instances where counsel failed to object for a lack of demonstrable prejudice.

### 2. Counsel Failed To Object To Testimony That Purportedly Violated Fed. R. Evid. 701

| | |
|---|---|
| Johnson II.C.4.b | Defaulted II.C.3.a, V.I |
| Tipton V.B.3.d.i, | Defaulted V.B.3.c(i), V.E.13 |

Federal Rule of Evidence 701 limits lay testimony to those opinions or inferences which are "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue." Fed. R. Evid. 701. A witness' testimony that he considered himself or others to work for the Defendants does not run afoul of either of the requirements of Fed. R. Evid. 701. See United States v. Freerman, 619 F.2d 1112, 1120 (6th Cir. 1980)(permitting witnesses to testify as to their perception of the defendants' relationship). The Advisory Committee's Notes explain that natural characteristics of the adversary system, such as cross-examination and closing argument will point up the weakness of empty assertions and exclusion should be reserved for those instances where the opinions constitute "meaningless assertions which amount to little more than choosing up sides." Fed. R. Evid. 701 advisory committee's notes. Here, counsel followed the foregoing admonition and used cross-examination and closing argument to suggest that the terms worker or employee did not imply the exercise of control by the Defendants. See e.g., Tr. at 2378-80, 2405-08; Tipton Closing Tr. at 3035 ("This worker-partner stuff is baloney. He wasn't their boss. He was their supplier."); Tr. at 3053-55; Johnson Closing Tr. at 3063-68. Moreover, counsel reasonably eschewed objecting to the use of the terms "partner" or "worker" because the witnesses were not offering a legal conclusion but were simply using the terms coined/employed by members of the conspiracy to describe the relationships

28

of different members of the drug conspiracy.[9]   Accordingly, counsel were not deficient for failing

to object to the use of the term worker or partner by the witnesses.   The above described claims will

be dismissed.

> **2(a).   The Prosecutors misled the jury by suggesting that they had not influenced witnesses to use terms "partner," "worker," and "employee."**
> Johnson Defaulted Claim V.J

Charles Townes, Hussone Jones, and Denise Berkley reiterated Antwoine Brooks' testimony

that the terms worker and partner originated from the members of the enterprise, not from the

prosecution, and swore that they had not been persuaded to use such terms by the prosecution.

Despite this explicit testimony, Johnson asserts that counsel should have known that the prosecution

encouraged the witnesses to use those terms by inserting the terms into their questioning of Jones

and Townes before the grand jury.   In light of the trial testimony directly refuting such a claim of

misconduct, counsel can hardly be deemed deficient for failing to raise such a claim based on the

nebulous evidence offered by Johnson.   Accordingly, Johnson's assertions of cause to excuse his

default are rejected.   Claim V.J is defaulted and will be dismissed.

> **3.   Counsel Were Deficient For Failing To Demonstrate That Each Defendant Supervised Less Than Five Individuals**
> Johnson II.C.4.c, IV.A.6
> Tipton V.B.3.d.(ii), V.F.3.a, V.F.1.f
> Roane IV.D

The Defendants contend that the Government's proof of the supervision was based entirely

---

[9]   Antwoine Brooks, was the first witness to explain what the terms meant in conjunction with the CCE in Richmond.  Tipton asked Brooks to be his "partner" in selling crack in Central Gardens.  Brooks explained that he and Tipton recruited Maurice Saunders and Hussone Jones as workers.  The workers were fronted $300 crack.  The workers were responsible for selling the crack and returning $200 to the partners.  When asked on cross-examination if someone had suggested that he use the term "worker," Brooks responded, "[w]e just came up with it. It is true. They worked for us at the time." Tr. at 1085.

29

on misleading testimony. Specifically, the Defendants assert that the term worker simply meant the purchasing of drugs on credit and does not demonstrate a supervisory relationship. The Defendants' argument in this regard ignores the abundance of testimony that indicated that the partners exercised control or supervision over the workers in addition to just providing them drugs on credit. The Defendants' arrangement with their dealers went beyond simple fronting and constituted a consignment or franchise type of operation, with the Defendants retaining ultimate control over the drugs.[10]  Brooks explained that people who were simply fronted drugs were not considered workers. Tr. at 1105. And, the workers consistently testified, not that they purchased drugs from the partners, but rather sold drugs "for" the partners. See, e.g., Tr. at. 1542, 1682-83, 2324. Furthermore, Brooks indicated the consignment relationship between partners and workers was an exclusive relationship. Tr. at 1103-4; see United States v. Butler, 885 F.2d 195, 201 (4th Cir. 1989)(concluding the defendant exercised control over purchaser whose relationship was "analogous to an exclusive franchise dealership"). Maurice Saunders, a "worker", explained that he was not permitted to obtain crack from sources other than a partner. Tipton told Saunders, on more than one occasion, "You deal only with me if you value your life." Tr. at 1322. In any event the provision of drugs on consignment to workers was not the only evidence the government adduced to show that each Defendant supervised, organized or managed in excess of five individuals.

> The record reveals--certainly supports findings beyond a reasonable doubt--that these 'retailers,' in more than sufficient numbers as to each of the appellants, acted as 'workers' who were either or both organized, supervised, and managed by appellants while acting as principal 'partners' in a concerted drug trafficking enterprise, and that

---

[10] While such a consignment relationship is not sufficient in and of itself to establish supervision, it is probative of that issue.  See United States v. Butler, 885 F.2d 195, 201 (4th Cir. 1989)(citing United States v. Possick, 849 F.2d 332 (8th Cir. 1988)).

J.A.1240

> some of these people served variously not only as street dealers for the enterprise but as sometime chauffeurs, hideout providers, weapons-keepers, and general underlings for each of the appellants.

United States v. Tipton, 90 F.3d 861, 890 (4th Cir. 1996).   No argument by counsel could have overcome the fact that each Defendant personally organized, managed or supervised in excess of five individuals.[11]   Accordingly, the Defendants have failed to demonstrate that they were prejudiced by any purportedly deficient effort by counsel to challenge the supervision element.   The above described claims will be dismissed.

4.    **Johnson Contends That Counsel Was Deficient For Failing To Introduce Evidence That Demonstrated That He Was Mentally Incapable Of Acting As An Organizer.**
       Johnson Claim-II.C.4.a

Johnson asserts that counsel should have adduced evidence of Johnson's low intelligence and learning disabilities to persuade the jury that he was mentally incapable of acting as a CCE organizer. Assuming such evidence would have been admissible in the guilt phase, it would have opened the door to a host of prejudicial evidence and its value to the defense was minimal.  Regardless of what any social worker or psychologist may have opined, the record amply demonstrates Johnson was a partner in the CCE and independently directed the activities of his many underlings.  Counsel was not deficient for reserving the evidence of Johnson's mental deficiencies, one of the few bolts of

---

[11] The transcript is simply littered with testimony supporting the supervision element. See e.g.: Tipton,Tr. at 1061, 1147, 1161, 1165-66, 1173, 1193, 1196-97, 1199, 1200, 1325, 1330, 1542, 1544, 1545-46, 1556, 1565, 1574-78, 1582, 1683-84, 1689-91, 1888, 2330, 2494, 2546-48, 2550, 2703, 2706-8 ; Johnson Tr. at 1162, 1582-83, 1683-84, 1690-92, 1705-8, 1711, 1720, 1888, 1891, 1895,1897, 1899, 1901, 1921, 2321-22, 2340, 2343, 2374, 2546-48, 2550, 2698, 2703, 2706, 2709, 2720; Roane Tr. at 1574, 1682, 1684, 1689, 1705-8, 1888-89, 1895, 1897, 2163, 2172, 2318, 2324, 2337, 2417, 2546, 2550, 2551, 2708.  The foregoing evidence also demonstrates that lack of merit of the assertion that the evidence was insufficient to support the supervision element. See Johnson Claim II.C.2, Tipton Claim V.B.3.b.

31

mitigation, for use to maximum effect at the inevitable sentencing proceeding. Claim II.C.4.a will be dismissed.

D.    **Purported Use Of False Testimony To Prove The Existence Of The CCE**

The Defendants assert that the government knowingly elicited false testimony from Gregg Scott, Maurice Saunders, and Priscilla "Pepsi" Greene. If the Defendant shows that: (1) the testimony was false, see Boyd v. French, 147 F.3d 319, 329-30 (4th Cir. 1998); and (2) the prosecutor or other government official knew, or should have known, the testimony was false; see Stockton v. Virginia, 852 F.2d 740, 749 (4th Cir. 1988); Thompson v. Garrison, 516 F.2d 986, 988 (4th Cir. 1975)(noting that "a recantation, particularly by an accomplice should be received skeptically"), then the conviction must be set aside if (3) there "is any reasonable likelihood that false testimony could have affected the judgment of the jury." See United States v. Bagley, 473 U.S. 667, 679 (1985). However, a prosecutor's mere suspicion about testimony is not enough. See, e.g., Hoke v. Netherland, 92 F.3d 1350, 1360 (4th Cir. 1996)(citing Bank of Nova Scotia v. United States, 487 U.S. 250, 261 (1988) ("Although the Government may have doubts about the accuracy of certain aspects of [evidence], this is quite different from having knowledge of falsity.")). And,"[m]ere inconsistencies in testimony by government witnesses do not establish the government's knowing use of false testimony." United States v. Grilley, 814 F.2d 967, 971 (4th Cir. 1987). The Defendants have garnered affidavits and other documents which they assert demonstrate that Maurice Saunders, Gregg Scott and Pepsi Greene testified falsely.

1.    **Gregg Scott's Testimony Linking Tipton And His Codefendants To The New York Boyz Was False, And The Government Knew Or Should Have Known That It Was False**
Johnson Claim I.B
Tipton Claim V.C.1.b
Roane Claim I.C.1

32

**J.A.1242**

The Defendants assert that Scott lied when he: (1) stated that he grew up at 155th and Amsterdam in New York; (2) described the New York Boyz as a gang; (3) swore that the New York Boyz met to discuss retaliating against individuals who threatened other members of the gang; and (4) testified falsely when he said he received guns from "Light". The first two statements the Defendants describe as false amount to a difference of opinion, rather than a perjurious statement of a fact. See United States v. Ellis, 121 F.3d 908, 927-8 (4th Cir. 1997). Additionally, the fact that Tipton and Johnson were associated with a gang in New York/New Jersey area that supplied the Defendants with drugs is beyond dispute.[12] See United States v. Smith, 223 F.3d 554, 574 (7th Cir. 2000), cert. denied, 122 S. Ct. 2658 (2002). In short, the Defendants have failed to demonstrate Scott's first two statements were false, much less that the prosecution knew they were false.

The Defendants have submitted evidence that creates a question of fact as to whether Scott testified accurately about the retaliation meetings and receiving guns from "Light"[13]. However, the

_____

[12] Anthony Howlen testified that both Tipton and Johnson were members of the gang known as the New York Boyz; Anthony Howlen and Richard Brice, a security guard, testified to a retaliatory gang attack over drug matters that involved both Johnson and Tipton; Officer Malone testified that a search of a residence Johnson shared with Scott, Lance Thomas and other purported New York Boyz, turned up guns and a substantial amount of crack; and multiple witnesses testified as to Tipton's comments regarding the New York Boyz, and his ability to call upon them for drugs and assistance. See also Tr. at 1072-73, 1684.

[13] At trial Scott was cross-examined regarding his statement that the New York Boyz would meet to discuss retaliating against any individual who threatened one of the members. Counsel asked Scott to describe those incidents where retaliation had taken place. Scott testified that "Smooth" was cut in a fight, after which Scott, Smooth, "Light," "Law," "L.A.", Lance Thomas, Cory Johnson, "Heavy D" and "Gary William" discussed retaliating against the guys who stabbed "Smooth" (Darryl Williams) and, thereafter, attacked the guys who had stabbed "Smooth." Tr. at 968-69. The Defendants have submitted affidavits, wherein "Light", "Hess", "L.A.", and "Smooth" swear that they were never involved in group discussions of retaliation. Tipton Reply Mem. App. at 1, 4, 5 and 6. "Smooth" further avers that he was never stabbed in his life. Id. at 6. Additionally, in his affidavit, "Light", a/k/a, Rufus Alvarez, a/k/a John Matthews, avers that he did not give any guns to Scott. Id. at 1 ¶ 10.

33

Defendants have offered no proof which suggests the prosecution knew, or should have known that

these aspects of Scott's testimony were false. Cf. United States v. Biberfeld, 957 F.2d 98, 102 (3d

Cir. 1992)(concluding petitioner was entitled to hearing where he alleged that prosecution had

reviewed files which indicated witness was testifying falsely). Instead, the Defendants speculate

that the prosecution knew the testimony was false because it was beneficial to the prosecution. The

Defendants then direct the Court to the affidavit of Government witness Sterling Hardy which they

suggest demonstrates that the prosecutors pressured witnesses to testify falsely and fed the witnesses

the testimony they wanted. The affidavit does not demonstrate that the prosecution knowingly

elicited false testimony from Hardy, much less support the claim currently before the Court, that the

prosecution knew Gregg Scott testified falsely.[14] Hardy's hopelessly muddy remark that the

---

[14] Indeed, Hardy's affidavit, when compared to his trial testimony, belies the suggestion
that the prosecutors permitted or encouraged Hardy to testify falsely to any fact. In his affidavit,
Hardy swears that,

> The prosecutors wanted me to say that Richard Tipton was
> present at the Southside shooting when Torrick Brown was killed.
> I told them Richard was not there, and I did not want to lye[sic]on
> him. The prosecutors also wanted me to say that Richard Tipton
> was present when Louis Johnson was killed. I again told them that
> Richard was not there.
>      I was not clear on many of the particulars, [h]owever after
> Mr. Vick and Mr. Parcell clarified them I was able to testify the
> way they wanted me to. They told me to tell the truth and be
> honest, but if I did, I would not have testified the way they wanted
> me to.
>      It was my understanding that Mr. Toby Vick instructed my
> attorney Mr. Everhart to have me say nine words. I did not know
> what nine words I needed to say until Mr. Everhart told me. He
> told me to say "James had problems in the Southside, go get Cory
> and Lance Thomas."

Johnson Reply Memo Ex. A, Aff. 8.
     At trial Hardy did not provide any testimony placing Tipton at the scenes of the Torrick
Brown and Johnson murders. Nor did Hardy testify that anyone had instructed him to get
Johnson and Lance Thomas to help Roane kill Torrick Brown. Furthermore, at trial, Hardy

34

J.A.1244

prosecutors "told me to tell the truth and be honest, but if I did, I would not have testified the way they wanted me to," does not warrant a different conclusion. Such "[a]iry generalities, conclusory assertions and hearsay statements [do] not suffice" to stave off summary judgment or entitle a habeas petitioner to an evidentiary hearing, because none of these would be admissible evidence at an evidentiary hearing. See United States v. Aiello, 814 F.2d 109, 113-14 (2d Cir. 1987). Simply put, the Defendants have failed to provide any factual anchor for the theory that prosecutors orchestrated false testimony from Scott. See Blackledge v. Allison, 431 U.S. 63, 80 (1976). The above listed claims will be dismissed.

### 2. Maurice Saunders' Testimony Linking Tipton to "Light" and Large Sums of Money Was False
Johnson Claim I.C
Tipton Claim V.C.1.a
Roane Claim I.C.2

The Defendants assert that Saunders testified falsely concerning his two trips to New York where he assisted in the purchase of cocaine and purported to see New York Boy, "Light." This claim flows from an apparent misstatement by the prosecutor in questioning Saunders about the date of the first of these two trips:

Q.    I direct your attention to after Christmas of 1991; did you have an occasion to make a trip to New York with "Hess"?
A.    Yes, I did.
Q.    What was the purpose of that trip?
A.    To bring back crack cocaine and some vials.
Q.    Who were you getting the crack cocaine for?
A.    For Rich[Tipton].

---

specifically and repeatedly disavowed that anyone had told him how he should testify. Tr. at 2193, 2202, 2243.

35

J.A.1245

Tr. at 1330.[15] Saunders explained that he and Hess went to an apartment building at 155th and Amsterdam to purchase the crack.

> Q.    Who did you see there?
> A.    I saw a few other people. Pointed out to me was a guy named "E.B." and pointed out to me was a dude named – he said "Light," I think it was "Light". I'm not sure.

Tr. at 1331. Hess then went into the apartment with $18,000 and emerged with roughly a kilo of crack. Tr. at 1333.

About a month after the first trip, Saunders accompanied Tipton, with $40,000, to New York, back to the same apartment building to buy two and half kilograms of cocaine. Tr. at 1336-37.

> Q.    Who did you see up there?
> A.    I saw the same faces.
> Q.    Did you see "Light" again?
> A.    Yes. I did.

Tr. at 1336-37.

The Defendants insist that Saunders testified falsely when he said he observed "Light" on each of these trips. In support of this claim, the Defendants direct the Court to (1) an affidavit from "Light" and criminal records which demonstrate that "Light" was incarcerated from December 3, 1990 to April 2, 1996, the period wherein the drug buying trips purportedly occurred and (2) an affidavit from Hess wherein he swears that he never pointed out "Light" to Saunders and that they

---

[15] By his question, the prosecutor suggested to Saunders that the first buying trip took place after Christmas in 1991. However, the whole of Saunders' testimony indicates the trip actually took place in late November or early December of 1990 and the second trip took place in January or February of 1991. Specifically, Saunders stated that he went to New York at about the same time Tipton promoted him and after he moved in with Tipton. Tr. at 1321, 1325. The move and promotion occurred in late November, Tr. at 1324, or early December of 1990. Tr. at 1320-21. Indeed, Hussone Jones, Saunders' brother, swore the first trip took place in the fall of 1990, around Christmas. Tr. at 1550.

36

**J.A.1246**

merely purchased clothes, rather than crack on their trip.    The Defendants have not adduced any evidence that the prosecution was, or should have been aware of "Light's" incarceration[16] at the time of the buying trips. See Horton v. United States, 983 F. Supp. 650, 654-55 (E.D. Va. 1997)(rejecting petitioner's assertion that, for Brady purposes, federal prosecutor is charged with knowledge of state prison records) or had obtained information from "Hess" regarding his version of the first trip to New York. Instead, the Defendants assert that the prosecution knew that Saunders' testimony in this regard was false because it had "orchestrated" Saunders' testimony to corroborate Scott's testimony, i.e., that the prosecution told Saunders to tell the jury that he had seen "Light" on his trips to New York. Neither this palpably incredible allegation nor the inconclusive affidavit from Sterling Hardy substantiate the charge that the prosecutors were aware of any inaccuracies with regard to Saunders' testimony. See McBride v. United States, 446 F.2d 229, 232 (10th Cir. 1971)(summarily dismissing § 2255 motion for failure to specifically advise the district court as to how he intended to factually prove his allegation of a knowing use of perjured testimony). The lack of proof on this score dooms the knowing use of false testimony claims. Accordingly, the above listed claims will be dismissed.

3.    **Counsel Were Deficient For Failing To Request An Investigator And For Failing To Conduct An Adequate Investigation**
Johnson Claim IV.A.1
Tipton Claim V.F.1.e
Roane IV.B.1

Tipton sought and was granted the appointment of an investigator to assist in the Richmond aspects of the case. However, Tipton now contends, along with Johnson and Roane, that counsel

---

[16] From December 3, 1990 until April 2, 1996, John Matthews a/k/a "Light" was detained, under the name of Rufus Alvarez, in Mercer County, New Jersey on a variety of drug related charges including conspiracy to distribute cocaine and maintaining a controlled dangerous substance production facility.

J.A.1247

should have requested investigative assistance with respect to the New York and New Jersey aspects of the case. The Defendants suggest that had counsel investigated this aspect of the conspiracy they would have discovered evidence to impeach the Government's witnesses. For example, the Defendants note that several of the reputed New York Boyz dispute their membership in an "organized" gang that distributed drugs or engaged in planned retaliatory violence.

The Defendants' assertion that they were prejudiced by the failure to introduce the evidence discovered by habeas counsel disregards the negative repercussions of introducing such evidence and overstates their impeachment value to the case as a whole. First, the suggestion that the Defendants were prejudiced by counsel's failure to locate and call as witnesses, New York Boyz, Lamont Sabb ("L.A."), Larry Williams ("Law"), Darryl Williams ("Smooth"), Jorge Delao ("Hess or James Wilkerson") and John H. Matthews ("Light") ignores the fact that the Strickland prejudice inquiry also accounts for the damaging evidence that could be elicited from each such individual upon cross-examination. See Whitley v. Bair, 802 F.2d 1487, 1494-97 (4th Cir. 1986)(emphasizing court must evaluate the negative aspects of any purportedly omitted mitigating evidence in evaluating prejudice). For example, although some of the above individuals denied being a member of a formal group called the New York Boyz or being involved in group discussions of retaliation, they do not dispute the fact that they hung out with Tipton and Johnson, were involved in the sale of drugs, and pooled their money with Tipton and Johnson to purchase additional drugs. See Tr. 907. Nor does John Matthews a/k/a "Light" deny that, for a time, he was Tipton's regular source of crack. Tr. at 918.

Additional investigation might have yielded the record of "Light's" incarceration, a fact which might have been introduced without additional damage to the defense. However, Saunders

38

**J.A.1248**

admitted that his identification of "Light" was questionable and impeachment on that matter hardly undermines confidence in their convictions.[17] For example the proffered testimony does not negate: Anthony Howlen's testimony that Johnson and Tipton were part of the New York Boyz and sliced him with razors when he interfered with their attempts to sell drugs in New Jersey; the repeated references to the New York Boyz during the course of the Richmond based activities; Tipton's threats to invoke the assistance of his New York associates if retaliatory actions were required; the appearance of New York Boyz Lance Thomas and Hess in Richmond; and the repeated trips by Tipton and Johnson from Richmond to New York to obtain drugs. Moreover, none of the proffered testimony undermines the voluminous evidence that during 1991 and 1992, the Defendants operated a continuing criminal enterprise in Richmond which distributed drugs through a series of workers and murdered numerous individuals in order to ensure the success of that enterprise. Therefore, the Defendants have failed to demonstrate they were prejudiced by counsel's purported omissions and their claims will be dismissed.[18]

---

[17] On direct examination, Saunders acknowledged that his identification was based on the fact that someone "pointed out to me . . . a dude named – he said 'Light,' I think it was 'Light'. I'm not sure." Tr. 1331. On cross-examination, Saunders acknowledged that, on his trips to New York, he heard a lot of names he did not connect with faces. Further, Saunders admitted that it is entirely possible, on the second trip, that Tipton obtained cocaine from someone other than "Light". Tr. 1366-69.

[18] The Defendants assertions of deficiency on the part of trial counsel are equally unconvincing. None of the Defendants couple the deficient investigation claim with evidence that suggested to counsel that an independent investigation into New York/New Jersey aspects would be helpful to the defense. See Smith v. Collins, 977 F.2d 951, 960 (5th Cir. 1992)(noting a reasonable defense does not "contemplate the employment of wholly unlimited time and resources"). While Johnson's trial counsel disparages the quality of his own pretrial preparation, see Johnson Memo Ex. 10, the tenor of the cross-examination reflects that counsel for Tipton and Johnson, whether from information provided by the government or their clients, had detailed knowledge of the activities and events in New York and New Jersey. See e.g. Tr. at 935-40, 967, 975-76. Additionally, Roane's counsel had little reason for allocating resources into

39

4. **Purported False Testimony By Priscilla "Pepsi" Greene**[19]

        a.      **The Government allowed Greene to testify falsely regarding her drug dealing activities**

Johnson Claim V.N

Tipton V.C.3

Roane Claim I.C.3.a

The Defendants contend that the purported difference between Greene's testimony regarding her drug dealing activities at their trial and the subsequent trial of their codefendant, Lance Thomas, demonstrate that Greene lied at their trial. At the Defendants' trial, Greene testified as follows:

> Q. How long were you involved with "O," "Whitey" and "J.R.," were you involved in the sale of cocaine with them?
> A. I never sold cocaine.
> Q. Did you help Curt Thorne when he sold cocaine?
> A. Yes.

Tr. at 2546. At Lance Thomas' trial, Pepsi Greene, consistent with her prior testimony, explained that she merely helped Curt Thorne to sell drugs.

> Q. Do you know how Curt Thorne supported himself?
> A. Yes. Curt sold drugs for "Whitey" and "O."
> Q. What kind of drugs did he sell for "Whitey" and "O"?
> A. Crack, cook'-em-up.
> Q. Did you help Curt in any way sell the drugs?
> A. Yes.
> Q. What did you do for him?
> A. Well, people would come to the door, maybe sometimes I would pass the

---

investigating the events in New York and New Jersey, because it was undisputed that Roane was not involved with Johnson and Tipton when they were selling drugs in New York/New Jersey. See Strickland v. Washington, 466 U.S. 668, 691 (1984). In short, the Defendants fail to demonstrate that prior to trial facts known to counsel suggested that independent investigation into the New York/New Jersey activities would be beneficial. Hence, the foregoing claim of ineffective assistance cannot succeed because the Defendants have not demonstrated that counsel were deficient.

[19] Roane's contention that Pepsi Greene provided false testimony regarding his role in the murder of Doug Moody is addressed infra at Section VII.B.

cocaine to them and get the money.

Thomas Tr. at 421-22.  The Defendants' claim of perjury is based on Greene's initial denial at their trial that she sold cocaine.  In Greene's perception she did not sell cocaine, she merely helped her boyfriend, Curt Thorne, sell cocaine.  See United States v. Derrick, 163 F.3d 779, 828-29(4th Cir. 1998)(emphasizing that an allegation of perjury as to a matter of perception fails absent conclusive proof that the witness testified falsely as to her belief, rather than that she was merely mistaken in her subjective assessment of the facts). Whatever the distinction in these activities, the claim lacks merit because the prosecution made sure the jury was not misled as to Greene's drug dealing activities.  See United States v. Vaziri, 164 F.3d 556, 564 (10th Cir. 1999).  Because the prosecution corrected Greene's misleading statements that she was not involved in selling drugs, and Greene did not otherwise testify falsely, the Defendants' claim of prosecutorial misconduct pertaining to this portion of Greene's testimony lacks merit and will be dismissed.

> **b.**  **The prosecution permitted Greene to testify falsely regarding the primacy of Thomas' role in the enterprise/ the Government engaged in misconduct by presenting two different version's of Tipton's role in the conspiracy at Lance Thomas' trial**
> Johnson Claim V.O
> Tipton Claim V.C.3, V.D.3, V.D.4, V.E.16
> Roane Claim I.c.3.b

At their trial, Greene testified that Tipton, Johnson, and Roane were "partners." Tr. at 2547. Additionally, in response to the question if she knew from whom Sandra Reavis received drugs, Greene stated, "'O.' Because 'O' was the head man." Tr. at 2552. Greene was not questioned regarding Thomas' role in the drug enterprise.

At Thomas' trial, Priscilla Greene testified that, around November of 1991, through Curt Thorne's drug selling activities, she met Tipton, Johnson and Roane. Thomas Tr. at 423.  About a

41

J.A.1251

month or two after that, Greene met Lance Thomas. Thomas Tr. at 424. Greene then explained that Thorne, "Papoose" Davis and others were merely sellers, while "[t]hey was like the head people." Thomas Tr. at 424. The prosecutor then asked Greene to explain who she meant by they.

Q.    Who were the head people?
A.    "Whitey," "O," – Whitey," "O," "J.R.," "V" because "V" mostly, after he came down he mostly controlled the drugs."

Thomas Tr. at 424-25.   She then explained that Thomas "controlled the drugs because he had it bagged up and gave it out to people to sell." Thomas Tr. at 425. Contrary to the Defendants' current suggestion, Greene did not contradict her prior testimony that the Defendants were "partners" nor did she contend that Thomas took over leadership of the organization and managed Tipton, Johnson and Roane. Rather, Greene's later testimony, merely reflects that in January and February of 1992, within the partnership, Thomas was primarily tasked with the duty of distributing the drugs to the workers.  Assumption of this task by Thomas, left the other Defendants more time to pursue the other increasing needs of the enterprise such as obtaining cocaine, collecting drug debts, eliminating the competition, and killing suspected snitches.[20]  Accordingly, the above listed claims will be dismissed because the Defendants have not demonstrated that the prosecution presented misleading, much less false testimony from Greene.

In his index of claims, Tipton alleged that Greene's purportedly false statements discussed above demonstrated that the Government had violated Brady v. Maryland, 373 U.S. 83 (1963). See Tipton Claims V.D.3, V.D.4. The three components to a Brady claim are (1) the evidence at issue must be favorable to the defendant, whether directly exculpatory or of impeachment value; (2) it

---

[20] Nor is there any plausible suggestion that Greene's testimony at Thomas' trial is somehow exculpatory.

42

J.A.1252

must have been suppressed by the government, whether willfully or inadvertently; and (3) it must be material. See Spicer v. Roxbury Correctional Institute, 194 F.3d 547, 555 (4th Cir. 1999). "Suppressed evidence is 'information which had been known to the prosecution but unknown to the defense.'" Id. at 556(quoting United States v. Agurs, 427 U.S. 97, 103 (1976)). Tipton fails to demonstrate that this evidence meets any of the above elements. The respective roles of Greene and Thomas in distributing drugs was common knowledge to the members of the drug conspiracy. Tr. at 1690, 2708; Fullwood v. Lee, 290 F.3d 663, 686 (4th Cir. 2002), cert. denied, No. 02-7101, 2003 WL 99455 (U.S. Jan 13, 2003). Moreover, Greene's statements from the Thomas' trial do not diminish Greene's credibility or Tipton's guilt and do not create any possibility of a different result at either the guilt or sentencing phases. Accordingly, Claims V.D.3 and V.D.4 will be dismissed.

## VI.    ACTUAL INNOCENCE
Tipton Claim V.I
Johnson Claim III
Roane VIII

"Claims of actual innocence, whether presented as freestanding ones, see Herrera v. Collins, 506 U.S. 390, 417, (1993), or merely as gateways to excuse a procedural default, see Schlup v. Delo, 513 U.S. 298, 317 (1995), should not be granted casually." Wilson v. Greene, 155 F.3d 396, 404 (4th Cir. 1998). In Schlup, the Supreme Court held that the proper test for whether a habeas petitioner has established that his case is "extraordinary" enough to fall into that "narrow class of cases," which "implicat[e] a fundamental miscarriage of justice," is whether that petitioner has shown that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." Schulp, 513 U.S. at 327. Thus, in order to have his procedurally defaulted claims reviewed in these proceedings, the Defendants must show that "it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." Id.; see also O'Dell v.

43

Netherland, 95 F.3d 1214, 1249-50 (4th Cir. 1996).

This exacting standard requires the petitioner to bring to the federal habeas court probative, reliable, new evidence which establishes the claim of innocence. See Weeks v. Bowersox, 119 F.3d 1342, 1352 (8th Cir. 1997)(en banc). And, as explained by the Supreme Court:

> To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence--whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence--that was not presented at trial. Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful.

Schlup, 513 U.S. at 324. And, of course, the new evidence "not presented at trial" must also have been evidence that was excluded or not available at the time of trial. Id. at 327-28. The habeas court then must evaluate "petitioner's innocence 'in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial.'" Schlup, 513 U.S. at 328 (quoting Friendly, Is Innocence Irrelevant? Collateral Attack on Criminal Judgments, 38 U. Chi. L. Rev. 142, 160 (1970)).

The Defendants assert that they are actually innocent of being an organizer of a continuing criminal enterprise violation. Their new reliable evidence of innocence consists of the same frail evidence they offer to prove their claims that Government witnesses perjured themselves. The Defendants' new evidence and the host of arguments presented in the papers does nothing to dispel the overwhelming evidence documentary and testimonial evidence that they are guilty of running a CCE and of the CCE related murders for which they stand convicted. Accordingly, with the exception of Roane's claim that he is actually innocent of the murder of Doug Moody, the

44

J.A.1254

Defendants' claims of actual innocence will be dismissed.

## VII.    THE MOODY MURDER

### A.    Evidence Of The Moody Murder At Trial

In early 1992, Ronita Hollman and Doug Moody were selling drugs in the Newtowne area for Peyton Maurice Johnson. Tr. at 1992-93. Tipton, Johnson, and Roane decided to take over the drug trade in Newtowne. Tr. at 1156-58, 2330. As part of this plan, Roane and Tipton approached Hollman to lure her away from her association with Peyton Johnson and to sell drugs for them. Tr. at 1962-63. Tipton told Hollman about his plans for the Newtowne area and informed her that they were willing to kill people to accomplish those plans. Tr. at 1963. Shortly, thereafter Tipton, Johnson, and Roane began to eliminate their competition in the Newtowne area.

On or about January 6, 1992, Cory Johnson and Roane left two handguns with their underling, Robert Papoose Davis. Tr. at 1894. On January 11 or January 12, 1992, Roane retrieved one of the guns from Davis. Tr. at 1895. Douglas Moody was murdered shortly after midnight on January 13, 1992. See Gov't Trial Exhibit 119. Moody had been shot once and stabbed repeatedly.

Shortly after midnight on January 13, 1992, Denise Berkley testified that she was smoking crack at a building on the corner of Clay and Harrison Streets. Tr. at 1694. Berkley heard a shot followed by the breaking of a window from the back of the building. Tr. at 1696. After disposing of her drugs, Berkley went outside and saw Roane repeatedly stabbing Doug Moody while Moody pleaded for Roane to stop. Tr. at 1697-98. Roane then approached Pepsi Greene, gave her the knife and told her to get rid of it. Tr. at 1699. Later that evening, Berkley went to a house on Moore Street, where Tipton was talking excitedly about how he had tried to shoot Moody at the house on Harrison Street.

Pepsi Greene testified that she was on the corner of Clay and Harrison Street when she heard two or three shots. Tr. at 2549. Pepsi then saw Roane and Tipton exit the house from where the shots were fired. Tr. at 2549. After five or ten minutes, Pepsi, accompanied by Roane, went to Curt Thorne's house, where Roane directed Pepsi to get him the big knife he stored there. Tr. at 2550-51, 2572-3. Later that night, Roane returned the knife, now covered with blood, to Pepsi and told her to dispose of it. Tr. at 2551-52.

Papoose Davis also testified that, on January 13, 1992, following the Moody murder, he heard Tipton and Roane conversing as follows, "Yeah, I got him, I got him . . . we can't stay out here this is hot anyway." Tr. at 1896. Davis lived within a block or two of the Moody murder. Tr. at 2560.

The next day, January 14, 1992, Berkley was present while Tipton, Johnson and Roane loaded firearms in a house on Norton Street. Tr. at 1705-6. Later that evening, Roane and Johnson retrieved the guns. Tr. at 1707-08. Roane asked Berkley if she had seen Peyton Maurice Johnson. Tr. at 1708-09. Berkley told him she had just seen him go around the corner. Tr. at 1709. Roane then located Peyton Maurice Johnson in a tavern. Within minutes of Roane departing the tavern, Cory Johnson entered the tavern and fatally shot Peyton Maurice Johnson with an automatic weapon.

### B.    Purported Perjury By Pepsi Greene
Roane Claim I.c.3.c

Roane contends that Greene's testimony from Lance Thomas' trial demonstrates that she lied at his trial regarding the events of the Moody murder. However, Roane does not direct the Court to any testimony from the Thomas trial that contradicts her earlier testimony. Rather, Roane directs the Court to testimony from Thomas' trial where Greene admits, 15 minutes prior to the shooting of Doug Moody, she was in Curt Thorne's apartment, with Curt. Roane and Doug Moody arrived

46

**J.A.1256**

and "they excused me out of the house." Thomas Tr. at 426. After the shots were fired, Curt ran out of the house followed by Roane. Thomas Tr. at 426. Roane fails to demonstrate how Greene's subsequent testimony contradicted her testimony at his trial; why Greene was on the corner at the time of the shooting was not explored at Roane's trial.[21] Accordingly, Roane's Claim I.c.3.c will be dismissed because he has failed to demonstrate that Greene testified falsely.

### C. Actual Innocence And Ineffective Assistance Of Counsel In Conjunction With The Moody Murder
Roane Claim IV.B.2

Roane contends that his counsel failed to conduct an adequate investigation and defense into the murder of Doug Moody. For ease of analysis, this claim is best divided into three subparts: (a) counsel's failure to adduce available testimonial and documentary evidence to support an alibi; (b) counsel's failure to discover the testimony of an eyewitness who swears that Tipton and Johnson, not Roane, murdered Moody; and (c) general critiques of the quality of counsel's cross-examination and argument. While the trial record largely belies Roane's general critiques of counsel's performance, Roane has tendered evidence which offers substantial support to the first two aspects of this claim and his assertion that he is actually innocent of the murder of Doug Moody.

#### 1. Counsel's Performance At Trial

At trial, David Baugh, one of Roane's attorneys, effectively cross-examined both Berkley and Greene, developing the inconsistencies between their accounts and the accounts of other witnesses. Furthermore, Baugh called Gina Taylor, a neighbor who had attempted to aid the

---

[21] Roane suggests that Greene concealed this information at his trial because she wished to prevent the exposure of Thorne's possible role in the murder of Moody. That suggestion is belied by the record; Greene acknowledged that Thorne was present at the site of Moody's murder in her statement to the police and implicitly in her testimony at trial. See Tr. at 2570-80; Clerk's Record # 778 Ex. A & B.

47

J.A.1257

wounded Moody. Taylor testified that she had seen the individual jabbing the prostrate Moody. Taylor testified that the assailant was only about five feet six inches tall and was definitely not Roane. Baugh followed up this description by presenting evidence that two hours before the murder, a person named Keith had come to Moody's mother's house looking for him, and that a week prior, Keith's friends, armed with machine guns, had kicked in the door of Moody's mother's residence while attempting to find Moody. Baugh then called Detective Dalton who stated the foregoing information initially had led the police to suspect Keith Barley, a small featured black juvenile male, as Moody's murderer. Roane's complaints about the quality of Baugh's courtroom performance, with exception of the lack of an objection to Pepsi Greene's statement regarding the motivations for the Moody murder, fail to point up any significant deficiency on the part of counsel.

Pepsi Greene stated Peyton Maurice Johnson and Doug Moody were killed because "O and Whitey and them didn't want Maurice and 'Little Doug' to work that area." Tr. at 2553. Assuming that counsel was deficient for failing to object to this statement on the ground that there was no foundation, Roane fails to demonstrate that an objection might have resulted in the exclusion of Greene's statement, much less altered the outcome of the proceedings. Although Rule 602 provides that a witness' testimony must be based on personal knowledge, it "does not require that the witness' knowledge be positive or rise to the level of absolute certainty. Evidence is inadmissible . . . only if in the proper exercise of the trial court's discretion it finds that the witness could not have actually perceived or observed that which he testifies to." M.B.A.F.B. Federal Credit Union v. Cumis Insurance Society, Inc., 681 F.2d 930, 932 (4th Cir. 1982). Roane fails to direct the Court to any evidence that suggests Greene's challenged statement was based on speculation rather than the conversations of her coconspirators. Moreover, even if Roane could have excluded Greene's

48

statement he cannot demonstrate prejudice. As recited above, there was ample circumstantial evidence, from numerous witnesses which demonstrated that the Doug Moody murder and the Peyton Johnson murder (that occurred the following day) were part of the Defendants' plan to eliminate competition in the Newtowne area. Accordingly, Roane was not prejudiced by counsel's failure to object to the foregoing statement.

### 2.    Failure To Present Alibi Evidence

Roane contends that his counsel was deficient for failing to present evidence that he was at a hotel on the night of Doug Moody's murder. An attorney's failure to present available exculpatory evidence is ordinarily deficient, "unless some cogent tactical or other consideration justified it." Washington v. Murray, 952 F.2d 1472, 1476 (4th Cir. 1991). In his affidavit, Baugh acknowledges that,

> [p]rior to trial, James Roane told me that at the time Douglas Moody was murdered he was at a Richmond motel. I attempted to obtain records from the motel confirming that fact, but was unsuccessful. Mr. Roane identified a witness to that fact, whom I interviewed. She confirmed Mr. Roane's account but stated that she did not want to testify. I do not recall why I did not subpoena her or call her as a witness.

Roane Opening Memo. Ex. H at ¶ 3. Neither Baugh nor the record suggests any tactical reasons for not calling this unnamed woman who would have provided Roane with an alibi for the Moody murder. Additionally, Roane has produced hotel records from the Howard Johnson hotel at 3207 North Boulevard that support his claim that he was at a hotel at the time of the Moody murder. See Roane Reply Memo Ex. A. The records reflect that on January 2, 1992 and January 12, 1992, a Mr.

J.A.1259

Chiles[22], rented a room and then checked out the following day. Id. The records are accompanied by a letter from the present management indicating they were readily available in 1992. Id.

Giving Roane the benefit of all favorable inferences, the record before the Court indicates that Roane's counsel performed deficiently when he failed to produce available testimonial and documentary evidence of an alibi. See Bruce v. United States, 256 F.3d 592, 599-600 (7th Cir. 2001); Griffin v. Warden, 970 F.2d 1355, 1358 (4th Cir. 1992). The Government fails to direct the Court to evidence to counter the suggestion that the failure to produce this evidence was attributable to bad judgment and an inadequate investigation. Furthermore, it is difficult to discount the effect of this alibi evidence in light of the disputed direct eyewitness testimony regarding the description of the individual who stabbed Moody to death. A plausible alibi might sufficiently bolster Gina Taylor's testimony that Roane was not the attacker to create a reasonable probability of a different result. See Bruce, 256 F.3d at 599-600 (remanding for evidentiary hearing to determine whether defendant prejudiced by counsel's failure to call alibi witness); Griffin, 970 F.2d at 1358. Accordingly, the Government's motion for summary judgment on Roane's claim that counsel was deficient in his investigation of the Moody murder will be denied.

### 3.    Demetris Rowe

Roane contends that the inadequacy of counsel's pretrial investigation is further evidenced by counsel's failure to locate and call as a witness Demetris Rowe. Roane has tendered an affidavit from Rowe, who swears that she witnessed the Moody murder from across the street on a porch.

---

[22] One of Roane's minions, who acted as a driver, was named Linwood Chiles. The registration card for January 2, 1992 is under the name of Linwood Chiles. The registration card and receipt for January 12, 1992, is under the name Larry Chiles. Both registration cards contain the same address for Mr. Chiles.

Specifically, Rowe avers that,

> At the time of the killing, I had been on the porch for several hours. Earlier, I had seen "Whitey" and "O" enter an apartment at the back of [the] house. A couple of hours later, I saw Doug Moody enter the same apartment. A few minutes later, I heard noises of a fight from the apartment, and saw Doug Moody come out of the apartment. Moody was bloody, and staggering. He was followed closely by "Whitey" and "O." Moody went into the yard, and then, the alley, where "Whitey' and "O" attacked him. A woman came out of the house next door and tried to help Moody.
>     I did not see James Roane, Sandra Reavis, Pepsi Greene or Denise Berkley at the scene of Douglas Moody's murder.

Roane Third Amend. Memo. Ex. A, Clerk Record #849.

The United States has not specifically addressed counsels' failure to discover Rowe's testimony in its motion for summary judgment. Hence, this Court may only summarily dispose of this claim without an evidentiary hearing only if, "the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255 Raines v. United States, 423 F.2d 526, 531 (4th Cir. 1970). In this regard, Roane persuasively argues that Rowe's proffered testimony creates a reasonable probability of a different result. Similarly, the record does not conclusively refute Roane's suggestion that the failure to discover Rowe's testimony is attributable to an unreasonable failure[23] by counsel to canvass the vicinity of the Moody murder to locate eyewitnesses to the crime who could exculpate his client.

Roane further contends that Rowe's testimony demonstrates that he is actually innocent of the Moody murder. In order for Roane to have his defaulted claims excused, based on his assertion

---

[23] The information known to counsel justified such an investigation. Specifically, prior to trial, counsel had the testimony of an apparently disinterested eyewitness, Gina Taylor, who insisted that Roane did not commit the murder. Second, counsel had the detailed account of the alibi from his client. Third, counsel's initial investigation, corroborated the details of the account provided by Roane.

51

of actual innocence, Roane must eventually persuade the Court that "it is more likely than not that no reasonable juror would have convicted him" had Rowe testified in accordance with her affidavit. See O'Dell v. Netherland, 95 F.3d 1214, 1249-50 (4th Cir. 1996). However, to survive summary judgment, Roane is required merely to produce evidence, which if credited, creates a material question of fact as to whether no reasonable juror would have convicted him. Certainly Rowe's belated testimony can be viewed with some scepticism and is not entirely supportive of the evidence of his innocence offered at trial.[24] Schulp, 513 U.S. at 332(noting the court may consider "the timing of the submission and the likely credibility of the affiants" in assessing probable reliability of new evidence). However, Roane's conviction turns primarily on a credibility contest between the testimony of Pepsi Greene and Denise Berkley and Gina Taylor. And, in this setting Pepsi Greene's credibility is bolstered by the statement she gave to the police prior to sustaining brain damage. See Schulp, 513 U.S. at 328 (actual innocence review includes evidence tenably claimed to have been wrongly excluded). Nevertheless, in light of the ample, but limited, evidence marshaled against Roane, Rowe's testimony, if credited, constitutes the sort of concrete eyewitness testimony deserving of a hearing. See Armine v. Bowersox, 128 F.3d 1222, 1227-28 (8th Cir. 1997). Accordingly, the foregoing claims will be dismissed in part. Roane is entitled to an evidentiary hearing on his assertions that he is actually innocent of the Moody murder and that he was denied effective assistance of counsel in defense of that crime.

## VIII. THE TALLEY MURDER

At approximately 8:00 a.m., on January 5, 1992, the police found Doug Talley stabbed to

---

[24] Rowe's proffered testimony is inconsistent with defense witness Gina Taylor's testimony that she saw a single small individual, who she did not recognize, stabbing Moody. Gina Taylor had had a romantic relationship Tipton.

death in his car, on the southside of Richmond. On the floor in the rear of the car, the police found an army field jacket belonging to Johnny Lee Byrd. In the jacket, the police found Byrd's glasses, some pills and a dull, rusty, six inch long knife(hereinafter the "Byrd knife"). The police tested the knife and although the presence of blood was detected, tests to determine the species of origin were inconclusive. Clerk's Record #778, Ex C. Additionally, police were unable to recover any "latent prints of value for identification purposes" from the Byrd knife. Id.

At trial, Johnny Lee Byrd testified he had been selling drugs with Talley for a few days, when on January 3, 1992, Tipton asked to borrow his field jacket. Later that day, Byrd and Talley went to Papoose Davis, on four or five occasions, to obtain drugs to sell. Thereafter, Byrd smoked some of the drugs he obtained and spent the money he had earned from selling the drugs so that he was unable to repay Davis or the Defendants.

On January 4, 1992, Talley accompanied by Tipton, Roane and Johnson came looking for Byrd. Byrd was hiding because he was unable to repay the Defendants for the drugs that had been provided to him. When the Defendants could not find Byrd at his residence, Roane punched Talley in the eye.[25] Then, Tipton, Roane, Johnson, and Talley drove off.

Hussone Jones testified that on January 4, 1992, Tipton told Jones to get in his car and follow Tipton and Roane who were going to ride with Doug Talley. Between 3 a.m. and 5 a.m. on January 5, 1992, Talley stopped on a corner on the southside of Richmond . Jones pulled in behind Talley's car, within a "car or two lengths." Tr. at 1571. Roane and Tipton got out of Talley's car and then got back in. Roane sat behind Talley and Tipton sat in the passenger seat. Roane grabbed Talley around the neck and Tipton started stabbing Talley in the body. "After awhile," Roane released

---

[25] A bruise over Talley's eye is clearly visible in the autopsy pictures. Gov't Ex. 4-3.

53

**J.A.1263**

Talley and got in the car with Jones.

At Roane's direction, Jones pulled up beside Talley's car. By this point, Tipton had gotten out of Talley's car and continued to stab Talley, who "was hanging out of the car." Tr. at 1575. Tipton's final stab stuck in Talley's head, and Tipton had to push his foot against the door to get the knife out. Tipton kicked the car door in an attempt to shut Talley's body in the car, but the door would not shut. Tipton, Roane and Jones, left the scene with Talley's body still hanging out of the door.

Tipton told Jones to take them to "Wildman's" house. After dropping off Roane, Tipton and Jones arrived at Wildman Stevens' house. Jones testified that Tipton gave Stevens the knife to wash off while he took a shower.

Tipton and Roane allege that the prosecution knew or should have known that Jones' description of the Talley murder and the events immediately following it were false. Additionally, Titpon contends that his counsel provided ineffective assistance in defending Tipton on the Talley murder.

### A.    Purportedly False Description of the Stabbing
Tipton Claim V.C.2,
Roane Claim I.c.4

Tipton and Roane assert the description of the stabbing was false because "the crime scene video and the location where Talley's car and body were discovered would have revealed that the position of the streetlights did not allow a clear view of the events. The most [Jones] could have seen were shadows and silhouettes." Tipton Opening Memo at 70. The record reflects that Jones was within ten to twenty feet of the stabbing. Although the crime scene video does not reveal any streetlights within fifty feet of where Talley's car and body were found, it offers persuasive evidence

54

that Jones would have been able to clearly witness the stabbing. In the video, filmed about four hours after the murder, the interior car light is on (Talley's head and arm prevented the door from closing). See Gov't'Trial Ex. 119. Thus, Jones would have had an illuminated view of the stabbing, after Roane exited Talley's car and subsequently when Talley or Tipton opened the driver's door.

Next, the Defendants cite Dr. Fierro's testimony for the proposition that Talley was either stabbed from behind by a right-handed assailant or stabbed from the front by a left-handed assailant. Asserting that he is right-handed, Tipton argues that Jones' account of the stabbing must have been false and the prosecutor must have known of its falsity. Contrary to the Defendants' suggestion, Dr. Fierro's testimony does not contradict, Hussone Jones' description of the mode of attack employed by Talley's murderer.

> Q.    You keep pointing to the right side of your neck. Were the majority of his injuries received from the right side of his body?
> A.    Yes.
> Q.    Would that indicate to you that his attacker was to his right, to his left, behind, or in front of him?
> A.    It either means that someone is behind him stabbing this way, or in front of him stabbing this way. (Witness indicating.)

Tr. at 2066. Dr. Fierro's testimony did not suggest that Tipton, who was initially sitting on the right of Talley, could not stab Talley on the right side of his body. Additionally, although Talley had 47 stab wounds to his right scalp and neck, the remainder of the wounds were distributed across his body and head.[26] Such a diffusion of wounds is consistent with Jones' description that, by the end of the stabbing, Talley had struggled partly out of the car and Tipton had left the car and continued to stab Talley from outside the vehicle. And, Jones' description of a stab wound penetrating the skull

---

[26] Talley had 11 stabs wounds on the front of his chest and neck, 14 stab wounds to his his face, 9 to his right upper back, and 3 stabs to his right wrist

**J.A.1265**

was confirmed by the autopsy.

In addition to the autopsy, the minutiae of Jones' account were corroborated by the crime scene and the testimony of Charles Townes. Just as Jones described, Talley's car was parked near a corner, Talley was left hanging out of the door, and the car door bore a dent from where Tipton had attempted to kick the door shut. Furthermore, the police recovered Tipton's blood-smeared finger print from the door of Talley's car. Finally, Jones' account of the stabbing was confirmed by Charles Townes. Tipton told Townes that Jones was present while Tipton stabbed Doug Talley in the head, in Talley's car, on the southside of Richmond. The record conclusively refutes Tipton and Roane's assertions that Jones testified falsely regarding his viewing of the Talley murder or that the prosecution knew Jones testified falsely in that regard.

Next, Roane and Tipton allege that the prosecution knew that Jones testified falsely about Tipton giving the murder weapon to Wildman Stevens' to wash. The only admissible evidence they offer to support this is a vague affidavit wherein Stevens swears that "Richard never gave me a knife to wash. I have never seen Richard with a knife. I recalled Mr. Toby Vick asking a lot of questions." Tipton Reply Memo App. at 8. The United States has responded by submitting the affidavit of Toby Vick and contemporaneous notes of his interview with Stevens. Vick swears that "[t]here was no information other than that contained within my written notes that was given to me by Mr. Stevens which was germane to the issue. There was nothing of an exculpatory nature contained in Mr. Stevens' statement to me." Govt's Resp. Ex. B.[27] Vick's notes do not indicate

---

[27] It is unclear when Vick interviewed Stevens. Jones initially failed to reveal his role in the Talley murder to the prosecution or the grand jury. Tr. at 1596-97, 1615, 1646. Until Jones revealed his role in the Talley murder, the record does not suggest the prosecution would have a reason to question Stevens about the night of the Talley murder.

56

Stevens was questioned or provided any information about a knife or the Talley murder.  The record

does not  demonstrate any knowing use of false testimony by the United States.  Moreover, in light

of the overwhelming evidence that corroborated Jones' account of the Talley murder, there is no

"reasonable likelihood" any testimony about events at Wildman's house "could have affected the

judgment of the jury," with regard to the conviction of Roane and Tipton for the Talley murder.  See

United States v. Bagley, 473 U.S. 667, 679 (1985).  Tipton's Claim V.C.3 and Roane's Claim I.c.4

will be dismissed.

> **B.      The Prosecution Suppressed "Wildman" Stevens' Statement Regarding The
>             Events At His Home Following The Talley Murder**
>             Tipton Claim V.D.1
>             Roane Claim I.b.

Roane and Tipton assert that the same facts which demonstrate that the prosecution knew

Jones lied about the events at Stevens' house constitute a Brady violation.  Specifically, Vick was

obliged to inform the defense that Stevens had denied receiving a knife from Tipton.  However, as

described above, there is no evidence that Stevens actually conveyed such information to Vick.

Accordingly the above listed claims will be dismissed because the prosecution had no exculpatory

information from Stevens.

> **C.      Counsel Failed To Adequately Defend Tipton On The Charge That He
>             Murdered  Talley**
>             Tipton Claims V.F.1.h

In support of this claim, Tipton asserts that counsel (1)  should have called Victoria Harris

as an alibi witness, (2)  should have called Wildman Stevens as a witness to refute Jones' testimony,

(3) should have pointed out that it was too dark for Jones to have observed the stabbing, (4) should

have performed independent testing on the knife found in Johnny Lee Byrd's jacket to determine

whether it was the murder weapon, and (5) should have requested the appointment of a fingerprint

**J.A.1267**

expert.

Conspicuously absent from these criticisms is any evidence from Tipton that he told his counsel that the foregoing avenues of investigation would have been fruitful.   See Lackey v. Johnson, 116 F.3d 439, 152 (5th Cir. 1997)(counsel is not ineffective for failing to discover evidence about which the defendant knows but withholds from counsel).  For example, there is no evidence that Tipton told counsel that Victoria Harris could provide him with an alibi[28] or that Wildman Stevens would contradict Hussone Jones' description of the events following the Talley murder. Nevertheless, Tipton maintains that counsel's duty to conduct a reasonable investigation required him to seek out and interview Stevens.  This is not true.  Counsel had no reason to believe that it would be fruitful to interview Stevens when the Government's evidence indicated that Stevens was simply another CCE minion.  Tipton has not shown counsel was deficient for failing to interview or call Stevens and Harris as witnesses.   Additionally, because Talley's car was illuminated by the interior car light, counsel wisely eschewed contending that Jones' description of the stabbing was a fabrication.

Similarly, counsel had little reason to believe the independent forensic analysis urged here by Tipton would aid Tipton's defense to the Talley murder.[29]  For example, Tipton contends counsel

---

[28]   Tipton has failed to produce an affidavit or any other evidence to support his claim that Victoria Harris could provide an alibi.  See Fed. R. Civ. P. 56(e).

[29] At trial, defense counsel suggested through cross-examination and argument that the knife found in the pocket of Byrd's jacket was the murder weapon.  Counsel then called Detective Cox who testified that they had questioned Byrd in conjunction with the Talley murder and that Byrd had provided inconsistent statements regarding the identity of the person to whom he had supposedly lent his jacket.  And in closing argument, counsel for Roane and Tipton called to the jury's attention the similarity in the width of the knife recovered from Byrd's jacket and the stab wounds described by Dr. Fierro.

58

J.A.1268

# EXHIBIT 73 - PART 2

**J.A.1269**

should have conducted an independent forensic and fingerprint analysis of the Byrd knife and the blood on that knife. Counsel's decision to forego independent forensic testing was entirely reasonable in light of his knowledge that pretrial testing was unable to ascertain the species of the blood on the knife and indicated that "no latent prints of value for identification purposes are present." Clerk's Record #778, Ex C; see Jones v. Murray, 947 F.2d 1106, 1112 (4th Cir. 1991)(concluding counsel reasonably relied on state experts in foregoing an investigation of mental health defenses).[30] Nevertheless, Tipton argues that even if the latent fingerprints were not sufficient to provide a positive match they might have been sufficient to eliminate him as the subject who left the fingerprints. Counsel reasonably eschewed this investigation -- no one suggested that Tipton had used the Byrd knife to murder Talley.[31] Thus, instead of wasting time and resources on an investigation that was unlikely to provide exculpatory information,[32] counsel chose to exploit the Government's failure to conduct the additional testing to undermine its proofs with respect to the

---

[30] Counsel had no reason to suspect the state employees who conducted the tests were incompetent or biased in the performance of their duties. The record indicates the testing was performed at a time when the police were still questioning Byrd as a suspect with regard to the Talley murder.

[31] Nor can Tipton demonstrate any prejudice flowing from the lack of an independent forensic examination of the Byrd knife . On May 3, 2000, the Court granted Tipton's request to have the knife examined by his expert. Thereafter, the Court forwarded the knife and other materials pertaining to the murder of Talley to Tipton's forensic expert, Herbert MacDonnell. MacDonnell's examination of the knife did not produce any new exculpatory information nor did it identify the species of the blood on the knife. See Clerk's Record # 822, Ex. 1. Instead, without explaining what tests he conducted, MacDonnell speculates that, perhaps, DNA testing might reveal the nature of the blood found on the knife blade.

[32] Counsel had good reason to believe that additional expert testimony would constrict the range of available defenses. Specifically, while counsel freely suggested to the jury that Byrd murdered Talley, counsel knew that Byrd had passed a lie detector test with regards to that murder. Tr. at 5. Additionally, the dull rusty knife recovered from Byrd's jacket is not entirely consistent with the "sharp blade" that had been used to kill Talley. Tr. at 2069(Dr. Fierro).

59

Talley murder.  See Smith v. Stewart, 140 F.3d 1263, 1273 (9th Cir. 1998)(in rejecting ineffective assistance claim, court notes that counsel "was happier to have [missing witness] as an empty chair to which he could point, without facing the danger of refutation").  Thus, in his closing argument, counsel employed these omissions to great effect noting the prosecution's failure to tell the jury about the Byrd knife even though it was "obvious[]" from Dr. Fierro's testimony that the knife could have been the murder weapon.  Tr. at 3041-42.  Counsel then suggested that the prosecution had not performed any tests to determine if the Byrd knife was the murder weapon because such tests might be inconsistent with the prosecution's "Get Whitey" theory.  Counsel made a similar inference about the failure of the police to determine whether the substance from which Tipton's fingerprint was lifted was in fact blood.

Undeterred, Tipton contends that counsel should have retained an expert to testify that Tipton's fingerprint recovered from the window of Talley's car could have been made prior to the Talley murder.  Counsel was able to elicit testimony on this point from the prosecution's expert who admitted that he could not tell if the fingerprint recovered from Talley's car had been made in December or January.  Such a brief jab at the prosecution's evidence was a sounder tact than prolonged expert testimony on the theoretical life span of fingerprints on glass or disputing the prosecution's assertion that the print found was superimposed in blood in light of the crime scene photos.  Those photos reflect that Tipton's latent print was found superimposed in a reddish brown substance that looks identical to the blood that was smeared all over the crime scene. See Gov't Ex. 1-1 through 1-7.  Tipton has not demonstrated that counsel was deficient in his investigation and presentation of a defense to the Talley murder.  For these same reasons, Tipton's request to conduct additional discovery and testing regarding Byrd's jacket and/or Byrd's other personal items obtained

60

from the Talley car will be denied.  See Clerk's Record 822.  Moreover, in light of Tipton's bloody fingerprint at the crime scene, Jones' well-corroborated eyewitness account of the murder, and Tipton's confession of the murder to Charles Townes, Tipton has failed to demonstrate a reasonable probability that any further investigation by counsel would have altered the jury's findings.   The above described claims will be dismissed.

> D.     **Counsel Was Deficient For Failing To Object To Incorrect Instructions Regarding The Enterprise Element Of the RICO Charges**
> Tipton Claim V.F.1.g.2

Title 18 U.S.C. § 1959 penalizes certain violent crimes, such as the Talley murder, when they are committed for the purposes of gaining entrance to or maintaining or increasing one's position in "an enterprise engaged in racketeering activity."  In order to secure a conviction under § 1959, "the Government must prove both the existence of an "enterprise" and the connected "pattern of racketeering activity."  United States v. Turkette, 452 U.S. 576, 583 (1981)(explaining the distinction between the two elements).  When instructing the jury on the elements of  a § 1959 offense, the Court twice misspoke, referring to racketeering activity when it should have said "an enterprise engaged in racketeering activity".  Tr. at 3220.  However, the instructions as a whole told the jury that it must find both the existence of an enterprise engaged in racketeering activity and the criminal acts that constitute the racketeering activity, see United States v. Tipton, 90 F.3d 861, 888 (4th Cir. 1996).   Moreover, in light of the abundance of evidence demonstrating that the racketeering enterprise existed, Tipton has not explained, much less demonstrated, a reasonable probability that more accurate instructions would have resulted in his acquittal on the RICO counts.  Accordingly, the above claim will be dismissed.

**IX.  THE STONEY RUN MURDERS** (Curt Thorne and Linwood Chiles)

61

**J.A.1272**

## A.   Evidence At Trial

On February 19, 1992, at approximately 10:15 p.m., Curt Thorne, Linwood Chiles, Gwen Greene and Pepsi Greene were shot in Chiles' station wagon, on Stoney Run Road.[33]  Pepsi Greene testified that she, Gwen, Thorne, Chiles and Johnson were driving when they pulled in "something like an alley." Tr. at 2558.  A gray car pulled in behind them.   Johnson told Chiles to place his head on the steering wheel, then Johnson put a gun to Chiles' head and shot him.

Gwen Greene testified that, immediately prior to being shot, Tipton called to her from outside the vehicle, she then saw Tipton wearing blue jeans and a brown jacket with a hood.[34]   This description of Johnson's accomplice to the Stoney Run murder was confirmed by Walter Tuck, a passing motorist, who observed a medium complexioned black male, wearing a brown jacket, walking away from the murder scene.

Additionally, the Government's evidence indicated that Tipton's arrival at the murder scene in the gray vehicle was part of a plan he and Johnson had coordinated to provide a getaway car. Specifically, Valerie Butler testified that at 4:00 p.m., on February 19, 1992, Johnson borrowed her gray car and then called Tipton.  Johnson then appeared at Nita Bracey's house around 7:30 p.m. with Curt Thorne.  At 8:00 p.m., Johnson dropped Butler off at her home and told her he needed to

---

[33] Officer Cynthia Riley testified that she received a call to respond to the shooting at 10:36 p.m.  Tr. at 2519.  Walter Tuck testified that he saw a lady lying in the road with blood around her head and the radio announced the time as 10:17 p.m.  Tr. at 2529-31.

[34] Tipton asserts that only a single gun, that was later recovered from Johnson, was used in the Stoney Run murders.  Although the portions of the record cited by Tipton attribute some of the recovered bullets to a Glock later retrieved from Johnson, the ballistic evidence does not demonstrate whether all the bullet fragments recovered from the crime scene came from the Glock recovered from Johnson.  In contrast, the possibility of a second shooter is suggested by Thorne's autopsy which reflected that he had been hit by bullets fired from two different directions.

J.A.1273

keep her car because he wasn't finished with it. Johnson then picked up Curt Thorne and drove to an apartment on the Southside of Richmond where they waited for Chiles and the Greene sisters to arrive. When Chiles and the Greene sisters arrived, Johnson paged Tipton, who was driving around with Charles Townes, John Knight, and Thomas "Stoodie" Green.[35] Tr. at 1188. Upon receiving the page, Tipton called Johnson back and then got in the car and said "'C.O. just got all four of them'. Studie [Stoodie] said, 'Who?' He said, 'Linwood, Curt,' and then he had cut it short." Tr. at 1189. Townes and Knight then dropped Tipton and Stoodie Green off at an apartment in the Southside of Richmond and drove home. Townes and Knight arrived home at 9:45 p.m.[36] Meanwhile, Tipton had left the apartment and was driving to aid Johnson in eliminating Thorne, Chiles, and the Greene sisters.

### B.    Alleged Brady Violation
Tipton Claim V.D.2

In Claim V.D.2, Tipton contends that the Government suppressed, in violation of Brady, the exculpatory statements of his alibi witnesses to the Stoney Run murders. Specifically, Tipton contends that, when he was paged by Johnson, the Stoney Run murders already had occurred, hence, he went back to the car and told Knight, Stoodie Green, and Townes that Johnson had killed four people. "Knight and Green [in turn] told government agents that Tipton said that Johnson had killed four people." Tipton Reply Memo at 52. This Brady claim is flawed. Here, Tipton obviously knew the identities of the parties who had heard his comments following the page from Johnson and was

---

[35] Townes testified that Tipton was wearing blue jeans and a gray hooded sweatshirt. Except for the color of the sweatshirt, the clothing is consistent with what Gwen Greene stated Tipton was wearing on the night of the murder.

[36] Townes was very sure about the time, because Knight had to work the next day.

J.A.1274

free to question them.  Such facts foreclose any <u>Brady</u> claim because, "where exculpatory information is not only available to the defendant but also lies in a source where a reasonable defendant would have looked, a defendant is not entitled to the benefit of the <u>Brady</u> doctrine." <u>United States v. Wilson</u>, 901 F.2d 378, 381 (4th Cir. 1990). "Certainly, then, information that is not merely available to the defendant but is actually known by the defendant would fall outside of the <u>Brady</u> rule." <u>Fullwood v. Lee</u>, 290 F.3d 663, 686 (4th Cir. 2002), <u>cert. denied</u>, No. 02-7101, 2003 WL 99455 (U.S. Jan 13, 2003).  Additionally, Tipton has not tendered evidence that demonstrates that Stoodie Green provided the police with any statement containing exculpatory information regarding the Stoney Run murders.  Moreover, as discussed below in connection with the related ineffective assistance claim, Green and Knight's vague proffers utterly fail to counter the direct and circumstantial evidence that Tipton was an active participant in the Stoney Run murders.  Tipton's Claim V.D.2 will be dismissed.

### C.    Counsels' Failure To Call Knight And Green As Defense Witnesses
Tipton Claim V.F.1.i

In Claim V.F.1.i, Tipton blames his counsel, rather than the Government, for failing to adduce purportedly exculpatory evidence from Knight and Stoodie Green.  Conspicuously absent from the record is any evidence from Tipton that he told counsel that Stoodie Green or Knight could exonerate him from involvement in the Stoney Run murders.  "In general, counsel is not ineffective for failing to discover evidence about which the defendant knows but withholds from counsel." <u>Lackey v. Johnson</u>, 116 F.3d 439, 152 (5th Cir. 1997).  Counsel reasonably concluded from Tipton's silence that neither Green nor Knight could provide exculpatory information.  Moreover, as discussed below, Tipton has failed to demonstrate that Green or Knight could counter the compelling

64

J.A.1275

evidence of his involvement in the Stoney Run murders.

Tipton has submitted an affidavit wherein Stoodie Green avers that,

> I was with Richard Tipton, Charles Townes, and John Knight on February 19, 1992, the night Linwood Chiles and Curt Thorne were killed. I remember Richard received a page from someone and using the telephone. Later that evening we hear it on the news.
> I know Richard Tipton did not commit that crime . . . .
> I never heard Richard Tipton talk about killing people.

Tipton Reply Memo Ex. 10. Strikingly absent from Green's affidavit is an indication that Green could provide Tipton with an alibi for the interval between roughly 9:30 and 10:17 p.m. when the Stoney Run murders occurred. In the absence of that information from Green, Green's general denial of Tipton's guilt has little probative value. See Evans v. Technologies Applications & Service Co., 80 F.3d 954, 960-61 (4th Cir. 1996). Nor does the affidavit of Alfred Brown prove that Green could offer a convincing alibi for Tipton.[37] Tipton Reply Memo Ex. 11. Brown's affidavit consists entirely of inadmissible hearsay. See Greensboro Prof. Firefighters Ass'n v. Greensboro, 64 F.3d 962, 967 (4th Cir. 1995); Maryland Highways Contractors Ass'n v. Maryland, 933 F.2d 1246, 1251-2 (4th Cir. 1991).

Tipton fails to demonstrate that John Knight could have contributed any more to his defense

---

[37] In his affidavit Brown states,

> Greene told me that on the afternoon of February 19, 1992, he was riding with Richard Tipton, John Knight and Charles Townes. They were in south Richmond when Richard Tipton received a page from Cory Johnson. After using the telephone, Richard returned to the vehicle and stated "four people just got killed."
> He also said that he and Richard remained together, and later that night they watched the report of the murders on the news.

Tipton Reply Memo Ex. 11.

65

than Stoodie Green. Knight avers that,

> On February 19, 1992, I was in the company of Thomas Green, Charles Townes, [and] Richard Tipton in South Richmond when Richard received a page. I stopped the car to allow him to use the telephone. He returned to my car and said four people had gotten killed.
> Shortly after that I drove them to Hillside court where Richard and Stoodie got out at a house.
> I returned to Central Gardens with Charles Townes.
> I was questioned by police and I gave the above statement to a detective.

Tipton Reply Memo Ex. 9. Conspicuously absent from Knight's proffered testimony is any reference to time. Regardless of what Tipton may have said upon his return to the vehicle, the evidence convincingly demonstrates that the murders did not occur until after Tipton received the page.

Saunders' testimony placed the page at about 9:30 p.m. Tuck, the passing motorist, indicated the murders had taken place just before 10:17 p.m. John Knight has not proffered any testimony that suggests he could have testified to Tipton's whereabouts during the interval of time between 9:30 p.m and 10:17 p.m. Furthermore, the circumstantial evidence, as recounted above, strongly supports the Government's theory that during the interval roughly from 9:30 p.m. to 10:17 p.m., Tipton had retrieved Valerie Butler's gray car and was following Chiles' station wagon, so as to provide Johnson a means to flee the crime scene. The theory that Tipton had planned the Stoney Run murders was further supported by Tipton's comments to Johnson that he "moved too fast; it was not supposed to be done there." Tr. at 1349 (Saunders' Testimony). Sterling Hardy also presented evidence that indicated the murder of Chiles was to be a joint venture planned by Johnson and Tipton. While incarcerated Sterling Hardy told Lance Thomas that he was concerned that Chiles

66

might testify against them. Tr. 2191. Thomas responded, "not to worry about that, because what he did for Cory and Whitey, that they will take care of that for them." Tr. at 2191. Finally, Gwen Greene's compelling testimony placed Tipton at the scene of the murders. Tipton has demonstrated neither deficiency nor prejudice. Tipton's Claim V.F.1.i will be dismissed.

## X.   THE PROSECUTION KNOWINGLY PERMITTED JERRY GAITERS TO TESTIFY FALSELY REGARDING THE MURDERS OF LONG, ARMSTRONG, AND CARTER
Johnson Claim V.P
Tipton Claim V.C.4

Jerry Gaiters testified that he aided Johnson in murdering Dorothy Armstrong. Relying on testimony from Lance Thomas' trial, Johnson claims that Gaiters perjured himself regarding when he knew that Johnson intended to kill Armstrong. Thomas Tr. at 569. The facts surrounding this claim are as follows. At Johnson's trial, Gaiters testified that he was talking to Linwood Chiles when Johnson asked him for directions to Armstrong's brother's house, Bobby Long. Gaiters told Johnson that he would take him over there. Tipton then pulled up in a car with a young fellow and Johnson and Gaiters got in the car. They drove to 1212 West Moore Street and retrieved a bag of guns. After dropping off the young fellow, they drove to Bobby Long's house. Johnson sat in the back seat playing with a Glock pistol he had retrieved from 1212 West Moore Street. Gaiters stated that he was kind of nervous because Johnson's manner led him to believe that he might be shot in the head.

When they arrived at Bobby Long's house, Johnson told Gaiters, "I want you to get 'Mousey' to bring out the house[sic]. When I shoot the bitch in the as[s] I want you to run back to the car." Tr. at 2343-44. Gaiters went to the door and induced Bobby Long to open the door. At which point,

67

**J.A.1278**

Johnson burst into the room and killed Armstrong, Carter and Long using a Glock pistol. [38]

At Lance Thomas' trial, Gaiters testified that he initially believed that Johnson simply wanted to talk to Armstrong. Thomas Tr. at 569. Counsel then asked Gaiters whether "[a]t some point on the way over there [you knew] what 'C.O.' was going to do didn't you?" Thomas Tr. at 569. To which Gaiters responded, "no." Thomas Tr. at 569. Johnson and Tipton contend that Gaiters' denial of foreknowledge of the Armstrong murder demonstrates that Gaiters lied at their trial and requires that their convictions be set aside. They are wrong.

First, at the Defendants' trial, Gaiters testified that during the car ride to Long's home there was no conversation regarding hurting or killing Armstrong. Tr. at 2367. And Gaiters stated that he only realized the purpose of the trip, "when we got over there" and "were near the house" but not beforehand. Tr. at 2415. Thus, Gaiters' testimony at Thomas' trial was consistent with his testimony at Johnson's trial, that he did not grasp that Johnson intended to shoot Armstrong until they approached Long's residence.

Second, even if the testimony could be deemed to be inconsistent, it would still fall short of demonstrating that Gaiters testified falsely, much less that the government knew that Gaiters was testifying falsely. See United States v. Grilley, 814 F.2d 967, 971 (4th Cir. 1987)("Mere inconsistencies in testimony by government witnesses do not establish the government's knowing use of false testimony.").

Third, even if Gaiters lied regarding the exact moment he became aware of the plan to murder Armstrong, there is no possibility that exposing such a lie to the jury would have altered

---

[38] Denise Berkley testified that Johnson wanted to kill Armstrong because Armstrong had welched on a drug debt.

68

Tipton's and Johnson's convictions and sentences. Defense counsel fully exposed Gaiters dissembling regarding his culpability for the murder of Dorothy Armstrong. See e.g., Tr. 2363-64, 2373-77, 2380-94. Exposing another misrepresentation of that ilk by Gaiters would not significantly diminish Gaiters' credibility regarding the roles Tipton and Johnson played in the murder of Armstrong, Long, and Carter. Cf. United States v. Hoyte, 51 F.3d 1239, 1243 (4th Cir. 1995)(discussing effect of cumulative impeachment evidence). Gaiters' testimony on that score was thoroughly confirmed by Charles Townes and the ballistics evidence. Charles Townes testified that immediately prior to the murders, Tipton and Johnson told him they were going to Church Hill to murder Armstrong. Subsequent to the murders, Tipton provided Townes with an account of the murders which largely corroborated Gaiters' testimony. And, the ballistics evidence corroborated Gaiters' account of the murder. Gaiters asserted that Johnson used a Glock pistol, retrieved from 1212 West Moore Street, to kill Dorothy Armstrong. The ballistic evidence reflected that the bullets that killed Dorothy Armstrong came from a Glock that was hidden at 1212 West Moore Street. Denise Berkley swore that Johnson was the only person who knew where the Glock was hidden. Claims V.P, and V.C.3 will be dismissed.

## XI.   INEFFECTIVE ASSISTANCE OF COUNSEL AT SENTENCING

Each Defendant received one or more sentences of death.[39] Johnson, Tipton, and Roane argue

---

[39] Ultimately, the jury recommended the death sentence for Johnson on all seven of the § 848(e) capital murders for which he had been convicted, those of Louis Johnson, Long, Carter, Armstrong, Thorne, Chiles, and Peyton Johnson. The jury recommended the death sentence for Tipton on three of the capital murders, those of Talley, Chiles, and Thorne, of the six for which he had been convicted. The jury recommended the death sentence for Roane on one of the capital murders, that of Moody, of the three for which he had been convicted. A full description of the aggravating and mitigating factors found as to each defendant is stated at United States v. Tipton, 90 F.3d 861, 894-95 (4th Cir. 1996).

69

J.A.1280

that if counsel had put forth a reasonable effort the result might have been different.  The Court

disagrees with the Defendants' critiques of counsel's performance and the suggestion that a different

result was obtainable but for counsel errors.  Counsel for each Defendant did an excellent job at

sentencing.  The sentences of death are not attributable to counsel's omissions, but to the absence

of evidence or argument that could counter the Government's compelling case that death was the

appropriate punishment for the each Defendant's brutal, remorseless behavior.

### A.    Purported Deficiencies By Roane's Counsel

The jury only sentenced Roane to death for his murder of Doug Moody.  As a necessary

predicate for that sentence, the Government was required to prove that Roane had committed the

murder after substantial planning and premeditation.  See 21 U.S.C. § 848(k)&(n)(8).  Roane

contends, in light of the centrality of this issue, counsel was deficient for failing to challenge the

Government's proof of the issue at sentencing and for conceding in his closing arguments that the

Government had proved the required aggravating factors.

### 1.    Counsel's Failure To Challenge Substantial Planning Aggravating Factor
Roane Claim IV.E.4

Counsel's concession of this issue was reasonable in light of the ample evidence that

demonstrated substantial planning and his sentencing phase strategy of focusing the jury's attention

on the humanity of this client rather than the inhumanity of his actions.  In rejecting his challenge

to the substantial planning factor on appeal, the Fourth Circuit aptly summarized the evidence on this

point as follows:

> the jury had before it information that well before Moody's murder,
> a motive for it, to which Roane was privy with Tipton and Cory
> Johnson, had developed. Specifically, trial evidence showed that

**J.A.1281**

> Moody and his superior, Peyton Johnson, a rival drug dealer, were thought by Tipton, Cory Johnson, and Roane to be standing in the way of their taking over the Newtowne drug market whose development was Roane's special function. Evidence from the guilt phase revealed . . . that. Tipton and Johnson "and them didn't want Maurice [Peyton Johnson] and 'Little Doug' [Moody] to work in that area ... selling cocaine." From this and other information respecting the details of Moody's murder, the jury properly could find that the visit of Roane and Tipton to [the] apartment on the night of his murder was for the pre-planned, premeditated purpose of murdering him. It showed that they went there armed with the pistol used by Tipton in wounding Moody although members of the enterprise did not as a matter of policy ordinarily carry weapons. It showed that Moody's initial wounding and eventual killing were in the pattern of the comparable enterprise-related, cold-blooded assassinations of Talley some ten days earlier and of Moody's superior, Peyton Johnson, the night after Moody was killed . . . . the issue was whether the murder, not its exact means, was the result of substantial planning and premeditation by Roane. And on that issue the jury had ample information upon which to base its finding beyond a reasonable doubt that Moody's murder was "substantially planned and premeditated" by Roane in concert with Tipton.

United States v. Tipton, 90 F.3d 861, 896 (4th Cir. 1996).  Despite this evidence and the jury's prior conclusion that he had murdered Moody as part of their drug dealing enterprise, Roane insists counsel should have argued at sentencing that the evidence did not demonstrate that he murdered Moody as a part of a turf battle.  Counsel wisely eschewed such a doomed tact.

The best hope for Roane was to emphasize the evidence in mitigation rather than challenge the prosecution's solid case on the substantial planning aggravating factor.  See Carter v. Johnson, 131 F.3d 452, 466 (5th Cir. 1997)(concluding it was reasonable for counsel to concede client's culpability in order to establish credibility with the jury); Bell v. Evatt, 72 F.3d 421, 429 (4th Cir. 1995)(concluding counsel reasonably conceded defendant's guilt on the kidnaping charge to retain credibility during the sentencing phase). Thus, at sentencing when the prosecution emphasized that

71

J.A.1282

death was the appropriate sentence based on the numerous violent acts of the Defendants, counsel conceded the acts of the defendants were bad, but emphasized that during the sentencing the jury was "to determine whether or not there is something about their lives and individuality that should justify not killing them. We are not here to look at the acts again. We are here to look at the people." Tr. 3928. In light of the foregoing, counsel's failure to challenge the substantial planning aggravating factor and focus on the mitigating evidence was neither prejudicial or deficient. See Truesdale v. Moore, 142 F.3d 749, 754 (4th Cir. 1998); Pruett v. Thompson, 996 F.2d 1560, 1571 n. 9 (4th Cir. 1993). Claim IV.E.4 will be dismissed.

### 2. Purported Deficiencies In Investigating And Presenting Evidence Of Roane's Mental And Emotional Background
Roane Claim IV.E.1-2

Although counsel adduced evidence regarding Roane's severe poverty, organic brain damage, neglect and abuse, humiliation at the hands of his peers, exposure to community and family violence, learning disabilities, self-medication, and the system's failure to respond to these problems, in Claim IV.E.1, Roane vaguely complains counsel's presentation prevented the information from reaching the jury in a cogent form and omitted other critical evidence. Such charges are heavy with adjectives but light on facts and rely primarily on the affidavit of Dr. Lee Norton, who swears that the mitigation case presented by the defense was incomplete and failed to help the jury understand the mitigation evidence presented. Norton fails to support such criticism with the purported omitted mitigating evidence or with any new insights into the relevance of Roanes' experiences and deficits.

For example, Norton criticizes the quality of the investigation into Roane's background. However, the record demonstrates that counsel and his mitigation experts reviewed thousands of

72

J.A.1283

pages of records and interviewed numerous witnesses in preparation for sentencing. At sentencing, Crystal Noakes, a social worker, described Roane's disturbing family background in great detail, including the fact that he had three uncles who were institutionalized, that his mother had been placed in foster care, and that his father left his mother and was convicted of robbery and murder. Despite these efforts, Roane contends that counsel was deficient for not reviewing the medical records, the school records, and the foster care records of Roane's mother; medical records and prison records of Roane's father; and the records documenting the mental illness of Roane's uncles.

The trial record reflects that counsel had uncovered the essential facts regarding these relatives. Additionally, Roane's mother refused to provide any information regarding her time in foster care and the Government has tendered evidence indicating that counsel actively pursued Roane's mother's medical and school records and his father's prison record. See Govt's Response at Ex. C; see also Tr. at 3723. With much on his plate, and his further inquiry into these areas stymied, counsel apparently concluded further investigation into the background of these relatives was not worth the time and effort. That decision appears to be entirely reasonable. "Just as counsel is not obliged to advance every available nonfrivolous argument, so counsel is not necessarily ineffective for failing to investigate every conceivable matter inquiry into which could be classified as nonfrivolous." Smith v. Collins, 977 F.2d 951, 960 (5th Cir. 1992). Roane fails to overcome the "heavy measure of deference" that is accorded counsel's judgment not to pursue further investigations into these tangential matters. See Strickland v. Washington, 466 U.S. 668, 691 (1984). Additionally, Roane fails to demonstrate that the omitted records would have yielded any significant mitigating evidence, much less that counsel should have been aware of that fact.

Next, Roane charges that his counsel failed to elicit expert testimony that explained to the

73

J.A.1284

jury the relevance of his self-medication, his relationship with his codefendants, his sexual abuse and his witnessing violence in his youth. The relevant impact of all these factors was addressed at sentencing. Dr. William Lordi testified that Roane suffered from brain damage and Attention Deficit Disorder which resulted in paranoia and other personality problems.[40] Dr. Lordi explained that people with Attention Deficit Disorder, like Roane, often self-medicate with drugs or alcohol and that Roane's criminal association with Tipton and Johnson was a natural consequence of Roane's mental disorders and his desire to create the family structure he never had.

Additionally, Dr. Lordi and Crystal Noakes documented and explained the high incident of trauma Roane had experienced growing up. Dr. Lordi and Noakes testified that Roane had been sexually abused by a family friend on a continuous basis from age four to six and that Roane's early antisocial behavior of setting fires was the result of such abuse. Noakes testified that Roane was traumatized by the death of 30 friends and relatives. Counsel made the obvious point that persons subjected to such persistent violence become desensitized to it. Roane criticizes counsel for "failing to make reference to the literature regarding the effects of exposure to violence on cognitive and emotional development," Roane Opening Memo. Ex. Aff. of Dr. Norton at ¶ 10, but fails to support that critique with citation to the literature or any specific proffer as to the content of that literature.

Having failed to demonstrate any omissions on the part of counsel's case in mitigation, Roane proceeds to challenge counsel's selection of witnesses. For example, Roane asserts that counsel should have called a more experienced expert than Crystal Noakes. The record does not suggest any reason why counsel's selection of Noakes was deficient. Indeed, counsel used Noakes'

---

[40] Dr. Semone confirmed Dr. Lordi's diagnosis and testified that Roane's spiral towards crime was entirely predictable and was not volitional or attributable to any moral weakness on Roane's part or the part of his family.

lack of criminal experience to emphasize Noakes' neutrality, noting that Roane's experts were not simply hired guns who regularly testified for defendants.[41] Roane fails to demonstrate that the selection of Noakes was detrimental, much less that it was deficient.

Finally, in Claim IV.E.2, Roane contends counsel was deficient for failing to present testimony from members of Roane's family. See Bassette v. Thompson, 915 F.2d 932, 940-41 (4th Cir. 1990)(noting that a claim that counsel was deficient for failing to call a witness must be accompanied by a specific proffer of the omitted witnesses' testimony). Roane's proof on this issue is limited to an affidavit from his mother, wherein she swears that she could have,

> described for the jury [Roane's] mental and emotional problems and our attempts to receive help for them. I could have described the circumstances of James' upbringing, as well as his effort to obtain additional education. I also would have told the jury that James is a human being, and that his family cares for him and begged the jury not to sentence him to death.

Roane Opening Memo Ex. Aff. Jeanette Roane at ¶ 4. Counsel was able to elicit this sympathetic information from its expert witnesses, and those experts laid part of the blame for Roane's condition at the feet of his mother who they suggested was too overwhelmed by her seven children to provide adequate care for Roane. Tr. at 3721, 3725, 3743-45, 3789-92. As the deficiencies of Roane's mother played a prominent role in the defense theory of mitigation, it was reasonable for defense counsel to conclude that Jeanette Roane might undermine that theory by casting her actions in a more favorable light. See Beaver v. Thompson, 93 F.3d 1186, 1196 (4th Cir. 1996)(concluding reliance on the credibility of reports and documents from disinterested parties rather than risk that

---

[41] Counsel selected Noakes after the mitigation expert originally engaged by the defense, Dr. Lee Norton, withdrew because the Court limited his hours. The record reflects that Crystal Noakes, a specialist in assessing dysfunctional families, was recommended to counsel by the Governor's Commission on Mental Health and Retardation.

J.A.1286

defendant's family members might be discredited or testify adversely to defendant's interests on cross-examination was reasonable trial strategy); Bunch v. Thompson, 949 F.2d 1354, 1364 (4th Cir. 1991)(counsel reasonably eschewed calling father for fear he might downplay traumatic childhood of the defendant). Furthermore, counsel was able to convey to the jury that Roane's family loved and supported him without exposing Roane to the risk of placing family members on the witness stand. During her testimony, Crystal Noakes pointed out Roane's mother and other family members who were in the audience. And, Noakes concluded her testimony by telling the jury that Roane has a "very loving family, very loving attitude. They care about James." Tr. at 3796. In short, the record reflects that counsel reasonably eschewed presenting testimony that stood to do more harm than good. Roane's Claims IV.E.1-2 will be dismissed for failure to demonstrate deficiency or prejudice.

**B.      Counsels' Failure To Introduce Evidence Of The Conditions The Defendants Would Face In Prison**
Tipton V.F.2.b
Johnson IV.B.2,
Roane IV.E.3

Each of the Defendants fault counsel for not presenting evidence regarding the conditions they would face in prison. Even if such evidence were admissible, counsel reasonably chose to forego such tepid evidence in light its potential to expose them to damning evidence and argument from the prosecution. Defense attempts to suggest that the Defendants' confinement was sufficient punishment would permit the prosecution to introduce how the Defendants behaved while confined. Specifically, the Government indicated that both Roane and Tipton had a history of assaultive behavior while incarcerated. The Court had precluded the Government from introducing this evidence because the prosecution failed to include future dangerousness as an aggravating factor

76

J.A.1287

in the death notice. Counsel for Roane had further reason to forego such evidence since he had introduced evidence that Roane preferred jail to his home. Additionally, a defense expert on prison conditions would provide the prosecution with another opportunity to remind the jury that Tipton, Johnson and Roane had a proven inclination to engineer murders from behind prison walls. See United State v. Johnson, 223 F.3d 665, 673-78 (7th Cir. 2000)(noting that it is nigh impossible to prevent inmates from transmitting lethal messages to individuals outside the prison), cert. denied, 122 S. Ct. 71 (2001). Finally, any evidence on the harshness of prison conditions would have permitted the prosecution to compare such conditions to the circumstances of the numerous victims of their crimes, particularly the incapacitated Greene sisters. Accordingly, counsel for the Defendants were not deficient for failing to introduce evidence of the Defendants' prison conditions.[42] Additionally, the Defendants cannot demonstrate prejudice because any mitigating benefit from such evidence was far outweighed by the harmful evidence and arguments that would have accompanied its introduction. See Whitley v. Bair, 802 F.2d 1487, 1494-97 (4th Cir. 1986)(emphasizing court must evaluate the negative aspects of any purportedly omitted mitigating evidence in evaluating prejudice). Accordingly, the above described claims will be dismissed.

### C.    Tipton's Counsel Failed To Present An Adequate Case In Mitigation
Tipton Claim V.F.2.a

Tipton contends that counsel failed to present sufficient evidence of his dysfunctional family life and his tender side. The record refutes such a claim. Mitigation evidence on this score was presented by Tipton's cousin, Tina Wilkinson, Hans Selvog, a clinical psychologist, and Brenda

---

[42] The assertion by Johnson's trial counsel that the failure to introduce this evidence was not the result of strategic or tactical decisions does not alter the Court's conclusion that such an omission was not deficient.

J.A.1288

Williams, a family friend. Wilkinson testified that Tipton grew up in a home in which his mother was regularly beaten, first by Tipton's father and later by his mother's live-in boyfriend; that Tipton's mother and her boyfriend were addicted to heroin and used the drug on a daily basis; that Tipton was present when his uncle committed suicide with a shotgun; that Tipton's mother used to punch him; and that Tipton learned to take care of himself because of his adverse upbringing.

Wilkinson's testimony of Tipton's disturbing upbringing was reinforced by Selvog, a clinical social worker who had interviewed Tipton and his relatives. Selvog described at length Charlene Tipton's (Tipton's mother) heroin addiction, including instances where she overdosed in front of Tipton and confined Tipton to the closet while she conducted all night drug parties. Selvog also related that Charlene would discipline Tipton by punching him in the face, and that Charlene was not attentive to Tipton's medical needs. Selvog testified that Tipton left his mother, but that his paternal grandmother, Ruby Tipton, refused to take him in. Thereafter, Tipton moved in with his father's girlfriend, Brenda Williams, in Richmond, Virginia. Tipton was happy to live with Williams but, recognizing that his presence was a financial burden to her, he told her he thought it was best if he moved on.

Brenda Williams then testified that while he lived with her, Tipton got a job, helped around the house and played with her children. Williams confirmed that Tipton left her home because he did not want to be a financial burden to her.

Based on the foregoing testimony, defense counsel argued, inter alia, that the following nonstatutory mitigating factors mitigated against a death sentence for Tipton:

> Tipton was subjected to emotional and physical abuse and neglect as a child and was deprived of parental guidance that was needed; Tipton suffers from frontal lobe brain dysfunction that went untreated

78

> when he was a child; Tipton was introduced to addictive drugs and alcohol while still a child; Tipton grew up in an impoverished, violent and brutal environment, and was exposed to extreme violence as a child and throughout his life.

Tipton Opening Memo Ex. H. The jury agreed; 10 or 12 jury members found each of the foregoing factors mitigated against a sentence of death and refused to impose such a sentence on Tipton for the murders of Long, Armstrong, and Carter.

In his present claim, Tipton contends counsel was deficient for not calling his mother, grandmother and Victoria Harris. Tipton contends that had counsel called his mother and grandmother as witnesses they would have recounted his terrible childhood and begged for his life, while Harris would testify that Tipton lived with her for a time and she once saw him crying while reading a book about self-image. First, the decision not to call Tipton's mother, or maternal grandmother or Harris is reasonable because their testimony would have been cumulative of the evidence regarding Tipton's dysfunctional family and his sensitive side already heard by the jury. See Bacon v. Lee, 225 F.2d 470, 481-82 (4th Cir. 2000), cert. denied 532 U.S. 950 (2001). Second, Tipton has not supported his assertion that the omitted testimony was qualitatively superior to the presented mitigation evidence. See Neal v. Puckett, 239 F.3d 683, 694 (5th Cir. 2001)(noting court should consider "quality and volume" of omitted mitigating evidence)(citing Williams v. Taylor, 520 U.S. 362, 397-99 (2000)). For example, Tipton has not submitted, affidavits from any of these individuals which demonstrate that they were willing to testify consistent with his allegations. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Thirdly, the record suggests that the decision not to call Tipton's mother or Tipton's grandmother was reasonable because they may have tempered the description of Tipton's childhood and their absence would enforce the idea that Tipton had been

**J.A.1290**

abandoned by his family. Selvog indicated that Charlene Tipton and Ruby Tipton(the paternal grandmother) were not cooperative in preparing Tipton's defense. And, Tipton's mother requested Wilkerson to "make me look good" when she testified. Tr. at 3445. Hence, the absence of testimony by Tipton's immediate family emphasized that Tipton had been "abandoned" by his family, Tr. at 3909, 3911, and permitted counsel to bring this point home to the jury by asking "[w]here was his mother . . . . When her son is on trial for capital murder, when he is facing the death penalty, his mother is concerned that she look good. Does that tell you why she was not here." Tr. at 3917. In light of the foregoing, counsel was not deficient nor was Tipton prejudiced by the absence of the witnesses he urges here. Tipton's Claim V.F.2.a. will be dismissed.

**D.    Johnson's Mental Ability Was Not Accurately Reflected By His I.Q. Test, And, In Fact, Was Below 77**

Johnson Claim IV.B.1, Claim XI

Federal law provides that "[a] sentence of death shall not be carried out upon a person who is mentally retarded." 21 U.S.C. § 848(l); 18 U.S.C. § 3596(c). The Supreme Court has indicated that "[t]o be classified as mentally retarded, a person generally must have an IQ of 70 or below." Penry v. Lynaugh, 492 U.S. 302, 308, n. 1 (1989)(citing American Association on Mental Deficiency (now Retardation) (AAMR), Classification in Mental Retardation at 11 (H. Grossman ed. 1983)). In 1992, the association revised its classification to identify individuals with an IQ of 75 or below as presumptively retarded. See Tr. at 3690; Atkins v. Virginia, 122 S. Ct. 2242, 2245 n. 5 (2002).

In 1982, based on his performance on the WISC-R I.Q. test, Johnson was found to have an IQ of 88. See Exhibit 14, Johnson's Reply Memo. When he was retested in 1985, Johnson was found to have an IQ of 69-74. Id. Counsel recognized the critical import of evidence that would

80

**J.A.1291**

demonstrate that Johnson was retarded. Therefore, in preparation for trial, on October 10, 1992, a defense expert, Dr. Cornell, administered a Wechsler Adult Intelligence Scale test ("WAIS test") to Johnson. Based on his performance on that test, Johnson was found to have an IQ of 77. Tr. at 3685.

Dr. Cornell was aware that if Johnson was found to have an IQ of 75 or lower, Johnson might be deemed mentally retarded and not eligible for the death penalty. Therefore, Dr. Cornell rechecked Johnson's scores, saw Johnson a second time, and consulted with colleagues in order to assure that Johnson's score of 77 was accurate. These efforts failed to reveal any evidence that undermined his conclusion that Johnson had an IQ of 77 and was not mentally retarded.

In Claim XI, Johnson contends his execution is barred because he is mentally retarded. In support of this claim, Johnson directs the Court to a paper published in 1996, subsequent to his trial, that states,

> Individuals appear to gain approximately 3-5 IQ points over a ten year period. Since the WAIS-R was published in 1981, this inflation factor could mean that the average IQ could be as high as 105-107 points rather than the accepted value of 100.

See Johnson Opening Memo Ex. 7, at 2, The Psychological Corporation, <u>An Introduction to the Wechsler Adult Intelligence Scale, 3ed, (WAIS-III)</u>, Tulsksy, Phd.(1996)). In support of the foregoing proposition, the 1996 paper cites to two articles published in 1984 and 1987.[43] However, Dr. Cornell's testimony that he checked his finding and consulted colleagues before concluding that Johnson was not mentally retarded belies the suggestion that Dr. Cornell's analysis did not account

---

[43] Flynn, J.R., <u>The Mean IQ of Americans: Massive Gains From 1932-1978</u>, Psychological Bulletin 95, 29-31 (1984); Flynn, J.R., <u>Massive IQ Gain in 14 Nations: What IQ Tests Really Measure</u>, Psychological Bulletin 101, 171-191 (1988).

81

for possible variations in his testing instrument. Nor has Johnson tendered any testimony from Dr. Cornell expressing doubt about his prior conclusion that Johnson is not mentally retarded. Finally, in preparation for his § 2255 motion, Johnson was granted another full opportunity to demonstrate that he is mentally retarded. See Clerk's Record #700 A & B, 701. Thereafter, Johnson rejected the Court's invitation to submit any new evidence of his mental retardation. See Clerk's Record # 870-874. Hence, the record before the Court demonstrates that Johnson is not mentally retarded. Claim XI will be dismissed.

Undeterred by his own evidence that indicates he is not mentally retarded, in Claim IV.B.1, Johnson contends that counsel was deficient for failing to argue at sentencing that Johnson could not or at least should not be executed because Johnson was mentally retarded. Johnson contends that counsel was deficient for not realizing that Johnson's score on his latest WISC-R IQ test overstated his IQ. In support of this assertion, Johnson tenders an affidavit from trial counsel, who swears that he was not aware of any studies that suggested the IQ tests taken by Johnson may have over estimated Johnson's IQ. Johnson asserts that in light of his 1985 IQ test indicating he had an IQ of 69-74, and the 1992 test that showed Johnson was within a few points of being considered mentally retarded, counsel should not have relied on his expert's conclusion that Johnson was not retarded. Johnson asserts that counsel should have checked behind Dr. Cornell and discovered the studies that suggested the WAIS-R test inflated IQ scores and thereafter argued to the jury and the Court that Johnson was mentally retarded.

With regard to the competency of counsel's performance, the critical question here is whether, in light of the information described above, counsel's reliance on Dr. Cornell's evaluation of Johnson's IQ was reasonable. "[C]ounsel has a duty to make reasonable investigations or to make

82

a reasonable decision that makes particular investigations unnecessary." Strickland v. Washington, 466 U.S. 668, 691 (1984). In this regard, "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Id. Hence, where counsel is presented with a mental health report that refutes prior indications that his client had a potential mental health defense, counsel generally is not required to "second guess the contents of [the] report . . . . [and] spend valuable time pursuing what appeared to be an unfruitful line of investigation." See Wilson v. Greene, 155 F.3d 396, 403 (4th Cir. 1998)(rejecting inmate's claim that counsel should have pursued mental health defenses where psychological report indicated inmate was competent to stand trial and not suffering from a significant mental disease or defect at time of the crime). Thus, the courts have consistently upheld as reasonable defense counsel's decision to abandon a particular mental health defense where expert examination determines such a defense is unfeasible. See Pruett v. Thompson, 996 F.2d 1560, 1574 (4th Cir. 1993); Washington v. Murray, 952 F.2d 1472, 1482 (4th Cir. 1992)(concluding counsel was not deficient for failing to suspect that subsequent experts would disagree with the diagnosis provided by the defense expert prior to trial).

Johnson fails to direct the Court to any laxity that should have caused counsel to doubt Dr. Cornell's conclusion that Johnson was not mentally retarded. Indeed, the record demonstrates that Dr. Cornell reached that conclusion after a careful analysis and consultation with colleagues. In light of Dr. Cornell's stated diligence and the standard for competent performance recited above, counsel was not deficient for failing to discover any purported overestimate of Johnson's IQ.

Johnson also suggests that despite Dr. Cornell's conclusion that Johnson was not mentally retarded, counsel should have nevertheless argued to the jury that Johnson was mentally retarded.

83

**J.A.1294**

Such a tactic fails to account for the loss of credibility that would flow from counsel arguing that his client was mentally retarded when his own expert disputed that conclusion. Instead, at sentencing, counsel conceded that Johnson was not mentally retarded but that the same lack of blameworthiness that had led Congress to preclude the execution of the mentally retarded, warranted a life sentence for Johnson. In this vein, counsel emphasized that Johnson missed the technical definition of mental retardation by a mere two points on his latest IQ evaluation and suffered from severe learning disabilities. Such a tactic was entirely reasonable. Johnson's Claim IV.B.1 will be dismissed.

## XII.  INEFFECTIVE ASSISTANCE OF COUNSEL AS CAUSE EXCUSING PROCEDURAL DEFAULT OF PROSECUTORIAL MISCONDUCT CLAIMS
Tipton V.B.3.d.v, V.F.1.j
Johnson II.C.4.f, IV.A.8,

In the above listed claims, Tipton and Johnson generally fault counsel for failing to stop the purported onslaught of prosecutorial misconduct. In order to prevail on a claim of prosecutorial misconduct, a defendant must demonstrate that: " (1) the prosecutor's remarks and conduct must in fact have been improper, and (2) such remarks or conduct must have prejudicially affected the defendant's substantial rights so as to deprive the defendant of a fair trial." United States v. Golding 168 F.3d 700, 702 (4th Cir. 1999)(internal quotations omitted). Here, Tipton and Johnson contend that both of the above components were satisfied because during the guilt phase the prosecutors vouched for their witnesses, suggested that a government witness had passed a polygraph test, introduced inadmissible evidence that the Defendants were threats to the lives of witnesses, improperly emphasized that Tipton and the other defendants did not testify, treated Tipton and the other Defendants as a group, and duped the trial court into believing witnesses were in the witness

84

J.A.1295

protection program in order to deny the Defendants access to the witnesses.[44] Of course, the question here is not whether the prosecution engaged in misconduct, but whether that misconduct, either individually or collectively, was so egregious that counsel's failure to challenge the misconduct at trial or on appeal denied Tipton and Johnson the right to effective assistance of counsel. It is to that question that the Court now turns.

A.     **Counsel Failed To Object To The Testimony Of Several Cooperating Witnesses Whose Testimony Violated 18 U.S.C. § 201(c)(2).**

| | |
|---|---|
| Tipton V.F.1.k. | Defaulted Tipton V.E.15 |
| Johnson | Defaulted Johnson V.M |
| Roane IV.F | Defaulted Roane I.d.[45] |

These claims are grounded in the now vacated panel decision in United States v. Singleton, 144 F.3d 1343 (10th Cir. 1998), vacated on reh.'g en banc, 165 F.3d 1297, 1299 (10th Cir. 1999). Title 18 U.S.C. Section 201(c)(2) does not prohibit the United States from offering leniency in exchange for testimony, see United States v. Richardson, 195 F.3d 192, 196-97 (4th Cir. 1999), or "from acting in accordance with the long-standing practice and statutory authority to pay fees, expenses, and rewards to informants even when the payment is solely for testimony, so long as the payment is not for or because of any corruption of the truth of testimony." United States v. Anty, 203 F.3d 305, 311 (4th Cir. 2000). None of the Defendants have demonstrated that the United States

---

[44] The Defendants' claims that the prosecution engaged in misconduct by introducing testimony without foundation and otherwise engaged in misconduct with regards to the CCE charges were rejected supra at Section V.C and V.D . Tipton and Johnson also assert the prosecution engaged in the following misconduct at sentencing: the prosecution made unsupported argument regarding the conditions Johnson and Tipton would face in prison; the prosecution misled the jury into believing it had a duty to impose the death sentence; the prosecution argued that sentencing should be based on deterrence. The claims that the prosecution engaged in misconduct at sentencing are addressed infra at XII.C.4.

[45] Roane suggests that novelty rather than ineffective assistance of counsel excused his default.

offered a witness inducements "for or because of any corruption of the truth of [the] testimony." Id. Accordingly, the Defendants cannot demonstrate that counsel were deficient or that they were in any way prejudiced by the failure to raise the claim. The above described claims will be dismissed.

### B.    Purported Prosecutorial Misconduct With Regards To The Witness List
Tipton Defaulted V.E.5.
Roane Defaulted I.a

Tipton and Roane assert that "the prosecution improperly duped the trial court into permitting it to withhold its witnesses' addresses because they ostensibly had been placed in the federal witness protection program when in fact they had not." Tipton's Index of claims at 15-16. This claim lacks a basis in fact. The record before the Court indicates that the prosecution clearly indicated on the witness list that some witnesses were actually in the "Witness Protection Program" while others were merely "in protective custody" or "in protection." Clerk's Record # 393 at 2; # 416. The Court's Order of January 5, 1993 recognized the distinction between witnesses in protective custody or protection and those formally in the Witness Protection Program. Clerk's Record # 397 at 1. The order did not direct the United States to provide defense counsel with any access to witnesses listed in the "Witness Protection Program" while the United States was required to make arrangements to permit defense counsel to meet with the witnesses "in protection" or "protective custody." Id. Nevertheless, the record indicates that the government provided defense counsel with an opportunity to speak with all witnesses in any protective status prior to trial. However, the majority of witnesses declined to speak with defense counsel. On appeal counsel claimed that the Court erred by failing to provide him with addresses of the witnesses in the Witness Protection Program or some other form of protection. The Fourth Circuit rejected that claim noting that "[a]ccess was ultimately

86

**J.A.1297**

provided, and though appellants quarrel with its timing and its circumstances, they have offered nothing indicating that they were actually harmed by the delay." United States v. Tipton, 90 F.3d 861, 889 (4th Cir. 1996). Thus, counsel reasonably eschewed pressing the claim urged here by Roane and Tipton because the prosecution did not engage in any misconduct and they cannot demonstrate how they were harmed by the prosecution's conduct. Additionally, Roane and Tipton allege that this claim is not defaulted because the facts supporting this claim were not available at the time of his appeal. They fail to identify any recently discovered facts that support such an allegation of cause. Accordingly, the above described claims are defaulted and will be dismissed.

## C.    Purportedly Improper Comments By The Prosecution

Even when the prosecution makes inappropriate remarks, a defendant is not entitled to relief unless the offending remarks or conduct "prejudicially affected the defendant's substantial rights so as to deprive [him] of a fair trial." United States v. Adam, 70 F.3d 776, 780 (4th Cir. 1995). The following factors are relevant to that inquiry:

> (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters . . . .(5) whether the prosecutor's remarks were invited by improper conduct of defense counsel . . . , and (6) whether curative instructions were given to the jury.

See United States v. Wilson, 135 F.3d 291, 299 (4th Cir. 1998)(internal quotations and citations omitted). "These factors are examined in the context of the entire trial, and no one factor is dispositive." Id.    However, the prosecutorial misconduct claims are defaulted and Tipton and Johnson must demonstrate cause and prejudice to excuse their default. As the discussion below

87

reflects, while some of the prosecution's comments were improper, in no single instance (or collectively), do the aforedescribed factors so favor a finding of prejudice that counsel was deficient for failing to pursue the claim of prosecutorial misconduct.

1.     **The Prosecution Introduced Inadmissible Evidence Through Which They Vouched That The Defendants Were Threats To The Lives Of The Witnesses**
Tipton Defaulted      V.E.4.
Johnson Defaulted    V.B

Johnson and Tipton complain that the Government improperly elicited testimony from Johnny Byrd, Hussone Jones, Denise Berkley, Denis Moody, Valerie Butler, Robert Davis, Stanley Smithers and Montez McCoy regarding their protective custody status to suggest to the jury that the Defendants posed an ongoing threat to the lives of these witnesses. "The Government may appropriately introduce evidence of their witnesses' participation in the Witness Protection Program in order to counter any inference of improper motivation or bias and, under some circumstances, may present this evidence on direct examination in anticipation of a defense attack upon the witnesses' credibility." United States v. Melia, 691 F.2d 672, 675 (4th Cir. 1982). The key question on this score is whether the prosecution was not merely using such testimony to rebut, "the appearance of special treatment and improper motivation" but was unfairly exploiting the inference that fear of a particular defendant caused the witness to seek the state's protection. Id. at 675-6.

In the Defendants' opening statements and questions on cross-examination, defense counsel suggested that the Government's principal witnesses were testifying because they were simply "bounty hunters" seeking financial rewards and personal gain in exchange for their testimony. See, e.g., 837, 849-54. Thereafter, the Court refused the Government's request to allow its witnesses to testify as to their protective custody status, unless and until, the defense opened the door on cross-

88

J.A.1299

examination. Thus, when the defense counsel elicited that the Government was paying Hussone Jones' rent, on redirect Jones explained that he was in danger and had been placed in the Witness Protection Program. Denise Berkley's testimony about which the Defendants currently complain followed a similar sequence of events.[46] Although Berkley and Jones mentioned concerns for their safety, the prosecution did not attempt in either case to capitalize on these comments.

However, with respect to Denis Moody, Valerie Butler, Robert Davis[47], Stanley Smithers, and Montez McCoy, the prosecution jumped the gun and on direct examination elicited testimony about their participation in the Witness Protection Program or about perceived threats to their safety. On direct examination, the prosecution asked Davis why he was testifying, to which he responded, "[m]y brother and sister got killed. And I felt I would be next." Tr. at 1906-7. On direct examination, Stanley Smithers explained that a state court had continued a show cause against him because he was currently in the Witness Protection Program. Tr. at 2099. On direct examination, eight year old Montez McCoy testified that the Marshals had moved his family to New York. Tr. at 2276. On direct examination, Valerie Butler explained that her children were not living with her because she was in the Witness Protection Program. Tr. at 2686. Although the above comments were technically improper and intentionally introduced, its potential for unfair prejudice was partly mitigated by the jury's understanding that the prosecution was countering the defense's repeated

---

[46] On cross-examination, the defense elicited from Denise Berkley that the United States had relocated her and paid the majority of her bills. Defense counsel further suggested by the tenor of his questioning that the promise of such support was made as an initial inducement to get Berkley to cooperate. On redirect, Berkley explained that she received support because she feared for her safety and had asked to be placed in the Witness Protection Program.

[47] On cross-examination, defense counsel did attempt to impeach Davis regarding the benefits he had received in exchange for his testimony. Tr. at 1933-34, 1952.

J.A.1300

assertion that the witnesses were simply bounty hunters out for personal gain. See United States v. Young, 470 U.S. 1, 12-13, 17 (1985). Moreover, any impression that the Defendants posed a threat to the lives of the witnesses was not the result of the isolated comments cited above but the abundance of properly admitted evidence reflecting that Johnson and Tipton did not want to leave any untrustworthy witnesses to their crimes. For example, Montez McCoy's comment that he had been moved to New York can hardly been deemed to have unfairly prejudiced the defense in light of Butler's testimony regarding a three way phone call between Tipton, Johnson and Roane during which Tipton had told Roane and Johnson that they were dumb for not killing Montez McCoy and the other witnesses to the Torrick Brown murder. Roane then responded that he wanted to kill Martha McCoy and people were trying to locate her for that purpose. Tr. at 2728-29. Butler's testimony in this regard was corroborated by Hussone Jones who testified that he heard Tipton say that Roane "should go back and get the kids" because there "[c]ouldn't be a witness" if there were "[n]o survivors." Tr. at 1580. Similarly, the record reflected that Chiles and Talley were murdered in part to stop them from testifying. Sterling Hardy testified that, while in jail, he told Lance Thomas that he was worried that Linwood Chiles was going to testify "against everybody." Tr. at 2191. Thomas told Hardy not to worry because Tipton and Johnson would "take care of" Chiles. Tr. at 2191. And, Johnson told Charles Townes he killed Chiles because he thought Chiles was talking to the police. Tr. at 1191-92; see Tr. at 2707. The record also suggests that Talley was murdered because Tipton and Roane thought he was involved with the police. Tr. at 1566-67. In summary, it would be nigh impossible to demonstrate unfair prejudice from the brief references to the safety concerns of witnesses because the Defendants were on trial for murdering several potential witnesses. The record was replete with admissible evidence of their efforts to eliminate anyone who

90

**J.A.1301**

posed a threat to the continued vitality of their drug enterprise and the defense invited many of the prosecution's closing comments by its repeated references to the witnesses as bounty hunters. Tipton and Johnson have not demonstrated that counsel were or that they were prejudiced by the failure to pursue the issue at trial or on appeal. The above listed claims will be dismissed.

**2.      The Prosecutors Suggested That A Government Witness Had Passed A Polygraph Test**
Johnson Defaulted V.F.
Tipton Defaulted V.E.8

On redirect examination of Jerry Gaiters, the prosecutor asked Gaiters if he fully cooperated with the police with respect to the murder of Katrina Rozier and did everything that was requested of him, "including taking a test." Tr. at 2428. Gaiters responded yes to each of these questions. Id. Counsel objected and moved for a mistrial. Id. The Court sustained the objection but denied the motion for a mistrial.

The Government concedes, as it must, that the reference to the polygraph was deliberate and improper. However, counsel reasonably eschewed requesting a specific curative instruction since such an instruction could likely draw more attention to Gaiters' ambiguous remark. Nor does this single reference to a "test," pertaining to the uncharged criminal conduct of the murder of Rozier, provide counsel with a strong claim for relief. See United States v. Tedder, 801 F.2d 1437, 1445 (4th Cir. 1986)(rejecting request for mistrial because brevity of polygraph remark without reference to results of test and witness' lengthy examination mitigated potential for prejudice). Hence, appellate counsel's failure to raise the issue on appeal was not deficient. See Plath v. Moore, 130 F.3d 595, 600-01 (4th Cir. 1997)(concluding petitioner could not demonstrate prejudice flowing from counsel's failure to object to brief reference to polygraph exam where results of exam were not mentioned and jury had ample opportunity to assess the witness' credibility); see also Arnold v. Evatt, 113 F.3d

91

J.A.1302

1352, 1363 (4th Cir. 1997).  Accordingly, the above described claims will be dismissed.

### 3.    Purported Improper Remarks By the Prosecution During The Guilt Phase Arguments

#### a.    Counsel were deficient for failing to object to prosecutor's improper closing arguments regarding the supervision element

| | |
|---|---|
| Johnson II.C.4.d | Defaulted II.C.3.b |
| Tipton V.B.3.d.(iii) | Defaulted V.B.3.c.(ii) |

After recapping the Government's evidence on the continuing series element, the prosecutor went on to the third and fourth elements[48] where he stated:

> The next thing we must have proven to you in order to find them guilty of a CCE is that it was undertaken with five or more people acting in conjunction.  And, in deciding this remind yourself of the testimony of Gregg Scott about the New York Boyz.  There were 30 or so New York Boyz operating in Trenton, each of whom recruited to themselves workers.  In Richmond, when the New York Boyz came south with "Whitey," you had the following people, at least, who were working with them in the sale or distribution of cocaine.  You had Denise Berkley, Priscilla Greene, Curt Thorne, Linwood Chiles, Jerry Gaiters, Sterling Hardy, "Papoose" Davis, Hussone Jones, Charles Townes, "Man Man," Maurice Saunders, Antwoine Brooks.  You had the people from Charles City that were testified about.  You had Pam Williams, Charlotte Moore, Greg Noble, Sam Taylor, and a number of others you have heard testimony

---

[48] In order to convict a defendant of engaging in a continuing criminal enterprise the Government must prove:
> (1) defendant committed a felony violation of the federal drug laws;  (2) such violation was part of a continuing series of violations of the drug laws;  (3) the series of violations were undertaken by defendant in concert with five or more persons;  (4) defendant served as an organizer or supervisor, or in another management capacity with respect to these other persons; and (5) defendant derived substantial income or resources from the continuing series of violations.

United States v. Ricks, 882 F.2d 885, 890-91 (4th Cir. 1989).

92

J.A.1303

about.[49]

So that aspect of the CCE is also very clearly proven in this case. That is not an issue.

What is an issue -- let me back up as to the five or more people. You need not find that everyone of these people charged with the CCE, and charged with the CCE are "Whitey," "C.O." and James Roane, you need not find that each and everyone one of these people supervised five or more persons themselves. You need only find as a group, there were five or more people involved in the distribution of cocaine, [hereinafter the **first comment**] just here in the City of Richmond.

But what will be an issue and what you do need to determine in order to determine that indeed a CCE was operated by these people, Continuing Criminal Enterprise was operated by these people, is whether "Whitey," "C.O.," and "J.R." occupied a position of organizer or supervisor. And I suggest to you in that regard, the testimony is also clear and unequivocal. They came down with their source of supply from New York, their source of cocaine, and they orchestrated, organized the people we have already mentioned to you in a distribution outlet, a distribution network. Each and every witness who took that stand testified remarkably consistently concerning the relationship of one with another; that "J.R.," "O," and "Whitey," "V" were partners or bosses; that they were the people who organized the workers, who went out and recruited the workers, who supplied the workers with the cocaine, and that those workers went forth and sold their cocaine on the streets of Richmond. That's all that is required by the law. [the **second comment**] It is not required by the law, as will be argued, I suggest, that they need to provide explicit directions in and orders to each and every one of the people who sold cocaine for them. Although there has been testimony that indeed they supplied directions and orders to each and everyone of these people, that is not necessary for you to find them guilty of operating a Continuing Criminal Enterprise. The language is clear there. All you need to find is that they organized people. And indeed the evidence is clear and unequivocal that they organized a number of people here in the City of Richmond to sell drugs.

---

[49] Johnson and Tipton claim that as a matter of law none of the listed individuals were capable of being a CCE supervisee. As discussed in Section V, the Defendants cannot demonstrate any prejudice on this issue because the jury was properly instructed on the supervision element and there was an abundance of evidence supporting the conclusion that Berkley, Thorne, Gaiters, Chiles, Davis, Jones, Townes, Saunders and numerous others were supervisees.

93

**J.A.1304**

Tr. at 2983-86. The Tipton and Johnson argue that the prosecutor's statements misstated the law and encouraged the jury to convict the Defendants without proof that each Defendant acted as a supervisor or organizer with respect to five or more persons. Additionally, Tipton and Johnson assert that counsel should have objected to the following argument in rebuttal which they contend was inappropriate because the prosecutor sought to avoid the issue of supervision by focusing on inflammatory issues and suggesting that because the case involved drug distribution the jury should convict the Defendants.

> My colleagues have told you and told you and told you how there is no organization here. There is no management. There is no supervision. They say all those things have to be done. It is not true. [the **third comment**] Judge Spencer will tell you what the law is and I will suggest to you the law is that it only requires a person to organize, to supervise or to supervise five or more people in a criminal activity. Mr. Cooley's little cute WonderBread-Safeway joke was interesting yesterday, but it didn't have anything to do with what we are about. Because we are talking about illegal crack cocaine. We are talking about killings. And we are talking about the furtherance of that killing that was done for the furtherance of the conspiracy. The conspiracy to distribute crack cocaine and to make money. [the **fourth comment**] It is not about the legal bread business or Safeway. It is a good analogy, but it does not make any difference. We are talking about apples and oranges. We are talking about a criminal enterprise and a criminal nature. He is talking about a legitimate business. [the **fifth comment**]

Tr. at 3187-88.

Taken in context, the second and third highlighted comments do not mislead the jury as to the supervision element. Rather, these comments simply remind the jury that the supervision element is disjunctive and the Government satisfies the element by demonstrating that the Defendant organized or managed or supervised five or more persons. The fourth and fifth comments were a fair response by the prosecutor to counsel's analogy that there was no supervision because their

94

relationship to the workers was analogous to the Wonderbread-man who simply delivers his bread to the grocery store. Moreover, "the question we have to ask is not whether the prosecutor's comments were proper, but whether they were so improper that counsel's only defensible choice was to interrupt those comments with an objection." Bussard v. Lockhart, 32 F.3d 322, 324 (8th Cir. 1994 ). see United States v. Young, 470 U.S. 1, 13 (1985). Here, counsel reasonably eschewed objecting to the second through fifth comments because they were sufficiently within the bounds of fair argument.

Although the first highlighted comment is not an accurate statement of the law, Tipton and Johnson were not prejudiced by the absence of an objection. As noted previously, the Court instructed the jury that the supervision element required the Government to prove that each defendant individually supervised or organized five individuals. Tr. at 3211-12. The Court repeatedly instructed the jury that "your source as to the law is the Court,"not the lawyers. Tr. at 887, see also Tr. 758-59, 972, 3193-95, And, the prosecutor reiterated that instruction.

> The Court will instruct you as to what the law is. What I say is the law, what any one of these counsel says is the law, is not necessarily what the law is. What the Court instructs you that the law is is what the law is. What the Court tells you is the law is the law that you must follow.

Tr. at 2961.[50] The Court's instructions, and the prosecutor's admonitions foreclose any suggestion that the jury applied the prosecution's single inaccurate statement of the law, rather than the appropriate instruction supplied to them by the Court. Accordingly, neither Tipton nor Johnson have demonstrated that they were prejudiced by counsel's failure to take action with respect to the first

---

[50] The prosecutor prefaced his CCE argument with a reminder to the jury that "the Court is going to apprize you of what the law is." Tr. at 2982.

95

comment. The above listed claims will be dismissed.

> b.      The prosecutors misled the jury by vouching (often in inflammatory terms) to their personal belief in the Defendant's guilt and the veracity of the prosecution witnesses
> Johnson Defaulted Claim V.A
> Tipton Defaulted Claim V.E.3

It is improper for a prosecutor to vouch for, or bolster the testimony of, its own witnesses. United States v. Lewis, 10 F.3d 1086, 1089 (4th Cir. 1993). "Vouching occurs when a prosecutor indicates a personal belief in the credibility or honesty of a witness; bolstering is an implication by the government that the testimony of a witness is corroborated by evidence known to the government but not known to the jury." United States v. Sanchez, 118 F.3d 192, 198 (4th Cir. 1997). In asserting that appellate counsel were deficient for failing to pursue the claim urged here, Tipton and Johnson overstate the occasions the prosecutor engaged in impermissible vouching and ignore the abundance of curative instructions provided by the Court.

During closing argument, the prosecution made the following highlighted comments, which Tipton and Johnson assert were improper vouching.

> Closing statement is . . . to give us an opportunity to argue to you what <u>we believe, what inferences we believe</u> you should draw from the evidence . . .

Tr. at 2956-7.

> There is no 848 murder here, no murder in furtherance of a Continuing Criminal Enterprise charged here, because <u>we know</u>, it was murder over a woman. <u>We know</u> that Robin Cooper was the cause of that murder of Torrick Brown . . . [w]e <u>also know</u> that despite the fact that that murder occurred . . . and was done by James Roane other members of the conspiracy joined him to help that murder.

Tr. at 3003-4. The mere use of the words "we believe" or "we know" does not constitute improper

96

vouching or bolstering because it was not done to suggest a personal belief in the credibility of a particular witness or imply to the jury that information known to the government but not placed before the jury corroborates the prosecution's version of events. See United States v. Adam, 70 F.3d 776, 780 (4th Cir. 1995) (noting that prosecutor's use of the phrase "I think" in an innocuous, conversational sense "d[id] not suggest an attempt to replace the evidence with the prosecutor's personal judgments"). Indeed, in both of the instances complained of above, the prosecutor's argument in the surrounding text directed the jury to consider the evidence as the barometer for judging what it should know or believe.[51]

The highlighted remark set forth below, though perhaps a misstep by the prosecutor, did not provide Johnson or Tipton with a viable basis for challenging their convictions.

> There is no evidence, ladies and gentleman, with the exception of Hardy, Sterling Hardy and Gaiters, that any of the people brought forth by the government and placed in this witness stand to provide evidence to you knowingly and willingly engaged in a murder . . . .
>
> \* \* \* \*
>
> . . . the government has told these people that the words that they give to you from that witness stand will not be used to prosecute them, with the exception of Hardy and Gaiters, who were knowingly involved in murders by their own testimony, who are facing sentencing in this Court, by this Judge, for their involvement in those murders. Ladies and gentlemen, again I remind you, you cannot penetrate a conspiracy without some of the participants in the conspiracy cooperating with you. It is not an exact science. Use-immunity agreements had to be given. We feel like we gave use immunity only to those people who were not the murderers in this case. There has been no evidence that anyone other than Richard Tipton, Cory Johnson, Lance Thomas, Sterling Hardy and Jerry Gaiters were involved in the murders.

---

[51] Nor was the prosecution's references to the portions of the witnesses' plea agreements that required them to testify truthfully good fodder for an appeal. Tr. at 2968; see United States v. Henderson, 717 F.2d 135, 137-8 (4th Cir. 1983); Jenner v. Class, 79 F.3d 736, 739 (8th Cir. 1996).

J.A.1308

Tr. at 2966-68.  While the comment may be read to suggest factors not presented to the jury played

a part in the distribution of use immunity, the unfair prejudicial effect was marginal because (1) it

was isolated; (2) it did not deflect any plausible suggestion of guilt from one of the witnesses[52] onto

the defendants; (3) the evidence of Johnson and Tipton's guilt of the murders was overwhelming;

and, (4) the jury was instructed that comments of the attorneys were not evidence and that "the

testimony of one who provides evidence against a defendant . . . for immunity from punishment . .

. must always be weighed by the jury with greater care and caution than the testimony of an ordinary

witness . . . . such testimony is always to be received with caution and weighed with great care." Tr.

at 3199-32000.

Indeed, the protective hedge of instructions issued by the Court provided a strong

disincentive to appellate counsel hoping to demonstrate prejudice flowing from any improper

comments by the prosecution. See Bennet v. Angelone, 92 F.3d 1336, 1346-7 (4th Cir. 1996); United

States v. Francisco, 35 F.3d 116, 120 (4th Cir. 1994).  At the outset of the trial, the Court explained

that:

> Certain things are not evidence and it is important that you
> understand what is not evidence . . . . First of all, statements,
> arguments, questions by lawyers are not evidence. Objections to the
> questions are not evidence . . . . You should not be influenced by the
> objection or the Court's ruling on it. If the objection is sustained,
> ignore the question. If the objection is overruled, treat the answer like
> any other.

Tr. at 759.  After opening statements, the Court admonished the jury that,

> [t]he evidence in this matter is what comes from the witness stand,

---

[52] Although the defense counsel tried to implicate Byrd in the Talley death, as reflected
supra, Tipton's guilt on that matter was overwhelming.

98

**J.A.1309**

the exhibits, and any stipulations. The statements, comments, arguments by lawyers are not evidence and should not be accepted as such. A classic example is that we had a couple of objections.

Tr. at 887-88. Finally, after closing arguments in the penalty phase, the Court instructed the jury:

it is your duty to determine the facts. And in so doing, you must only consider the evidence that I have admitted in the case. The term 'evidence' includes the sworn testimony of the witnesses and the exhibits admitted into the record, and any stipulations or agreements between the parties.

Remember that any statements, objections, or arguments made by the lawyers are not evidence in the case. . . . What the lawyers say is not binding upon you.

Tr. at 3194-95. Given the instructions provided to the jury and the evidence arrayed against their client, counsel wisely refrained from pursuing the claims urged here by Tipton and Johnson.

For example, Tipton and Johnson fault counsel for failing to raise on appeal an exchange where the prosecution purportedly vouched for Gaiters by the manner in which it asked questions.[53] In light of the fact the objection was sustained and that Woody's subsequent proper testimony corroborated Gaiters' account, and the Court's instructions, any unfair prejudice to the defense was unmeasurable.[54] Next, Johnson and Tipton contend that the prosecution engaged in misconduct

---

[53] The prosecution asked Detective Woody whether Gaiters "is telling the truth" regarding the Armstrong, Long, and Carter murders. Tr. at 2442-43. Counsel objected and the objection was sustained. Tr. at 2443. Detective Woody then testified that Gaiters had consistently described the motive and the manner in which Johnson had committed the triple murder. Tr. at 2443.

[54] The defense later called Woody as a witness. In response to defense questions, Woody testified that in consideration for information, the police had dropped a number of petty charges against Gaiters. Counsel asked whether a number of more serious charges including a murder charge, a rape charge and a robbery charge against Gaiters also had been dropped. Woody responded affirmatively to this question. On cross-examination, the prosecution asked if the murder, rape and robbery charges were dismissed in consideration for cooperation or because the "investigation revealed that he had not committed" the particular crime. Tr. at 2855. Woody responded that the charges were dismissed based on Gaiters' apparent lack of culpability rather

99

when it asked Roane's psychiatric expert whether he considered Roane to be "a virtual killing machine." Tr. at 3770. The Court sustained the objection. While the prosecution's question was improper, appellate counsel for Johnson and Tipton were hardly deficient for failing to pursue the issue on appeal; the question was not directed to their client, the objection was sustained, and the Court instructed the jury to ignore a question if any objection is sustained. The Defendants also complain about the manner in which the prosecution twice phrased its objections. Even if such remarks were improper, they were hardly worthy of appellate consideration. See Tr. at 1983, 2053-54.

Finally, Johnson and Tipton complain that the prosecution engaged in misconduct during the sentencing p hase w hen t wice d uring o pening a rgument, a nd o nce d uring c losing a rgument h e referred to them as "mass murderers." Counsel reasonably abstained from appealing the issue because that appears to be a fair description of their clients. In light of the instructions provided, the context of the purportedly improper comments and the abundance of evidence, counsel reasonably decided not to appeal the issues urged by Tipton and Johnson in Claims V.E.3 and V.A and such claims will be dismissed.

      **c.    The prosecutors misled the jury by treating the Defendants as a group, rather than as individuals**
Tipton Defaulted Claim V.E.9
Johnson Defaulted Claim V.G.

During guilt phase closing arguments, the prosecution told the jury that,

> What happened on January 14? James Roane, Cory Johnson, and Richard Tipton and 'V' Mack get Pam Williams to go buy this Intratec and the AA Arms handguns. What do they do with these guns next? They take them to 'Papoose' Davis' house . . . [Tipton's

---

than for any consideration for his cooperation.

100

counsel's objection to the use of 'they' overruled] . . . They come up there that day on January 14th, get the guns, and go take a life, that of Peyton Maurice Johnson. They come back and brag about their marksmanship.

Tr. at 3176. Johnson contends that the prosecutor misled the jury because there was no evidence linking him to Williams' purchase of the handguns and Tipton contends there is no evidence that he shot Peyton Johnson. Johnson is simply wrong. Although Roane and Thomas accompanied Williams to the gun shop, Johnson gave Williams crack cocaine in partial payment for her aid in obtaining the guns and told Williams' boyfriend that Williams was required to complete the transaction when she attempted to back out of purchasing the guns.

Although it may be reasonably inferred that Tipton approved of the murder of Peyton Maurice Johnson, it was imprecise and sloppy for the prosecution to suggest, during guilt phase closing argument, that Tipton had actually shot Peyton Johnson.[55] However, in light of the abundance of evidence of guilt, the precise verdict forms, and Court's instructions[56], appellate counsel would have had an impossible task in demonstrating their clients were prejudiced by the

---

[55] Tipton and Johnson also restate their complaint, rejected above (see supra first comment and fifth comment Section XII.C.3.a) , that the prosecutor misstated the law when he suggested the supervision element was satisfied if the Defendants had collectively supervised five persons.

[56] At the beginning of the trial, the Court instructed the jury that, "Each defendant's case should be considered independently." Tr. at 35. After opening statements the Court stated, "one final thing before I make the admonishment and let you go: the defendants are charged in a number of Counts, and there are obviously four defendants. Each defendant is entitled to individual consideration. They cannot be grouped. When the time comes for you to decide guilt or innocence, you will consider each defendant individually, as it relates to each count in which that defendant may be charged." Tr. at 888. And the jury was admonished in closing instructions that "the case of each defendant should be considered separately and individually. The fact that you may find one or more of the accused guilty or not guilty should not control your verdict as to any other offense or any other defendant." Tr. at 3231.

101

prosecutor's occasional collective references to the Defendants. Tipton and Johnson's challenges to the prosecutor's collective references during the sentencing phase are addressed below.

### 4.    Alleged Improper Comments By The Prosecution During The Penalty Phase

#### a.    The prosecutors misled the jury by treating the Defendants as a group, rather than as individuals
Tipton Defaulted Claim V.E.9
Johnson Defaulted Claim V.G.

One of the nonstatutory aggravating factors was that the defendant was a knowing and willing member of a conspiracy which had as one of its goals the murder of individuals other than those for which the defendant was charged.[57] In opening statement at the sentencing phase, the prosecution suggested this factor was satisfied because, "it is clear that each one of them intended to kill other people to hide this conspiracy. They intended to kill Martha McCoy and her children because they survived and were witnesses." Tr. at 2228. "Remember under the law of conspiracy, they are guilty of each and every one of the acts that they did together."Tr. at 3330.[58] Contrary to Tipton and Johnson's suggestion, the underlined comment was permissible because it does not encourage the jury to collectively assign blame based on membership in a conspiracy but based on jointly committed actions.

_____

[57] To support that factor, the Government reintroduced the guilt phase evidence. The Government also presented further evidence that Johnson, Tipton, and Roane, while incarcerated, had planned to kill several witnesses: Johnson told another inmate he planned to kill Detective Woody; Roane told Douglas Cunningham, Martha McCoy's boyfriend, there was $10,000 "hit" on McCoy's life if she testified, and that McCoy's uncle "was going to be the next one," Tr. 3361; Tipton told Cunningham, "that something was going to happen to me if I was to testify," Tr. at 3359; and Willie Seward overheard Tipton using the phone to tell someone that "he wanted Detective Woody killed . . ." Tr. at 3385.

[58] Shortly thereafter, the prosecutor stressed that each defendant was "due individual consideration in your rendering of your verdict." Tr. 3332.

102

J.A.1313

Next, Johnson and Tipton contend that the prosecutor made a number of collective references in closing argument that were improper. "They deserve the maximum punishment, ladies and gentlemen, because in addition to their drug dealing, they chose to kill ten people." Tr. at 3903; "We have been in trial for five weeks, the same length of time within a week that these three people killed ten –[59]." Tr. at 3945. "They know how to do these crimes." Tr. at 3948. Appellate counsel did not ignore these above comments by the prosecution. Rather, appellate counsel cited these comments to support their primary challenge to the Defendants' sentence; that the failure to conduct separate penalty hearings denied them individualized consideration. See Roane App. Brief at 120. In rejecting that argument the Fourth Circuit concluded that "the court's frequent instructions on the need to give each defendant's case individualized consideration sufficed to reduce the risk to acceptable levels." United States v. Tipton, 90 F.3d 861, 892 (4th Cir. 1996)(noting any risk of unfair prejudice was diminished by the separate packets of penalty verdict forms for each Defendant and the Court remonstrances to the Government to "be specific" and to "do it individually" when objections were made). Appellate counsel's use of the prosecution's improper collective references to support his challenge to the joint penalty hearing, rather than in support of a separate claim of prosecutorial misconduct, reflects effective appellate advocacy. Moreover, the Court's repeated instructions foreclose any suggestion of prejudice.[60] Hence, Johnson and Tipton's assertion that ineffective assistance of counsel excuses their default is rejected because they have not demonstrated

---

[59] At this point, Tipton's counsel objected to the use of "these" and the amount of murders. The Court sustained the objection.

[60] The Court's closing instructions repeatedly emphasized that each defendant was to be judged individually. Tr. 3985-86, 4002. The Court repeated during closing instructions that the arguments of lawyers were not evidence and it is the juror's recollection of the evidence that controls. Tr. at 3996.

103

J.A.1314

that counsel was deficient or that they were prejudiced. Tipton's Claim V.E.9 and Johnson's claim

Claim V.G will be dismissed.

> **b.    The prosecutor misled the jury by improperly emphasizing that the defendants did not testify**
> Defaulted Tipton V.E.7
> Defaulted Johnson V.E

Tipton and Johnson assert that the prosecutor engaged in misconduct when he repeatedly

commented upon their silence. The most egregious of these comments occurred during the closing

argument. The prosecutor noted that Tipton had told his experts about the deprivation of his youth

which his experts had then conveyed to the jury, yet, "[h]ave you once seen from that witness stand

this week an iota of remorsefulness from that man?" Tr. at 3897. Counsel objected. The Court

sustained the objection and admonished the prosecutor "don't get stupid in the end of this, please."

Id. Immediately, upon the conclusion of the prosecutor's argument the Court instructed the jury as

follows:

> Mr. Vick, in the zeal of his argument, indicated that Mr. Tipton had spoken many times and openly to the defense expert and they took the stand and discussed that. He then followed that up with "But you haven't seen one iota of remorse from the witness stand."
> You cannot, you will not, ever require a defendant to take the stand. The defendant doesn't have to testify. The defendant doesn't have any burden to prove that he should not be put to death. The burden is on the government to prove beyond a reasonable doubt that a defendant should be put to death.
> As I will indicate to you in further instructions, as I've said to you earlier in the first part of the trial, the argument on the part of counsel is just that. It is not evidence. And you must consider it in that light. But under no circumstances are you to take that kind of argument as indicating that the defendant has an obligation to take the stand and tell you something, even if to indicate remorse. Do you understand?

Tr. at 3906-7. Later, the Court denied the Defendants' motion for mistrial. Tipton's counsel

J.A.1315

appealed that decision and the Fourth Circuit summarily rejected the claim. United States v. Tipton, 90 F.3d 861, 901 n.25 (4th Cir. 1996).

Tipton and Johnson contend that appellate counsel should have shorn up this claim by pointing to other instances where the prosecutor purportedly made improper comments about their silence. The following rule is used to assess whether argument by the prosecution constitutes an improper comment on the defendant's failure to testify, "[w]as the language used manifestly intended to be, or was it of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify?" United States v. Francis, 82 F.3d 77, 78 (4th Cir. 1996)(quoting United States v. Anderson, 481 F.2d 685, 701 (4th Cir. 1973)). In answering that question, the Court must look to the context in which the comment was made. See Francais, 82 F.3d at 78. Because, as reflected below, the other remarks, in context, are not indicative of a manifest intent to comment upon the defendants' failure to testify and are more readily understood to comment upon the evidence and defense counsel's arguments, counsel reasonably eschewed pursuing the claims urged here by Johnson and Tipton. See Bates v. Lee, 308 F.3d. 411, 420-22 (4th Cir. 2002).

During the sentencing phase closing arguments, the prosecution summarized Johnson's case in mitigation as follows,

> As to Mr. Cory Johnson, he too says, "I've had a bad youth. I've got a learning disability. I should therefore be excused from blameworthiness for what I have done." You can't do that, ladies and gentleman. The testimony of the doctors who testified for him have made it clear that he knew right from wrong.

Tr. at 3898. The foregoing statement does not seek to impugn Johnson's silence. In fact, its most natural reading is to encourage the jury to give Johnson's statements conveyed though his experts

the same weight as if Johnson had made them directly from the witness stand.  Cf. United States

v. Walker, 272 F.3d 407, 415 (7th Cir. 2001)(concluding similar attribution of testimonial evidence

to defendant during closing argument was not outside the bounds of closing argument), cert. denied,

122 S. Ct. 1456 (2002).

Next, Johnson and Tipton complain that the prosecutor commented upon their silence, when

during closing argument at the guilt phase, he argued that

> I suggest to you that the evidence has been clear and unequivocal . . .
> . That 11 people lie dead in the streets of Richmond, Virginia because
> those men with others, including "V," wanted to make themselves rich
> selling drugs, wanted to protect their drug business . . . .I suggest to
> you that . . . as to Count One of the indictment, the conspiracy count,
> that those gentlemen haven't truly argued to you, in either opening or
> in the questions presented to the witnesses during the trial, that they
> are not guilty of Count One.  <u>They have implicitly conceded that
> indeed that they have sold drugs, that indeed they sold drugs together.
> Count One in this case has been implicitly conceded by defendants
> James Roane, Cory Johnson</u> –

Tr. at 2960.  At this point the Court overruled an objection by Roane's counsel.  The prosecution

then continued,

> And I suggest to you through opening and through questioning of the
> witnesses in this case, there can be no great issue as to the guilt of
> James Roane, Richard Tipton, and Cory Johnson as to . . . the
> conspiracy count.  Each of them admitted tacitly, if not implicitly,
> that they sold drugs.  <u>Each of them admitted tacitly, if not implicitly,
> that they were together often.  Each of them has admitted tacitly, if
> not implicitly that they sold drugs together in concert with each other.</u>

Tr. at 2961-62.  Placed in context, the remarks are not of such character that the jury would

naturally and necessarily take them to be a comment on the failure of the accused to testify; the

highlighted remarks direct the jury to consider the evidence adduced and the comments by defense

counsel, not the Defendants' silence, in evaluating whether the Defendants were guilty of

106

**J.A.1317**

conspiracy.[61] Therefore, the comments are not inappropriate.  See United States v. Mietus, 237 F.3d. 866, 871-72 (7th Cir. 2001); Oken v. Corcoran, 220 F.3d 259, 270-71 n. 7 (4th Cir. 2000); Francis, 82 F.3d 77, 78 (4th Cir. 1996); see also Tr. at 2976.  To the extent the prosecution's comments may have otherwise been improper, counsel reasonably forsook appealing the issue in light of the evidence of guilt on the conspiracy charge and their concessions during their own opening statements and closing arguments that their clients were guilty of conspiracy to distribute drugs, but not of running a CCE.

Finally, Tipton and Johnson complain about an exchange that occurred during guilt phase closing argument.  Counsel for Sandra Reavis stated, "But remember, Cory Johnson said that he never gave drugs to Sandra Reavis to sell.  So this contradicts what Valerie Butler had to say." Tr. at 3163.  The prosecutor objected by stating, "I don't remember Cory Johnson testifying, your Honor." Id.  The Court sustained the objection.  Defense counsel apologized and corrected his statement by stating, "Cory Johnson told Rodney Tucker, who testified here, that he never gave Sandra Reavis any drugs." Tr. at 3163-64.  "No manifest intent exists where there is another, equally plausible explanation for the remark." See United States v. Calderon, 127 F.3d 1314, 1338 (11th Cir. 1997).  The prosecutor's attempt to correct a misstatement by defense counsel does not manifest an improper intent to comment on Johnson's failure to testify. See United States v. Smith, 30 F.3d 568, 571 (4th Cir. 1994)(noting context of prosecutor's statement indicated an intent to

---

[61] Counsel for each defendant conceded in opening argument that his client sold drugs. During questioning of Government witnesses, defense counsels' questions generally focused on negating the substantial income and supervision element of the CCE count, rather than disputing that the petitioners were engaged in the concerted distribution of cocaine.  Tipton also called Gloria Bridges as a witness.  Bridges testified on direct examination that she came to know Titpon because he sold drugs.

107

J.A.1318

object to form of the question rather than comment upon the defendant's silence). To the extent, the objection reminded the jury that Johnson had failed to testify, it did not encourage the jury to draw any negative inference from that omission and the Court repeatedly had admonished the jury that it could not draw such an inference. Accordingly, the above claims will be dismissed because Tipton and Johnson cannot demonstrate appellate counsel were deficient for not pursuing the claims.

> c.   **The prosecution improperly made unsupported comments during closing argument regarding the conditions the Defendants would face in prison if given a life sentence.**
> Johnson Defaulted V.D
> Tipton Defaulted V.E.2

During closing argument the prosecutor asked the jury to ponder what the Defendants' conditions would be if they were sentenced to life in prison.

> I'm not telling you incarceration is nice and a lifetime of incarceration is not punishment. But think about each and every day of existence in jail. They will wake up, bathe, be fed. They will be able to watch TV, read books. They will be able to use the telephone to talk to their loved ones.

Tr. at 3904. Defense counsel objected and the Court sustained the objection. Tr. at 3904. While the foregoing comments were improper, it did not provide counsel with a substantial claim for relief on appeal. The Court had made clear to the jury that the verdict was to be based on the evidence, the arguments of the lawyers were not evidence and it was not to consider matters to which objections had been sustained. Accordingly, counsel was not deficient for failing to raise the issue on appeal.

> d.   **The prosecution improperly argued that sentencing should be based on deterrence**
> Johnson Defaulted V.H
> Tipton Defaulted V.E.10

108

**J.A.1319**

Tipton and Johnson contend that they were denied individualized consideration because the prosecutor twice urged the jury to consider deterrence during closing argument at the sentencing phase. The limited law on the subject indicates that a defendant's right to individualized consideration is not violated when the prosecutor urges the jury to consider whether a sentence of death in this instance would further the specific deterrent purpose of the statute. See Brooks v. Kemp, 762 F.2d 1383, 1407 (11th Cir. 1985)(en banc), cert. granted, Kemp v. Brooks, 478 U.S. 1016 (1986)(vacating Brooks and remanding for further consideration in light of Rose v. Clark, 478 U.S. 570 (1986)), reinstated on remand, Brooks v. Kemp, 809 F.2d 700 (11th Cir. 1987)). Here, when the prosecutor began to make comments that could be construed as a general deterrence argument, he was cut short by an objection. Thereafter, the prosecutor focused his comments on why the deterrence goals of the CCE death penalty statute favored the imposition of a sentence of death for the acts committed by Tipton and Johnson. In light of the single comment about general deterrence, the sustained objection to that comment, and the extensive instructions on the Defendants' entitlement to individualized consideration, appellate counsel reasonably forsook the claims urged here by Johnson and Tipton.

> **e. The prosecutors misled the jury into believing that it had a duty to convict the Defendants and impose a death sentence**
> Tipton Defaulted Claim V.E.6
> Johnson Defaulted Claim V.C

Tipton and Johnson assert that the prosecution affirmatively misrepresented the law to suggest to the jury that it was legally required to convict the Defendants and impose a sentence of death. See Potts v. Zant, 734 F.2d 526, 535-6 (11th Cir. 1984)(prosecutor engaged in misconduct by suggesting prior state supreme court decisions mandated imposition of death penalty in this case), vacated on other grounds, 478 U.S. 1017 (1986). Tipton and Johnson base these arguments on the prosecutor's

J.A.1320

repeated references to "duty."[62]  As reflected below, the challenged comments were proper because

they emphasized that the jurors' duty to convict and impose the death penalty derived from their

sworn obligation to fairly apply the evidence in light of the applicable law.  See Davis v. Kemp, 829

F.2d 1522, 1527 (11th Cir. 1988)(concluding defendant not denied individualized consideration by

---

[62] The highlighted comments to which Tipton and Johnson object are set forth below.

> You have taken an oath and you can't shirk from that oath.
> That oath says that you will truly render facts to a verdict.  When
> you do that, you have no choice but to find these defendants guilty
> of each and every count of the indictment.

Tr. at 3021(guilt phase sentencing).

> Now it is time for you to go back and do your duty.
> Each of you during the voir dire . . . stated that in the
> appropriate case, given the appropriate circumstances,  that you
> could indeed render a verdict of death against a defendant . . . . I
> submit that based upon the evidence that you have seen from this
> witness stand over the last five weeks, that this is the appropriate
> case to render a verdict of death as to each and every defendant.
> You took an oath.  It is an awesome responsibility.  It is an
> awesome duty. But nonetheless, it is just that a duty.  Your duty,
> ladies and gentleman of the jury, given the argument that you have
> heard, requires no less verdict than death.

Tr. at 3881-82.

> . . . it is an awesome duty you have undertaken.  But the law is
> clear that in some cases the death penalty should be imposed.  It is
> the will of Congress.  It is the law you must follow.  What you
> must determine, is given the evidence that you have heard, is this
> one those appropriate cases?  And I suggest to you, ladies and
> gentleman, it is the appropriate case . . . .
> Ladies and gentleman, it is a strong duty you have.  But it is
> just that.  It is a duty.  This case warrants the imposition of the
> maximum punishment possible, the imposition of the death penalty
> as to each defendant.

Tr. at 3905-6.

110

**J.A.1321**

prosecutor's argument that jurors had an obligation to impose the death penalty if they believed it was warranted by the defendant's crime and the evidence introduced at sentencing); cf. United States v. Locasio, 6 F.3d 924, 947 (2d Cir. 1993)(concluding it was not inappropriate for prosecutor to remind jurors of their oath to render a verdict without fear or favor).

Moreover, the Court's numerous instructions throughout the trial refuted any suggestion that the law required that the Defendants receive a sentence of death. "I want to emphasize that even if a jury makes such findings, it is never required to impose a sentence of death upon a defendant." Tr. at 36; 496-97. Again, at the beginning of the sentencing phase the Court reminded the jury that, "[i]t is the government that bears the burden of persuading you beyond a reasonable doubt that a sentence of death is justified as to each defendant." Tr. at 3307. "[E]ven if you do make the findings required by law as prerequisites to the imposition of the death penalty, no jury is ever required to impose the death penalty." Tr. at 3309. And, "[i]t is the government that must persuade you that the death penalty is justified as to each individual defendant. In short, a defendant is not required to prove that he should be allowed to live." Tr. at 3313. And, "you cannot return a decision imposing the death penalty absent a unanimous finding of the existence of certain aggravating factors, no jury is ever required to impose the death penalty, even if it does make such findings." Tr. at 3315. Hence, Tipton and Johnson's attempt to excuse their default is rejected because they have not demonstrated counsel were deficient or that they were prejudiced by any omission of counsel.

### D. Cumulative Claims of Error With Regards To Prosecutorial Misconduct And CCE Convictions

| | |
|---|---|
| Tipton Claim V.B.3.d.v. V.F.1.j | Tipton Defaulted V.E.14 |
| Johnson Claim II.C.4.f, IV.A.8, IV.C | Johnson Defaulted V.L |

Whether the prosecutor's improper conduct is isolated or extensive is one of the six factors relevant to assessing whether a defendant was prejudiced by improper comments by the prosecution.

111

See United States v. Wilson, 135 F.3d 291, 298 (4th Cir. 1998). Thus, Tipton and Johnson contend appellate counsel should have exploited this factor and challenged all of the purportedly improper conduct on appeal.[63] In this regard, Tipton and Johnson must demonstrate their present claims of error were clearly more promising than the substantial claims counsel raised on direct appeal. See Bell v. Jarvis, 236 F.3d 139, 164 (4th Cir. 2000)(en banc), cert. denied, 122 S. Ct. 124 (2001); Smith v. South Carolina, 882 F.2d 895, 899 (4th Cir. 1989)(counsel's failure to raise a weak constitutional claim may constitute an acceptable strategic decision designed "to avoid diverting the appellate court's attention from what [counsel] felt were stronger claims"). Neither Tipton nor Johnson meets this burden. The fact that habeas counsel has seen fit to regurgitate many of the same issues pressed by appellate counsel certainly belies the suggestion that appellate counsel made poor choices on appeal. Moreover, the appellate record confirms that counsel pursued the most promising claims for relief on direct appeal. See Smith v. Murray, 477 U.S. 527, 536 (1986)("Winnowing out weaker arguments on appeal and focusing on those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy.") Appellate counsel reasonably chose to pursue promising claims of instructional errors, separation of powers and errors during voir dire that would entitle their clients to relief under a more lenient showing of prejudice than would be required to prevail on a prosecutorial misconduct claim. See, e.g., United States v. Tipton, 90 F.3d 861, 872-882, 895, 897-98 (4th Cir. 1996). Accordingly, the above listed claims will be dismissed because Tipton and Johnson have failed to demonstrate deficiency on the part of counsel.

## XIII. CUMULATIVE CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL
Tipton Claims V.B.3.d.vii, V.F.4

---

[63] That portion of these claims which challenges counsels' conduct at trial is rejected for the reasons previously stated by the Court.

112

**J.A.1323**

Johnson IV.D, IV.C

The Defendants contend that the cumulative effect of all counsel's errors prejudiced them. The cumulative analysis the Defendants seek is not permitted for those claims where the Court rejected their assertion that counsel performed deficiently. Fisher v. Angelone, 163 F.3d 835, 852-3 (4th Cir. 1998). "Attorney acts or omissions 'that are not unconstitutional individually cannot be added together to create a constitutional violation.'" Id. (qouting Wainwright v. Lockhart, 80 F.3d 1226, 1233 (8th Cir. 1996). Having reviewed those relatively few instances where the Court rejected an individual claim solely for a lack of prejudice, the Court finds even when considered collectively there is no reasonable possibility that the result of the Defendants' convictions or sentence would be different.[64]  See Huffington v. Nuth, 140 F.3d 572, 583 (4th Cir. 1998).  The Defendants' guilt and culpability were confirmed by numerous credible witnesses. The testimony of the witnesses was well corroborated by the physical evidence including forensic testing, receipts for firearms, the video tape of the murder scenes, and the testimony of other witnesses. The above claims will be dismissed.

## XIV.  THE DEFENDANTS' ADOPTION BY REFERENCE OF CODEFENDANTS' CLAIMS
Tipton V.J
Johnson X
Roane IX

In their initial § 2255 motion, each Defendant asserts that he adopts by reference any claims by his copetitioners to the extent such claims are applicable to him.[65]   By Order entered December

---

[64] Roane did not list in his index a separate claim of cumulative ineffective assistance. The Court's rejection of Roane's assertion of collective prejudice does not encompass Roane's Claim IV.B.2 pertaining to the murder of Douglas Moody.

[65] United States v. Merlino, 2 F.Supp.2d 647, 669 (E.D. Pa. 1997)(denying as inappropriate defendant's request to join codefendants' § 2255 motions).

113

J.A.1324

11, 2000, the Court directed each Defendant to provide an index of his claims. Clerk's Record # 830. That order further required each Defendant to list each of his grounds for relief including the subparts thereto and to cite to the portions of the record where the claim is raised and discussed.[66] This opinion has addressed every separate ground for relief listed by Tipton, Johnson, and Roane in his respective index. In light of the specific pleading requirements for § 2255 motions and this Court's orders, the oblique references to the unspecified claims of codefendants do not warrant further individual consideration. Cf. Gray v. Netherland, 99 F.3d 158, 165-66 (4th Cir. 1996)(concluding habeas petitioner had not properly raised claim in federal court where he failed to articulate how the fact and law combined to violate his rights). Claims V.J , X and IX will be dismissed for the reasons previously stated in conjunction with each claim specifically raised by Johnson, Tipton and Roane.

Tipton and Johnson's motion for relief pursuant to 28 U.S.C. § 2255 will be denied. Roane's motion for 28 U.S.C. § 2255 relief is denied in part.

An appropriate Order shall issue.

_____
United States District Judge

Richmond, Virginia
Date: 5-1-03

---

[66] The Court warned the parties that review of their claims would be limited to those portions of the record designated in their individual index.

114

APPENDIX A
RICHARD TIPTON'S GROUNDS FOR RELIEF[1]

V.A    JUROR MISCONDUCT VIOLATED TIPTON'S RIGHT TO AN IMPARTIAL JURY AND TO DUE PROCESS OF LAW.

V.B.3.a[2]    The Jury Was Not Properly Instructed As To The Supervision Element:

(i)    The trial court failed to instruct the jury that a mere buyer/seller of drug relationship is insufficient to establish the "organization, supervision, or management" element under section 848;

(ii)    The trial court failed to instruct the jury that some persons alleged to be CCE supervisees were, as a matter of law, incapable of being CCE supervisees;

(iii)    The trial court failed to instruct the jury that it must unanimously agree to the identity of each of the five supervisees;

(iv)    The trial court failed to instruct the jury that the government must prove "management" to satisfy the organizer/supervisor element of a CCE.

V.B.3.b    There Was Insufficient Evidence To Support The Supervision Element Because The Government Failed To Prove Tipton Supervised Five Persons.

V.B.3.c    The Prosecutorial Misconduct Relating To The Supervision Element:

(i)    The Prosecution used unsupported, ambiguous, and misleading testimony to prove "supervision";

(ii)    The Prosecution used improper and prejudicial argument, misleading the jury, about the supervision element.

V.B.3.d    Ineffective Assistance of Counsel At Trial and On Appeal:

(i)    Counsel failed to object to the repeated use of improper and prejudicial evidence;

(ii)    Counsel failed to determine and demonstrate that there were less than five supervisees;

(iii)    Counsel failed to object to the prosecutor's closing argument on the supervision element;

(iv)    Counsel failed to seek proper jury instructions on the supervision element;

(v)    Counsel failed to stop the onslaught of prosecutorial misconduct;

(vi)    Counsel failed to seek relief available pursuant to Barona and Jerome;

(vii)    Counsel's errors, viewed individuallly or collectively, require the Court to grant relief.

V.C.1    Tipton's Right To Due Process Was Violated Because The Government Knew Or Should Have Known that:

_____

[1] Tipton's claims are identified by the letters and numerals used by Tipton in his index of claims.

[2] Section V.B. 1 & 2 discuss legal principals and background and do not set forth claims.

i

**J.A.1326**

a.     Maurice Saunder's Testimony Linking Tipton to "Light" and Large Sums of Money Was False; .

b.     Greg Scott's Testimony Linking Tipton and his Codefendants to the New York Boyz Was False.

C.2   Hussone Jones' Testimony That Tipton Stabbed Douglas Talley Was False.

C.3   Priscilla "Pepsi" Greene Testified Falsely Regarding Her Drug Dealing Activities And The Hierarchy Of The Drug Dealing Enterprise In Richmond.

C.4   Jerry Gaiters Testified Falsely Regarding His Foreknowledge Of The Murder Of Dorothy Armstrong.

V.D.   The Government Failed to Turn Over Exculpatory Evidence In Violation of <u>Brady v. Maryland</u>:

1.     The Government Withheld Evidence that Tipton Could Have Used To Impeach The Testimony of Hussone Jones About The Murder Of Douglas Talley;

2.     The Government Suppressed Evidence that Gave Tipton An Alibi For The Stoney Run Shooting Deaths of Linwood Chiles and Curt Thorne;

3.     The Government Suppressed Evidence that Could Have Been Used To Impeach Priscilla GreenE Testimony That She Did Not Sell Drugs;

4.     The Government Suppressed Evidence that Pointed to Co-Conspirator Lance Thomas As The Principal Of The Drug Activities Charged In The Indictment;

V.E. Prosecutorial Misconduct

1.&12. The Prosecution Improperly Discriminated Against Women.

2.     The Prosecutors Made Inflammatory Arguments To The Jury, Unsupported By The Evidence, Regarding The Conditions Tipton Would Face If Given A Life Sentence.

3.     The Prosecutors Misled The Jury By Vouching, In Inflammatory Terms, To Their Personal Belief Regarding Tipton's Guilt And The Veracity Of Witnesses.

4.     The Prosecutors Introduced Inadmissible Evidence Through Which They Vouched That Tipton And The Other Defendants Were Threats To The Lives Of Witnesses

5.     The Government Committed Misconduct When It Formulated And Produced Its Witness List.

6.     The Prosecutors Misled The Jury Into Believing That It Had A Duty To Convict And Impose A Death Sentence.

7.     The Prosecutors Misled The Jury By Improperly Emphasizing That Tipton And The Other Defendants Did Not Testify.

8.     Prosecutors Suggested That A Government Witness Passed A Polygraph Test.

9.     The Prosecutors Misled The Jury By Treating Tipton And The Other Defendants As A Group, Rather Than As Individuals.

10.   The Prosecutors Improperly Argued That Sentencing Should Be Based On Deterrence.

11.   The Prosecutors Presented Testimony Without Foundation.

13.   The Prosecutors Committed Misconduct With Respect To The CCE Supervision

J.A.1327

Element.

14.    The Scope Of The Government's Misconduct Prejudiced Tipton And Requires The Court To Grant The Writ.

15.    Prosecutors Violated 18 U.S.C. § 201(c)(2) When Obtaining And Presenting The Testimony Of Several Cooperating Witnesses.

16.    The Government Improperly Manipulated Material Evidence Regarding The Alleged CCE By Presenting Two Different Accounts At Tipton's And Lance Thomas' Trial Through The Testimony Of Priscilla Greene.

V.F.    INEFFECTIVE ASSISTANCE OF COUNSEL

1.a    Counsel Failed to Move for a Change of Venue Despite Inflammatory Media Coverage.

1.b    Defense Counsel Failed to Request Voir Dire Pursuant to Morgan v. Illinois.

1.c    Defense Counsel Failed to Object to the Prosecution's Strikes Against Female Jurors.

1.d    Trial Counsel's Errors Resulted in Tipton's Exclusion From Voir Dire, and The Loss Of His Right To Participate In Jury Selection.

1.e    Defense Counsel Failed to Investigate Whether in Fact the CCE Existed in New York And New Jersey.

1.f    Defense Counsel Failed to Challenge the Government's Evidence that Tipton Was A Supervisor Of A CCE.

1.g    Ineffective Assistance of Counsel With Respect To Jury Instructions:

    1    Defense Counsel Failed To Request An Unanimity Instruction On The CCE Elements.

    2    Defense Counsel Failed To Object To And Ask For A Proper Jury Instruction On The RICO Enterprise Element.

    3    Defense Counsel Failed to Object To And Ask For A Proper Jury Instruction On The Supervision Elements Of The CCE Charges.

    4    Tipton's Counsel Were Ineffective When They Failed To Request An Instruction that the Jurors Must Unanimously Agree On The Violations That Make The Continuing Series Element Of A CCE.

1.h    Counsel Failed to Adequately Defend Tipton on the Charge That He Murdered Douglas Talley.

1.i    Defense Counsel Failed to Prepare an Adequate Defense To The Stoney Run Murders.

1.j.    Defense Counsel Failed to Object to the Improper and Highly Prejudicial Conduct and Arguments By The Prosecutors Throughout Tipton's Trial.

1.k.    Defense Counsel Failed to Object to the Testimony Of Several Cooperating Witnesses Pursuant to 18 U.S.C. § 201(c)(2).

2.a.    Counsel Failed to Investigate and Prepare an Adequate Mitigation Defense

2.b.    Counsel Failed to Present Evidence of Tipton's Prison Conditions If Sentenced To Life Without Parole And Effect On Question Of Future Dangerousness.

J.A.1328

3.a.    Tipton's Appellate Counsel Was Ineffective Because He Failed to Demonstrate that the Government's Evidence, As A Matter of Law, Did Not Prove The CCE Supervision Element.

3.b.    Tipton's Appellate Counsel Was Ineffective Because They Failed to Demonstrate that the Government's Evidence Was Not Sufficient As A Matter of Law to Prove That Tipton Murdered Talley.

4.    The Cumulative Effect of Counsel's Errors Prejudiced Tipton.

V.G.    THE UNBRIDLED DISCRETION TO FORMULATE NON-STATUTORY AGGRAVATING FACTORS GIVEN TO PROSECUTORS UNDER SECTION 848 REPRESENTS AN UNCONSTITUTIONAL DELEGATION OF LEGISLATIVE AUTHORITY.

V.H    TIPTON WAS DENIED HIS STATUTORY AND CONSTITUTIONAL RIGHT TO JUSTICE WITHOUT DISCRIMINATION.

V.I    TIPTON IS ACTUALLY INNOCENT OF THE CCE CONVICTIONS.

V.J    TIPTON ADOPTS BY REFERENCE ANY CLAIMS RAISED BY JOHNSON AND ROANE TO THE EXTENT THAT THEY APPLY TO HIM.

V.K.    THE DISTRICT COURT INCORRECTLY INSTRUCTED THE JURY ON THE ESSENTIAL ELEMENTS OF THE CCE STATUTE IN VIOLATION OF TIPTON'S SIXTH AMENDMENT RIGHT TO TRIAL BY A JURY.

V.L    TIPTON IS ENTITLED TO RELIEF BECAUSE THE INDICTMENT FAILED TO CHARGE THE AGGRAVATING FACTORS IN THE INDICTMENT AS REQUIRED BY Apprendi v. New Jersey, 530 U.S. 466 (2000) .

iv

**J.A.1329**

APPENDIX B
JOHNSON'S GROUNDS FOR RELIEF[1]

I.     THE GOVERNMENT KNOWINGLY OR NEGLIGENTLY USED FALSE EVIDENCE
       TO CREATE THE ILLUSION THAT JOHNSON AND HIS CO-DEFENDANTS WERE
       LEADERS OF HIGHLY ORGANIZED CONTINUING CRIMINAL ENTERPRISE
       HAVING ITS ROOTS IN NEW YORK AND/OR NEW JERSEY.
       B.     Greg Scott's Trial Testimony Linking Johnson And His Co-Defendants To The New
              York Boyz Was False, And The Government Knew or Should Have Known That It
              Was False.
       C.     Maurice Saunder's Trial Testimony Linking Tipton to "Light" And To Large Sums
              Of Money Was False, And The Government Knew Or Should Have Known It Was
              False.

II.    THE EVIDENCE WAS LEGALLY INSUFFICIENT TO CONVICT JOHNSON AS A
       SUPERVISOR OF A CONTINUING CRIMINAL ENTERPRISE UNDER 21 U.S.C.
       SECTION 848.
       C.1    The Jury Was Not Properly Instructed As To The Supervision Element
              a.     The trial court failed to instruct the jury that a Buyer-Seller Relationship is
                     insufficient to establish the organization, supervision, or management
                     element;
              b.     The trial court failed to instruct the jury:
                     (i)     that some persons alleged to be CCE supervisees were incapable of
                             counting as supervisees as a matter of law;
                     (ii)    failed to instruct the jury that it must unanimously agree to the
                             identity of each of the five supervisees.
              c.     The trial court failed to instruct the jury that the government must prove the
                     element of management as part of the element of supervision for a CCE
                     organizer;
       C.2    There Was Insufficient Evidence To Support the Supervision Element.
       C.3    Prosecutorial Misconduct Relating To Supervision Element:
              a.     Improper use of unsupported ambigous testimony;
              b.     Improper argument concerning the supervision element;
       C.4    Ineffective Assitance of Counsel At Trial and Appeal:
              a.     Counsel should have shown that Johnson was incapable of being a supervisor
                     or at least not likely to be a supervisor;
              b.     Counsel failed to object to repeated improper evidence;
              c.     Counsel failed to demonstrate that the proof against Johnson did not establish
                     five supervisees;
              d.     Counsel failed to object to the prosecutor's closing argument on the

_____

[1] Johnson's claims are identified by the letters and numerals used by Johnson in his index
of claims.

i

**J.A.1330**

supervision element;

    e.    Counsel failed to request proper jury instructions on the supervision argument of the CCE statute;

    f.    Trial counsel failed to stop the onslaught of prosecutorial misconduct;

    g.    Counsel failed to seek relief available under <u>Barona</u> and <u>Jerome.</u>

III.    JOHNSON IS ACTUALLY INNOCENT OF THE CCE CONVICTIONS

IV.    TRIAL AND APPELLATE COUNSEL PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL

    A.    Guilt Phase Ineffectiveness:

        1.    Defense counsel failed to request the appointment of an investigator and failed to conduct an adequate investigation;

        2.    Defense counsel failed to move for a change of venue;

        3.    Defense counsel failed to request voir dire pursuant to <u>Morgan v. Illinois</u> 504 U.S. 719 (1992);

        4.    Defense counsel failed to object to the prosecution's strikes against women jurors;

        5.    Defense counsel failed to object to Johnson's absence from voir dire and Johnson lost his right to participate in jury selection;

        6.    Defense counsel failed to challenge the Government's evidence that Johnson was a supervisor of a CCE;

        7.    Defense counsel failed to object or ask for proper jury instructions on the substantive counts charged;

            a.    Defense counsel failed to request a unanimity instruction on the CCE elements;

            b.    The jury was not properly instructed as to the supervision element of the CCE charges.

        8.    Defense counsel failed to object to improper and highly prejudicial conduct and arguments by the prosecutors throughout Johnson's capital trial;

    B.    Counsel Provided Ineffective Assistance of Counsel At The Sentencing Phase

        1.    Defense counsel failed to argue that Johnson's mental ability was not accurately reflected by his I.Q. test, and, in fact, was below 77;

        2.    Defense counsel failed to present evidence of Johnson's prison conditions if sentenced to life;

    C.    Ineffective Assistance of Counsel on Appeal;

    D.    The Cumulative Effect of Counsel's Errors Prejudiced Johnson.

V.    PROSECUTORIAL MISCONDUCT DEPRIVED JOHNSON OF HIS RIGHTS TO DUE PROCESS AND A FAIR TRIAL

    A.    The Prosecutors Misled the Jury By Vouching In Inflammatory terms, To Their Personal Belief In Johnson's Guilt And The Veracity of Their Witnesses.

    B.    The Prosecutors Introduced Inadmissible Evidence Suggesting That Johnson And

J.A.1331

The Other Defendants Threatened The LiveS Of Witnesses.

C.    The Prosecutors Misled The Jury Into Believing It Had A Duty To Convict And Impose A Death Sentence.

D.    The Prosecutors Misled The Jury by Making Misleading And Inflammatory Arguments To The Jury, Unsupported by the Evidence Regarding The Conditions Johnson Would Likely Face If Given A Life Sentence.

E.    The Prosecutors Improperly Emphasized That Johnson And The Other Defendants Did Not Testify.

F.    The Prosecutors Suggested That A Government Witness Had Passed A Polygraph Test.

G.    The Prosecutors Improperly Treated Johnson And The Other Defendants As A Group, Rather Than As Individuals.

H.    The Prosecutors Improperly Argued That Sentencing Should Be Based On Deterrence.

I.    Misconduct Relating To Testimony Without Foundation.

J.    The Prosecutors Misled The Jury By Suggesting That They Had Not Influenced Witnesses To Use The Terms "Partner", "Worker", And "Employee".

K.    The Government excluded Women From The Jury In Violation of J.E.B. v. Alabama, 114 S.Ct. 1419 (1994).

L.    Misconduct Relating To The CCE Supervision Element.

M.    The Prosecutors Violated 18 U.S.C. § 201(c)(2) By Obtaining And Presenting The Testimony Of Several Cooperating Witnesses.

N.    The Prosecutors Presented The False Testimony Of Priscilla "Pepsi" Greene.

O.    The Prosecution Engaged In Misconduct By Presenting Materially Different Accounts Of The CCE Supervision Activities At Co-Conspirator Thomas' Subsequent Trial.

P.    The Prosecution Engaged In Misconduct By Presenting The False Testimony Of Jerry Gaiters.

VI.    THE PROSECUTION IMPROPERLY DISCRIMINATED AGAINST WOMEN IN SELECTING THE JURY.

VII.    JUROR MISCONDUCT VIOLATED JOHNSON'S RIGHTS TO AN IMPARTIAL JURY AND TO DUE PROCESS OF LAW.

VIII.    JOHNSON WAS DENIED HIS STATUTORY AND CONSTITUTIONAL RIGHT TO JUSTICE WITHOUT DISCRIMINATION.

IX.    SECTION 848'S DELEGATION OF AUTHORITY TO PROSECUTORS TO CREATE NON-STATUTORY AGGRAVATORS IS AN UNCONSTITUTIONAL DELEGATION OF AUTHORITY THAT VIOLATES THE SEPARATION OF POWERS.

X.    JOHNSON ADOPTS THOSE CLAIMS OF TIPTON AND ROANE THAT ARE

iii

J.A.1332

APPLICABLE TO HIM.

XI.    JOHNSON IS EXEMPT FROM EXECUTION UNDER 18 U.S.C. § 3596(C) AND 21 U.S.C. § 848(1) BY VIRTUE OF MENTAL RETARDATION.

XII.   THE DISTRICT COURT FAILED TO PROPERLY INSTRUCT THE JURY ON THE ESSENTIAL ELEMENTS OF THE CCE STATUTE IN VIOLATION OF PETITIONER'S SIXTH AMENDMENT RIGHT TO TRIAL BY JURY.

XIII.  JOHNSON IS ENTITLED TO RELIEF BECAUSE THE INDICTMENT FAILED TO CHARGE THE AGGRAVATING FACTORS IN THE INDICTMENT AS REQUIRED BY Apprendi v. New Jersey, 530 U.S. 466 (2000).

J.A.1333

## APPENDIX C
## JAMES ROANE'S GROUNDS FOR RELIEF

To the extent possible, Roane's claims are identified by the letters and numerals used by Roane in his index of claims.

I.  PROSECUTORIAL MISCONDUCT
    a.  The Prosecution Misled The Court As To Which Witnesses Were In The Witness Protection Program;
    b.  The Prosecution Failed To Provide The Defendants With Exculpatory Information In Violation of Brady v. Maryland -The Government Withheld Evidence that Roane Could Have Used To Impeach The Testimony of Hussone Jones About The Murder Of Douglas Talley;
    c.  The Prosecution Introduced Evidence That They Knew Or Should Have Known Was False:
        1.  Greg Scott's Trial Testimony Linking the Defendants To The New York Boyz Was False, And The Government Knew Or Should Have Known That It Was False.
        2.  Maurice Saunders' Trial Testimony Linking Tipton to "Light" And To Large Sums Of Money Was False, And The Government Knew Or Should Have Known It Was False;
        3.  Priscilla Greene Testified Falsely Regarding:
            a.  Her innocence in selling drugs;
            b.  Regarding the Primacy of Johnson's role in the enterprise;
            c.  Roane's role in the murdering Doug Moody.
        4.  Hussone Jones' Description Of The Talley Murder.
    d.  Prosecutors Violated 18 U.S.C. § 201(c)(2) When Obtaining And Presenting the Testimony Of Several Cooperating Witnesses.

II. THE PROSECUTION IMPROPERLY DISCRIMINATED AGAINST WOMEN IN THE SELECTION OF THE JURY

III. THE JURY WAS TAINTED BY OUTSIDE INFLUENCES

IV. INEFFECTIVE ASSISTANCE OF COUNSEL
    A.  Trial Counsel Failed To Seek A Change of Venue.
    B.  Defense Counsel Failed To Conduct An Adequate Investigation Of:
        1.  The Events In New York/New Jersey;
        2.  The Moody Murder.
    C.  Defense Counsel Waived Roane's Right To Be Present During Voir Dire.
    D.  Trial Counsel Failed To Challenge The Government's Evidence That Roane Supervised Or Managed Five Or More Persons.
    E.  Trial Counsel Failed To Present An Adequate Penalty Phase Case.
        1.  Counsel Failed To Investigate And Present Evidence Of Roane's Mental And Emotional Background.

**J.A.1334**

2.    Counsel Failed To Present Testimony From Roane's family.

3.    Counsel Failed To Present Evidence Regarding The Conditions That Roane Would Face Prison In Prison.

4.    Counsel Failed To Address The Absence Of Evidence Of Substantial Planning

F.    Failed To Object To Prosecution's Purchasing Testimony From Cooperating Witnesses

V.    ROANE WAS DENIED HIS RIGHT TO JUSTICE WITHOUT DISCRIMINATION

VI.    THE TRIAL COURT FAILED TO INSTRUCT THE JURY ON THE ESSENTIAL ELEMENTS OF THE CCE STATUTE (As defined by Richardson v. United States 526 U.S. 813 (1999)

VII.    ROANE IS ENTITLED TO RELIEF BECAUSE THE INDICTMENT FAILED TO CHARGE THE AGGRAVATING FACTORS IN THE INDICTMENT AS REQUIRED BY Apprendi v. New Jersey, 530 U.S. 466 (2000).

VIII.    ROANE IS ACTUALLY INNOCENT OF THE CCE VIOLATIONS AND THE MURDER OF DOUG MOODY

IX.    ROANE ADOPTS BY REFERENCE ALL CLAIMS BY HIS CODEFENDANTS TO THE EXTENT THEY ARE APPLICABLE TO HIM

J.A.1335

# EXHIBIT 74

**RECORD NOS. 03-13(L),**
**03-26, 03-27.**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

**UNITED STATES OF AMERICA,**

Respondent-Appellee,

versus

**CORY JOHNSON AND RICHARD TIPTON, III,**

Petitioners-Appellants.

**On Appeal From the United States District Court**
**For The Eastern District Of Virginia**
**Richmond Division**

**BRIEF FOR APPELLANTS**
**CORY JOHNSON AND RICHARD TIPTON**

| | |
|---|---|
| Stephen A. Northup | Barbara L. Hartung |
| TROUTMAN SANDERS, LLP | ATTORNEY AT LAW |
| 1111 East Main Street | 700 East Main Street |
| P.O. Box 1122 | Suite 1600 |
| Richmond, VA 23218 | Richmond, VA 23219 |
| (804) 697-1200 | (804) 353-4999 |
| | |
| Frederick R. Gerson | Edward E. Scher |
| ROBINSON & GERSON, PC | THORSEN & SCHER, LLP |
| 7102 Three Chopt Road | 3810 Augusta Avenue |
| Richmond, VA 23226 | Richmond, VA 23230 |
| (804) 282-2500 | (804) 359-3000 |
| | |
| *Counsel for Appellant* | *Counsel for Appellant* |
| *Richard Tipton, III* | *Cory Johnson* |

**J.A.1337**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES..........................................................................-vi-

SUBJECT MATTER AND APPELLATE JURISDICTION ............................. 1

STATEMENT OF THE ISSUES ........................................................................ 1

STATEMENT OF THE CASE ........................................................................... 3

STATEMENT OF FACTS .................................................................................. 6

    The Charges ................................................................................................ 6

    Relevant Pretrial Motions and Jury Selection ........................................... 8

    The Guilt Phase Trial................................................................................. 9

    The Penalty Phase Trial ........................................................................... 10

    The Direct Appeal Proceedings ............................................................... 12

SUMMARY OF THE ARGUMENT................................................................ 12

STANDARD OF REVIEW.............................................................................. 14

ARGUMENT ....................................................................................................

I.    The District Court Erred In Denying On Procedural Grounds
    Appellants' Claim That They Were Denied Their Fifth
    Amendment Right To Indictment By A Grand Jury Because
    The Indictment Failed To Charge Any Of The Aggravating
    Factors Required For Imposition Of The Death Penalty
    Under 21 U.S.C. § 848(n)...................................................................... 15

    A.    Any Procedural Default Is Excused By Novelty............................. 17

    B.    *Teague v. Lane* Does Not Bar Relief................................................ 21

        i)    The Rule Announced In *Ring* Is Substantive
            And Not Subject To *Teague* ................................................ 21

i

**J.A.1338**

ii)    Even If The Rule Announced In *Ring* Was "Procedural,"
It Was A Watershed" Rule That Must Be Applied
Retroactively. ........................................................................ 26

II.    The District Court Erred When It Summarily Dismissed Appellants'
Claim That § 848(h) (Permitting Prosecutors To Create Non-
Statutory Aggravators) Is An Unconstitutional Delegation of
Legislative Authority ................................................................. 33

III.    The District Court Erred When It Failed To Grant Appellants Leave To
Take Discovery On The Ground That Appellants Had To Establish A
*Prima Facie* Case For Relief In Order To Obtain Discovery ................... 47

IV.    The District Court Erred When It Granted Summary Judgment Without
Providing Appellants A Meaningful Opportunity For Discovery ............. 51

V.    The District Court Erred In Denying On Procedural Grounds Appellants'
Claim That The Prosecutors Improperly Discriminated Against Women
In Selecting The Jury In Violation Of The Equal Protection Clause ........ 55

    A.    Appellants' Failure To Raise The *J.E.B.* Claim At Trial Was
Excused By Ineffective Assistance Of Counsel ................................ 60

    B.    Appellants' Failure To Raise The *J.E.B.* Claim Was Excused
By Novelty ................................................................................. 63

VI.    The District Court Erred In Dismissing Appellants' Claim That They
Were Denied Their Statutory And Constitutional Right To Justice
Without Discrimination In Violation Of The Fifth And Eighth
Amendments ............................................................................ 64

VII.    The District Court Erred In Dismissing Appellants' Claims Of Juror
Misconduct -- After Prohibiting Any Investigation Of The Jury --
In Violation Of Appellants' Rights To An Impartial Jury And To Due
Process Of Law .......................................................................... 69

**J.A.1339**

VIII. The District Court Erred When It Dismissed Appellants' Claims Related To Their Substantive CCE Convictions And Also Found That Counsel Were Not Ineffective On The CCE Convictions ........................................ 75

    A.    The Trial Court Failed To Give A *Richardson* Unanimity Instruction Regarding The "Series" Of Predicate Acts That Constitute A CCE Under § 848 ........................................ 77

        i)    The Trial Court Omitted A Critical *Richardson* Unanimity Instruction ........................................ 77

        ii)    Trial Counsel Were Ineffective For Failing To Seek A *Richardson* Unanimity Instruction ........................................ 83

    B.    The Trial Court Failed To Give A *Jerome* Unanimity Instruction Regarding The Identity Of The CCE Supervisees. ......... 85

        i)    The Trial Court Omitted A Critical *Jerome* Unanimity Instruction ........................................ 89

        ii)    Trial Counsel Were Ineffective For Failing To Seek A *Jerome* Unanimity Instruction ........................................ 91

    C.    The Trial Court Failed To Instruct The Jury That Some Persons Alleged To Be CCE Supervisees Were, As A Matter Of Law, Incapable Of Being CCE Supervisees ........................................ 92

        i)    The Trial Court Omitted A Critical *Barona* Instruction ......... 92

        ii)    Trial Counsel Were Ineffective For Failing To Seek A *Barona* Instruction ........................................

    D.    The Trial Court Failed To Instruct The Jury That The Government Must Prove "Management" To Satisfy The Organizer/Supervisor Element Of A CCE ........................................ 96

        i)    The Trial Court Omitted A Critical Instruction Requiring "Management" ........................................ 96

        ii)    Trial Counsel Were Ineffective For Failing To Seek An Instruction That Required "Management" ........................................ 98

**J.A.1340**

E.    The Government Failed To Prove That Each Appellant Supervised Five Individuals Within The Meaning Of The CCE Statute *And* Defense Counsel Failed To Determine And Demonstrate That There Were Fewer Than Five Supervisees .......... 99

    i)    The Evidence Demonstrates That Each Appellant Supervised Fewer Than Five People ...................................... 99

    ii)    Trial Counsel Were Ineffective For Failing To Demonstrate That The Appellants Each Did Not Supervise Five People.............................................................. 100

IX.    The District Court Erred In Dismissing Appellants' Ineffective Assistance Of Counsel Claims ................................................................ 101

    A.    Appellants Were Denied Effective Assistance By Counsel's Failure To Request An Investigator And To Conduct An Adequate Factual Investigation ......................................................... 103

    B.    The District Court Erred In Holding That Appellants Were Not Prejudiced By Counsel's Failure To Request *Voir Dire* Pursuant to *Morgan v. Illinois* ........................................................ 107

    C.    The District Court Erred In Holding That Counsel Were Not Ineffective When They Failed To Object To The Prosecution's Strikes Against Women Jurors ........................................................ 112

    D.    The District Court Erred In Holding That Counsel Were Not Ineffective When They Failed To Present Evidence About Prison Conditions If The Appellants Received Life Sentences And That Appellants Were Not Prejudiced ...................................................... 114

    E.    Tipton's Counsel Failed to Adequately Defend Tipton on the Charge That He Murdered Douglas Talley ...................................... 118

    F.    Tipton's Counsel Failed to Prepare an Adequate Defense to the Stoney Run Murders ................................................................. 122

    G.    Tipton's Counsel Failed To Investigate And Prepare An Adequate Mitigation Case ............................................................... 126

iv

**J.A.1341**

X.      The District Court Erred When It Summarily Dismissed Appellants' Claims That They Were Denied Their Constitutional Right To A Fair Trial By The Prosecution's Use Of Testimony It Knew Or Should Have Known Was False............................................................................ 128

     A.   Greg Scott's Trial Testimony Was False And The Government Knew Or Should Have Known It Was False.............. 129

     B.   Maurice Saunders' Trial Testimony Was False And The Government Knew Or Should Have Known It Was False.............. 131

     C.   Hussone Jones' Trial Testimony Was False And The Government Knew Or Should Have Known It Was False.............. 132

XI.     The District Court Erred By Summarily Dismissing Tipton's Claim That The Government Violated His Right To Due Process By Failing To Disclose Certain Items Of Material Exculpatory Evidence................................................................................ 133

     A.   The Prosecution Failed to Disclose Exculpatory Statements of "Wildman" Stevens ................................................................ 134

     B.   The Prosecution Failed to Disclose Exculpatory Statements of John Knight and Stoodie Green ................................................ 136

XII.    The District Court Erred In Holding That Johnson Was Not Exempt From Execution Based On His Long Standing, Well Documented Mental Impairments *And* That Counsel Were Not Ineffective When They Conceded The Issue At Trial...................... 139

     A.   Johnson's Execution Is Barred By Statute ...................................... 144

     B.   Defense Counsel Failed To Investigate And Challenge The Accuracy Of Johnson's 1992 I.Q. Test .................................... 147

CONCLUSION ............................................................................................. 151

REQUEST FOR ORAL ARGUMENT........................................................... 152

CERTIFICATE OF SERVICE........................................................................ 154

**J.A.1342**

**Cases**

*Adamson v. Ricketts*, 865 F.2d 1011 (9th Cir. 1988) (en banc) ........................ 23, 24

*Almendarez-Torres v. United States*, 523 U.S. 224 (1990) ............................. 19, 21

*Amadeo v. Zant*, 486 U.S. 214 (1988) ................................................................ 67

*Apprendi v. New Jersey*, 503 U.S. 466 (2000) .......................................... passim

*Arizona v. Fulminante*, 499 U.S. 279 (1991) ................................................. 64, 80

*Atkins v. Virginia*, 536 U.S. 304 (2002) .................................... 139, 141, 148

*Batson v. Kentucky*, 476 U.S. 79 (1986) .......................................... passim

*Bell v. United States*, 349 U.S. 81 (1954) .............................................. 43

*Berger v. United States*, 295 U.S. 78 (1935) .......................................... 134

*Berryhill v. Zant*, 858 F.2d 633 (11th Cir. 1988) ...................................... 62

*Blanco v. Singletary*, 943 F.2d 1477 (11th Cir. 1991) ............................ 149

*Bousley v. United States*, 523 U.S. 614 (1998) ................................ passim

*Boyd v. French*, 147 F.3d 319 (4th Cir. 1998) ...................................... 128

*Bracy v. Gramley*, 520 U.S. 899 (1997) .............................. 48, 49, 50, 68

*Brady v. Maryland*, 373 U.S. 83 (1963) ......................... 107, 126, 133, 134

*Brecht v. Abrahamson*, 509 U.S. 619 (1993) ...................................... 64

*Calderon v. Nicolaus*, 98 F.3d 1102 (9th Cir. 1996) ............................. 50

*Campbell v. Louisiana*, 523 U.S. 392 (1998) ....................................... 28

*Castaneda v. Partida*, 430 U.S. 482 (1977) ......................................... 55

*Claudio v. Scully*, 982 F.2d 798 (2d Cir. 1992) ................................ 62, 98

*Coleman v. Thompson*, 501 U.S. 722 (1991) ................................... 63, 85

*Dalton v. United States*, 862 F.2d 1307 (8th Cir. 1988) ..................... 18, 63

J.A.1343

*Davis v. United States*, 417 U.S. 333 (1974) .......................................................... 77

*Dean v. Barber*, 951 F.2d 1210 (11th Cir. 1992)...................................................53

*Devose v. Norris*, 53 F.2d 201 (8th Cir. 1995).......................................................59

*Dufour v. Florida*, 495 So. 2d 154 (Fla. 1986) .....................................................17

*Duren v. Missouri*, 439 U.S. 357 (1979)...............................................................55

*Elder v. Holloway*, 510 U.S. 510 ........................................................................ 14

*Emerson v. Gramley,* 91 F.ed 898 (7th Cir. 1996)................................................. 18

*Engle v. Isaac*, 456 U.S. 107 (1982) .................................................................... 18

*English v. United States*, 998 F.2d 609 (8th Cir. 1993)..........................................77

*Evans v. Technologies Applications & Services Co.,*
    80 F.3d 954 (4th  Cir. 1996) ......................................................................52

*Ex parte Bain*, 121 U.S. 1....................................................................................28

*Ex parte United States*, 242 U.S. 27 (1916)..........................................................43

*Farmer v. Brennan*, 81 F.3d 1444 (7th Cir. 1996)..................................................53

*First Chicago Int'l v. United Exchange Co.*, 836 F.2d 1375
    (D.C. Cir 1988) .........................................................................................53

*Freeman v. Lane*, 962 F.2d 1252 (7th Cir. 1992)....................................... 61, 62, 98

*Gibson v. Zant*, 705 F.2d 1543 (11th Cir. 1983) ...................................................62

*Government of Virgin Islands v. Forte,* 865 F.2d 59 (3d Cir. 1989) ..................... 113

*Griffin v. Warden*, 970 F.2d 1355 (4th Cir. 1992)........................................ 121, 125

*Griffith v. Kentucky*, 479 U.S. 314 (1987). ..........................................................56

*Hargrave v. Dugger*, 832 F.2d 1528 (11th Cir. 1987)............................................ 18

*Harris v. Nelson*, 394 U.S. 286 (1969).............................................................48, 49

**J.A.1344**

*Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214
(4th Cir. 2002)..............................................................51, 52, 53, 54

*Haywood v. United States*, 216 F. Supp.2d 725 (N.D. Ill. 2002)...........................95

*Hellstrom v. U.S. Dep't of Veterans Affairs*, 201 F.3d 94
(2nd Cir. 2000)..............................................................53

*Hendricks v. Calderon*, 70 F.3d 1032 (9th Cir. 1995) .........................................149

*Hollis v. Davis,* 941 F.2d 1471 (11th Cir. 1991), *cert. denied,*
503 U.S. 938 (1992)..............................................................113

*Honeycutt v. Mahoney,* 698 F.2d 213 (4th Cir. 1983).............................................114

*Howard v. Moore*, 131 F.3d 399 (4th Cir. 1997) (*en banc*)....................................59

*Huffington v. Nuth*, 140 F.3d 572 (4th Cir. 1998)....................................................125

*J. W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394 (1928)..........................36

*J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994) .........................................passim

*Jackson v. Herring*, 42 F.3d 1350 (11th Cir. 1995) ...............................................149

*Jackson v. Virginia*, 443 U.S. 307 (1979)..............................................................100

*Jones v. Thigpen*, 788 F.2d 1101 (5th Cir. 1986).................................................149

*Jones v. United States*, 526 U.S. 227 (1999)...................................................16, 25

*Kenley v. Armontrout*, 937 F.2d 1298 (8th Cir. 1991).........................................106

*Kimmelman v. Morrison*, 477 U.S. 365 (1986)..........................................106, 121

*Kornahrens v. Evatt*, 66 F.3d 1350 (4th Cir. 1995)..............................................114

*Kyles v. Whitley*, 514 U.S. 419 (1995) ..............................................107, 133, 134

*Lockett v. Ohio*, 438 U.S. 586 (1978)......................................................................18

*Lockhard v. McCree*, 476 U.S. 162 (1986) ..........................................................109

*Loving v. United States*, 517 U.S. 748 (1996)...................................................passim

**J.A.1345**

*Mach v. Stewart,* 129 F.3d 495 (9th Cir. 1997) ...................................................... 74

*McBee v. Grant,* 763 F.2d 811 (6th Cir. 1985) ...................................................... 63

*McCleskey v. Kemp,* 481 U.S. 279 (1987) ........................................................... 68

*McCleskey v. Zant,* 499 U.S. 467 (1991) ........................................................ 67, 68

*McMillan v. Pennsylvania,* 477 U.S. 79 (1986)] .............................................. 19, 21

*McNally v. United States,* 483 U.S. 350 (1987) ..................................................... 18

*Mistretta v. United States,* 488 U.S. 361 (1989) ............................................... 36, 46

*Morgan v. Illinois,* 504 U.S. 719 (1992) ............................................ 107, 109, 111

*Murray v. Carrier,* 477 U.S. 478 (1986) .............................................................. 67

*North Carolina v. Dixon,* 361 S.E.2d 562 (N.C. 1987) ........................................... 17

*Orzaio v. Dugger,* 876 F.2d 1508 (11th Cir. 1989) ........................................... 62, 98

*Panama Refining Co. v. Ryan,* 293 U.S. 388 (1935) ............................................... 36

*Pecoraro v. Page,* No. 97C5361, 1998 U.S. Dist. LEXIS 15746
    (N.D. Ill. Sept. 30, 1998) ............................................................................... 50

*People v. Reyes,* 542 N.Y.S.2d 178 (N.Y. App. Div. 1989) .................................... 62

*Pruett v. Thompson,* 996 F.2d 1560 (4th Cir. 1993) .............................................. 150

*Pruitt v. McAdory,* 337 F.3d 921 (7th Cir. 2003) .................................................. 58

*Rattigan v. United States,* 151 F.3d 551 (6th Cir.), *cert. denied,*
    525 U.S. 1031 (1998) ............................................................................... 18, 63

*Reed v. Ross,* 468 U.S. 1 (1984) ......................................................................... 66

*Reed v. Ross,* 704 F.2d 705 (4th Cir. 1983), *aff'd,*
    468 U.S. 1 (1984) ......................................................................................... 18

*Richardson v. United States,* 526 U.S. 813 (1999) ......................................... passim

*Ring v. Arizona,* 536 U.S. 584 (2002) .......................................................... passim

ix

**J.A.1346**

*Rose v. Clark,* 478 U.S. 570 (1986)...................................................................................80

*Ross v. Reed,* 704 F.2d 705 (4th Cir. 1983)......................................................................20

*Sales v. United States,* 139 F.3d 322 (2d Cir.), *cert. denied,*
     118 S. Ct. 2377 (1998)...............................................................................................77

*Sattazhan v. Pennsylvania,* 537 U.S. 101 (2003)........................................................16, 25

*Sawyer v. Smith,* 497 U.S. 227 (1990) ...............................................................................26

*Wiggins v. Smith,* 123 S. Ct. 2527, 2543 (2003) ..............................................................47

*Smith v. Yeager,* 393 U.S. 122 (1968)................................................................................63

*Stirone v. United States,* 361 U.S. 212 (1960) .............................................................28, 32

*Stockton v. Commonwealth,* 852 F.2d 740 (4th Cir. 1988)...............................................74

*Stockton v. Virginia,* 852 F.2d 740 (4th Cir. 1988).........................................................128

*Strickland v. Washington,* 466 U.S. 668 (1984)..........................................................passim

*Strickler v. Greene,* 527 U.S. 263 (1999)......................................................................67, 71

*Stringer v. Black,* 503 U.S. 222 (1992) .........................................................................46, 47

*Sullivan v. Louisiana,* 508 U.S. 275 (1993) ............................................................31, 80, 81

*Summerlin v. Stewart,* 341 F.3d 1082 (9th Cir. 2003), *cert. granted,*
     *Schriro v. Summerlin,* 124 S. Ct. 833 (12/01/03) ...........................................passim

*Talamantez v. Superior Ct. of San Diego County,* 122 Cal. App. 3d 629
     (Cal. Ct. App. 1981).................................................................................................17

*Taylor v. Louisiana,* 419 U.S. 522 (1975)..........................................................................55

*Teague v. Lane,* 489 U.S. 288 (1989)...........................................................................passim

*Townsend v. Sain,* 372 U.S. 293 (1963).............................................................................65

*U.S. v. Chambless,* 680 F. Supp. 793 (E.D.La. 1988).......................................................46

*Underwood v. United States,* 15 F.3d 16 (2d Cir. 1993).....................................................77

x

**J.A.1347**

*United States v. Agurs*, 427 U.S. 97 (1976) .................................................... 133, 134

*United States v. Alanis*, 335 F.3d 965 (9th Cir. 2003) .............................................. 58

*United States v. Allen*, No. 98-2549, 2004 WL 188080
(8th Cir. (Mo.) Feb. 2, 2004)............................................................................ 17, 31

*United States v. Apodaca*, 843 F.2d 421 (10th Cir. 1988) ........................................ 97

*United States v. Bagley*, 473 U.S. 667 (1985).............................................. 128, 133

*United States v. Barona*, 56 F.3d 1087 (9th Cir. 1995) ................................... passim

*United States v. Bradley*, 880 F. Supp. 271 (M.D. Pa. 1994) ................................ 38

*United States v. Broussard*, 987 F.2d 215 (5th Cir. 1993)...................................... 60

*United States v. Butler*, 885 F.2d 195 (4th Cir. 1989) ...................................... 86, 97

*United States v. Cotton*, 261 F.3d 397 (4th Cir. 2001), *rev'd on
other grounds*, 535 U.S. 625 (2002) ...................................................................... 18

*United States v. Cronic*, 466 U.S. 648 (1984)....................................................... 103

*United States v. Davis*, 184 F.3d 366 (4th Cir. 1999) ............................................. 16

*United States v. DeGross*, 913 F.2d 1417 (9th Cir. 1990) ...................................... 60

*United States v. DeGross*, 960 F.2d 1433 (9th Cir. 1992) *(en banc)*....................... 60

*United States v. Delgado*, 4 F.3d 780 (9th Cir. 1993)................................. 87, 97, 98

*United States v. Edmonds*, 80 F.3d 810 (3d Cir. 1996).......................................... 83

*United States v. Floresca*, 38 F.3d 706 (4th Cir. 1994) ................................... 28, 31

*United States v. Frady*, 456 U.S. 152 (1982) ......................................................... 15

*United States v. Grimaud*, 220 U.S. 506 (1911) ................................................... 43

*United States v. Hall*, 93 F.3d 126 (4th Cir. 1996) ................................... 87, 91, 98

*United States v. Hamilton*, 850 F.2d 1038 (4th Cir. 1988) ................................... 61

*United States v. Hernandez*, 137 F. Supp. 2d 919 (N.D. Ohio 2001)................... 26

**J.A.1348**

*United States v. Higgs*, 353 F.3d 281 (4th Cir. 2003) ........................................ 17, 32

*United States v. Jackson*, 327 F.3d 273 (4th Cir. 2003), *cert. denied,*
124 S. Ct. 566 (2003) .................................................................................... 16

*United States v. Jerome*, 942 F.2d 1328 (9th Cir. 1991) ................................. passim

*United States v. Joe*, 928 F.2d 99 (4th Cir. 1991) .................................................. 58

*United States v. Jones,* 132 F.3d 232 (5th Cir. 1998) ............................................. 37

*United States v. Lane*, 866 F.2d 103 (4th Cir. 1989) .............................................. 64

*United States v. Lindsey*, 123 F.3d 978 (7th Cir. 1997) ......................................... 95

*United States v. Lindsey*, 123 F.3d 978 (7th Cir. 1997) ......................................... 97

*United States v. McCullah,* 76 F.3d 1087 (10th Cir. 1996) .................................... 37

*United States v. McNamara,* 74 F.3d 514 (4th Cir. 1996) .................................... 114

*United States v. Moten,* 582 F.2d 654 (2d Cir. 1978) ............................................. 71

*United States v. Nance*, 236 F.3d 820 (7th Cir. 2000) ........................................... 20

*United States v. Natelli*, 553 F.2d 5 (2d Cir.), *cert. denied,*
434 U.S. 819 (1977) ...................................................................................... 66

*United States v. Nichols*, 937 F.2d 1257 (7th Cir. 1991) ...................................... 60

*United States v. Palumbo*, 608 F.2d 529 (3d Cir. 1979), *cert. denied,*
446 U.S. 945 (1980) ...................................................................................... 66

*United States v. Paul,* 217 F.3d 989 (8th Cir. 2000) .............................................. 37

*United States v. Paz,* 927 F.2d 176 (4th Cir. 1991) .............................................. 117

*United States v. Peay,* 972 F.3d 71 (4th Cir. 1992) .............................................. 117

*United States v. Peoples,* 74 F.Supp.2d 930 (W.D. Mo. 1999) ............................ 115

*United States v. Peters*, 778 F. Supp. 431 (N.D. Ill. 1991) .................................... 17

*United States v. Pitera*, 795 F. Supp. 546 (E.D.N.Y.),
*aff'd.,* 986 F.2d 499 (2nd Cir. 1992) ......................................................... 37, 38

**J.A.1349**

*United States v. Possick*, 849 F.2d 332 (8th Cir. 1988) ............................................ 97

*United States v. Pretlow*, 779 F. Supp. 758 (D.N.J. 1991) ......................... 36, 37, 38

*United States v. Quinones*, 313 F.3d 49 (2d Cir. 2002) ............................................ 17

*United States v. Radonjich*, 1 F.3d 117 (2d Cir. 1993) ............................................ 71

*United States v. Rovetuso*, 768 F.2d 809 (7th Cir. 1985)............................... 129, 138

*United States v. Sanders*, 247 F.3d 139 (4th Cir.), *cert. denied*,
   122 S. Ct. 573 (2001) .................................................................................... passim

*United States v. Shark*, 158 F. Supp. 2d 43 (D.D.C. 2001).................................... 26

*United States v. Stitt*, 250 F.3d 878 (4th Cir. 2001) ...................................... 80, 90, 91

*United States v. Tindale*, 860 F.2d 125 (4th Cir. 1988) ............................................ 59

*United States v. Tipton, et al.*, 90 F.3d 861 (4th Cir. 1996) .............................. passim

*United States v. Ward*, 37 F.3d 243 (6th Cir. 1994)................................................ 87

*United States v. Weston*, 519 F. Supp. 565 (W.D.N.Y. 1981) ....................... 129, 138

*United States v. Williams-Davis*, 90 F.3d 490 (D.C. Cir. 1996) ............................ 97

*Wainwright v. Witt*, 469 U.S. 412 (1985)............................................................... 108

*Walton v. Arizona*, 497 U.S. 639 (1990) ................................................................ 24

*Washington v. Murray*, 952 F.2d 1472 (4th Cir. 1992).......................................... 150

*Whalen v. United States*, 445 U.S. 684 (1980).................................................. 43, 45

*Wiggins v. Smith*, 123 S. Ct. 2527 (2003) ....................................................... passim

*Williams v. Taylor*, 529 U.S. 420 (2000) ......................................................... passim

*Wilson v. Greene*, 155 F.3d 396 (4th Cir. 1998) .................................................. 150

*Witherspoon v. Illinois*, 391 U.S. 510, 522 (1968) .......................................... passim

**J.A.1350**

**Statutes**

10 U.S.C. § 818 ................................................................................................. 40

10 U.S.C. § 836(a) ........................................................................................... 40

10 U.S.C. § 856 ................................................................................................ 40

10 U.S.C. § 918(1), (4) .............................................................................. 38, 40

18 U.S.C. § 1959 ........................................................................................... 4, 35

18 U.S.C. § 3231 ................................................................................................ 1

18 U.S.C. § 3595(c) ....................................................................................... 139

18 U.S.C. § 3596(c) ....................................................................................... 145

18 U.S.C. § 924(c) .............................................................................................. 4

21 U.S.C. § 484(c) ........................................................................................... 75

21 U.S.C. § 841 .................................................................................. 19, 20, 30

21 U.S.C. § 841(a)(1) ......................................................................................... 4

21 U.S.C. § 846 .......................................................................................... 4, 5, 30

21 U.S.C. § 848 ......................................................................................... passim

21 U.S.C. § 848(a) ............................................................................................. 4

21 U.S.C. § 848(e) ......................................................................................... 4, 15

21 U.S.C. § 848(g) ........................................................................................... 15

21 U.S.C. § 848(h) ....................................................................................... 1, 33

21 U.S.C. § 848(h)(1)(B) ..................................................................... 33, 35, 37

21 U.S. C. § 848(h)(1)(D) ............................................................................... 37

21 U.S.C. § 848(k) ........................................................................................... 15

21 U.S.C. § 848(1) .................................................................................... 139, 145

J.A.1351

21 U.S.C. § 848(n)................................................................................. 1, 15

21 U.S.C. § 848(n)(1)....................................................................... 7, 34, 35

21 U.S.C. § 848(n)(2)............................................................................... 35

21 U.S.C. §848(n)(5)................................................................................. 7

21 U.S.C. § 848(n)(8)................................................................................. 7

21 U.S.C. § 848(n)(12)............................................................................. 35

21 U.S.C. § 848(o)................................................................................. 8, 68

21 U.S.C. § 848(o)(2)............................................................................... 64

21 U.S.C. § 848(q)................................................................................... 104

21 U.S.C. § 924(c)..................................................................................... 4

28 U.S.C. § 1291 ....................................................................................... 1

28 U.S.C. § 2253(a)................................................................................... 1

28 U.S.C. §§ 2253(c)(1)(B)......................................................................... 6

28 U.S.C. § 2254 ...........................................................................47, 48, 100

28 U.S.C. § 2255 .............................................................................. passim

## Other Authorities

*Classification In Mental Retardation 1* (H. Grossman ed., 1983)....................... 143

Ellis & Luckasson, Mentally Retarded Criminal Defendants, 53 Geo. Wash. L.
    Rev. 414, 422 n.44 (1985) .................................................................... 143

Flynn, J.R., *Massive IQ Gain in 14 Nations: What IQ Tests Really Measure*,
    Psychological Bulletin 101, 171-191 (1988) ....................................... 144

Flynn, J.R., *The Mean IQ of Americans: Massive Gains From 1932-1978*,
    Psychological Bulletin 95, 29-31 (1984) .............................................. 144

J.A.1352

GAO Report To The Senate And House Committees On The Judiciary, Death
   Penalty Sentencing:  Research Indicates Pattern Of Racial Disparities at 5 (Feb.
   1990) ..................................................................................................................64, 65

Rory K. Little, *The Federal Death Penalty:  History And Some Thoughts About
   The Department of Justice's Role*, 26 Fordham Urb. L.M. 347, 479-480 (March
   1999) ...........................................................................................................................67

The Psychological Corporation, *An Introduction to the Weschsler Adult
   Intelligence Scale, 3ed (WAIS-III)*, David Tulsksy, Ph.D., et al. (1996)............ 144

United States Constitution, Article I, § 8, cl. 14 ("Clause 14")............................... 39

United States Constitution, Article I, § I........................................................ 35, 42

United States Sentencing Guidelines .......................................................................19

## Rules

Fed. R. Civ. P. 52(a)................................................................................................ 14

Fed. R. Civ. P. 52(b)................................................................................................ 52

Fed. R. Civ. P. 56(f) .............................................................................51, 52, 53, 55

Fed. R. Civ. P. 59(2)................................................................................................ 52

Fed. R. Civ. P. 606(b)............................................................................................... 69

Local Rule 83.5 of the United States District Court
   for the Eastern District of Virginia ..................................................................... 70

Rules for Courts-Martial (RCM), Rule 1004(a)(2)................................................. 39

Rules for Courts-Martial (RCM), Rule 1004(b)...................................................... 39

Rules for Courts-Martial (RCM), Rule 1004(c)...................................................... 39

Rule 6(a) Governing Section 2255 Proceedings ..................................................... 48

Supreme Court Rule 10(a)........................................................................................ 61

**J.A.1353**

Ex. 7 at 2, The Psychological Corporation, *An Introduction to the Weschsler Adult Intelligence Scale, 3ed (WAIS-III)*, David Tulsksy, Ph.D., et al. (1996)[40] at JA 963.

The WAIS-R test that Johnson took in October 1992 was published in 1981 and was based on data collected one year before. *Id.* Thus, the normative data was twelve years old when Johnson took that test. Given I.Q. gains over time, Johnson's full scale I.Q. score of 77 was inflated by at least 3-5 points and possibly more. Allowing for the inflation effect, Johnson's score was actually in the 72-74 range or lower and placed him within the recognized and accepted I.Q. range for mental retardation. Moreover, this corrected 1992 score would be consistent with his 1985 I.Q. score of 69-74 when he was a teenager. Thus, Johnson could have presented a *prima facie* case of mental retardation at the time of his trial had counsel investigated the divergent scores and Flynn's studies on I.Q. testing.

## A.    Johnson's Execution Is Barred By Statute.

Without an evidentiary hearing, the district court dismissed Johnson's claim that his execution was prohibited even though Johnson presented evidence that refuted the validity of his 1992 I.Q. score. The government offered no evidence that challenged Dr. Flynn's research on I.Q. inflation. And the

---

[40]    Citing Flynn, J.R., *The Mean IQ of Americans: Massive Gains From 1932-1978,* Psychological Bulletin 95, 29-31 (1984); Flynn, J.R., *Massive IQ Gain in 14 Nations: What IQ Tests Really Measure*, Psychological Bulletin 101, 171-191 (1988). JA 975.

144

government presented no evidence that Dr. Cornell had considered or knew of Dr. Flynn's studies when evaluating Johnson.

The district court also denied Johnson's motion for discovery of the government's policies on, interpretation of, and application of 18 U.S.C. § 3596(c) and 28 U.S.C. § 848(1) in other capital cases. In fact, the Justice Department *refused* to state what criteria it employs when applying §§ 3596(c) and 848(1), or how those statutes have been applied and interpreted by the Justice Department in other criminal cases.[41] Thus, the Justice Department may well have *excluded* other defendants from capital prosecution who exhibited Johnson's very same characteristics. Johnson had presented a *prima facie* claim for relief and discovery. The district court clearly erred in denying Johnson's motions for discovery and an evidentiary hearing to properly develop these issues.

Nevertheless, without any evidence in the form of trial testimony or affidavits, the district court concluded that Dr. Cornell must have considered "possible variations in the testing instrument." JA 2304-05. This conclusion was

---

[41]     In contrast to the Justice Department, the Social Security Administration publishes its criteria for assessing mental retardation. Johnson demonstrated that under the Social Security Regulations he would have qualified as mentally retarded and been eligible for benefits. Ex. 18 and Notice of Supplemental Authority filed 8/17/2000, at JA 1810-1828. The Code of Federal Regulations (CFR) directs that the *lowest* of the three I.Q. scores on the WAIS-R must be used when assessing mental retardation. JA 1822 (at 449, col.2). In October 1992, Johnson's lowest score on the three-part WAIS-R was a 75 verbal, thus placing him within the mental retardation range for Social Security purposes and benefits.

145

not based on any specific testimony or discussion about possible I.Q. inflation.

Rather, the court relied only on Dr. Cornell's general testimony at trial that he had

"checked his finding and consulted colleagues before concluding that Johnson was

not mentally retarded." *Id.* However, Cornell's testimony never addressed the

issue Johnson presented to the district court. Furthermore, the government had

offered no evidence to refute Johnson's claim that his 1992 I.Q. score was simply

erroneous given Dr. Flynn's studies.

Although Johnson presented a *prima facie* case that the 1992 I.Q.

testing was flawed and unreliable, the district court faulted Johnson for failing to

demonstrate many years after the fact what an accurate I.Q. test administered in

1992 would have shown. JA 2305. This is precisely the type of issue that requires

an evidentiary hearing. Many factors influence the accuracy of I.Q. testing --

including the frequency and repetition of I.Q. tests, the testing environment, and

the experience of the test administrator, as well as the effects of extended

incarceration on the subject. The district court was not qualified to decide the issue

without the benefit of expert testimony. Nevertheless, the district court

erroneously assumed *without any evidence or authority* that a test many years after

the trial could demonstrate what a valid I.Q. score would have been at the time of

Johnson's trial. Given the specialized nature of I.Q. testing and the complexities of

146

**J.A.1356**

mental retardation in general, the district court erred in dismissing this claim without hearing testimony from specialists in these areas.

## B. Defense Counsel Failed To Investigate And Challenge The Accuracy Of Johnson's 1992 I.Q. Test.

The wide variations in Johnson's I.Q. scores standing alone should have suggested to his defense counsel that further inquiry was required. Counsel knew of the disparate scores. No special training was required to realize their potential significance for Johnson's defense. In fact, defense counsel included the testing information in the penalty phase evidence but completely failed to recognize and to argue its significance. JA 6296. During the post-conviction proceedings, defense counsel stated that he had no knowledge of Dr. Flynn's studies. JA 1007-08.

Instead, in his penalty phase opening statement, defense counsel conceded that Johnson was not mentally retarded:

> The law states that mentally retarded persons cannot be executed. And the reasons that they are excluded is because the law recognizes that mentally retarded persons are not totally and completely blameworthy. They are not fully responsible for their actions.
>
> Now, I'm not intending to suggest at this juncture or any other juncture that Cory Johnson is mentally retarded.

JA 6271.

147

**J.A.1357**

# CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of February, 2004, two copies of

the foregoing Brief for Appellants Cory Johnson and Richard Tipton were mailed,

postage prepaid, to:

Robert J. Erickson
Deputy Chief, Criminal Division
Appellate Section
U.S. Department of Justice
Room 6102, Patrick Henry Building
601 D Street, N.W.
Washington, D.C.  20530

*Counsel for the United States*

Paul Enzinna, Esq.
Michael Barta, Esq.
Baker & Botts, L.L.P.
1299 Pennsylvania Avenue
Washington, D.C.  20004-2400
(202) 639-7700
*Counsel for James Roane, Jr.*

G. Wingate Grant
Assistant United States Attorney
Office of the United States Attorney
600 East Main Street
Suite 800
Richmond, Virginia 23219

*Counsel for the United States*

#1232449v2

154

J.A.1358

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **Case No. 3:92CR68 (DJN)** |
| | : | **CAPITAL CASE** |
| **COREY JOHNSON,** | : | **Execution Scheduled for** |
| | : | **January 14, 2021** |
| Defendant. | : | |

**NOTICE OF SUBMISSION OF EXHIBITS (SUBMISSION 8 OF 8)**

Corey Johnson hereby gives notice of the submission of Exhibits 75-79 as attachments to

his Motion Pursuant to 28 U.S.C. § 2255 Raising Claim of Ineligibility To Be Executed Under

18 U.S.C. § 3596(c). This is the eighth submission of eight.


Dated: December 14, 2020                    Respectfully submitted,

                                            /s/ David E. Carney
                                            David E. Carney, VA Bar #: 43914
                                            Donald P. Salzman (Admitted Pro Hac Vice)
                                            Skadden, Arps, Slate, Meagher & Flom, LLP
                                            1440 New York Avenue, NW
                                            Washington, DC 20005
                                            Telephone: (202) 371-7246
                                            Fax: (202) 661-8295
                                            Email: david.carney@skadden.com

                                            *Counsel for Corey Johnson*

**J.A.1359**

**CERTIFICATE OF SERVICE**

I hereby certify that on December 14, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send notification of such filing to all parties and counsel included on the Court's Electronic Mail notice list.

/s/ David E. Carney
David E. Carney, VA Bar #: 43914
Skadden, Arps, Slate, Meagher & Flom, LLP
1440 New York Avenue, NW
Washington, DC 20005
Telephone: (202) 371-7246
Fax: (202) 661-8295
Email: david.carney@skadden.com

## INDEX OF EXHIBITS TO MOTION PURSUANT TO 28 U.S.C. § 2255 RAISING CLAIM OF INELIGIBILITY TO BE EXECUTED UNDER 18 U.S.C. § 3596(c)

EXHIBIT NO.

**SUBMISSION 1**

**EXPERT REPORTS**

Report of Daniel J. Reschly, Ph.D., Aug. 26, 2016 ........................................................1

Curriculum Vitae of Daniel J. Reschly, Ph.D., May 15, 2020...................................... 1(a)

Report of J. Gregory Olley, Ph.D., Aug. 24, 2016.........................................................2

Curriculum Vitae of J. Gregory Olley, Ph.D., Oct. 2020 ............................................ 2(a)

Letter from Gary N. Siperstein, Ph.D. to Counsel for Corey Johnson, Dec. 16, 2016 ...................3

Curriculum Vitae of Gary N. Siperstein, Ph.D., Sept. 2020 ........................................ 3(a)

Debra Nelson, Mitigation Report, Sept. 27, 2016...........................................................4

Report of Richard G. Dudley, Jr., M.D., Aug. 22, 2016.................................................5

**TRIAL TRANSCRIPTS**

Trial Tr., Feb. 3, 1993 .....................................................................................................6

**SUBMISSION 2**

Trial Tr., Feb. 10, 1993 ...................................................................................................7

**SUBMISSION 3**

Cornell Mitigation Information and Report (Excerpt)......................................................8

Trial Tr., Feb. 12, 1993 ...................................................................................................9

Trial Tr., Feb. 15, 1993 .................................................................................................10

**AFFIDAVITS & DECLARATIONS**

Declaration of Kenneth Barish, Ph.D. (staff psychologist at Pleasantville Cottage
    School), July 22, 2014 ............................................................................................11

Affidavit of Richard Benedict (special education teacher at Pleasantville Cottage
    School), Dec. 5, 2011..............................................................................................12

Affidavit of Darnell Brown (acquaintance in Trenton, NJ), Oct. 14, 2011 ..................13

Affidavit of Darold Brown (acquaintance in Trenton, NJ), June 15, 2011 ...................14

Affidavit of Craig S. Cooley (appointed counsel in 1992), Sept. 20, 2016 ..................15

Affidavit of Courtney Daniels (Corey's lifelong friend), May 21, 2011 .......................16

Declaration of Monica Dawkins (Corey's former girlfriend), July 16, 2012 ................17

**SUBMISSION 4**

Declaration of Cary Gallaudet, Ph.D. (psychologist at Pleasantville Diagnostic
    Center), Mar. 19, 2012............................................................................................18

**J.A.1361**

**EXHIBIT NO.**

Declaration of Ann Harding (staff member at Pleasantville Cottage School), Nov. 21, 2011..........................................................................................................................19

Affidavit of Minnie Hodges (Corey's maternal aunt), Apr. 30, 2011 ...........................20

Affidavit of Priscilla Hodges (Corey's cousin), Apr. 30, 2011 .....................................21

Affidavit of Queenie Hodges (Corey's cousin), Apr. 30, 2011 .....................................22

Declaration of Esther Johnson (Corey's maternal grandmother), Apr. 30, 2011 ..........23

Affidavit of Robert Johnson (Corey's half-brother), June 29, 2011...............................24

Affidavit of Antionette Daniels Joseph (the best friend of Corey's mother and Corey's godmother), May 21, 2011) ...................................................................................25

Declaration of Leona Klerer (reading teacher at Mount Pleasant Cottage School), June 3, 2011 ...........................................................................................................26

Affidavit of Gerald Lefkowitz (unit administrator at Pleasantville Cottage Center), Dec. 5, 2011 .........................................................................................................27

Affidavit of Odette Noble (social worker at Elmhurst), Dec. 1, 2011 ...........................28

Declaration of George Sakheim, Ph.D. (Chief of Psychological Services at Pleasantville Diagnostic Center), June 17, 2011 ....................................................29

Affidavit of David Washington (childcare worker at Elmhurst), Mar. 1, 2012..............30

**SUBMISSION 5**

**CHILDHOOD & TESTING RECORDS**

Gregory Judge, School Social Worker, Social History, Mar. 4, 1977............................31

Cheryl Spillane, Learning Consultant, Bureau of Pupil Personnel Services, Jersey City Public Schools, Learning Consultant Evaluation to Child Study Team, Mar. 18, 1977...............................................................................................................32

F.A. Figurelli, M.D., Chief Psychologist, Psychological Examination Record, Mar. 25, 1977...............................................................................................................33

Eleanor Glantz, Social Worker, Case Service, Dec. 11, 1978 .......................................34

Committee on the Handicapped, Referral to the Committee on the Handicapped, Feb. 26, 1979...............................................................................................................35

Committee on the Handicapped Records, May 21, 1979 ...............................................36

Washington Heights-West Harlem Community Mental Health Center, Child Assessment Evaluation Summary, Dec. 9, 1981 ....................................................37

Ernest H. Adams, Staff Psychologist, Psychodiagnostic Evaluation, Dec. 11, 1981 ....38

Cary Gallaudet, Psy.D., Pleasantville Cottage School, Psychological Evaluation, Feb. 1, 1982.................................................................................................................39

**J.A.1362**

EXHIBIT NO.

Leona Klerer, Mount Pleasant Cottage School Screening Upon Admission, Feb. 22, 1982 ............................................................................................................40

Amira Offer, Caseworker, Psychosocial Summary, Mar. 15, 1982 ..............................................41

Gloria Caro, Pleasantville Cottage School, Reassessment Summary, May 21, 1982 ...................42

Gloria Caro, Caseworker, Initial Conference, Current Assessment and Transfer Summary, June 9, 1982............................................................................................43

Gayle Turnquest, Caseworker, Pleasantville Cottage School, Current Assessment, Jan. 31, 1983 ..................................................................................................44

**SUBMISSION 6**

Ken Barish, Ph.D., Psychologist, Pleasantville Cottage School, Psychological and Educational Evaluation, Apr. 29, 1983 .............................................................45

John B. Stadler, M.D., Clinical Director, Pleasantville Cottage School, Psychiatric Evaluation, Aug. 26, 1983 ..........................................................................46

Lynda Coccaro, Speech and Language Pathologist, Donald R. Reed Speech Center, Inc., Phelps Memorial Hospital, Speech and Language Evaluation, Oct. 5, 1983 .................47

Lynn Polstein, Jewish Child Care Association of New York, Pleasantville Cottage School, Change in Permanency Plan, Apr. 13, 1984 ...................................................48

Gerard Maier, Social Worker, Current Assessment, Sept. 4, 1984 ...............................................49

Christine Aaron, MSW Intern, Jewish Child Care Association of New York, Pleasantville Cottage School, Visitation Plan, Dec. 12, 1984 ..................................................50

Kenneth Barish, Ph.D., Psychologist, Pleasantville Cottage School Psychological Evaluation, Apr. 15, 1985 ..........................................................................51

Gerard Maier, Pleasantville Cottage School, Discharge/Transfer Plan, May 28, 1985................52

Board of Education of the City of New York, Individualized Education Plan – Phase 1, July 1, 1985..........................................................................................53

Odette Noble, Social Worker, Jewish Child Care Association of New York, Elmhurst Boys Residence, UCR Reassessment and Service Plan Review 6 Month, Nov. 21, 1985.............................................................................................................54

**SUBMISSION 7**

Odette Noble, Social Worker, Jewish Child Care Association of New York, Elmhurst Boys Residence, UCR Reassessment and Service Plan Review 6 Month, June 28, 1986.............................................................................................................55

Odette Noble, Social Worker, Jewish Child Care Association of New York, Elmhurst Boys Residence, UCR Plan Amendment: Form D Trial Discharge, Feb. 23, 1987 ...............56

Newtown High School, Scholastic Transfer Record, Dec. 7, 1987 .............................................57

3

**J.A.1363**

**EXHIBIT NO.**

Janet Valentine, Child Care Worker, Pleasantville Diagnostic Center, Outline for Cottage Report (undated) ................................................................................58

**COURT RECORDS**

Notice of the Intention of U.S.A. to Seek Death Penalty as to Mr. Tipton, May 1, 1992 ..........................................................................................................59

Notice of the Intention of U.S.A. to Seek Death Penalty as to Mr. Roane, May 1, 1992..............60

Second Superseding Indictment, July 20, 1992, Dkt. 115 .........................................61

Notice of the Intention of U.S.A. to Seek Death Penalty as to Mr. Thomas, Oct. 28, 1992 ..........................................................................................................62

Verdict Form, Feb. 3, 1993, Dkt. 466 ..............................................................63

Notice of the Intention of U.S.A. to Seek Death Penalty as to Mr. Johnson, Feb. 8, 1993 ..........................................................................................................64

Special Findings, Feb. 16, 1993, Dkt. 508 ........................................................65

Motion to Have Defendant Declared Mentally Retarded, *United States v. Thomas*, No. 3:92CR68 (E.D. Va. Apr. 15, 1993) ..............................................................66

Memorandum in Support of Initial Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. Section 2255, June 15, 1998, Dkt. 714 (Excerpt) ........................................67

Reply Memorandum in Support of Initial Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. Section 2255, Mar. 15, 1999, Dkt. 761 (Excerpt) ....................................68

Ex. 14 to Reply Memorandum in Support of Initial Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. Section 2255, Mar. 15, 1999 ...........................................69

Ex. 15 to Reply Memorandum in Support of Initial Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. Section 2255, Mar. 15, 1999 ...........................................70

**SUBMISSION 8**

Petitioners' Joint Motion for Leave to Take Discovery, June 24, 1999, Dkt. 770 ......................71

Memorandum Opinion, May 3, 2000, Dkt. 803 ........................................................72

Memorandum Opinion, May 1, 2003, Dkt. 896 ........................................................73

Brief for Appellants Cory Johnson and Richard Tipton at 146, *United States v. Johnson*, No. 03-13(L), 03-26, 03-27 (4th Cir. Feb. 17, 2004) (Excerpt) ..............................74

**SUBMISSION 9**

**DIAGNOSTIC MATERIALS**

American Association on Intellectual and Developmental Disabilities Definition Manual ("AAIDD-11") (Excerpt)........................................................................75

AAIDD User Guide to 11th Edition (Excerpt) ......................................................76

Diagnostic and Statistical Manual of Mental Disorders ("DSM-5") (Excerpt)..........................77

**J.A.1364**

**EXHIBIT NO.**

**CONGRESSIONAL RECORDS**

134 Cong. Rec. 22,926 (1988) (Excerpt)..................................................................................78

136 Cong. Rec. S6873 (daily ed. May 24, 1990) (Excerpt)........................................................79

**J.A.1365**