**EXECUTION SCHEDULED FOR JANUARY 14, 2021**

No. 21-1

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

_____

**UNITED STATES OF AMERICA,**

**Plaintiff – Appellee,**

**v.**

**COREY JOHNSON, A/K/A O, A/K/A CO,**

**Defendant – Appellant.**

_____

**JOINT APPENDIX VOLUME VII**

_____

Donald P. Salzman
Jonathan Marcus
David E. Carney
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue, NW
Washington, DC 20005
(202) 371-7983
donald.salzman@skadden.com
*Counsel for Appellant Corey Johnson*

PAGE(S)

## VOLUME I

### I.  DOCKET SHEET

E.D. Va. Docket Sheet, No. 92CR68 (1992-2019)..............................................J.A.1

E.D. Va. Docket Sheet, No. 92CR68 (2020) ...................................................J.A.25

### II. RELEVANT INDICTMENT, ORDERS AND OPINIONS

Second Superseding Indictment, July 20, 1992....................................................J.A.33

Order (Dec. 15, 2020), ECF No 95.................................................................J.A.55

Memorandum Opinion (Dismissing § 2255 Petition) (Jan. 2, 2021), ECF No. 99.......................................................................................................J.A.58

Order (Granting Motion for Leave to File Supplemental Authority) (Jan. 2, 2021), ECF No. 100.................................................................................J.A.80

Order (Dismissing § 2255 Petition) (Jan. 2, 2021), ECF No. 102....................J.A.81

### III. OTHER RELEVANT FILINGS

Notice of Execution Date (Nov. 20, 2020), ECF No. 78.................................J.A.82

Motion Pursuant to 28 U.S.C. § 2255 Raising Claim of Ineligibility To Be Executed under 18 U.S.C. § 3596(c) (Dec. 14, 2020), ECF No. 86............J.A.84

Index of Exhibits to Motion Pursuant to 28 U.S.C. § 2255 Raising Claim of Ineligibility To Be Executed under 18 U.S.C. § 3596(c), ECF No. 86-1 ..........................................................................................................J.A.143

Ex. 1, Report of Daniel J. Reschly, Ph.D., Aug. 26, 2016, ECF No. 86-2.....J.A.148

Ex. 1a, Curriculum Vitae of Daniel J. Reschly, Ph.D., May 15, 2020, ECF No. 86-3 ...................................................................................................J.A.199

Ex. 2, Report of J. Gregory Olley, Ph.D., Aug. 24, 2016, ECF No. 86-4 ......J.A.251

Ex. 2a, Curriculum Vitae of J. Gregory Olley, Ph.D., Oct. 2020, ECF No. 86-5 ...................................................................................... J.A.299

Ex. 3, Letter from Gary N. Siperstein, Ph.D. to Counsel for Corey Johnson, Dec. 16, 2016, ECF No. 86-6 .................................................. J.A.318

Ex. 3a, Curriculum Vitae of Gary N. Siperstein, Ph.D., Sept. 2020, ECF No. 86-7 ...................................................................................... J.A.332

## VOLUME II

Ex. 4, Debra Nelson, Mitigation Report, Sept. 27, 2016, ECF No. 86-8 ....... J.A.355

Ex. 5, Report of Richard G. Dudley, Jr., M.D., Aug. 22, 2016, ECF No. 86-9 ...................................................................................... J.A.391

Ex. 6, Trial Tr., Feb. 3, 1993, ECF No. 86-10 ................................................ J.A.411

Notice of Submission of Exhibit 7, ECF No. 87 ............................................. J.A.426

## VOLUME III

Exs. 7-1 – 7-3, Trial Tr., Feb. 10, 1993, ECF Nos. 87-2 – 87-4 ..................... J.A.433

Notice of Submission of Exhibits, ECF No. 88 ............................................... J.A.519

Ex. 8, Cornell Mitigation Information and Report (Excerpt), ECF No. 88-2 ...................................................................................... J.A.526

Ex. 9, Trial Tr., Feb. 12, 1993, ECF No. 88-3 ................................................ J.A.546

## VOLUME IV

Ex. 10, Trial Tr., Feb. 15, 1993, ECF No. 88-4 .............................................. J.A.611

Ex. 11, Declaration of Kenneth Barish, Ph.D. (staff psychologist at Pleasantville Cottage School), July 22, 2014, ECF No. 88-5 .................... J.A.623

Ex. 12, Affidavit of Richard Benedict (special education teacher at Pleasantville Cottage School), Dec. 5, 2011, ECF No. 88-6 .................... J.A.635

Ex. 13, Affidavit of Darnell Brown (acquaintance in Trenton, NJ), Oct. 14, 2011, ECF No. 88-7 ........................................................................ J.A.647

Ex. 14, Affidavit of Darold Brown (acquaintance in Trenton, NJ), June 15, 2011, ECF No. 88-8 ...................................................................... J.A.652

Ex. 15, Affidavit of Craig S. Cooley (appointed counsel in 1992), Sept. 20, 2016, ECF No. 88-9 ................................................................... J.A.659

Ex. 16, Affidavit of Courtney Daniels (Corey's lifelong friend), May 21, 2011, ECF No. 88-10 ..................................................................... J.A.669

Ex. 17, Declaration of Monica Dawkins (Corey's former girlfriend), July 16, 2012, ECF No. 88-11 ................................................................... J.A.675

Notice of Submission of Exhibits, ECF No. 89 .............................................. J.A.678

Ex. 18 Declaration of Cary Gallaudet, Ph.D. (psychologist at Pleasantville Diagnostic Center), Mar. 19, 2012, ECF Nos. 89-2 – 89-3 ................................................................... J.A.685

Ex. 19, Declaration of Ann Harding (staff member at Pleasantville Cottage School), Nov. 21, 2011, ECF No. 89-4 ....................................... J.A.696

Ex. 20, Affidavit of Minnie Hodges (Corey's maternal aunt), Apr. 30, 2011, ECF No. 89-5 ..................................................................... J.A.699

Ex. 21, Affidavit of Priscilla Hodges (Corey's cousin), Apr. 30, 2011, ECF No. 89-6 .......................................................................... J.A.710

Ex. 22, Affidavit of Queenie Hodges (Corey's cousin), Apr. 30, 2011, ECF No. 89-7 .......................................................................... J.A.718

Ex. 23, Declaration of Esther Johnson (Corey's maternal grandmother), Apr. 30, 2011, ECF No. 89-8 ..................................................................... J.A.722

Ex. 24, Affidavit of Robert Johnson (Corey's half-brother), June 29, 2011, ECF No. 89-9 ...................................................................... J.A.728

Ex. 25, Affidavit of Antionette Daniels Joseph (the best friend of Corey's mother and Corey's godmother), May 21, 2011, ECF No. 89-10 ............. J.A.740

Ex. 26, Declaration of Leona Klerer (reading teacher at Mount Pleasant Cottage School), June 3, 2011, ECF No. 89-11 ....................................... J.A.752

Ex. 27, Affidavit of Gerald Lefkowitz (unit administrator at Pleasantville Cottage Center), Dec. 5, 2011, ECF No. 89-12 ....................................... J.A.760

Ex. 28, Affidavit of Odette Noble (social worker at Elmhurst), Dec. 1, 2011, ECF No. 89-13 ................................................................... J.A.765

3

Ex. 29, Declaration of George Sakheim, Ph.D. (Chief of Psychological Services at Pleasantville Diagnostic Center), June 17, 2011, ECF No. 89-14 .................................................................................... J.A.772

Ex. 30, Affidavit of David Washington (childcare worker at Elmhurst), Mar. 1, 2012, ECF No. 89-15 ..................................................................... J.A.807

Notice of Submission of Exhibits, ECF No. 90 .............................................. J.A.811

Ex. 31, Gregory Judge, School Social Worker, Social History, Mar. 4, 1977, ECF No. 90-2 ................................................................................. J.A.818

Ex. 32, Cheryl Spillane, Learning Consultant, Bureau of Pupil Personnel Services, Jersey City Public Schools, Learning Consultant Evaluation to Child Study Team, Mar. 18, 1977, ECF No. 90-3 ............................... J.A.822

Ex. 33, F.A. Figurelli, M.D., Chief Psychologist, Psychological Examination Record, Mar. 25, 1977, ECF No. 90-4 ............................... J.A.827

Ex. 34, Eleanor Glantz, Social Worker, Case Service, Dec. 11, 1978, ECF No. 90-5 ................................................................................................ J.A.830

Ex. 35, Committee on the Handicapped, Referral to the Committee on the Handicapped, Feb. 26, 1979, ECF No. 90-6 ............................................... J.A.832

Ex. 36, Committee on the Handicapped Records, May 21, 1979, ECF No. 90-7 ................................................................................................ J.A.837

## VOLUME V

Ex. 37, Washington Heights-West Harlem Community Mental Health Center, Child Assessment Evaluation Summary, Dec. 9, 1981, ECF No. 90-8 ................................................................................................ J.A.863

Ex. 38, Ernest H. Adams, Staff Psychologist, Psychodiagnostic Evaluation, Dec. 11, 1981, ECF No. 90-9 ............................................... J.A.865

Ex. 39, Cary Gallaudet, Psy.D., Pleasantville Cottage School, Psychological Evaluation, Feb. 1, 1982, ECF No. 90-10 .......................... J.A.868

Ex. 40, Leona Klerer, Mount Pleasant Cottage School Screening Upon Admission, Feb. 22, 1982, ECF No. 90-11 .............................................. J.A.872

Ex. 41, Amira Offer, Caseworker, Psychosocial Summary, Mar. 15, 1982, ECF No. 90-12 ................................................................................. J.A.876

Ex. 42, Gloria Caro, Pleasantville Cottage School, Reassessment Summary, May 21, 1982 , ECF No. 90-13..................................................J.A.882

Ex. 43, Gloria Caro, Caseworker, Initial Conference, Current Assessment and Transfer Summary, June 9, 1982, ECF No. 90-14 .............................J.A.896

Ex. 44, Gayle Turnquest, Caseworker, Pleasantville Cottage School, Current Assessment, Jan. 31, 1983, ECF No. 90-15 ..................................J.A.902

Notice of Submission of Exhibits, ECF No. 91.................................................J.A.905

Ex. 45, Ken Barish, Ph.D., Psychologist, Pleasantville Cottage School, Psychological and Educational Evaluation, Apr. 29, 1983, ECF No. 91-2 ........................................................................................J.A.912

Ex. 46, John B. Stadler, M.D., Clinical Director, Pleasantville Cottage School, Psychiatric Evaluation, Aug. 26, 1983, ECF No. 91-3 ................J.A.916

Ex. 47, Lynda Coccaro, Speech and Language Pathologist, Donald R. Reed Speech Center, Inc., Phelps Memorial Hospital, Speech and Language Evaluation, Oct. 5, 1983, ECF No. 91-4...................................J.A.919

Ex. 48, Lynn Polstein, Jewish Child Care Association of New York, Pleasantville Cottage School, Change in Permanency Plan, Apr. 13, 1984, ECF No. 91-5...................................................................J.A.925

Ex. 49, Gerard Maier, Social Worker, Current Assessment, Sept. 4, 1984, ECF No. 91-6........................................................................................J.A.931

Ex. 50, Christine Aaron, MSW Intern, Jewish Child Care Association of New York, Pleasantville Cottage School, Visitation Plan, Dec. 12, 1984, ECF No. 91-7 ................................................................J.A.935

Ex. 51, Kenneth Barish, Ph.D., Psychologist, Pleasantville Cottage School Psychological Evaluation, Apr. 15, 1985, ECF No. 91-8 .............J.A.949

Ex. 52, Gerard Maier, Pleasantville Cottage School, Discharge/Transfer Plan, May 28, 1985, ECF No. 91-9 .......................................................J.A.952

Ex. 53, Board of Education of the City of New York, Individualized Education Plan – Phase 1, July 1, 1985, ECF No. 91-10 ..........................J.A.966

Ex. 54, Odette Noble, Social Worker, Jewish Child Care Association of New York, Elmhurst Boys Residence, UCR Reassessment and Service Plan Review 6 Month, Nov. 21, 1985, ECF No. 91-11................J.A.974

Notice of Submission of Exhibits, ECF No. 92.............................................J.A.986

Ex. 55, Odette Noble, Social Worker, Jewish Child Care Association of
New York, Elmhurst Boys Residence, UCR Reassessment and
Service Plan Review 6 Month, June 28, 1986, ECF No. 92-2 ...................J.A.993

Ex. 56, Odette Noble, Social Worker, Jewish Child Care Association of
New York, Elmhurst Boys Residence, UCR Plan Amendment: Form
D Trial Discharge, Feb. 23, 1987, ECF No. 92-3...................................J.A.1003

Ex. 57, Newtown High School, Scholastic Transfer Record,
Dec. 7, 1987, ECF No. 92-4 ..............................................................J.A.1008

Ex. 58, Janet Valentine, Child Care Worker, Pleasantville Diagnostic
Center, Outline for Cottage Report (undated), ECF No. 92-5..................J.A.1011

Ex. 59, Notice of the Intention of U.S.A. to Seek Death Penalty as to Mr.
Tipton, May 1, 1992, ECF No. 92-6......................................................J.A.1015

Ex. 60, Notice of the Intention of U.S.A. to Seek Death Penalty as to Mr.
Roane, May 1, 1992, ECF No. 92-7 ......................................................J.A.1020

Ex. 61, Second Superseding Indictment, July 20, 1992, Dkt. 115,
ECF No. 92-8 .....................................................................................J.A.1025

Ex. 62, Notice of the Intention of U.S.A. to Seek Death Penalty as to Mr.
Thomas, Oct. 28, 1992, ECF No. 92-9 ..................................................J.A.1048

Ex. 63, Verdict Form, Feb. 3, 1993, Dkt. 466, ECF No. 92-10....................J.A.1053

Ex. 64, Notice of the Intention of U.S.A. to Seek Death Penalty as to Mr.
Johnson, Feb. 8, 1993, ECF No. 92-11..................................................J.A.1060

Ex. 65, Special Findings, Feb. 16, 1993, Dkt. 508, ECF No. 92-12 ............J.A.1065

Ex. 66, Motion to Have Defendant Declared Mentally Retarded, *United
States v. Thomas*, No. 3:92CR68 (E.D. Va. Apr. 15, 1993),
ECF No. 92-13 ...................................................................................J.A.1078

Ex. 67, Memorandum in Support of Initial Petition for Writ of Habeas
Corpus Pursuant to 28 U.S.C. Section 2255, June 15, 1998, Dkt. 714
(Excerpt) , ECF No. 92-14...................................................................J.A.1093

## VOLUME VI

Ex. 68, Reply Memorandum in Support of Initial Petition for Writ of
Habeas Corpus Pursuant to 28 U.S.C. Section 2255, Mar. 15, 1999,
Dkt. 761 (Excerpt), ECF No. 92-15.......................................................J.A.1109

6

Ex. 69, Ex. 14 to Reply Memorandum in Support of Initial Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. Section 2255, Mar. 15, 1999, ECF No. 92-16 ...................................................................... J.A.1125

Ex. 70, Ex. 15 to Reply Memorandum in Support of Initial Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. Section 2255, Mar. 15, 1999, ECF No. 92-17 ...................................................................... J.A.1133

Notice of Submission of Exhibits, ECF No. 93 .......................................... J.A.1137

Ex. 71, Petitioners' Joint Motion for Leave to Take Discovery, June 24, 1999, Dkt. 770, ECF No. 93-2 ................................................................. J.A.1144

Ex. 72, Memorandum Opinion, May 3, 2000, Dkt. 803, ECF No. 93-3 ...... J.A.1195

Ex. 73, Memorandum Opinion, May 1, 2003, Dkt. 896, ECF Nos. 93-4 – 93-5 .............................................................................. J.A.1209

Ex. 74, Brief for Appellants Cory Johnson and Richard Tipton, *United States v. Johnson*, No. 03-13(L), 03-26, 03-27 (4th Cir. Feb. 17, 2004) (Excerpt), ECF No. 93-6 .............................................................. J.A.1336

Notice of Submission of Exhibits, ECF No. 94 .......................................... J.A.1359

## VOLUME VII

Ex. 75, American Association on Intellectual and Developmental Disabilities Definition Manual ("AAIDD-11") (Excerpt), ECF Nos. 94-2 – 94-3 ............................................................................ J.A.1366

Ex. 76, AAIDD User's Guide to 11th Edition (Excerpt), ECF No. 94-4 ..... J.A.1392

Ex. 77, Diagnostic and Statistical Manual of Mental Disorders ("DSM-5") (Excerpt), ECF No. 94-5 ................................................... J.A.1405

Ex. 78, 134 Cong. Rec. 22,926 (1988) (Excerpt), ECF No. 94-6 ................ J.A.1418

Ex. 79, 136 Cong. Rec. S6873 (daily ed. May 24, 1990) (Excerpt), ECF No. 94-7 ...................................................................................... J.A.1423

Government's Response to Court's December 15, 2020 Order (Dec. 21, 2020), ECF No. 96 ............................................................................... J.A.1435

Corey Johnson's Reply Pursuant to December 15, 2020 Order (Dec. 24, 2020), ECF No. 97 ............................................................................... J.A.1451

Exhibit 1, Amended Judgment in a Criminal Case, ECF No. 97-1 .............. J.A.1459

United States' Motion for Leave to File Supplemental Authority (Dec. 31, 2020), ECF No. 98 ..................................................................J.A.1467

United States' Notice of Supplemental Authority (Jan. 2, 2021), ECF Nos. 98-1, 101 ..............................................................................J.A.1469

Notice of Appeal (Jan. 4, 2021), ECF No. 103 ...........................................J.A.1489

# EXHIBIT 75 - PART 1

Case 3:92-cr-00068-DJN   Document 94-2   Filed 12/14/20   Page 2 of 12 PageID# 3549

USCA4 Appeal: 21-1      Doc: 11-2        Filed: 01/08/2021      Pg: 11 of 134

# INTELLECTUAL DISABILITY

Definition, Classification, and Systems of Supports

## THE 11TH EDITION OF THE AAIDD DEFINITION MANUAL



J.A.1367

USCA4 Appeal: 21-1    Doc: 11-2    Filed: 01/08/2021    Pg: 12 of 134

# Intellectual Disability

## Definition, Classification, and Systems of Supports

*The AAIDD Ad Hoc Committee on*
*Terminology and Classification*

## 11th Edition



American Association
on Intellectual and
Developmental Disabilities

J.A.1368

Case 5:92-cr-00008-DSN Document 54-2 Filed 12/14/20 Page 4 of 121 &
USCA4 Appeal: 21-1     Doc: 11-2     Filed: 01/08/2021     Pg: 13 of 134

Copyright © 2010 by the American Association on Intellectual and Developmental
Disabilities

Published by
American Association on Intellectual and Developmental Disabilities
501 3rd Street, NW, Suite 200
Washington, DC 20001-2760

Printed in the United States of America

Library of Congress Cataloging-in-Publication Data

Intellectual disability : definition, classification, and systems of supports / The AAIDD
Ad Hoc Committee on Terminology and Classification.—11th ed.
        p. cm.
  Includes bibliographical references and index.
  ISBN 978-1-935304-04-3 (alk. paper)
  1.  Mental retardation—Classification.  I. American Association on Intellectual and
Developmental Disabilities.
  RC570.C515 2010
  616.85'88—dc22                                          2009040030

iv

J.A.1369

# CONTENTS

List of Tables ........................................................................... ix

List of Figures ......................................................................... xi

Preface ................................................................................... xiii

**Definition of Intellectual Disability** ...................................... 1

**Part I: Understanding Intellectual Disability and Its Assessment** ............ 3

Chapter 1    Definition of Intellectual Disability ...................... 5

Chapter 2    Multidimensional Framework for Understanding
           Intellectual Disability .................................. 13

Chapter 3    Role of Assessment in Diagnosis, Classification, and
           Systems of Supports ................................... 21

**Part II: Diagnosis and Classification of Intellectual Disability** ............... 27

Chapter 4    Intellectual Functioning and Its Assessment .............. 31

Chapter 5    Adaptive Behavior and Its Assessment .................... 43

Chapter 6    Role of Etiology in the Diagnosis of
           Intellectual Disability .................................. 57

Chapter 7    Multidimensional Approach to Classification .............. 73

Chapter 8    Role of Clinical Judgment in Diagnosis,
           Classification, and Development of
           Systems of Supports ................................... 85

**Part III: Systems of Supports** ................................................ 105

Chapter 9    Support Needs of Persons With Intellectual Disability .... 109

Chapter 10    Prevention as a Form of Support ...................... 123

Chapter 11    Mental and Physical Health-Related Supports ............ 135

Chapter 12    Support Needs of Persons With Intellectual
            Disability Who Have Higher IQ Scores ................ 151

© American Association on Intellectual and Developmental Disabilities

**J.A.1370**

USCA4 Appeal: 21-1    Doc: 11-2    Filed: 01/08/2021    Pg: 15 of 134

CONTENTS

**Part IV: Implications** ........................................................... 167

    Chapter 13  Implications for Public Policy ......................................... 171

    Chapter 14  Implications for Education ............................................ 185

    Chapter 15  Implications for Support Provider Organizations ......... 201

**Glossary** ........................................................................... 217

**References** ......................................................................... 227

**Index** ................................................................................ 255

        Intellectual Disability: Definition, Classification, and Systems of Supports

J.A.1371

# DEFINITION OF INTELLECTUAL DISABILITY

Intellectual disability is characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills. This disability originates before age 18. The following five assumptions are essential to the application of this definition:

1. Limitations in present functioning must be considered within the context of community environments typical of the individual's age peers and culture.
2. Valid assessment considers cultural and linguistic diversity as well as differences in communication, sensory, motor, and behavioral factors.
3. Within an individual, limitations often coexist with strengths.
4. An important purpose of describing limitations is to develop a profile of needed supports.
5. With appropriate personalized supports over a sustained period, the life functioning of the person with intellectual disability generally will improve.

© American Association on Intellectual and Developmental Disabilities

**J.A.1372**

(Schalock, Luckasson, & Shogren, 2007). The concept of adaptive skills implies an array of competencies and provides the foundation to three key points: (a) the assessment of adaptive behavior is based on an individual's typical performance during daily routines and changing circumstances, not to maximum performance; (b) adaptive skill limitations often coexist with strengths in other adaptive skill areas; and (c) a person's strengths and limitations in adaptive skills should be documented within the context of ordinary community environments typical of the person's age peers and tied to the person's individualized needs for support. Readers are referred to chapter 5 for a detailed discussion of adaptive behavior and its assessment.

## DIMENSION III: HEALTH

The World Health Organization (1999) defined *health* as a state of complete physical, mental, and social well-being. Health is a component of an integrated understanding of individual functioning because the health condition of an individual can affect his or her functioning directly or indirectly in each or all of the other four dimensions of human functioning. Health problems are disorders, diseases, or injuries and are classified in the *International Statistical Classification of Diseases and Related Health Problems—ICD-10* (World Health Organization, 1999).

For people with ID, the effects of health and mental health on functioning range from greatly facilitating to greatly inhibiting. Some individuals enjoy robust health with no significant activity limitations, which allows them to participate fully in social roles such as work, recreation, or leisure activities. On the other hand, some people have a variety of significant health limitations, such as epilepsy or cerebral palsy, that greatly impair body functioning in areas such as mobility and nutrition and that severely restrict personal activities and social participation. Similarly, some individuals may have activity and other limitations related to mental illness. Most individuals with ID are somewhere in between these extremes. Readers are referred to chapter 11 for a detailed discussion of mental and physical health-related supports.

## DIMENSION IV: PARTICIPATION

*Participation*, which is the performance of people in actual activities in social life domains, is related to the functioning of the individual in society. Participation in everyday activities is important for an individual's learning and is a central feature of development-in-context perspectives of human growth and development (Bronfenbrenner, 1999; Dunst, Bruder, Trivette, & Hamby, 2006).

Participation refers to roles and interactions in the areas of home living, work, education, leisure, spiritual, and cultural activities. It also includes social roles that are valid activities considered normative for a specific age group. Participation is best reflected in the direct observation of engagement and the degree of involvement in everyday activities.

J.A.1373

critical of the often used classification categories of mild, moderate, severe, and profound "levels of mental retardation" because these categories, based only on an intelligence test score, were too often used as profiles to make decisions about support needs. This stated concern was misinterpreted by some to mean that AAIDD was opposed to IQ classification for *any* purpose. Although classification by IQ subgroups might be appropriate for a research study in which measured intelligence is a relevant variable, it is not useful for decisions about residential or educational placement. Instead, such classification decisions should be based on more meaningful assessment information and planning procedures related to the purpose of developing support systems.

As shown in Table 3.1, assessment in the field of ID is conducted in order to diagnose a disability, classify by relevant characteristics, and plan for an individual's needed supports. As shown in the second column, each broad assessment function can be purposefully directed to take certain actions. The third column illustrates examples of assessment measures, tools, and methods that are needed to conduct assessments associated with different purposes. For diagnosis, certain assessment tools are required, while other assessment purposes typically necessitate different measures, tools, and assessment methods.

## Assessing to Diagnose Intellectual Disability

Intellectual disability is diagnosed using assessment information obtained from standardized and individually administered instruments that assess intellectual functioning and adaptive behavior (along with the criterion that age of onset is documented). If criteria for a diagnosis of ID are met, the diagnosis may be applied to achieve several focused purposes, including, but not limited to, establishing the presence of the disability in an individual and confirming an individual's eligibility for services, benefits, and legal protections. Chapters 4 and 5 provide specific guidelines and recommendations for the assessment of intelligence and adaptive behavior, respectively.

## Assessing to Classify

Information about individuals with ID (or the individuals themselves) can be grouped or classified for several purposes, such as conducting research, providing service reimbursement/funding, developing services and supports, and communicating about selected characteristics. As discussed in chapter 7, clinicians and other users of this *Manual* should select classification systems that are consistent with a specific purpose and must be careful not to use classification information for inappropriate purposes. For example, a clinician may classify adults with ID by their adaptive behavior levels if this information contributes to an agency's systematic way of determining caregiving reimbursement rates; but adaptive behavior levels should not guide programming content and work choice options. Multiple classification systems are available based on the assessment of adaptive behavior, intellectual functioning, educational requirements, and individual support needs. To prevent inappropriate grouping of individuals with ID, classification systems

J.A.1374

CHAPTER 3: ROLE OF ASSESSMENT IN DIAGNOSIS, CLASSIFICATION, AND SYSTEMS OF SUPPORTS

## TABLE 3.1
## Framework for Assessment

| Assessment function | Specific purpose | Examples of measures, tools, and assessment methods[a] |
|---|---|---|
| Diagnosis | Establish presence or absence of intellectual disability<br>Establish eligibility for services<br>Establish eligibility for benefits<br>Establish eligibility for legal protections | • Intelligence tests<br>• Adaptive behavior scales<br>• Documented age of onset<br>• Developmental measures<br>• Social history and educational records |
| Classification | Classify for intensity of needed support(s)<br>Classify for research purposes<br>Classify by selected characteristics<br>Classify for special education supports<br>Classify for reimbursement/funding | • Support needs intensity scales<br>• Levels of adaptive behavior<br>• IQ ranges or levels<br>• Environmental assessment<br>• Etiology-risk factor systems<br>• Mental health measures<br>• Benefit categories |
| Planning and developing a systems of supports | Support to enhance human functioning<br>Support to improve outcomes<br>Support to help implement person's choices<br>Support to assure human rights | • Person-centered planning<br>• Self-appraisal<br>• Ecological inventory<br>• Developmental tests<br>• Speech/language, motor, sensory assessment<br>• Achievement tests<br>• Support needs intensity scales<br>• Functional behavioral assessment<br>• Behavior support plan<br>• Family centered support plan<br>• IFSP, IEP, ITP[b]<br>• Self-directed plan |

[a] Column 2 purposes are not parallel to Column 3 examples.
[b] IFSP = Individualized Family Support Plan, IEP = Individualized Education Program, ITP = Individualized Transition Plan.

© American Association on Intellectual and Developmental Disabilities

J.A.1375

# PART II

## DIAGNOSIS AND CLASSIFICATION OF INTELLECTUAL DISABILITY

### OVERVIEW

A diagnosis of *intellectual disability* (ID) involves meeting three criteria: (a) significant limitations in intellectual functioning, (b) significant limitations in adaptive behavior, and (c) age of onset before age 18. As discussed more fully in Schalock, Luckasson, and Shogren (2007), there has been considerable consistency in these three criteria—and their operational definitions—for the last 50 years. As discussed more fully in chapters 4 and 5, the operational definitions of the first and second criteria are as follows:

- *Intellectual functioning*: an IQ score that is approximately two standard deviations below the mean, considering the standard error of measurement for the specific assessment instruments used and the instruments' strengths and limitations
- *Adaptive behavior*: performance on a standardized measure of adaptive behavior that is normed on the general population including people with and without ID that is approximately two standard deviations below the mean of either (a) one of the following three types of adaptive behavior: conceptual, social, and practical or (b) an overall score on a standardized measure of conceptual, social, and practical skills

The third criterion, *age of onset*, refers to the age at which the disability began. The purpose of the age of onset criterion is to distinguish ID from other forms of disability that may occur later in life. Intellectual disability typically originates close to the time of birth—either during fetal development, the birth process, or soon after birth. Sometimes, however, especially when the etiology of the disability indicates progressive damage (such as malnutrition) or damage related to an acquired disease or injury (such as infection or traumatic brain injury), the condition may originate later. Thus, disability does not necessarily have to have been formally identified, but it must have originated during the developmental period. The early onset criterion is apparent in the earliest formulation of

**J.A.1376**

## Comparability of Scores From Different Tests

Not all scores obtained on intelligence tests given to the same person will be identical. Specifically, IQ scores are not expected to be the same across tests, editions of the same test, or time periods (Evans, 1991). A number of studies have revealed significantly different results from appropriately selected tests. For example, Quereshi and Seitz (1994) reported that the Wechsler Preschool and Primary Scale of Intelligence-Revised (WPPSI), Wechsler Intelligence Scale for Children-Revised (WISC-R), and the Wechsler Preschool and Primary Scale of Intelligence-Revised (WPPSI-R) did not yield the same results when used on young children. Highest IQ scores were obtained on the WPPSI and lowest on the WPPSI-R. The SBIS-4 yielded significantly higher scores (by over 14 points) than did the WISC-R for students with lower IQ scores but yielded significantly lower scores for students with higher IQ scores. The two tests yielded similar scores for students with IQ scores between 70 and 90 (Prewett & Matavich, 1992). Scores on the WISC-III were significantly correlated with scores on the SBIS-4 with a population of students with mild mental retardation, but the average IQ on the WISC-III was 8 points lower (Lukens & Hurrell, 1996). Nelson and Dacey (1999) reported that in a sample of adults who had mild to moderate mental retardation an SBIS will yield a significantly lower score than a Wechsler test. Their results were consistent with earlier work published in the Stanford Binet Technical Manual (Thorndike, Hagen, & Sattler, 1986b).

Users of this *Manual* need to be aware of—and sensitive to—potential differences in scores obtained from two different tests. Sources of variation can result from (a) group versus individually administered tests; (b) the purposes for which the test was administered (e.g., administered initially to measure academic achievement but later used to derive an IQ score); (c) the properties of the test (e.g., using two tests with very disparate standard errors of measurement); (d) nonstandardized administration of the assessment instrument(s); (e) test content across different scales and between different age levels on the same scale; (f) scores obtained on verbal versus nonverbal tests; (g) differences in the standardization samples; (h) changes between different editions of the same scale/test; (i) use of an alternative scale as an individual's chronological age increases; and/or (j) variations in the person's abilities or performance.

## Practice Effect

The *practice effect* refers to gains in IQ scores on tests of intelligence that result from a person being retested on the same instrument. Kaufman (1994) noted that practice effect can occur when the same individual is retested on a similar instrument. For example, the WAIS-III *Manual* presents data showing the artificial increase in IQ scores when the same instrument is readministered within a short time interval. The WAIS-III *Manual* also reports the average increase between administrations with intervals of 2 to 12 weeks (Wechsler, 1997). For this reason, established clinical practice is to avoid administering the same intelligence test within the same year to the same individual because it will often lead to an overestimate of the examinee's true intelligence.

J.A.1377

# EXHIBIT 75 - PART 2

J.A.1378

# CHAPTER 5

## ADAPTIVE BEHAVIOR AND ITS ASSESSMENT

> Adaptive behavior is the collection of conceptual, social, and practical skills that have been learned and are performed by people in their everyday lives.
>
> For the diagnosis of intellectual disability, significant limitations in adaptive behavior should be established through the use of standardized measures normed on the general population, including people with disabilities and people without disabilities. On these standardized measures, significant limitations in adaptive behavior are operationally defined as performance that is approximately two standard deviations below the mean of either (a) one of the following three types of adaptive behavior: conceptual, social, or practical or (b) an overall score on a standardized measure of conceptual, social, and practical skills. The assessment instrument's standard error of measurement must be considered when interpreting the individual's obtained scores.

## OVERVIEW

The inclusion of the concept of adaptive behavior in the diagnosis of persons with *intellectual disability* (ID) has a long history. Nihira (1999), for example, cited early leaders, such as Itard, Seguin, Voison, and Howe, who referred to signs of ID that included the absence of social competency, a need for skill training, an inability to meet social norms, and difficulty with fending for one's self. Although adaptive behavior did not play a formal role in the diagnosis of ID during the first half of the 20th century, the construct's importance to understanding ID was not completely abandoned. Doll, for example, introduced the Vineland Social Maturity Scale in 1936, an instrument that included 117 items focused on practical skills used in everyday situations.

When the intelligence test, resulting in an IQ score, was introduced in the early 1900s, it was embraced as an efficient and objective means to distinguish individuals with ID from the general population (Scheerenberger, 1983). The intelligence test not only produced a highly reliable score, but because it was normed on the general population, it yielded an unambiguous indicator of how much a person deviated from others. However, dissatisfaction with the IQ score as the sole indicator of ID emerged over time. Among the greatest concerns about intelligence testing was that IQ scores only provided a narrow measure of intellectual functioning related to academic tasks (i.e., linguistic, conceptual,

J.A.1379

and mathematical abilities and skills), thus ignoring important aspects of intellectual functioning that included social and practical skills. Also, the perception that IQ scores contributed to misdiagnosing children from poor and minority backgrounds shook people's confidence in using the IQ as the sole diagnostic measure (Reschly, Myers, & Hartel, 2002; Scheerenberger, 1983).

As a result of this dissatisfaction, adaptive behavior reemerged in 1959 as one of the three criteria used to diagnose ID. According to Heber in the AAIDD 1959 *Manual on Terminology and Classification*, "measured intelligence cannot be used as the sole criteria of mental retardation [the term in use then] since intelligence test performances do not always correspond to level of deficiency in total adaptation" (pp. 55–56). *Adaptive behavior* was defined by Heber (1959) as

> the effectiveness with which the individual copes with the nature and social demands of his environment. It has two major facets: the degree to which the individual is able to function and maintain himself independently, and the degree to which he meets satisfactorily the culturally-imposed demands of personal and social responsibility. (p. 61)

Grossman (1973, 1983) reaffirmed the importance of adaptive behavior in the diagnosis of ID. Grossman's (1983) definition of adaptive behavior was "the effectiveness or degree with which individuals meet the standards of personal independence and social responsibility expected for his age and cultural group" (p. 1). The importance of adaptive behavior in the diagnosis of ID has been reaffirmed in each of the successive AAIDD *Terminology and Classification Manuals* (Luckasson et al., 1992, 2002).

Both Heber and Grossman recognized the multidimensionality of adaptive behavior and the influence of culture on the assessment of the construct. Heber conceptualized adaptive behavior as consisting of three primary factors: maturation, learning, and social adjustment. These three domains continue to be part of the most current conceptualization of adaptive behavior but are reframed as practical, conceptual, and social skills.

The consensus, based on considerable published research on the factor structure of adaptive behavior (e.g., Harrison & Oakland, 2003; McGrew, Bruininks, & Johnson, 1996; Thompson, McGrew, & Bruininks, 1999), is that adaptive behavior is multidimensional and includes the following:

- *Conceptual skills*: language; reading and writing; and money, time, and number concepts
- *Social skills*: interpersonal skills, social responsibility, self-esteem, gullibility, naïveté (i.e., wariness), follows rules/obeys laws, avoids being victimized, and social problem solving
- *Practical skills*: activities of daily living (personal care), occupational skills, use of money, safety, health care, travel/transportation, schedules/routines, and use of the telephone

In this chapter we discuss the role that adaptive behavior and its assessment plays in the diagnosis of ID. The seven sections of the chapter are (a) key factors to keep in mind

J.A.1380

when reading the chapter, (b) the assessment of adaptive behavior, (c) the use of standard error of measurement in score interpretation, (d) adaptive behavior versus problem behavior, (e) special considerations in the assessment of adaptive behavior, (f) guidelines for selecting an adaptive behavior instrument, and (g) future considerations. Throughout the chapter, adaptive behavior is defined as the collection of conceptual, social, and practical skills that have been learned and are performed by people in their everyday lives. Material included in the chapter regarding assessment guidelines and the technical adequacy of adaptive behavior assessment instruments is based on the published work of Finlay and Lyons (2002), Greenspan (1999, 2006a), Harrison and Raineri (2008), and Reschly et al. (2002).

## KEY FACTORS TO KEEP IN MIND WHEN READING THIS CHAPTER

In this chapter we discuss in more detail the following 10 key factors about adaptive behavior and its assessment that are relevant to a diagnosis of ID:

1. There are three criteria for a diagnosis of ID: significant limitations in intellectual functioning, significant limitations in adaptive behavior, and age of onset before age 18. Adaptive behavior and intellectual functioning should be given equal consideration.
2. Adaptive behavior is a multidomain construct. The domains that have emerged from a long history of factor-analytic studies are consistent with a conceptual model of adaptive behavior that has three general areas of adaptive skills: conceptual, social, and practical.
3. Adaptive behavior as defined in this *Manual* is the collection of conceptual, social, and practical skills that have been learned and are performed by people in their everyday lives.
4. The concept of adaptive skills implies an array of competencies and provides a foundation for three key points: (a) the assessment of adaptive behavior is based on the person's typical (not maximum) performance, (b) adaptive skill limitations often coexist with strengths, and (c) the person's strengths and limitations in adaptive skills should be documented within the context of community and cultural environments typical of the person's age peers and tied to the person's need for individualized supports.
5. Although no existing measure of adaptive behavior completely measures all adaptive behavior skills, most provide domain scores that represent the three domains used in this *Manual*: conceptual, social, and practical. A comprehensive assessment of adaptive behavior will likely include a systematic review of the individual's family history, medical history, school records, employment records (if an adult), other relevant records and information, as well as clinical interviews with a person or persons who know the individual well.

J.A.1381

USCA4 Appeal: 21-1    Doc: 11-2       Filed: 01/08/2021    Pg: 26 of 134

## ASSESSMENT OF ADAPTIVE BEHAVIOR

### Use Standardized Measures

Significant limitations in adaptive behavior are established through the use of standardized measures and, like intellectual functioning, significant *limitations in adaptive behavior* are operationally defined as performance that is approximately two standard deviations below the population average on one of the three adaptive skills domains of conceptual, social, or practical. In evaluating the role that an adaptive behavior score—as assessed on a standardized measure—plays in making a diagnosis of ID, clinicians should (a) determine the standard error of measurement (see following section) for the particular assessment instrument used, realizing that the standard error of measurement is test-specific and is used to establish a statistical confidence interval within which the person's true score falls and (b) assure that within reporting, standard error of measurement is properly addressed.

### Focus on Typical Performance

The assessment of adaptive behavior focuses on the individual's typical performance and not their best or assumed ability or maximum performance. Thus, what the person typically does, rather than what the individual can do or could do, is assessed when evaluating the individual's adaptive behavior. This is a critical distinction between the assessment of adaptive behavior and the assessment of intellectual functioning, where best or maximal performance is assessed. Individuals with an ID typically demonstrate both strengths and limitations in adaptive behavior. Thus, in the process of diagnosing ID, significant limitations in conceptual, social, or practical adaptive skills is not outweighed by the potential strengths in some adaptive skills.

### Use Knowledgeable Respondents

Using standardized adaptive behavior measures to determine significant limitations in adaptive behavior usually involves obtaining information regarding the individual's adaptive behavior from a person or persons who know the individual well. Generally, individuals who act as respondents should be very familiar with the person and have known him/her for some time and have had the opportunity to observe the person function across community settings and times. Very often, these respondents are parents, older siblings, other family members, teachers, employers, and friends. Parents are often the best respondents available because they have known the individual the longest and observed attainment of developmental milestones, maturation, and the achievement of adaptive behavior skills. Because adaptive behavior assessment relies on third party respondents, it is important for clinicians to assess the reliability of any respondent providing adaptive behavior information. Obtaining information from multiple respondents and other relevant sources (e.g., school records, employment history, previous evaluations) is essential to providing corroborating information that provides a comprehensive picture of the individual's functioning.

J.A.1382

# CHAPTER 6

## ROLE OF ETIOLOGY IN THE DIAGNOSIS OF INTELLECTUAL DISABILITY

> Etiology represents a multifactorial construct composed of four categories of risk factors (biomedical, social, behavioral, and educational) that interact across time and affect the individual's overall functioning. Diagnostic assessment and classification of the etiology consists of a description of all of the risk factors that are present in a particular individual and that contribute to the individual's present functioning and potential diagnosis of intellectual disability. Genotype-phenotype correlations may be useful, but caution is needed when applying these data to individual circumstances.

## OVERVIEW

In this chapter we describe the multifactorial nature of the etiology of *intellectual disability* (ID) and how etiology is determined and classified based on biomedical, social, behavioral, and educational risk factors. The five sections of the chapter cover (a) the importance of etiology, (b) the multifactorial nature of etiology, (c) etiologic assessment, (d) etiologic diagnosis and classification, and (e) etiology and performance. These five sections incorporate genetic research advances and research about behaviors that are associated with specific etiologies. Additionally, the system for etiologic diagnosis and classification presented in the chapter is consistent with the multidimensional approach to ID presented in this *Manual* and facilitates the design and implementation of strategies for prevention and support (see chapter 10).

## IMPORTANCE OF ETIOLOGY

Consideration of the etiology of ID is important for several reasons. Chief among these are the following:

1. The etiology may be associated with other health-related problems that may influence physical and psychological functioning.

J.A.1383

2. The etiology may be treatable, which could permit appropriate treatment to minimize or prevent ID.
3. Accurate information is needed for the design and evaluation of programs to prevent specific etiologies of ID.
4. Comparison of individuals for research, administrative, or clinical purposes may depend on formation of maximally homogeneous groups composed of individuals with the same or similar etiologies.
5. The etiology may be associated with a specific behavioral phenotype that allows anticipation of actual, potential, or future functional support needs.
6. Information about the etiology facilitates genetic counseling and promotes family choice and decision making, including preconception counseling.
7. Individuals and families can be referred to other persons and families with the same etiologic diagnosis for information and support.
8. Knowing the etiology facilitates self-knowledge and life planning for the individual.
9. Understanding the etiology may clarify clinical issues for service providers.
10. Clarification of biomedical, social, behavioral, and educational risk factors that contribute to the etiology offers opportunities for prevention of the disability.

Performing a diagnostic evaluation to determine the etiology may be questioned by some providers. They may argue that the cost of testing is excessive and that the results will not change the individual's treatment. If the parents do not plan to have any more children, they may argue that testing for an inherited disorder is pointless. When the individual with ID is an adult, the parents may no longer have any interest in finding the etiology. Adult service providers may feel that the etiology is irrelevant to the development of the individual's plan of supports and services. These objections can be answered by considering the reasons for establishing the etiology listed earlier, and the cost of diagnostic testing can often be justified in specific situations. For example, knowing that an adult with cognitive decline has Down syndrome should alert the provider to look for hypothyroidism or depression. Knowing that a child with cognitive decline has Angelman syndrome should alert the provider to look for subclinical seizures. Knowing that an individual with new neurological findings has tuberous sclerosis should alert the provider to look for the characteristic brain tumor associated with this diagnosis. Knowing that an adult man has fragile X syndrome should alert the provider to offer genetic testing to the man's sisters who may be carriers and could have affected sons. Knowing that a child has a particular condition allows the family to search the Internet and to contact other families affected by this diagnosis, thereby learning more about it than their health care provider may know. These examples illustrate why testing to establish the etiologic diagnosis may be important for many individuals with ID.

## MULTIFACTORIAL NATURE OF ETIOLOGY

In this chapter we build on the approach to etiology described in previous AAMR *Manuals* (Luckasson et al., 1992, 2002). Etiology is conceptualized as a multifactorial

J.A.1384

USCA4 Appeal: 21-1     Doc: 11-2          Filed: 01/08/2021       Pg: 29 of 134

construct composed of four categories of risk factors (biomedical, social, behavioral, and educational) that interact across time, including across the life of the individual and across generations from parent to child. This construct replaces prior approaches that divided the etiology of ID into two broad types: ID of biological origin and ID due to psychosocial disadvantage (Grossman, 1983). The two-group approach (biological and cultural-familial) was defended on the basis of developmental theory (Hodapp, Burack, & Zigler, 1990). Different developmental pathways were associated with ID due to identified biological disorders compared to ID for which no organic etiology is apparent (due to cultural-familial factors or psychosocial disadvantage). These researchers recommended a biological or genetic classification of etiology, in which there is either a demonstrated biological cause or there is not. This approach is consistent with the approach presented in this chapter. In fact, the risk factor approach can be seen as a fine-tuning of the developmental (two-group) approach. What was called "ID of biological origin" can be seen as involving individuals for whom biomedical risk factors predominate, while "ID of cultural-familial origin" can be seen as involving individuals for whom social, behavioral, or educational risk factors predominate.

The two-group distinction is often blurred in real life, however. The multiple risk factor approach correctly notes that biomedical risk factors may be present in persons with ID of cultural-familial origin, and social, behavioral, and educational risk factors may be present in persons with ID of biological origin. For example, individuals with the same biomedical genetic etiology often vary widely in functioning, presumably as the result of other modifying risk factors. The multiple risk factor approach to etiology thus is the logical extension of previous work in this area and provides a more comprehensive explanation of the many interacting causes of impaired functioning in persons with ID (Chapman, Scott, & Stanton-Chapman, 2008).

There has been an explosion of new genetic information in the past decade (cf. Butler & Meaney, 2005). This explosion has led some to consider the etiology of ID primarily in genetic terms. The recommendations of the American College of Human Genetics for the etiologic evaluation of ID (Curry, Stevenson, Aughton, & Byrne, 1997) emphasized genetic testing, as did the recommendations of the Committee on Genetics of the American Academy of Pediatrics (Moeschl & Shevell, 2006). The Child Neurology Society's practice parameter on the evaluation of children with global developmental delay (Shevell et al., 2003) also emphasized biomedical causes and included evidence-based recommendations for genetic testing. Although in a recent textbook on ID, Harris (2006) mentions AAIDD's multifactorial risk factor approach presented in the 2002 *Manual* (Luckasson et al.), the author discusses in depth primarily genetic and other biomedical causes.

Clearly, genetics cannot explain the cause of ID in every case. Individuals may be born with perfectly normal DNA and still develop ID due to a birth injury, malnutrition, child abuse, or extreme social deprivation. Understanding the cause of ID in these cases requires consideration of other biomedical, behavioral, and social risk factors. The guidelines reviewed above all note that even the most extensive and up-to-date genetic and biomedical testing will identify an etiology in less than half of all cases. Indeed, even if one could measure the entire genome in patients with ID (which should become

J.A.1385

PART II: DIAGNOSIS AND CLASSIFICATION OF INTELLECTUAL DISABILITY

feasible within the next 10 years), the results would not explain the cause when ID is due primarily to social or behavioral risk factors. On the other hand, at least one or more of the risk factors shown in Table 6.1 will be found in every case of ID. Thus a multifactorial approach to etiology (which incorporates all of the above genetic and biomedical testing,

## TABLE 6.1
### Risk Factors for Intellectual Disability

| Timing | Biomedical | Social | Behavioral | Educational |
|---|---|---|---|---|
| Prenatal | 1. Chromosomal disorders<br>2. Single-gene disorders<br>3. Syndromes<br>4. Metabolic disorders<br>5. Cerebral dysgenesis<br>6. Maternal illnesses<br>7. Parental age | 1. Poverty<br>2. Maternal malnutrition<br>3. Domestic violence<br>4. Lack of access to prenatal care | 1. Parental drug use<br>2. Parental alcohol use<br>3. Parental smoking<br>4. Parental immaturity | 1. Parental cognitive disability without supports<br>2. Lack of preparation for parenthood |
| Perinatal | 1. Prematurity<br>2. Birth injury<br>3. Neonatal disorders | 1. Lack of access to prenatal care | 1. Parental rejection of caretaking<br>2. Parental abandonment of child | 1. Lack of medical referral for intervention services at discharge |
| Postnatal | 1. Traumatic brain injury<br>2. Malnutrition<br>3. Meningoencephalitis<br>4. Seizure disorders<br>5. Degenerative disorders | 1. Impaired child-caregiver interaction<br>2. Lack of adequate stimulation<br>3. Family poverty<br>4. Chronic illness in the family<br>5. Institutionalization | 1. Child abuse and neglect<br>2. Domestic violence<br>3. Inadequate safety measures<br>4. Social deprivation<br>5. Difficult child behaviors | 1. Impaired parenting<br>2. Delayed diagnosis<br>3. Inadequate early intervention services<br>4. Inadequate special education services<br>5. Inadequate family support |

J.A.1386

USCA4 Appeal: 21-1　　Doc: 11-2　　Filed: 01/08/2021　　Pg: 31 of 134

as well as consideration of all of the other potential risk factors that might be operative) provides the most thorough way to evaluate the etiology of ID in a particular case.

The multifactorial approach to etiology presented in this chapter expands the list of causal factors in two directions: types of factors and timing of factors. The first direction expands the types or categories of factors into four groupings:

1. *Biomedical*: biologic processes, such as genetic disorders or nutrition
2. *Social*: social and family interaction, such as stimulation and adult responsiveness
3. *Behavioral*: potentially causal behaviors, such as dangerous (injurious) activities or maternal substance abuse
4. *Educational*: availability of educational supports that promote mental development and the development of adaptive skills

The second direction concerns the timing of the occurrence of causal factors according to whether these factors affect the parents of the person with ID, the person with ID, or both. This aspect of causation is termed *intergenerational* to describe the influence of factors present during one generation on the outcome in the next generation. The modern concept of intergenerational effects must be distinguished from the historical concept that ID was related to "weak genes" due to psychosocial, cultural, or familial factors (Scheerenberger, 1983). This modern concept recognizes that reversible environmental factors in the lives of some families may be related to the etiology of ID and stresses that the understanding of these factors should lead to enhanced individual and family supports. Because of the relationship to prevention and supports, these intergenerational effects are considered further in chapter 10 (see Table 10.1 in particular).

Table 6.1 lists risk factors for ID by category and by the time of occurrence of the risk factor in the life of the individual. Unlike classification systems based primarily on biomedical conditions (such as the *ICD-10* [World Health Organization, 1993]), the classification system outlined in Table 6.1 represents a multifactorial approach to the etiology of ID. It incorporates biomedical risk factors but places them in context by including other risk factors that may be of equal or greater importance in determining the individual's level of functioning. The list of risk factors in Table 6.1 is not exclusive and can be expanded as new risk factors are discovered. Research should result in continual revision and updating of these specific risk factors, but the basic structure of the table should be relevant for the foreseeable future.

Because ID is characterized by impaired functioning, its etiology is whatever caused this impairment in functioning. A biomedical risk factor may be present but by itself may not cause ID (as, for example, when a patient with a genetic disorder has average intelligence). Any risk factor causes ID only when it results in impaired functioning sufficient to meet the criteria for a diagnosis of ID as described in this *Manual*. Table 6.1 emphasizes that the impairment of functioning that is present when an individual meets the three criteria for a diagnosis of ID usually reflects the presence of several risk factors that interact over time. Thus, the search for the etiology of ID in a particular individual must consist of a search for all of the risk factors that might have resulted in impaired functioning for that person. This search involves obtaining as much historical medical

J.A.1387

information as possible, performing psychological and physical examinations, and pursuing sufficient laboratory investigations to consider reasonable possibilities.

## ETIOLOGIC ASSESSMENT

### Medical History

Diagnostic assessment begins with a complete history and physical examination to uncover all of the potential risk factors that may be present in each of the four categories shown in Table 6.1. The medical history begins at conception and includes detailed information about the prenatal, perinatal, and postnatal periods. Information needed about the prenatal period includes maternal age; parity and health (including maternal infections such as hepatitis, HIV, rubella, cytomegalovirus, group B streptococcus, etc.); the adequacy of maternal nutrition; the amount and quality of prenatal care (including results of prenatal screening, ultrasound examinations, and amniocentesis if performed); maternal use of drugs, alcohol, and other substances; maternal exposure to potential toxins or teratogens (such as lead or radiation); and occurrence of any significant maternal injuries during the pregnancy. Information needed about the perinatal period includes growth status at birth (gestational age at birth, birthweight, length, and head circumference); labor and delivery experiences (including onset, duration, route of delivery, presence of fetal distress prior to delivery, Apgar scores after birth, need for resuscitation); and the occurrence of any neonatal disorders after birth (such as seizures, infections, respiratory distress, brain hemorrhage, and metabolic disorders). Information needed about the postnatal period includes the history of any significant head injuries, infections, seizures, toxic and metabolic disorders (such as lead poisoning), significant malnutrition or growth impairment, and any indication of loss of previously acquired developmental skills that could indicate the presence of a progressive or degenerative disorder or a disorder on the autism spectrum.

A detailed family history is necessary to identify potential genetic etiologies (Curry et al., 1997). A detailed three-generation pedigree is recommended that includes information about the health status, medical and psychological disorders, and level of functioning of all known relatives. In particular, relatives who were affected by conditions that may be associated with ID (such as autism) or who were diagnosed with ID should be noted. Additional records concerning these individuals may be requested to provide further details. The occurrence of ID in other family members does not necessarily imply a genetic mechanism however. Multiple individuals in a family may be affected by fetal alcohol syndrome, for example, or ID in a relative may be due to childhood infections or head trauma. Results of genetic testing performed previously on any relatives should be sought and examined for completeness because testing performed more than 5 to 10 years earlier may have missed conditions diagnosable with current methods.

J.A.1388

### TABLE 6.2
### Hypotheses and Strategies for Assessing Etiologic Risk Factors

| Onset | Hypothesis | Social |
|---|---|---|
| Prenatal | Chromosomal or single gene disorder | Extended physical examination<br>Referral to clinical geneticist<br>Chromosomal and DNA analyses |
| | Syndrome disorder | Extended family history and examination of relatives<br>Extended physical examination<br>Referral to clinical geneticist |
| | Inborn error of metabolism | Newborn screening using tandem mass spectrometry<br>Analysis of amino acids in blood, urine, and/or cerebrospinal fluid<br>Analysis of organic acids in urine<br>Blood levels of lactate, pyruvate, very long chain fatty acids, free and total carnitine, and acylcarnitines<br>Arterial ammonia and gases<br>Assays of specific enzymes in cultured skin fibroblasts<br>Biopsies of specific tissue for light and electron microscopy and biochemical analysis |
| | Cerebral dysgenesis | Neuroimaging (CT or MRI) |
| | Social, behavioral, and environmental risk factors | Intrauterine and postnatal growth<br>Placental pathology<br>Detailed social history of parents<br>Medical history and examination of mother<br>Toxicological screening of mother at prenatal visits and of child at birth<br>Referral to clinical geneticist |
| Perinatal | Intrapartum and neonatal disorders | Review of maternal records (prenatal care, labor, and delivery)<br>Review of birth and neonatal records |

J.A.1389

USCA4 Appeal: 21-1    Doc: 11-2    Filed: 01/08/2021    Pg: 34 of 134

TABLE 6.2 (*continued*)

| Onset | Hypothesis | Social |
|---|---|---|
| Postnatal | Head injury | Detailed medical history<br>Brain X-rays and neuroimaging |
| | Brain infection | Detailed medical history<br>Cerebrospinal fluid analysis |
| | Demyelinating disorders | Neuroimaging<br>Cerebrospinal fluid analysis |
| | Degenerative disorders | Neuroimaging<br>Specific DNA studies for genetic disorders<br>Assays of specific enzymes in blood or cultured skin fibroblasts<br>Biopsies of specific tissue for light and electron microscopy and biochemical analysis<br>Referral to clinical geneticist or neurologist |
| | Seizure disorders | Electroencephalography<br>Referral to clinical neurologist |
| | Toxic-metabolic disorders | See "Inborn errors of metabolism" above<br>Toxicological studies<br>Lead and heavy metal assays |
| | Malnutrition | Body measurements<br>Detailed nutritional history<br>Family history of nutrition |
| | Environmental and social disadvantage | Detailed social history<br>History of abuse or neglect<br>Psychological evaluation<br>Observation in new environment |
| | Educational inadequacy | Early referral and intervention records<br>Review of educational records |

J.A.1390

PART II: DIAGNOSIS AND CLASSIFICATION OF INTELLECTUAL DISABILITY

TABLE 8.3

Critical Thinking Skills Involved in the Synthesis of Information

**Analysis**: Examine the case, its elements, and its component parts; reduce the complexity of the case into simpler or more basic components or elements. Important subskills include looking for contradictory explanations for findings and contradictory evidence, recognizing the limits of anecdotal evidence, and recognizing the bias in hindsight analysis (i.e., knowing the outcome of events biases our recall and interpretation of events).

**Evaluation**: Determine the precision, accuracy, and integrity of available information through careful appraisal and study. Important subskills include using evidence-based decision making; assessing the validity of premises, assumptions, and conclusions; seeking confirmation to reduce uncertainty; understanding the limitations of statistical analysis (e.g., correlation does not mean causation) and the fallibility of human memory; avoiding appeals to ignorance (i.e., lack of information on an issue cannot be used to support an argument); and judging the credibility of an information source.

**Interpretation**: Integrate the available information in light of the individual's beliefs, judgment, or circumstance. Important subskills include recognizing mental models and the way that definitions shape how we think about issues and constructs such as ID, appreciating the limits of extrapolation, understanding how contrast effects can influence judgments and decisions, and understanding the limits of correlational evidence (i.e., relationship vs. causal).

**Inference**: Form conclusion or recommendation by integrating all of the facts and tested hypotheses. Important subskills include avoiding reification (i.e., the tendency to treat hypothetical constructs as if they were concrete things); avoiding common fallacies, such as irrelevant reasons, circular reasoning, slippery slope reasoning, weak analysis, and false dichotomies; and discarding previously held theories and/or mental models.

## Synthesis Guidelines

The following 12 guidelines augment the critical thinking skills listed in Table 8.3.

1. Show clearly that the obtained data are aligned with the critical question(s) asked. Those questions will relate to diagnosis, classification, or systems of supports.
2. Integrate information from multiple sources. A valid diagnosis of ID is based on multiple sources of information that include a thorough history (social, medical, educational), standardized assessments of intellectual functioning and adaptive behavior, and possibly additional assessments or data relevant to the diagnosis. When considering the relative weight or degree of confidence given to any assessment instrument, the clinician needs to consider (a) the technical adequacy of the instrument, including content and construct validity, reliability, stability of the obtained measures; the generalization of scores; predictive validity; and appropriateness to the individual being assessed; (b) the purpose of the test(s); (c) the

J.A.1391

# EXHIBIT 76

J.A.1392

# USER'S GUIDE

# INTELLECTUAL DISABILITY

Definition, Classification, and Systems of Supports

## 11TH EDITION



aaidd

# User's Guide

To Accompany the 11th Edition
of Intellectual Disability:
Definition, Classification,
and Systems of Supports

Applications for Clinicians, Educators, Organizations
Providing Supports, Policymakers, Family Members
and Advocates, and Health Care Professionals

*Developed by the AAIDD User's Guide Work Group*

Robert L. Schalock, Ruth Luckasson, Val Bradley, Wil Buntinx, Yves Lachapelle,
Karrie A. Shogren, Martha E. Snell, James R. Thompson, Marc Tassé,
Miguel A. Verdugo-Alonso, and Michael L. Wehmeyer



American Association
on Intellectual and
Developmental Disabilities

J.A.1394

© 2012 by American Association on Intellectual and Developmental Disabilities

All rights reserved. No part of this book may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopying, recording, or by any information storage and retrieval system, without permission in writing from the publisher.

Printed in the United States of America

# CONTENTS

Overview and Purpose of the User's Guide . . . . . . . . . . . . . . . vii

List of Tables . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . viii

List of Figures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ix

Chapter 1    Overview of the 2010 AAIDD Definition,
Classification, and Systems of Supports . . . . . . . . . . . . . . . . . . 1

Chapter 2    Relevance of the 2010 AAIDD System to
Professionalism and Professional Responsibilities . . . . . . . . . . . 7

Chapter 3    Applications for Clinicians in the Diagnosis of
Intellectual Disability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Chapter 4    Applications for Educators . . . . . . . . . . . . . . . . . . . . . . . . . 29

Chapter 5    Applications for Organizations Providing Supports . . . . . . . . . 41

Chapter 6    Applications for Policymakers . . . . . . . . . . . . . . . . . . . . . . . 49

Chapter 7    Applications for Family Members and Advocates . . . . . . . . . . 59

Chapter 8    Applications for Health Care Professionals . . . . . . . . . . . . . . 63

Glossary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

Subject Index . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

J.A.1396

# OVERVIEW

## PURPOSE OF THE USER'S GUIDE

Professionals in the field of intellectual disability (ID) are responsible for making decisions and recommendations regarding the diagnosis, classification, and planning of individualized supports for persons with ID. These decisions need to be based on best practices in ID, professional standards, professional ethics, and clinical judgment. These four professional responsibility requirements are used to try to make excellent decisions or recommendations, and ultimately to help improve the welfare and personal well-being of people with ID. Essential to those efforts is a clear understanding of ID and best practices regarding the diagnosis, classification, and planning of individualized supports for persons with ID. The primary purpose of this *User's Guide* is to provide that clear understanding of ID and summarize best practices in the field. Its authors are a subgroup of the AAIDD 2010 Terminology and Classification Committee.

The American Association on Intellectual and Developmental Disabilities (AAIDD) has updated the definition of ID (formerly mental retardation) 11 times since 1908. Each update has reflected the then-current understanding of the phenomenon and practices related to its definition and diagnosis. In the past three decades, there have been significant changes in our understanding of ID and best practices regarding its diagnosis, classification, and amelioration through systems of supports. In that regard, the 1992 manual (Luckasson et al.) went from simply defining and classifying individuals to: moving the diagnostic process away from deficits identified solely on the basis of an intelligence test score, contextualizing diagnosis and classification within systems of individualized supports, and shifting from an emphasis on providing programs to people with ID to an emphasis on designing and delivering individualized supports. The 2002 manual (Luckasson et al.) extended the 1992 system by providing more explicit criteria for diagnosis and classification, and expanded on the use of clinical judgment in those processes. At the same time, the 2002 system retained an emphasis on assessment for multiple purposes, a functional orientation, and the supports paradigm.

The 2010 manual (Schalock et al.) continues to describe best practices related to a systematic approach to the diagnosis, classification, and provision of individualized supports to persons with ID. The approach is based on current knowledge regarding the etiology of ID and an ecological model of disability, recent developments in the assessment of intellectual functioning and adaptive behavior, and a multidimensional framework that is used to both explain the phenomenon of ID and as a basis for assessment, classification, and developing individualized systems of supports.

This edition of the *User's Guide* accompanies the 11th edition of the *AAIDD Manual: Intellectual Disability: Definition, Classification, and Systems of Supports*. The guide builds on the previous *User's Guide* that was used widely as a practical resource to accompany the 10th edition of the AAIDD manual. Through the guide's chapters, the reader will find:

- An overview of the 2010 AAIDD System as described more fully in the manual
- A discussion of the relevance of the 2010 AAIDD System to professionalism and professional responsibilities

J.A.1397

USCA4 Appeal: 21-1     Doc: 11-2          Filed: 01/08/2021     Pg: 42 of 134

- Best-practice procedures and guidelines regarding the diagnosis of ID
- Applications for clinicians, educators, organizations providing supports, policy-makers, family members and advocates, and health care professionals

In addition, at the end of each chapter readers will find Application Key Points that provide a quick overview and summary of the main ideas discussed in the respective chapter. A glossary is also provided at the end of the guide that defines important terms and concepts.

This edition of the *User's Guide* has been developed to assist professionals in the field of ID to understand and apply the 2010 AAIDD System. The intent is not to repeat the considerable conceptual and scientific details found in the 2010 manual. Rather, our primary purposes are to provide an overview of the key features of the 2010 system, tie the system to public policies and best practices affecting service delivery trends in the field, and show how one's use of the various components of the 2010 system can help one understand the dynamic nature of ID and thereby enhance the effectiveness and quality of policies, practices, and valued personal outcomes.

J.A.1398

## TABLE 3.1

## Characteristics of Persons with ID with Higher IQ Scores

- High rates of classroom segregation and slightly lower rates of leaving school compared to students without ID

- Lower socioeconomic status

- Low rate of employment and low career success

- Poorer nutrition and access to health care

- Most continue to live with parents or others

- Impaired social judgment that involves inadequate response systems, lessened interpersonal competence and decision making skills, difficulties in social problem solving and flexible thinking, and increased vulnerability and victimization

- Inadequate social responding and judgment as reflected in a tendency to deny or minimize their intellectual disability, a desire to please authority figures, gullibility when others mislead or harm them, and/or naiveté or suggestibility

- Difficulty in thinking and learning as reflected in difficulties in making sense of the world through consistent, reliable, socially mature levels of planning, problem solving, thinking abstractly, comprehending complex ideas, learning quickly, and learning from experience

## TABLE 3.2

## Significant Limitations in Adaptive Behavior: A Summary of the Research

| Adaptive Behavior Domain | Likely Significant Limitations |
| --- | --- |
| Conceptual Skills | Impaired, inconsistent, or immature quality of independent planning, problem solving, or thinking abstractly |
| | Limited ability to generate possible solutions and/or choose a good solution when confronted with a complex problem or situation |
| | Difficulty comprehending or using effectively complex ideas or symbols such as time and mathematical functions |
| | Difficulty effectively communicating complex thoughts or ideas |

J.A.1399

APPLICATIONS FOR CLINICIANS IN THE DIAGNOSIS OF INTELLECTUAL DISABILITY

TABLE 3.2 (*continued*)

| Adaptive Behavior Domain | Likely Significant Limitations |
|---|---|
| Conceptual Skills (*continued*) | Difficulty in self-direction as reflected in limited ability to independently arrange or plan future life activities such as advanced job training<br><br>Difficulty anticipating cause and effect, understanding and planning for consequences, and using logic to understand the world |
| Social Skills | Impaired social judgment and learning from experiences, especially concerning interactions with other people<br><br>Impaired ability to understand and follow rules and laws in complex situations<br><br>Difficulties in working effectively with others toward group problem solving and decision making<br><br>Inflexible and concrete thinking and acting during complex social problems<br><br>Increased vulnerability and victimization, especially concerning who can be trusted, whom to follow, and what circumstances are safe<br><br>Inadequate social responding, social judgment, and self-direction<br><br>Tendency to deny or minimize the disability to their detriment<br><br>Inappropriate desire to please authority figures based on limited understanding of situation<br><br>Gullibility, naïveté, and suggestibility in interactions with others |
| **Adaptive Behavior Domain** | **Likely Significant Limitations** |
| Practical Skills | Limitations in activities of daily living such as arranging steady groceries and proper sleeping arrangements, meal planning, keeping appointments, and maintaining one's medication regime<br><br>Limitations in occupational skills such as obtaining a steady job that covers expenses, meeting work competencies, getting along with coworkers and managers, handling job conflict appropriately, maintaining high quality work under pressure |

© American Association on Intellectual and Developmental Disabilities

J.A.1400

measures to assess intelligence, there are clearly some circumstances in which neither will be appropriate. This may be because the individual being assessed has cognitive deficits that fall below the floor of the test, has sensory or motor limitations that preclude certain forms of test presentation/response, or is influenced by a variety of cultural-, social-, ethnicity-, and language-based factors. When this is the case, it may be necessary to select among alternative instruments rather than rely on the more traditional intelligence tests.

*Broad-based assessment of adaptive behavior.*   There are times when information obtained from a standardized adaptive behavior assessment instrument does not validly answer the diagnostic question because of lack of opportunity, lack of appropriate norms, significant limitations of the person, contradictory information, and/or cultural and linguistic factors. *In these situations, the clinician should interview multiple individuals using the following standard: the persons interviewed should know the individual well and have had the opportunity to directly observe the individual engaging in his or her typical behaviors across community contexts (e.g., home, community, school, and work).* The use of multiple respondents, consistent with this standard, will ensure greater reliability of the information obtained, and provide a broader coverage of adaptive behavior across settings.

As a broad-based assessment strategy, interviews based on the above standard should focus heavily on what the person actually does and how he or she interacts with the environment, with an emphasis on the individual's typical performance and not his or her best or assumed ability or maximum performance. As an assessment strategy, the following guidelines for adaptive behavior interviews should be used:

- Inquire about *what the person typically does*, rather than what the individual can do or could do.
- Use *multiple informants* who know the person well and have had the opportunity to directly observe the person engaging in his or her typical behaviors across contexts (e.g., home, community, school, and work).
- *Base observations on multiple occurrences* of the behavior and not a single event or experience.
- Weigh observations across multiple observers to reconcile different observations.
- Recognize that limitations in present functioning must be considered within the context of community environments typical of the individual's age peers and culture.
- Distinguish between adaptive behavior and problem behavior(s). They are independent constructs and not opposite poles of a continuum. Information regarding problem behavior does not inform the clinician regarding the person's adaptive behavior.

## Strategy Four: Synthesize the Obtained Information

The synthesis of information requires critical thinking skills related to analysis, evaluation, interpretation, and inference—skills that are increasingly being recognized as the cognitive engine driving the processes of knowledge development and clinical judgment in a wide variety of professional fields. Synthesizing the obtained information as a prelude to making a diagnosis and formulating one or more recommendations is facilitated by using the 12 synthesis guidelines presented in Table 3.3.

18

J.A.1401

## TABLE 3.3

### Guidelines for Synthesizing Obtained Information

| | |
|---|---|
| 1. | Show clearly that the obtained information is aligned to the critical diagnostic question: "Does the person meet the three criteria necessary for a diagnosis of intellectual disability?" |
| 2. | Integrate information from multiple data sources (i.e. broad-based assessments and a thorough history). A valid diagnosis of ID is based on multiple data points that not only include giving equal weight to significant limitations in adaptive behavior and intellectual functioning, but also requires evaluating the pattern of test scores and factors that affect the standard error of measurement of the standardized assessment instruments used. |
| 3. | Be aware that some factors might artificially inflate test scores, thus inaccurately suggesting higher scores than the individual's true score. These misleading factors include anomalies in the structural features of the norming sample, gaps in the development of spacing of item difficulties or sub-tests of a comprehensive adaptive behavior measure, and pure error variance (Jacobson & Mulick, 2006). |
| 4. | Be aware of the potential 'false positive' (where the person is diagnosed as an individual with ID but in actuality is not) and 'false negative' (where the person's true ID is not diagnosed as such) (Greenspan, 2006). To overcome a potentially incorrect diagnosis, clinicians need to: (a) equally consider (that is, equate the relative importance of) adaptive behavior and intellectual functioning in making a diagnosis of ID; (b) factor in the standard error of measurement of the assessment instrument as well as other technical properties of the instrument used; and (c) incorporate information from multiple sources, including a thorough history. |
| 5. | When a series of scores differ while purporting to measure the same construct, thoroughly explore and analyze the possible reasons for differences in data. Possible reasons include poorly trained examiner(s), improper generalizations of test scores administered for other purposes, improper selection of tests, making mistakes in scoring, administration of the same test too close in time, using different editions of the same test and not using the most recent version, examiner bias, and so forth. For example, there is evidence that IQ score estimates obtained from the WAIS may not be precisely equivalent to those obtained from the Stanford Binet (Lukens & Hurrell, 1996; Nelson & Dacey, 1999, Silverman et al., (2010). |
| 6. | Consider possible effects of personal characteristics and environmental factors that can affect test results. |
| 7. | In the synthesis of school related factors, determine whether the assessment(s) included classroom functioning and academic performance. |
| 8. | In the synthesis of information related to the evaluation of social competence, the focus should be whether the person: (a) interprets accurately others' emotions and intentions |

J.A.1402

TABLE 3.3  (*continued*)

| |
|---|
| based on available cues; (b) generates appropriate social strategies in response to social problems, and (c) demonstrates knowledge and use of social skills such as anticipating the consequences of one's behavior or resolving particular social problems in a given social situation. |
| 9.  Recognize the impact of practice effects, which refer to gains in IQ scores that result from a person being retested on the same test. Practice effect gains occur even when the examinee has not been given any feedback on his performance regarding test items. In addition, practice effects do not reflect growth or other improvement on the skills being assessed (Kaufman, 1994). |
| 10.  Recognize that self-ratings have a high risk of error, since people with ID are more likely to attempt to look more competent and 'normal' than they actually are, as well as frequently exhibit an acquiescence bias. In addition, having ID is often a stigmatizing status that is tied closely to how a person is perceived by peers, family members, and others in the community; therefore, many people with ID and their families attempt to avoid the diagnosis and thus the stigma. |
| 11.  Do not use past criminal behavior or verbal behavior to infer level of adaptive behavior. The diagnosis of intellectual disability is based on meeting three criteria: significant limitations in intellectual functioning; significant limitations in adaptive behavior as expressed in conceptual, social, and practical adaptive skills; and age of onset prior to age 18. The diagnosis of ID is not based on the person's 'street smarts', behavior in jail or prison, or 'criminal adaptive functioning.' |
| 12.  Recognize that a number of reasons might explain the lack of an earlier, official diagnosis of ID including: (a) the individual was excluded from a full school experience; (b) the person's age precluded their access to specialized services such as special education programs; (c) the person was given no diagnosis or a different diagnosis for 'political purposes' such as protection from stigma or teasing, avoidance of assertions of discrimination, or because of the potential impact on benefits of a particular diagnosis; (d) the school's concern about over-representation for data reporting purposes of specific diagnostic groups within their student population; (e) parental concerns to avoid a label; (f) school-based political issues such as availability or non-availability of services and potential funding streams at that time; and (g) the lack of entry referral into the diagnostic-referral process due to cultural and linguistic differences or for other reasons. |

## RETROSPECTIVE DIAGNOSIS GUIDELINES

*The careful synthesis of information is required when a retrospective diagnosis is made.* Such a diagnosis should be based on multiple data points that not only give equal consideration to adaptive behavior and intelligence scores, but also reflect an evaluation of the pattern

J.A.1403

USCA4 Appeal: 21-1    Doc: 11-2         Filed: 01/08/2021    Pg: 48 of 134
Case 3:92-cr-00068-DJN   Document 94-4   Filed 12/14/20   Page 13 of 13 I

APPLICATIONS FOR CLINICIANS IN THE DIAGNOSIS OF INTELLECTUAL DISABILITY

tistical confidence (around the obtained score) in which the person's true score will fall 95% of the time. Thus, an obtained score on an adaptive behavior scale should be considered as an approximation that has either a 66% or 95% likelihood of accuracy, depending on the confidence interval used. There is no evidence suggesting that the population mean on standardized tests of adaptive behavior is increasing at a rate comparable to that observed on standardized tests of intelligence (i.e., Flynn effect). Because of the differences in test construction and administration between intellectual functioning and adaptive behavior, practice effect is not an issue with standardized adaptive behavior scales. One source of measurement error may be specific to measures of adaptive behavior and that is the concern that individuals may exaggerate their adaptive skills when asked to self-report their adaptive behavior. For this reason, numerous sources (e.g. Edgerton, 1967; Finlay & Lyons, 2002; Greenspan & Switzky, 2006; Schalock et al., 2010) have recommended against relying on self-reported measures of adaptive behavior when ruling-in or -out a diagnosis of ID.

*Cutoff score.* A cutoff score is the score(s) that determines the boundaries of the "significant limitations in intellectual functioning and adaptive criteria" for a diagnosis of ID.

- For both criteria, the cutoff score is approximately 2 standard deviations (SD) below the mean of the respective instrument, considering the SEM (see *Confidence interval*) for the specific instrument used, and the strengths and limitations of the instrument.
- A fixed point cutoff for ID is not psychometrically justifiable. The diagnosis of ID is intended to reflect a clinical judgment rather than an actuarial determination.

*Flynn Effect.* The *Flynn Effect* refers to the increase in IQ scores over time (i.e., about 0.30 points per year). The Flynn Effect effects any interpretation of IQ scores based on outdated norms. Both the 11th edition of the manual and this *User's Guide* recommend that in cases in which a test with aging norms is used as part of a diagnosis of ID, a corrected Full Scale IQ upward of 3 points per decade for age of the norms is warranted (Fletcher et al., 2010; Gresham & Reschly, 2011; Kaufman, 2010; Reynolds et al., 2010; Schalock et al., 2010). For example, if the Wechsler Adult Intelligence Scale (WAIS-III; 1997) was used to assess an individual's IQ in July, 2005, the population mean on the WAIS-III was set at 100 when it was originally normed in 1995 (published in 1997). However, on the basis of Flynn's data (2006), the population mean on the WAIS-III Full-Scale IQ corrected for the Flynn Effect would be 103 in 2005 (9 years $\times$ 0.30 = 2.7). Hence, using the significant limitations of approximately 2 SDs below the mean, the Full-Scale IQ cutoff would be approximately 73 and not approximately 70 (plus or minus the SEM).

*Practice effect.* The practice effect refers to gains in IQ scores on tests of intelligence that result from a person being tested on the same instrument. The established clinical best practice is to avoid administering the same intelligence test within a year to the same individual because it will often lead to an overestimation of the examinee's true intelligence.

**J.A.1404**

# EXHIBIT 77

J.A.1405



# DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS

## FIFTH EDITION

## DSM-5®

AMERICAN PSYCHIATRIC ASSOCIATION

J.A.1406

# American Psychiatric Association

*Officers 2012–2013*
PRESIDENT DILIP V. JESTE, M.D.
PRESIDENT-ELECT JEFFREY A. LIEBERMAN, M.D.
TREASURER DAVID FASSLER, M.D.
SECRETARY ROGER PEELE, M.D.

*Assembly*
SPEAKER R. SCOTT BENSON, M.D.
SPEAKER-ELECT MELINDA L. YOUNG, M.D.

*Board of Trustees*
JEFFREY AKAKA, M.D.
CAROL A. BERNSTEIN, M.D.
BRIAN CROWLEY, M.D.
ANITA S. EVERETT, M.D.
JEFFREY GELLER, M.D., M.P.H.
MARC DAVID GRAFF, M.D.
JAMES A. GREENE, M.D.
JUDITH F. KASHTAN, M.D.
MOLLY K. MCVOY, M.D.
JAMES E. NININGER, M.D.
JOHN M. OLDHAM, M.D.
ALAN F. SCHATZBERG, M.D.
ALIK S. WIDGE, M.D., PH.D.

ERIK R. VANDERLIP, M.D.,
MEMBER-IN-TRAINING TRUSTEE-ELECT

J.A.1407

# DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS

## FIFTH EDITION

# DSM-5™





Washington, DC
London, England

J.A.1408

Copyright © 2013 American Psychiatric Association

DSM and DSM-5 are registered trademarks of the American Psychiatric Association. Use of these terms is prohibited without permission of the American Psychiatric Association.

ALL RIGHTS RESERVED. Unless authorized in writing by the APA, no part of this book may be reproduced or used in a manner inconsistent with the APA's copyright. This prohibition applies to unauthorized uses or reproductions in any form, including electronic applications.

Correspondence regarding copyright permissions should be directed to DSM Permissions, American Psychiatric Publishing, 1000 Wilson Boulevard, Suite 1825, Arlington, VA 22209-3901.

Manufactured in the United States of America on acid-free paper.

ISBN 978-0-89042-554-1 (Hardcover) 2nd printing June 2013

ISBN 978-0-89042-555-8 (Paperback) 3rd printing November 2014

American Psychiatric Association
1000 Wilson Boulevard
Arlington, VA 22209-3901
www.psych.org

The correct citation for this book is American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition. Arlington, VA, American Psychiatric Association, 2013.

**Library of Congress Cataloging-in-Publication Data**
Diagnostic and statistical manual of mental disorders : DSM-5. — 5th ed.
    p. ; cm.
DSM-5
DSM-V
Includes index.
ISBN 978-0-89042-554-1 (hardcover : alk. paper) — ISBN 978-0-89042-555-8 (pbk. : alk. paper)
I. American Psychiatric Association. II. American Psychiatric Association. DSM-5 Task Force.
III. Title: DSM-5. IV. Title: DSM-V.
[DNLM: 1. Diagnostic and statistical manual of mental disorders. 5th ed. 2. Mental Disorders—classification. 3. Mental Disorders—diagnosis. WM 15]
RC455.2.C4
616.89'075—dc23

2013011061

**British Library Cataloguing in Publication Data**
A CIP record is available from the British Library.

Text Design—Tammy J. Cordova

Manufacturing—R.R. Donnelley

J.A.1409

# Contents

DSM-5 Classification. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xiii

Preface . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .xli

## Section I
### DSM-5 Basics

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

Use of the Manual . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

Cautionary Statement for Forensic Use of DSM-5. . . . . . . . . . . .25

## Section II
### Diagnostic Criteria and Codes

Neurodevelopmental Disorders . . . . . . . . . . . . . . . . . . . . . . . . . . . .31

Schizophrenia Spectrum and Other Psychotic Disorders . . . . . .87

Bipolar and Related Disorders . . . . . . . . . . . . . . . . . . . . . . . . . . . .123

Depressive Disorders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .155

Anxiety Disorders. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .189

Obsessive-Compulsive and Related Disorders . . . . . . . . . . . . .235

Trauma- and Stressor-Related Disorders. . . . . . . . . . . . . . . . . . .265

Dissociative Disorders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .291

Somatic Symptom and Related Disorders . . . . . . . . . . . . . . . . .309

Feeding and Eating Disorders . . . . . . . . . . . . . . . . . . . . . . . . . . .329

Elimination Disorders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .355

Sleep-Wake Disorders. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .361

Sexual Dysfunctions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .423

Gender Dysphoria . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .451

J.A.1410

Disruptive, Impulse-Control, and Conduct Disorders . . . . . . . . 461

Substance-Related and Addictive Disorders . . . . . . . . . . . . . . . 481

Neurocognitive Disorders. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 591

Personality Disorders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 645

Paraphilic Disorders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 685

Other Mental Disorders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 707

Medication-Induced Movement Disorders
  and Other Adverse Effects of Medication . . . . . . . . . . . . . . . . 709

Other Conditions That May Be a Focus of Clinical Attention . . 715

## Section III
### Emerging Measures and Models

Assessment Measures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 733

Cultural Formulation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 749

Alternative DSM-5 Model for Personality Disorders . . . . . . . . . 761

Conditions for Further Study . . . . . . . . . . . . . . . . . . . . . . . . . . . 783

## Appendix

Highlights of Changes From DSM-IV to DSM-5 . . . . . . . . . . . . . 809

Glossary of Technical Terms . . . . . . . . . . . . . . . . . . . . . . . . . . . 817

Glossary of Cultural Concepts of Distress . . . . . . . . . . . . . . . . 833

Alphabetical Listing of DSM-5 Diagnoses and Codes
  (ICD-9-CM and ICD-10-CM). . . . . . . . . . . . . . . . . . . . . . . . . . . 839

Numerical Listing of DSM-5 Diagnoses and Codes
  (ICD-9-CM) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 863

Numerical Listing of DSM-5 Diagnoses and Codes
  (ICD-10-CM) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 877

DSM-5 Advisors and Other Contributors . . . . . . . . . . . . . . . . . 897

Index . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 917

cians an opportunity to document factors that may have played a role in the etiology of the disorder, as well as those that might affect the clinical course. Examples include genetic disorders, such as fragile X syndrome, tuberous sclerosis, and Rett syndrome; medical conditions such as epilepsy; and environmental factors, including very low birth weight and fetal alcohol exposure (even in the absence of stigmata of fetal alcohol syndrome).

# Intellectual Disabilities

# Intellectual Disability (Intellectual Developmental Disorder)

## Diagnostic Criteria

Intellectual disability (intellectual developmental disorder) is a disorder with onset during the developmental period that includes both intellectual and adaptive functioning deficits in conceptual, social, and practical domains. The following three criteria must be met:

A. Deficits in intellectual functions, such as reasoning, problem solving, planning, abstract thinking, judgment, academic learning, and learning from experience, confirmed by both clinical assessment and individualized, standardized intelligence testing.

B. Deficits in adaptive functioning that result in failure to meet developmental and sociocultural standards for personal independence and social responsibility. Without ongoing support, the adaptive deficits limit functioning in one or more activities of daily life, such as communication, social participation, and independent living, across multiple environments, such as home, school, work, and community.

C. Onset of intellectual and adaptive deficits during the developmental period.

**Note:** The diagnostic term *intellectual disability* is the equivalent term for the ICD-11 diagnosis of *intellectual developmental disorders*. Although the term *intellectual disability* is used throughout this manual, both terms are used in the title to clarify relationships with other classification systems. Moreover, a federal statute in the United States (Public Law 111-256, Rosa's Law) replaces the term *mental retardation* with *intellectual disability*, and research journals use the term *intellectual disability*. Thus, *intellectual disability* is the term in common use by medical, educational, and other professions and by the lay public and advocacy groups.

*Specify* current severity (see Table 1):

317 (F70)  Mild
318.0 (F71) Moderate
318.1 (F72) Severe
318.2 (F73) Profound

## Specifiers

The various levels of severity are defined on the basis of adaptive functioning, and not IQ scores, because it is adaptive functioning that determines the level of supports required. Moreover, IQ measures are less valid in the lower end of the IQ range.

J.A.1412

## Diagnostic Features

The essential features of intellectual disability (intellectual developmental disorder) are deficits in general mental abilities (Criterion A) and impairment in everyday adaptive functioning, in comparison to an individual's age-, gender-, and socioculturally matched peers (Criterion B). Onset is during the developmental period (Criterion C). The diagnosis of intellectual disability is based on both clinical assessment and standardized testing of intellectual and adaptive functions.

Criterion A refers to intellectual functions that involve reasoning, problem solving, planning, abstract thinking, judgment, learning from instruction and experience, and practical understanding. Critical components include verbal comprehension, working memory, perceptual reasoning, quantitative reasoning, abstract thought, and cognitive efficacy. Intellectual functioning is typically measured with individually administered and psychometrically valid, comprehensive, culturally appropriate, psychometrically sound tests of intelligence. Individuals with intellectual disability have scores of approximately two standard deviations or more below the population mean, including a margin for measurement error (generally +5 points). On tests with a standard deviation of 15 and a mean of 100, this involves a score of 65–75 (70 ± 5). Clinical training and judgment are required to interpret test results and assess intellectual performance.

Factors that may affect test scores include practice effects and the "Flynn effect" (i.e., overly high scores due to out-of-date test norms). Invalid scores may result from the use of brief intelligence screening tests or group tests; highly discrepant individual subtest scores may make an overall IQ score invalid. Instruments must be normed for the individual's sociocultural background and native language. Co-occurring disorders that affect communication, language, and/or motor or sensory function may affect test scores. Individual cognitive profiles based on neuropsychological testing are more useful for understanding intellectual abilities than a single IQ score. Such testing may identify areas of relative strengths and weaknesses, an assessment important for academic and vocational planning.

IQ test scores are approximations of conceptual functioning but may be insufficient to assess reasoning in real-life situations and mastery of practical tasks. For example, a person with an IQ score above 70 may have such severe adaptive behavior problems in social judgment, social understanding, and other areas of adaptive functioning that the person's actual functioning is comparable to that of individuals with a lower IQ score. Thus, clinical judgment is needed in interpreting the results of IQ tests.

Deficits in adaptive functioning (Criterion B) refer to how well a person meets community standards of personal independence and social responsibility, in comparison to others of similar age and sociocultural background. Adaptive functioning involves adaptive reasoning in three domains: conceptual, social, and practical. The *conceptual (academic) domain* involves competence in memory, language, reading, writing, math reasoning, acquisition of practical knowledge, problem solving, and judgment in novel situations, among others. The *social domain* involves awareness of others' thoughts, feelings, and experiences; empathy; interpersonal communication skills; friendship abilities; and social judgment, among others. The *practical domain* involves learning and self-management across life settings, including personal care, job responsibilities, money management, recreation, self-management of behavior, and school and work task organization, among others. Intellectual capacity, education, motivation, socialization, personality features, vocational opportunity, cultural experience, and coexisting general medical conditions or mental disorders influence adaptive functioning.

Adaptive functioning is assessed using both clinical evaluation and individualized, culturally appropriate, psychometrically sound measures. Standardized measures are used with knowledgeable informants (e.g., parent or other family member; teacher; counselor; care provider) and the individual to the extent possible. Additional sources of information include educational, developmental, medical, and mental health evaluations. Scores from standardized measures and interview sources must be interpreted using clinical judgment. When standardized testing is difficult or impossible, because of a variety of

J.A.1413

USCA4 Appeal: 21-1      Doc: 11-2          Filed: 01/08/2021      Pg: 58 of 134

factors (e.g., sensory impairment, severe problem behavior), the individual may be diagnosed with unspecified intellectual disability. Adaptive functioning may be difficult to assess in a controlled setting (e.g., prisons, detention centers); if possible, corroborative information reflecting functioning outside those settings should be obtained.

Criterion B is met when at least one domain of adaptive functioning—conceptual, social, or practical—is sufficiently impaired that ongoing support is needed in order for the person to perform adequately in one or more life settings at school, at work, at home, or in the community. To meet diagnostic criteria for intellectual disability, the deficits in adaptive functioning must be directly related to the intellectual impairments described in Criterion A. Criterion C, onset during the developmental period, refers to recognition that intellectual and adaptive deficits are present during childhood or adolescence.

## Associated Features Supporting Diagnosis

Intellectual disability is a heterogeneous condition with multiple causes. There may be associated difficulties with social judgment; assessment of risk; self-management of behavior, emotions, or interpersonal relationships; or motivation in school or work environments. Lack of communication skills may predispose to disruptive and aggressive behaviors. Gullibility is often a feature, involving naiveté in social situations and a tendency for being easily led by others. Gullibility and lack of awareness of risk may result in exploitation by others and possible victimization, fraud, unintentional criminal involvement, false confessions, and risk for physical and sexual abuse. These associated features can be important in criminal cases, including Atkins-type hearings involving the death penalty.

Individuals with a diagnosis of intellectual disability with co-occurring mental disorders are at risk for suicide. They think about suicide, make suicide attempts, and may die from them. Thus, screening for suicidal thoughts is essential in the assessment process. Because of a lack of awareness of risk and danger, accidental injury rates may be increased.

## Prevalence

Intellectual disability has an overall general population prevalence of approximately 1%, and prevalence rates vary by age. Prevalence for severe intellectual disability is approximately 6 per 1,000.

## Development and Course

Onset of intellectual disability is in the developmental period. The age and characteristic features at onset depend on the etiology and severity of brain dysfunction. Delayed motor, language, and social milestones may be identifiable within the first 2 years of life among those with more severe intellectual disability, while mild levels may not be identifiable until school age when difficulty with academic learning becomes apparent. All criteria (including Criterion C) must be fulfilled by history or current presentation. Some children under age 5 years whose presentation will eventually meet criteria for intellectual disability have deficits that meet criteria for global developmental delay.

When intellectual disability is associated with a genetic syndrome, there may be a characteristic physical appearance (as in, e.g., Down syndrome). Some syndromes have a *behavioral phenotype,* which refers to specific behaviors that are characteristic of particular genetic disorder (e.g., Lesch-Nyhan syndrome). In acquired forms, the onset may be abrupt following an illness such as meningitis or encephalitis or head trauma occurring during the developmental period. When intellectual disability results from a loss of previously acquired cognitive skills, as in severe traumatic brain injury, the diagnoses of intellectual disability and of a neurocognitive disorder may both be assigned.

Although intellectual disability is generally nonprogressive, in certain genetic disorders (e.g., Rett syndrome) there are periods of worsening, followed by stabilization, and in

J.A.1414

USCA4 Appeal: 21-1   Doc: 11-2   Filed: 01/08/2021   Pg: 59 of 134

Case 3:92-cr-00068-DJN   Document 94-5   Filed 12/14/20   Page 11

others (e.g., San Phillippo syndrome) progressive worsening of intellectual function. After early childhood, the disorder is generally lifelong, although severity levels may change over time. The course may be influenced by underlying medical or genetic conditions and co-occurring conditions (e.g., hearing or visual impairments, epilepsy). Early and ongoing interventions may improve adaptive functioning throughout childhood and adulthood. In some cases, these result in significant improvement of intellectual functioning, such that the diagnosis of intellectual disability is no longer appropriate. Thus, it is common practice when assessing infants and young children to delay diagnosis of intellectual disability until after an appropriate course of intervention is provided. For older children and adults, the extent of support provided may allow for full participation in all activities of daily living and improved adaptive function. Diagnostic assessments must determine whether improved adaptive skills are the result of a stable, generalized new skill acquisition (in which case the diagnosis of intellectual disability may no longer be appropriate) or whether the improvement is contingent on the presence of supports and ongoing interventions (in which case the diagnosis of intellectual disability may still be appropriate).

## Risk and Prognostic Factors

**Genetic and physiological.**   Prenatal etiologies include genetic syndromes (e.g., sequence variations or copy number variants involving one or more genes; chromosomal disorders), inborn errors of metabolism, brain malformations, maternal disease (including placental disease), and environmental influences (e.g., alcohol, other drugs, toxins, teratogens). Perinatal causes include a variety of labor and delivery-related events leading to neonatal encephalopathy. Postnatal causes include hypoxic ischemic injury, traumatic brain injury, infections, demyelinating disorders, seizure disorders (e.g., infantile spasms), severe and chronic social deprivation, and toxic metabolic syndromes and intoxications (e.g., lead, mercury).

## Culture-Related Diagnostic Issues

Intellectual disability occurs in all races and cultures. Cultural sensitivity and knowledge are needed during assessment, and the individual's ethnic, cultural, and linguistic background, available experiences, and adaptive functioning within his or her community and cultural setting must be taken into account.

## Gender-Related Diagnostic Issues

Overall, males are more likely than females to be diagnosed with both mild (average male:female ratio 1.6:1) and severe (average male:female ratio 1.2:1) forms of intellectual disability. However, gender ratios vary widely in reported studies. Sex-linked genetic factors and male vulnerability to brain insult may account for some of the gender differences.

## Diagnostic Markers

A comprehensive evaluation includes an assessment of intellectual capacity and adaptive functioning; identification of genetic and nongenetic etiologies; evaluation for associated medical conditions (e.g., cerebral palsy, seizure disorder); and evaluation for co-occurring mental, emotional, and behavioral disorders. Components of the evaluation may include basic pre- and perinatal medical history, three-generational family pedigree, physical examination, genetic evaluation (e.g., karyotype or chromosomal microarray analysis and testing for specific genetic syndromes), and metabolic screening and neuroimaging assessment.

## Differential Diagnosis

The diagnosis of intellectual disability should be made whenever Criteria A, B, and C are met. A diagnosis of intellectual disability should not be assumed because of a particular

J.A.1415

USCA4 Appeal: 21-1   Doc: 11-2   Filed: 01/08/2021   Pg: 60 of 134

genetic or medical condition. A genetic syndrome linked to intellectual disability should be noted as a concurrent diagnosis with the intellectual disability.

**Major and mild neurocognitive disorders.**   Intellectual disability is categorized as a neurodevelopmental disorder and is distinct from the neurocognitive disorders, which are characterized by a loss of cognitive functioning. Major neurocognitive disorder may co-occur with intellectual disability (e.g., an individual with Down syndrome who develops Alzheimer's disease, or an individual with intellectual disability who loses further cognitive capacity following a head injury). In such cases, the diagnoses of intellectual disability and neurocognitive disorder may both be given.

**Communication disorders and specific learning disorder.**   These neurodevelopmental disorders are specific to the communication and learning domains and do not show deficits in intellectual and adaptive behavior. They may co-occur with intellectual disability. Both diagnoses are made if full criteria are met for intellectual disability and a communication disorder or specific learning disorder.

**Autism spectrum disorder.**   Intellectual disability is common among individuals with autism spectrum disorder. Assessment of intellectual ability may be complicated by social-communication and behavior deficits inherent to autism spectrum disorder, which may interfere with understanding and complying with test procedures. Appropriate assessment of intellectual functioning in autism spectrum disorder is essential, with reassessment across the developmental period, because IQ scores in autism spectrum disorder may be unstable, particularly in early childhood.

## Comorbidity

Co-occurring mental, neurodevelopmental, medical, and physical conditions are frequent in intellectual disability, with rates of some conditions (e.g., mental disorders, cerebral palsy, and epilepsy) three to four times higher than in the general population. The prognosis and outcome of co-occurring diagnoses may be influenced by the presence of intellectual disability. Assessment procedures may require modifications because of associated disorders, including communication disorders, autism spectrum disorder, and motor, sensory, or other disorders. Knowledgeable informants are essential for identifying symptoms such as irritability, mood dysregulation, aggression, eating problems, and sleep problems, and for assessing adaptive functioning in various community settings.

The most common co-occurring mental and neurodevelopmental disorders are attention-deficit/hyperactivity disorder; depressive and bipolar disorders; anxiety disorders; autism spectrum disorder; stereotypic movement disorder (with or without self-injurious behavior); impulse-control disorders; and major neurocognitive disorder. Major depressive disorder may occur throughout the range of severity of intellectual disability. Self-injurious behavior requires prompt diagnostic attention and may warrant a separate diagnosis of stereotypic movement disorder. Individuals with intellectual disability, particularly those with more severe intellectual disability, may also exhibit aggression and disruptive behaviors, including harm of others or property destruction.

## Relationship to Other Classifications

ICD-11 (in development at the time of this publication) uses the term *intellectual developmental disorders* to indicate that these are disorders that involve impaired brain functioning early in life. These disorders are described in ICD-11 as a metasyndrome occurring in the developmental period analogous to dementia or neurocognitive disorder in later life. There are four subtypes in ICD-11: mild, moderate, severe, and profound.

The American Association on Intellectual and Developmental Disabilities (AAIDD) also uses the term *intellectual disability* with a similar meaning to the term as used in this

J.A.1416

manual. The AAIDD's classification is multidimensional rather than categorical and is based on the disability construct. Rather than listing specifiers as is done in DSM-5, the AAIDD emphasizes a profile of supports based on severity.

## Global Developmental Delay

### 315.8 (F88)

This diagnosis is reserved for individuals *under* the age of 5 years when the clinical severity level cannot be reliably assessed during early childhood. This category is diagnosed when an individual fails to meet expected developmental milestones in several areas of intellectual functioning, and applies to individuals who are unable to undergo systematic assessments of intellectual functioning, including children who are too young to participate in standardized testing. This category requires reassessment after a period of time.

## Unspecified Intellectual Disability (Intellectual Developmental Disorder)

### 319 (F79)

This category is reserved for individuals *over* the age of 5 years when assessment of the degree of intellectual disability (intellectual developmental disorder) by means of locally available procedures is rendered difficult or impossible because of associated sensory or physical impairments, as in blindness or prelingual deafness; locomotor disability; or presence of severe problem behaviors or co-occurring mental disorder. This category should only be used in exceptional circumstances and requires reassessment after a period of time.

## Communication Disorders

Disorders of communication include deficits in language, speech, and communication. *Speech* is the expressive production of sounds and includes an individual's articulation, fluency, voice, and resonance quality. *Language* includes the form, function, and use of a conventional system of symbols (i.e., spoken words, sign language, written words, pictures) in a rule-governed manner for communication. *Communication* includes any verbal or nonverbal behavior (whether intentional or unintentional) that influences the behavior, ideas, or attitudes of another individual. Assessments of speech, language and communication abilities must take into account the individual's cultural and language context, particularly for individuals growing up in bilingual environments. The standardized measures of language development and of nonverbal intellectual capacity must be relevant for the cultural and linguistic group (i.e., tests developed and standardized for one group may not provide appropriate norms for a different group). The diagnostic category of communication disorders includes the following: language disorder, speech sound disorder, childhood-onset fluency disorder (stuttering), social (pragmatic) communication disorder, and other specified and unspecified communication disorders.

# EXHIBIT 78

**22926**

## CONGRESSIONAL RECORD—HOUSE

# HOUSE OF REPRESENTATIVES—*Thursday, September 8, 1988*

The House met at 10 a.m.

The Chaplain, Rev. James David Ford, D.D., offered the following prayer:

We are grateful, O God, that You raise up public servants who dedicate their lives to make our Nation a better place and who do what they can to help people of every background or need. We are thankful that there are leaders who use their gifts to help lift people to walk on higher ground. At the beginning of this new day we express our special gratitude for the contributions of our friend and colleague, CLAUDE PEPPER. At this time of his birthday we remember him for his life and labor and pray that Your benediction will continue to bless him and each one of us that we will be the people You would have us be and do those good things that honor You and serve every person in Your creation. This we pray. Amen.

---

### THE JOURNAL

The SPEAKER. The Chair has examined the Journal of the last day's proceedings and announces to the House his approval thereof.

Pursuant to clause 1, rule I, the Journal stands approved.

Mrs. BENTLEY. Mr. Speaker, pursuant to clause 1, rule I, I demand a vote on agreeing to the Speaker's approval of the Journal.

The SPEAKER. The question is on the Chair's approval of the Journal.

The question was taken; and the Speaker announced that the ayes appeared to have it.

Mrs. BENTLEY. Mr. Speaker, I object to the vote on the ground that a quorum is not present and make the point of order that a quorum is not present.

The Speaker. Evidently, a quorum is not present.

The Sergeant at Arms will notify absent Members.

The vote was taken by electronic device, and there were—yeas 256, nays 117, not voting 58, as follows:

[Roll No. 293]

#### YEAS—256

| | | |
|---|---|---|
| Akaka | Bennett | Brooks |
| Alexander | Berman | Broomfield |
| Anderson | Bevill | Brown (CA) |
| Andrews | Bilbray | Bruce |
| Annunzio | Boggs | Bryant |
| Applegate | Boland | Bustamante |
| Archer | Bonior | Byron |
| Aspin | Bonker | Callahan |
| Atkins | Borski | Campbell |
| Bartlett | Bosco | Cardin |
| Bateman | Boucher | Carper |
| Bates | Boxer | Carr |
| Beilenson | Brennan | Chappell |
| Clarke | Kaptur | Quillen |
| Clement | Kasich | Rahall |
| Coelho | Kastenmeier | Ravenel |
| Coleman (TX) | Kennedy | Ray |
| Collins | Kildee | Regula |
| Combest | Kleczka | Richardson |
| Conte | Kolter | Rinaldo |
| Cooper | Kostmayer | Ritter |
| Costello | Lancaster | Robinson |
| Courter | Lantos | Roe |
| Coyne | Lehman (CA) | Rose |
| Darden | Lehman (FL) | Rostenkowski |
| Davis (MI) | Leland | Rowland (GA) |
| de la Garza | Lent | Russo |
| DeFazio | Levin (MI) | Sabo |
| Derrick | Levine (CA) | Saiki |
| Dicks | Lewis (GA) | Savage |
| Dixon | Lipinski | Sawyer |
| Donnelly | Lloyd | Scheuer |
| Dorgan (ND) | Lott | Schneider |
| Downey | Lowry (WA) | Schulze |
| Durbin | Luken, Thomas | Schumer |
| Dwyer | Manton | Sharp |
| Dymally | Markey | Shaw |
| Eckart | Martinez | Shumway |
| Edwards (CA) | Matsui | Shuster |
| English | Mavroules | Sisisky |
| Erdreich | Mazzoli | Skaggs |
| Espy | McCollum | Skelton |
| Evans | McCrery | Slattery |
| Fascell | McCurdy | Slaughter (NY) |
| Fawell | McEwen | Smith (FL) |
| Fazio | McHugh | Smith (IA) |
| Fish | McMillen (MD) | Smith (NE) |
| Flake | Mfume | Smith (NJ) |
| Flippo | Miller (CA) | Solarz |
| Florio | Miller (WA) | Spratt |
| Foglietta | Mineta | Staggers |
| Foley | Mollohan | Stallings |
| Frost | Montgomery | Stark |
| Gaydos | Moody | Stenholm |
| Gejdenson | Morella | Stokes |
| Gephardt | Morrison (CT) | Stratton |
| Gibbons | Morrison (WA) | Studds |
| Gilman | Mrazek | Sweeney |
| Glickman | Murtha | Swift |
| Gonzalez | Myers | Synar |
| Gordon | Natcher | Tallon |
| Grant | Neal | Taylor |
| Gray (IL) | Nelson | Thomas (GA) |
| Green | Nowak | Torricelli |
| Guarini | Oakar | Traficant |
| Hall (TX) | Oberstar | Traxler |
| Hamilton | Obey | Udall |
| Hammerschmidt | Olin | Valentine |
| Harris | Ortiz | Vento |
| Hatcher | Owens (NY) | Visclosky |
| Hayes (IL) | Owens (UT) | Volkmer |
| Hayes (LA) | Oxley | Walgren |
| Hefner | Panetta | Watkins |
| Hertel | Parris | Weiss |
| Hochbrueckner | Patterson | Whitten |
| Horton | Payne | Williams |
| Hoyer | Pease | Wise |
| Hubbard | Pelosi | Wolpe |
| Huckaby | Pepper | Wortley |
| Hughes | Perkins | Wyden |
| Jeffords | Petri | Wylie |
| Jenkins | Pickett | Yates |
| Johnson (CT) | Pickle | Yatron |
| Johnson (SD) | Porter | Young (AK) |
| Jontz | Price | |
| Kanjorski | Pursell | |

#### NAYS—117

| | | |
|---|---|---|
| Armey | Buechner | Dannemeyer |
| Baker | Burton | Daub |
| Ballenger | Chandler | Davis (IL) |
| Barton | Clay | DeLay |
| Bentley | Clinger | DeWine |
| Bereuter | Coats | Dickinson |
| Bilirakis | Coble | DioGuardi |
| Bliley | Coleman (MO) | Dornan (CA) |
| Boehlert | Craig | Dreier |
| Brown (CO) | Crane | Edwards (OK) |
| Emerson | Lightfoot | Sensenbrenner |
| Fields | Livingston | Shays |
| Frenzel | Lukens, Donald | Sikorski |
| Gallegly | Lungren | Skeen |
| Gallo | Madigan | Slaughter (VA) |
| Gekas | Marlenee | Smith (TX) |
| Goodling | Martin (IL) | Smith, Denny |
| Gradison | Martin (NY) | (OR) |
| Grandy | McCandless | Smith, Robert |
| Gregg | McMillan (NC) | (NH) |
| Gunderson | Meyers | Smith, Robert |
| Hansen | Michel | (OR) |
| Hastert | Miller (OH) | Snowe |
| Hefley | Molinari | Solomon |
| Henry | Moorhead | Stangeland |
| Herger | Murphy | Stump |
| Hiler | Nielson | Sundquist |
| Holloway | Pashayan | Swindall |
| Hopkins | Penny | Tauke |
| Hunter | Rhodes | Thomas (CA) |
| Inhofe | Ridge | Upton |
| Ireland | Roberts | Vander Jagt |
| Jacobs | Rogers | Vucanovich |
| Kolbe | Roth | Walker |
| Kyl | Roukema | Weber |
| Lagomarsino | Rowland (CT) | Weldon |
| Latta | Saxton | Wheat |
| Leach (IA) | Schaefer | Whittaker |
| Lewis (CA) | Schroeder | Wolf |
| Lewis (FL) | Schuette | Young (FL) |

#### NOT VOTING—58

| | | |
|---|---|---|
| Ackerman | Frank | McCloskey |
| Anthony | Garcia | McDade |
| AuCoin | Gingrich | McGrath |
| Badham | Gray (PA) | Mica |
| Barnard | Hall (OH) | Moakley |
| Boulter | Hawkins | Nagle |
| Bunning | Houghton | Nichols |
| Chapman | Hutto | Packard |
| Cheney | Hyde | Rangel |
| Conyers | Jones (NC) | Rodino |
| Coughlin | Jones (TN) | Roybal |
| Crockett | Kemp | Spence |
| Dellums | Kennelly | St Germain |
| Dingell | Konnyu | Tauzin |
| Dowdy | LaFalce | Torres |
| Dyson | Leath (TX) | Towns |
| Early | Lowery (CA) | Waxman |
| Feighan | Lujan | Wilson |
| Ford (MI) | Mack | |
| Ford (TN) | MacKay | |

□ 1024

So the Journal was approved.

The result of the vote was announced as above recorded.

---

### ANNOUNCEMENT BY THE SPEAKER

The SPEAKER. The Chair desires to make a statement and will then recognize the gentleman from California [Mr. HUNTER]. The Chair would like to explain the plans for the consideration of legislation and other action by the House today.

With the kind permission of the membership, the Chair would like to suggest the following order of legislative business today: Members may desire to learn what is planned and in what order in order that they may make their own plans. It is the intention of the Chair that we would receive messages from the Senate or from the President, and then the

---

□ This symbol represents the time of day during the House proceedings, e.g., □ 1407 is 2:07 p.m.

Matter set in this typeface indicates words inserted or appended, rather than spoken, by a Member of the House on the floor.

USCA4 Appeal: 21-1     Doc: 11-2     Filed: 01/08/2021     Pg: 64 of 134
Case 3:92-cr-00068-DJN   Document 94-6   Filed 12/14/20   Page 3 of 5 PageID# 3602

We cannot afford to make it more difficult to bring drug traffickers to trial and to obtain convictions. I urge my colleagues to oppose the Gekas death penalty amendment.

Mr. DREIER of California. Mr. Chairman, I rise in support of the Gekas amendment to permit the death penalty for the intentional killing of a person in the course of committing or in the furtherance of a drug felony. The Supreme Court ruled in 1976 that the death penalty is constitutional, as long as certain procedures and safeguards are followed. The Gekas amendment establishes a constitutionally acceptable procedure for imposing capital punishment that would require an examination of the aggravating and mitigating circumstances surrounding each offense.

Mr. Chairman, tougher punishment is necessary to address the dramatic increase in drug-related crime. It has been demonstrated that such crime is more likely to include violence, particularly against police and increasingly against innocent bystanders. In light of this fact, we need to give prosecutors stronger weapons which will send a message that murder in the context of drug trafficking will not be tolerated.

I would like to share with my colleagues the results of a 1987 Los Angeles Times poll that showed 74 percent of the people questioned favored the use of the death penalty in certain instances. If this poll was conducted in my Los Angeles County congressional district today, I would promise you that the favorable response on capital punishment would be even greater.

The law-abiding citizens of Covina, Claremont, Glendora, Whittier, Pomona, and other communities in my district know the fear that comes from living near neighborhoods with armed street gangs involved in the drug trade. In many cases, these gangs have become well-organized, highly sophisticated criminal enterprises involved in national and international criminal activities. My constituents understand that these gangs do not value human life, instead they take it without compunction. Unfortunately, no deterrent seems to exist currently for this inhuman behavior. If there is a solution to this cycle of violence, I think the threat of the death penalty is it.

Finally, many of my colleagues have argued that foreign countries which arrest drug kingpins would be reluctant to extradite them to a death sentence. I believe it is important to point out that the Gekas amendment gives the Secretary of State the discretion to preclude the death penalty if that were the only way to bring such an individual before the American judicial system.

Mr. ROWLAND of Connecticut. Mr. Chairman, I rise in strong support of the Gekas amendment to H.R. 5210, the Omnibus Drug Initiative Act of 1988. This amendment will provide an important tool in the war against drugs. Clearly, strong steps are needed to reduce the epidemic of drug-related murders.

I am concerned with the increasing amount of drug-related crime and the fact that this type of crime is more likely to be associated with violence. Police and an increasing number of innocent bystanders are being killed by drug traffickers. Drug-related murders demonstrate a total disregard for civilized standards of behavior and the sanctity of life. I urge my colleagues to take an important step toward stopping the escalating number of drug-related killings and support the Gekas amendment.

The CHAIRMAN. The question is on the amendment offered by the gentleman from Pennsylvania [Mr. GEKAS].

The question was taken; and the Chairman announced that the noes appeared to have it.

### RECORDED VOTE

Mr. GEKAS. Mr. Chairman, I demand a recorded vote.

A recorded vote was ordered.

The vote was taken by electronic device, and there were—ayes 299, noes 111, not voting 21, as follows:

[Roll No. 298]

AYES—299

| | | |
|---|---|---|
| Anderson | DioGuardi | Kasich |
| Andrews | Donnelly | Kennedy |
| Annunzio | Dorgan (ND) | Kennelly |
| Anthony | Dornan (CA) | Kolbe |
| Applegate | Dreier | Kolter |
| Archer | Durbin | Konnyu |
| Armey | Dyson | Kyl |
| Aspin | Early | Lagomarsino |
| Baker | Eckart | Lancaster |
| Ballenger | Edwards (OK) | Lantos |
| Barnard | Emerson | Latta |
| Bartlett | English | Leath (TX) |
| Barton | Erdreich | Lehman (CA) |
| Bateman | Espy | Lent |
| Bennett | Fascell | Lewis (CA) |
| Bentley | Fawell | Lewis (FL) |
| Bereuter | Fields | Lightfoot |
| Bevill | Fish | Lipinski |
| Bilbray | Flippo | Livingston |
| Bilirakis | Florio | Lloyd |
| Bliley | Frenzel | Lott |
| Boehlert | Frost | Lowery (CA) |
| Borski | Gallegly | Lujan |
| Bosco | Gallo | Lukens, Donald |
| Boxer | Gaydos | Lungren |
| Brooks | Gekas | Mack |
| Broomfield | Gephardt | MacKay |
| Brown (CO) | Gibbons | Madigan |
| Bruce | Gilman | Manton |
| Bryant | Gingrich | Marlenee |
| Buechner | Glickman | Martin (NY) |
| Bunning | Gradison | Matsui |
| Burton | Grandy | Mavroules |
| Bustamante | Grant | Mazzoli |
| Byron | Gray (IL) | McCandless |
| Callahan | Green | McCloskey |
| Campbell | Gregg | McCollum |
| Carper | Guarini | McCrery |
| Carr | Gunderson | McDade |
| Chandler | Hall (OH) | McEwen |
| Chapman | Hall (TX) | McGrath |
| Chappell | Hammerschmidt | McMillan (NC) |
| Clarke | Hansen | McMillen (MD) |
| Clement | Harris | Meyers |
| Clinger | Hastert | Mfume |
| Coats | Hatcher | Michel |
| Coble | Hayes (LA) | Miller (OH) |
| Coelho | Hefley | Moakley |
| Coleman (MO) | Hefner | Molinari |
| Coleman (TX) | Henry | Montgomery |
| Combest | Herger | Moorhead |
| Cooper | Hiler | Morrison (WA) |
| Costello | Holloway | Murphy |
| Coughlin | Hopkins | Murtha |
| Courter | Horton | Myers |
| Craig | Houghton | Natcher |
| Crane | Hubbard | Neal |
| Dannemeyer | Huckaby | Nelson |
| Darden | Hughes | Nichols |
| Daub | Hunter | Nielson |
| Davis (IL) | Hutto | Oakar |
| Davis (MI) | Hyde | Olin |
| de la Garza | Inhofe | Ortiz |
| DeFazio | Ireland | Oxley |
| DeLay | Jeffords | Panetta |
| Derrick | Jenkins | Parris |
| DeWine | Johnson (CT) | Pashayan |
| Dickinson | Johnson (SD) | Patterson |
| Dicks | Kanjorski | Payne |
| Dingell | Kaptur | Pease |

| | | |
|---|---|---|
| Pepper | Schaefer | Sundquist |
| Perkins | Schneider | Sweeney |
| Petri | Schuette | Swindall |
| Pickett | Schulze | Tallon |
| Pickle | Sensenbrenner | Tauzin |
| Porter | Shaw | Taylor |
| Price | Shumway | Thomas (CA) |
| Pursell | Shuster | Thomas (GA) |
| Quillen | Sisisky | Torricelli |
| Ravenel | Skeen | Traficant |
| Ray | Skelton | Udall |
| Regula | Slattery | Upton |
| Rhodes | Slaughter (VA) | Valentine |
| Richardson | Smith (FL) | Vander Jagt |
| Ridge | Smith (NE) | Volkmer |
| Rinaldo | Smith (TX) | Vucanovich |
| Ritter | Smith, Denny | Walgren |
| Roberts | (OR) | Walker |
| Robinson | Smith, Robert | Watkins |
| Roe | (NH) | Weldon |
| Rogers | Smith, Robert | Whittaker |
| Rose | (OR) | Whitten |
| Rostenkowski | Snowe | Wilson |
| Roth | Solomon | Wolf |
| Roukema | Spratt | Wortley |
| Rowland (CT) | St Germain | Wyden |
| Rowland (GA) | Stallings | Wylie |
| Russo | Stangeland | Yatron |
| Saiki | Stenholm | Young (AK) |
| Sawyer | Stratton | Young (FL) |
| Saxton | Stump | |

NOES—111

| | | |
|---|---|---|
| Ackerman | Gonzalez | Obey |
| Akaka | Goodling | Owens (NY) |
| Atkins | Gordon | Owens (UT) |
| AuCoin | Gray (PA) | Pelosi |
| Bates | Hamilton | Penny |
| Bellenson | Hawkins | Rahall |
| Berman | Hayes (IL) | Rangel |
| Boggs | Hertel | Rodino |
| Boland | Hochbrueckner | Roybal |
| Bonior | Hoyer | Sabo |
| Bonker | Jacobs | Savage |
| Boucher | Jontz | Scheuer |
| Brennan | Kastenmeier | Schroeder |
| Brown (CA) | Kildee | Schumer |
| Cardin | Kleczka | Sharp |
| Clay | Kostmayer | Shays |
| Collins | LaFalce | Sikorski |
| Conte | Leach (IA) | Skaggs |
| Conyers | Lehman (FL) | Slaughter (NY) |
| Coyne | Leland | Smith (IA) |
| Crockett | Levin (MI) | Smith (NJ) |
| Dellums | Levine (CA) | Solarz |
| Dixon | Lewis (GA) | Staggers |
| Downey | Lowry (WA) | Stokes |
| Dwyer | Markey | Studds |
| Dymally | McHugh | Synar |
| Edwards (CA) | Miller (CA) | Tauke |
| Evans | Miller (WA) | Traxler |
| Feighan | Mineta | Vento |
| Flake | Mollohan | Visclosky |
| Foglietta | Moody | Weber |
| Foley | Morella | Weiss |
| Ford (MI) | Morrison (CT) | Wheat |
| Ford (TN) | Mrazek | Williams |
| Frank | Nagle | Wise |
| Garcia | Nowak | Wolpe |
| Gejdenson | Oberstar | Yates |

NOT VOTING—21

| | | |
|---|---|---|
| Alexander | Jones (TN) | Packard |
| Badham | Kemp | Spence |
| Boulter | Luken, Thomas | Stark |
| Cheney | Martin (IL) | Swift |
| Dowdy | Martinez | Torres |
| Fazio | McCurdy | Towns |
| Jones (NC) | Mica | Waxman |

□ 1557

The Clerk announced the following pairs:

On this vote:

Mr. Torres for, with Mr. Towns against.

Mr. Jones of North Carolina for, with Mr. Waxman against.

Mrs. Martin of Illinois for, with Mr. Thomas A. Luken against.

Mr. Kemp for, with Mr. Fazio against.

Mr. DAUB and Mr. ROSE changed their vote from "no" to "aye."

J.A.1420

USCA4 Appeal: 21-1    Doc: 11-2    Filed: 01/08/2021    Pg: 65 of 134
Case 3:92-cr-00068-DJN    Document 94-6    Filed 12/14/20    Page 4 of 5 PageID# 3603

So the amendment was agreed to.

The result of the vote was announced as above recorded.

### AMENDMENT OFFERED BY MR. LEVIN OF MICHIGAN

Mr. LEVIN of Michigan. Mr. Chairman, I offer an amendment.

The CHAIRMAN. The Clerk will designate the amendment.

The text of the amendment is as follows:

Amendment offered by Mr. LEVIN of Michigan: At the end of the matter designated as a quoted subsection (1) in the matter proposed to be inserted, insert the following:

A sentence of death shall not be carried out upon a person who is mentally retarded.

□ 1600

The CHAIRMAN. Pursuant to the rule, the gentleman from Michigan [Mr. LEVIN] will be recognized for 10 minutes.

Does the gentleman from Pennsylvania [Mr. GEKAS] seek recognition?

Mr. GEKAS. Yes, I do, Mr. Chairman, but I do not oppose the amendment.

The CHAIRMAN. Then the gentleman does not qualify.

Does the gentleman from New Jersey [Mr. HUGHES] seek recognition?

Mr. HUGHES. Mr. Chairman, I do not oppose the amendment in its present form.

Mr. LEVIN of Michigan. Mr. Chairman, I will yield half of my time to the gentleman from Pennsylvania [Mr. GEKAS], and perhaps that will solve the problem.

The CHAIRMAN. There being no Member seeking recognition in opposition, the gentleman from Michigan [Mr. LEVIN], under the rule, will be recognized for 10 minutes.

The Chair recognizes the gentleman from Michigan [Mr. LEVIN].

Mr. LEVIN of Michigan. Mr. Chairman, I yield myself such time as I may consume.

Mr. Chairman, my amendment consists simply of one sentence: "A sentence of death shall not be carried out upon a person who is mentally retarded."

Two years ago in Georgia, Jerome Bowden was executed. Tests upon him indicated over the years that his IQ ranged from 59 to 65.

This year the Georgia Legislature enacted a law that prohibits execution in the case of a mentally retarded person. It was a bipartisan action that passed by a substantial margin. It had the support of the vast majority of the public.

As mentioned, my amendment would state simply that a sentence of death shall not be carried out upon a person who is mentally retarded. There is a well-established definition of mental retardation, and I would like to read it. It is brief. I know the gentleman from Pennsylvania [Mr. GEKAS] has a question regarding it.

The definition of "mental retardation" promulgated by the American Association on Mental Retardation and universally accepted in the courts states as follows: It states that a person shall be considered mentally retarded when they have "significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the developmental period." That is in the early period of their lives.

Under this bill, we do not execute children. I think it would be equally inhumane to execute someone who is mentally retarded.

Mr. Chairman, I urge support of this amendment.

Mr. GEKAS. Mr. Chairman, will the gentleman yield?

Mr. LEVIN of Michigan. I yield to the distinguished gentleman from Pennsylvania.

Mr. GEKAS. Mr. Chairman, I thank the gentleman for yielding.

Did the gentleman read into the record the definition as we agreed is the instant definition that is used nationwide?

Mr. LEVIN of Michigan. Yes; this is the present definition. It is subject to change, but it has not changed very much. The whole thrust is not to expand it; it is to focus it on those who are truly mentally retarded. So I think there is no danger here that there would be effective abuse by someone who inappropriately claimed mental retardation. The purpose of this is very much confined to prohibit execution of those who are mentally retarded.

Mr. GEKAS. Mr. Chairman, I thank the gentleman for the explanation.

I rise in support of the proposition of the gentleman from Michigan, and of his amendment. I do so on two bases, on my inherent feeling and my own sympathies with the theme of mental retardation that caused me to support the amendment, but I want to make it abundantly clear that what we do here in placing the definition into the RECORD at the time of the debate on this amendment is meant, at least from my standpoint and that of others, to create that kind of legislative history which will guide both prosecutor and defense attorney, as well as the court, in the application of all of this, should a death penalty case arise, and then be confronted with a defense of mental retardation.

I also want to make it clear that it is my understanding that legislative history should reflect the thought that in the advancement of mental retardation as a defense, the burden, therefore, should be on the defense, which it will be, if the present structure of our system obtains. So the legislative history through my remarks should also reflect that.

Mr. LEVIN of Michigan. Mr. Chairman, I have inserted the definition, indicated the circumstances under which it is operated. As to raising the defense, I would agree with the purport of what you are saying, that that defense would be handled as any other defense would be when it came to this kind of a crime or the sentencing thereof, which may be operated under a different procedure.

Mr. BARTLETT. Mr. Chairman, will the gentleman yield?

Mr. LEVIN of Michigan. Mr. Chairman, I yield to the gentleman from Texas.

Mr. BARTLETT. Mr. Chairman, I thank the gentleman for yielding

Mr. Chairman, I commend the gentleman from Michigan [Mr. LEVIN] for this amendment. It is one that needs to be adopted. I also commend the gentleman from Pennsylvania [Mr. GEKAS] for supporting it.

Mr. Chairman, I rise in support of the Levin amendment which will prohibit the death penalty from being imposed on a person who is mentally retarded. Mental retardation is one specific type of a substantial disability which impairs an individual's capacity to understand and control his actions. There are two points that need to be made about mental retardation in this context and that need to be highlighted, first that mental retardation is permanent and, second, it can be measured in quantifiable scientific terms.

The level of mental retardation is determined by qualified psychologists, using one of several individually administered standardized general intelligence tests. These tests have been scientifically proven to be reliable and valid measures of ability and performance. A person is diagnosed as being mentally retarded, it is irreversible and incurable.

The American Association on Mental Retardation, the Nation's oldest and largest professional organization in the field of mental retardation defines a mentally retarded person as "someone who has significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the developmental period." This means a person with an IQ of 70 or below or less than 3 percent of the population. It is this definition which should guide the courts in determining whether an individual is mentally retarded or not.

Under this definition, an adult with mental retardation who is functioning at the highest levels only has the mental age of a 12-year-old child. Such an individual, because of his disability, cannot understand the nature of the death penalty, the nature of the court proceedings and cannot recognize and communicate facts to assist in his defense. In addition, the death penalty

J.A.1421

USCA4 Appeal: 21-1    Doc: 11-2    Filed: 01/08/2021    Pg: 66 of 134
Case 3:92-cr-00068-DJN   Document 94-6   Filed 12/14/20   Page 5 of 5 PageID# 3604

will not deter other individuals with mental retardation from committing drug-related murders because they are incapable of comprehending that the death penalty will apply to them if such a crime is committed.

Throughout the United States there is widespread sentiment from those who support the death penalty that it should not apply to people with mental retardation. In 1986, the State of Georgia executed an individual whose IQ was determined to be between 59 and 65. Public reaction in Georgia to this execution spurred the State to enact legislation prohibiting future executions of persons who are mentally retarded. It was the first State to enact such a law.

The death penalty is the ultimate punishment. It is reserved for those individuals sentenced by a court of law on the basis of their blameworthiness, moral guilt and personal responsibility.

People with mental retardation have substantial deficits in the areas of communication, memory, impulsiveness, and moral comprehension thereby limiting their ability to control and understand their actions. I believe people with mental retardation should be tried, convicted, and punished for any crime they commit. I do not believe the death penalty serves its purpose when applied to the mentally retarded.

I urge my colleagues to support and pass the Levin amendment.

Mr. GREGG. Mr. Chairman, will the gentleman yield?

Mr. LEVIN of Michigan. I yield to the gentleman from New Hampshire.

Mr. GREGG. Mr. Chairman, I thank the gentleman from Michigan for yielding.

Mr. Chairman, I respect the gentleman's amendment. I think it is an excellent amendment, one that is totally appropriate to the amendment that was just adopted relative to the death penalty, which I also think is appropriate and reflects the balance that this bill is reaching, on the issue of drugs, that we are addressing both sides of the question. We are addressing the enforcement side, to new initiatives in the area of coordination of police and coordination of our administrative forces, and also addressing the educational side of the drug questions, and especially the mental health side of the drug question, not only on this narrow issue, but a broader issue, setting up an alcoholic abuse area, which is also a drug.

I want to congratulate the gentleman on his amendment. We are certainly proceeding in the right way with it.

Mr. LEVIN of Michigan. Mr. Chairman, I yield 2 minutes to the gentleman from South Carolina [Mr. RAVENEL].

Mr. RAVENEL. Mr. Chairman, I rise to speak for this amendment to prohibit the death penalty for persons who are mentally retarded.

Mental retardation is a permanent and crippling disability. A mentally retarded person has the mind of a child, but he does not live in the world of a child and the world does not treat him like a child. Although a mentally retarded person may recognize that a particular act is right or wrong, he cannot understand or appreciate the magnitude of his actions or even the finality of death.

Capital punishment can serve as a deterrent only when the murder is a result of premeditation and deliberation. A person who is mentally retarded does not have the capacity to premeditate a crime or to understand its consequences, therefore the execution of a mentally retarded person does not serve as a deterrent. Instead, capital punishment becomes a cruel and excessive response, much like spanking a 6-year-old child for hitting a sibling 2 years after the act. The child has insufficient cognitive capacity to appreciate the length between his prior action and such belated punishment. The same is true with a mentally retarded person. Because I am the father of a 29-year-old mentally retarded son, and because of the knowledge and experience I have gained as a result of knowing and loving my William, I strongly urge you to support this amendment prohibiting the death penalty for persons who are mentally retarded.

Mr. LEVIN of Michigan. Mr. Chairman, I urge support of this amendment, and I yield back the balance of my time.

The CHAIRMAN. The question is on the amendment offered by the gentleman from Michigan [Mr. LEVIN].

The amendment was agreed to.

### AMENDMENTS EN BLOC OFFERED BY MR. EDWARDS OF CALIFORNIA

Mr. EDWARDS of California. Mr. Chairman, I offer amendments en bloc consisting of the amendments numbered 1, 2, 4, and 6 as printed.

The CHAIRMAN. The Clerk will designate the amendments.

The text of the amendments is as follows:

Amendments en bloc offered by Mr. EDWARDS of California:

In the portion of the matter proposed to be inserted that is designated as a quoted subsection (m), insert the following at the end of such quoted subsection (m):

"(5) The defendant was youthful, although not under the age of 18.

"(6) The defendant did not have a significant prior criminal record.

"(7) The defendant committed the offense under severe mental or emotional disturbance.

"(8) Another defendant or defendants, equally culpable in the crime, will not be punished by death.

"(9) Other defendants in other cases who were equally culpable have not been sentenced to death.

"(10) The victim consented to the criminal conduct that resulted in the victim's death.

"(11) That other factors in the defendant's background or character mitigate against imposition of the death sentence.

At the end of the portion of the matter proposed to be inserted that is designated as subsection (r) insert the following:

SEC. 6802. GAO STUDY OF THE COST OF EXECUTIONS.

(a) STUDY.—No later than three years after the date of the enactment of this Act, the Comptroller General shall carry out a study to review the cost of implementing the procedures for imposing and carrying out a death sentence prescribed by this title.

(b) SPECIFIC REQUIREMENTS.—Such study shall consider, but not be limited to, information concerning impact on workload of the Federal prosecutors and judiciary and law enforcement necessary to obtain capital sentences and executions under this Act.

(c) SUBMISSION OF REPORT.—Not later than four years after date of the enactment of this Act, the Comptroller General shall submit to Congress a report describing the results of the study.

At the end of the portion of the matter proposed to be inserted that is designated as a quoted subsection (k) insert the following:

The jury or the court, regardless of its findings with respect to aggravating and mitigating factors, is never required to impose a death sentence and the jury shall be so instructed.

Strike out the last sentence at the end of the portion of the matter proposed to be inserted that is designated as a quoted subsection (l), and insert in lieu thereof the following:

A sentence of death shall not be carried out upon a person who, as a result of mental disability—

(1) cannot understand the nature of the pending proceedings, what such person was tried for, the reason for the punishment, or the nature of the punishment; or

(2) lacks the capacity to recognize or understand facts which would make the punishment unjust or unlawful, or lacks the ability to convey such information to counsel or to the court.

The CHAIRMAN. Under the rule, the gentleman from California [Mr. EDWARDS] will be recognized for 10 minutes.

Does the gentleman from Pennsylvania [Mr. GEKAS] seek recognition?

Mr. GEKAS. I do, Mr. Chairman. I oppose the amendment as it is now constituted.

The CHAIRMAN. Pursuant to the rule, the gentleman from Pennsylvania [Mr. GEKAS] will be recognized for 10 minutes.

The Chair recognizes the gentleman from California [Mr. EDWARDS].

Mr. EDWARDS of California. Mr. Chairman, I yield myself such time as I may consume.

Mr. Chairman, these four amendments address some of the ambiguities that I see in the Gekas amendment.

Amendment No. 1 specifies additional mitigating factors that a jury may consider. The jury can impose the

# EXHIBIT 79

J.A.1423

# *Senate*

## THURSDAY, MAY 24, 1990

### *(Legislative day of Wednesday, April 18, 1990)*

The Senate met at 8:30 a.m., on the expiration of the recess, and was called to order by the President pro tempore.

The PRESIDENT pro tempore. The Senate will come to order. As we prepare to reverence Him who hast been our dwelling place in all generations, the Senate Chaplain will deliver the prayer, Dr. Halverson.

### PRAYER

The Chaplain, the Reverend Richard C. Halverson, D.D., offered the following prayer:

Let us pray:

The son of our man who presides at the guard desk, Art Fleming, will have surgery tomorrow. Let us just have a moment of silent prayer remembering him.

*The Lord is thy keeper: the Lord is thy shade upon thy right hand. The sun shall not smite thee by day, nor the moon by night. The Lord shall preserve thee from all evil: He shall preserve thy soul. The Lord shall preserve thy going out and thy coming in from this time forth, and even for evermore.*—Psalm 121:5–8.

Eternal God, omnipotent, omniscient, and omnipresent, as the Senators disperse for their varied activities during this recess, may this promise of the Psalmist be fulfilled in their lives. Bless their time with their families and opportunities with constituents and whatever responsibilities fall to them. Help them to find time for rest and recreation and renewal. And bring them safely back to the tasks which await them.

"The Lord bless you, and keep you: The Lord make His face to shine upon thee, and be gracious unto thee: The Lord lift up His countenance upon thee, and give thee peace." Amen.

The PRESIDENT pro tempore. The Senate will be in order.

## RESERVATION OF LEADER TIME

The PRESIDENT pro tempore. Under the previous order the leadership time is reserved.

## OMNIBUS CRIME BILL

The PRESIDENT pro tempore. The Senate will now resume consideration of S. 1970, which the clerk will report.

The assistant legislative clerk read as follows:

A bill (S. 1970) to establish constitutional procedures for the imposition of the sentence of death, and for other purposes.

The Senate resumed consideration of the bill.

Pending:

Thurmond amendment No. 1690, to add a "right versus wrong" standard to the term mentally retarded.

The PRESIDENT pro tempore. The pending amendment is the amendment by Mr. THURMOND, amendment No. 1690, on which there will be 90 minutes of debate equally divided and controlled by Mr. THURMOND and Mr. BIDEN. Mr. THURMOND is recognized.

Mr. THURMOND. Mr. President, I suggest the absence of a quorum.

The PRESIDENT pro tempore. The absence of a quorum has been suggested, and the clerk will call the roll.

The assistant legislative clerk proceeded to call the roll.

Mr. THURMOND. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDENT pro tempore. Without objection, it is so ordered.

Mr. THURMOND. Mr. President, the underlying bill contains as title I, a modified version of the Federal Death Penalty Act, which I introduced. There are several serious problems with this version of the death penalty and this amendment addresses one of them.

I am opposed to the provision in the underlying bill, S. 1970, which would categorically prohibit the execution of a capital defendant solely because he claims he is mentally retarded without regard to whether the defendant knew the difference between right and wrong.

The amendment I am offering to the bill modifies the underlying death penalty language and is based upon the constitutionally recognized principle that punishment must be directly related to the defendant's personal culpability. It would require that no person could be executed who was mentally retarded and who wholly lacks the capacity to appreciate the wrongfulness of his actions. In other words, it would prohibit the execution of mentally retarded persons who do not know the difference between right and wrong.

This principle was recently affirmed by the Supreme Court of the United States in the case of Penry versus Lynaugh. In this case, Mr. Penry was sentenced to death in Texas for having brutally raped, beaten, and stabbed to death, with a pair of scissors, Pamela Carpenter, the sister of former Redskins kicker Mark Moseley.

The issue before the Supreme Court was whether Penry was sentenced to death in violation of the eighth amendment because the jury was not instructed that it could consider and give effect to mitigating evidence related to his moderate mental retardation when deciding whether the death penalty should be imposed.

The Court held that the jury, in a capital case, must be allowed to consider and give effect to mitigating evidence of mental retardation. In fact, the Court remanded the case to the Texas State court for a new sentencing hearing.

Mr. President, the Penry decision appropriately recognized that it is cruel and unusual punishment to execute severely retarded persons and those lacking in the capacity to appreciate the wrongfulness of their actions.

I do not dispute this holding. The Court went on to note that such retarded persons would not be convicted today since the modern insanity defense generally includes "mental defect" as part of the legal definition of insanity.

In addition, retarded persons would not be considered since the case of Ford versus Wainwright prohibits the execution of persons who are unaware of their punishment and why they are being punished. Proponents of this amendment would have the Nation believe the Supreme Court has authorized the execution of severely retarded individuals. This is not the case.

Where the Supreme Court and this bill's proponents part company is on the issue of whether the eighth amendment categorically prohibits the execution of all mentally retarded capital murderers regardless of whether the murderer knew the difference between right and wrong and was capable of conforming his conduct to the requirements of law.

The Supreme Court held that the eighth amendment does not prohibit the execution of such individuals. The Court concluded that it cannot be said that all mentally retarded people, by virtue of their mental retardation alone, inevitably lack the ability to understand the difference between right

---

● This "bullet" symbol identifies statements or insertions which are not spoken by a Member of the Senate on the floor.

S 6873

**J.A.1424**

USCA4 Appeal: 21-1 Doc: 11-2 Filed: 01/08/2021 Pg: 69 of 134

and wrong and conduct themselves accordingly.

Mr. President, the Court went on to hold that the concept of "mental age" or "intelligence quotient" is an insufficient basis for the eighth amendment rule since it is imprecise, and does not adequately account for individuals' varying abilities.

I would like to repeat that because I think that is a very key point in this matter.

The Court went on to hold that the concept of "mental age" or "intelligence quotient" is an unsufficient basis for an eighth amendment rule since it is imprecise, and does not adequately account for individuals' varying abilities. Proponents of this legislation would have an IQ test, or a mental age determination by a partisan witness, determine whether a sentence of death is appropriate rather than the determination of jurors and judges sworn to uphold the law. The issue of whether these defendants knew right from wrong would be tossed aside.

Finally, opponents of this amendment suggest that there is a national consensus against executing any, and all, capital murderers who are retarded. Yet, the Supreme Court in Penry found this not to be the case. In fact, only one in three States currently have categorical prohibitions against the execution of the mentally retarded.

In closing, the decision whether to sentence a capital murderer to death should not rest on the imprecise findings of psychologists. Every Senator here today knows that all death row inmates will claim they are mentally retarded and will be able to hire unlimited psychologists who will agree with them. The decision whether to give a particular defendant the death penalty should rest upon the—whether he knew right from wrong and could conform his behavior to the law. The more Congress takes away these decisions from the juries and gives them to statisticians and psychologists, the more we throw into serious question the principles that underlie our criminal justice system.

For these reasons, I urge my colleagues to vote for this amendment.

Mr. President, no right thinking human being wants to execute a person who does not know right from wrong. But just to claim that they are mentally deficient without an appropriate standard does not make sense. In other words, if a man goes out here and kills seven or eight people and then tries to go in court and claim mental retardation without the question being decided as to whether he knew what he was doing—and knew right from wrong, then the Supreme Court says that he can be held responsible for his actions. If he did not know right from wrong, then he would not be held legally responsible. That is the issue here today.

Are we going to follow the Supreme Court's ruling when a man is charged with a crime to say whether he knew right from wrong? If he did not know right from wrong, that is one thing. If he did know right from wrong, and he knew what he was doing when he murdered the innocent, why should be not be held responsible? We feel that is the only sensible course to take.

This matter has gone on for years and years in different States and different courts. The Supreme Court has ruled that you will not hold a man responsible if he does not know right from wrong. You will hold him responsible if he does know right from wrong. What fairer test could you have?

This is the standard in most States, it is the standard the Supreme Court of the United States has held is a proper test. We feel that that this amendment that I have offered should be adopted.

I urge my colleagues to take the view the Supreme Court has taken, and the courts in most of the States have taken, and follow this course.

Mr. President, I suggest the absence of a quorum.

The PRESIDENT pro tempore. The absence of a quorum has been suggested. The clerk will call the roll.

The assistant legislative clerk proceeded to call the roll.

Mr. BIDEN. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDENT pro tempore. Without objection, it is so ordered.

The Senator from Delaware is recognized.

Mr. BIDEN. Mr. President, I would like to make it clear what I think this debate and this amendment is all about. This is not about being against the death penalty. So I think it is important we start off there.

I have introduced a bill with the cosponsorship of many of my colleagues that increases the number of offenses for which death is a possible penalty. But I have always believed when we are talking about the death penalty that we should be sure that when that ultimate sanction is being imposed we are as reasonable, we are as fair, and we are as judicious as we possibly can be. And, as a society, once having decided that that ultimate sanction will be applied, we should at least have it reflect, in the process of deciding that, the values that we as a nation and we as civilized people stand for.

I realize there are many among us who disagree with me and with the Presiding Officer and others in this body and suggest that the death penalty under any circumstances for any reason is not a legitimate reflection of what the values of this society should be, and there is healthy and honest disagreement on that point. But I happen to think that there are certain crimes and acts for which society has the right to impose the ultimate sanction.

But, Mr. President, when one concludes that that sanction should be imposed, there are limits upon which one would consider imposing it. For example, no one would consider, to take the extreme—and I do not think anyone disagrees with this—no one would consider that if a 6-year-old or a 5-year-old child committed murder, that we would go out to the public gallows and string up a 6-year-old.

I do not think anyone, on the other hand, would suggest if anyone who was clearly mentally retarded, clearly lacking the intelligence quotient to be able to comport themselves in any way remotely like what we in society would think would be normal behavior—not because of anything they did themselves, not because of anything that they intended, just because they were born that way—that that person should be strung up or sat in an electric chair or given a lethal injection.

So I suspect as we debate this issue and as we come to resolution on it shortly, we are all going to have to reach down inside and decide are there circumstances under which we would need to put someone away because they are such a threat to society, because they are dangerous—are there circumstances where we would put them away, but conclude that we should not put them to death; whereas, someone else, a different age, with a different mental capacity, we might very well conclude they should be put to death? So, what we are talking about here is not death penalty versus no death penalty. We will have that argument later.

We have outstanding colleagues on this floor who believe with every fiber in their being the death penalty is immoral, a negative reflection of the values of Judeo-Christian ethics, and others do not. That is the debate on death. This is a debate on humanity. This is not about death. This is about measuring ourselves in the degree to which we are humane.

It seems to me my distinguished colleague, Senator THURMOND, and I have reached a compromise—at least he and I have—on the death penalty bill. He and I agree on the number of crimes to which the death penalty shall be extended. He and I agree that we should not put someone to death for having committed a crime while they are a minor. We may put them in jail for the rest of their lives, but we do not put them to death. He agrees with that.

What we are disagreeing about here is whether or not someone who is not criminally insane, not the victim of temporary insanity, not someone who acted in the heat of passion, but someone who is mentally retarded, who does not have the mental capacity to achieve the ability to act, ever, as an adult. We all know people that way. We all know families into which people are born who do not have a high enough intelligence quotient to

USCA4 Appeal: 21-1    Doc: 11-2    Filed: 01/08/2021    Pg: 70 of 134

ever achieve a degree of maturation about which society would say we can justly and fairly measure their actions against every other person in society, notwithstanding they do not have the mental capacity. Nothing in the world that they can do—nothing—can bring them to the point where they will be able to achieve the degree of maturity that their brothers and sisters in the same families, that their mothers or fathers, or that anyone else can.

As I said, some antideath people may think if we are going to have the death penalty the retarded should be eligible, too, as well as those prodeath people who think that as well. But I think we are being incredibly naive, and saying so much about ourselves as a nation that is negative, if we cannot distinguish, if we cannot understand that there are graduations of culpability, and that there should be circumstances under which we as a civilized nation say, my God, am I going to put to death someone with a 45 or a 50 I.Q., who can barely walk and talk, because they committed an offense that resulted in the death of someone else?

We may have to take that person and say take them off the street and they will be put away forever and a day. But, my God, I cannot fathom the notion of strapping down someone with a 60 I.Q. in a chair and saying now you are going to die for your sins against humanity. From their perspective there has already been a sin against humanity committed and it was one committed on them when they were born.

Let me tell my colleagues what else this is not about, and I make this point again: It is not about mental insanity, it is not about instability, it is not about emotional upset; this amendment has nothing to do with John Hinckley; this amendment has nothing to do with the insanity defense; this has nothing to do with temporary insanity or mental derangement. This is about mental retardation, a permanent condition of being stunted in your mental growth. That is what it is about.

If we say here it is humane not to put to death a 15-year-old person who commits an offense, why would we put to death a 30-year-old person, a 40-year-old person, with the mental capacity and growth of a 14-year-old? Why would we do that? Why do we say that if a child commits an offense we will not hang him, but if it is done by a 50-year-old man or a 50-year-old woman with a mental capacity less than that child, oh, we will hang that one?

(Mr. REID assumed the chair.)

Mr. BIDEN. Mr. President, is physical maturation a test of one's ability to function in society? If we do that, then we should go along with a tape measure and decide everybody who is 6 feet should be held at a higher standard, no pun intended, than someone 5 foot 10; someone who is 6 foot 3 at a higher standard than someone 5 foot 7.

This is crazy. What are we? What possible benefit do we get as a nation? What do we say about ourselves when, for the possible one person in probably 20 years who will fall under this Federal death penalty provision for the mentally retarded, we insist as a nation to write on our books that we are going to put mentally retarded people to death.

What I am about to say I think is very important. There is no dispute over what the meaning of retardation is, no dispute, Even the Supreme Court who said you can execute the retarded recognize we all know the definition of retarded. The definition is a person with an IQ of 70 or less, or put another way, with a mental capacity, with a mental age of 12 or less.

Think about how incongruous we are about to become if we vote for this amendment. We are going to say we cannot put to death someone who is less than 17 years old at the time they committed the offense, yet every psychologist, psychiatrist, every physician, everyone agrees that someone lacking the IQ of 70 cannot and does not achieve the socialization, the maturity, the intellectual capability of anyone over the age of 12. We all agree to that. We all understand that.

So we are going to say in the same bill, put them to death at age 12, in terms of their capability. Keep in mind, now, we are not talking about some sort of artsy craftsy liberal notion of was this person insane at the moment. I have 14 psychiatrists who say he is, and 12 that say he is not. I have nine that say what triggered him was his flashback at a moment to an event when he was 7 years old that caused him great pain, and all that malarkey.

We are not talking about that. We are not saying that at all. We are saying if you march into a courtroom a child who happens to be 40 years old, you can look at him, you can talk to him, you can tell that person has an exceedingly low IQ. We are saying we are going to put that person to death.

Senator THURMOND and I are not fighting over the definition of mental retardation. We both know what it means. Our debate is over whether or not we should execute the retarded. Senator THURMOND says that if the retarded person knows the difference between right and wrong, they should be eligible for the death penalty.

I say that we should ban the execution of the retarded, period. It is barbaric. Keep in mind, a 15-year-old knows the difference between right and wrong, and we are all agreeing we are not going to put a 15-year-old to death.

A 10-year-old can know the difference between right and wrong. There is no dispute about that. But we are agreeing, whether they do or not, we are not going to put them to death as a society. We are not going to say, "Ten-year-old kid, you did it; you're dead." Everyone in here is saying we

are not going to do that. We are talking about someone who is not insane, not temporarily insane, not temporarily deranged. What we are saying now is very basic and very simple: If you are so mentally stunted in your growth, and observably so; if you have the inability because of your diminished mental capability of ever achieving a level of maturation above the age of someone who is 10 of 12 or 14—we do not even get that high—we are not going to put you to death. We will put you in prison for life with no possibility of probation or parole, but we are just not going to do that.

This is coming from a guy who supports the death penalty. Let my colleagues who are listening to this make no mistake. It is the Biden death penalty bill that we are voting for. It is the Biden death penalty bill that increases the number of offenses for which someone can be put to death. And it is Biden who is saying, but for God's sake, if we acknowledge you should not put children to death, acknowledge we should not as a nation put to death the mentally retarded.

One other point I want to make to my colleagues, this is not a case about dueling experts. Now we are each going to bring into court our experts. It is kind of hard to fake your IQ. You have to be awfully smart to be able to fake for your whole life that your IQ is below 70. I never could quite understand the rationale for trying to do that your whole life, because that is what we are talking about.

It is not someone who walks in and says, "By the way, my client, look at her; she has an IQ of 70. She took a test in the pyschologists's office and she flunked."

They roll in five people who say, "How come I saw that kid go through high school with me? How come that person was able to do—"

A person is not going to fake having an IQ below 70. So this is not about dueling experts: My expert says this person is insane; my expert says this person is not insane. Forget the experts. They are out of it. This is simple common sense and humanity.

By the way, let us talk about what the Supreme Court said, because we all around here, myself included, my colleague Senator THURMOND and my colleague Senator HATCH, quote the Supreme Court in tones of reverence when we agree with them. And when we do not agree with them, like Senator DANFORTH does not, and others do not, on their ruling relative to segregation, we intone them about nine arrogant people sitting on the bench. We can do it all in the same day, in the same breath.

Right now, you will hear the Supreme Court intoned. The Supreme Court says it is all right to put mentally retarded people to death. Just because the Supreme Court said we can, that does not mean we should, because what the Supreme Court went on to

USCA4 Appeal: 21-1    Doc: 11-2    Filed: 01/08/2021    Pg: 71 of 134
Case 3:92-cr-00068-DJN   Document 94-7   Filed 12/14/20   Page 5 of 12 PageID# 3609

say was that the decision is not up to them.

All the Court said was we could execute a retarded person if we wished; that the moral decision was ours because we in this body, and our colleagues in the House, are supposed to reflect the moral values of the Nation. The Court said, if you do not think there is a moral value consequence, we cannot write it into the law.

Or conversely: Because you did not express whether or not there should be a moral prohibition and a legal prohibition as a society from executing 12-year-olds, mental 12-year-olds and physical 12-year-olds, because of that, the Court said you can do it.

Last year when we passed the death penalty for drug kingpins, we prohibited the execution of the retarded. We made that choice. We did it last year.

For all those of my colleagues going around with good reason and saying they supported that bill that Biden and many others had in there last year that included death for drug kingpins—the thing the President keeps saying he wants and he forgets he has—when my colleagues voted for that, they voted to say we are not going to execute someone who is mentally retarded.

We made that choice once already. My colleagues have already voted once for sanity, for social sanity. Let us make that same choice again.

Let us show that our support for the death penalty is bounded by humanity, that we support the death penalty, but it is bounded by humanity. Let us forbid the execution of people who mentally, under a measure agreed upon by all, are children under the age of 12. We do not execute children. Let us not execute people who never get beyond that stage in their life through absolutely no fault of their own.

In conclusion, there are other death penalty States that ban execution of the retarded, I might add for my colleagues. This is not something wacky. This is not something crazy. This is not something that some of my liberal friends have come to me and said, "Joe, I can support your death penalty ban, but put this in so we can show it up." I never heard anybody talk about the border States in the South being particularly antideath. The State of Georgia says hang them unless they are mentally retarded. The State of Maryland says death unless they are mentally retarded—not insane, mentally retarded. The State of Kentucky says death but not for mentally retarded. The State of Tennessee says death but not for the mentally retarded.

I believe the reason why many more States have not passed such a law is there is the implicit assumption that we would not put to death people who are under the age of 12 in their capability by any measure. These are people who from the time they were born, in most cases, were never able to achieve, never able, through no fault

of their own, to reach any degree of maturity. I only hope that they will resist the Thurmond amendment and support the Biden death penalty bill with which the Senator from South Carolina is now only in disagreement on two points, this being one of them.

I yield the floor.

The PRESIDING OFFICER. Who yields time?

Mr. THURMOND. Mr. President, I yield the distinguished Senator from Utah as much time as he requires.

The PRESIDING OFFICER. The Senator from Utah is recognized.

Mr. HATCH. Mr. President, I think it is time to put this in perspective. If the Biden amendment stays in the way it is and we do not vote for the Thurmond amendment, then I guarantee that in every case they are going to claim mental retardation. Seventy percent of all of the convicted murderers in this country today claim mental retardation, maybe not even at trial but long after trial because of the suffering and pain that they have experienced.

All the distinguished Senator from South Carolina would like to do is allow the mental retardation defense for defendants who do not know right from wrong. But his point is this: If they know right from wrong, they ought to face the consequences. The majority of prisoners on death row today claim that they are retarded, not that they do not know right from wrong, not that they did not commit the murder or murders as is the case; as many, I understand, as 70 percent of them. I can bet you that almost 100 percent will claim it if S. 1970 is enacted and the Thurmond amendment is not added to it.

Let us understand something. The trial comes up. Defendants can raise any issue about mental capacity, disability, or retardation they want. The jury will determine whether that person is mentally retarded enough to not know right from wrong in most jurisdictions in this country. They have a full at bat for showing mental retardation and influencing the jury. They can bring in all the psychiatrists they want, all the social workers, friends and family, all the associates. They can bring in experts galore. The jury then decides, "No, you knew what you were doing. You cold-bloodedly murdered that person, and we find you guilty."

Then the sentencing comes up. They have a right to come in and do it all over again. They can then go completely through it again with psychiatrists, social workers, all the experts they want to bring in to show mitigation. The jury says, "No, you knew what you were doing. You killed these people. You did it in cold blood. It was a cold-blooded murder, and we find, after all of this testimony"—this is a jury of peers—"death is the sentence you should have."

The Biden amendment in this bill then goes and gives them a third time,

only it says it a little bit differently. It says, if you can show you are mentally retarded, you cannot be executed. You will stay in jail the rest of your life, but do you not have to suffer the death penalty. This is better than habeas corpus for prisoners. They can raise it at any time.

We went through habeas corpus yesterday, and we are going to vote on it again today, but we went through habeas corpus yesterday and we know that just the appeal process in the Gacy case took 9 years. The trial started in 1980, as I recall, and it went 9 years, to 1989, before the Supreme Court rejected the appeal on the matters affecting the trial. The habeas process starts this year, and, if it is like William Andrews in Utah, you can count on 10 more years after this year and maybe way beyond that if the current Graham habeas language is kept in this bill. That is about 27 years at that point, and he is still not executed. I can guarantee you in that 27 years they will be back in time and time again, time and time again claiming mental retardation. And if they can find a sympathetic forum, they are going to get off from what the jury of their peers decided, what the Court decided, what the appellate process decided, what the habeas process decided, in countless appeals, even if the Graham habeas amendment is what we wind up with in this bill.

All the distinguished Senator from South Carolina is saying is, look, we will give consideration to mental retardation, but, if they know right from wrong, they should not be able to use that ad infinitum and they should not be able to use that over and over again until they finally are able to convince somebody down the road, be it a 27-year period, or 17-year period as in the case of Andrews, or 9-year period as in the case of Gacy that is going on forever—if they find some sympathy in that 27 years, they can then get off from the heinous murder that they have caused.

This is a soft, artsy, liberal approach that is for one reason and one reason only, and that is—and it is a legitimate reason if you believe this way—the folks who advocate it do not want the death penalty under any circumstances, and this is just another way that they can prevent the death penalty.

Mr. BIDEN. Will the Senator yield for a question, a very short one?

Mr. HATCH. Go ahead, on the Senator's time.

Mr. BIDEN. On my own time. Does the Senator think we should put to death a 12-year-old child who knows right from wrong and says, "Daddy, I'm shooting you," boom? I do not think we should put to death a person who is mentally retarded.

I yield the floor.

Mr. HATCH. Wait. Who does not know the difference between right and wrong?

USCA4 Appeal: 21-1    Doc: 11-2    Filed: 01/08/2021    Pg: 72 of 134
Case 3:92-cr-00068-DJN   Document 94-7   Filed 12/14/20   Page 6 of 12 PageID# 3610

Mr. BIDEN. What is the distinction, if I may ask my friend?

Mr. HATCH. The distinction is that the law takes empathy and has sympathy for children and the law does not have the same degree of sympathy for adults who know right from wrong even though they might not be geniuses.

Mr. BIDEN. Even though they are mentally retarded?

Mr. HATCH. Mental retardation, who determines that? Are we going to determine it by objective tests, because there are none. Are we going to determine that because there is some scientific way of determining mental retardation? There is no way of doing that. It comes down to what experts say, and you have experts on both sides of that question. And, if they can, in that 27-year period I have just outlined, find some sympathetic group, liberal, if you will, they are going to get off. It is that simple. The American people say, we are sick of it. We have jails competely full of these people who have committed cold-blooded, premeditated murder who are adults who know right from wrong, and the majority of them claim they are mentally retarded.

Seventy percent have made claims at one time or another, as I understand it. Look at S. 1970, the Supreme Court ruling in the recent case of Penry versus Lynaugh. In that case, the Court held that the eighth amendment does not categorically prohibit the execution of mentally retarded capital murderers. The Court stated that it may indeed be cruel and unusual punishment to execute persons who are wholly lacking in the capacity to appreciate the wrongfulness of their actions. Such persons however are not likely to be convicted or face the prospect of punishment today, since the modern insanity defense generally excludes mental defect as part of the legal definition of insanity.

Ford versus Wainwright prohibits the execution of persons who are unaware of their punishment. They should not suffer.

There are plenty protections for mental retardation in the law today. I agree with those. I would even go farther. If the crime is not heinous, if it is not willfully meditated, heinous, vicious crimes, I would have a difficult time using the death penalty under those circumstances. But where you have a heinous, vicious, willful, premeditated crime, where the person knows right from wrong, they should not escape from the consequences just because somebody else claims they are mentally retarded.

I remember when people felt that Steinmetz, the greatest mathmetician in the world at the time—because he did not make good grades in certain areas of schooling—was mentally retarded. He turned out to be one of the greatest geniuses in the history of the world.

We all know that every criminal claims that he is not responsible for what happened because of what happened in his past. The court has provided guidance in each case. A criminal cannot be executed if he or she was insane at the time the murder took place, or at the time of trail. The language of the amendment of the Senator from South Carolina follows the courts' criteria. As such, the defendant's mental condition will not be ignored. It has to be considered as a mitigating factor.

So, to summarize, I believe truly mentally retarded people who do not know what they were doing should not be sentenced to death. I agree with that. Any humane person would. But there has to be a standard. That standard ought to be, if they know right from wrong, they should not be able to escape the responsibility for it.

Dalton Prejean willfully and premeditatedly killed a police officer, a Louisiana State trooper. What was his defense? He was mentally retarded.

I have to admit, if he was truly mentally retarded and did not know right from wrong and the jury determined that, he should have gotten life in prison or have been put in a mental institution. But he knew right from wrong. The jury knew he knew right from wrong. The jury knew that he knew what he was doing. He was not mentally retarded enough to not know what he was doing.

That is all the distinguished Senator from South Carolina is saying. If they are mentally retarded, they do not know what they are doing, you are right, Senator BIDEN. But, if they are mentally retarded or claimed they are, they know what they are doing, they did it in a willful, vicious, premeditated way, by gosh, society ought to be able to have this option to prevent it in the future, because mentally retarded people who know right from wrong can be deterred from doing these things if they know there is an ultimate sanction against what they are doing.

But the real issue is this. People who are not mentally retarded, but who will act like they are, who will claim that they are, and who can get any kind of a psychiatrist they want to say that they are, these people will be making these claims ad infinitum, long after the trial where they are protected on the insanity defense, long after the sentences where they are protected on the insanity defense, and long after any mitigating circumstances thereafter, or all of these repetitive habeas appeals or petitions in accordance with the Graham amendment, if that is what we adopt here today.

The fact of the matter is, we have to set some standards that society can live with, that protects society. That is all the distinguished Senator from South Carolina is doing. He is not saying we are insensitive to mental retardation, nor that we are insensitive to murder, nor that we are insensitive to our fellow human beings being killed in a premeditated way, nor that we are insensitive to not doing what we can for those people by stopping it and deterring it. That is why we have the death penalty. It works. Prejean is never going to kill another trooper again.

There are all kinds of other illustrations just like it. In every case, you are going to find these people claiming mental retardation, except where it is patently clear that they cannot. It is just another way of trying to prevent the death penalty. It is clear that is what it is.

I ask my colleagues to listen to the distinguished Senator from South Carolina. He is right on this issue. We ought to support him. Those who are totally against the death penalty, they are going to vote the other way. We understand that. They are principled in doing so. Wrong, but principled.

The fact of the matter is, let us not be misled by this type of an argument that these mentally retarded people are all going to claim. Many, many more are going to get off. There are going to be other Prejeans who kill troopers. People will say, why were we not doing something about it when we had the chance. This is the time to do it. The only way you can do anything about it is to vote for the Thurmond amendment.

I reserve the remainder of our time.

The PRESIDING OFFICER. Without objection, the Senator from Massachusetts is recognized for 10 minutes, the time to be charged to Senator BIDEN.

Mr. KENNEDY. Thank you very much, Mr. President.

I want to state at the outset that I do not come to this debate without strong personal feelings since I have a sister who is mentally retarded. So I have spent some time learning about the affliction and I have strong feelings about this particular amendment.

It is truly amazing to me, Mr. President, that we would be addressing this particular amendment of the Senator from South Carolina on this measure. In 1988, we passed the drug bill containing the first Federal death penalty provision since Furman and Gregg. In that law we excluded from the possible application of the death penalty those with mental retardation. I have to ask my colleagues who are supporting this particular proposal: What has happened in this country over the period of the last 2 years that should lead us now to make sure that we are going to be able to give the ultimate penalty, the ultimate penalty to those who have mental retardation? Where is the crime wave by the mentally retarded? Where is it, Mr. President? What has happened in the last 2 years since the Senate went on record in the 1988 omnibus drug bill against execution of the retarded? That bill did not say we will not punish the retarded; it

S 6878        **CONGRESSIONAL RECORD — SENATE**        *May 24, 1990*

did not say we could not give lifetime in prison to those individuals who have the mental capacity of a 12-year-old. It did not say that.

But the pending amendment says that if they have retardation but can tell the difference between right and wrong, they are going to be eligible for the ultimate penalty of death.

In fact, Mr. President, this is not just a little add-on to the mental retardation provision in S. 1970. Include those words of the Senator from South Carolina, and you change the ball game in a very dramatic and significant way. The reason is that the Thurmond amendment describes an empty set. We ought to understand that from various court holdings. If you cannot tell the difference between right and wrong, you probably will not be tried in the first place, whether you are mentally retarded or not. You are probably criminally insane or incompetent to stand trial.

So let us understand the significance of the few little words, the difference between right and wrong. Generally speaking, maybe with rare exceptions, if you cannot tell the difference between right and wrong, you do not go to trial, mentally retarded or not.

So, Mr. President, these few words about telling the difference between right and wrong added to the words that exist in the current proposal effectively say you can go ahead and execute just about anyone, mentally retarded or not.

Mr. President, an argument has been made here on the floor of the U.S. Senate that all criminals are going to say that they are mentally retarded, and therefore escape blame. This is ridiculous on its face and the argument would not be made by anyone who understands mental retardation. Under the existing legislation, the burden of persuasion is upon the defendant to demonstrate that he is mentally retarded and lacks the IQ of 70, part of the definition which has been accepted by the Supreme Court of the United States. We heard just now that there is no definition. That is not so.

The Supreme Court of the United States has recognized that there is a definition, and referenced it in the Penry case. That is the same kind of definition that is included and referred to in the Biden bill currently. It has been accepted by the American Psychiatric Association and by the American Association on Mental Retardation.

Effectively, if you are going to be able to qualify as mentally retarded, you have to demonstrate over the course of a lifetime that you have needed treatment. You cannot just go in and say I am mentally retarded. Any court would throw you out. You have to demonstrate over a lifetime of examinations or medical treatment, over a lifetime, that you have these deficiencies.

So anyone that says that, well, you are going to be found guilty and then

you are going to say mental retardation, does not understand what mental retardation is about, has no idea what it is about. None.

Mr. President, it is extraordinary to me that we say on the one hand we will not apply the death penalty to someone who is 16 years old, on one part of the bill, and say, OK, over here someone who only has the mental capability and intelligence of a 12-year-old, we are going to fry them. I cannot understand the logic of that. I just cannot understand that, Mr. President.

This is really a proud moment in the U.S. Senate as we are about to enter the 21st century, about the only democracy in the world that has the death penalty, and we are debating now whether we are going to execute the mentally retarded. That says a lot about our society, about the United States of America. Where are we? Where are we, Mr. President?

The proponents of the amendment say: Let us go ahead and execute those individuals. Let us go ahead. But what are, we trying to accomplish? Are we going to try to deter with the punishment of the death penalty, that we are going to take individuals of 70 IQ or less, and we are going to deter them because we here in the United States are passing a death penalty? Does anybody believe that is going to deter the mentally retarded? Of course, it is not. Are we declaring here in the U.S. Senate that we want retribution on those mentally retarded, so we are going to execute them? That is real retribution for our society. Mr. President, that says more about our society today than anything else.

I hope that we will accept the challenge of the Supreme Court in the Penry case, which is very clear. The Court in that particular decision was inviting legislatures to act and respond. A number of the legislatures have done it. Four States have acted and responded, and we have a responsibility to act and respond as well with the criteria that we want in terms of the death penalty.

I believe that what is included in the current legislation, its definition of mentally retardation, is a definition that has been accepted by the Association of Mental Retardation, the American Bar Association, referenced by the Supreme Court of the United States, and would, I believe, be accepted by the broad scope of American public opinion. By adding the language of the Senator from South Carolina, we are effectively gutting any kind of effective protection for the mentally retarded. I hope that the amendment will be rejected. I yield back the remainder of my time.

The PRESIDING OFFICER. Who yields time?

Mr. THURMOND. I yield 5 minutes to the Senator from Wyoming.

The PRESIDING OFFICER. The Senator from Wyoming is recognized for 5 minutes.

Mr. SIMPSON. Mr. President, I have listened to my friend from Massachusetts, who I work with in so many areas and who I enjoy so very much. He is a spirited legislator, and I was off the floor the other day musing in the library when I suddenly heard this ringing voice coming from inside the Chamber—as if the very pillars were to be pulled in upon each other. It was my friend from Massachusetts.

He and I have had spirited debates like that, and he speaks with great passion. He speaks from a source that none of us will really ever know in these areas, because of the loss of two dear and stalwart brothers at the hands of two really sick people. So, that is something we have to weigh and consider always when we hear our friend from Massachusetts speak. That passion is something none of us would ever even perceive.

With that in perspective, to get back to this issue—and it is tough one—for we are talking about killing people. But we are also talking about killing people who have killed other people. And we are talking about people who did it in a hideous, vicious, brutal, and foul way. That is what we are talking about.

My friend says, "What has happened in America? What has happened at this time of our life as a Nation?" I guess the answer is, and it has to be heard, "Too many people are getting away with murder." It is that simple. Too many people are getting away with murder. They are clever. They have a battery of attorneys who join them. We fund attorneys in this country to help the poor and the destitute with divorce, and rent, and problems of everyday life, and for some reason, they all gravitate to these screwballs. They help them petition, and petition, and petition, ad infinitum. That is a sick part of what has happened in society. We set up a system to take care of people and all those funds and energies have been subverted by people who just cannot wait to get in and see if we can find another Birdman or somebody else. At best, you get about 1 out of 1,000.

But I tell you, we must remember that before you can be charged for first degree murder, you must have known the difference between right and wrong. The prosecution must prove it to a jury. The Government must prove that the defendant did the act and did it knowing right from wrong. That is the law. Also, to be convicted of first-degree murder and be sentenced to death, the defendant had to have committed the murder in an especially cruel and beastly and vicious manner. That is now the law.

It is not like the 8-year-old or the 12-year-old shooting his dad and going, "Zap, you are gone, dad." That is not it. Maybe I am the only one that ever was involved in a couple of first degree murders. I have dealt with heavy lidded, slack jawed people, who sat

USCA4 Appeal: 21-1    Doc: 11-2    Filed: 01/08/2021    Pg: 74 of 134
Case 3:92-cr-00068-DJN   Document 94-7   Filed 12/14/20   Page 8 of 12 PageID# 3612

there after raping and pounding some woman to pieces and I said, "Why did you do that?" And he said, "I like it.". And I said; "You sick slob."

I remember doing that with one man, and the "shrink" ran in from the other room and said, "You cannot call him a sick slob." I said, "I just did." And he said, "Oh, now we are going to have to go now and repair 283 hours of psychotherapy."

I said, "I am not sorry that I did that, but since I was court appointed here, I thought I would ask that. Now I have another question, Doctor. What is there to make us feel certain that he won't do it again?" Then the doctor said, "Oh, I hope you would have asked that question outside of his presence. That will set him back another 10 years."

Well, it must have.

Anyway, he was released and he went back into society and he got a job and his roommate did not know what his past was—thank heavens. He got through that period of his life, and then he married. Then he came home 1 day after a day at his job and he sliced his wife up into 83 sections and plastered her on the wall.

So for every story you have to tell me, I have one to tell you. That is what often irritates people on the other side. There are some people in life who are humans only in the name of anatomical essence. Other than that, they are bums, animals, and beasts, and they ought to be salted away.

Mr. President, I support capital punishment. This is crucial to meaningful crime control. I understand, though, that this is a deep and personal moral issue, too—my own father stands exactly and diametrically apart from me on this issue. When he was Governor of Wyoming, he refused to carry out the final act of capital punishment— he commuted the sentences of several on death row. So I understand fully the reasons of those who honestly and openly oppose capital punishment.

I, on the other hand, feel that capital punishment is an important deterrent to crime. I support that concept— there is also an important factor of "social retribution" served by capital punishment.

We should not allow our compassion for the life of a convicted man to dilute our revulsion and disgust at what that individual has done. Capital punishment is reserved for only the most heinous of crimes. These are crimes so brutal, so devious, so evil, that even the strongest-willed individual is sickened by the act.

These murderers are human only biologically—they are animals in terms of behavior. Too many of these individuals commit their atrocities, are apprehended, and sit smugly in court laughing at society and the judicial system—they know that they will likely die of old age before society has its due. They have no remorse or regret. There is no atonement in these

people. They are evil through and through, and society is better off without them.

By their own actions, these individuals have let it be known that they will kill again if given the chance— either while in prison or out on parole, they will kill again. The only certain method to assure that these persons do not kill again is through the use of capital punishment.

Government has another role in this issue. The families of the victims of these atrocities are now looking to Government to keep its end of the contract. The victims' families are following the rule of law, they are asking society—Government—us—to do what we promised and mete justice out where this particular form of justice is warranted.

Think very carefully about the kind of beings that are subject to the ultimate sanction. We are not talking about, as prosecuters say: the "garden variety muderer." What we are talking about in capital murders are the most cruel, the most vicious, the most beastly acts of inhumanity imaginable.

These murderers have made their views of the value of human life very clear: to them, human life has no value; to these murderers, human life is beneath contempt, it is something to be "snuffed out" with absolutely no remorse what so ever. Many of these murderers enjoy killing; they may even delight in it! Many want to do it again. Many have. And some of those who are interminably delaying their executions with countless frivolous appeals will kill again, even while they are in prison.

As long as these particular individuals live, society is at risk. We should not waste our compassion on these individuals.

Direct your compassion, instead, to the families and loved ones of the victims of these heinous acts. Consider the suffering that is with them every time an execution is delayed on a string of frivolous appeals. Have compassion for these people, if you have no compassion for the suffering of the victim.

Juries may not consider the suffering of the victim during the guilt phase of a murder trial. Consider also, and have special compassion for, the families and loved ones of future victims. Even if those are the families and loved ones of prisoners who, themselves, are at risk during their terms of incarceration.

We constantly talk about the rights of individuals. A criminal trial is carefully conducted to ensure that the rights of a defendant are guaranteed and scrupulously protected. Great pains are taken to make very sure that a conviction is based purely on the evidence—a great deal of potential evidence is never presented to a jury because of the overwhelming concern for the defendant's rights.

That is why the Thurmond amendment is important—crucial—if we are

going to enact meaningful legislation. This amendment clarifies language that would frustrate the desires of the American people.

Many are going to suggest that we are going to be executing mental incompetents if this amendment is passed. That is simply not true. The crafters of the language we are trying to amend know that and the opponents of the Thurmond amendment know that.

The simple fact is this: mental competency must be proven, not argued, but proven, at the beginning of the trial stage. It must also be proven during the sentencing phase. That is already the law.

As the language currently stands, the most heinous, devious, clever and deceptive butchers on death row will be able to fake mental retardation to avoid the only penalty which is appropriate for their acts of butchery. That is what we are talking about. Insidiously clever butchers, and only those kinds of people, get the death penalty. All that we are trying to do with this amendment is to make it clear that the death penalty will not be imposed if it can be proven to the court that the murderer, at the time of execution was completely and wholly "lacking in the [mental] capacity to appreciate the wrongfulness of his act."

Do not allow yourselves to be duped into believing that such a person could ever be convicted of murder in the first degree, a person must be proven to have acted with the knowledge and intent of killing. Planned, premeditated, and carefully orchestrated acts of butchery. As the law is today, a convicted murderer can not be given the death penalty if they do not comprehend right from wrong.

Society has rights, too. Society's concerns are not voiced in a criminal trial. The courts are charged with the duty of enforcing the law and protecting individual rights. It is only here, in Congress, that the rights of society are considered. It is in this body where the rights of society must be debated.

We are charged with the duty of protecting the rights of society. So far, I fear, we have fallen behind in ensuring the right of society to be protected from vicious crime. We have a constitutional and moral obligation to the law-abiding citizens of this country to make sure that they are not put at risk of life and limb needlessly. We now have a unique opportunity to partially fulfill that obligation and enact tough, meaningful, and constitutional criminal law reform. By voting for the Thurmond amendment, we are telling the country that we do, indeed, take our responsibilities seriously.

The PRESIDING OFFICER. The time has expired.

Who yields time?

Mr. THURMOND. Mr. President, I yield 5 minutes to the able Senator from Mississippi.

J.A.1430

USCA4 Appeal: 21-1    Doc: 11-2    Filed: 01/08/2021    Pg: 75 of 134

S 6880 CONGRESSIONAL RECORD — SENATE *May 24, 1990*

The PRESIDING OFFICER. The Senator from Mississippi is recognized for 5 minutes.

Mr. LOTT. Thank you, Mr. President, and I thank Senator THURMOND for yielding me this time.

I say to my colleagues, over the past 40 years we have lost control of crime in this country. Society is suffering because of what is happening over all these past 40 years. The courts have made it impossible for us to do the job we need to do in fighting crime in this country. Victims are being ignored. The people who have to pay the true penalty for these crimes that we are talking about and law enforcement officials have been damned with laws that make it impossible for them to do their job.

We have set up procedures to protect the criminals and not just the petty criminal, the hardened, repetitive raper, murderer, drug pusher, the system is set up to protect their rights. What about the rights of society? What about the rights of the victims? What about the ability of law enforcement officials to do their job?

The court systems is collapsing, prisons are bulging, overcrowded with courts saying you cannot have the systems where the jails are not adequate for prisoners.

I had a situation recently in my own State where we were housing some Federal prisoners and the Federal officials called and said, "We are not going to allow them to stay any longer because the jails are not air-conditioned." We are worried about prisoners not having air-conditioning when people out in society working and paying the bills do not always have air-conditioning.

We have a cost of $1.1 billion a year just to house these prisoners. It was asked earlier this morning what has happened to this country. I will tell you what has happened to this country. Crime has happened to this country and the people are fed up with it. They want something done.

What does this amendment do? Is it so dastardly? It says, "and is wholly lacking in the capacity to appreciate the wrongfulness of his actions." Is that asking too much? What is mentally retarded? I still think there is a world of question about where that level is. Is it a 20 IQ, 50? Maybe 70? The Senator referred earlier here as 70 being the magic mark. Or is it 90?

Let us just follow what the Supreme Court and what the law has been interpreted to mean. In the Penry decision, if these criminals have the ability to understand right from wrong, the wrongfulness of their act, they should pay for these ghastly, heinous crimes that they have committed. We have a court system. They can make these decisions.

When we have a person that is only moderately retarded, can he appreciate the wrongfulness of his acts? We can all cite these crimes that have been committed that will turn your

stomach. People have had enough in this country. In State after State where for years they could not have capital punishment, they are now going back to it.

There was this recent case in Louisiana where for months, years, there was a fight to prevent the execution of a criminal who had been repetitive in his actions, but the Governor made the decision and the appellate courts made the decision they should go forward with this execution.

We need a minimal standard. Yes, we should consider mental retardation. It is a factor that should be considered and the courts can do that. But if they know what they are doing they should pay the price.

It is time I say to my colleagues, the American people demand that we do more in fighting crime in this country. We have an opportunity with this legislation to address a myriad of questions to put criminals in jail and to excute those criminals who need to be executed.

We cannot have the insanity plea or mental retardation plea or, gee wheez, I am sorry, suffice to punish these criminals that are causing so many problems in this country.

So I say to my colleagues, I urge the adoption of this minimal standard that the Senator from South Carolina has proposed here this morning.

I yield my time.

The PRESIDING OFFICER. Who yields time?

Mr. THURMOND. Mr. President, I yield 2 minutes to the distinghished Senator from Utah.

The PRESIDING OFFICER. The Senator is recognized for 2 minutes.

Mr. HATCH. Mr. President, why does not the other side just admit that they are against the death penalty? They have a principled position there. I disagree with it but it is principled. They use anything to get rid of the death penalty in any way, in any instance.

As a matter of fact, there will be a big loophole if S. 1970 stays the way it is, if we do not put the Thurmond "right or wrong" language in. That language is better than current law or habeas because it means that after they have had a full trial and they brought up all the psychiatrists, social workers, and everybody else they can, to show the person really did not know what that person was doing or was mentally retarded or whatever, and the jury rejects that, and then they have a full hearing on sentencing with all the mitigation brought out and the jury rejects that and sentences the person to death, then from that point on, anytime a capital defendant can show any change, they can raise the point that the person is mentally retarded. As soon as they find, during those years and years and decades under current law, one group that will say he is mentally retarded for any reason, then they can stop the death penalty in that case.

All Senator THURMOND is trying to say is look, and this is the bottom line—neither Senator THURMOND nor I, nor anyone else who is supportive of Senator THURMOND's position, none of us want mentally retarded persons to be sentenced to death, none of us do if they do not know right from wrong, and if a jury of their peers agree, that is the botton line.

The PRESIDING OFFICER. The Senator's time has expired.

Who yields time?

Mr. THURMOND. How much time do we have remaining?

The PRESIDING OFFICER. Three and a half minutes.

Mr. THURMOND. Mr. President, say this: We want to keep the present law. They want to change the present law. If a man is charged with a crime—and I am told according to the statistics about 70 percent of those who are charged with murder claim they are mental retarded—if they are truly mentally retarded and do not know right from wrong, we do not want them executed.

Our amendment does not do that. The amendment says if they do know right from wrong and they have committed a serious murder, a vicious, heinous murder, they should face the ultimate punishment. Under this bill, they would not face capital punishment.

I thought we were going to pass a tough crime bill. If this amendment is adopted, you will have a tougher crime bill on this subject. Make up your minds. Do you want a tougher crime bill or not? Do you favor the death penalty or not?

I have a feeling some of the people taking a position against this amendment do not favor the death penalty under any condition. If a defendant knows right from wrong and commits a serious crime, he should have to pay the ultimate penalty. That is all we are asking. The Supreme Court has decided that. That is the law now. It is the law in most States. Why do the opponents want to undo it?

I say a man who is guilty should not be allowed to claim mental retardation when the facts do show he knew right from wrong. Why should we just pass a law that categorically under all circumstances makes one who is mentally retarded but knows right from wrong, not responsible?

Mr. President, that does not make sense. This Senate knows it does not make sense. Again, if he is truly mentally retarded, does not know right from wrong, our bill does not affect that person at all. But if an individual claims mental retardation when he knows right from wrong, if sentenced to the ultimate punishment, then we feel that decision should stand.

I say let us stand by the present law on this. Do not weaken the law. Why pass a crime bill if you are going to come in here and weaken current law? We thought we were going to pass a

USCA4 Appeal: 21-1    Doc: 11-2    Filed: 01/08/2021    Pg: 76 of 134

stronger crime bill. This will be a weaker crime bill.

Mr. President, it would be a great mistake not to adopt this amendment. The Supreme Court of the United States has laid down the rule. All we are asking is to stand by that rule. They have approved it. Let us stand by it. Let us protect the law abiding people. Those who are guilty cannot be allowed to avoid appropriate punishment by claiming they are mentally deficient when they are not, when the courts have found they know right from wrong. If they know right from wrong, they are responsible; if they do not know right from wrong, they are not responsible. That is all my amendment does, Mr. President.

The PRESIDING OFFICER. The Senator's time has expired. All time controlled by the Senator from South Carolina has expired.

The Senator from Delaware has 8½ minutes.

Mr. BIDEN. Mr. President, I yield myself 3 minutes.

Everyone gets emotional on this subject, but it is time I think we set a few facts straight. First, this does not change the law. The only Federal law on the books relating to death says you cannot put a mentally retarded person to death. That is the law. Boom, point one.

Second, they do not go free. Nobody, nobody, nobody is suggesting that anyone, mentally retarded or not, will go free.

Third, my friend from Mississippi, the home of Faulkner, would have, in the "Sound and the Fury," put Ben to death. Ben knew right from wrong. But he was mentally retarded.

Under this law, if it is changed, if we changed the Federal law now, we say we can put a mentally retarded person to death. If you watch "L.A. Law," old Benny, he is right for the block. He knows right from wrong. He knows you put your hand on the copy machine, instead of your nose or ears. He knows you do not go and knock people down. But he is mentally retarded as portrayed. Just like the 12-year-old kid and the 16-year-old kid who work in that office knows right from wrong.

We are saying here, all my colleagues looking very smug on this, and saying we are going to get tough. Well, if it is get tough, let us eliminate the provision saying you do not put children to death, you do not put children to death. Lay them out there, too; smack them up against the wall. Strap them in, I say to my friend from Wyoming; let them fry. Let us do that, too. They know right from wrong.

Is anyone here suggesting a 16-year-old does not know right from wrong? But we are agreeing in this bill, even though they know right from wrong, they cannot be put to death. Anyone suggesting a 17-year-old does not know right from wrong? But we are agreeing, in this tough bill, we will not put them to death. And you all are voting for that.

Anybody suggesting that a 14-year-old, any of these pages, do not know right from wrong? But you are agreeing that none of them can be put to death. So you are either having a double standard here or you just do not like mentally retarded people, you have some kind of prejudice or something. I do not know what else it is.

Because you are saying, you are acknowledging, a 12-year-old knows right from wrong, but we are not going to put him to death. You are acknowledging, in your own bill, a 17-year-old knows right from wrong, a 16-year-old knows right from wrong, but we are not going to put them to death. No, we say we are not going to do that because they are 16, because they are 15, because they are 12, because they are 10. But you are saying that if someone—and, by the way, faking mental retardation is a lifetime's work. That is a good one. Faking mental retardation. Fake your way through an IQ of 60. It is easily rebuttable. Come in and say they have an IQ of 60. You can present evidence and say, by the way, how come this guy graduated at the top of our class; how come this guy holds a job as an assistance to Senator BIDEN or Senator SIMPSON; how do they do that?

What are we talking about? You do not fake mental retardation. You either are or you are not.

And so I say to my friend from Mississippi, we have to get tough, we have to start helping victims. I agree. That is why I hope he will agree to put more money in the victims fund in the bill this year, which he does not like to do, I might add. Let us help victims.

We also want to go out and help law enforcement. Well, I say to my friend from Mississippi, let us help them. Vote for the Biden amendment for $900 million for them. Vote to take away those guns that are killing them. Let us help law enforcement.

What is all this stuff? This is about a simple proposition, and that is as a society we have collectively in here and in this Nation made a judgment: we will not put children to death, even though they know right from wrong, even though they may commit a heinous crime, even though they may be an ax murderer; that is what these gentleman and I are voting for.

Now if we say that, what is this tremendous leap? If I can quote in another context, for another reason, a Supreme Court Justice talking about pornography said, "I cannot define it, but I know it when I have seen it." Have any of you never seen a mentally retarded person? They know right from wrong; most know right from wrong. But, nonetheless, they are mentally retarded. Which means not that they are psychotic, not that they are insane, not that they have antisocial behavior that puts them in a category that says they should be not guilty of by reason of mental insanity but because they simply do not have enough gray matter to be able to ever

in their entirety of their life, in their whole life, to achieve an ability to operate in society beyond that of a 12-year-old. My God, what have we come to?

I yield what remaining time I have, if I do, to the Senator from Massachusetts.

The PRESIDING OFFICER. The Senator from Massachusetts is recognized.

Mr. KENNEDY. I cannot improve on the case that the Senator from Delaware has made, Mr. President.

I yield back to him or yield the balance of the time.

Mr. BIDEN. Is there any time left?

The PRESIDING OFFICER. Two minutes.

Mr. BIDEN. Does the opposition have any time?

The PRESIDING OFFICER. No.

Mr. BIDEN. I yield back my time.

The PRESIDING OFFICER. Both sides have yielded their time. Under the agreement, at 10 a.m., the question will recur on the motion to reconsider the vote by which amendment No. 1687 was defeated.

Mr. GRASSLEY. Mr. President, I rise to support the amendment offered by my colleague from South Carolina [Mr. THURMOND].

Societies are created for the mutual protection of the individuals who are the elements of any given society. Where the safety of its citizenry can no longer be guaranteed, a society can no longer justify its reason for existing.

In providing its individual members protection, society must do what is necessary within its legal framework to deter those who would break its laws and to punish, in an appropriate manner, those who choose to do so.

Along with controlling behavior, a criminal law structure worth enforcing must promote respect for life, moral integrity, and property rights.

In a country that cherishes a separation between the state and any officially sanctioned religious practice, the criminal law is one of the few available institutions through which society can make a moral statement and hope to promote the goals I have just mentioned above.

A society makes a moral statement when it punishes. Therefore, to be successful, a society must establish punishments appropriate to what has been offended.

As the scholar Walter Berns once wrote:

If human life is to be held in awe, the law forbidding the taking of it must be held in awe; and the only way it can be made to be awful or awe inspiring is to entitle society to inflict the penalty of death.

Mr. President, it is not enough to proclaim the sanctity and importance of innocent life. Innocent life must be—and can only be—secured by a society that is willing to impose its severest penalty upon those who threaten such life.

J.A.1432

USCA4 Appeal: 21-1 Doc: 11-2 Filed: 01/08/2021 Pg: 77 of 134

As Professor Berns observed:

We think that some criminals must be made to pay for their crimes with their lives, and we think that we, the survivors of the world they violated, may legitimately extract that payment because we, too, are their victims. By punishing them, we demonstrate that there may be laws that bind men across generations as well as across and within nations, that we are not simply isolated individuals, each pursuing his selfish interests.

Consequently, imposition of the death penalty may be necessary, in certain circumstances, to adequately protect society in the future from the possible actions of those who have already committed capital crimes.

Mr. President, by an overwhelming majority, the American public supports the imposition of capital punishment. The American people are usually out in front of politicians on the issues that matter the most—issues of basic fairness, equality, and true justice.

As for the ultimate criminal sanction—the death penalty—the American people are not out to fill some psychological blood lust.

However, they do know that when it comes to heinous, outrageous, and abominable criminal acts, the death penalty is necessary, appropriate, and in these certain circumstances the only just punishment.

To attach a lesser sanction against such criminal acts would, in my view, undermine our system of justice and its ability to deter crimes.

Worse, the lack of the capital sentencing option is an abdication of one of our most fundamental duties: the protection of the people.

To advocate the use of society's ultimate criminal sanction is not something I take lightly. But the Constitution permits us the option to end a convicted criminal's life if certain prescribed procedures are followed, including appropriate and constitutional due process procedural safeguards.

As a longstanding and strong supporter of the death penalty, I do not believe in an across-the-board absolute prohibition against imposing the death penalty based solely on mental impairment.

I opposed a similar provision in the Judiciary Committee because the issue should not simply be one of whether a capital defendant is mentally retarded, but whether or not the defendant understands the difference between right and wrong.

This issue was considered by the Supreme Court in Penry versus Lynaugh, in 1989. In this case, the Court, when addressing the issue of imposing the death penalty on an individual who is mildly retarded articulated a standard of whether the defendant knows the difference between right and wrong.

The Court held that if a mentally retarded individual has the cognitive and moral capacity to act with a degree of culpability associated with the death penalty, it may be imposed.

It should be acknowledged that proponents of the categorical prohibition against the execution of mentally deficient capital murderers are also, for the most part, against the death penalty.

As a part of their campaign against the death penalty, they would have us believe the Supreme Court has authorized the execution of severely retarded individuals. This simply is not true. In fact, the Court noted that retarded persons would not be convicted today because the modern insanity defense includes "mental defect" as part of the legal definition of insanity.

Further, the case of Ford versus Wainwright prohibits the execution of those who are unaware of their punishment and why they might suffer its consequences. True insanity is and should be a valid mitigating factor in the fact finder's deliberations.

Therefore, it would be inappropriate to find that all mentally impaired people—by virtue of their mental impairment alone—inevitably lack the ability to understand the difference between right and wrong, nor do they understand the ultimate consequences of their choice of conduct.

The Thurmond amendment now before us embodies the holding of the Court in its decision in Penry. Senator THURMOND offered similar language, which I supported, to the general Federal death penalty bill during its consideration by the Senate Judiciary Committee.

The effect of the Thurmond amendment would be to prohibit the execution of those who are mentally deficient and who lack the ability to appreciate the wrongfulness of their actions.

I believe this provision should be a part of any general Federal death penalty statute because it recognizes that severely mentally deficient individuals who do not understand the difference between right and wrong should not and would not be subject to society's ultimate criminal sanction.

The Thurmond amendment is humanitarian. It protects the valid rights of the mentally deficient who do not know the wrongfulness of their actions. It allows the finder of fact to consider the ability of the defendant to know the difference between right and wrong.

However, it also recognizes when Congress seeks to categorically limit or totally eliminate important fact determinations from juries, it tends to give these decisions to statisticians and psychologists. I believe to do so throws into serious question the principles that underlie the operation of our criminal justice system.

Mr. President, in our system of justice, computers do not hand down sentences. So there is no role for statisticians or social scientists in the courtroom. Rather, for more than 200 years, our system has dispensed justice through the efforts of prosecutors, judges, and juries. They take an oath to serve the ends of justice.

Lady Justice, unlike the social scientists, is blind. She dispenses justice without regard to color, race, religion, gender, or national origin. Lady Justice hears only the facts of the case. She serves the facts, not some political agenda.

The Congress should not impose an arbitrary, across-the-board, and blanket standard—against the valid will and common sense of the people—upon prosecutors, judges, and juries.

If a defendant knows the difference between right and wrong, and commits a heinous and abominable crime of murder, he is responsible for the consequences of his own actions. And he should be liable to society's ultimate criminal sanction.

I urge my colleagues to support the Thurmond amendment.

Mr. BIDEN. Mr. President, I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The assistant legislative clerk proceeded to call the roll.

Mr. BIDEN. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER (Mr. LIEBERMAN). Without objection, it is so ordered.

### VOTE ON MOTION TO RECONSIDER

The PRESIDING OFFICER. The question is on agreeing to the motion to reconsider the vote by which the amendment numbered 1687 was defeated.

The yeas and nays have been ordered and the clerk will call the roll.

The assistant legislative clerk called the roll.

Mr. CRANSTON. I announce that the Senator from Hawaii [Mr. AKAKA] is necessarily absent.

Mr. SIMPSON. I announce that the Senator from Rhode Island [Mr. CHAFEE] is necessarily absent.

The PRESIDING OFFICER. Are there any other Senators in the Chamber who desire to vote?

The result was announced, yeas 52, nays 46, as follows:

[Rollcall Vote No. 106 Leg.]

**YEAS—52**

| | | |
|---|---|---|
| Armstrong | Gorton | Murkowski |
| Bond | Gramm | Nickles |
| Boren | Grassley | Nunn |
| Boschwitz | Hatch | Pressler |
| Breaux | Heflin | Rockefeller |
| Burns | Heinz | Roth |
| Byrd | Helms | Rudman |
| Coats | Hollings | Shelby |
| Cochran | Humphrey | Simpson |
| Cohen | Johnston | Specter |
| D'Amato | Kassebaum | Stevens |
| Danforth | Kasten | Symms |
| Dixon | Lott | Thurmond |
| Dole | Lugar | Wallop |
| Domenici | Mack | Warner |
| Durenberger | McCain | Wilson |
| Exon | McClure | |
| Garn | McConnell | |

**NAYS—46**

| | | |
|---|---|---|
| Adams | Bingaman | Burdick |
| Baucus | Bradley | Conrad |
| Bentsen | Bryan | Cranston |
| Biden | Bumpers | Daschle |

*May 24, 1990*   **CONGRESSIONAL RECORD — SENATE**   S 6883

| | | |
|---|---|---|
| DeConcini | Kerrey | Pell |
| Dodd | Kerry | Pryor |
| Ford | Kohl | Reid |
| Fowler | Lautenberg | Riegle |
| Glenn | Leahy | Robb |
| Gore | Levin | Sanford |
| Graham | Lieberman | Sarbanes |
| Harkin | Metzenbaum | Sasser |
| Hatfield | Mikulski | Simon |
| Inouye | Mitchell | Wirth |
| Jeffords | Moynihan | |
| Kennedy | Packwood | |

### NOT VOTING—2

| | |
|---|---|
| Akaka | Chafee |

So the motion was agreed to.

The PRESIDING OFFICER. The Chair recognizes the majority leader.

Mr. MITCHELL. I ask unanimous consent that the vote on the Thurmond amendment, No. 1687, occur at 11 a.m. this morning, and that the vote now scheduled to occur at 11, occur immediately following the disposition of the Thurmond amendment.

The PRESIDING OFFICER. Is there objection?

Mr. SPECTER. Reserving the right to object, Mr. President, I do not understand. What time would the vote be on the underlying amendment?

Mr. MITCHELL. At 11 o'clock this morning.

Mr. President, I withdraw my request and I ask that we have a voice vote on the question.

The PRESIDING OFFICER. Is there objection?

Mr. SPECTER. Reserving the right to object, I did not hear what the Senator said.

Mr. MITCHELL. I asked to be done what the Senator just asked me to do.

Mr. SPECTER. Then I will not object.

### AMENDMENT NO. 1687

The PRESIDING OFFICER. The question is now on agreeing to amendment No. 1687.

The amendment (No. 1687) was agreed to.

Mr. HATCH. I move to reconsider the vote.

Mr. DOLE. I move to lay that motion on the table.

The motion to lay on the table was agreed to.

Mr. MITCHELL. Mr. President, may I have the attention of Members of the Senate.

The PRESIDING OFFICER. The Chair recognizes the majority leader.

Mr. MITCHELL. Mr. President, the Senate is about to recess to permit Senators to attend the ceremony outside on the Capitol steps honoring 40 years of American military heroism. These are the men and women who, in the post World War II period, have given their lives and their limbs to defend our Nation. I hope that as many Members of the Senate as possible will take the time and trouble to just walk a few steps outside of this Senate Chamber to help us pay tribute to these courageous men and women. That is the reason the Senate will go into recess momentarily, and I urge and encourage my colleagues to attend.

### RECESS UNTIL 11 A.M.

The PRESIDING OFFICER. Under the previous order, the Senate will now stand in recess until the hour of 11 a.m.

Thereupon, the Senate, at 10:26 a.m., recessed until 11:01 a.m.; whereupon, the Senate reassembled when called to order by the Presiding Officer [Mr. CRANSTON].

### AMENDMENT NO. 1690

The PRESIDING OFFICER. The question occurs now on the Thurmond amendment, No. 1690.

Mr. SPECTER. Mr. President, I ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second?

There appears to be a sufficient second.

The yeas and nays were ordered.

The PRESIDING OFFICER. The question is on agreeing to the amendment of the Senator from South Carolina [Mr. THURMOND].

The yeas and nays have been ordered and the clerk will call the roll.

The legislative clerk called the roll.

Mr. BOREN (after having voted in the affirmative). On this vote I have a pair with the distinguished Senator from Hawaii [Mr. AKAKA]. If he were present and voting, he would vote "nay." If I were at libety to vote, would vote "yea." I withdraw my vote.

Mr. CRANSTON. I announce that the Senator from Hawaii [Mr. AKAKA], is necessarily absent.

Mr. SIMPSON. I announce that the Senator from Rhode Island [Mr. CHAFEE], is necessarily absent.

I further announce that, if present and voting, the Senator from Rhode Island [Mr. CHAFEE], would vote "nay."

The PRESIDING OFFICER (Mr. KERREY). Are there any other Senators in the Chamber who desire to vote?

The result was announced—yeas 38, nays 59, as follows:

PRESENT AND GIVING A LIVE PAIR, AS PREVIOUSLY RECORDED—1

BOREN, for

[Rollcall Vote No. 107 Leg.]

#### YEAS—38

| | | |
|---|---|---|
| Armstrong | Heflin | Nickles |
| Bond | Helms | Pressler |
| Burns | Hollings | Robb |
| Byrd | Humphrey | Roth |
| Coats | Kasten | Rudman |
| Cochran | Lieberman | Shelby |
| Dixon | Lott | Simpson |
| Exon | Lugar | Symms |
| Garn | Mack | Thurmond |
| Gorton | McCain | Wallop |
| Gramm | McClure | Warner |
| Grassley | McConnell | Wilson |
| Hatch | Murkowski | |

#### NAYS—59

| | | |
|---|---|---|
| Adams | Cohen | Ford |
| Baucus | Conrad | Fowler |
| Bentsen | Cranston | Glenn |
| Biden | D'Amato | Gore |
| Bingaman | Danforth | Graham |
| Boschwitz | Daschle | Harkin |
| Bradley | DeConcini | Hatfield |
| Breaux | Dodd | Heinz |
| Bryan | Dole | Inouye |
| Bumpers | Domenici | Jeffords |
| Burdick | Durenberger | Johnston |

| | | |
|---|---|---|
| Kassebaum | Mikulski | Rockefeller |
| Kennedy | Mitchell | Sanford |
| Kerrey | Moynihan | Sarbanes |
| Kerry | Nunn | Sasser |
| Kohl | Packwood | Simon |
| Lautenberg | Pell | Specter |
| Leahy | Pryor | Stevens |
| Levin | Reid | Wirth |
| Metzenbaum | Riegle | |

### NOT VOTING—2

| | |
|---|---|
| Akaka | Chafee |

So, the amendment (No. 1690) was rejected.

Mr. KENNEDY. Mr. President, I move to reconsider the vote by which the amendment was rejected.

Mr. BIDEN. I move to lay that motion on the table.

The motion to lay on the table was agreed to.

The PRESIDING OFFICER. Under the previous order, the Senator from Florida is to be recognized to offer an amendment on which debate is limited to 2 hours equally divided and controlled by the Senator from Florida and the Senator from Delaware.

Mr. BIDEN. Mr. President, I ask unanimous consent that I be given 1 minute to make a brief explanation of something said earlier in the debate.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. BIDEN. Mr. President, during the debate on the last amendment I said:

We are saying here, all my colleagues looking very smug on this, and saying we are going to get tough. Well, if it is get tough, let us eliminate the provision saying you do not put children to death, you do not put children to death. Lay them out there, too; smack them up against the wall. Strap them in, I say to my friend from Wyoming; let them fry. Let us do that, too. They know right from wrong.

My friend from Wyoming and others may have thought I was implying that I thought he wished to see children who committed a capital offense put to death. That was not my intention. That is not what I meant to say. I do not think I did say that. I know better, as well as anyone here, my friend from Wyoming has a great deal of compassion and wisdom. I would not even remotely suggest that that is what he had in mind.

It was by way of trying to compare the law saying minors do not get put to death, to what we would be saying had we voted the other way. I thank my colleague.

The PRESIDING OFFICER (Mr. FORD). The time of the Senator has expired.

Mr. BIDEN. Mr. President, I ask unanimous consent my friend from Wyoming be able to proceed for 1 minute.

The PRESIDING OFFICER. Without objection, the Senator may proceed for 1 minute.

Mr. SIMPSON. Mr. President, that is a very kind gesture on behalf of the Senator from Delaware. It is much appreciated and relieved. It was not quite necessary. I understood the spirit and the energy of the debate, and he is a

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

*Richmond Division*

UNITED STATES OF AMERICA,       )
                                )
       v.                    )       Criminal No. 3:92-cr-68 (DJN)
                                )
COREY JOHNSON,              )
                                )
       Defendant.      )

**Government's Response to
<u>Court's December 15, 2020, Order</u>**

Corey Johnson received seven death sentences in 1993 under 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2 for the murders of seven people—Peyton Maurice Johnson; Louis J. Johnson, Jr.; Bobby Long; Anthony Carter; Dorothy Mae Armstrong; Curtis Thorne; and Linwood Chiles. Defendant was also convicted for his role in the murder of an eighth person, Torrick Brown, Jr., an offense that was ineligible for a death sentence, and he was convicted of an assault resulting in serious bodily injury to Martha McCoy. Johnson's convictions and death sentences were affirmed on direct appeal. *United States v. Tipton*, 90 F.3d 861 (4th Cir. 1996), *cert. denied*, 520 U.S. 1253 (1997). And his challenges to his convictions and death sentences were also denied under 28 U.S.C. § 2255. *United States v. Roane*, 378 F.3d 382 (4th Cir. 2004), *cert. denied*, 546 U.S. 810 (2005).

Johnson argues now that he has an intellectual disability severe enough to preclude carrying out his seven death sentences. But Johnson has had the opportunity and motivations to advance this argument over the past three decades, and he has done so. The argument has simply failed to be persuasive, as Johnson is not intellectually disabled. *See, e.g.*, *Hall v. Florida*, 572 U.S. 701, 709 (2014) ("[T]hose with intellectual disability are, by reason of their condition, likely unable to

**J.A.1435**

make the calculated judgments that are the premise for deterrence rationale," and the "diminished capacity of the intellectually disabled lessens moral culpability and hence the retributive value of the punishment."); *Atkins v. Virginia*, 536 U.S. 304, 318 (2002) (explaining that intellectually disabled defendants "often act on impulse rather than pursuant to a premeditated plan, and that in group settings they are followers rather than leaders"). While rejecting that he has intellectual disabilities that preclude his death sentences, courts have repeatedly and correctly concluded that Johnson's seven murders were planned to advance his drug trafficking and were not impulsive acts by someone incapable of capable making calculated judgments, and are therefore eligible for the death penalty.

Johnson played a leadership role in a continuing criminal enterprise, and in returning the death sentences under § 848(e)(1)(A), the jury found that Johnson intentionally killed each of his victims and committed the killings after substantial planning and premeditation. Each of the capital murders was carried out to advance the drug organization. Johnson shot Peyton Maurice Johnson fifteen times on January 14, 1992, because he was a rival drug dealer. Johnson later helped murder Louis J. Johnson, who was shot seven times on January 29, 1992, because he was perceived as making a threat against the defendant. Johnson shot Dorothy Mae Armstrong, known as "Mousey," multiple times on February 1, 1992, because she owed $400 on a drug debt and was believed to be cooperating with police. To complete the murder of Armstrong, Johnson also shot and killed Bobby Long and Anthony Carter, who happened to be in the wrong place at the wrong time when Johnson arrived to kill Armstrong. Johnson and his codefendants did not want any witnesses to Armstrong's murder, so Johnson shot Carter while he was seated in a chair and shot Long as he tried to get away. Linwood Chiles was also killed because of the drug organization. Fearing Chiles was cooperating with police, Tipton and Johnson instructed Chiles to put his head on a steering

2

wheel and then shot him at close range. Curtis Thorne was also killed, and two other passengers in the car, Gwen and Priscilla Greene, were also critically wounded.

Defendant used violence to further his drug trafficking even before the murder spree in Richmond. When the drug organization was operating in Trenton, New Jersey, Johnson beat people with a metal bat to protect his drug trafficking and carried a razor in his mouth. Even the murder of Torrick Brown, who was killed because he was friendly with James Roane's girlfriend, ultimately tied back to the drug organization. Johnson had no problem with Brown and joined in shooting Brown to help Roane, another member of the drug organization. Brown was in an apartment with his sister, Martha McCoy, along with her three children, when Roane, Johnson, and another codefendant arrived, looking for Brown. After McCoy answered the door, and the three assailants began shooting, McCoy jumped over a couch but was shot six times, resulting in twelve wounds. McCoy laid still after the shooting ended. "I guess they thought I was dead," she testified at trial. Trial tr. at 2260. Shortly after the assailants left, McCoy's brother stopped breathing, while she told him, "We are going to be all right." *Id.* at 2261. Terrified, she "didn't know if they was coming back and I didn't know what was going on." *Id.* at 2262. Taking car keys from her dead brother's pocket, she told her kids to "come on" and tried to escape, but the car would not start. At trial, McCoy's eight-year-old child testified that he saw his mother and uncle shot and saw three people doing the shooting.

As explained below, because Johnson has not obtained the requisite pre-filing authorization from the Fourth Circuit, his § 2255 motion is an unauthorized successive petition and this Court lacks jurisdiction to rule on it.

A.     **Johnson is indicted, convicted, and sentenced.**

On July 20, 1992, Johnson, along with six others, was charged as part of a 33-count indictment with:

3

**J.A.1437**

- Conspiracy to possess with intent to distribute and to distribute 50 grams or more of cocaine base, in violation of 21 U.S.C. § 846 (Count 1);

- Engaging in a continuing criminal enterprise, in violation of 21 U.S.C. § 848(a) (Count 2);

- Capital murder in furtherance of a criminal enterprise, in violation of 21 U.S.C. § 848(e) and 18 U.S.C. § 2 (Counts 8, 11, 17, 18, 19, 24, and 25);

- Commission of violent crimes in aid of racketeering activity, in violation of 18 U.S.C. § 1959 (Counts 10, 13, 14, 16, 21, 22, 23, 27, 28, 29, and 30);

- Use of a firearm in relation to a crime of violence or a drug-trafficking offense, in violation of 18 U.S.C. § 924(c) (Counts 9, 12, 15, 20, and 26); and

- Possession with intent to distribute cocaine base, in violation of 21 U.S.C. § 841(a)(1) (Counts 31 and 32).

(Second Superseding Indictment.) These charges stemmed from Johnson's leadership role, along with Richard Tipton and James Roane, in a continuing criminal enterprise, the "New York Boyz," that trafficked large quantities of cocaine in the Richmond, Virginia area between 1990 and 1992.

The trial evidence established that Johnson, Titpon, and Roane were "principal 'partners' in a substantial drug-trafficking conspiracy," in furtherance of which they committed multiple murders, including those described above. *Tipton*, 90 F.3d at 868–69. In February 1993, a jury convicted Johnson of seven capital murders under § 848(e) (Counts 8, 11, 17, 18, 19, 24, 25); conspiracy to possess cocaine base with the intent to distribute under § 846 (Count 1); engaging in a continuing criminal enterprise under § 848(a) (Count 2); committing violent crimes in aid of racketeering activity under § 1959 (Counts 10, 13, 14, 16, 21, 22, 23, 27, 28, 29, 30); using a firearm in relation to a crime of violence or a drug-trafficking offense under § 924(c) (Counts 9, 12, 15, 20, 26); and possession of cocaine base with the intent to distribute under § 841(a)(1) (Counts 32, 33). Following a penalty hearing on the capital murder counts, the jury recommended that Johnson be sentenced to death for all of the seven murders for which he was convicted under

4

**J.A.1438**

§ 848(e). *See Tipton*, 90 F.3d at 870.

The jury also sentenced Richard Tipton to death on three of the § 848(e)(1)(A) murders for which he had been convicted, and sentenced James Roane to death for one of the three § 848(e)(1)(A) murders for which he was convicted. *Id*. After sentencing, the Court refused to order the defendants' execution on the grounds that Congress neither authorized the means by which the death sentences were to be carried out nor authorized the Attorney General to implement regulations to that effect. *Id*.

All three defendants appealed their convictions and sentences and the government cross-appealed the Court's stay of execution of the death sentences. *Id*. The Fourth Circuit affirmed the defendants' convictions and sentences, with the exception of the Count One § 846 cocaine conspiracy, which it vacated as being a lesser included offense of the § 848 continuing criminal enterprise convictions. *Id*. at 891, 903. In addition, the Fourth Circuit reversed and "remand[ed] with instructions to enter appropriate orders for the executions in accordance with regulation promulgated by the Attorney General." *Id*. at 903.

### B.    Johnson's first 28 U.S.C. § 2255 motion.

Following the Fourth Circuit's decision, Johnson sought relief under 28 U.S.C. § 2255, and he appealed after the district court dismissed or denied all of his claims. *See Roane*, 378 F.3d at 389. As relevant here, Johnson argued that his death sentence violates the Eighth Amendment because "he is mentally retarded and cannot constitutionally be executed, and that his counsel were ineffective in failing to address this issue at sentencing and on direct appeal." *Id*. at 395–96 & n.8.

The Fourth Circuit rejected those arguments in a lengthy opinion. *Id*. at 396–407. As relevant here, Johnson argued that "he is mentally retarded and that, under federal law, he cannot be executed[] … [and] that his counsel were ineffective for failing to argue this point during sentencing." *Id*. at 408. Like the district court, the Fourth Circuit disagreed:

5

The district court found, based on data of the American Association on Retardation, that an IQ of 75 or below places a person in the retarded category. At the penalty phase of Johnson's trial, Dr. Dewey Cornell, a psychologist, testified that, on October 10, 1992, he had administered a Wechsler Adult Intelligence Scale Test ("WAIS Test"). Johnson exhibited an IQ of 77, which indicated a "generally impaired intelligence," placing him "just above the level of mental retardation." Importantly, Dr. Cornell testified that he knew the significance of finding Johnson's IQ to be above 75 (i.e., this finding would render Johnson death-eligible), and that he double-checked his numbers and consulted colleagues before reaching this conclusion.

Despite Dr. Cornell's evidence, Johnson asserts that he is in fact mentally retarded. In support of this proposition, Johnson points to evidence offered during the penalty phase that his IQ was somewhere between 69 and 74 in 1985, and he relies on a 1996 publication concluding that the WAIS test tends to inflate IQ scores over the years:

> Individuals appear to gain 3-5 IQ points over a ten year period. Since the WAIS-R was published in 1981, this inflation factor could mean that the average IQ could be as high as 105-107 points rather than the accepted value of 100.

Based on these authorities, Johnson maintains that his actual IQ is below 75 and that his score of 77 is a product of score inflation. As the district court explained, however, Dr. Cornell's evidence that he double-checked his findings and consulted with colleagues before concluding that Johnson was not mentally retarded "belies the suggestion that Dr. Cornell's analysis did not account for possible variations in his testing instrument." Accordingly, Johnson is not barred from execution due to mental retardation.

*Id*. at 408–09 (internal citations omitted). The Fourth Circuit also rejected Johnson's related ineffective assistance of counsel argument:

> Johnson next contends that his counsel was ineffective for failing to assert possible IQ-score inflation at sentencing. We agree with the district court that Johnson's trial attorney was not ineffective for failing to raise this issue. Under *Strickland*, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." And "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." In this instance, Johnson's lawyer was presented with a mental health report, and he was under no mandate to second-guess that report. In these circumstances, Johnson's counsel was not constitutionally ineffective in this respect.

*Id*. at 409 (internal citations omitted).

6

**J.A.1440**

**C.    Johnson's second 28 U.S.C. § 2255 motion**

On November 20, 2020, the government informed Johnson that it had set his execution date for January 14, 2021. (ECF No. 78.) On December 14, 2020, Johnson filed a § 2255 motion in this Court seeking to enjoin his execution because he is intellectually disabled. (ECF No. 86.) This Court promptly ordered the government to provide its position as to whether Johnson's motion constitutes a successive petition and whether the Court possesses jurisdiction to entertain such a motion. (ECF No. 95.) The United States therefore does not address the merits of Johnson's claim here.

**Argument**

Once a "prisoner has filed one unsuccessful § 2255 motion, . . . he may not file another except under very limited circumstances." *Lester v. Flournoy*, 909 F.3d 708, 710 (4th Cir. 2018). A federal district court may consider a "second or successive" § 2255 motion only upon certification from the appropriate court of appeals that the motion meets certain criteria.  28 U.S.C. § 2255(h); *United States v. Winestock*, 340 F.3d 200, 205 (4th Cir. 2003) ("a prisoner seeking to file a successive application in the district court must first obtain authorization from the appropriate court of appeals" (citing 28 U.S.C. § 2244(b)(3))). The relevant statute makes no room for exceptions: "Before a second or successive application permitted by this section is filed in the district court, the applicant shall move in the appropriate court of appeals for an order authorizing the district court to consider the application." 28 U.S.C. § 2244(b)(3)(A). Specifically, a successive § 2255 motion must be certified as provided in 28 U.S.C. § 2244 to contain:

> (1) newly discovered evidence that, if proven and viewed in light of the evidence
> as a whole, would be sufficient to establish by clear and convincing evidence that
> no reasonable factfinder would have found the movant guilty of the offense; or
> (2) a new rule of constitutional law, made retroactive to cases on collateral review
> by the Supreme Court, that was previously unavailable.

*See* § 2255(h); *see In re Vassell*, 751 F.3d 267, 271 (4th Cir. 2014) ("Section 2255(h) requires a

7

**J.A.1441**

court of appeals considering whether to authorize a second or successive § 2255 motion to follow the gatekeeping procedure 'provided in section 2244.'"). The Fourth Circuit "will authorize a petitioner to file his successive § 2255 motion in the district court only if one of these gatekeeping requirements is satisfied." *Farkas v. Butner*, 972 F.3d 548, 555 (4th Cir. 2020). Crucially, however, the "initial determination of whether a claim satisfies these [gatekeeping] requirements must be made by *a court of appeals*." *In re Williams*, 364 F.3d 235, 238 (4th Cir. 2004) (citing § 2244(b)(3)(A)) (emphasis added); *accord Gonzalez v. Crosby*, 545 U.S. 524, 530 (2005) ("before the district court may accept a successive petition for filing, the court of appeals must determine that it presents a claim not previously raised that is sufficient to meet § 2244(b)(2)'s new-rule or actual-innocence provisions."). Through § 2244(b)(3)(A), Congress chose to place the responsibility for authorizing successive petitions squarely with courts of appeals, not district courts. As such, absent pre-filing authorization from the Fourth Circuit, Johnson cannot lodge his successive § 2255 petition in this Court.

This procedure was a deliberate choice on Congress' part. Indeed, the "problem of repetitive collateral litigation ha[d] absorbed the attention of Congress" prior to the passage of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See id*. at 238. Congress therefore enacted § 2244(b)(3)(A) in order to codify the courts of appeals' new role as gatekeepers between repeat litigants and district courts. *Id*. ("By assigning this role to the court of appeals, the AEDPA transfer[red] ... to the court of appeals a screening process previously performed by the district court." (internal quotations marks and citation omitted)). This case is a perfect example of why AEDPA mandates that repeat litigants seek pre-filing authorization from a court of appeals. Johnson not only seeks to file a second § 2255 motion, but to re-litigate the same intellectual disability claim he pursued in his first round of collateral attacks, and which both this Court and

8

**J.A.1442**

the Fourth Circuit rejected. *See Roane*, 378 F.3d at 408–09.

Because Johnson has not obtained, or even sought, pre-filing authorization from the Fourth Circuit to pursue the claim raised in the instant § 2255 motion, this Court lacks jurisdiction to consider it. *See Burton v. Stewart*, 549 U.S. 147, 157  (2007) ("Burton neither sought nor received authorization from the Court of Appeals before filing his 2002 petition, a 'second or successive' petition challenging his custody, and so the District Court was without jurisdiction to entertain it."); *Winestock*, 340 F.3d at 205 ("In the absence of pre-filing authorization, the district court lacks jurisdiction to consider an application containing abusive or repetitive claims."); *United States v. Elliott*, 785 F. App'x 201, 202 (4th Cir. 2019) ("In the absence of prefiling authorization from this court, the district court lacked jurisdiction to consider the motion." (citing 28 U.S.C. § 2244(b)(3))).  As the Seventh Circuit has put it, "[b]ecause a district judge lacks jurisdiction to rule on a successive such application without [the court of appeals'] permission, if he does so we must order his judgment vacated." *Curry v. United States*, 507 F.3d 603, 605 (7th Cir. 2007). If Johnson wishes to pursue the claim raised in the instant motion, he "must file in the court of appeals a motion for leave to file a second or successive habeas application in the district court." *Felker v. Turpin*, 518 U.S. 651, 657 (1996). Having failed to do so, he cannot initiate his latest collateral challenge before this Court.

Notwithstanding those well-established principles discussed above, Johnson contends that his motion is not a successive petition and is therefore not subject to pre-filing authorization under § 2244(b)(3). Johnson's sole argument on this score is that Federal Death Penalty Act (FDPA), 18 U.S.C. § 3596(c), "creates an independent, substantive prohibition on the implementation of the sentence based on intellectual disability." (ECF No. 86 at 45.) And, he claims, § 3596(c) "contemplates that, where applicable, a determination of 'mental retardation' will be made when

9

**J.A.1443**

the government sets an execution date." *Id*.

First, Johnson ignores that, as this Court and the Fourth Circuit have already concluded, Johnson's death sentence is controlled by the repealed procedures in 21 U.S.C. § 848, rather than the FDPA. *United States v. Roane*, No. 3:92cr68, 2020 WL 6370984, at \*16 n.8 (E.D.Va. Oct. 29, 2020) (citing *United States v. Stitt*, 552 F.3d 345, 354 (4th Cir. 2008)). Indeed, in Johnson's direct appeal, the Fourth Circuit squarely held that the FDPA's "general implementation provision, which authorize[s] the execution of any defendant 'sentenced to death *pursuant to this chapter*,' … does not by its terms apply to death sentences imposed under §848(e)." *Tipton*, 90 F.3d at 902 (citation omitted). Johnson suggests that the government nonetheless "agrees" with him that the FDPA controls here, citing the government's position with respect to Dustin Honken, who was executed in July 2020, Dkt. No. 86 at 2 n.3, but in that case the government was bound by Honken's 2005 criminal judgment, which—in stark contrast to Johnson's Execution Order—expressly invoked the FDPA. *See United States v. Honken*, CR01-3047-001-MWB (N.D. Iowa Oct. 11, 2005), Judgment in Criminal Case (attached as Exhibit C) at 2. In reality, the government has never represented that the FDPA is applicable to defendants like Johnson who were not sentenced under the FDPA, and Johnson errs by invoking the FDPA here.

Second, neither the FDPA nor a similarly-worded provision of the Anti-Drug Abuse Act of 1988 (under which Johnson was actually sentenced) functions, *sub silentio*, as an exception to § 2244(b)(3)(A)'s requirements. Johnson states that "[t]he plain language, structure, and statutory history of the FDPA establish that Mr. Johnson is permitted to raise his status as a person with intellectual disability now, at the time when he has a pending execution date." (*Id*. at 44.) But § 3596(c) does not override the limits on successive § 2255s, even if § 3596(c) applied to this case. *See Bourgeois v. Watson*, 977 F.3d 620, 632 (7th Cir. 2020), *cert. denied*, No. 20-

10

**J.A.1444**

6500, 2020 WL 7296816 (U.S. Dec. 11, 2020) (explaining, in rejecting a similar FDPA claim, that "there are two exceptions to [the] rule" that Section 2255 limits prisoners to "one shot at relief": prisoners can pursue a "second or successive motion" at the court of appeals, or can seek to invoke the "savings clause" of 2255(e)).

Johnson cites no relevant authority for the proposition that § 3596(c) operates as a standalone exception to the bar on successive petitions, and the government is aware of none. Couching a claim in the language of § 3596(c) is simply not enough to circumvent the requirements of § 2244(b)(3)(A). *Accord In re Wright*, 826 F.3d 774, 782 (4th Cir. 2016) ("Wright's assertion—that simply because he chose to fill out his claims on a form labeled '28 U.S.C. § 2241,' he should reap the benefits of § 2241's broad construction and subvert AEDPA's restrictions—would defeat this purpose. Such an interpretation would allow state prisoners to sidestep the statutory gatekeeping mechanisms present in § 2244 and § 2254, thereby thwart[ing] Congressional intent to restrict[] the availability of second and successive petitions through Section 2244(b). We cannot embrace such an interpretation." (internal quotations marks and citation omitted)).

Johnson's reliance on *Panetti v. Quarterman*, 551 U.S. 930 (2007), and *Stewart v. Martinez-Villareal*, 523 U.S. 637 (1998), for the proposition that "similar claims are not successive even though they are second-in-time because they should be litigated when an execution date is set" is misplaced. (ECF No. 86 at 45.) *Martinez-Villareal* declined to treat an identical second-in-time claim as successive because it was initially dismissed for failure to exhaust state remedies. 523 U.S. at 642–45; *see also id*. at 644 ("We believe that respondent's *Ford* claim here—previously dismissed as premature—should be treated in the same manner as the claim of a petitioner who returns to a federal habeas court after exhausting state remedies."). *Panetti* held that a numerically second § 2254 habeas petition was not successive because the claim was not ripe at

11

**J.A.1445**

the time of the initial petition. 551 U.S. at 942–47. *Martinez-Villareal* is irrelevant to the question presented, and *Panetti* is inapposite because Johnson did, in fact, raise the same intellectual disability claim in his prior § 2255 motion and on appeal. *Roane*, 378 F.3d at 408–09. He cannot, therefore, argue that his claim was unripe at the time of his first § 2255 motion when he raised that precise claim in 2004. Moreover, *Panetti* addressed unripe incompetency claims under *Ford v. Wainwright*, 477 U.S. 399 (1986), not intellectual disability claims under § 3596(c) or *Atkins v. Virginia*, 536 U.S. 304 (2002). That difference is critical to determining whether late-breaking claims should be deemed so unripe as to evade the strictures on successive petitions. As the Seventh Circuit recently noted in a related context, intellectual disability is a permanent condition, whereas incompetency may come and go in a short span of time. *See Bourgeois v. Watson*, 977 F.3d 620, 637–38 (7th Cir. 2020), *cert. denied*, No. 20-6500, 2020 WL 7296816 (U.S. Dec. 11, 2020); *see also Busby v. Davis*, 925 F.3d 699, 714 (5th Cir. 2019), *cert. denied*, 140 S. Ct. 897 (2020); *Williams v. Kelley*, 858 F.3d 464, 472 (8th Cir. 2017).

For similar reasons, Johnson errs in contending that the FDPA's prohibition on executing a person who "is" intellectually disabled means that he must be given the opportunity to bring a new intellectual-disability claim today based on "development and refinement in the medical profession." Dkt. No. 86 at 50 n.51. As the Seventh Circuit observed, Congress's use of the present tense verb "is" simply reflects the fact that "[i]ntellectual disability is a *permanent* condition that must manifest before the age of 18." *Id.* at 637 (emphasis added); *see Atkins*, 536 U.S. at 318. Given the early manifestation and continuous nature of intellectual disability, it would not have made sense for Congress to have phrased the statute differently, so as to proscribe, for example, "the execution of someone who merely 'was' intellectually disabled when they were sentenced, or who 'will be' intellectually disabled when their sentence is carried out." 977 F.3d at

12

637. As a permanent and continuing condition that must have manifested during youth, intellectual disability differs from "the temporary condition of incompetency, which may come and go." *Id.*; *see Ford v. Wainwright*, 477 U.S. 399 (1986).[1] Thus, unlike a competency claim—which challenges the *implementation* of the sentence during a particular, potentially transient, period of time—a claim of intellectual disability asserts that the sentence can *never* be carried out and is thus fundamentally unlawful. Such a challenge to the inherent lawfulness of the sentence is the proper subject of a § 2255 motion, *see* 28 U.S.C. § 2255(a), and is not exempt from that statute's requirements.

The legislative history of the FDPA does not suggest otherwise. The provision at issue here, § 3596(c), derives from language in the Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, Tit. VII, Subtit. A, § 7001(l), 102 Stat. 4390. *See, e.g., Atkins*, 536 U.S. at 314 & n.10. During debate on that legislation, the sponsor of the amendment that added the pertinent language stated that a defendant's intellectual-disability claim "would be handled *as any other defense* would be when it came to this kind of a crime or the sentencing thereof." 134 Cong. Rec. 22,993 (1988) (statement of Rep. Levin) (emphasis added). That statement undermines Johnson's argument that a prisoner can assert a new intellectual-disability claim "regardless of other relief sought previously." Dkt. No. 86 at 48. There is likewise no indication that Congress embraced petitioner's view of § 3596(c) when it adopted the current version of the FDPA.[2] The broader debate in

---

[1] Intellectual disability likewise differs from pregnancy, which Congress addressed separately in 18 U.S.C. § 3596(b). Notably, although Congress provided that a death sentence could not be carried out "upon a woman *while* she is pregnant," 18 U.S.C. § 3596(b) (emphasis added)—implying a transient condition—it did not use the same language in § 3596(c).

[2] From 1989 to 1994, Congress debated several iterations of the legislation that ultimately became the FDPA and based Section 3596(c) on language from the Anti-Drug Abuse Act of 1988. *See* S. Rep. No. 170, 101st Cong., 1st Sess. 23 (1989).

13

**J.A.1447**

Congress centered on streamlining and shortening the federal appeals process, not lengthening it. *See, e.g.*, 140 Cong. Rec. 10,238-10,240 (1994) (statement of Sen. Specter) ("appeals process has been vastly overdone").

Johnson notes (Dkt. No. 86 at 49) that, at one point during congressional debate, Senator Hatch expressed concern that the intellectual-disability provision would allow federal prisoners to raise the issue of intellectual disability "at any time," 136 Cong. Rec. 12,254 (May 24, 1990), and supported an amendment that would have modified the intellectual-disability provision to prohibit only the execution of intellectually disabled persons "who do not know the difference between right and wrong," *id.* at 12,251 (statement of Sen. Thurmond); *see id.* at 12,254-12,255. Johnson suggests that because the FDPA does not include that proposed language, Congress necessarily agreed with Senator Hatch that the provision would permit federal prisoners to raise the issue of intellectual disability "at any time." But the Supreme Court has cautioned against attributing the views of a single legislator to the entire Congress and against drawing inferences from proposed, but unenacted, legislation. *See, e.g., Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990). Both of those admonitions apply here, and in any event, the most natural inference to be drawn from the history highlighted by Johnson is that Congress wished to prohibit the execution of all intellectually disabled persons, not just those "who do not know the difference between right and wrong." 136 Cong. Rec. at 12,251.

## Conclusion

Johnson seeks to re-litigate the intellectual disability claim that this Court and the Fourth Circuit rejected in 2004. But he failed to obtain preauthorization for his filing from the Fourth Circuit, depriving this Court of jurisdiction to adjudicate his successive § 2255 motion.

**J.A.1448**

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney

By:            /s/

Richard D. Cooke
Joseph Attias
Assistant United States Attorneys

15

**J.A.1449**

**Certificate of Service**

I certify that on December 21, 2020, I filed electronically the foregoing with the Clerk of

Court using the CM/ECF system, which will serve all counsel of record.


By:    _____/s/_____

Richard D. Cooke
Assistant United States Attorney

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **Case No. 3:92CR68 (DJN)** |
| | : | **CAPITAL CASE** |
| **COREY JOHNSON,** | : | **EXECUTION** |
| | : | **SCHEDULED FOR** |
| Defendant. | : | **JANUARY 14, 2021** |

**COREY JOHNSON'S REPLY PURSUANT TO DECEMBER 15, 2020 ORDER**

The government's response to Mr. Johnson's § 2255 Motion ("Motion") contains

numerous inaccuracies and confuses the pertinent issues before this Court.  Although he

disagrees with the government's merits argument, Mr. Johnson will not address the merits in this

pleading because that would be outside the scope of this Court's Order and would be improper

before jurisdiction is established.  Order at 2, ECF No. 95; *see also Trustgard Ins. Co. v. Collins*,

942 F.3d 195, 200-01 (4th Cir. 2019) (holding that courts may not assume hypothetical

jurisdiction to reach merits); *Leal Garcia v. Quarterman*, 573 F.3d 214, 224-25 & n.4 (5th Cir.

2009) (vacating district court's alternative merits analysis of second-in-time capital habeas

petition).

I.      **The Government's Response Relies on Several Misunderstandings of Law**

The government argues that Mr. Johnson cannot proceed in this Court because he did not

seek authorization from the Fourth Circuit.  Gov't Response ("GR") at 7-9.  According to the

government, Mr. Johnson's "sole argument" in support of this Court's jurisdiction is the

language of § 3596(c)[1] and that statute cannot be an exception to the successor requirements

---

[1] The language of § 848(*l*) and § 3596(c) is identical; both provide a "sentence of death shall not
be carried out upon a person who is mentally retarded."  Mr. Johnson's Motion references both.

because it would allow prisoners to circumvent the prohibitions on successive applications.  GR at 9-10.  Not so.  This circular reasoning does not aid this Court's analysis because it simply avoids the very issue before it: Does the specific language adopted by Congress allow a determination of mental retardation to be made at the time a death sentence is to be implemented?  If it does, as Mr. Johnson has shown, his claim is not successive.

The government repeatedly, but erroneously, conflates the statutory claim with Eighth Amendment jurisprudence.  The government cites to *Atkins v. Virginia*, 536 U.S. 304 (2002), throughout but in so doing misses the import of the federal statute.  Mr. Johnson raised a statutory claim premised on the right Congress created to prevent the execution of persons with mental retardation.  Many cases cited by the government are simply inapposite.  *Busby v. Davis*, 925 F.3d 699 (5th Cir. 2019), and *Williams v. Kelley*, 858 F.3d 464 (8th Cir. 2017), for example, rejected arguments that a state prisoner could raise an Eighth Amendment *Atkins* claim in a second-in-time non-successive application.  But these cases have no bearing on whether a federal statute (which expressly provides that a determination of mental retardation can be made when the sentence is to be implemented) is non-successive.  *Busby*, in fact, supports Mr. Johnson's position, stating "Texas law is less demanding than federal law in this regard," 925 F.3d at 712, meaning the statutes of the jurisdiction of conviction (Texas in *Busby* and federal law here) may allow a second-in-time pleading notwithstanding a court's interpretation of *Atkins*.

Neither is the Seventh Circuit's recent decision in *Bourgeois v. Watson*, 977 F.3d 620 (7th Cir. 2020), germane to the jurisdictional question before this Court.  Bourgeois sought relief under § 2241 which requires a threshold showing that the § 2255 remedy is "inadequate or

2

ineffective." *Id*. at 627.  The circuit decision precluding § 2241 relief is not relevant to whether § 2255 allows a remedy under the distinct and unique circumstances in Mr. Johnson's case.[2]

The government also asserts that "*Panetti* is inapposite because Johnson did . . . raise the same intellectual disability claim in his prior § 2255 motion and on appeal."  GR at 12.  The government misunderstands the history of *Stewart v. Martinez-Villareal*, 523 U.S. 637 (1998), and *Panetti v. Quarterman*, 551 U.S. 930 (2007), and misconstrues their significance.  In 1998, *Martinez-Villareal* held that a claim "previously dismissed as premature" should not be treated as a successive habeas petition.  523 U.S. at 644-45.  The Court declined to decide whether the successor bar applies to a claim raised first after the initial round of habeas review.  *Id*. at 645.

The Court did not finally resolve that issue until 2007 in *Panetti* when it held that when such claims are raised after conclusion of the initial habeas review they should still be considered non-successive.  551 U.S. at 945.  The best practice—between *Martinez-Villareal* and *Panetti*, the very time Mr. Johnson was litigating his § 2255 motion—was to raise all claims, even those which were potentially to be litigated at a future date.  Failure to do so could be fatal.  *See Richardson v. Johnson*, 256 F.3d 257, 259 (5th Cir. 2001) (refusing to hear *Ford* claim not raised in initial petition because petitioner's mental illness was long-standing and claim could have been discovered previously); *see also In re Provenzano*, 215 F.3d 1233, 1235 (11th Cir. 2000) (same).  That Mr. Johnson raised his claim in his prior § 2255 does not render *Panetti* inapposite.

Moreover, the previous consideration of his claim also has no bearing on the jurisdictional question.  Although initially-pleaded non-successive claims were often dismissed as premature, some district courts during this period resolved them on the merits even when no

---

[2] This is especially true because Bourgeois went to trial after *Atkins* was decided and he was also afforded a week-long hearing on his claim during his § 2255 proceedings.

execution date was imminent.  *See, e.g.*, *Jacobs v. Cockrell*, No. 97-CV-2728, 2002 WL 172629 at *34-36 (N.D. Tex. Jan. 31, 2002) (finding petitioner competent to be executed during initial habeas review).  This did not, however, somehow transform any future claim into a successor and thus preclude its litigation.  Contrary to the government's suggestion, a claim's procedural history (especially during the time when Mr. Johnson's was litigated) does not obviate the need to inquire whether it is second-in-time yet non-successive.  In sum, none of the government's arguments undermines Mr. Johnson's right to challenge the carrying out of his execution when it is scheduled.  Both the plain language and legislative history of § 3596 permit such a challenge.

## II.    The Government Misunderstands the Statutory History of § 3596(c)

To the extent that the Court needs to look beyond the plain language of the ADAA and FDPA, which both enact a statutory bar for the execution of the intellectually disabled, the government's arguments on statutory interpretation fail for myriad reasons.  First, the government's argument that Mr. Johnson's case is controlled by the ADAA rather than the FDPA is both wrong and a reversal of its prior position.  As Mr. Johnson noted in his Motion, *see* Motion at 2 n.3, the government previously admitted as much in pleadings in the D.C. lethal injection lawsuit.[3]  Based, in part, on the government's assertions, the district court agreed.  *See* Mem. Op. at 3, *In the Matter of the Fed. Bureau of Prisons' Execution Protocol Cases*, 19-mc-00145-TSC (Nov. 20, 2019), ECF No. 50 ("Plaintiffs' cases are governed by the FDPA because when the death penalty portions of the ADAA were repealed in 2006, the FDPA was 'effectively render[ed] . . . applicable to all federal death-eligible offenses.'") (quoting *United States v.*

---

[3] The government now argues that it "was bound by Honken's 2005 criminal judgment, which—in stark contrast to Johnson's Execution Order—expressly invoked the FDPA."  GR at 10.  This is false.  Honken was granted partial § 2255 relief, and the remaining operative death sentences were only § 848 counts.  His judgment was amended in 2013, and thus the D.C. litigation related only to those death sentences.  *See* Ex. 1 (Honken Amended Judgment).

*Barrett*, 496 F.3d 1079, 1106 (10th Cir. 2007)).  Notably, *United States v. Tipton*, 90 F.3d 861 (4th Cir. 1996), relied on by the government, predates the repeal in 2006 of the death penalty portions of the ADAA.[4]

Regardless of the government's current position, § 848 and § 3596 *both* bar the execution of someone with intellectual disability.  Not only did the plain language of § 848 make clear that it pertains to the time period when the sentence of death is to "be carried out," the Supreme Court has acknowledged that § 848 reached past sentencing to the execution itself.  *See Atkins*, 536 U.S. at 314 n.10 (citing the ADAA, and explaining "Congress expanded the federal death penalty law in 1994.  It *again* included a provision that prohibited any individual with mental retardation from being sentenced to death *or executed*." (emphasis added) (citation omitted)).  If the Supreme Court understood § 3596 as imposing a one-time decision regarding intellectual disability made only at the time of sentencing, as the government advances in its response, the Court would have written only "sentenced to death" and not included "or executed."

Second, the structure and statutory history of § 3596 make clear that intellectual disability is to be determined after an execution date is set, reinforcing the statute's plain language. Section 848 had no overarching structure—§ 848(k), for example, governed how juries should apply aggravating and mitigating factors, factors not presented until §§ 848(m) and (n); § 848(q) concerned the appeal process, but § 848(*l*) discussed carrying out the execution.

When Congress wrote the FDPA, it rearranged the sections to chronologically follow a typical death penalty case.  Section 3591 begins with a guilty verdict, and § 3597 ends with

---

[4] Furthermore, this Court's conclusion in *United States v. Roane* regarding the relationship between § 848 and § 3596 relates to sentencing provisions, not the implementation of the death penalty.  *See* No. 92cr68, 2020 WL 6370984, at *16 n.8 (E.D. Va. Oct. 29, 2020) (quoting *United States v. Stitt*, 552 F.3d 345, 354 (4th Cir. 2008)).

5

execution procedures.  Congress also created an "implementation" section, one notably absent from § 848.  Where Congress prohibited "carrying out" death sentences[5] on juveniles, the mentally retarded, and the insane in the ADAA, it chose to include only mental retardation and insanity in the FDPA implementation section, and added the new pregnancy category.  Congress moved the prohibition on executing juveniles to § 3591(a), a section titled "sentence of death," thus clearly indicating this issue was to be determined at sentencing, not at the time of execution, a sensible distinction.  Whether a defendant is under 18 is an immutable fact.  By contrast, the intellectual disability bar was moved to § 3596.  In doing so, Congress placed it between the pregnancy and mental capacity bars—two conditions that can only be assessed on the eve of an execution, conditions that even the government would appear to acknowledge, *see* GR at 13, are suitably challenged when execution is imminent.[6]  By the statute's structure, Congress made clear its intent that seeking § 3596(c) relief is available when an execution warrant has been issued.  Motion at 47-48.

---

[5] Congress's language choice in the ADAA and FDPA indicates its intent for the determination of mental retardation to be when an execution is imminent.  "Carry out" and "implement" are synonymous:

> Implementing a sentence means carrying it out.  *See Implement*, Webster's Third New International Dictionary . . . ("to carry out: accomplish, fulfill"); *Implementation Plan*, Black's Law Dictionary . . . ("An outline of steps needed to accomplish a particular goal."). . . .  [U]nder the FDPA, "implementation" of a death sentence involves only conduct that immediately precedes the execution. . . . "[I]mplementation" does not include scheduling the execution, but instead presupposes a set time and date.

*In re Fed. Bureau of Prisons' Execution Protocol Cases*, No. 20-5361, slip op. at 5 (D.C. Cir. Dec. 10, 2020) (Katsas, J., concurring).

[6] There has been unambiguous development in the medical and legal standards such that a person who was determined to not have intellectual disability in 1993 could be determined to have intellectual disability in 2020.  And, this is precisely one point Congress meant to capture by placing intellectual disability in § 3596(c).  *See* Motion Sections III and IV.A.

**J.A.1456**

Third, the government's attacks on Mr. Johnson's reliance on the legislative history miss the mark on both grounds. Senator Hatch's floor speech criticized the meaning of the plain language of the intellectual disability bar enacted in the ADAA two years prior to the Senate debate. Senator Hatch understood the plain language of the existing bar provided multiple opportunities across a span of time to raise an intellectual disability bar. Congress rejected the proposed change and preserved the existing bar as is. Senator Hatch's critique was not to "proposed, but unenacted, legislation," GR at 14, but was to enacted legislation (the ADAA) and a proposal—the Biden Amendment—that reconfirmed the language of the ADAA,[7] recognition that both statutes permitted a defendant to litigate his intellectual disability at the time of execution despite any prior filings.

## III.    Conclusion

Mr. Johnson respectfully requests the Court find that it has jurisdiction to consider his non-successive § 2255 motion, set a briefing schedule, and set the date for an evidentiary hearing, so that Mr. Johnson can present evidence of his intellectual disability.

Dated: December 24, 2020                              Respectfully submitted,

/s/ David E. Carney
David E. Carney, VA Bar #: 43914
Donald P. Salzman (Admitted Pro Hac Vice)
Skadden, Arps, Slate, Meagher & Flom, LLP
1440 New York Avenue, NW
Washington, DC 20005
Telephone: (202) 371-7246
Fax: (202) 661-8295
Email: david.carney@skadden.com
*Counsel for Corey Johnson*

---

[7] The government also takes Congressman Levin's statement out of context; he was responding to a comment about "the burden" of proof being "on the defense." *See* Motion Ex. 78 (134 Cong. Rec. 22,926, 22,993 (1988)). It also is unclear why the government would rely on the statement of Congressman Levin to reflect the intent of the entire Congress when it contends that Mr. Johnson's reliance on the statements of a single senator is contrary to Supreme Court precedent.

7

**J.A.1457**

**CERTIFICATE OF SERVICE**

I hereby certify that on the 24th of December, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send notification of such filing to all parties and counsel included on the Court's Electronic Mail notice list.

/s/ David E. Carney
David E. Carney, VA Bar #: 43914
Skadden, Arps, Slate, Meagher & Flom, LLP
1440 New York Avenue, NW
Washington, DC 20005
Telephone: (202) 371-7246
Fax: (202) 661-8295
Email: david.carney@skadden.com

**J.A.1458**

# EXHIBIT 1

AO 245C (Rev. 11/11) Amended Judgment in a Criminal Case      (NOTE: Identify Changes with Asterisks (*))
Sheet 1

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF IOWA

| | |
|---|---|
| UNITED STATES OF AMERICA<br>V.<br>**DUSTIN LEE HONKEN** | **AMENDED JUDGMENT IN A CRIMINAL CASE** |

Date of Original Judgment: __October 11, 2005__
(Or Date of Last Amended Judgment)

Case Number:    **CR 01-3047-001-LRR**
USM Number:    **06951-029**
\* Shawn Nolan & Timothy Patrick Kane
Defendant's Attorney

## Reason for Amendment:

☐ Correction of Sentence on Remand (18 U.S.C. 3742(f)(1) and (2))

☐ Reduction of Sentence for Changed Circumstances (Fed. R. Crim. P. 35(b))

☐ Correction of Sentence by Sentencing Court (Fed. R. Crim. P. 35(a))

☐ Correction of Sentence for Clerical Mistake (Fed. R. Crim. P. 36)

**Asterisks (\*) denote changes from Original Judgment**

☐ Modification of Supervision Conditions (18 U.S.C. §§ 3563(c) or 3583(e))

☐ Modification of Imposed Term of Imprisonment for Extraordinary and Compelling Reasons (18 U.S.C. § 3582(c)(1))

☐ Modification of Imposed Term of Imprisonment for Retroactive Amendment(s) to the Sentencing Guidelines (18 U.S.C. § 3582(c)(2))

■ Direct Motion to District Court Pursuant ■ 28 U.S.C. § 2255 or ☐ 18 U.S.C. § 3559(c)(7)

☐ Modification of Restitution Order (18 U.S.C. § 3664)

### THE DEFENDANT:

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____ which was accepted by the court.

■ was found guilty on count(s) __1 through 17 of the Superseding Indictment__ after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section Nature of Offense | | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. §§ 1512(a)(1)(A) & (C), 1513(a)(1)(A) & (B) & 1111 | Witness Tampering | 07/25/1993 | 1 |
| 18 U.S.C. §§ 1512(a)(1)(C), 1512(a)(2)(A) & 1111 | Witness Tampering | 07/25/1993 | 2 |
| 18 U.S.C. §§ 1512(a)(1)(C), 1512(a)(2)(A) & 1111 | Witness Tampering | 07/25/1993 | 3 |
| 18 U.S.C. §§ 1512(a)(1)(C), 1512(a)(2)(A) & 1111 | Witness Tampering | 07/25/1993 | 4 |

The defendant is sentenced as provided in pages 2 through ___6___ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

\*■ Count(s) __8 through 12 of the Superseding Indictment are vacated but are subject to being reinstated by the District Court.__

It is ordered that the defendant must notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

__October 4, 2013__
Date of Imposition of Judgment

Signature of Judge

__Linda R. Reade, Chief U.S. District Judge__
Name and Title of Judge

October 8, 2013
Date

AO 245C    (Rev. 11/11) Amended Judgment in a Criminal Case
Sheet 1A

(NOTE: Identify Changes with Asterisks (*))

Judgment — Page __1(a)__ of ___6___

DEFENDANT:      **DUSTIN LEE HONKEN**
CASE NUMBER:    **CR 01-3047-001-LRR**

## ADDITIONAL COUNTS OF CONVICTION

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. §§ 1512(a)(1)(C), 1512(a)(2)(A) & 1111 | **Witness Tampering** | 11/05/1993 | 5 |
| 18 U.S.C. §§ 373(a)(1) & 2 | **Soliciting the Murder of a Witness** | 02/24/1998 | 6 |
| 18 U.S.C. § 371 | **Conspiracy to Tamper with Witnesses and to Solicit the Murder of Witnesses** | 01/01/2000 | 7 |
| 21 U.S.C. §§ 848(e)(1)(A), 18 U.S.C. § 2 | **Conspiracy to Commit Murder While Engaging in the Manufacture and Distribution of Methamphetamine** | 07/25/1993 | 8 |
| 21 U.S.C. §§ 848(e)(1)(A), 18 U.S.C. § 2 | **Conspiracy to Commit Murder While Engaging in the Manufacture and Distribution of Methamphetamine** | 07/25/1993 | 9 |
| 21 U.S.C. §§ 848(e)(1)(A), 18 U.S.C. § 2 | **Conspiracy to Commit Murder While Engaging in the Manufacture and Distribution of Methamphetamine** | 07/25/1993 | 12 |
| 21 U.S.C. §§ 848(e)(1)(A), 18 U.S.C. § 2 | **Conspiracy to Commit Murder While Engaging in the Manufacture and Distribution of Methamphetamine** | 07/25/1993 | 10 |
| 21 U.S.C. §§ 848(e)(1)(A), 18 U.S.C. § 2 | **Conspiracy to Commit Murder While Engaging in the Manufacture and Distribution of Methamphetamine** | 07/25/1993 | 11 |
| 21 U.S.C. § 848(e)(1)(A) 18 U.S.C. § 371 | **Continuing Criminal Enterprise Murder** | 07/25/1993 | 13 |
| 21 U.S.C. § 848(e)(1)(A) 18 U.S.C. § 371 | **Continuing Criminal Enterprise Murder** | 07/25/1993 | 14 |
| 21 U.S.C. § 848(e)(1)(A) 18 U.S.C. § 371 | **Continuing Criminal Enterprise Murder** | 11/05/1993 | 17 |
| 21 U.S.C. § 848(e)(1)(A) 18 U.S.C. § 371 | **Continuing Criminal Enterprise Murder** | 07/25/1993 | 15 |
| 21 U.S.C. § 848(e)(1)(A) 18 U.S.C. § 371 | **Continuing Criminal Enterprise Murder** | 07/25/1993 | 16 |

J.A.1461

AO 245C    (Rev. 11/11) Amended Judgment in a Criminal Case
          Sheet 2 — Imprisonment                                         (NOTE: Identify Changes with Asterisks (*))

Judgment — Page   2   of   6  

DEFENDANT:     **DUSTIN LEE HONKEN**
CASE NUMBER:     **CR 01-3047-001-LRR**

# IMPRISONMENT

**✱**   The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of: **Death on Counts 15, and 16**.

Furthermore the defendant is committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of: **Life. This term consists of Life on Counts 1, 2, 3, 4, 5, 13, 14 and 17; 20 years on Count 6; 5 years on Count 7, all counts to be served concurrently.**

**Pursuant to 18 U.S.C. § 3596, you are committed to the custody of the Bureau of Prisons until exhaustion of the procedures for appeal of the judgment of conviction and review of sentence. When the sentence is to be implemented, the Attorney General shall release the defendant to the custody of a United States Marshal, who shall supervise implementation of the sentence in the manner prescribed by the law of the State of Indiana.**

☐   The court makes the following recommendations to the Bureau of Prisons:

■   The defendant is remanded to the custody of the United States Marshal.

☐   The defendant shall surrender to the United States Marshal for this district:

    ☐   at _____   ☐ a.m.   ☐ p.m.   on _____ .

    ☐   as notified by the United States Marshal.

☐   The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐   before 2 p.m. on _____ .

    ☐   as notified by the United States Marshal.

    ☐   as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

_____

_____

_____

Defendant delivered on _____ to _____

a _____ with a certified copy of this judgment.

_____
                        UNITED STATES MARSHAL

By _____
                        DEPUTY UNITED STATES MARSHAL

J.A.1462

AO 245C    (Rev. 11/11) Amended Judgment in a Criminal Case
            Sheet 3 — Supervised Release                                                    (NOTE: Identify Changes with Asterisks (*))

Judgment—Page ___3___ of ___6___

DEFENDANT:       **DUSTIN LEE HONKEN**
CASE NUMBER:     **CR 01-3047-001-LRR**

# SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of: **3 years on each count, to be served concurrently**.

      The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

      The defendant shall not commit another federal, state, or local crime.

      The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

☐    The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse. (Check, if applicable.)

■    The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon. (Check, if applicable.)

■    The defendant shall cooperate in the collection of DNA as directed by the probation officer. (Check, if applicable.)

☐    The defendant shall register with the state sex offender registration agency in the state where the defendant resides, works, or is a student, as directed by the probation officer. (Check, if applicable.)

☐    The defendant shall participate in an approved program for domestic violence. (Check, if applicable.)

      If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

      The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

# STANDARD CONDITIONS OF SUPERVISION

1)   the defendant shall not leave the judicial district without the permission of the court or probation officer;

2)   the defendant shall report to the probation officer in a manner and frequency directed by the court or probation officer;

3)   the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4)   the defendant shall support his or her dependents and meet other family responsibilities;

5)   the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6)   the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

7)   the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8)   the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9)   the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10)   the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11)   the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12)   the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court; and

13)   as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record, personal history, or characteristics and shall permit the probation officer to make such notifications and confirm the defendant's compliance with such notification requirement.

J.A.1463

AO 245C       (Rev. 11/11) Amended Judgment in a Criminal Case
              Sheet 3C — Supervised Release

Judgment—Page ___4___ of ___6___

DEFENDANT:          **DUSTIN LEE HONKEN**
CASE NUMBER:        **CR 01-3047-001-LRR**

## SPECIAL CONDITIONS OF SUPERVISION

*The defendant must comply with the following special conditions as ordered by the Court and implemented by the U.S. Probation Office:*

Not applicable

Upon a finding of a violation of supervision, I understand the Court may: (1) revoke supervision; (2) extend the term of supervision; and/or (3) modify the condition of supervision.

These conditions have been read to me. I fully understand the conditions and have been provided a copy of them.

_____         _____
Defendant                                               Date

_____         _____
U.S. Probation Officer/Designated Witness                    Date

J.A.1464

AO 245C    (Rev. 11/11) Amended Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

(NOTE: Identify Changes with Asterisks (*))

Judgment — Page __5__ of __6__

DEFENDANT:    **DUSTIN LEE HONKEN**
CASE NUMBER:  **CR 01-3047-001-LRR**

## CRIMINAL MONETARY PENALTIES

The defendant must pay the following total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Fine | Restitution |
|---|---|---|---|
| **TOTALS** | $ * 1,200 | $ 0 | $ 75,942.67 |

☐    The determination of restitution is deferred until_____.  An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

■    The defendant shall make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below.  However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss* | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| **Amber Duncan Estate** | | $7,941.98 | 1 |
| **Candice Duncan Estate** | | $6,031.99 | 1 |
| **Gregory Nicholson** | | $10,429.60 | 1 |
| **Lori Duncan Estate** | | $13,533.00 | 1 |
| **Terry DeGeus Estate** | | $16,869.48 | 1 |
| **Brenda DeGeus** | | $1,366.40 | 2 |
| **Brian DeGeus** | | $800.00 | 2 |
| **Wendy Jensen** | | $248.00 | 2 |
| **Rhonda Francis** | | $397.76 | 2 |
| **Federal Crime Victim Fund** | | $6,305.28 | 3 |
| **Globe Life and Accident Insurance Company** | | $12,000.00 | 4 |

| **TOTALS** | $_____ | $ 75,942.67 |
|---|---|---|

☐    Restitution amount ordered pursuant to plea agreement  $ _____

☐    The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f).  All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

■    The court determined that the defendant does not have the ability to pay interest, and it is ordered that:

■    the interest requirement is waived for    ☐ fine    ■ restitution.

☐    the interest requirement for the    ☐ fine    ☐ restitution is modified as follows:

* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

J.A.1465

AO 245C    (Rev. 11/11) Amended Judgment in a Criminal Case
            Sheet 6 — Schedule of Payments                                    (NOTE: Identify Changes with Asterisks (*))

|  |  |
|---|---|
| DEFENDANT: **DUSTIN LEE HONKEN** | Judgment — Page __6__ of __6__ |
| CASE NUMBER: **CR 01-3047-001-LRR** | |

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties shall be due as follows:

**A**  ☐  Lump sum payment of $ _____ due immediately, balance due

    ☐  not later than _____ , or
    ☐  in accordance with  ☐  C,  ☐  D,  ☐  E, or  ☐  F below; or

**B**  ■  Payment to begin immediately (may be combined with  ☐ C,  ☐ D, or  ■ F below); or

**C**  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of  $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

**D**  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of  $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a term of supervision; or

**E**  ☐  Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F**  ■  Special instructions regarding the payment of criminal monetary penalties:

    **While incarcerated, you shall make monthly payments in accordance with the Bureau of Prison's Financial Responsibility Program. The amount of the monthly payments shall not exceed 50% of the funds available to you through institution or non-institution (community) resources and shall be at least $25 per quarter.**

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

    Defendant and Co-Defendant Names and Case Numbers (including defendant number), Joint and Several Amount, and corresponding payee, if appropriate.

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☐  The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

J.A.1466

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

*Richmond Division*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Criminal No. 3:92-cr-68 (DJN) |
| | ) | |
| COREY JOHNSON, | ) | |
| | ) | |
| Defendant. | ) | |

## United States' Motion for Leave to File
## Supplemental Authority

The United States respectfully moves pursuant to Local Criminal Rule 47(F)(1) for permission to file a supplemental authority. Last evening, the United States District Court for the District of Columbia issued an opinion addressing whether the Federal Death Penalty Act, 18 U.S.C. § 3591 *et seq.*, or the repealed capital procedures in 21 U.S.C. § 848 of the Anti-Drug Abuse Act govern the execution of defendant Johnson.

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney

By: _____/s/_____
Richard D. Cooke
Joseph Attias
Assistant United States Attorneys

**J.A.1467**

**Certificate of Service**

I certify that on December 31, 2020, I filed electronically the foregoing with the Clerk of

Court using the CM/ECF system, which will serve all counsel of record.


By:      _____/s/_____

Richard D. Cooke
Assistant United States Attorney

J.A.1468

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

*Richmond Division*

UNITED STATES OF AMERICA,     )
                              )
      v.                )      Criminal No. 3:92-cr-68 (DJN)
                              )
COREY JOHNSON,          )
                              )
     Defendant.     )

### United States' Notice of Supplemental Authority

The United States respectfully notifies this Court that last evening, the United States District Court for the District of Columbia issued an opinion, which is attached to this notice, addressing whether the Federal Death Penalty Act, 18 U.S.C. § 3591 *et seq.*, or the repealed capital procedures in 21 U.S.C. § 848 of the Anti-Drug Abuse Act govern the execution of defendant Johnson and concluded that the repealed procedures in § 848 control. *See In the Matter of Federal Bureau of Prisons' Execution Protocol Cases*, No. 19-mc-145 (TSC), Dkt. No. 378 (D.D.C.).

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney

By:                 /s/
            Richard D. Cooke
            Joseph Attias
            Assistant United States Attorneys

**J.A.1469**

**Certificate of Service**

I certify that on December 31, 2020, I filed electronically the foregoing with the Clerk of

Court using the CM/ECF system, which will serve all counsel of record.


By:    _____/s/_____
                        Richard D. Cooke
                        Assistant United States Attorney

**J.A.1470**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| In the Matter of the ) | |
| Federal Bureau of Prisons' Execution ) | |
| Protocol Cases, ) | |
| ) | |
| LEAD CASE: *Roane, et al. v. Barr* ) | Case No. 19-mc-145 (TSC) |
| ) | |
| THIS DOCUMENT RELATES TO: ) | |
| ) | |
| *Roane v. Barr*, 05-cv-2337 ) | |
| ) | |

**MEMORANDUM OPINION**

Plaintiff Cory Johnson has moved for relief from judgment pursuant to Fed. R. Civ.

P. 60(b)(1), (3), and (6) (ECF No. 364), and to compel discovery, (ECF No. 363). Because

Johnson lacks standing to sue under the Federal Death Penalty Act (FDPA), both motions will be

DENIED.

**I.      BACKGROUND**

Johnson is one of several federal death row inmates who filed an amended complaint

challenging Defendants' implementation of their executions pursuant to the Federal Bureau of

Prisons' execution protocol (the 2019 Protocol). Among other things, Plaintiffs alleged that the

2019 Protocol violates § 3596(a) of the FDPA which requires the federal government to

implement an execution "in the manner prescribed by the law of the State in which the sentence

is imposed." 18 U.S.C. § 3596(a). To support their claim, Plaintiffs identified several

differences between the 2019 Protocol and laws in the various states in which Plaintiffs were

sentenced. In the case of Johnson, who was sentenced to death in Virginia, Plaintiffs pointed to

Va. Code Ann. § 53.1-234, which allows a condemned inmate to choose between electrocution

and lethal injection as the method of execution.

1

**J.A.1471**

Defendants, in moving for summary judgment on the FDPA claim, took the position that the 2019 Protocol "'allows the federal government to depart from its procedures as necessary to conform to state statutes and regulations,' which [the Bureau of Prisons] is prepared to do if such circumstances arise." (ECF No. 170 at 32 (quoting *In re Fed. Bureau of Prisons' Execution Protocol Cases*, 955 F.3d 106, 112 (D.C. Cir. 2020)).) In light of that representation, on September 14, 2020, the court ordered Defendants "to file a notice . . . indicating whether they are prepared to deviate from the procedures of the 2019 Execution Protocol to accommodate" the statutes identified by Plaintiffs, including Va. Code. Ann. § 53.1-234. In no uncertain terms, the court further instructed that if Defendants "have not determined whether they will comply with a given statute, they shall so indicate."

In response to the court's Order, on September 15, 2020 Defendants filed a notice in which they stated:

> [T]he South Carolina and Virginia statutes identified by the Court provide that condemned inmates may choose between lethal injection and electrocution, and if they do not do so before a certain number of days prior to the scheduled execution, the manner of execution shall be lethal injection. *See* S.C. Code § 24-3-530(A) and Va. Code Ann. § 53.1-234. As those provisions are incorporated by the FDPA even on the government's interpretation of the statute, the government will not execute any plaintiff whose sentence was issued in federal court in Virginia or South Carolina and is subject to the FDPA (see 18 U.S.C. §§ 3591, 3596) without complying with those provisions of S.C. Code § 24-3-530(A) or Va. Code Ann. § 53.1-234.

(ECF No. 247 at 5.)

On September 20, 2020, the court granted Defendants' motion for summary judgment, relying in large part on the representations made in Defendants' September 15 notice. (*See* ECF No. 261 at 27 ("Defendants stated that 'the government will not execute any plaintiff whose sentence was issued in federal court in Virginia or South Carolina and is subject to the FDPA without complying with those provisions of S.C. Code § 24-3-530(A) or Va. Code Ann. § 53.1-

2

234.' . . . Thus, the court is satisfied that there is no live controversy as to the alleged discrepancies between the 2019 Protocol and the relevant South Carolina, Virginia, and Missouri laws.").)  Accordingly, at Plaintiffs' request, the court entered partial final judgment in Defendants' favor on November 16, 2020.  (ECF No. 315.)

On November 18, 2020, the D.C. Circuit upheld this court's grant of summary judgment for Defendants on the FDPA claim, also based, in part, on Defendants' agreement to comply with the relevant provisions of state law.  *In re Fed. Bureau of Prisons' Execution Protocol Cases*, 980 F.3d 123, 138 (D.C. Cir. 2020) (noting the existence of "a governmental agreement to comply").

Meanwhile, the parties engaged in discovery.  Johnson served five interrogatories and five requests for documents on Defendants seeking information regarding his possible selection of electrocution for his method of execution.  (*See* ECF Nos. 363-2, 363-3.)  On December 11, 2020, Defendants informed Johnson's counsel that they "will be objecting to the requests wholesale as seeking irrelevant information."  (ECF No. 363-5 at 3.)  Defendants assert that the discovery requests were "based on the incorrect premise that Mr. Johnson may select electrocution as a method of execution under the Federal Death Penalty Act and Virginia law."  (*Id.*)  Defendants also noted that "even if Mr. Johnson were able to select electrocution as a method of execution, he has not done so, making the requested information doubly irrelevant."  (*Id.*)

In their formal response to Johnson's discovery request, Defendants reiterated their relevance objection to each interrogatory and document request.  (*See generally* ECF No. 363-4.)  They also invoked the deliberative process privilege and the law enforcement privilege.

3

**J.A.1473**

## II.    DISCUSSION

In light of Defendants' refusal to provide him the option to choose between death by electrocution or lethal injection, Johnson filed a motion to compel discovery and a motion for relief from the court's November 16, 2020 entry of partial final judgment in Defendants' favor on the FDPA claim. The main issue in both motions is whether Johnson's death sentence is subject to the FDPA or the Anti-Drug Abuse Act (ADAA), an earlier federal death penalty statute. Johnson argues that Defendants are judicially estopped from asserting that the FDPA does not apply to him based on this court's prior rulings and the fact that Defendants have taken the exact opposite position in this litigation. Defendants argue that the Fourth Circuit has already ruled that Johnson's sentence is subject to the ADAA and therefore collateral estoppel precludes relitigating the issue.

The court will address Johnson's motion for relief from judgment first. Rule 60(b) allows a court to relieve a party from a final judgment for: mistake, inadvertence, surprise, or excusable neglect, Fed. R. Civ. P. 60(b)(1); fraud, misrepresentation, or other misconduct by an opposing party, Fed. R. Civ. P. 60(b)(3); or "any other reason that justifies relief," Fed. R. Civ. P. (60(b)(6). The party seeking relief from judgment bears the burden of proof. *See Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 383–84 (1992); *Green v. Am. Federation of Labor*, 287 F.R.D. 107, 109 (D.D.C. 2012).

"[T]he decision to grant or deny a rule 60(b) motion is committed to the discretion of the District Court." *United Mine Workers of Am. 1974 Pension v. Pittston Co.*, 984 F.2d 469, 476 (D.C. Cir. 1993). "Relief under Rule 60(b)(1) turns on equitable factors." *Elec. Priv. Info. Ctr. v. Dep't of Homeland Sec.*, 811 F. Supp. 2d 216, 225 (D.D.C. 2011). Under Rule 60(b)(3), the moving party must show that the misrepresentation "prevented him or her from fully and fairly presenting his or her case" and that the misrepresentation "is attributable to the party or, at least,

4

to counsel." *See Richardson v. Nat'l R.R. Passenger Corp.*, 150 F.R.D. 1, 7 (D.D.C. 1993), *aff'd*, 49 F.3d 760 (D.C. Cir. 1995). And, finally, a relief from judgment under Rule 60(b) requires the movant to show "'extraordinary circumstances' justifying the reopening of a final judgment." *Salazar ex rel. Salazar v. District of Columbia*, 633 F.3d 1110, 1116 (D.C. Cir. 2011) (quoting *Ackermann v. United States*, 340 U.S. 193, 199 (1950)).

Though the court agrees that Defendants have changed their position during this litigation, Johnson has failed to establish standing and, thus, is unable to secure the relief afforded by Rule 60(b). In one of their first filings in this consolidated action, Defendants described the statutory scheme as follows: "The FDPA did not initially govern death sentences, like [former Plaintiff Dustin Honken's], under the ADAA, 21 U.S.C. § 848(e) (1988) [but i]n 2006, Congress repealed the capital provisions of § 848, 'effectively rendering the FDPA applicable to all federal death-eligible offenses.'" (ECF No. 36 at 5 n.1 (quoting *United States v. Barrett*, 496 F.3d 1079, 1106 (10th Cir. 2007)).) Former Plaintiff Honken, like Johnson, was sentenced while the ADAA was in effect—thus, Defendants clearly took the position at the beginning of this litigation that all plaintiffs were subject to the FDPA.

And despite the fact that Defendants' September 15, 2020 notice to the court was carefully worded, it was nevertheless misleading. Defendants stated, unequivocally, that Va. Code. Ann. § 53.1-234 was "incorporated by the FDPA even on the government's interpretation of the statute," and that "the government will not execute any plaintiff whose sentence was issued in federal court in Virginia . . . and is subject to the FDPA (see 18 U.S.C. §§ 3591, 3596) without complying with" that provision. (ECF No. 247 at 5.) Defendants did reserve the right to deny an inmate the choice of an alternate execution method if they were not sentenced under the FDPA. But under Defendants' new position, not a single plaintiff sentenced to death in Virginia in this case would fall under the FDPA. Thus, Defendants' September 15 representation was

5

disingenuous and obfuscated its response to the court's inquiry as to whether it intended to allow the plaintiffs sentenced in Virginia to choose their method of execution.

Defendants' misleading representation notwithstanding, the court cannot apply judicial estoppel, an equitable remedy. The question of whether Johnson can invoke the FDPA is an issue of standing, which cannot be waived or bypassed by equitable principles. *See Barrett*, 496 F.3d at 1106 (holding that condemned inmate sentenced to death under the ADAA "lack[ed] standing to challenge the FDPA because he was not sentenced to death under that Act."); *La Botz v. Fed. Election Comm'n*, 61 F. Supp. 3d 21, 27 (D.D.C. 2014) (quoting *Hasse v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987) ("[A] defect of standing is a defect in subject matter jurisdiction.").

The court finds that the FDPA, by its plain terms, does not apply to an inmate sentenced under the ADAA.[1] Section 3596(a) applies only to "[a] person who has been sentenced to death pursuant to this chapter"—namely, chapter 228 of Title 18. Johnson, however, was sentenced to death under chapter 13 of Title 21. Nothing in the FDPA purports to apply to inmates condemned under a different statutory regime. *See United States v. Stitt*, 552 F.3d 345, 352–53 (4th Cir. 2008) (explaining that the FDPA cannot be read to encompass a sentence under the ADAA, which appeared in a different title of the United States Code); *Tipton*, 90 F.3d at 902 (holding that § 3596(a) of the FDPA "does not by its terms apply to death sentences imposed

---

[1] Contrary to Defendants' position, the issue of whether the FDPA applied to Johnson, as framed here, was not squarely addressed in *Tipton v. United States*, 90 F.3d 861 (4th Cir. 1996), which was decided before the death penalty provisions of the ADAA were repealed in 2006. Thus, collateral estoppel does not apply because the issue here—whether Johnson has standing to invoke the FDPA given the repeal of the ADAA—was not decided. *See, e.g.*, *Capital Servs. Mgmt., Inc. v. Vesta Corp.*, 933 F.3d 784, 794 (D.C. Cir. 2019) (quoting *Walker v. FedEx Office & Print Servs., Inc.*, 123 A.3d 160, 164 (D.C. 2015)) (explaining that collateral estoppel applies where, inter alia, "the issue is actually litigated"). Nevertheless, *Tipton* is instructive.

under [the ADAA]" because it only applies to the execution of persons 'sentenced to death pursuant to this chapter'" (quoting 18 U.S.C. § 3596(a))); *United States v. Flores*, 63 F.3d 1342, 1369 (5th Cir. 1995) (holding that a portion of the FDPA was inapplicable to the defendant because it was not in effect at the time of his sentencing).

Johnson provides no precedent to the contrary. In fact, the case upon which he relies most heavily supports the court's conclusion. *See Barrett*, 496 F.3d at 1106 (explaining that though "Congress repealed the death penalty provisions of [the ADAA], effectively rendering the FDPA applicable to all federal death-eligible offenses . . . [the plaintiff] lacks standing to challenge the FDPA because he was not sentenced to death under that Act").[2]

Johnson also contends that this court has already found that the FDPA applies. To be sure, in one of its first opinions in this case, the court explained that "Plaintiffs' cases are governed by the FDPA because when the death penalty portions of the ADAA were repealed in 2006, the FDPA was effectively rendered . . . applicable to all federal death-eligible offenses." (ECF No. 50 at 3.) But, again, the court cannot waive a jurisdictional defect, even when raised late in a case. *See, e.g., Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434–35 (2011) ("Objections to subject-matter jurisdiction [] may be raised at any time . . . . Indeed, a party may

---

[2] Citing *United States v. Hager*, Johnson also claims that "[o]ther courts have found that the FDPA is capable of replacing repealed portions of the ADAA." (ECF No. 366 at 7 n.2 (citing 530 F. Supp. 2d 778 (E.D. Va. 2008)).) In *Hager*, the court ruled that "only the procedural provisions of the FDPA apply to this defendant," relying on the Savings Statute, which preserves the penalty, forfeiture or liability imposed by a repealed statute but not procedures set forth therein. *Id.* at 782, 785 (discussing 1 U.S.C. § 109). The *Hager* court found that the procedures set forth in §§ 848(g), (h), (i), and (k) (now-repealed provisions of the ADAA) were procedural and thus were not preserved by the Savings Statute. This conclusion appears to contradict the Fourth Circuit's assessment of the repealed provisions of the ADAA in *Stitt*, which found that §§ 848(g)–(r) were all preserved by the Savings Statute because "the [death] penalty provided in [the ADAA] cannot be fully preserved without also preserving the mechanisms for enforcing it." *Stitt*, 552 F.3d at 354. Thus, the court is not convinced that the *Hager* decision supports Johnson's position. In any event, *Hager* does not address whether the implementation provision of the FDPA is substantive or procedural and thus offers limited guidance.

7

J.A.1477

raise such an objection even if the party had previously acknowledged the [] court's jurisdiction.")

Because Johnson lacks standing to invoke the FDPA, his motion to compel discovery will also be denied. Under Rule 26, a party "may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. Pro. 26(b)(1). Since Johnson is not entitled to select electrocution as a method of execution, his discovery requests are irrelevant to his claims in the present litigation.

## III.    CONCLUSION

Accordingly, Johnson's motions for relief under Fed. R. Civ. P. 60(b) and to compel discovery must be DENIED.

The court finds it ironic that, throughout this litigation, Defendants have repeatedly decried filings by Plaintiffs and rulings by the court on the eve of an execution but have, themselves, gone a step further by reversing their litigation position at the last minute. Accordingly, Defendants shall provide notice by January 1, 2021, indicating which other plaintiffs they believe lack standing to bring challenges under the FDPA. By the same date, Defendants shall also show cause as to why they did not assert this standing issue when they moved for summary judgment or when the court issued its September 14, 2020 show cause order. The court will issue a separate order accordingly.

Date: December 30, 2020

*Tanya S. Chutkan*

TANYA S. CHUTKAN
United States District Judge

8

**J.A.1478**

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

*Richmond Division*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Criminal No. 3:92-cr-68 (DJN) |
| | ) | |
| COREY JOHNSON, | ) | |
| | ) | |
| Defendant. | ) | |

**United States' Notice of Supplemental Authority**

The United States respectfully notifies this Court that last evening, the United States

District Court for the District of Columbia issued an opinion, which is attached to this notice,

addressing whether the Federal Death Penalty Act, 18 U.S.C. § 3591 *et seq.*, or the repealed capital

procedures in 21 U.S.C. § 848 of the Anti-Drug Abuse Act govern the execution of defendant

Johnson and concluded that the repealed procedures in § 848 control. *See In the Matter of Federal*

*Bureau of Prisons' Execution Protocol Cases*, No. 19-mc-145 (TSC), Dkt. No. 378 (D.D.C.).

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney

By:      _____/s/_____
Richard D. Cooke
Joseph Attias
Assistant United States Attorneys

**J.A.1479**

**Certificate of Service**

I certify that on December 31, 2020, I filed electronically the foregoing with the Clerk of

Court using the CM/ECF system, which will serve all counsel of record.


By:  _____/s/_____

Richard D. Cooke
Assistant United States Attorney

2

**J.A.1480**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| In the Matter of the Federal Bureau of Prisons' Execution Protocol Cases, ) ) ) ) ) | |
| LEAD CASE: *Roane, et al. v. Barr* ) | Case No. 19-mc-145 (TSC) |
| ) | |
| THIS DOCUMENT RELATES TO: ) | |
| ) | |
| *Roane v. Barr*, 05-cv-2337 ) ) | |

## MEMORANDUM OPINION

Plaintiff Cory Johnson has moved for relief from judgment pursuant to Fed. R. Civ. P. 60(b)(1), (3), and (6) (ECF No. 364), and to compel discovery, (ECF No. 363). Because Johnson lacks standing to sue under the Federal Death Penalty Act (FDPA), both motions will be DENIED.

## I. BACKGROUND

Johnson is one of several federal death row inmates who filed an amended complaint challenging Defendants' implementation of their executions pursuant to the Federal Bureau of Prisons' execution protocol (the 2019 Protocol). Among other things, Plaintiffs alleged that the 2019 Protocol violates § 3596(a) of the FDPA which requires the federal government to implement an execution "in the manner prescribed by the law of the State in which the sentence is imposed." 18 U.S.C. § 3596(a). To support their claim, Plaintiffs identified several differences between the 2019 Protocol and laws in the various states in which Plaintiffs were sentenced. In the case of Johnson, who was sentenced to death in Virginia, Plaintiffs pointed to Va. Code Ann. § 53.1-234, which allows a condemned inmate to choose between electrocution and lethal injection as the method of execution.

1

**J.A.1481**

Defendants, in moving for summary judgment on the FDPA claim, took the position that the 2019 Protocol "'allows the federal government to depart from its procedures as necessary to conform to state statutes and regulations,' which [the Bureau of Prisons] is prepared to do if such circumstances arise." (ECF No. 170 at 32 (quoting *In re Fed. Bureau of Prisons' Execution Protocol Cases*, 955 F.3d 106, 112 (D.C. Cir. 2020)).) In light of that representation, on September 14, 2020, the court ordered Defendants "to file a notice . . . indicating whether they are prepared to deviate from the procedures of the 2019 Execution Protocol to accommodate" the statutes identified by Plaintiffs, including Va. Code. Ann. § 53.1-234. In no uncertain terms, the court further instructed that if Defendants "have not determined whether they will comply with a given statute, they shall so indicate."

In response to the court's Order, on September 15, 2020 Defendants filed a notice in which they stated:

> [T]he South Carolina and Virginia statutes identified by the Court provide that condemned inmates may choose between lethal injection and electrocution, and if they do not do so before a certain number of days prior to the scheduled execution, the manner of execution shall be lethal injection. *See* S.C. Code § 24-3-530(A) and Va. Code Ann. § 53.1-234. As those provisions are incorporated by the FDPA even on the government's interpretation of the statute, the government will not execute any plaintiff whose sentence was issued in federal court in Virginia or South Carolina and is subject to the FDPA (see 18 U.S.C. §§ 3591, 3596) without complying with those provisions of S.C. Code § 24-3-530(A) or Va. Code Ann. § 53.1-234.

(ECF No. 247 at 5.)

On September 20, 2020, the court granted Defendants' motion for summary judgment, relying in large part on the representations made in Defendants' September 15 notice. (*See* ECF No. 261 at 27 ("Defendants stated that 'the government will not execute any plaintiff whose sentence was issued in federal court in Virginia or South Carolina and is subject to the FDPA without complying with those provisions of S.C. Code § 24-3-530(A) or Va. Code Ann. § 53.1-

2

234.' . . . Thus, the court is satisfied that there is no live controversy as to the alleged discrepancies between the 2019 Protocol and the relevant South Carolina, Virginia, and Missouri laws.").) Accordingly, at Plaintiffs' request, the court entered partial final judgment in Defendants' favor on November 16, 2020. (ECF No. 315.)

On November 18, 2020, the D.C. Circuit upheld this court's grant of summary judgment for Defendants on the FDPA claim, also based, in part, on Defendants' agreement to comply with the relevant provisions of state law. *In re Fed. Bureau of Prisons' Execution Protocol Cases*, 980 F.3d 123, 138 (D.C. Cir. 2020) (noting the existence of "a governmental agreement to comply").

Meanwhile, the parties engaged in discovery. Johnson served five interrogatories and five requests for documents on Defendants seeking information regarding his possible selection of electrocution for his method of execution. (*See* ECF Nos. 363-2, 363-3.) On December 11, 2020, Defendants informed Johnson's counsel that they "will be objecting to the requests wholesale as seeking irrelevant information." (ECF No. 363-5 at 3.) Defendants assert that the discovery requests were "based on the incorrect premise that Mr. Johnson may select electrocution as a method of execution under the Federal Death Penalty Act and Virginia law." (*Id.*) Defendants also noted that "even if Mr. Johnson were able to select electrocution as a method of execution, he has not done so, making the requested information doubly irrelevant." (*Id.*)

In their formal response to Johnson's discovery request, Defendants reiterated their relevance objection to each interrogatory and document request. (*See generally* ECF No. 363-4.) They also invoked the deliberative process privilege and the law enforcement privilege.

3

## II.    DISCUSSION

In light of Defendants' refusal to provide him the option to choose between death by electrocution or lethal injection, Johnson filed a motion to compel discovery and a motion for relief from the court's November 16, 2020 entry of partial final judgment in Defendants' favor on the FDPA claim.  The main issue in both motions is whether Johnson's death sentence is subject to the FDPA or the Anti-Drug Abuse Act (ADAA), an earlier federal death penalty statute.  Johnson argues that Defendants are judicially estopped from asserting that the FDPA does not apply to him based on this court's prior rulings and the fact that Defendants have taken the exact opposite position in this litigation.  Defendants argue that the Fourth Circuit has already ruled that Johnson's sentence is subject to the ADAA and therefore collateral estoppel precludes relitigating the issue.

The court will address Johnson's motion for relief from judgment first.  Rule 60(b) allows a court to relieve a party from a final judgment for: mistake, inadvertence, surprise, or excusable neglect, Fed. R. Civ. P. 60(b)(1); fraud, misrepresentation, or other misconduct by an opposing party, Fed. R. Civ. P. 60(b)(3); or "any other reason that justifies relief," Fed. R. Civ. P. (60(b)(6).  The party seeking relief from judgment bears the burden of proof.  *See Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 383–84 (1992); *Green v. Am. Federation of Labor*, 287 F.R.D. 107, 109 (D.D.C. 2012).

"[T]he decision to grant or deny a rule 60(b) motion is committed to the discretion of the District Court." *United Mine Workers of Am. 1974 Pension v. Pittston Co.*, 984 F.2d 469, 476 (D.C. Cir. 1993).  "Relief under Rule 60(b)(1) turns on equitable factors." *Elec. Priv. Info. Ctr. v. Dep't of Homeland Sec.*, 811 F. Supp. 2d 216, 225 (D.D.C. 2011).  Under Rule 60(b)(3), the moving party must show that the misrepresentation "prevented him or her from fully and fairly presenting his or her case" and that the misrepresentation "is attributable to the party or, at least,

4

to counsel." *See Richardson v. Nat'l R.R. Passenger Corp.*, 150 F.R.D. 1, 7 (D.D.C. 1993), *aff'd*, 49 F.3d 760 (D.C. Cir. 1995). And, finally, a relief from judgment under Rule 60(b) requires the movant to show "'extraordinary circumstances' justifying the reopening of a final judgment." *Salazar ex rel. Salazar v. District of Columbia*, 633 F.3d 1110, 1116 (D.C. Cir. 2011) (quoting *Ackermann v. United States*, 340 U.S. 193, 199 (1950)).

Though the court agrees that Defendants have changed their position during this litigation, Johnson has failed to establish standing and, thus, is unable to secure the relief afforded by Rule 60(b). In one of their first filings in this consolidated action, Defendants described the statutory scheme as follows: "The FDPA did not initially govern death sentences, like [former Plaintiff Dustin Honken's], under the ADAA, 21 U.S.C. § 848(e) (1988) [but i]n 2006, Congress repealed the capital provisions of § 848, 'effectively rendering the FDPA applicable to all federal death-eligible offenses.'" (ECF No. 36 at 5 n.1 (quoting *United States v. Barrett*, 496 F.3d 1079, 1106 (10th Cir. 2007)).) Former Plaintiff Honken, like Johnson, was sentenced while the ADAA was in effect—thus, Defendants clearly took the position at the beginning of this litigation that all plaintiffs were subject to the FDPA.

And despite the fact that Defendants' September 15, 2020 notice to the court was carefully worded, it was nevertheless misleading. Defendants stated, unequivocally, that Va. Code. Ann. § 53.1-234 was "incorporated by the FDPA even on the government's interpretation of the statute," and that "the government will not execute any plaintiff whose sentence was issued in federal court in Virginia . . . and is subject to the FDPA (see 18 U.S.C. §§ 3591, 3596) without complying with" that provision. (ECF No. 247 at 5.) Defendants did reserve the right to deny an inmate the choice of an alternate execution method if they were not sentenced under the FDPA. But under Defendants' new position, not a single plaintiff sentenced to death in Virginia in this case would fall under the FDPA. Thus, Defendants' September 15 representation was

5

disingenuous and obfuscated its response to the court's inquiry as to whether it intended to allow the plaintiffs sentenced in Virginia to choose their method of execution.

Defendants' misleading representation notwithstanding, the court cannot apply judicial estoppel, an equitable remedy. The question of whether Johnson can invoke the FDPA is an issue of standing, which cannot be waived or bypassed by equitable principles. *See Barrett*, 496 F.3d at 1106 (holding that condemned inmate sentenced to death under the ADAA "lack[ed] standing to challenge the FDPA because he was not sentenced to death under that Act."); *La Botz v. Fed. Election Comm'n*, 61 F. Supp. 3d 21, 27 (D.D.C. 2014) (quoting *Hasse v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987) ("[A] defect of standing is a defect in subject matter jurisdiction.").

The court finds that the FDPA, by its plain terms, does not apply to an inmate sentenced under the ADAA.[1] Section 3596(a) applies only to "[a] person who has been sentenced to death pursuant to this chapter"—namely, chapter 228 of Title 18. Johnson, however, was sentenced to death under chapter 13 of Title 21. Nothing in the FDPA purports to apply to inmates condemned under a different statutory regime. *See United States v. Stitt*, 552 F.3d 345, 352–53 (4th Cir. 2008) (explaining that the FDPA cannot be read to encompass a sentence under the ADAA, which appeared in a different title of the United States Code); *Tipton*, 90 F.3d at 902 (holding that § 3596(a) of the FDPA "does not by its terms apply to death sentences imposed

---

[1] Contrary to Defendants' position, the issue of whether the FDPA applied to Johnson, as framed here, was not squarely addressed in *Tipton v. United States*, 90 F.3d 861 (4th Cir. 1996), which was decided before the death penalty provisions of the ADAA were repealed in 2006. Thus, collateral estoppel does not apply because the issue here—whether Johnson has standing to invoke the FDPA given the repeal of the ADAA—was not decided. *See, e.g.*, *Capital Servs. Mgmt., Inc. v. Vesta Corp.*, 933 F.3d 784, 794 (D.C. Cir. 2019) (quoting *Walker v. FedEx Office & Print Servs., Inc.*, 123 A.3d 160, 164 (D.C. 2015)) (explaining that collateral estoppel applies where, inter alia, "the issue is actually litigated"). Nevertheless, *Tipton* is instructive.

under [the ADAA]" because it only applies to the execution of persons 'sentenced to death pursuant to this chapter'" (quoting 18 U.S.C. § 3596(a))); *United States v. Flores*, 63 F.3d 1342, 1369 (5th Cir. 1995) (holding that a portion of the FDPA was inapplicable to the defendant because it was not in effect at the time of his sentencing).

Johnson provides no precedent to the contrary. In fact, the case upon which he relies most heavily supports the court's conclusion. *See Barrett*, 496 F.3d at 1106 (explaining that though "Congress repealed the death penalty provisions of [the ADAA], effectively rendering the FDPA applicable to all federal death-eligible offenses . . . [the plaintiff] lacks standing to challenge the FDPA because he was not sentenced to death under that Act").[2]

Johnson also contends that this court has already found that the FDPA applies. To be sure, in one of its first opinions in this case, the court explained that "Plaintiffs' cases are governed by the FDPA because when the death penalty portions of the ADAA were repealed in 2006, the FDPA was effectively rendered . . . applicable to all federal death-eligible offenses." (ECF No. 50 at 3.) But, again, the court cannot waive a jurisdictional defect, even when raised late in a case. *See, e.g.*, *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434–35 (2011) ("Objections to subject-matter jurisdiction [] may be raised at any time . . . . Indeed, a party may

---

[2] Citing *United States v. Hager*, Johnson also claims that "[o]ther courts have found that the FDPA is capable of replacing repealed portions of the ADAA." (ECF No. 366 at 7 n.2 (citing 530 F. Supp. 2d 778 (E.D. Va. 2008)).) In *Hager*, the court ruled that "only the procedural provisions of the FDPA apply to this defendant," relying on the Savings Statute, which preserves the penalty, forfeiture or liability imposed by a repealed statute but not procedures set forth therein. *Id.* at 782, 785 (discussing 1 U.S.C. § 109). The *Hager* court found that the procedures set forth in §§ 848(g), (h), (i), and (k) (now-repealed provisions of the ADAA) were procedural and thus were not preserved by the Savings Statute. This conclusion appears to contradict the Fourth Circuit's assessment of the repealed provisions of the ADAA in *Stitt*, which found that §§ 848(g)–(r) were all preserved by the Savings Statute because "the [death] penalty provided in [the ADAA] cannot be fully preserved without also preserving the mechanisms for enforcing it." *Stitt*, 552 F.3d at 354. Thus, the court is not convinced that the *Hager* decision supports Johnson's position. In any event, *Hager* does not address whether the implementation provision of the FDPA is substantive or procedural and thus offers limited guidance.

7

raise such an objection even if the party had previously acknowledged the [] court's jurisdiction.")

Because Johnson lacks standing to invoke the FDPA, his motion to compel discovery will also be denied. Under Rule 26, a party "may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. Pro. 26(b)(1). Since Johnson is not entitled to select electrocution as a method of execution, his discovery requests are irrelevant to his claims in the present litigation.

### III.    CONCLUSION

Accordingly, Johnson's motions for relief under Fed. R. Civ. P. 60(b) and to compel discovery must be DENIED.

The court finds it ironic that, throughout this litigation, Defendants have repeatedly decried filings by Plaintiffs and rulings by the court on the eve of an execution but have, themselves, gone a step further by reversing their litigation position at the last minute. Accordingly, Defendants shall provide notice by January 1, 2021, indicating which other plaintiffs they believe lack standing to bring challenges under the FDPA. By the same date, Defendants shall also show cause as to why they did not assert this standing issue when they moved for summary judgment or when the court issued its September 14, 2020 show cause order. The court will issue a separate order accordingly.

Date:  December 30, 2020


*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge


8

**J.A.1488**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 3:92CR68 (DJN)** |
| | : | **CAPITAL CASE** |
| **COREY JOHNSON,** | : | |
| | : | |
| **Defendant.** | : | |

## NOTICE OF APPEAL

Notice is hereby given that the defendant in the above-captioned case hereby appeals to the United States Court of Appeals for the Fourth Circuit from the Order dismissing for want of jurisdiction Defendant's Motion Pursuant to 28 U.S.C. § 2255 Raising Claim of Ineligibility to be Executed Under 18 U.S.C. § 3596(c) entered in this case on the 2nd day of January 2021.

Respectfully submitted,

Dated: January 4, 2021

/s/ _____
David E. Carney, VA Bar # 43914
Donald P. Salzman*
Lotus D. Ryan, VA Bar # 71425
Skadden, Arps, Slate, Meagher & Flom, LLP
1440 New York Avenue, NW
Washington, DC 20005
Telephone: (202) 371-7246
Fax: (202) 661-8295
Email: david.carney@skadden.com

*Admitted Pro Hac Vice

*Counsel for Corey Johnson*

**J.A.1489**

**CERTIFICATE OF SERVICE**

I hereby certify that on the 4th day of January 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send notification of such filing to all parties and counsel included on the Court's Electronic Mail notice list.

/s/
David E. Carney, VA Bar # 43914
Skadden, Arps, Slate, Meagher & Flom, LLP
1440 New York Avenue, NW
Washington, DC 20005
Telephone: (202) 371-7246
Fax: (202) 661-8295
Email: david.carney@skadden.com

2

**J.A.1490**