**EXECUTION SCHEDULED FOR JANUARY 14, 2021**

No. 21-1

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

_____

**UNITED STATES OF AMERICA,**

**Plaintiff – Appellee,**

**v.**

**COREY JOHNSON, A/K/A O, A/K/A CO,**

**Defendant – Appellant.**

_____

**JOINT APPENDIX VOLUME I**

_____

Donald P. Salzman
Jonathan Marcus
David E. Carney
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue, NW
Washington, DC 20005
(202) 371-7983
donald.salzman@skadden.com
*Counsel for Appellant Corey Johnson*

PAGE(S)

## VOLUME I

## I.  DOCKET SHEET

E.D. Va. Docket Sheet, No. 92CR68 (1992-2019)..............................................J.A.1

E.D. Va. Docket Sheet, No. 92CR68 (2020) ...................................................J.A.25


## II. RELEVANT INDICTMENT, ORDERS AND OPINIONS

Second Superseding Indictment, July 20, 1992...................................................J.A.33

Order (Dec. 15, 2020), ECF No 95...................................................................J.A.55

Memorandum Opinion (Dismissing § 2255 Petition) (Jan. 2, 2021), ECF
   No. 99.........................................................................................................J.A.58

Order (Granting Motion for Leave to File Supplemental Authority) (Jan.
   2, 2021), ECF No. 100...............................................................................J.A.80

Order (Dismissing § 2255 Petition) (Jan. 2, 2021), ECF No. 102....................J.A.81


## III. OTHER RELEVANT FILINGS

Notice of Execution Date (Nov. 20, 2020), ECF No. 78..................................J.A.82

Motion Pursuant to 28 U.S.C. § 2255 Raising Claim of Ineligibility To Be
   Executed under 18 U.S.C. § 3596(c) (Dec. 14, 2020), ECF No. 86............J.A.84

Index of Exhibits to Motion Pursuant to 28 U.S.C. § 2255 Raising Claim
   of Ineligibility To Be Executed under 18 U.S.C. § 3596(c), ECF No.
   86-1 ..........................................................................................................J.A.143

Ex. 1, Report of Daniel J. Reschly, Ph.D., Aug. 26, 2016, ECF No. 86-2.....J.A.148

Ex. 1a, Curriculum Vitae of Daniel J. Reschly, Ph.D., May 15, 2020,
   ECF No. 86-3 .............................................................................................J.A.199

Ex. 2, Report of J. Gregory Olley, Ph.D., Aug. 24, 2016, ECF No. 86-4 ......J.A.251

1

Ex. 2a, Curriculum Vitae of J. Gregory Olley, Ph.D., Oct. 2020,
ECF No. 86-5 ....................................................................................... J.A.299

Ex. 3, Letter from Gary N. Siperstein, Ph.D. to Counsel for Corey
Johnson, Dec. 16, 2016, ECF No. 86-6 .................................................. J.A.318

Ex. 3a, Curriculum Vitae of Gary N. Siperstein, Ph.D., Sept. 2020,
ECF No. 86-7 ....................................................................................... J.A.332

## VOLUME II

Ex. 4, Debra Nelson, Mitigation Report, Sept. 27, 2016, ECF No. 86-8 ....... J.A.355

Ex. 5, Report of Richard G. Dudley, Jr., M.D., Aug. 22, 2016,
ECF No. 86-9 ....................................................................................... J.A.391

Ex. 6, Trial Tr., Feb. 3, 1993, ECF No. 86-10 .................................................. J.A.411

Notice of Submission of Exhibit 7, ECF No. 87 ............................................. J.A.426

## VOLUME III

Exs. 7-1 – 7-3, Trial Tr., Feb. 10, 1993, ECF Nos. 87-2 – 87-4 ..................... J.A.433

Notice of Submission of Exhibits, ECF No. 88 ............................................. J.A.519

Ex. 8, Cornell Mitigation Information and Report (Excerpt),
ECF No. 88-2 ....................................................................................... J.A.526

Ex. 9, Trial Tr., Feb. 12, 1993, ECF No. 88-3 ................................................. J.A.546

## VOLUME IV

Ex. 10, Trial Tr., Feb. 15, 1993, ECF No. 88-4 ............................................. J.A.611

Ex. 11, Declaration of Kenneth Barish, Ph.D. (staff psychologist at
Pleasantville Cottage School), July 22, 2014, ECF No. 88-5 ..................... J.A.623

Ex. 12, Affidavit of Richard Benedict (special education teacher at
Pleasantville Cottage School), Dec. 5, 2011, ECF No. 88-6 ..................... J.A.635

Ex. 13, Affidavit of Darnell Brown (acquaintance in Trenton, NJ),
Oct. 14, 2011, ECF No. 88-7 .........................................................................J.A.647

Ex. 14, Affidavit of Darold Brown (acquaintance in Trenton, NJ),
June 15, 2011, ECF No. 88-8 .........................................................................J.A.652

Ex. 15, Affidavit of Craig S. Cooley (appointed counsel in 1992),
Sept. 20, 2016, ECF No. 88-9.........................................................................J.A.659

Ex. 16, Affidavit of Courtney Daniels (Corey's lifelong friend),
May 21, 2011, ECF No. 88-10 .......................................................................J.A.669

Ex. 17, Declaration of Monica Dawkins (Corey's former girlfriend),
July 16, 2012, ECF No. 88-11 .......................................................................J.A.675

Notice of Submission of Exhibits, ECF No. 89..............................................J.A.678

Ex. 18 Declaration of Cary Gallaudet, Ph.D. (psychologist at
Pleasantville Diagnostic Center), Mar. 19, 2012,
ECF Nos. 89-2 – 89-3 ....................................................................................J.A.685

Ex. 19, Declaration of Ann Harding (staff member at Pleasantville
Cottage School), Nov. 21, 2011, ECF No. 89-4.........................................J.A.696

Ex. 20, Affidavit of Minnie Hodges (Corey's maternal aunt),
Apr. 30, 2011, ECF No. 89-5..........................................................................J.A.699

Ex. 21, Affidavit of Priscilla Hodges (Corey's cousin), Apr. 30, 2011,
ECF No. 89-6...................................................................................................J.A.710

Ex. 22, Affidavit of Queenie Hodges (Corey's cousin), Apr. 30, 2011,
ECF No. 89-7 ..................................................................................................J.A.718

Ex. 23, Declaration of Esther Johnson (Corey's maternal grandmother),
Apr. 30, 2011, ECF No. 89-8...........................................................................J.A.722

Ex. 24, Affidavit of Robert Johnson (Corey's half-brother),
June 29, 2011, ECF No. 89-9 .........................................................................J.A.728

Ex. 25, Affidavit of Antionette Daniels Joseph (the best friend of Corey's
mother and Corey's godmother), May 21, 2011, ECF No. 89-10.............J.A.740

Ex. 26, Declaration of Leona Klerer (reading teacher at Mount Pleasant
Cottage School), June 3, 2011, ECF No. 89-11 ........................................J.A.752

Ex. 27, Affidavit of Gerald Lefkowitz (unit administrator at Pleasantville
Cottage Center), Dec. 5, 2011, ECF No. 89-12........................................J.A.760

Ex. 28, Affidavit of Odette Noble (social worker at Elmhurst),
Dec. 1, 2011, ECF No. 89-13 ..................................................................J.A.765

3

Ex. 29, Declaration of George Sakheim, Ph.D. (Chief of Psychological Services at Pleasantville Diagnostic Center), June 17, 2011, ECF No. 89-14 ..................................................................................... J.A.772

Ex. 30, Affidavit of David Washington (childcare worker at Elmhurst), Mar. 1, 2012, ECF No. 89-15 ................................................................ J.A.807

Notice of Submission of Exhibits, ECF No. 90 ............................................... J.A.811

Ex. 31, Gregory Judge, School Social Worker, Social History, Mar. 4, 1977, ECF No. 90-2 ...................................................................... J.A.818

Ex. 32, Cheryl Spillane, Learning Consultant, Bureau of Pupil Personnel Services, Jersey City Public Schools, Learning Consultant Evaluation to Child Study Team, Mar. 18, 1977, ECF No. 90-3 ............................... J.A.822

Ex. 33, F.A. Figurelli, M.D., Chief Psychologist, Psychological Examination Record, Mar. 25, 1977, ECF No. 90-4 ............................... J.A.827

Ex. 34, Eleanor Glantz, Social Worker, Case Service, Dec. 11, 1978, ECF No. 90-5 ................................................................................... J.A.830

Ex. 35, Committee on the Handicapped, Referral to the Committee on the Handicapped, Feb. 26, 1979, ECF No. 90-6 .............................. J.A.832

Ex. 36, Committee on the Handicapped Records, May 21, 1979, ECF No. 90-7 ................................................................................... J.A.837

## VOLUME V

Ex. 37, Washington Heights-West Harlem Community Mental Health Center, Child Assessment Evaluation Summary, Dec. 9, 1981, ECF No. 90-8 ................................................................................... J.A.863

Ex. 38, Ernest H. Adams, Staff Psychologist, Psychodiagnostic Evaluation, Dec. 11, 1981, ECF No. 90-9 ................................................ J.A.865

Ex. 39, Cary Gallaudet, Psy.D., Pleasantville Cottage School, Psychological Evaluation, Feb. 1, 1982, ECF No. 90-10 .......................... J.A.868

Ex. 40, Leona Klerer, Mount Pleasant Cottage School Screening Upon Admission, Feb. 22, 1982, ECF No. 90-11 ............................................. J.A.872

Ex. 41, Amira Offer, Caseworker, Psychosocial Summary, Mar. 15, 1982, ECF No. 90-12 .................................................................... J.A.876

Ex. 42, Gloria Caro, Pleasantville Cottage School, Reassessment
Summary, May 21, 1982 , ECF No. 90-13.................................................J.A.882

Ex. 43, Gloria Caro, Caseworker, Initial Conference, Current Assessment
and Transfer Summary, June 9, 1982, ECF No. 90-14 ............................J.A.896

Ex. 44, Gayle Turnquest, Caseworker, Pleasantville Cottage School,
Current Assessment, Jan. 31, 1983, ECF No. 90-15 .................................J.A.902

Notice of Submission of Exhibits, ECF No. 91................................................J.A.905

Ex. 45, Ken Barish, Ph.D., Psychologist, Pleasantville Cottage School,
Psychological and Educational Evaluation, Apr. 29, 1983,
ECF No. 91-2 .........................................................................................J.A.912

Ex. 46, John B. Stadler, M.D., Clinical Director, Pleasantville Cottage
School, Psychiatric Evaluation, Aug. 26, 1983, ECF No. 91-3 ................J.A.916

Ex. 47, Lynda Coccaro, Speech and Language Pathologist, Donald R.
Reed Speech Center, Inc., Phelps Memorial Hospital, Speech and
Language Evaluation, Oct. 5, 1983, ECF No. 91-4...................................J.A.919

Ex. 48, Lynn Polstein, Jewish Child Care Association of New York,
Pleasantville Cottage School, Change in Permanency Plan,
Apr. 13, 1984, ECF No. 91-5...................................................................J.A.925

Ex. 49, Gerard Maier, Social Worker, Current Assessment, Sept. 4, 1984,
ECF No. 91-6 .........................................................................................J.A.931

Ex. 50, Christine Aaron, MSW Intern, Jewish Child Care Association of
New York, Pleasantville Cottage School, Visitation Plan,
Dec. 12, 1984, ECF No. 91-7 .................................................................J.A.935

Ex. 51, Kenneth Barish, Ph.D., Psychologist, Pleasantville Cottage
School Psychological Evaluation, Apr. 15, 1985, ECF No. 91-8 .............J.A.949

Ex. 52, Gerard Maier, Pleasantville Cottage School, Discharge/Transfer
Plan, May 28, 1985, ECF No. 91-9 .........................................................J.A.952

Ex. 53, Board of Education of the City of New York, Individualized
Education Plan – Phase 1, July 1, 1985, ECF No. 91-10 ..........................J.A.966

Ex. 54, Odette Noble, Social Worker, Jewish Child Care Association of
New York, Elmhurst Boys Residence, UCR Reassessment and
Service Plan Review 6 Month, Nov. 21, 1985, ECF No. 91-11................J.A.974

Notice of Submission of Exhibits, ECF No. 92.............................................J.A.986

Ex. 55, Odette Noble, Social Worker, Jewish Child Care Association of New York, Elmhurst Boys Residence, UCR Reassessment and Service Plan Review 6 Month, June 28, 1986, ECF No. 92-2 ................... J.A.993

Ex. 56, Odette Noble, Social Worker, Jewish Child Care Association of New York, Elmhurst Boys Residence, UCR Plan Amendment: Form D Trial Discharge, Feb. 23, 1987, ECF No. 92-3 ................................... J.A.1003

Ex. 57, Newtown High School, Scholastic Transfer Record, Dec. 7, 1987, ECF No. 92-4 ...................................................................... J.A.1008

Ex. 58, Janet Valentine, Child Care Worker, Pleasantville Diagnostic Center, Outline for Cottage Report (undated), ECF No. 92-5.................. J.A.1011

Ex. 59, Notice of the Intention of U.S.A. to Seek Death Penalty as to Mr. Tipton, May 1, 1992, ECF No. 92-6...................................................... J.A.1015

Ex. 60, Notice of the Intention of U.S.A. to Seek Death Penalty as to Mr. Roane, May 1, 1992, ECF No. 92-7 ...................................................... J.A.1020

Ex. 61, Second Superseding Indictment, July 20, 1992, Dkt. 115, ECF No. 92-8 ...................................................................................... J.A.1025

Ex. 62, Notice of the Intention of U.S.A. to Seek Death Penalty as to Mr. Thomas, Oct. 28, 1992, ECF No. 92-9 ................................................. J.A.1048

Ex. 63, Verdict Form, Feb. 3, 1993, Dkt. 466, ECF No. 92-10.................... J.A.1053

Ex. 64, Notice of the Intention of U.S.A. to Seek Death Penalty as to Mr. Johnson, Feb. 8, 1993, ECF No. 92-11.................................................. J.A.1060

Ex. 65, Special Findings, Feb. 16, 1993, Dkt. 508, ECF No. 92-12 ............ J.A.1065

Ex. 66, Motion to Have Defendant Declared Mentally Retarded, *United States v. Thomas*, No. 3:92CR68 (E.D. Va. Apr. 15, 1993), ECF No. 92-13 ..................................................................................... J.A.1078

Ex. 67, Memorandum in Support of Initial Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. Section 2255, June 15, 1998, Dkt. 714 (Excerpt) , ECF No. 92-14................................................................. J.A.1093

## VOLUME VI

Ex. 68, Reply Memorandum in Support of Initial Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. Section 2255, Mar. 15, 1999, Dkt. 761 (Excerpt), ECF No. 92-15....................................................... J.A.1109

Ex. 69, Ex. 14 to Reply Memorandum in Support of Initial Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. Section 2255, Mar. 15, 1999, ECF No. 92-16 ..................................................................... J.A.1125

Ex. 70, Ex. 15 to Reply Memorandum in Support of Initial Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. Section 2255, Mar. 15, 1999, ECF No. 92-17 ..................................................................... J.A.1133

Notice of Submission of Exhibits, ECF No. 93 ........................................ J.A.1137

Ex. 71, Petitioners' Joint Motion for Leave to Take Discovery, June 24, 1999, Dkt. 770, ECF No. 93-2 ....................................................... J.A.1144

Ex. 72, Memorandum Opinion, May 3, 2000, Dkt. 803, ECF No. 93-3 ...... J.A.1195

Ex. 73, Memorandum Opinion, May 1, 2003, Dkt. 896, ECF Nos. 93-4 – 93-5 ...................................................................... J.A.1209

Ex. 74, Brief for Appellants Cory Johnson and Richard Tipton, *United States v. Johnson*, No. 03-13(L), 03-26, 03-27 (4th Cir. Feb. 17, 2004) (Excerpt), ECF No. 93-6 ........................................................... J.A.1336

Notice of Submission of Exhibits, ECF No. 94 ........................................ J.A.1359

## VOLUME VII

Ex. 75, American Association on Intellectual and Developmental Disabilities Definition Manual ("AAIDD-11") (Excerpt), ECF Nos. 94-2 – 94-3 ...................................................................... J.A.1366

Ex. 76, AAIDD User's Guide to 11th Edition (Excerpt), ECF No. 94-4 ..... J.A.1392

Ex. 77, Diagnostic and Statistical Manual of Mental Disorders ("DSM-5") (Excerpt), ECF No. 94-5 ...................................... J.A.1405

Ex. 78, 134 Cong. Rec. 22,926 (1988) (Excerpt), ECF No. 94-6 ................ J.A.1418

Ex. 79, 136 Cong. Rec. S6873 (daily ed. May 24, 1990) (Excerpt), ECF No. 94-7 ......................................................................... J.A.1423

Government's Response to Court's December 15, 2020 Order (Dec. 21, 2020), ECF No. 96 .............................................................. J.A.1435

Corey Johnson's Reply Pursuant to December 15, 2020 Order (Dec. 24, 2020), ECF No. 97 .............................................................. J.A.1451

Exhibit 1, Amended Judgment in a Criminal Case, ECF No. 97-1 ............. J.A.1459

United States' Motion for Leave to File Supplemental Authority (Dec.
31, 2020), ECF No. 98 ................................................................... J.A.1467

United States' Notice of Supplemental Authority (Jan. 2, 2021), ECF
Nos. 98-1, 101 ............................................................................... J.A.1469

Notice of Appeal (Jan. 4, 2021), ECF No. 103 ............................... J.A.1489

| CRIMINAL | | | | | WRIT | | VS. | JOHNSON, CORY a/k/a "O"; a/k/a "CO" | JURY | | 04 | 24 | 92 | Docket No. 3:92CR68-02 | Def. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PO | □ | 422 | 3 | 2218 | □ JUVENILE | | | | | | Mo. | Day | Yr. | | |
| Misd. | □ | 422 | 3 | 2218 | □ ALIAS | | | | | No. of Def's | 7 | U.S. MAG. CASE NO. ▶ | | | |
| Felony ☑ | District | Off | Judge/Magistr. | OFFENSE ON INDEX CARD▶ | | | | | | | | | | | |

## I. CHARGES

SUPERSEDING INDICTMENT: SAME CODE SECTIONS & COUNTS AS BELOW
SECOND SUPERSEDING INDICTMENT: SAME CODE SECTIONS & COUNTS AS BELOW

| | | | DISM. NG |
|---|---|---|---|
| 21:846 | Conspiracy (Ct. 1) | 1 | X |
| 21:848 | Continuing Criminal Enterprise (Ct. 2) | 1 | X |
| 21:848(e)(1)(A) & 18:2 | Murder in furtherance of CCE; aid & abet (Cts. 8, 11, 17-19; 24 & 25) | 7 | X |
| 18:924(c) & 2 | Use of firearm in relation to crime of violence or drug trafficking crime; aid & abet (Cts. 9, 12, 15, 20 & 26) | 5 | X |
| 18:1959 & 2 | Violent Crimes in aid of racketeering; aid & abet (Cts. 10, 13, 14, 16, 21-23, 27-30) | 11 | X |
| 21:841(a)(10 & 18:2 | Distribution of Crack; aid & abet (Ct. 31) | 1 | X |
| 21:841(a)(1) & 18:2 | Possession w/intent to distribute crack; aid & abet (Cts. 32) | 1 | X |

SUPERSEDING COUNTS

## II. KEY DATE

INTERVAL ONE — KEY DATE — EARLIEST OF: □ arrest □ sum'ns □ custody □ appears on complaint

KEY DATE — APPLICABLE: 4/24/92

END ONE AND/OR BEGIN TWO (OR RESTART PERIOD TO TRIAL)
X Indictment filed/unsealed
□ consent to Magr. trial on complaint
□ Information
□ Felony-W/waiver

KEY DATE: 8/11/92   5/18/92 & 7/20/92

a) X 1st appears on pending charge /R40
b) □ Receive file R20/21
c) X Supsdg; X Indt □ Inf
d) □ Order New trial
e) □ Remand  f) □ G/P Withdrawn

END INTERVAL TWO — KEY DATE — APPLICABLE: 1/11/93
□ Dismissal
□ Pled guilty — □ After N.G.
□ Nolo — □ After nolo
□ Trial (voir dire) began
X □ Jury □ N.J.

| 1st appears with or waives counsel | ARRAIGNMENT 8/11/92 | 1st Trial Ended 2/16/93 | RE-TRIAL | 2nd Trial Began | DISPOSITION DATE 2/16/93 | SENTENCE DATE 6/1/93 | PTD Nolle Pros. | FINAL CHARGES DISMISSED □ on S.T. □ grounds □ W.P. □ WOP | on def motion on gov't motion |
|---|---|---|---|---|---|---|---|---|---|

## III. MAGISTRATE

| Search Warrant | Issued / Return | DATE | INITIAL/NO. | INITIAL APPEARANCE DATE ▶ | | INITIAL/NO. | OUTCOME: □ DISMISSED |
|---|---|---|---|---|---|---|---|
| Summons | Issued / Served | | | PRELIMINARY EXAMINATION OR REMOVAL HEARING | Date Scheduled ▶ / Date Held ▶ | | HELD FOR GJ OR OTHER PRO-CEEDING IN THIS DISTRICT |
| Arrest Warrant Issued | | | | □ WAIVED □ NOT WAIVED | Tape Number | | HELD FOR GJ OR OTHER PRO-CEEDING IN DISTRICT BELOW |
| COMPLAINT ▶ | | | | □ INTERVENING INDICTMENT | | | |
| Date of Arrest | | OFFENSE (In Complaint) | | | | | |

## IV. NAMES & ADDRESSES OF ATTORNEYS, SURETIES, ETC.

Show last names and suffix numbers of other defendants on same indictment/information:
01-Tipton; 03-Roane; 04-Thomas; 05-Gaiters; 06-Hardy; 07-Reavis

RULE: 20 21 40 In Out

ATTORNEYS — U.S. Attorney or Asst.

Howard C. Vick, AUSA; William H. Parcell, III, Special AUSA

2255 See Tipton's Docket sheet

Defense: 1 ☑ CJA.  2 □ Ret.  3 □ Waived.  4 □ Self.  5 □ Non/Other.  6 □ PD.  7 □ CD

John F. McGarvey, Esquire
320 West Broad Street
Richmond VA 23220
644-3420

Craig S. Cooley, Esquire
P.O. Box 7268
Richmond VA 23221
358-2328

2255 petition    as of 8/1/01
Barbara L. Hartung, Esq. Suite 600
#504, 100I East Main Street 700 E. Main
Richmond, VA 23219    353-4999
649-1088    FAX 353-5299

Edward E. Scher, Esquire
Thorsen & Scher 316 West Broad ST.
3810 Augusta Avenue  -4219
Richmond, VA 23220-4219
359-3000    FAX 359-3139

See Tipton's docket sheet for 2255 gout Atty

Status :
On Motion : 11-2-92, 2:00
FPTC :
FPON 8-11-92 3:00

4CCA No.: 93-4006
Consolidated w/No.: 93-4005(L)

BAIL ● RELEASE

PRE-INDICTMENT
Release Date
Bail □ Denied
AMOUNT SET $
Date Set
□ Bail Not Made
Date Bond Made
□ Fugitive
□ Pers. Rec.
□ PSA
Conditions
□ 10% Dep.
□ Surety Bnd
□ Collateral
□ 3rd Prty
□ Other

POST-INDICTMENT
Release Date
Bail □ Denied
AMOUNT SET $
Date Set
□ Bail Not Made
Date Bond Made
□ Fugitive
□ Pers. Rec.
□ PSA
Conditions
□ 10% Dep.
□ Surety Bnd
□ Collateral
□ 3rd Prty
□ Other

X Docket Entries Begin On Reverse Side

APPEALS FEE PAYMENTS

| FINE AND RESTITUTION PAYMENTS | | | | | | |
|---|---|---|---|---|---|---|
| DATE | RECEIPT NUMBER | C.D. NUMBER | DATE | RECEIPT NUMBER | C.D. NUMBER | |

J.A.1

U.S. Government Attorneys

Robert J. Erickson          and          G. Wingate Grant
Deputy Chief,                            Assistant U. S. Attorney
Criminal Division
Appellate Section
U.S. Department of Justice
Room 6102, Patrick Henry Bdlg.
601 D Street, N.W.
Washington, D.C.   20530
(202) 514-2841

DATE

**J.A.2**

USCA4 Appeal: 21-1 Doc: 12-1 Filed: 01/08/2021 Pg: 12 of 363
Case 3:92-cr-00068-DJN Document 72 Filed 11/17/20 Page 3 of 24 PageID# 2169

| DATE | | MASTER DOCKET · MULTIPLE DEFENDANT CASE | PAGE 1 OF | VI. EXCLUDABLE DELAY |
|---|---|---|---|---|
| DOCUMENT NO. | | X PROCEEDINGS DOCKET FOR SINGLE DEFENDANT | | Start Date End Date |

3:92CR68-02

**V. PROCEEDINGS**

(OPTIONAL) Show last names of defendants

**1992**

| | | |
|---|---|---|
| April 24 | 1 | Indictment, a true bill, returned before a Judge in Open Court at Richmond, filed. UNDER SEAL     lcq |
| April 24 | | IN OPEN COURT: Spencer, J., GJCR. Appearances: AUSA only. Govt's motion that BW be issued, GRANTED.     lcq |
| April 28 | 2 | Govt's Motion to Unseal, filed.     lcq |
| April 28 | 3 | ORDER granting govt's motion to unseal indictment ent'd, JRS, filed.     lkm |
| May 7 | 42 | Govt's Motion Concerning the Setting of the Trial Date, filed. phb |
| May 18 | 49 | Superseding Indictment, a true bill, returned before the Judge in Open Court at Richmond, filed.     lkm |
| June 29 | 99 | CJA 20, appt of counsel, John McGarvey, for deft, executed, filed. lkm |
| June 29 | 100 | CJA 20, appt of counsel, Craig Cooley, for deft, executed, filed. lkm |
| June 29 | 101 | Govt's motion for issuance of subpoenas pursuant to Local Rule 19(e) for production prior to trial filed.     lkm |
| July 1 | 102 | ORDER granting govt's motion for early issuance of subpoenas; ent'd, JRS, filed. Copies to counsel.     lkm |
| July 14 | 110 | ORDER granting defts Tipton, Roane & Thomas' motion for continuance of trial set for 9/16/92. Trial rescheduled for 10 a.m. on 1/11/93; ent'd, JRS, filed. Copies mailed.     lkm |
| July 20 | 115 | Second Superseding Indictment, a true bill, returned to a Judge in open court at Richmond, filed.     lkm |
| July 21 | - | Transcript of bond hearing on 5/5/92 filed by OCR.     lkm |
| July 23 | - | Copies of second superseding indictment mailed to counsel.     lkm |
| July 23 | - | BW issued as detainer on 2nd superseding indictment pursuant to order of USMJ Lowe.     lkm |
| July 31 | 124 | Deft's ex parte motion for preparation of transcript filed.     lkm |
| Jul. 31 | 125 | AMENDED ORDER continuing trial until 1/11/93. ENT 7/31/92, JRS, filed. Cps. dist.     phb |
| Jul. 31 | - | Magistrate's papers from SD/NY-New York, rec'd.     phb |
| Aug. 3 | 127 | ORDER UNDER SEAL . ENT 8/3/92, JRS, filed. Cps. dist. phb |
| Aug. 5 | 128 | Deft's Motion for Appointment of Psychiatric, Neurologic, Investigative, Medical, & Mitigation Experts, filed.     phb |
| Aug. 5 | 129 | Deft's Motion for a Bill of Particulars, filed.     phb |
| Aug. 5 | 130 | Deft's Memorandum in Support of Motion, filed.     phb |
| Aug. 5 | 131 | Deft's Motion for Early Disclosure of Jencks Act & Brady Material & Incorporated Memorandum, filed.     phb |
| Aug. 5 | 132 | Deft's Motion for Disclosure of R.404 Evidence & Incorporated Memorandum, filed.     phb |
| Aug. 5 | 133 | Deft's Motion for Discovery & Inspection & Incorporated Memorandum, filed.     phb |
| Aug. 5 | 134 | Deft's Motion for Disclosure of Exculpatory Evidence & Incorporated Memorandum, filed.     phb |
| Aug. 5 | 135 | Deft's Motion to Adopt Codef's Motions & Supporting Memorandum, filed.     phb |
| Aug. 5 | 136 | Deft's Ex Parte Motion for Preparation of Transcript, filed. phb |
| Aug. 7 | 137 | EX PARTE ORDER that Deft's motin for 6/12/92 & 7/28/92 transcripts is GRANTED. ENT 8/7/92, JRS, filed. Cps. dist. phb |
| Aug. 11 | | IN OPEN COURT: Lowe, M., Kull, OCR. Appearances: Deft. w/counsel. AUSA Matter came on for arraignment. Deft WFA, entered plea of not guilty to all charges; requested trial by jury. Jury trial set for 1/11/93 at 10:00 a.m. Deft. to file any brief or objections within 10 days. Bond hearing set for 8/17/92 at 2:00 p.m. Deft. remanded. (:12)     lcq |
| Aug. 11 | 138 | Temporary Detention Order, ENT 08-11-92, DGL, filed.     lcq |
| Aug. 17 | | PROCEEDINGS BEFORE MAGISTRATE: Lowe, M. Kull, OCR. Appearances: Deft. w/counsel. AUSA. Matter came on for bond hearing. Govt. adduced evidence, rested. Deft. adduced no evidence. Case submitted w/no arguments. Govt's list of murders and witnesses submitted, UNDER SEAL. Findings of fact stated from the bench. |

CONTINUED TO PAGE

J.A.3

UNITED STATES DISTRICT COURT
CRIMINAL DOCKET    *U. S. vs*

JOHNSON, CORY                    PAGE 2

AO 256A ⊕

| | | | 92CR68-02 |
|---|---|---|---|
| | | Yr. | Docket No. | Def. |

| DATE | PROCEEDINGS (continued) | V. EXCLUDABLE DELAY | | | |
|---|---|---|---|---|---|
| | (Document No.) | (a) | (b) | (c) | (d) |

| DATE | PROCEEDINGS | (a) | (b) | (c) | (d) |
|---|---|---|---|---|---|
| **1992** Aug. 17 | PROCEEDINGS BEFORE MAGISTRATE continued: Deft. held w/o bond. Deft's request for transcript of bond hearing, GRANTED. Deft. remanded to custody. (:30) lcq | | | | |
| Aug. 18 | 140   Order of Detention Pending Trial, ENT 08-18-92, DGL, filed. lcq | | | | |
| Aug. 18 | 141   Govt's Omnibus Response to Deft. Johnson's Pre-trial Motions, filed. lcq | | | | |
| Aug. 20 | 144   ORDER that Deft's motion for a bill of particulars is DENIED. ENT 8/20/92, JRS, filed. Cps. dist. phb | | | | |
| Aug. 20 | 145   ORDER re: schedule of Discovery & Inpsection, Brady Material, & Jencks/Giblio Materials. ENT 8/20/92, JRS, filed. Cps. dist. phb | | | | |
| Aug. 21 | 146   Deft's Motion for Penalty Phase Discovery, filed. phb | | | | |
| Aug. 27 | 148   ORDER of the Court - EX PARTE. (SEALED) ENT 8/27/92, JRS, filed. Cps. dist. phb | | | | |
| Sep. 9 | 155   Govt's Response to Deft's Motion for Penalty Phase Discovery, filed. phb | | | | |
| Sep. 17 | 160   Deft's Motion for Bill of Particulars of the Notice of the Intention of the Govt to Seek the Death Penalty, filed. phb | | | | |
| Oct. 8 | -   Marshal's return on 4/24/92 Warrant for Arrest, executed, & filed. phb | | | | |
| Oct. 8 | -   Marshal's return on 7/23/92 Warrant for Arrest, unexecuted, & filed. phb | | | | |
| Oct. 14 | 174   Deft's Motion for Compliance w/18:3432, filed. phb | | | | |
| Oct. 14 | 175   Deft's Motion for Continuance, filed. phb | | | | |
| Oct. 14 | 176   Deft's Motion for Discovery & Inspection from Codefts at a Joint Trial, filed. phb | | | | |
| Oct. 14 | 177   Deft's Notice of Request for Hearing, filed. phb | | | | |
| October 14 | 179 Govt's Response to Deft's Motion for Bill of Particulars of the Notice of the Intention of the United States to Seek the Death Penalty, filed. rlw | | | | |
| Oct. 14 | 181 Deft's ex parte motion UNDER SEAL filed. lkm | | | | |
| Oct. 20 | 182   EX PARTE ORDER UNDER SEAL. ENT 10/20/92, JRS, filed. Cps. to Deft's attys. phb | 2 | 10/21/92 | T2 | |
| Nov. 2 | -   IN OPEN COURT: Spencer, J., Kull, OCR. Appearances: Deft w/counsel, AUSA. Matter came on for hearing on pending motions. Counsel heard on following motions: to continue trial; for discovery & inspection; for penalty phase discovery; for bill of particulars; for notice of govt's intention to seek death penalty; for early disclosure of Jencks & Brady; for compliance w/ 18 USC 3432; for discovery & inspection from co-defts. Motions taken under advisement; order to issue. Deft remanded. lkm | | | | |
| Nov. 4 | 197   Deft's Motion and Memorandum to Transfer Deft, filed. jtj | | | | |
| Nov. 9 | 201 Deft's Ex Parte Motion UNDER SEAL filed. lkm | | | | |

Interval
(per Section II)

Start Date
End Date

Ltr. Total
Code Days

File No. 2

File No. 3

File No. 4

J.A.4

UNITED STATES DISTRICT COURT
CRIMINAL DOCKET

U.S. v. JOHNSON, CORY    PAGE 3    3:92CR68

AO 256A

| DATE | (Document No.) | PROCEEDINGS (continued) | V. EXCLUDABLE DELAY (a) | (b) | (c) | (d) |
|------|---------------|-------------------------|-----|-----|-----|-----|
| **1992** | | | | | | |
| Nov. 9 | 202 | Ex Parte ORDER **UNDER SEAL** ent'd, JRS, filed. Copy to deft's counsel. lkm | | | | |
| Nov. 9 | 204 | ORDER ent'd, JRS, filed, with Court's ruling on motions heard in open court on 11/2/92. 1. Motion for continuance - denied. 2. motion for guilty phase discovery - denied. 3. motion for penalty phase discovery - granted; govt to provide information as it is available, but no later than 12/1/92 as relates to non-statutory aggravating factors; motion denied as to statutory aggravating factors. 4. motion for reconsidera-tion w/respect to bill of particulars - denied. 5. motion for bill of particulars of notice of intention to govt to seek death penalty - denied. 6. mtion for compliance w/18 USC 3432 to furnish list of witnesses - granted; to be furnished no later than 1/1/93. 7. motion for discovery & inspection from co-defts - denied. 8. motion for early disclosure of Jencks and Brady materials - Order of 8/20/92 modified; govt ordered to produce such material no later than 1/4/93; counsel may disclose info to clients; may not provide clients w/copies; all such materials to be returned to USAtty at conclusion of trial; order of 8/20/92 remains in effect in all other respects. 9. motion to adopt co-defts' motions - denied; court will permit deft upon filing of appropriate motion to adopt co-deft Tipton's motion on constitutionality of federal death penalty statute & supporting memorandum.   Copy to counsel. lkm | | | | |
| Nov. 16 | 209 | ORDER that U.S. Marshal's Office transport Deft from Western Piedmont Regional Jail to the Richmond City Jail at the first opportunity.  ENT 11/16/92, JRS, filed. Cps. dist.                                phb | | | | |
| Nov. 18 | 212 | Petition & ORDER FOR WHCAT for Maurice Saunders ret. 11/19/92 at 9 AM.  ENT 11/18/92, JRS, filed.     phb | | | | |
| Nov. 18 | - | WHCAT for Maurice Saunders ret. 11/19/92 at 9 AM, issued.                                          phb | | | | |
| Nov. 19 | 214 | ORDER that Govt has until 11/27/92 to respond to Deft's Motion to Dismiss, filed.                      phb | | | | |
| Nov. 23 | 218 | Deft's Ex Parte Motion for Issuance of Subpoena Duces Tecum, filed.  **SEALED**                      phb | | | | |
| Nov. 23 | 219 | Deft's Motion on the Constitutionality of the Fed. Death Penalty Statute on Its Fact & as Applied to Him, filed. phb | | | | |
| Nov. 23 | 220 | Deft's Memo. in Support of Motion, filed.        phb | | | | |
| Nov. 24 | - | Marshal's return on WHCAT for Maurice Saunders, unexecuted, & filed.                                    phb | | | | |
| Dec. 1 | 231 | Govt's Motion for Reciprocal Discovery, filed.   phb | | | | |
| Dec. 2 | 232 | EX PARTE ORDER **UNDER SEAL**.  ENT 12/2/92, JRS, filed. Cps. dist.                                phb | | | | |
| Dec. 2 | 234 | EX PARTE ORDER **UNDER SEAL**.  ENT 12/2/92, JRS, filed. Cps. dist.                                phb | | | | |
| Dec. 8 | 309 | Govt's response to deft's motion on constitutionality of Federal death penalty statute filed.            lkm | | | | |
| Dec. 10 | 316 | Govt's notice of intention to provide victim impact testimony filed.                                    lkm | | | | |

CONTINUED ON NEXT PAGE

Interval (per Section II)    Start Date End Date    Ltr. Total Days

**J.A.5**

USCA4 Appeal: 21-1    Doc: 12-1    Filed: 01/08/2021    Pg: 15 of 363

UNITED STATES DISTRICT COURT
CRIMINAL DOCKET · · U. S. vs · · · JOHNSON, CORY

AO 256A ⊕

3:92CR68-02

Yr. | Docket No. | Def.

| DATE | PROCEEDINGS (continued) | V. EXCLUDABLE DELAY |
| | | (a) | (b) | (c) | (d) |
| | (Document No.) | | | | |

**1992**

| Dec. 10 | – One (1) box of records received from Dr. Natalie Weissblum, NY,NY in response to subpoena. | km |
| Dec. 14 | 322 Deft's Motion for Pretrial Conference, filed. phb |
| Dec. 14 | 323 Deft's Motion for Severance of Defts at Penalty Phase, filed. phb |
| Dec. 14 | 324 Deft's Memo. in Support of Motion, filed. phb |
| Dec. 14 | 325 Deft's Motion to Dismiss the Death Penalty Provision of 21 USC §848, for Want of Justice w/out Discrimination, filed. phb |
| Dec. 14 | 326 Deft's Memo. in Support of Motion, filed. phb |
| Dec. 21 | 334 Deft's Motion in Limine, filed. phb |
| Dec. 21 | 335 Deft's Request for Bill of Particulars Regarding Notice of the Intention of the Govt to Provide Victim Impact Testimony, filed. phb |
| Dec. 21 | 336 Govt's Motion for Permission to Allow Jurors to Take Notes During Trial, filed. phb |
| Dec. 22 | 340 Petition & ORDER FOR WHCAT for Douglas Cunningham ret. 1/11/93 at 10 AM. ENT 12/22/92, JRS, filed. phb |
| Dec. 22 | – WHCAT for Douglas Cunningham ret. 1/11/93 at 10 AM, issued. phb |
| Dec. 22 | 341 Petition & ORDER FOR WHCAT for Rodney Tucker ret. 1/11/93 at 10 AM. ENT 12/22/92, JRS, filed. phb |
| Dec. 22 | – WHCAT for Rodney Tucker ret. 1/11/93 at 10 AM, issued. phb |
| Dec. 22 | 342 Petition & ORDER FOR WHCAT for Gregory Noble ret. 1/11/93 at 10 AM. ENT 12/22/92, JRS, filed. phb |
| Dec. 22 | – WHCAT for Gregory Noble ret. 1/11/93 at 10 AM, issued. phb |
| Dec. 22 | 343 Petition & ORDER FOR WHCAT for Daryl Moses ret. 1/11/93 at 10 AM. ENT 12/22/92, JRS, filed. phb |
| Dec. 22 | – WHCAT for Daryl Moses ret. 1/11/93 at 10 AM, issued. phb |
| Dec. 22 | 344 ORDER that parties & their counsel are ORDERED to treat all juror information as CONFIDENTIAL. This requirement applies equally to specific information about individual jurors & to information about the panel as a whole. Counsel are REMINDED that per Local R.9(A)(1), "no juror shall be approached, either directly or through any member of his or her immediate family, in an effort to secure information concerning such juror." ENT 12/22/92, JRS, filed. Cps. dist. phb |
| Dec. 22 | – **IN OPEN COURT:** Spencer, J., Medford W. Howard, Ct. Rept. Appearances: Defts Tipton, Johnson, Roane w/counsel; deft Reavis by counsel; AUSA. Matter came on for hearing on defts' motion on constitutional challenge to statue. Counsel submitted issue on briefs by parties. Order to enter. Pretrial conference held to resolve issue raised by counsel prior to trial. Counsel for Tipton, Johnson, Roane heard. Govt heard. Court to enter order setting forth procedures to be followed at trial. Defts remanded. (:40) lkm |
| Dec. 23 | 348 ORDER granting govt's motion for reciprocal discovery; directing defts to provide govt w/all materials required under FRCrP 16(b) and 12.2 by 12/30/92; entered, JRS, filed. Copies to counsel. lkm |
| Dec. 23 | 349 Pretrial Order ent'd, JRS, filed. Copies to counsel. lkm |

| Interval (per Section II) | Start Date End Date | Ltr. Code | Total Days |

FiLE No. 6

FiLE No. 7

J.A.6

UNITED STATES DISTRICT COURT
CRIMINAL DOCKET                          US v JOHNSON, CORY                    PAGE 5     3:9

AO 256A

| DATE | | PROCEEDINGS (continued) | V. EXCLUDABLE DELAY | | | |
|------|--|-------------------------|--------------------|--|--|--|
|      | (Document No.) | | (a) | (b) | (c) | (d) |
| **1992** Dec. 29 | 371 | MEMORANDUM OPINION of the Court. ENT 12/29/92, JRS, filed. Cps. dist.                    phb | | | | |
| Dec. 29 | 372 | ORDER that Defts' motions challenging the constitutionality of the death penalty provisions of 21:848 are DENIED. ENT 12/29/92, JRS, filed. Cps. dist.           phb | | | | |
| Dec. 30 | 375 | Deft's ex parte motion UNDER SEAL filed.                    lkm | | | | |
| Dec. 31 | 378 | Petition & ORDER FOR WHCAT for Anthony Holland ret. 1/11/93 at 10 AM. ENT 12/31/92, JRS, filed.    phb | | | | |
| Dec. 31 | - | WHCAT for Anthony Holland ret. 1/11/93 at 10 AM, issued.phb | | | | |
| Dec. 31 | 383 | EX PARTE ORDER UNDER SEAL. ENT 12/31/92, JRS, filed. Copy to Deft's atty.                    phb | | | | |
| **1993** Jan. 4 | 387 | ORDER Govt will not be permitted to make use of certain information re: nonstatutory aggravating factors at trial if the Govt has failed to provide such information to the Defts as previously ordered. Govt is REMINDED it may only introduce information re: nonstatutory aggravating factors for which notice has been provided. Deft's motions for trial date continuance are DENIED. ENT 1/4/93, JRS, filed. Cps. dist.           phb | | | | |
| Jan. 4 | 388 | ORDER DENYING Defts Johnson & Roane's motions to dismiss for want of justice w/out discrimination and Deft Tipton's motion to dismiss on grounds of racial discrimination. ENT 1/4/93, JRS, filed. Cps. dist.phb | | | | |
| Jan. 4 | 389 | ORDER DENYING Defts Johnson & Roane's motion to sever their trial. ENT 1/4/92, JRS, filed. Cps. dist. phb | | | | |
| Jan. 04 | 393 | Defts' Motion to Compel Disclosure of Addresses of Witnesses & Motion to Continue, rec'd.                    rlw | | | | |
| Jan. 05 | 394 | Order directing that Gov't shall not be permitted to introduce certain victim impact testimony at the sentencing phase and that motions by Deft and Co-Deft Tipton seeking bills of particulars are hereby MOOT; ent'd 01-05-93 (JRS), filed. Copies distributed.                    rlw | | | | |
| Jan. 05 | 396 | EX PARTE ORDER, pursuant to Co-Deft Roane's ex parte motion, pursuant to 21 USC §848(q)(9), relating to certain reasonable and necessary services required for his representation, APPROVING and AUTHORIZING the hiring of a stenographer by counsel for Co-Deft Roane for purposes of transcribing statements made on investigatory tapes previously provided to Deft and Co-Defts by Gov't, up to a maximum total cost for such services of $1,000.00, and defense counsel are ADMONISHED that these services should be thoroughly documented to assure payment of such services, and to ensure that services are not duplicative of other services; ent'd 01-05-93 (JRS), filed. Copies distributed.           rlw | | | | |
| Jan. 05 | 398 | Order that Deft's motion in limine seeking to exclude certain evidence of unadjudicated criminal conduct alledged to have been committed by Deft in New Jersey in 1989-1991 is hereby DENIED; ent'd 01-05-93 (JRS), filed. Copies distrbuted.    rlw | | | | |

*File No. 7*

*File No. 8*

|  | Interval (per Section II) | Start Date End Date | Ltr. Code | Total Days |
|--|---------------------------|---------------------|-----------|------------|

**J.A.7**

UNITED STATES DISTRICT COURT
CRIMINAL DOCKET   | U. S. vs   JOHNSON, COREY   PAGE 6          3:92CR68-02

AO 256A ⊕                                             Yr. | Docket No. | Def.

| DATE | | PROCEEDINGS (continued) | V. EXCLUDABLE DELAY | | | |
|---|---|---|---|---|---|---|
| | (Document No.) | | (a) | (b) | (c) | (d) |
| **1993** | | | | | | |
| Jan. 5 | 399 | Govt's Proposed Voir Dire for the Jury, filed.          phb | | | | |
| Jan. 6 | 400 | Govt's Response to the Court's Order to Specify Which Aggravating Factors Relate to Which Offense, filed. phb | | | | |
| Jan. 6 | 401 | Deft's Motion for Reconsideration of Atty. Participation in Voir Dire, filed.                              phb | | | | |
| Jan. 7 | 402 | ORDER that Deft's motion for reconsideration of atty. participation in voir dire is DENIED.  Counsel is REMINDED they may propose questions to be asked.  ENT 1/7/93, JRS, filed.  Cps. dist.                           phb | | | | |
| Jan. 7 | 403 | Petition & ORDER FOR WHCAT for Austin O. Nwanze ret. 1/11/93 at 10 AM.  ENT 1/7/93, JRS, filed.          phb | | | | |
| Jan. 7 | - | WHCAT for Austin O. Nwanze ret. 1/11/93 at 10 AM, issued. phb | | | | |
| Jan. 7 | 404 | Govt's Proposed Jury Instructions, filed.          phb | | | | |
| Jan. 11 | 414 | Deft's Proposed Voir Dire Questions for the Jury, filed. phb | | | | |
| Jan. 11 | 415 | Govt's List of Exhibits, filed.                    JtJ | | | | |
| Jan. 11 | 416 | Govt's List of Witnesses, filed.                   JtJ | | | | |
| Jan. 11 | 417 | Deft's ex parte request for subpoenas, filed.      phb | | | | |
| Jan. 11 | - | **JURY TRIAL PROCEEDINGS, DAY I:** Spencer, J., Kull, OCR. Appearances: Deft w/counsel, AUSA. IN CHAMBERS: Pretrial motion heard; denied.  Procedure discussed; issues revolved. Govt's motion to dismiss Cts. 11-13 as to deft Tipton granted. IN OPEN COURT:  Jury panel No. 1 appeared; sworn; examined on voir dire.  Individual voir dire commenced.  Trial adjourned for the day; to commence at 9:30 a.m. on 11/12/93.  (7.0)    lkm | 2 | 1/1/93 | T2 | 83 |
| Jan. 12 | - | **JURY TRIAL PROCEEDINGS, DAY 2:** Spencer, J., Kull, OCR. Appearances: Deft w/counsel, AUSA.  Individual voir dire continued with Panel I.  Voir dire begun with Panel 2; excused until 1:00 P.M. on 1/13/93.  Panel I, Nos. 115-130 to return at 9:30 a.m. on 1/13/93.  Deft remanded.      (8:15)      lkm | | | | |
| Jan. 12 | 420 | Petition & ORDER FOR WHCAT for Ronita Rochelle Hollman ret. 1/19/93 at 10 AM.  ENT 1/12/93, JRS, filed.    phb | | | | |
| Jan. 12 | - | WHCAT for Ronita Rochells Hollman ret. 1/19/93 at 10 AM, issued.                                              phb | | | | |
| Jan. 12 | 421 | Petition & ORDER FOR WHCAT for Austin O. Nwanze ret. 1/25/93 at 10 AM.  ENT 1/13/93, JRS, filed.          phb | | | | |
| Jan. 12 | - | WHCAT for Austin O. Nwanze ret. 1/25/93 at 10 AM, issued. phb | | | | |
| Jan. 13 | 422 | EX PARTE ORDER that Deft's motion for subpoenas is GRANTED, & Clerk is DIRECTED to issue subpoenas as set for in motion.  ENT 1/13/93, JRS, filed.          phb | | | | |
| Jan. 13 | - | **JURY TRIAL PROCEEDINGS, DAY 3:** Spencer, J., Kull, OCR. Counsel present.  Individual voir continued w/Panel I; to return at 9:30 a.m. on 1/14/93.  Panel 2 excused except for 26 jurors listed on attached list; remaining Panel 2 jurors to return at 10 a.m. on 1/14/93.      (1:40)       lkm | | | | |
| Jan. 14 | 427 | Petition & ORDER FOR WHCAT for Douglas Cunningham ret. 1/18/93 at 10 AM.  ENT 1/14/93, JRS, filed.        phb | | | | |
| Jan. 14 | - | WHCAT for Douglas Cunningham ret. 1/18/93 at 10AM, issued. phb | | | | |
| Jan. 14 | - | **JURY TRIAL PROCEEDINGS, DAY 4:** Spencer, J., Kull, OCR. Appearances: Deft w/counsel, AUSA.  IN CHAMBERS:  All motions in limine heard; Court to review video b/4 decision; other motions denied.  Court directed that questionnaires will be part of the record.  IN OPEN COURT:  Jury empaneled; sworn to try issue.  Opening statements made.  Trial adjourned for the day; to commence at 10 a.m. on 1/15/93.  Deft remanded. (6:55) lkm | | | | |

FILE NO. 8

| | | | | | Start Date | | |
|---|---|---|---|---|---|---|---|
| | | | | | End Date | Ltr. | Total |
| | | | | (per Section II) | | Code | |

UNITED STATES DISTRICT COURT
CRIMINAL DOCKET
AO 256A

U.S. v. JOHNSON, CORY

PAGE 7

3:92CR68-02

| DATE | PROCEEDINGS (continued) | V. EXCLUDABLE DELAY | | | |
|------|-------------------------|------|------|------|------|
| | (Document No.) | (a) | (b) | (c) | (d) |

**1993**

Jan. 14 — 428 Deft's Supplemental Proposed Voir Dire Questions, rec'd by the Court during voir dire and filed as of this date.  jtj

Jan. 15 — Marshal's return on WHCAT for Douglas Cunningham ret. 1/11/93 at 10 AM, unexecuted, & filed.  phb

Jan. 15 — Marshal's return on WHCAT for Austin O. Nwanze ret. 1/11/93 at 10 AM, unexecuted, & filed.  phb

Jan. 15 — 432 Petition & ORDER FOR WHCAT for Douglas Cunningham ret. 1/18/93 at 10 AM.  ENT 1/15/93, JRS, filed.  phb

Jan. 15 — WHCAT for Douglas Cunningham ret. 1/18/93 at 10 AM, issued. phb

Jan. 15 — **JURY TRIAL PROCEEDINGS, DAY 5:** Spencer, J., Kull, OCR. Appearances: Deft w/counsel, AUSA. Jury appeared. Govt's evidence begun.  Trial adjourned for the day; to commence at 10 a.m. on 1/18/93. Deft remanded.  lkm

Jan. 18 — 434 Defts' Motion for court-supervised access to witnesses in witness protection program filed.  lkm

Jan. 18 — **JURY TRIAL PROCEEDINGS, DAY 6:** Spencer, J., Kull, OCR. Appearances: Deft w/counsel, AUSA.  Counsel heard in argument as to order of witnesses; Court left issue up to counsel. Counsel heard on defts' motion for court-supervised access to WPP witnesses; motion denied.  Jury appeared.  Govt's evidence continued.  Trial adjourned for the day; to commence at 10 a.m. on 1/19/93. Deft remanded.  (5:05)  lkm

Jan. 19 — Marshal's return on WHCAT for Douglas Cunningham ret. 1/18/93 at 10 AM, unexecuted, & filed.  phb

Jan. 19 — **JURY TRIAL PROCEEDINGS, DAY 7:** Spencer, J., Kull, OCR. Appearances: Deft w/counsel, AUSA. Jury appeared. Govt's evidence continued.  Trial adjourned for the day; to commence at 10 a.m. on 1/21/93. Deft remanded.  (4:40)  lkm

Jan. 21 — **JURY TRIAL PROCEEDINGS, DAY 8:** Spencer, J., Kull, OCR. Appearances: Deft w/counsel, AUSA. Jury appeared. Govt's evidence continued.  Trial adjourned for the day; to commence at 10 a.m. on 1/22/93. Deft remanded.  (4:30)  lkm

Jan. 21 — 439 Deft's Appellate exhibit filed.  lkm

Jan. 22 — **JURY TRIAL PROCEEDINGS, DAY 9:** Spencer, J., Kull, OCR. Appearances: Deft w/counsel, AUSA. Jury appeared. Govt's evidence continued.  BW for Dennis Moody - issued as a material witness - quashed upon completion of Moody's testimony.  Trial ajourned for the day; to commence at 10 a.m. on 1/25/93.  Deft remanded.  (4:10)  lkm

Jan. 25 — Marshal's return on WHCAT for Ronita Rochelle Hollman ret. 1/19/93 at 10 AM, executed, & filed.  phb

Jan. 25 — **JURY TRIAL PROCEEDINGS, DAY 10:** Spencer, J., Kull, OCR. appearances: Deft w/counsel, AUSA. Jury appeared.  Defts' motion to voir dire jury on Saturday's newspapers article (Tipton appellate exhibit) granted.  Voir dire conducted.  Individual voir dire conducted as to Mr. Cooke and Ms. Hayes.  Mr. Cooke remains as juror; Ms. Hayes excused; first alternate, Debra J. Dabney seated. Govt's evidence continued.  Voir dire as to witness Montez McCoy conducted in chambers.  Trial adjourned for the day; to commence at 10 a.m. on 1/26/93.  (4:30)  lkm

File No. 8

| | Interval (per Section II) | Start Date End Date | Ltr. Code | Total Days |
|--|--|--|--|--|

**JA.9**

| UNITED STATES DISTRICT COURT CRIMINAL DOCKET | *U. S. vs* | JOHNSON, CORY | 3:92CR68-02 |
|---|---|---|---|

AO 256A ⊕

| | Yr. | Docket No. | Def. |

| DATE | PROCEEDINGS (continued) | V. EXCLUDABLE DELAY |
|---|---|---|
| | (Document No.) | (a) (b) (c) (d) |

**1993**

**Jan. 26** — Marshal's return on WHCAT for Austin O. Nwanze ret. 1/25/93 at 10 AM, unexecuted, & filed.  phb

**Jan. 26** — JURY TRIAL PROCEEDINGS, DAY II: Spencer, J., Kull, OCR. Appearances: Deft w/counsel, AUSA. Jury appeared. Govt's evidence continued. Trial ajourned for the day; to commence at 10 a.m. on 1/27/93. Deft remanded.  (4:30)  lkm

**Jan. 27**  443  Deft's Ex Parte Motion for Issuance of Subpoenae, filed.  phb

**Jan. 27** — SO ORDERED that subpoenae be issued. ENT 1/27/93, JRS, filed. Cps. dist.  phb

**Jan. 27** — JURY TRIAL PROCEEDINGS, DAY I2: Spencer, J., Kull, OCR. Appearances: Deft w/counsel, AUSA. Jury appeared. Motion of defts Tipton, Johnson, Roane for Court to conduct examination as to competence of witnesses Pepsi Greene and Gwen Greene to testify denied. Govt's evidence continued. Trial adjourned for the day. Jury to return at 10 a.m. on 1/29/93; counsel to return at 9:45 a.m. on 1/28/93 for motions. Defts remanded. (4:55)

**Jan. 28** — JURY TRIAL PROCEEDINGS, DAY I3: Spencer, J., Kull, OCR. Appearances: Deft w/counsel, AUSA. Matter came on for hearing on motions at conclusion of govt's evidence. Counsel heard on motion to strike and motions for judgments of acquittal. All motions denied except motions for judgment as to murder of Brown and wounding of McCoy; motion TUA. Deft remanded.(:55)lkm

**Jan. 28**  446  Deft's Ex Parte Motion for Issuance of Subpoena, filed.  phb

**Jan. 29** — SO ORDERED that Clerk issue subpoena for Det. M.D.Scott. ENT 1/28/93, JRS, filed. Copy to Deft's atty.  phb

**Jan. 29**  447  Deft's Ex Parte Motion for Issuance of Subpoena, filed.  phb

**Jan. 29** — SO ORDERED that Clerk issue subpoena for Odette Noble. ENT 1/29/93, JRS, filed. Copy to Deft's atty.  phb

**Jan. 29**  448  Deft's Ex Parte Motion, filed.  (SEALED)  phb

**Jan. 29** — JURY TRIAL PROCEEDINGS, DAY I4: Spencer, J., Kull, OCR. Appearances: Deft w/counsel, AUSA. Govt's motion in limine as to testimony of some of defts' witnesses heard; guidelines directed by the Court. Court's ruling given as to Rule 29 motions as to Torrick Brown's murder. Motion denied. Jury appeared. Govt's case continued, concluded. Govt rested. Defts adduced evidence. Trial adjourned for the day; to commence at 10 a.m. on 2/1/93. Deft remanded. (2:35)  lkm

**Feb. 1**  451  EX PARTE ORDER UNDER SEAL. ENT 2/1/93, JRS, filed. Cps. dist.  phb

**Feb. 1**  454  Appellate Exhibit for Tipton and Johnson filed.  lkm

**Feb. 1** — JURY TRIAL PROCEEDINGS, DAY I5: Spencer, J., Kull, OCR. Appearances: Deft w/counsel, AUSA. Jury appeared. Defts' evidence continued and concluded. Defts rested. Evidence concluded. Defts' renewed motions for dismissal heard; denied. Closing arguments of Govt, Tipton, & Johnson made. Trial adjourned for the day; to commence at 9:30 a.m. on 2/2/93. Deft remanded. (4:05) lkm

CONTINUED ON NEXT PAGE

FILE No. 8

File No. 9

| | Interval (per Section II) | Start Date End Date | Ltr. Total |

J.A.10

USCA4 Appeal: 21-1   Doc: 12-1   Filed: 01/08/2021   Pg: 29 of 363
Case 3:92-cr-00068-DJN   Document 72   Filed 11/17/20   Page 11 of 24 PageID# 2177

Page 9

UNITED STATES DISTRICT COURT
CRIMINAL DOCKET
AO 256A

U.S. v. JOHNSON, CORY

3:92CR68-02

| DATE | PROCEEDINGS (continued) | V. EXCLUDABLE DELAY | | | |
|---|---|---|---|---|---|
| | (Document No.) | (a) | (b) | (c) | (d) |
| **1993** | | | | | |
| Feb. 2 | **JURY TRIAL PROCEEDINGS, DAY 16:** Spencer, J., Kull, OCR. Appearances: Deft w/counsel, AUSA. Jury appeared. Closing arguments of defts Roane and Reavis made. Govt's rebuttal made. Jury charged by the Court. Objections noted to charge. Jury retired to deliberate at 1:25 p.m. Trial adjourned for the day; to commence at 9:30 a.m. on 2/3/93. Deft remanded. (3:40) lkm | | | | |
| Feb. 2 | 457 Appellate Exhibit on behalf of defts Tipton & Johnson filed. lkm | | | | |
| Feb. 2 | 458 Jury Instruction offered on behalf of defts Tipton, Johnson, Roane & Reavis; refused by the Court; filed. lkm | | | | |
| Feb. 2 | 459 ORDER directing that lunch be furnished to jury on 2/1/93 ent'd, JRS, filed. Copy to financial. lkm | | | | |
| Feb. 2 | 460 ORDER directing that lunch be furnished to jury on 2/2/93 ent'd, JRS, filed. Copy to financial. lkm | | | | |
| Feb. 2 | 462 Deft's ex parte motion for advance fund for penalty-phase witnesses filed; SO ORDERED, JRS, filed. lkm | | | | |
| Feb. 3 | **JURY TRIAL PROCEEDINGS, DAY 17:** Spencer, J., Kull, OCR. Appearances: Deft w/counsel, AUSA. Jury appeared. Jury excused to continue deliberations. Question of jury rec'd, answered. Jury returned verdict at 5:05 p.m. Jury found deft Johnson guilty as charged in Counts 1,2,8,9,10,11,12,13,14,15,16,17,18, 19,20,21,22,23,,24,25,26,27,28,29,30,31,32 (all counts as charged in indictment. Jury polled. Jury excused until 10 a.m. on 2/8/93 for penalty phase. Court directed lawyers to make no comments to press. Deft remanded. (:45) lkm | | | | |
| Feb. 3 | 466 Jury Verdict filed. lkm | | | | |
| Feb. 4 | 470 Govt's List of Proposed Witnesses (Penalty Phase), filed. phb | | | | |
| Feb. 4 | 470A ORDER that jurors' 2/3/93 lunch bill be paid by Clerk. ENT 2/4/93, JRS, filed. phb | | | | |
| Feb. 5 | 471 Petition & ORDER FOR WHCAT for Douglas Cunningham ret. 2/8/93 at 10 AM. ENT 2/5/93, JRS, filed. phb | | | | |
| Feb. 5 | WHCAT for Douglas Cunningham ret. 2/8/93 at 10AM, issued. phb | | | | |
| Feb. 5 | 472 Petition & ORDER FOR WHCAT for Paris Robinson ret. 2/8/93 at 10 AM. ENT 2/5/93, JRS, filed. phb | | | | |
| Feb. 5 | WHCAT for Paris Robinson ret. 2/8/93 at 10 AM, issued. phb | | | | |
| Feb. 5 | 478 Petition and ORDER directing that WHCAT be issued for Rodney Tucker ret. 2/8/93 at 10:00 a.m., ENT 02-05-93, DGL, filed. lcq | | | | |
| Feb. 5 | WHCAT issued for Rodney Tucker ret. 2/8/93 at 10:00 a.m. lq | | | | |
| Feb. 5 | 479 Deft's Motion for Proffer from the Govt as to Relevance of the Testimony from Proposed Witnesses, filed. phb | | | | |
| Feb. 5 | 480 Deft's Motion in Linine Re: 1)Murder of Torrick Brown & Wounding of Martha McCoy & 2)Murder of Katrina Rozier, filed. phb | | | | |
| Feb. 8 | 483 Govt's Amended List of Proposed Witnesses (Penalty Phase), filed. phb | | | | |

Interval (per Section II)   Start Date End Date   Ltr. Total

| UNITED STATES DISTRICT COURT CRIMINAL DOCKET | U.S. vs | JOHNSON, CORY | PAGE 10 | 3:92CR68-02 |
|---|---|---|---|---|
| AO 256A | | | | Yr. \| Docket No. \| Def. |

| DATE | PROCEEDINGS (continued) | V. EXCLUDABLE DELAY |
|---|---|---|
| | (Document No.) | (a) \| (b) \| (c) \| (d) |

__1993__

Feb. 8   484   Govt's List of Proposed Exhibits (Penalty Phase), filed. phb

Feb. 8   485   Petition & ORDER FOR WHCAT for Melvin E. Garrison aka Willie Seward ret. 2/8/93 at 1PM.  ENT 2/8/93, JRS, filed.                                                                 phb

Feb. 8   -   WHCAT for Melvin E. Garrison aka Willie Seward ret. 2/8/93 at 1 PM, issued.                                                 phb

Feb. 8   -   Marshal's return on WHCAT for Rodney Tucker ret. 1/11/93 at 10 AM, executed, & filed. (iss.12/22/92)   phb

Feb. 8   -   Marshal's return on WHCAT for Rodney Tucker ret. 1/11/93 at 10 AM, executed, & filed. (iss.12/29/92)   phb

Feb. 8   -   **JURY TRIAL PROCEEDINGS, DAY 18 OF TRIAL, DAY 1 of PENALTY PHASE:** Spencer, J., Kull, OCR.  Appearances: Deft w/counsel, AUSA.  IN CHAMBERS:  Counsel heard as to procedures to be followed in penalty phase.  Counsel heard in argument on motions; Court's rulings in record.  IN OPEN COURT: Jury appeared.  Jury instructed by the Court on penalty phase. Govt adduced evidence; rested.  Jury discharged for the day. Counsel heard in arguments on motion for mistrial and motions regarding aggravating factors.  Court's ruling given from the bench as to those statutory and non-statutory factors that would be dismissed.  Trial adjourned for the day; to commence at 10 a.m. on 2/9/93. Deft remanded.    (2:10)        lkm

Feb. 8   490   Govt's Notice of the Intention of the U.S.A. to Seek the Death Penalty, filed.                                          phb

Feb. 9   -   **JURY TRIAL PROCEEDINGS, DAY 19 OF TRIAL, DAY 2 OF PENALTY PHASE:** Spencer, J., Kull, OCR.  Appearances: Deft w/counsel, AUSA.  IN CHAMBERS:  Counsel heard of deft Tipton's motion, joined by all defts, to excuse juror Cooke because of previous newspaper article on shooting at Det. Woody's car & trial testimony of defts' plans to have Det. Woody killed.  Motion denied.  _Style_ article of 2/9/93 submitted as appellate exhibit on behalf of all defts.  IN OPEN COURT:  Jury appeared.  Jury admonished by the Court to avoid 2/9/93 issue of _Style_.  Opening statement made on behalf of deft Tipton.  Evidence adduced on behalf of deft Tipton; deft rested.  Trial adjourned for the day; to commence at 10 a.m. on 2/10/93. Deft remanded.    (3:05)        lkm

Feb. 9   491   Appellate Exhibit filed on behalf of all defts.     lkm

Feb. 9   492   Deft's Tendered Punishment Phase Instructions filed.   phb

Feb. 10   -   **JURY TRIAL PROCEEDINGS, DAY 20 OF TRIAL, DAY 3 OF PENALTY PHASE:** Spencer, J., Kull, OCR.  Appearances: Deft w/counsel, AUSA.  Jury appeared.  Deft Johnson's opening statement made.  Evidence adduced by deft Johnson. Deft rested.  Trial adjourned for the day; to commence at 10 a.m. on 2/11/93. Deft remanded.    (4:05)        lkm

CONTINUED ON NEXT PAGE

File No. 9

File No. 10

| | Interval (per Section II) | Start Date End Date | Ltr. \| Total |
|---|---|---|---|

J.A.12

UNITED STATES DISTRICT COURT
CRIMINAL DOCKET

U.S. v. JOHNSON, CORY

PAGE 11     3:92CR68

AO 256A

| DATE | PROCEEDINGS (continued) | V. EXCLUDABLE DELAY | | | |
|------|--------------------------|------|------|------|------|
| | (Document No.) | (a) | (b) | (c) | (d) |

**1993**

**Feb. 11** — **JURY TRIAL PROCEEDINGS, DAY 21 OF TRIAL, DAY 4 OF PENALTY PHASE:** Spencer, J., Kull, OCR. Appearances: Deft w/counsel, AUSA. Jury appeared. Deft Roane's opening statement made. Evidence adduced by deft Roane. Deft rested. Trial adjourned for the day; to commence at 10 a.m. on 2/12/93. Deft remanded. (3:35)     lkm

**Feb. 11** 496 ORDER FOR SEQUESTRATION. ENT 2/11/93, JRS, filed. Cps. dist. (SEALED)     Cps. phb

**Feb. 12** Marshal's return on executed WHCAT for Douglas Cunningham, filed.     lcq

**Feb. 12** Marshal's return on executed WHCAT for Daryl Moses, filed.     lcq

**Feb. 12** Marshal's return on executed WHCAT for Gregory Noble, filed.     lcq

**Feb. 12** Marshal's return on executed WHCAT for Melvin E. Garrison, filed.     lcq

**Feb. 12** Marshal's return on executed WHCAT of Douglas Cunningham, filed.     lcq

**Feb. 12** Marshal's return on executed WHCAT for Rodney Tucker, filed.     lcq

**Feb. 12** Marshal's return on executed WHCAT for Paris Robinson, filed.     lcq

**Feb. 12** — **JURY TRIAL PROCEEDINGS, DAY 22, DAY 5 OF PENALTY PHASE.** Appearances: Deft w/counsel, AUSA. Jury appeared. Closing arguments of counsel made. Defts' motions for mistrial and renewed motions for severance based on govt's closing arguments heard; ruling given from the bench; motions denied. Jury charged by the Court. Alternate jurors discharged. Jury retired to deliberate at 2:30 p.m. No objections noted to charge. Trial adjourned for the day; to commence on 2/13/93 at 9:30 a.m. Deft remanded.     lkm

**Feb. 13** — **JURY TRIAL PROCEEDINGS, DAY 23, DAY 6 OF PENALTY PHASE.** Appearances: Deft w/counsel, AUSA. Jury appeared.. Jury retired to continue deliberations. Inquiry of jury rec'd, answered. Trial adjourned for the day; to commence at 9:30 a.m. on 2/15/93. Deft remanded.     lkm

**Feb. 15** — **JURY TRIAL PROCEEDINGS, DAY 24, DAY 7 OF PENALTY PHASE.** Appearances: Deft w/counsel, AUSA. Jury appeared. Jury retired to continue deliberations. Trial adjourned for the day; to commence at 9:30 a.m. on 2/16/93. Deft remanded. (:06)     lkm

**Feb. 16** 498 ORDER that jurors be kept together in custody of U.S. Marshal who shall furnish them lunch Feb. 8, 9, 10, 11, 12, & 13, 1993. ENT 2/16/93, JRS, filed.     phb

**Feb. 16** 499 ORDER that U.S. Marshals Service & U.S. Bureau of Prisons are DIRECTED to permit Deft reasonable access to phones to speak w/counsel. ENT 2/16/93, JRS, filed. Cps. dist.     phb

CONTINUED ON NEXT PAGE

J.A.13

UNITED STATES DISTRICT COURT
CRIMINAL DOCKET    *U. S. vs*

JOHNSON, CORY

3:92CR68-02

AO 256A ⊕

| | | | Yr. | Docket No. | Def. |

| DATE | | PROCEEDINGS (continued) | V. EXCLUDABLE DELAY |
|------|------|------|------|
| | (Document No.) | | (a) | (b) | (c) | (d) |

**1993**

| Feb. 16 | — | **JURY TRIAL PROCEEDINGS, DAY 25, DAY 8 OF PENALTY PHASE.** Appearances: Deft w/counsel, AUSA. Jury appeared. Jury retired to continue deliverations. Jury returned verdict at 1:30 p.m. Jury voted a sentence of death as to killing of Peyton Maurice Johnson, Louis J. Johnson, Bobby Long, Anthony Carter, Dorothy Mae Armstrong, Curtis Thorne, and Linwood Chiles. Jury polled. Jury discharged. Sentencing set for 9 a.m. on 5/18/93. Sentencing Guideline Order ent'd. Deft remanded. (:40) | lkm |
| Feb. 16 | 508 | Special Findings of Jury filed. | lkm |
| Feb. 16 | 509 | Decision Form as to the killing of Peyton Maurice Johnson filed. | lkm |
| Feb. 16 | 510 | Decision Form as to the killing of Louis J. Johnson filed. | lkm |
| Feb. 16 | 511 | Decision Form as to the killing of Bobby Long filed. | lkm |
| Feb. 16 | 512 | Decision Form as to the killing of Anthony Carter filed. | lkm |
| Feb. 16 | 513 | Decision Form as to the killing of Dorothy Mae Armstrong filed. | lkm |
| Feb. 16 | 514 | Decision Form as to the killing of Curtis Thorne filed. | lkm |
| Feb. 16 | 515 | Decision Form as to the killing of Linwood Chiles filed. | lkm |
| Feb. 16 | 516 | Certificate of Jury filed. | lkm |
| Feb. 16 | 523 | Sentencing Guideline Order ent'd, JRS, filed. | lkm |
| Feb. 16 | — | Trial exhibits in exhibit room; weapons & drugs in Drawer 2 of evidence safe; trial minutes, etc. in expandable w/file. | km |
| March 16 | 535 | Third Superseding Indictment returned before a Judge in Open Court, filed. (Applied to deft Thomas; not this deft) lkm | |
| May 7 | 567 | Govt's Motion, filed. | phb |
| May 14 | 572 | Defts' Motion to Bar Imposition of the Death Penalty & for a New Jury Sentencing Hearing Due to Improper Weighing of Aggravating Circumstances, filed. | phb |
| May 17 | 573 | Defts' Motion to Bar Execution of Defts Due to Absence of a Congressionally Authorized Execution Method, filed. | phb |
| May 18 | 580 | Deft's Motion for Stay of Execution, filed. | phb |
| May 18 | — | **IN OPEN COURT:** Spencer, J., Kull, OCR. appearances: Deft w/counsel, AUSA. Deft's motion for continuance of sentencing heard; granted. Sentencing rescheduled for 9:30 a.m. on 6/1/93. Deft remanded. | lkm |
| May 21 | 581 | Deft's Motion for New Penalty Phase Trial, filed. phb | |
| May 21 | 585 | ORDER that Defts' Joint Motion to Bar Imposition of Death Penalty Due to Improper Weighing of Aggravating Circumstances is DENIED. Deft Tipton's Motion for Leave to Interview Jury Foreperson RE: Penalty Phase Deliberations is DENIED. Deft Tipton's Motion for Disclosure of Information Relating to Mental Condition of Deft Thomas is DENIED, but doe not preclude Deft from asking 4CCA to order same, if appealed. Defts' Motions to Stay Execution are DENIED. ENT 5/21/93, JRS, filed. Cps. dist. | phb |

FILE NO. 16

| | Interval (per Section II) | Start Date End Date | Ltr. Good | Total Day |

**J.A.14**

UNITED STATES DISTRICT COURT
CRIMINAL DOCKET

AO 256A

U.S. v. JOHNSON, CORY

PAGE 13          3:92CR68-C

| DATE | PROCEEDINGS (continued) | V. EXCLUDABLE DELAY | | | |
|------|-------------------------|------|------|------|------|
| | (Document No.) | (a) | (b) | (c) | (d) |
| **1993** | | | | | |
| May 24 | 586 MEMORANDUM OPINION of the Court. ENT 5/24/93, JRS, filed. Cps. dist. phb | | | | |
| May 24 | 587 ORDER that Deft's motion for new sentencing hearing is DENIED. ENT 5/24/93, JRS, filed. Cps. dist. phb | | | | |
| May 25 | 588 Govt's Memo. in Opposition to the Motion to Bar Execution of Defts Due to the Absence of a Congressionally-Authorized Execution Method, filed. phb | | | | |
| May 28 | 590 Deft's Position w/Respect to Sentencing Factors, filed. phb | | | | |
| May 28 | 591 Deft's Motion to Vacate Judgments of Convictions, filed. phb | | | | |
| June 1 | – SENTENCING PROCEEDINGS: Spencer, J., Kull, OCR. Appearances: Deft w/counsel, AUSAs. Matter came on for sentencing. Deft's motion to vacate judgment denied. Court advised parties that jury's recommended sentence would be imposed but that the Court would not designate method of execution unless and until Congress enacted proper legislation. Objections to PSR heard; overruled. Statements made on behalf of and by deft. Govt heard. Sentence imposed: Cts. 8, 11, 17, 18, 19, 24, 25 – Death as to each ct. Life plus 85 years consisting of Ct. 2 – Life. Cts. 10,13,14,21,22,23,27,28 – Life as to each ct, concurrent. Ct. 29 – 30 yrs, concurrent. Ct. 30 – 30 yrs, concurrent. Ct. 16 – 20 yrs, concurrent. Ct. 31 – 20 yrs, concurrent. Ct. 32 – 40 yrs, concurrent. Ct. 9 – 5 yrs consecutive. Cts 12,15,20,26 – 20 yrs as to each ct., consecutive. Should deft be released, deft is placed on 5 yrs. supr release. $1300 SA. Note: conspiracy sentence is set aside when deft is convicted of both 21 USC 848 and 21 USC 848; no sentence was imposed as to Ct. 1. Deft advised of right of appeal. Deft remanded to BOP until sentence is carried out. lkm | | | | |
| June 1 | 593 Judgment is a Criminal Case ent'd, JRS, filed. Copies distributed. lkm | | | | |
| June 10 | 598 Deft's Notice of Appeal filed. TPO to both counsel. lkm | | | | |
| June 10 | 599 Deft's Notice of Appeal from Sentence of Death filed. lkm | | | | |
| June 17 | --- P.S.R. from Probation Office, rec'd. UNDER SEAL jjp | | | | |
| June 18 | 600 ORDER that Defts are hereby ORDERED to file such amended motions by and no later than July 9, 1993, ENT 06/18/93, JRS, filed. Cps. mailed. jjp | | | | |
| Jun. 29 | 601 Govt's Notice of Appeal, filed. TPO pkg. sent. phb | | | | |
| Jun. 29 | – Transcript of 6/1/93, filed by OCR. phb | | | | |
| July 22 | --- Order from USCA consolidating cases Richard Tipton 93-4005, Cory Johnson 93-4006, James H. Roane, Jr. 93-4007, Tipton, Johnson and Roane 93-4009, and Tipton 93-4010, for purposes of briefing and oral argument, filed. jjp | | | | |
| Aug. 25 | 610 Copy of 4CCA Order extending time to file transcript, filed. phb | | | | |
| Aug. 30 | 611 MEMORANDUM OPINION of the Court. ENT 8/30/93, JRS, filed. Cps. dist. phb | | | | |
| Aug. 30 | 612 ORDER that Deft Tipton's Amended Motion to Vacate Judgments of Conviction is DENIED. ENT 8/30/93, JRS, filed. Cps. dist. phb | | | | |

Interval
(per Section II)

Start Date
End Date

Ltr. Total

J.A.15

| UNITED STATES DISTRICT COURT CRIMINAL DOCKET | U.S. vs | JOHNSON, CORY | PAGE 14 | 3:92CR68-02 |
|---|---|---|---|---|

AO 256A ⊕

| | | Yr. | Docket No. | Def. |
|---|---|---|---|---|

| DATE | PROCEEDINGS (continued) | V. EXCLUDABLE DELAY |
|---|---|---|
| | (Document No.) | (a) \| (b) \| (c) \| (d) |

**1993**

| Sep. 3 | Transcript of proceedings of January 11, 1993, Volume I, filed by OCR. | lcq |
|---|---|---|
| Sep. 3 | Transcript of proceedings 1f January 12, 1993, Volume II, filed by OCR. | lcq |
| Sep. 3 | Transcript of proceedings of January 13, 1993, Volume III, filed by OCR. | lcq |
| Sep. 3 | Transcript of proceedings of January 14, 1993, Volume IV, filed by OCR. | lcq |
| Sep. 3 | Transcript of proceedings of January 15, 1993, Volume V, filed by OCR. | lcq |
| Sep. 3 | Transcript of proceedings of January 18, 1993, Volume VI, filed by OCR. | lcq |
| Sep. 3 | Transcript of proceedings of January 19, 1993, Volume VII, filed by OCR. | lcq |
| Sep. 3 | Transcript of proceedings of January 20, 1993, Volume VIII, filed by OCR. | lcq |
| Sep. 3 | Transcript of proceedings of January 21, 1993, Volume IX, filed by OCR. | lcq |
| Sep. 8 | Transcript of 1/25/93, Vol. X, filed by OCR. | phb |
| Sep. 8 | Transcript of 1/26/93, Vol. XI, filed by OCR. | phb |
| Sep. 8 | Transcript of 1/27/93, Vol. XII, filed by OCR. | phb |
| Sep. 8 | Transcript of 1/28/93, Vol. XIII, filed by OCR. | phb |
| Sep. 8 | Transcript of 1/29/93, Vol. XIV, filed by OCR. | phb |
| Sep. 8 | Transcript of 2/1/93, Vol. XV, filed by OCR. | phb |
| Sep. 8 | Transcript of 2/2/93, Vol. XVI, filed by OCR. | phb |
| Sep. 8 | Transcript of 2/3/93, Vol. XVII, filed by OCR. | phb |
| Sep. 14 | Transcript of 2/8/93, Vol. XVIII, filed by OCR. | phb |
| Sep. 14 | Transcript of 2/9/93, Vol. XIX, filed by OCR. | phb |
| Sep. 14 | Transcript of 2/10/93, Vol. XX, filed by OCR. | phb |
| Sep. 20 | Transcript of proceedings of February 11, 1993 Volume XXI, filed by OCR. | lcq |
| Sep. 20 | Transcript of proceedings of February 12, 1993 Volume XXII, filed by OCR. | lcq |
| Sep. 20 | Transcript of proceedings of February 13, 1993 Volume XXIII, filed by OCR. | lcq |
| Sep. 20 | Transcript of proceedings of February 15, 1993 Volume XXIV, filed by OCR. | lcq |
| Sep. 20 | Transcript of proceedings of February 16, 1993 Volume XXV, filed by OCR. | lcq |
| Sept. 29 | 615  Certification of Completion sent to USCA re: appeal by Deft.(jpea) | |
| Nov. 30 | -  Transcript of 12/22/92 at 2:00 p.m., filed by Crane-Snead.phb | |
| Dec. 15 | 628  Amended Certificate of Completion sent to USCA re: appeal (jpea) | |
| Dec. 20 | ---  Amended Certificate of Completion RETURNED to USDC from USCA because additional transcripts requested.  JJP | |
| Dec. 22 | Transcript of proceedings of November 2, 1992 filed by OCR. | lcq |
| **1994** Jan. 20 | -  Transcript of 8/11/92 filed by OCR. | phb |

* See Next Page *

| | Interval (per Section II) | Start Date End Date | Ltr. Good | Total Days |
|---|---|---|---|---|

**J.A.16**

UNITED STATES DISTRICT COURT
CRIMINAL DOCKET

AO 256A

U.S. v. JOHNSON, CORY                    PAGE 15          3:92CR68-02

| DATE | | PROCEEDINGS (continued) | V. EXCLUDABLE DELAY | | | |
|---|---|---|---|---|---|---|
| | (Document No.) | | (a) | (b) | (c) | (d) |
| **1994** | | | | | | |
| March 7 | 632 | 2nd Amended Certificate of Completion sent to USCA re: appeal by Deft.(jpea) | | | | |
| **1996** | | | | | | |
| July 8 | 650 | Per curiam opinion, Vol. 1 of 2, affirming in part, vacating and remanding, filed. | dht | | | |
| July 8 | 651 | Per curiam opinion, Vol. 2 of 2, affirming in part, vacating and remanding, filed. | dht | | | |
| Novm 5 | 652 | Cert. copy of judgment of USCA, filed. | dht | | | |
| Nov. 22 | 654 | ORDER of Execution setting date of 3-20-97 setting forth procedures to be followed, ent'd, JRS, filed. Copies as directed. | lkm | | | |
| **1997** | | | | | | |
| Feb. 20 | 656 | Deft's Consent Motion to Stay Execution filed. | lkm | | | |
| Feb. 21 | 657 | ORDER granting motion for stay of deft's execution scheduled for 3/20/97; execution stayed pending further order of Court. Copies to counsel. | lkm | June 2 | Order of Su denying cer |
| **** | | | | | | |
| Oct. 14 | 675 | Deft's Motion for leave to proceed in forma pauperis filed. | lkm | | | |
| Oct. 14 | 676 | Petitioner's Motion for appointment of counsel before filing writ of H.C. filed. | lkm | | | |
| Oct. 14 | 677 | Petitioner's Memorandum in support of motion for appointment of counsel filed. | lkm | | | |
| Nov. 14 | 679 | ORDER granting motion to proceed in forma pauperis; granting motion for appointment of counsel; appointing Barbara L. Hartun, Esq., and Edward E. Scher, Esq for petitioner. | lkm | | | |
| Nov. 14 | 680 | CJA30 appointing Edward E. Scher, Esquire. | lkm | | | |
| Nov. 14 | 681 | CJA 30 appointment Barbara L. Hartung, Esquire. | lkm | | | |
| **1998** | | | | | | |
| Feb. 23 | 693 | CJA30, No. 2 sent to Edward E. Scher, filed. | lkm | | | |
| **April 16 | 699 | CJA30, No. 2, for Ms. Hartung filed. | lkm | | | |
| April 17 | 701 | ORDER directing that Petition for writ of habeas corpus be filed by 6/1/98, ent'd, JRS, filed. Copies mailed. | lkm | | | |
| *** | | | | | | |
| May 8 | 702 | Motion Pursuant to Local Rule 83.5 for leave to interview Jurors, Incorporating Memorandum in Support as to Cory Johnson, Richard Tipton and James Roane, Jr. Filed. | | lcn | | |
| May 22 | 707 | (See Richard Tipton) | | | | |
| May 26 | 708 | (See Richard Tipton) | | | | |
| May 26 | 709 | (See Richard Tipton) | | | | |
| June 5 | 712 | (See Richard Tipton) | | | | |
| June 10 | 713 | (See Richard Tipton) | | | | |
| June 1 | 714 | 2255 petition filed as to Cory Johnson. Civil Action #3:98CV895. | | lcn | | |
| June 15 | 719 | Memorandum in support of [714] Motion to vacate set aside, or correct sentence. as to Cory Johnson. Filed. | | lcn | | |
| ** Apr. 16 | 700A | Petitioner's Motion UNDER SEAL. | lkm | | | |
| Apr. 16 | 700B | Petitioner's Motion UNDER SEAL. | lkm | | | |
| ***Apr. 24 | 701A | ORDER UNDER SEAL. | lkm | | | |

Interval (per Section II) | Start Date End Date | Ltr. | Total

**J.A.17**

UNITED STATES DISTRICT COURT
CRIMINAL DOCKET   *U. S. vs* Cory Johnson          *Page 16*          3:92CR68-02

AO 256A ⊕

| | | | Yr. | Docket No. | Def. |

| DATE | PROCEEDINGS (continued) | V. EXCLUDABLE DELAY |
| | | (a) | (b) | (c) | (d) |
|---|---|---|---|---|---|
| | (Document No.) | | | | |
| June 16 | 721 ORDER as to Cory Johnson directing the Respondent to file an answer to the claims contained in the petition no later than August 14, 1998; and the Petitioner Johnson shall respond to respondent's answer within thirty (30) days of receipt of a copy of the answer. Entered JRS 6-16-98. Filed Copies distr. | 1cn | | | |
| July 22 | 727 (See Richard Tipton) | | | | |
| July 24 | 728 (See Richard Tipton) | | | | |
| Aug. 14 | 731 CJA30, No. 3, to Barbara Hartung. | 1km | | | |
| Sept. 3 | 735 Govt's Consent Motion for additional extension of time to file response to 2255 filed. | | 1km | | |
| Sept. 3 | 736 Order granting extension to file response to 2255 until 9/29/98, ent'd, JRS, filed. Copies mialed. | 1km | | | |
| Sept. 24 | 737 Deft's first amendment to intitial petition under 2255 and to memorandum in support of petition. | 1km | | | |
| Sept. 25 | 738 Consent Motion for additional extension of time for U.S. to file response to 2255 Petition filed. | 1km | | | |
| Sept. 28 | 739 ORDER granting U.S. extension of time until 10/29/98 to filed consolidated response to 2255 petition; ent'd, JRS, filed. Copies mailed. | 1km | | | |
| Oct. 29 | 745 Govt's Motion for leave to file outsized consolidated response to 2255 motions filed. | 1km | | | |
| Oct. 29 | 746 Govt's Memorandum in response to Petitioners' Motions under 2255 filed. | 1km | | | |
| Nov. 20 | 748 Joint Consent Motion for extension of time for Petitioners to file reply to U.S. Memorandum for dismissal of 2255 Petitions filed. | | 1km | | Smtn |
| Nov. 25 | 749 ORDER granting leave for petitioners to file response to govt's Memorandum on 2/1/99; ent'd, JRS,filed. Copies mailed. | 1km | | | |
| 1999 | | | | | |
| Jan. 11 | 751 ORDER granting govt's motion for leave to file outsized consolidated response to petitioners' motion under 2255, ent'd, JRS, filed. Copies mailed. | 1km | | | |
| Jan. 19 | 752 Joint Consent Motion for extension of time to file petitioners' reply to US memorandum requesting summary dismissal of 2255 motions for collateral relief filed. | 1km | | | |
| Jan. 28 | 753 ORDER extending time for petitioners to file response to govt's memo seeking dismissal of 2255 petition until 2/22/99; ent'd, JRS, filed. Copies mailed. | 1km | | | |
| Feb. 18 | 754 Petitioners' Joint Consent Motion for Extension of Time to respond to U.S. Memo requesting dismissal of 2255 filed. | 1km | | | |
| Feb. 22 | 755 ORDER granting motion to extend petitioners' time to respond to govt's response to 2255 until 3/15/99, ent'd, JRS, filed. Copies mailed. | 1km | | | |
| March 15 | 760 Petitioner Johnson's Motion for leave to amend and Second Amendment to Initial Petition under 2255 and to Memo in support of Petition filed. | 1km | | | |
| March 15 | 761 Petitioner Johnson's Reply Memorandum in support of initial Petition under 2255 filed. | 1km | | | |

Interval (per Section II) | Start Date End Date | Ltr. Code | Total

**J.A.18**

UNITED STATES DISTRICT COURT
CRIMINAL DOCKET

AO 256A

**U.S. v. CORY JOHNSON**        3:92 CR 68-02        *page 17*

| DATE | PROCEEDINGS (continued) | V. EXCLUDABLE DELAY | | | |
|------|--------------------------|-----|-----|-----|-----|
|      | (Document No.) | (a) | (b) | (c) | (d) |
| **1999** | | | | | |
| April 26 | 765   Petitioner's Notice of Supplemental Authority filed.   lkm | | | | |
| May 20 | 768   Order granting petitioner's motion for leave to file second amendment to 2255 Petition; ent'd. JRS, filed.  Copies to counsel.   lkm | | | | |
| **June 14** | 769   CJA 30, No. 4, filed; mailed to counsel.   lkm | | | | |
| June 24 | 770   Joint Petitioners' Motion for leave to take discovery.   lkm | | | | |
| June 29 | 771   Petitioners' Joint Motion to Amend 2255 Petition filed.   lkm | | | | |
| July 7 | 772   Govt Motion for extension of time to file response to Petitioners' joint motion for leave to take discovery (Styled as Consent Motion; no signatures of Petitioners; counsel.)   lkm | | | | |
| July 9 | 773   ORDER granting govt motion for extension of time to respond to petitioners' Joint Motion for leave to take discovery; Response due by 9/7/99; ent'd, JRS, filed.  Copies mailed.   lkm | | | | |
| 7/16/99 | 774   Govt's Response to Petitioners' Motion to Amend petition filed.  lkm | | | | |
| Aug. 3 | 775   ORDER granting Petitioners' Motion for leave to amend petition; directing amendments be filed by 10/1/99; govt response 60 days thereafter; petitioners' replies 20 days thereafter; ent'd, JRS, filed.  Copies mailed.   lkm | | | | |
| Sept. 2 | 776   Govt's Motion for extension of time to file Response to Petitioners' Joint Motion for leave to take discovery filed.   lkm | | | | |
| Sept. 7 | 777   Petitioner Johnson's Response to govt's Motion for extension of time to file response to petitioners' Joint Motions for leave to take discovery filed.   lkm | | | | |
| Sept. 24 | 778   Govt's Response to Petitioners' Consolidated Motion for Discovery filed.   lkm | | | | |
| Oct. 1 | 780   Johnson's Third Amendment to initial Petition under 2255 w/supporting Memorandum filed.   lkm | | | | |
| Oct 13 | 782   Consent Motion for an extention  to time for Petitioner to file a reply to the govt's response to Petitoners' Joint Motion for Leave to take discovery, filed   srb | | | | |
| Nov. 10 | 783   ORDER granting Petitioners' motion for extension of time to file reply to govt's response to petitioners' joint motion for leave to take discovery; directing reply be filed by COB on 1/10/00; ent'd, JRS, filed.  Copies mailed.   lkm | | | | |
| Nov. 30 | 784   Consolidated Response of U.S. to Petitioners Tipton's & Roane's 2nd Amendment to 2255 Petition & to Petitioner Johnson's 3rd Amendment to 2255 Petition.   lkm | | | | |
| Dec. 10 | 785   Joint Consent Motion for extension of time to file Petitioners' Reply to U.S. Consolidated Response to Second and Third Amendment to 2255 Petitions filed.   lkm | | | | |
| **2000** | | | | | |
| Jan. 5 | 786   Petitioner Tipton's Motion for appt of counsel; Petitioners' Joint Motion for extension of time to file reply to U.S.'s consolidated response to Second and Third Amendments to 2255 Petition; Petitioners' Joint Motion for extension of time to file reply to U.S.'s response to Petitioners' consolidated motion for discovery; filed.   lkm | | | | |
| Jan. 6 | 787   ORDER granting petitioner Tipton's motion for new counsel; counsel to be appointed; granting Petitioner Tipton's motions for extensions of time on matters pending b/4 Court; granting Petitioner Johnson's and Roane's motions for extensions of time requested in Pleadings No. 782 and 785; directing responses be filed by 2/14/00; ent'd, JRS, filed.  Copies faxed & mailed.   lkm | | | | |

Interval lkm   Start Date   Ltr   Total
(per Section II)   End Date   Code Day

**J.A.19**

USCA4 Appeal: 21-1    Doc: 12-1    Filed: 01/08/2021    Pg: 29 of 363

PAGE 18

| UNITED STATES DISTRICT COURT CRIMINAL DOCKET | U. S. vs | JOHNSON, CORY | | 92 CR68–02 |
|---|---|---|---|---|

*Page 18*

AO 256A ⊕

| | | | Yr. | Docket No. | Def. |
|---|---|---|---|---|---|

| DATE | | PROCEEDINGS (continued) | V. EXCLUDABLE DELAY | | | |
|---|---|---|---|---|---|---|
| | (Document No.) | | (a) | (b) | (c) | (d) |
| **2000** | | | | | | |
| Feb. 14 | 791 | Petitioner Johnson's Reply to Govt's Consolidated Response to Petitioner's 3rd Amendment to 2255 Petition.filed.    lkm | | | | |
| Feb. 14 | 792 | Petitioner Johnson's Reply to U.S.'s Response to Petitioners' Consolidated Motion for Discovery filed.    lkm | | | | |
| March 6 | 796 | Petitioner Johnson's Supplemental Exhibit in support of Claim VIII of initial 2255 Petition filed.    lkm | | | | |
| April 27 | 799 | Petitioner Johnson's Notice Adopting Tipton's Reply in support of Tipton's 2nd Amendment to his 2255 Petition.filed.    lkm | | | | |
| April 27 | 800 | Petitioner Johnson's Notice Adopting Tipton's Reply in support of Petitioners' Joint Discovery Motions filed.    lkm | | | | |
| April 27 | 801 | Petitioner Johnson's Notice of Supplemental Authority in support of Petitioners' Joint Motion for Leave to Take Discovery filed.    lkm | | | | |
| April 27 | 802 | Petitioner Johnson's Notice of Supplemental Authority in support of his 2255 Petition raising cliams of Ineffective Assistance by Counsel filed.    lkm | | | | |
| May 3 | 803 | Memorandum Opinion relating to Petitioners' Joint Motion for leave to take discovery ent'd, JRS, filed.Copies mailed. | | lkm | | |
| May 3 | 804 | ORDER denying Petitioners' Joint Motion for leave to take discovery EXCEPT as to Tipton who will have until 6/16/00 to have knife tested and relevant information submitted; ent'd, JRS, filed.  Copies mailed.    lkm | | | | |
| June 1 | 805 | Petitioners' Joint Motion for reconsideration of Court's Discovery Order and supporting memorandum filed.    lkm | | | | |
| June 22 | 809 | ORDER granting motion of U.S. for extension until 7/10/00 to file response to Petitioners' Joint Motion for reconsideration of Discovery Order; ent'd, JRS, filed. Copies mailed.    lkm | | | | |
| July 10 | 813 | Response of U.S. to Petitioners' Joint Motion for Reconsideration of Discovery Order & supporting Memorandum filed.    lkm | | | | |
| July 12 | 814 | Petitioner's Notice of Supplemental Authority and Second Supplemental Exhibit in support of Claim VIII of 2255 filed.  lkm | | | | |
| July 19 | 815 | Petitioners' Reply to Response of U.S. to Petitioners' Joint Motion for Reconsideration of Court's Discovery Order and Supporting Memorandum filed.    lkm | | | | |
| Aug. 17 | 820 | Petitioner Johnson's Notice of Supplemental Authority and Supplemental Exhibit in support of Claim IV(B)(1) of Second Amendment to 2255 Petition filed.    lkm | | | | |
| Sept. 25 | 826 | Petitioner's Notice of Supplemental Authority w/exhibit filed.  lkm | | | | |
| Dec. 11 | 830 | ORDER directing that Tipton's Motion to Amend 2255 Petition is granted; directing counsel to provide index for grounds for relief, listing of claims raised in Petition w/i 15 days; govt to respond & file index w/i 30 days; directing that Court will review only those claims so designated as directed in this Order; ent'd, JRS, filed. Copies mailed and faxed.    lkm | | | | |
| Dec. 14 | 831 | Petitioner's Motion for extension of time to respond to Order of 12/11/00 filed.  (Styled Consent Motion; no signatures for other Petitioners; filed only as to Johnson.)    lkm | | | | |
| Dec. 18 | 832 | ORDER granting Petitioner Johnson's motion for extension of time until 1/9/01 for filing directed in Order of 12/11/00; govt's response due 1/24/01.  Copies mailed.    lkm | | | | |

| | Interval (per Section II) | Start Date End Date | J.A 20 |
|---|---|---|---|

UNITED STATES DISTRICT COURT      JOHNSON, CORY        Page 19
CRIMINAL DOCKET

AO 256A

| DATE | | PROCEEDINGS (continued) | V. EXCLUDABLE DELAY | | | |
|------|------|------|------|------|------|------|
| | (Document No.) | | (a) | (b) | (c) | (d) |
| **2001** | | | | | | |
| Jan. 9 | 835 | Petitioner's Index to Grounds for 2255 Relief filed.     lkm | | | | |
| Jan. 18 | 837 | Govt's Motion for extension of time to file Index of Pleadings filed. | | lkm | | |
| | Jan. 19 — | SO ORDERED: Govt's motion for extension of time to file Index until 1/29/01; ent'd, JRS, filed. Copies to counsel. lkm | | | | |
| Jan. 29 | 838 | Govt's Index to 2255 claims raised by petitioner Johnson filed. | lkm | | | |
| July 18 | 843 | Ms. Hartung's Notice of New address and telephone number filed. lkm | | | | |
| August 10 | 844 | ORDER granting [841] Motion to Amend. United States DIRECTED to file its response to the amended claim w/in 20 days of date of entry hereof. Any reply by Tipton, Johnson or Roane shall be filed w/in 30 days of date of entry hereof; def. Tipton, Johnson or Roane shall file w/in 30 days of date of entry hereof briefs directed to additional allegations of default; United States must inform the Court w/in 15 days of date of entry hereof to demand summary judgment on the record currently before the Court. ENTERED: JRS. Copies mailed: yes | | lts | | |
| Aug. 10 | 847 | Petitioner's Notice and Motion adopting Petitioner Roane's Third Amendment as Johnson's Fourth Amendment to 2255 petition filed pursuant to Order of 8/10/01.    lkm | | | | |
| Aug. 22 | 850 | Petitioners' Joint Consent Motion for extension of time to file briefs in response to govt's new allegations of procedural default filed.    lkm | | | | |
| Aug. 23 | 851 | Govt's Motion to Dismiss, or in the alternative, for summary judgment and Brief in support filed.    lkm | | | | |
| Aug. 30 | 852 | Joint Consent Motion for extension of time for petitioners to file opposition to govt's motion to dismiss or for summary judgment filed (As to petitioners Johnson & Roane only; incorrect signature as to Tipton.)    lkm | | | | |
| Aug. 30 | 853 | Govt's Supplemental Motion to Dismiss, or in alternative, for Summary Judgment; Response of US to petitioners Johnson & Tipton's 4th Amended motion and petitioner Roane's 3rd amended motion filed.    lkm | | | | |
| Aug. 31 | 854 | ORDER granting petitioners extension of time to 10/1/01 to file responses to new assertions of procedural default; govt's reply due 10/11/01. Court directs U.S. to file statement of undisputed facts for summary judgment claims by 9/20/01; petitioners to respond by 10/22/01; U.S. to reply by 11/2/01; ent'd, JRS, filed.    lkm | | | | |
| Sept. 19 | 855 | Govt's Motion for extension of time to file Statement of Undisputed Facts filed.    lkm | | | | |
| Sept. 25 | 856 | ORDER grant govt's motion for extension of time to file statement of undisputed facts until 10/10/01; responses due 11/12/01; reply due 11/22/01; ent'd, JRS, filed. Copies mailed. lkm | | | | |
| Oct. 1 | 858 | Petitioner's Reply to govt's claims of procedural default filed. lkm | | | | |

SEE NEXT PAGE

UNITED STATES DISTRICT COURT
CRIMINAL DOCKET   U. S. vs   JOHNSON, CORY   Page 20   3:92CR68-2

AO 256A ⊕

| | | Yr. | Docket No. | Def. |

| DATE | PROCEEDINGS (continued) | V. EXCLUDABLE DELAY |
|------|------|------|
| | (Document No.) | (a) | (b) | (c) | (d) |

**2001**

| Oct. 10 | 860 | Govt's Motion for extension of time to reply to petitioners' Procedural Default Responses filed. | lkm |
| Oct. 10 | 861 | Govt's Supplemental Statement of Undisputed Material Facts in support of govt's Motion for Summary Judgment filed. | lkm |
| Oct. 23 | 862 | ORDER granting U.S. an extension of time until 10/26/01 to file responses to petitioners' new assertions of procedural default; ent'd, JRS, filed. Copies mailed. | lkm |
| Oct. 26 | 864 | Govt's Response to Petitioner's Pleading regarding procedurally defaulted claims filed. | lkm |
| Nov. 13 | 868 | Petitioner's Opposition to govt's Motion for Summary Judgment and Motion to Dismiss and Supplemental Statement of undisputed material facts in support of its Motion for Summary Judgment filed. | lkm |
| Nov. 27 | 870 | EX PARTE, SEALED ORDER as to deft Johnson filed. | lkm |
| Dec. 4 | 871 | Petitioner Johnson's Exparte, Under Seal motion filed. | |

**2002**

| | | | lts |
| Jan. 2 | 872 | Exparte, Under Seal ORDER ent'd, JRS, filed. Copy to counsel. | lkm |
| Jan. 4 | 873 | Exparte, Under Seal Response filed by Petititoner Johnson. | lkm |
| Jan. 14 | 874 | ORDER, Ex parte, Under Seal, ent'd as to Petitioner Johnson, JRS, filed. Copy to Johnson counsel only. | lkm |
| Aug. 14 | 886 | ORDER directing all counsel to advise the Court by 8/30/02 if any motion/amendment based on videotapes recently provided by the U.S. will be filed. Any such pleading must be filed by 9/13/02; U.S. to reply by 10/4/02; ent'd, JRS, filed. Copies mailed. | lkm |
| Aug. 30 | 888 | Petitioner Johnson's Consent motion for 2 week extension of time to review videotapes and submit notice to Court filed. | lkm |
| Aug. 30 | 889 | Petitioner Johnson's Notice and motion adopting argument of Petitioner roane submited in reponse to govt letter dated 7/18/02 filed. | lkm |
| Sept. 11 | 893 | ORDER extending deadlines in Order of 8/14/02 to 9/13/02 to advise Court if motion or amendment will be filed relating to videotapes and 9/27/02 to file any such motion or amendment; ent'd, JRS, filed. Faxed and mailed to counsel. | lkm |
| Sept. 13 | -- | By letter: counsel advises that Petitioner Johnson will not be filing any additional motions or amendments relating to videotapes interviews. | lkm |

**2003**

| May 1 | 896 | Memorandum Opinion ent'd, JRS, filed. Copies mailed. | lkm |
| May 1 | 897 | ORDER granting US' motion for summary judgment in part, denying in part; dismisssing Petitioners Tipton and Johnson's grounds for 2255 relief & their motions under 2255 are denied; dismissing all of Petitioner Roane's 2255 grounds except for his claim that he was denied effective assistance of counsel in conjunction with charges pertaining to murder of Douglas Moody & his claim that he is innocent of the murder of Moody; denyinig Tipton's request to conduct add'l discovery; ent'd, JRS, filed. Copies mailed. | lkm |

Interval (per Section II) | Start Date / End Date | Total Code/Days

JA22

UNITED STATES DISTRICT COURT
CRIMINAL DOCKET

JOHNSON, CORY

AO 256A

| DATE | (Document No.) | PROCEEDINGS (continued) | V. EXCLUDABLE DELAY | | | |
|------|---|---|---|---|---|---|
| | | | (a) | (b) | (c) | (d) |
| **2003** | | | | | | |
| May 15 | 900 | Motion of Petitioners Tipton, Johnson & Roane to alter Court's Order and Opinion dated 5/1/03 pursuant to FRCiP 52(b) and 59(e) filed. | 1km | | | |
| May 27 | 901 | Govt's motion for extension of time to file response to Petitioners' motions pursuant to Rules 52 and 59 filed. | 1km | | | |
| June 2 | 902 | ORDER granting govt's motion for extension of time to respond to petitioners' motion to alter opinion of 5/1/03, ent'd JRS, filed. Cps mailed. | 1km | | | |
| June 5 | 903 | Counsel's Notice of new address filed by Mr. Scher. | 1km | | | |
| June 12 | 904 | Govt's Response to petitioners' motion to alter Order of 5/1/03 filed. | 1km | | | |
| July 15 | 906 | Memorandum Opinion ent'd, JRS, filed; cps mailed. | 1km | | | |
| July 15 | 907 | ORDER denying Petitioners' motion to alter or amend judgment ent'd 5/1/03 ent'd, JRS, filed. Copies mailed. | 1km | | | |
| Sept. 11 | 908 | Petitioner Johnson's Notice of Appeal from Order ent'd 5/1/03, Order of 7/15/03, Order of 5/1/03, Order of 6/10/03, Order of 5/3/00 filed. | 1km | TPO ✓ | | |
| Sept 17 | --- | Copy of Notice of Appeal, Orders, Memorandum Opinions, and docket sheet sent to USCA. | 1cb | | | |
| Oct. 10 | 913 | Petitioner Johnson's Motion for Certificate of Appealability filed. | 1km | | | |
| Oct. 24 | 916 | Response of U.S. to Petitioners Tipton and Johnson's Applications for Certificates of Appealability filed. | 1km | | | |
| Nov. 3 | 918 | Petitioner's Johnson Rely to Response of U.S. to Petitioner's Application for Certificate of Appealability filed. | 1km | | | |
| Nov. 26 | 920 | Memorandum of the Court ent'd, JRS, filed. Copies mailed. | 1km | | | |
| Nov. 26 | 921 | Order granting Petitioners' motions for certificates of appealability ent'd, JRS, filed. Copies mailed. | 1km | | | |
| Dec. 9 | 923 | Certification of completion sent to USCA re: as to Cory Johnson [908] appeal by Cory Johnson | 1cb | | | |
| Aug. 9 | 935 | Opinion of USCA affirming in part, reversing in part, rec'd, filed. | 1km | | | |
| Oct. 12 | 937 | Mandate of USCA filed. | 1km | | | |
| Oct. 18 | 938 | Govt's motion to vacate stays of execution & vacate orders setting time, place & method of execution filed. | 1km | | | |
| Oct. 31 | 941 | Petitioner's Memorandum in opposition to govt's motion to vacate stay of execution & to vacate order setting execution filed. | 1km | | | |
| Nov. 3 | 942 | Govt's Reply Memorandum to its Motion to vacate stay of execution, etc. filed. | 1km | | | |

Interval (per Section II) | Start Date / End Date | Ltr. Code | Total Days

**J.A.23**

UNITED STATES DISTRICT COURT
CRIMINAL DOCKET   *U. S. vs*   JOHNSON, CORY                     3:92CR68-02

AO 256A ⊕                                          Yr. | Docket No. | Def.

| DATE | (Document No.) | PROCEEDINGS (continued) | V. EXCLUDABLE DELAY | | | |
|---|---|---|---|---|---|---|
| | | | (a) | (b) | (c) | (d) |
| 2005 | | | | | | |
| Nov. 16 | 943 | Govt's Notice advising Court that matter is ripe & that no hearing is requested.        lkm | | | | |
| Nov. 17 | 944 | ORDER granting govt's motion to vacate Orders of 11/22/96; Orders vacated.  Court to issue execution orders; vacting Order of 2/21/97 staying execution; ent'd, JRS, filed.   lkm | | | | |
| Nov. 17 | 946 | ORDER directing execution of the sentence of death by a U.S. Marshal; execution shall be by lethal injection at date and place designated by the Director, Bureau of Prisons; committing Johnson to custody of Attorney General for appropriate detention pending execution; directing U.S. Marshal designated to promptly return to the Court the document informing the Court that the sentence of death has been executed; ent'd, JRS, filed. Copies to counsel, USM, BOP.        lkm | | | | |
| 7/31/09 | 969 | ORDER - appointing PAUL GILL, Asst. Federal Public Defender for the purpose of seeking clemency kbh | | | | |
| 8/11/10 | 974 | EXPARTE MOTION                               KBH | | | | |
| 8/17/10 | 975 | EXPARTE ORDER                                KBH | | | | |
| 9/10/10 | 976 | USCA Order That the Court GRANTS counsel's motion to withdraw from further representation  kbh | | | | |
| 6/30/14 | 991 | Sealed Ex Parte Motion by Cory Johnson (w/sketch Order)                                JLT | | | | |
| 5/20/16 | | USCA 2244 In re: Cory Johnson case docketed. USCA Case No. 16-4; Case Manager R.Warren  lcb | | | | |
| 6/6/16 | 1000 | USCA 2244 ORDER: The Court DENIES movant's 28 U.S.C. 2244 motion(in #16-4).     lcb | | | | |
| 6/20/16 | | USCA 2244 In re: Cory Johnson case docketed. USCA Case No. 16-13, Case manager R.Warren.  lcb | | | | |
| 6/22/16 | 1002 | USCA 2244 ORDER: The Court DENIES MOVANT"S 28 U.S.C. 2244 motion (in #16-13).   lcb | | | | |
| 4/17/19 | | USCA 2244 In re: Cory Johnson case docketed. USCA Case No. 19-1; Case Manager E.Borneisen  lcb | | | | |
| 5/14/19 | 1003 | USCA ORDER: Movant has filed a motion under 28 USC 2244 for an order authorizing the district court to consider a second or successive application for relief under 28 USC 2255. THE COURT DENIES THE MOTION  for authorization to file a second or successive application for relief under 28 USC 2255 and GRANTS THE MOTION FOR LEAVE TO FILE A REPLY.             lcb | | | | |

Interval (per Section II) | Start Date End Date | Ltr. Code | Total

J.A.24

2255,CLOSED,DEATHP

# U.S. District Court
# Eastern District of Virginia - (Richmond)
# CRIMINAL DOCKET FOR CASE #: 3:92-cr-00068-DJN-2

Case title: USA v. Tipton, et al
Related  Case: 3:20-cv-00957-DJN

Date Filed: 04/24/1992
Date Terminated: 06/01/1993

Assigned to: District Judge David J. Novak

**Defendant (2)**

**Cory Johnson**
*TERMINATED: 06/01/1993*
*also known as*
"O"
*also known as*
"Co"

represented by **David Emmett Carney**
Skadden Arps Slate Meagher & Flom LLP
1440 New York Ave NW
Washington, DC 20005-2111
(202) 371-7000
Email: David.Carney@skadden.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexander C Drylewski**
Skadden Arps Slate Meagher & Flom
One Manhattan West
New York City, NY 10001
**NA**
212-735-2123
Fax: 917-777-2129
Email:
Alexander.Drylewski@skadden.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Appointed Attorney*

**Donald Paul Salzman**
Skadden, Arps, Slate, Meagher & Flom
(DC-NA)
1440 New York Avenue, N.W.
Washington, DC 20005
**NA**
202-371-7983
Fax: 202-661-9098
Email: salzman@skadden.com

**J.A.25**

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Appointed Attorney*

**Judith A Flumenbaum**
Skadden Arps Slate Meagher & Flom
One Manhattan West
New York City, NY 10001
\*\*NA\*\*
212-735-2764
Fax: 917-777-2764
Email: Judy.Flumenbaum@skadden.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Appointed Attorney*

**Lotus Davna Ryan**
Skadden Arps Slate Meagher & Flom LLP
(DC)
1440 New York Ave NW
Washington, DC 20005-2111
202-371-7000
Fax: 202-661-0527
Email: lotus.ryan@skadden.com
*ATTORNEY TO BE NOTICED*

**Pending Counts**                    **Disposition**

None

**Highest Offense Level (Opening)**

None

**Terminated Counts**                 **Disposition**

None

**Highest Offense Level (Terminated)**

None

**Complaints**                        **Disposition**

None

---

**Intervenor**

J.A.26

**Willie Lee Seward**

**Plaintiff**

**USA**
*TERMINATED: 05/27/1992*

represented by **S. David Schiller**
Office of the U.S. Attorney
SunTrust Building
919 East Main Street
Suite 1900
Richmond, VA 23219
(804) 819-5400
Email: david.schiller@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph Attias**
United States Attorney Office (Richmond-NA)
SunTrust Building
919 East Main Street
Suite 1900
Richmond, VA 23219
**NA**
804-819-5400
Email: joseph.attias2@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Richard D. Cooke**
United States Attorney's Office (Richmond)
SunTrust Building
919 East Main Street
Suite 1900
Richmond, VA 23219
804-819-5449
Email: richard.cooke@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Thomas Arthur Garnett**
US Attorney Office (Richmond)
SunTrust Building
919 East Main Street
Suite 1900
Richmond, VA 23219
(804) 819-5431
Email: Thomas.A.Garnett@usdoj.gov

**J.A.27**

*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/23/2020 | | Case reassigned to District Judge David J. Novak. District Judge James R. Spencer no longer assigned to the case. (jsmi, ) (Entered: 03/23/2020) |
| 05/27/2020 | | Appeal Remark: USCA 2255 case docketed. USCA Case 20-8, Case Manager EBorneisen (lgar, ) (Entered: 05/27/2020) |
| 07/16/2020 | 12 | 2255 ORDER of USCA as to Cory Johnson : Upon consideration of submissions relative to the movants motion to hold in abeyance, the court grants the motion and places this case in abeyance pending a decision by this court in United States v. Taylor, No. 19-7616. Entered at the direction of Judge Motz with the concurrence of Judge Floyd. Judge Wilkinson voted to deny authorization to file a successive motion under 28 U.S.C. § 2255. (lbre, ) (Entered: 07/16/2020) |
| 08/07/2020 | 28 | NOTICE OF ATTORNEY APPEARANCE Richard D. Cooke appearing for USA. (Cooke, Richard) (Entered: 08/07/2020) |
| 08/19/2020 | 33 | NOTICE OF ATTORNEY APPEARANCE: David Emmett Carney appearing for Cory Johnson (Carney, David) (Entered: 08/19/2020) |
| 08/19/2020 | 34 | Motion to appear Pro Hac Vice by Donald P. Salzman and Certification of Local Counsel David E. Carney (Filing fee $ 75 receipt number 0422-7359816.) by Cory Johnson. (Carney, David) (Entered: 08/19/2020) |
| 08/19/2020 | 35 | Motion to appear Pro Hac Vice by Alexander C. Drylewski and Certification of Local Counsel David E. Carney (Filing fee $ 75 receipt number 0422-7359818.) by Cory Johnson. (Carney, David) (Entered: 08/19/2020) |
| 08/19/2020 | 36 | Motion to appear Pro Hac Vice by Judith A. Flumenbaum and Certification of Local Counsel David E. Carney (Filing fee $ 75 receipt number 0422-7359819.) by Cory Johnson. (Carney, David) (Entered: 08/19/2020) |
| 08/19/2020 | 37 | MOTION for Leave to File Excess Pages by Cory Johnson. (Attachments: # 1 Proposed Order)(Carney, David) (Entered: 08/19/2020) |
| 08/19/2020 | 38 | MOTION to Reduce - First Step Act *(Motion for a Reconsideration of Sentence Hearing Pursuant to the First Step Act of 2018)* by Cory Johnson. (Attachments: # 1 Proposed Order)(Carney, David) (Entered: 08/19/2020) |
| 08/19/2020 | 39 | Memorandum in Support by Cory Johnson re 38 MOTION to Reduce - First Step Act *(Motion for a Reconsideration of Sentence Hearing Pursuant to the First Step Act of 2018)* (Attachments: # 1 Exhibit Index, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit 13, # 15 Exhibit 14, # 16 Exhibit 15, # 17 Exhibit 16, # 18 Exhibit 17, # 19 Exhibit 18, # 20 Exhibit 19, # 21 Exhibit 20, # 22 Exhibit 21, # 23 Exhibit 22, # 24 Exhibit 23, # 25 Exhibit 24, # 26 Exhibit 25, # 27 Exhibit 26, # 28 Exhibit 27, # 29 Exhibit 28, # 30 Exhibit 29, # 31 Exhibit 30, # 32 Exhibit 31, # 33 Exhibit 32, # 34 Exhibit 33, # 35 Exhibit 34, # 36 |

J.A.28

| | | Exhibit 35)(Carney, David) (Entered: 08/19/2020) |
|---|---|---|
| 08/20/2020 | [40](#) | ORDER that the Court hereby GRANTS Defendant Corey Johnsons [37](#) Motion for Leave to File Excessive Pages. The Government shall have an equal number of pages for its response. See Order for details. Signed by District Judge David J. Novak on 8/20/2020. (jsmi, ) (Entered: 08/20/2020) |
| 09/04/2020 | [46](#) | ORDER as to Corey Johnson that the Court hereby DIRECTS the United States Attorney's Office to respond within 15 days of this Order and to explain its position regarding Defendant's First Step Act Motion and requested relief. If Defendant disagrees with the Government's response, Defendant may reply to the Government's response within 15 days of the date that the Government's response is filed. The United States Probation Office is DIRECTED to prepare a First Step Act Worksheet within 14 days of the date of entry hereof. See Order for details. Signed by District Judge David J. Novak on 9/2/2020. (jsmi, ) (Entered: 09/04/2020) |
| 09/04/2020 | [47](#) | ORDERS granting [34](#) , [35](#) , and [36](#) Motions for Pro hac vice as to Cory Johnson. Alexander C. Drylawski, Judith A. Flumenbaum, and Donald P. Salzman added. Signed by District Judge David J. Novak on 9/2/2020. (jsmi, ) (Entered: 09/04/2020) |
| 09/18/2020 | [51](#) | First Step Act Work Sheet (Sealed Document) as to Cory Johnson (drumheller, dorothy) (Entered: 09/18/2020) |
| 09/21/2020 | [52](#) | MOTION for Extension of Time to File Response/Reply as to [39](#) Memorandum in Support of Motion,,, [38](#) MOTION to Reduce - First Step Act *(Motion for a Reconsideration of Sentence Hearing Pursuant to the First Step Act of 2018)* by USA as to Cory Johnson. (Attias, Joseph) (Entered: 09/21/2020) |
| 09/22/2020 | [56](#) | ORDER that Government's [52](#) Unopposed Motion for a Two Day Extension for Filing the United States' Response to§ 404 Motion moving for a two-day extension to respond to Defendant Corey Johnson's First Step Act Motion is hereby GRANTED. The Government shall have until September 23, 2020, by which to file its response to Defendant's First Step Act Motion. Signed by District Judge David J. Novak on 9/21/2020. (jsmi, ) (Entered: 09/22/2020) |
| 09/23/2020 | [58](#) | RESPONSE in Opposition by USA as to Cory Johnson re [38](#) MOTION to Reduce - First Step Act *(Motion for a Reconsideration of Sentence Hearing Pursuant to the First Step Act of 2018)* (Attias, Joseph) (Entered: 09/23/2020) |
| 10/08/2020 | [63](#) | NOTICE OF ATTORNEY APPEARANCE: Lotus Davna Ryan appearing for Cory Johnson (Ryan, Lotus) (Entered: 10/08/2020) |
| 10/08/2020 | [64](#) | Reply to Motion by Cory Johnson re [38](#) MOTION to Reduce - First Step Act *(Motion for a Reconsideration of Sentence Hearing Pursuant to the First Step Act of 2018)* (Attachments: # [1](#) Index to Exhibits, # [2](#) Exhibit A, # [3](#) Exhibit B, # [4](#) Exhibit C) (Carney, David) (Entered: 10/08/2020) |
| 11/03/2020 | [68](#) | ORDER of USCA(20-8) as to Cory Johnson : For reasons appearing to the court, this case is placed in abeyance pending a decision by this court in U.S. v. Juan Ortiz-Orellana, No. 16-4844. (lgar, ) (Entered: 11/03/2020) |
| 11/17/2020 | | PAPER DOCKET SHEET as to Cory Johnson. (jsmi, ) (Entered: 11/17/2020) |

J.A.29

| | | |
|---|---|---|
| | 72 | |
| 11/19/2020 | 75 | ORDER as to Cory Johnson that the Court finds that Defendant's convictions on Counts Two, Eight, Eleven, Seventeen, Eighteen, Nineteen, Twenty-Four and Twenty-Five Jo not constitute covered offenses under the First Step Act. Although Defendant's convictions on Counts Thirty-One and Thirty-Two do constitute covered offenses, the Court declines to exercise its discretion to reduce Defendant's sentence. Therefore, Defendant's 38 Motion for a Reconsideration of Sentence Hearing Pursuant to the First Step Act of 2018 will be denied. Signed by District Judge David J. Novak on 11/19/2020. (jsmi, ) (Entered: 11/19/2020) |
| 11/20/2020 | 77 | NOTICE *of Appeal* by Cory Johnson re 75 Order on Motion to Reduce - First Step Act,, (Carney, David) (Entered: 11/20/2020) |
| 11/20/2020 | 78 | NOTICE *of execution date* by USA (Cooke, Richard) Modified on 11/23/2020 to correct text(tjoh, ). (Entered: 11/20/2020) |
| 11/23/2020 | 79 | Transmission of Notice of Appeal to US Court of Appeals as to Cory Johnson re 77 Notice of Appeal (All case opening forms, plus the transcript guidelines, may be obtained from the Fourth Circuit's website at www.ca4.uscourts.gov) (lbre, ) (Entered: 11/23/2020) |
| 11/23/2020 | | USCA Case Number 20-15, Case Manager E.Borneisen, for 77 Notice of Appeal filed by Cory Johnson.(lbre, ) (Entered: 11/24/2020) |
| 12/08/2020 | 84 | MOTION TO INTERVENE by Willie Lee Seward. (jsmi, ) (Entered: 12/08/2020) |
| 12/14/2020 | 86 | MOTION to Vacate under 28 U.S.C. 2255 by Cory Johnson. (Attachments: # 1 Index to Exhibits, # 2 Exhibit 1, # 3 Exhibit 1(a), # 4 Exhibit 2, # 5 Exhibit 2(a), # 6 Exhibit 3, # 7 Exhibit 3(a), # 8 Exhibit 4, # 9 Exhibit 5, # 10 Exhibit 6)(Carney, David) Civil case 3:20-cv-00957 opened. (Entered: 12/14/2020) |
| 12/14/2020 | 87 | NOTICE *of Submission of Exhibit 7 - Parts 1-3* by Cory Johnson re 86 MOTION to Vacate under 28 U.S.C. 2255 (Attachments: # 1 Index to Exhibits, # 2 Exhibit 7 - Part 1, # 3 Exhibit 7 - Part 2, # 4 Exhibit 7 - Part 3)(Carney, David) (Entered: 12/14/2020) |
| 12/14/2020 | 88 | NOTICE *of Submission of Exhibits 8 - 17* by Cory Johnson re 86 MOTION to Vacate under 28 U.S.C. 2255 (Attachments: # 1 Index to Exhibits, # 2 Exhibit 8, # 3 Exhibit 9, # 4 Exhibit 10, # 5 Exhibit 11, # 6 Exhibit 12, # 7 Exhibit 13, # 8 Exhibit 14, # 9 Exhibit 15, # 10 Exhibit 16, # 11 Exhibit 17)(Carney, David) (Entered: 12/14/2020) |
| 12/14/2020 | 89 | NOTICE *of Submission of Exhibits 18 - 30* by Cory Johnson re 86 MOTION to Vacate under 28 U.S.C. 2255 (Attachments: # 1 Index to Exhibits, # 2 Exhibit 18 - Part 1, # 3 Exhibit 18 - Part 2, # 4 Exhibit 19, # 5 Exhibit 20, # 6 Exhibit 21, # 7 Exhibit 22, # 8 Exhibit 23, # 9 Exhibit 24, # 10 Exhibit 25, # 11 Exhibit 26, # 12 Exhibit 27, # 13 Exhibit 28, # 14 Exhibit 29, # 15 Exhibit 30)(Carney, David) (Entered: 12/14/2020) |
| 12/14/2020 | 90 | NOTICE *of Submission of Exhibits 31 - 44* by Cory Johnson re 86 MOTION to Vacate under 28 U.S.C. 2255 (Attachments: # 1 Index to Exhibits, # 2 Exhibit 31, # 3 Exhibit 32, # 4 Exhibit 33, # 5 Exhibit 34, # 6 Exhibit 35, # 7 Exhibit 36, # 8 Exhibit 37, # 9 Exhibit 38, # 10 Exhibit 39, # 11 Exhibit 40, # 12 Exhibit 41, # 13 Exhibit 42, # 14 |

J.A.30

| | | Exhibit 43, # 15 Exhibit 44)(Carney, David) (Entered: 12/14/2020) |
|---|---|---|
| 12/14/2020 | 91 | NOTICE *of Submission of Exhibits 45 - 54* by Cory Johnson re 86 MOTION to Vacate under 28 U.S.C. 2255 (Attachments: # 1 Index to Exhibits, # 2 Exhibit 45, # 3 Exhibit 46, # 4 Exhibit 47, # 5 Exhibit 48, # 6 Exhibit 49, # 7 Exhibit 50, # 8 Exhibit 51, # 9 Exhibit 52, # 10 Exhibit 53, # 11 Exhibit 54)(Carney, David) (Entered: 12/14/2020) |
| 12/14/2020 | 92 | NOTICE *of Submission of Exhibits 55 - 70* by Cory Johnson re 86 MOTION to Vacate under 28 U.S.C. 2255 (Attachments: # 1 Index to Exhibits, # 2 Exhibit 55, # 3 Exhibit 56, # 4 Exhibit 57, # 5 Exhibit 58, # 6 Exhibit 59, # 7 Exhibit 60, # 8 Exhibit 61, # 9 Exhibit 62, # 10 Exhibit 63, # 11 Exhibit 64, # 12 Exhibit 65, # 13 Exhibit 66, # 14 Exhibit 67, # 15 Exhibit 68, # 16 Exhibit 69, # 17 Exhibit 70)(Carney, David) (Entered: 12/14/2020) |
| 12/14/2020 | 93 | NOTICE *of Submission of Exhibits 71 - 74* by Cory Johnson re 86 MOTION to Vacate under 28 U.S.C. 2255 (Attachments: # 1 Index to Exhibits, # 2 Exhibit 71, # 3 Exhibit 72, # 4 Exhibit 73 - Part 1, # 5 Exhibit 73 - Part 2, # 6 Exhibit 74)(Carney, David) (Entered: 12/14/2020) |
| 12/14/2020 | 94 | NOTICE *of Submission of Exhibits 75 - 79* by Cory Johnson re 86 MOTION to Vacate under 28 U.S.C. 2255 (Attachments: # 1 Index to Exhibits, # 2 Exhibit 75 - Part 1, # 3 Exhibit 75 - Part 2, # 4 Exhibit 76, # 5 Exhibit 77, # 6 Exhibit 78, # 7 Exhibit 79)(Carney, David) (Entered: 12/14/2020) |
| 12/15/2020 | 95 | ORDER that the Government file a brief addressing these issues, which shall not exceed 14 pages, not later than December 21, 2020. Petitioner shall file any reply, limited to 7 pages, not later than December 24, 2020. Following this briefing, should the Court find that it may consider the merits of the Second § 2255 Petition, the Court will set a briefing schedule to address the merits of the Second § 2255 Petition. See Order for details. Signed by District Judge David J. Novak on 12/15/2020. (jsmi, ) (Entered: 12/15/2020) |
| 12/21/2020 | 96 | RESPONSE in Opposition by USA as to Cory Johnson re 86 MOTION to Vacate under 28 U.S.C. 2255 (Cooke, Richard) (Entered: 12/21/2020) |
| 12/24/2020 | 97 | REPLY TO RESPONSE to by Cory Johnson re 86 MOTION to Vacate under 28 U.S.C. 2255 *(Corey Johnson's Reply Pursuant to December 15, 2020 Order)* (Attachments: # 1 Exhibit 1)(Carney, David) (Entered: 12/24/2020) |
| 12/31/2020 | 98 | MOTION for Leave to File by USA as to Cory Johnson. (Attachments: # 1 Exhibit supplemental authority, # 2 Proposed Order)(Cooke, Richard) (Entered: 12/31/2020) |
| 01/02/2021 | 99 | MEMORANDUM OPINION as to Cory Johnson. Signed by District Judge David J. Novak on 1/2/2021. (cgar) (Entered: 01/02/2021) |
| 01/02/2021 | 100 | ORDER granting 98 Motion for Leave to File Supplemental Authority as to Cory Johnson (2). Signed by District Judge David J. Novak on 1/2/2021. (cgar) (Entered: 01/02/2021) |
| 01/02/2021 | 101 | Supplemental Authority by USA as to Cory Johnson. (cgar) (Entered: 01/02/2021) |
| 01/02/2021 | | |

J.A.31

| | 102 | ORDER dismissing without prejudice for want of jurisdiction 86 Motion to Vacate (2255) certificate of appealability is denied as to Cory Johnson (2). Appeal must be filed within sixty (60) days. Signed by District Judge David J. Novak on 1/2/2021. (cgar) Civil Case 3:20-cv-00957-DJN closed. (Entered: 01/02/2021) |
| 01/04/2021 | 103 | NOTICE *of Appeal* by Cory Johnson re 102 Order on Motion to Vacate (2255), (Carney, David) (Entered: 01/04/2021) |
| 01/05/2021 | 104 | Transmission of Notice of Appeal to US Court of Appeals as to Cory Johnson re 103 Notice of Appeal (All case opening forms, plus the transcript guidelines, may be obtained from the Fourth Circuit's website at www.ca4.uscourts.gov) (lbre, ) (Entered: 01/05/2021) |

<table>
<tr><td colspan="4" align="center">**PACER Service Center**</td></tr>
<tr><td colspan="4" align="center">**Transaction Receipt**</td></tr>
<tr><td colspan="4" align="center">01/06/2021 13:20:18</td></tr>
<tr><td>**PACER Login:**</td><td>LotusRyan:6526587:0</td><td>**Client Code:**</td><td>811110-06586 Ryan</td></tr>
<tr><td>**Description:**</td><td>Docket Report</td><td>**Search Criteria:**</td><td>3:92-cr-00068-DJN</td></tr>
<tr><td>**Billable Pages:**</td><td>6</td><td>**Cost:**</td><td>0.60</td></tr>
</table>

**J.A.32**



IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division



JUL 2 0 1992

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | CRIMINAL NO. 3:92CR68 |
| ) | |
| RICHARD TIPTON aka Whittey ) | 21 USC § 846 |
| (Counts 1-7, 11-30, 32-33) ) | Conspiracy |
| ) | (Count 1) |
| CORY JOHNSON aka "O" aka "CO" ) | |
| (Counts 1, 2, 8-32) ) | 21 USC § 848 |
| ) | Continuing Criminal Enterprise |
| JAMES H. ROANE, JR., aka "J.R." ) | (Count 2) |
| (Counts 1, 2, 5-16, 32) ) | |
| ) | 21 USC § 848(e)(1)(A) & 18 USC § 2 |
| VERNON LANCE THOMAS ) | Murder in Furtherance of CCE |
| aka Anthony Mack aka "V" ) | (Counts 3,5,8,11,17,18,19,24,25) |
| (Counts 1, 2, 11-16, 24-30, 32) ) | |
| ) | 18 USC § 924(c) |
| JERRY R. GAITERS ) | Use of Firearm in Relation to Crime of |
| (Counts 1, 17-23, 32) ) | Violence or Drug Trafficking Crime |
| ) | (Counts 6,9,12,15,20,26) |
| STERLING HARDY ) | |
| (Counts 1, 14-16, 32) ) | 18 USC §§ 1959 & 2 |
| ) | Violent Crimes in Aid of Racketeering |
| SANDRA REAVIS ) | (Counts 4,7,10,13,14,16,21-23,27-30) |
| (Count 1) ) | |
| ) | 21 USC § 841(a)(1) |
| ) | Distribution of Crack |
| ) | (Count 31) |
| ) | |
| ) | 21 USC § 841(a)(1) & 18 USC § 2 |
| ) | Possession w/Intent to Distribute Crack |
| ) | (Counts 32-33) |

00085

J.A.33

SECOND SUPERSEDING INDICTMENT

JULY 1992 TERM - At Richmond

COUNT ONE

THE GRAND JURY CHARGES that from on or about January, 1989, the exact date being unknown to the grand jury, and continuously thereafter up to and including the filing of this indictment, in the Eastern District of Virginia, and elsewhere, the defendants, RICHARD TIPTON, aka Whittey, CORY JOHNSON, aka "O," aka "CO", VERNON LANCE THOMAS, aka Anthony Mack, aka "V", JAMES H. ROANE, JR., aka "J.R.", JERRY GAITERS, STERLING HARDY, and SANDRA REAVIS, did unlawfully, knowingly, and intentionally combine, conspire, confederate, and agree with each other and with other persons, both known and unknown to the grand jury to commit the following offenses against the United States of America:

1.      To knowingly, intentionally, and unlawfully possess with the intent to distribute, and to distribute, a Schedule II narcotic controlled substance, that is, at least fifty (50) grams or more of a mixture or substance described in Title 21, United States Code, Section 841(b)(1)(A)(ii), which contains cocaine base, in violation of Title 21, United States Code, Section 841(a)(1).

WAYS, MANNERS, AND MEANS OF THE CONSPIRACY

The ways, manners, and means by which the conspirators carried out the purpose of the conspiracy includes, but are not limited to, the following:

1.      It was part of the conspiracy that defendants and co-conspirators would cause cocaine to be purchased in New York City, and elsewhere, and transported to Richmond, Virginia, where the cocaine was to be distributed.

2

00086

J.A.34

2.    It was further part of the conspiracy that once the defendants and co-defendants would receive cocaine in Richmond, Virginia, they would cook the cocaine in such a way to make it cocaine base ("crack" or "cook-em-up"), which cocaine was intended to be distributed on the streets of Richmond, Virginia.

3.    It was further part of the conspiracy that the defendants and co-defendants would induce other individuals to work for them selling the crack cocaine on the streets of Richmond, Virginia.

4.    It was further part of the conspiracy to engage in a pattern of violent activity, including murder, assaults, and threats of violence to further the goals of the conspiracy.  To that end, members of the conspiracy bought, possessed, and transferred firearms, which firearms were used in their violent activities.

### OVERT ACTS

In furtherance of this conspiracy, and to bring about the objects and goals of the conspiracy, the defendants, co-conspirators, and unindicted co-conspirators committed overt acts in the Eastern District of Virginia and elsewhere, including, but not limited to, the following:

1.    In or about December, 1991, defendants RICHARD TIPTON, aka Whittey, and CORY JOHNSON, aka "O," aka "CO", assaulted an individual known to the grand jury over a cocaine debt.

2.    On or about January 5, 1992, RICHARD TIPTON, aka Whittey, murdered Douglas A. Talley.

3

00087

J.A.35

3.  On or about January 13, 1992, RICHARD TIPTON, aka Whittey, and JAMES H. ROANE, JR., aka "J.R." murdered Douglas Moody.

4.  On or about January 13, 1992, an individual known to the grand jury, disposed of the knife used by JAMES ROANE, JR., aka "J.R.", to kill Doug Moody.

5.  On or about January 14, 1992, members of the conspiracy caused an individual known to the grand jury to purchase one Glock handgun and two Tech 9mm handguns from Southern Gun World in Richmond, Virginia.

6.  On or about January 14, 1992, JAMES ROANE, JR., aka "J.R." and CORY JOHNSON, aka "O," aka "CO", murdered Peyton Maurice Johnson.

7.  On or about January 15, 1992, CORY JOHNSON, aka "O," aka "CO", distributed a certain amount of cocaine base ("crack" or "cook em up") in Richmond, Virginia.

8.  On or about January 29, 1992, RICHARD TIPTON aka Whittey, JAMES ROANE, JR., aka "J.R.", and CORY JOHNSON, aka "O," aka "CO", VERNON LANCE THOMAS, aka Anthony Mack, aka "V", murdered Louis J. Johnson, Jr., in Richmond, Virginia.

9.  On or about January 31, 1992, CORY JOHNSON, aka "O," aka "CO", assaulted an individual known to the grand jury over a drug debt, and solicited that individual to kill Dorothy Armstrong.

10. On or about February 1, 1992, JAMES ROANE, JR., aka "J.R.", RICHARD TIPTON aka Whittey, CORY JOHNSON, aka "O," aka "CO", VERNON

4

00088

**J.A.36**

LANCE THOMAS, aka Anthony Mack, aka "V", and STERLING HARDY murdered Torrick Brown and shot Martha McCoy in Richmond, Virginia.

11. On or about February 1, 1992, RICHARD TIPTON aka Whittey, CORY JOHNSON, aka "O," aka "CO", and JERRY GAITERS murdered Bobby Long, Anthony Carter, and Dorothy Mae Armstrong aka Mousey, in Richmond, Virginia.

12. On or about February 2, 1992, defendants RICHARD TIPTON aka Whittey, CORY JOHNSON, aka "O," aka "CO", STERLING HARDY, VERNON LANCE THOMAS, aka Anthony Mack, aka "V", JAMES H. ROANE, JR., aka "J.R.", and JERRY GAITERS possessed with the intent to distribute crack cocaine.

13. On or about February 13, 1992, STERLING HARDY solicited the murders of certain individuals.

14. On or about February 19, 1992, RICHARD TIPTON, aka Whittey, CORY JOHNSON, aka "O," aka "CO", and VERNON LANCE THOMAS, aka Anthony Mack, aka "V", murdered Curtis Thorne, Linwood Chiles, and shot, seriously wounding, Gwendolyn Green and Priscilla Green, in Richmond, Virginia.

15. On or about April 10, 1992, RICHARD TIPTON, aka Whittey, possessed with the intent to distribute crack cocaine in Richmond, Virginia.

(In violation of Title 21, United States Code, Section 846).

## COUNT TWO

THE GRAND JURY FURTHER CHARGES that from at least January, 1991, and continuously thereafter up to and including the date of the filing of this indictment, in the Eastern District of Virginia, and elsewhere, the defendants RICHARD TIPTON,

5

00089

J.A.37

aka Whittey, CORY JOHNSON, aka "O", aka "CO," JAMES H. ROANE, JR., aka "JR," and VERNON LANCE THOMAS, aka Anthony Mack, aka "V", unlawfully, intentionally, and knowingly, did engage in a Continuing Criminal Enterprise, that is, they did violate Title 21, United States Code, Section 841 and 846, including, but not limited to, those violations alleged in the instant indictment, which are realleged and incorporated by reference herein, and did commit other violations of said statutes, which violations were part of a continuing series of violations of said statutes undertaken by RICHARD TIPTON, aka Whittey, CORY JOHNSON, aka "O", aka "CO," JAMES H. ROANE, JR., aka "JR," and VERNON LANCE THOMAS, aka Anthony Mack, aka "V", in concert with at least five other persons with respect to whom they occupied positions of organizer, supervisor, and manager, and from which continuing series of violations the defendant, RICHARD TIPTON aka Whittey, CORY JOHNSON, aka "O", aka "CO," JAMES H. ROANE, JR., aka "JR," and VERNON LANCE THOMAS, aka Anthony Mack, aka "V", obtained substantial income and resources.

(In violation of Title 21, United States Code, Section 848.)

## COUNT THREE

THE GRAND JURY FURTHER CHARGES that on or about January 5, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendant RICHARD TIPTON aka Whittey, while engaged in and working in furtherance of a Continuing Criminal Enterprise, 21 USC § 848(a), knowingly, intentionally, and unlawfully killed and counseled, commanded, induced, procured, and caused the intentional killing of Douglas A. Talley, and such killing resulted.

6

(In violation of Title 21, United States Code, Section 848(e)(1)(A) and Title 18, United States Code, Section 2.).

## COUNT FOUR

THE GRAND JURY FURTHER CHARGES that on or about January 5, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendant, RICHARD TIPTON aka Whittey, did knowingly, intentionally, and unlawfully cause the murder of Douglas Talley, as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value from an enterprise engaged in racketeering activity, and for the purpose of gaining entrance to and maintaining and increasing position in an enterprise engaged in racketeering activity, said racketeering activity being dealing in narcotic or other dangerous drugs.

(In violation of Title 18, United States Code, Sections 1959 and 2.)

## COUNT FIVE

THE GRAND JURY FURTHER CHARGES that on or about January 13, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants RICHARD TIPTON aka Whittey, and JAMES H. ROANE, JR., aka "J.R.", while engaged in and working in furtherance of a Continuing Criminal Enterprise, 21 USC § 848(a), knowingly, intentionally, and unlawfully killed and counseled, commanded, induced, procured, and caused the intentional killing of Douglas Moody, and such killing resulted.

(In violation of Title 21, United States Code, Section 848(e)(1)(A) and Title 18, United States Code, Section 2.).

7

00091

J.A.39

## COUNT SIX

THE GRAND JURY FURTHER CHARGES that on or about January 13, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants RICHARD TIPTON, aka Whittey, and JAMES H. ROANE, JR., aka "J.R.", did knowingly, willfully, and unlawfully use a firearm, during and in relation to a crime of violence or a drug trafficking crime, which is a felony prosecutable in a court of the United States, that is, a violation of Title 21, United States Code, Section 846 and 848, and Title 18, United States Code, Section 1959, as set forth in Counts One, Five and Seven of this Indictment. (In violation of Title 18, United States Code, Sections 924(c) and 2.)

## COUNT SEVEN

THE GRAND JURY FURTHER CHARGES that on or about January 13, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON, aka Whittey, and JAMES H. ROANE, JR., aka "J.R.", did knowingly, intentionally, and unlawfully cause the murder of Douglas Moody, as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value from an enterprise engaged in racketeering activity, and for the purpose of gaining entrance to and maintaining and increasing position in an enterprise engaged in racketeering activity, said racketeering activity being dealing in narcotic or other dangerous drugs.

(In violation of Title 18, United States Code, Sections 1959 and 2.)

8

00092

J.A.40

## COUNT EIGHT

THE GRAND JURY FURTHER CHARGES that on or about January 14, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants JAMES H. ROANE, JR., aka "J.R.", CORY JOHNSON, aka "O," aka "CO", and while engaged in and working in furtherance of a Continuing Criminal Enterprise, 21 USC § 848(a), knowingly, intentionally, and unlawfully killed and counseled, commanded, induced, procured, and caused the intentional killing of Peyton Maurice Johnson, and such killing resulted.

(In violation of Title 21, United States Code, Section 848(e)(1)(A) and Title 18, United States Code, Section 2.).

## COUNT NINE

THE GRAND JURY FURTHER CHARGES that on or about January 14, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants JAMES H. ROANE, JR., aka "J.R.", and CORY JOHNSON, aka "O," aka "CO", did knowingly, willfully, and unlawfully use a firearm, during and in relation to a crime of violence or a drug trafficking crime, which is a felony prosecutable in a court of the United States, that is a violation of Title 21, United States Code, Sections 846 and 848, and Title 18, United States Code, Section 1959, as set forth in Counts One, Eight and Ten of this Indictment.

(In violation of Title 18, United States Code, Sections 924(c) and 2.)

9

00093

J.A.41

## COUNT TEN

THE GRAND JURY FURTHER CHARGES that on or about January 14, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, JAMES H. ROANE, JR., aka "J.R." and CORY JOHNSON, aka "O," aka "CO", did knowingly, intentionally, and unlawfully cause the murder of Peyton Maurice Johnson, as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value from an enterprise engaged in racketeering activity, and for the purpose of gaining entrance to and maintaining and increasing position in an enterprise engaged in racketeering activity, said racketeering activity being dealing in narcotic or other dangerous drugs.

(In violation of Title 18, United States Code, Sections 1959 and 2.)

## COUNT ELEVEN

THE GRAND JURY FURTHER CHARGES that on or about January 29, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants RICHARD TIPTON aka Whittey, JAMES H. ROANE, JR., aka "J.R.", CORY JOHNSON, aka "O," aka "CO", and VERNON LANCE THOMAS, aka Anthony Mack, aka "V", while engaged in and working in furtherance of a Continuing Criminal Enterprise, 21 USC § 848(a), knowingly, intentionally, and unlawfully killed and counseled, commanded, induced, procured, and caused the intentional killing of Louis J. Johnson, Jr., and such killing resulted.

(In violation of Title 21, United States Code, Section 848(e)(1)(A) and Title 18, United States Code, Section 2.).

10

00094

## COUNT TWELVE

THE GRAND JURY FURTHER CHARGES that on or about January 29, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON aka Whittey, JAMES H. ROANE, JR., aka "J.R.", CORY JOHNSON, aka "O," aka "CO", and VERNON LANCE THOMAS, aka Anthony Mack, aka "V", did knowingly, willfully, and unlawfully use a firearm, during and in relation to a crime of violence or a drug trafficking crime, which is a felony prosecutable in a court of the United States, that is a violation of Title 21, United States Code, Sections 846 and 848, and Title 18, United States Code, Section 1959, as set forth in Counts One, Eleven and Thirteen of this Indictment.

(In violation of Title 18, United States Code, Sections 924(c) and 2.)

## COUNT THIRTEEN

THE GRAND JURY FURTHER CHARGES that on or about January 29, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON aka Whittey, JAMES H. ROANE, JR., aka "J.R.", CORY JOHNSON, aka "O," aka "CO", and VERNON LANCE THOMAS, aka Anthony Mack, aka "V", did knowingly, intentionally, and unlawfully cause the murder of Louis J. Johnson, Jr., as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value from an enterprise engaged in racketeering activity, and for the purpose of gaining entrance to and maintaining and increasing position in an enterprise engaged in racketeering activity, said racketeering activity being dealing in

11

00095

J.A.43

narcotic or other dangerous drugs.

(In violation of Title 18, United States Code, Sections 1959 and 2.)

## COUNT FOURTEEN

THE GRAND JURY FURTHER CHARGES that on or about February 1, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON aka Whittey, JAMES H. ROANE, JR., aka "J.R.", CORY JOHNSON, aka "O," aka "CO", VERNON LANCE THOMAS, aka Anthony Mack, aka "V", and STERLING HARDY, did knowingly, intentionally, and unlawfully cause the murder of Torrick Brown, Jr., as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value from an enterprise engaged in racketeering activity, and for the purpose of gaining entrance to and maintaining and increasing position in an enterprise engaged in racketeering activity, said racketeering activity being dealing in narcotic or other dangerous drugs.

(In violation of Title 18, United States Code, Sections 1959 and 2.)

## COUNT FIFTEEN

THE GRAND JURY FURTHER CHARGES that on or about February 1, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON aka Whittey, JAMES H. ROANE, JR., aka "J.R.", CORY JOHNSON, aka "O," aka "CO", VERNON LANCE THOMAS, aka Anthony Mack, aka "V", and STERLING HARDY, did knowingly, willfully, and unlawfully use a firearm, during and in relation to a crime of violence or a drug trafficking crime, which is a felony prosecutable in a court

12

00096

J.A.44

of the United States, that is a violation of Title 21, United States Code, Section 846, and Title 18, United States Code, Section 1959, as set forth in Counts One, Fourteen and Sixteen of this Indictment.

(In violation of Title 18, United States Code, Sections 924(c) and 2.)

## COUNT SIXTEEN

THE GRAND JURY FURTHER CHARGES that on or about February 1, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON aka Whittey, JAMES H. ROANE, JR., aka "J.R.", CORY JOHNSON, aka "O," aka "CO", VERNON LANCE THOMAS, aka Anthony Mack, aka "V", and STERLING HARDY, did knowingly, intentionally, and unlawfully commit assault resulting in serious bodily injury to Martha McCoy, as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value from an enterprise engaged in racketeering activity, and for the purpose of gaining entrance to and maintaining and increasing position in an enterprise engaged in racketeering activity, said racketeering activity being dealing in narcotic or other dangerous drugs.

(In violation of Title 18, United States Code, Sections 1959 and 2.)

## COUNT SEVENTEEN

THE GRAND JURY FURTHER CHARGES that on or about February 1, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants RICHARD TIPTON aka Whittey, CORY JOHNSON, aka "O," aka "CO", and JERRY GAITERS, while engaged in and working in furtherance of a Continuing Criminal Enterprise, 21

13

00097

J.A.45

USC § 848(a), knowingly, intentionally, and unlawfully killed and counseled, commanded, induced, procured, and caused the intentional killing of Bobby Long, and such killing resulted.

(In violation of Title 21, United States Code, Section 848(e)(1)(A) and Title 18, United States Code, Section 2.).

## COUNT EIGHTEEN

THE GRAND JURY FURTHER CHARGES that on or about February 1, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants RICHARD TIPTON aka Whittey, CORY JOHNSON, aka "O," aka "CO", and JERRY GAITERS, while engaged in and working in furtherance of a Continuing Criminal Enterprise, 21 USC § 848(a), knowingly, intentionally, and unlawfully killed and counseled, commanded, induced, procured, and caused the intentional killing of Anthony Carter, and such killing resulted.

(In violation of Title 21, United States Code, Section 848(e)(1)(A) and Title 18, United States Code, Section 2.).

## COUNT NINETEEN

THE GRAND JURY FURTHER CHARGES that on or about February 1, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants RICHARD TIPTON aka Whittey, CORY JOHNSON, aka "O," aka "CO", and JERRY GAITERS, while engaged in and working in furtherance of a Continuing Criminal Enterprise, 21 USC § 848(a), knowingly, intentionally, and unlawfully killed and counseled, commanded,

14

00098

J.A.46

induced, procured, and caused the intentional killing of Dorothy Mae Armstrong, and such killing resulted.

(In violation of Title 21, United States Code, Section 848(e)(1)(A) and Title 18, United States Code, Section 2.).

## COUNT TWENTY

THE GRAND JURY FURTHER CHARGES that on or about February 1, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON aka Whittey, CORY JOHNSON, aka "O," aka "CO", and JERRY GAITERS, did knowingly, willfully, and unlawfully use a firearm, during and in relation to a crime of violence or a drug trafficking crime, which is a felony prosecutable in a court of the United States, that is a violation of Title 21, United States Code, Sections 846 and 848, and Title 18, United States Code, Section 1959, as set forth in Counts One, Seventeen, Eighteen & Nineteen and Twenty-One through Twenty-Three of this Indictment.

(In violation of Title 18, United States Code, Sections 924(c) and 2.)

## COUNT TWENTY-ONE

THE GRAND JURY FURTHER CHARGES that on or about February 1, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON aka Whittey, CORY JOHNSON, aka "O," aka "CO", and JERRY GAITERS, did knowingly, intentionally, and unlawfully cause the murder of Bobby Long, as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value from an enterprise engaged in racketeering activity,

15

00099

J.A.47

and for the purpose of gaining entrance to and maintaining and increasing position in an enterprise engaged in racketeering activity, said racketeering activity being dealing in narcotic or other dangerous drugs.

(In violation of Title 18, United States Code, Sections 1959 and 2.)

## COUNT TWENTY-TWO

THE GRAND JURY FURTHER CHARGES that on or about February 1, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON aka Whittey, CORY JOHNSON, aka "O," aka "CO", and JERRY GAITERS, did knowingly, intentionally, and unlawfully cause the murder of Anthony Carter, as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value from an enterprise engaged in racketeering activity, and for the purpose of gaining entrance to and maintaining and increasing position in an enterprise engaged in racketeering activity, said racketeering activity being dealing in narcotic or other dangerous drugs.

(In violation of Title 18, United States Code, Sections 1959 and 2.)

## COUNT TWENTY-THREE

THE GRAND JURY FURTHER CHARGES that on or about February 1, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON aka Whittey, CORY JOHNSON, aka "O," aka "CO", and JERRY GAITERS, did knowingly, intentionally, and unlawfully cause the murder of Dorothy Mae Armstrong, as consideration for the receipt of, and as consideration for a promise and

16

00100

J.A.48

agreement to pay, something of pecuniary value from an enterprise engaged in racketeering activity, and for the purpose of gaining entrance to and maintaining and increasing position in an enterprise engaged in racketeering activity, said racketeering activity being dealing in narcotic or other dangerous drugs.

(In violation of Title 18, United States Code, Sections 1959 and 2.)

## COUNT TWENTY-FOUR

THE GRAND JURY FURTHER CHARGES that on or about February 19, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants RICHARD TIPTON, aka Whittey, VERNON LANCE THOMAS, aka Anthony Mack, aka "V", and CORY JOHNSON, aka "O," aka "CO", while engaged in and working in furtherance of a Continuing Criminal Enterprise, 21 USC § 848(a), knowingly, intentionally, and unlawfully killed and counseled, commanded, induced, procured, and caused the intentional killing of Curtis Thorne, and such killing resulted.

(In violation of Title 21, United States Code, Section 848(e)(1)(A) and Title 18, United States Code, Section 2.).

## COUNT TWENTY-FIVE

THE GRAND JURY FURTHER CHARGES that on or about February 19, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants RICHARD TIPTON, aka Whittey, VERNON LANCE THOMAS, aka Anthony Mack, aka "V", and CORY JOHNSON, aka "O," aka "CO", while engaged in and working in furtherance of a Continuing Criminal Enterprise, 21 USC § 848(a), knowingly,

17

00101

intentionally, and unlawfully killed and counseled, commanded, induced, procured, and caused the intentional killing of Linwood Chiles, and such killing resulted.

(In violation of Title 21, United States Code, Section 848(e)(1)(A) and Title 18, United States Code, Section 2.).

## COUNT TWENTY-SIX

THE GRAND JURY FURTHER CHARGES that on or about February 19, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON, aka Whittey, VERNON LANCE THOMAS, aka Anthony Mack, aka "V", and CORY JOHNSON, aka "O," aka "CO", did knowingly, willfully, and unlawfully use a firearm, during and in relation to a crime of violence or a drug trafficking crime, which is a felony prosecutable in a court of the United States, that is a violation of Title 21, United States Code, Section 846 and 848, and Title 18, United States Code, Section 1959, as set forth in Counts One, Twenty-Four, Twenty-Five and Twenty-Seven through Thirty of this Indictment.

(In violation of Title 18, United States Code, Sections 924(c) and 2.)

## COUNT TWENTY-SEVEN

THE GRAND JURY FURTHER CHARGES that on or about February 19, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON, aka Whittey, VERNON LANCE THOMAS, aka Anthony Mack, aka "V", and CORY JOHNSON, aka "O," aka "CO", did knowingly, intentionally, and unlawfully cause the murder of Curtis Thorne, as consideration for the receipt of, and as

18

00102

J.A.50

consideration for a promise and agreement to pay, something of pecuniary value from an enterprise engaged in racketeering activity, and for the purpose of gaining entrance to and maintaining and increasing position in an enterprise engaged in racketeering activity, said racketeering activity being dealing in narcotic or other dangerous drugs.

(In violation of Title 18, United States Code, Sections 1959 and 2.)

## COUNT TWENTY-EIGHT

THE GRAND JURY FURTHER CHARGES that on or about February 19, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON, aka Whittey, VERNON LANCE THOMAS, aka Anthony Mack, aka "V", and CORY JOHNSON, aka "O," aka "CO", did knowingly, intentionally, and unlawfully cause the murder of Linwood Chiles, as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value from an enterprise engaged in racketeering activity, and for the purpose of gaining entrance to and maintaining and increasing position in an enterprise engaged in racketeering activity, said racketeering activity being dealing in narcotic or other dangerous drugs.

(In violation of Title 18, United States Code, Sections 1959 and 2.)

## COUNT TWENTY-NINE

THE GRAND JURY FURTHER CHARGES that on or about February 19, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON, aka Whittey, VERNON LANCE THOMAS, aka Anthony Mack, aka "V", and CORY JOHNSON, aka "O," aka "CO", did knowingly, intentionally, and

19

00103

J.A.51

unlawfully cause the maiming of Priscilla Green, as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value from an enterprise engaged in racketeering activity, and for the purpose of gaining entrance to and maintaining and increasing position in an enterprise engaged in racketeering activity, said racketeering activity being dealing in narcotic or other dangerous drugs.

(In violation of Title 18, United States Code, Sections 1959 and 2.)

## COUNT THIRTY

THE GRAND JURY FURTHER CHARGES that on or about February 19, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON, aka Whittey, VERNON LANCE THOMAS, aka Anthony Mack, aka "V", and CORY JOHNSON, aka "O," aka "CO", did knowingly, intentionally, and unlawfully cause the maiming of Gwendolyn Green, as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value from an enterprise engaged in racketeering activity, and for the purpose of gaining entrance to and maintaining and increasing position in an enterprise engaged in racketeering activity, said racketeering activity being dealing in narcotic or other dangerous drugs.

(In violation of Title 18, United States Code, Sections 1959 and 2.)

## COUNT THIRTY-ONE

THE GRAND JURY FURTHER CHARGES that on or about January 15, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendant, CORY

20

00104

JOHNSON, aka "O," aka "CO", did knowingly and intentionally distribute a Schedule II narcotic controlled substance, that is, a mixture and substance described in Title 21, United States Code, Section 841(b)(1)(A)(ii), which contains cocaine base, commonly known as "crack," or "cook em up."

(In violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.)

## COUNT THIRTY-TWO

THE GRAND JURY FURTHER CHARGES that on or about February 2, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON aka Whittey, CORY JOHNSON, aka "O," aka "CO", STERLING HARDY, VERNON LANCE THOMAS, aka Anthony Mack, aka "V", JAMES ROANE, JR., aka "J.R.", and JERRY GAITERS, did knowingly and intentionally possess with the intent to distribute a Schedule II narcotic controlled substance, that is, more than fifty (50) grams of a mixture and substance described in Title 21, United States Code, Section 841(b)(1)(A)(ii), which contains cocaine base, commonly known as "crack," or "cook em up."

(In violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.)

## COUNT THIRTY-THREE

THE GRAND JURY FURTHER CHARGES that on or about April 10, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD

21

00105

J.A.53

TIPTON aka Whittey, did knowingly and intentionally possess with the intent to

distribute a Schedule II narcotic controlled substance, that is, more than fifty (50) grams

of a mixture and substance described in Title 21, United States Code, Section

841(b)(1)(A)(ii), which contains cocaine base, commonly known as "crack," or "cook em

up."

(In violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United

States Code, Section 2.)


                                                                A TRUE BILL:


                                                    ISl Christopher F. Snead
                                                    **F O R E P E R S O N**

**RICHARD CULLEN**
**UNITED STATES ATTORNEY**

By:

Howard C. Vick, Jr.
Assistant United States Attorney

William Parcell
Special Assistant U.S. Attorney


22

00106

**J.A.54**

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

UNITED STATES OF AMERICA

    v.               Criminal No. 3:92CR68 (DJN)

COREY JOHNSON,
     Petitioner.

## ORDER
### (Setting Briefing Schedule)

This matter comes before the Court on Petitioner Corey Johnson's ("Petitioner") Motion Pursuant to 28 U.S.C. § 2255 Raising Claims of Ineligibility to be Executed Under 18 U.S.C. § 3596(c) (the "Second § 2255 Petition" (ECF No. 86)), filed on December 14, 2020. Previously, on June 1, 1998, Petitioner filed a petition under 28 U.S.C. § 2255 (the "First § 2255 Petition" (Dkt. No. 714)), raising the issue that Petitioner's mental disability precluded the Government from executing him, among other challenges to his conviction and sentence. After permitting multiple amendments to the First § 2255 Petition, the Court ultimately dismissed the First § 2255 Petition on May 1, 2003. (Dkt. No. 897.) In dismissing the First § 2255 Petition, the Court expressly rejected the argument that 18 U.S.C. § 3596(c) precluded the execution of Petitioner on the grounds of his mental disability, and that Petitioner's counsel was ineffective for not properly raising his mental disability at the sentencing phase. (Dkt. No. 896 at 80-84.) On appeal, the Fourth Circuit affirmed the Court's dismissal of the First § 2255 Petition, stating that "Johnson is not barred from execution due to mental retardation." *United States v. Roane*, 378 F.3d 382, 409 (4th Cir. 2004).

**J.A.55**

On December 14, 2020, Petitioner filed the Second § 2255 Petition, arguing again that 18 U.S.C. § 3596(c) bars his execution due to mental retardation. However, the Antiterrorism and Effective Death Penalty Act of 1996 restricted the jurisdiction of the district courts to hear second or successive applications for federal habeas corpus relief by prisoners attacking the validity of their convictions and sentences by establishing a "'gatekeeping' mechanism." *Felker v. Turpin*, 518 U.S. 651, 657 (1996). Specifically, "[a] second or successive motion must be certified as provided in section 2244 by a panel of the appropriate court of appeals . . ." 28 U.S.C. § 2255(h). Section 2244, in turn, requires that, "[b]efore a second or successive application permitted by this section is filed in the district court, the applicant shall move in the appropriate court of appeals for an order authorizing the district court to consider the application." 28 U.S.C. § 2244(b)(3)(A). If a petitioner files a successive petition without authorization from the court of appeals, then the district court dismisses it for want of jurisdiction.

Before addressing the merits of the Second § 2255 Petition, the Court must satisfy itself that it has jurisdiction. *See Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 94-95 (1998) ("The requirement that jurisdiction be established as a threshold matter springs from the nature and limits of the judicial power of the United States and is inflexible and without exception."). Petitioner has not moved the Fourth Circuit for an order authorizing the Court to consider the Second § 2255 Petition. He argues that the Second § 2255 Petition is not successive, because he could not previously challenge his execution under 18 § U.S.C. 3596(c), thus obviating the need to seek authorization from the Fourth Circuit. (Second § 2255 Petition at 43-50.)

**J.A.56**

Therefore, the Court will order briefing limited to the question of whether Petitioner's Second § 2255 Petition constitutes a successive petition, whether Petitioner must first seek authorization from the Fourth Circuit and whether the Court has jurisdiction to consider the Second § 2255 Petition. Accordingly, it is hereby ORDERED that the Government file a brief addressing these issues, which shall not exceed fourteen (14) pages, not later than December 21, 2020. Petitioner shall file any reply, limited to seven (7) pages, not later than December 24, 2020. Following this briefing, should the Court find that it may consider the merits of the Second § 2255 Petition, the Court will set a briefing schedule to address the merits of the Second § 2255 Petition.

Let the Clerk file a copy of this Order electronically and notify all counsel of record.


It is so ORDERED.


_____/s/_____
David J. Novak
United States District Judge


Richmond, Virginia
Dated:  December 15, 2020

3

**J.A.57**

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division


UNITED STATES OF AMERICA,

    v.                                                                          Criminal No. 3:92cr68 (DJN)

COREY JOHNSON,
    Defendant.


**MEMORANDUM OPINION**
**(Dismissing § 2255 Petition)**

Convicted serial killer Corey Johnson ("Defendant" or "Johnson") comes before the Court with a Motion Pursuant to 28 U.S.C. § 2255 Raising Claim of Ineligibility to Be Executed Under 18 U.S.C. § 3596(c) ((the "Present § 2255 Petition") (ECF No. 86)), attempting to relitigate a question decided long-ago — a question that the Court lacks jurisdiction to decide again. Specifically, the Court and the Fourth Circuit have already rejected Defendant's claim that his intellectual disability[1] precludes the Government from executing him, and only the Fourth Circuit can decide whether to revisit those decisions. Yet Defendant attempts to skirt the rules in hopes of finding a court that will stay his execution, scheduled for January 14, 2021, regardless of whether the Court has the authority to do so. Indeed, district courts generally lack jurisdiction to consider successive § 2255 petitions absent preauthorization from the Court of Appeals. This case presents no exception to that requirement. Accordingly, for the reasons stated below, the Court will dismiss Defendant's Present § 2255 Petition for want of jurisdiction.

---

[1]    The Court uses the term "intellectual disability" rather than "mental retardation" throughout this Opinion. However, in the prior proceedings on this same question and the earlier caselaw, courts use the terms interchangeably.

## I.  BACKGROUND[2]

### A.  Factual Background

Defendant, along with Richard Tipton ("Tipton") and James Roane, Jr. ("Roane") (collectively, the "partners"), ran a substantial drug-trafficking conspiracy that lasted from 1989 through July of 1992. *Roane*, 378 F.3d at 389. The partners in the conspiracy obtained wholesale quantities of powder cocaine from suppliers in New York City, converted it into crack cocaine, divided it among themselves and then distributed it through a network of 30-40 street level dealers. *Id.* at 389-90. Typically, the partners took two-thirds of the proceeds realized from the street-level sales of their product. *Id.* at 390.

Over a short time in early 1992, the partners took part, in some form, in the murders of ten persons in the Richmond area. *Id.* These murders occurred "in relation to their drug-trafficking operation and either because their victims were suspected of treachery or other misfeasance, or because they were competitors in the drug trade, or because they had personally offended one of the 'partners.'" *Id.* The murders described below directly implicated Defendant.

On January 14, 1992, Roane and Johnson located Peyton Johnson, another rival drug dealer, at a tavern. *Id.* Shortly after Roane left the tavern, Corey Johnson entered and fatally shot Peyton Johnson with a semiautomatic weapon. *Id.*

On January 29, 1992, Roane pulled his car around the corner of an alley, got out and shot Louis Johnson, who had threatened one of the partners while acting as a bodyguard for a rival

---

[2]    The Court takes these background facts from the Fourth Circuit's opinion in *United States v. Roane*, 378 F.3d 382 (4th Cir. 2004), which recited the factual summary *in haec verba* from *United States v. Tipton*, 90 F.3d 861 (4th Cir. 1996), the opinion on the defendants' direct appeal. The Court also recited these facts in its Memorandum Order denying Defendant's First Step Act Motion (ECF No. 75).

2

drug dealer. *Id.* Corey Johnson and Lance Thomas ("Thomas") then got out of Roane's car and began firing at Louis Johnson. *Id.* As Louis Johnson laid on the ground, either Corey Johnson or Thomas shot him twice at close range. *Id.* Louis Johnson died from these gunshot wounds. *Id.*

On February 1, 1992, Roane, Johnson and Thomas went to the apartment of Torrick Brown, who had given Roane trouble. *Id.* After the three men knocked on the apartment door, Brown's half-sister opened the door and summoned Brown. *Id.* The three men opened fire with semiautomatic weapons, killing Brown and critically wounding his half-sister. *Id.*

In late January 1992, after Johnson threatened Dorothy Armstrong for not paying for a supply of crack cocaine, Armstrong went to live with her brother, Bobby Long. *Id.* On February 1, 1992, Johnson, Tipton and Jerry Gaiters ("Gaiters") went to Long's house. *Id.* at 391. While Tipton waited in the car, Johnson and Gaiters approached the front door. *Id.* When Long opened the door, Johnson opened fire, killing Dorothy Armstrong and Anthony Carter. *Id.* As Bobby Long fled out the front door, Johnson shot him dead in the front yard. *Id.*

On February 19, 1992, Johnson arranged to meet with Linwood Chiles, who Johnson suspected of cooperating with the police. *Id.* That night, Chiles and Johnson drove off together in Chile's station wagon, with Curtis Thorne and sisters Priscilla and Gwen Greene also in the car. *Id.* Chiles parked in an alley before Tipton parked behind the station wagon and walked up beside it. *Id.* With Tipton standing by, Johnson told Chiles to place his head on the steering wheel before shooting him twice at close range. *Id.* The partners fired additional shots, killing Thorne and critically wounding the Greene sisters in the station wagon. *Id.*

## B.    Verdict and Sentencing

In January and February of 1993, then-United States District Judge James R. Spencer

3

J.A.60

presided over the trial of Defendant and his co-conspirators. Defendant[3] faced capital murder charges for Murder in Furtherance of a Continuing Criminal Enterprise ("CCE") under 21 U.S.C. § 848(e)(1)(A) for seven of these killings — Peyton Johnson (Count Eight), Louis Johnson (Count Eleven), Armstrong (Count Seventeen), Carter (Count Eighteen), Long (Count Nineteen), Thorne (Count Twenty-Four) and Chiles (Count Twenty-Five) (collectively, the "Capital Murder Counts"). *Id.* at 391; (Second Superseding Indictment ("Indictment") (Dkt. No. 115) at 7-18). On February 3, 1993, the jury convicted him of all seven Capital Murder Counts. 378 F.3d at 391.[4]

During the penalty hearing, Defendant's expert psychologist, Dr. Dewey Cornell, testified that Defendant did not qualify as intellectually disabled, but that he tested just above that level. (May 1, 2003 Mem. Op. Denying § 2255 Petition ("First § 2255 Op.") (Dkt. No. 896) at 81.) Dr. Cornell found that Defendant had an IQ of 77. (*Id.*) To ensure the accuracy of his findings, Dr. Cornell rechecked his scores, consulted his colleagues, interviewed Defendant a second time, interviewed individuals involved in Defendant's life and reviewed a substantial amount of background information regarding Defendant. (*Id.*; Tr. of Feb. 10, 1993 Penalty Phase ("Tr.") at 3565-75.) Because Defendant's own expert did not find him intellectually

---

[3]    The Court tried Roane, Tipton and Johnson along with four other defendants on a thirty-three-count superseding indictment.

[4]    The jury also convicted Defendant of one count of participating in a Conspiracy to Possess Cocaine Base with Intent to Distribute, in violation of 21 U.S.C. § 846 (Count One); one count of engaging in a CCE, in violation of 21 U.S.C. § 848(a) (Count Two); eleven counts of Committing Acts of Violence in Aid of Racketeering ("VICAR"), in violation of 18 U.S.C. § 1959 (Counts Ten, Thirteen, Fourteen, Sixteen, Twenty-One, Twenty-Two, Twenty-Three, Twenty-Seven, Twenty-Eight, Twenty-Nine, Thirty); five counts of Use of a Firearm in Relation to a Crime of Violence or Drug Trafficking Offense, in violation of 18 U.S.C. § 924(c) (Counts Nine, Twelve, Fifteen, Twenty, Twenty-Six); and two counts of Distribution of or Possession with Intent to Distribute Crack Cocaine, in violation of 21 U.S.C. § 841(a)(1) (Counts Thirty-One and Thirty-Two). *Roane*, 378 F.3d at 392; (Dkt. Nos. 466, 593).

4

disabled, Defendant's counsel did not argue that Defendant's intellectual disability rendered him ineligible for the death penalty. (First § 2255 Op. at 84.) However, he did argue that the same reasons underlying the prohibition against executing the intellectually disabled mitigated against the imposition of the death penalty on Defendant. (*Id.*)

On February 16, 1993, following the penalty hearing, the jury recommended that the Court sentence Defendant to death for all seven of the Capital Murder Counts. *Roane*, 378 F.3d at 392. On the Special Findings Form, the jury indicated that it had unanimously found that Defendant committed each of the seven murders "after substantial planning and premeditation." (Dkt. No. 508 at 2.) Eight of the jurors found, by a preponderance of the evidence, that Defendant's "full scale I.Q. is 77." (Dkt. No. 508 at 9.) On June 1, 1993, pursuant to 21 U.S.C. § 848(l), the Court sentenced Johnson to death for Counts Eight, Eleven, Seventeen, Eighteen, Nineteen, Twenty-Four and Twenty-Five. (Dkt. No. 593.)

However, the Court refused to order the execution on the grounds that Congress had neither directly authorized the means to carry out the death sentences, nor properly delegated to the Attorney General the authority to issue the implementing regulations that the Government invoked. *Roane*, 378 F.3d at 392. As a result, the Court stayed the execution of the death sentences until such time as Congress had authorized the means of execution. *Id.*

## C.    Direct Appeal

The defendants appealed their convictions and sentences and the Government cross-appealed the stay of the death sentences. *Id.* at 392. In a lengthy opinion, the Fourth Circuit analyzed and disposed of approximately sixty issues, including challenges by the defendants to aspects of the jury-selection process and both the guilt and penalty phases of the trial. *Tipton*, 90 F.3d at 868. The Fourth Circuit rejected nearly all of the claims, affirming the convictions and

5

sentences of all of the defendants, except that it vacated on Double Jeopardy grounds the drug conspiracy convictions under 21 U.S.C. § 846. *Id.* at 903. Additionally, the Fourth Circuit vacated the stay of the death sentences and remanded for the executions to proceed in accordance with regulations promulgated by the Attorney General. *Id.* at 901-03.

### D.    First § 2255 Petition

On June 1, 1998, Defendant filed a petition under 28 U.S.C. § 2255 to vacate or set aside his sentences (the "First § 2255 Petition" (Dkt. No. 714)). Among other challenges to his conviction and sentence, Defendant argued that his intellectual disability precluded the Government from executing him. As part of his intellectual disability challenge, Defendant argued that his counsel had been ineffective in failing to argue at sentencing that Defendant could not be executed due to his intellectual disability. In arguing that "[u]nder federal law, a mentally retarded defendant cannot be executed," Defendant cited both 18 U.S.C. § 3596(c) and 21 U.S.C. § 848(l). (Dkt. No. 719 at 108).

In his First § 2255 Petition, Defendant did not submit any evidence from Dr. Cornell expressing doubt about his conclusions regarding Defendant's lack of intellectual disability. (First § 2255 Op. at 82.) The Court permitted multiple amendments to the First § 2255 Petition and granted Defendant "another full opportunity to demonstrate that he is mentally retarded." (*Id.*) Defendant submitted no new evidence regarding his intellectual disability. (*Id.*)

On May 1, 2003, the Court entered a lengthy opinion denying the First § 2255 Petition. The Court expressly rejected the argument that 18 U.S.C. § 3596(c) precluded the execution of Defendant on the grounds of his mental disability, because "the record before the Court demonstrates that Johnson is not mentally retarded." (First § 2255 Op. at 82.) The Court also rejected Defendant's ineffective assistance of counsel claims, finding that counsel acted

6

reasonably in not arguing intellectual disability when his own expert disputed that conclusion. (*Id.* at 84.)  Consequently, the Court denied Defendant's First § 2255 Petition on the merits.

Defendant appealed the denial of his First § 2255 Petition.  (Dkt. No. 908.)  In arguing that "Johnson's execution is barred by statute," Defendant cited both 18 U.S.C. § 3596(c) and 21 U.S.C. § 848(l).  (Appellants' Br., *United States v. Johnson*, No. 03-13 (4th Cir. Feb. 17, 2004) at 144-45.)  On August 9, 2004, the Fourth Circuit affirmed this Court's denial of the First § 2255 Petition.  *Roane*, 378 F.3d at 408.  The Fourth Circuit noted that federal law prohibits the carrying out of a sentence of death upon a person of intellectual disability.  *Id.*  However, the Fourth Circuit rejected Defendant's argument that the law barred his execution, stating plainly that "Johnson is not barred from execution due to mental retardation."  *Roane*, 378 F.3d at 408-09.  The Fourth Circuit also rejected Defendant's argument that his counsel had rendered ineffective assistance by failing to raise additional intellectual disability arguments at sentencing. *Id.*  In sum, the Fourth Circuit agreed with this Court on the merits of Defendant's intellectual disability challenge in his First § 2255 Petition.

### E.    Other Attacks on His Sentence

Defendant has attempted to invalidate his sentences on several other occasions.  In 2016, Defendant filed multiple § 2244 applications with the Fourth Circuit for authorization to file successive § 2255 petitions to invalidate his § 924(c) convictions.  The Fourth Circuit denied his requests. *In re Corey Johnson*, No. 16-4 (4th Cir. 2016), ECF Nos. 2, 10; *In re Corey Johnson*, No. 16-13 (4th Cir. 2016), ECF Nos. 2, 8.  In 2019, the Fourth Circuit again denied Defendant's § 2244 application for authorization to file a successive § 2255 petition. *In re Corey Johnson*, No. 19-1 (4th Cir. 2019), ECF Nos. 1, 13.  On May 22, 2020, in the wake of the Supreme Court's decision in *United States v. Davis*, 139 S. Ct. 2319 (2019), Defendant filed yet another § 2244

7

**J.A.64**

application with the Fourth Circuit for authorization to file a successive § 2255 petition. The Fourth Circuit has placed the case in abeyance pending its decision in *United States v. Dickerson*. *In re Corey Johnson*, No. 20-8 (4th Cir. 2020), ECF Nos. 2, 23. The proposed petition attached to the § 2244 application does not raise the same issues that Defendant raises in the Present § 2255 Petition.

On August 19, 2020, Defendant filed a motion in this Court under the First Step Act (ECF No. 38), arguing that the Court should reduce his death sentences under the statute enacted to reduce sentences for nonviolent crack offenders. The motion had no merit and amounted to another thinly-veiled attempt by Defendant to relitigate his intellectual disability claim. (ECF No. 39 at 16-31.) Consequently, the Court denied it. (ECF No. 75.) Defendant has appealed that decision to the Fourth Circuit. (ECF No. 77.)

Most recently, on December 23, 2020, Defendant filed a motion in the United States District Court for the District of Columbia, asking that court to enjoin his execution on the basis that he has tested positive for Coronavirus-2019. *In The Matter of The Federal Bureau of Prisons' Execution Protocol Cases*, No. 19mc145 (TSC) (D.D.C.), Dkt. No. 373. That motion remains pending.

### F.    Defendant's Present § 2255 Petition

On November 20, 2020, the Government informed Defendant that it had scheduled his execution to occur on January 14, 2021. (ECF No. 78.) On December 14, 2020, Defendant filed the Present § 2255 Petition. (ECF No. 86.) Defendant argues that he suffers from an intellectual disability and, therefore, proves ineligible for execution. Defendant asks this Court to issue an order prohibiting his execution on January 14, 2021, and to enjoin his execution until the Court can hold an evidentiary hearing on his intellectual disability. (Present § 2255 Pet. at 3.)

8

Defendant argues that the Present § 2255 Petition does not constitute a "second or successive" petition, thereby eliminating the requirement to seek authorization to file from the Fourth Circuit, because 18 U.S.C. § 3596(c) provides for review of an intellectual disability claim when the Government sets an execution date. (Present § 2255 Pet. at 43.)

On December 15, 2020, the Court recognized that district courts generally lack jurisdiction to entertain second or successive 28 U.S.C. § 2255 motions without preauthorization from the appropriate Court of Appeals. Therefore, it ordered the parties to brief the limited question of whether Defendant must first seek authorization from the Fourth Circuit and whether the Court has jurisdiction to consider the Present § 2255 Petition. (ECF No. 95.) On December 21, 2020, the Government responded (Govt's Resp. to Court's December 15, 2020 Order ("Govt's Resp.") (ECF No. 96)), arguing that the Court lacks jurisdiction to consider the Present § 2255 Petition. On December 24, 2020, Defendant filed Corey Johnson's Reply Pursuant to December 15, 2020 Order (ECF No. 97), rendering this matter now ripe for review.

## II. ANALYSIS

Because the general prohibition on filing second or successive § 2255 petitions calls into question the Court's jurisdiction, the Court must first resolve that issue to determine whether it has jurisdiction to entertain the Present § 2255 Petition. In making this determination, the Court will review the general prohibition against second or successive § 2255 petitions before determining whether the Present § 2255 Petition falls under that prohibition. This analysis involves examining the interplay between habeas law and the Federal Death Penalty Act ("FDPA"), which provides, in relevant part, that "a sentence of death shall not be carried out upon a person who is mentally retarded." 18 U.S.C. § 3596(c).[5] Because the Court ultimately

---

[5] The Court notes that the parties dispute whether Defendant could raise a challenge under

9

determines that Defendant must obtain authorization from the Fourth Circuit to file the Present § 2255 Petition, it will not reach the merits of the Petition.

### A.    The Current Statutory Restrictions on Second or Successive § 2255 Petitions

"[I]t is 'particularly egregious' to enter a stay on second or subsequent habeas petitions unless 'there are substantial grounds upon which relief might be granted.'" *Delo v. Blair*, 509 U.S. 823, 823 (1993) (quoting *Herrera v. Collins*, 506 U.S. 390, 425-26 (1993) (O'Connor, J., joined by Kennedy, J., concurring)). Nevertheless, before the passage of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), the appellate courts often had "to vacate last minute stays of executions granted by district courts ruling on procedurally defaulted claims in successive petitions." *Stockton v. Angelone*, 70 F.3d 12, 13 (4th Cir. 1995) (citing *Peterson v. Murray*, 949 F.2d 704 (4th Cir. 1991)); *Evans v. Muncy*, 916 F.2d 163 (4th Cir. 1990); *Clanton v. Bair*, 826 F.2d 1354 (4th Cir. 1987)); *see id.* (observing that petitioner's habeas petition "reflects a formula for eleventh-hour relief that is increasingly common in capital cases").

In the wake of these and other practices, the AEDPA restricted the jurisdiction of the district courts to hear second or successive applications for federal habeas corpus relief by prisoners attacking the validity of their convictions and sentences by establishing a "gatekeeping mechanism." *Felker v. Turpin*, 518 U.S. 651, 657 (1996) (internal quotation marks omitted). Specifically, as pertinent here, 28 U.S.C. § 2255(h) states:

---

§ 3596(c), given that the Court sentenced him to death under the now-repealed sentencing provisions of 21 U.S.C. § 848, rather than the FDPA. Indeed, the United States District Court for the District of Columbia recently ruled that Defendant lacked standing to challenge his execution under § 3596(a). *In the Matter of Federal Bureau of Prisons' Execution Protocol Cases*, No. 19mc145, ECF No. 378 (D.D.C. Dec. 30, 2020). Nevertheless, § 848(l) and § 3596(c) contain identically worded prohibitions on executing intellectually disabled individuals. Here, the Court need not reach the merits of whether Defendant can raise a challenge under § 3596(c), because Defendant's Present § 2255 Petition qualifies as second and successive even assuming § 3596(c) applies to him.

10

(h) A second or successive motion must be certified as provided in section 2244 by a panel of the appropriate court of appeals to contain—

(1) newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense; or

(2) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable.

28 U.S.C. § 2255. Section 2244, in turn provides, "[b]efore a second or successive application permitted by this section is filed in the district court, the applicant shall move in the appropriate court of appeals for an order authorizing the district court to consider the application." 28 U.S.C. § 2244(b)(3)(A). "The core of the AEDPA restrictions on second or successive § 2255 petitions is related to the longstanding judicial and statutory restrictions embodied in the form of res judicata known as the 'abuse of the writ' doctrine." *United States v. Barrett*, 178 F.3d 34, 44 (1st Cir. 1999); *see Felker*, 518 U.S. at 663–64 (citation omitted) (observing that the AEDPA's restrictions on successive petitions "transfers from the district court to the court of appeals [the] screening function" for petitions that constitute an abuse writ). "In the absence of pre-filing authorization, the district court lacks jurisdiction to consider an application containing abusive or repetitive claims." *United States v. Winestock*, 340 F.3d 200, 205 (4th Cir. 2003), *abrogated in part on other grounds by United States v. McRae*, 793 F.3d 392 (4th Cir. 2015).

Here, the parties do not dispute that Defendant neither sought nor obtained authorization from the Fourth Circuit to file the Present § 2255 Petition. Nor do they dispute that Defendant previously filed a § 2255 petition. Instead, they dispute whether the requirement to obtain authorization applies to this claim.

**B.     Defendant's Present § 2255 Petition Constitutes a Second or Successive Petition.**

Defendant argues that he did not need to obtain authorization from the Fourth Circuit,

11

J.A.68

because the Present § 2255 Petition does not constitute a second or successive § 2255 petition within the meaning of § 2255(h). "[I]t is settled law that not every numerically second petition [or motion] is a 'second or successive' petition [or motion] within the meaning of the AEDPA." *United States v. Hairston*, 754 F.3d 258, 262 (4th Cir. 2014) (quoting *In re Williams*, 444 F.3d 233, 235 (4th Cir. 2006)). The Supreme Court has "described the phrase 'second or successive' as a 'term of art.'" *Magwood v. Patterson*, 561 U.S. 320, 332 (2010) (quoting *Slack v. McDaniel*, 529 U.S. 473, 486 (2000)). In assessing "what qualifies as second or successive," courts should look for guidance in: (1) "historical habeas doctrine and practice"; and, (2) the "AEDPA's own purposes." *Banister v. Davis*, 140 S. Ct. 1698, 1705–06 (2020). As explained below, both these guides convincingly demonstrate that the Present § 2255 Petition constitutes a second or successive § 2255 petition within the meaning of 28 U.S.C. § 2255(h).

> ### i. *Historical Principles Dictate Treating the Present § 2255 Petition as a Second or Successive § 2255 Petition.*

Under the historical guide, if the litigant's "later-in-time filing would have "constituted an abuse of the writ, as that concept is explained in . . . [pre-AEDPA] cases . . . it is successive; if not, likely not." *Id.* (alteration in original) (internal quotation marks omitted) (citation omitted). The doctrine of abuse of the writ

> mandates dismissal of claims presented in habeas petitions if the claims were raised, or could have been raised, in an earlier petition. Thus, the doctrine "encourages petitioners to present their claims simultaneously for resolution, rather than fragmenting grounds for collateral relief or advancing endless permutations of the same themes."

*Noble v. Barnett*, 24 F.3d 582, 585 (4th Cir. 1994) (quoting *Miller v. Bordenkircher*, 764 F.2d 245, 248 (4th Cir. 1985)). Defendant contends that his claim could not have been raised earlier, likening it to the mental competency claims that courts have found unripe. (Present § 2255 Pet. at 45.)

12

The decision of *Stewart v. Martinez–Villareal*, 523 U.S. 637 (1998), cited by Defendant,

illustrates how the historical habeas practice informs AEDPA jurisprudence in determining

whether a second in time application for relief constitutes a second or successive application.  In

*Stewart*, Martinez-Villareal's federal habeas petition, filed in 1993, contained a number of claims

for relief, including a claim pursuant to *Ford v. Wainwright*, 477 U.S. 399 (1986), that his mental

incompetence precluded his execution ("*Ford* claim").  *Id.* at 640.  The district court dismissed

Martinez-Villareal's *Ford* claim as premature and, after remand, denied the remainder of the

petition for a writ of habeas corpus.  *Id.*

Later, the state set an execution date for the petitioner.  *Id.*  Martinez-Villareal then

sought relief in federal court on his *Ford* claim.  *Id.* at 640–41.  The state asserted that this

subsequent request for federal habeas relief required prefiling authorization from the Court of

Appeals pursuant to 28 U.S.C. § 2244(b).  *Id.*  The Supreme Court rejected the state's position

and noted:

> [The most recent petition] may have been the second time that [Martinez-Villareal]
> had asked the federal courts to provide relief on his *Ford* claim, but this does not
> mean that there were two separate applications, the second of which was necessarily
> subject to [the second or successive petition].  There was only one application for
> habeas relief, and the District Court ruled (or should have ruled) on each claim at
> the time it became ripe.  [Martinez-Villareal] was entitled to an adjudication of all
> of the claims presented in his earlier, undoubtedly reviewable, application for
> federal habeas relief.

*Id.* at 643–44.  The Supreme Court compared Martinez-Villareal's position to "a petitioner who

returns to a federal habeas court after exhausting state remedies."  *Id.* at 644.  And, with a nod to

the abuse of the writ doctrine, noted that Martinez-Villareal's "*Ford* claim would not be barred

under any form of res judicata.  [Martinez-Villareal] brought his claim in a timely fashion, and it

has not been ripe for resolution until now."  *Id.* at 645; *see also Slack*, 529 U.S. at 478, 487

(declining to apply § 2244(b) to a second application where the district court dismissed the first

J.A.70

application for lack of exhaustion).

Unlike the *Ford* claim in *Stewart v. Martinez–Villareal*, Defendant has already raised his claim that his intellectual disability precludes his execution in his First § 2255 Petition. And, both this Court and the Fourth Circuit rejected it on the merits. *United States v. Roane*, 378 F.3d 382, 409 (4th Cir. 2004) ("Johnson is not barred from execution due to mental retardation."). Thus, res judicata would bar the claim.

Defendant unconvincingly compares his intellectual disability claim to the incompetency claim of Martinez-Villareal and similar litigants whose claims were not ripe or did not arise until after they filed their first request for federal habeas relief. (Present § 2255 Pet. at 44.) Yet, in comparing the two claims, Defendant "confuse[s] intellectual disability with the temporary condition of incompetency, which may come and go." *Bourgeois v. Watson*, 977 F.3d 620, 637 (7th Cir. 2020) (citing *Ford*, 477 U.S. 399; *Williams v. Kelley*, 858 F.3d 464, 472 (8th Cir. 2017); *Busby v. Davis*, 925 F.3d 699, 713 (5th Cir. 2019)), *cert. denied sub nom. Bourgeois v. Watson*, No. 20–6500, 2020 WL 7296816 (U.S. Dec. 11, 2020). Importantly, "[i]ntellectual disability is a permanent condition that must manifest before the age of 18." *Id.* (citing *Atkins v. Virginia*, 536 U.S. 304, 318 (2002)).

Moreover, the distinct penological purposes behind the respective prohibitions on executing the intellectually disabled and the mentally incompetent underscore the difference in the time at which a defendant may successfully raise each claim. In *Ford*, the Supreme Court indicated that the prohibition on executing the mentally incompetent stemmed from the defendant's lack of comprehension regarding the punishment that he would soon suffer: "we may seriously question the retributive value of executing a person who has no comprehension of why he has been singled out and stripped of his fundamental right to life." 477 U.S. at 409-10.

14

Similarly, Justice Powell wrote in concurrence that the Eighth Amendment "forbids the execution only of those who are unaware of the punishment they are about to suffer and why they are to suffer it." *Id.* at 422 (Powell, J., concurring). Indeed, the *Ford* Court noted the various stages at common law at which a defendant could raise a distinct competency claim, *e.g.*, when pleading an insanity defense, when asserting incompetence to stand trial or before execution. *Id.* at 406-07. Each could require a different competency assessment. *Id.*

Conversely, the prohibition on executing the intellectually disabled stems from the defendant's diminished moral culpability for the crime. As the Supreme Court has stated, "[t]he diminished capacity of the intellectually disabled lessens moral culpability and hence the retributive value of the punishment." *Hall v. Florida*, 572 U.S. 701, 709 (2014). Likewise, the diminished ability to control his conduct through foresight and reason renders a potential death sentence an unlikely deterrent for an intellectually disabled individual. *Id.* Moreover, the prohibition also serves to protect the trial process, as intellectually disabled persons "are more likely to give false confessions, are often poor witnesses, and are less able to give meaningful assistance to their counsel." *Id.*

Thus, the prohibition on executing the intellectually disabled has a foundation in the mental state of the defendant at the time of the crime and trial. And, this mental state manifests early in life and would not change as a defendant's execution nears. For this reason, courts may consider challenges that a defendant's intellectual disability precludes a death sentence at all phases of the trial and sentence. *See, e.g., United States v. Salad*, 959 F. Supp. 2d 865, 867-68 (E.D. Va. 2013) (considering the defendant's *Atkins* and § 3596(c) challenges before trial); *Ortiz v. United States*, 664 F.3d 1151, 1165-66 (8th Cir. 2011) (considering the defendant's *Atkins* and § 3596(c) challenges at the habeas stage). Conversely, the prohibition on the execution of the

15

J.A.72

mentally incompetent has a foundation in the mental state of the defendant at the time of his execution. This mental state can change and may not have manifested before the crime or trial. Consequently, an intellectual disability challenge ripens before a defendant files the first petition for federal habeas relief, whereas a competency challenge may not ripen until later.

Here, Defendant's intellectual disability ripened years ago, and the courts rejected it years ago. Indeed, both this Court and the Fourth Circuit ruled on Defendant's intellectual disability claim on the merits, rather than dismissing it as unripe. Therefore, his current attempt to relitigate that claim would be deemed an abuse of the writ. *See Noble*, 24 F.3d at 585 (observing that the abuse of the writ doctrine "mandates dismissal of claims presented in habeas petitions if the claims were raised [and rejected] . . . in an earlier petition."). Accordingly, guidance from historical habeas jurisprudence directs that Defendant's Present § 2255 Petition constitutes a second or successive § 2255 petition within the meaning of 28 U.S.C. § 2255(h).

### ii.    *The Statutory Aims of the AEDPA Indicate that the Present § 2255 Petition is a Second or Successive § 2255 Petition.*

The purpose behind the AEDPA's restrictions on multiple requests for federal habeas relief was to "conserve judicial resources, reduc[e] piecemeal litigation," and "lend[ ] finality to . . . judgments within a reasonable time." *Banister*, 140 S. Ct. at 1706 (alterations in original) (ellipses added) (interpreting 28 U.S.C. § 2244(b)) (quoting *Panetti v. Quaterman*, 551 U.S. 930, 945–46 (2007)). As explained below, not treating the Present § 2255 Petition as a second or successive motion would frustrate these statutory aims.

### a.    Defendant's § 3596(c) challenge does not differ from his previous *Atkins* challenge.

Defendant's argument that the Present § 2255 Petition constitutes a fresh intellectual disability claim, distinct from his previously-failed challenges, contravenes the purposes behind the AEDPA. To succeed on this argument, Defendant argues that an *Atkins* challenge differs

16

J.A.73

entirely from a challenge under § 3596(c), because "[s]ection 3596(c) provides more specific process for inmates with compelling claims of intellectual disability than is afforded by the Eighth Amendment." (Present § 2255 Pet. at 45-46.) However, the statute does not list the more specific process for intellectually disabled individuals and Defendant offers no authority for this position, or examples of the additional process afforded to intellectually disabled inmates under § 3596(c). Additionally, this argument ignores the fact that courts regularly consider Eighth Amendment and § 3596(c) challenges in tandem, using the same standards. *See, e.g., Bourgeois*, 977 F.3d at 634 (applying analysis equally to both *Atkins* and § 3596(c) claim, because they both provide "the same substantive protection"); *United States v. Cisneros*, 385 F. Supp. 2d 567, 569-70 (E.D. Va. 2005) (analyzing § 3596(c) and *Atkins* claims as one); *United States v. Coonce*, 932 F.3d 623, 632-33 (8th Cir. 2019) (same).

Moreover, Congress could not have sought to include additional protections to the Eighth Amendment, as the passage of the FDPA predated the Supreme Court's holding in *Atkins* that the Eighth Amendment prohibits the execution of the intellectually disabled. Indeed, the Supreme Court heavily relied on the fact that Congress, along with many other states, had passed legislation prohibiting the execution of the intellectually disabled. 536 U.S. at 314. Rather than creating a separate and distinct prohibition from § 3596(c), the Supreme Court in *Atkins* "articulated the constitutional dimension to this prohibition." *Salad*, 959 F. Supp. 2d at 868.

Defendant's argument also ignores the history of *this case*. Defendant previously challenged his death sentence under § 3596(c), citing that provision in his First § 2255 Petition and in his appeal to the Fourth Circuit after the Court's denial of the First § 2255 Petition. Similarly, the Court cited both *Atkins* and § 3596(c) in its Opinion denying the First § 2255 Petition, singularly analyzing the challenges under each, just as Defendant presented them to the

17

J.A.74

Court. (First § 2255 Op. at 80-84.)  Now, despite previously raising a challenge under § 3596(c), Defendant argues for the first time that "adjudication pursuant to § 3596(c) is premature" before the Government has set an execution date.  (Present § 2255 Pet. at 45.)  But, neither this Court, the Fourth Circuit nor Defendant hinted that Defendant may have prematurely brought his § 3596(c) challenge.  Rather than conserving judicial resources and reducing piecemeal litigation — the aims of the AEDPA — splitting the intellectual disability challenge in two would waste judicial resources and encourage piecemeal litigation.

> ### b.    Defendant's Textual Argument Lacks Merit.

Defendant argues that the language and structure of the text require the determination of intellectual disability when the Government sets an execution date.  (Present § 2255 Pet. at 46.) Defendant correctly points out that the statute does not allow the death penalty "to be carried out" on a person with an intellectual disability.  Yet, contrary to Defendant's argument, it does not follow that a determination on a defendant's intellectual disability must occur shortly before execution. A successful challenge under this provision that occurs pretrial, at sentencing or in the time to raise a federal habeas petition will prevent the death sentence from being "carried out" on the defendant.  It also makes little sense, given that the prohibition applies to a permanent condition that — by definition — must have manifested before the defendant committed the capital crime.  *Compare Atkins*, 536 U.S. at 318 (intellectual disability must manifest before age of eighteen); *with Roper v. Simmons*, 543 U.S. 551 (2005) (prohibiting imposition of death penalty on juvenile offenders).  For example, here, had Defendant's First § 2255 Petition succeeded in convincing the Court or the Fourth Circuit that he suffered from an intellectual disability, his death sentence would not be carried out.

Likewise, Defendant points out that Congress placed the prohibition on executing the

intellectually disabled between the prohibition on executing pregnant or mentally incompetent individuals, two statuses that must be determined at the time of execution. (Present § 2255 Pet. at 48.) However, this section concerns who the Government may not execute. It does not concern when to determine ineligibility. The fact that eligibility for the other two types of individuals can only be determined on the eve of execution does not mean that the Court must re-review a determination of intellectual disability, particularly when the defendant's ineligibility would stem from a condition that has not developed since the previous determination.

Alternatively, Defendant's argument requires finding that § 3596(c) explicitly allows for two separate challenges — one before the expiration of federal habeas proceedings and another after the Government sets an execution date. Again, this position lacks any support in the caselaw. Moreover, it would require piecemeal litigation, the waste of judicial resources and a lack of finality of the defendant's death sentence, all in contravention to the aims of the AEDPA.

Defendant argues, without support, that when the Government schedules the execution of a person for which evidence of an intellectual disability exists, "§ 3596(c) requires that assessment to be made when the sentence is set to be implemented, even if that issue has been previously litigated." (Present § 2255 Pet. at 46.) This requirement would result in repeated litigation to determine a definitionally permanent condition. The Seventh Circuit recently considered, in the § 2241 context, a similar argument that § 3596(c) entitles the defendant to a new intellectual disability determination before execution. *Bourgeois*, 977 F.3d at 635-39. The court roundly rejected "that end-around § 2255(h)" argument that *Atkins* and § 3596(c) "forbid both the 'imposition' and the 'execution' of death sentences on the intellectually disabled" as follows:

19

J.A.76

> Intellectual disability is a permanent condition that must manifest before the age of 18. It would be senseless to proscribe the execution of someone who merely "was" intellectually disabled when they were sentenced, or who "will be" intellectually disabled when their sentence is carried out. Bourgeois seems to confuse intellectual disability with the temporary condition of incompetency, which may come and go. . . . And with no textual (or other) support, we are unwilling to accept Bourgeois's sweeping argument that a fresh intellectual-disability claim arises every time the medical community updates its literature.

*Id.* at 637-38 (internal citations omitted). The Supreme Court denied Bourgeois' petition for a writ of certiorari without explanation. *Bourgeois v. Watson*, 2020 WL 7296816 (U.S. Dec. 11, 2020). Defendant's argument that the Present § 2255 Petition does not constitute a successive petition depends on finding that a new intellectual disability claim has arisen. But, Defendant cannot claim that his intellectual functioning has changed since the previous determinations — only that the methods of assessing a potential intellectual disability have changed. However, the Court agrees with the Seventh Circuit that a fresh intellectual-disability claim does not arise every time the medical community updates its literature.

The Court is mindful of its role in protecting the intellectually disabled from execution. However, if Congress wanted to allow for an extra step in the review process, it could have done so. As it stands now, § 3596(c) neither explicitly nor implicitly states that a new intellectual disability claim arises when the Government schedules an inmate's execution. Because such a claim would frustrate the purposes of the AEDPA, the Court finds that § 3596(c) does not override the ban on successive § 2255 petitions. Accordingly, the Court finds that the Present § 2255 Petition constitutes a successive petition, such that the Fourth Circuit must first authorize Defendant to file it. Determining whether Defendant may pursue this successive petition falls beyond the power of this Court. Until the Fourth Circuit authorizes the filing of the successive petition, the Court lacks jurisdiction to entertain the merits of the petition.

20

### III.    CONCLUSION

In passing the AEDPA, Congress sought to put an end to the eleventh-hour relief that capital defendants often sought in district courts. Defendant's litigation tactics highlight the need for a mechanism to stem the filing of last-minute claims. Less than two weeks after asking this Court to enjoin his execution, and before the completion of the expedited limited briefing, Defendant asked the D.C. District Court to do the same. The Court sentenced Defendant to death over twenty-five years ago, yet he now races to different courts looking for one to block his execution. He made no effort to comply with the statutory obligations of the AEDPA, despite the fact that the Court and the Fourth Circuit previously rejected the exact claim that he states now entitles him to relief. And, this case comes on the heels of Defendant filing several unrelated § 2244 applications for authorizations to file successive § 2255 petitions in the Fourth Circuit, along with an appeal of a First Step Act Motion that had no merit.

Because the Fourth Circuit has not authorized this Court to entertain Petitioner's Present § 2255 Petition, Defendant's Motion Pursuant to 28 U.S.C. § 2255 Raising Claim of Ineligibility to Be Executed Under 18 U.S.C. § 3596(c) (ECF No. 86) will be DISMISSED WITHOUT PREJUDICE for want of jurisdiction.

An appeal may not be taken from the final order in a § 2255 proceeding unless a judge issues a certificate of appealability ("COA"). 28 U.S.C. § 2253(c)(1)(B). A COA will not issue unless a prisoner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This requirement is satisfied only when "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4

21

(1983)).  For the reasons stated above, Defendant has not satisfied this standard.

An appropriate Order shall issue.

Let the Clerk file a copy of this Memorandum Opinion electronically and notify all

counsel of record.

_____ /s/ _____
David J. Novak
United States District Judge

Richmond, Virginia
Dated:  January 2, 2021

22

**J.A.79**

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

UNITED STATES OF AMERICA,

v.                                                      Criminal No. 3:92cr68 (DJN)

COREY JOHNSON,
    Defendant.

## ORDER
**(Granting Motion for Leave to File Supplemental Authority)**

This matter comes before the Court on the Government's Motion for Leave to File

Supplemental Authority (ECF No. 98), requesting leave to file a recent opinion from the United

States District Court for the District of Columbia. Because the Court finds good cause, and that

no party will suffer prejudice, the Court hereby GRANTS the Government's Motion. The

Government's Notice of Supplemental Authority (ECF No. 98-1) is hereby deemed filed as of

the date of this Order.

Let the Clerk file a copy of this Order electronically and notify all counsel of record.

It is so ORDERED

                                        /s/
                                     David J. Novak
                                     United States District Judge

Richmond, Virginia
Date: January 2, 2021

**J.A.80**

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

UNITED STATES OF AMERICA,

v.                                                              Criminal No. 3:92cr68 (DJN)

COREY JOHNSON,
          Defendant.

## ORDER
### (Dismissing § 2255 Petition)

This matter comes before the Court on Defendant's Motion Pursuant to 28 U.S.C. § 2255

Raising Claim of Ineligibility to Be Executed Under 18 U.S.C. § 3596(c) ((the "Present § 2255

Petition) (ECF No. 86)). In accordance with the accompanying Memorandum Opinion, it is

hereby ORDERED that:

1.    The Present § 2255 Petition (ECF No. 86) is hereby DISMISSED
      WITHOUT PREJUDICE for want of jurisdiction; and

2.    A certificate of appealability is hereby DENIED.

Should Petitioner desire to appeal, written notice of appeal must be filed with the Clerk of

the Court within sixty (60) days of the date of entry hereof. Failure to file a notice of appeal

within that period may result in the loss of the right to appeal.

Let the Clerk file a copy of this Order electronically and notify all counsel of record.

It is so ORDERED.

                                                    _____/s/_____
                                                    David J. Novak
                                                    United States District Judge

Richmond, Virginia
Dated: January 2, 2021

**J.A.81**

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

*Richmond Division*

UNITED STATES OF AMERICA

v.                                              Case No. 3:92-cr-68 (DJN)

COREY JOHNSON,

*Defendant*.

## NOTICE OF EXECUTION DATE

The United States hereby notifies the Court that the Director of the Federal Bureau of

Prisons, upon the direction of the Attorney General and in accordance with 28 C.F.R. Part 26,

has scheduled the execution of Corey Johnson for January 14, 2021.

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney

_____/s/_____
Richard D. Cooke
Assistant United States Attorney
United States Attorney's Office
919 East Main Street, Suite 1900
Richmond, Virginia 23219
Office:    (804) 819-5471
Email:    richard.cooke@usdoj.gov

1

**J.A.82**

**Certificate of Service**

I certify that on November 20, 2020, I filed electronically the foregoing with the Clerk of

Court using the CM/ECF system, which will serve all counsel of record.


By:    _____/s/_____
       Richard D. Cooke
       Assistant United States Attorney
       United States Attorney's Office
       919 East Main Street, Suite 1900
       Richmond, Virginia 23219
       Office:   (804) 819-5471
       Email:    richard.cooke@usdoj.gov

**J.A.83**

<span style="color:red">**EXECUTION SCHEDULED FOR JANUARY 14, 2021**</span>

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | **Case No. 3:92CR68 (DJN)** |
| | **:** | **CAPITAL CASE** |
| **COREY JOHNSON,** | **:** | |
| | **:** | |
| Defendant. | **:** | |

**MOTION PURSUANT TO 28 U.S.C. § 2255 RAISING CLAIM OF INELIGIBILITY TO
BE EXECUTED UNDER 18 U.S.C. § 3596(c)**

David E. Carney, VA Bar # 43914
Donald P. Salzman (Admitted Pro Hac Vice)
Skadden, Arps, Slate, Meagher & Flom, LLP
1440 New York Avenue, NW
Washington, DC 20005
Ph: (202) 371-7246
Fax: (202) 661-8295
Email: david.carney@skadden.com

*Counsel for Corey Johnson*

**J.A.84**

**TABLE OF CONTENTS**

I.     INTRODUCTION .................................................................................................1

II.    STATEMENT OF RELEVANT PROCEDURAL HISTORY.............................3

       A.    Trial Proceedings .................................................................................3

       B.    The Penalty Hearing .............................................................................5

       C.    Direct Appeal .......................................................................................9

       D.    Post-Conviction Proceedings ...............................................................9

       E.    Appeal of Post-Conviction Proceedings .............................................13

       F.    Subsequent Proceedings and Discovery of Additional IQ Scores .........14

III.   RELEVANT FACTS AND ISSUES .................................................................15

IV.    ARGUMENT .....................................................................................................20

       A.    When All the Relevant Data Are Evaluated According to Accurate,
             Complete, and Prevailing Legal and Medical Standards, Corey Johnson
             Must Be Adjudged Intellectually Disabled ...........................................20

             1.    Mr. Johnson Has Significant Deficits in Intellectual Functioning
                   Diagnostic of an Intellectual Disability .....................................21

             2.    Mr. Johnson Has Significant Deficits in Adaptive Functioning
                   Diagnostic of an Intellectual Disability .....................................24

                   a)    Conceptual Domain ........................................................25

                   b)    Social Domain................................................................33

                   c)    Practical Domain............................................................37

                   d)    Adaptive Behavior Composite.......................................41

             3.    The Onset of Mr. Johnson's Intellectual and Adaptive Deficits
                   Began Well Before the Age of Eighteen.....................................42

       B.    Mr. Johnson's Motion Is Not "Second or Successive" Under the
             Gatekeeping Provision of 28 U.S.C. § 2255(h) ...................................43

             1.    Mr. Johnson's Claim Is Not Successive Because a Statute Provides
                   for Review When an Execution Date Is Imminent ...................44

a)     The Plain Language of § 3596(c) Demonstrates That a Determination of Mental Status Must Be Made When an Execution Date Is Set ........................................................46

b)     The Other Provisions of § 3596(c), as Well as the Broader Structure of the FDPA, Reinforce That the § 3596(c) Bar Is Properly Raised After an Execution Date Is Set ...........................47

c)     The Legislative History of § 3596(c) Demonstrates Congress's Intent .........................................................48

V.     CONCLUSION..................................................................................................51

USCA4 Appeal: 21-1      Doc: 12-1          Filed: 01/08/2021      Pg: 95 of 363
Case 3:92-cr-00068-DJN   Document 86   Filed 12/14/20   Page 3 of 59 PageID# 2268

**J.A.86**

**TABLE OF AUTHORITIES**

Page(s)

**CASES**

*Brumfield v. Cain*, 135 U.S. 305 (2015) ......................................................................24

*Castro v. United States*, 540 U.S. 375 (2003)..............................................................44

*Davis v. Michigan Department of Treasury*, 489 U.S. 803 (1989).............................47

*Ford v. Wainwright*, 477 U.S. 399 (1986) ...................................................................45

*Garza v. Lappin*, 253 F.3d 918 (7th Cir. 2001) ...........................................................44

*Hall v. Florida*, 572 U.S. 701 (2014)..........................................................12, 16, 17, 43

*Hoxha v. Levi*, 465 F.3d 554 (3d Cir. 2006) ................................................................45

*Johnson v. United States*, 546 U.S. 810 (2005) ...........................................................13

*Magwood v. Patterson*, 561 U.S. 320 (2010) ..............................................................43

*Moore v. Texas*, 137 S. Ct. 1039 (2017) ................................................................ passim

*Murphy v. Smith*, 138 S. Ct. 784 (2018) ......................................................................47

*Panetti v. Quarterman*, 551 U.S. 930 (2007)...........................................................44, 45

*Stewart v. Martinez-Villareal*, 523 U.S. 637 (1998)...............................................44, 45

*United States v. Davis*, 139 S. Ct. 2319 (2019) ..............................................................4

*United States v. Davis*, 611 F. Supp. 2d 472 (D. Md. 2009) ............................... passim

*United States v. Hairston*, 754 F.3d 258 (4th Cir. 2014)............................................44

*United States v. Hardy*, 762 F. Supp. 2d 849 (E.D. La. 2010) ........................... passim

*United States v. Lewis*, No. 1:08 CR 404, 2010 WL 5418901 (N.D. Ohio Dec. 23, 2010)...........24

*United States v. Nelson*, 419 F. Supp. 2d 891 (E.D. La. 2006)....................................23

*United States v. Roane*, 378 F.3d 382 (4th Cir. 2004)................................................13

*United States v. Roland*, 281 F. Supp. 3d 470 (D.N.J. 2017) ............................. passim

*United States v. Salad*, 959 F. Supp. 2d 865 (E.D. Va. 2013)............................ passim

**J.A.87**

*United States v. Shields*,
No. 04-20254, 2009 WL 10714661 (W.D. Tenn. May 11, 2009) .........................16, 17, 22

*United States v. Smith*, 790 F. Supp. 2d 482 (E.D. La. 2011)........................................................16

*United States v. Wilson*, 170 F. Supp. 3d 347 (E.D.N.Y. 2016) ...............................................17, 18

*Webster v. Daniels*, 784 F.3d 1123 (7th. Cir. 2015) .......................................................................2

*Webster v. Watson*, 975 F.3d 667 (7th Cir. 2020).............................................................19, 22, 41

## STATUTES

18 U.S.C. § 1959.....................................................................................................................4

18 U.S.C. § 3591..................................................................................................................47

18 U.S.C. § 3592..................................................................................................................47

18 U.S.C. § 3593..................................................................................................................47

18 U.S.C. § 3594..................................................................................................................47

18 U.S.C. § 3595.............................................................................................................46, 48

18 U.S.C. § 3596........................................................................................................... passim

18 U.S.C. § 3597..................................................................................................................48

18 U.S.C. § 3598..................................................................................................................48

18 U.S.C. § 3599..................................................................................................................48

18 U.S.C. § 924.....................................................................................................................4

21 U.S.C. § 841.....................................................................................................................4

21 U.S.C. § 846.....................................................................................................................4

21 U.S.C. § 848...............................................................................................................2, 4, 9

28 U.S.C. § 2255.......................................................................................................... passim

**J.A.88**

## REGULATIONS

28 C.F.R. § 1.10(e) ................................................................................................... 14

## OTHER AUTHORITIES

*Carryout*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/carryout
(last visited Dec. 14, 2020) ...........................................................................................46

v

**J.A.89**

## I.  INTRODUCTION

Corey Johnson[1] remained in the second grade for three years, and also repeated third and fourth grades.  When asked his birthday at age eight, while in second grade, he thought it was in March, though he was actually born in November.  When he was 13 years old, he could barely write his own name.  And while he knew there were 12 months in the year, he could recite them only up to August.  Corey was not able to tell time or perform arithmetic beyond a third-grade level.  At age 18, a high school teacher concluded that Corey could never pass the competency exams required to graduate.  When he was in his early twenties, achievement testing measured his grade-equivalent levels no higher than second grade in reading and writing.  When he was last tested at age 45, Mr. Johnson was still at an elementary school level.

As an adolescent and teenager, Corey functioned like a younger child—he struggled to prepare snacks for himself, wet his bed (until he was twelve), and could not be trusted to roam school halls without getting lost or go to the store and receive correct change.  A social worker from his residential placement reported that when he was 13, Corey was "frightened" of other children and "isolated" from them.  He was never able to make his way alone through any but the most familiar streets even up to the time of his arrest in this case.  He has never managed to live on his own.

\* \* \*

---

[1]  Mr. Johnson's first name has been misspelled in various proceedings.  The correct spelling is Corey.  When referring to his childhood years, Mr. Johnson is referred to herein as Corey.

**J.A.90**

Even before the Supreme Court banned the execution of those with intellectual disability[2] as violative of the Eighth Amendment, Congress enacted legislation prohibiting the federal government from executing those afflicted with this condition, Federal Death Penalty Act ("FDPA" or "§ 3596"), 18 U.S.C. § 3596(c) ("A sentence of death *shall not be carried out* upon a person who is mentally retarded." (emphasis added)).[3]  The language, structure, and legislative history of the FDPA establish that the implementation of the sentence for an individual with intellectual disability is legally barred.  The execution of an intellectually disabled prisoner by the federal government would be an "intolerable result" prohibited by statute.  *Webster v. Daniels*, 784 F.3d 1123, 1139 (7th. Cir. 2015).[4]

Corey Johnson is intellectually disabled.  Experts agree he meets the three diagnostic criteria established in legal and clinical definitions of intellectual disability.  *First*, he exhibits intellectual deficits that put him in the bottom two to three percent of the American population.  *Second*, he lacks the skills necessary to navigate the world on his own, to engage in normal

---

[2] The modern convention is to refer to individuals as "intellectually disabled," replacing the previous term of "mentally retarded."  However, this motion uses the term "mentally retarded" when citing statutes and case law or quoting documents that use it.

[3] The Anti-Drug Abuse Act of 1988, 21 U.S.C. § 848(*l*) ("ADAA"), under which Mr. Johnson was convicted, also prohibited carrying out a death sentence on a person who was "mentally retarded."  Mr. Johnson relies on § 3596(c) in this motion because the government agrees that it is the controlling statute.  *See, e.g.*, Defs.' Opp'n to Pl. Intervenor Dustin Lee Honken's Mot. for Prelim. Inj. at 5 n.1, *In re Fed. Bureau of Prisons' Execution Protocol Cases*, No. 19-mc-145 (TSC) (D.D.C. Nov. 12, 2019), ECF No. 36 (declaring that implementation provision of § 3596 applies because of Congress's repeal of the death penalty provisions of § 848).

[4] *See also United States v. Salad*, 959 F. Supp. 2d 865, 868 (E.D. Va. 2013) ("The [FDPA] prohibits execution of intellectually disabled defendants."); *United States v. Davis*, 611 F. Supp. 2d 472, 507 (D. Md. 2009) ("The [FDPA] and the Eighth Amendment preclude the machinery of death from turning when a defendant is mentally retarded.").

social interaction, and to respond to changing circumstances.  In legal and clinical parlance, he

has extensive adaptive deficits.  *Third*, these intellectual and adaptive impairments existed well

before his 18th birthday.

Nevertheless, Mr. Johnson is now scheduled to be executed on January 14, 2021.  But he

cannot be executed without violating the rule of law and the will of duly elected members of

Congress and the people whose interests they reflected in the FDPA.

For federal prisoners such as Mr. Johnson, § 3596 stands as the bulwark against an illegal

execution.  And because the Attorney General has set his execution date, Mr. Johnson is entitled

to present, now, in a non-successive action pursuant to 28 U.S.C. § 2255 ("§ 2255"),[5] proof that

he is intellectually disabled and that his execution must, therefore, not be carried out.  This

demonstration, and the standards by which it is judged, must "align[] with the medical

community's information" to prevent "an unacceptable risk that [a] person[] with intellectual

disability will be executed."  *Moore v. Texas*, 137 S. Ct. 1039, 1044 (2017) (citation omitted).

Mr. Johnson asks this Court to issue an order prohibiting his execution on January 14,

2021, and permanently enjoining the implementation of his death sentences after holding an

evidentiary hearing to allow him to present the evidence of, and establish, his disability, and to

grant him argument and post-hearing briefing, on any factual matters the government may

dispute.

## II.      STATEMENT OF RELEVANT PROCEDURAL HISTORY

### A.      Trial Proceedings

In April 1992, Corey Johnson and six co-defendants were charged in a 33-count

indictment with offenses arising from a drug conspiracy pursuant to the ADAA.  (4/24/92

---

[5] Although second in time, this § 2255 motion is not successive.  *See infra* Section IV.B.

3

Indictment, Dkt. 1.).  The government sought death for three of the co-defendants, Mr. Johnson, James Roane, and Richard Tipton.  Ex. 64 (2/8/93 Notice of Intention to Seek Death Penalty as to Mr. Johnson); Ex. 60 (5/1/92 Notice of Intention to Seek Death Penalty as to Mr. Roane); Ex. 59 (5/1/92 Notice of Intention to Seek Death Penalty as to Mr. Tipton).[6]  This was among the first federal capital trials prosecuted in the modern era of the death penalty, and the very first in which the government charged and tried co-defendants together.

In the superseding indictment under which he was ultimately tried, Mr. Johnson was charged with 27 counts, including conspiracy to violate provisions of the ADAA under 21 U.S.C. § 846, murder in the course of a continuing criminal enterprise ("CCE") under 21 U.S.C. § 848(e)(1)(A), using a firearm during a crime of violence under 18 U.S.C. § 924(c), possession of cocaine base with the intent to distribute under 21 U.S.C. § 841(a)(1), and killing and maiming in aid of racketeering under 18 U.S.C. § 1959(a).  Ex. 61 (7/20/92 Second Superseding Indictment, Dkt. 115).[7]  On February 3, 1993, the jury convicted Mr. Johnson of all 27 charged

---

[6] The government initially filed a notice of intent to seek the death penalty against co-defendant, Vernon Lance Thomas who was eventually convicted of killing four victims.  Ex. 62 (10/28/92 Notice of Intention to Seek Death Penalty as to Mr. Thomas).  Mr. Thomas's case was severed from that of the other three defendants for reasons related to the availability of his appointed counsel.

Following authorization, but prior to trial, Mr. Thomas presented an expert report to the government that concluded Mr. Thomas had an IQ of 71 and was "mentally retarded."  Shortly thereafter, the government withdrew its death authorization, and Mr. Thomas faced a maximum penalty of life without parole at his trial.  *See, e.g.*, Ex. 66 (4/15/93 Mot. to Have Def. Declared Mentally Retarded).

[7] Mr. Johnson's death sentence is itself infirm on several grounds.  He is therefore currently seeking authorization from the U.S. Court of Appeals for the Fourth Circuit to challenge his § 924(c) convictions under *United States v. Davis*, 139 S. Ct. 2319 (2019).  Mot. for Authorization to File a Successive Mot. Pursuant to 28 U.S.C. § 2255(h)(2), *In re Corey Johnson*, No. 20-8 (4th Cir. May 22, 2020), ECF No. 2-1.  He is also appealing to the Fourth Circuit the denial of relief

4

J.A.93

counts, including seven CCE murders.  *See* Ex. 63 (2/3/93 Verdict Form, Dkt. 466); Ex. 6 (2/3/93 Trial Tr. 3259-63).

### B.    The Penalty Hearing

A penalty phase hearing followed shortly after conviction in front of the same jury.  Mr. Johnson's defense team presented evidence in mitigation, which included his difficult and tumultuous childhood and his severe mental impairments and their manifestations in his day-to-day life.  The defense presented much of the mitigating evidence, including about Mr. Johnson's impairments, through Dewey Cornell, Ph.D., a University of Virginia psychologist hired by the defense to evaluate Mr. Johnson as part of a standard mental health evaluation and to offer mitigation to the jury.[8]  As described below, while the mitigation case noted Mr. Johnson's severe limitations, the defense informed the jury, in both opening and closing arguments, that Mr. Johnson was *not* intellectually disabled and that jurors would not be asked to make such a determination.  Ex. 7 (2/10/93 Trial Tr. 3547); Ex. 9 (2/12/93 Trial Tr. 3921).

Instead, although Dr. Cornell testified that Mr. Johnson's mental impairments made him "unprepared to function in society, unprepared to survive on his own when he left institutional care . . . and made him unable to cope and adapt to society in a way that a normal individual would," Ex. 7 (2/10/93 Trial Tr. 3574), Dr. Cornell also affirmatively told the jury that Mr. Johnson did not meet the criteria for a diagnosis of mental retardation.  He explained that Mr. Johnson did not satisfy that diagnosis because, on an IQ test Dr. Cornell had administered, Mr.

---

he sought pursuant to the First Step Act.  Mem. Order (Nov. 19, 2020), ECF No. 75, *appeal docketed*, *United States v. Johnson*, No. 20-15 (4th Cir. Nov. 23, 2020).

[8] The defense specifically asked Dr. Cornell to: (1) determine whether Mr. Johnson was competent to stand trial; (2) determine if he was criminally responsible for his crimes; and (3) gather, analyze, and prepare potential mitigation evidence for the capital sentencing hearing.  Ex. 15 ¶ 9 (9/20/16 Aff. of C. Cooley).

**J.A.94**

Johnson had scored 77, "just above the level of mental retardation," "two points above that."  Ex. 7 (2/10/93 Trial Tr. 3691-92).  This, he said, failed to satisfy the first prong of a such a diagnosis—that Mr. Johnson had a significant intellectual deficit, as represented by this one IQ score.[9]

Because Dr. Cornell did not believe Mr. Johnson satisfied prong one, no attempt was made during these proceedings to establish that Mr. Johnson met the clinical definition of intellectual disability,[10] and neither the judge nor the jurors were asked to determine whether Mr. Johnson is a person with intellectual disability.[11]  The defense, through Dr. Cornell's testimony, simply presented as mitigation Mr. Johnson's documented, ongoing educational failures; diagnoses he had received as an adolescent of diffuse organic brain damage;[12] and standardized

---

[9] Dr. Cornell reached this conclusion even though he also testified that Corey had received an IQ score of 69 when he was 16, which Dr. Cornell acknowledged was a score below the threshold for a mental retardation diagnosis.  Ex. 7 (2/10/93 Trial Tr. 3607-09).

Dr. Cornell's disregard of this IQ test score of 69, which satisfies the first prong of the diagnosis, can only be explained by a belief that a single score above the default threshold disqualifies one for the diagnosis even when there are scores that satisfy the prong.  This view is contrary to the law.  *See infra* pp. 17-18.

[10] The test for intellectual disability generally accepted in both the legal and medical communities is a three-pronged analysis requiring findings of a significant intellectual deficit, significant adaptive deficits, and onset before the age of 18.  *See infra* Section III.

[11] Because he believed Mr. Johnson failed to qualify under the first prong, requiring a significant deficit in intellectual functioning as measured by IQ scores, Dr. Cornell never engaged in the full consideration of the second prong—deficits in adaptive behavior—which under modern diagnostic standards is given relatively more weight in an intellectual disability diagnosis than the intellectual functioning prong.  *See infra* note 20.  Nevertheless, his testimony described many documented adaptive impairments observed during Mr. Johnson's childhood that would have satisfied that prong, and which have since been corroborated by numerous other witnesses.

[12] Brain damage is considered one of several potential causes of, and a contributing factor to, intellectual disability.  Mr. Johnson's brain damage is so severe and widespread that, unlike many people who have localized damage, Mr. Johnson is unable to develop "workarounds" that employ healthy sections of his brain.  Dr. Cornell himself testified, "The problem with Cory (sic)

6

J.A.95

test scores that placed him in the bottom one to two percent of children his age, Ex. 7 (2/10/93 Trial Tr. 3590). Dr. Cornell also identified concrete ways Mr. Johnson fell far below his age-peers in his life skills.[13] These included Mr. Johnson's inability into early adolescence to make it through the night without wetting or soiling himself, or to recite all the months of the year by age 13, Ex. 7 (2/10/93 Trial Tr. 3576, 3585); and by late adolescence, his inability to read beyond a second-grade level, tell time, count money, do math beyond simple arithmetic, or to navigate any but the most familiar streets, Ex. 7 (2/10/93 Trial Tr. 3545-3714), though he did not describe them as being indicative of a diagnosis of mental retardation for Mr. Johnson.

While he ruled out mental retardation as an explanation for Mr. Johnson's deficits, Dr. Cornell did testify to other afflictions Mr. Johnson had been diagnosed with or appeared to manifest. During the course of his testimony, Dr. Cornell referred to records created during Mr. Johnson's childhood showing he had been diagnosed with brain damage, resulting in serious deficits in nonverbal abstract reasoning, perception organization, visual perception and perceptual motor functioning, comparable to a child five years below his chronological age. Ex. 7 (2/10/93 Trial Tr. 3583-84). Dr. Cornell discussed records showing that Mr. Johnson had severe neurologic dysfunctions, including reading and arithmetic disorders, and that observations of these disorders were consistent across evaluators and across time. Ex. 7 (2/10/93 Trial Tr.

---

is that his—his disability was so severe, so diffuse, he couldn't compensate." Ex. 7 (2/10/93 Trial Tr. 3592, 3678-79).

[13] Unaware (because trial counsel had not found them) that Mr. Johnson had two additional childhood IQ scores—one from a test given to him when he was eight years old that at the time of his trial would have placed him in the diagnostic range for intellectual disability and another from a test administered at age twelve that under modern standards is also within the intellectual disability range—Dr. Cornell mistakenly understood these impairments as only being indicative of a calamitous learning disability and noted that, but for his out-of-range IQ, these impairments aligned with the adaptive deficits one would find in a person who was mentally retarded. Ex. 7 (2/10/93 Trial Tr. 3692-97).

3604). He recounted notations in records from adolescent institutionalization in residential treatment and group homes in which professional staff (who routinely dealt with special education students) noted that Corey was among the most severely learning-disabled children they had taught. Dr. Cornell told the jury that one doctor deemed Corey the *most* severe case of learning disability—a misdiagnosis of Corey—he had ever seen, despite Corey's valiant efforts to learn. Ex. 7 (2/10/93 Trial Tr. 3589, 3591).[14] Dr. Cornell also testified that achievement test scores Corey received throughout his childhood placed him in the range of mental retardation. Ex. 7 (2/10/93 Trial Tr. 3592, 3600, 3608).[15]

The mitigation evidence Dr. Cornell testified to, that Mr. Johnson had diffuse brain damage, neurologic dysfunction, and learning disabilities, was all consistent with a diagnosis of intellectual disability; these are considered risk factors for and comorbidities with, intellectual

---

[14] It is worth noting that an intellectual disability can be a co-morbid state with learning disabilities. Ex. 77 at 39-40 (Diagnostic and Statistical Manual of Mental Disorders ("DSM-5")); Ex. 75 at 60-62, 65-66 (American Association on Intellectual and Developmental Disabilities Definition Manual ("AAIDD-11")); *see, e.g.*, *Davis*, 611 F. Supp. 2d at 482, 485; *United States v. Roland*, 281 F. Supp. 3d 470, 480, 546 (D.N.J. 2017). Note, however, that Dr. Reschly, an expert who has since evaluated Mr. Johnson, *see infra* Section IV.A, believes Mr. Johnson was misdiagnosed as having a learning disability and did not meet the diagnostic criteria for one. Ex. 1 at 32-38 (Reschly Report).

[15] During the period of time Corey was attending public schools, and living in a residential facility and later in a group home while in foster care, he was receiving the same social and educational supports a person with intellectual disability would receive. He was not, however, given a designation of intellectual disability. This was likely due in part to the then-prevalent notion that if an intellectually disabled child already had access to individualized services it was preferable not to stigmatize the child with a label of mental retardation. *See* Ex. 1 at 37-45 (Reschly Report). In addition, the evidence strongly suggests that those evaluating Mr. Johnson did not have access to all his IQ test scores, or sufficient documentation or expertise to evaluate the outlying higher scores he had received. *See infra* note 34.

8

J.A.97

disability.[16]  Additional evidence from family members likewise described biomedical, educational, and social circumstances the medical community deems risk factors for intellectual disability.  But the jury was never asked to consider this extensive evidence for any purpose other than as mitigating evidence of disadvantage and general impairment.

Even though the jury found several mitigating factors associated with Mr. Johnson's cognitive impairments, it returned a verdict of seven death sentences, one for each of his CCE convictions.  Ex. 65 (2/16/93 Special Findings, Dkt. 508); Ex. 10 (2/15/93 Trial Tr. 4027-31).  Considering mental retardation was not an option.

## C. Direct Appeal

Mr. Johnson timely appealed to the Fourth Circuit, raising issues relating to the guilt and penalty phases of his trial.  No issue regarding intellectual disability was raised in his direct appeal.

## D. Post-Conviction Proceedings

In June 1998, Mr. Johnson's attorneys filed a motion for collateral relief pursuant to § 2255.  In both initial and supplementary pleadings, counsel asserted for the first time that their client was ineligible for a death sentence pursuant to 21 U.S.C. § 848(*l*) and 18 U.S.C. § 3596 because he was mentally retarded.

In their pleadings, recognizing that Dr. Cornell had failed to take into account the age of the IQ tests on which he had relied during his trial testimony, post-conviction counsel asserted that Dr. Cornell should have adjusted all of Mr. Johnson's IQ scores using the Flynn Effect—a testing phenomenon that causes IQ scores to inflate over time and requires scores to be corrected

---

[16] Given the current state of the law and medical science (including the Flynn Effect) as well as the discovery of two additional childhood IQ results, a finding today of Mr. Johnson's intellectual disability would be virtually indisputable.  *See infra* Sections III and IV.A.

9

**J.A.98**

accordingly[17]—and that, had Dr. Cornell made these necessary adjustments, Mr. Johnson's IQ scores would have fallen within the standard error of measurement ("SEM") diagnostic of mental retardation, and a full evaluation would not have been ruled out. Habeas counsel also asserted that trial counsel was constitutionally ineffective for not pursuing a claim that their client was mentally retarded, regardless of the advice and assessment they had received from Dr. Cornell. Ex. 67 at 108-11 (6/15/98 Mem. in Supp. of Initial Petition for Writ of Habeas, Dkt. 714 (Excerpt)). To support both these claims, counsel attached to the reply to the § 2255 motion three IQ test results (which had been admitted into evidence at trial), Ex. 68 (3/15/99 Reply Br., Dkt. 761 (Excerpt)), Ex. 69 (3/15/99 Reply Br. Ex. 14), and a single social services record, Ex. 70 (3/15/99 Reply Br. Ex. 15). An excerpt from the same social services record that § 2255 counsel attached to the reply was admitted in evidence at trial, and Dr. Cornell mentioned the record in his testimony as well. *See* Ex. 7 (2/10/93 Trial Tr. 3617-18, 3712); *compare* Ex. 55 at 1, 7-9 (6/28/86 Service Plan Review 6 Month) *with* Ex. 8 at 10 (Excerpt of Cornell Mitigation Information and Report) (admitted into evidence at trial and same as Ex. 55 at 1) *and* Ex. 70 (3/15/99 Reply Br. Ex. 15) (same as Ex. 55 at 7-9).

---

[17] Research scientist James Flynn discovered IQ tests across populations increase slowly over time—approximately .3 points per year or 3 points over ten years. In the context of an intellectual disability assessment, at the time an IQ test is normed, the upper range of IQ scores in support of an intellectual disability diagnosis would range from approximately 70 to 75. According to the Flynn Effect, if the same IQ test were given to a subject ten years after the IQ test was normed, the upper end of the intellectual disability range would have risen from approximately 75 to approximately 78. For example, as applied in Mr. Johnson's case, his 1992 IQ score of 77 would be adjusted to 73.7, which is in the range for mild intellectual disability. While experts in intellectual disability have now weighed in on this issue, § 2255 counsel did not present expert support for this proposition during § 2255 proceedings and relied exclusively on scientific literature. *E.g.,* Ex. 1 at 8-10 (Reschly Report); Ex. 2 at 3-5 (Olley Report); Ex. 3 at 3-4, 10 (Siperstein Letter).

10

In light of Dr. Cornell's failure to adjust the IQ scores to account for the Flynn Effect, an omission on which his opinion hinged, counsel made relevant discovery requests during these post-conviction proceedings. They asked for information about the criteria the Department of Justice used to evaluate whether a defendant charged with a capital crime was mentally retarded. They also sought to learn in what specific federal capital cases defendants had asserted their execution should be barred due to mental retardation, and also requested all reports and memoranda specifically related to the application of the mental retardation bar against the defendants in the case.[18] Finally, they sought any documents regarding the government's knowledge of Mr. Johnson's "mental impairments." Ex. 71 at 32 (6/24/99 Joint Mot., Dkt. 770).

The district court denied Mr. Johnson's mental retardation-related discovery requests as unnecessary, summarily resolving the question of whether Dr. Cornell's scoring should have been modified on the grounds that "[e]vidence at trial indicated that [Mr. Johnson's] I.Q. is 77, and he is therefore not mentally retarded . . . clearly Johnson cannot prevail on this claim in light of the evidence presented at trial." Ex. 72 at 12 (5/3/00 Mem. Op., Dkt. 803).

In 2003, the district court granted the government's motion for summary judgment, denying Mr. Johnson relief on all grounds. *See* Ex. 73 (5/1/03 Mem. Op., Dkt. 896). In light of the fact that no new evidence had been offered with respect to the issue of Mr. Johnson's mental retardation, the Court found that "the record before the Court demonstrates that Johnson is not mentally retarded" and that Mr. Johnson's trial counsel was not ineffective for failing to raise the issue that Mr. Johnson's IQ score was overstated because counsel had reasonably relied on Dr.

---

[18] This discovery was especially relevant because of the outcome of Vernon Lance Thomas's case. *See supra* note 6.

**J.A.100**

Cornell's assessment.[19]  Despite § 2255 counsel's explanation of the Flynn Effect and the fact that Mr. Johnson had childhood scores under 75 as reported by Dr. Cornell, the district court nevertheless relied on Dr. Cornell's conclusion that Mr. Johnson was not mentally retarded.[20] The court concluded that Mr. Johnson could, therefore, not be deemed mentally retarded; with Dr. Cornell having testified at trial he had "rechecked" that Mr. Johnson's score of 77 was accurate, his IQ was simply too high to qualify.  Ex. 73 at 81 (5/1/03 Mem. Op., Dkt. 896).  Had § 2255 counsel introduced expert testimony about the Flynn Effect, as is now routinely done in cases,[21] or if counsel had located the childhood IQ scores that Dr. Cornell was not aware of, the district court almost certainly would not have come to its conclusion, on the limited record before it, that Mr. Johnson is not mentally retarded.

---

[19] Ex. 73 at 80-84 (5/1/03 Mem. Op., Dkt. 896).  The district court rejected counsel's argument that Mr. Johnson's IQ score was inflated on the basis that Dr. Cornell's testimony "belies the suggestion that Dr. Cornell's analysis did not account for possible variations in his testing instrument."  *Id.* at 81-82.  But Dr. Cornell merely testified that he double-checked his findings and consulted colleagues before concluding that Mr. Johnson was not mentally retarded because he was aware that finding Mr. Johnson's IQ to be above 75 made him death penalty-eligible.  Ex. 7 (2/10/93 Trial Tr. 3691).

Dr. Cornell never mentioned the Flynn Effect at trial nor was evidence provided to the court in § 2255 proceedings that Dr. Cornell had taken the Flynn Effect into account.

[20] To the extent that the court's decision could be read to require that all of one's IQ scores must be under 75 to be considered intellectually disabled or that a court can ignore adaptive deficits if a single score is above 75, such requirements would be inconsistent with the consensus of the current legal and medical communities.  *See Hall v. Florida*, 572 U.S. 701, 712 (2014); *Moore*, 137 S. Ct. at 1049; Ex. 77 at 37 (DSM-5); Ex. 76 at 23 (AAIDD-11 User's Guide).

[21] The Flynn Effect is now routinely regarded as valid, "persuasive," and "best practice," by the courts considering federal capital cases, including those in the Fourth Circuit, and must be taken into account when expert testimony supports its use.  *See Davis*, 611 F. Supp. 2d at 488; *Roland*, 281 F. Supp. 3d at 503; *see also Salad*, 959 F. Supp. 2d at 872 n.10 ("The Flynn Effect describes a documented increase in IQ levels over time.  As a result, IQ tests must be periodically re-normed to account for the population becoming more intelligent; a score on an outdated test might overstate IQ relative to the contemporary population.").

**J.A.101**

E.      Appeal of Post-Conviction Proceedings

In 2004, § 2255 counsel appealed to the Fourth Circuit. They argued with regard to Mr. Johnson's mental retardation claim that the district court had made a mistake in refusing to consider scores corrected for the Flynn Effect because the court had simply assumed that Dr. Cornell had considered the Flynn Effect, even though no evidence supported that assumption. Ex. 74 at 145-46 (Br. for Appellants Cory Johnson and Richard Tipton, *United States v. Johnson*, No. 03-13(L), 03-26, 03-27 (4th Cir. Feb. 17, 2004) (Excerpt)). The court sidestepped the issue and instead adopted the district court's rationale—that the IQ score Dr. Cornell had assigned Mr. Johnson placed him outside the diagnostic range for mental retardation and that ended the inquiry. The Fourth Circuit also agreed with the district court that Mr. Johnson's counsel were not ineffective for failing to consider the Flynn Effect at sentencing because they were "under no mandate to second-guess" Dr. Cornell's report. *United States v. Roane*, 378 F.3d 382, 408-09 (4th Cir. 2004).

Subsequently, the Fourth Circuit denied Mr. Johnson's petition for rehearing. Still convinced of Mr. Johnson's intellectual disability, counsel again raised the issue, along with several others, in a petition for certiorari to the U.S. Supreme Court. The Court denied the petition. *Johnson v. United States*, 546 U.S. 810 (2005).

In late 2005, counsel filed a motion to recall the mandate and for rehearing in light of new Fourth Circuit decisions remanding cases to trial courts to consider evidence of Flynn Effect adjustments to IQ scores above 75 that would bring the scores below 75—exactly what Mr. Johnson had asked the district court to do in his own § 2255 motion. The Fourth Circuit, however, denied the motion to recall, without opinion.

13

J.A.102

### F.      Subsequent Proceedings and Discovery of Additional IQ Scores

In 2006, the government set an execution date for Mr. Johnson.  Mr. Johnson applied for executive clemency, a feature of which was a plea that then President George W. Bush reduce his sentence from death to life without possibility of parole because of his intellectual disability. Because Mr. Johnson's execution was stayed as a result of litigation challenging the government's planned method of execution, counsel withdrew his clemency application before it was ruled upon.[22]

Following the entry of the lethal injection stay, new counsel began representing Mr. Johnson.  Convinced that their client's intellectual limitations had not been adequately explored and concerned that a full case for intellectual disability had never been presented, counsel searched for and located two additional scores from IQ tests he had been administered as a child. One of these scores was a 73 at age eight; the other was a 75, when properly corrected for the Flynn Effect.  Both of these scores constitute evidence of a significant intellectual deficit, satisfying the first prong for a diagnosis of intellectual disability.  Counsel also arranged to have three nationally renowned experts in intellectual disability conduct full evaluations of Mr. Johnson.[23]  Dr. J. Gregory Olley interviewed numerous witnesses, both old and new, who

---

[22] Because Department of Justice regulations provide a petitioner with only one determination on a request for clemency, 28 C.F.R. § 1.10(e), applicants often withdraw their petitions if a ruling becomes unnecessary because of a stay or for another reason.

[23] Dr. J. Gregory Olley is a clinical psychologist and professor emeritus at the University of North Carolina with more than 40 years of experience and a researcher and clinician focused on the diagnosis of intellectual disability in children and adults.  *See* Ex. 2(a) (Olley CV).  Dr. Daniel J. Reschly is a psychologist and professor emeritus at Vanderbilt University with more than 40 years of expertise in intellectual disability and learning disabilities.  *See* Ex. 1(a) (Reschly CV).  Dr. Gary N. Siperstein is a psychologist with more than 50 years of expertise on intellectual disability and is founder and director of the Center for Social Development and Education at the University of Massachusetts at Boston.  *See* Ex. 3(a) (Siperstein CV).

14

**J.A.103**

described Mr. Johnson's pervasive adaptive deficits.[24]  Many of these witnesses—teachers, psychologists, counselors at the institutional boarding schools Mr. Johnson attended—had documented their observations of Mr. Johnson during his childhood.  All three experts, considering all three prongs, concluded that Mr. Johnson is intellectually disabled.

Although he had no scheduled execution date, Mr. Johnson again requested clemency in 2016 at the close of the Obama Administration.  A central feature of Mr. Johnson's clemency request was a plea to reduce his sentence from death to life without parole in light of the strong evidence of his intellectual disability, based on the assessments of top experts in the field who, applying up-to-date diagnostic standards, were able to take into account all the evidence amassed during the course of trial and § 2255 proceedings, plus the newly found childhood IQ scores and other childhood records, and extensive lay witness records and declarations.

As before, he (along with other applicants at the time) withdrew his petition in early 2017 before it was ruled upon by the departing Administration.

## III.    RELEVANT FACTS AND ISSUES

In order to determine whether § 3596 bars Corey Johnson's execution, because of his intellectual disability, this Court must apply the prevailing medical and legal standards to the evidence.  Under these standards, a finding of intellectual disability requires proof of three

---

[24] Dr. Olley conducted in-person and phone interviews with more than two dozen witnesses. This included family and friends who had known Mr. Johnson all his life and professionals trained to work with children, who had spent time with, observed, and/or evaluated Mr. Johnson at various points in his development.

15

J.A.104

elements:  (1) significant deficits in intellectual functioning, usually represented by IQ scores of 75 or below; (2) significant deficits in adaptive functioning (*i.e.*, "the inability to learn basic skills and adjust behavior to changing circumstances"); and (3) onset before the age of 18. *Moore*, 137 S. Ct. at 1042, 1045 (quoting *Hall*, 572 U.S. at 710), 1048 (recognizing these standards and emphasizing that the AAIDD-11 and DSM-5 are "the most recent (and still current) versions of the leading diagnostic manuals"); *see also* Ex. 75 (AAIDD-11); Ex. 77 (DSM-5).[25]

*Significant deficits in intellectual functioning.*  A deficit in intellectual functioning is typically demonstrated by proof of a valid, reliable IQ score that falls two or more standard deviations below the norm for the general population.  An IQ score of approximately 75 or below falls within the presumptive range for intellectual disability because it takes into account the SEM.[26]  *Hall*, 572 U.S. at 713, 723; *see also Moore*, 137 S. Ct. at 1049 ("[T]he [SEM] is 'a statistical fact, a reflection of the inherent imprecision of the test itself.' . . .  [T]his imprecision

---

[25] These are the standards district courts within the Fourth Circuit have adopted in other federal capital cases, *e.g.*, *Salad*, 959 F. Supp. 2d at 868-69 (applying the AAIDD-11 and DSM–IV–TR standard and holding that "[a]ll three elements are essential to a finding that an individual is intellectually disabled"); *Davis*, 611 F. Supp. 2d at 475, as have other district courts around the country, *e.g.*, *United States v. Hardy*, 762 F. Supp. 2d 849, 856 (E.D. La. 2010); *United States v. Shields*, No. 04-20254, 2009 WL 10714661, at *1-2 (W.D. Tenn. May 11, 2009); *United States v. Smith*, 790 F. Supp. 2d 482, 485 (E.D. La. 2011).

[26] A score of 75 represents an IQ that is two standard deviations below the population mean and accounts for the typical five-point SEM.  *See, e.g.*, *Davis*, 611 F. Supp. 2d at 475 ("[T]he SEM in IQ assessments is approximately 5 points, therefore raising the operational definition of mental retardation to 75."); *Hardy*, 762 F. Supp. 2d at 856-57 ("[T]he [American Psychiatric Association or "APA"] and [the American Association on Mental Retardation] direct that the test's measurement error must be taken into account when interpreting its result," and there is "almost universal agreement" that "a score of 75 should be used as the upper bound of the IQ range describing mild mental retardation."); *Smith*, 790 F. Supp. 2d at 490 (same); *see also* Ex. 1 at 8 (Reschly Report).

**J.A.105**

in the testing instrument 'means that an individual's score is best understood as a range of scores on either side of the recorded score'" within which the individual's true score must be understood to lie.  (citations omitted)).

Although not commonly understood at the time Mr. Johnson was tried, it is now well-recognized that IQ tests administered years after such tests were originally developed produce measurably inflated scores, a phenomenon known as the Flynn Effect.  *Davis*, 611 F. Supp. 2d at 488 (finding that because Flynn Effect evidence is "both relevant and persuasive," adjusted scores should be used in place of raw scores, and the failure to do so "would be unwise—if not reckless" where a life and death categorization depends on a strict numerical cutoff ); *Shields*, 2009 WL 10714661, at \*12 (finding that Flynn Effect "must be considered").[27]  Scores on such older tests must be adjusted to correct for this effect; without such adjustments, the scores are invalid reflections of the subject's true intellectual functioning.  *Hardy*, 762 F. Supp. 2d at 860 (observing that "where a test with aging norms is used, a correction for the age of the norms is warranted" and collecting cases from the Fourth and Eleventh Circuits, explicitly endorsing use of the Flynn Effect).

An individual need only one qualifying score of 75 or below, even if other scores are above 75.  *Hall*, 572 U.S. at 719-20.  In *Hall*, the Supreme Court rejected a "rigid rule" that foreclosed further examination of cognitive functioning when an individual has met the threshold on one valid and reliable IQ test because such a rule "creates an unacceptable risk that persons with intellectual disability will be executed."  *Id.* at 704; *see also United States v. Wilson*, 170 F. Supp. 3d 347, 366 (E.D.N.Y. 2016) (holding that prong two adaptive deficit analysis is necessary

---

[27] The experts in intellectual disability who evaluated Mr. Johnson employed this standard approach.  Ex. 1 at 9-10 (Reschly Report); Ex. 2 at 3-4 (Olley Report); Ex. 3 at 4 (Siperstein Letter).

"if any IQ test, evaluated in the context of a 95% interval, reflects a range falling to 70 or below"). Thus, once a defendant establishes an IQ score of approximately 75 or below, the sentencing court must consider the adaptive functioning criterion of the intellectual disability test. For example, the court in *Wilson* ruled that a federal inmate who had taken *nine* IQ tests between the ages of six and 30, with full-scale scores ranging from 70 to 84 (seven of which were higher than 75) met the intellectual deficit prong for significantly subaverage intellectual functioning because *one* test was reasonably reliable and below the threshold. 170 F. Supp. 3d at 351.

    *Significant deficits in adaptive functioning.* Adaptive functioning describes "how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting." *Salad*, 959 F. Supp. 2d at 877 (quoting DSM-IV-TR at 42); *see also Davis*, 611 F. Supp. 2d at 491 (observing that adaptive functioning encompasses "skills that are required for people to function in their everyday lives"). Thus, a diagnosis of intellectual disability requires significant deficits in at least one of three areas of adaptive functioning: (1) conceptual functioning, (2) social functioning, or (3) practical functioning. *Moore*, 137 S. Ct. at 1050 (citing AAIDD-11 at 47; DSM-5 at 33, 38). Conceptual functioning "includes language, reading and writing, money and time/number concepts, and a range of skills related to self-direction." *Salad*, 959 F. Supp. 2d at 881; *see also* Ex. 2 at 17 (Olley Report). Social functioning "includes interpersonal skills, social responsibility, self-esteem, and gullibility." *Salad*, 959 F. Supp. 2d at 880 n.32. Practical functioning involves "skills related to daily living, personal care, occupational skills, and safety." *Id*. at 882.

18

**J.A.107**

The adaptive deficits prong is satisfied by a showing of impairment in just one of the three adaptive functioning domains. *Webster v. Watson*, 975 F.3d 667, 685 (7th Cir. 2020) ("*Webster II*") (citing DSM-5 at 38; AAIDD-11 at 27). Moreover, legal and medical standards recognize that within any individual, strengths co-exist with weaknesses; thus, a relative strength in one domain does not serve as a counterweight to an established deficit. *Moore*, 137 S. Ct. at 1050; Ex. 75 at 47 (AAIDD-11). In *Moore*, the Supreme Court emphasized that

> the medical community focuses the adaptive-functioning inquiry on adaptive
> *deficits*. *E.g.*, AAIDD-11 at 47 ("significant limitations in conceptual, social or
> practical adaptive skills [are] not outweighed by the potential strengths in some
> adaptive skills."); DSM-5, at 33, 38 (inquiry should focus on "[d]eficits in
> adaptive functioning"; deficits in only one of the three adaptive-skills domains
> suffice to show adaptive deficits).

137 S. Ct. at 1050 (alterations in original).[28]

Adaptive deficits are typically established by records from childhood, retrospective interviews using modern standardized assessment tools with people who knew the individual well during childhood, and testimonial evidence supplied by family members, friends, teachers, employers, mental health professionals, and others who interacted regularly with him or her. *See Davis*, 611 F. Supp. 2d at 492 (There is a "relative consensus that the best way to retroactively assess a defendant's adaptive functioning is to review the broadest set of data possible and to look for consistency and convergence over time."); *see also, e.g.*, *Roland*, 281 F. Supp. 3d at 478 ("'A valid diagnosis of ID is based on multiple sources of information that include a thorough

---

[28] Intellectual disability evaluations focus on the limitations, not the relative strengths, because it is the impairments that characterize and define an intellectual disability diagnosis. Many people with mild intellectual disability can hold simple jobs, maintain relationships, and sometimes live independently, but they often require significant support. This group of the intellectually disabled (those who are not the severely impaired) can have relative strengths that co-exist with their significant impairments. Ex. 75 at 47 (AAIDD-11).

19

**J.A.108**

history (social, medical, educational), standardized assessments of intellectual functioning and

adaptive behavior, and possibly additional assessments or data relevant to the diagnosis.'

[AAIDD-11 at 100]."); Ex. 76 at 18-20 (AAIDD-11 User's Guide).

*Onset before the age of 18.*  Intellectual disability is considered a developmental

disability.  Thus, evidence that supports findings of intellectual and adaptive deficits will stem

from observations of behavior and capabilities made during the defendant's childhood.[29]  Ex. 77

at 38 (DSM-5).

## IV.    ARGUMENT

### A.    When All the Relevant Data Are Evaluated According to Accurate, Complete, and Prevailing Legal and Medical Standards, Corey Johnson Must Be Adjudged Intellectually Disabled

Drs. Reschly, Olley, and Siperstein, three nationally-recognized experts in intellectual

disability who have extensively reviewed Mr. Johnson's life history, testing data, and records,

agree that Mr. Johnson is intellectually disabled.  Their opinions are based on a broad universe of

information, much of which comes from test results and observations recorded during Mr.

Johnson's childhood.  This Motion seeks to place before this Court evidence that, when judged

by prevailing legal and medical standards, establishes, as a matter of law, Mr. Johnson's

intellectual disability and prohibits the implementation of his death sentence.

---

[29] Additionally, causation is often informative of, but not necessary to, a finding of intellectual disability.  A diagnosis of intellectual disability does not require any determination of a cause; a person must be found to have an intellectual disability if he or she meets the diagnostic criteria, irrespective of causation.  The origins of a person's intellectual disability can be manifold and apparent, or remain unknown.  Still, experts recognize four categories of risk factors— biomedical, social, behavioral, and educational—that form a common pathway that can result in the disability.  *See, e.g.*, *Roland*, 281 F. Supp. 3d at 479; Ex. 77 at 39 (DSM-5); Ex. 75 at 57-61 (AAIDD-11).  Poor education and socialization, and brain damage, for example, do not explain away intellectual disability—rather, they can contribute to it.

### 1.    Mr. Johnson Has Significant Deficits in Intellectual Functioning Diagnostic of an Intellectual Disability

Mr. Johnson satisfies the first prong of intellectual disability with four valid and reliable full-scale IQ scores within the presumptive range for intellectual disability.  The following table shows the results of three IQ tests administered to Mr. Johnson during his childhood and one IQ test administered to Mr. Johnson on the eve of his capital trial, with the scores listed with and without correction for the Flynn Effect.

21

**J.A.110**

| Corey Johnson's IQ Tests | | | | |
|---|---|---|---|---|
| **IQ Test** | **Year** | **Age** | **Full Scale IQ Score** | **Flynn Corrected IQ Score** |
| WISC-R | 1977[30] | 8 | 73 | 72 |
| WISC-R | 1981[31] | 12 | 78 | 75 |
| WISC-R | 1985[32] | 16 | 69 | 65 |
| WAIS-R | 1992[33] | 23 | 77 | 73 |

Ex. 1 at 13-22 (Reschly Report).

These four IQ scores fall within the requisite range when corrected for the Flynn Effect. Even *uncorrected* (though law and medicine demand they all should be corrected), two of Mr. Johnson's scores are within the requisite intellectual disability range.[34]  *See Moore*, 137 S. Ct. at

---

[30] Ex. 33 at 1 (3/25/77 Psychological Exam).

[31] Ex. 38 at 2 (12/11/81 Psychodiagnostic Eval.).

[32] Ex. 51 at 1 (4/15/85 Psychological Eval.).

[33] Ex. 8 at 12 (Excerpt of Cornell Mitigation Information and Report).

[34] In addition to these four valid tests, Corey was administered two additional tests that suffered serious methodological flaws and must be disregarded as invalid. *See Webster II*, 975 F.3d at 686 ("Intellectual functioning is typically measured with individually administered and psychometrically valid, comprehensive, culturally appropriate, psychometrically sound tests of intelligence." (citing DSM-5 at 37)).  First, in 1979, when Corey was ten, he was given the original Wechsler Intelligence Scale for Children ("WISC") test.  Ex. 36 at 6-8 (5/21/79 Comm. on the Handicapped Records).  This severely outdated test (from 1949), which yielded a score of 91, was over 30 years old at the time of testing and had been replaced with an updated version of the WISC, five years earlier.  Using an outdated test violates the APA's *Standards for Educational and Psychological Testing*, at that time and now.  Ex. 1 at 15-16 (Reschly Report); Ex. 2 at 13-14 (Olley Report) ("By current psychometric standards, the norms were so old and so culturally out-of-date that their use was inexcusable and their results invalid.");  *see also Shields*, 2009 WL 10714661 at *10 (concluding that a test that had been standardized nearly 40 years prior to its administration could have resulted in a "significant" inflation of 25-30 points and was not a true indicator of the defendant's intellectual functioning).

Second, when Corey was twelve and thirteen, he was given the same WISC-R IQ test twice in a span of four months.  In October 1981, Dr. Ernest Adams, staff psychologist at the Council's

22

J.A.111

Center for Problems of Living, administered the WISC-R to Corey, yielding a Flynn Effect adjusted score of 75.  Ex. 38 at 2 (12/11/81 Psychodiagnostic Eval.); Ex. 1 at 17 (Reschly Report).  Then, four months later, on February 8, 1982, Dr. Cary Gallaudet, an inexperienced and unlicensed psychologist, administered the same test and obtained an IQ score of 88.  *See* Ex. 39 at 1 (2/1/82 Psychological Eval.); Ex. 18 ¶ 5 (3/19/12 Decl. of C. Gallaudet); Ex. 29 ¶ 13 (6/17/11 Decl. of G. Sakheim).  The Gallaudet test administration was flawed for two main reasons.  The first was its re-administration.  Dr. Gallaudet was unaware that Corey had taken the exact same IQ test four months prior.  Ex. 18 ¶¶ 13-15 (3/19/12 Decl. of C. Gallaudet) (declaring that she would not have administered the same test had she known Corey's past experience taking it).

Re-administration of IQ testing typically results in an inflated score on the second administration due to the "practice effect."

> The *practice effect* refers to gains in IQ scores on tests of intelligence that result from a person being retested on the same instrument."  AAIDD-11 at 38.  According to the AAIDD, "established clinical practice is to avoid administering the same intelligence test within the same year to the same individual because it will often lead to an overestimate of the examinee's true intelligence."  *Id.*; *see also* User's Guide at 23.  The APA also recognizes that practice effect is one of the factors that may affect test scores.  *See* DSM-5 at 37.

*Roland*, 281 F. Supp. 3d at 509; *see also Salad*, 959 F. Supp. 2d at 872 (noting "the court should be cognizant of the 'practice effect' . . . phenomenon [that] describes the likelihood of inflated scores on re-administrations of similar IQ tests within a short period of time"); *Hardy*, 762 F. Supp. 2d 849, 857 (disregarding higher score due to practice effect); *United States v. Nelson*, 419 F. Supp. 2d 891, 897-99 (E.D. La. 2006) (giving higher scores less weight because of the practice effect); Ex. 1 at 12-13 (Reschly Report) (discussing practice effect); Ex. 2 at 14-15 (Olley Report) (same); Ex. 3 at 3 (Siperstein Letter) (same).

Dr. Gallaudet also improperly took steps to help Corey better focus his attention on the tasks at hand, actions known to artificially inflate IQ scores.  Ex. 39 at 1 (2/1/82 Psychological Eval.) ("Frequently Corey would interrupt his own work with irrelevant questions about toys, games, and at those times, the examiner would have to help him refocus on the task at hand."); *see also* Ex. 29 ¶¶ 13-21 (6/17/11 Decl. of G. Sakheim); Ex. 1 at 11 (Reschly Report) ("During the administration of an IQ test to Corey Johnson in February 1982, there is documented evidence in the report by Dr. Cary Gallaudet that she provided assistance to Corey Johnson during her administration of that test, which compromised the reliability of her results (see the detailed discussion below)."); *id.* at 19; Ex. 2 at 14 (Olley Report).

1049-50 (concluding that IQ score of 74 satisfied the intellectual-functioning prong); *Brumfield v. Cain*, 135 U.S. 305, 315 (2015) (concluding that IQ score of 75 was "squarely in the range of potential intellectual disability"); *Davis*, 611 F. Supp. 2d 472 (concluding that IQ scores ranging from 62 to 73 supported intellectual disability finding); *Hardy*, 762 F. Supp. 2d at 863, 878-79 (concluding that IQ scores of 68 to 71 supported intellectual disability finding); *United States v. Lewis*, No. 1:08 CR 404, 2010 WL 5418901 at *12-13 (N.D. Ohio Dec. 23, 2010) (concluding that IQ scores of 67 and 72 supported intellectual disability finding).

Drs. Reschly, Olley, and Siperstein agree that Mr. Johnson's IQ test results show a person with significant intellectual functioning deficits. Ex. 1 at 3 (Reschly Report) ("Corey Johnson's reliable IQ scores were consistently two standard deviations below the mean. This satisfies the intellectual functioning prong."); Ex. 2 at 15 (Olley Report) ("Corey Johnson meets the intellectual functioning prong of the intellectual disability framework, because his IQ test results show significant limitations in his intellectual functioning before the age of 18."); Ex. 3 at 4 (Siperstein Letter) ("[B]ased on my 50 years of work in the field of intellectual disability, the conclusions Dr. Reschly draws concerning Corey Johnson's intellectual functioning are irrefutable.").

Mr. Johnson meets the intellectual deficit prong of the diagnostic standards for intellectual disability.

### 2. Mr. Johnson Has Significant Deficits in Adaptive Functioning Diagnostic of an Intellectual Disability

Mr. Johnson also meets the adaptive deficit prong of the diagnostic standard of an intellectual disability. In order to meet this prong, one need only have significant limitations in a single domain of adaptive behavior. Mr. Johnson has significant deficits in all three domains—conceptual, social, and practical—as evidenced by childhood records, standardized assessment

24

**J.A.113**

tools, information obtained from more than two dozen family members, friends, teachers, and mental health professionals who knew Corey throughout his childhood, and expert evaluations conducted by Drs. Reschly, Olley, and Siperstein.[35]

### a)        Conceptual Domain

As his academic performance records document, and interviews with family and teachers and assessment instruments confirm, Mr. Johnson has had significant deficits in the conceptual domain since childhood. "The *conceptual (academic) domain* involves competence in memory, language, reading, writing, math reasoning, acquisition of practical knowledge, problem solving, and judgment in novel situations, among others." *Roland*, 281 F. Supp. 3d at 528 (quoting the DSM-5).

*Academic failures.* Mr. Johnson's school records document his consistent academic failure, reflective of deficits in the conceptual domain, from a young age. He repeated several grades, including second grade three times, and, as he got older, he fell further and further behind. Ex. 3 at 35 (Nelson Report); Ex. 2 at 18-19 (Olley Report); Ex. 35 at 2 (2/26/79 Referral to the Comm. on the Handicapped). At age eight, Corey had "no concept of number facts, no reading skills, [could not] retain sight vocabulary words," and "had difficulty saying the alphabet." Ex. 31 at 1 (3/4/77 Social History); Ex. 32 at 3 (3/18/77 Learning Consultant Evaluation). Two years later, at age ten, Corey was referred to the Committee on the Handicapped for "school failure" and, after testing, was placed in Special Education classes. Ex. 36 at 1, 4 (5/21/79 Comm. on the Handicapped Records); Ex. 2 at 19-20 (Olley Report).

---

[35] Dr. Cornell's mitigation testimony at trial, *see e.g.*, Ex. 7 (2/3/93 Trial Tr.), would have fully supported a finding of the adaptive deficit prong, as well, had he conducted a comprehensive adaptive functioning evaluation.

Corey's academic failures continued in his teens.  At age 13, a social worker reported, "Corey's academic deficits have been a serious problem and he has been left back twice in 3rd and 4th grade. . . .  He currently reads on 2nd grade level and has not improved in quite some time."  Ex. 41 at 1 (3/15/82 Psychosocial Summary).  That same year, another assessment concluded that Corey's reading level was "not quite up to second-grade level."  Ex. 43 at 2 (6/9/82 Current Assessment and Transfer Summary).  A year later, when he was 14, a psychiatrist who evaluated Corey concluded, "He needs very Special Education, and I know of no methods to suggest to remediate his defects, beyond a great deal of individual attention and drill."  Ex. 46 at 2 (8/26/83 Psychiatric Eval.).  And the next year, when he was 15, Corey's academic year was classified as "ungraded" and his assessment once again notes that he "never progressed beyond the 2nd grade reading level."  Ex. 49 at 1 (9/4/84 Current Assessment).

While at the Elmhurst Boys Residence, a group home, from ages 16 to 18, he attended high school but was placed in remedial, special education, and vocational classes.  Even then, Corey failed or got Ds in nearly every class.  Ex. 2 at 21 (Olley Report); Ex. 57 at 1-2 (12/7/87 Scholastic Transfer Record).  His teachers determined that he was unable to pass school competency tests, and he ultimately left high school without graduating.  Ex. 2 at 21 (Olley Report); Ex. 56 at 3 (2/23/87 Form D Final Discharge).

Mr. Johnson stood out to staff and evaluators at his residential placements because of his intellectual deficits.  Ann Harding, a staff member at Pleasantville, observed, "Corey was very slow intellectually. . . .  I do not remember anyone else at Pleasantville who was similarly slow intellectually."  Ex. 19 ¶ 6 (11/21/11 Decl. of A. Harding).  Gerald Lefkowitz, Unit Administrator at Pleasantville Cottage Center, noted, "Corey stood out as being particularly slow intellectually compared to the other residents at the Cottage."  Ex. 27 ¶ 9 (12/5/11 Aff. of G.

26

**J.A.115**

Lefkowitz).  Corey's caseworker at Elmhurst, Odette Noble, saw Corey's comparatively weaker intellectual abilities.  "Compared to virtually all of the other boys I encountered at Elmhurst, Corey was much weaker cognitively."  Ex. 28 ¶ 7 (12/1/11 Aff. of O. Noble).  And, David Washington, a childcare worker at Elmhurst, had a similar perspective.  "My impression was that while there were many boys with below normal intellectual ability and various levels of functioning, almost all of the other boys there were more intelligent than Corey."  Ex. 30 ¶ 7 (3/1/12 Aff. of D. Washington).

Corey failed academically despite having an evident strong self-motivation to learn.  He "wanted to live [at Pleasantville Cottage School] to get help."  Ex. 7 (2/10/93 Trial Tr. 3601); *see also* Ex. 39 at 3 (2/1/82 Psychological Eval.) (reporting that "he continues to be an ambitious boy who is motivated to improve his situation"); Ex. 44 at 1 (1/31/83 Current Assessment) ("He is truly motivated to do well and to succeed and has not yet given up on himself. . . .  Corey's progress in his class has been very, very, very slow almost to the point where one might feel that he is not learning.").  Throughout his time there, Corey generally "remained cooperative, eager to learn, and willing to take on the challenge of his disability."  Ex. 7 (2/10/93 Trial Tr. 3584).

*Reading, writing, and math deficiencies.*  When he was 13, one school evaluator noted that Corey was barely able to write his own name and "was unable to read single syllable short vowel words in isolation" and "did not know the sounds of g and c[,] . . . was not sure of the consonant sound of m and y, [and] did not know the rule of silent e."  Ex. 40 at 1-2 (2/22/82 Screening Upon Admission).  In 1983, when Corey was 14, he scored in the bottom one percent on an achievement test, which means he scored "as low as you go" and "at the bottom."  Ex. 7

27

**J.A.116**

(2/10/93 Trial Tr. 3590).[36]  At age 16, Corey's reading comprehension, oral comprehension, sight vocabulary, and arithmetic ability were on a second- to third-grade level.  Ex. 2 at 20-21 (Olley Report); *see also* Ex. 53 at 3 (7/1/85 IEP - Phase 1).  When Mr. Johnson was 24, Dr. Cornell administered the Test of Written Language and the Woodcock-Johnson Test of Achievement-Revised, which measures both language and math skills.  Mr. Johnson scored grade-level equivalents between second and sixth grades.  Ex. 2 at 21 (Olley Report); Ex. 8 at 14-17 (Excerpt of Cornell Mitigation Information and Report).  As Dr. Cornell testified, achievement test scores at the sixth-grade level or below are consistent with intellectual disability.  Ex. 7 (2/10/93 Trial Tr. 3693) ("We now know that a mildly retarded person can be educated up to about the sixth-grade level.").

Although experts caution against evaluating behavior in an institutional setting when assessing intellectual disability, prison testing may, in certain instances, be relevant.  Prison records note that obtaining his GED by passing the required examination is one of Mr. Johnson's lifetime goals.  Since his incarceration almost 30 years ago, Mr. Johnson has diligently studied to become eligible to take GED exams.  However, he has remained in the pre-GED stage, never having passed the test.  In 2014, when Mr. Johnson was 45, Dr. Reschly administered the then-latest version of the Woodcock-Johnson Test of Achievement III.  Mr. Johnson's results placed him in the second- to fourth-grade range for every subject area except concrete math

---

[36] This testimony by Dr. Cornell was based on the results of an achievement test administered in March 1983 by Dr. Kenneth Barish.  Ex. 45 at 2 (4/29/83 Psychological and Educational Eval.).  Dr. Barish later stated, "Nearly 30 years after I met and evaluated him, Corey still stands out in my mind due to his profound impairment in learning.  Corey's deficit in phonological processing remains the most profound impairment of this kind I have encountered in three decades of clinical practice."  Ex. 11 at ¶¶ 8-9 (7/22/14 Decl. of K. Barish).  Dr. Barish considered Corey's deficit "so profound that [he has] used it over the past 30 years as a teaching example in [his] classes."  *Id*. at ¶ 11.

28

calculations,[37] and his overall total grade equivalent, even accounting for his relative strength in math, was still in the fourth-grade range, as represented in the table below.

| Achievement Cluster | Standard Score | Grade Equivalent |
|---|---|---|
| Broad Written Language | 74 | 2.8 |
| Oral Language | 83 | 3.5 |
| Broad Reading | 76 | 4.1 |
| Broad Math | 89 | 8.2 |
| Total Achievement | 77 | 4.6 |

Ex. 1 at 30 (Reschly Report).

*Language and communications deficiencies.* Mr. Johnson's records show that his significant deficits in language and communication started at an early age. Dr. Olley, after reviewing scores of records, concluded, "Corey Johnson has never demonstrated the conceptual aspects of communication appropriate for his age, and, instead, his language and communication abilities are significantly impaired." Ex. 2 at 24 (Olley Report). When Corey was eight, Dr. F. A. Figurelli, a psychiatrist, noted that he "reveal[ed] a speech defect." Ex. 2 at 23 (Olley Report). Similarly, Mr. Johnson's records from Pleasantville repeatedly described him as having speech difficulties and deficits as a teenager. Ex. 2 at 23 (Olley Report). When Corey was just shy of 15, speech, language, and vocabulary testing revealed that he was approximately two or five years below his chronological age in several categories, leading the evaluator to conclude that he had "a significant speech and language disorder of a receptive and expressive nature." Ex. 47 at 4 (10/5/83 Speech and Language Eval.). Dr. Cornell testified to Mr. Johnson's

---

[37] Dr. Olley attributes this improvement in prison to significant practice and efforts on Mr. Johnson's part to improve his performance. Ex. 2 at 22 (Olley Report).

29

"communication deficits with his speech impairment and communication problems." Ex. 7 (2/10/93 Trial Tr. 3691).

Mr. Johnson's friends and family recall similar limitations in his communication and comprehension skills. Both his aunt, Minnie Hodges, and his grandmother, Esther Johnson, recall that Corey had trouble following oral directions and that they often had to repeat themselves many times before he understood. Ex. 2 at 23-24 (Olley Report). His cousin, Queenie Hodges, recalls, "[W]henever [Corey] talked, he was disorganized in his speaking and would frequently change topics. Over the past 19 years, I have seen a number of letters Corey has written. The letters he writes are similarly disorganized; the letters are almost nonsensical." Ex. 22 ¶ 5 (4/30/11 Aff. of Q. Hodges). In general, Corey "had difficulty communicating." Ex. 16 ¶ 13 (5/21/11 Aff. of C. Daniels).

*Problems with numbers, money, and time.* Mr. Johnson fares badly with concepts involving numbers, money, and time. At age eight, contemporaneous records document that he had "[n]o concept of number facts," and, when asked his date of birth, "[h]e thought he was born in March," although he was actually born in November. Ex. 2 at 24-25 (Olley Report); Ex. 33 at 1 (3/25/77 Psychological Exam).

When he was 13, although he understood that there are twelve months in the year, he could recite them in sequence only up to August. Ex. 40 at 3 (2/22/82 Screening Upon Admission); *see also* Ex. 22 ¶ 12 (4/30/11 Aff. of Q. Hodges). At 13, Corey was also unable to tell time. Ex. 26 ¶ 13 (6/3/11 Decl. of L. Klerer). He was assessed to have, at best, third-grade math skills; he could not divide a single digit number by two, multiply by three, or read numbers that were more than four digits long. Ex. 40 at 2 (2/22/82 Screening Upon Admission).

30

**J.A.119**

Multiple family members reported that he was not trusted with money because he was unable to calculate change.  Ex. 22 ¶ 12 (4/30/11 Aff. of Q. Hodges); Ex. 20 ¶ 40 (4/30/11 Aff. of M. Hodges); Ex. 24 ¶ 62 (6/29/11 Aff. of R. Johnson); Ex. 23 ¶ 26 (4/30/11 Decl. of E. Johnson); Ex. 25 ¶ 39 (5/21/11 Aff. of A. Joseph).  When Corey was 16, social worker Gerald Maier included as an objective for Corey to work toward: "learn[ing] enough simple arithmetic th[at] he will be able to figure out correct change."  Ex. 52 at 9 (5/28/85 Discharge/Transfer Plan).

*Lack of judgment, planning, and problem-solving skills.*  Mr. Johnson has deficits in judgment, planning, and problem solving that manifested themselves in childhood.  Corey displayed the naïve and highly gullible behavior often associated with those suffering from intellectual disabilities.  Also indicative of intellectual disability, in his teens and later, Mr. Johnson exhibited poor judgment and made rash decisions, often to his own detriment and physical harm.  Ex. 2 at 25-26 (Olley Report); Ex. 25 ¶ 39 (5/21/11 Aff. of A. Joseph); Ex. 21 ¶ 15 (4/30/11 Aff. of P. Hodges).

Mr. Johnson lacks problem-solving skills.  For example, Darold Brown, a member of the Trenton drug group with which Mr. Johnson was involved, observed, "Corey could not handle a job where unexpected problems came up, as he would not know what to do."  Ex. 14 ¶ 29 (6/15/11 Aff. of Darold Brown).  When Mr. Johnson was living in Trenton, his girlfriend once asked him to pay a phone bill in downtown Trenton.  She reported that he went downtown to do so but did not pay the bill.  He claimed he had forgotten, but she believed he could not figure out how to do it.  Ex. 17 ¶ 5 (7/16/12 Decl. of M. Dawkins).

*Expert opinions and results of the ABAS-II test of adaptive deficits.*  Each of the experts has concluded that Mr. Johnson has significant adaptive deficits in the conceptual domain.  Ex. 2

31

**J.A.120**

at 27 (Olley Report); Ex. 1 at 32 (Reschly Report); Ex. 3 at 4-5 (Siperstein Letter).[38]  The three

expert witnesses arrived at this conclusion based on their review of contemporaneous records of

Mr. Johnson's youth from teachers, social workers, psychologists, and psychiatrists who knew or

treated Mr. Johnson, the results of achievement tests administered to Mr. Johnson, and

statements from more than two dozen family members, friends, acquaintances, other prisoners,

and professionals who knew him as a child, adolescent, and/or adult.[39]

In addition, Dr. Olley administered the ABAS-II, a standardized tool developed to assess

adaptive functioning,[40] to three adults who knew Mr. Johnson well when he was a child.  Much

like IQ scores, ABAS-II scores are reported as standardized scores with a mean of 100, a

standard deviation of 15, and the intellectual disability range beginning approximately two

standard deviations below the mean (approximately 70).  As noted in the table below, one of his

---

[38] Dr. Cornell also found deficits in Mr. Johnson's language skills and judgment.  Ex. 7 (2/10/93 Trial Tr. 3685-86) (describing the results of a written language test Dr. Cornell had given Mr. Johnson and noting his writing and spelling were "very immature"); *id.* 3693-94 (acknowledging Mr. Johnson had "impaired ability to use good judgment to control his behavior" and "impaired ability to understand and foresee the consequences of his actions").

[39] Drs. Olley and Reschly met with Mr. Johnson in person, and Dr. Reschly administered the achievement tests to him.  In addition, Dr. Olley interviewed approximately two dozen people who have known Mr. Johnson at various stages of his life.  For a complete recitation of information considered in reaching their opinions, see Exhibits 1 and 2.

[40] As described in Dr. Olley's report, the ABAS-II is a rating scale administered to individuals familiar enough with the subject to rate the subject in certain areas related to adaptive functioning.  Ex. 2 at 16 (Olley Report).  Dr. Olley administered the ABAS-II to three individuals, who provided responses to standardized questions, which produced scores that assess Mr. Johnson's adaptive functioning.  The individuals were Antoinette Daniels Joseph, the best friend of Mr. Johnson's mother and Corey's godmother; Minnie Hodges, Mr. Johnson's maternal aunt; and Richard Benedict, Mr. Johnson's former teacher and administrator at Pleasantville Cottage School.

**J.A.121**

conceptual domain scores fell two standard deviations below the mean when accounting for the

SEM; and the others fell well below that.[41]

| ABAS-II RATERS | CONCEPTUAL DOMAIN SCORES |
|---|---|
| Antionette Joseph | 63 |
| Minnie Hodges | 57 |
| Richard Benedict | 74 |

Ex. 2 at 27 (Olley Report).

### b)     Social Domain

Mr. Johnson has significant impairments in the social domain, as reflected in

contemporaneous records created during his childhood and anecdotes reported by people who

knew him during his childhood, adolescence, and adulthood, as well as standardized adaptive

functioning test results.  The social domain of adaptive functioning includes interpersonal skills,

friendships, leadership, gullibility, naivete, and victimization.[42]

*Interpersonal skills and friendships.*  In his youth, Mr. Johnson was a loner who was

often taken advantage of by his family and school peers.  Corey's grandmother, Esther Johnson,

---

[41] Richard Benedict was a teacher for several years at Mr. Johnson's institutional school placement.  It is well documented that people with intellectual disability will fare better within almost any institutional setting because they are getting the very supports they need in such placements.  *See infra* note 46.

Yet even with the substantial aids provided in the highly supportive institutional setting of this boarding school for children requiring special education, Mr. Johnson still performed at a significantly impaired level.  This is borne out by Mr. Benedict's own assessment.  He noted that "[w]hile the diagnostic testing results are generally consistent with my personal experience teaching Corey, I believe that, if anything, the results may have somewhat overstated Corey's abilities.  Corey performed worse in an uncontrolled environment." Ex. 12 ¶ 9 (12/5/11 Aff. of R. Benedict).

[42] Ex. 75 at 43-45 (AAIDD-11); Ex. 76 at 15 (AAIDD-11 User's Guide).

33

**J.A.122**

observed that "growing up, Corey did not engage much with other children and did not make friends easily." Ex. 2 at 29 (Olley Report). She viewed him as "withdrawn socially both as a child and a teenager." *Id*. When he was ten, a teacher referred Corey for special education services, noting that he had "poor peer relations." Ex. 34 at 1 (12/11/78 Case Service). At age 13, records indicate that Corey "relate[d] like a younger child and appear[ed] limited. . . . Corey does not have friends." Ex. 41 at 3 (3/15/82 Psychosocial Summary). Later that year, another caseworker observed that Corey was "frequently isolated from the other children," did "not appear ready to engage with other children," and was "frightened and expects to be rebuffed." Ex. 43 at 2-3 (6/9/82 Current Assessment and Transfer Summary). She concluded that Corey "will need a good deal of experience and contact before he will be ready to engage." *Id*. at 3. Dr. Olley concluded that Corey was "a solitary, fearful child who had few friends and felt most comfortable playing by himself or with younger children." Ex. 2 at 27 (Olley Report). And, as he got older, "Corey had real problems in understanding how to interact with his peers and adults and marked difficulty in understanding social cues and norms." *Id*. at 28.

Psychiatrist Richard Dudley, a trauma expert who evaluated Mr. Johnson in person as an adult and conducted an extensive review of his social and educational history, noted that Mr. Johnson's "placement records indicate that although he clearly was willing to do anything to be liked, he lacked the social skills required to successfully do that in appropriate ways." Ex. 5 at 7 (Dudley Report).[43]

---

[43] Dr. Dudley attributed much of this to the "extremely difficult childhood that [Mr. Johnson] endured [which] also directly resulted in other underlying developmental difficulties" related to his social functioning, including interpersonal relationships, self-image, affects, and decision-making, all important aspects of the social domain. Ex. 5 at 11 (Dudley Report).

34

**J.A.123**

*Leadership, gullibility, naivete, and victimization.* Multiple reporters described Mr. Johnson as a follower, not a leader. This, too, can be a hallmark of intellectual disability.[44] Ms. Harding, who knew Corey from 1982 to 1985 when Corey was a teenager, observed, "I do not think Corey possessed leadership qualities. To the contrary, he was more of a follower than a leader in his interactions." Ex. 2 at 31 (Olley Report). Janet Valentine, a counselor at Pleasantville Cottage School, noted, "He was a follower. He was not a leader at all." *Id.*; Ex. 58 at 2 (Outline for Cottage Report) ("Most of the time he stays by himself. He [is scared] of the other kids."). Mr. Benedict thought Corey wanted to "please" adults and was not a leader. Rather, "[b]eing a leader doesn't match Corey." Ex. 2 at 31 (Olley Report); Ex. 27 ¶ 14 (12/5/11 Aff. of G. Lefkowitz) ("Corey was more easily influenced than the other children at the Cottage and was a follower."); *see also* Ex. 12 ¶ 12 (12/5/11 Aff. of R. Benedict).

Mr. Johnson was victimized by his peers. Mr. Johnson's aunt, Minnie Hodges, reported:

> Other people took advantage of him, such as taking his lunch money. People found it easy to take advantage of him all throughout his childhood and teen years. He wouldn't understand others but didn't want to look bad, so other children easily tricked and manipulated him.

Ex. 20 ¶ 44 (4/30/11 Aff. of M. Hodges). His cousin, Priscilla Hodges, said other kids "would take his money, ball, or other possessions. Corey would not assert himself with these other kids." Ex. 21 ¶ 14 (4/30/11 Aff. of P. Hodges). She continued:

> Corey was easily influenced by others and could be persuaded to do things that, in my view, showed very poor judgment. He would go to great lengths—and jeopardize his own well-being—just to fit in with the crowd.

*Id.* ¶ 15; *see also* Ex. 25 ¶ 39 (5/21/11 Aff. of A. Joseph) ("[P]eople took advantage of [Corey] because he would readily give his money away.").

---

[44] Ex. 75 at 43-45 (AAIDD-11); Ex. 77 at 38 (DSM-5).

35

J.A.124

Similarly, at Elmhurst, people knew him "as someone who could be convinced to do what you asked him to do." Ex. 30 ¶ 13 (3/1/12 Aff. of D. Washington). Mr. Washington, a childcare worker at Elmhurst, recalled that Corey "would generally go along with what others wanted to do." *Id.* ¶ 12. Corey's caseworker also reported that he was "susceptible to peer pressure" and "did not have a good 'read' of situations or other people." Ex. 28 ¶¶ 17-18 (12/1/11 Aff. of O. Noble). She explained:

> Corey could be easily influenced into doing what his peers wanted him to do. If some of his more intellectually developed peers convinced Corey to do something, he would go along with it even if he did not perceive any logical reason for doing so. He would act in this way in circumstances in which, if he had been more intelligent, he would have realized that his actions could get him into difficulty.

*Id.* ¶ 20.

Mr. Johnson was a "poor social decisionmaker." *Id.*; *see also* Ex. 7 (2/10/93 Trial Tr. 3694-95). He "lacked the ability to understand the consequences that his actions could have." Ex. 28 ¶ 16 (12/1/11 Aff. of O. Noble). Corey's desire to be accepted by his peers led him to engage in risky behavior. Ex. 2 at 35 (Olley Report); Ex. 21 ¶ 16 (4/30/11 Aff. of P. Hodges) (describing an incident when peers persuaded Corey to roller skate down "an incredibly steep hill, an act that no one else would attempt"); *id.* ¶ 17 ("[W]hen Corey was also a young teen, Corey's 'friends' told him to ride his bike across a busy two-way street in the middle of traffic. I warned Corey not to do it, but he did it anyway. He made it across the street but was nearly hit by a car. The driver had to slam on his brakes to avoid hitting Corey.").

*Expert opinions and results of the ABAS-II test of adaptive deficits.* The ABAS-II results noted in the table below show that one of the raters' observations resulted in a score for the social domain considerably lower than two standard deviations below the mean. The two other scores were significantly above this level, but Dr. Olley notes in reporting these two scores that

36

J.A.125

they are inconsistent with information the raters provided in interviews with him.  Ex. 2 at 33

(Olley Report).

| ABAS-II RATERS | SOCIAL DOMAIN SCORES |
|---|---|
| Antionette Joseph | 56 |
| Minnie Hodges | 81 |
| Richard Benedict | 88 |

*Id.*

Drs. Olley, Reschly, and Siperstein all believe that interviews conducted with an

extensive array of professionals, family, and friends who provided vivid descriptions of Mr.

Johnson's social abilities, along with the documented historical evidence, provide strong support

that Mr. Johnson has significant limitations in the social domain, consistent with intellectual

disability.  Ex. 2 at 34 (Olley Report); Ex. 1 at 32, 37 (Reschly Report); Ex. 3 at 4 (Siperstein

Letter); *see also* Ex. 5 at 7, 11 (Dudley Report).

### c)        Practical Domain

As with the conceptual and social domain, Mr. Johnson's inability to perform practical

tasks and life skills are consistently reflected in contemporaneous records created during his

childhood, achievement testing results, anecdotes described during interviews with people who

knew him during his childhood, and the ABAS-II test results.  The practical domain is generally

considered to encompass skills that involve navigating through the typical tasks that one faces on

a regular basis, including things like personal and self-care; travel and transportation; health and

safety; home living; and work.  Ex. 77 at 37 (DSM-5).  Those who know him have observed that

Corey did not have the capacity to take care of himself.

*Self-care.*  Corey wet and soiled his bed until he was about 12 years old.  Ex. 2 at 34

(Olley Report); Ex. 20 ¶ 36 (4/30/11 Aff. of M. Hodges); Ex. 21 ¶ 9 (4/30/11 Aff. of P. Hodges);

37

**J.A.126**

Ex. 22 ¶ 9 (4/30/11 Aff. of Q. Hodges); Ex. 7 (2/10/93 Trial Tr. 3576). Corey neglected his teeth, and dental problems resulted. Ex. 2 at 34 (Olley Report); Ex. 37 at 1 (12/9/81 Child Assessment Eval.) (noting Corey's dental cavities and gingivitis). He needed constant reminders to keep himself clean. Ex. 2 at 34 (Olley Report). When he was living in Trenton as a young adult, people who visited him described his home as "filthy," "old, dark, and dirty" and "strewn with trash, dishware, and clothes." Ex. 24 ¶ 70 (6/29/11 Aff. of R. Johnson); Ex. 2 at 34 (Olley Report).

*Transportation and travel.* As a child through adolescence and his teen years, Corey was not trusted to travel alone, and he relied on others to get around. As a child, caregivers asked Corey's *younger* half-brother, Robert, to lead Corey around when they went out together. Ex. 2 at 34 (Olley Report).[45] His individualized education plan from Pleasantville notes, "Corey needs travel training until he is familiar with route and new neighborhood." Ex. 53 at 7 (7/1/85 IEP - Phase 1); Ex. 2 at 36 (Olley Report). Mr. Benedict, Corey's teacher when he was 16-17, reported that the Pleasantville staff "assigned an aide to accompany Corey to the bathroom and waited outside when Corey was using it. Previously, when no aide was assigned to do so, Corey would get lost on his way back to our class and wander into other classrooms." Ex. 12 ¶ 17 (12/5/11 Aff. of R. Benedict). Corey never obtained a driver's license; as an adult, he relied primarily on cabs for transit. Ex. 2 at 34 (Olley Report).

*Home living.* Mr. Johnson has never been able to develop the skills necessary to live on his own. This was not surprising given the limitations recognized in records from Pleasantville

---

[45] Records indicate Corey even had trouble navigating his residential placement. Ex. 42 at 5 (5/21/82 Reassessment Summary) ("[Corey] [age 13 and a half] is slow to understand things. Cottage staff will make special effort to acclimate him to routine and provide a predictable environment for him.").

38

**J.A.127**

(age 13, 15 and 16) and Elmhurst (age 17). According to Gloria Caro, a caseworker at Pleasantville, at 13 and a half, Corey was "slow to understand things. Cottage staff will make special effort to acclimate him to routine and provide a predictable environment for him." Ex. 42 at 5 (5/21/82 Reassessment Summary). Both Pleasantville and Elmhurst established goals for him such as, "Corey will use opportunities offered him to learn independent living skills," and "Corey will learn how to handle money so that he can shop for himself." Ex. 48 at 2 (4/13/84 Change in Permanency Plan); *see also* Ex. 50 at 8 (12/12/84 Visitation Plan) (setting the same goals); Ex. 52 at 9 (5/28/85 Discharge/Transfer Plan) (same); Ex. 54 at 6 (11/21/85 Service Plan Review 6 Month) (same); Ex. 55 at 7 (6/28/86 Service Plan Review 6 Month) (same). There are no indications in the records that Corey ever achieved these goals.

After leaving institutional school settings, Corey moved in with his mother and half-brother, had a brief stay with the father of his half-brother and his wife, and then lived with a series of girlfriends and acquaintances. Ex. 2 at 8 (Olley Report). Ms. Noble told Dr. Olley, "He's the kind of kid who I don't think could make it on his own—pay his rent, etc. Some people should stay in a protected setting all their lives." *Id*. at 37; *see also* Ex. 28 ¶ 38 (12/1/11 Aff. of O. Noble).

Corey's aunt remembers his inability to do simple tasks to take care of himself. For example, "[a]t age 10-13, he couldn't prepare a meal or even a simple sandwich. By age 15, he only improved a little in that he didn't make as much of a mess when preparing simple meals. I didn't give him much to do because he couldn't do it." Ex. 20 ¶ 38 (4/30/11 Aff. of M. Hodges). When Corey was 18 and living with Ann and Robert Butler, Ms. Butler noted, "[H]e was still like a little boy. He could not have taken care of himself on his own." Ex. 2 at 38 (Olley Report).

39

*Work.* Mr. Johnson has a very limited work history. While at Pleasantville, he had a couple of summer jobs doing manual labor, which he could not maintain. Ex. 2 at 39 (Olley Report). His family and friends did not recall that he ever held a job. *Id.*; Ex. 52 at 6 (5/28/85 Discharge/Transfer Plan) ("[Corey] work[ed] for a few weeks in a grocery store. He was not able to maintain this, an indication of how much work needs to be done in this area.").

Other than participating in structured job programs while at Elmhurst, Mr. Johnson's only "job" was selling drugs. Even his acquaintances in these activities depicted Corey as challenged in his ability to count money and keep track of drug sales. They described him as a passive participant who followed the directions of others. Ex. 24 ¶¶ 60-63 (6/29/11 Aff. of R. Johnson); Ex. 13 ¶¶ 9-11 (10/14/11 Aff. of Darnell Brown); Ex. 14 ¶¶ 11-12, 20, 25-26 (6/15/11 Aff. of Darold Brown).

At trial, Dr. Cornell concluded, "Self care . . . work, the ability to maintain a job, to have good work habits, to use the kinds of common sense you need to hold a job, all of those are possible areas in which his functioning is not at a normal level." Ex. 7 (2/10/93 Trial Tr. 3691).

*Expert opinions and results of the ABAS-II test of adaptive deficits.* The ABAS-II results noted in the table below show that two of the raters' observations resulted in scores for the practical domain considerably lower than two standard deviations below the mean. Mr. Benedict's scores were significantly above this level, but Dr. Olley noted that this was understandable given that Mr. Benedict only knew Mr. Johnson while he was living in an institutional setting where supports and structure can artificially inflate the scores.[46]

---

[46] Experts caution against evaluating institutional behavior when assessing adaptive functioning. *See Hardy*, 762 F. Supp. 2d at 899 (noting that "an institutional environment of any kind necessarily provides 'hidden supports'"); *Roland*, 281 F. Supp. 3d at 544 (Experts testified that institutional settings, including prisons, typically provided ongoing support and a structured environment that enabled intellectually disabled persons to improve.). As a result, modern

40

J.A.129

| ABAS-II RATERS | PRACTICAL DOMAIN SCORES |
|---|---|
| Antionette Joseph | 60 |
| Minnie Hodges | 65 |
| Richard Benedict | 88 |

Ex. 2 at 40 (Olley Report).

Drs. Olley, Reschly, and Siperstein all believe the records, interviews, and ABAS-II results strongly support a finding that Mr. Johnson has significant limitations in adaptive functioning in the practical domain, beginning in childhood and continuing through adolescence, and into adulthood. Ex. 2 at 1-2, 34-41 (Olley Report); Ex. 1 at 3, 25, 32 (Reschly Report); Ex. 3 at 4-6 (Siperstein Letter).

###### d)      Adaptive Behavior Composite

As noted earlier, in order to meet the adaptive behavior prong of an intellectual disability diagnosis, an individual need only have significant limitations in a single domain. As noted above, Mr. Johnson has significant deficits in all three.

In addition, the ABAS-II produces a composite score, the General Adaptive Composite (the "GAC"), which both measures the degree to which a person's overall adaptive functioning

---

scientific standards emphasize, for example, assessing skills "not within the structured prison environment but 'within the context of ordinary community environments typical of the person's age peers and tied to the person's individualized needs for support.'" *Webster II*, 975 F.3d at 686 (citing AAIDD-11 at 16 and DSM-5).

Yet even with the substantial aids provided in the highly-supportive institutional setting of this boarding school for children requiring special education, Mr. Johnson still performed at a significantly impaired level. This is borne out by Mr. Benedict's own assessment. He noted that "[w]hile the diagnostic testing results are generally consistent with my personal experience teaching Corey, I believe that, if anything, the results may have somewhat overstated Corey's abilities. Corey performed worse in an uncontrolled environment." Ex. 12 ¶ 9 (12/5/11 Aff. of R. Benedict).

41

departs from the mean, and identifies the percentile of the population into which an individual fits, relative to the general population.  A score of 75 or below meets the standard for the adaptive prong of an intellectual disability diagnosis.  Ex. 2 at 40 (Olley Report).

The table below shows the GAC for each of the three raters.  Mr. Johnson has GAC scores below 75 from each of them.

| ABAS-II RATER | GENERAL ADAPTIVE COMPOSITE SCORE | PERCENTILE OF POPULATION |
|---|---|---|
| Antoinette Joseph | 60 | 0.4 |
| Minnie Hodges | 64 | 1 |
| Richard Benedict | 74 | 4 |

*Id*.

Drs. Olley, Reschly, and Siperstein agree that Mr. Johnson meets the adaptive behavior prong of an intellectual disability diagnosis and has deficits in all three domains.  Ex. 2 at 2, 17, 40 (Olley Report); Ex. 1 at 3, 25, 32 (Reschly Report); Ex. 3 at 4-5 (Siperstein Letter).

### 3.    The Onset of Mr. Johnson's Intellectual and Adaptive Deficits Began Well Before the Age of Eighteen

Mr. Johnson's significant limitations in intellectual and adaptive functioning manifested themselves during his developmental period, as evidenced by the IQ test scores he achieved during childhood and the contemporaneous records created during his childhood, and corroborated by interviews with numerous reporters who knew Mr. Johnson during his formative years as well as the results of standardized adaptive functioning instruments.  This evidence has been assessed by Drs. Reschly, Olley and Siperstein, who all agree his disability began in childhood.  Ex. 2 at 1 (Olley Report); Ex. 1 at 45 (Reschly Report); Ex. 3 at 7 (Siperstein Letter).  These experts also have reported that Mr. Johnson experienced the biomedical, behavioral,

42

J.A.131

educational, and social risk factors that can result in intellectual disabilities.[47]  While an

intellectual disability diagnosis does not require proof of causation, Mr. Johnson's personal,

family, and social history lend support to the corroborated evidence of his intellectual disability.

*Roland*, 281 F. Supp. 3d at 479.

In sum, Mr. Johnson is a person with intellectual disability and meets all requirements for

such a diagnosis according to the standards identified by the medical community and in federal

capital case law.  Under 18 U.S.C. § 3596(c), his death sentence cannot be "carried out."

**B.      Mr. Johnson's Motion Is Not "Second or Successive" Under the Gatekeeping Provision of 28 U.S.C. § 2255(h)**

Although this Motion is not the first Mr. Johnson has filed, it is nevertheless not a

successive pleading.  It is properly before this Court.

As the Supreme Court has repeatedly explained, the phrase "second or successive" "does

not simply 'refe[r] to all [§ 2255] applications filed second or successively in time.'"  *Magwood*

*v. Patterson*, 561 U.S. 320, 332 (2010) (quoting *Panetti v. Quarterman*, 551 U.S. 930, 944

(2007)).  Rather, the phrase "second or successive" is a "term of art" that takes its full meaning

from the Supreme Court's case law, including decisions predating the enactment of the

Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  To determine whether a

---

[47] Mr. Johnson's childhood trauma is well documented.  Debra Nelson, a mitigation specialist, prepared a comprehensive report of his life. Ex. 4 (Nelson Report).  Dr. Dudley provided an analysis of the systematic trauma that Corey suffered throughout his childhood and adolescence. Ex. 5 (Dudley Report).  Mr. Johnson's childhood history includes many specific risk factors as well, including: young parents, poverty, domestic violence, parental drug use, parental immaturity, parental abandonment, and child abuse and neglect.  *See Hall*, 572 U.S. at 706 (recognizing that the defendant's upbringing, which was "under the most horrible family circumstances imaginable," "appeared to make his deficits in adaptive functioning all the more severe" (citation omitted)); *Moore*, 137 S. Ct. at 1051 ("[T]raumatic experiences, however, count in the medical community as "risk factors" for intellectual disability").

43

**J.A.132**

second-in-time pleading should be deemed successive, a court must look to the purposes of the

AEDPA, which are "to further the principles of comity, finality, and federalism." *Panetti*, 551

U.S. at 947. The Supreme Court has cautioned courts to ensure that "petitioners [do not] 'run the

risk' under the proposed interpretation of forever losing their opportunity for any federal review"

and to "resist[] an interpretation of the statute that would . . . 'close our doors to a class of habeas

petitioners seeking review without any clear indication that such was Congress' intent.'" *Id*. at

946 (citation omitted); *see also Castro v. United States*, 540 U.S. 375, 380-81 (2003).

A second-in-time petition should be treated as non-successive where the asserted claims

did not arise until after a prior petition was filed, where the claim was premature, or where a

subsequent filing is contemplated by statute. *See United States v. Hairston*, 754 F.3d 258, 262

(4th Cir. 2014); *see also Garza v. Lappin*, 253 F.3d 918, 922-23 (7th Cir. 2001) (allowing

second-in-time claim where issue, by its very nature, could only be raised after first post-

conviction review was completed).[48] Mr. Johnson's motion presents such a claim.

> **1. Mr. Johnson's Claim Is Not Successive Because a Statute Provides for Review When an Execution Date Is Imminent**

Mr. Johnson brings his claim pursuant to 18 U.S.C. § 3596(c), a statute governing

implementation of a death sentence. The plain language, structure, and statutory history of the

FDPA establish that Mr. Johnson is permitted to raise his status as a person with intellectual

---

[48] Mr. Garza proceeded under § 2241 but only after the Fifth Circuit deemed his pleadings successive. The Seventh Circuit, in its subsequent opinion, questioned that holding and suggested that, under *Stewart v. Martinez-Villareal*, 523 U.S. 637 (1998), his claim should have been considered non-successive. *Garza*, 253 F.3d at 923. Ultimately, the Seventh Circuit speculated that the Fifth Circuit must have rejected such an argument because Martinez-Villareal had previously raised the claim and it had been dismissed whereas Garza had not raised it in his initial § 2255. *Id*. at 924. As this Court is aware, the Supreme Court in *Panetti* explicitly rejected that Fifth Circuit reasoning several years later.

disability now, at the time when he has a pending execution date.  Unlike other claims by federal inmates seeking to challenge their convictions or sentences that must be raised in an initial § 2255 motion, this provision contemplates that, where applicable, a determination of "mental retardation" will be made when the government sets an execution date.

This statute creates an independent, substantive prohibition on the implementation of the sentence based on intellectual disability.  It is unique to the federal death penalty: the § 2254 statute, pursuant to which state prisoners must raise their challenges, lacks a corresponding proscription.  One analogue in § 2254 proceedings, however, is the jurisprudentially required mechanism for resolving mental competency claims when an execution becomes imminent.  *See Panetti*, 551 U.S. at 934-35; *Martinez-Villareal*, 523 U.S. at 644-45; *Ford v. Wainwright*, 477 U.S. 399, 418 (1986).

As *Panetti* and *Martinez-Villareal* make clear, similar claims are not successive even though they are second-in-time because they should be litigated when an execution date is set.  The Bureau of Prison's action setting an execution date triggers the need for a determination of Mr. Johnson's mental status under § 3596(c).  Prior to the Bureau of Prison's notice of an execution date, adjudication pursuant to § 3596(c) is premature.  *Cf. Hoxha v. Levi*, 465 F.3d 554, 564-65 (3d Cir. 2006) (finding, in habeas proceeding challenging extradition, that Administrative Procedures Act challenge under particular federal statute premature because agency action had not yet occurred and the government "may ultimately decide not to extradite Petitioner").

Section 3596(c) provides more specific process for inmates with compelling claims of intellectual disability than is afforded by the Eighth Amendment.  Limiting § 3596 to the minimum process required by the Constitution ignores the reality of the FDPA.  Indeed, the

45

**J.A.134**

FDPA includes provisions clearly intended to provide greater protection than the minimum required by the Constitution.  This particular section, however, differs from other such provisions because it is not restricted by or dependent upon another avenue of review.  *Cf.* 18 U.S.C. § 3595(c) (mandating independent review of death sentence to ensure it is free from arbitrariness and clearly stating this review is a part of the direct appeal).  In contrast, the review required by § 3596 is not confined to an earlier stage of review and it articulates no limitation on claims previously raised.  When there is evidence that a prisoner scheduled for execution is a person with intellectual disability (mental retardation in the statute and legislative history), § 3596(c) requires that assessment to be made when the sentence is set to be implemented, even if that issue had been previously litigated.[49]

**a)**　**The Plain Language of § 3596(c) Demonstrates That a Determination of Mental Status Must Be Made When an Execution Date Is Set**

Section 3596(c) applies when the sentence of death is to "be carried out."  In its plainest terms, the § 3596(c) bar pertains to the period of time in which the sentence is "complete[d]" or "accomplish[ed]"—or "put into execution."  *Carryout*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/carryout (last visited Dec. 14, 2020).  It applies *after* the defendant is "sentenced" and *after* a federal death row inmate has "*exhaust[ed] . . . the procedures for appeal of the judgment of conviction and for review of the sentence*." 18 U.S.C. § 3596(a) (emphasis added).  As made clear by the title of the section, § 3596(c) applies at the "implementation" of the sentence.  Congress did not otherwise qualify this statutory bar.

---

[49] As addressed below, this was openly discussed during Congressional debate.

46

**J.A.135**

> **b)**     **The Other Provisions of § 3596(c), as Well as the Broader Structure of the FDPA, Reinforce That the § 3596(c) Bar Is Properly Raised After an Execution Date Is Set**

Statutory terms must be interpreted "in their context and with a view to their place in the overall statutory scheme." *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989).  The "statutory scheme surrounding the specific language" of § 3596(c) "reinforces" its plain text. *Murphy v. Smith*, 138 S. Ct. 784, 789 (2018).

Congress placed the FDPA's prohibition on carrying out the execution of persons with mental retardation in the "implementation" section of the statute, situating the intellectual disability bar between the pregnancy bar and mental competency bar—all challenges that are raised once execution is imminent.  By structuring the statute in this manner, Congress made plain and clear its intent that an inmate seeking relief under these three prohibitions should do so when an execution is imminent.

First, the placement of the "mental retardation" provision within § 3596 is dispositive. The first subsection, § 3596(a) (entitled "In General"), circumscribes this section of the U.S. Code and provides instructions about how the sentence is be implemented.  Importantly, it also contains a temporal restriction which specifies *when* the rest of the statutory provision becomes relevant: implementation shall occur after all appeals have concluded and the prisoner is released to the custody of a U.S. marshal.  Subsection (b) and (c) are therefore limitations on the marshal's implementation of the sentence and enumerate prohibitions to be raised "[w]hen the sentence is to be implemented."  18 U.S.C. § 3596(a).

The FDPA's structure as a whole further supports this conclusion.  The FDPA has nine sections which generally follow the chronological stages of a capital case.  The first four FDPA provisions, §§ 3591 through 3594, involve the pretrial and trial stages of death penalty proceedings, including, *inter alia*, crimes eligible for the death penalty, aggravating and

47

**J.A.136**

mitigating factors, and sentencing hearing requirements. Next, § 3595 concerns the process for the direct appeal. As discussed above, § 3596 covers prisoner custody procedures once execution is imminent as well as bars on the implementation of the sentence for pregnancy and mental capacity (including both intellectual disability and mental competency to be executed). Then, § 3597 addresses execution procedures once the U.S. marshals take custody of the prisoner. The last two sections of the FDPA are miscellaneous provisions that do not have any temporal components: § 3598 governs capital proceedings for crimes occurring within the boundaries of Indian country, and § 3599 addresses the right to counsel in capital cases.

Congress's decision to place the mental retardation bar after the provisions governing ordinary judicial review of a capital proceeding, and specifically in the section titled "Implementation of a sentence of death," is telling. Congress intended that claims related to § 3596 prohibitions could be raised up to the eve of execution. The legislative history of the mental retardation bar, discussed below, strongly corroborates Congress's intent in this regard.

### c) The Legislative History of § 3596(c) Demonstrates Congress's Intent

Congress passed the FDPA with the intent of providing a prisoner with the opportunity to assert the statutory mental retardation bar after an execution date has been set and before execution, regardless of other relief sought previously. In fact, the legislative history confirms that Congress understood that the FDPA would allow defendants to raise such claims "at any time," including between judgment and execution, and including after an execution date has been set, even if a claim based on intellectual disability was litigated earlier. *See* Ex. 79 (136 Cong. Rec. S6873, S6876 (daily ed. May 24, 1990) (comments by Sen. Hatch)).

During debate of the FDPA in May 1990, Senator Strom Thurmond of South Carolina introduced an amendment (the "Thurmond Amendment") to Senate Bill 1970, 101st Cong.

48

J.A.137

(1990), which had been introduced by then-Senator Joseph Biden of Delaware. The amendment proposed to modify the existing mental retardation provision in the ADAA, which had passed two years earlier. Specifically, Senator Thurmond proposed to limit the mental retardation prohibition to only cases in which the defendant "lack[ed] the capacity to appreciate the wrongfulness of his actions" so that "it would prohibit the execution of mentally retarded persons who do not know the difference between right and wrong." Ex. 79 (136 Cong. Rec. S6873, S6873 (daily ed. May 24, 1990) (comments by Sen. Thurmond)). During the debate on the Thurmond Amendment, Senator Orrin Hatch expressed his understanding of the intellectual disability prohibition both as incorporated in Senate Bill 1970, and as enacted in the ADAA.

> Let us understand something. The trial comes up. Defendants can raise any issue about mental capacity, disability or retardation they want. . . .
>
> Then the sentencing comes up. They have the right to come in and do it all over again. . . .
>
> The Biden amendment in this bill[50] then goes and *gives them a third time*, only it says it a little bit differently. It says, if you can show you are mentally retarded, you cannot be executed. You will stay in jail the rest of your life, but do you not [sic] have to suffer the death penalty. *This is better than habeas corpus for prisoners. They can raise it at any time.*

Ex. 79 (136 Cong. Rec. S6873, S6876 (daily ed. May 24, 1990) (comments by Sen. Hatch) (emphasis added)).

Several other times during the debate, Senator Hatch reiterated his understanding that the FDPA would permit federal death row inmates to raise mental retardation defenses "at any time" and "ad infinitum." *Id.* at S6876. "People who are not mentally retarded . . . will claim that they are . . . these people will be making these claims ad infinitum, long after the trial . . . and long

---

[50] Senator Hatch's reference to the "Biden Amendment in this bill" is a reference to the already enacted "mental retardation" death penalty bar in the 1988 ADAA.

49

**J.A.138**

after . . . all these repetitive habeas appeals or petitions . . . if that is what we adopt here today."

*Id*. at S6877.  Later, Senator Hatch emphasized the temporal lengths during which one could

assert a § 3596(c) bar.  He attacked § 3596(c) by contending that, long after trial and sentencing,

a capital defendant who finds an expert even "years and years and decades" later to say he is

intellectually disabled "can stop the death penalty in that case."[51]  *Id*. at S6880.

Notably, none of the supporters of § 3596(c) contradicted Senator Hatch's interpretation

of S. 1970 that an intellectual disability claim could be brought long after an inmate was

sentenced to death and could be brought more than once.  Instead, the Senate rejected the

Thurmond Amendment by a vote of 59 to 38.  Ex. 79 (136 Cong. Rec. S6873, S6883 (daily ed.

May 24, 1990)).  Both houses of Congress passed the FDPA, with bipartisan support, and it was

signed into law in 1994, with the intellectual disability provision intact.[52]

---

[51] Of course, this is not what has happened here.  Mr. Johnson's case relies not on finding a new expert but on the development and refinement in the medical profession, and the subsequent adoption by the courts, of standards for diagnosing intellectual disability that did not exist at the time he was tried in 1993 or pursued remedies in § 2255 in the late 1990s.

[52] The plain language and legislative history of the ADAA, which preceded the FDPA, reflects a similar commitment to ensuring that a person with intellectual disability will not be executed by the federal government.  Ex. 78 (134 Cong. Rec. 22,926, 22,993 (1988)).

**J.A.139**

## V.    CONCLUSION

Mr. Johnson is a person with intellectual disability and his execution is, therefore, prohibited by federal law.  For these reasons, Mr. Johnson respectfully requests that this Court provide the following relief:

1.    Require Respondent to file an Answer to the Motion in the form prescribed by Rule 5 of the Rules Governing Section 2255 Proceedings in the United States District Courts, specifically admitting or denying the factual allegations set forth above;

2.    Permit Movant to file a Reply to the Respondent's Answer, responding to any affirmative defenses raised by the Answer;

3.    Conduct an evidentiary hearing to resolve any factual disputes raised by the Respondent's Answer to this Motion, or by Movant's Reply to any affirmative defenses raised by the Respondent.  Because Movant has alleged facts which, if true, entitle him to relief, he is also entitled to a full evidentiary hearing to establish the facts he alleges;

4.    Enter an order prohibiting the carrying out of a death sentence on Mr. Johnson due to his intellectual disability; and

5.    Grant such further and additional relief as may be just and proper.

51

**J.A.140**

Dated: December 14, 2020

Respectfully submitted,

/s/ David E. Carney
David E. Carney, VA Bar #: 43914
Donald P. Salzman (Admitted Pro Hac Vice)
Skadden, Arps, Slate, Meagher & Flom, LLP
1440 New York Avenue, NW
Washington, DC 20005
Telephone: (202) 371-7246
Fax: (202) 661-8295
Email: david.carney@skadden.com

*Counsel for Corey Johnson*

## CERTIFICATION PURSUANT TO RULE 2(b)(5) OF THE RULES GOVERNING SECTION 2255 PROCEEDINGS

The undersigned, being authorized to sign for the movant, declares under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on: December 14, 2020

/s/ David E. Carney
David E. Carney, VA Bar #: 43914
Skadden, Arps, Slate, Meagher & Flom, LLP
1440 New York Avenue, NW
Washington, DC 20005
Telephone: (202) 371-7246
Fax: (202) 661-8295
Email: david.carney@skadden.com

52

**J.A.141**

## CERTIFICATE OF SERVICE

I hereby certify that on the 14th of December, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send notification of such filing to all parties and counsel included on the Court's Electronic Mail notice list.

/s/ David E. Carney
David E. Carney, VA Bar #: 43914
Skadden, Arps, Slate, Meagher & Flom, LLP
1440 New York Avenue, NW
Washington, DC 20005
Telephone: (202) 371-7246
Fax: (202) 661-8295
Email: david.carney@skadden.com

## INDEX OF EXHIBITS TO MOTION PURSUANT TO 28 U.S.C. § 2255 RAISING CLAIM OF INELIGIBILITY TO BE EXECUTED UNDER 18 U.S.C. § 3596(c)

EXHIBIT NO.

**SUBMISSION 1**

**EXPERT REPORTS**

Report of Daniel J. Reschly, Ph.D., Aug. 26, 2016 ...........................................................1

Curriculum Vitae of Daniel J. Reschly, Ph.D., May 15, 2020................................... 1(a)

Report of J. Gregory Olley, Ph.D., Aug. 24, 2016............................................................2

Curriculum Vitae of J. Gregory Olley, Ph.D., Oct. 2020 ......................................... 2(a)

Letter from Gary N. Siperstein, Ph.D. to Counsel for Corey Johnson, Dec. 16, 2016 ...................3

Curriculum Vitae of Gary N. Siperstein, Ph.D., Sept. 2020 .................................... 3(a)

Debra Nelson, Mitigation Report, Sept. 27, 2016............................................................4

Report of Richard G. Dudley, Jr., M.D., Aug. 22, 2016...................................................5

**TRIAL TRANSCRIPTS**

Trial Tr., Feb. 3, 1993 .......................................................................................................6

**SUBMISSION 2**

Trial Tr., Feb. 10, 1993 .....................................................................................................7

**SUBMISSION 3**

Cornell Mitigation Information and Report (Excerpt)......................................................8

Trial Tr., Feb. 12, 1993 .....................................................................................................9

Trial Tr., Feb. 15, 1993 ...................................................................................................10

**AFFIDAVITS & DECLARATIONS**

Declaration of Kenneth Barish, Ph.D. (staff psychologist at Pleasantville Cottage
    School), July 22, 2014 ..............................................................................................11

Affidavit of Richard Benedict (special education teacher at Pleasantville Cottage
    School), Dec. 5, 2011................................................................................................12

Affidavit of Darnell Brown (acquaintance in Trenton, NJ), Oct. 14, 2011 ...................13

Affidavit of Darold Brown (acquaintance in Trenton, NJ), June 15, 2011 ...................14

Affidavit of Craig S. Cooley (appointed counsel in 1992), Sept. 20, 2016 ...................15

Affidavit of Courtney Daniels (Corey's lifelong friend), May 21, 2011 .......................16

Declaration of Monica Dawkins (Corey's former girlfriend), July 16, 2012 ...............17

**SUBMISSION 4**

Declaration of Cary Gallaudet, Ph.D. (psychologist at Pleasantville Diagnostic
    Center), Mar. 19, 2012..............................................................................................18

**J.A.143**

EXHIBIT NO.

Declaration of Ann Harding (staff member at Pleasantville Cottage School), Nov. 21, 2011..............................................................................................................................19

Affidavit of Minnie Hodges (Corey's maternal aunt), Apr. 30, 2011 .........................................20

Affidavit of Priscilla Hodges (Corey's cousin), Apr. 30, 2011 ..................................................21

Affidavit of Queenie Hodges (Corey's cousin), Apr. 30, 2011 ..................................................22

Declaration of Esther Johnson (Corey's maternal grandmother), Apr. 30, 2011 ........................23

Affidavit of Robert Johnson (Corey's half-brother), June 29, 2011...........................................24

Affidavit of Antionette Daniels Joseph (the best friend of Corey's mother and Corey's godmother), May 21, 2011) ..........................................................................................25

Declaration of Leona Klerer (reading teacher at Mount Pleasant Cottage School), June 3, 2011 ...........................................................................................................................26

Affidavit of Gerald Lefkowitz (unit administrator at Pleasantville Cottage Center), Dec. 5, 2011 ..........................................................................................................................27

Affidavit of Odette Noble (social worker at Elmhurst), Dec. 1, 2011...........................................28

Declaration of George Sakheim, Ph.D. (Chief of Psychological Services at Pleasantville Diagnostic Center), June 17, 2011 .....................................................................29

Affidavit of David Washington (childcare worker at Elmhurst), Mar. 1, 2012.............................30

**SUBMISSION 5**

**CHILDHOOD & TESTING RECORDS**

Gregory Judge, School Social Worker, Social History, Mar. 4, 1977..........................................31

Cheryl Spillane, Learning Consultant, Bureau of Pupil Personnel Services, Jersey City Public Schools, Learning Consultant Evaluation to Child Study Team, Mar. 18, 1977..................................................................................................................................32

F.A. Figurelli, M.D., Chief Psychologist, Psychological Examination Record, Mar. 25, 1977..................................................................................................................................33

Eleanor Glantz, Social Worker, Case Service, Dec. 11, 1978 ......................................................34

Committee on the Handicapped, Referral to the Committee on the Handicapped, Feb. 26, 1979..................................................................................................................................35

Committee on the Handicapped Records, May 21, 1979 ............................................................36

Washington Heights-West Harlem Community Mental Health Center, Child Assessment Evaluation Summary, Dec. 9, 1981 ....................................................................37

Ernest H. Adams, Staff Psychologist, Psychodiagnostic Evaluation, Dec. 11, 1981 ....................38

Cary Gallaudet, Psy.D., Pleasantville Cottage School, Psychological Evaluation, Feb. 1, 1982..................................................................................................................................39

2

**J.A.144**

EXHIBIT NO.

Leona Klerer, Mount Pleasant Cottage School Screening Upon Admission, Feb. 22, 1982 .................................................................................................................40

Amira Offer, Caseworker, Psychosocial Summary, Mar. 15, 1982 ...............................41

Gloria Caro, Pleasantville Cottage School, Reassessment Summary, May 21, 1982 ..................42

Gloria Caro, Caseworker, Initial Conference, Current Assessment and Transfer Summary, June 9, 1982 .....................................................................................43

Gayle Turnquest, Caseworker, Pleasantville Cottage School, Current Assessment, Jan. 31, 1983 ............................................................................................................44

**SUBMISSION 6**

Ken Barish, Ph.D., Psychologist, Pleasantville Cottage School, Psychological and Educational Evaluation, Apr. 29, 1983 .......................................................45

John B. Stadler, M.D., Clinical Director, Pleasantville Cottage School, Psychiatric Evaluation, Aug. 26, 1983 ..........................................................................46

Lynda Coccaro, Speech and Language Pathologist, Donald R. Reed Speech Center, Inc., Phelps Memorial Hospital, Speech and Language Evaluation, Oct. 5, 1983 .................47

Lynn Polstein, Jewish Child Care Association of New York, Pleasantville Cottage School, Change in Permanency Plan, Apr. 13, 1984 .............................................48

Gerard Maier, Social Worker, Current Assessment, Sept. 4, 1984 ...............................49

Christine Aaron, MSW Intern, Jewish Child Care Association of New York, Pleasantville Cottage School, Visitation Plan, Dec. 12, 1984 .................................50

Kenneth Barish, Ph.D., Psychologist, Pleasantville Cottage School Psychological Evaluation, Apr. 15, 1985 ...................................................................................51

Gerard Maier, Pleasantville Cottage School, Discharge/Transfer Plan, May 28, 1985 .................52

Board of Education of the City of New York, Individualized Education Plan – Phase 1, July 1, 1985 .....................................................................................................53

Odette Noble, Social Worker, Jewish Child Care Association of New York, Elmhurst Boys Residence, UCR Reassessment and Service Plan Review 6 Month, Nov. 21, 1985 ...........................................................................................................54

**SUBMISSION 7**

Odette Noble, Social Worker, Jewish Child Care Association of New York, Elmhurst Boys Residence, UCR Reassessment and Service Plan Review 6 Month, June 28, 1986 ...........................................................................................................55

Odette Noble, Social Worker, Jewish Child Care Association of New York, Elmhurst Boys Residence, UCR Plan Amendment: Form D Trial Discharge, Feb. 23, 1987 ...............56

Newtown High School, Scholastic Transfer Record, Dec. 7, 1987 ..............................57

J.A.145

**EXHIBIT NO.**

Janet Valentine, Child Care Worker, Pleasantville Diagnostic Center, Outline for Cottage Report (undated) ..................................................................................58

**COURT RECORDS**

Notice of the Intention of U.S.A. to Seek Death Penalty as to Mr. Tipton, May 1, 1992.................................................................................................................59

Notice of the Intention of U.S.A. to Seek Death Penalty as to Mr. Roane, May 1, 1992..............60

Second Superseding Indictment, July 20, 1992, Dkt. 115 ..........................................61

Notice of the Intention of U.S.A. to Seek Death Penalty as to Mr. Thomas, Oct. 28, 1992.................................................................................................................62

Verdict Form, Feb. 3, 1993, Dkt. 466.............................................................................63

Notice of the Intention of U.S.A. to Seek Death Penalty as to Mr. Johnson, Feb. 8, 1993.................................................................................................................64

Special Findings, Feb. 16, 1993, Dkt. 508...................................................................65

Motion to Have Defendant Declared Mentally Retarded, *United States v. Thomas*, No. 3:92CR68 (E.D. Va. Apr. 15, 1993) ..............................................................66

Memorandum in Support of Initial Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. Section 2255, June 15, 1998, Dkt. 714 (Excerpt) ....................................67

Reply Memorandum in Support of Initial Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. Section 2255, Mar. 15, 1999, Dkt. 761 (Excerpt)...............................68

Ex. 14 to Reply Memorandum in Support of Initial Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. Section 2255, Mar. 15, 1999 .................................69

Ex. 15 to Reply Memorandum in Support of Initial Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. Section 2255, Mar. 15, 1999 .................................70

**SUBMISSION 8**

Petitioners' Joint Motion for Leave to Take Discovery, June 24, 1999, Dkt. 770 ........................71

Memorandum Opinion, May 3, 2000, Dkt. 803 ..........................................................72

Memorandum Opinion, May 1, 2003, Dkt. 896 ..........................................................73

Brief for Appellants Cory Johnson and Richard Tipton at 146, *United States v. Johnson*, No. 03-13(L), 03-26, 03-27 (4th Cir. Feb. 17, 2004) (Excerpt) .............................74

**SUBMISSION 9**

**DIAGNOSTIC MATERIALS**

American Association on Intellectual and Developmental Disabilities Definition Manual ("AAIDD-11") (Excerpt)....................................................................75

AAIDD User Guide to 11th Edition (Excerpt) .............................................................76

Diagnostic and Statistical Manual of Mental Disorders ("DSM-5") (Excerpt)............................77

4

**J.A.146**

**EXHIBIT NO.**

**CONGRESSIONAL RECORDS**

134 Cong. Rec. 22,926 (1988) (Excerpt)...................................................................................78

136 Cong. Rec. S6873 (daily ed. May 24, 1990) (Excerpt)...........................................................79

5

**J.A.147**

# EXHIBIT 1

J.A.148

## REPORT
### Corey Johnson's Status as a Person with Intellectual Disability
#### Daniel J. Reschly, Ph.D.

### I.      Executive Summary

In my opinion, Mr. Corey Johnson is clearly a person with intellectual disability based on my review of extensive prior records and evaluations, my evaluation of him, and my application of the criteria for intellectual disability established by authoritative national and international authorities.  The generally accepted three-pronged standard to classify someone as having intellectual disability is met if the individual demonstrates significant limitations in intellectual functioning and significant limitations in adaptive behavior that were apparent in the developmental period.  My evaluation has convinced me that there is evidence of Mr. Johnson's significant limitations in intellectual functioning and adaptive behavior that were documented by contemporaneous records created during his child, adolescent, and adult years and that are corroborated by a persuasive array of additional evidence.

Corey Johnson was raised in poverty by a single mother who suffered from a significant drug problem that started before the time that he was born and continued during his childhood and adolescence; in fact, his mother's family members and close friends who knew her when she was pregnant with Corey believe that she used drugs during that pregnancy.  Corey Johnson had little contact with his father until he was an adolescent and never developed a significant relationship with him.  His mother had a series of relationships with boyfriends during his childhood, and many of them were either emotionally abusive toward his mother and Corey, physically abusive to them, or both.

Because of his family circumstances, Mr. Johnson lived an unstable and transient young life.  His mother moved Corey and his brother from home to home as she began and ended relationships with various men, interspersed by periods when she, Corey, or both of her children

**J.A.149**

lived with her family.  For this reason, Corey Johnson and his brother attended numerous schools as children, in both New Jersey and New York, and in both the public and private school systems.  He consistently failed as a student, and was held back and repeated early elementary school grades multiple times.

Although some of his school records have not been located, the records that do exist show that some of those schools that Corey Johnson attended referred him for educational assessments and psychological evaluations, including IQ testing, as he fell far behind academically.  In addition, Mr. Johnson received services from several different social services agencies, and some of those agencies conducted psychological testing, including IQ tests.  Mr. Johnson's chaotic and transient childhood led professionals to administer tests of intellectual functioning to him five times between the ages of 8 and 16; he was administered a sixth IQ test at age 23, after his arrest in the present case.  Four of those six IQ tests are valid measures of Corey Johnson's intellectual functioning.  Taken together, these four IQ tests demonstrate that Corey Johnson had significant deficits in intellectual functioning as a child, adolescent, and young adult.[1]

**Table 1**

| Year Test Administered | 1977 | 1981 | 1985 | 1992 |
|---|---|---|---|---|
| Corey Johnson Flynn Effect Adjusted Score[2] | 71.5 | 75.3 | 65.1 | 72.8 |

---

[1] For the reasons I explain in detail below, two other IQ tests administered to Mr. Johnson as a child lack validity and reliability and should be given little weight in determining whether Corey Johnson meets the criteria for Intellectual Disability.  One of these tests had been published more than 30 years before it was administered to Corey Johnson and had already been replaced by a new version of the test whose content had changed dramatically.  The use of this test was improper and raises serious questions about the competence of the administrator.  The other test was seriously flawed because it was given to Corey Johnson within just a few months after he took the same test, which significantly inflated and the results and invalidated them.

[2] The Flynn Effect is explained on pages 9 and 10.

2

J.A.150

School, social services, and other records from Corey Johnson's childhood and adolescence are filled with concrete and vivid documentation of corresponding deficits in his adaptive functioning in conceptual, social and practical domains. Those records show academic failures and a consistent inability to learn and progress in school. They also show significant communication and language deficits, challenges with social interactions, gullibility and naiveté, an inability to care for himself, or to participate in age-appropriate social activities, and other deficits. These contemporaneous records are corroborated by descriptions from Corey Johnson's family, friends, treatment and social services professionals, and others who have known him over the course of his life. They are also corroborated by the results of a standardized adaptive behavior instrument that Dr. Gregory Olley administered to three individuals who knew Corey Johnson well before he turned 18 years old, two of whom have known him since birth.

Corey Johnson's reliable IQ scores were consistently two standard deviations below the mean. This satisfies the intellectual functioning prong. Moreover, records throughout Corey Johnson's life, statements obtained from those who knew him well, and standardized adaptive behavior instruments show that Corey Johnson had significant limitations in all three adaptive function domains and those limitations are directly related to his limitations in intellectual functioning, and they demonstrate particularly deficits in executive functioning, including reasoning, judgment, and decision-making. Finally, both Corey Johnson's significant limitations in intellectual functioning and his significant limitations in adaptive functioning manifested before he turned 18 years old. Based on my review of all of this information and based on my decades of experience, and applying my clinical judgment, I have concluded that Corey Johnson meets the criteria for intellectual disability because he had significant limitations in intellectual functioning and in adaptive functioning prior to age 18.

3

J.A.151

## II.    Overview and Credentials

I have been asked by counsel for Corey J. Johnson (Date of Birth ███████████ ) to conduct an evaluation and to determine whether Mr. Johnson meets the criteria for the classification of intellectual disability.  Mr. Johnson is imprisoned at the United States Penitentiary in Terre Haute, Indiana.

My credentials to support this opinion are summarized in Appendix A.  Briefly, I have conducted clinical evaluations and developed expertise in assessing intellectual disability (ID) and learning disability (LD), engaged in research, and published in the field for over 40 years as a scholar, practitioner, and educator.  I have authored many published articles in refereed journals, book chapters, presentations at professional conferences.  I have testified in court proceedings and consulted with lawyers and state and national agencies.  In 1999 I was selected by the National Academy of Sciences to chair a panel on determining eligibility for Social Security benefits in mental retardation.[3]  (Reschly, Meyers, & Hartel, 2002).  I have attached a condensed version of my curriculum vitae and a more complete description of my background and credentials in Appendix A.

I have reviewed a substantial amount of information concerning Corey Johnson, including contemporaneous educational, social services, treatment, residential placement and other records from Corey Johnson's childhood, adolescence, and young adulthood, as well as prison records since his incarceration.  These records included academic assessments, psychological, and psychiatric evaluations, including IQ test results and other test results.  I have also reviewed witness statements from people who have known him at various times during his

---

[3] The term *mental retardation* was changed to *intellectual disability* by the American Association on Intellectual and Developmental Disabilities.  The terms have equivalent meaning. In 2010 Congress changed federal terminology from mental retardation to intellectual disability in what was called Rosa's Law (PL 111-256).  In 2013 the American Psychiatric Association's DSM-5 discontinued the term mental retardation and adopted the term intellectual disability.

4

life.  I met with Corey Johnson on July 30 and July 31, 2014, and administered the Woodcock Johnson-III achievement test.  In this report I express my expert opinion that Mr. Johnson is a person with mild intellectual disability based on all of the information that I reviewed during my evaluation.

### A. Intellectual Disability Criteria and Levels

Intellectual disability is defined in similar ways by the two leading national organizations in the field of intellectual disability, the American Association on Intellectual and Developmental Disabilities (AAIDD), in its "Intellectual Disability: Definition, Classification, and Supports" 11th Edition, Schalock et al. (2010) (AAIDD Classification Manual), and the American Psychiatric Association (APA), in its Diagnostic and Statistical Manual of Mental Disorders 5th Edition (2013) (DSM-5).  The AAIDD Classification Manual and the DSM-5 use essentially the same criteria; both groups require that three conditions exist: (a) Significant limitations in intellectual functioning; (b) Significant limitations in adaptive behavior as expressed in conceptual, social, and practical adaptive skills; and (c) Origination of the above limitations during the developmental period, which AAIDD ends at 18 while DSM-5 leaves undefined.  In my opinion Mr. Johnson meets these criteria.

Intellectual disability can range across a wide continuum from relatively mild to profound.  Regardless of the degree of sub-average intelligence, variability in intellectual disability severity is currently described by the level of support individuals need, with individuals with greater degrees of impairment requiring higher levels of support while those with relatively mild impairments require less support in order to function adequately in society. Typical adaptive behavior limitations in conceptual, social, and practical domains are described as a guide to the meaning of each of the levels.

**J.A.153**

In older definitions of what now is called intellectual disability the levels were characterized by ranges of scores on tests of intellectual functioning with means of 100 and standard deviations of 15. The mild level was defined by intellectual functioning scores of approximately two to three standards deviations below the population mean, or a score range of about 55 to 75, with consideration of the standard error of measurement for the test. (Grossman, 1973, 1983). The DSM-5 further indicates that this range can extend slightly higher if an individual demonstrates substantial adaptive behavior deficits.

The discussion of levels is relevant to the classification of persons with intellectual disability because *qualitative* as well as quantitative differences exist between the levels. Individuals with mild levels of intellectual disability typically present no characteristic identifiable biological bases for their disability. They demonstrate strengths and weaknesses in social roles, and thus require varying levels of support, and in some social roles or behavior, demonstrate no need for any support at all and yet meet the diagnosis of intellectual disability.

The characteristics of persons with more severe or even profound levels of intellectual disability are often and *incorrectly* attributed to all persons at the upper end of the range of intellectual disability, also known as persons with mild intellectual disability. Persons at the mild level of intellectual disability typically appear normal, that is, they do not show the stereotypical physical appearance of persons with intellectual disability. Moreover, about half of this population can become, with appropriate supports, self-supporting and independent functioning in the community. Community adjustment is precarious, often requiring assistance with basic areas of functioning such as judgment about social roles, employment, money handling, travel, law compliance, and relationships such as marriage. Absent the appropriate

6

**J.A.154**

supports, many persons with mild intellectual disability struggle with meeting basic community responsibilities, self-support, and/or law compliance.

The most current definition of intellectual disability has moved away from strict IQ thresholds below which an individual must fall to qualify for that diagnosis. This change has been due to the recognition that significant deficits in adaptive functioning support a conclusion of intellectual disability even if IQ scores fall slightly above traditional thresholds.

The key deficits of persons with mild intellectual disability are in the areas of learning and understanding abstract relationships in the conceptual, social, and practical areas of adaptive behavior. The learning abilities of people with intellectual disabilities are more concrete and dependent on supports than individuals with greater intellectual ability. Persons with intellectual disability have a significantly reduced capacity to learn, recall, and reason. (Campione, Brown, & Ferrara, 1982; Campione, Brown, Ferrara, & Bryant, 1985; Reschly, 1987; Snell et al., 2009). Such persons are particularly limited in applying abstract reasoning to practical situations and in spontaneously recalling thinking strategies to solve problems. These fundamental intellectual deficits affect everyday activities and responsibilities. Other learning deficits reported frequently with persons with low intellectual ability include difficulty in applying basic learning to new situations and severe limitations in literacy skills.

My evaluation of Corey Johnson as a person with mild intellectual disability is supported by evidence of his deficits in intellectual functioning and adaptive behavior that originated in the developmental period and continued to the time of the crime and beyond in his adult years. The AAIDD Classification Manual and DSM-5 classification criteria emphasize that the intellectual disability classification is defined by *deficits* and that intellectual disability typically is marked by a pattern of strengths and weaknesses. Identified strengths cannot, therefore, be used to rule

7

**J.A.155**

out the existence of mild intellectual disability. Mr. Johnson exhibited numerous deficits in his functioning in every-day life that are well documented, consistent, and compelling.

## B. Significant Considerations in Interpreting Intellectual Functioning Results for Corey Johnson

Significant limitations in intellectual functioning are a defining feature of intellectual disability. Tests of intellectual functioning, called IQ tests, typically are used as part of the determination of limitations in intellectual functioning. Current clinical standards define significant limitations in intellectual functioning as performance in the range of IQ of approximately 75 or below, which is approximately two standard deviations below the mean (taking into consideration the standard error of measurement, which I describe in more detail below), *assuming* that appropriate consideration of several characteristics of tests of intellectual functioning occurs in interpreting scores. These considerations include the appropriateness of normative standards and correction for the obsolescence of norms (Flynn Effect), application of professional standards for administration, scoring, and interpretation of tests, and probable error in the assessment process, as well as application of the expert's clinical judgment.

Standards for the assessment of intellectual functioning in the context of mild intellectual disability diagnoses are described in the AAIDD Classification Manual. Briefly, these standards require use of a comprehensive, multiple factor measure of general intellectual functioning that is individually administered to the client by a professional with appropriate graduate education and supervised experience in order to administer, score, and apply appropriate clinical judgment to the interpretation of the test results. The testing must meet high professional standards for reliability and validity. The testing must be administered, scored, and interpreted in accordance with the standardized procedures developed by the test author/publisher. Cultural, social, individual, and situational conditions as well as special artifacts of intellectual assessment (such

**J.A.156**

as the Flynn Effect and Practice Effects, which I explain below) must be considered as part of decisions about general intellectual functioning. Finally, test scores on tests of intellectual functioning must be considered in relation to the individual's everyday functioning in conceptual, social, and practical skills.

In my review of the intellectual assessments administered to Mr. Johnson, I have given special attention to the obsolescence of normative standards, the qualifications and decision making of examiners, the standard error of measurement, and practice effects.

### 1. Obsolescence of normative standards (Flynn effect)

Sophisticated analysis of IQ test result data has shown that IQ scores across populations steadily rise over time after a specific IQ test has been normed and standardized. This phenomenon was corroborated by research conducted by James Flynn, is commonly known as the Flynn Effect (and more formally as "normed obsolescence"), and has been validated internationally.

The practical significance of the Flynn Effect is that scores across the population that are produced by a particular IQ test rise over time. The Flynn Effect is an especially important consideration when tests with outdated norms (also referred to as less stringent norms) are used in evaluations of persons with potential significant intellectual limitations. (Pietschnig & Voracek, 2015; Trahan et al., 2014). This is true because intellectual functioning for purposes of an intellectual disability diagnosis is assessed based on whether an individual's IQ scores deviate from the mean by approximately two standard deviations. Because the mean for IQ scores rises steadily over time due to the Flynn Effect, the significance of any particular IQ test that is given a significant time after the norming of the IQ instrument must be considered in light of the Flynn Effect. The existence of the declining stringency of norms has been established by hundreds of

9

**J.A.157**

articles from multiple nations involving a vast array of data (see recent review by Pietschnig & Voracek, 2015).

Flynn calculated the steady rise in IQ scores (across populations) at the rate of just above 0.3 points per year or a little more than three points for every ten years after an IQ test was normed; his calculation has been corroborated by numerous research studies conducted since he published his findings. See AAIDD *User's Guides* (Schalock et al., 2007, 2012); Pietschnig & Voracek, 2015; Trahan, Stuebing, Fletcher, & Hiscock, 2014 (meta-analysis from over 100 research reports concluded that Flynn Effect is a valid phenomenon scientific, the rate of norms obsolescence described as approximately 0.3 points per year is confirmed (the most up-to-date measurements calculate the rise as .33 points per year), and test interpretation should use the Flynn correction when IQ test results are used in high stakes decisions).

As a real world example of how the Flynn effect works, if the norms for an intelligence test are ten years old, the population mean on the test which ordinarily is set at 100 would no longer be 100. Instead, the population mean would become 103 [100 + (0.3 x 10)]. Moreover, the point that is two standard deviations below the mean would no longer be 70, but ten years later would be 73 (assuming a mean of 100 and standard deviation of 15).

In Mr. Johnson's case, all of known IQ tests administered to him as a child and adolescent had outdated norms necessitating the corrections described by Flynn.

### 2. Examiner expertise and experience and importance of clinical judgment.

One of the most basic competencies an examiner must exhibit is to select an appropriate test, including knowledge about the availability of tests, their characteristics, and the applicability to a specific client when they are administered. Best professional practices always

**J.A.158**

have emphasized the choice and use of the most recently standardized test in a series of tests such as the Wechsler Scales or the Stanford Binet Scales of Intelligence. Current professional standards are explicit regarding the use of the most recent version of standardized tests. *Standards for Educational and Psychological Testing* 2014, Standard 5-11, pp. 104-105; AAIDD *User's Guide* (Schalock et al., 2007) ("[T]he clinician needs to use the most current version of an individually administered test of intelligence"). This basic premise was violated in the assessment of Mr. Johnson in 1979 when an outdated version of a Weschler IQ test was administered by Nathalie Smith to Corey Johnson five years after a new version of the test had been released (see later discussion).

In addition, examiners must be well prepared and educated about key decisions required in intellectual assessment. They must be objective and make sure that they neither intentionally nor inadvertently influence the test results. Examiners who stray from careful adherence to these principles can produce unreliable and invalid test results. During the administration of an IQ test to Corey Johnson in February 1982, there is documented evidence in the report by Dr. Cary Gallaudet that she provided assistance to Corey Johnson during her administration of that test, which compromised the reliability of her results (see the detailed discussion below).

### 3. Standard error of measurement (SEM)

Errors of measurement always must be considered in interpreting tests of intellectual functioning. Because IQ tests produce estimates of intellectual functioning, they are always subject to errors, which can be predicted statistically using the standard error of measurement (SEM). Once the SEM for a particular IQ test has been calculated, experts can determine the likelihood that the subject's score accurately reflects his or her true IQ within a particular range using a degree of confidence, which is called a confidence interval. While there is no correct or

11

definitive answer as to which level of certainty to use, a common confidence interval used for IQ tests is the 95 percent confidence interval (plus or minus two SEM), which means that subject's true IQ is likely to fall within the range of 95 percent certainty. For the typical IQ test, two SEM produces a range of plus or minus five points at the 95 percent confidence interval.

The AAIDD Classification Manual and the DSM-5, using two SEM, recognize a range of intellectual functioning scores of 65-75 as the approximate upper range for the mild intellectual disability classification, and this plus or minus five point range is generally used by professional practitioners, public and private agencies, and the courts in making determinations of intellectual functioning for purposes of an intellectual disability diagnosis.

Every IQ test has its own specific standard error of measurement which is established during the norming of the test. Furthermore, each test has an SEM depending on the age of the individual to whom the IQ test is administered at the time of the test   As an alternate and more accurate method for determining the upper range of intellectual functioning that would be consistent with intellectual disability based on the individual's age and the specific test, it is also appropriate to use the SEM for the specific instrument and the age of the individual at the time the test was administered.

### 4. Practice Effect

Intellectual test performance also is influenced by the practice effect, meaning test scores tend to increase when the same test is used repeatedly. Repeated administrations of the same test can produce artificially inflated scores on individually administered tests of general intellectual functioning. Calamia, Markon & Tranel (2012) (showing practice effects are greater and more persistent than previously research had shown). This is because a test subject will become

12

**J.A.160**

familiar with the tasks involved in and concepts tested by a particular standardized instrument and can learn strategies for solving those tasks when exposed to the same test more than once.

The closer in time that the same test is given to a subject, the larger the practice effects. Practice effects undoubtedly significantly affected at least one of the intellectual functioning scores reported for Mr. Johnson, the February 1982 IQ results obtained by Dr. Gallaudet. As discussed below, Dr. Gallaudet administered the WISC-R test to Corey Johnson only four months after another psychologist gave him the exact same WISC-R IQ test in October 1981.

### III.    Corey Johnson Intellectual Functioning Assessment

As described above, Mr. Johnson's childhood was unstable and transient. As a result, Corey Johnson attended numerous schools and also came to the attention of several social services agencies and he was administered five IQ tests between age 8 and 16. Each of these IQ tests, and the IQ test administered to him during a mitigation evaluation when he was 23 years old after his arrest for the capital murder charges in this case, were a version of the Weschler intelligence tests. Specifically, Wechsler IQ tests were administered to Mr. Johnson in 1977, 1979, 1981, 1982, 1985, and 1992 as demonstrated in the following table:

**Table 2**

| Date (administered by) | Test | Full-Scale Score | Flynn-Adjusted Score |
|---|---|---|---|
| March 25, 1977 (Figurelli) | WISC-R | 73 | 71.5 |
| May 3, 1979 (Smith) | WISC | 91 | 81.4 |
| October 1981 (Adams) | WISC-R | 78 | 75.3 |
| Feb. 5 & 8, 1982 (Gallaudet) | WISC-R | 88 | 85 |
| March 15, | WISC-R | 69, (74) | 65.1, (70.1) |

13

**J.A.161**

| 1985 (Barish) | | | |
|---|---|---|---|
| October 9, 1992 (Cornell) | WAIS-R | 77 | 72.8 |

The IQ results from these six tests have varying degrees of validity due to the obsolescence of norms, practice effects, and probable administration errors. I discuss each in turn below.

### A. Figurelli WISC-R (1977).

The first administration of an individually administered test of intellectual functioning was by Dr. Jennifer Figurelli, a school psychologist for the Jersey City Public Schools. Dr. Figurelli assessed Corey Johnson in March 1977, when he was age 8 years 4 months and in the second grade. The assessment was prompted by the typical reasons school age children are referred for consideration of disability classification and special education services, specifically chronic and severe achievement problems including extremely low reading skills and poor concepts of numeracy resulting in academic failure and grade retention. Dr. Figurelli administered to Corey Johnson the Wechsler Intelligence Scales for Children-Revised (WISC-R; Wechsler, 1974); the WISC-R had been normed five years before this testing. The obtained scores using the uncorrected and Flynn corrected scores were Full Scale 73 (Flynn 71.5), Verbal 67 (Flynn 65.5), and Performance 84 (Flynn 82.5).

Unfortunately, Dr. Figurelli did not report subtest scores in her evaluation report nor has a copy of the test booklet that would contain the results of those individual subtests been discovered. The absence of raw data and the individual subtest scores makes it difficult to identify patterns of strengths and weaknesses within the scales. However I have known Dr. Figurelli for many years, am familiar with her experience and care, and have high regard for her

14

qualifications. Dr. Figurelli's test results were apparently free of practice effects since this was the first known time that a Wechsler Scale was administered to Mr. Johnson.

### B. Smith WISC (1979).

The results from a second administration in 1979 of a Wechsler Scale are in sharp contrast to the first because the examiner used a significantly outdated, 30+year old test version that had already been replaced by a new version of the Wechsler test. This circumstance raises serious questions about the professional judgment of the administrator and undermines reliability of the results.

Nathalie Smith, who worked in the Evaluation Unit of the West Manhattan Center, gave Corey Johnson the WISC IQ test (Wechsler Intelligence Scale for Children, 1949). I am unfamiliar with Ms. Smith or her qualifications, background, and experience. Ms. Smith administered the WISC to Mr. Johnson in 1979, five years *after* Wechsler published a revised edition and 32 years after the normative standards for the original version were established. The reported WISC scores are Full Scale IQ 91 (Flynn Adjusted Full Scale IQ 81.4).

However, there are significant and serious flaws that undermine any reliability and validity from this test result. Most importantly, the original WISC version was completely outdated and had been replaced years before by an updated, culturally relevant version. For this reason, I believe the 1979 WISC results are not valid and should be given little if any weight in determining whether Corey Johnson meets the intellectual functioning prong of an intellectual disability evaluation.

The use of the 1949 WISC in 1979 rather than the revised 1974 WISC-R (which was the version given to Corey Johnson two years earlier by Dr. Figurelli) violated what was then and is currently a widely understood best practice of using the most recently standardized version of a

15

test.  Current testing standards are explicit about using the recently developed version of a test

series.  *Standards for Educational and Psychological Tests,* 2014, pp. 104-105.  The AAIDD

Classification Manual starkly makes this point:

> The main recommendation resulting from this work [regarding the Flynn Effect]
> is that all intellectual assessments must use a reliable and appropriate individually
> administered intelligence test.  In cases of multiple versions, the most recent
> version with the most current norms should be used at all times.

AAIDD Classification Manual at 37, quoting *User's Guide: Mental retardation definition,*

*classification, and systems of supports.* (Schalock 2007).  Even in 1979, practitioners widely

understood that using the most current version of an IQ test was the generally accepted best

practice.  In this instance, the newer version had been available for five years and the vast

majority of psychologists in 1979 used the newer rather than the older version.  This

circumstance raises questions about whether the examiner in 1979 had the appropriate

experience and applied the proper and critical clinical judgment necessary to reach a reliable and

valid result during the testing of Corey Johnson in 1979.

The 1979 WISC test was not only severely outdated when it was administered to Corey

Johnson, many of the subtests were significantly revised because substantial cultural and societal

changes occurred during the more than three decades between the time the WISC was normed

and the time it was administered to Corey Johnson.  Wechsler 1974, pp. 10-16.  In fact,

significant parts of the WISC test had been replaced in the WISC-R because those outdated

portions of the WISC had a weak correlation to general intelligence.  For all of these reasons, it

is impossible to conclude that the 1979 WISC scores are valid and reliable measures of Corey

Johnson's intellectual functioning.  In my opinion, the Smith IQ tests results cannot be

considered to be valid and should be given little if any consideration in determining if Mr.

Johnson has significant limitations in intellectual functioning.

16

**J.A.164**

## C. Adams WISC-R (1981).

The WISC-R was administered twice to Mr. Johnson within a short four month period in late 1981 and early 1982.  Earnest Adams, M.S., who at the time worked at the Council's Center for Problems of Living, administered the WISC-R in October 1981, obtaining a Full Scale IQ of 78, converted to Full Scale IQ that was a fraction above 75 using the Flynn Correction for the age of the WISC-R norms.  The subtest scores for Dr. Adams are available and there is nothing in those results or other aspects of Dr. Adams' evaluation that raises concerns about the reliability and validity of his results.  The Full-Scale IQ of 78 adjusted for the obsolescence of the WISC-R norms (Flynn 75.3) is in the range of scores that can support a diagnosis of Intellectual Disability.  Although the general SEM is commonly described as five points, the specific SEM for the WISC-R test administered by Dr. Adams to Corey Johnson, given his age at the time of the test (12 and a half years old) using the 95 % confidence interval is +/- 6.46 points, which would give a Flynn-adjusted Full Scale IQ of 68.84.  Thus, Corey Johnson' 1982 IQ test administered by Dr. Adams falls well within the intellectual disability range.

## D. Gallaudet WISC-R (1982).

Dr. Cary Gallaudet, a psychologist at the Pleasantville Diagnostic Center, administered the same WISC-R test to Mr. Johnson in early February 1982, four months after Dr. Adams' testing.  Dr. Gallaudet obtained a Full-Scale IQ result of 82.  Dr. Gallaudet has indicated in an affidavit that she was unaware of Dr. Adams' administration of the WISC-R just four months earlier.  She has stated that had she known of Dr. Adams' recent use of the WISC-R test with Corey Johnson she would likely not have administered the WISC-R to him again.  In fact, she has stated that she believes the practice effect impacted Corey Johnson's performance on the WISC-R tests she gave to him.

17

**J.A.165**

Studies have consistently shown that the practice effect is most pronounced when the same test is administered within a short period of time. Four months between test administrations is an extremely short period of time and, in my opinion, the repeat administrations of the exact same test inflated the results of the Gallaudet WISC-R results. Evidence of the practice effect in Corey Johnson's case stemming from the October 1981 and February 1982 administration of the exact same IQ tests can be seen on the following subtest scores, which all rose between the two administrations of the identical test: Information; Similarities; Comprehension; Picture Completion; Block Design; Object Assembly; and Coding. The two subtests that had the greatest increase between the Adams administration in October 1981 and the Gallaudet administration in February 1982 were Similarities and Object Assembly, and studies have shown that Object Assembly is one of the tests that is particularly prone to practice effects.

As noted previously, practice effects on psychological tests are larger than generally believed by psychologists. Calamia, et al., 2012. Verbal scale and performance scale subtests show varying degrees of practice effects with the latter scale generally showing larger practice effects than the former; Corey Johnson's scores on the performance scales rose slightly more than on the verbal scales, consistent with the research. Given the extremely short interval between the Adams and the Gallaudet administrations of the WISC-R and the clear evidence of the practice effect, the validity and reliability of the Gallaudet IQ test results are sorely undermined.

In addition, Dr. Gallaudet has conceded that she was an inexperienced practitioner at the time she administered the WISC-R to Corey Johnson. She was practicing under the supervision of a more experienced practitioner during the time she assessed Corey Johnson and he too has

18

**J.A.166**

noted her inexperience at the time that she evaluated Mr. Johnson. Dr. Gallaudet's evaluation report reflects her inexperience, because she noted in her report that "[f]requently Corey would interrupt his own work with irrelevant questions . . . and at those times, the examiner would have to help him refocus on the task at hand." Such efforts by the practitioner administering an IQ test artificially inflate the test score results. Moreover, Dr. Gallaudet has indicated that she was administering a large volume of evaluations during this time period and may have had a heightened chance for making errors during the testing of Corey Johnson. Dr. Gallaudet has specifically indicated that she believes that she may have made errors in her scoring of Corey Johnson's WISC-R testing.

Dr. George Sakheim was the chief psychologist at Pleasantville when Corey Johnson was a resident and he directly supervised Dr. Gallaudet during the time period when she evaluated Corey Johnson. Dr. Sakheim describes Dr. Gallaudet as a very inexperienced practitioner who had just started her professional career three months earlier. He notes Dr. Gallaudet's testing report indicating that she helped refocus Corey Johnson on task during testing and says he has observed such assistance from less experienced practitioners during his career. Dr. Sakheim said Dr. Gallaudet's evaluation report is consistent with her personality and her desire to be helpful to test subjects. Dr. Sakheim has further indicated that if an examiner provides assistance or extra time to a subject, the test findings are compromised. Dr. Sakheim has specifically indicated that he believes the results from Dr. Gallaudet's 1982 testing of Corey Johnson "may have been so compromised."

Although apparently Dr. Galluadet did not know of Mr. Adams' prior evaluations, the validity of the 1982 results are highly questionable regardless of her knowledge of prior assessments. There is no question that the practice effect elevated Corey Johnson's performance

19

**J.A.167**

on the Gallaudet IQ administration. Moreover, her inexperience, her statement upon reflection that she may have made scoring errors due to the volume of evaluations she was performing during that time, and the assistance she apparently provided to Corey Johnson during the testing all raise serious concerns about the reliability and validity of her results. For all of these reasons, the Full Scale WISC-R IQ score of 85 reported by Dr. Gallaudet cannot be considered to be valid and should be given little or no weight in determining if Mr. Johnson has significant limitations in intellectual functioning.

### E.  Barish WISC-R (1985).

Dr. Kenneth Barish, psychologist for the Pleasantville Cottage School where Mr. Johnson was placed, administered the WISC-R to Mr Johnson in 1985. This test yielded a Full Scale IQ score of 69. Moreover, application of the Flynn Effect correction to this score changes the Full Scale IQ score from 69 to 65.1. Either with or without correction for the Flynn Effect, the results of Dr. Barish's IQ test to Corey Johnson are clearly within the range for concluding that Mr. Johnson had significant limitations in intellectual functioning during the developmental period.

Dr. Barish also engaged in a process of "testing the limits." Testing the limits is done *after* a subtest has been given using the standardized procedures. It involves observing the improvement in performance when re-administering previously failed items giving additional time or hints and prompts to assist the examinee. Even with such assistance, Mr. Johnson's performance did not improve significantly through the testing the limits process and remained well within the intellectual disability range. Dr. Barish's test results make clear that he appropriately used the testing the limits process because he reported completely separate scores without assistance and with assistance.

20

**J.A.168**

Dr. Barish has indicated that he was not aware of Dr. Adams' IQ testing nor was he aware that Dr. Gallaudet's WISC-R testing occurred just four months after Dr. Adams administered the exact same IQ test to Corey Johnson. Dr. Barish's 1985 evaluation report reflects his lack of knowledge. In comparing Dr. Gallaudet's WISC-R Full Scale IQ result of 85 to his WISC-R Full Scale IQ result of 69, Dr. Barish stated: "This decline in IQ scores is difficult to account for." Dr. Barish has indicated that if he had known that these two WISC-R tests (Gallaudet's and Adams's) had been given within such close proximity, he would not have given weight to Dr. Gallaudet's testing and likely would have considered a "mental retardation" diagnosis (the term used at the time) for Corey Johnson.

Dr. Barish's declaration explains his original classification of Mr. Johnson as deficient-borderline in intellectual functioning. He recalled Mr. Johnson as one of the lowest functioning individuals he evaluated in his career. His report indirectly indicated that he followed all standardized procedures rigorously (note the testing the limits results) and his later declaration further verified that he knew Mr. Johnson well at the time of the evaluation and that he recalled him clearly.

Dr. Sakheim was also a colleague of Dr. Barish at Pleasantville. Dr. Sakheim indicates that in comparison to Dr. Gallaudet, Dr. Barish was a more experienced and objective psychologist at the time. His review of Dr. Barish's evaluation report has led him to believe that Dr. Barish's results are sound and more reliable than Dr. Gallaudet's for the reasons described above and because he concludes that Dr. Gallaudet's results may have been artificially inflated due to the practice effect. For all of these reasons, I believe the WISC-R IQ test results obtained by Dr. Barish are valid and reliable measures of Corey Johnson's intellectual functioning.

**F. Cornell WAIS-R (1992).**

21

**J.A.169**

In 1992 after being incarcerated on capital murder charges, Mr. Johnson was administered the Wechsler Adult Intelligence Scale-Revised (WAIS-R: Wechsler, 1981) by Dr. Dewey Cornell, a psychologist retained by Mr. Johnson's trial counsel. The obtained score of 77 by Dr. Cornell was based on normative standards that were 14 years out of date. The Flynn Correction to this score yields a Full Scale IQ of 72.8.

Dr. Cornell did not adjust his WAIS-R IQ test results in Corey Johnson's case for the Flynn Effect. This is not surprising because, while the Flynn Effect is a now a widely understood and accepted scientific fact, broad knowledge of the Flynn Effect and overwhelming scientific support for its existence did not emerge until at least the mid to late 1990s, well after Dr. Cornell's testing and testimony in Mr. Johnson's case. In fact, application of the Flynn Correction to adjust scores to take into account obsolete norms emerged as a practice about 2005, over a decade after Dr. Cornell's evaluation of Corey Johnson. In any event, the Flynn adjusted WAIS-R Full Scale IQ score of 73 places Corey Johnson well within the range significant limitations in intellectual functioning to support a current diagnosis of intellectual disability.

### C. Analysis of Corey Johnson IQ results

Given the history of the Flynn Effect and particularly the fact that it did not become widely discussed within the psychology profession until after the six IQ tests were administered to Mr. Johnson, it is not surprising that corrections for the Flynn Effect were not applied to any of the Wechsler Scales at the time they were administered to Mr. Johnson. The necessity of applying the Flynn Correction now is amply established and I have adjusted Corey Johnson's IQ scores in Table 3 below.

I have summarized Mr. Johnson's performance on tests of intellectual functioning in Table 2, and provide the following opinion of the validity of the six IQ tests administered to him.

**J.A.170**

Two test administrations, by Smith and Gallaudet, clearly are outliers and suffer from significant flaws that undermine their validity. They deserve little if any weight due to significant interference from well-known features that compromise validity: obsolescence of item content (Smith); and practice effects, inappropriate examiner assistance, and possible examiner error (Gallaudet).

Smith's use of the 1949 WISC (normed in 1947) in 1979, a test with item content and norms that were over 30 years out of date, was inappropriate. Those results must be given little if any weight in consideration of Mr. Johnson's intellectual performance.

Gallaudet's WISC-R results obtained in February 1982 likewise must be given little if any weight due to significant flaws that compromise their validity, including practice effects, apparent on subtests most likely to be affected by prior exposure to the test items, and the admitted assistance provided to Corey Johnson during the test administration by an inexperienced examiner. Although the repeat administration of the same test after a short three to four month interval was apparently because Gallaudet was unaware of the recent test administered by Adams, such repeat administration would be indefensible professionally if done knowingly. Similarly, Dr. Gallaudet's WISC-R results are also compromised due to her admitted coaching/assistance to Corey Johnson during her administration of that IQ test, and her acknowledgment that due to her inexperience, she believes she may have made errors in the scoring of his IQ test results.

The remaining four IQ test results, each of which appear to be valid measures of intellectual functioning, establish that Mr. Johnson meets the standard for significant limitations in intellectual functioning based on obtained full-scale scores between 65 and 75 over the course of his life.

23

**J.A.171**

**Table 3. Validity and Summary of Corey Johnson's Intellectual Functioning Results**

| Test | Year | Full-Scale IQ with Flynn Correction | Validity |
|------|------|-------------------------------------|----------|
| WISC-R | 1977 (March) | 71.5 | No threats to validity are apparent. However, subtest scores are not available and thus it is difficult to interpret strengths and weaknesses. |
| WISC | 1979 (May) | 81.4 | Invalid for many reasons. Specifically, obsolete item content, limited normative sample, and obsolete population stratification due to use of 3-decade old test that had been superseded by WISC-R released 5 years before test administered to Corey Johnson. Serious questions exist about examiner experience, competence, and clinical judgment due to choice/use of obsolete test. |
| WISC-R | 1981 (Oct.) | 75.3 | Valid; Norms were 7 years outdated requiring Flynn adjustment. |
| WISC-R | 1982 (Feb.) | 85.3 | Invalid due to large practice effects. Examiner later disclosed she was unaware of October 1981 WISC-R, described her inexperience, and conceded: "I may have made errors in my scoring." |
| WISC-R | 1985 (March) | 65.1 | Valid results from a measure that was administered, scored, and interpreted by a psychologist described as competent and experienced by his supervisor. |
| WAIS-R | 1992 (Oct.) | 72.8 | Valid administration and scoring. Norms were 13 years outdated requiring a Flynn Correction of 4 points. |

Those four Wechsler Scale administrations were at least two standard deviations below the mean (between 65 and 75) using the general SEM of plus or minus five points and with appropriate corrections for the Flynn Effect and were clearly in the range signifying significant limitations in intellectual functioning according to the AAIDD Classification Manual and the DSM-5): (1) Figurelli in 1977; (2) Adams in 1981;[4] (3) Barish in 1985; and (4) Cornell in 1992. Mr. Johnson's valid intellectual performance results were obtained when he was a child (age 8),

---

[4] The actual SEM for the WISC-R administered by Dr. Adams to Corey Johnson, based on Mr. Johnson's age at the time that test was administered to him, was +/- 3.23. If the actual SEM was calculated at the 95 percent confidence interval (+/- 6.46 points), rather than using the general 5 point SEM at the 95 percent confidence interval, the Adams test with a correction for the Flynn Effect would be 68.915 on the low end of the range, which is clearly two standard deviations below the mean and well within the range for significant deficits in intellectual functioning.

24

**J.A.172**

an adolescent (ages 13 and 16), and an adult (age 23), documenting significant limitations in intellectual functioning in childhood through adulthood.

### IV.    Corey Johnson Adaptive Behavior Assessment

My evaluation of the substantial educational, treatment, social services, and other records provided to me has persuaded me that Corey Johnson exhibited significant limitations in all three domains of adaptive behavior that are related to his limitations in intellectual functioning. After reaching my own conclusions, I had an opportunity to review the excellent and comprehensive adaptive behavior report by Dr. Gregory Olley that summarizes the extensive evidence supporting the conclusion that Mr. Johnson had significant adaptive behavior limitations during the developmental period (age birth to 18) that continued into the adult years. I agree with the analysis and conclusions in Dr. Olley's report. I address one further issue regarding adaptive behavior, specifically Mr. Johnson's competencies in the Conceptual Domain including educational performance, literacy, and his public education classification of emotional disturbance or specific learning disability rather than mild intellectual disability.

Adaptive behavior has been organized into different areas or domains in prior authoritative intellectual disability classification systems. The number of areas varied from ten adaptive skills in AAIDD 9th edition (Luckasson et al., 1992), 11 areas in DSM-4 TR (2000) and three broad domains in AAIDD's 10th and 11th editions (Luckasson et al., 2002, 2010 and the Classification Manual respectively) and the DSM-5.

The Conceptual Skills Domain of adaptive behavior is defined in the most recent AAIDD *Classification Manual* as "language; reading and writing; and money, time, and number concepts." In the DSM-5, conceptual skills are defined similarly. DSM-5 at 37. Literacy skills are an important component of both groups' constructs for the Conceptual Domain; indeed,

25

**J.A.173**

inadequate literacy skills establish an enormous barrier to adequate adjustment in the adult years. Failing school performance prior to age 18 is another important indicator of significant limitations in the Conceptual Skills Domain during the developmental period; continuing, life-long deficits in the Conceptual Skills Domain usually follow very poor school performance in literacy skills. Functional intelligence typically is revealed in several adaptive behavior domains, particularly the Conceptual Skills Domain.

### A. Corey Johnson's school performance

Mr. Johnson's severe and chronic achievement problems were apparent early in his school career and continued into his high school and early adult years. Although some of the educational records have been destroyed, likely due to mandatory state legal requirements for purging special education records, sufficient evidence exists to clearly support the conclusion of chronic and severe achievement problems consistent with the classification of mild intellectual disability.

Mr. Johnson experienced consistent academic failure throughout his school career. He was retained multiple times in elementary school, repeating second grade at least three times. Mr. Johnson was in special education from the third grade through the remainder of his school career and he was classified as learning disabled and was never diagnosed as mentally retarded for a number of reasons that I explain below. When in the public school context, Corey Johnson was placed in a self-contained special class, the special education placement used most frequently with students with mild intellectual disability. Students with specific learning disability (SLD) typically were not placed in special self-contained classes where all of the students generally had similar and equally severe disabilities; rather, they were educated in part-time resource-teaching programs for time periods of approximately 40 to 120 minutes.

**J.A.174**

Even when placed in special classes, Mr. Johnson experienced academic failure. Over numerous school reports and teacher observations, Mr. Johnson had very low scores on language measures, including both expressive and receptive components. His reading performance varied little over numerous measures and was extremely low. When he attended the Jersey City Public Schools, Corey Johnson was described as "… having no concept of reading skills. He cannot retain sight vocabulary words." Third graders were expected to read approximately 110 words per minute in third grade reading materials. Mr. Johnson could not come close to this average level of performance. His math Grade Equivalent score on an achievement test at that time was at the first grade, fourth month, also markedly below grade level. There was little variation across his general intellectual functioning and educational achievement in key areas, a significant pattern more consistent with classification as mild intellectual disability than specific learning disability (see later paragraphs).

**B. Corey Johnson's achievement test results as a child**

The scores from standard achievement assessments support the above conclusion about chronic and severe achievement deficits.

**Table 4: Corey Johnson Wide Range Achievement Test Results**

| Date | Age | Administrator | Arithmetic Grade Level/ Percentile | Reading Grade Level/ Percentile | Spelling Grade Level/ Percentile | Word Recognition Grade Level/ Percentile |
|------|-----|---------------|-----------------------------------|--------------------------------|----------------------------------|------------------------------------------|
| 3/25/77 | 8 | Figurelli | 1-44 | | | |
| 5/79 | 10 | Price | 3-9 (Level 1) | | | |
| 2/22/82 | 13 | Klerer | 3 | | 2 | 2 |
| 3/83 | 14 | Barish | 2%[5] (SS[6] 68) | 1% (SS 62) | 1% (SS 64) | |

[5] "Percentile" means the percentile rank which indicates the percentile of people who scored below a particular point, e.g., in Corey Johnson's case, 98% of students of his age scored higher on an arithmetic subtest in 1983.

27

J.A.175

| 7/85 | 15 | Hopper | 3.4 (computation) | | | 3.7 (sight vocabulary) |
|------|-----|--------|-------------------|---|---|------------------------|

In 1981 when he was age 13 his math was about four years behind and his reading about six years below his chronological age. In 1982 on the Gray Oral Reading Test his oral reading and reading comprehension were both at the second grade level, approximately six grade levels below his grade placement. In 1983 at age 16 on the Woodcock Johnson his reading was still at the second grade level, but his math was about 5th grade, still well below expectations for his grade level and chronological age.

The reading, language, and mathematics performance patterns persisted through the school years. Mr. Johnson's skills as they were assessed during his childhood were consistently at an extremely low level and the contemporaneous school and achievement records show that Corey Johnson had significant limitations in language, communication, math and number concepts as a child during his developmental period.

### C. Corey Johnson's achievement test results as an adult.

Mr. Johnson's literacy skills were assessed by Dr. Dewey Cornell in 1993 as part of an evaluation prior to his trial on the charges for which he was convicted. Dr. Cornell used a highly regarded achievement battery, the Woodcock-Johnson Tests of Achievement-Revised. Mr. Johnson obtained Grade Equivalent scores in Broad Reading and Broad Math of 2.5 and 5.9. While there was a minor discrepancy between these results, it is important to understand that this discrepancy does not meet the definition of nor support a conclusion that Corey Johnson was learning disabled (see Section V.A below for a detailed discussion). In order to classify a learning disability, "a child [must have] a severe discrepancy between achievement and intellectual ability." Reschly & Hosp, 2004; 34 C.F.R. 300.541. It is understandable that Dr.

---

[6] "SS" refers to standard scores on a scale with a mean of 100 and a standard deviation of 15.

**J.A.176**

Cornell likely interpreted this discrepancy as a sign of a learning disability because he did not apply the State of Virginia or the typical US criteria for a learning disability diagnosis.

Dr. Cornell also did not know about the severe practice effect that distorted the results of Gallaudet IQ tests. He did not discuss Dr. Adams or his evaluation at all in his report or his testimony during Corey Johnson's death penalty hearing, and the list of records he reviewed likewise does not include any materials from Adams. The only prior IQ tests that he reviewed were the 1982 Gallaudet, which his records describe as Mr. Johnson's first psychological evaluation, and the 1985 Barish test, which Dr. Cornell's records describe as Corey's second psychological evaluation. Thus, Dr. Cornell had no context to appreciate why Dr. Barish (who was also not aware of the recent prior WISC-R administration by Adams) did not conclude that Corey Johnson was intellectually disabled despite Barish's WISC-R results, which placed Mr. Johnson solidly in the intellectual disability range.

In any event, Mr. Johnson's broad reading and broad math scores on the achievement tests administered by Dr. Cornell (shown in Table 5 below) placed him well below basic adult literacy and math levels. On a language test Mr. Johnson scored at the second percentile, or to put it differently, 98% of a representative sample from the general population had language skills above his level.

**Table 5: Corey Johnson Woodcock-Johnson Revised Results from January 1993 (age 23)**

| Test Name | Age | Raw Score | Age Equivalent | Grade Equivalent[7] |
|---|---|---|---|---|
| **Letter-Word Identification** | 23 | 30 | 7-11 | 2.4 |
| **Passage Comprehension** | 23 | 15 | 8-1 | 2.6 |
| **Calculation** | 23 | 28 | 12-2 | 6.7 |

---

[7] GE stands for Grade Equivalent. The GE indicates that the score is at the level obtained by children with a specified amount of school experience. A GE of 3.4 means that the individual has obtained a score at the average of persons in third grade, in the fourth month of the year.

29

J.A.177

| Applied Problems | 23 | 33 | 10-4 | 4.9 |
|---|---|---|---|---|
| Broad Reading | 23 | | 7-10 | 2.5 |
| Broad Math | 23 | | 11-3 | 5.9 |

Mr. Johnson's recent achievement results on a test I administered mirror the clear documentation of comprehensive deficits in his educational records from his childhood. In Table 6, Mr. Johnson's achievement results are summarized from the Woodcock-Johnson Tests of Achievement (3rd Ed.) Standard Battery (WJ-3) Woodcock, McGrew, & Mather, 2001) administered by me on July 30, 2014 during my evaluation at USP Terre Haute.

**Table 6: Corey Johnson Woodcock Johnson III Results, July 2014 (Age 46)**

| Achievement Cluster[8] | Standard Score | Grade Equivalent |
|---|---|---|
| Broad Written Language | 74 | 2.8 |
| Oral Language | 83 | 3.5 |
| Broad Reading | 76 | 4.1 |
| Broad Math | 89 | 8.2 |
| Total Achievement | 77 | 4.6 |

Mr. Johnson's achievement test results from 1993 and 2014 are remarkably consistent and reflect scores substantially below his grade level. Most important, Corey Johnson's achievement test results when he was 23 and 46 years old respectively are not consistent with someone with a learning disability because they are not unexpected given his intellectual functioning as measured by his IQ tests. In order to diagnose someone with a learning disability, there must be a severe discrepancy between achievement and intellectual ability. Put another way, a person with a learning disability demonstrates unexpected low achievement in one or more areas than would be anticipated by assessments of the individual's intellectual functioning.

---

[8] Note: Woodcock Johnson-III Achievement Cluster scores are composed of two or more subtests as follows: (a) Broad Written Language is composed of Writing Samples, Spelling, and Writing Fluency; (b) Oral Language is composed of Understanding Directions and Story Recall; (c) Broad Reading is composed of Letter-Word Identification, Reading Fluency, and Passage Comprehension; (d) Broad Math is composed of Calculation, Math Fluency, and Applied Problems; (e) Total Achievement is composed of summary or composite score of the Woodcock Johnson-III subtest scores.

30

J.A.178

In Corey Johnson's case, his summary scores are extremely low except for his performance in Broad Mathematics. The highest score in this domain (GE 8.2, standard score 89) represents the results of the many years Mr. Johnson has studied the General Educational Diploma (GED) educational materials; Mr. Johnson reported to me and prison records support his statement that he has been studying for working toward his GED for 20 years. However, prison records show that Mr. Johnson has not advanced beyond the pre-GED phase and, therefore, he has never attempted to take the GED exam. Mr. Johnson brought his GED study materials to my evaluation. While he has made some progress in mathematics, particularly in simple calculations, he continues to have difficulty with fractions, decimals, negative numbers, and percentages, which are more conceptual and complicated math skills. The mathematics materials he was studying appeared to be at about the 7th to 8th grade levels. However, this must be put in context. Prison records show that Mr. Johnson has been practicing these broad math skills (basic arithmetic problems) consistently for several decades. Thus, while Mr. Johnson has done relatively better in simple math calculations than in other areas, his achievement in that area is not unexpected and is consistent with his significant limitations in intellectual functioning.

Mr. Johnson's 1993 and 2014 scores in language based achievement domains show little improvement. He obtained scores at the second to fourth grades levels in Broad Written Language (GE 2.8), Oral Language (GE 3.5), and Broad Reading (GE 4.1) despite concentrated efforts over many years to prepare for the GED. My review of the GED reading and grammar materials he was studying showed he was at a level involving basic parts of a sentence and reading materials at or below the fourth grade level. It appears from examining the GED preparation materials including the unit tests associated with the program that Mr. Johnson has

31

**J.A.179**

worked very hard to improve his literacy and numeracy skills. Despite his concerted efforts, his total achievement remains at the grade level of fourth grade sixth month, an overall level typical of adults with mild intellectual disability. Reschly (2013).

The materials I reviewed have convinced me that Mr. Johnson has significant limitations in the Conceptual Domain of adaptive behavior that appeared early in his life and continue to the present. Moreover, ample evidence gathered and summarized by Dr. Gregory Olley document Mr. Johnson's deficits with concepts of money, time, and numbers. It is critical to understand that these deficits emerged early and continued through the time of the crimes he committed.

Significant limitations in one of the three adaptive domains is sufficient to meet the adaptive behavior prong of the AAIDD 11th and DSM-5 intellectual disability classification criteria. Based on Mr. Johnson's limitations in the Conceptual Domain he meets the adaptive behavior prong of the intellectual disability classification. Mr. Johnson also has significant limitations in the Social and Practical Domains.

## V.    Analysis of Corey Johnson's Childhood Diagnosis of Severe Learning Disability

While Mr. Johnson meets all of the criteria for intellectual disability, he was not diagnosed as a child with mental retardation. Instead, at various times in his childhood, Mr. Johnson was diagnosed as severely learning disabled even though he did not meet the common classification criteria for specific learning disability—*unexplained* low achievement—that dominated SLD classification in the US from 1977 to 2006. Nor does he meet the definition for learning disabled today.

**J.A.180**

### A. Learning disability classification

Achievement expectations related to specific learning disability can be established in a number of ways; however, the principal method in the US from 1977 through 2006 was the student's performance on achievement measures in defined areas and an individually administered test of general intellectual functioning such as the Wechsler or Stanford-Binet battery of tests. The key phrase in Federal and state legislation was the requirement that "a child has a severe discrepancy between achievement and intellectual ability" in one of seven specified areas of achievement (Reschly & Hosp, 2004; 34 C.F.R. 300.541). The achievement had to be at a level below intellectual ability that constituted a severe discrepancy.

### B. Corey Johnson does not have a learning disability

Careful examination of Mr. Johnson's intellectual ability and achievement during his school age years *fails* to meet the requirement of achievement significantly *below* his intellectual ability. In fact, Mr. Johnson's record involving multiple measures of achievement and intellectual functioning revealed that his achievement was commensurate with his intellectual ability. Mr. Johnson did not meet the classification criteria for SLD.

#### 1. Corey Johnson's IQ results are not consistent with learning disability

As discussed in earlier sections of this report, Mr. Johnson's IQ test results are consistent with intellectual disability and are not consistent with specific learning disability despite some variation across some of his subtest scores. Significant variation across the Wechsler subtest scores is typical for persons of *all* levels of intellectual ability, including persons with mild Intellectual Disability. As noted in the authoritative source AAIDD Classification Manual at p. 7, "Within an individual, limitations often coexist with strengths." This statement also is true of the intellectual and educational performance of persons with mild intellectual disability.

33

**J.A.181**

A finding of variability in an individual's sub-test scores has often led to the erroneous diagnosis of learning disability. This is because the typical profile for *groups* of people with intellectual disability (not individuals) is flat (relatively consistent scores showing little variability). However, the *individual* profiles of persons with mild intellectual disability typically show considerable variability across subtests or scale scores on a comprehensive test battery such as the Wechsler series of intellectual ability measures. Bergeron & Floyd, 2013.[9] The finding of considerable variability in the individual profiles of persons with mild intellectual disability requires re-examination of many prior interpretations of the performance of persons diagnosed as borderline rather than mild intellectual disability.

In addition to the variability in subtest scores due to an individual with intellectual disability's strengths and weaknesses, variability is also due to the Wechsler IQ test instruments themselves. Subtest scatter, that is, differences between Wechsler Scales subtest scores, should not be over-interpreted because a large component of the difference scores found by subtracting one subtest score from another is due to error.[10] The Wechsler subtests scores are on a standard score scale with a mean of ten and standard deviation of three. For example the difference between hypothetical scores for Vocabulary (8) and for Block Design (4) seems like a large difference. In fact, many children, youth, and adults have score differences of this and greater magnitude. Such variations are not unusual among the general population and persons with mild intellectual disability. Moreover, difference scores are less reliable than either of the scores that are compared. Cronbach, 1984, pp. 237, 312-314.

---

[9] Similarly, persons in the average range of ability (not those with mild intellectual disability) also show flat profiles as a group. But considerable variability has been known to exist for about 40 years in typical *individual* profiles of persons with average ability. Kaufman, 1976a, b.
[10] A difference score is a variable that has been formed by subtracting one variable from another.

34

J.A.182

Corey Johnson's performance appears to be a case on point. He had considerable variability across the components of intellectual measures that likely influenced interpretations that he was learning disabled rather than a person with intellectual disability. But, most critically to the proper conclusion that Corey Johnson did not have a learning disability but instead has a mild intellectual disability, Mr. Johnson never displayed *unexpected* low achievement, the most salient feature of the specific learning disability (see later paragraph). Put another way, Corey Johnson never exhibited a significant discrepancy between his IQ and his achievement, which in 1992 was the accepted federal definition of a learning disability. Code of Federal Regulations; Reschly & Hosp (2004). My review of the records suggests that Dr. Cornell interpreted Corey Johnson's 1992 performance on the WAIS-R as borderline performance for a number of reasons. The records he reviewed for Corey Johnson did not contain the October 1981 WISC-R results for the IQ testing administered by Adams and, therefore, he was not aware of the significant practice effect that artificially elevated the results of the Gallaudet testing just four months later. In fact, Dr. Cornell quoted in the materials he prepared as part of his evaluation of Corey Johnson Dr. Barish's discussion of the IQ results Barish obtained: "These scores reflect a significant decline since Corey was tested in 1982 [by Gallaudet] . . . . This decline is difficult to account for." What neither Barish nor Cornell appreciated was that the IQ test results from Gallaudet's administration were dramatically artificially inflated because of the practice effect. So the decline Barish observed in Corey Johnson's IQ results was due to severe practice effect from the administration of the identical IQ test twice within four months. In reality, there was no significant difference between Adams' IQ testing and Barish's and both should have led to the consideration of Corey Johnson's adaptive functioning deficits and to the conclusion that Corey

35

**J.A.183**

Johnson was likely intellectually disabled.  That did not occur because neither Gallaudet nor Barish were aware of the Adams IQ testing shortly before Gallaudet's.

And, of course, Gallaudet's report notes that she refocused Corey on task, and that inappropriate assistance by an inexperienced practitioner most certainly skewed the results and inflated Corey Johnson's performance on the 1982 IQ test, as did the practice effect.  Thus, considered in isolation, the Gallaudet scores clearly appeared to Barish and to Cornell to be outside of the intellectual disability range when, in fact, the Adams, Barish, and Cornell IQ results were within the intellectual disability range.

Dr. Cornell also did not adjust his WAIS-R results for the Flynn Effect, which is not surprising since the Flynn Effect was not widely understood in the early 1990s; such an adjustment alone would have placed Dr. Cornell's WAIS-R results clearly within the intellectual disability range, but without the proper Flynn adjustment, those results and the Gallaudet erroneously appeared more consistent with a learning disability diagnosis rather than an intellectual disability diagnosis.

### 2. Corey Johnson performed best on outdated subtests with weak correlations with general intelligence

We now know that typical variability across subtests for average performers *also* applies equally to persons with mild intellectual disability.  Bergeron & Floyd, 2013.  Variability across subtests should be expected both with persons scoring in the average range and in the extremely low range of intellectual ability.  While the Object Assembly subtest is one of the performance scales that typically show the largest practice effect on studies of practice effects on the Wechsler Scales, it is critical to understand the Object Assembly and Picture Arrangement

36

subtests, the ones on which Corey Johnson performed best, are the WAIS-R performance tests that constituted relatively weak measures of general intelligence.

Moreover, for the most recent update of the Wechsler Adult Intelligence Scale (4th Ed.) (WAIS IV; Wechsler, 2008) these subtests were either deleted (Object Assembly), placed in a category of supplemental tests (Picture Arrangement), or reorganized into a third scale, (Processing Speed), that has a lower relationship to general intellectual functioning (Wechsler, 2008). Notably, these weaker subtests all appeared on the WAIS-R Performance Scale where Mr. Johnson obtained a higher score of 82. Thus, the Performance Scale subtests on which Corey Johnson produced the highest scores have been deleted or marginalized in the newer versions of the WAIS, because they have been shown to have less validity as measures of general intellectual functioning than previously believed.

When all of Corey Johnson's valid and reliable IQ test administrations are considered and the results properly corrected and when those results are compared to his achievement, it becomes clear that Corey Johnson does not meet and never met the learning disability diagnostic criteria. Instead, his valid IQ tests show that he had significant limitations in intellectual functioning, satisfying the intellectual functioning prong of the intellectual disability diagnosis. Moreover, my analysis of Corey Johnson's adaptive functioning, which is consistent with the comprehensive and detailed evaluation by Greg Olley, persuades me that Mr. Johnson has significant limitations in all three domains of adaptive behavior. As noted in authoritative sources, significant limitations in just one of the three critical domains meets the second prong for a classification of intellectual disability. Mr. Johnson's across the board impairments in adaptive functioning are also inconsistent with a diagnosis of learning disability. Finally, my review of all of the information related to Corey Johnson shows that his significant limitations in

37

**J.A.185**

intellectual and adaptive functioning began during the developmental period and persisted into adulthood.

### 3. Corey Johnson's diagnosis had little significance to his educational services

As a practical matter the classification of specific learning disability rather than mild intellectual disability made little or no difference in the special education services delivered to Mr. Johnson. For most of Mr. Johnson's career he was essentially in a self-contained special education class with speech therapy services, rather than a part-time resource program for students with learning disabilities. Yet, despite significant resources, a range of educational services and varied strategies devoted to supporting his learning, Corey Johnson did not advance, his performance improved only marginally while his peers surpassed him, and, thus, he fell further and further behind. Moreover, it is important to note that these types of self-contained classrooms were mostly used during this time period for students with intellectual disabilities, not children with learning disabilities. Regardless of whether students were classified as intellectually disabled (or at that time, as mentally retarded) or as learning disabled, the self-contained classroom setting was the manner for educating students with intellectual disabilities in that era. Children in such classes, regardless of diagnosis or clinical classification, received the same range of services. Given the controversy that raged around the over-classification of black students as mentally retarded (discussed below), the Bureau of Child Guidance (the New York City agency responsible for evaluating special education students) shied away from labeling students as "mentally retarded" at that time.

### C. Factors that led to the reduction in the classification of with mental retardation during the period starting in the 1960s through the 1980s

Some further context is needed to explain why Mr. Johnson was not identified by school personnel as a child with mild intellectual disability even though his educational performance

38

**J.A.186**

and his scores on valid tests of general intellectual functioning would have been more consistent with intellectual disability rather than specific learning disability. Mr. Johnson was classified as "severe[ly]" learning disability at several different times as reflected in his school records, and by the staff at the Pleasantville residential facility. There is no differentiation of levels of specific learning disability in any special education classification system at the federal or state level (Mercer, King-Sears, & Mercer, 1990; Reschly & Hosp, 2004). When the adjective "severe" was attached to specific learning disability it often denoted a set of symptoms consistent with mild intellectual disability, for reasons that are explained below.

Mild intellectual disability was the most frequent classification of children served in special education programs in the first 75 years of the 20th century. Moreover, minority children, particularly African American children, were overrepresented in their classification as intellectually disabled (or, as they were classified at the time, mentally retarded) compared to their percentage in the population. However, a number of factors—including policy and practice changes, public attention brought on by litigation and advocacy efforts, and other reasons—modified this pattern beginning in the early 1970s and led to rapid reductions in the number of children and youth diagnosed with mild intellectual disability. And, as part of that rapid reduction and because of a public outcry about the overrepresentation of black students classified as intellectually disabled, schools and psychologists began to avoid the classification of children as having mild intellectual disabilities, and specifically, avoided classifying children with mild intellectual disability as mentally retarded.

### 1.  The national growth of the specific learning disability classification

Specific learning disability (SLD) was emerging as a special education category in some states and in federal legislation in the late 1960s and early 1970s. It was incorporated into

39

**J.A.187**

Federal mandatory special education law (Education of All Handicapped Children Act, 1975) after considerable controversy in Congress about identification procedures and likely prevalence (Reschly & Hosp, 2004; Federal Register, 1976, 1977).

SLD was approved and adopted by the states in the mid to late 1970s, producing an immediate impact on the classification of children with mild intellectual disability and SLD. In only four years, 1976 to 1980, SLD surpassed intellectual disability prevalence at a time when children and youth with more severe levels of intellectual disability were gaining access to the public schools for the first time. Reschly (2013). The national pattern of increasing classification of specific learning disability and declining classification of mild intellectual disability is represented in Figure 1. From 1976 to 2000 SLD increased steadily and dramatically while intellectual disability declined significantly. The national trend remained relatively stable from 2000 to 2010, with SLD continuing to be far more common than intellectual disability in special education classification.



Even though during this period more children with severe levels of ID were gaining access to the public schools, the prevalence of intellectual disability classifications overall was

40

J.A.188

declining.  This meant that the classification of children with mild intellectual disability was declining even more rapidly, and thus the decline in the number of children classified as having mild intellectual disability during this period was even larger than the depiction in Figure 1.

Modern research studies have consistently shown that beginning in the 1970s, as many as one-third of children diagnosed by schools as having a learning disability actually met the clinical criteria for mild intellectual disability.  Gottlieb, J.C. Alter, M. Gottliebe, B.W. & Wischner, J.  Special education in urban America: It's not justifiable for many.  The Journal of Special Education, 27, 457-465; Gottlieb, J. Alter, M. & Gottlieb, B.W.  Mainstreaming academically handicapped children in urban school districts.  In A.C. Repp, J. Lloyd, and N. Singh (Eds.) The Regular Education Initiative. DeKalb, IL; Sycamore Press. 1992; MacMillan, Gresham & Bocian, (1998); Donald L. MacMillan and Gary N. Siperstein, Learning Disabilities as Operationally Defined by Schools (2002); McMillan, Siperstein, Leffert,  "Children with Mental Retardation: A Challenge for Classification Practices" (2006).

**2.  Similar trend to classify children as learning disabled in New York City**

The same general pattern that developed nationally is apparent in the classification of students for special education services in New York (see Figure 2).  These changes in policies and practices likely explain why Corey Johnson was classified as a child with SLD while he was in the New York City Public Schools rather than mentally retarded or educable mentally retarded, terms used by the school district when Mr. Johnson was in the New York City public schools.  The number of students classified as specific learning disabled (SLD) increased dramatically from 1976-77 to 1990-91, then leveled off over the last 20 years.  In sharp contrast, the number of students in New York classified with intellectual disability declined significantly

41

**J.A.189**

from 1976-77 through 2010-11. The disability identification trends in the US and New York likely influenced the decisions regarding Mr. Johnson's special education classification.



**Figure 2:**
**Number of Students Classified as ID and SLD in New York by Year**

The movement away from mild intellectual disability to SLD was especially strong in urban school districts and with African-American children and youth. Further enforcing the national trends away from mild ID was the *Jose P.* and *Lora* litigation that led to a judgment concluding that the New York City Public Schools were seriously out of compliance in implementing the Education of the Handicapped Act of 1975, including the nondiscrimination provisions (Jose P., 1979, 1980; Lora v. Board of Education, 1978, 1980, 1984). The combined judicial orders placed intense pressure on the system and school psychologists to meet timelines, address language differences, avoid discrimination in assessment and overrepresentation of minority students in special education. The same trends in special education toward greater use of SLD and markedly diminished use of intellectual disability were apparent in both public and private schools in New York and overall in the US.

In an Appendix to *Lora* (1984) the court approved a statement on *Nondiscriminatory Standards and Procedures* that even by contemporary standards is well conceived and

42

constructive. These standards and the various decisions in *Lora* were concerned with fair assessment of minority students and avoidance of minority overrepresentation in special education programs, particularly mild intellectual disability and emotional disturbance. These standards, however, specify aspirations for improved assessment and decision making that are not easily applied to all cases and situations. The inherent ambiguity in the standards and the continuing *Jose P.* and *Lora* litigation and court ordered monitoring of the New York City special education practices created a situation where personnel were reluctant to make decisions that might be rejected by parents or be seen as discriminatory toward minority students. As a black student in an urban school district, Mr. Johnson presented the kind of case most likely to be influenced by the legal requirements that contributed to the large decline in mild intellectual disability identification in the late 1970s, 1980s and 1990s.

Due to political and social pressures and the desire not to stigmatize children with labels carrying perceived negative consequences, many schools and school districts simply stopped using the mental retardation label for children in the educational system. As noted previously, this development had little impact on how those children were taught or the programs made available to them so, from the schools viewpoint, there was little significance to classifying children as learning disabled rather than mentally retarded.

This phenomena was recognized by leading national organizations in the field. The National Research Council Panel report, *Mental retardation: Determining eligibility for social security benefits* (Reschly, Myers, & Hartel, 2002) expressed concern about the unreliability of public school assigned disability labels. The problem for the panel was how to interpret school-based diagnoses of SLD when the data developed by the school were more consistent with the mild intellectual disability classification. This question pertained directly to whether a person

43

**J.A.191**

with a school classification of SLD met the developmental origin criterion for mild intellectual disability.

The panel reviewed extensive evidence on school-assigned disability categories and concluded that school assigned diagnoses were unreliable, particularly with regard to mild intellectual disability. The panel recommended paying close attention to school generated data on achievement, intellectual functioning, and behavior in decisions about the SSI eligibility of children and adults for mild intellectual disability classification, but to largely ignore the actual disability assigned by school teams.

My evaluation suggests a number of factors that led Corey Johnson to be erroneously classified as learning disabled during his school years rather than the correct classification as mentally retarded (or now, intellectually disabled). Several of the early IQ tests administered to him were flawed due to poor choice of instrument, examiner inexperience and inappropriate assistance provided during testing, and the lack of awareness of the recent prior administration of the identical test by subsequent examiners. The lack of appreciation of the need to correct for normed obsolescence at the time Corey Johnson's IQ tests were being interpreted (since Flynn did not first publish his research until after Mr. Johnson's last IQ test as an adolescent) played a significant role, and combined with the flaws in some of the tests obscured the strong evidence that mental retardation was the appropriate classification. Finally, the reluctance to label school children, particularly minority school children like Corey Johnson, with mental retardation also very likely led to the alternate, and erroneous classification of him as severely learning disabled which, as I noted above, has no educational meaning and was a euphemism for mental retardation.

## VI. Summary and Conclusions

44

Mr. Johnson is a person with mild intellectual disability as conceptualized and defined by the AAIDD Classification Manual and the DSM-5. Significant limitations in intellectual functioning and adaptive behavior existed during child, adolescent, and adult years. He is by definition and classification criteria a person with intellectual disabilities.

_____

Daniel J. Reschly, Ph.D.
Professor Education and Psychology Emeritus
Vanderbilt University

8-26-2016
Date

J.A.193

## References Cited in Report

American Association on Intellectual and Developmental Disabilities (2010). *Intellectual disability: Definition, classification, and systems of supports.* Washington DC: Author. (Note also cited as Schalock et al., 2010.)

American Psychiatric Association. (2013). *Diagnostic and statistical manual of mental disorders (5th ed.)* Washington, DC: Author.

*Atkins v. Virginia,* 536 U.S. S. Ct. 304 (2002).

Bergeron, R., & Floyd, R. G. (2013). Individual part score profiles of children with intellectual disability: A descriptive analysis across three intelligence tests. *School Psychology Review, 42,* 22-38.

Calamia, M. Markon, K., & Tranel, D. (2012). Second time around: Meta-analyses of practice effects in neuropsychological assessment. *Clinical Neuropsychologist, 26(4),* 543-570.

Campione, J. C., Brown, A. L., & Ferrara, R. A. (1982). Mental retardation and intelligence. In R. J. Sternberg (Ed.), *Handbook of Human Intelligence* (pp. 392- 490). Cambridge, England: Cambridge University Press.

Campione, J. C., Brown, A. L., Ferrara, R. A., & Bryant, N. R. (1985). Breakdowns in flexible use of information: Intelligence-related differences in transfer following equivalent learning performances. *Intelligence, 9,* 297-315.

Cronbach, L. J. (1984). *Essentials of psychological testing* (4th Ed.). New York: Harper & Row.

Duvall, J. C., & Morris, R. J. (2006). Assessing mental retardation in death penalty cases: Critical issues for psychology and psychological practice. *Professional Psychology: Research and Practice, 37,* 658-665.

*Federal Register* (1976). Assistance to states for education of handicapped children: Notice of proposed rulemaking. November 29, *41*(230), pp. 52404-52407.

Federal Register (1977). Procedures for evaluating specific learning disabilities. December 29, 42(250), pp. 65082-65085.

Flynn, J. R. (1984). The mean IQ of Americans: Massive gains 1932 to 1978. *Psychological Bulletin, 95, 29-51.*

Flynn, J. R. (1998). IQ gains over time: Toward finding the causes. In U. Neisser (Ed.), *The rising curve: Long-term gains in IQ and related measures* (pp. 25-66). Washington DC: American Psychological Association.

Flynn, J. R. (2012). *Are we getting smarter? Rising IQ in the twenty-first century.* Cambridge, England: Cambridge University Press.

46

J.A.194

Grossman, H. (Ed.). (1973). *Manual on terminology and classification in mental retardation.* Washington, DE: American Association on Mental Deficiency. Also 1977 revision.

Grossman, H. J. (Ed.) (1983). *Classification in mental retardation.* Washington D.C.: American Association on Mental Deficiency.

*Hall v. Florida,* 134 S. Ct. 1986 (2014).

*Jose P. v. Ambach,* 557 F. Supp. 1230 (E.D.N.Y. 1979, 1980, 1983).

Kaufman, A. (1976a). A new approach to interpretation of test scatter on the WISC-R. *Journal of Learning Disabilities, 9,* 160-168.

Kaufman, A. (1976b). Verbal performance IQ discrepancies on the WISC-R. *Journal of Consulting and Clinical Psychology, 44,* 739-744.

*Lora v. Board of Education, 456 F. Supp. 1211 (E.D.N.Y. 1978, 1980, 1984)*

Luckasson, R., Borthwick-Duffy, S., Buntinx, W. H. E., Coulter, D. L., Craig, E. M., Reeve, A., Schalock, R. L., Snell, M. E., Spitalnik, D. M., & Spreat, S., & Tasse, M. J. (2002). *Mental retardation: Definition, classification, and systems of support* (10th Ed.) Washington DC: American Association on Mental Retardation.

Luckasson, R., Coulter, D. L., Polloway, E. A., Reiss, S., Schalock, R. L., Snell, M. E., Spitalnik, D. M., & Stark, J. A. (1992). *Mental retardation: Definition, classification, and systems of support* (9th Ed.) Washington DC: American Association on Mental Retardation.

Mercer, C. D., King-Sears, P., & Mercer, A. R. (1990). Learning disabilities definitions and criteria used by state education departments. *Learning Disability Quarterly, 13,* 141-152.

Pietschnig, J., & Voracek, M. (2015). One century of global IQ gains: A formal meta-analysis of the Flynn Effect. *Perspectives on Psychological Science, 10, 282-306.*

Reschly, D. J. (1987). Learning characteristics of mildly handicapped students: Implications for classification, placement, and programming. In M. C. Wang, M. C. Reynolds, & H. J. Walberg (Eds.), *The handbook of special education: Research and practice* (Vol. I)(pp. 35-58). Oxford, England: Pergamon Press.

Reschly, D. J., & Hosp, J. L. (2004) State SLD policies and practices. *Learning Disability Quarterly, 27,* 197-213.

Reschly, D. J., Myers, T. G., & Hartel, C. R. (Eds.) (2002). *Mental retardation: Determining eligibility for social security benefits.* Washington DC: National Academy Press. http://www.nap.edu/catalog/10295.html?se_side

Schalock, R. L., Borthwick-Duffy, S. L., Bradley, V. J., Buntinx, W. H. E., Coulter, D. L., Craig, E. M., Gomez, S. C., Lachapelle, Y., Luckasson, R., Reeve, A., Shogren, K. A., Snell, M. E., Spreat, S., Tasse, M. J., Thompson, J. R., Verdugo-Alonso, M. A., Wehmeyer, M. L.,

J.A.195

& Yeager, M. H. (2010). *Intellectual disability: Definition, classification, and system of supports* (11th Ed.). Washington D. C.: American Association on Intellectual and Developmental Disability.

Schalock, R. L., Luckasson, R., Bradley, V., Buntinx, W., Lachapelle, Y., Shogren, K. A., .....Wehmeyer, M. (2012). *User's guide: Mental retardation definition, classification, and systems of support.* Washington DC: American Association on Intellectual and Developmental Disabilities.

Schalock, R. L., Buntinx, W. H. E., Borthwick-Duffy, S. L., Luckasson, R., Snell, M. E., Tasse, M. J., & Wehmeyer, M. (2007). *User's guide: Mental retardation definition, classification, and systems of support.* Washington DC: American Association on Intellectual and Developmental Disabilities.

Snell, M. E., & Luckasson, R. with Borthwick-Duffy, S., Bradley, V., Buntix, W. H. E. .....Yeager, M. H. (2009). Characteristics and needs of people with intellectual disability who have higher IQs. *Intellectual and Developmental Disabilities, 47,* 220-233.

*Standards for educational and psychological testing* (2014), Washington DC: American Educational Research Association. (Prepared by the Joint Committee on Standards for Educational and Psychological Testing of the American Educational Research Association, American Psychological Association and National Council on Measurement in Education).

Trahan, L. H., Stuebing, K. K., Fletcher, J. M., & Hiscock, M. (2014). The Flynn Effect: A meta-analysis. *Psychological Bulletin, 140, 1332-1360.*

Wechsler, D. (1949). *Manual Wechsler Intelligence Scale for Children.* San Antonio, TX: Psychological Corporation.

Wechsler, D. (1974). Manual for the Wechsler Intelligence Scale for Children-Revised. San Antonio, TX: Psychological Corporation.

Wechsler, D. (1981). *Manual for the Wechsler Adult Intelligence Scale-Revised.* San Antonio, TX: Psychological Corporation.

Wechsler, D. (2008). *Wechsler Adult Intelligence Scale-Fourth Edition.* San Antonio, TX: Psychological Corporation.

Woodcock, R. W., McGrew, K. S., & Mather, N. (2001). <u>*Woodcock-Johnson Tests of Achievement III-Third Edition (WJ-3)*</u>. Itasca, IL: Riverside Publishing.

J.A.196

Appendix B
Sources Used in Report

In addition to the references previously cited, the following sources were considered in preparing this report.

- Notes by social worker, Bureau of Child Guidance, Upper West Side, 1978.
- Social History Report, Bureau of Child Guidance, Upper West Side, March 1977.
- Bureau of Special Service, Jersey City Public Schools, March 1977 evaluation including Learning Consultant Evaluation Report, March 1977; Psychological Examination Record, March 1977; Psychiatric Examination Record, March 1977; Progress Notes, November-December, 1978. (WISC-R administered by Jennifer Figurelli).
- Referral to Committee on the Handicapped, New York City Public Schools, February 1979.
- Evaluation Unit handwritten report, West Manhattan Center, New York Public Schools, May 1979. (WISC administered by Nathalie Smith).
- Psychodiagnostic Evaluation, Council's Center for Problems in Living, December 1981. (WISC-R administered by Earnest Adams).
- Pleasantville Cottage School in February, 1982: Psychological Evaluation, Psychiatric Evaluation, Screening Upon Admission (Educational Testing), Psychosocial Summary, Conference Summary, (WISC-R administered by Cary Gallaudet).
- Pleasantville Cottage School: January 1983 Current Assessment Report.
- Pleasantville Cottage School: Psychological and Education Evaluation (March 1983), Psychiatric Evaluation (September 1983, Speech and Language Evaluation (September-October 1983), Current Assessment Summary (December 1983).
- Pleasantville Cottage School: Psychiatric Evaluation (June-December 1984); Grades in subjects (1984-85), Speech and Language Evaluation (September-October 1983), Current Assessment Summary (August 1984), Social History Report (March 1985).
- Psychological Evaluation, Pleasantville Cottage School in March, 1985 (WISC-R administered by Kenneth Barish).
- Jewish Child Care Association JCCA) of New York, Group Home Division, Initial Treatment and Service Plan (June-July 1985); Three Month Conference Note (September 1985).
- New York City Foster Care Review (June 1986). Newtown High School note regarding special education (n.d., likely 1986), Odette Noble note regarding counseling (June 1986).
- Psychological Evaluation, October 1992 (WAIS-R, Test of Written Language, Woodcock-Johnson-Revised, and Millon Clinical Multiaxial Inventory II, administered by Dewey Cornell)
- Dewey C. Cornell vita (n.d., approximately 1992).
- WAIS-R Record Form, evaluation October 1992).
- Dewey C. Cornell correspondence with Craig S. Cooley and others regarding arrangements for the evaluation and evaluation results (October 1992 through January 1993).
- Neuropsychological Services of Virginia Neuropsychological Evaluation (January 1993)

57

**J.A.197**

Case 3:92-cr-00068-DJN   Document 86-2   Filed 12/14/20   Page 51 of 51 PageID# 2380

- Phone Interviews with JCCA staff regarding their recollections of Corey Johnson, Jerry Lefkowitz, John Stadler, Kenneth Barish, Elizabeth Clemmons, Odette Noble, and Christine Aron (Phone conversation, January 1993).
- Mitigation Report by Dewey C. Cornell (January-February 1993).
- Gary N. Siperstein correspondence with Lisa Greenman (January 2008).
- Kenneth Barish correspondence with Lisa Greenman (February 2008).
- Dewey C. Cornell testimony in Corey Johnson trial (n.d.)
- US Department of Justice, FBI Identification Division, Corey Johnson legal violations history (April 1991).
- Gregory Olley Adaptive Behavior Report regarding Corey Johnson (March 2012).
- JCCA Child Care Book I (pp. 1-110), Book II (pp. 111-480), Book III (pp. 481-692), Book IV (pp. 693-986).
- Affidavits signed and notarized by Ernest Adams, Kenneth Barish, Ammon Brown, Darnell Brown, Darold Brown, Ann Butler, Robert Butler, Courtney Daniels, Monica Dawkins, Cary Gallaudet, Ann Harding, Sonya Hilton, Minnie Hodges, Priscilla Hodges, Queenie Hodges, Esther Johnson, Robert Johnson Antoinette Daniels Joseph, King Salim Abdullah Khafani, Leona Llerer, Kevin Koger, Gerald Lefkowitz, Julie McConnell, Odette Noble, George Sakheim, Holly Scott, Mary Sitgraves, Elizabeth Sykes, James Sykes, David Washington, Bobby West, Sarah Jane Woodson West, Darryl Williams.

**J.A.198**

# EXHIBIT 1(a)

Rev. 5-15-20

DANIEL J. RESCHLY

## Biographical Summary

Dan Reschly is Professor of Education and Psychology Emeritus in Peabody College, Vanderbilt University where he Chaired Department of Special Education from 1998-2006, gaining the #1 national ranking for the first time in 2003. From 1975 to 1998 Reschly directed the Iowa State University School Psychology Program where he achieved the rank of Distinguished Professor of Psychology. Reschly earned graduate degrees at the University of Iowa and the University of Oregon and served as a school psychologist in Iowa, Oregon, and Arizona. Reschly has published on identification of disabilities (Mild ID, SLD, minority issues), response to intervention, and policy issues in special education. In recent years he has served as an expert witness in trials involving claims of mild intellectual disability in death penalty cases. In 2015 Reschly was recognized as the second most cited author in the history of school psychology and is among the top 5 contributors to service and leadership. He has been active in state and national leadership roles including President of the National Association of School Psychologists (NASP), Editor of the *School Psychology Review*, Chair of NASP-NCATE Graduate Program Approval, President of the Society for the Study of School Psychology, and Chair of the Council of Directors of School Psychology Programs. Reschly served on the National Academy of Sciences Panels on *Standards-based Reform and the Education of Students with Disabilities* and *Minority Students in Special and Gifted Education.* He chaired the National Academy Panel on *Mental Retardation: Determining Benefits for Social Security*. He has received the NASP Lifetime Achievement Award, three NASP Distinguished Service Awards, the Stroud Award, appointment to Fellow of the American Psychological Association and the American Psychological Society, 1996 Outstanding Alumnus University of Oregon, 2000 NASP Lifetime Achievement Award, and the 2007 NASP Legend Award.

## Personal Data

Birthplace: Wayland, IA – Married, three children
Address:    1023 Coffee Ridge, Spring Hill, TN 37174
Telephone: Office/Cell 615-708-7910
e-mail:    dan.reschly@gmail.com or dan.reschly@vanderbilt.edu

## Educational Background

BS    1966 Iowa State University, Honors Program, History/Psychology/Education
MA    1968 University of Iowa, NDEA Fellowship, School Psychology/Special Education
PhD    1971 University of Oregon, EPDA Fellowship, Educational Psychology/School Psychology

**J.A.200**

## Professional Employment History

1967-1969:  School Psychologist, Louisa County Schools, Wapello, IA

1969:            Director of Summer Head Start Program, Louisa County, IA

1970-1971:  School Psychology Intern, Albina Youth Opportunity Center and Portland Oregon Public Schools

1971-1975:  Assistant Professor, Department of Educational Psychology, University of Arizona, Tucson, AZ

1975-1998:  Associate Professor/Professor/Distinguished Professor and Director of the School Psychology Program, Joint Appointment to Department of Psychology (75%) and Professional Studies in Education (25%), Iowa State University (Promotions: to Professor in 1980; to Distinguished Professor 1991)

1996-1998:  Associate Dean, College of Education, Iowa State University and Director of Research Institute for Studies in Education

1998-2014   Professor of Education and Psychology and Chair (1998-2006), Department of Special Education, Peabody College, Vanderbilt University

2014-           Professor of Education and Psychology Emeritus, Department of Special Education, Peabody College, Vanderbilt University

## Licensure

Nationally Certified School Psychologist (14126), renewed through June 30, 2021
State Licensure as a School Psychologist in Iowa, Oregon, and Arizona (Inactive)
Iowa Teaching Certification Endorsements in Special Education, K-12 Teaching
Endorsement in Mental Retardation, Secondary Social Studies

## Major Areas of Professional Interest

Teaching:    Psychology and education of persons with disabilities, mild intellectual disability, special education policy

Research:    Mild Intellectual Disability, School psychology services, high incidence disabilities (mild MR and SLD), minority overrepresentation

## Professional Memberships

National Association of School Psychologists, American Psychological Association (Divisions 15, 16, & 33), American Association on Intellectual and Developmental Disabilities, Council for Exceptional Children,

Publications (refereed journals, book chapters and books)

Reschly, A. L., & Reschly, D. J. (2014). School consultation and response to intervention: Convergence, divergence, and future directions for research and practice. In W. P. Erchul & S. M. Sheridan (Eds), *Handbook of research in school consultation* (pp. 495-512)*.* New York: Routledge.

**J.A.201**

Reschly, D. J. (2014). Identifying and treating educational disabilities. In I. B. Weiner & R. K. Otto (Eds.). *Handbook of forensic psychology (4th ed.) (pp. 197-218).* New York: John Wiley.

Reschly, D. J. (2014). Response to intervention and the identification of specific learning disabilities. *Topics in Language Disorders, 34,* 39-58.

Oliver, R. M. & Reschly, D. J. (2014). Special education teacher preparation in classroom organization and behavior management. In, P. T. Sindelar, E. D. McCray, M. T. Brownell, & B. Lignugaris-Kraft (Eds.). *Handbook of research on special education teacher preparation* (288-302). New York: Routledge, Taylor, & Francis.

Reschly, D. J. (2013). Assessing mild intellectual disability: Issues and best practices. In D. H. Saklofske, C. R. Reynolds, & V. L. Schwean, & (Eds.). *The Oxford handbook of child psychological assessment* (pp. 683-697). New York: Oxford University Press.

Gresham, F. M., & Reschly, D. J. (2011). Standard of practice and Flynn Effect testimony in death penalty cases. *Intellectual and Developmental Disabilities, 49(3),* 131-140.

Oliver, R. M., Wehby, J. H., Reschly, D. (2011). *The effects of teachers' classroom management practices on disruptive or aggressive student behavior. Campbell Systematic Reviews*, *4,* 1-55. http://campbellcollaboration.org. Also listed in *Crime Solutions at* www.crimesolutions.gov

Oliver, R. M., & Reschly, D. J. (2010). Special education teacher preparation in classroom management: Implications for students with emotional and behavioral disorders. *Behavioral Disorders, 35,* 188-199.

Gresham, F. M., Reschly, D. J., & Shinn, M. R. (2010). RTI as a driving force in educational improvement: Historical, legal, research, and practice perspectives. In M.R. Shinn & H.M. Walker (Eds.). *Interventions for achievement and behavior problems in a three-tier model including RTI (*2nd ed., pp. 47-77). Bethesda, MD: National Association of School Psychologists.

Reschly, D. J., & Bergstrom, M K. (2009). Response to intervention. In T. B. Gutkin & C. R. Reynolds (Eds.) *The handbook of school psychology* (4th ed., pp. 434-460). New York: Wiley.

Reschly, D. J. (2009). Documenting the developmental origins of mild mental retardation. *Applied Neuropsychology, 16,* 124-134.

Reschly, D. J. (2009). *Prevention of Disproportionate Special Education Representation Using Response to Intervention.* Washington DC: Learning Point Associates. http://www.tqsource.org/forum/documents/TQ_Issue_Paper_RTI_Disproportionality.pdf

Reschly, D. J., & Wood-Garnett, S. (2009). *Teacher Preparation and Response to Intervention at Middle and High Schools.* Washington DC: :Learning Point Associates, National Comprehensive Center for Teacher Quality. http://www.tqsource.org/publications/September2009Brief.pdf

Reschly, D. J., Holdheide, L. R., Behrstock, E., & Weber, G. (2009). Enhancing teacher preparation, development and support. In L. R. Goe (Ed.), *America's opportunity: Teacher effectiveness and equity in K-12 classrooms* (pp. 41-69). Washington DC: Learning Point Associates, National Comprehensive Center on Teacher Quality.

Reschly, D. J. (2008). School psychology RTI paradigm shift and beyond. In A. Thomas & J. Grimes (Eds.) *Best practices in school psychology V* (5th ed., pp. 3-15). Bethesda, MD: National Association of School Psychologists.

USCA4 Appeal: 21-1    Doc: 12-1    Filed: 01/08/2021    Pg: 212 of 363
Case 3:92-cr-00068-DJN    Document 86-3    Filed 12/14/20    Page 5 of 52 PageID# 2385

Reschly: p. 4

Smartt, S. M., & Reschly, D. J. (2007). *Barriers to the preparation of highly qualified teachers in reading.* Chicago: Learning Point Associates, National Comprehensive Center on Teacher Quality.

Holdheide, L. R., & Reschly, D. J. (2008). *Teacher Preparation to Deliver Inclusive Services to Students with Disabilities.* Washington DC: Learning Point Associates, National Comprehensive Center on Teacher Quality. http://www.tqsource.org/publications/TeacherPreparationtoDeliverInclusiveServices.pdf

Oliver, R. M., & Reschly, D. J. (2007). *Improving student outcomes in general and special education: Effective classroom management.* Washington, DC: Learning Point Associates, National Comprehensive Center for Teacher Quality. http://www.tqsource.org/topics/effectiveClassroomManagement. pdf

Reschly, D. J., Smartt, S. M., & Oliver, R. M. (2007). Innovation configurations to improve teacher preparation in reading, behavior management, and inclusive practices. In C. Dwyer (Ed), *Biennial Report of the National Comprehensive Center on Teacher Quality* (23-45)*.* Chicago: Learning Point Associates, National Comprehensive Center on Teacher Quality.

Reschly D. J. (2006). Legal influences on the identification and treatment of educational disabilities. In I. B. Weiner & A. K. Hess, (Eds.). *Handbook of forensic psychology* (3rd ed., pp. 167-189.). New York: John Wiley & Sons.

Batsche, G., Elliott, J., Graden, J. L., Grimes, J., Kovaleski, J. F., Prasse, D., Reschly, D. J., Schrag, J., & Tilly III, W. D. (2005). *Response to intervention.* Alexandria, VA: National Association of State Directors of Special Education. (Authors listed alphabetically) (60,000 copies sold as of December 2006)

Reschly, D. J. (2005). LD identification: Primary intervention, secondary intervention, then what? *Journal of Learning Disabilities, 38,* 510-515*.*

Fletcher, J. M., & Reschly, D. J. (2005). Changing procedures for identifying learning disabilities: The danger of perpetuating old ideas. *The School Psychologist, 59* (1), 10-15.

1. Fletcher, J. M., Coulter, W. A., Reschly, D. J., Vaughn, S. (2004). Alternative approaches to the definition and identification of learning disabilities: Some questions and answers. *Annals of Dyslexia, 54,* 304-331.

2. Reschly, D. J. (2004). Paradigm shift, outcomes criteria, and behavioral interventions: Foundations for the future of school psychology. *School Psychology Review, 33,* 408-416.

Hosp, J. L., & Reschly, D. J. (2004). Disproportionate representation of minority students in special education: Academic, demographic, and economic predictors. *Exceptional Children, 70,* 185-199.

Reschly, D. J., & Hosp, J. L. (2004) State SLD policies and practices. *Learning Disability Quarterly, 27,* 197-213*.*

Fuchs, D., Deshler, D. D., & Reschly, D. J. (2004). National research center on learning disabilities: Multimethod Studies of Identification and Classification Issues. *Learning Disability Quarterly, 27,* 189-195.

**J.A.203**

Reschly, D. J. (2003). School psychology. In I. B. Weiner (Ed.) *Comprehensive Handbook of Psychology, Volume VII Educational Psychology* (W. M. Reynolds & G. E. Miller, Eds.) (pp. 431-453). Hoboken, NJ: John Wiley.

Hosp, J. L., & Reschly, D. J. (2003). Referral rates for intervention or assessment: A meta-analysis of racial differences. *Journal of Special Education, 37,* 67-80.

Reschly, D. J. (2002). Minority overrepresentation: The silent contributor to LD prevalence and diagnostic confusion. In R. Bradley, L. Danielson, & D. P. Hallahan (Eds.) *Identification of learning disabilities: Research to practice* (pp. 361-368). Mahwah, NJ: Lawrence Erlbaum.

Hosp, J. L., & Reschly D. J. (2002). Regional differences in school psychology practice. *School Psychology Review, 31,* 11-29.

Reschly, D. J., & Ysseldyke, J. E. (2002). Paradigm shift: The past is not the future. In A. Thomas & J. Grimes (Eds.) *Best practices in school psychology IV* (4th ed., pp. 3-20). Bethesda, MD: National Association of School Psychologists.

Reschly, D. J., & Grimes, J. P. (2002). Best practices in intellectual assessment. In A. Thomas & J. Grimes (Eds.) *Best practices in school psychology IV* (4th ed., pp. 1337-1350). Bethesda, MD: National Association of School Psychologists.

Hosp, J. L., & Reschly D. J. (2002). Predictors of restrictiveness of placement for African-American and Caucasian students. *Exceptional Children, 68,* 225-238.

Reschly, D. J., Myers, T. G., & Hartel, C. R. (Eds.) (2002). <u>*Mental retardation: Determining eligibility for Social Security benefits.*</u> Washington DC: National Academy Press.

Artiles, A. J., Harry, B., Reschly, D. J., & Chinn, P. C. (2002). Over-identification of students of color in special education: A critical overview. *Multicultural Perspectives, 4(1),* 3-10.

Reschly, D. J., & Robinson-Zanartu, C. (2000). Evaluation of aptitudes. In G. Goldstein & M. Hersen (Eds.), Handbook of psychological assessment (3rd ed., pp 183-201). New York: Pergamon.

Reschly, D. J. (2000). Assessment and eligibility determination in the *Individuals with Disabilities Act of 1997.* In C. F. Telzrow & M. Tankersley, M. (Eds.) *IDEA amendments of 1997: Practice guidelines for school-based teams* (pp. 65-104). Bethesda, MD: National Association of School Psychologists.

Reschly, D. J. (2000). The present and future status of school psychology in the United States. *School Psychology Review, 29,* 507-522.

Reschly, D. J. (1999). Assessing educational disabilities. In A. Hess & I. Weiner (Eds.), *The handbook of forensic psychology*, (2nd ed., pp. 127-150). New York: Wiley.

Reschly, D. J., & Bersoff, D. N. (1999). Law and school psychology. In C. R. Reynolds & T. B. Gutkin (Eds.) *Handbook of School Psychology* (3rd ed., pp. 1077-1112). New York: John Wiley Inc.

Reschly, D. J., Tilly, W. D. III, & Grimes, J. P. (Eds.) (1999). *Special education in transition: Functional assessment and noncategorical programming* Longmont, CO: Sopris West.

Reschly, D. J., & Tilly, W. D. III (1999). Reform trends and system design alternatives. In D. J. Reschly, W. D. Tilly III, & J. P. Grimes (Eds.) *Special education in transition: Functional assessment and noncategorical programming* (pp. 19-48). Longmont, CO: Sopris West.

Tilly, W. D. III, Reschly, D. J., & Grimes, J. P. (1999). Disability determination in problem solving systems: Conceptual foundations and critical components. In D. J. Reschly, W. D. Tilly III, & J. P. Grimes (Eds.) *Special education in transition: Functional assessment and noncategorical programming* (pp. 285-321). Longmont, CO: Sopris West.

USCA4 Appeal: 21-1    Doc: 12-1    Filed: 01/08/2021    Pg: 214 of 363
Case 3:92-cr-00068-DJN   Document 86-3   Filed 12/14/20   Page 7 of 52 PageID# 2387

Reschly: p. 6

MacMillan, D. L., & Reschly, D. J. (1998). The disproportionate representation of African-Americans in special education: The case for greater specificity or reconsideration of the variables examined. *Journal of Special Education, 32*, 15-24.

Lund, A. R., Reschly, D. J., & Martin, L. M. (1998). School psychology personnel needs: Correlates of current patterns and historical trends. *School Psychology Review, 27,* 106-120.

Ysseldyke, J., Dawson, P., Lehr, C., Reschly, D., Reynolds, M., & Telzrow, C. (1997). *School psychology: A blueprint for training and practice II.* Bethesda, MD: National Association of School Psychologists.

Reschly, D. J. (1997). Diagnostic and treatment utility of intelligence tests. In Flanagan, D. P., Genshaft, J. L., & Harrison, P. L. (Eds.) *Beyond traditional intellectual assessment: Contemporary and emerging theories, tests, and issues* (pp. 437-456). New York: Guilford Press.

MacMillan, D., & Reschly, D. J. (1997). Issues in definition and classification. In W. E. MacLean (Ed.), *Ellis' Handbook of mental deficiency: Psychological theory and research* (3rd ed., pp. 47-74). Hillsdale, NJ: Lawrence Erlbaum.

Reschly, D. J., & Wilson, M. S. (1997). Characteristics of school psychology graduate education: Implications for the entry level discussion and doctoral level specialty definition. *School Psychology Review, 26,* 74-92.

Reschly, D. J. (1997). Utility of individual ability measures and public policy choices for the 21st century. *School Psychology Review, 26*, 234-241.

Reschly, D. J. (1997). *Disproportionate minority representation in general and special education programs: Patterns, issues, and alternatives.* Des Moines, IA: Mountain Plains Regional Resource Center, Drake University. (147 pages). ERIC ED 415632 http://www.eric.ed.gov/PDFS/ED415632.pdf

Robinson-Zanartu, C., & Reschly, D. J. (1997). Evaluacion de las aptitudes. In G. Buela-Casal & J. F. Navarro (Eds.), *Manual de evaluacion psicologica*, (pp. 559-588). Madrid: Siglo Veintiuno de Espana Editores, SA

Wilson, M. S., & Reschly, D. J. (1996). Assessment in school psychology training and practice. *School Psychology Review, 25,* 9-23.

Reschly, D. J. (1996). Identification and assessment of children with disabilities. *The Future of Children: Special Education for Children with Disabilities, 6(1),* 40-53.

Reschly, D. J. (1996). "Role change and diversity"; "Employment trends", "Role restriction", "Adaptive Behavior", "Turf issues." In T. Fagan & P. Warden (Eds.), *Historical Encyclopedia of School Psychology* (pp. ). Westport, CT: Greenwood Publishing Group.

Reschly, D. J. (1996). Functional assessment and special education decision making. In W. Stainback & S. Stainback (Eds.), *Controversial issues confronting special education: Divergent perspectives* (2nd ed., pp. 115-128). Boston: Allyn & Bacon.

Reschly, D. J. (1996). *IQ and Special Education: History, Current Status, and Alternatives.* Washington D.C.: National Academy of Sciences (Commissioned Paper)

Reschly, D. J., & Ysseldyke, J. E. (1995). School psychology paradigm shift. In A. Thomas & J. Grimes (Eds.) *Best practices in school psychology III* (3rd ed., pp. 17-31). Washington DC: National Association of School Psychologists.

Reschly, D. J., & Wilson, M. S. (1995). School psychology practitioners and faculty: 1986 to 1991-1992 trends in demographics, roles, satisfaction, and system reform. *School Psychology Review, 24,* 62-80.

**J.A.205**

USCA4 Appeal: 21-1    Doc: 12-1    Filed: 01/08/2021    Pg: 215 of 363
Case 3:92-cr-00068-DJN    Document 86-3    Filed 12/14/20    Page 8 of 52 PageID# 2388

Reschly: p. 7

Wilson, M. S., & Reschly, D. J. (1995). Gender and school psychology: Questions, answers, and issues. *School Psychology Review, 24*, 45-61.

Reschly, D. J., & Grimes, J. P. (1995). Best practices in intellectual assessment. In A. Thomas & J. Grimes (Eds.), *Best practices in school psychology* (3rd ed., pp. 763-773). Washington, DC: National Association of School Psychologists.

Reschly, D. J., (1995). Psychological practice in the schools: System change in the heartland. In R. C. Talley & R. J. Short (Eds.), *Creating a new vision of school psychology: Emerging models of psychological practice in the schools* (pp. 23-27). Washington D C: American Psychological Association.

Flugum, K. R., & Reschly, D. J. (1994). Pre-referral interventions: Quality indices and outcomes. *Journal of School Psychology, 32*, 1-14.

Reschly, D. J. (1993). Consequences and incentives: Implications for inclusion/exclusion decisions regarding students with disabilities in state and national assessment programs. In J. E. Ysseldyke & M. L. Thurlow (Eds.), *Views on inclusion and testing accommodations for students with disabilities* (pp. 35-46). Minneapolis, MN: University of Minnesota, National Center on Educational Outcomes.

Reschly, D. J. (1993). A review of continuing education programs. In J. E. Zins, T. R. Kratochwill, & S. E. Elliott (Eds.), *The handbook of consultation services for children* (pp. 394-418). San Francisco: Jossey-Bass.

Reschly, D. J. (1992). Mental retardation: Conceptual foundations, definitional criteria, and diagnostic operations. In S. R. Hooper, G. W. Hynd, & R. E. Mattison, (Eds.), *Developmental disorders: Diagnostic criteria and clinical assessment* (pp. 23-67). Hillsdale, NJ: Lawrence Erlbaum.

Reschly, D. J. (1992). Special education decision making and functional/behavioral assessment. In W. Stainback & S. Stainback (Eds.), *Controversial issues confronting special education: Divergent perspectives* (pp. 127-138). Boston: Allyn & Bacon. Reprinted in E. L. Meyen, G. A. Vergason, & R. J. Whelan (Eds.), *Challenges facing special education* (pp. 227-241). Denver, CO: Love Publishing Co.

Reschly, D. J. & McMaster-Beyer, M. (1991). Influences of degree level, institutional orientation, college affiliation, and accreditation status on school psychology graduate education. *Professional Psychology: Research and Practice, 22*, 368-374.

Reschly, D. J. & Grimes, J. P. (1991). State department and university cooperation: Evaluation of continuing education in consultation and curriculum based assessment. *School Psychology Review, 20,* 519-526.

Reschly, D. J. & Ward, S. M. (1991). Use of adaptive measures and overrepresentation of black students in programs for students with mild mental retardation. *American Journal of Mental Retardation, 96,* 257-268.

Reschly, D. J. (1991). The effects of placement litigation on psychological and educational classification. *Diagnostique, 17,* 6-20.

Reschly, D. J. (1991). Bias in cognitive assessment: Implications for future litigation and professional practices. *Diagnostique, 17*, 86-90.

Reschly, D. J. (1990). Found: Our Intelligences: What do they mean? *Journal of Psychoeducational Assessment, 8,* 259-267.

Reschly, D. J. & Wilson, M. S. (1990). Cognitive processing vs. traditional intelligence: Diagnostic utility, intervention implications, and treatment validity. *School Psychology Review, 19,* 443-458.

Reschly, D. J. & Connolly, L. M. (1990). Comparisons of school psychologists in the city and the country: Is there a "rural" school psychology? *School Psychology Review, 19,* 534-549.

Reschly, D. J. (1990). Review of "Assessment and Placement of Minority Students." *School Psychology Review, 19,* 575-577.

Reschly, D. J. (1990). Adaptive behavior. In A. Thomas & J. Grimes (Eds.), *Best practices in school psychology* (2nd ed., pp. 29-42). Washington, DC: National Association of School Psychologists.

Reschly, D. J. (1990). Aptitude tests in educational classification and placement. In G. Goldstein & M. Hersen (Eds.), *Handbook of psychological assessment* (2nd ed., pp. 148-172). New York: Pergamon.

Reschly, D. J., & Grimes, J. P. (1990). Intellectual assessment. In A. Thomas & J. Grimes (Eds.), *Best practices in school psychology* (2nd ed., pp. 425-439). Washington, DC: National Association of School Psychologists.

Reschly, D. J. (1990). Mild mental retardation: Persistent themes, change dynamics, and future prospects. In M. C. Wang, M. C. Reynolds, & H. J. Walberg (Eds.), *Special education research and practice: Synthesis of findings* (pp. 81-99). Oxford, England: Pergamon Press.

McMaster, M., Reschly, D., & Peters, J. (1989). *The directory of graduate programs in school psychology.* Washington, DC: National Association of School Psychologists (includes a 30 page summary and narrative reporting the results of a survey of all programs).

Reschly, D. J., & Gresham, F. M. (1989). Current neuropsychological diagnosis of learning problems: A leap of faith. In C. R. Reynolds (Ed.), *Child neuropsychology: techniques of diagnosis and treatment,* (pp. 503-519). New York: Plenum.

Reschly, D. J. (1989). Incorporating adaptive behavior deficits into instructional programs. In G. A. Robinson, J. R. Patton, E. A. Polloway, & L. R. Sargent (Eds.), *Best practices in mild mental retardation,* (pp. 39-63). Reston, VA: Council for Exceptional Children, Division on Mental Retardation.

Reschly, D. J. (1988). Minority mild mental retardation overrepresentation and special education reform. *Exceptional Children, 54,* 316-323.

Reschly, D. J. (1988). *Larry P.! Larry P.!* Why the California sky fell on IQ testing. *Journal of School Psychology, 26,* 199-205.

Reschly, D. J., Kicklighter, R. H., & McKee, P. (1988a). Recent placement litigation, Part I: Regular education grouping: Comparison of *Marshall* (1984, 1985) & *Hobson* (1967, 1969). *School Psychology Review, 17,* 7-19.

Reschly, D. J., Kicklighter, R. H., & McKee, P. (1988b). Recent placement litigation, Part II: Minority EMR overrepresentation: Comparison of *Larry P.* (1979, 1984, 1986) with *Marshall* (1984, 1985) and *S-1* (1986). *School Psychology Review, 17,* 20-36.

Reschly, D. J., Kicklighter, R. H., & McKee, P. (1988c). Recent placement litigation, Part III: Analysis of differences in *Larry P., Marshall,* and *S-1* and implications for future practices. *School Psychology Review, 17,* 37-48.

McDougall, L. M., Reschly, D. J., & Corkery, J. M. (1988). Changes in referral interviews with teachers after behavioral consultation training. *Journal of School Psychology, 26*, 225-232.

Reschly, D. J. (1988). Special education reform: School psychology revolution. *School Psychology Review, 17,* 459-475.

USCA4 Appeal: 21-1     Doc: 12-1      Filed: 01/08/2021     Pg: 217 of 363
Case 3:92-cr-00068-DJN   Document 86-3   Filed 12/14/20   Page 10 of 52 PageID# 2390

Reschly: p. 9

Reschly, D. J. (1988). Obstacles, starting points, and doldrums notwithstanding: Reform/revolution from outcomes criteria. *School Psychology Review, 17,* 495-501.

Reschly, D. J. (1988). Assessment issues, placement, litigation, and the future of mild mental retardation classification and programming. *Education and Training of the Mentally Retarded, 17,* 285-301.

Sabers, D. L., Feldt, L. S., & Reschly, D. J. (1988). Appropriate and inappropriate uses of estimated true scores. *Journal of Special Education, 22,* 358-366.

Reschly, D. J. (1988). Minority EMR overrepresentation: Legal issues, research findings, and reform trends. In M. C. Wang, M. C. Reynolds, & H. J. Walberg (Eds.), *The handbook of special education: Research and practice, Vol. II* (pp. 23-41). Oxford, England: Pergamon Press, Ltd. [Also edited the five chapter section on mild mental retardation and wrote section introduction.]

Reschly, D. J. (1988). Alternative delivery systems: Legal and ethical issues. In J. L. Graden, J. E. Zins, & M. J. Curtis (Eds.), *Alternative educational delivery systems: Enhancing instructional options for all students* (pp. 525-552). Washington, DC: National Association of School Psychologists.

Gresham, F. M., & Reschly, D. J. (1987). Dimensions of social competence: Method factors in the assessment of adaptive behavior, social skills, and peer acceptance. *Journal of School Psychology, 25,* 367-381.

Gresham, F. M. & Reschly, D. J. (1987). Sociometric differences between mildly handicapped and non-handicapped black and white students. *Journal of Educational Psychology, 79,* 195-197.

Gresham, F. M., Reschly, D. J., & Carey, M. P. (1987). Teachers as "tests." Classification accuracy and concurrent validation in the identification of learning disabled children. *School Psychology Review, 16*, 543-553.

Reschly, D. J. (1987). Learning characteristics of mildly handicapped students: Implications for classification, placement, and programming. In W. C. Wang, M. C. Reynolds, & H. J. Walberg (Eds.), *The handbook of special education: Research and practice (Vol. 1-3, pp. xxx-xxx)*. Oxford, England: Pergamon Press.

Reschly, D. J. (1987). Assessing educational handicaps. In A. Hess & I. Weiner (Eds.), *The handbook of forensic psychology,* (pp. 155-187). New York: Wiley.

Gresham, F. M. & Reschly, D. J. (1987). Issues in the conceptualization, classification, and assessment of social skills in the mildly handicapped. In T. R. Kratochwill (Ed.), *Advances in school psychology, Vol. VI*, (pp. 203-247). Hillsdale, NJ: Lawrence Erlbaum, Inc.

Reschly, D. J., & Graham-Clay, S. L. (1987). Psychological abuse from prejudice and cultural bias. In M. R. Brassard, R. Germain, & S. N. Hart (Eds.), *The psychological maltreatment of children and youth*, (pp. 137-145). New York: Pergamon Press.

Reschly, D. J., & Gresham, F. M. (1987). Adaptive behavior and the mildly handicapped. In T. R. Kratochwill (Ed.), *Advances in school psychology, Vol. VI*, (pp. 265-298). Hillsdale, NJ: Lawrence Erlbaum, Inc.

Reschly, D. J. (1986). Functional psychoeducational assessment: Trends and issues. *Special Service in the Schools* (Special Issues on Emerging Perspectives on Assessment of Exceptional Children), 2, 57-69. [Also reprinted in R. E. Bennett & C. A. Maher (Eds.) 1986, *Emerging perspectives on assessment of exceptional children.* New York: Haworth Press, Inc.]

Prasse, D. P., & Reschly, D. J. (1986). Larry P.: A case of segregation, testing, or program efficacy? *Exceptional Children, 52,* 333-346.

Gresham, F. M., & Reschly, D. J. (1986). Social skill deficits and low peer acceptance of mainstreamed learning disabled children. *Learning Disability Quarterly, 9,* 23-32.

Reschly, D. (1986). Economic and cultural factors in childhood exceptionality. In R. Brown & C. Reynolds (Eds.), *Psychological perspectives on childhood exceptionality: A handbook,* (pp. 423-466). New York: Wiley Interscience.

Reschly, D. (1985). Best practices: Adaptive behavior. In A. Thomas & J. Grimes (Eds.), *Best practices in school psychology,* (pp. 353-368). Washington, DC: National Association of School Psychologists.

Fleig, G. S., & Reschly, D. J. (1985). Special education and the law. In L. Sametz & C. S. McLoughlin (Eds.), *Educators and the law,* (pp. 84-109). Springfield, IL: Charles C. Thomas.

Reschly, D. (1984). A reaction to "A national survey of students; and practitioners' perceptions of training." *School Psychology Review, 13,* 405-406.

Reschly, D. (1984). Beyond test bias: The National Academy Panel's analysis of minority EMR overrepresentation. *Educational Researcher, 13(3)*, 15-19.

Reschly, D. (1984). Advances II: Two steps forward, and … [Review of *Advances in School Psychology, Vol. 2] Contemporary Psychology*, 29, 68-69.

Reschly, D. (1984). Aptitude tests in educational classification and placement. In G. Goldstein & M. Hersen (Eds.), *Handbook of psychological assessment.* Elmsford, NY: Pergamon Press.

Reschly, D. (1984). Assessment and decision making. In J. E. Ysseldyke (Ed.), *School psychology: The state of the art.* Minneapolis, MN: National School Psychology Inservice Training Network, University of Minnesota.

Graham-Clay, S., & Reschly, D. (1984). Legal and ethical issues in behavior modification. In C. A. Maher & S. C. Foreman (Eds.), *Providing effective educational services in school organizations: A behavioral approach.* Hillsdale, NJ: Erlbaum.

Ross-Reynolds, J., & Reschly, D. (1983). An investigation of item bias on the WISC-R with four sociocultural groups. *Journal of Consulting and Clinical Psychology, 51,* 144-146. (Full report at ERIC Document Reproduction Service No. ED 222 529)

Reschly, D. (1983). Legal issues in psychoeducational assessment. In G. Hynd (Ed.), *The school psychologist: Contemporary perspectives (xxx-xxx).* Syracuse, NY: Syracuse University Press.

Reschly, D. (1982). School psychology today: Progress, not impasse. *Professional Psychology Research and Practice, 13,* 990-998.

Patrick, J., & Reschly, D. (1982). Relationship of state education criteria and demographic variables to prevalence of mental retardation. *American Journal of Mental Deficiency, 86,* 351-360.

Reschly, D. (1982). Assessing mild mental retardation: The influence of adaptive behavior, sociocultural status, and prospects for nonbiased assessment. In C. R. Reynolds & T. B. Gutkin (Eds.), *The handbook of school psychology.* (pp. 209-242) New York: Wiley.

Reschly, D. (1982). Psychological services. In H. Mitzel (Ed.), *Encyclopedia of educational research,* 5th ed. New York: MacMillan.

USCA4 Appeal: 21-1     Doc: 12-1     Filed: 01/08/2021     Pg: 219 of 363
Case 3:92-cr-00068-DJN   Document 86-3   Filed 12/14/20   Page 12 of 52 PageID# 2392

Reschly: p. 11

Kazimour, K. K. & Reschly, D. (1981). Investigation of norms and concurrent validity for the Adaptive Behavior Inventory for Children. *American Journal of Mental Deficiency, 85,* 512-520.

Reschly, D. (1981). Evaluation of the effects of SOMPA measures on classification of students as mildly retarded. *American Journal of Mental Deficiency, 86,* 16-20.

Reschly, D. (1981). Psychological testing in educational classification and placement. *American Psychologist, 36,* 1094-1102.

Reschly, D. (1981). Nonbiased assessment and the mildly retarded. In T. Oakland, *Nonbiased assessment.* Minneapolis, MN: National School Psychology Inservice Training Network, University of Minnesota.

Reschly, D. (1980). Psychological evidence in the Larry P. Opinion: A case of right problem–wrong solution? *School Psychology Review, 9,* 136-148.

Reschly, D. (1980). School Psychologists and assessment in the future. *Professional Psychology: Research and Practice, 11,* 841-848.

Reschly, D., & Sabers, D. (1979). Analysis of test bias in four groups with the regression definition. *Journal of Educational Measurement, 16,* 1-9.

Reschly, D., & Lamprecht, M. (1979). Expectancy effects of labels: Fact or artifact? *Exceptional Children, 46,* 55-58.

Reschly, D., & Reschly, J. (1979). Validity of WISC-R factor scores in predicting teacher ratings of achievement and attention among four groups. *Journal of School Psychology, 17,* 355-361.

Phye, G., & Reschly, D. (Eds.). (1979). *School psychology: Perspectives and issues.* New York: Academic Press.

Reschly, D. (1979). Nonbiased assessment. In G. Phye & D. Reschly (Eds.), *School psychology: Perspectives and issues* (xxx-xxx)*.* New York: Academic Press.

Reschly, D. (1978). WISC-R factor structures among Anglos, Blacks, Chicanos, and Native American Papagos. *Journal of Consulting and Clinical Psychology, 46,* 417-422.

Reschly, D., & Davis, R. (1977). Comparability of WISC and WISC-R scores among borderline and mildly retarded children. *Journal of Clinical Psychology, 33,* 1045-1048.

Hall, G., & Reschly, D. (1977). Effects of differing external feedback conditions on rates of self-reinforcement. *Journal of General Psychology, 97,* 109-115.

Reschly, D. (1976). School psychology consultation: "Frenzied, faddish or fundamental?" *Journal of School Psychology 14,* 105-113.
    Also reprinted in M. Curtis & J. Zins (Eds.), *The theory and practice of school consultation.* Springfield, IL: Charles. C. Thomas.

Reschly, D., & Jipson, F. (1976). Ethnicity, geographic locale, age, sex, and urban-rural residence as variables in the prevalence of mild mental retardation. *American Journal of Mental Deficiency, 81,* 154-161.
    Also reprinted in S. Chess & S. Thomas (Eds.) *Annual progress in child psychiatry and child development: Tenth annual edition,* (612-624). New York: Brunner/Mazel.

Reschly, D., & Sabers, D. (1974). Open education: Have we been there before? *Kappan, 55,* 675-677.

Brown, D., Reschly, D., & Sabers, D. (1974). Using group contingencies with time out and positive reinforcement to modify aggressive behaviors in a Head Start classroom. *Psychological Record, 24,* 491-496.

Reschly: p. 12

Brown, D., Reschly, D., & Wasserman, H. (1974). Effects of surreptitious modeling upon teacher classroom behaviors. *Psychology in the Schools, 11,* 366-369.
> Reprinted in K. O'Leary & S. O'Leary (Eds.), *Classroom management: The successful use of behavior modification* (2nd ed.) 211-215. New York: Pergamon Press
> Reprinted in L. J. Carroll (Ed.), *Contemporary School Psychology (pp. xxx-xxx).* Brandon, VT: Clinical Psychology Publishing Co.

Reschly, D. (1973). Consistency of self-reinforcement rates over different tasks: Sex, task success, and ability as determinants of rates of self-reinforcement. *Psychological Record, 23,* 237-242.

Reschly, D., & Mittman, A. (1973). The relationship of self-esteem status and task ambiguity to the self-reinforcement behavior of children. *Developmental Psychology, 9,* 16-19.

## Other Publications (Technical Reports/Monographs/Newsletter)

- Reschly, D. (1972). *Technical Report: EPDA Summer Institute*. Tucson, AZ: Arizona Center for Educational Research and Development.
- Reschly, D. et al. (1974). *The development and use of instructional objectives for open education classrooms.* Tucson, AZ: University of Arizona, Arizona Center for Educational Research and Development.
- Reschly, D. (1978). *Nonbiased assessment and school psychology*. Des Moines, IA: Iowa Department of Public Instruction. (ERIC Document Reproduction Service No. ED 157 240)
- Reschly, D. (1980). *Nonbiased assessment.* Unpublished monograph, Iowa State University, Ames. (ERIC Document Reproduction Service No. ED 209 810; EC 140 324) (Distributed to all school psychologists in Iowa, Illinois, Kansas, and Florida)
- Reschly, D., Grimes, J., & Ross-Reynolds, J. (1981). *State norms for IQ, adaptive behavior, and sociocultural background: Implications for nonbiased assessment* (Project Report). Des Moines, IA: Department of Public Instruction. (ERIC Document Reproduction Service No. ED 209-811, EC 140 315)
- Reschly, D., Gresham, F., & Graham-Clay, S. (1984). *Multi-factored nonbiased assessment: Convergent and discriminant validity of social and cognitive measures with black and white regular and special education students* (Final Project Report). Ames, IA: Iowa State University, Department of Psychology. ED No 252 034.
- Reschly, D. J. NASP Presidential Editorials
  "What's good about school psychology?" 1984, 13(1), 1-2.
  "The professional development imperative." 1984, 13(2), 1-2.
  "Professional standards ARE practical." 1984, 13(3), 1-2.
  "Expanding roles or guild interests." 1984, 13(4), 1-2.
  "Diversity in school psychology." 1985, 13(5), 1,8.
  "The NASP-APA relationship: A good news-bad news story." 1985, 13(6), 1-2.
  "The scourge of racism." 1985, 13(7), 1.
  "LD or not LD? Simple solutions to complex problems." 1985 13(8), 1-2.
- Reschly, D. J., & Casey, A. (1986). *Behavioral consultation*. Ames, IA: Iowa State University, Department of psychology, Project RE-AIM. (67 pp.) (Distributed to all school psychologists in Iowa)

**J.A.211**

- Reschly, D. J. (1987). Behavioral consultation. In M. Wang (Ed.), *What works in the education of special needs students*. Washington, DC: Department of Education, Office of Special Education and Rehabilitation Services.
- Reschly, D. J. (1987). *Adaptive behavior in classification and programming*. St. Paul, MN: Minnesota Department of Education. Revised and expanded in 1988 for the state of Florida.
- Reschly, D. J. (1987). "Disproportionality", (pp. 526-528), "Labeling", (pp. 901-903), "*Marshall v. Georgia*" (pp. 989-992), "*PASE V. Hannon*", (pp. 1156-1157). In C. R. Reynolds & L. Mann (Eds.), *Encyclopedia of special education*. New York: Wiley Interscience.
- Reschly, D. J., Genshaft, J., & Binder, M. S. (1987). *The 1986 NASP survey: Comparison of practitioners, NASP leadership, and university faculty on key issues*. Washington, DC: National Association of School Psychologists. ED 300 733.
- Reschly, D. J., Robinson, G. A., Volmer, L. M., & Wilson, L. R. (1988). *Iowa mental disabilities research project final report*. Des Moines, IA: Iowa Department of Education, Bureau of Special Education.
- Reschly, D. J. (1989). Videotape: *Adaptive behavior: Definition and assessment*. Washington D. C.: National Association of School Psychologists.
- Reschly, D. J. (1989). Videotape: *Adaptive behavior: Designing interventions and monitoring progress*. Washington D. C.: National Association of School Psychologists.
- Reschly, D. J. (1990). *Classification of students for special education: Alternative models and criteria* (47 pp.). Sacramento, CA: California Department of Education Policy Analysis Paper.
- Connolly, L. & Reschly, D. J. (1990). Personnel shortages: The school psychology crisis of the 1990s. *NASP Communique, 19(3)*, 1,12.
- Flugum, K., Ward, S., Golbert, K., Yoo, T-Y., Reschly, D. J., & Robinson, G. A. (1990). *Baseline comparison of Year 1 and Year 2 Renewed Service Delivery System trial sites*. Des Moines, IA: Iowa Department of Education, Bureau of Special Education.
- Reschly, D. J., Robinson, G. A., Ward, S., Flugum, K., Golbert, K., & Yoo, T-Y. (1990). *Baseline results for Phase II RSDS trial sites*. Des Moines, IA: Iowa Department of Education, Bureau of Special Education.
- Reschly, D. J., Robinson, G. A., & Ward, S. (1990). *Evaluation of the Renewed Services Delivery System: (Research Report #1)*. Des Moines, IA: Bureau of Special Education, Iowa Department of Education.
- Reschly, D. J., Robinson, G. A., Ward, S., Flugum, K., & Yoo, T-Y. (1990). *Baseline results for Phase II trial sites: (Research Report #2)*. Des Moines, IA: Bureau of Special Education, Iowa Department of Education.
- Flugum, K., Ward, S., Golbert, K., Yoo, T-Y, Reschly, D. J., & Robinson, G. A. (1990). *Comparison of baseline results for Phase I and II trial sites: (Research Report #3)*. Des Moines, IA: Bureau of Special Education, Iowa Department of Education.
- Flugum, K. & Reschly, D. J. (1991). *Quality indices and the outcomes of prereferral interventions: (Research Report #4)*. Des Moines, IA: Bureau of Special Education, Iowa Department of Education.

**J.A.212**

- Reschly, D. J., & Flugum, K. R. (1992). *Special education and related services: Characteristics of current services and implications for reform*. Des Moines, IA: Iowa Department of Education, Bureau of Special Education.
- Reschly, D. J., & Tilly, W. D. (1993). The WHY of system reform. *Communique, 22(1)*, 1, 4-6.
- Reschly, D. J., & Starkweather, A. R. (1997). *Evaluation of an alternative special education assessment and classification program in the Minneapolis Public Schools*. Minneapolis, MN: Minnesota Department of Children, Families, and Learning, Division of Special Education (82 pages).
- Reschly, D. J., & Tilly, W. D. (1997). *Effects of the systems change process on the implementation of transition services*. Des Moines, IA: Iowa Department of Education, Bureau of Special Education (32 pages).
- Ysseldyke, J. E., Thurlow, M. L., Kozleski, E., & Reschly, D. (Eds.) (1998). *Accountability for the results of educating students with disabilities.* Minneapolis MN: National Center for Educational Outcomes, University of Minnesota, College of Education and Human Development.
- Reschly, D. J., & Hughes, G. (1999, March). *Review of Special Schools Placement Data for Roma and Non-Roma Children in Ostrava, Czech Republic*. Unpublished report, Department of Special Education, Vanderbilt University, Nashville TN.
- Reschly, D. J. (2002). Change dynamics in special education assessment: Historical and cotemporary patterns. *Peabody Journal of Education, 77(2),* 117-136.
- Gresham, F., Reschly, D., Tilly, W. D., Fletcher, J., Burns, M., Crist, T., Prasse, D., Vanderwood, M., & Shinn, M. (2004). Comprehensive evaluation of learning disabilities: A response-to-intervention perspective. *School Psychology Communique, xx,* xx-xx.
- Reschly, D. J. (2006). *Response to Intervention: Why Now?* Video California Department of Education. http://www4.scoe.net/rti/materials.cfm?menuChoice=2
- Reschly, D. J., Holdheide, L. R., Smartt, S. M., & Oliver, R. M. (2007). *Evaluation of special education teacher preparation coursework in reading, behavior, and inclusive practices.* Springfield, IL: Illinois State Board of Education.

### Administrative Law Judge Decisions:

-Reschly, D. J. In Re: David F.. *Renee M. v. Mason City Community School District and Northern Trails Area Education Agency 2*, 7 D.o.E. 74, Administrative docket # 2027, May, 1989.

-Reschly, D. J. In Re: Hussun H., *Aldona H. v. Sioux City Community School District and Western Hills Area Education Agency 12*, 7 D.o.E. App. Dec. 144, Admin. Doc. #2029, June, 1989

-Reschly, D. J. In Re: Leonna N., *Vera N. v. West Burlington Community School District and Great River Area Education Agency 16*, 7 D.o.E. App. Dec. 144, Admin. Doc. #2021, October, 1989.

-Reschly, D. J., In Re: Michael H., *Des Moines Community School District v. Mary A.,* 7 D.o.E., App. Dec. 387, Admin. Doc. S.E. #13, June, 1990.

USCA4 Appeal: 21-1    Doc: 12-1    Filed: 01/08/2021    Pg: 223 of 363
Case 3:92-cr-00068-DJN   Document 86-3   Filed 12/14/20   Page 16 of 52 PageID# 2396

Reschly: p. 15

-Reschly, D. J., In Re: Christopher L., *Victoria L. v. Ottumwa Community School District and Southern Prairie Area Education Agency 15*, D.o.E. App. Dec. 125, Admin. Doc. S.E. #21, November, 1990.

-Reschly, D. J. In Re: Timothy B. (June 12, 1991), *Timothy B. v. Keokuk Community School District,* SE-35, *Individuals with Disabilities Education Law Report, 18,* 874

-Reschly, D. J., In Re: Jill C. (April 12, 1993), *Jill C. v. Sioux City Community School District, Individuals with Disabilities Education Law Report, 20,* 107.

Reschly, D. J. In re: Laura L. (December 28, 1993). *Laura L. v. Burlington Community School District*, SE-96, *Individuals with Disabilities Education Law Report, 20,* 1014.

-Reschly, D. J. In Re Nick B. *Gail B. v. Ottumwa Community School District & Southern Prairie Area Education Agency XV*, Admin. Doc. SE-102, 11 DoE App. Dec. 331, September 13, 1994, *Individuals with Disabilities Education Law Report, 22,* 740.

-Reschly, D. J. In Re In re John M. *Glen and Rita K., v. Des Moines Independent School District and Heartland Area Education Agency XI*, Admin. Doc. SE-109, Cite as 12 D.o.E. App. Dec. 168, December, 1994. *Individuals with Disabilities Education Law Report, 22,* 176.

-Reschly, D. J. In Re Travis H. *Sandra Y. v. Newton Community School District and Heartland Area Education Agency XI*, Admin. Doc. SE-146, Cite as 12 D.o.E. App. Dec. 288, March, 1995. *Individuals with Disabilities Education Law Report, 22,* 915.

-Reschly, D. J. In Re Ryan U. *Burlington Community School District and Great River AEA 16 v. Mr. and Mrs. Allen Underwood*, Admin. Doc. SE-151, Cite as 12 D.o.E. App. Dec. 360, September, 1995. *Individuals with Disabilities Education Law Report, 23*, 162.

-Reschly, D. J. In Re Robert T. *John T. and Leigh T. v. Marion Independent School District and Grant Wood AEA 10,* Admin. Doc. SE-160, Cite as 13 D.o.E. App. Dec. 40, January 29, 1996, February 21, 1996. *Individuals with Disabilities Education Law Report,*

-Reschly, D. J. In Re Jonathan G. *Frank and Judy G. v. Cedar Rapids Community School District,* June 28, 1996.

-Reschly, D. J. In Re: Amanda S., *Amanda S. v. Webster City Community School District,* SE-185, May 22, 1997. *Individuals with Disabilities Education Law Report, 26,* 80

-Reschly, D. J. In Re: Theodor A., *Theodor A. v. Fairfield Community School District*, SE-192, September 2, 1997. *Individuals with Disabilities Education Law Report, 26*, 1090.

-Reschly, D. J. In Re: Stefan S. *Stefan S. v. Ankeny Community School District and Heartland Area Education Agency 11*, SE 194, March 6, 1998. <u>*Individuals with Disabilities Education Law Report, 27*</u>, 1007

## **Grants**

- Reschly, D., & Jipson, F. (1974-1975). Arizona Department of Education, *Prevalence of handicapped students by sociocultural group and region*. $92,700.
- Reschly, D., & Gresham, F. (1981-1982). Federal Department of Education, *Use of social competence measures to facilitate parent/teacher involvement, and nonbiased assessment.* $48,769.
- Reschly, D. (1985-1986). Iowa Department of Education, *Project excellence, continuing education of school psychologists*. $26,880.

- Reschly, D., & Andre, T. (1986-1987). Iowa Department of Education, *Investigation of programs for children and youth with mental disabilities*. $14,904.
- Grimes, J. P., & Reschly, D. (1986-1988). United States Department of Education, *Project RE-AIM (Relevant educational assessment and intervention model)*, total award $175,000; ISU portion $51,140.
- Reschly, D., & Casey, A. (1987-1988). Iowa Department of Education, *Extension and expansion of the analysis and evaluation of mental disabilities programs*, $24,991.
- Reschly, D. J., & Reiher, T. C. (1987-1988). Iowa Department of Education, *Iowa behavior disorders research project,* $19,602.
- Reschly, D. J. (1987). National Association of School Psychologists Contract to edit *Directory of school psychology graduate programs*, $7,845.
- Reschly, D. J., & Reiher, T. C. (1988-1989). Iowa Department of Education, *Iowa Behavior Disorders Research Project Extension*, $24,950.
- Reschly, D. J. (1989-1992). Bureau of Special Education, Iowa Department of Education, "Evaluation of Renewed Services Delivery System for At Risk and Handicapped Children and Youth," $210,700.
- Peterson, C. & Reschly, D. (1994-1999). "School Psychologists in Early Childhood Preservice Training Project." Personnel Preparation Program, U. S. Department of Education. ($433,913).
- Reschly, D. J. (1994-1996). *Evaluation of Conventional and Alternative Special Education Assessment Procedures with Diverse Populations in an Urban School Environment.* Minnesota Department of Education, Bureau of Special Education. ($90, 000).
- Fuchs, D., Reschly, D., & Deshler, D. (Co-Directors) (2001-2006). *The National Research Center in Learning Disabilities.* U.S. Department of Education, Office of Special Education Programs ($3,500,000).
- Coulter, T., Dwyer, C., Laine, S., & Reschly, D., (Principal Investigators), National Comprehensive Center on Teacher Quality, (2005-2010) $5,000,000, US Department of Education.
    Reschly is the PI for the Vanderbilt University subcontract, 2005-2006 funding at $225,000; 2006-2007 funding at $248,920; 2007-2008 funding at $250,207; 2008-2009 funding at 250,000; 2009-2010 funding at $261, 066; 2010-2011 at $261,970; 2011-2012 at $270,000.

## Refereed Papers Presented

- Reschly, D. (1972). *Rates of self-reinforcement as a function of task ambiguity and self-esteem status*. Paper presented at the meeting of the Rocky Mountain Psychological Association. Las Cruces, NM.
- Reschly, D. & Sabers, D. (1972). *An empirical study of attitudes toward open education*. Paper presented at the meeting of the Rocky Mountain Educational Research Association. Las Cruces, NM.
- Reschly, D., & Swanson, R. (1973, May). *An investigation of word difficulty of the adjective check list*. Paper presented at the meeting of the Rocky Mountain Psychological Association. Las Vegas.

USCA4 Appeal: 21-1    Doc: 12-1    Filed: 01/08/2021    Pg: 225 of 363
Case 3.92-cr-00068-DJN   Document 86-3   Filed 12/14/20   Page 18 of 52 PageID# 2398

Reschly: p. 17

- Reschly, D. (1974, March). *Diverse meanings of consultation as a means of providing school psychological services*. Paper presented at the meeting of the National Association of School Psychologists. Las Vegas.
- Reschly, D., Brown, D., Wasserman, H., & Davis, R. (1974, March). *Use of covert modeling and self-management procedures in modifying inappropriate teacher behaviors and children's hyperactivity*. Paper presented at the meeting of the National Association of School Psychologists. Las Vegas.
- Sabers, D., Reschly, D., & Meredith, K. (1974, April). *Age differences in degree of acquiescence on positively and negatively scored attitude scale items*. Paper presented at the meeting of the National Council on Measurement in Education. San Francisco.
- Reschly, D. (1975, April). *Empirical data on traditional and pluralistic assessment procedures with culturally different children*. Paper presented at the meeting of the National Association of School Psychologists. Atlanta.
- Reschly, D. (1975, April). Chair. *Practical differences among three approaches to school psychology consultation*. Symposium conducted at the meeting of the National Association of School Psychologists.
- Reschly, D. (1975, April). *Key variables in behavioral consultation*. Paper presented at the meeting of the National Association of School Psychologists.
- Reschly, D. (1976, March). Chair. *Issues in behavioral consultation*. Symposium conducted at the meeting of the National Association of School Psychologists.
- Reschly, D. (1976, March). *Problems and tentative solutions for evaluating the outcomes of behavioral interventions in the schools*. Paper presented at the meeting of the National Association of School Psychologists.
- Reschly, D., Sabers, D., & Meredith, K. (1976, April). *Analysis of different concepts of cultural fairness using WISC-R and MAT scores from four ethnic groups*. Paper presented at the meeting of the American Educational Research Association. (ERIC Document Reproduction Service No. ED 126 111)
- Reschly, D. (1977, March). Chair. *Continuing Education for School Psychologists: Content, Method, and Means*. Symposium conducted at the meeting of the National Association of School Psychologists.
- Reschly, D. (1977, March). *School psychologists' evaluations of training programs and in service needs*. Paper presented at the meeting of the National Association of School Psychologists.
- Reschly, D. (1977, March). *Nonbiased assessment: Differing conceptions and empirical results*. Paper presented at the meeting of the National Association of School Psychologists.
- Reschly, D. (1978, March). *Predictive validity of WISC-R factor scores: Implications for nonbiased assessment*. Paper presented at the meeting of the National Association of School Psychologists.
- Reschly, D. (1978, May). *Comparison of bias in assessment using conventional and pluralistic measures*. Paper presented at the meeting of the Council for Exceptional Children. (ERIC Document Reproduction Service No. ED 153 386)
- Reschly, D. (1979, March). Research with the WISC-R: Implications for assessment of minorities. In *Assessment of minorities*. Symposium conducted at the meeting of the National Association of School Psychologists.

USCA4 Appeal: 21-1    Doc: 12-1    Filed: 01/08/2021    Pg: 226 of 363
Case 3:92-cr-00068-DJN   Document 86-3   Filed 12/14/20   Page 19 of 52 PageID# 2399

Reschly: p. 18

- Reschly, D. (1979, March). Journal policies in school psychology. In *Editors of school psychology journals*. Symposium conducted at the meeting of the National Association of School Psychologists.
- Reschly, D. (1980, April). Journal policies in school psychology. In *Editors of school psychology journals*. Symposium conducted at the meeting of the National Association of School Psychologists.
- Reschly, D., & Kazimour, K. (1980, April). *Generalizability of SOMPA standardization data to other populations.* Paper presented at the meeting of the National Association of School Psychologists.
- Reschly, D. (1981, April). *WISC-R differential validity: Psychological evidence vs court opinions.* Paper presented at the meeting of the National Association of School Psychologists.
- Reschly, D. (1981, April). Journal policies in school psychology. In *Editors of school psychology journals*. Symposium conducted at the meeting of the National Association of School Psychologists.
- Reschly, D. (1981, April). Continuing education needs of school psychologists. In *Leadership in school psychology*. Symposium conducted at the meeting of the National Association of School Psychologists.
- Reschly, D. (1982, March). *SOMPA research: First facts.* Paper presented at the meeting of the National Association of School Psychologists.
- Reschly, D. (1982, March). *Neuropsychological vs behavioral models: To explain or to change?*  Invited paper presented at the meeting of the National Association of School Psychologists.
- Reschly, D. (1983, March). *Convergent and discriminant validity of the Children's Adaptive Behavior Scale.* Paper presented at the meeting of the National Association of School Psychologists.
- Reschly, D. (1983, March). *Neuropsychological vs behavioral models: To explain or to change?* Invited paper presented at the meeting of the National Association of School Psychologists.
- Reschly, D. (1983, April). The right questions (finally): Comments on the National Academy of Sciences report on mild mental retardation classification/placement. In *Placing children in special education: Findings of the National Academy of Sciences panel*. Symposium conducted at the meeting of the American Educational Research Association, Montreal, Canada. (Invited)
- Reschly, D. J. (1984, April). *ABIC and ELP validity: The search for psychological meaning and educational relevance.* Paper presented at the meeting of the National Association of School Psychologists, Philadelphia, PA.
- Reschly, D. J. (1984, April). *School neuropsychology: Excess baggage in psychoeducational assessment.* Paper presented at the meeting of the National Association of School Psychologists, Philadelphia, PA.
- Reschly, D. J., Graham-Clay, S., & Gresham, F. M. (1984, May). *Adaptive behavior measures with mildly retarded students: The name IS the same but the results are different.* Paper presented at the meeting of the American Association on Mental Deficiency.

**J.A.217**

Reschly: p. 19

- Reschly, D. J. (1984, July). *Mild mental retardation: An international perspective.* Paper presented at the meeting of the VII International School Psychology Colloquium, Orleans, France. (Invited)
- Reschly, D. J. (1985, April). *Psychometric differences between nonimpaired and mildly impaired black students.* Paper presented at the meeting of the National Association of School Psychologists, Las Vegas, NV.
- Reschly, D. J. (1985, April). *School neuropsychology: Excess baggage in psychoeducational assessment.* Paper presented at the meeting of the National Association of School Psychologists, Las Vegas, NV.
- Reschly, D. J. (1985, August). Myths and realities in minority special education overrepresentation. Invited paper in <u>Placement of children in special education: Scientific issues and policy trends</u>. Board of Scientific Affairs Symposium conducted at the Annual Convention of the American Psychological Association, Los Angeles, CA.
- Reschly, D. J., & Kicklighter, R. J. (1985, August). *Comparison of black and white EMR students from Marshall v. Georgia.* Paper presented at the meeting of the American Psychological Association, Los Angeles, CA.
- Reschly, D. J. (1985, December). Invited participant and speaker. Wingspread Conference on the Education of Students with Special Needs: Research Findings and Implications for Policy and Practice, Racine, WI.
- Reschly, D. J. (1986, April). *The research integration project and special education reform: Implications for school psychologists.* Paper presented at the meeting of the National Association of School Psychologists, Hollywood, FL.
- Reschly, D. J. (1986, April). Discussant. *New directions in the assessment of behavior disorders.* Symposium conducted at the meeting of the National Association of School Psychologists, Hollywood, FL.
- Reschly, D. J. (1986, April). Chair. *Refereed journals in school psychology.* Editor's Roundtable conducted at the meeting of the National Association of School Psychologists, Hollywood, FL.
- Corkery, J., McDougall, L., & Reschly, D. (1986, April). *Testing or intervention? Effects of behavioral interviews with referral agents.* Paper presented at the meeting of the National Association of School Psychologists, Hollywood, FL.
- Reschly, D. J. (1986, May). Moderator and Discussant. *The special education reform movement: Implications for students now classified as mildly mentally retarded.* American Association on Mental Deficiency, Denver, CO.
- Reschly, D. J. (1986, May). The quiet revolution: Changes in educational criteria, placement, and programming for the mildly retarded. Invited paper in *Sociocultural mental retardation: Perspectives and issues in prevention and treatment.* Multidisciplinary Session conducted at the Annual Convention of the American Association on Mental Deficiency, Denver, CO.
- Reschly, D. J. (1986, August). Adaptive behavior: Issues in classification, placement, program planning, and interventions. In *Social competence characteristics of mildly handicapped children.* Symposium conducted at the Annual Convention of the American Psychological Association, Washington, DC.
- Reschly, D., & Casey, A. (1987, March). Effects of behavioral consultation training on school psychologists. In *Special/regular education reform: Preparing for the revolution*

USCA4 Appeal: 21-1    Doc: 12-1    Filed: 01/08/2021    Pg: 228 of 363

*in school psychology.* Symposium conducted at the Annual Convention of the National Association of School Psychologists, New Orleans, LA.

- Grimes, J., & Reschly, D. (1987, March). *Project RE-AIM goals and initial outcomes.* Paper presented at the meeting of the National Association of School Psychologists, New Orleans, LA.
- Reschly, D. (1987, May). *The influence of the AAMD classification manual on placement bias litigation.* Invited paper presented at the meeting of the American Association on Mental Deficiency, Los Angeles, CA.
- Reschly, D. (1987, May). *Development of the S-1 Federal Court defense against allegations of discrimination due to minority EMR overrepresentation.* Invited paper presented at the Annual Convention of the American Association on Mental Deficiency, Los Angeles, CA.
- Reschly, D. (1987, May). *The continuing saga of minority misclassification litigation.* In symposium conducted at the meeting of the American Association on Mental Deficiency, Los Angeles, CA.
- Reschly, D. (1987, August). Evaluation of RE-AIM. In *Alternative designs for alternative delivery systems.* Symposium conducted at the meeting of the American Psychological Association, New York, NY.
- Reschly, D. (1987, August). A statewide consultation project. *In Behavioral consultation research: A synthesis of the Mardi Gras symposium.* Symposium at the Annual Convention of the American Psychological Association, New York, NY.
- Reschly, D. (1988, April). Chair. *Special education reform/school psychology revolution.* Symposium at the Annual Convention of the National Association of School Psychologists, Chicago, IL.
- Binder, M., Marks, R., & Reschly, D. J. (1988, April). RE-AIM results: Participants' evaluation of training and commitment to reforms. In *Special education reform/school psychology revolution.* Symposium conducted at the meeting of the National Association of School Psychologists, Chicago, IL.
- Grimes, J. P., & Reschly, D. J. (1988, April). The relevant educational assessment and intervention models. In *Special education reform/school psychology revolution.* Symposium conducted at the meeting of the National Association of School Psychologists, Chicago, IL.
- Pierce, K., Reschly, D., Casey, A., & Derr, S. (1988, April). RE-AIM results: Acquisition of behavior consultation skills, consultee evaluations, and student outcomes. In *Special education reform/school psychology revolution.* Symposium conducted at the meeting of the National Association of School Psychologists, Chicago, IL.
- Reschly, D. (1989, March). *Legal and ethical issues in the design of alternative delivery systems.* Paper presented at the Annual Convention of the National Association of School Psychologists, Boston, MA.
- Reschly, D. J., & McMaster-Beyer, M. (1990, April). *Trends and non-trends in school psychology graduate education.* Paper presented at the meeting of the National Association of School Psychologists, San Francisco, CA.
- Prasse, D. P., & Reschly, D. J. (1990, April). *Legal challenges to special education reform.* Paper presented at the meeting of the National Association of School Psychologists, San Francisco, CA.

- Reschly, D. J. (1990, April). *The Iowa Renewed Services Delivery System baseline results: Implications for national reform plans*. Paper presented at the Annual Convention for the national Association of School Psychologists, San Francisco, CA.
- Reschly, D. (1990, July). *Trends in the graduate education of school psychologists in the United States.* Paper presented at the Thirteenth Annual International School Psychology Colloquium, Salve Regina College, Newport, RI.
- Reiher, T. C., & Reschly, D. J. (1990, October). *Teacher ratings of support services for Iowa behaviorally disordered students.* Paper presented at the meeting of the Iowa Council for Exceptional Children, Des Moines, IA.
- Reschly, D. J. (1991, March). *University faculty shortages: A 1989-1991 study of filled and unfilled vacancies*. Annual Convention of the National Association of School Psychologists, Dallas.
- Reschly, D. J. (1991, March). Symposium Organizer and Chair. *Personnel shortages: The school psychology crisis of the 1990s and beyond*. Meeting of the National Association of School Psychologists, Dallas, TX.
- Reschly, D. J., & Ullman, J. (1991, March). Redefining service delivery options for school psychologists: Current status and the Iowa experience. In *Training initiatives in school psychology: Programs and perspectives*. Symposium conducted at the meeting of the National Association of School Psychologists, Dallas, TX.
- Reschly, D. J., & McMaster-Beyer, M. (1991, March). *Program enrollment and graduates: A twenty-year decline*. Paper presented at the meeting of the National Association of School Psychologists, Dallas TX.
- Reschly D. J., & Connolly, L. M. (1991, March). University faculty shortages: A 1989-1991 study of filled and unfilled vacancies. In *Personnel shortages: The school psychology crisis of the 1990s and beyond*. Symposium conducted at the meeting of the National Association of School Psychologists, Dallas, TX.
- Reschly, D. J., Flugum, K., & Golbert, K. (1991, August). *Influences of intervention quality on the outcomes of prereferral interventions.* Annual Convention of the American Psychological Association, San Francisco.
- Reschly, D. J. & Starkweather, A. (1992, March). *Alternative educational delivery systems: The emerging consensus among practitioners and faculty*. Paper presented at the meeting of the National Association of School Psychologists, Nashville, TN.
- Reschly, D. J. (1992, March). *School psychology faculty and practitioners' demographics, job satisfaction, and role preferences.* Paper presented at the meeting of the National Association of School Psychologists, Nashville, TN.
- Reschly, D. J. (1992, March). IQ testing: Our past, not our future. Invited address. In *The Future of Psychological Assessment.* Symposium conducted at the meeting of the National Association of School Psychologists, Nashville, TN.
- Reschly, D. J. & Flugum, (1992). *Prediction of consultation short- and long-term outcomes.* Annual Convention of the American Psychological Association, Toronto.
- Reschly, D. J. (1993, August). *School psychology and minority overrepresentation.* Paper. SSSP. Toronto.
- Andresen, K. R., & Reschly, D. J. (1993). *Effects of the conceptualization of student problems on teacher self-efficacy.* Annual Convention of the National Association of School Psychologists. Washington DC

J.A.220

- Reschly, D. J. (1993, March). *The future of assessment.* Debate. Annual Convention of the National Association of School Psychologists, Washington D.C.
- Reschly, D. J. (1993, March). *Functional assessment for classification and intervention.* Preconvention Workshop. NASP.
- Reschly, D. J. (1994, March). *System reform implications for the training of school psychologists.* Annual Convention of the National Association of School Psychologists, Seattle.
- Reschly, D. J. (1994, March). *Analysis of minority overrepresentation research and litigation: Implications for system reform.* Annual Convention of the National Association of School Psychologists, Seattle.
- Reschly, D. J. (1994, March). Assessment issues and NASP Policy. Invited presentation. In *The future of psychological assessment.* Symposium. Annual Convention of the National Association of School Psychologists, Seattle.
- Reschly, D. J. (1994, August). Behavior Assessment Technology and the Revision of the Standards for Educational and Psychological Testing, Symposium. Annual Convention American Psychological Association, Los Angeles.
- Reschly, D. J. (1994, August). Variables related to behavioral consultation outcomes. In *Behavior consultation: Advances in research and practice.* Symposium. Annual Convention American Psychological Association, Los Angeles.
- Reschly, D. J. (1995, January). *IQ and Special Education: History, Current Status, and Alternatives.* Invited Address. Board on Testing and Assessment, National Research Council, National Academy of Sciences, LaJolla, CA.
- Reschly, D. J., Starkweather, A. R., Birtwistle, J., & Dawson, M. M. (1995, July). *Role Preferences and Priorities: Comparisons of British (Educational) and American (School) Psychologists.* Paper Presented at the XVIII International School Psychology Colloquium, University of Dundee, Dundee, Scotland.
- Reschly, D. J. (1995, August). *Characteristics of school psychology graduate education and school-based practice: Implications for doctoral specialty definition.* Paper presented at the meeting of the Council of Directors of School Psychology Programs Second Annual School Psychology Training Conference, American Psychological Association, New York, NY.
- Reschly, D. J. (1995, August). *System change in the heartland.* Paper presented at the Second Annual Institute for Administrators of School Psychological Services, American Psychological Association, New York.
- Reschly, D. J. (1995, August). *Politics or science—The Bell Curve controversy.* In symposium presented at the meeting of the American Psychological Association, New York.
- Reschly, D. J. (1996, April). Approaches to the Analysis and Resolution of Disproportionate Minority Participation in General and Special Education Programs, Mini-Skills Workshop, National Association of School Psychologists Annual Convention, Atlanta.
- Reschly, D. J., & Wilson, M. S. (1996, August). Psychologists' Choices of Assessment Instruments: Malpractice Litigation Looking for a Place to Happen? American Psychological Association Symposium Paper, Annual Convention, Toronto

Reschly: p. 23

- Reschly, D. J. (1997, March). Analysis and Prevention of Disproportionate Minority Representation in General and Special Education Programs. Annual Convention of the National Association of School Psychologists, Anaheim.
- Reschly, D. J. (1998, April). *Review and critique of the responsibilities of test users in the proposed APA/AERA/NCME standards*. Paper presented as part of symposium, "Standards for educational and psychological testing in the 21st century." Annual Convention of the National Association of School Psychologists, Anaheim, CA.
- Ikeda, M. J., & Reschly, D. J. (1997). *Application of problem solving to low incidence conditions and evaluation of effects of problem solving*. Presented as part of a day long workshop at the National Association of School Psychologists Annual Conference, Anaheim, CA, April 1997.
- Reschly, D. J. (1997). *Patterns of disproportionate representation and strategies to reduce overrepresentation in special education.* Paper presented at the Annual Convention of the National Association for Multicultural Education, Albuquerque, New Mexico.
- Reschly, D. J. (1998, April). *Securing school psychology's future: Data-based decision making and outcomes criteria.* Preconvention Workshop, Annual Convention of the National Association of School Psychologists, Orlando FL.
- Reschly, D. J. (1998, April). *Special education categorical diagnoses: Communicating too little and too much.* Paper presented as part of symposium, "Boxes, little boxes, no more little boxes: A shift from categorical to noncategorical needs-based special education." Annual Convention of the National Association of School Psychologists, Orlando FL.
- Reschly, D. J. (1998, April). *Profile analysis: Reification of error*. Paper presented as part of symposium, "A critical appraisal of *Kaufman's Intelligent Testing with the WISC-III*. Annual Convention of the National Association of School Psychologists, Orlando FL.
- Reschly, D. J. (1998, April). *Debate: School psychology and mental health: Is it time to sever the connection.* (with Irwin Hyman). Annual Meeting of the Trainers of School Psychologists, Orlando FL.
- Reschly, D. J. (1998, August). *School psychology: Is there evidence of change?* Annual Convention of the American Psychological Association, San Francisco.
- Reschly, D. J. (1999, August). *Dilemmas for psychologists who determine disability status in educational settings.* Annual Convention of the American Psychological Association, Boston.
- Reschly, D. J., Ikeda, M. (2000, March). *Comparisons of school psychologists with and without IQ: Roles, assessment practices, and job satisfaction.* Annual Convention of the National Association of School Psychologists,, New Orleans, LA.
- Reschly, D. J., & Hosp, J. (2000, August). *Regional and Setting Differences in School Psychology Practice.* Annual Convention of the American Psychological Association, Washington DC.
- Reschly, D. J. (2001, April). *Minority overrepresentation: New legal requirements, alternative criteria, and solutions.* Mini-skills Workshop, Annual Convention of the National Association of School Psychologists, Washington DC.

**J.A.222**

USCA4 Appeal: 21-1    Doc: 12-1    Filed: 01/08/2021    Pg: 232 of 363
Case 3.92-cr-00068-DJN   Document 86-3   Filed 12/14/20   Page 25 of 52 PageID# 2405

Reschly: p. 24

- Reschly, D. J. (2001, April). *Black School Psychologists: Roles, Satisfaction, Assessment Practices, and Reform Attitudes.* Poster, Annual Convention of the National Association of School Psychologists, Washington DC.
- Reschly, D. J. (2001, August). Black School Psychologists' Evaluations of Reform Themes and Special Education Acceptability. Poster, Annual Convention of the American Psychological Association, San Francisco.
- Reschly, D. J. (2001, August). Reform-Revolution Revisited: Outcomes Criteria and School Psychology Change in the 21st Century. Invited address, Division 16 at the Annual Convention of the American Psychological Association, San Francisco.
- Reschly, D. J. & Rosenfield, S. (February, 2002). Minority Overrepresentation: Legal Issues and Intervention Alternatives. Annual Convention of the National Association of School Psychologists, Chicago.
- Reschly, D. J. (February, 2002). *State and National Disproportionality Patterns by Disability and Sociocultural Group.* Mini-skills Workshop, Annual Convention of the National Association of School Psychologists, Chicago.
- Reschly, D. J., & Harry, B. (April 2002). *Minority Overrepresentation in Special Education: The NRC Report.* Council for Exceptional Children, New York.
- Reschly, D. J. (2002, August). *Symposium organizer and chair, The National Research Council Report on SSA Eligibility in MR* and paper *Combining Information on Intelligence and Adaptive Behavior in Eligibility Decisions.* Annual Convention of the American Psychological Association, Chicago.
- Reschly, D. J., Hosp, J. L., & Schmied, C. M. (February 2003). *And Miles to Go….State SLD Requirements and National Recommendations.* International Conference of the Learning Disabilities Association. Chicago
- Ysseldyke, J. E., Reschly, D. J., & Vanderwood, M. (April 2003). Full-day Workshop on Assessment. National Association of School Psychologists Annual Convention. Toronto.
- Reschly, D. J. (2003, April). *Redefinition of Learning Disabilities*. Council for Exceptional Children Annual Convention, Seattle.
- Reschly, D. J. (March 2003). *Demise of IQ-Achievement Discrepancy: What Are the Alternatives.* National Association of School Psychologists Annual Convention, Dallas
- Reschly, D. J. (March 2004).
- Reschly, D. J., Ysseldyke, J. E., & Vanderwood, M. (April 2004). Full-day Workshop on Assessment. National Association of School Psychologists Annual Convention. Dallas.
- Reschly, D.J. (April 2004). *Trends in State SLD Criteria*. Presented as part of the Symposium, NRCLD's Classification Studies, Focus Groups, and State Surveys. Council for Exceptional Children Annual Convention. New Orleans.
- Reschly, D. J. (June 2004). *Alternative Approaches to Disability Classification*. Third Anglo-American Conference on Special Education and School Reform. Cambridge England.

*Note: Refereed presentations at national learned society meetings 2005-2006 to be added*

**J.A.223**

USCA4 Appeal: 21-1    Doc: 12-1    Filed: 01/08/2021    Pg: 233 of 363
Case 3.92-cr-00068-DJN   Document 86-3   Filed 12/14/20   Page 26 of 52 PageID# 2406

Reschly: p. 25

- Reschly, D. J. (2007, April 19). *Specific learning disabilities identification policies: Choices and consequences.* Paper Annual Convention of the Council for Exceptional Children, Louisville, KY.
- Reschly, D. J. (2007, March 29). *Paradigm shift and beyond: Improving results for all.* Invited general session address, Annual Convention National Association of School Psychologists, New York City.
- Reschly, D. J., & Patton, J. M. (2007, March 30). *Overrepresentation policy, prevention, early intervention/treatment, and system change.* Invited 4 hour pre-convention workshop Annual Convention National Association of School Psychologists, New York City.
- Reschly, D. J. (2007, August 19). Organized symposium, *Controversies in determination of mental retardation in death penalty appeals* and presented paper, *Misunderstandings in death penalty appeals: Varying MR conceptions and criteria.* Annual Convention American Psychological Association, San Francisco.
- Reschly, D. J. (2009). *Consequences of school psychologists' decisions: Death penalty and SSI outcomes*. Annual Convention of the National Association of School Psychologists, Boston.
- Reschly, D. J. (2009, August 7). Organized symposium, *Death Penalty Court Decisions and Mental Retardation Classification and Research,* and presented paper, *Authoritative Conceptions of Mental Retardation and Atkins Decisions.* Annual Convention of the American Psychological Association. Toronto.
- Reschly, D. J. (2009, August 6). *School psychology paradigm shift:  or  Cronbach's two disciplines of scientific psychology.* Annual Convention of the American Psychological Association. Toronto.
- Reschly, D. J., & McGraner, K. L. (2010, March). *Improving teacher preparation with evidence-based innovation configurations in reading and math.* Annual Convention of the Council for Exceptional Children, Nashville, TN.
- Reschly, D. J., & Gresham, F. M. (2010, August*). Standard of practice and Flynn Effect testimony in death penalty appeals.* Annual Convention of the American Psychological Association, San Diego.
- Welsh, J. S. & Reschly, D. J. (2011, February 23). *Survival skills for litigation: Preparation, testimony, and the Daubert challenge.* Invited Workshop, National Association of School Psychologists, San Francisco.
- Oliver, R. M., & Reschly, D. J. (2011, February 25). *State SLD identification policies: A changing landscape since the reauthorization of IDEA 2004.* Poster Annual Convention National Association of School Psychologists, San Francisco.
- Reschly, D. J. (2011, April). *Evaluating teacher effectiveness: What does it mean for special educators.* Annual Convention of the Council for Exceptional Children, Washington DC.
- Welsh, J. S. & Reschly, D. J. (2012). *Survival skills for litigation: Preparation, testimony, and the Daubert challenge.* Invited Workshop, National Association of School Psychologists, Philadelphia.
- Welsh, J. S. & Reschly, D. J. (2013). *Survival skills for litigation: Preparation, testimony, and the Daubert challenge.* Invited Workshop, National Association of School Psychologists, Seattle.

**Other Presentations**

**Colloquia at the following universities** (listed in chronological order)

University of Wisconsin-Eau Claire, University of British Columbia, University of Utah, University of Oklahoma, University of Arizona, Wichita State University, Memphis State University, James Madison University, University of Georgia (twice), Pennsylvania State University (twice), New York University, University of Pittsburgh, University of Oregon (twice), Indiana State University, Illinois State University (twice), Louisiana State University, San Diego State University, University of California-Riverside (twice), Ohio State University, Syracuse University, University of Kentucky, Governor's State University (IL), Northern Illinois University, Vanderbilt University, University of South Carolina, Mississippi State University, University of Texas (twice), University of Minnesota, Iowa State University, City University of New York-Queens, University of Iowa, University of Otago (NZ), Massey University (NZ)

Colloquium topics have included empirical studies on bias in assessment, legal issues, mild mental retardation classification issues, and school psychology professional issues.

**Keynote Addresses and Workshops in 47 States (Over 300 presentations)**

- Reschly, D. (1976, February). *Use of behavioral consultation techniques in interventions for chronically disruptive students*. Presentation. Iowa Department of Public Instruction Workshop for School Psychologists.
- Reschly, D. (1976, August). *Issues in the classification, assessment, and interventions for children with emotional disabilities*. Presentation. Iowa Department of Public Instruction Workshop for School Psychologists, Waterloo, IA.
- Reschly, D. (1976, October). *Adaptive behavior assessment and interventions with mentally retarded students*. Presentation. Iowa Department of Public Instruction Workshop for School Psychologists, Ames, IA.
- Reschly, D. (1976, November). *Behavioral consultation in schools*. Presentation. Iowa Department of Public Instruction Workshop for School Psychologists, Des Moines, IA.
- Reschly, D. (1976, November). *Recent research in intellectual assessment*. Presentation. Metropolitan Nashville Inservice Meeting for School Psychologists, Nashville, TN.
- Reschly, D. (1977, April). *Behavioral consultation with parents and teachers*. Presentation. University of Wisconsin-Eau Claire, Sixth Annual School Psychology Institute, Eau Claire, WI.
- Reschly, D. (1977, May). *Nonbiased assessment and school psychologists*. Presentation. Michigan Association of School Psychologists.
- Reschly, D. (1977, May). *Legal challenges to school psychological assessment*. Presentation. Area Education Agency IX, Davenport, IA.
- Reschly, D. (1977, October). *Adaptive behavior assessment with the mildly retarded*. Presentation. Area Education Agency VII, Waterloo, IA.

**J.A.225**

USCA4 Appeal: 21-1     Doc: 12-1     Filed: 01/08/2021     Pg: 235 of 363
Case 3.92-cr-00068-DJN   Document 86-3   Filed 12/14/20   Page 28 of 52 PageID# 2408

Reschly: p. 27

- Reschly, D. (1977, November). School Psychologists and assessment in the future. P. O. Wagner Memorial Address, Ohio School Psychologist Association.
- Reschly, D. (1977, December). *Nondiscrimination in placement: The challenge to school psychologists*. Presentation. South Dakota Association of School Psychologists, Vermillion, SD.
- Reschly, D. (1978, February). *The measurement and use of adaptive behavior in special education classification and programming*. Presentation. Special Study Institute for Intern School Psychologists, Division of Special Education, Ohio Department of Education, Columbus, OH.
- Reschly, D. (1979, January). *Assessment of adaptive behavior in mental disabilities diagnosis and programming*. Presentation. Area Education Agency VI, Marshalltown, IA.
- Reschly, D. (1979, April). *Nonbiased assessment and mild mental retardation.* Presentation. Area Education Agency V, Ft. Dodge, IA.
- Reschly, D. (1979, May). *Measurement and use of adaptive behavior*. Workshop. Council Bluffs Public Schools and Iowa Department of Public Instruction, Council Bluffs, IA.
- Reschly, D. (1979, July). *What's new in assessment*. Colloquium. University of British Columbia, Vancouver, BC.
- Reschly, D. (1979, October). *Bias in assessment: What are the issues?* Keynote address. Georgia Association of School Psychologists Fall Workshop.
- Reschly, D. (1979, September). *University personnel as a support system for psychological research in the schools*. Presentation. Iowa Department of Public Instruction Workshop for School Psychologists.
- Reschly, D. (1979, December). *Bias in assessment: What are the issues?* Keynote address. Iowa Educational Research and Evaluation Association.
- Reschly, D. (1980, April). *Bias in assessment: Differing conceptions and empirical results*. Colloquium. University of Utah, Salt Lake City, UT.
- Oakland, T., & Reschly, D. (1980, April). *Nonbiased assessment*. Preconvention Workshop. National Association of School Psychologists Annual Convention, Washington, DC.
- Reschly, D. (1980, April). *Overview of PL 94-142*. Presentation. Morningside College, Sioux City, IA.
- Reschly, D. (1980, April). *Characteristics of handicapped children*. Presentation. Morningside College, Sioux City, IA.
- Reschly, D. (1980, May). *Adaptive behavior and nonbiased assessment*. Workshop. University of Wisconsin-Eau Claire, Ninth Annual School Psychology Institute.
- Reschly, D. (1980, May). *Bias in assessment: Differing conceptions and empirical results*. Keynote address. South Carolina Association of School Psychologists Spring Convention.
- Reschly, D. (1980, May). *Adaptive behavior: Background, assessment, and practices*. Workshop. Iowa Department of Public Instruction Special Institute.
- Reschly, D. (1980, June). *Nondiscriminatory assessment: Quality indicators*. Workshop. Indianapolis Public Schools.

- Reschly, D. (1980, June). Invited participant, Spring Hill Symposium on the Future of Psychology in the Schools. Minneapolis, MN.
- Reschly, D. (1980, July & August). *Psychoeducational assessment.* Workshop. Louisiana State Department of Education.
- Reschly, D. (1980, September). *Trends in school psychological assessment.* Keynote address. Association of School Psychologists.
- Reschly, D. (1980, October). *Nondiscriminatory assessment.* Workshop. Colorado Society of School Psychologists Fall Convention.
- Reschly, D. (1980, October). *Recent research on test bias.* Colloquium. University of Oklahoma.
- Reschly, D. (1980, November). *What's right about school psychology.* Keynote address. Oklahoma School Psychological Association Fall Convention.
- Reschly, D. (1980, November). *Nonbiased assessment.* Workshop. Oklahoma School Psychological Association Fall Convention.
- Reschly, D. (1980, December). *Nonbiased assessment.* Workshop. Illinois Department of Education and Illinois School Psychologists Association, Suburban Chicago.
- Reschly, D. (1981, January). Nonbiased assessment. Workshop for Illinois School Psychologists Association and the Chicago Public Schools.
- Reschly, D. (1981, January). *Empirical studies of test bias.* Colloquium. University of Arizona.
- Reschly, D. (1981, January). *Nonbiased assessment.* Workshop. Arizona State School Psychologists Association.
- Reschly, D. (1981, February). *School psychology and the issue of bias.* Colloquium. Wichita State University, Wichita, KS.
- Reschly, D. (1981, February). *Research on SOMPA.* Workshop. Wichita Public Schools, Wichita, KS.
- Reschly, D. (1981, February). *Trends in psychoeducational assessment.* Workshop. Heartland Area Education Agency 11.
- Oakland, T., & Reschly, D. (1981, April). *Nonbiased assessment.* Preconvention Workshop. National Association of School Psychologists Annual Convention, Houston, TX.
- Reschly, D. (1981, May). *Nondiscriminatory assessment.* Workshop. Texas Psychological Association.
- Reschly, D. (1981, May). *Research on performance of minorities on standardized tests.* Colloquium. Memphis State University.
- Reschly, D. (1981, July). *Trends in research, court opinions, and legislation regarding bias.* Colloquium. James Madison University Annual Summer Institute for School Psychologists.
- Reschly, D. (1981, August). *Psychoeducational assessment.* Workshop. Louisiana State Department of Education.
- Reschly, D. (1981, September). *Assessment of social skills.* Workshop. Iowa Department of Public Instruction.
- Reschly, D. (1981, October). *Current trends in school psychology.* Keynote address. Oklahoma School Psychology Association Fall Convention.

**J.A.227**

USCA4 Appeal: 21-1    Doc: 12-1    Filed: 01/08/2021    Pg: 237 of 363
Case 3:92-cr-00068-DJN   Document 86-3   Filed 12/14/20   Page 30 of 52 PageID# 2410

Reschly: p. 29

- Reschly, D. (1981, October). *Behavioral consultation*. Workshop. Oklahoma School Psychology Association Fall Convention.
- Reschly, D. (1981, November). Invited participant. Olympia Conference on Planning the Future of School Psychology.
- Reschly, D. (1981, November). *Nonbiased assessment*. Workshop. Florida Association of School Psychologists.
- Reschly, D. (1982, January). *Professional issues related to assessment of adaptive behavior*. Workshop. Grant Wood Area Education Agency 10, Cedar Rapids, IA.
- Reschly, D. (1982, April). *Current developments in school psychology*. Continuing Education Presentation. Mississippi Bend Area Education Agency 9 School Psychologists.
- Reschly, D. (1982, April). *Fair and useful assessment for minority students*. Workshop. Illinois State Board of Education, Mt. Vernon, IL.
- Reschly, D. (1982, April). *Placement bias litigation and psychoeducational assessment*. Invited paper. Buros-Nebraska Symposium on Measurement and Testing.
- Reschly, D. (1982, May). *Discrimination in special education assessment: Myth and reality*. Colloquium. University of Georgia.
- Reschly, D. (1982, September). *Assessing adaptive behavior*. Inservice. Arrowhead Education Agency.
- Reschly, D. (1982, October). *Nontest based assessment of children*. Workshop. North Carolina School Psychology Association Fall Conference, Wrightsville Beach, NC.
- Reschly, D. (1982, October). *School psychology today: Progress, not impasse*. Colloquium. Pennsylvania State University.
- Reschly, D. (1982, October). *Use of social competence data in classification/placement and program planning/intervention decisions*. Workshop. Sixteenth Annual Pennsylvania School Psychologists Conference.
- Reschly, D. (1983, January). *School psychology in the decade ahead: Old problems, new solutions*. Keynote address. New Jersey Association of School Psychologists Winter Meeting.
- Reschly, D. (1983, January). *Use of social competence information in classification/placement decisions*. Seminar. New York City Association of School Psychologists.
- Reschly, D. (1983, January). *Use of social skills and adaptive behavior data in programming: IEP objectives and least restrictive environment*. Keynote address. Cuyahoga Special Education Service Center, Cuyahoga, OH.
- Reschly, D. (1983, March). *Beyond test bias: Appropriate assessment and programming for handicapped minority students*. Keynote address. Mississippi Association for Psychology in the Schools Spring Meeting.
- Reschly, D. (1983, April). *Recent developments in ability testing*. Presentation. Iowa Psychological Association Continuing Education, Ames, IA.
- Reschly, D., & Fleig, G. (1983, May). *Conflicting assessment information: Separating the wheat from the chaff*. Invited workshop. Fourth National Institute on Legal Problems of Educating the Handicapped.

- Reschly, D. (1983, June). *Learning problems: Handicaps or cultural differences? Appropriate assessment for minority students*. Workshop. Central Ohio Special Education Regional Resource Center, Columbus, OH.
- Reschly, D. (1983, September). *Screening and monitoring referrals*. Workshop. Schaumberg Public Schools, Schaumberg, IL.
- Reschly, D. (1983, October). Keynote address. Georgia Association of School Psychologists, Rock Eagle, GA.
- Reschly, D. (1983, October). Keynote address. Washington Association of School Psychologists, Wenatchee, WA.
- Reschly, D. (1983, October). *Recent advances in assessment*. Workshop. AEA VII staff, Waterloo, IA.
- Reschly, D. (1983, November). Keynote address. North Dakota and Northwest Minnesota School Psychologists, Moorhead, MN.
- Reschly, D. (1983, November). *Assessment of adaptive behavior*. Keynote address and workshop.  South Carolina Association of School Psychologists Fall Convention.
- Reschly, D. (1983, November). Assessment for the Teaching/Learning Process. Keynote address at the Ontario Institute for Studies in Education International Symposium on Exceptional Students, Toronto, Canada.
- Reschly, D. (1984, February). School Psychology Workshop. Gary, IN.
- Reschly, D. (1984, February). School Psychology Workshop. NSSEO Inservice, Palentine, IL.
- Reschly, D. (1984, March). *Current issues and recent advances in assessment of the handicapped*. State of Virginia Department of Education Workshop for Related Services Personnel.
- Reschly, D. (1984, April). *Recent developments in ability testing and nonbiased assessment*. Seminar. Iowa Psychological Association Continuing Education, Ames, IA.
- Reschly, D. (1984, May). *Beyond test bias and minority overrepresentation*. General Session Address. Fifth National Institute on Legal Problems of Educating the Handicapped, Chicago, IL.
- Reschly, D. (1984, May). *Assumptions in placement bias litigation: A research agenda in mild mental retardation*. First Annual Pittsburgh Symposium on Research with the Handicapped, Pittsburgh, PA.
- Reschly, D. (1984, May). *Adaptive behavior and social skills in classification and placement decisions*. Thirteenth Annual School Psychology Institute, University of Wisconsin, Eau Claire, WI.
- Reschly, D. J. (1984, July). Mild mental retardation: An international perspective. Paper presented at the VII International School Psychology Colloquium, Orleans, France.
- Reschly, D. (1984, September). *Choices and alternatives for compliance with psychoeducational legal requirements*. Iowa DPI Conference on Reevaluation of Assessment Practices.
- Reschly, D. (1984, September). *Due process and testing practices*. AEA7, Waterloo, IA.
- Reschly, D. (1984, September). *Social competence: Research and interventions*. Kentucky Association of School Psychologists, Lexington, KY.

**J.A.229**

USCA4 Appeal: 21-1    Doc: 12-1    Filed: 01/08/2021    Pg: 239 of 363
Case 3:92-cr-00068-DJN   Document 86-3   Filed 12/14/20   Page 32 of 52 PageID# 2412

Reschly: p. 31

- Reschly, D. (1984, October). *Avoiding placement bias litigation: Lessons from Larry P., PASE, and Marshall*. Presentation. National Association of Directors of Special Education.
- Reschly, D. (1984, October). *Potpourri of school psychology issues*. Iowa School Psychology Association.
- Reschly, D. (1984, October). *Social skills assessment and intervention*. Northern New England School Psychology Conference.
- Reschly, D. (1984, November). *Adaptive behavior research, assessment, and training*. Florida Association of School Psychologists.
- Reschly, D. (1984, November). *Social competence: Adaptive behavior and social skills*. Tennessee Association of School Psychologists.
- Reschly, D. (1984, November). *Understanding psychoeducational assessment evidence*. Workshop. Due Process Hearing Officers, Virginia Department of Education.
- Reschly, D. (1984, November). *Fair and useful assessment: Current trends*. Workshop. Washington Public Schools, Washington, DC.
- Reschly, D. (1984, December). *Legal influences on intellectual assessment*. Colloquium. University of Arizona, Tucson, AZ.
- Reschly, D. (1984, December). *Trends in assessment*. Workshop. Clark County Public Schools, Las Vegas, NV.
- Reschly, D. (1985, May). Colloquium. University of Oregon, Eugene, OR.
- Reschly, D. (1985, May). Workshop and Keynote Address. Oregon School Psychologists Association, Portland, OR.
- Reschly, D. (1985, June). Presentation. State Department Conference on Identification and Assessment, Maryland State Department of Education, Baltimore, MD.
- Reschly, D. (1985, October). Workshop. Florida State Department of Education, Tampa, FL.
- Reschly, D. (1985, October). Colloquium. School Psychology Faculty and Students. Indiana University, Bloomington, IN.
- Reschly, D. (1985, October). *Social competence*. Workshop. Canton, OH.
- Reschly, D. (1985, November). Address. University of Arizona Conference on Assessment of Minorities, Tucson, AZ.
- Reschly, D. (1986, January). *Assessment of adaptive behavior*. Presentation. South Suburban (Chicago) Special Education Cooperative, Chicago, IL.
- Reschly, D. (1986, February). *Non-biased assessment*. Colloquium. Illinois State University, Normal, IL.
- Reschly, D. (1986, March). *Adaptive behavior assessment*. Keynote address. Minnesota Association for Education of Mentally Retarded Students.
- Reschly, D. (1986, April). *Assessment of social competence for classification and programming*. Workshop. Wisconsin School Psychologists Association.
- Reschly, D. (1986, May). Keynote address. Minnesota Department of Education Conference on Special Education Assessment, Minneapolis, MN.
- Reschly, D. (1986, May). Keynote Address. Arizona Association of School Psychologists Spring Convention, Phoenix, AZ.

J.A.230

USCA4 Appeal: 21-1    Doc: 12-1    Filed: 01/08/2021    Pg: 240 of 363
Case 3.92-cr-00068-DJN   Document 86-3   Filed 12/14/20   Page 33 of 52 PageID# 2413

Reschly: p. 32

- Reschly, D. (1986, June). Address. New Jersey Conference on Special Education, Newark, NJ.
- Reschly, D. (1986, July). *Continuing education videotapes for school psychologists*. Arkansas State Department of Education.
- Reschly, D. (1986, September). Two-day RE-AIM workshop. Atlantic, IA.
- Reschly, D. (1986, September). Two-day RE-AIM workshop. Des Moines, IA.
- Reschly, D. (1986, October). Keynote address and workshop. Arkansas School Psychology Association, Little Rock, AK.
- Reschly, D. (1986, October). *MD data analysis*. Iowa Association of School Psychologists, Altoona, IA.
- Reschly, D. (1986, November). *Mental retardation classification criteria*. Workshop. Minnesota State Department of Education, Minneapolis, MN.
- Reschly, D. (1986, November). *Assessment of adaptive behavior*. Workshop. Minnesota State Department of Education, Brainard, MN.
- Reschly, D. (1987, January). Workshop & Keynote Address. Northern Ohio School Psychology and Special Education meetings, Richfield, OH.
- Reschly, D. (1987, January). *RE-AIM Continuing Education Presentation*. Cedar Rapids, IA.
- Reschly, D. (1987, January). *RE-AIM Continuing Education Presentation*. Elkader, IA.
- Reschly, D. (1987, February). Workshop. Northwest Ohio School Psychologists, Wapakoneta, OH.
- Reschly, D. (1987, February). Workshop. West Central Ohio SERCC, Bluffton College, Bluffton, OH.
- Reschly, D. (1987, March). *Large scale training and evaluation of the impact of behavioral consultation.* Colloquium. Louisiana State University, Baton Rouge, LA.
- Reschly, D. (1987, April). Invited Address. Seminar for Federal Judges sponsored by the Danforth Foundation, Park City, UT.
- Reschly, D. (1987, May). General Session Address. Eighth National Institute on Law and Education of the Handicapped, Scottsdale, AZ.
- Reschly, D. (1987, June). *Behavioral consultation*. Workshop. New Jersey School Psychologists, Freehold, NJ.
- Reschly, D. (1987, September). Keynote address. Minnesota State School Psychologists Meeting, Minneapolis, MN.
- Reschly, D. (1987, October). A*daptive behavior.* Keynote address and workshop. Nebraska State School Psychologists Fall Convention, Lincoln, NE.
- Reschly, D. (1987, November). *Behavioral consultation*. Workshop. Egg Harbor, NJ.
- Reschly, D. (1987, December). Keynote address and workshop. New Jersey Association of School Psychologists, Clark, NJ.
- Reschly, D. (1988, January). Assessment issues and legal developments. General Session Address. CEC-MR International Conference, Mental retardation: Emerging challenges for the future, Honolulu, HI.
- Reschly, D. (1988, March). *Assessment and legal issues*. Presentation. Iowa Conference on Futures in Mental Disabilities.

- Reschly, D. (1988, May). *Why the sky fell on IQ testing, but only in California.* Colloquium. University of California-Riverside, Riverside, CA.
- Reschly, D. (1988, May). *Preparation for the 1990s revolution in the practice of school psychology.* Colloquium. San Diego State University, San Diego, CA.
- Reschly, D. (1988, May). *Tangible evidence vs expert opinion: The psychologist's contribution to legal proceedings.* Presentation. Iowa Psychological Association.
- Reschly, D. (1988, June). *Expanding special Olympics opportunities to junior and senior high school students with mild mental retardation.* Joseph P. Kennedy, Jr., Foundation Symposium, Arlington, VA.
- Reschly, D. (1988, October). Keynote address and workshops. Virginia Association of School Psychologists-Virginia Psychological Association Fall Convention, Norfolk, VA.
- Reschly, D. (1988, October). Keynote address. Indiana Association of School Psychologists, Indianapolis, IN.
- Reschly, D. (1988, November). *Adaptive behavior. W*orkshops and Keynote address. Fall Conference of Florida Association of School Social Workers, Orlando, FL.
- Reschly, D. (1988, November). Workshop. School Psychologists, Bakersfield Public Schools Administration Center, Bakersfield, CA.
- Reschly, D. (1988, December). Presentation. Arkansas Department of Education Staff, Little Rock, AK.
- Reschly, D. (1989, January). *Terminology and classification in mental retardation.* Invited presentation. Committee on Terminology and Classification – Mental Retardation, National Headquarters of the American Association on Mental Retardation, Alexandria, VA.
- Reschly, D. (1989, January). Seminar for administrative law judges. University of Iowa, Iowa City, IA.
- Reschly, D. (1989, February). Keynote address. Utah Association of School Psychologists, Salt Lake City, UT.
- Reschly, D., & Stumme, J. (1989, March). *The school psychologist in the courtroom.* Pre-Convention Workshop (full day). National Association of School Psychologists, Boston, MA.
- Reschly, D. (1989, April). *Minority overrepresentation in programs for the mildly handicapped.* Keynote address. Arkansas Department of Education Conference, Little Rock, AK.
- Reschly, D. (1989, June). *Behavior consultation and school psychology in the 1990s.* Two-day workshop. California Department of Education, San Jose, CA.
- Reschly, D. (1989, July). Presentation. School Psychologists, California Department of Education, Lake Tahoe, CA.
- Reschly, D. (1989, August). Presentation. School Psychologists, California Department of Education, San Diego, CA.
- Reschly, D. (1989, August). Presentation. School Psychologists, Tampa, FL.
- Reschly, D. (1989, August). Presentation. School Psychologists, Clearwater, FL.
- Reschly, D. (1989, September). *Assessment and intervention in adaptive behavior and social skills.* Presentation. Psychologists. Little Rock, AK.
- Reschly, D. (1989, October). Colloquium. Ohio State School Psychology Program, Columbus, OH.

USCA4 Appeal: 21-1    Doc: 12-1    Filed: 01/08/2021    Pg: 242 of 363
Case 3:92-cr-00068-DJN   Document 86-3   Filed 12/14/20   Page 35 of 52 PageID# 2415

Reschly: p. 34

- Reschly, D. (1989, November). Keynote address and workshop. British Columbia Association of School Psychologists, Vancouver, BC.
- Reschly, D. (1989, November). Presentation to faculty representing 11 Ohio university school psychology programs regarding NASP approval procedures, Columbus, OH.
- Reschly, D. (1990, January). *Adaptive Behavior: Definition, assessment, and developing interventions*. Presentation. Iowa Department of Education, Des Moines, IA.
- Reschly, D. (1990, March). Keynote address. Connecticut Symposium on Special Education, Hartford, CT.
- Reschly, D. (1990, March). *Special education law and practice*. Workshop. ED Law Institute, Costa Mesa, CA.
- Reschly, D. (1990, April). Keynote address. Adaptive Behavior Conference, St. Paul, MN.
- Reschly, D. (1990, May). *Found our intelligence: What do they mean?* Invited Presentation. Invitational Conference Center for Applied Psychological Research, Memphis State University, Memphis, TN
- Reschly, D. (1990, June). *Presentation on social competencies*. Pinellas School Officials, Tampa, FL.
- Reschly, D. (1990, September). Colloquium. Riverside County School Psychologists Association, University of California-Riverside, Riverside, CA.
- Reschly, D. (1990, September). Keynote address. San Bernardino County School Psychologists Association, San Bernardino, CA.
- Reschly, D. (1990, September). *School psychology national standards*. Testimony. Oregon Teacher Licensing Commission , Salem, OR.
- Reschly, D. (1990, October). Keynote address. Oklahoma School Psychological Association Fall Meeting, Oklahoma City, OK.
- Reschly, D. (1990, October). *NASP program approval procedures and trends in graduate education.* Presentation. Faculty representing universities in northern California, San Jose, CA.
- Reschly, D. (1990, November). *Evaluation of the Iowa Renewed Services Delivery System*. Invited address. Iowa Educational Research and Evaluation Association, Des Moines, IA.
- Reschly, D. J. (1991, February). *Behavioral models and the 1990s school psychology revolution*. Colloquium. Syracuse University, Syracuse, NY.
- Reschly, D. J. (1991, February). Keynote address. 20th Annual School Psychology Institute, University of Wisconsin-Eau Claire, Eau Claire, WI.
- Reschly, D. J. (1991, February). *School psychology program approval and accreditation: Current standards and trends.* Colloquium. Southern California Consortium of School Psychology Faculty, Los Angeles, CA.
- Reschly, D. J. (1991, April). *The research base for delivery system reform and 1990s changes in school psychological services.* Keynote Address. New Jersey School Psychology Association, Newark, NJ.
- Reschly, D. J. (1991, May). Psychological and educational research and the legal basis for ADHD in the Education of Children with Disabilities Act. Invited Address, Institute on Law and Education of the Handicapped, Phoenix.

- Reschly, D. J. (1991, August). *Interventions for social skills and adaptive behavior deficits*. Continuing Education Workshop. Loess Hills Area Education Agency, Council Bluffs, IA.
- Reschly, D. J. (1991, August). *Evidence for changes in the delivery system and the roles of support services providers*. Continuing Education Workshop. Pine County Special Services Cooperative, Pine City, MN.
- Reschly, D. J. (1991, September). *The two disciplines of scientific psychology and the struggle for the future of school psychology*. Colloquium. University of Kentucky, Lexington, KY.
- Reschly, D. J. (1991, October). *The 1990s and school psychology*. Keynote address. Alabama Association of School Psychologists Annual Convention, Gulf Shores, AL.
- Reschly, D. J. (1991, October). *Preparation of expert witness testimony for <u>when</u> (not if) school psychologists appear in legal proceedings*. Workshop. Alabama Association of School Psychologists Annual Convention, Gulf Shores, AL.
- Reschly, D. J. (1991, November). *Trends in research and legal analyses of bias in assessment and classification*. Keynote address. Tennessee Association of School Psychologists Annual Convention, Chattanooga, TN.
- Reschly, D. J. (1992, January). Keynote address. Illinois Directors of Special Education, Bloomington, IL.
- Reschly, D. J. (1992, January). Colloquium. Psychology Department, Illinois State University, Normal, IL.
- Reschly, D. J. (1992, February). Keynote address. Alaska School Psychology Association, Anchorage, AK.
- Reschly, D. J. (1992, March). *NASP training program standards and preparation of program approval applications*. Workshop. National Association of School Psychologists, Nashville, TN.
- Reschly, D. J. (1992, October). Colloquium. Indiana State University, Terre Haute, IN.
- Reschly, D. J. (1993, March). *The future of assessment.* Debate. National Association of School Psychologists, Washington, DC.
- Reschly, D. J. (1993, March). *Functional assessment for classification and intervention*. Preconvention Workshop. National Association of School Psychologists, Washington, DC.
- Reschly, D. J. (1993, April). *Assessment as it relates to diagnosis and 1990s trends*. Oklahoma School Psychological Association Continuing Education, Oklahoma City, OK.
- Reschly, D. J. (1993, May). *Social skills intervention with survivors of traumatic brain injury*. Keynote address. Phoenix, AZ.
- Reschly, D. J. (1993, June). Colloquium. University of Oregon, Eugene OR.
- Reschly, D. J. (1993, June). Workshop. California Summer Institute, Fresno, CA.
- Reschly, D. J. (1993, August). *Behavioral consultation for school psychologists*. Continuing education presentation. Consortium of northern California counties, Red Bluff, CA.
- Reschly, D. J. (1993, October). Continuing education presentations. Orlando, FL..
- Reschly, D. J. (1993, October). Keynote address. Michigan Association of School Psychologists. Traverse City, MI.

**J.A.234**

Reschly: p. 36

- Reschly, D. J. (1993, November). Keynote address and workshop. Florida Association of School Psychologists, Miami, FL.
- Reschly, D. J. (1993, November). Continuing education presentation. Illinois school psychologists. Galesburg, IL.
- Reschly, D. J. (1994, February). *Behavioral problem solving.* Workshop. Psychologists in the High Plains Educational Cooperative, Garden City, KS.
- Reschly, D. J. (1994, March). *Minority assessment issues and the identification of children and youth with ADHD.* Colloquium. San Diego State University, San Diego, CA.
- Reschly, D. J. (1994, April). *Minority overrepresentation in mild disabilities: Expanded educational opportunities or denial of equal rights?* Colloquium. University of California-Irvine, Irvine, CA
- Reschly, D. J. (1994, April). *Re-learning social skills: Children and adolescents with traumatic brain injury.* Presentation. Columbus, OH.
- Reschly, D. J. (1994, September). *Behavioral problem solving.* Workshop. Central Illinois School Psychologists, Galesburg, IL.
- Reschly, D. J. (1994, September). Workshop. Michigan Psychologists, Detroit, MI.
- Reschly, D. J. (1994, October). Colloquium. Penn State School Psychology Program University Park, PA.
- Reschly, D. J. (1994, October). Continuing Education Presentation. Pennsylvania Association of School Psychologists, University Park, PA.
- Reschly, D. J. (1995, May). System Reform and Roles of School Psychologists. Mid-Eastern Pennsylvania School Psychology Association.
- Reschly, D. J. (1995, September). *Interventions for Children and Youth with ADHD and Conduct Disorders.* North Dakota Association of School Psychologists, September, 1995.
- Reschly, D. J. (1996, January). Pre-convention workshop and Keynote Address. Minnesota Association of School Psychologists, St. Cloud, MN.
- Reschly, D. J. (1996, February). Avoiding Due Process Hearings. School Administrators of Iowa, Des Moines.
- Reschly, D. J. (1996, March). *System Reform and the Problem of Minority Over-representation in Special Education Programs.* Keynote Address, California Association of School Psychologists.
- Reschly, D. J. (1996, April). Pre-Convention Workshop and Keynote Address. Tri-State (ID, OR, WA) School Psychology Conference, Portland, OR.
- Reschly, D. J. (1996, August) Behavioral Consultation. Sacramento Public Schools School Psychologists.
- Reschly, D. J. (1996, October). Legal Constraints on Disciplining Students with Behavior Disorders. Iowa Behavioral Initiative Fall Conference.
- Reschly, D. J. (1996, October). Conducting Section 504 Hearings. Iowa Association of School Boards Workshop.
- Reschly, D. J. (1997, June). Outcomes Criteria and Behavioral Intervention: The Keys to School Psychology in the 2000s. Continuing Education Conference for the State of Washington and the Washington Association of School Psychologists, Seattle.
- Reschly, D. J. (1997, September). Behavioral Consultation as the Base for System Reform. LaGrange Area Special Education Services Cooperative, Chicago.

**J.A.235**

USCA4 Appeal: 21-1    Doc: 12-1    Filed: 01/08/2021    Pg: 245 of 363
Case 3.92-cr-00068-DJN   Document 86-3   Filed 12/14/20   Page 38 of 52 PageID# 2418

Reschly: p. 37

- Reschly, D. J. (1997, October). Legal, Policy and Assessment Issues. Major address at the State of Iowa sponsored conference, Iowa's Culturally and Linguistically Diverse Children with Special Needs, Iowa City, IA.
- Reschly, D. J. (1998, March). Disproportionality: Questions, Statistics, Rationale, and Solutions? Keynote Address at the Twelfth Annual Conference on the Management of Federal/State Data Systems, WESTAT and OSEP, Bethesda, MD.
- Reschly, D. J. (1998, August). Analyses of Overrepresentation: Different Approaches and Different Outcomes. BEUNO National Conference, Sponsored by the University of Colorado, Vail, CO.
- Reschly, D. J. (1998, September). The Demise of the Old-time Religion and the System Reform Imperative. Iowa Department of Education inservice for special educators.
- Reschly, D. J. (1998, October). Securing the Future of School Psychology Through Data-Based Decision Making. Clark County School Psychologists, Las Vegas.
- Reschly, D. J. (1998, October). School Psychology and Leadership in System Reform and Workshop on Disproportionate Minority Representation in Special Education, South Carolina Association of School Psychologists, Columbia SC.
- Reschly, D. J. (1998, October). School Psychology in the 2000s. Keynote Address, Maryland Association of School Psychologists, Baltimore.
- Tilly, W. D. III, Reschly, D. J., & Knoster, T. (1998, November) Using functional assessment to improve the special education process. National Association of State Directors of Special Education Annual Conference, Baltimore.
- Reschly, D. J. (1998, November). School Psychology: Change or Stagnation, Keynote Address for the Mid-South (TN, AL, and MS) Biannual Conference on School Psychology, Tunica, MS.
- Reschly, D. J. (1999, January) Shifting from the old-time religion: Reform trends and system design alternatives. University of Oregon and Willamette Valley special educators. Eugene, OR.
- Reschly, D. J. (1999, January). System Reform in Special Education and School Psychology. South Carolina state-wide conference for directors of special education. Columbia, SC
- Reschly, D. J. (1999, February). The Charge for School Psychologists. Metro Nashville Public Schools Inservice for School Psychologists. Nashville, TN.
- Reschly, D. J. (1999, February) System Reform in Special and General Education. Inservice for general and special education personnel in the Dubuque (IA) Community Schools and the Keystone Area Education Agency
- Reschly, D. J. (1999, March) Design of system reform waivers for performance. Horry County (SC) Public Schools, Myrtle Beach.
- Reschly, D. J. (Multiple Occasions) Special Education Overrepresentation: Assessment Reforms and System Change. Alliance Project Seminars, Los Angeles March, 1999; Nashville, November 2000; Miami, January 2001, Honolulu, February 2001;
- Reschly, D. J. (April 2000). Keynote Address. System Reform and the Future of School Psychology. Tennessee Association of School Psychologists.
- Reschly, D. J. (June 2000). Classification Criteria in a Problem Solving System. Area Education Agency 5, Marshalltown, IA.

- Reschly, D. J. & Fagan, T. K. (November 2000). The Past and Future of School Psychology. Mid-South Regional School Psychology Conference, Mobile Alabama.
- Reschly, D. J. (March 2001). State-wide Testing and Students with Disabilities. Law and Education Conference, Washington DC
- Reschly, D. J. (June 2001). Avoiding Stereotypes: Overrepresentation Statistics, Risk or Composition? Council for Exceptional Children, IDEA Summit, Washington DC
- Reschly, D. J. (July 2001). Overrepresentation, It's Not What You Think It Is: Equal Treatment Studies. US Department of Education, Office of Special Education Programs, Project Directors Summer Meeting. Washington DCReschly, D. J. (August 2001). Keynote address, System Reform and the Design of Services for Students with Learning Disabilities. Minnesota Special Education Director's Conference, Grand Rapids MN
- Reschly, D. J. (August 2001). Reaction paper, *Minority Overrepresentation: The Silent Contributor to LD Prevalence and Diagnostic Confusion*. US Department of Education, Office of Special Education Programs. Learning Disabilities Summit.
- Reschly, D. J. (September 2001) Keynote Address, System Reform, Learning Disabilities, and the Future of School Psychology. Kentucky Association of School Psychologists, Louisville KY.
- Reschly, D. J. (October, November, December 2001). Disproportionate Representation: Facts, Myths, and Solutions. US Department of Education, Improving America's Schools Regional Conferences. Mobile, Reno, San Antonio.Reschly, D. J. (October 2001). Keynote Address, Overrepresentation Patterns and LD Classification Issues: Converging Trends to System Reform. Tennessee Association of School Psychologists, Nashville Reschly, D. J. (December 2001). Continuing Education Workshop, Metro Nashville Public Schools, "Converging Themes: Overrepresentation, MR and LD Classification Issues, and System Reform"
- Reschly, D. J. (February, 2002). National Academy of Sciences Study on Disproportionality of Minority Students in Special Education. U.S. Department of Education, Office of Special Education Programs, Joint Personnel Development/State Improvement Conference, Crystal City, VA.
- Reschly, D. J. (February, 2002). Invited Testimony, Minority Students in Gifted and Special Education. President's Commission of Excellence in Special Education, Houston.
- Reschly, D. J. (March, 2002). Minority Students in Gifted and Special Education. Mid-South Regional Resource Center, Nashville, TN.
- Reschly, D. J. (March, 2002). Minority Students in Gifted and Special Education. WESTAT Conference for State IDEA Data Managers. Washington, DC.
- Reschly, D. J. (April, 2002). Summary of Testimony: Research Recommendations. President's Commission of Excellence in Special Education, Nashville.
- Reschly, D. J., (April, 2002). System Reform Principles: The New Special Education Establishment. Innovations Conference, Kansas City.
- Reschly, D. J., (October, 2002). Reforms in Special Education Eligibility Criteria. Missouri Council of Special Education Administrators, Columbia, MO.
- Reschly, D. J. (July 2002). Legal Issues in School Mental Health Services. Memphis City Schools.

USCA4 Appeal: 21-1    Doc: 12-1    Filed: 01/08/2021    Pg: 247 of 363
Case 3:92-cr-00068-DJN   Document 86-3   Filed 12/14/20   Page 40 of 52 PageID# 2420

Reschly: p. 39

- Reschly, D. J. (October 2002). Mild Mental Retardation Identification. National Organization of Social Security Claimants' Representatives. San Francisco.
- Reschly, D. J. (October 2002). Keynote, RTI and Special Education Reform. 4th Annual Golden Empire Special Education Partnership Conference, Bakersfield, CA .
- Reschly, D. J. (November 2002). Response to Intervention. Northwest Ohio SERRC, Kitland, OH.
- Reschly, D. J. (February 2003). Keynote: SLD Identification and RTI. (psychologists, special educators, and principals) Charleston, SC.
- Reschly, D. J. (June 2003). Disproportionality Statistics and Interverntions. IDEA Partnerships 2nd National Summit on Implementation of IDEA 1997. Arlington, VA.
- Reschly, D. J. (October 2003). Keynote. RTI and Special Education Reform. Kern County School Psychology Conference, Bakersfield, CA.
- Reschly, D. J. (October 2003). Keynote. RTI and Special Education Reform. Washington Association of School Psychologists, Spokane, WA.
- Reschly, D. J. (October 2003). Keynote. RTI and Special Education Reform. Pennsylvania Association of School Psychologists.
- Reschly, D. J. (November 2003). Keynote Address. Keynote. RTI and Special Education Reform Florida Association of School Psychologists. Tampa
- Reschly, D. J. (September 2003). Keynote: The Dog Catches the Truck: What Next? National Innovations Conference. Charleston, SC.
- Reschly, D. J. (January 2004). Keynote. RTI and Special Education Reform. Bremerton Public Schools, Bremerton, WA.
- Reschly, D. J. (March 2004). Keynote. RTI and Special Education Reform. West Central Ohio SERRC, Wapakoneta, OH.
- Reschly, D. J. (March 2004). Keynote: RTI and Special Education Reform. Clark County School District, Las Vegas, NV.
- Reschly, D. J. (April 2004). Colloquium: Disproportionality Causes and Solutions. University of Texas, Austin, TX.
- Reschly, D. J. (October 2004). Keynote: Special Education Overrepresentation: Causes and Solutions. Mississippi Department of Education. Tunica, MS
- Reschly, D. J. (October 2004). Keynote: School Psychology and the Future. Mid-South Regional Conference on Psychology in the Schools. Memphis, TN.
- Reschly, D. J. (November 2004). Problem Solving and Key Intervention Principles. Clark County School District Related Services Personnel. Las Vegas NV
- Reschly, D. J. (February 2005). Keynote: Problem Solving and SLD Identification. School Psychology Institute, Normal IL.
- Reschly, D. J. (February 2005). Keynote: RTI at Three Tiers of Intervention. Pennsylvania Training and Technical Assistance Network. Hershey, PA>
- Reschly, D. J. (February 2005). Response to Intervention. West Chester, PA Schools.
- Reschly, D. J. (July 2005). Keynote: Preparation of School Personnel for RTI. Florida Department of Education Summer Institute for the Florida Association of Student Services Administrators. Stuart, FL.
- Reschly, D. J. (July 2005). Keynote: Alternatives for SLD Identification. National Association of School Psychologists Summer Institute, Las Vegas, NV.

- Reschly, D. J. (August 2005). Keynote: IDEA Re-authorization and RTI Principles. Wyoming School Psychologists Summer Institute. Jackson Hole, WY.
- Reschly, D. J. (August 2005). Keynote: RTI and Prevention of Prevention of Special Education Disproportionality. Louisiana Fall Pupil Appraisal Institute. Baton Rouge, LA
- Reschly, D. J. (August 2005). Fall In-service: RTI and Improving Classroom Results. Westside School District, Omaha NE.
- Reschly, D. J. (September 2005). Keynote: RTI and General Education Reforms. Oregon Confederation of School Administrators. Eugene, OR.
- Reschly, D. J. (September 2005). Keynote: Improving IEPs and Special Education Outcomes. Illinois Alliance of Administrators of Special Education. Chicago.
- Reschly, D. J. (September 2005). Keynote: RTI in General, Remedial, and Special Education. National Innovations Conference, Lansing, MI.
- Vanderbilt University, Kennedy Center for Research on Human Development, Developmental Disabilities Grand Rounds, *Persistence of Minority Overrepresentation in Mild Mental Retardation Despite Court, Legislative, and Social Science Prohibitions."* Nashville, TN, November 2, 2005.
- Reschly, D. J. (October 2005). RTI and Identification of SLD. South Carolina Special Education Administrators Conference, Columbia, SC.
- Reschly, D. J. (October 2005). State policy and RTI. Ohio Department of Education, Columbus, OH.
- Reschly, D. J. (October 2005). Keynote Address. RTI and the Future of School Psychology. North Carolina Association of School Psychologists Fall Conference. Charlotte NC.
- Reschly, D. J. (November 2005) Response to Intervention. Mississippi State Department of Education, Jackson, MS.
- Reschly, D. J. (January 2006). Keynote: Reducing Disproportionality through Early Identification-Treatment and Special Education Exit Criteria. Texas Council of Administrators of Special Education, Austin, TX.
- Reschly, D. J. (February 2006). Keynote: RTI and Special Education System Reform. Minnesota Council for Exceptional Children Winter Conference. Rochester MN.
- Reschly, D. J. (February 2006). Aligning Assessment with Improving Special Education Outcomes. Presentation to South Carolina Department of Education Staff, Columbia, SC.
- Reschly, D. J. (February 2006). Keynote: RTI and School Psychology Services. Mid-Winter Conference, Calhoun Intermediate School District, Marshall, MI.
- Reschly, D. J. (March 2006). Keynote: RTI and Learning Disabilities Identification. IDEA Partnership Regional Meeting. Miami, FL.
- Reschly, D. J. (May 2006). Keynote: Problem Solving. Illinois Problem Solving Conference, DeKalb, IL.
- Reschly, D. J. (May 2006). Keynote: Understanding RTI: What It Is and Why It Works. LRP National Institute on Legal Issues of Educating Individuals with Disabilities. Orlando, FL.

*Note: Presentations 2007-2011 to be updated*

**J.A.239**

USCA4 Appeal: 21-1    Doc: 12-1    Filed: 01/08/2021    Pg: 249 of 363
Case 3:92-cr-00068-DJN   Document 86-3   Filed 12/14/20   Page 42 of 52 PageID# 2422

Reschly: p. 41

- Reschly, D. J. (2009, October 3). *Overcoming Barriers to Effective Implementation of Response to Intervention.* Council for Learning Disabilities National Conference Keynote Address,. Dallas, , 2009
- Reschly, D. J. & Smartt, S. M. (2009, May 24). *Barriers to scientifically-based reading instruction.* Invited address, B. F. Skinner Lecture, Association for Applied Behavior Analysis International, Phoenix
- Reschly, D. J. (2010). *Teacher preparation and research-based principles of tiered instruction.* Invited keynote address, Wing Conference on Effective Educational Practices, Berkeley, CA.
- Reschly, D. J. (2011, February 7). *Mild intellectual disability: Characteristics and controversies.* Vanderbilt University Grand Rounds, Department of Hearing and Speech Services.
- Reschly, D. J. (2011, March 24). *Special education: Sky is falling or best is yet to be?* University of Iowa, Center for Disability Research and Education.
- Reschly, D. J. (2011, April 28). *Innovation configurations: Helping pre-service and in-service teachers implement effective classroom practices in urban schools.* Conference Great Teachers for Our City Schools National Summit, Denver, CO.
- Reschly, D. J. (2011, May 20). *Psychological testimony in death penalty appeals due to intellectual disability.* Annual Conference of the Tennessee Association of Criminal Defense Lawyers. Knoxville.
- Reschly, D. J. (2011, June 1).*Improving mathematics achievement through response to intervention.* District Teacher In-Service, Boone Co KY, Florence, KY.
- Reschly, D. J. (2011, June 13). *Developing great teachers for all schools.* Metro Nashville Public Schools.
- Reschly, D. J. (2011, July 20). *Improving the efficacy of teacher preparation programs: General and special education.* Invited paper on Office of Special Education Programs Panel, *Improving the efficacy of teacher preparation programs.* OSEP Project Directors Summer Meeting, Washington DC.
- Reschly, D. J., Holdheide, L. R., & Hougen, M. (2011, July 20). *Improving teacher preparation: Including knowledge and skills in evidence-based practices.* Invited Workshop at OSEP Project Directors Meeting, Washington DC.
- Reschly, D. J. (2011, October). *Issues in the implementation of RTI multiple tiers.* Keynote address, North Carolina School Psychologists Association, Winston-Salem, NC.
- Reschly, D. J. (2011, November 14). *US death penalty and the continuing dilemma of mild intellectual disability.* Colloquium, Department of Psychology, University of Otago, Dunedin, NZ.
- Reschly, D. J. (2011, November 22). *Closing gaps with response to intervention.* Keynote Address, Annual Educational Psychology Forum, Auckland, NZ.

## University/Department Service (Since 1975)

- Chair, Iowa State University School Psychology Program Committee, 1975-1998
- Chair, ISU Psychology Department Teaching Evaluation committee, 1977-1980

**J.A.240**

USCA4 Appeal: 21-1    Doc: 12-1    Filed: 01/08/2021    Pg: 250 of 363

- Member (elected), ISU Psychology Promotion and Tenure Committee, 1978-1981; 1984-1989, 1991-1997.
- Member, ISU College of Sciences and Humanities Promotion and Tenure Committee, 1982-1983
- Member, ISU Department Affairs Committee, 1977-1983
- Member, ISU Department of Psychology Graduate Program Committee, 1985-1997
- Member, ISU College of Liberal Arts and Sciences  Representative Assembly (elected to represent  department), 1987-1995; Executive Committee, 1992-1994; Chair, Executive Committee, 1994-1995
- Chair, ISU Faculty Search Committees, 1979; 1982; 1985; 1986; 1988; 1990, 1992, 1995
- Chair, ISU Department Head Search Committee, 1987-1988 (appointed by Dean, College of Sciences and Humanities)
- Member, ISU Psychology Department Grievance Committee, 1983-1988
- Member (elected), ISU Department of Psychology Executive Committee, 1988-1992; 1995-1997
- ISU Department of Psychology Faculty Enhancement (Chair, 1996-1997)
- ISU School/Counseling Diversity Search Member 1994-1996
- Member, ISU University Committee on Handicapped, 1979-1989
- Member, ISU Department of Psychology Faculty Development Committee, 1992-1996
- College of Liberal Arts and Sciences Committee on Faculty and Alumni Recognition (1992-98) (Chair, 1993-1998)
- ISU Provost's Ad Hoc Committee on Selection of University Distinguished Professors (Chair, 1994)
- ISU Ad Hoc Grievance Committee, Professional Studies in Education (Chair, 1994)
- ISU Ad Hoc Committee on Behavior Management, Department of Curriculum and Instruction (1995)
- ISU College of Liberal Arts and Sciences  Associate Dean Search Committee (1994)
- ISU College of Liberal Arts and Sciences Five-Year Strategic Plan Writing Committee (1994-95)
- ISU Graduate College Premium for Academic Excellence Committee, 1997-1998
- ISU Co-Chair, College of Education and College of Family and Consumer Sciences Task Force on Collaborative Programs and Services, 1996-1998.
- Vanderbilt University Committee on Peabody College Undergraduate Programs, Member, 1998-2000
- Vanderbilt University Committee on Promotion and Tenure Grievances, Member, 1999-2002
- Vanderbilt University Ad Hoc Committee on the Human Development Counseling Program, Chair, 1998-1999
- Vanderbilt University Department of Leadership and Organizations Chair Search, Member, 1999-2001
- Vanderbilt University Search Committee for Kennedy Center Director, Co-Chair, 2000-2001

**J.A.241**

USCA4 Appeal: 21-1    Doc: 12-1    Filed: 01/08/2021    Pg: 251 of 363
Case 3.92-cr-00068-DJN   Document 86-3   Filed 12/14/20   Page 44 of 52 PageID# 2424

Reschly: p. 43

- Vanderbilt University Search Committee for Dunn Family Chair in Psychoeducational Assessment, Chair, 1999-2006
- Vanderbilt University Council on Teacher Education, 2000-2007
- Vanderbilt University, Chair Search Committee, Counselor Education 2001-2002
- Vanderbilt University, Member Mental Retardation Search Committee 2001-2002
- Vanderbilt University Chair Department of Special Education, 1998-2006
- Vanderbilt University Dean's Cabinet, 1998-2006
- Vanderbilt University Faculty Senate, 2007-2010
- Faculty Senate Committee on Professional Ethics and Academic Freedom, (Chair, 2008-2009)
- Vanderbilt University, Peabody College Promotion and Tenure Committee, 2008-09.
- Vanderbilt University, university-wide Promotion and Tenure Committee, 2009-2013 (Chair 2010-11 and 2011-12)

## Professional Service and Leadership (Sample Activities)

- Editor, 1979-1981, School Psychology Review
- Editorial Board Memberships:
  - School Psychology Review, 1974-2000
  - Journal of School Psychology, 1982-1996
  - School Psychology Quarterly, 1984-1990 (Associate Editor, 1991-1994)
  - Journal of Psychoeducational Assessment, 1983-1988
  - Exceptional Child Quarterly, 1983-1988
  - Canadian Journal of School Psychology, 1990-
  - Contributing Editor, EDLAW Briefing Papers, 1990-1995
  - Journal of Learning Disabilities 1998-

- Ad Hoc Reviewer

  Journal of Consulting and Clinical Psychology
  American Psychologist
  Exceptional Child
  American Educational Research Journal
  Review of Educational Research
  American Journal of Mental Retardation
  Journal of Educational Psychology
  School Psychology International
  Psychological Bulletin

- President, National Association of School Psychologists (NASP), 1984-1985
- Chair, NASP Program Approval, 1989-1992
- Member, American Psychological Association Committee on Psychological Tests and Assessment, 1991-1994.
- Site Visitor, American Psychological Association Doctoral Program Accreditation

**J.A.242**

USCA4 Appeal: 21-1    Doc: 12-1    Filed: 01/08/2021    Pg: 252 of 363
Case 3:92-cr-00068-DJN   Document 86-3   Filed 12/14/20   Page 45 of 52 PageID# 2425

Reschly: p. 44

- Chair, NASP Publications Committee, 1982-1984, 1986-1988
- Member, NASP Accreditation, Certification and Graduate Training Committee, 1976-1980
- President, 1974-1975, Arizona Association of School Psychologists
- Member, NASP Executive Board, 1976-1978, 1981-1986
- Member, American Psychological Association, Division 16 Task Force on School Psychology Reform, 1990-1992
- Member, American Psychological Association (APA) Task Force on Children, Youth, and Families, 1981-1983.
- Member, APA Division 16 Committee on Testing Issues, 1982-1984
- Member, APA Division 16 Convention Program Committee, 1981-1985
- Member, APA Division 16 Task Force on the Future of the Practice of Psychology in Education, 1983-1985
- Chair or Member of numerous committees for the Arizona Association of School Psychologists and the Iowa School Psychologists Association
- President, Iowa School Psychologists Association, 1994-1995
- Member, National Academy of Sciences Panel on Goals 2000 and the Education of Students with Disabilities (7 meetings in 1995-1996)
- Member, State of Iowa Task Force on Mental Disabilities Classification Criteria 1995-1996
- Member, State of Iowa Task Force on Disproportionate Representation of African-American Students in Programs for Students with Disabilities 1995-1997
- External Reviewer, Lehigh University Personnel Preparation Grant, Preparing School Psychologists to Provide Services to Children with Developmental Disabilities
- Member, Iowa Department of Education Task Force on Assessment of Outcomes for Students with Disabilities, 1995-1997.
- Member, Seven Person Writing Team, *Assessment and Eligibility in Special Education: An Examination of Policy and Practice with Proposals for Change*, National Association of School Psychologists under contract with the Office of Special Education Programs, U. S. Department of Education, 1994
- President, President-Elect, and Past-President, Society for the Study of School Psychology, 1995-1998; 2001-2004
- President (1998-1999) and Board Member (1996-1999) Council of Directors of School Psychology Programs
- Member, National Academy of Sciences Panel on Overrepresentation of Minorities in Special Education, member 1999-2001
- Chair, National Academy of Sciences Panel on Disability Determination in Mental Retardation, 2000-2002
- Member, Office of Special Education Programs SLD Summit. November, 2003, Washington DC.
- Member, Disproportionality Determination Task Force, Office of Special Education and WESTAT, 2003.
- Co-chair, Division 33 (Mental Retardation and Developmental Disabiities) Program. American Psychological Association Annual Convention (Toronto 2003)

**J.A.243**

- Member, Executive Board, Higher Education Consortium in Special Education, 2002-2005.
- President, Division for Research, Council for Exceptional Children, 2005-2006.
- Invited testimony, US Commission on Civil Rights, December 3, 2007.
- US Department of Education, Institute for Educational Sciences, Task Force on the Evaluation of the Office for Special Education Programs Personnel Preparation and Doctoral Leadership Grants, 2008-2010.
- Member, Institute for Educational Sciences Proposal Review Board (Special Education), 2009-2012
- Co-chair, Transformation Leadership Group: Special Needs Students. Metro Nashville Public Schools, 2009-2012.
- Advisory Member, State of Wisconsin Governor's Panel on Educational Reform, March 30, 2011.
- External Review Team and author of chapter on special education, Webster Co. Parish Public Schools, April-October, 2011.
- Advisor, statistical analyses, and reports on special education disproportionality, Clark County School District, 2003-2019

**<u>Expert Witness and Case Consultation</u>**

3. *\*AZ v. Coleman,* 1972; (State Court Tucson, AZ; No. 20854). (Expert Witness Testimony). (State)
4. *Marshall v. Georgia* 1983; (Federal District Court); Savannah, GA. (Report and expert witness testimony).  (Federal)
5. *Bradley, v. Robb*, 1985; (Federal District Court); Richmond, VA. (Expert witness testimony). (Federal)
6. *S-1 v. Turlington*, 1986; (Federal District Court); Miami, FL. (Report and expert witness testimony). (Federal)
7. *Little Rock v. Pulaski Co.*, 1986. (Federal District Court); Little Rock, AR. (Expert witness testimony). (Federal)
8. *Egg Harbor Township Board of Education v. S. O.*, 1992 (Federal District Court) (Expert witness testimony). (Federal)
9. *Coalition to Save Our Children v. Board of Education*, 901 F. Supp. 784 (D. Del. 1995), aff'd 90 F.3d 752 (3d Cir. 1996). (Report and expert witness testimony). (Federal)
10. *Campaign for Fiscal Equity, Inc. v. State,* 719 N.Y.S. 2d 475, 485-487 (Sup. Ct. N.Y. Ctny.2001) (Report and expert witness testimony). (State)
11. *Harper et al. v. Patterson et al.*, 2003 (GA State Court, Civil Action No. 2:99-CV-0200 WCO); Elijay, GA. (Expert witness testimony) (State)
12. *\*Darick Demorris Walker v. William Page True,* United States District Court for the Eastern District of Virginia, Alexandria Division, Case No. 1:03-cv-00764 (CMH). (Report and expert witness testimony in 2005; Executed May 20, 2010). (Federal)
13. *School Districts' Alliance for Adequate Funding of Special Education v. The State of Washington.* State of Washington, Thurston County Superior Court, NO. 04-2-02000-7 (Report and expert witness testimony in November 2006) (State)

**J.A.244**

Reschly: p. 46

14. *Kevin Green v. Gene M. Johnson,* US District Court, Eastern District of Virginia, NO. 2:05cv340. (Report and expert witness testimony in October, 2006, Executed May 27, 2008 ). (Federal)

15. *Consortium for Adequate School Funding in Georgia, Inc., et al. v. State of Georgia et al.* (Report, Deposition, case dropped). (State)

16. *Penry v. Texas,* Death Penalty Appeal (Consultant, 2006-2008. Case Settled LWOP). (State)

17. *John Lionel Neal Jr. v. State of Alabama, 28th Judicial Circuit Court, Baldwin Co., No. CC 87-520.60.* (Consultant to Petitioner, 2006-2008, Case Settled LWOP). (State)

18. *Winston v. Kelly,* US District Court, Western District of Virginia, Roanoke, Case No. 7:ev00364. (Report and expert witness testimony in November 2008, Case Settled LWOP). (Federal)

19. *Bridgers v. Texas,* (Evaluation, Report, May 2009, Death Sentence pending). (State)

20. *Rollins v. Tennessee,* Circuit Court of Sullivan County, TN, Second Judicial District at Blountville. (Evaluation, Report and Expert Witness Testimony October, 2009; Case Settled Life Sentence). (State)

21. *Chase v. Mississippi, Circuit Court, Copiah County, MS. (*Expert Witness Report and Testimony August 2010, Atkins Claim Denied, Execution Pending) (State)

22. *Keen v. State of Tennessee,* Criminal Court of Shelby County Tennessee at Memphis Division 8. No. P-25157. (Report, August 2010, Trial pending). (State)

23. *S.R v. El Campo Independent School District et al.* Civil Action in District Court, Southern District of Texas. (Expert Report March 2011, Case settled)

24. *State of Tennessee v. Willie Clyde Puckett,* Sullivan County Criminal Court, No. S54,153. (Report May 2011, Case Settled LWOP). (State)

25. *Blunt, et al. v. Lower Merion Sch. Dist.,* 826 F.Supp. 749 760-61 (E. D. Pa., 2011). (Report & Deposition, June-July, 2011, Case Dismissed). (Federal)

26. *State of Tennessee v. Jawaune Massey,* Sullivan County Criminal Court No. S52,127. (Report, Expert Testimony 2012, Case Settled LWOP). (State)

27. *Chalmers v. Tennessee* (Evaluation, Report 2012-2014, Pending). (State)

28. *John Henretta v. Tennessee* (Evaluation, Report 2012, Case Settled LWOP). (State)

29. *David Jackson v. US* (Consultant 2013, Evaluation, Case Settled LWOP). (Federal)

30. *Pervis Payne v State of Tennessee* (Evaluation, Report 2012, Case Pending). (State)

31. *State of Texas v. Stanley R. Robertson* (Report 2011, Report, Expert Witness Testimony 2013, Case Settled LWOP). (State)

32. *State of Tennessee v. Lasergio Wilson* (Evaluation, Report 2013, Death Sentence 2017). (State)

33. *US v. Chastain Montgomery* (Report 2013, Report, Testimony, *Atkins* denied, LWOP). (Federal)

34. *State of Tennessee v. Calvin Rogers,* (Report 2013, Testimony, Case Settled LWOP). (State)

35. *State (GA) v. Favors*, 2014 (Evaluated Gregory Favors, Case Settled LWOP). (State)

36. *US v. Naeem Willians*, 2014 (Consultation, Brief Evaluation). (Federal)

37. * People (CA) v. Townsell,* 2014 (Consultation, Reviewed Records, Report, LWOP). (State)

38. *US v. Guerrero* 2013-2014. N0 1:08-cr-00259-pmp (Evaluation, Report, Case Settled LWOP). (Federal)

USCA4 Appeal: 21-1    Doc: 12-1    Filed: 01/08/2021    Pg: 255 of 363
Case 3.92-cr-00068-DJN   Document 86-3   Filed 12/14/20   Page 48 of 52 PageID# 2428

Reschly: p. 47

39. *Eaton v. Wilson (WY),* No 09-cv-00261-J, 2014 (Evaluation, Report, Case settled LWOP). (State)
40. *KY v. Allman,* 2014 (Evaluation, Case settled LWOP). (State)
41. *Odom v. TN,* 2014 No 91-07049 (Evaluation). (State)
42. *Rice v. TN,* 2014, No. 01-0035 (Evaluation). (State)
43. *Caruthers v. TN,* 2014 (Evaluation, Report, Client deceased natural causes). (State)
44. *Corey Johnson v. VA,* 2014, (Evaluation, Report, Case Pending). (State)
45. *AZ v. Boyston,* 2014, No CR 2004-007442-001, (Evaluation, Report, Case Pending). (State)
46. *US v. Ronell Wilson,* 2014, No 04-CR-1016 (NGG). (Record Review, Consultation, Report, Case Settled LWOP). (Federal)
47. *SC v. Brown,* 2014 (Evaluation, Report, Expert Testimony, Court Opinion Atkins claim approved, LWOP). (State)
48. *TX v. Allen* 2014-2015 (Evaluation, Report, Case Settled LWOP). (State)
49. *Tuilaepa v. US,* 2014-2015, (Evaluation). (Federal)
50. *TX v. Adams,* 2014-2015, No 1372221. (Evaluation, Report, Case Settled LWOP). (State)
51. *AR v. Friar,* 2015, No CR-2013-75 (Consultation, Record Review, Case Settled LWOP). (State)
52. *KY v. Taylor,* 2015, (Evaluation, Case Settled LWOP). (State)
53. *US v. Bolton,* 2015, (Evaluation). (Federal)
54. *People (CA) v. Griffin*, 2010-2015, (Report 2010, Expert Testimony May 2015, Judicial decision for LWOP, Reversing Death Penalty Sentence). (State)
55. *Lard v. Arkansas, 2015* (Evaluation, Report, Expert Testimony, Decision Pending) (State)
56. *CJEFF v State of Connecticut,* (Report, Deposition, Testimony [April, 2016], Decision Pending). (State)
57. *State of Texas v. Charles E. Brownlow Jr.,* 422 Judicial District of Kaufman County, Kaufman TX. (Evaluation, Report, testimony, *Atkins* appeal denied. (May 16-17, 2016). (State)
58. *Debra Brown v. Shirley A. Jones, Case,* No.: 1:99-CV-00549. (2016, Evaluation, Report, LWOP). (Federal)
59. *US v James Nathaniel Watts, Criminal No. 14-40063-JPG. (2016-2017).* (Evaluation, Report, Case settled LWOP). (Federal)
60. *USA v Ulysses Jones Jr., Case No. 10-03090-CR-S-DGK.* US District Court for the Western District of Missouri, Southern Section. (Evaluation, Report, Expert Testimony, *Atkins* Claim Denied September, 2017; Jury Trial October 2017 awarded LWOP). (Federal)
61. *State of Oklahoma v Alton Alexander Nolen.* (Review of records and adaptive behavior evaluation, Report, Expert Testimony, *Atkins* Claim denied, April, 2017). (State)
62. *Smith v Dunn (State of Alabama).* Civil Action No.: 05-04744-CG-M. (Reviewed records and evaluations, Report, Expert Testimony May 2017, Decision Pending). (State) (Joseph Clifton Smith)

USCA4 Appeal: 21-1    Doc: 12-1    Filed: 01/08/2021    Pg: 256 of 363
Case 3:92-cr-00068-DJN   Document 86-3   Filed 12/14/20   Page 49 of 52 PageID# 2429

Reschly: p. 48

63. *Yazzie et al and Martinez et al v. New Mexico Public Education Department,* NO: D-101-CV-2014-0224. (Report, Expert Testimony August, 2017, decision pending). (State)
64. *Texas v. Antonio Cochran* (Evaluation, Report, Case settled LWOP, December 2017. (State)
65. *South Carolina v. Stephen Corey Bryant* (Evaluation, December 2017). (State)
66. *Robbins v. California* (Review of records, report, January 2018). (State)
67. *Eric Royce Leonard v. Ron Davis, Warden,* United States District Court, Eastern District of California, No. 2:17-CV-0796 JAM-AC (Evaluation, report, LWOP, 2018). (Federal)
68. *California v. Pearl Fernandez,* Case No. BA 425180 (Evaluation, report, LWOP, June 2018). (State)
69. *State of Texas v. Shaun Ruiz Puente* (Adaptive behavior evaluation only, testimony, LWOP awarded by a jury, February 2018). (State)
70. *US v. Chattam*, US District Court Eastern District of Michigan Southern Division, Case No: 17-20184. (Evaluation June 2018). (Federal)
71. *State of Nevada v. Paul Darrell Jones,* Case No. C-17-326614-1. (Evaluation, Report, Prosecution agreed to Intellectual Disability, October 2018.) (State)
72. *US v. Alonzo Horta,* US District Court for the Northern District of Illinois Eastern Division, Case No. 16 CR 463-23 (Evaluation December 2018). (Federal)
73. *Maestas v State of Utah,* Case No. 130907856, July 2018 (Adaptive behavior evaluation, report, client deceased in 2019).
74. *Webster v. Lockett,* Cause No: 2:12-cv-86-WTL-MJD, US District Court Southern District of Indiana Terre Haute Division, upheld at the 7th Circuit, USCOA-7th Circuit, No 19-2683, September 22, 2020 (Evaluation, Report, Testimony, *Atkins granted,* June 2019). (Federal)
75. *Texas v. Armando Luis Juarez*, 292nd Judicial Court of Dallas County, Texas N0 F18-70634-V (Evaluation, report 2019-2020)
76. *Florida v. Reginald Jackson,* Circuit Court of the 11th Judicial Circuit, Miami-Dade County, Florida, Case N0 F13-017684-A. (Report, Deposition, 2019-2020).
77. *US v. Juhwun Foster,* US District Court, Northern District of Illinois Eastern Division, N0. 17 CR 611-4 (Evaluation, LWOP awarded, 2019-2020).
78. *Gallegos v. Shinn, et al.*, No. CV-01-01909-PHX-NVW, United States District Court for the District of Arizona. (Adaptive Behavior analysis from records).

79. *Fiorella*
80. *Davis.*
81. *Davis, R*

* Cases involving mild intellectual disability and death penalty issues, (N=57)

Summary: Expert witness in 29 cases, 19 state courts and 10 federal courts.  Have never been denied expert witness status.

**Consultant Activities (Sample Activities)**

**J.A.247**

USCA4 Appeal: 21-1    Doc: 12-1    Filed: 01/08/2021    Pg: 257 of 363

- Baltimore Public School Psychological Services, 1972-1974
- National Follow Through, 1971-1975
- Pima County Pluralistic Assessment Project, 1973-1975
- Iowa Department of Education Nonbiased Assessment Project, 1976-1979;
- Iowa Department of Education Adaptive Behavior Project, 1980-1982;
- State of Georgia, 1980 (Handbook for School Psychologists)
- Illinois-Indiana Race Desegregation Center, 1981-1982
- Florida Atlantic University SOMPA Standardization Project, 1982-1983
- University of California-Berkeley Nondiscrimination Assessment Project, 1982-1985
- Chicago Public Schools, 1984-1986
- Charles E. Merrill Test Division, 1983-1986
- Psychological Corporation, 1984, 1986, 1988
- Minnesota Department of Education, 1986-1987 (MR Classification Criteria)
- Florida Department of Education, 1986-1989 (MR Classification Criteria)
- ETS-NASP, 1989-1991 (regarding bias in the National School Psychology Licensing Examination)
- Administrative Law Judge, State of Iowa (Hearings Regarding Education of the Handicapped), 1989-1998
- Consultant, American Association on Mental Retardation Committee on Classification in Mental Retardation, 1989-1992.
- Consultant to Board on Testing and Assessment, National Academy of Sciences, Issues Related to the Appropriate Assessment of Minority Children and Youth with Disabilities, 1994.
- State of Florida, Development of Criteria for Identification of Learning Disabilities and Mild Mental Retardation, 1995-1997.
- Consultant to Department of Psychology, Minot State University, Development and Need of School Psychology Graduate Program Opportunities in North Dakota, May, 1994.
- Consultant, U. S. DE Office of Special Education Programs and U.S. DE Office for Civil Rights, Task Force on Over-representation of Minority Students in Special Education Programs, 1993-1995
- Member, U. S. Department of Education, Office of Special Education Programs, Task Force on Educational Outcomes for Students with Disabilities, March, 1994
- Member, Ford Foundation Task Force, Equity and Educational Assessment, May, 1996
- Grant Review Panel, U.S. Department of Education, Behavior Disorders Prevention and Intervention
- National Association of School Psychologists Panel, *Blueprint for School Psychology in the 21st Century (July, 1996 to March, 1997).*
- State of Iowa Committee on Implementation of the Federal Education of the Handicapped Act 1979- 1983
- National Advisory Panel for Buros-Nebraska Institute of Mental Measurements, 1981-1988
- Erlbaum Series Advances in School Psychology, 1983-1991
- United States Department of Education Task Force on At Risk Students, 1984-1986

**J.A.248**

- Guilford Press Child Practitioner Series, 1985-1991
- United States Department of Education Project: Research Integration on Handicapped Students, 1985-1988
- State of Georgia Advisory Committee on Student Assessment, 1986-1996
- State of Iowa Task Force on Special Education Reform, 1989-1991
- Member, United States Department of Education Task Force on ADHD Assessment and Interventions, 1991-1992
- Grant Review Panel, ADHD Grant Competition, United States Department of Education, Office of Special Education Programs, 1991
- Consultant, National Center for Educational Outcomes, University of Minnesota and U.S. Office of Special Education Programs, 1995-1998
- Consultant, State of Kansas Board of Regents, Wichita State University Proposal re: School Psychology Doctoral Program 1996
- Member, Leadership Council, State of New York, Department of Education, Division of Vocational Education and Special Education, 1997-2003
- Consultant, (Pro bono) European Roma Rights Center, Budapest, 1999- (Evaluations and consultation regarding Roma children placed in special education programs in Ostrava, Czech Republic.)
- Williamson County Schools, Franklin TN, School Psychology Department, 1998-2000
- Consultant, Florida Department of Education. Project on Identification of Educable Mental Retardation. 2000-2001.
- State of Tennessee Department of Education Task Force on IDEA rules revisions, 1999-2001
- Minneapolis Public Schools, Waiver Project Evaluation, December, 2001.
- Consultant, New York Department of Education Disproportionality Task Force, Presentation to State Board, December 2002
- State of Indiana Disproportionality Project. 2000-2003
- State of Missouri Department of Education, Division of Special Education, Criteria for Disability Determination, 2002-2004
- Grant review panels, Office of Special Education Programs, several grant competitions 2002-2013
- Clark County School District (Las Vegas), Disproportionality Analyses and reports, 2003-2015.
- Connecticut Department of Education, 2003-2005, Mental retardation criteria and manual.
- Member, National Advisory Committee, Voyager Learning Inc., Dallas, TX, 2008-
- Hancock County Schools (Georgia), Achievement gap and disproportionality. 2008
- Jefferson County School District (Louisville, Kentucky). Achievement gap and disproportionality. 2009-10

## Awards/Honors

- Distinguished Service Award, "Outstanding Services in the Editing and Design of the School Psychology Review," National Association of School Psychologists, 1980

**J.A.249**

USCA4 Appeal: 21-1     Doc: 12-1      Filed: 01/08/2021     Pg: 259 of 363
Case 3:92-cr-00068-DJN   Document 86-3   Filed 12/14/20   Page 52 of 52 PageID# 2432

Reschly: p. 51

- New Jersey Association of School Psychologists Award for "Outstanding Contributions to the Development of School Psychology," 1983
- Distinguished Service Award, "Dedicated Service and Leadership as President," National Association of School Psychologists, March, 1987
- Fellow, Division 16 (School Psychology), "In recognition of outstanding contributions to the science and profession of psychology," American Psychological Association (Elected in 1985)
- Charter Fellow, American Psychological Society, 1989
- James B. Stroud Award, "Outstanding contributions to the practice of school psychology," Iowa School Psychologists Association, October 1989
- Distinguished Service Award, "Design and administration of the NASP program approval service," National Association of School Psychologists, 1990
- Fellow, Division 15 (Educational Psychology), "In recognition of outstanding contributions to the science and profession of psychology," American Psychological Association (Elected in 1990)
- Distinguished Professor of Liberal Arts and Sciences, a career title representing, "...the highest academic honor bestowed by Iowa State University," May, 1991
- Dorthy H. Hughes Memorial Award for Distinguished Service in Educational and School Psychology by the Department of Applied Psychology, New York University, May, 1994
- Charter Member, Iowa Academy of Education (one of 15 persons appointed by the FINE Foundation as Charter Members)
- Outstanding Alumnus Award, College of Education, University of Oregon, 1996
- Cited in 1999 as in top five of school psychologists providing service to the profession as editor, associate editor, or editorial board member on school psychology journals
- National Association of School Psychologists Lifetime Achievement Award, "In Recognition of Outstanding Achievement and Distinguished Service to the Profession of School Psychology, March, 2000
- Vanderbilt University Opportunity Development Center Award for "Exemplary Effort in Support of the University's Commitment to Promoting Opportunities for Persons with Disabilities, October 2004
- National Association of School Psychologists "Legend in School Psychology Award" March 27, 2007

**J.A.250**

USCA4 Appeal: 21-1    Doc: 12-1    Filed: 01/08/2021    Pg: 260 of 363
Case 3:92-cr-00068-DJN   Document 86-4   Filed 12/14/20   Page 1 of 48 PageID# 2433

# EXHIBIT 2

J.A.251



UNC
CAROLINA INSTITUTE FOR
DEVELOPMENTAL DISABILITIES

101 RENEE LYNNE COURT
CARRBORO, NC 27510

T 919-966-5171
F 919-966-2230
www.cidd.unc.edu

*Mailing Address*
CAMPUS BOX 7255
UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL
CHAPEL HILL, NC 27599-7255

## Psychological Evaluation

JOHNSON, Corey James
Date of Report: August 24, 2016

Date of Birth: ▮▮▮▮▮▮▮▮▮▮
Age: 47

### I.    Introduction and Summary of Opinions

I conducted an evaluation of Corey Johnson at the request of Mr. Johnson's attorneys in order to address the question of whether Mr. Johnson has intellectual disability (formerly referred to as mental retardation). In my opinion, Corey Johnson has intellectual disability that originated during his childhood and has persisted into adulthood.

Corey Johnson was raised in poverty and experienced a chaotic, abusive, and extremely unstable childhood. He lived in nearly a dozen different homes from his birth until he was 12 years old, and attended nearly as many different schools during that period. He failed at every level of school, repeatedly demonstrating that it was extremely difficult for him to learn and progress across all academic subjects. Corey also failed to learn how to interact with others, to read social situations, to communicate clearly, logically, and effectively, and to use judgment to solve problems. He further failed to learn how to care for himself and never developed the range of skills necessary to live independently as an adult.

My opinion concerning Corey Johnson's intellectual disability is based in part on my analysis of his intellectual functioning as reflected in the IQ tests administered to him between the time he was 7 years old and 23 years old. Four of those IQ tests produced valid and reliable results, but two of them were so flawed that their results have inadequate validity, and I did not consider them in my analysis. My analysis of the results for the four valid IQ tests is that they are consistent with significant impairments in intellectual functioning.

My opinion is also based on my comprehensive review of a broad array of records and other information related to Corey Johnson's adaptive functioning in the community. My assessment of his adaptive behavior revealed persuasive evidence that he has significant limitations in adaptive functioning in many areas, beginning in the developmental period before he was 18 years old and continuing into adulthood. More specifically, I reviewed contemporaneous educational, social services, treatment, and evaluation records created during Corey Johnson's childhood and adolescence. I

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

interviewed more than two dozen family members, friends, and professionals who had significant interactions with him and knew him well during various times throughout his life, and I reviewed written statements submitted by many of those individuals. Finally, I administered a standardized adaptive behavior instrument to three individuals who knew Corey Johnson particularly well in varied contexts. The information I considered as part of my adaptive behavior evaluation led me to conclude that Corey Johnson has significant limitations in all three domains of adaptive behavior—Conceptual, Social, and Practical—that are related to his intellectual functioning deficits. Based on my thorough evaluation and detailed analysis of the available information, discussed in detail below, the evidence is compelling and consistent that Corey Johnson is intellectually disabled and that his intellectual disability originated during his childhood and has continued into adulthood.

## II.    Overview

This report is sequenced chronologically and addresses the key factors that must be considered in determining a diagnosis of intellectual disability ("ID"). My qualifications are set out in Appendix A to this report.

As part of my evaluation, I reviewed records related to Corey Johnson's childhood, adolescence, and adulthood, including all available school records; foster care and social services records; psychological, psychiatric, and educational/achievement evaluations and treatment records; and residential placement and treatment records. I also interviewed over two dozen individuals who have known Corey Johnson, including family members; friends; peers; teachers; mental health evaluators and treatment professionals; and residential placement staff. I have reviewed declarations and statements obtained by Mr. Johnson's attorneys from these individuals and from others who have known Corey Johnson. I also administered a standardized adaptive behavior instrument to three individuals who knew Corey Johnson well. Finally, I have reviewed materials related to the criminal charges that led to Corey Johnson's 1993 death sentences. I have attached as Appendix B a list of the materials that I have reviewed as part of my evaluation.

### a.    Intellectual Disability Definition and Diagnosis

The most widely accepted definitions of intellectual disability are those of the American Association on Intellectual and Developmental Disabilities ("AAIDD") and the American Psychiatric Association ("APA"). The framework for defining intellectual disabilities by the AAIDD and the APA has been in substantial agreement for many years and consists of significant impairment in general intelligence (which has been recognized to mean approximately two standard deviations below the mean using properly administered and scored standardized IQ tests) concurrent with significant impairment in adaptive behavior, both of which must have originated in childhood before the age of 18, which is also referred to as the developmental period.

Specifically, the AAIDD, in its *Intellectual Disability: Definition, Classification, and Systems of Supports* (11th ed., 2010) (hereafter "AAIDD Manual") states:

2

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

"Intellectual disability is characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills. This disability originates before age 18." The AAIDD stresses the importance of clinical judgment in the accurate diagnosis of intellectual disability. The AAIDD defines clinical judgment as "a special type of judgment rooted in a high level of clinical expertise and experiences that emerge directly from extensive data."

The APA, in its *Diagnostic and Statistical Manual of Mental Disorders* (5th ed., 2013) (also known as the "DSM-5"), states: "Intellectual disability (intellectual developmental disorder) is a disorder with onset during the developmental period that includes both intellectual and adaptive functioning deficits in conceptual, social, and practical domains." The APA states that adaptive behavior deficits must be related to deficits in intellectual functioning in order to clarify that the three parts of the diagnostic criteria are not separate characteristics but interrelated parts of one disability.

### b. Factors that influence IQ test scores and adaptive behavior assessment

Clinicians and research scientists recognize the research-supported factors that influence intelligence test scores and adaptive behavior assessment. Several of the factors summarized below, but not all of them, were not widely known or were not customarily applied by practitioners at the time Corey Johnson was sentenced to death:

i.  While the essential diagnostic framework for intellectual disability diagnoses has remained constant, there has been significant shift over time in the emphasis and weight accorded to the general intelligence and adaptive behavior prongs of the diagnosis and stress on the importance of clinical judgment in making an accurate diagnosis. The most recent example of this shift, as far as APA is concerned, is its DSM-5, which was released in 2013, and states that:

> IQ scores are approximations of conceptual functioning but may be insufficient to assess reasoning in real-life situations and mastery of practical tasks. For example, a person with an IQ score above 70 may have such severe adaptive behavior problems in social judgment, social understanding, and other areas of adaptive functioning that the person's actual functioning is comparable to that of individuals with a lower IQ score. Thus, clinical judgment is needed in interpreting the results of IQ tests.

This is a significant change from the diagnostic criteria existing in 1993 when Corey Johnson was sentenced to death.

ii.  Extensive research has indicated that average IQ scores have been rising and continue to rise at a rate of approximately three points per decade (the actual calculation is .33 points per year), although the reasons for this phenomenon are

3

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

**J.A.254**

not well understood.  The phenomenon, known as norm obsolescence, aging norms, or the Flynn effect, should be taken into account by correcting IQ scores obtained from older tests.  As an example, an individual given an IQ test in 1980 that was normed in 1980 and who received an IQ score of 70 (two standard deviations below the mean) would meet the intellectual functioning prong for an intellectual disability diagnosis.  An individual given that same test (normed in 1980) 10 years later, in 1990, and who obtained an IQ score of 73 would also meet the intellectual functioning prong for an intellectual disability diagnosis, because .33 point per year rise in average IQ scores, identified as the Flynn effect, demonstrates that two standard deviations below the mean would then be a score of 73.3, rather than a score of 70.  The validity of the Flynn effect is noted in the DSM-5.[1]  Flynn first published his research related to norm obsolescence in the mid-1980s, but his research did not become widely known and generally accepted until well after Corey Johnson was sentenced to death.

iii.    Experience with repeat administration of IQ tests commonly results in higher scores, particularly when repeat administration of the same IQ tests occurs close in time.  This "practice effect" should be taken into consideration when a defendant has taken multiple IQ tests or multiple administrations of the same test or when the same test is given to an individual close in time to a previous administration of the same test, and when there is a demonstrated and unexplained rise in test scores.

iv.    Whether considering assessment of intelligence or adaptive behavior, the examiner must acknowledge that people of low intelligence frequently have relative strengths that accompany their deficits.  Because intellectual disability is defined by deficits, its diagnosis is a matter of documenting deficits (in both intelligence and adaptive behavior).  Further, because relative strengths often accompany deficits, documenting strengths is not a valid method for ruling out intellectual disability.

v.    The retrospective use of standardized adaptive behavior instruments is currently recognized as one method for gathering information on adaptive functioning.  However, before the time that Corey Johnson was sentenced to death, there were few instances in which retrospective analyses were needed.

---

[1] *See*, Trahan, L., Stuebing, K. K., Hiscock, M. K., & Fletcher, J. M. (2014). *The Flynn effect: A meta-analysis*, *Psychological Bulletin*. *140*, 1332–1360.

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

**J.A.255**

### III.    Corey Johnson's Social History

In order to diagnose a person with intellectual disability, it is not necessary to identify the causes of his or her impairment; in fact in about half of the cases of individuals with a mild intellectual disability, no specific cause can be determined. However, there are risk factors that can increase the probability that someone might develop intellectual disability.  I have found several of these risk factors in Corey Johnson's social history.

In the AAIDD Manual, risk factors for intellectual disability are organized by type of risk.  During Corey Johnson's prenatal development and his childhood, he was exposed to most of these risk factors.

a.  **Risk factors for intellectual disability**

i.  **Biomedical factors:** genetic disorders; prenatal nutrition and disease; young parental age.

- Emma Johnson was Corey Johnson's mother, and James Sykes was his father. Both his parents were 17 years old when Corey was born.

ii.  **Environmental factors**: poverty, domestic violence; lack of access to prenatal care; impaired child-caregiver interaction; lack of adequate stimulation; family poverty; parental drug use; parental alcohol use; parental smoking; parental immaturity; parental rejection of caretaking; parental abandonment of child; child abuse and neglect; domestic violence; inadequate safety measures; social deprivation; parental lack of preparation for parenthood; impaired parenting; inadequate early intervention services; and inadequate family support.

- James Sykes was in prison when Corey was born, and Corey did not meet his father (other than a brief encounter when Corey was an infant) until Corey was approximately 9 or 10 years old.
- Corey lived in poverty through his childhood.  His mother, Emma, rarely worked and was often on public assistance.
- Corey and his mother and brother lived in at least 11 different apartments between his birth and age 13 in Brooklyn, Manhattan, Queens, Long Island, and New Jersey.
- Corey's mother was emotionally and physically abusive toward Corey. She was also involved in several relationships with men who were not Corey's father; one of them was emotionally abusive toward Corey, his brother, and his mother, and another was physically abusive toward all three.

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

**J.A.256**

- Both Corey's mother and father had serious drug problems as did one of the men with whom Corey and his mother lived for several years. Corey's maternal grandfather, with whom he lived on several occasions, was a chronic alcoholic.
- Emma Johnson was an immature parent who was more focused on her own needs and desires, rather than on those of her children. She was often emotionally distant from Corey.
- Corey's mother often left him with other caregivers while she was out of the home using drugs or partying, sometimes for weeks at a time.
- Corey's mother voluntarily surrendered Corey and his brother to foster care under the custody of the Department of Social Services when Corey was about 13 years old, because she was unable to care for her children and was focused on her own needs and desires.
- Corey attended at least ten different schools (mostly public schools but also two private schools) between age 5 and age 13 in the Bronx, Brooklyn, Manhattan, Queens, and New Jersey.
- Corey apparently retained in the second grade for three years and may have repeated third grade as well.
- Corey was not placed in a special education program until approximately age 10.

### b. Corey Johnson's Background and History

#### i. Corey Johnson's parents and siblings

Corey Johnson was born on ███████████ in Brooklyn, New York. His parents, Emma Johnson and James Sykes, were both 17 years old when he was born. James Sykes was a gang member who went to prison before Corey was born. James returned from prison when Corey was 18 months old but then was sent back to prison, and Corey did not meet his father until he was 9 or 10 years old, and Mr. Sykes never played a significant role in raising Corey.

Corey Johnson has two half-brothers. Emma Johnson had another son, Robert Johnson, with a later boyfriend, Robert Butler. Corey's half-brother, Robert, is two years younger than Corey, and he and Corey were raised and spent their childhood together. James Sykes had a second son too, named James, Jr., with another woman, but Corey did not have much, if any, relationship with his half-brother, James, Jr.

#### ii. Parental substance abuse

Both Emma and James Sykes developed drug addictions at a young age. Emma, Corey's mother, battled substance abuse for most of her life, including addictions to powder and later crack cocaine. She experimented with drugs before she was pregnant

6

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

**J.A.257**

with Corey at age 17, and her family members believe she likely continued her drug use while pregnant with Corey. According to family members, Emma's drug abuse became progressively worse after she had Corey and his younger half-brother Robert Johnson. Emma lost multiple jobs due to her drug use, was on and off welfare, and spent much of her money on drugs when she was using heavily. Emma left drug paraphernalia around their apartment and spent time with drug users. In 1995, after many years of chronic drug use, Emma died of a cocaine overdose at the age of 45.

Corey's father, James became a heroin user at age 18 when he was released from incarceration sometime after Corey was born. James Sykes has battled a heroin addiction for most of his adult life.

### iii.    Family academic/educational history

Both Emma and James experienced significant academic challenges during their school-aged years. Emma was a poor student and usually received grades in the 60s on her school work. In high school, Emma still could not read well and dropped out. Emma's younger son, Robert Johnson, also faced significant learning challenges. Robert took intelligence tests in 1979 and 1983 at the ages of 8 and 12 and obtained IQ scores of 76 and 75, respectively. Robert was placed in Special Education in the first grade but failed to make any progress in the special classes. At the age of 11, he was still reading at a second grade level and could not relate to his peers and adult caretakers in an age-appropriate manner.

Corey's father, James Sykes, dropped out of high school in the ninth grade. At the time, he was reading at a fifth grade level. As he got older, James discovered that he had a learning disability and spatial deficits. He was diagnosed as learning disabled and dyslexic. As an adult, James Sykes was evaluated by the Office of Vocational and Educational Services for Individuals with Disabilities (VESID) and was found to qualify for services. Years after Corey's birth, James had a son, James, Jr. (Corey's other half-brother), with another woman. James, Jr. was in Special Education classes growing up and never attended high school.

### iv.    Transient home life

Corey spent his first years in Brooklyn with Emma and his maternal grandmother, Esther Johnson. When Corey was a toddler, Emma began to date Robert Butler, and they had Corey's half-brother, Robert Johnson, when Corey was 2-years-old. Corey, Robert, Emma, and Robert Butler lived with Emma's mother before moving into an apartment in Manhattan together.

When Corey was about 6 years old, Robert Butler left Emma due to her drug use and associated lifestyle. After the breakup, Emma moved frequently because of her drug use, volatile relationships with men, and inability to hold a job. Between boyfriends and apartments, Emma, Corey, and Robert Johnson stayed with Esther or with Emma's father, Love Johnson, in Brooklyn. At times, Corey and Robert also stayed with other relatives and friends for prolonged periods.

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

When Corey was 7, Emma moved with her sons to Jersey City, New Jersey to live with her then boyfriend, Robert "Mitch" Mitchell. Mitch lived in public housing and was unemployed. After about 18 months, Emma and Mitch split up. Emma and her sons moved in with Emma's brother Amos, and his family in Hollis, Queens. After a few months, Emma again moved with her sons, this time to an apartment in Harlem.

In Harlem, Emma met a new boyfriend named Bobby Koger, who was a violent heroin addict. When Corey was about 9 years old, Emma and her children moved in with Bobby Koger in an apartment in Harlem. When Corey was about 10 years old, after his mother lost her temper and was physically abusive toward him, Corey lived with his mother's close friend, Antoinette Joseph, for approximately six months.

When Corey was about 11 years old, his mother sent him to live with her father, Love Johnson, in Brooklyn, because she claimed that Corey exhibited behavior problems that she could not handle. Love Johnson was an active alcoholic. After living with his grandfather for several months, Corey returned to live with his mother and brother in Manhattan. When Corey was 13 years old, his mother surrendered custody of him to the foster care system, and Corey was placed in the Pleasantville Cottage School. Corey remained at the Cottage school for three years and then was transitioned to a group home in an attempt to prepare him for independent living. For about two years, he lived in the group home called Elmhurst Boys Home and attended Newtown High School.

Shortly before graduation, Corey was suspended from school and left Elmhurst to return to live with his mother. He then lived for several months with his mother's former boyfriend, Robert Butler and his wife, Ann, in Goldsboro, North Carolina before returning to Brooklyn. Not long after his return, Corey moved to Trenton, New Jersey with a group of people selling drugs there, and he lived in Trenton for several years, sometimes with his drug associates and other times with girlfriends. Finally, after the leaders and others in that drug gang were arrested, Corey and two of his later co-defendants in his capital case moved to Richmond, Virginia and continued selling drugs there.

### v.    Domestic abuse and neglect

Emma was volatile and angry toward her children. She screamed at her sons, hit them, and threw things when she got mad. Corey wet the bed fairly often as a child, and he sometimes had bowel-movement accidents while sleeping as well (encopresis). When Emma found wet or soiled sheets that Corey hid after having an accident, she screamed at Corey, sometimes beat him, and sometimes refused to wash Corey's sheets, making him sleep in the soiled sheets. Although she got angry frequently at both her sons, Emma was particularly physically abusive to Corey, and she would smack and hit him, sometimes on the head. Emma's best friend, Antoinette Joseph, reported that Emma said she was tired of her sons, described them as getting on her nerves, and even threatened to kill them. During this period Emma continued to be physically and emotionally abusive toward her children. She repeatedly punished Corey for bedwetting, which he continued to do until he was 11 years old.

8

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

Even when Corey and Robert were young, Emma would leave them home alone while she was out on the streets or with friends and abusing drugs. Sometimes she would leave them with family, friends, and acquaintances for days upon end. In general, family members and friends stated that Emma shirked her responsibilities of motherhood and did not show much affection or concern for her sons.

Emma was also the victim of abuse. Robert Butler was emotionally abusive to Emma, and the children regularly witnessed their arguments. Emma's next boyfriend, Mitch Mitchell, was militant and inflexible. He and Emma constantly fought and created a turbulent environment for Corey and Robert.

After breaking up with Mitch Mitchell, Emma dated Bobby Koger, and she and the children lived with him. Koger was violent and abusive man. Corey, Emma, and Robert were all the targets of Koger's emotional and physical abuse. Other family members, including Emma's sister, Minnie, Corey's grandmother, Esther, Corey's biological father, James Sykes, Corey's godmother, Antoinette, and Bobby Koger's older son, Kevin Koger, have reported seeing bruises on Corey, Robert, and Emma on several occasions during Emma's relationship with Bobby Koger. Koger inflicted injuries on Emma that required hospital visits and once set fire to her apartment. Emma later acknowledged to social workers that Koger was a violent heroin addict who was "abusive to the kids" and that she and Bobby were prone to violent conflict. One social worker noted:

> Mrs. Johnson stated that her home environment has been unstable and chaotic since she started living with Mr. Krager [Koger]. He required numerous emergency hospitalizations and Corey and his brother witnessed many fights and arguments between Mrs. Johnson and Mr. Krager . . . . This has been a destructive and chaotic relationship and Mrs. Johnson who has been quite depressed over this relationship has not been able to extricate herself. Mr. Krager has been drug addicted and has been involved with another woman over the past two years and this has been a very painful situation for Mrs. Johnson who feels trapped and, wants help to reorganize her life.

### vi.    Corey Johnson's academic/educational failure

Corey attended at least six different elementary schools before he finished the second grade, and he attended at least ten schools by the time he was 13 years old, all because his family repeatedly moved as his mother began and later ended relationships with a series of boyfriends. Corey struggled in school from an early age and exhibited profound difficulties in all academic subjects. Although detailed school records from all of his elementary school years and some of his middle school years could not be located, the records that have been obtained paint a uniform picture of complete academic failure.

When Corey was 8, he was referred for an academic evaluation, and records note that he was kept in second grade and required evaluation, because he "[c]ouldn't perform third grade work," or follow directions. Corey's results on an achievement tests demonstrated that he was performing at the first grade level, though he was repeating

9

second grade for the second time. Despite being 8 years old, Corey's developmental age was 4 years and 9 months on one test and 5 years and 5 months on another. Corey ultimately was retained in second grade for three years as he continued to struggle both at school and at home.

Corey was referred to the Committee on the Handicapped for counseling and services in 1978 and again in 1979 due to "ongoing school failure . . . ." Based on the results of those evaluations, the Committee on the Handicapped determined that Corey had special education needs and placed him in Special Education classes in August 1979. Corey was only in Special Education for that one school year, as his mother then sent him to live with his grandfather in Brooklyn, where he apparently briefly attended a private parochial school.

In October 1981, when Corey was almost 13 years old, Emma brought Corey to a mental health center, the Council's Center for Problems of Living in West Harlem. The Council's Center was an outpatient treatment facility for adolescents and children. After an evaluation by the Center in January 1982, Emma signed papers to voluntarily place both Corey and his brother Robert in foster care; at the time, Corey was 13 and Robert was 11 years old. Corey was placed by a court in the care and custody of the Department of Social Services, which then placed Corey in a foster care placement under the supervision of the Jewish Child Care Association ("JCCA"). The JCCA placed Corey in the Pleasantville Cottage School in Pleasantville, NY. The Pleasantville Cottage School was a residential program for youths with troubled backgrounds. Corey lived in a residential cottage and spent several months in the Pleasantville Diagnostic Center. He then he was placed in the Mount Pleasant School, which is also part of the larger Pleasantville facility.

One of Corey's Pleasantville evaluators, Leona Klerer, who worked with children with significant learning disabilities, said that the other children with whom she worked, unlike Corey, all learned to read at a reading level higher than a second grade level. Based on her assessment of Corey and the "unusual and significant" facts that he was in Special Education classes, was over 13 years old, and still was reading at a second grade level, Ms. Klerer concluded that Corey could be mentally retarded.

Throughout the approximately three years Corey spent at Pleasantville, he stood out as being particularly slow intellectually compared to the other residents. Corey's initial adjustment to school at Pleasantville was problematic, and he often wandered from class like "a frightened animal," unable to sit or pay attention. June 9, 1982, Report of Gloria Caro. By the beginning of 1983, Corey's teacher reported that his "progress in class ha[d] been very, very, very slow almost to the point where one might feel that he is not learning." Even with Special Education and tutoring in reading and Pleasantville's efforts to use a variety of teaching strategies with Corey, his academic skills did not progress, and Corey kept falling further behind his peers as he failed to respond to any of Pleasantville's teaching methods. Despite being placed in a small class setting, his academic performance did not improve, and his reading and math performances were consistently below his grade level. Corey's reading ability plateaued at the second grade level.

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

During another assessment in March 1983, when Corey was almost 14 and a half years old, Dr. Kenneth Barish, psychologist, "confirm[ed] the presence of severe learning disabilities in reading, spelling and arithmetic . . . ." Corey obtained a reading score and spelling score at the first percentile, or lowest one percent of the population, and an arithmetic score at the second percentile, or lowest two percent of the population.

In 1985, after three years at Pleasantville, the JCCA transitioned Corey to an off-campus school program, because Corey was 16 years old, his mother, Emma, was not willing to have him return to her care, and he needed to learn independent living skills to prepare him to live on his own. JCCA, therefore, moved Corey to a residential program in New York City called the Elmhurst Boy's Residence.

Corey arrived at Elmhurst Boys' Residence in June 1985. Elmhurst consisted of two apartments and housed up to eight boys at a time, with staff living in a separate apartment on site. To staff members and the social worker at Elmhurst, Corey stood out as having significant intellectual limitations and being cognitively slower than the other residents at the group home.

While living at Elmhurst, Corey attended Newtown High School where, unlike most of the other boys in the residence who attended mainstream classes and were expected to move on to college, he was placed in Special Education classes. Despite receiving three years of special education and remediation at Pleasantville, Corey, at age 16, was still functioning at second and third grade levels for reading and math. After arriving in Elmhurst, Corey was enrolled in Special Education and Vocational Education classes at Newtown High School. He attended remedial math and reading classes in summer school but failed those and many of his other classes as well. He also exhibited significant attendance problems. Corey's teachers noted that he would not be able to pass any of the school competency tests and, therefore, would not be able to graduate but would receive a certificate of completion if he completed his senior year. However, just a short time before the end of his senior year, Corey was suspended for misbehavior and ended his attendance at Newtown.

### IV.    Intellectual Disability Evaluation

I have concluded, based on my thorough examination of a wide and comprehensive array of materials and more than two dozen interviews, that Corey Johnson is intellectually disabled, and his intellectual disability began before age 18 and persisted into his adulthood, including at the time he committed the capital crimes for which he is currently sentenced to death, which is the relevant time period. In my opinion, the evidence for Corey Johnson's intellectual disability diagnosis is strong and deep, and it is corroborated by contemporaneous records created by professionals during his childhood and adolescence, by my interviews of a diverse group of people who knew him best from an array of perspectives, by statements given by many of those individuals and by others, and by standardized testing.

My evaluation has also led me to conclude that no similar comprehensive, exhaustive evaluation of Corey Johnson by experts in intellectual disability has been

11

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

**J.A.262**

previously conducted before two other experts, Drs. Daniel Reschly and Gary Siperstein, and I were retained by Corey Johnson's attorneys. Instead, my review of the available materials related to Corey Johnson makes clear that despite many referrals and evaluations during his childhood, beginning at age 8 through at least age 16, including at least five known administrations to him of IQ tests, there was never a sophisticated analysis of Corey Johnson's IQ test results, and there does not appear to have been consideration in later years (after he had taken several IQ tests) of the factors that may have affected those IQ results. Nor was there a comprehensive evaluation that included a thorough review of his adaptive functioning to determine if Corey Johnson was mentally retarded (the term at the time, but what is now referred to as intellectually disabled). Instead, the records contain, at times, the conclusion that Corey had a severe learning disability, seemingly based almost exclusively on IQ test results, but lack any discussion or analysis of whether he had limitations in adaptive functioning that would support a diagnosis of mental retardation (intellectual disability).

The psychologist who conducted a mitigation evaluation of Corey in preparation for the sentencing phase of his capital trial, Dr. Dewey Cornell, collected some of the educational, social services, evaluation and treatment records related to Corey Johnson. The records Dr. Cornell obtained labeled Corey as a severely learning disabled child, and Dr. Cornell also spoke to a handful of staff members from his residential placements. But Dr. Cornell did not obtain many critical records that would have revealed flaws in the administration of some of the IQ tests nor did he interview some of the staff professionals who knew Corey Johnson best. In addition, Dr. Cornell did not correct the results of the IQ test he administered for the Flynn effect (likely because the Flynn effect was not a widely known or discussed phenomenon in 1993 nor had it been at that point validated by the enormous body of research that exists today). Finally, apparently because Dr. Cornell concluded that Corey Johnson just missed the IQ score threshold for a mental retardation (intellectual disability) diagnosis by a few points, he did not conduct a comprehensive assessment of Corey's adaptive functioning.

I have divided my discussion and analysis of Corey Johnson's appropriate diagnosis into two parts. First, I analyze the intellectual functioning prong, including the six IQ tests administered to Corey and the factors that affected the results of those tests. Next, I thoroughly review all of the relevant material to analyze Corey Johnson's adaptive functioning as a child, adolescent, and young adult.

### a. Prong 1: Deficits in Intellectual Functioning

Psychologists, psychiatrists, and social workers conducted many evaluations of Corey Johnson during his childhood and adolescence. This summary will refer only to those tests that are relevant to a diagnosis of intellectual disability. For example, personality tests and tests of motor skills are not discussed, nor are some neuropsychological tests that are not directly related to the determination of whether Mr. Johnson has intellectual disability.

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

**J.A.263**

IQ tests are approximations of intellectual functioning.  The customary cutoff for the intellectual functioning prong of a diagnosis of intellectual disability is two standard deviations below the population mean.  However, as noted in section II.b.i. above, the APA's most current expression of the diagnostic criteria for intellectual disability in the DSM-5 notes that attained scores above two standard deviations, if accompanied by such severe adaptive behavior problems, can support the conclusion by a practitioner applying clinical judgment that the person's actual functioning is comparable to that of individuals with lower IQ scores.

Proper interpretation of obtained IQ scores takes into account the error inherent in all tests.  This error is expressed in the statistic called the standard error of measurement (SEM).  By applying the SEM of the test, one can compute a confidence interval around the obtained score and note the probability that the "true" score lies within this range.  Applying the customary 95 percent confidence interval to this cutoff results in a range of 65-75 as the upper end of the range for intellectual disability for a typical IQ test.  Thus, obtained scores of 75 or lower have for many years been considered sufficient to support a diagnosis of intellectual disability, assuming they are accompanied by significant limitations in adaptive functioning.

Psychologists apply other psychometric principles to the interpretation of obtained scores.  These include the practice effect and the effect of aging or obsolete norms, known as the Flynn effect.  These factors are discussed below as they apply.

It is important to understand the context for Corey Johnson's history of IQ testing. During Corey's childhood, he and his mother moved repeatedly from New York City borough to borough, as well as from New York City to New Jersey and back to New York City.  He attended many different schools and was referred for educational and psychological evaluations in New Jersey, Manhattan, and Westchester.  It is clear from the records from these agencies that they were not always aware of the results of previous evaluations or of the specific test instruments that were used during those evaluations.

### i.    Corey Johnson IQ Testing

With regard to intelligence testing, Mr. Johnson's first test for which records are available was on March 25, 1977, when he was 8 years, 4 months old.  Jennifer Figurelli, Ph.D. of the Jersey City Schools administered the Wechsler Intelligence Scale for Children-Revised (WISC-R) and obtained a Full Scale IQ of 73.  Corrected for aging norms, this IQ score would be corrected to 71.8.

Two years later on May 3, 1979, Nathalie Smith, of the Evaluation Unit of the West Manhattan Center administered the original Wechsler Intelligence Scale for Children, which yielded a much higher IQ of 91.  It must be noted that there are serious problems with the choice of this test.  First, the updated version of the Wechsler IQ test for children, the WISC-R, had been available for 5 years, so administration of the WISC, which had been published in 1949 and was 30 years old and well out of date when Smith selected it, was a violation of the American Psychological Association's *Standards for Educational and Psychological Testing* at that time and now.  Significantly, the norming of the WISC, as noted, was more than 30 years old when Smith administered it to Corey

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

**J.A.264**

Johnson.  By current psychometric standards, the norms were so old and so culturally out-of-date that their use was inexcusable and their results invalid.  Finally, not all of the subtests of the WISC were administered, and the score was obtained by prorating.  In my opinion, these cumulative problems make this score uninterpretable, invalid, and unreliable.

In October 1981, Ernest Adams, M.S., from the Council Center for Problems of Living in Manhattan, administered the WISC-R to Corey Johnson again, and Corey obtained an IQ of 78.  Corey was 12 years, 1 month old, and this was his third administration of a Weschler IQ test in 4 and a half years.  Further, the WISC-R had been normed almost nine years earlier.  Taking into consideration norm obsolescence, the obtained score should be corrected by nearly three points, to a fraction above 75 (specifically 75.36).

Only three or four months later, on February 8, 1982, Cary Gallaudet, Psy.D., administered another WISC-R to Corey at the Pleasantville Diagnostic Center in Westchester, New York; this was the fourth administration of a Weschler IQ test to Corey in 5 years.  Dr. Gallaudet obtained an IQ of 88 on the WISC-R, which correcting by three points for the Flynn effect, would become a score of 85.  In addition, Dr. Gallaudet has indicated that she was not aware that Mr. Adams had administered the identical WISC-R test just a few months earlier at a different agency in Manhattan.  Dr. Gallaudet has also said that she would not have given Corey the WISC-R test if she had known that Corey had taken it so recently.  The practice effect surely inflated this score to some unknown but likely significant extent.

Moreover, Dr. Gallaudet acknowledged in her test report that she provided assistance to Corey during the testing process by refocusing him to keep him on task when his attention strayed.  Dr. Gallaudet has also acknowledged that she was an inexperienced psychologist in 1982, and this has been substantiated by her supervisor at the time.  It is likely that Dr. Gallaudet's assistance to Corey during testing also artificially inflated his score.  Her supervisor at the time, George Sakheim, Ph.D, has indicated that providing this type of assistance compromises the results of the testing.  For all of these reasons, the February 8, 1982, WISC-R results have compromised validity and cannot be properly interpreted.

On March 15, 1985, when Corey was 16 years, 4 months old, Kenneth Barrish, Ph.D. again administered the WISC-R to Corey Johnson and obtained an IQ of 69.  Corrected for aging norms, the IQ test given to Corey Johnson by Dr. Barish is 65.04.  I interviewed Dr. Barrish who remembered Corey Johnson well.  Dr. Barish described Corey Johnson as the child with "the most profound impairment in learning" of any child he evaluated in his more than 3 decades of clinical practice.  Dr. Barish was an experienced psychologist when he evaluated Corey Johnson.  He also has stated that he was not aware of the October 1981 administration of the WISC-R to Corey Johnson by Adams and of the likely practice effect due to Dr. Gallaudet's administration of the identical IQ test just a few months later.  This is corroborated by Dr. Barish's report at the time, because he noted that the significant drop in Corey's IQ results from the results obtained by Gallaudet "was difficult to account for."  In any event, Dr. Barish's results

14

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

placed Corey Johnson solidly in the intellectual disability range on the intellectual functioning prong of the diagnostic framework.

Finally, on October 9, 1992, when Corey Johnson was 23 years, 11 months old, Dewey Cornell, Ph.D. of the University of Virginia, administered the Wechsler Adult Intelligence Scale-Revised (WAIS-R) and obtained a score of 77. This was Corey's sixth administration of a Wechsler test, and the norms of the test were over 14 years old. If corrected for aging norms, the score would be 72.8.

In summary, correcting scores for aging norms (without any consideration of practice effects) would yield four scores compatible with the diagnosis of intellectual disability (Figurelli 71.8; Adams 75.6; Barish 65.4; and Cornell 72.8). The 1979 administration of the extremely outdated WISC test, both temporally and culturally, renders the results of that test invalid. Thus, only the February 1982 WISC-R was an outlier, but that test was surely significantly artificially inflated by the practice effect, as it was given on the heels of the same test in October 1981 and by the admitted assistance given to Corey by an inexperienced examiner; its results lack validity. Based on my clinical judgment and experience, I find the four IQ test administered by Figurelli, Adams, Barish, and Cornell to be the only IQ tests valid for diagnosis. In my opinion, based on my analysis of the valid IQ tests in this case and on the comprehensive analysis conducted by Dr. Daniel Reschly, an expert in both intellectual disability and learning disorders, Corey Johnson meets the intellectual functioning prong of the intellectual disability framework, because his IQ test results show significant limitations in his intellectual functioning before the age of 18.

**b. Prong 2: Deficits in Adaptive Behavior**

    **i.    Adaptive Behavior Standards**

As noted earlier, significant deficits in adaptive behavior is the second prong of a diagnosis of intellectual disability. The current definition used by the AAIDD refers to three areas of adaptive behavior and requires a significant impairment in at least one of the three areas—Conceptual skills; Social skills; and Practical skills—or significant impairment in a measure of overall adaptive functioning.

The American Psychiatric Association in its DSM-5 uses a very similar construct for an adaptive behavior assessment. Like the AAIDD structure, the DSM-5 identifies three domains of adaptive behavior—Conceptual; Social; and Practical. Like the AAIDD, the DSM-5 provides that in order to establish significant impairments in adaptive functioning sufficient to support a diagnosis of intellectual disability, a person must have significant limitations in at least one of the three areas or domains of adaptive functioning. Moreover, as mentioned above, compelling evidence of adaptive behavior impairments can be considered in the interpretation of intellectual functioning under prong one of an intellectual disability diagnosis, according to the DSM-5.

15

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

**J.A.266**

### ii.    Adaptive Behavior Assessment Methodology

A comprehensive collection of information concerning adaptive functioning requires gathering information from a wide array of people who knew the individual at different times in the person's life, in a variety of settings, and from different perspectives.  The purpose of obtaining a broad spectrum of information is to try to identify consistencies in functioning across times and settings.  It is important to note that some inconsistency is to be expected, and clinical judgment is, therefore, required to synthesize all of the available information to reach a diagnostic conclusion.

In order to assess Corey Johnson's adaptive functioning, I reviewed a wide array of contemporaneous school, social services, treatment, and institutional records created during his childhood, adolescence, and young adulthood before his current incarceration.  I also interviewed over 25 family members, friends, members of the drug dealing groups with whom Mr. Johnson associated; and teachers, staff members, and other professionals who knew him when he was placed in schools and institutional environments.  I reviewed statements prepared by many of these individuals and by others whom I did not interview.

To complement the information obtained from documents and interviews and to obtain a retrospective standardized assessment of Mr. Johnson's adaptive functioning, I administered a standardized adaptive behavior rating instrument to three people who knew Corey Johnson well, although each had a different relationship with him.  The Adaptive Behavior Assessment System (2nd ed.) ("ABAS-II") is a rating scale of adaptive behavior administered to people who knew the individual well enough to provide ratings in each of the areas used to assess adaptive functioning.  In Mr. Johnson's case, I was not able to obtain a standardized assessment of his work history, because he did not have enough of a work history to allow for valid ratings.

The three raters were (1) Antoinette Daniels Joseph, best friend of Corey Johnson's mother, (2) Minnie Hodges, maternal aunt of Corey Johnson, and (3) Richard Benedict, former teacher and administrator at Pleasantville Cottage School.  Ms. Joseph and Ms. Hodges completed ratings using the Parent Form of the ABAS-II, and Mr. Benedict completed the Teacher Form.  The items on the Teacher Form are limited to adaptive behavior shown in school.

It is important to note that Mr. Benedict knew Corey Johnson only in an institutional setting, the Pleasantville Cottage School, where staff and other professionals provided many supports to residents.  As I noted above, while administering standardized instruments to raters who knew or observed an individual only in an institutional setting is permissible, caution should be used when interpreting the results, because adaptive functioning for purposes of an intellectual disability diagnosis is focused on adaptive behavior in the community setting, which is significantly different from an institutional setting.  Mr. Benedict's ratings must be considered in this context; institutional settings can artificially inflate assessments of adaptive functioning, because they do not take into account the significant institutional supports provided to residents.

16

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

**J.A.267**

On the ABAS-II, scores for the three areas of adaptive behavior are derived from scores in nine areas. A mean score on the nine areas rated is 10 with a standard deviation of three. Thus, a score indicating significant impairment (two standard deviations below the mean) is a score of 4 or lower. Attached as Appendix C are charts depicting the full ABAS-II results.

As I explain below, I have concluded that Corey Johnson demonstrates significant limitations in all three adaptive behavior domains. Corey Johnson's adaptive behavior limitations are well documented in contemporaneous school and treatment records. They are also reflected in numerous statements from the people who knew him best during his childhood, adolescence, and adulthood. And they are corroborated, particularly in the Conceptual and Practical domains, by the results of the retrospective administration of standardized adaptive behavior instruments.

As noted above, significant limitations in only one domain is all that is required to support a diagnosis of intellectual disability, as long as there are accompanying significant limitations in intellectual functioning as measured by standardized IQ tests and as long as the significant limitations in intellectual functioning and adaptive functioning were manifested in the developmental period.

I have structured my evaluation and analysis below for each of the three domains in the same manner, starting with an explanation of the skills encompassed by the three separate domains. I then include a summary of my significant findings and conclusions for each domain, followed by selected examples of support found in the contemporaneous institutional records created during Corey Johnson's childhood and adolescence and from the recollections of professionals who worked with, evaluated, or treated Corey. I then highlight relevant observations from Corey's family, friends, and others who have known him over the years. Finally, I summarize the results from my administration of the ABAS-II standardized adaptive behavior instrument for each domain and the relevant categories.

### iii.    Conceptual Adaptive Behavior Domain

The AAIDD definition of the Conceptual domain encompasses the following areas: language; reading and writing; and money, time, and number concepts. The DSM-5 definition is very similar, as it includes: competence in memory; language/reading/writing; math reasoning; acquisition of practical knowledge; problem solving and judgment in novel situations; among others. For ease of analysis, I have grouped these areas into the following four areas for the Conceptual domain: (a) Academic performance; language and communication; (b) Number comprehension, money, and time; and (c) Judgment, planning and problem solving.

As the discussion below vividly demonstrates, Corey Johnson had significant limitations in all of the areas encompassed by the Conceptual functioning domain during his childhood and adolescence, and into adulthood. Corey failed educationally and academically. He was never able to learn to read or write adequately, to analyze or understand rudimentary subjects, or to develop a more than superficial store of

17

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

**J.A.268**

knowledge.  For these reasons, Corey repeated grades over and over without success and never came close to graduating from high school.  Various achievement tests administered to Corey over the years placed him far below his age and grade level, and even as an adult, his achievement plateaued at a young middle school level for the most part.

Corey Johnson also demonstrated from an early age significant challenges with language and communication.  As a youngster, he stuttered and had a lisp.  But his limitations went well beyond those obvious speech impediments.  In addition to his rudimentary reading and writing ability, Corey's oral language abilities and comprehension have been compromised throughout his life.  He has often had to rely upon simple language or slang to communicate with others, and those who have known him have limited their conversations with him to basic, concrete language.  But even so, they report that he often did not grasp what was being said to him.

Similarly, Corey Johnson lacked proficiency in math, particularly when tasks involved more than basic computation.  Those challenges expressed themselves in related life skills, such as telling time or correctly calculating change when making purchases.

Finally, the results of the standardized ABAS-II instrument that I administered corroborate that Corey Johnson had significant limitations in the Conceptual domain.  For all of these reasons, in my opinion, there is overwhelming evidence that Corey Johnson has significant limitations in adaptive functioning for skills encompassed within the Conceptual domain that manifested when he was child, adolescent, and an adult at the time of the crime in this case.

### A.  Academic performance

Corey Johnson's school and academic performance history reflects a persistent pattern of failure.  As I described above, Corey experienced a chaotic childhood characterized by constant upheaval and repeated moves from place to place—a pattern that involved living with his mother and close family members, then living with his mother and one of her boyfriends, and back with family—in various boroughs in New York City and in New Jersey.  That disruptive and transient life led to Corey's being enrolled and attending school after school.  He attended at least ten different schools in Manhattan, Brooklyn, New Jersey, and the Bronx before he was placed in the Pleasantville residential program in Westchester County, New York at age 13 for middle school and high school.  Corey also attended a high school in Queens after his transfer from the Pleasantville residential facility.

From the very beginning, Corey's contemporaneous school and treatment records show that he was failing academically and far behind his peers.  At times, Corey repeated grades because he could not progress.  However, despite remaining in the same grade as his peers advanced, Corey could not improve his performance.  At other times, the records suggest that Corey was advanced to the next grade, despite his continued

18

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

**J.A.269**

academic failure.  As he got older, the records show that Corey fell further and further behind, because, simply put, he could not learn.

Nevertheless, school and treatment records created when Corey was a child reflect numerous attempts by educators and clinical treatment providers to assist him.  They document a variety of strategies and efforts by those professionals to assist him in his academic performance and a range of supports to address his significant needs.  The records also regularly reported that Corey tried hard, exhibited good effort, and the records repeatedly noted that he was motivated to learn.  Despite the variety of strategies and supports he received and his sincere efforts, Corey could not learn and failed academically at every turn.  Corey's academic deficits in childhood cut across all academic subjects and generalized to applications in community life, such as shopping and reading for pleasure or for general information.

Despite significant efforts by Corey Johnson's current attorneys to gather his school records, comprehensive educational records could not be located.  However, references in later records help fill in some of the gaps in his school history.  Most importantly, the contemporaneous records summarized below starkly demonstrate Corey Johnson's educational and academic failure.

Corey appears to have attended first grade at both PS 103 and PS 63.  This is corroborated by later records from the Bureau of Child Guidance, Upper West Side Center when Corey was in third grade, which indicate that he was retained in the first grade and had a history of poor academic performance.

There are also records suggesting that, for a period of time in 1974 (when Corey was 6 years old), he attended first grade at St. Rita's, a private Catholic school.  Records show that Corey was in the second grade at PS 309 in Brooklyn when he was 6 years old in 1975 and that he repeated the second grade at PS 16 in Jersey City, New Jersey when he was 7 years old.  Records also show that Corey was still in the second grade when he attended PS 134 in Queens in 1978 when he was 9 years old, and they show that he remained in the second grade at PS 76 in Manhattan in 1979 after he turned 10 years old.

The first documented concern about Corey's academic performance that has been located was when he was identified for testing when he was 8 years old and repeating the second grade in New Jersey.  In March 1977, at the age of 8 years, 4 months and in the second grade, Corey participated in an evaluation by the Learning Consultant to the Child Study Team of the Jersey City Public Schools.  The report of this evaluation by Cheryl Spillane, Learning Consultant, indicated that Corey was enrolled in PS 16 Elementary School in Jersey City and that he was referred for evaluation because he:

> [c]ouldn't perform third grade work.  Being retained in second.  Cannot follow directions. No concept of number facts, low comprehension. No reading skills.  Unable to retain sight vocabulary.

In February 1979, when Corey was 10, he was referred to the Committee on the Handicapped, by the Bureau of Child Guidance for reason described as "school failure." Records from the Evaluation Unit of the West Manhattan Center in May 1979 (age 10

19

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

**J.A.270**

years, 5 months) included an Education Assessment.  Corey was administered the Peabody Individual Achievement Test, Reading Recognition subtest, and scored a grade equivalent of 1.3, which placed him at the first grade level with visual discrimination and reversals noted.  Arithmetic on the Wide Range Achievement Test was at the 3.9 grade level.  This evaluation determined that Corey had special education needs and placed him in Special Education classes with a curriculum that included (1) a special reading program to teach visual discrimination of letters and words; (2) perceptual motor training to improve writing skills; and (3) maximize auditory processing by giving small chunks of information which Corey could act upon in meaningful ways.

Records show that Corey was placed in the third grade in the fall of 1979 at PS 200, when he was 10 years old.  But the next academic year (in the fall of 1980), records show that Corey was placed in Special Education classes in the fifth grade at PS 92.  There is no explanation for why Corey skipped from the third grade to the fifth grade, and it is not clear if he ever was placed in the fourth grade at any school.

A Social History at Pleasantville Cottage School (3-19-85) noted, "Corey was left back in school in the 3rd and 4th grade[s] and was placed in a special class in 1980."  Records of St. Rita's Catholic School indicate that Corey also attended that school in 1980 at age 11, when his mother then sent him to live with his grandfather in Brooklyn.  Corey was only enrolled briefly at St. Rita's, and then he enrolled at a public school, PS 213, in Brooklyn.

A Child Assessment Evaluation Summary dated December 9, 1981, when Corey was 13 years old, indicates that Corey's mother took him to the Washington Heights-West Harlem Community Mental Health Center for assistance "due to academic failure and behavior problems."

When Corey was 13, his mother placed him in foster care through the supervision of the Department of Social Services ("DSS"), and the DSS put Corey in the care of the JCCA.   The JCCA placed Corey in its facility at the Pleasantville Cottage School in Pleasantville, NY and conducted a diagnostic screening of Corey upon his admission.  The screening records noted that his Wide Range Achievement Test scores showed functioning on second and third grade levels in word recognition, spelling, and arithmetic.  He could only recite the months of the year up to August.

Despite the specialized services at Pleasantville, his report cards indicate that Corey continued to perform far below grade level, even though he demonstrated "sustained  . . . effort" and was seen as "extremely cooperative."  The Pleasantville records repeatedly describe Corey as having a severe learning disability, a label that does not have any diagnostic significance for intellectual disability.  The records note time and again that Corey was barely able to read.

Pleasantville prepared an Individualized Education Program ("IEP") for Corey in June 1985, when he was 16 years old and when he was at the end of his last academic year at Pleasantville before transferring to a group home and Newtown High School.  Corey's IEP notes an assessment of his reading comprehension on the Brigance Inventory of Essential Skills as 40 percent at the third grade level and his oral comprehension

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

ability on the Gray Oral Reading Test at 75 percent at the second and third grade level. Other achievement testing assessed his sight vocabulary level on the Wide Range Achievement Test as a grade equivalent of 3.7 (third grade) and his arithmetic ability on the Wide Range Achievement Test as a grade equivalent 3.4 (also third grade). Thus, after three years in Special Education and remediation classes at Pleasantville, Corey was still functioning at the second and third grade levels for reading and math at age 16.

It should be noted that every staff member from Pleasantville who provided an interview or declaration remembered Corey Johnson, and each described Corey as the slowest student or the most impaired student they had ever known to come through that institution. For instance, Ann Harding, a residential staff member wrote, "Corey was very slow intellectually. I knew this by the way he would talk to me. I do not remember anyone else at Pleasantville who was similarly slow intellectually."

The JCCA placed Corey at the Elmhurst Boys Residence when he was 16 years old and aged out of Pleasantville. This placement was supposed to prepare Corey for independent living, because his teachers and counselors concluded that returning to the care of his mother was not an option that was in Corey's best interest. Ms. Odette Noble conducted individual and group therapy sessions while Corey was at Elmhurst, and Corey Johnson attended those weekly. Ms. Nobel stated in her affidavit, "Compared to virtually all of the other boys I encountered at Elmhurst, Corey was much weaker cognitively."

Corey attended Newtown High School, his last school placement, while he lived at Elmhurst. At Newtown, Corey was placed in remedial, Special Education, and Vocational Education classes. Corey failed almost all of his classes, despite regular support from his friend, Courtney Daniels. Courtney recalled helping Corey several times a week for a couple of hours in the afternoon, providing particular support to Corey in math by giving him step-by-step instructions about how to tackle a problem. Yet those efforts did not help Corey succeed. For example, in his "junior year" of high school, Corey took fifth and sixth grade English classes and barely passed with a D. He was placed in fundamentals of math both his junior and senior year and received a D his junior year and failed his senior year. He also received a D in typing his junior year. Corey attended remedial math and reading classes in summer school but failed those classes and failed nearly every class his senior year. During his time at Newtown, teachers determined that he was unable to pass school competency tests. Corey left Newtown without graduating or obtaining a certificate of attendance.

After Corey Johnson was charged with the capital offenses that have prompted this evaluation, his court-appointed defense psychologist, Dr. Dewey Cornell, conducted the mitigation evaluation noted above. Dr. Cornell testified briefly at the capital sentencing hearing in Corey's case about some of Corey's adaptive functioning. Dr. Cornell stated: "Certainly, functional academics, the ability to do academic work is one in which he has impairment."

Dr. Cornell also administered the Test of Written Language ("TOWL") and the Woodcock-Johnson Test of Achievement-Revised in January 1993, when Corey was 24-years-old. On both tests, Corey Johnson obtained age equivalents substantially below his chronological age and obtained grade equivalents between second and sixth grades.

21

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

Since that time, Corey Johnson has diligently studied while in prison in pre-GED classes, because he has stated that one of his most important life goals is to pass the GED. Despite several decades of study, Corey Johnson's achievement has remained relatively constant. In 2014, Dr. Daniel Reschly administered the latest version of the Woodcock Johnson Test of Achievement-III to Corey Johnson. With the exception of concrete math calculations, on which his performance has improved after diligent study, the vast majority of Corey Johnson's grade equivalent achievement test results remain in the second to the fourth grade range.

### B.  Language and communication

Corey Johnson's school and treatment records show that he had language and communication deficits that began at an early age and continued throughout his life. He had marked speech impediments at an early age. Records show that he exhibited "marked stuttering" when he was young up until age 5, and had "some stuttering problems" later on as well as a slight lisp.

While those obvious speech difficulties eased as he got older, his school and mental health evaluations during Corey's childhood and adolescence documented communication difficulties, debilitating disabilities in reading, writing, and oral expression, and limitations in his ability to understand others. Achievement testing showed that as an adolescent and even as an adult, his reading, comprehension, and oral communication skills were far below his age. As noted earlier, his oral comprehension ability on the Gray Oral Reading Test was at 75 percent at the second and third grade level. In other words, as a mid-teenager, he understood little of what people spoke to him.

Family members and friends similarly described Corey's having difficulty understanding what others say, which required that they communicate with him using simple words and phrases. Nevertheless, they said he often did not comprehend what they said to him. In my interview with Corey Johnson's capital defense attorney, he similarly stressed that he had more difficulty explaining issues to Corey than he had with "other low-intelligence" clients he has represented during his career. He had to explain thing to Mr. Johnson more times than with his typically low-intelligence clients and said that Mr. Johnson would sit there and nod his head but not understand. All of the information I reviewed, some of which is summarized below, demonstrates Corey Johnson's significant limitations in language and communication.

The earliest set of school records that have been located document his reading and communication deficits. In March 1977, at the age of 8 years, 4 months and in the second grade, Corey participated in an evaluation by the Learning Consultant to the Child Study Team of the Jersey City Public Schools. Cheryl Spillane, Learning Consultant, described Corey's speech as "at times quality is unclear . . . [s]ays v for b sometimes. Needs further investigation." The evaluations done at this time show that Corey was functioning below his chronological age on speech and language tests. Among other deficits, the evaluation shows that he could not perform the most basic function of

22

writing his own name.  The recommendations at the conclusion of the evaluation included a recommended referral for a speech evaluation.

Dr. F. A. Figurelli, a psychiatrist who evaluated Corey for the Jersey City Board of Education in October 1977, when Corey was 8 years old, wrote that "[h]e reveals a speech defect."  Additional records consistently show that serious concerns about Corey's speech and language development were repeatedly noted.  However, as late as when Corey was a teenager at Pleasantville, despite several evaluations recommending speech therapy from the time he was 10 until he was 15, he did not receive those services. Elizabeth Clemmens, Psychiatric Summary, December 1984.

The Pleasantville records, beginning when Corey was 13, repeatedly describe him as having speech impediments and disorders, receptive and expressive language disorders, as well as noting that he is barely able to read and functions at a second grade level.  They note that Corey's deficits were evident during his initial evaluations.  Corey spoke with "markedly slurred speech," had very poor reading skills, a poor understanding of what he was reading and no understanding of how to read.   Barely able to write his own name and unable to recognize the sounds of many letters on the page, Corey was reading on a second grade level, indicating "a significant deficit in his abilities."  Lynda Coccaro Speech and Language Evaluation, October 5, 1983.

Janet Valentine (former counselor and clinical social worker at Pleasantville Cottage School) described Corey to me as follows: "He wasn't very expressive."  She reported that he didn't use many sentences, was basically a listener.  "I thought it was a processing problem."  She said that he had difficulty processing both receptive and expressive language.  She said that she "Didn't know if he couldn't express or just didn't understand."  "He could follow one or two step directions, but nothing elaborate."  "You had to show him, I'm talking about basic living things."  "I couldn't take for granted that he understood, so I showed him."  "I remember him because he just wasn't getting it."

As noted above in Section IV.a.iii.A., Corey's assessment on the Brigance Inventory of Essential Skills showed that he understood less than half of what he read at the third grade level and his oral comprehension was only 75 percent at the second and third grade level.

In January 1993, at age 24, Dr. Cornell administered the TOWL.  The oldest age group for the results of this test was 17 years old, and on two portions of the test, contextual vocabulary and syntactic maturity, Corey scored as low as one to two percent of the 17 year age group population respectively.  His score on the latter of those two tests was comparable to children aged 7 to 8.  Based on those TOWL results and the rest of Dr. Cornell's evaluation, he testified that, in the context of adaptive functioning, "communication deficits with his speech impairment and communication problems, he has some deficits there."

Corey's family members and friends described communication difficulties that mirrored the evaluations of his teachers, case workers, and mental health professionals and his performance on various evaluations.  Corey's Aunt Minnie Hodges stated that "Corey had difficulty following certain instructions, and I would have to repeat myself

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

many times before he could comprehend what I was directing him to do. (Esther Johnson said the same thing in her affidavit.)  Sometimes he appeared to be puzzled or mixed up when I would tell him certain things."  Corey's friend from childhood, Holly Scott, described his communication as all slang and said she had difficulty picking up on it.  She said in her affidavit, "Our conversations were always very simple."   Her comments were mirrored by Sonya Hilton, who dated Mr. Johnson when he was about 20.  She stated that: "He had a limited vocabulary, and he spoke mostly using street words and slang."  She further recalled that: "If Corey was in the room with four other people, it was clear that Corey was not on the same intellectual level as the other people and had difficulty keeping up with the conversation.  For example, if the group was talking about the weather, Corey would abruptly talk about a race car show."  Corey's cousin, Queenie Hodges, described Corey as "quiet; he may not have understood."  She said that Corey would often change topics and was disorganized in his conversations.  She stated that although someone had been helping him to write letters to her recently, his "letters are just nonsense."  She described them as disorganized like his conversation.

 Similarly, maternal aunt Minnie Hodges reported, "He wouldn't understand others but didn't want to look bad."  She also felt that he had difficulty making himself understood.  She said that even when he calls her today, she has to tell him to explain, because she doesn't understand him.

In my discussion with former Warden Mark Bezy, he indicated that he met with all death-row inmates weekly.  He described his conversations with Mr. Johnson as "very simple" and noted that Mr. Johnson never raised any legal discussion or engaged in discussion of any other complex matter.

These comments and others by people who have known Mr. Johnson well indicate that his communication has been adequate for some of the simple communication demands of everyday life but were at the concrete level of a child.  All of the information I reviewed clearly establishes that Corey Johnson has never demonstrated the conceptual aspects of communication appropriate for his age, and, instead, his language and communication abilities are significantly impaired.

### C.  Number comprehension, money, and time

The records I reviewed and my interviews with those who knew Corey Johnson uniformly portray him as a child, adolescent and adult with impaired abilities with respect to number concepts, the use of money, and the concept of time.  Even the leaders of the drug operation in New Jersey for whom Corey Johnson sold drugs recognized his unreliability in keeping track of how much money customers owed him for the drugs and how much money Corey owed his superiors.  Corey's achievement testing at various stages during his educational career reinforce and corroborate those conclusions.  His performance on the Arithmetic subtest on the valid IQ tests that Corey Johnson was administered also reflect his limitations with numbers.

Corey's first documented academic evaluation at age 8 revealed that he demonstrated "[n]o concept of number facts . . . ."  That same evaluation showed that

24

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

Corey: "had no understanding of his date of birth.  He thought he was born in March," although he was born in November.

When he was repeating second grade for the first time, records note that Corey was not able to work out math problems that children his age and younger were able to do by themselves, and they describe Corey's math skills as similarly poor and state that they did not improve despite receiving help.  In addition, Corey was only able to tell time on the hour, and although he knew there were 12 months in the year, he could only recite the months in sequence up to August.  He also could not multiply by three, divide a single digit by two, or read numbers of more than four digits.

At Pleasantville Cottage School, as a teenager, records show that despite being placed in a small class setting, Corey's math performance was consistently below his grade level.  Later, when Corey was 16 and 17 years old at the Elmhurst group home, one of his counselors, Odette Noble, recalled that: "Mr. Johnson's limitations in school achievement and functional academics continued in his later adolescence and adulthood." While at Elmhurst, goals for Corey included "learn how to handle money so that [Corey] can shop for himself."  She also noted: "Caseworker, houseparents [sic] and teachers will help Corey learn enough simple arithmetic that he will be able to figure out correct change."  These objectives were not obtained, because handling money was consistently identified as a goal for Corey throughout his stay at Elmhurst.

Interviews and statements from family and friends sketch a similar picture.  Cousin Queenie Hodges reported to me in interview that at age 11 or 12, Corey could not tell time and that even at later ages, he consistently spelled her name wrong.  Aunt Minnie Hodges recalls that when Corey was 12 or 13 years old, unlike other children his age, he could not count small change without making mistakes, a problem she said continued into his late teens.  Priscilla Hodges and Antoinette Joseph said they ordinarily would have to accompany Corey to the store and would need to tell him whether he received the proper change after buying something.

The affidavit of Esther Johnson states that she did not feel comfortable trusting Corey with money and would send his younger brother, Robert, to accompany Corey to the store to make sure the purchase was done correctly and the proper change was received.  Many similar examples of problems in both school achievement and functional academics in childhood can be found in affidavits and interviews.

After leaving Elmhurst and after about a 6 month stay with his mother's former boyfriend, Robert Butler and his wife, Ann, in Goldsboro, North Carolina, Corey began working under the Brown brothers in their drug selling operation in Trenton, New Jersey.  Their statements to me during my interviews detail the problems that Corey Johnson had with handling money.  The Browns limited Corey's role to be sure he did not handle and lose their money.

### D.  Judgment, planning and problem solving

Corey Johnson also exhibited significant limitations in judgment, planning, and problem solving, the final aspect of the Conceptual adaptive behavior domain.  In later

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

**J.A.276**

pages of Corey Johnson's adaptive functioning in the Social domain, I document the records and the anecdotes from a range of reporters who described Corey Johnson as highly gullible and naïve. Several of those anecdotes also demonstrate his poor judgment and rash, impulsive actions. For example, Corey's willingness on a dare to ride his bike across a street through traffic and to roller skate down a steep hill show his limited judgment and inability to consider the consequences of his actions, in addition to reflecting his susceptibility to peer pressure. Another time, when Corey was living with Robert Butler and his wife, they reported that he borrowed a 10-speed bicycle and rode it in the woods as if it were a dirt bike. He did this while wearing nice church clothes and returned from his ride in the woods covered in mud.

My evaluation also shows that Corey Johnson thought little about the future but instead simply reacted to events as they occurred to him. My review has also revealed that Corey Johnson had very limited problem solving skills. Those who knew him best said that he would do as he was told by peers, regardless of whether it was the best course of action or the right thing to do. As the records and anecdotes discussed below show, Corey Johnson exhibited significant impairment in judgment, planning, and problem solving.

When he was evaluated in 1979 at the West Manhattan Center, Nathalie Smith reported that at age 10 years, 5 months, "Corey would like to be a policeman when he grows up. His range of interests appeared very limited in view of his intelligence . . . ." In discussing Mr. Johnson's time at Pleasantville with Ms. Janet Valentine, I asked whether he had any plans for the future or independent living. Ms. Valentine replied that Corey did not take initiative in many things. "He didn't process things like that. I don't think he gave things like that a thought. I don't think he was on that level." She also said, "I saw no skills of being independent at all" compared to others his age.

By adolescence Corey Johnson still had not developed any plan for his future life. In reporting on Corey's time at Elmhurst, Ms. Odette Noble, social worker, said that he could not plan life decisions. She described such planning as "too complex a series of tasks for him." Ms. Noble discussed with Corey in counseling about the need to make good decisions, such as determining who is trustworthy. She said that he could talk about the future but "in the moment, he couldn't make sensible decisions that would help his future." She said Corey "lived in the moment." When I asked Robert Johnson whether his brother had plans for the future, Robert remembered that Corey said he planned to go to college, which given his complete academic failure, was impossible, and that he wanted to play basketball in the NBA, which, while a common teenaged boy's dream, was also unrealistic.

Dr. Dewey Cornell testified that in his early 20s, Corey Johnson had impaired ability to reason, use good judgment to control his behavior, and understand and foresee the consequences of his actions. This is consistent with Odette Noble's observation during Corey Johnson's time at Elmhurst that Corey "lacked the ability to understand the consequences that his actions could have."

In my interview with her and in her affidavit, Corey's friend, Holly Scott, said that he never discussed his future plans. Queenie Hodges reported (to me and in her

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

**J.A.277**

affidavit) that she did not remember Corey ever having stated any goals.  She stated in her affidavit, "Corey was definitely not a leader and he never took authority over anything.  He was a passive follower; he just went with the flow."  Robert Butler said he never heard Corey speak about his goals in life.  Darnell Brown stated in his affidavit that "Corey also seemed incapable of taking any initiative on his own . . . ."  In her affidavit, Priscilla Hodges stated, "Corey struck me as directionless."  Former girlfriend, Monica Dawkins, stated in her declaration, "[h]e would follow directions, whether they were good or bad."

### E.  Conceptual domain ABAS-II results

Using the current AAIDD and APA system of assessing adaptive behavior, the ABAS-II standardized results for all three raters demonstrate significant limitations in adaptive functioning in the Conceptual domain, as shown by the following chart.  The reported scores are standard scores with a mean of 100 and a standard deviation of 15 and can be interpreted in a similar way as IQ scores.  Thus, two raters provided scores below 70, and one rater provided a score approximately two standard deviations below the mean using the 95 percent confidence interval.

| ABAS-II Raters | Conceptual Domain Scores |
|---|---|
|  |  |
| Antoinette Joseph | 63 |
| Minnie Hodges | 57 |
| Richard Benedict | 74 |

### F.  Conceptual domain conclusion

Based on all of the information I reviewed, it is my opinion that that the evidence is persuasive that Corey Johnson had a significant impairment in all aspects of adaptive behavior domain of Conceptual beginning in childhood and continuing through his adolescence and adulthood.

### iv.    Social Adaptive Behavior Domain

The AAIDD defines the Social domain as encompassing the following: interpersonal skills; social responsibility; self-esteem; gullibility/naïveté (i.e., wariness); follows rules/obeys laws; avoids being victimized; and social problem solving.  Similarly, the APA DSM-5 definition of the Social domain includes: awareness of others' thoughts, feelings, and experiences; empathy; interpersonal communication skills; friendship abilities; and social judgment, among others.  For purposes of this evaluation, I have grouped these skills as follows: (a) Interpersonal skills and friendship; and (b) Leisure activities; and (c) Leadership, gullibility, naiveté, and victimization.

The records I reviewed and my interviews show that Corey Johnson was a solitary, fearful child who had few friends and felt most comfortable playing by himself or with younger children.  As an awkward, anxious child, he was teased by other children

27

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

**J.A.278**

and had few if any skills to cope, other than turning to adults to intervene.  My review suggests that as he got older and became an adolescent, Corey had real problems in understanding how to interact with peers and adults and marked difficulty in understanding social cues and norms.  His inability to master basic social interactions led him at times to engage in disruptive behavior, such as playing the role of class clown, and left him with few friends as an adolescent.  The only close friends he had were girls, particularly those who took a protector role.  While Corey had a few recreational activities that he enjoyed—sports and watching cartoons—family and friends repeatedly portrayed Corey as someone who was passive, who followed others' leads, and engaged in whatever activities those around him pursued.  Corey is also described in contemporaneous records as naïve, easily influenced by others, and someone who was vulnerable to and succumbed to peer-pressure, which on a number of occasions led him to misbehave or even break the law.

Time and again, those I interviewed or the records and statements I reviewed described Corey as engaging in behavior suggested by others without considering the consequences to him or others.  His lack of social skills led him to be easily victimized by others, including his mother, brother, and school peers.  My review of contemporaneous records created during Corey's childhood and adolescence and the more recent statements and my interviews with those who knew him, provide support for the finding that Corey Johnson had significant limitations in the Social domain, starting in childhood and continuing as an adolescent and young adult.  The retrospective standardized ABAS-II results are mixed, ranging from one reviewer whose responses clearly placed Corey in the significantly impaired range, another who placed him in the borderline range, and the third (the teacher who only knew Corey in the structured Pleasantville Cottage School setting, with its range of supports) rating him higher.

### A.  Interpersonal skills, friendship

Corey Johnson's school and treatment records are filled with references to his limitations in making friends and interacting with peers and adults. For example, a March 1977 home visit report when Corey Johnson was 8 years old stated that he could be easily manipulated and would become upset when teased by other children.  In her psychological evaluation four months later, Dr. Jennifer Figurelli described Corey as a "solitary figure."  In December 1978, when Corey was 10 years old and in third grade, an evaluation by the Bureau of Child Guidance, Upper West Side Center stated that Corey was referred by teacher due to, among other reasons, "poor peer relations."

During his time in the Pleasantville Diagnostic Center, a psychosocial summary in March 1982 noted that Corey "relates like a younger child and appears limited . . . . Corey does not have friends, he appears frightened of children and does not like any physical contact with them."  A Cottage School Initial Conference, Current Assessment and Transfer Summary dated June 9, 1982, described Corey as "frequently isolated from the other children . . . .  He does not appear ready to engage with other children . . . ." The Assessment went on to say: "He is frightened and expects to be rebuffed.  He will need a good deal of experience and contact before he will be ready to engage."

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

In reflecting on Corey's time at Pleasantville, Janet Valentine told me that she observed "teasing by other children, poor social judgment, not being aware of why others were upset with him; he just didn't fit in." She added: "He could be quite vulnerable with other kids." "He initiated it (e.g., teasing, just outright lying) to get a rise out of kids." "Peer relations were a significant problem." "Initially, the other students ignored him, and then he would provoke others and he would go to the female staff for protection. He didn't seek out the staff except when he was in trouble with the other kids." Ms. Valentine also reported silliness and immaturity. She said that Corey never took initiative with the girls like the other boys did. "We used to have a prom. I don't remember him ever participating." This is despite other references to Corey being "girl-crazy" at the time, which suggests that his interest in girls exceeded his constrained ability to interact with them.

Odette Noble, a social worker at Elmhurst, remembers stark details about Corey's peer relations based on the 20 months that Corey participated in weekly individual and group counseling with her when Corey was ages 16 to 18. According to Ms. Noble, "[i]n social settings, he did not initiate action, but rather went along with what others did . . . . Corey did not have a good 'read' of situations or other people. He was not very sensitive to social cues. He had difficulty 'learning the rules of the game' and understanding who was in charge."

Observations by Corey's family and friends paralleled the observations from Corey's treatment professionals and educators. Corey's Aunt, Minnie Hodges, remembered that Corey played by himself as a child most of the time, because the other children would tease him or try to take the ball, money, candy, or other possessions away from him. Aunt Minnie described how his limitations constrained his interactions with peers when things did not go his way, noting: "He wouldn't understand others but didn't want to look bad." Similarly, his grandmother, Esther Johnson, said that growing up, Corey did not engage much with other children and did not make friends easily. She said he was withdrawn socially both as a child and a teenager and, even when he did have friends, he did not appear to be close to any of them.

Corey spent time from infancy through early adulthood with his mother's best friend, Antoinette Daniels Joseph, and her daughter, Courtney Douglas. Antoinette Joseph stated in her affidavit that "Both as a child and as a teenager, Corey was withdrawn socially." Ms. Joseph said that she thought hanging out with her family was a stabilizing influence for Corey. She expressed concern that "people would take advantage of him" (e.g., ask for money and never give it back)." "Robert [Corey's younger brother] took advantage of him."

Courtney Douglas is just a few months older than Corey. In an interview with me, Courtney described Corey as shy and withdrawn. She also described him as mild and meek. She said that as a teenager, Corey probably had friends, but he did not bring them home. She said that he hung out with Courtney, Holly Scott, and their friends. In Courtney Daniels' affidavit, she described Corey as he was growing up as "a cautious observer, rather than an active participant." "Corey rarely talked about himself or shared if he was upset by something. Instead Corey always asked me how I was doing and whether or not anyone was bothering me." She described how protective he was of

29

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

**J.A.280**

friends and family, particularly women. "Corey was generally very quiet around girls. I never saw him approach a girl on his own. Corey would ask me to talk to girls for him." "Through all the years that I knew Corey, Corey and I did not have serious conversations."

### B.  Leisure activities

With regard to leisure interests, the records I reviewed and my interviews paint a mixed picture. Janet Valentine reported that Corey never talked about sports. She said he would watch others play basketball, but she did not recall his playing. She said there was so much teasing going on, he would have been scapegoated if he played and was not good enough. (This report is inconsistent with records that show he played on the basketball team later at Newtown High School.)

Mr. Johnson did have an early interest in playing basketball, but apparently he had no other consistent interest and did not use his leisure time to do more than hang around the house of whomever he was staying with. He did not initiate leisure interests or explore available community leisure opportunities. Affidavits of Minnie Hodges, Antoinette Joseph, Sonya Hilton, and Darnell Brown.

With regard to leisure interests, JCCA conference notes (2-19-86) indicated that while at Elmhurst Boys Residence and attending Special Education classes at Newtown High School, Mr. Johnson was on the wrestling team. The same document identified a goal that "Corey will pursue his wrestling activity which will help build his self-esteem and build confidence." There is no indication that he followed up on this interest. Another goal was "Corey will learn to seek out leisure activities on his own and take initiative to participate." In his affidavit, David Washington, former staff member at Elmhurst, stated Corey "did not join other residents to play games or for other recreational activities."

Queenie Hodges reported (in my interview and her affidavit) that she could not remember Corey having any leisure activities other than basketball and TV cartoons. Minnie Hodges's affidavit also identified only cartoons and playing by himself as leisure activities. Courtney Daniels, Robert Johnson, and Kevin Koger also remembered Mr. Johnson's playing basketball when he was younger. His friend, Holly Scott, said that he just hung out when he visited her and Courtney; sometimes they would go to a park. She said that they never went to parties or movies. The leisure activities that Mr. Johnson participated in were usually initiated by someone else, as indicated in cousin Priscilla Hodges's affidavit. She gave the examples of skating and going to the movies together. Ms. Noble said that while at Elmhurst, Mr. Johnson engaged in passive activities, such as listening to music or hanging out at the mall, but she could not recall his having any particular interests.

In describing Mr. Johnson's role within the group of drug-sellers in New Jersey, Darold Brown described Mr. Johnson's leisure interests as going to people's houses, drinking, and listening to music. He went with the group when they went to hang out at someone's house. He did not go to clubs. Mr. Brown could not think of any other leisure interests besides hanging with the group. Although Mr. Johnson appeared to know his

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

**J.A.281**

way around the areas in which he lived, and by adolescence he had learned to use public transportation, he did not participate in community life or take advantage of the opportunities that his community offered.

### C.  Leadership, gullibility, naiveté, and victimization

Everyone whom I interviewed described Corey Johnson as a follower rather than a leader.  In describing Corey's time at Pleasantville, Ann Harding, a supervisor at the Pleasantville Cottage School's older boys' cabin, where Corey lived in 1984 and 1985, stated, "I do not think Corey possessed leadership qualities.  To the contrary, he was more of a follower than a leader in his interactions.  I believe that Corey was probably taken advantage of by the other students occasionally."

Janet Valentine, who was also a counselor at Pleasantville, said, "He was a follower.  He was not a leader at all."  "Peers could lead him to do things, but he never initiated except for that teasing thing (e.g., he wouldn't get a group of guys together to play basketball or something)."  She added: "He just did that immature teasing like a much younger child."  When asked if he had friends, Ms. Valentine said that the other kids tolerated him: "He'd play the role of 'victim' a lot. I didn't see any maturing.  He had poor self-esteem."

In describing Corey Johnson at Pleasantville, Richard Benedict reported that Corey wanted to "please" adults and was not a leader.  "It would baffle me if he could get a group to do anything.  He couldn't do it."  "Being a leader doesn't match Corey."  "In class he was more of a clown than a leader."  Mr. Benedict reported that Corey "sought out adult approval, but didn't have the ability to do it."  As noted above, Pleasantville records indicated that Mr. Johnson did not make friends easily, often stayed by himself, and was afraid of the other children at the facility.  In fact, Mr. Benedict said that Corey often required protection from the other children in his class, because they "frequently scapegoated him."  Benedict further explained that Corey was desperate to be accepted by his peers and would do anything that someone told him to do.

Odette Noble noted many things identified by others who knew Mr. Johnson, such as going along with others, susceptibility to peer pressure, failure to make good social decisions, and trusting the wrong people.  In her affidavit, Ms. Noble noted that in August 1986, Corey was persuaded to go along with an older resident's plan to rob another resident of his paycheck.  Although he was not the leader and went along with the plan just to be accepted and make friends, this incident resulted in Corey's being arrested and jailed at Riker's Island for robbery.

Dr. Dewey Cornell testified during the sentencing phase of Corey Johnson's death penalty trial about Corey's "social skills."  In the context of the consideration of Corey Johnson's adaptive functioning, Dr. Cornell testified that social skills were an area, among others, that Corey's functioning was not at a normal level.

Corey's family and friends provided similar descriptions.  Corey's cousin Priscilla Hodges and his Aunt Minnie Hodges both flatly said that Corey was a follower, not a leader.  Similarly, Holly Scott remembered, "Corey never seemed to be a leader during

31

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

**J.A.282**

any of the years I saw him – even the years in which I saw him less frequently.  Courtney and I used to be able to talk him into just about anything.  We would ask him to go places with us, and he would end up coming even when he did not want to."

Corey's Aunt Minnie Hodges reported that "Other people took advantage of him, such as taking his lunch money.  People found it easy to take advantage of him all throughout his childhood and teen years.  He wouldn't understand others but didn't want to look bad, so other children easily tricked and manipulated him."  She further stated:

> He would cry much longer than the other children.  He would get very upset when he was teased by the other children.  When Corey would interact with the other children, he would mainly play by himself, but the other children would tease him and try to take his ball away from him.  If my children or Robert didn't intervene, the children in the neighborhood would bully him and take his ball or candy away from him.  He could not defend himself or stick up for himself without protection and chose to play by himself most of the time instead.

Cousin Priscilla Hodges described similar experiences in her affidavit.  "As a child, Corey complained that other kids bothered him and would take his money, ball, or other possessions.  Corey would not assert himself with these other kids."  "Corey was a follower, rather than a leader, first as a child and then as a teenager.  Corey was easily influenced by others and could be persuaded to do things that, in my view showed very poor judgment.  He would go to great lengths – and jeopardize his own well-being – just to fit in with the crowd."  Priscilla remembered an incident that captured Corey's poor judgment and susceptibility to peer-pressure: "Once, when Corey was in his early teenage years, his 'friends' dared him to roller skate down an incredibly steep hill, an act that no one else would attempt.  I told him not to do it, but his friends insisted.  He ended up falling and suffering a bruise and scrapes.  I believe he accepted the dare only to please his 'friends.'"  She gave another example of Corey's riding a bike across a busy 2-way street.  "Corey would do whatever his 'friends' told him to do, even if it could have killed or seriously hurt him."  This deficit in judgment is also indicative of a deficit in Safety, which is a component of the Practical adaptive behavior area.

Corey and Robert Johnson both spent time regularly with Emma's mother, Esther Johnson, whom many described as the ruler of the family and the strict one.  At the time of my interview, she was 84 years old and in frail health.  Her memory for details was poor; however, she did remember instances of other children taking advantage of Corey.  She said, for instance, every time he got a new sweater, somebody at school took it.  When I asked if the same was true for Robert, she clearly said no.  When I asked if Robert could stand up better to the other kids (although 2 years younger), she said, "You know it!"  She described Corey as the easy one to take advantage of.  This same information is confirmed in Esther Johnson's affidavit.

Mr. Johnson's maternal aunt, Minnie Hodges, told similar stories of other children taking advantage of him (e.g., taking his lunch money).  She said that throughout his life, he was easily taken advantage of.  She said that he was never a leader and just followed

others.  Kevin Koger also described Corey in childhood as someone who "could be manipulated by others."

Corey Johnson spent most of his weekends before going to Pleasantville with his maternal aunt, Minnie Hodges and Ms. Hodges' daughters, Queenie and Priscilla.  In interview, Aunt Minnie remembered Corey as a child who liked to be by himself a lot. She felt that she needed to look after him and that he needed more attention because "he played by himself and his mind wandered."  "He liked to be alone."  Aunt Minnie said that other children teased him, because he was considered strange and maybe slow, and he could not keep up conversation like other kids his age.  Other kids took advantage of him by taking his ball and other toys.  Cousin Priscilla independently reported that kids realized that they could take advantage of Corey.  "They could get him to do anything."

### D.  Social domain ABAS-II results

Using the current AAIDD and APA system of assessing adaptive behavior, the ABAS-II standardized results by Antoinette Joseph demonstrate significant limitations in Corey Johnson's adaptive functioning in the Social domain.  In contrast to my interview with her and the descriptions she provided in a later statement, which highlight Corey's social limitations, Minnie Hodge's ratings of Corey on the ABAS-II Social domain are higher.  Similarly, Richard Benedict's ratings for Corey Johnson on the Social domain, are bit higher than and are inconsistent with the information he gave me in my interview of him.

| ABAS-II Raters | Social Domain Scores |
|---|---|
|  |  |
| Antoinette Joseph | 56 |
| Minnie Hodges | 81 |
| Richard Benedict | 88 |

### E.  Social domain conclusion

The contemporaneous records I reviewed contain numerous descriptions of Corey Johnson's deficiencies interacting with his peers and with adults at various times in his childhood and adolescence and in different social contexts and situations.  They also document his gullibility and susceptibility to peer pressure, and his poor judgment.  My interviews with the professionals who worked with Corey during that time and with family, friends, and associates who have known him throughout his life paint similar pictures of Corey Johnson's substantial deficiencies in social interactions and judgment.

As indicated earlier, the adaptive behavior evaluation relies upon information from as many different sources as possible.  This approach has the advantage of gathering information that describes the individual at different time in his life and from the vantage point of different individuals who knew him in different ways.  Thus, it is to be expected that there would be inconsistencies in the obtained information.  For example, Mr. Benedict knew Corey Johnson in the structured environment of a residential school where

33

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

**J.A.284**

students' performance would be expected to be higher than in the unstructured environment in their neighborhood. Further, ratings of adaptive behavior can be influenced by the rater's positive feelings toward the individual. Ms. Joseph and Ms. Hodges knew Corey Johnson in different settings and over a longer period of time than Mr. Benedict. Inconsistencies are not unusual when considering information from many sources spanning many years. What is important is to examine the comprehensive evidence to determine an overall assessment.

Overall, the historical, documentary evidence I obtained related to Corey Johnson's adaptive functioning with respect to the Social domain and my interviews provide strong support for the conclusion that he had significant limitations in the Social adaptive behavior domain, while the standardized test results are mixed. Corey's school and treatment records document a consistent pattern of social impairments and significant limitations in judgment. Many of the professionals and family and friends whom I interviewed also described significant adaptive functioning impairments in the Social domain. Given the strong support in the records and the vivid descriptions from a wide array of professionals and lay-persons describing Corey's social abilities, I have concluded that Corey Johnson has significant limitations in the Social Domain that manifested themselves during his childhood, adolescence, and adulthood.

### v.    Practical Adaptive Behavior Domain

The AAIDD definition for the Practical adaptive behavior domain consists of the following skills: activities of daily living (personal care); occupational skills; use of money; safety/health care; travel/transportation; schedules/routines; and use of the telephone. The APA's DSM-5 defines the Practical domain as learning and self-management across life settings in similar terms to the AAIDD definition, including: personal care; job responsibilities; money management; recreation/leisure; self-management of behavior; and school and work task organization; among others. I have grouped my assessment of Corey Johnson's adaptive functioning in the Practical domain into the following categories: (a) Personal care/self-care; (b) Community use, travel, and transportation; (c) Health and safety; (d) Home living; and (e) Work.

The records and information I have considered demonstrate that Corey Johnson had significant limitations in personal and self-care from an early age that continued all the way up to his young adulthood. Corey wet his bed and soiled his sheets until he was about 12 years old. He needed constant reminders to clean himself after these accidents and to generally keep his body clean. He neglected cleaning his teeth and developed dental problems as a result. His self-care performance improved only slightly in the structured environments at Pleasantville and Elmhurst, and those who visited him as an adult, particularly when he lived in Trenton, described his living in apartments that were dirty and strewn with trash, dishware, and clothes. Corey demonstrated similar limitations in getting around in his neighborhoods. As a child, his caregivers did not trust him to travel alone, and his younger brother, Robert, was asked to lead Corey when they went out together. As a teenager and adult, Corey apparently never obtained a driver's license nor owned a car, and those who knew him recall that he often took cabs to get from place to place, although he sometimes used public transportation.

34

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

**J.A.285**

During the last few years that he was in a structured environment, Corey's caseworkers recognized that he would need to focus on independent living skills, because returning to his mother would not be in his best interest. Despite this critical goal, Corey was not able to develop independent living skills, nor did he possess the judgment to ensure his safety. He continued to succumb to the influence of others to engage in risky and unhealthy behavior. As I noted in the previous section on Corey Johnson's limitations in the Conceptual domain, he also demonstrated long-standing limitations with math and counting as it relates to the use and managing of money. As a result, he was never able to learn how to perform simple money management tasks, such as paying bills or making and following a budget. When he did earn money through drug dealing, friends often kept it for him so he would not spend it. Sometimes, family members (including his mother) and others took advantage of Corey by borrowing money from him and never paying him back.

After leaving Elmhurst abruptly, Corey never was able to live on his own but instead moved from living with his mother and brother, to a brief stay with his mother's ex-boyfriend and his wife in North Carolina, and then with a series of girlfriends and drug colleagues in New Jersey and later in Richmond, Virginia. Other than participating in structured work programs while at Elmhurst, Corey never held a job other than dealing drugs. Those with whom he engaged in the drug trade described Corey as challenged in his ability to count money and to keep track of drug sales, and described him as a passive participant who followed the directions of others.

Finally, two of the raters on the ABAS-II standardized rating scale produced scores corroborating his significant limitations in the Practical domain. Richard Benedict's ratings, which again were based only on his interactions with Corey Johnson in a structured setting, were substantially higher. Based on the information I have reviewed, some of which is highlighted below, I have concluded that Corey Johnson has significant limitations in the Practical adaptive functioning domain that demonstrated themselves when he was a child, adolescent, and adult up to the time of his crime.

### A.  Personal care/self-care

The Committee on the Handicapped records from the time when Corey was 10 years old noted that Corey was enuretic (wetting the bed) and encopretic (soiling himself) well into his middle school years.

When Corey was 13, a Child Assessment Evaluation Summary noted that he had dental cavities and gingivitis, evidence that he did not properly care for and brush his teeth. Consistent with that note, Janet Valentine said that Corey's self-care at Pleasantville was a problem initially, but over time he was able to slightly improve his self-care. As she put it: "He didn't come with those skills, but got a little better." However, a Comprehensive Service Plan for Corey from May 1985 indicates that by age 16 and a half and shortly before he was transferred to a group home as part of an attempt to transition him to independent living, Corey had not acquired independent living skills.

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

**J.A.286**

Dr. Dewey Cornell testified during the sentencing phase of Corey Johnson's capital that self-care was one of areas in which Corey's functioning was not at a normal level. Specifically, Dr. Cornell stated:

> Self care . . . work, the ability to maintain a job, to have good work habits, to use the kind of common sense you need to hold a job, all of those are possible areas in which his functioning is not at a normal level.

The reports from Corey's family describe similar limitations in self-care. Affidavits of Minnie and Priscilla Hodges also indicate that Corey Johnson wet the bed until age 11 and also soiled himself sometime between ages 8 and 12. Corey's Aunt Minnie recalled that she needed to remind Corey not to drink too many fluids before he went to bed, but he would still wake up with wet clothes, a wet bed, and an embarrassed look on his face. After these accidents continued for a while, she started waking him up in the middle of the night to use the bathroom. Minnie's daughter, Priscilla Hodges, remembered that Corey would try to cover the wet sheets with a comforter to hide the fact that he had wet the bed. His brother, Robert and friend, Antoinette Joseph, also remember Corey's wetting the bed. Regarding self-care in childhood, Cousin Queenie Hodges reported that Corey needed reminders to "wash up." Her affidavit indicated that he needed these reminders to bathe when he wet the bed up to about age 10. Queenie's mother, Minnie similarly reported to me that Corey was slower than other children to learn habits of hygiene and that she was still looking after him at age 8 to 10 to wash up. As noted earlier, Corey relied on reminders and structure in his early years but apparently learned some minimal standards of self-care while living at Pleasantville and Elmhurst by the time he was 18.

### B. Community use, travel, and transportation

Mr. Johnson's Individualized Education Program (IEP) at Pleasantville (7-1-85, age 16 to 18) noted "Corey needs travel training until he is familiar with route and new neighborhood."

With regard to community use, in his affidavit, Robert Johnson noted, "Corey also had a hard time finding his way around. In terms of travelling, I would be able to pick up on a route the first time just by paying attention. But Corey needed a lot more training in that area. Around the ages of 8 to 10, my mother would choose me rather than Corey to go to my grandfather's house in Brooklyn, because she knew that Corey would get lost."

### C. Health and safety

With regard to health and safety, health decisions in childhood were made by others. Corey did have a history of compromising his safety in order to ingratiate himself to peers. Cousin Priscilla Hodges gave examples of times when "friends" dared Corey to do dangerous things, and he foolishly complied. In the earlier section of this report on Social adaptive behavior, the example is given of roller skating down a steep hill and

36

riding a bike across a busy street, which was unsafe.  Priscilla told him not to do it, but he did anyway and was nearly hit by a car.

### D. Home living

With regard to home living, Mr. Johnson's Comprehensive Service Plan Child, dated May 28, 1985, when he was 16 and a half and winding down his time at Pleasantville, stated: "Corey will use opportunities offered him to learn independent living skills."

While at Elmhurst, Corey's team established goals for him to "learn how to handle money so that [Corey] can shop for himself" and "Caseworker, houseparents [sic], and teachers will help Corey learn enough simple arithmetic to figure out correct change."  However, these objectives were not achieved; handling money was consistently identified as a goal throughout Corey's stay at Elmhurst.

Describing his time at Elmhurst, Odette Noble told me, "He's the kind of kid who I don't think could make it on his own – pay his rent, etc.  Some people should stay in a protected setting all of their lives."  "He couldn't negotiate all of the things that community life means." Ms. Noble repeated her concerns in her affidavit, stating, "I questioned Corey's ability to negotiate even the simple, day-to-day tasks that community life requires, such as paying the bills, obtaining a driver's license, or purchasing and maintaining a car.  Somewhat more complex skills—like planning a budget—were clearly beyond Corey's abilities."

Ms. Noble reported that while living in the structured and supervised setting at Elmhurst, Corey Johnson kept clean, kept his room clean, did the dishes, and set the table.  However, she recognized that the support structure at Elmhurst was critical to Corey.  He did not have much occasion to cook or shop for food or household supplies.  And, more fundamentally, she questioned whether he could live successfully on his own.  "Because of Corey's intellectual limitations, I had concerns that Corey would not be able to hold a job.  In short, I doubted that Corey was equipped to make it on his own, to live independently as an adult.  Some people stay in a protected setting their entire lives and that may have been what was appropriate for Corey."

Corey's family and friends provide similar descriptions of his inability to care for himself and live on his own.  For example, Queenie Hodges stated in her affidavit, "I do not remember him ever preparing a meal for himself."  With regard to home living, Queenie Hodges reported that her mother had rules and expectations, but she had to remind Corey, "Pick up after yourself."  She said she did not remember Corey ever doing any meal preparation.  She also said that when he would pour milk in a bowl for cereal, he would make a mess, so Minnie would just do it for him.

Aunt Minnie Hodges's affidavit told a similar story.  She said, "At age 10 to 13, he couldn't prepare a meal or even a simple sandwich.  By age 15, he only improved a little in that he didn't make as much of a mess when preparing simple meals.  I didn't give him much to do, because he couldn't do it . . . .  Even when he made a sandwich, I'd

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

have to stand there and check." In my interview with Ms. Hodges, she told me essentially the same thing.

Ann Butler noted that when Mr. Johnson was 18 and living with her and Mr. Butler in Goldsboro, "he was still like a little boy. He could not have taken care of himself on his own." As noted earlier, the Butlers described an incident when Corey rode a bike in the woods wearing nice clothes and returned covered in mud. Ms. Butler said that she did things for him around the house, because he could not do them. According to her, Corey was too child-like. Although he had been taught home living skills at Pleasantville and Elmhurst, he still had to be reminded to carry out the simplest home tasks.

Mr. Johnson's brother, Robert, like others, indicated that Corey never lived by himself. But Robert, unlike all other reporters who expressed an opinion, thought that Corey could have lived independently. He had help from girls and guys he knew in New Jersey. Robert indicated that Corey could not live in the streets, although he did not give a clear reason why. People Robert was involved with would let Corey into their group, because they knew Robert well. In his affidavit, Robert Johnson stated, "He lived in several different places while in Trenton, always with others. Corey never lived by himself." In my interview and in his affidavit, Robert Johnson said Corey lived in New Jersey with a young girl whose nickname was "Mudda" (Ayesha Harris). He described the place where they lived as a shack. Robert said, "I thought it must be a crack spot. It was not something I would have lived in. Everything was cold, dark, and untidy."

Darnell Brown who was a leader of the group with which Mr. Johnson sold drugs in New Jersey said with regard to living conditions that the group lived everywhere, often crashing with whichever woman would provide meals. The group members did not have to pay for meals or lodging. Mr. Brown pointed out that Mr. Johnson never had his own place to live, never paid bills, and never had any responsibilities beyond his minor role in selling drugs.

Monica Dawkins, who dated Corey for 2 and a half years during the time that he lived in Trenton, New Jersey, said she once asked him to pay the phone bill in downtown Trenton, because she had to go to school. She said that Corey went downtown but did not pay the bill and instead claimed that he had forgotten, but she thought that the reason was because he was not able to figure out how to pay the bill.

Corey's friend, Sonya Hilton, knew Corey when he was living in Trenton, New Jersey. She recalled that Corey was very forgetful, sometimes forgetting plans he made in the morning by the afternoon. She said he frequently lost his keys and lost money. In fact, she said that he began to leave the back door to his house unlocked, because he had lost the front door key and had been locked out so many times.

The institutional records and my interviews showed that from his early adolescence until he left institutional care, many of the staff attempted repeatedly to teach Corey Johnson independence and home living skills. In fact, those were considered important goals as he became an older teenager to prepare him for adult life. With supervision and support in his institutional settings, Corey was able to make limited

38

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

**J.A.289**

progress.  However, when that support ended and he left the institutional settings, my evaluation shows that Corey failed to apply those skills.

### E.  Work

All of Corey Johnson's work opportunities were in structured settings with significant supports.  With regard to Work, Dr. Cornell reported in his 1993 testimony that Mr. Johnson had summer jobs involving manual labor while he was at Pleasantville Cottage.  Dr. Cornell went on to say "He also was placed in a more vocational-oriented program called BOCES.  It is a special educational program in which he was learning carpentry and did reasonably well.  He tended to do best when he did things with his hands that did not involve language" (p. 3605).  Mr. Benedict from Pleasantville said Corey "had a job at the school and liked making money – some kind of clean up."

A Psychiatric Summary from Pleasantville Cottage School (Elizabeth Clemmens, M.D., 1-18-85) stated: "During the summer, he worked at the Pace Farm as part of the Youth Employment Summer Program, doing manual labor.  In September, he continued classes at BOCES where he learns carpentry and apparently is doing well."

Ms. Noble told me Mr. Johnson participated in a summer Neighborhood Youth work program while at Elmhurst.  In my interview with Mr. Johnson, reported previously, he described several brief, unskilled jobs during this period. The jobs were, in Mr. Johnson's words, "simple."

Mr. Johnson fared well in structured work preparation programs that required manual labor.  He did not demonstrate any skills or initiative at job-seeking, and he did not make the effort to stay in jobs for more than brief periods.  Priscilla Hodges, Robert Johnson, Holly Scott, Darold Brown, and Darnell Brown each reported to me that Corey never had a job that they knew about.  Commenting on Mr. Johnson's job prospects, Darold Brown stated in his affidavit that the only "job I could have believed Corey to be able to perform would have been a job requiring manual labor . . . where the work is repetitive and a supervisor would have been available to tell Corey what to do.  Corey could not handle a job where unexpected problems came up, as he would not know what to do.  Corey was not a problem solver."  "Corey needed to be told what to do."

### F.  Practical domain ABAS-II results

Using the current AAIDD and APA system of assessing adaptive behavior, the ABAS-II standardized results by Antoinette Joseph and Minnie Hodges demonstrate significant limitations in Corey Johnson's adaptive functioning in the Practical domain. The ABAS-II results from Richard Benedict were substantially higher.  However, Mr. Benedict's results must be understood as having been based on observations that occurred in the context an institutional environment, where supports and structure can artificially inflate the scores.

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

**J.A.290**

| ABAS-II Raters | Practical Domain Scores |
|---|---|
| | |
| Antoinette Joseph | 60 |
| Minnie Hodges | 65 |
| Richard Benedict | 88 |

### G. Practical domain conclusion

In my opinion, the records, statements, interviews, and adaptive behavior instrument in the Practical domain strongly demonstrate that Corey Johnson has significant limitations in adaptive functioning in this area starting in his childhood and continuing through his adolescence and into adulthood up until the time he committed the crimes in this case.

### vi.    Adaptive Behavior Conclusion

As I noted at the outset, in order to meet the adaptive behavior prong of an intellectual disability diagnosis, it is only necessary to find significant limitations in adaptive functioning on one of the three domains or significant impairment in a measure of overall adaptive functioning.   My review above of the contemporaneous records created during Corey Johnson's childhood and adolescence, my review of statements from those who knew him well, and my interview of those individuals led me to conclude that Corey Johnson demonstrated significant limitations in all three domains.

The ABAS-II results corroborate this conclusion, because the General Adaptive Composite ("GAC") score for all three raters, depicted below, demonstrates significant impairments in adaptive functioning.  A GAC score of 75 or below meets the diagnostic standard for the adaptive behavior prong of an intellectual disability diagnosis.

| ABAS-II Rater | General Adaptive Composite Score | Percentile |
|---|---|---|
| | | |
| Antoinette Joseph | 60 | 0.4 |
| Minnie Hodges | 64 | 1 |
| Richard Benedict | 74 | 4 |

### V.    Conclusion

This report summarizes extensive information regarding Corey Johnson's intelligence and adaptive behavior in childhood and in adolescence and adulthood.  This information supports my diagnostic opinion that Corey Johnson has significant impairment in intellectual functioning and adaptive behavior, and that these impairments originated in childhood.  This conclusion is based on IQ testing between ages 7 and 24,

40

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

**J.A.291**

adaptive behavior information from numerous and varied sources, corroborated by a standardized adaptive behavior scale.  Mr. Johnson was administered six Wechsler intelligence tests between ages 8 and 23, four of which produced valid and reliable results and all four demonstrate significant limitations in intellectual functioning.  Adaptive behavior information from my interviews, administration of the ABAS-II to three raters, and documents from numerous sources was consistent in indicating significant impairment in adaptive behavior.   Based on all of this information, it is my opinion that Corey Johnson has intellectual disability originating in childhood and persisting into adulthood.

J. Gregory Olley, Ph.D.
Psychologist

Date: August 24, 2016

41

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

**J.A.292**

**Appendix A**

John Gregory Olley received a bachelor's degree in psychology from the College of William and Mary in 1966, a master's degree in general-experimental psychology from Wake Forest University in 1968, and a Ph.D. in psychology with emphasis in mental retardation (now intellectual disability) from George Peabody College (now George Peabody College of Vanderbilt University) in 1973. He completed a clinical psychology internship at the University of Kansas Medical Center in 1972. He has been licensed to practice psychology since 1974.

Dr. Olley has held positions as Assistant Professor in the Department of Psychology at the University of Massachusetts at Amherst and Clinical Associate Professor in the Department of Psychiatry and the School of Education at the University of North Carolina at Chapel Hill. During this period at UNC-Chapel Hill, Dr. Olley was Director of Training for Division TEACCH, the statewide program for children and adults with autism. After a brief stint at the Groden Center in Providence, Rhode Island, Dr. Olley returned to UNC-Chapel Hill as a psychologist in the Clinical Center for the Study of Development and Learning, which is now the Carolina Institute for Developmental Disabilities. Dr. Olley retired in July 2016 but continues to hold an academic appointment as Clinical Professor in the Department of Allied Health Sciences in the UNC School of Medicine.

Dr. Olley has published extensively in many aspects of developmental disabilities. In addition to his research and teaching roles, he has been engaged in a variety of professional and public service activities. Dr. Olley is a Life Member and Fellow in the American Psychological Association. He is a past President of the Division on Intellectual/Developmental Disabilities and Autism of APA and is a member of the Division's Executive Council. He is a Life Member and Fellow of the American Association on Intellectual and Developmental Disabilities.

Among his public service roles, Dr. Olley is a member of the Policy and Positions Committee of the Arc of the United States and the American Association on Intellectual and Developmental Disabilities, and he is Past Chairperson of the North Carolina Commission on Mental Health, Developmental Disabilities, and Substance Abuse Services.

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

**J.A.293**

**Appendix B**

The sources upon which this report is based are as follows:

- School and residential records from Mount Pleasant Cottage School (a.k.a. Pleasantville Cottage School) for Corey Johnson
- Records of Bureau of Child Guidance, Upper West Side Center
- Report of Learning Consultant Evaluation to the Child Study Team, Jersey City Schools, 3-18-77
- Report of Psychological Examination of Corey Johnson by Jennifer Figurelli, Ph.D., 3-25-77
- Report of Psychiatric Evaluation of Corey Johnson by F. A. Figurelli, M.D., 10-4-77
- Psychological Report for Corey Johnson by Nathalie Smith, Ph.D., Manhattan Center, 5-3-79
- Report of Psychodiagnostic Evaluation of Corey Johnson by Ernest H. Adams, The Council's Center for Problems of Living, 12-11-1981
- Report of Psychological Evaluation of Corey Johnson by Cary Gallaudet, Psy.D., Pleasantville Cottage School, 2-8-1982
- Report of Speech-Language Evaluation at the Donald Reed Speech Center, September and October 1983
- Memo from Louise Sciaruto, Jewish Child Care Association, regarding speech therapy, January 19, 1984
- Report of Psychological and Educational Evaluation of Corey Johnson by Kenneth Barish, Ph.D., Pleasantville Cottage School, 3-15-1985
- Newtown High School records for Corey Johnson
- Interview with Corey Johnson at Federal Correction Center, Terre Haute, IN, February 7, 2011
- Interview by telephone with Mark A. Bezy, former warden at the Federal Correction Center, Terre Haute, IN, January 19, 2011
- Interview by telephone with James Sykes, father of Corey Johnson, January 21, 2011
- Affidavit of James Sykes, May 17, 2011
- Interview with Robert West, former pastoral counselor to Corey Johnson, at his church in Salem, VA, June 2, 2010
- Interview with Sarah West, former pastoral counselor to Corey Johnson at her husband's church in Salem, VA, June 2, 2010
- Interview by telephone with Pernell Williams, friend of Corey Johnson, June 25, 2010

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

**J.A.294**

- Interview with Holly O. Scott, friend of Corey Johnson at her apartment, Brooklyn, NY, July 17, 2010
- Affidavit of Holly Scott, June 23, 2011
- Interview with Courtney Daniels, childhood friend of Corey Johnson, New York, NY, May 22, 2010
- Affidavit of Courtney Daniels, May 21, 2011
- Interview with Esther Johnson, grandmother of Corey Johnson at her apartment, New York, NY, May 21, 2010
- Affidavit of Esther Johnson, April 30, 2011
- Interview with Robert Lee Johnson, half-brother of Corey Johnson, New York, NY, May 7, 2010
- Affidavit of Robert Johnson, June 29, 2011
- Interview with Antoinette Daniels Joseph, best friend of Corey Johnson's mother, New York, NY, July 17, 2010
- Affidavit of Antoinette Daniels Joseph, May 21, 2011
- Interview with Minnie Lee Johnson Hodges, maternal aunt of Corey Johnson at her apartment, New York, NY, May 8, 2010
- Affidavit of Minnie Hodges, April 30, 2011
- Interview by telephone with Kevin Koger, step-brother of Corey Johnson, August 3, 2010
- Affidavit of Kevin Koger, May 26, 2011
- Interview by telephone with Dr. Claire Barabash, former Deputy Superintendent of the New York Board of Education, April 23, 2010
- Interview with John McGarvey, former defense attorney for Corey Johnson, Richmond, VA, June 3, 2010
- Interview with Craig Cooley, former defense attorney for Corey Johnson, Richmond, VA, June 3, 2010
- Interview with Darold Brown, friend of Corey Johnson, New York, NY, May 21, 2010
- Affidavit of Darnold Brown, June 15, 2011
- Interview with Darnell Brown, friend of Corey Johnson, New York, NY, May 21, 2010
- Affidavit of Darnell Brown, October 14, 2011
- Interview with Queenie Hodges, cousin of Corey Johnson, at her apartment, New York,
- NY, May 8, 2010
- Affidavit of Queenie Hodges, April 30, 2011
- Interview with Priscilla Hodges, cousin of Corey Johnson, at her apartment, New York, NY, May 8, 2010

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

**J.A.295**

- Affidavit of Priscilla Hodges, April 30, 2011
- Affidavit of Elizabeth Sykes, half-sister of Corey Johnson, October 15, 2011
- Affidavit of Sonya Hilton, former girlfriend of Corey Johnson, June 15, 2011
- Interview with Gerald Lefkowitz, M.S.W., former Unit Administrator of the Pleasantville Diagnostic Center, and Richard Benedict, former teacher and administrator at Pleasantville Cottage School, May 7, 2010
- Declaration of Leona Klerer, a reading  teacher formerly employed at the Mount Pleasant Cottage School, June 3, 2011.
- Declaration of George Sakheim, Ph.D., formerly a supervising psychologist at the Pleasantville Diagnostic Center and Pleasantville Cottage School, June 17, 2011.
- Affidavit of Gerald Lefkowitz, December 5, 2011
- Interview with Ms. Odette Noble, M.S.W., former social worker at Elmhurst Residential Home, New York, NY, May 7, 2010
- Affidavit of Odette Noble, December 1, 2011
- DVD of interview of Corey Johnson by Dewey Cornell, Ph.D., January 8, 1993
- Transcript of testimony of Dewey Cornell, Ph.D. at trial of Corey Johnson, January 1993
- Transcript of testimony of Gerald Lefkowitz, M.S.W. at trial of Corey Johnson, January 1993
- Transcript of testimony of Odette Noble, M.S.W. at trial of Corey Johnson, January 1993
- Telephone interview with Janet Valentine, former counselor and clinical social worker at Pleasantville Cottage School, May 5, 2011
- Declaration by Ann Harding, former staff member at Pleasantville Cottage School, November 21, 2011
- Interview with Robert Lee Butler, step-father of Corey Johnson, at his home in Lawrenceville, Georgia, December 17, 2011
- Interview with Ann Butler, wife of Robert Lee Butler, at her home in Lawrenceville, Georgia, December 17, 2011
- Declaration by Robert Lee Butler, December 17, 2011
- Declaration by Ann Butler, December 17, 2011
- Affidavit of David Washington, former staff member at Elmhurst Boys Residence, March 1, 2012
- Declaration by Cary Gallaudet, Ph.D., psychologist formerly employed at the Pleasantville Diagnostic Center, March 1, 2012
- Affidavit of Mary Sitgraves, Ph.D., psychologist, July 5, 2012
- Declaration by Monica Dawkins, former girlfriend of Corey Johnson, July 16, 2012

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

**J.A.296**

- Declaration of Kenneth Barish, formerly a psychologist at the Pleasantville Cottage School, July 22, 2014.

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

**J.A.297**

**Appendix C**

**I. ABAS-II Results (3 Domains):**

| ABAS-II: 3 Domains | Antoinette Joseph | Minnie Hodges | Richard Benedict |
|---|---|---|---|
|  |  |  |  |
| Conceptual | 63 | 57 | 74 |
| Social | 56 | 81 | 88 |
| Practical | 60 | 65 | 88 |
|  |  |  |  |
| GAC | 60 | 64 | 74 |
| Percentile | 0.4 | 1 | 4 |

**II. ABAS-II Results (10 Domains):**

The mean score for the general population is 10.  A score of 4 or below indicates significant impairment (two standard deviations below the mean).

| ABAS-II: 10 Domains | Antoinette Joseph | Minnie Hodges | Richard Benedict |
|---|---|---|---|
|  |  |  |  |
| Communications | 7 | 2 | 1 |
| Functional Academics | 2 | 1 | 3 |
| Self-Direction | 1 | 4 | 4 |
| Leisure | 2 | 3 | 8 |
| Social | 1 | 9 | 7 |
| Community Use | 8 | 5 | 8 |
| Home Living | 3 | 1 | 8 |
| Health-Safety | 1 | 3 | 7 |
| Self-Care | 4 | 4 | 6 |
| Work | - | - | - |
|  |  |  |  |
| GAC | 60 | 64 | 74 |
| Percentile | 0.4 | 1 | 4 |

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

**J.A.298**

# EXHIBIT 2(a)

USCA4 Appeal: 21-1   Doc: 12-1   Filed: 01/08/2021   Pg: 309 of 363
Case 3:92-cr-00068-DJN   Document 86-5   Filed 12/14/20   Page 2 of 19 PageID# 2482

# CURRICULUM VITA

## John Gregory Olley

### Address

Carolina Institute for Developmental Disabilities
CB# 7255
University of North Carolina at Chapel Hill
Chapel Hill, North Carolina 27599-7255
(919) 966-4613      FAX (919) 966-2230
E-mail: greg.olley@cidd.unc.edu

### Education

College of William and Mary
Williamsburg, Va., A.B., 1966, Psychology

Wake Forest University
Winston-Salem, N.C., M.A., 1968, General-Experimental Psychology

George Peabody College for Teachers (now George Peabody College of Vanderbilt
University) Nashville, Tenn., Ph.D., 1973, Mental Retardation Research - Clinical Psychology;
"Related Area" - Special Education

### Current Position

Psychologist, Adjunct Professor, Carolina Institute for Developmental Disabilities and
Clinical Professor, Division of Clinical Rehabilitation and Mental Health Counseling,
Department of Allied Health Sciences, School of Medicine, University of North Carolina at
Chapel Hill

### Previous Positions Held

Program Director, Behavioral Associates of Massachusetts, Inc., Attleboro, MA and
Associate Clinical Director, The Groden Center, Inc., Providence, RI, June 1986 to July 1988.

Clinical Associate Professor, Department of Psychiatry, and Director of Training, Division
   TEACCH (Treatment and Education of Autistic and related Communication
   handicapped CHildren), and
Clinical Associate Professor, Division of Special Education, School of Education, University of
   North Carolina at Chapel Hill, March 1978 to June 1986.

Assistant Professor, Department of Psychology, University of Massachusetts, Amherst, MA,
   September 1972 - March 1978.

Director, Preschool Intervention Project, Psychological Services Center, University of
   Massachusetts, June 1973 - June 1975.

### Professional Preparation

**J.A.300**

October 2020
2

Graduate Assistant in Psychology, Developmental Evaluation Clinic, Bowman Gray School of Medicine of Wake Forest University, Winston-Salem, NC, September 1966 - August 1968.

Fellow, Training Program for Research Behavioral Scientists in Mental Retardation, George Peabody College, Nashville, TN, September 1968 - August 1971.

Clinical Psychology - Mental Retardation Intern, Division of Medical Psychology, Neuropsychiatric Institute, Center for the Health Sciences, University of California, Los Angeles, CA, June 1970 - August 1970.

Clinical Child Psychology Intern, Children's Rehabilitation Unit, University of Kansas Medical Center, Kansas City, KS, September 1971 - August 1972.

**Editorial Work**

Served as Guest Editor for: *American Journal on Mental Retardation, American Journal of Psychiatry, Behavior Therapy, Applied Research in Mental Retardation, Child Development, Journal of Applied Behavior Analysis,  Journal of Autism and Developmental Disorders, Journal of Child and Family Studies, Journal of Clinical Child Psychology, Journal of Mental Health Research in Developmental Disabilities,  Journal of the Association for Persons with Severe Handicaps, Journal of Intellectual Disabilities Research, Journal of Policy and Practice in Intellectual Disabilities, International Journal of Forensic Mental Health, Law & Social Inquiry, Merrill-Palmer Quarterly, Research in Autism Spectrum Disorders, Research in Developmental Disabilities*

Book Review Editor: *Journal of Autism and Developmental Disorders*, 1982 - 1986.

Consulting Editor: *Preventing School Failure* (formerly *The Pointer*), 1979 - 2016.

Consulting Editor: *Focus on Autism and Other Developmental Disabilities*, 1995 - 2016

**Grants and Contracts**

Principal Investigator: Contract with the North Carolina Council on Developmental Disabilities: Development of the Council's 5-Year Plan (March 2005-November 2005)

Principal Investigator: Youths for Advocacy, a Project of National Significance funded by the U. S. Administration on Developmental Disabilities.  (October 2007-September 2010)

Principal Investigator: Work Group on the Role of Psychologists in *Atkins* Hearings, funded by the American Psychological Association (January 2007-November 2008)

Principal Investigator: Next Generation: Acting for Advocacy, a Project of National Significance funded by the U. S. Administration on Developmental Disabilities. (October 2004-September 2007)

Principal Investigator (with Anne Wheeler): Linking Learning with Neurodevelopmental Functioning: Management Strategies for Children with Prader-Willi Syndrome. Grant from the Prader-Willi Research Foundation. (May 2006-April 2007)

Principal Investigator: 5-Year Plan Project, grant from the North Carolina Council on Developmental Disabilities. (October 2005-June 2006)

**J.A.301**

USCA4 Appeal: 21-1    Doc: 12-1    Filed: 01/08/2021    Pg: 311 of 363

Principal Investigator: Transition to Community, contract with the NC Division of Mental Health, Developmental Disabilities, and Substance Abuse Services. (June 2005 – September 2007)

Principal Investigator: Shifting the Power, a Project of National Significance funded by the U.S. Administration on Developmental Disabilities.  (October 2000 – September 2003)

Principal Investigator: Steps Toward Independence and Responsibility funded by the North Carolina Council on Developmental Disabilities (September 2001 – August 2004)

Principal Investigator: contracts with Developmental Disabilities Section of NC Department of Health and Human Services for surveys associated with the Core Indicators Project (September 2000-June 2003), Summer Apprenticeship (April 1998-June 2000), Behavioral Supports Clearinghouse (August 1998 – June 2000), training in Problem Solving for Life (August 1998 –June 2000), Self-Determination and Self-Advocacy (April 1998 – present), and consultation to community programs (September 1995 – June 2000).

Principal Investigator:  "Learning for Life," U.S. Administration on Developmental Disabilities, October 1994-June 1997; July 1997-June 2001.

Contract with *Thomas S.* Section of NC Department of Human Resources, Screening of Adults for Eligibility in the *Thomas S.* Class, February 1995-March 1996.

Principal Investigator: "Survey of Summer Campers with Spina Bifida and Their Siblings," University Research Council, University of North Carolina at Chapel Hill, June 1991 - May 1992.

Principal Investigator, Grumman Grant for continuing education for teachers to use the TEACCH communication and social skills curricula, from Division of Extension and Continuing Education, University of North Carolina, July 1, 1984 - June 30, 1985.

Early Education Component Director, "Model Educational Program for Autistic Children and Youth," contract from Office of Special Education, October 1980 - January 1984.

One of the Participating Trainers, "National Personnel Training Program for Teachers of Children with Autism," grant from Office of Special Education to National Society for Children and Adults with Autism, August 1981 - May 1985.

Co-Director (with Eric Schopler): "Special Project: Comprehensive Inservice Training Program for Personnel Serving Autistic Children," Office of Special Education, June 1979 - May 1982.

Co-Principal Investigator (with R. J. Simeonsson and L. M. Marcus): "An Observational Approach to the Investigation of Educational Skills of Autistic Children," Research Grants in Education for Young Scholars in the Behavioral Sciences, School of Education, University of North Carolina at Chapel Hill, July 1978 - June 1979.

Co-Director (with Beth Sulzer-Azaroff): "Training Grant for Educational Change Strategists for the Severely Handicapped," Bureau of Education for the Handicapped, July 1974 - March 1978.

Principal Investigator: Faculty Research Grant, University of Massachusetts, "Investigation of Effects of Modeling on Diversity of Children's Drawings" (in collaboration with Richard Dubanoski, University of Hawaii), June 1976 - May 1977.

Principal Investigator: Broadened Faculty Research Grant, University of Massachusetts, "Relaxation as a Self-Control Procedure for Children," fall semester, 1975.

Principal Investigator: contract between University of Massachusetts and Massachusetts Department of Public Welfare for the Preschool Intervention Project, May 1973 - June 1975.

## Honors

Fellow, Division on Intellectual and Developmental Disabilities, American Psychological Association

Fellow, American Association on Intellectual and Developmental Disabilities

Recipient of the North Carolina Arc LIFEguardianship Distinguished Service Award, 1994

Recipient of the Excellence in Applied Behavior Analysis Award from the North Carolina Association for Behavior Analysis, 1991

Recipient of the Distinguished Teacher in Psychology Award from Council of Undergraduate Students in Psychology, University of Massachusetts, Amherst, 1974 and 1976.

## Research and Publications

Olley, J. G. (1968). *The effect of ready signal contingency and partial reinforcement on eyelid conditioning.*  Unpublished master's thesis, Wake Forest University, Winston-Salem, NC.

Stedman, D. J., & Olley, J. G. (1969). Bibliography of the world's clinical and research literature on Down's syndrome: Behavioral, social and educational studies through 1968 (*IMRID Papers and Reports*, Vol. 6, No. 2). Nashville, TN: George Peabody College, Institute on Mental Retardation and Intellectual Development.

Olley, J. G.  (1971). Sex differences in human behavior in the first year of life. (*Peabody Papers on Human Development*, Vol. 9, No. 1). Nashville, TN: George Peabody College.

Johnson, J. T., & Olley, J. G. (1971). Behavioral comparisons of mongoloid and nonmongoloid retarded persons: A review. *American Journal of Mental Deficiency*, *75*, 546-559.

Olley, J. G. (1974).  Mother-infant interactions during feeding (Doctoral dissertation, George Peabody College for Teachers, 1973). *Dissertation Abstracts International, 34*, 347B. (University Microfilms No. 73-32646).

Olley, J. G., & Fremouw, W. J. (1974). The voting rights of the mentally retarded:  A survey of state laws.  *Mental Retardation*, 12(1), 14-16.  Reprinted in:  (1974). Behavior Today, 5, 112.  Reprinted in:  Office of Handicapped Individuals (1976). *Handicapping conditions:  A resource book.*  Atlanta:  Transaction Systems.

Olley, J. G.  (1977). Another influence on the direction of school psychology. *American Psychologist*, *32*, 779. (Comment).

USCA4 Appeal: 21-1    Doc: 12-1    Filed: 01/08/2021    Pg: 313 of 363
Case 3:92-cr-00068-DJN    Document 86-5    Filed 12/14/20    Page 6 of 19 PageID# 2486

Olley, J. G., & Ramey, G. D. (1978). Voter participation of retarded citizens in the 1976 presidential election. *Mental Retardation*, *16*, 255-258.

Loveland, K. K., & Olley, J. G. (1979). The effect of external reward on interest and quality of task performance in children of high and low intrinsic motivation. *Child Development*, *50*, 1207-1210.

McHale, S. M., & Simeonsson, R. J., Marcus, L. M., & Olley, J. G. (1980). The social and symbolic quality of autistic children's communication. *Journal of Autism and Developmental Disorders*, *10*, 299-310.

Novak, M. A., Olley, J. G., & Kearney, D. S. (1980). Social skills of handicapped children in integrated and separate preschools. In T. M. Field (Ed.), *High-risk infants and children: Adult and peer interactions* (pp. 327-346). New York: Academic Press.

Olley, J. G. (1980). Organization of educational services for autistic children and youth. In B. Wilcox & A. Thompson (Eds.), *Critical issues in educating autistic children and* youth (pp. 13-23). Washington, DC: US Department of Education, Office of Special Education/Division of Innovation and Development. Reprinted in (1981). *Counterpoint*, *2*(1), 1, 31-33.

Olley, J. G. (1980). Report of a survey on licensure of psychologists in mental retardation. *Mental Retardation Newsletter*, *1*, 6.

Schopler, E., & Olley, J. G. (1980). Public school programing for autistic children. *Exceptional Children*, *46*, 461-463.

Marcus, L. M., McHale, S. M., Olley, J. G., & Simeonsson, R. J. (1981). A Piagetian approach to investigate educational skills of autistic children. In P. Mittler (Ed.)*, Frontiers of knowledge in mental retardation. Proceedings of the Fifth Congress of IASSMD*, Vol. 1, *Social educational, and behavioral aspects* (pp. 91-99). Baltimore: University Park Press.

McHale, S. M., Olley, J. G., Marcus, L. M., & Simeonsson, R. J. (1981). Nonhandicapped peers as tutors for autistic children. *Exceptional Children*, *48*, 463-465.

Olley, J. G., DeVellis, R. F., DeVellis, B. M., Wall, A. J., & Long, C. E. (1981). The Autism Attitude Scale for Teachers. *Exceptional Children*, *47*, 371-372.

Schopler, E., & Olley, J. G. (1982). Comprehensive educational services for autistic children: The TEACCH model. In T. B. Gutkin & C. R. Reynolds (Eds.), *The handbook of school psychology* (pp. 629-643). New York: Wiley.

Sulzer-Azaroff, B., & Olley, J. G. (1982). Training of psychologists in mental retardation: A graduate training program. *Psychology in Mental Retardation: Division 33 Newsletter*, 7(3), 6-7.

McHale, S. M., & Olley, J. G. (1982). Using play to facilitate the social development of handicapped children. *Topics in Early Childhood Special Education*, *2*(3), 76-86.

Olley, J. G., & Marcus, L. M. (1984). Considerations in the assessment of children with autism. In S. J. Weaver (Ed.), *Testing children: A reference guide for effective clinical and psychoeducational assessments* (pp. 71-84). Kansas City, MO: Test Corporation of America.

**J.A.304**

October 2020

6

Olley, J. G. (1985). Social aspects of language in autistic children. In E. Schopler & G. B. Mesibov (Eds.), *Communication problems in autism* (pp. 311-328). New York: Plenum.

Olley, J. G., & Rosenthal, S. L. (1985). Current issues in school services for students with autism. *School Psychology Review, 14*, 166-170.

Schopler, E., Olley, J. G., & Lansing, M. (1985). *Jiheisho no chiryo-kyoiku purogurame* [Remedial-education program for autism]. Tokyo: Budou-sha.

Olley, J. G. (1986). The TEACCH curriculum for teaching social behavior to children with autism. In E. Schopler & G. B. Mesibov (Eds.), *Social behavior and autism* (pp. 351-373). New York: Plenum. doi: 10.1007/978-1-4899-2242-7_17

Olley, J. G. (1987). Classroom structure and autism. In D. J. Cohen, & A. M. Donnellan (Eds.), *Handbook of autism and pervasive developmental disorders* (pp. 411-417). Silver Spring, MD: Winston.

Simeonsson, R. J., Olley, J. G., & Rosenthal, S. L. (1987). Early intervention for children with autism. In M. J. Guralnick & F. C. Bennett (Eds.), *The effectiveness of early intervention for at risk and handicapped children* (pp. 275-296). Orlando, FL: Academic Press.

Marcus, L. M., & Olley, J. G. (1988). Developing public school programs for autistic and other severely developmentally disabled students. In M. D. Powers (Ed.), *Severe developmental disabilities: Expanding systems of interaction* (pp. 179-197). Baltimore: Brookes.

Olley, J. G., & DiLavore, P. C. (1989). Special education. In T. B. Karasu (Ed.), *Treatments of psychiatric disorders: A task force report of the American Psychiatric Association (pp. 123-*129). Washington, DC: American Psychiatric Association.

Olley, J. G., & Marcus, L. M. (1989). Education for children with autism. In T. B. Karasu (Ed.), *Treatments of psychiatric disorders: A task force report of the American Psychiatric Association* (pp. 192-201). Washington, DC: American Psychiatric Association.

Olley, J. G., & Stevenson, S. E. (1989). Preschool curriculum for autistic children: Addressing early social skills. In G. Dawson (Ed.), *Autism: Nature, diagnosis and treatment* (pp. 346-366). New York: Guilford.

Olley, J. G. (1992). Autism: Historical overview, definition, and characteristics. In D. E. Berkell (Ed.), *Autism: Identification, education, and treatment* (pp. 3-20). Hillsdale, NJ: Lawrence Erlbaum.

- Olley, J. G., Robbins, F., & Morelli Robbins, M. (1993). Current practices in early intervention for children with autism. In E. Schopler, M. E. Van Bourgondien, & M. Bristol (Eds.), Preschool issues *in autism* (pp. 223-245). New York: Plenum. DOI:
- 10.1007/978-1-4899-2441-4_11

Hooper, S. R., & Olley, J. G. (1996). Psychological comorbidity in adults with learning disabilities. In N. Gregg, C. Hoy, & A. F. Gay (Eds.), *Adults with learning disabilities: Theoretical and practical perspectives* (pp. 162-183). New York: Guilford.

**J.A.305**

USCA4 Appeal: 21-1    Doc: 12-1    Filed: 01/08/2021    Pg: 315 of 363
Case 3:92-cr-00068-DJN   Document 86-5   Filed 12/14/20   Page 8 of 19 PageID# 2488

October 2020
7

Olley, J. G., & Reeve, C. E. (1997). Curriculum and classroom structure. In D. J. Cohen (Ed.), *Handbook of autism and pervasive developmental disorders* (2nd ed., pp. 484-508). New York: Wiley.

Baroff, G. B., with Olley, J. G. (1999). *Mental retardation: Nature, cause, and management* (3rd ed.). Philadelphia: Brunner-Routledge.

Olley, J. G. (1999). Curriculum for students with autism. *School Psychology Review*, *28*, 595-607.

Olley, J. G., & Gutentag, S. S. (1999). Autism: Historical overview, definition, and characteristics. In D. E. Zager (Ed.), *Autism: Identification, education, and treatment* (2nd ed., pp. 3-22). Hillsdale, NJ: Lawrence Erlbaum.

Paraschiv, I., & Olley, J. G. (1999). Problem Solving for Life: A training program in interpersonal skills. *The NADD Bulletin*, *2*, 107-109.

Olley, J. G. (2005). Curriculum and classroom structure. In F. R. Volkmar, R. Paul, A. Klin, & D. Cohen (Eds.), *Handbook of autism and pervasive developmental disorders* (3rd ed., Vol. 2, pp. 863-881). Wiley.

Olley, J. G., Greenspan, S., & Switzky, H. (2006). Division 33 *Ad Hoc* Committee on Mental Retardation and the Death Penalty. *Psychology in Mental Retardation and Developmental Disabilities*, *31*(2), 11-13.

Olley, J. G. (2006). The assessment of adaptive behavior in adult forensic cases: Part 1. *Psychology in Mental Retardation and Developmental Disabilities*, *32*(1), 2-4.

Olley, J. G. (2006). The assessment of adaptive behavior in adult forensic cases: Part 2. The importance of adaptive behavior. *Psychology in Mental Retardation and Developmental Disabilities*, *32*(3), 7-8.

Olley, J. G. (2007). The assessment of adaptive behavior in adult forensic cases: Part 3. Sources of adaptive behavior information. *Psychology in Mental Retardation and Developmental Disabilities*, *33*(1), 3-6.

Everington, C., & Olley, J. G. (2008). Implications of *Atkins v. Virginia*: Issues in defining and diagnosing mental retardation. *Journal of Forensic Psychology Practice*, *8*, 1-23.

Larson, K. A., Griffin, M. P., & Olley, J. G. (2008). Competency to be sentenced. In B. L. Cutler (Ed.), *Encyclopedia of psychology and law* (Vol. 1, pp. 116-118). Sage.

Olley, J. G., & Cox, A. W. (2008). Assessment of adaptive behavior in adult forensic cases: The use of the Adaptive Behavior Assessment System-II. In T. Oakland & P. L. Harrison (Eds.), *Adaptive Behavior Assessment System-II: Clinical use and interpretation* (pp. 381-398). Elsevier.

Macvaugh, G. S., Salekin, K. L., & Olley, J. G. (2009). Mental retardation and the death penalty. In A. Jamieson & A. Moenssens (Eds.), *Wiley encyclopedia of forensic science* (pp. 1730-1737). Wiley.

USCA4 Appeal: 21-1    Doc: 12-1    Filed: 01/08/2021    Pg: 316 of 363
Case 3:92-cr-00068-DJN   Document 86-5   Filed 12/14/20   Page 9 of 19 PageID# 2489

October 2020
8

Marinos, V., Griffiths, D., Gosse, L., Robinson, J., Olley, J. G., & Lindsay, W. (2009). Legal rights and persons with intellectual disabilities. In F. Owen & D. Griffiths (Eds.), *Challenges to the human rights of people with intellectual disabilities* (pp. 124-154). Jessica Kingsley.

Olley, J. G. (2009). Challenges in implementing the *Atkins* decision. *American Journal of Forensic Psychology*, *27*(2), 63-73.

Olley, J. G. (2009). Knowledge and experience required for experts in *Atkins* cases. *Applied Neuropsychology*, *16*, 135-140. doi:10.1080/09084280902864477

Salekin, K. L., & Olley, J. G. (2009). Mental retardation/intellectual disability. In A. Jamieson & A. Moenssens (Eds.), *Wiley encyclopedia of forensic science* (pp. 1724-1730)*.* Wiley.

Salekin, K. L., Olley, J. G., & Hedge, K. A. (2010). Offenders with intellectual disability: Characteristics, prevalence, and issues in forensic assessment. *Journal of Mental Health Research in Intellectual Disabilities*, *3*, 97-116. https://doi.org/10.1080/19315861003695769

Chen, D., Salekin, K., Olley, J. G., & Fulero, S. M. (2011). Research with offenders with intellectual disability. In B. Rosenfeld & S. D. Penrod (Eds.), *Research methods in forensic psychology* (pp. 421-432). Wiley.

Olley, J. G. (2012). Intellectual disability past, present and future. *Psychology in Intellectual and Developmental Disabilities*, *38*(1), 3-5.

Olley, J. G. (2012). The death penalty, the courts, and intellectual disability. In J. K. Luiselli (Ed.), *The handbook of high-risk challenging behaviors: Assessment and intervention* (pp. 229-240).: Brookes.

Olley, J. G. (2013). Definition of intellectual disability in criminal court cases. *Intellectual and Developmental Disabilities*, *51*, 117-121. doi:10.1352/1934-9556-51.2.117

Olley, J. G. (2014). Capital sentencing: *Atkins*-type cases. In K. Heilbrun, D. DeMatteo, S. B. Holiday, & C. LaDuke (Eds.) *Forensic mental health assessment: A casebook* (2nd ed., pp. 146-163).: Oxford University Press.

Greenspan, S., & Olley, J. G. (2015). Variability of IQ test scores. In E. Polloway (Ed.), *The death penalty and intellectual disability* (pp. 141-153.).: American Association on Intellectual and Developmental Disabilities.

Olley, J. G. (2015). Adaptive behavior instruments. In E. Polloway (Ed.), *The death penalty and intellectual disability* (pp. 187-200). American Association on Intellectual and Developmental Disabilities.

Olley, J. G. (2015). Time at which disability must be shown in *Atkins* cases. In E. Polloway (Ed.), *The death penalty and intellectual disability* (pp. 213-218)*.* American Association on Intellectual and Developmental Disabilities.

Olley, J. G. (2018). Death penalty and intellectual disability. In E. Braaten (Ed.), *SAGE encyclopedia of intellectual and developmental disorders* (pp. 349-352). SAGE.

Aiello, P., Di Gennaro, D. C., Girelli, L., & Olley, J. G. (2018). Inclusione e atteggiamenti Dei docent verso gli student con disturb dello spettro autistic:Suggestioni de uno studio pilota (Inclusion and teachers' attitudes towards students with autism spectrum disorder: Reflections from a pilot study). *Formazione &* Insegnamento, *15 (1),* 175-188. doi: 107346/-fei-XVI-01-18_15

Olley, J. G., & Cox, A. W. (in press). Intellectual and developmental disabilities in the criminal justice system. In L. M. Glidden (Ed.), *APA handbook on intellectual and developmental disabilities*. American Psychological Association.

**Papers presented** (since 1990 only)

Olley, J. G. (1990, March).  *Behavioral services for adults with developmental disabilities in the community.*  Invited address presented at the meeting of the North Carolina Association for Behavior Analysis, Charlotte.

Olley, J. G. (1990, October). *Workshop on assessment and treatment for people with dual diagnosis.*  Workshop presented at the meeting of the Berkshire Association for Behavior Analysis and Therapy, Amherst, MA.

Olley, J. G. (1991, February). *A behavioral look at dual diagnosis.* Invited presentation at the meeting of the North Carolina Association for Behavior Analysis, Greensboro, NC.

Olley, J. G., & Larkins, C. H. (1991, February). *Implications of the 'Thomas S.' lawsuit for community services.* Invited presentation at the Creative Dimensions in Developmental Disabilities conference, Greenville, NC.

Olley, J. G., & Hooper, S. R. (1991, August). *Do people with mental retardation understand what they are asked in personality tests?*  Paper presented at the meeting of the American Psychological Association, San Francisco.

Olley, J. G. (1991, October). *The future of research and services in autism.*  Keynote address at the annual EDEN Institute Conference on Autism, Princeton, NJ.

Olley, J. G. (1994, May). *Psychopathology in individuals with mental retardation: A behavioral look at dual diagnosis.* Paper presented at the meeting of the North Carolina Psychological Association, Atlantic Beach, NC.

Olley, J. G. (1995, August). *Curriculum issues in autism.* Invited presentation at the meeting on autism of the Texas Education Agency, Austin, TX.

Olley, J. G., Jens, K. G., & Klindworth, L. M. (1995, November). *Learning for Life: Adult Education for Individuals with Mental Retardation.* Paper presented at the meeting of the National Association for Adults with Special Learning Needs, Chicago, IL.

October 2020

10

Olley, J. G. (1995, December). *Psychopathology and mental retardation: Educational and environmental approaches.* Invited presentation at the meeting of the Alabama Council for Children with Behavioral Disorders, Birmingham, AL.

Olley, J. G. (1996, February). *Behavioral treatment of individuals with Prader-Willi syndrome.* Paper presented at the meeting of the North Carolina Association for Behavior Analysis, Asheville, NC.

Olley, J. G., & Jens, K. G. (1996, May). *Issues in the education of adults with mental retardation.* Paper presented at the meeting of the Commission on Adult Basic Education, Pittsburgh, PA.

Olley, J. G. (1996, May). *What information do policymakers need to make policy in developmental disabilities?* Symposium chaired at the meeting of the American Association on Mental Retardation, San Antonio, TX.

Olley, J. G., Jacob, A. V., Paraschiv, I., Klindworth, L. M., & Jens, K. G. (1996, May). *Diagnosis of mental retardation in adults.* Paper presented at the meeting of the American Association on Mental Retardation, San Antonio, TX.

Olley, J. G., & Paraschiv, I. (1996, September). *Problem Solving for Life: Instruction for adults with mental retardation.* Paper presented at the meeting of the National Association for Adults with Special Learning Needs, New Orleans, LA.

Olley, J. G. (1996, October). *Autism: Conventional wisdom, careful research, and controversial approaches.* Invited presentation at the 1996 Cornwell Lecture Series, Morganton, NC.

Olley, J. G. (1997, October). *Curriculum for children and adults with autism.* Paper presented at the meeting of the North Carolina American Association on Mental Retardation, Greensboro, NC.

Paraschiv, I., & Olley, J. G. (1998, April). *Problem Solving for Life: Social skills training for adults with mental retardation/developmental disabilities.* Paper presented at the conference of the YAI: National Institute for People with Disabilities, New York, NY.

Olley, J. G., Golden, J., & Bailey, J. (1998, May). *One act with three players: Turning critics of behavior analysis into partners for positive change.* Symposium presented at the meeting of the Association for Behavior Analysis, Orlando, FL.

Olley, J. G. (1998, May). Discussant for symposium *The Ralph J. Bauduin Oral School: Research and program design for children with autism.* Symposium presented at the meeting of the Association for Behavior Analysis, Orlando, FL.

**J.A.309**

USCA4 Appeal: 21-1    Doc: 12-1    Filed: 01/08/2021    Pg: 319 of 363

Olley, J. G. (1998, September). *What do we know about autism that is new?* Invited paper presented at the meeting of the North Carolina American Association on Mental Retardation, Greensboro, NC.

Olley, J. G., Carswell, R., & Palmer, G. (1998, October). *Successful behavior interventions.* Invited presentation at Together We Can! Using Positive Behavior Support in the Classroom and at Home. Greensboro, NC.

Olley, J. G., & Paraschiv, I. (1998, November). *A program to teach problem solving skills for independent living.* Paper presented at the meeting of NADD: An Association for Persons with Developmental Disabilities and Mental Health Needs, Albuquerque, NM.

Olley, J. G., Paraschiv, I., & Carswell, R. (1999, May). *Problem solving as a format for supporting self-determination and choice-making.* Pre-conference workshop presented at the meeting of the American Association on Mental Retardation, New Orleans, LA.

Olley, J. G. (1999, September). *Mental retardation and the criminal justice system.* Paper presented at the meeting of the North Carolina American Association on Mental Retardation, Greensboro, NC.

Olley, J. G. (1999, September). *Progress in services and supports for people with disabilities: One person makes a difference.* Invited presentation at the meeting of the North Carolina American Association on Mental Retardation, Greensboro, NC.

Olley, J. G. (1999, October). *Prader-Willi syndrome and other low prevalence disorders.* Paper presented at the meeting of the Community Living Association, Atlantic Beach, NC.

Olley, J. G., Tassé, M., & Havercamp, S. (2000, February). *Applications of applied behavior analysis in community settings serving people with disabilities.* Paper presented at the meeting of the North Carolina Association for Behavior Analysis, Asheville, NC.

Olley, J. G., Carswell, R., Finks, W., & Dorton, R. (2000, April). *Sex and relationships: When to say yes and when to say no.* Workshop presented at the North Carolina Self-Advocacy Convention, Winston-Salem, NC.

Olley, J. G. (2000, May). *Activity schedules as a guide to community consultation: A call for research.* Paper presented at the meeting of the Association for Behavior Analysis International, Washington, DC.

Dykeman, C., Pennell, R. L., Dawkins, B., Holden, J., & Olley, J. G. (2001, May). *Factors associated with problem behavior in the Special Olympics World Summer Games.* Paper presented at the meeting of the Association for Behavior Analysis International, New Orleans, LA.

Holburn, C. S., Vietze, P. M., Olley, J. G., & Baer, D. M. (2001, May). *Is applied behavior analysis adapting to the changing DD environment?* Panel discussion at the meeting of the Association for Behavior Analysis International, New Orleans, LA.

Golden, J. A., Strickland, D., Olley, J. G., & Cripe, M. (2001, May). *Trauma in foster children: Perspectives and contributions from behavior analysis.* Pannel discussion at the meeting of the Association for Behavior Analysis International, New Orleans, LA.

USCA4 Appeal: 21-1    Doc: 12-1    Filed: 01/08/2021    Pg: 320 of 363
Case 3.92-cr-00068-DJN   Document 86-5   Filed 12/14/20   Page 13 of 19 PageID# 2493

October 2020
12

Olley, J. G., & Yates, L. (2001, May). *Criminal justice initiatives: A report from the DD/Criminal Justice Work Group.* Paper presented at the Best Practices in Developmental Disabilities Conference, Greensboro, NC.

Olley, J. G. (2002, February). *Effective services for students with autism: What do we know and what do we need to know?* Invited presentation at the Alaska Statewide Special Education Conference, Anchorage, AK.

Olley, J. G. (2002, April). *Autism and developmental disorders.* Invited presentation at the meeting of the Maryland School Psychology Association, Baltimore, MD.

Paraschiv, I., & Olley, J. G. (2003, February). *Teaching problem solving for community living.* Paper presented at the meeting of the Council on Exceptional Children's Division on Developmental Disabilities, Koloa, HI.

Olley, J. G. (2003, April). *Autism: What do we know and what do we need to know?* Invited paper presented at the 19th Annual Sharing Our Best Conference, Hastings, NE.

Olley, J. G. (2003, May). *Cautions in evaluating alternative therapies and approaches.* Paper presented at the Best Practices in Developmental Disabilities Conference, Greensboro, NC.

Olley, J. G. (2003, November). *Mental retardation and the death penalty: The psychologist as expert witness.* Invited presentation at the meeting of the Virginia Bar Association, Richmond, VA.

Everington, C., & Olley, J. G. (2004, March). *An analysis of forensic psychological evaluations in capital cases involving defendants with mental retardation: Has Atkins made a difference?* Paper presented at the meeting of the American Psychology-Law Society, Scottsdale, AZ.

Olley, J. G. (2004, May). *Psychological assessment of mental retardation in capital cases*. Invited presentation at the Capital Habeas Unit Conference, Administrative Office of the U.S. Courts, Ponte Vedra Beach, FL.

Olley, J. G. (2004, October). *Recent advances in the education of children with autism*. Presentation at the Fall NCAAMR Institute, Morganton, NC.

Olley, J.G. (2006, May). *The death penalty: Issues in expert testimony in Atkins hearings.* Paper presented at the meeting of The International Summit for the Alliance on Social Inclusion, Montreal, Canada.

Olley, J. G. (2006, August). Symposium Chair*: Mental retardation and the death penalty: Challenges facing psychologists.* Symposium at the meeting of the American Psychological Association, New Orleans, LA.

USCA4 Appeal: 21-1    Doc: 12-1    Filed: 01/08/2021    Pg: 321 of 363
Case 3.92-cr-00068-DJN   Document 86-5   Filed 12/14/20   Page 14 of 19 PageID# 2494

October 2020

13

Olley, J. G. (2006, August). *Search for professional standards in Atkins hearings.* Paper presented at the meeting of the American Psychological Association, New Orleans, LA.

Olley, J. G., & Everington, C. (2007, March). *The measurement of adaptive behavior in Atkins cases.* Paper presented at the Off the Witness Stand conference, John Jay College of Criminal Justice, New York.

Salekin, K. L., & Olley, J. G. (2008, March). *Conducting an "Atkins" evaluation: What we know, what we don't know, and what we need to find out.* Workshop presented at the meeting of the American Psychology-Law Society, Jacksonville, FL.

Olley, J. G. (2008, August). *Psychology training in developmental disabilities at the University of North Carolina at Chapel Hill.* Paper presented at the meeting of the American Psychological Association, Boston, MA.

Olley, J. G. (2008, August). Symposium Chair: *Intellectual disability and the death penalty: Current and future contributions of psychologists in Atkins cases.* Symposium at the meeting of the American Psychological Association, Boston, MA.

Salekin, K. L., & Olley, J. G. (2008, August). *What does research tell us, and what research do we need in Atkins cases?* Paper presented at the meeting of the American Psychological Association, Boston, MA.

Olley, J.G. (2008, November). Symposium Chair: *Challenges facing professional organizations in developmental disabilities.* Symposium at the Annual Meeting of the Association of University Centers on Disabilities, Washington, DC.

Olley, J. G., Salekin, K. L., & Siperstein, G. N. (2009, March). *Diagnosis of intellectual disability in high stakes conditions: T*ranslating basic research to practice in death penalty cases*. Paper presented at the 43rd Annual Gatlinburg Conference on Research and Theory in Intellectual and Developmental Disabilities, New Orleans, LA.

Olley, J. G. (2009, October). *Investigating intellectual disabilities with a focus on adaptive functioning*. Invited presentation at the Capital Case Seminar of the Los Angeles County Public Defender's Office, Los Angeles, CA.

Olley, J. G., & Stevens, K. C. (2010, January). *Recognizing and explaining mild mental retardation*. Death Penalty 2010: Continuing Legal Education Seminar of the North Carolina Advocates for Justice, Cary, NC.

Olley, J. G. (2010, August). *The death penalty, the courts, and what we have learned about intellectual disability.* Division 33 Presidential *Address* presented at the meeting of the American Psychological Association, San Diego, CA.

Olley, J. G. (2011, February). *The expert witness, intellectual disability, and the death penalty.* Invited address presented at the California Attorneys for Criminal Justice and California Public Defenders Association Capital Case Defense Seminar, Monterey, CA.

**J.A.312**

USCA4 Appeal: 21-1    Doc: 12-1    Filed: 01/08/2021    Pg: 322 of 363
Case 3:92-cr-00068-DJN   Document 86-5   Filed 12/14/20   Page 15 of 19 PageID# 2495

October 2020
14

Olley, J. G., & Yackel-Christenson, J. (2011, March). *Atkins investigation: Roles and responsibilities of the mitigation specialist.* Invited 3-part presentation at the meeting of the National Alliance of Sentencing Advocates and Mitigation Specialists, Orlando, FL.

Olley, J. G. (2011, March). *Lessons learn*ed *from Atkins v. Virginia: Implications for juveniles*. Invited presentation at the National Judges' Science School: Developmental Forensics of Children Adjudicated by Courts, Chapel Hill, NC.

Olley, J. G. (2011, August). Chair: *Perspectives on intellectual disability and the death penalty – Toward more effective contribution of psychologists in Atkins cases*. Invited Symposium at the Convention of the American Psychological Association, Washington, DC.

Salekin, K. L. & Olley, J. G. (2011, August). *Eligible for execution? Assessment of intellectual disability as per Atkins*. Continuing Education Workshop presented at the Convention of the American Psychological Association, Washington, DC.

Olley, J. G., & Yackel, J. C. (2011, October). *Building partnerships: The complementary role of mitigation specialist and evaluating experts*. Invited presentation at Advanced Capital Training, New Orleans, LA.

Greenman, L., & Olley, J. G. (2011, November). *Exploring intellectual disability in your client*. Invited presentation at the Virginia Bar Association Capital Defense Workshop, Richmond, VA.

Olley, J. G., & Yackel, J. C. (2011, November). *Investigating capital cases involving dual diagnosis.* Paper presented at the annual meeting of NADD: An Association for Persons with Developmental Disabilities and Mental Health Needs, Nashville, TN.

Salekin, K. L., Olley, J. G., & Ellis, J. (2012, June). *The assessment of ID in capital cases*. Workshop presented at the annual conference of the American Association on Intellectual and Developmental Disabilities, Charlotte, NC.

Yackel, J. C., & Olley, J. G. (2012, November). *Understanding the law and science between Atkins and its progeny.* Invited presentation at the Life in the Balance conference of the National Legal Aid and Defender Association, St. Louis, MO.

Garvey, S., & Olley, J. G. (2013, October). *Investigating and presenting evidence of adaptive deficits*. Invited presentation at the Habeas Corpus Resource Center Fall Conference 2013, San Francisco, CA.

Salekin, K. L., & Olley, J. G. (2014, March). *Evaluation of intellectual disability in capital cases: Twelve years post Atkins*. Workshop presented at the meeting of the American Psychology-Law Society. New Orleans, LA.

Olley, J. G., & Miller, C. N. (2014), June). *Challenges in assessing intellectual and adaptive functioning in foreign nationals*. Paper presented at the meeting of the American Association on Intellectual and Developmental Disabilities, Orlando, FL.

Olley, J. G. (2014, November). *People with intellectual disability and autism in the criminal justice system*. Paper presented at the meeting of NC Training, Instruction, Development, and Education, Asheville, NC.

Nygren, M. A., Polloway, E. A., Tassé, M. J., & Olley, J. G. (2015, June). *Focus on the death penalty.* Panel presentation at the meeting of the American Association on Intellectual and Developmental Disabilities, Louisville, KY.

Olley, J. G. (2015, August). *Stereotypes of intellectual disability affect death penalty decisions: Examples from court opinions.* Paper presented at the convention of the American Psychological Association, Toronto, Ontario.

Olley, J. G. (2015, August). *Adaptive deficits: The current state of the science*. Invited presentation at the Twentieth Annual National Federal Habeas Corpus Seminar, Charlotte, NC.

Olley, J. G. (2016, September). *Identifying persons with intellectual disability*. Keynote Address at the Georgia Capital; Defenders' Quarterly Training Conference, Atlanta, GA.

Olley, J. G. (2016, October) *Intellectual disability: Understanding intelligence testing*. Invited address at the 2016 Association of Administrative Law Judges Education Conference, San Diego, CA.

Olley, J. G., & Hazelrigg, M. (2017, May). *Intellectual disability*. Presentation at Capital Case Management for Superior Court Judges, North Carolina Judicial College, Chapel Hill, NC

Olley, J. G. (2018, January). *Gathering information and providing expert testimony on adaptive behavior functioning in capital cases.* Invited paper presented at the 2018 Texas Summit on the Assessment of Adaptive Behavior in Capital Cases, Austin, Texas.

Olley, J. G. (2019, May). *Interviewing victims: Key issues and challenges*.  Invited presentation at the Annual Meeting and Conference of the North Carolina Partnership to Address Adult Abuse, Raleigh, NC.

Olley, J. G., Reschly, D., Yackel, J., & Salekin, K. (2019, August). *New developments in the death penalty and people with intellectual disability*. Continuing education workshop presented at the Convention of the American Psychological Association, Chicago, IL.

Olley, J. G. (2020, July). *Evaluation of intelligence in Atkins cases*. Continuing education symposium presented by Zoom at the National Association for Public Defenders Symposium.

**Posters**

J.A.314

USCA4 Appeal: 21-1    Doc: 12-1    Filed: 01/08/2021    Pg: 324 of 363
Case 3.92-cr-00068-DJN   Document 86-5   Filed 12/14/20   Page 17 of 19 PageID# 2497

October 2020
16

Olley, J. G., Hooper, S. R., & Flagler, S. (1990, October).  *Assessment of the social-emotional status of adults with mental retardation using self-report.*  Poster presented at the meeting of the American Association of University Affiliated Programs in Developmental Disabilities, Madison, WI.

Olley, J. G., Hooper, S. R., & Flagler, S. (1990, October).  *Personal adjustment counseling for young adults with mental retardation.* Poster presented at the meeting of the American Association of University Affiliated Programs in Developmental Disabilities, Madison, WI.

Olley, J. G., Paraschiv, I., Allison, J., & Jacob, A. V. (1996, September). *Problem Solving for Life: Adult education for individuals with mental retardation.* Poster presented at the meeting of the North Carolina chapter of the American Association on Mental Retardation, Raleigh, NC.

Olley, J. G., Paraschiv, I., & Jacob, A. V. (1997, May). *Learning for Life: A training program to assist the Compensatory Education of adults with mental retardation.* Poster presented at the meeting of the American Association on Mental Retardation, New York, NY.

Paraschiv, I., & Olley, J. G. (1997, May). *Effectiveness of a training program in social problem solving skills.* Poster presented at the meeting of the American Association on Mental Retardation, New York, NY.

Olley, J. G., & Carswell, R. (1998, September). *The behavioral supports clearinghouse.* Poster presented at Together We Can! Using Positive Behavior Support in the Classroom and at Home, Greensboro, NC.

Paraschiv, I., Olley, J. G., & Carswell, R. L. (1999, April). *A program to teach problem solving as a skill for independent decision making.* Poster presented at the meeting of the Council for Exceptional Children, Charlotte, NC.


## Book Reviews

Olley, J. G.  (1979). Review of *Mental Retardation:  A developmental approach* by C. C. Cleland, *Mental retardation:  The changing outlook* by R. P. Ingalls, and *Retardation: Issues, assessment, and intervention* by J. T. Neisworth & R. M. Smith.  *Journal of Autism and Developmental Disorders*, *9*, 131-133.

Olley, J. G.  (1986). Review of *Annotated bibliography of autism:  1943-1983* by A. J. Tari, J. L. Clewes, & S. J. Semple.  *Journal of Autism and Developmental Disorders*, *16*, 245-246.

Olley, J. G.  (1986). Review of *Classic readings in autism* by A. Donnellan (Ed.).  *Journal of Autism and Developmental Disorders*, *16*, 394-395.

Olley, J. G.  (1987). Review of *Management of autistic behavior: Information service for educators.*  Edited by R. L. Simpson & M. Regan.  *Journal of the Association for Persons with Severe Handicaps*, *12,* 72-73.

Olley, J. G. (2006). *Review of Lessons learned from a lawsuit: Creating services for people with mental illness and mental retardation*, Social *Science & Medicine*, *62*, 523-524.

USCA4 Appeal: 21-1    Doc: 12-1    Filed: 01/08/2021    Pg: 325 of 363

## Instructional Materials

Olley, J. G., Paraschiv, I., Allison, J., & Jacob, A. V. (2000). *Problem solving for life: Teaching problem solving to adolescents and adults with developmental disabilities.* Clinical Center for the Study of Development and Learning, University of North Carolina at Chapel Hill: Chapel Hill, NC.

## Memberships in Professional Associations

American Psychological Association (Life Member; member of Divisions 25 & 41; Fellow in Division 33)
   President, Division on Intellectual and Developmental Disabilities 2009-2010
American Association on Intellectual and Developmental Disabilities (formerly American Association on Mental Retardation) (Fellow, Life Member)
North Carolina Chapter, American Association on Intellectual and Developmental Disabilities (Chair, Committee on Research)
North Carolina Association for Behavior Analysis (President 1992-93)

## Licensure

Licensed Psychologist, North Carolina, license number 587.

## Community and Professional Service (since 1990 only)

| | |
|---|---|
| 1990 - 1993 | Member, Exceptional Children's Advisory Council, Chapel Hill-Carrboro City Schools |
| 1992 - 1993 | President, North Carolina Association for Behavior Analysis |
| 1992 - 2007 | Behavioral consultant to NC Arc Lifeguardianship |
| 1993 - 1998 | Member, National Community Education Directors Council, American Association of University Affiliated Programs |
| 1994 - 2002 | Member, Area Board of the Orange-Person-Chatham Mental Health, Developmental Disabilities, and Substance Abuse Services (Secretary 1999-2002); Committee on Developmental Disabilities (1994-2002); Client Rights Committee (1994-2008) |
| 1995 - 2006 | Consultant: The North Carolina Mentor Network |
| 1995 - 2000 | Consultant: Southeastern Regional MH, DD, and SA Services, *Thomas S.* Section |
| 1996 - 1998 | Consultant: Piedmont Area MH, DD, and SA Services, *Thomas S.* Section |
| 1998 | Grant Application Panel Review Member.  National Institute on |

October 2020
18

| | |
|---|---|
| | Disability and Rehabilitation Research, U.S. Dept. of Education |
| 1998 - 2008 | Member, North Carolina Council on Developmental Disabilities |
| 2000 – 2012 | Chair, Committee on Research, North Carolina American Association on Intellectual and Developmental Disabilities |
| 2002 – 2007 | *Ex Officio* Member, North Carolina Governor's Advocacy Council for Persons with Disabilities |
| 2002 | Member, NC Health Choice Task Force |
| 2000 – 2007 | Member, North Carolina Partners in Justice Advisory Committee |
| 2005 - present | Member, *ad hoc* Committee on Developmental Disability and the Criminal Justice System, Division 33, American Psychological Association (Chair 2005-2015) |
| 2008 | *Ex Officio* Member, Disability Rights North Carolina |
| 2008 - 2014 | Member, North Carolina Commission for Mental Health, Developmental Disabilities, and Substance Abuse Services (Vice-Chair, 2009 – 2011 ; Chair, 2011-2014) |
| 2009 -2011 | Member, American Association on Intellectual and Developmental Disabilities Task Force on Intellectual Disability and the Death Penalty |
| 2014-2019 | Member, Policy and Positions Committee, Arc of the United States |
| 2018-2020 | Chair, Committee on the Constitution and By-Laws, Division 33 of the American Psychological Association. |

**J.A.317**

# EXHIBIT 3



# Center for Social Development and Education



December 19, 2016

Donald P. Salzman
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue, NW
Washington, DC  20005

Re: Corey Johnson

Dear Mr. Salzman:

You have asked me to prepare a letter concerning my evaluation of Corey Johnson to determine whether he meets the diagnostic criteria for intellectual disability.  You have also asked me to comment on reports prepared in 2016 by experts in the fields of intellectual disability and learning disability who also evaluated Corey Johnson, as well as a recent affidavit from an expert on the role of race in the classification of children as either intellectually disabled or learning disabled during the period when Corey Johnson was a child.

### Summary of review and records considered

I was first asked to examine whether Corey Johnson has intellectual disability in late 2007 and early 2008 by Lisa Greenman, a counsel affiliated with the Federal Capital Habeas Project.  At that time, I thoroughly reviewed an extensive set of materials that Ms. Greenman provided to me.  Based on my review, I expressed my conclusion, in a January 11, 2008 letter to Ms. Greenman (which I have enclosed as Appendix A), that Corey Johnson's significant cognitive impairments and impairments in adaptive behavior, demonstrated before the age of 18, are consistent with mild mental retardation.[1]

Over the last several years, I have reviewed a significant number of additional records related to Mr. Johnson that I understand included contemporaneous records that had not been located at the time that Ms. Greenman asked me to conduct my earlier evaluation, plus extensive materials that were not in existence at the time of my January 2008 analysis.  The new materials included intellectual disability evaluations conducted by two leading experts in the field, Daniel J. Reschly, Ph.D. and J. Gregory Olley, Ph.D.  The new set of materials that were not available to me in 2007 and 2008 also included additional IQ test results from Corey Johnson's childhood that provide important insights in Corey Johnson's intellectual functioning and other new records concerning Corey Johnson's childhood related to his education and social services he received, among others.  These materials also provide a significantly more expansive picture of Corey Johnson's adaptive functioning, one that is greatly enhanced by dozens of interviews with and

---

[1] "Mental retardation" is the term that was generally accepted in 2008 but has since been replaced by "intellectual disability," which is a synonym that describes the same level of impairment.

J.A.319

statements by family, friends, teachers, mental health professionals and others as well as the results from the administration of a standardized adaptive behavior instrument given to key individuals who knew Mr. Johnson best in different settings.

Overall, the materials I reviewed in 2008 and again recently, as well as the new materials, are comprehensive and include: school, social services, and institutional records for Corey Johnson; reports of Corey Johnson's psychological evaluations as a child and adolescent; the mitigation report by Dr. Dewey Cornell, a psychologist retained by the defense before trial, and his subsequent testimony at Corey Johnson's sentencing hearing; the report by Dr. Edward Peck, a neuropsychologist retained by the defense, concerning his neuropsychological exam, also presented during Corey Johnson's sentencing hearing; several dozen affidavits, declarations, and witness interview summaries collected long after Corey Johnson was sentenced to death from professionals, family members, and friends who knew Corey Johnson in a variety of settings during childhood, adolescence, and/or adulthood concerning Corey Johnson's adaptive functioning. These materials were analyzed in a report dated August 26, 2016 prepared by Dr. Reschly and a report dated August 24, 2016 prepared by Dr. Olley, including the results of the standardized adaptive behavior instrument administered by Dr. Olley to three individuals, which I have carefully reviewed. Finally, I have reviewed a declaration from Dr. Jay Gottlieb. My thorough and independent review of all of this information has strongly reinforced and reconfirmed my previous opinion that Corey Johnson's significant cognitive impairment and impairments in adaptive behavior, demonstrated before the age of 18, clearly demonstrate that Corey Johnson has mild intellectual disability.[2]

### Background and experience

To arrive at my conclusion that Corey Johnson has intellectual disability, I have drawn from my extensive background and experience in the field of intellectual disability, including nearly 50 years of teaching, research, program and policy development, and clinical service. As the founder and director of the Center for Social Development and Education at the University of Massachusetts Boston, I have managed more than $25 million of research in intellectual disability and related disabilities. I have authored over 100 articles, chapters, and books on intellectual disability; topics including the identification and diagnosis of intellectual disability and teaching children with intellectual disability. I have also served as associate editor and editor for major journals (AMERICAN JOURNAL OF MENTAL RETARDATION, AAMR's *Research Monograph* series) and as a consulting editor to numerous journals in developmental disabilities.

I have served in leadership roles at the local, state, and national levels including, for example, board memberships on the Governor's Council for Mental Retardation and as a consultant to the President's Commission on People with Intellectual Disabilities. As a licensed Psychologist, my work as a practitioner in the area of intellectual disability has also been extensive, particularly involving the intellectual assessment of children with intellectual

---

[2] When I use the term "mild intellectual disability," I am referring to Corey Johnson as someone who has *significant* impairments and who is at the upper range of all individuals with intellectual disability, but the adjective "mild" should not be interpreted to mean that he is not significantly impaired.

2

J.A.320

disability. My educational background includes an APA Post-Doc Fellowship in the Developmental Evaluation Clinic (DEC), Children's Hospital, Harvard University.

I have directly tested and evaluated over 100 children and adolescents in diagnostic settings to determine whether they have intellectual disability. In addition, through my research, I have personally observed hundreds of children and adolescents with intellectual disability. I have also reviewed hundreds of students' records for the purpose of confirming the prior diagnoses by others of intellectual disability, and thus to determine whether or not they were eligible for inclusion in our federally funded research studies and our summer program for children with disabilities. I have enclosed my curriculum vitae as Appendix B.

### Intellectual disability criteria

The diagnosis of intellectual disability has three parts, or prongs. To be intellectually disabled, a person must demonstrate significant limitations in intellectual (cognitive) functioning, which is measured through the administration of standardized IQ tests. The person also must demonstrate significant limitations in adaptive functioning (how their cognitive limitations are reflected in their behavior and functioning in every-day life), and specifically must show significant limitations in at least one of three areas (known as domains)—conceptual, social, and practical—of adaptive behavior. Finally, the individual's limitations in intellectual functioning and adaptive functioning must have originated during the developmental period (during childhood).

### Analysis of Corey Johnson's intellectual functioning

I explained in my 2008 letter that it is clear that Corey Johnson meets the criteria for intellectual disability. The additional materials that I have reviewed recently only reinforce and strengthen my conclusion.

On the intellectual functioning prong, the discovery by Corey Johnson's current clemency counsel—after I wrote my 2008 letter—of two additional IQ tests whose existence was not known at the time he was sentenced to death is critical new corroboration of my previous conclusion. First, the test administered by Dr. Figurelli when Corey was eight years old produced a Full Scale IQ of 73, which is clearly within the mild intellectual disability range, and is consistent with the scores obtained by Dr. Barish, when Mr. Johnson was 16, and by Dr. Cornell, when he was 22. Second, the discovery of the WISC-R IQ test administered by Dr. Adams in October 1981 when Corey Johnson was age 12, is vital evidence that eviscerates any validity of the identical WISC-R IQ test given to Corey Johnson only four months later by Dr. Gallaudet. The Gallaudet test (a clear outlier) played a central role in the erroneous classification (which I discuss below) of Corey Johnson as a "severely learning disabled" child, rather than as a child with intellectual disability.

The opinions I expressed concerning Corey Johnson's significant impairments in intellectual functioning are echoed and expanded upon in Dr. Reschly's August 2016 report, which focuses principally on the intellectual functioning prong of the intellectual disability diagnosis. He provides a comprehensive explanation of the evolution in the understanding and

3

**J.A.321**

conceptualization/definition of intellectual disability over the past several decades, particularly on the assessment of intellectual functioning. He clearly captures the essence of the Flynn effect and the statistical concept of the standard error of measurement (SEM), two critical components to interpreting the results of intelligence testing. For persons with mild intellectual disability, it is vital that we recognize, as Dr. Reschly does, the importance of up-to-date norms of intelligence tests, and understand that when "cut-off" points for intellectual disability are considered, confidence intervals (based on the standard error of measurement) must be taken into account. Today's definition of intellectual disability by the leading professional organizations, as discussed by Dr. Reschly, puts the Flynn effect and confidence intervals in bold relief. Their applications to diagnosing and applying the intellectual disability definition have become standard practice, as the meta-analysis demonstrating the Flynn Effect by Trahan *et. al.*,[3] and the Supreme Court's holding in *Hall v. Florida*, recognizing the consensus among practitioners that the SEM must be taken into account in any *Atkins* determination, make clear.

Applying these two elements to interpreting the multiple administration of the WISC and the WAIS to Corey Johnson, Dr. Reschly persuasively concludes that Corey Johnson has significant deficits in intellectual functioning, a conclusion that I had arrived at independently in 2008 and continue to share today. Dr. Reschly's report contains a detailed and in-depth analysis of Corey Johnson's IQ test results. He explains why four of the IQ tests given to Corey Johnson are valid, consistent with each other, and place Corey clearly within the range of intellectual disability. Dr. Reschly also persuasively shows why two other tests are severely flawed, hold little validity, and should be given little, if any, weight in assessing Mr. Johnson's intellectual disability. Dr. Reschly explains that one of those invalid tests (administered by Smith in 1979) was out-dated by decades at the time it was given to Corey Johnson, and had been superseded by a then-recent, culturally relevant version of the same test. He further describes how the other IQ test (the WISC-R test given by Gallaudet that I discuss above) was inadvertently administered to Corey Johnson just four months after he was given the identical WISC-R IQ test by Dr. Adams, artificially inflating the results of the Gallaudet test and rendering it invalid and useless. Overall, based on my 50 years of work in the field of intellectual disability, the conclusions Dr. Reschly draws concerning Corey Johnson's intellectual functioning are irrefutable.

### Analysis of Corey Johnson's adaptive behavior functioning

In my 2008 letter, I concluded that, in addition to his significant cognitive impairment, Corey Johnson also demonstrated significant deficits throughout his childhood in all three areas of adaptive functioning—conceptual, social and practical skills—even though significant impairment in only one of these areas is necessary to support an intellectual disability diagnosis. I explained that those deficits were documented by the contemporary records from Corey Johnson's childhood and adolescence and by information contained within the psychological report prepared by Dr. Cornell and Dr. Cornell's 1993 sentencing hearing testimony, as well as other records and information I reviewed in 2008.

---

[3] Trahan, L.H, Stuebing, K.K., Fletcher, J.M., & Hiscock, M. (2014). *The Flynn Effect, A meta-analysis. Psychological Bulletin*, 140, 1332-1360.

4

University of Massachusetts Boston   100 Morrissey Boulevard   Boston MA 02125-3393   Telephone 617.287.7250   Fax 617.287.7249

**J.A.322**

The new evidence developed by Corey Johnson's current clemency counsel and by Dr. Olley since 2008 provides a wealth of additional support for the conclusions I reached in 2008. They have gathered substantial new information demonstrating that Corey Johnson's adaptive functioning deficits are corroborated by numerous written statements from and interviews with Corey Johnson's teachers, mental health professional, relatives, and friends, who were interviewed by Dr. Olley and by Mr. Johnson's current clemency counsel. Those interview statements, affidavits, and declarations are further corroborated by numerous contemporaneous records created by professionals during Corey Johnson's childhood and adolescence.

Building upon and concurring with the thorough analysis of the intellectual functioning prong of the intellectual disability diagnosis by Dr. Reschly, Dr. Olley focuses the majority of his excellent report on the evidence supporting his conclusion that there is overwhelming, undeniable evidence that Corey Johnson suffered significant impairments in all three areas of adaptive functioning. His logic and the clarity of facts and interpretation contained in his comprehensive report impeccably reflect the most rigorous interpretation and explanation possible concerning Corey Johnson's intellectual disability, and the conclusions he draws are both sound and irrefutable. Dr. Olley employs the strictest reading and rigorous application of the standards incorporated in the definitions of intellectual disability put forth by the American Psychiatric Association (APA) in its most recent Diagnostic and Statistical Manual (DSM-5) and by the American Association on Intellectual and Developmental Disabilities (AAIDD), the two leading medical and professional organizations in the field.

Dr. Olley's assessment is extensive and goes well beyond what would be expected of an evaluation. He painstaking and thoroughly weighs all factors individually and in combination. He sought out multiple sources of information, recreating with clarity Corey Johnson's developmental, educational, and family history, placing it all within the context of the changing field of intellectual disability. Most importantly, Dr. Olley has illuminated the nexus between Corey Johnson's developmental history and the context within which that development took place. Throughout, he provides corroborating evidence, documenting with the utmost detail the overwhelming risk factors that were the pathway to a diagnosis of intellectual disability. At the same time, Dr. Olley provides a clear explanation of why a diagnosis of intellectual disability was never rendered when Corey Johnson was a child, adolescent, or even an adult facing the death penalty, a critical point that both Dr. Reschly and Dr. Gottlieb also address, and one that I discussed in my 2008 letter. And he has shown why a diagnosis of intellectual disability was called for at the time Corey Johnson was in elementary school, given the weight of overwhelming evidence of the breadth and severity of his impairments.

Guided by his rigorous interpretation of the standards for the diagnosis of intellectual disability established by the APA and the AAIDD, Dr. Olley utilizes well recognized best practices for extrapolating and assessing Corey Johnson's adaptive behavior. Dr. Olley addresses Corey Johnson's academic performance, including multiple grade retentions that did not help in improving Corey's academic performance, which characterized his repeated academic failure. In his early elementary years, he was clearly a candidate for special education services, yet he did not receive them. Without intensive services, Corey showed no improvement in learning during his elementary grades; in fact, his academic performance significantly deteriorated. And when he finally received special education services, first when he

5

University of Massachusetts Boston   100 Morrissey Boulevard   Boston MA 02125-3393   Telephone 617.287.7250   Fax 617.287.7249

J.A.323

was about 10 years old, then as a teenager at the residential Pleasantville Cottage School program, and later as a high school student, Corey continued to show no improvements.

The corroboration of Corey Johnson's language deficits by Dr. Olley leaves no doubt of the seriousness of Corey's deficit in this area. Dr. Olley explains how Corey entered the early grades at a disadvantage. Later, when he entered the Pleasantville Cottage School, Corey's significant absence of both expressive and receptive language skills at his age is further evidence of an adolescent with intellectual disability.

Similarly, Dr. Olley's documentation of Corey's significant lack of social skills across his lifespan, from early childhood to adulthood, underscores the fact that intellectual disability was present since a young age. Notwithstanding all the attempts to support Corey Johnson through direct instruction and counseling, he showed little if any improvement in his social skills. As someone who has written two books on teaching social skills to children with intellectual disability, I can confirm that if Corey Johnson did not have an intellectual disability, there would been a natural improvement in his social skills over the years, yet his deficit in social skills was not remediable. This is a clear sign of his intellectual disability. Dr. Olley further recounts numerous practical skill deficits in support of his conclusion that Corey Johnson had significant impairments in the practical domain, a conclusion I share.

Finally, the conclusions that Dr. Olley draws from his review of all of the records and the information he collected from various sources were confirmed by the results of the administration of the ABAS-II, which he gave to three key sources. Thus, Dr. Olley's multiple prong approach to evaluating Corey Johnson's adaptive functioning in all three domains of adaptive behavior leads inexorably to only one conclusion. Using the expression "leaving no stone left unturned," Dr. Olley systematically and painstakingly demonstrates that Mr. Johnson's significant deficits in adaptive behavior were clearly recognizable at an early age and have lasted into adulthood. His summary of voluminous information and his careful interpretation of that information leave no room to doubt his conclusion that Corey Johnson has an intellectual disability, a conclusion that I wholeheartedly and unequivocally share and one that I reached in 2008.

**Failure to classify Corey Johnson as intellectually disabled as a child**

As I explained in my 2008 letter, Corey Johnson attended school during the 1970s and 1980s when the trend in education, particularly with respect to poor, minority children (especially African American children) in schools in urban districts, was to avoid labeling students as "mentally retarded." Instead, the less stigmatizing label of "learning disabled" was chosen for children who actually met the criteria for mental retardation. Forty-five years ago (1971), I had the opportunity to observe the clinical assessment of children referred for special education in the New York Public School system. As the program evaluator of the newly established Evaluation and Placement Centers throughout the five boroughs of New York City, I personally sat in and observed the deliberations of the interdisciplinary clinical teams. I can attest to the proclivity of the teams to not place children in special education classrooms designed for students with mental retardation, even when there were clear indications of mild intellectual disability. Dr. Gottlieb was one of the key social science researchers to study this

6

University of Massachusetts Boston   100 Morrissey Boulevard   Boston MA 02125-3393   Telephone 617.287.7250   Fax 617.287.7249

trend and demonstrates its existence on a broad scale (as I had personally observed it occur on a more individual level). His declaration provides a detailed explanation of how well-meaning litigation efforts that began in the 1960s and other factors created a climate where educators and mental health professionals felt pressure not to label children with mental retardation, particularly when the label was not important to the services children received in school.

Dr. Reschly cogently explains in his report that the label of "severe learning disability"—which has no diagnostic meaning but was repeatedly applied to Corey Johnson—was a euphemism for mental retardation during the time that Corey was in school. He also describes why the learning disabled diagnosis did not then, and does not now, fit Corey Johnson's comprehensive, consistent, and significant impairments. He documents how Corey Johnson's impaired achievement was consistent with his impaired intellectual functioning, which is diagnostic of intellectual disability and inconsistent with learning disability. Finally, Dr. Reschly punctuates his report with statistics graphically demonstrating how the learning disability diagnosis exploded in numbers over the past few decades, while the "mental retardation" and later "intellectual disability" diagnosis declined, even though professionals have understood all along that the actual number of children fitting the diagnostic criteria for these conditions has not changed.

I concur with Dr. Reschly and in a past chapter, Learning Disabilities as Operationally Defined by Schools (MacMillan and Siperstein (2002)), we clearly explain how the process schools adopt to identify students with learning disabilities did not conform to the federal definition and resulted in almost a third of students with mild intellectual disabilities being otherwise diagnosed and incorrectly placed in programs for the learning disabled. Subsequent research by MacMillan and his colleagues documented that, in fact, up to one-third of minority students in classrooms for the learning disabled met the criteria for mild intellectual disability.

### Conclusion

Based on all of the documents I reviewed, and my nearly 50 years of extensive involvement in the field of disabilities, I unequivocally conclude that Corey Johnson meets all three prongs of the most recent definition of Intellectual Disability (APA, AAIDD) and clearly is mildly intellectually disabled.

Sincerely,

Gary N. Siperstein, Ph.D.
Professor Emeritus
Director
Center for Social Development and Education
University of Massachusetts Boston

Enclosure

7

J.A.325

# APPENDIX A



Center for Social Development and Education



January 11, 2008

Lisa Greenman, Esq.
3925 Morrison Street NW
Washington, DC 20015

Dear Ms. Greenman,

I have reviewed the documents pertaining to Corey Johnson and provide here, in summary form, my opinion on the question concerning a diagnosis of mental retardation. The material that I reviewed was extensive and included reports of Corey Johnson's psychological evaluations, his neuropsychological exam, information about his behavioral and emotional issues in a variety of settings as well as the mitigation report by Dr. Dewey Cornell and subsequent testimony. Based on my thorough review of all of this information, it is my opinion that Corey Johnson's significant cognitive impairment and impairment in adaptive behavior, demonstrated before the age of 18, is consistent with mild mental retardation, not a learning disability.

To arrive at this conclusion I have drawn from my extensive background and experience in the field of mental retardation including over 40 years of teaching, research, program and policy development, and clinical service. As the founder and director of the Center for Social Development and Education at the University of Massachusetts Boston, I have managed more than $20 million of research in mental retardation and related disabilities. I have authored over 100 articles, chapters, and books on mental retardation; topics including the identification and diagnosis of mental retardation and teaching children with mental retardation. I have also served as an editor for major journals (AMERICAN JOURNAL OF MENTAL RETARDATION, AAMR's *Research Monograph* series) and as a consulting editor to numerous journals in developmental disabilities. I have served in leadership roles at the local, state, and national levels including, for example, board memberships on the Governor's Council for Mental Retardation and as a consultant to the President's Commission on People with Intellectual Disabilities. As a licensed Psychologist, my work as a practitioner in the area of mental retardation has also been extensive, particularly involving the intellectual assessment of children with mental retardation. Not only have I directly tested and evaluated over 100 children and adolescents with mental retardation in diagnostic settings, through my research I have personally observed hundreds of children and adolescents with mental retardation and have reviewed hundreds of students' records for the purpose of substantiating students' diagnosis of mental retardation for inclusion in our federally funded research studies.

With regard to intellectual functioning, it is clear that Corey Johnson meets the criteria for mental retardation. The consistent pattern of strengths and weaknesses that emerges

**J.A.327**

across the intelligence assessments administered by Drs. Barish and Cornell clearly point to significant intellectual impairment. On the administration of the WISC-R by Dr. Barish in 1985, Corey Johnson showed significant intellectual impairment (Full Scale IQ = 69). It is important to point out that there was no statistically significant difference between Corey Johnson's Verbal IQ (68) and Performance IQ (78) – the two major components that make up his Full Scale IQ score (it should be noted that when there is a significant difference between the Verbal and Performance IQ, this difference is often characteristic of a person with a learning disability). Furthermore, Corey Johnson's Verbal IQ subtest scores showed no significant scatter; that is all of the scores were similar (i.e., reflecting a flat profile of scores across the verbal subtests). In addition, with regard to his Performance IQ subtest scores, three of the five were not only similar to each other, but also similar to the Verbal IQ subtest scores. This flat profile of subtest scores is characteristic of someone with mental retardation, not a learning disability.

Corey Johnson's performance on the adult version of the Wechsler (WAIS-R), administered by Dr. Cornell in 1992, is strikingly similar to his previous performance particularly when one takes into account the Flynn effect. The Flynn effect, supported by extensive research by Dr. James Flynn, represents the well-established finding that intelligence test norms "age" or slowly go out of date at the rate of 0.3 Full Scale IQ points per year. The norms used to assess Corey Johnson's performance in 1992 were collected in approximately 1979, because the WAIS-R was published in 1981. The 13-year gap between the date when the norms were established and the year Corey Johnson was tested means that his Full Scale IQ would be overestimated by about 4 points (i.e., 13 X 0.3 = 3.9 points). As such, Corey Johnson's Full Scale IQ of 77 is inflated by approximately 4 points. [Note: See Flynn and Widaman (in press) for discussion of the need to adjust for outdated norms when identifying individuals with mental retardation.]

After adjustment for the Flynn effect, the best estimate of Corey Johnson's Full Scale IQ is 73. Dr. Cornell's decision not to factor in the outdated norms in light of the Flynn effect was mistaken. It is the established procedure in the field that the Flynn effect be invoked, and an adjusted Full Scale IQ calculated based on a correction for the changes in norms over time, before a decision is made regarding the presence of mental retardation. The adjusted Full Scale IQ score of 73 is notably consistent with the Full Scale IQ score of 69 obtained when Corey Johnson was tested in 1985. Indeed, the standard error of measurement, which is the standard deviation of scores obtained by an individual across multiple measurements, is about 3 points for the WAIS-R. The 95% confidence interval for his score would be calculated as his obtained IQ score plus or minus twice the standard error or measurement, or his score plus or minus 6 points. His adjusted Full Scale IQ score of 73 in 1992 falls only 4 points from the Full Scale IQ score of 69 he received in 1985, and this is entirely consistent with the standard error of measurement for the WAIS-R. Corey Johnson's adjusted Full Scale IQ score of 73 clearly falls within the IQ range of 70-75 that allows diagnosis of a person as having mental retardation.

Focusing specifically on his performance on the adult version of the Wechsler, as was the case on the child version, there was no statistically significant difference between his Verbal IQ (75) and Performance IQ (82). Also, across all eleven subtests, only the Object

University of Massachusetts Boston   100 Morrissey Boulevard  Boston MA 02125-3393  Telephone 617.287.7250  Fax 617.287.7249

J.A.328

Assembly subtest differed significantly from the other subtest scores. Here again, as with the WISC-R, Corey Johnson's performance is relatively flat across the subtests of the WAIS-R. Furthermore, Corey Johnson's performance on the specific subtests of the WAIS-R was strikingly similar to his performance on the subtests of the WISC-R administered 7 years earlier. [Note: Only two subtests - Block Design and Object Assembly - were different from the WISC-R subtests.] Overall, it is evident that Corey Johnson's performance on the WAIS-R in 1992 and his performance on the WISC-R in 1985 are both characteristic of a person with mild mental retardation.

In addition to his significant cognitive impairment, there are strong indications that Corey Johnson also experienced deficits throughout his childhood in all three areas of adaptive functioning: conceptual, social and practical skills. Although there was no direct assessment of Corey Johnson's adaptive behavior using a standardized measure, there is information in the documents provided that describes his adaptive behavior, or more descriptively his ability to perform activities required for everyday living. The available information, particularly that which was provided in the mitigation report by Dr. Cornell and his subsequent testimony, and in Dr. Peck's neuropsychological evaluation, indicates that Corey Johnson has significant difficulties with tasks common to everyday living. For example, Dr. Peck states in his evaluation that Corey Johnson, "…would be at risk for day-to-day difficulty in the area of logical thinking" and that his findings "indicate an increased risk for interpersonal difficulty wherein he might misinterpret situations." Comments from one of Corey Johnson's former social workers included in Dr. Cornell's report also allude to his adaptive limitations in that while in school, Corey Johnson was characterized as, "a follower who was so eager to be accepted by his peers that he would act without thinking." His deficits with practical skills were also referenced in several places. For example, Corey Johnson was (and still is) unable to handle money or tell time. Dr. Cornell also indicates in his report and during his testimony that Corey Johnson has significant impairment in adaptive behavior in several areas. He states, "certainly functional academics….communication deficits with his speech impairment and communication problems....self care, social skills…. the ability to maintain a job….all of those are possible areas in which his functioning is not at a normal level." Corey Johnson's deficits in adaptive behavior combined with his significant cognitive impairment are characteristic of mental retardation, not a learning disability.

I am fully aware that my conclusion of mental retardation is in stark contrast to the conclusion first rendered by Dr. Barish in 1983 when Corey Johnson was 15 years old. It is important to consider however, that while the initial diagnosis of a learning disability made by Dr. Barish was based on his personal administration of a number of tests (e.g. achievement level, visual motor coordination, language, speech sound discrimination etc.) significantly, there was no IQ testing done by Dr. Barish at that time. Rather, Dr. Barish's understanding of Corey Johnson's intellectual functioning was based on the report he received of an earlier administration of the WISC-R conducted by another clinician. Dr. Barish did not personally administer the IQ test which reported Corey Johnson's IQ to be in the normal range -- a conclusion that is inconsistent with all other reports about his intellectual functioning.

University of Massachusetts Boston   100 Morrissey Boulevard  Boston MA 02125-3393  Telephone 617.287.7250  Fax 617.287.7249

**J.A.329**

To clarify, the diagnosis of a learning disability Dr. Barish reached was based on his belief, based on the earlier IQ testing, that Corey Johnson had average intellectual functioning. This would make his seriously deficient academic achievement (i.e., in the 1st and 2nd percentile when compared to national norms) "unexpected" (MacMillan and Siperstein, 2002). It is unexpected in that in the absence of a learning disability, a person with an average IQ would not be so seriously deficient in his or her achievement; thus, this deficiency is explained by the presence of a learning disability. However, such deficient academic achievement in a child who also has a significant cognitive impairment is "expected". That is, it is expected that a person with significant intellectual impairment would also be deficient in his or her academic achievement; thus, this deficiency is explained by the presence of mental retardation. I believe that Dr. Barish would in fact have made the diagnosis of mental retardation if he had based his initial decision solely on his own administration of the WISC-R two years later in 1985 (Full Scale IQ = 69). In doing so it is clear that Corey Johnson's deficient academic achievement is attributable to his significant intellectual impairment – mental retardation. Instead Dr. Barish's diagnosis was based on what appears to be an invalid assessment of Corey Johnson's intellectual functioning in 1982 as it is inconsistent with all subsequent assessments of his intelligence.

I know from extensive experience in similar situations that there are several reasons why Corey Johnson's diagnosis of learning disability was perpetuated by psychologists and educators even when challenged with his performance on IQ assessments that represented mild mental retardation. Educators rarely change an initial diagnosis particularly if the change involves moving from the label of a learning disability to mental retardation. Educators generally lean toward the least stigmatizing diagnosis (in this case a learning disability) particularly when the educational programs and support services recommended are the same as those that would be recommended for a child with mental retardation. For example, in reviewing the educational plan in place for Corey Johnson while attending the Pleasantville Cottage School it is clear that there would have been minimal changes in his goals had his diagnosis been revised from a learning disability to mental retardation.

Another reason the diagnosis was perpetuated was due to the mindset of the 1980's regarding labeling children. The materials I reviewed in Corey Johnson's case paint a complex portrait of a child growing up during a time where the trend in education was to avoid labeling a student as having mental retardation; this was particularly true for African American children. In fact, in the late 1970's, African American children were found to be overrepresented in special education classes, which resulted in a series of landmark court cases (e.g. Larry P. v. Riles, 1972; Marshall v. Georgia, 1984) and position papers by the Office of Civil Rights. At the same time, attention was drawn to the inadequacy and inherent bias of IQ tests for assessing African American students (Mercer, 1973; 1974). During the time Corey Johnson was in school, teachers and administrators were hesitant to refer an African American child for special education services and, moreover, reluctant to administer an IQ test, even when the child was significantly at risk. This helps explain the school system's response to Corey Johnson's significant academic deficits. Only after he was retained in the 3rd grade and then again in

University of Massachusetts Boston   100 Morrissey Boulevard  Boston MA 02125-3393  Telephone 617.287.7250  Fax 617.287.7249

J.A.330

the 4th grade, and all intervention failed, was he (at the age of 12) finally referred for special education services.

Lastly, it is not at all surprising that there was not only a considerable delay in the referral of a child representing such significant academic problems for special education services, but also that the diagnosis of mild mental retardation was missed when Corey Johnson was a child. It is not unusual for this to happen; in fact it is frequently the case with mild mental retardation. Many teachers, as well as the public, perceive people with mental retardation as being moderately to severely impaired, i.e. those who need external supports for the most basic needs (Siperstein & Bak, 1980; Siperstein, Norins & Corbin, 2002; Siperstein, Parker, Norins Bardon & Widaman, 2007). It is expected that a person with mental retardation has physical stigmata and engages in stereotypic behavior that is often accompanied by motor problems. From the records I reviewed, Corey Johnson did not fit these preconceptions. Therefore, because he did not fit the stereotypic image of a child with mental retardation, his significant academic problems did not appear to be due to a significant cognitive impairment. Recent research supports this in that my colleagues MacMillan and Gresham have consistently found that up to 1/3 of children diagnosed by schools as having a learning disability actually meet the clinical criteria for mild mental retardation (MacMillan, Gresham & Bocian, 1998).

In order to be identified as having a learning disability, even a severe learning disability, an individual must display a range of abilities such that the learning disability affects a very circumscribed area of academic functioning, while other areas are unimpaired. Corey Johnson demonstrates a consistent pattern of significant subaverage intellectual functioning accompanied by a pattern of significant below average achievement in all areas that is inconsistent with a diagnosis of a learning disability. Furthermore, there is every indication that Corey Johnson displayed subaverage adaptive behavior when he was in school.

I have tried in this letter to set down the major points we discussed in our phone call, and I would be happy to elaborate further if needed. As I have said, even among mental health professionals and special educators, mild mental retardation is misunderstood and the diagnosis is frequently missed for the complex reasons we talked about. This typically happens in an effort to offer the child and his family an optimistic prognosis. Please let me know if I can be of further assistance.

Sincerely,

Gary N. Siperstein, Ph.D.
Professor
Director
Center for Social Development and Education
University of Massachusetts Boston

University of Massachusetts Boston   100 Morrissey Boulevard  Boston MA 02125-3393  Telephone 617.287.7250  Fax 617.287.7249

J.A.331

# EXHIBIT 3(a)

**GARY N. SIPERSTEIN**
University of Massachusetts Boston
100 Morrissey Boulevard
Boston, MA 02125
(617) 287-7250
gary.siperstein@umb.edu

EMPLOYMENT

1978 -            Director, Center for Social Development and Education, University of
                 Massachusetts Boston

2014-            Professor Emeritus, John W. McCormack Graduate School of Policy and
                 Global Studies, University of Massachusetts Boston

2008 - 2013      Professor of Policy Studies, John W. McCormack Graduate School of Policy
                 and Global Studies, University of Massachusetts Boston

1976 - 2007      Professor of Psychology, College of Public and Community Service,
                 University of Massachusetts Boston

1986 - 1990      Psychologist, Developmental Evaluation Clinic, Children's Hospital, Harvard
                 University

1973 - 1976      Senior Research Associate:  Research Institute for Educational Problems,
                 Cambridge, Massachusetts

MEMBERSHIPS

2010 – 2017      Board of Directors, National Inclusion Project

1998 – 2007      State Advisory Council, Department of Mental Retardation,
                 Commonwealth of Massachusetts

2001 – 2007      Governor's Commission on Mental Retardation, Commonwealth of
                 Massachusetts

1998 – 2009      Research and Policy Committee, Board of Directors, Special Olympics
                 International

2003 - 2005      President, Division of Research, Council for Exceptional Children

2000 – 2002      National Academy of Science, Committee on Disability Determination for
                 Mental Retardation

1999 - 2004      Standing Review Panel, US Department of Education, Office of Special
                 Education Programs

1984 – 1990      Ad hoc reviewer, National Institute of Child Health and Human
                 Development

**J.A.333**

EDITORSHIPS

Editorial Board Member:        *Journal of Special Education* (2007 – 2010)
Editor:                        *AAMR's Research Monograph Series* (1993-1998)
Associate Editor:              *American Journal on Intellectual & Developmental Disabilities*
                               (1988-1992)
Consulting Editor:             *American Journal on Intellectual & Developmental Disabilities*
                               (1980 – 2008)
                               *Exceptional Children* (1980 – 2000)
                               *Intellectual and Developmental Disabilities* (1980 – 2010)

EDUCATION

1985        Post-doctoral Fellow, Children's Hospital, Harvard University, Boston, MA 1972
             Ph.D. in Developmental Psychology/Special Education, Ferkauf Graduate School
            of Psychology, Yeshiva University, New York, NY
1967        M.A. in Experimental Psychology, Hofstra University, Hempstead, NY
1965        B.A. in Psychology, Penn State University, University Park, PA


AWARDS

2017        HPOD Award for the Betterment of Humanity, Harvard Law School
2008        Chancellors Award for Distinguished Scholarship, University of Massachusetts
            Boston
2007        President's Public Service Award, University of Massachusetts
1984        MERIT Award, NICHD
1968        NICHD Research Fellowship

LICENSE

Registered Psychologist, Commonwealth of Massachusetts (License # PY 1105)

**J.A.334**

PUBLICATIONS

Siperstein, G. N., May, N. G., Ballard, S., & Shriver, T.P. (In review). A place for everybody: Students' perspectives on inclusive behavior in schools. *Educational Researcher.*

Dattilo, J, Siperstein, G. N., McDowell, E. M., Schleien, S. J., Whitaker, E. B., Block, M. E., Spolidoro, M., Bari, J. & Hall, A. (2019) Perceptions of Programming Needs for Inclusive Leisure Services. *Journal of Park and Recreation Administration*, 37(4), 70–91.

Siperstein, G. N., McDowell, E. M., Jacobs, H. J., Stokes, J. E. & Cahn, A. L. (2019) Unified Extracurricular Activities as a Pathway to Social Inclusion in High Schools. *American Journal on Intellectual and Developmental Disabilities.* 24(6), 568-582.

Siperstein, G. N., McDowell, E. D., Schleien, S. J., Dattilo, J., Block, M. E., Spolidoro, M., Bari, J. & Hall, A. (2019). Best practices in inclusive camping: A roundtable discussion on programming. *Camping Magazine*, 92(2), 52.

Shriver, T. & Siperstein, G. N. (2018). Commentary: Inclusion of students with disabilities. *Journal of Educational Leadership and Policy Studies*, 77-78.

Siperstein, G. N., Albert, A. B., Jacobs, H. E., Osborne, K. O., & Stokes, J. E. (2018). A schoolwide approach to promoting student bystander behavior in response to the use of the word "retard." *Research in Developmental Disabilities, 80*, 142-152.

Siperstein, G. N., Spolidoro, M., & Gildea, B. (2018). Camp-based recreational programs for children with intellectual and developmental disabilities. In E. Braaten (Ed.), *Encyclopedia of Intellectual and Developmental Disorders*. Thousand Oaks, CA: Sage Press.

Siperstein, G. N., Summerill, L. A., Jacobs, H. E., & Stokes, J. E. (2017). Promoting Social Inclusion in High Schools Using a Schoolwide Approach. *Inclusion, 5*(3), 173-188.

Albert, A. B., Jacobs, H. E., & Siperstein, G. N. (2016). Sticks, stones, and stigma: Student bystander behavior in response to hearing the word "retard." *Intellectual and Developmental Disabilities, 54*(6), 391-401.

Heyman, M., Stokes, J. E., & Siperstein, G. N. (2016). Not all jobs are the same: Predictors of job quality for adults with intellectual disabilities. *Journal of Vocational Rehabilitation, 44*(3), 299-306.

Favazza, P. C., & Siperstein, G. N. (2016). Motor skill acquisition for young children with disabilities. In B. Reichow et al. (Eds.), Handbook of Early Childhood Special Education (pp. 225-245). Switzerland: Springer.

Favazza, P.C., Siperstein, G.N., Ghio, K.G., Wairimu, J., & Masila, S. (2016). The Young Athletes Curriculum: Impact on Children with Disabilities in Kenya. *Journal of Research in Childhood Education*. Association of Early Childhood International. 30:1. p 113-127. DOI: 10.1080/02568543.2015.1107157.

Wiley, A. L., & Siperstein, G. N. (2015). Social and emotional learning for students with high-incidence disabilities. In J. A. Durlak et al. (Eds.), *Handbook of Social and Emotional Learning* (2nd ed.). New York, NY: Guilford.

**J.A.335**

Siperstein, G. N., & Collins, M. (2015). Mild Intellectual Disabilities. In E. A. Polloway (Ed.), *The Death Penalty and Intellectual Disability*. AAIDD: Washington, DC.

Siperstein, G. N., Heyman, M., & Stokes, J. E. (2014). Pathways to employment: A national survey of adults with intellectual disabilities. *Journal of Vocational Rehabilitation, 41*, 165-178.

Siperstein, G. N., Parker, R. C., & Drascher, M. L. (2014). National Snapshot of Adults with Intellectual Disabilities in the Labor Force. *Journal of Vocational Rehabilitation*, 39(3) 157-165, IOS Press.

Wiley, A. L & Siperstein, G. N. (2014). Social and Emotional Learning for Students with High-Incidence disabilities. In *Handbook of Social and Emotional Learning* (2nd ed.).

Siperstein, G.N. and Collins, M. (2014). Mild Intellectual Disabilities. In Ed Polloway (Ed.) *Determining Intellectual Disability in the Courts: Focus on Capital Cases*. AAIDD.

Favazza, P.C. & Siperstein, G.N. (2013). Young Athletes: A Special Olympics Motor Skill Development Program. Journal for National Association of State Boards of Education.

Kersh, J., Corona, L. L.., & Siperstein, G. N. (2013). Social well-being and friendship of people with intellectual disabilities. In M. L. Wehmeyer (Ed.) *Oxford Handbook of Positive Psychology and Disability.*

Siperstein, G. N., Parker, R. C., & Drascher, M. L. (2013). National Snapshot of Adults with Intellectual Disabilities in the Labor Force. *Journal of Vocational Rehabilitation*.

Siperstein, G. N., Romano, N., Iskenderoglu, G., Roman A., Iskenderolgu G., Roman A., Folwer, F. J., and Drascher, M. (2013). *The American Public's Perception of Illegal Steroid Use: A National Survey*. Report to the National Baseball Hall of Fame and Museum.

Favazza, P.C., Siperstein, G.N., Zeisel, S., Odom, S.L. Sideris, J.H., Moskowitz, A.L. (2013). Young Athletes Program: Impact on Motor Development . *Adapted Physical Activity Quarterly*. 30, 235 – 253.

Shriver, T., Corbin, S., and Siperstein, G.N. (2011). Special Olympics International. *Encyclopedia of Autism and Related Disorders*. New York, NY: Facts on File, Inc.

Wiley, A.L. & Siperstein, G.N. (2011). Seeing Red, Feeling Blue: The Impact of State Political Leaning on State Identification Rates for Emotional Disturbance. *Behavioral Disorders*, 36 (3), 195-207.

Harada, C.M., Siperstein, G.N., Parker, R. & Lenox, D. (2011). Promoting Social Inclusion for People with Intellectual Disabilities Through Sport: Special Olympics International, Global Sport Initiatives, and Strategies. In *Disability in the Global Sport Arena: A Sporting Chance*. Routledge/Taylor & Francis.

Siperstein, G.N., Wiley, A.L., Forness, S.R. (2011).  School Context and the Academic and Behavioral Progress of Students with Emotional Disturbance.  *Behavioral Disorders*, *36* (3), 172-184.
.

Siperstein, G.N., Parker, R.C., Norins, J., & Widaman, K.F. (2011). A National Study of Chinese Youth Attitudes toward Students with Intellectual Disabilities. *Journal of Intellectual Disability Research,* 55 (4), 370-384.

Wiley, A.L., Siperstein, G.N., Forness, S.R., & Brigham, F.J. (2010) School context and the problem behavior and social skills of students with emotional disturbance. *Journal of Child and Family Studies.* 19(4), 451-461.

Siperstein, G.N., Pociask, S., & Collins, M., (2010). Sticks, Stones, and Stigma: A Study of Students' Use of the Derogatory Term 'Retard'. *Intellectual and Developmental Disabilities.* 48(2), 126-134.

Leffert, J.S., Siperstein, G.N., & Widaman, K.F. (2010). Social perception in children with intellectual disabilities: The interpretation of benign and hostile intentions. *Journal of Intellectual Disability Research.* 54(2), 168-180.

Leffert, J.S., Brady, M.E., & Siperstein, G.N. (2009). A "tools for teachers" approach for infusing social skills instruction into daily teaching activities. *Teaching Exceptional Children Plus.* 6(2), 1-23.

Siperstein, G. N., Pociask, S., & Barnes, K., (2009). Let's ALL Play: Helping to make inclusion in summer camps a success. *Camping Magazine.* 82(6), 46-51.

Widaman, K. F., & Siperstein, G. N. (2009). Assessing adaptive behavior of criminal defendants in capital cases: A reconsideration. *American Journal of Forensic Psychology.* 27(2), 5-32.

Wiley, A.L., Siperstein, G.N., Bountress, K.E., Forness, S.R., & Brigham, F.J. (2009). Academic achievement characteristics of children identified as emotionally disturbed in different school contexts. *Behavioral disorders.* 33(4), 198-210.

Siperstein, G. N., & Glick, G. C., & Parker, R. (2009). The social inclusion of children with intellectual disabilities in an out of school recreational setting. *Intellectual and Developmental Disabilities.* 47(2), 97-107.

Harada, C.M., & Siperstein, G.N. (2009). The sport experience of athletes with intellectual disabilities: A national survey of Special Olympics athletes and their families. *Adapted Physical Actively Quarterly.* 26 (1).

Siperstein, G.N., & Parker, R.C. (2008). Toward an understanding of social integration: A special issue. *Exceptionality,* 16, 119-124.

Benson, P.R., Karlof, K.L., & Siperstein, G.N. (2008). Maternal involvement in the education of young children with autism spectrum disorder. *Autism* 12: 47-63

Siperstein, G,N., Parker, R.C., Bardon, J.N., & Wildaman, K.F. (2007). A national study of youth attitudes toward the inclusion of students with intellectual disabilities. *Exceptional Children.* 73(4), 435-455.

**J.A.337**

Siperstein, G.N., Glick, G.C, Harada, C.M., Bardon, J.N, & Parker, R.C. (2007). Camp Shriver: A model for inclusive day camps. *Camping Magazine.* 80 (4), 20-27.

Siperstein, G.N., & Favazza, P.C. (2007) Placing young children "At Promise": Future directions for promoting social competence. In W. Brown, S. Odom, and S. McConnell (eds.) *Social Competence of Young Children.* Baltimore, Brookes.

Siperstein, G.N., Romano, N., Mohler, A., & Parker, R. (2006) A national survey of consumer attitudes toward companies that hire people with disabilities. *Journal of Vocational Rehabilitation. 24,* 3-9.

Siperstein, G.N. Adjective Checklist (ACL) (2006). *Encyclopedia of Measurement & Statistics.* Thousand Oaks, CA: Sage Publications.

MacMillan, D.L., Siperstein, G.N., & Leffert, J.S. (2006). Children with Mild Mental Retardation: A Challenge for Classification Practices - Revised. In H.N. Switzky & S. Greenspan (eds.) *What is Mental Retardation? Revised - Ideas for an Evolving Disability in the 21st Century.* Washington, D.C.: American Association on Mental Retardation.

Siperstein, G.N., Norins, J. & Mohler, A. (2005). Social Acceptance and Attitude Change: Fifty Years of Research. In J. W. Jacobson & J. A. Mulick (Eds.), *Handbook of Intellectual and Developmental Disabilities.* New York: Kluwer/Plenum.

Leffert, J.S. & Siperstein, G.N. (2003). Social Skills Instruction for Students with Learning Disabilities (Current Practice Alerts Series). Council for Exceptional Children. Reston, VA

Siperstein, G.N. & Rickards, E.P. (2003). *Promoting Social Success.* Baltimore, MD: Paul Brookes Publishing Co.

MacMillan, D. L., Siperstein, G. N. (2002). Learning Disabilities as Operationally Defined by Schools. In R. Bradley, L.Danielson & D. Hallahan (eds.) (2002). *Identification of Learning Disabilities: Research to Practice.* Mahwah, NJ: Lawrence Erlbaum Assoc.

Leffert, J.S. & Siperstein, G.N. (2002). Social cognition: A key to understanding adaptive behavior in individuals with mental retardation. In L.M. Glidden (Vol Ed.), *International Review of Research in Mental Retardation:* Vol. 25, pp. 135-181. San Diego. CA: Academic Press.

Brennan, R. T., Kim, J., Wenz-Gross, M., & Siperstein, G. N. (2001). The relative equitability of high-stakes testing versus teacher-assigned grades: And analysis of the Massachusetts Comprehensive Assessment System, (MCAS). *Harvard Educational Review, 71* (2). 173-216.

Manetti, M., Schneider, B. H., & Siperstein, G. N. (2001). Social acceptance of developmentally challenged children: Testing the contact hypothesis with an Italian sample. *International Journal of Behavioral Development, 25*, 279 -286.

Leffert, J. S., Siperstein, G. N., & Milliken, E. (2000). Understanding social adaptation in children with mental retardation: A social-cognitive perspective. *Exceptional Children, 66*(4), 530-545.

**J.A.338**

Siperstein, G. N. & Leffert, J. S. (1999). Managing limited resources: Do children with learning problems share? *Exceptional Children, 65* (2), 187-199.

Wenz-Gross, M., & Siperstein, G. N. (1998). Students with learning problems at risk in middle school: Stress, social support and adjustment. *Exceptional Children, 65*, 91-100.

MacMillan, D. L., Siperstein, G. N., Gresham, F. M., & Bocian, K. (1997). Mild mental retardation: A concept that may have lived out its usefulness. Psychology in Mental Retardation and Developmental Disabilities, 23 (1), 5-12.

MacMillan, D. L., Gresham, F. M., Bocian, K. M., & Siperstein, G. N. (1997). The role of assessment in qualifying students as special education eligible: What is and what's supposed to be. *Focus on Exceptional Children, 30* (2), 1-18.

Marchant, C., & Siperstein, G. N. (1997). Meeting the social needs of students with ADHD by addressing the professional development needs of their teachers. *Teacher Education and Special Education, 20* (2), 92-102.

Siperstein, G. N., Leffert, J. S., & Wenz-Gross, M. (1997). The quality of friendships between children with and without mental retardation. *American Journal on Mental Retardation, 102*(2), 55-70.
Siperstein, G. N., & Leffert, J. S. (1997). Comparison of socially accepted and rejected children with mental retardation. *American Journal on Mental Retardation, 101* (4), 339-351.

Wenz-Gross, M., Siperstein, G. N., Untch, A. S., & Widaman, K.F. (1997). Stress, social support and adjustment of adolescents in middle school. *Journal of Early Adolescents, 17* (2), 129-151.

Wenz-Gross, M., & Siperstein, G. N. (1997). Importance of social support in the adjustment of children with learning problems. Exceptional Children, 63 (2), 183-193.

Leffert, J. S., & Siperstein, G. N. (1996). Assessment of social cognitive processes in children with mental retardation. *American Journal on Mental Retardation, 100,* 441-455.

MacMillan, D. L., Siperstein, G. N., & Gresham, F. M. (1996). A challenge to the viability of mild mental retardation as a diagnostic category. *Exceptional Children, 62,* 356-371.

MacMillan, D. L., Gresham, F. M., Siperstein, G. N., & Bocian, K. (1996). The Labyrinth of IDEA: School decisions on referred students with subaverage general intelligence. *American Journal on Mental Retardation, 100*, 161-174.

Siperstein, G. N., Leffert, J. S., & Widaman, K. (1996). Social behavior and the social acceptance and rejection of children with mental retardation. Education and Training in Mental Retardation and Developmental Disabilities, 31 (4), 271-281.

Wenz-Gross, M., & Siperstein G. N. (1996). The social world of preadolescents with mental retardation: Social support, family environment and adjustment. *Education and Training in Mental Retardation and Developmental Disabilities, 31* (3), 177-187.

**J.A.339**

Gresham, F. M., MacMillan, D. L., & Siperstein, G. N. (1995). Critical analysis of the 1992 AAMR definition: Implications for school psychology. *School Psychology Quarterly, 10* (1), 1-19.

MacMillan, D. L., Gresham, F. M., & Siperstein, G. N. (1995). Heightened concerns over the AAMR definition: Presence of advocacy and absence of precision. *American Journal on Mental Retardation, 100* (1), 87-95.

Campbell, P., & Siperstein, G. N. (1994). I*mproving social competence: A resource for elementary school teachers*. Boston, MA: Allyn & Bacon.

Siperstein, G. N., Wolraich, M. L., & Reed, D. (1994). Professionals' prognoses for individuals with mental retardation: A search for consensus within interdisciplinary settings. American Journal on Mental Retardation, 98, 519-526.

Campbell, P., & Siperstein, G. N. (1993). Improving the social competence of students with learning disabilities: An opportunity for teachers in today's classroom. *Their World Publication of the National Center for Learning Disabilities*, 20-22.

MacMillan, D. L., Gresham, F. M., & Siperstein, G. N. (1993). Conceptual and psychometric problems with the 1992 AAMR definition. *American Journal on Mental Retardation, 98*, 325-335.

Siperstein, G. N. (1992). Social competence: An important construct in mental retardation. *American Journal on Mental Retardation, 96*, iii-vi.

Siperstein, G. N. (1992). [Review of *Quality of Life: Perspectives and Issues*]. *Education and Training in Mental Retardation, 27*, 388 -390.

Wolraich, M. L., Siperstein, G. N., & Reed, D. (1992). The prognostications of physicians about mentally retarded individuals. In M. L. Wolraich & D. Routh (Eds.), *Advances in developmental & behavioral pediatrics* (Vol. 10). Greenwich, CT: JAI Press.

Siperstein, G. N., Wolraich, M. L., & Reed, D. (1991). Physicians prognoses about the quality of life for infants with intraventricular hemorrhage. *Journal of Developmental and Behavioral Pediatrics, 12*, 148-153.

Siperstein, G. N., & Wenz-Gross, M. (1991). Stress in mentally retarded children and adolescents. In M. E. Colten & S. Gore (Eds.), *Adolescence and stress: Causes and consequences*. Hawthorne, NY: Aldine de Gruyter.

Wolraich, M. L., Siperstein, G. N., & Reed, D. (1991). Physicians' decisions and prognostications for infants with Down syndrome. *Developmental Medicine and Child Neurology, 33*, 336-342.

Hemphill, L. E., & Siperstein, G. N. (1990). Conversational competence and peer response to mildly retarded children. *Journal of Educational Psychology, 82*, 128-134.

**J.A.340**

Siperstein, G. N., Reed, D., Wolraich, M. L., & O'Keefe, P. (1990). Capabilities essential for adults who are mentally retarded to function in different residential settings. *Education and Training of the Mentally Retarded, 25*, 45-51.

Siperstein, G. N., & Bak, J. J. (1989). Social relationships of moderately mentally retarded adolescents. *Mental Retardation, 27*, 5-10.

Siperstein, G. N., Wolraich, M. L., Reed, D., & O'Keefe, P. (1988). Medical decisions and prognostications of pediatricians for infants with meningomyelocele. *The Journal of Pediatrics, 113*, 835-840.

Siperstein, G. N., Bak, J. J., & O'Keefe, P. (1988). Relationship between children's attitudes toward and their social acceptance of mentally retarded peers. *American Journal on Mental Retardation, 93*, 24-27.

Siperstein, G. N., & Bak, J. J. (1988). Improving social skills in schools: The role of parents. *Exceptional Parent, 18*, 18-22.

Siperstein, G. N. (1988). Students with learning disabilities in college: The need for a programmatic approach to critical transitions. *Journal of Learning Disabilities, 21*, 431-436.

Bak, J. J., & Siperstein, G. N. (1987). Similarity as a factor effecting change in children's attitudes toward mentally retarded peers. *American Journal of Mental Deficiency, 91*, 524-531.

Bak, J. J., & Siperstein, G. N. (1987). Effects of mentally retarded children's behavioral competence on nonretarded peers' behaviors and attitudes: Toward establishing ecological validity in attitude research. *American Journal of Mental Deficiency, 92*, 31-39.

Bak, J. J., Cooper, E. M., Dobroth, K. M., & Siperstein, G. N. (1987). Special class placements as labels: Effects of different placements on children's attitudes toward learning handicapped peers. *Exceptional Children, 54*, 151-155.

Wolraich, M. L., Siperstein, G. N., & O'Keefe, P. (1987). Pediatricians' perceptions of mentally retarded individuals. *Pediatrics, 80*, 643-649.

Bak, J. J., & Siperstein, G. N. (1986). Protective effects of the label "mentally retarded" on children's attitudes toward their mentally retarded peers. *American Journal of Mental Deficiency, 91*, 95-97.

Wolraich, M. L., & Siperstein, G. N. (1986). Physicians' and other professionals' expectations and prognoses for mentally retarded individuals. A*merican Journal of Mental Deficiency, 91,* 244-249.

Lutwin, D. R., & Siperstein, G. N. (1985). The househusband father. In S. H. Hanson & F. W. Bozett (Eds.), *Dimensions of fatherhood* (pp. 269-287). Beverly Hills, CA: Sage Publications.

Siperstein, G. N., & Goding, M. J. (1985). Teachers' behavior toward LD and non-LD children: A strategy for change. *Journal of Learning Disabilities, 18*, 139-144.

**J.A.341**

Siperstein, G. N., & Bak, J. J. (1985). Understanding factors that affect children's attitudes toward mentally retarded peers. In C. J. Meisel (Ed.), *Mainstreaming handicapped children: Outcomes, controversies, and new discoveries* (pp. 55-75). Hillsdale, NJ: Lawrence Erlbaum Associates.

Siperstein, G. N., & Bak, J. J. (1985). Effects of social behavior on children's attitudes toward their mildly and moderately mentally retarded peers. *American Journal of Mental Deficiency, 90*, 319-327.

Wolraich, M. L., & Siperstein, G. N. (1983). Assessing professionals' prognostic impressions of mental retardation. *Mental Retardation, 21*, 8-12.

Siperstein, G. N., & Goding, M. J. (1983). Social integration of learning disabled children in regular classrooms. In K. Gadow and I. Bialer (Eds.), *Advances in learning and behavioral disabilities,* (Vol. 2, pp. 227-263). Greenwich, CT: JAI Press.

Budoff, M., & Siperstein, G. N. (1982). Judgements of EMR students toward their peers: Effects of label and academic competence. *American Journal of Mental Deficiency, 86*, 367-371.

Siperstein, G. N., & Davis, F. (1982). *Children's perceptions of their peers: Evidence of implicit personality theory*. Unpublished manuscript, University of Massachusetts, Center for the Study of Social Acceptance, Boston.

Siperstein, G. N., & Chatillon, A. C. (1982). Importance of perceived similarity in improving children's attitudes toward mentally retarded peers. *American Journal of Mental Deficiency, 86*, 453-458.

Siperstein, G. N., & Goding, M. (1981). [Review of *Exceptional Children and Special Education for the 80's*]. *American Journal of Mental Deficiency, 86*, 108-109.

Siperstein, G. N., Budoff, M., & Bak, J. J. (1980). Effects of the labels "mentally retarded" and "retard" on the social acceptability of mentally retarded children. *American Journal of Mental Deficiency, 84*, 596-601.

Siperstein, G. N., & Bak, J. J. (1980). Students' and teachers' perceptions of the mentally retarded child. In J. Gottlieb (Ed.), *Educating mentally retarded persons in the mainstream* (pp. 207-230). Baltimore, MD: University Park.

Siperstein, G. N., & Bak, J. J. (1980). Improving children's attitudes toward blind peers. *Journal of Visual Impairment and Blindness*, 74, 132-135.

Siperstein, G. N. (1980). Adjective Checklist (ACL) and Friendship Activity Scale (FAS): *Instruments for measuring children's attitudes*. University of Massachusetts, Center for the Study of Social Acceptance, Boston.

Budoff, M., Siperstein, G. N., & Conant, S. (1979). Children's knowledge of mental retardation. *Education and Training of the Mentally Retarded, 14*, 277-281.

**J.A.342**

Budoff, M., & Siperstein, G. N.  (1978).  Low income children's attitudes toward mentally retarded children: Effects of labeling and academic behavior.  *American Journal of Mental Deficiency, 82*, 474-479.

Siperstein, G. N., & Gottlieb, J.  (1978).  Parents' and teachers' attitudes toward mildly and severely retarded children.  *Mental Retardation, 16*, 321-322.

Siperstein, G. N., Bopp, M., & Bak, J. J.  (1978).  Social status of learning disabled children. *Journal of Learning Disabilities, 11*, 98-102.

Siperstein, G. N. (1978). *A scale for measuring (parents'/teachers') attitudes toward mildly and severely retarded persons*. University of Massachusetts, Center for the Study of Social Acceptance, Boston.

Budoff, M., & Siperstein, G. N. (1977). Learning among mentally retarded. In B. B. Wolman (Ed.), *International encyclopedia of psychiatry, psychology, psychoanalysis and neurology,* (Vol.1, pp. 381-387).

Siperstein, G. N., & Gottlieb, J. (1977). Physical stigma and academic performance as factors affecting children's first impressions of handicapped peers. *American Journal of Mental Deficiency, 81*, 455-462.

Siperstein, G. N., Bak, J. J., & Gottlieb, J. (1977).  Effects of group discussion on children's attitudes toward handicapped peers. *Journal of Educational Research, 70*, 131-134.

Gottlieb, J., & Siperstein, G. N. (1976). Attitudes toward mentally retarded persons: Effects of attitude referent specificity.  *American Journal of Mental Deficiency, 80,* 376-381.

Butterfield, E. C., & Siperstein, G. N.  (1972).  Influences of contingent auditory stimulation upon non-nutritive sucking.  In *Oral sensation and perception: The mouth of an infant*.  Springfield, IL:  C. C. Thomas.

Blackman, L. S., & Siperstein, G. N. (1968). Job analysis and the vocational evaluation of the mentally retarded. *Rehabilitation Literature, 29*, 103-105.

## FEDERAL AND PRIVATE FOUNDATION GRANTS

| | |
|---|---|
| 2019 – Present | Special Olympics Texas Unified Champion Schools Evaluation. Special Olympics Texas. |
| 2018 – Present | Promoting Social and Emotional Learning Through Special Olympics Unified Champion schools. Special Olympics Inc. |
| 2018 – 2019 | Evaluation of Camp PALS. PALS Programs |

**J.A.343**

| | |
|---|---|
| 2017 – 2019 | Special Olympics Panama: Evaluation of Unified Schools Model. Special Olympics Inc. and Special Olympics Latin America. |
| 2016 – 2019 | Standards and Accreditation for Inclusive Recreation. National Inclusion Project. |
| 2008 – Present | National Evaluation of Unified Champion Schools. Special Olympics Inc. |
| 2016 – 2017 | Comprehensive Description of SOTX Athletes and Families. Special Olympics Texas. |
| 2015 – 2016 | CHildren in Action: Motor Program for PreschoolerS (CHAMPPS). U.S. Department of Education. Institute of Education Sciences. |
| 2012 – 2013 | Public Perceptions and Understanding of Steroids. National Baseball Hall of Fame and Museum, Taylor Hooton Foundation, and Professional Baseball Athletic Trainers Society. |
| 2010 – 2013 | Unified Sports Plus. U.S. Department of Education, OSERS, Rehabilitation Services Administration. |
| 2001 – 2010 | Parent Involvement in Public School Programs for Young Children with Autism. U.S. Department of Education, OSERS, Division of Research to Practice. |
| 2005 – 2008 | What ED Means in Different School Contexts: Implications for Served and Unserved populations. U.S. Department of Education, OSERS, Division of Research to Practice. |
| 2001 – 2005 | Tools for Teachers: Development of Assessment and Instructional Tools for Improving the Social Functioning of Children with Mental Retardation in General Education Classrooms. U.S. Department of Education, OSERS, Division of Research to Practice. |
| 2001 - 2005 | Translating Social-Cognitive Research into Practice: The Development and Validation of a Social Cognitive Assessment and Instructional Planning Resource for Children with Mental Retardation. U.S. Department of Education, OSERS, Division of Research to Practice. |
| 2001 – 2003 | Multinational Study of Attitudes toward Individuals with Intellectual Disabilities. Special Olympics Inc. |
| 2000 – 2001 | National Evaluation of the Unified Sports Program. Special Olympics Inc. 1998 |
| - 2001 | Promoting Social Success: An Intervention to Improve the Social Adjustment of Students with Mental Retardation. Joseph P. Kennedy Jr. Foundation. |
| 1998 - 2001 | Maximizing School Adjustment for Students with Learning Problems Making the Transition into Middle School. U.S. Department of Education, OSERS, Division of Research to Practice. |

**J.A.344**



| 1998 - 2001 | Improving the Social Adjustment of Students with Mental Retardation: An Intervention Based on a Social Information Processing Model. U.S. Department of Education, OSERS, Division of Research to Practice. |
| 1995 - 1998 | The Influence of Teacher Characteristics on the Academic Performance and Behavioral Adjustment of Students with Attention Deficit Hyperactivity Disorder. U.S. Department of Education, OSERS, Division of Innovation and Development. |
| 1994 - 1998 | Stress, Social Support and Adjustment to Middle School Transition in Children with Learning Disabilities. U.S. Department of Education, OSERS, Division of Innovation and Development. |
| 1994 - 1996 | The Role of Social Information Processing in Social Competence of Children with Mental Retardation. U.S. Department of Education, OSERS, Division of Innovation and Development. |
| 1992 - 1995 | Inservice Training Curriculum to Provide Teachers with the Knowledge and Skills to Improve the Social Functioning of Children with Attention Deficit Hyperactivity Disorder. U.S. Department of Education, OSERS, Division of Personnel Preparation. |
| 1982 - 1995 | The Social Acceptability of Mentally Retarded Children. National Institute for Child Health and Human Development (NICHD). |
| 1993 - 1994 | Students with Learning Disabilities' Adjustment in Middle School: The Impact of Stress and Social Support. U.S. Department of Education, OSERS, Division of Innovation and Development. |
| 1989 - 1994 | A Longitudinal Investigation of Mentally Retarded Children's Social Networks and Social Support During Transition to Middle School (Mentor). U.S. Department of Education, OSERS, Division of Innovation and Development. |
| 1990 - 1992 | Development of an Inservice Training Curriculum to Provide Teachers with the Knowledge and Skills to Reduce Stress in Children with Disabilities. U.S. Department of Education, OSERS, Division of Personnel Preparation. |
| 1987 - 1990 | The Development of Conversational Skills and their Relationship to Linguistic and Social Cognitive Abilities in Mentally Retarded Children. U.S. Department of Education, OSERS, Division of Innovation and Development. |
| 1987 - 1990 | Development of an Inservice Training Curriculum for Special Educators to Improve the Social Functioning of Handicapped Children, U.S. Department of Education, OSERS, Division of Personnel Preparation. |
| 1987 - 1989 | Assessing the Outcomes of Mentally Retarded Adults in the Three Areas Where Professionals Prognosticate. U.S. Department of Education, National Institute of Disability and Rehabilitation Research. |

**J.A.345**

| | |
|---|---|
| 1985 - 1989 | Special Education Preservice Training Program at the Masters Level: The Social Development, Assessment and Training of Children with Special Needs. U.S. Department of Education, OSERS, Division of Innovation and Development. |
| 1984 - 1989 | An Investigation of the Relationship between Professional and Parental Performance Expectations and Prognostications and Actual Outcomes in Handicapped Children. U.S. Department of Education, OSERS, Division of Innovation and Development. |
| 1987 - 1988 | An Investigation of the Relationship between Physicians' Performance Expectations and Prognostications and their Medical Decision-Making for Disabled Infants.  U.S. Department of Education, National Institute of Disability and Rehabilitation Research. |
| 1985 - 1988 | Social Skills Inservice Training Curriculum: Preparing Facilitators on the National Level.  Foundation for Children with Learning Disabilities. |
| 1983 - 1986 | Development of an Inservice Training Curriculum for Improving the Social Functioning of Learning Disabled Children. U.S. Department of Education, OSERS, Division of Personnel Preparation. |
| 1983 - 1984 | Improving the Social Adjustment of Children with Learning Disabilities: A Teaching Module.  Foundation for Children with Learning Disabilities. |
| 1981 - 1983 | Empowering the Disabled Student in Postsecondary Education. U.S. Office of Education, OSERS, Division of Regional Education Programs. |
| 1980 - 1983 | An Investigation of Classroom Intervention Strategies on Children's Acceptance of Handicapped Peers.  U.S. Office of Education, OSERS, Division of Innovation and Development. |
| 1978 - 1980 | An Investigation of Teachers' Stereotypes, Feelings, and Behaviors Concerning Handicapped Children. U.S. Office of Education, Bureau of Education for the Handicapped. |
| 1977 - 1979 | An Investigation of Factors Mediating Children's First Impressions of Handicapped Peers. U.S. Office of Education, Bureau of Education for the Handicapped. |

NATIONAL AND INTERNATIONAL PRESENTATIONS

| | |
|---|---|
| Apr 2020 | "People just judge you": Middle school students negotiate the social barriers to acting inclusively. Roundtable presentation at the American Educational Research Association Conference, San Francisco, CA. With May, N.G., Jacobs, H.E., Van Gaasbeek, E.K. & Ballard, S.C. |
| Mar 2020 | The role of social responsibility in adolescent prosocial reasoning: Doing the "wrong thing" for the "right reason," presentation at the |

**J.A.346**

|  |  |
|---|---|
|  | Society for Research on Adolescence Biennial Meeting. With Jacobs, H.E. Ballard, S.C. , Van Gaasbeek, E.K. & May, N.G. |
| Oct 2019 | Fulfilling the promise: Moving from best practices to standards for inclusive camp programs, presentation at the First International Symposium on Inclusive Leisure Experiences. With McDowell, E., Spolidoro, M., Dattilo, J., Schleien, S. J., & Block, M. E. |
| Oct 2019 | Promoting social and emotional learning through inclusive extracurricular activities, presentation at the Social and Emotional Learning Exchange. With Jacobs, H. E., Smith, L. B., Van Gaasbeek, E., & Cahn, A. L. |
| Aug 2019 | Camp PALS: Changing Perspectives about People with Down Syndrome, Poster Presentation at the 2019 IASSIDD World Congress. With Jacobs, H., Landis, K., Newbury Ross, J., Meltzer, W. A.. |
| Aug 2019 | Inclusive Extracurricular Activities Facilitate Higher Quality Friendships between Students with and without Intellectual Disability, Poster Presentation at the 2019 IASSIDD World Congress. With Jacobs, H., Smith, L., & Osborne, K. |
| Apr 2019 | Inclusive Extracurricular Activities as a Pathway to Social Inclusion in High Schools, Presentation at the 2019 AERA Conference. With McDowell, E. D., Jacobs, H. E., Stokes, J. E. & Cahn, A. L. |
| Feb 2019 | Moving from Best Practices to Standards for Inclusion. Jewish Community Centers Annual Meeting, Orlando, FL. With Spolidoro, M. |
| Nov 2018 | A schoolwide approach to social inclusion in high schools,  Presentation at the2018 CASE Conference.. With |
| Apr 2018 | The Attitudes toward Classroom Inclusion Scale: Factor structure, correlates, and use as an outcome measure, 2018 American Educational Research Association (AERA) Conference, New York, NY.. With Jacobs, H. E. & Widaman, K. |
| Apr 2018 | Sticks, stones, and stigma: Student bystander behavior in response to hearing the word "retard," 2018 Society for Research on Adolescence Biennial Meeting, Minneapolis, MN.. With Albert, A., Jacobs, H. E., McDowell, E. D., Osborne, K. O. & Jang, Y. |
| Jun 2017 | The Social World of High School: Are Students with Intellectual Disability Included? Presented at the American Association on Intellectual and Developmental Disabilities (AAIDD) 141st Annual Meeting, Hartford, CT. With Jacobs, H. E. |

**J.A.347**

| | |
|---|---|
| Jul 2012 | Special Olympics participation enhances family well-being: Findings from a national survey.  In J. Kersh (Chair), Quality of Life Enhancement through Special Olympics.  Paper symposium presented at the International Association for the Scientific Study of Intellectual Disabilities World Congress 2012, Halifax, Nova Scotia.. With Kersh, J., & Moskowitz, A. |
| Oct 2012 | Young Athletes: Effects of a Structured Motor Program on the Motor Skills of Young Children with Disabilities. DEC's 28th Annual International Conference on oung Children with Special Needs and Their Families, Minneapolis, MN. With Favazza, P.C., Zeisel, S., & Odom, S.L. |
| Oct 2011 | Seeing Red, Feeling Blue: State Political Leaning and Under-Identification of ED. The 35th Annual TECBD Conference, Tempe, AZ. With Wiley, A. L. |
| Oct 2011 | Academic and Behavioral Progress of Students with ED served in Low Income versus High Income Schools. The 35th Annual TECBD Conference, Tempe, AZ. With Wiley, A. L. & Forness, S. R. |
| Apr 2011 | Fulfilling the Promise of Inclusion: Recreational Settings.  National Inclusion Project Annual Conference.  Raleigh, NC. |
| Apr 2011 | Young Athletes: Promoting Motor Skill Development In Preschool Aged Children With Disabilities.  Council for Exceptional Children 2011 Annual Convention.  National Harbor, MD. With Favazza, P. |
| Mar 2011 | Revisiting Inclusive Recreation: Predictors of Social Acceptance in a Camp Setting.  Gatlinburg Conference on Research & Theory in Intellectual & Developmental Disabilities. San Antonio, Texas.. With Collins, M., & Kersh, J. |
| Jan 2011 | Promoting Social Inclusion through Unified Sports.  Special Olympics Unified Sports Leadership Summit. Middletown, Connecticut. With Kersh, J., and Norins, J. |
| Apr 2009 | Gender differences in the relationship between academic difficulties and school stress: Are adolescent girls at risk?  Society for Research in Child Development Biennial Meeting. Denver, CO. With Glick, G.C., & Wenz-Gross, M. |
| Mar 2009 | The Positive Contributions of Special Olympics to Individuals and Families. Gatlinburg Conference on Research & Theory in Intellectual & Developmental Disabilities. New Orleans, LA. With Kersh, J. |
| Aug 2008 | Universal Trends in Youths' Attitudes toward Students with Intellectual Disabilities.  International Association of the Scientific Study of Intellectual Disability 13th World Congress. Cape Town, South Africa. With Norins Bardon, J., Corbin, S.B., & Widaman, K.F. |
| Apr 2008 | Documenting the attitudes of multinational youth toward inclusion of students with intellectual disabilities.  Council for Exceptional Children 2008 |

**J.A.348**

|  |  |
|---|---|
|  | Annual Convention. Boston, MA. With Norins Bardon, J., Corbin, S.B., & Widaman, K.F. |
| Apr 2008 | Young Athletes: A New Avenue for Promoting Development in Young Children.  Council for Exceptional Children 2008 Annual Convention. Boston, MA. With Favazza, P.C. |
| Apr 2008 | Summer Camp can promote the social inclusion of children with intellectual disabilities.  Council for Exceptional Children 2008 Annual Convention. Boston, MA. with Glick, G.C. |
| Nov 2006 | Understanding the benefits of sports and physical activity for athletes with intellectual disabilities. International Olympic Committee Sport For All Conference, Havana, Cuba.  With Corbin, S.B., Harada, C.M. |
| Nov 2006 | Attitudes as a Barrier to the Full Inclusion of People with Intellectual Disabilities. American Public Health Association 134th Annual Meeting and Exposition.  With Norins Bardon, J. & Corbin, S.B. |
| Nov 2006 | Community partnerships in addressing youth violence.  In roundtable presentation *Applications of and Outcomes from Community-Based Public Health Research and Education.* American Public Health Association 134th Annual Meeting and Exposition.  With Pearrow, M., Irwin, B., Desai, S., & Siperstein, G. |
| May 2006 | Global Attitudes Toward People with Intellectual Disabilities: A formidable barrier to social inclusion. International Summit Alliance on Social Inclusion AAMR Conference. Montréal, Canada. With Norins Bardon, J. & Corbin, S.B. |
| May 2006 | Comprehensive National Survey of Youth Attitudes Toward the Inclusion of Students with Intellectual Disabilities. International Summit Alliance on Social Inclusion AAMR Conference. Montréal, Canada.  With Norins Bardon, J., Corbin, S.B. & Widaman, K.F. |
| Oct 2005 | Motivation for sport participation and withdrawal in athletes with intellectual disabilities. Annual meeting of the Association for the Advancement of Applied Sport Psychology (AAASP), Vancouver, British Columbia.With Harada, C.M., McGuire J. & Hardman, M. |
| Oct 2005 | A cross-national, intergenerational perspective on attitudes toward individuals with intellectual disabilities. Southeastern Ontario Community-University Research Alliance in Intellectual Disabilities Conference. Kingston, Ontario. With Norins Bardon, J., Corbin, S.B. & Widaman, K.F. |
| Jul 2004 | Public attitudes about the health care of individuals with intellectual disabilities. Presented at the Annual Conference of the National Center on Birth Defects and Developmental Disabilities, Washington, D.C. |

**J.A.349**

| | |
|---|---|
| Jul 2004 | Parent engagement, problem behaviors, and adaptive functioning in children with ASD. Presented at the OSEP Research Project Directors' Conference, Washington, D.C.  With Paul Benson. |
| Jul 2004 | Changing attitudes in America: The need for an effective public awareness campaign. Presented at the National Down Syndrome Society, Washington, D.C. |
| Jun 2004 | Measurement of social perception skills in children with mild intellectual disability. Presented at the 10th World Congress of the International Association for the Scientific Study of Intellectual Disability, Montpelier, France.  With Jim Leffert. |
| Apr 2004 | Improving the social skills in diverse learners: A cognitive-based approach. Presented at the Annual Conference of the Council for Exceptional Children, New Orleans, LA. With Mary Brady. |
| Apr 2004 | A cognitive model for understanding the social behavior of children with mental retardation: A springboard to social skills training. Presented at the Leonard and Frances Blackman Lecture Series, Teachers College, Columbia University, NY. |
| Nov 2003 | Multinational Study of Attitudes Toward Individuals with Intellectual Disabilities. Presentation to the American Public Health Association. San Francisco, CA. With Jennifer Norins. |
| Jun 2003 | Multinational Study of Attitudes Toward Individuals with Intellectual Disabilities. Special Olympics Summer World Games, Scientific Symposium, Belfast, Northern Ireland. With Jennifer Norins. |
| Sept 2003 | Preparing for a Public Awareness Campaign: Findings of Multinational Attitude Study and Review of Attitude Change Research.  Presentation to the President's Committee for People with Intellectual Disabilities. Washington D.C. |
| Apr 2003 | World Views on Educational Inclusion. Annual Conference of the Council for Exceptional Children.  Seattle, Washington. With Jennifer Norins. |
| Nov 2002 | Special Olympics Unified Sports Program: The value and impact of inclusive sports for athletes with and without mental retardation.  American Public Health Association, 130th Annual Meeting. |
| Apr 2002 | Social cognition: A key to understanding adaptive behavior in individuals with mental retardation. Conference on Human Development in Charlotte, North Carolina.. |
| Nov 1999 | The Impact of Academic Stress on Social Emotional Adjustment.  Harvard Graduate School of Education:  15th Annual Learning Disorders Conference. |

J.A.350

| | |
|---|---|
| Jun 1999 | Psychological Aspects of the Special Athlete.  American Academy of Orthopaedic Surgeons.  30th Special Olympic International Games. |
| Jun 1999 | Professional Attitudes Towards People with Mental Retardation:  How it Impacts Health Care.  Healthy Athlete Programs Symposium – 30th Special Olympic International Games. |
| Apr 1999 | The Concept of Mental Retardation:  Changes in the 21st Century.  National Institute for People with Disabilities – YAI's 20th Annual International Conference on Mental Retardation and Developmental Disabilities. |
| Apr 1999 | Social Perception and Strategy Generation:  Two Key Social-Cognitive Processes in Children with Mental Retardation.  Biennial meeting of the Society for Research and Child Development. With James Leffert and Emily Millikan. |
| Apr 1997 | Stress, Social Support, and Adjustment During the Transition to Middle School. Biennial meeting of the Society for Research in Child Development. With Melodie Wenz-Gross and Robin Parker. |
| Mar 1997 | Mental Retardation: Utility of a Concept for the 21st Century. Johns Hopkins Medical Institutions, |
| Apr 1996 | Student Stress and Its Implications for Learning in the Classroom Conference for Regular Classroom and Special Educators on Creating Supportive Learning Environments across the Ability/Needs Spectrum, Project ERR, |
| Mar 1996 | The Effect of a Home Visit on the Third Year Medical Students' Knowledge, Beliefs and Attitudes about Families and their Children with Mental Retardation: A Randomized Prospective Study. Council on Medical Student Pediatric Education Annual Meeting, With Ben Siegel, et al. |
| Apr 1995 | Improving the Social Functioning of Students with ADHD. The Council for Exceptional Children (CEC) Convention, With Ross Greene and Catherine Marchant |
| May 1995 | Improving the Social Functioning of Students with ADHD: Conceptual Issues and Research Findings. National Association of School Psychologist 27th Annual National Convention, With Ross W. Greene, Catherine Marchant, et al. |
| Oct 1994 | Improving Social Competence for Students. National Association for Pupil Services Administration (NAPSA), With Janice A. Magno. |
| Mar 1994 | Helping parents reduce stress in the home. Massachusetts Chapter One Statewide Dissemination Project, Annual Conference. |
| May 1993 | Transition Issues. Sharing the Responsibility Educating Children With Attention Deficit Disorder (ADD). Children With Attention Deficit Disorders (CH.A.D.D.) Conference, |

**J.A.351**

| | |
|---|---|
| Apr 1993 | Social support and adjustment in children with disabilities. Poster presented at the Biennial Meeting of the Society for Research in Child Development, New Orleans, Louisiana. With Melodie Wenz-Gross. |
| Mar 1993 | The relationship of intelligence to quality of life. Developmental Evaluation Center (UAP) 25th Anniversary Conference. |
| 1992 | Exploring social competence in children with mental retardation: a social cognitive approach. Distinguished lecture on Human Development and Mental Retardation: Kennedy Center, Vanderbilt University. |
| 1992 | Helping children with learning disabilities manage stress. Northeast Conference on Learning Disabilities and Mental Health. |
| 1992 | Substantiating physicians prognoses for children born with mental retardation: The actual outcomes of adults with mental retardation. Gattlinberg Research Conference, 1992. With Mark L. Wolraich. |
| Apr 1991 | Behavioral antecedents of emerging social status among mentally retarded and nonretarded children in academic and play situations. Biennial meeting of the Society for Research in Child Development, With Melodie Wenz-Gross and Kate Sullivan. |
| Nov 1991 | Social competence: Improving the social skills of the at-risk child. Keeping the At-Risk Student in the Mainstream. Conference sponsored by the Center for the Study of Social Acceptance |
| Apr 1991 | Relationship between social status and peer assessment of social behavior among mentally retarded children and nonretarded children. Biennial meeting of the Society for Research in Child Development. With Paul O'Keefe and Susan Saxon. |
| 1990 | Social Competence and Stress in the classroom: A developmental perspective. Northeast conference on Learning Disabilities and Mental Health. |
| Oct 1989 | Pediatricians' and neonatologists' prognostications and decisions about treatment for infants with varying degrees of intraventricular hemorrhage. American Academy for Cerebral Palsy and Developmental Medicine 43rd Annual Meeting. With Mark L. Wolraich. |
| Oct 1989 | Techniques for Fostering Social Competence. Association of Teachers of Exceptional Children, Halifax, Nova Scotia. |
| Oct 1989 | Social Relationships Among Exceptional Children. Association of Teachers of Exceptional Children, Halifax, Nova Scotia. |
| Apr 1983 | Improving peer relationships of rejected children. Paper presented at the Biennial Meeting of the Society for Research in Child Development. |

J.A.352

| | |
|---|---|
| Oct 1983 | Teaching Psychology to the Adult Student in the Urban Community. Paper presented at the New England Psychological Association, |
| Apr 1984 | Peer acceptance of handicapped children. Paper presented at the University of Delaware Symposium on Mainstreaming Handicapped Children, |
| May 1984 | Mentally retarded children's friendships in special school settings. Paper presented at the annual meeting of the American Association on Mental Deficiency. With S. Jay Kuder. |
| May 1984 | Social behavior: How it affects children's acceptance of mildly and moderately retarded peers. Paper presented at the annual meeting of the American Association on Mental Deficiency.  With John J. Bak. |
| May 1985 | Professional expectations and prognostications about mental retardation. Paper presented at the annual meeting of the American Association for Mental Deficiency.  With Mark L. Wolraich. |
| May 1986 | Establishing the ecological validity of children's attitudes toward mentally retarded peers:  Two related studies.  Paper presented at the annual meeting of the American Association for Mental Deficiency, With John J. Bak. |
| Jun 1986 | Attitudes: A barrier between children. Paper presented at Hofstra University Conference on Attitudes toward Persons with Disabilities. |
| Oct 1986 | The expectations and prognostications of pediatricians about mentally retarded children.  American Academy of Cerebral Palsy and Developmental Medicine With Mark L. Wolraich. |
| Nov 1986 | Mainstreaming in Public Education:  766 Eleven Years Later.  The Governor's 1986 Conference on Disability Issues, |
| Nov 1987 | Pediatricians' expectations and prognostications about mental retardation (Child Development Section).  American Academy of Pediatrics, With Mark L. Wolraich. |
| Oct 1988 | Prognostications for AAUAP members.  American Association of University Affiliated Programs.  With Mark L. Wolraich. |
| Apr 1989 | Improving social skills in schools. Keynote address to the Massachusetts Down Syndrome Congress. |
| Apr 1989 | The relationship of social competence to social acceptance and rejection among mainstreamed mentally retarded children. Paper presented at the Biennial meeting of the Society for Research in Child Development. With Lowry E. Hemphill. |
| Apr 1989 | Social interchanges between mentally retarded and nonretarded friends and acquaintances.  Biennial meeting of the Society for Research in Child Development,.  With Mary V. Brownley & Cynthia K. Scott. |

**J.A.353**

| Oct 1989 | Primary care physicians' and pediatric surgeons' prognostications and decisions about surgery for infants with Down Syndrome. American Academy for Cerebral Palsy and Developmental Medicine 43rd Annual Meeting,. With Mark L. Wolraich and David Reed. |
|---|---|
| Apr 1981 | Development of attitudes and problems in changing attitudes: Public attitudes, professional attitudes, community attitudes, neighborhood and employer attitudes. Paper presented at the Young Adult Institute and United Nations Conference in support of the International Year of Disabled Persons. |
| Apr 1981 | Teachers' behavior toward children who differ academically and socially: The importance of teacher awareness as an intervention strategy. Paper presented at the 1981 Biennial Meeting of the Society for Research in Child Development. |
| Sept 1980 | A strategy to change children's attitudes toward mentally retarded peers. Paper presented at the 88th Annual Meeting of the American Psychological Association. |
| Apr 1980 | Students' perceptions of their non-handicapped and handicapped peers: Evidence of implicit personality theory. Paper presented at the 51st Annual Meeting of the Eastern Psychological Association. |
| Sept 1979" | Mentally retarded" vs. "retard": Children's reactions to a label. Paper presented at the 87th Annual Meeting of the American Psychological Association. |
| Mar 1977 | Development of clustering as a free recall strategy among middle and lower class black and white students. Paper presented at the Biennial meeting of the Society for Research in Child Development. |
| May 1976 | Socialization of the special needs child. Paper presented at the Annual Meeting of the New England Educational Research Organization. |
| Apr 1975 | Noun-paired learning at different ages under self-paced and experimenter-paced conditions. Paper presented at the Biennial Meeting of the Society for Research in Child Development. |
| Mar 1973 | Differential modifications of neonatal behavior. Paper presented at the Biennial Meeting of the Society for Research in Child Development. |
| May 1969 | The vocational performance of mentally retarded trainees and physically disabled workers: A comparative and predictive analysis. Paper presented at the 93rd Annual Meeting of the American Association on Mental Deficiency. |
| Mar 1969 | Aspects of temporal perception in the mentally retarded. Paper presented at the Annual Meeting of the Council for Exceptional Children. |

**J.A.354**