IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Appellee, | ) | |
| | ) | |
| v. | ) | No. 21-1 |
| | ) | |
| COREY JOHNSON, | ) | |
| | ) | |
| Appellant. | ) | |

**United States' Response in Opposition
to Defendant's Motion to Stay Execution**

Corey Johnson murdered eight people, permanently maimed others, and held a leadership role in a continuing criminal enterprise that ran for multiple years during which, as the jury found, he supervised five or more people in drug trafficking, earning substantial income. Johnson's murders were premeditated, involved substantial planning, and advanced the goals of the drug organization that he helped lead, as the jury concluded in imposing seven death sentences over 27 years ago. His convictions and sentences have been upheld by this Court on direct appeal and collateral review. *See United States v. Tipton*, 90 F.3d 861 (4th Cir. 1996); *United States v. Roane*, 378 F.3d 382 (4th Cir. 2004).

Johnson now seeks to stay his execution, which is set for January 14, 2021. This stay application, the third pending before this Court, is based on Johnson's desire to re-litigate the issue of his intellectual disability without being burdened by

1

the requirements imposed by the Antiterrorism and Effective Death Penalty Act (AEDPA) on post-conviction litigation. Johnson has already had a full opportunity through his initial habeas proceedings to prove that he is permanently intellectually disabled, and he litigated that claim to a ruling on the merits before the district court and this Court.  Dissatisfied with those rulings, Johnson now seeks a do-over on the eve of his execution. He claims that the Federal Death Penalty Act (FDPA), 18 U.S.C. § 3596(c), permits that procedure. But the U.S. Court of Appeals for the Seventh Circuit very recently rejected that claim and the U.S. Supreme Court denied certiorari, permitting an execution to proceed in the face of the same meritless argument.  There is no reason for a different result here.

Without justifying his delay—or filing a stay in the district court first—Johnson filed the stay application at issue here (along with over 900 pages of exhibits) at 11:30 PM on Friday, January 8, 2021, six days prior to his execution.  A stay of execution "is not available as a matter of right[,]" *Hill v. McDonough*, 547 U.S. 573, 584 (2006), and "last-minute stays" of executions "should be the extreme exception, not the norm." *Barr v. Lee*, 140 S. Ct. 2590, 2591 (2020) (citation omitted). In fact, "the last-minute nature of an application" that "could have been brought" earlier, or "an applicant's attempt at manipulation," "may be grounds for denial of a stay." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1134 (2019).[1] The Supreme

---

[1] As an example of such unjustified delay, the Supreme Court in *Bucklew* cited its reversal of a lower court's entry of a stay of execution brought 10 days prior to an

2

Court has repeatedly "reiterated the importance of these principles[.]" *Long v. Sec.y, Dep't of Corr.*, 924 F.3d 1171, 1176 (11th Cir.), *cert. denied sub nom. Long v. Inch*, 139 S. Ct. 2635 (2019).

Even aside from his delay, Johnson fails to satisfy the stay standards. His effort to create an end-run around the requirements of 28 U.S.C. § 2255 for intellectual-disability claims fails, and his evidence of intellectual disability is unpersuasive in the context of the record as a whole. The balance of equities also weighs heavily against a stay. More than 27 years after his conviction, over a dozen family members of Johnson's murder victims are traveling to Terre Haute this week to witness the execution of his sentence. Johnson's meritless claims provide no basis for delay.

## Procedural History

### A.    Johnson's prosecution and direct appeal.

On July 20, 1992, a grand jury charged Johnson, along with six others, with numerous crimes related to his leadership role, along with Richard Tipton and James Roane, in a continuing criminal enterprise called the "New York Boyz," which trafficked large quantities of powder and crack cocaine in the Richmond, Virginia area between 1990 and 1992. Those charges included seven counts of capital murder

---

execution for a murder committed 24 years prior. *See Bucklew*, 139 S. Ct. at 1134 (citing *Dunn v. Ray*, 139 S. Ct. 661 (2019)); *see also Dunn v. Price*, 139 S. Ct. 1312 (2019) (considering last-minute nature of stay application in vacating lower court's entry of stay of execution).

in furtherance of a criminal enterprise, in violation of 21 U.S.C. § 848(e) and 18 U.S.C. § 2 (Counts 8, 11, 17, 18, 19, 24, and 25).

Each of the murders charged under § 848(e) was carried out to advance the drug organization. Johnson shot Peyton Maurice Johnson fifteen times on January 14, 1992, because he was a rival drug dealer. Johnson later helped murder Louis J. Johnson, who was shot seven times on January 29, 1992, because he was perceived to have threatened him. Johnson shot Dorothy Mae Armstrong multiple times on February 1, 1992, because she owed $400 on a drug debt and was believed to be cooperating with police. Aiming to eliminate any witnesses to Armstrong's murder, Johnson also killed Bobby Long (shot as he tried to flee) and Anthony Carter (shot while sitting in a chair), bystanders who happened to be in the wrong place at the wrong time.

Linwood Chiles suffered the same fate as Armstrong. Fearing Chiles was cooperating with police, Tipton and Johnson instructed Chiles to put his head on a steering wheel and then shot him at close range. Curtis Thorne was also killed in that attack, and two other passengers in the car, Gwen and Priscilla Greene, were critically wounded. Finally, Johnson murdered Torrick Brown over a petty grievance: he was friendly with James Roane's girlfriend. Brown was in an apartment with his sister, Martha McCoy, along with her three children when Roane, Johnson, and another codefendant arrived looking for Brown. When McCoy

4

answered the door, the trio began shooting. McCoy jumped over a couch but was shot six times, resulting in twelve wounds.

In February 1993, a jury convicted Johnson of seven capital murders under § 848(e); conspiracy to possess cocaine base with the intent to distribute under 21 U.S.C. § 846; engaging in a continuing criminal enterprise under 21 U.S.C. § 848(a); committing violent crimes in aid of racketeering activity under 18 U.S.C. § 1959; using a firearm in relation to a crime of violence or a drug-trafficking offense under 18 U.S.C. § 924(c); and possession of cocaine base with the intent to distribute under 21 U.S.C. § 841(a)(1). Following a penalty hearing on the capital murder counts, the jury recommended that Johnson be sentenced to death for each of the seven murders for which he was convicted under § 848(e). *See Tipton*, 90 F.3d at 870. The jury also sentenced Richard Tipton to death on three of the § 848(e)(1)(A) murders for which he had been convicted, and sentenced James Roane to death for one of the three § 848(e)(1)(A) murders for which he was convicted. *Id*.

On direct appeal, this Court affirmed the defendants' convictions and sentences, but merged the § 846 cocaine conspiracy conviction with the § 848 continuing criminal enterprise conviction. *Id*. at 891, 903.

### B. Johnson's first § 2255 motion.

Following this Court's decision on direct review, Johnson sought relief from the district court under § 2255, asserting numerous claims, including that intellectual disability barred his execution under the FDPA. The district court dismissed or

denied all of Johnson's claims, and he appealed. *See Roane*, 378 F.3d at 389. As

relevant here, Johnson argued to this Court that "he is mentally retarded and that,

under federal law, he cannot be executed[] … [and] that his counsel were ineffective

for failing to argue this point during sentencing." *Id.* at 408. Like the district court,

this Court disagreed:

> Under federal law, "[a] sentence of death shall not be carried out upon a person who is mentally retarded." 21 U.S.C. § 848(l); *see also Atkins v. Virginia*, 536 U.S. 304 (2002) (holding that execution of mentally retarded defendant constitutes cruel and unusual punishment under Eighth Amendment). The district court found, based on data of the American Association on Retardation, that an IQ of 75 or below places a person in the retarded category. At the penalty phase of Johnson's trial, Dr. Dewey Cornell, a psychologist, testified that, on October 10, 1992, he had administered a Wechsler Adult Intelligence Scale Test ("WAIS Test"). Johnson exhibited an IQ of 77, which indicated a "generally impaired intelligence," placing him "just above the level of mental retardation." Importantly, Dr. Cornell testified that he knew the significance of finding Johnson's IQ to be above 75 (i.e., this finding would render Johnson death-eligible), and that he double-checked his numbers and consulted colleagues before reaching this conclusion.
>
> Despite Dr. Cornell's evidence, Johnson asserts that he is in fact mentally retarded. In support of this proposition, Johnson points to evidence offered during the penalty phase that his IQ was somewhere between 69 and 74 in 1985, and he relies on a 1996 publication concluding that the WAIS test tends to inflate IQ scores over the years:
>
>> Individuals appear to gain 3-5 IQ points over a ten year period. Since the WAIS-R was published in 1981, this inflation factor could mean that the average IQ could be as high as 105-107 points rather than the accepted value of 100.
>
> Based on these authorities, Johnson maintains that his actual IQ is below 75 and that his score of 77 is a product of score inflation. As the district court explained, however, Dr. Cornell's evidence that he double-checked his findings and consulted with colleagues before

6

concluding that Johnson was not mentally retarded "belies the suggestion that Dr. Cornell's analysis did not account for possible variations in his testing instrument." Accordingly, Johnson is not barred from execution due to mental retardation.

*Id*. at 408–09 (internal citations omitted). This Court also rejected Johnson's related

ineffective assistance of counsel argument:

Johnson next contends that his counsel was ineffective for failing to assert possible IQ-score inflation at sentencing. We agree with the district court that Johnson's trial attorney was not ineffective for failing to raise this issue. Under *Strickland*, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." And "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." In this instance, Johnson's lawyer was presented with a mental health report, and he was under no mandate to second-guess that report. In these circumstances, Johnson's counsel was not constitutionally ineffective in this respect.

*Id*. at 409 (internal citations omitted).

## C.    Johnson's successive § 2255 motions.

Johnson has attempted to invalidate his sentences on several other occasions.

In 2016, he filed multiple 28 U.S.C. § 2244 applications with this Court seeking

authorization to file successive § 2255 petitions concerning his § 924(c) convictions,

which this Court denied. *In re Corey Johnson*, No. 16-4 (4th Cir. 2016), ECF Nos.

2, 10; *In re Corey Johnson*, No. 16-13 (4th Cir. 2016), ECF Nos. 2, 8. In 2019, this

Court again denied a § 2244 application filed by Johnson for authorization to file a

successive § 2255 petition. *In re Corey Johnson*, No. 19-1 (4th Cir. 2019), ECF

Nos. 1, 13. On May 22, 2020, Johnson filed yet another § 2244 application with this

7

Court, this time invoking the Supreme Court's recent decision in *United States v. Davis*, 139 S. Ct. 2319 (2019). That case is currently held in abeyance. *In re Corey Johnson*, No. 20-8 (4th Cir. 2020), ECF Nos. 2, 23.

On November 20, 2020, the government informed Johnson that it had set his execution date for January 14, 2021. (ECF No. 78.) In turn, on December 14, 2020, Johnson filed a motion to vacate under § 2255, arguing that the FDPA permitted re-litigating the issue of his mental health before his execution. (ECF No. 86.) The district court dismissed that petition as an unauthorized successive § 2255 on Saturday, January 2, 2021, and denied a certificate of appealability. (ECF No. 99.) Johnson appealed but did not seek to expedite a resolution of this appeal on the merits. *See United States v. Johnson*, 21-1 ECF No. 1 (4th Cir. Jan 5, 2021). He now seeks a stay before this Court despite having not moved in the district court for a stay.[2]

---

[2] Federal Rule of Appellate Procedure 8(2) mandates that the party seeking a stay in a court of appeals must have either first tried and failed to obtain a stay in the district court or, alternately, "show that moving first in the district court would be impracticable." Fed. R. App. P. 8(a)(2)(A). Johnson has made no showing of impracticability, instead claiming "it would have been futile to file a motion for a stay in the district court and a requirement, if any, to do so, should be excused" given that the district court ruled against him. Stay Mot. 1 n.1. He cites no authority for that claim, which is incorrect. *See S.E.C. v. Dunlap*, 253 F.3d 768, 774 (4th Cir. 2001) ("Elfindepan has plainly failed to satisfy the requirements of Rule 8, and we therefore deny its motions without prejudice."); *see also Whole Woman's Health v. Paxton*, 972 F.3d 649, 654 (5th Cir. 2020) (applicant's failure to comply with Fed. R. App. P. 8(a)(2)(A) rendered stay application "patently procedurally defective"); *Baker v. Adams Cnty./Ohio Valley Sch. Bd.*, 310 F.3d 927, 930-31 (6th Cir. 2002)

At 10:03 PM on January 7, 2021, Johnson also filed in this Court a motion for authorization to file a successive § 2255 based on his purported intellectual disability. *See In re Johnson*, 21-2, ECF. No. 2-1 (4th Cir. Jan 7, 2021). Between 1:03 AM and 1:35 AM Johnson filed over 1,700 pages of exhibits, and at 3:15 AM on January 8, he filed another motion to stay his execution based on his Jan 7 successive application. *Id*. at ECF No. 9.

## Argument

To obtain a stay of execution, a defendant bears the burden of demonstrating that (1) he has a "strong" likelihood of success on the merits of his claim; (2) he "will be irreparably injured absent a stay"; (3) a stay will not "substantially injure the other parties interested in the proceeding"; and (4) "the public interest" favors a stay. *Nken v. Holder*, 556 U.S. 418, 434 (2009) (quotations omitted). The burdens of proof and persuasion are on the inmate seeking injunctive relief, not on the government, and the inmate must carry that burden "by a clear showing." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). A court cannot enjoin a defendant's execution "without finding that he has a significant possibility of success on the merits[.]" *Dunn v. McNabb*, 138 S. Ct. 369 (2017).[3]

---

(seeking a stay pending appeal first in the district court is "[t]he cardinal principle of stay applications").

[3] For example, the Supreme Court recently vacated a stay of execution where the court of appeals found the defendant's claims were "worthy of further exploration" and that a stay would permit more "time for consideration and deliberation." *Purkey v. United States*, 964 F.3d 603, 618 (7th Cir.), *stay vacated*, 141 S. Ct. 195 (2020).

When a defendant's conviction and sentence have been upheld on direct appeal and collateral review, a court must recognize the government's "strong interest in proceeding with its judgment" and must consider "the extent to which the inmate has delayed unnecessarily in bringing the claim" on which a stay application is based. *Nelson v. Campbell*, 541 U.S. 637, 649-50 (2004); *see Bucklew*, 139 S. Ct. at 1133–34 (explaining that "[b]oth the State and the victims of crime have an important interest in the timely enforcement of a [death] sentence" that has been upheld on direct appeal and collateral review, and "[c]ourts should police carefully against attempts to use [further] challenges as tools to interpose unjustified delay") (quotation marks omitted). Because the government has a "significant interest in enforcing its criminal judgments, there is a strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay." *Nelson*, 541 U.S. at 650.

**A.     Johnson has not shown a significant possibility of success on the merits.**

This Court will not issue a certificate of appealability absent "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When the district court denies relief on procedural grounds, a defendant must demonstrate both that the dispositive procedural ruling is debatable, and that the motion states a debatable claim of the denial of a constitutional right. *Slack v. McDaniel*, 529 U.S.

473, 484–85 (2000). Johnson's application fails to establish either of these criteria. As such, his stay application falters at the first step: he has failed to demonstrate any likelihood of success on the merits, let alone a "significant possibility" of success.

The district court correctly concluded that Johnson's § 2255 motion was a successive petition and that it therefore lacked jurisdiction to entertain it in the first instance. On the merits, Johnson's novel theory that the FDPA permits re-litigation of a defendant's mental status prior to execution fails for both legal and conceptual reasons. Johnson's argument has not been endorsed by any court, and was recently rejected by the Seventh Circuit in an analogous context. *See Bourgeois v. Watson*, 977 F.3d 620 (7th Cir. 2020), *cert. denied*, No. 20-6500, 2020 WL 7296816 (U.S. Dec. 11, 2020).

### 1. The district court correctly concluded that Johnson's § 2255 motion constituted an impermissible successive petition.

Through his § 2255 motion, Johnson seeks one thing: to re-litigate his intellectual disability claim—a claim this Court considered on the merits and rejected in 2004. *Roane*, 378 F.3d at 409 ("Johnson is not barred from execution due to mental retardation."). Claiming the FDPA entitles him to do so, Johnson filed a successive petition in the district court without first obtaining this Court's authorization. This was error and the district court correctly treated it as such.

Once a "prisoner has filed one unsuccessful § 2255 motion, . . . he may not file another except under very limited circumstances." *Lester v. Flournoy*, 909 F.3d

708, 710 (4th Cir. 2018). A federal district court may consider a "second or successive" § 2255 motion only upon certification from the appropriate court of appeals that the motion meets certain criteria. 28 U.S.C. § 2255(h); *United States v. Winestock*, 340 F.3d 200, 205 (4th Cir. 2003) ("a prisoner seeking to file a successive application in the district court must first obtain authorization from the appropriate court of appeals" (citing 28 U.S.C. § 2244(b)(3))). The statute makes no room for exceptions: "Before a second or successive application permitted by this section is filed in the district court, the applicant shall move in the appropriate court of appeals for an order authorizing the district court to consider the application." 28 U.S.C. § 2244(b)(3)(A). Specifically, a successive § 2255 motion must be certified as provided in 28 U.S.C. § 2244 to contain:

> (1) newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense; or
> (2) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable.

*See* § 2255(h); *see In re Vassell*, 751 F.3d 267, 271 (4th Cir. 2014) ("Section 2255(h) requires a court of appeals considering whether to authorize a second or successive § 2255 motion to follow the gatekeeping procedure 'provided in section 2244.'").

On appeal, Johnson argues that these provisions do not apply to him. In support, he claims that his case "mirrors" this Court's decision in *United States v. Hairston*, 754 F.3d 258 (4th Cir. 2014). Stay Mot. 6. *Hairston*, however, is

12

inapposite. In *Hairston*, this Court deemed a second-in-time § 2255 motion as not successive (and therefore not subject to § 2255(h)), because "the facts relied on by the movant seeking resentencing did not exist when the numerically first motion was filed and adjudicated." 754 F.3d at 262. There, however, the facts unavailable upon the filing of the first § 2255 motion were the petitioner's since-vacated state conviction. *Id. Hairston*, therefore, does not control the outcome of this case because Johnson's argument is premised not on a vacated conviction, but rather on a purported entitlement to a reassessment of his intellectual capacity prior to execution based on evidence that has existed since he was a child. Johnson has not cited, and the government has not found, any case where this Court has applied *Hairston* to situations analogous to those raised in the instant motion.

Johnson argues that his intellectual disability claim was unripe at "any earlier point in his litigation," thus absolving him of complying with § 2244(b)(3)(A). Stay Mot. 6. Johnson's argument on this score errs in conflating competency and intellectual disability claims. As the district court concluded, relying on the aforementioned Seventh Circuit opinion, "in comparing the two claims, [Johnson] 'confuse[s] intellectual disability with the temporary condition of incompetency, which may come and go.'" *United States v. Johnson*, No. 3:92-cr-68 (DJN), 2021 WL 17809, at *8 (E.D. Va. Jan. 2, 2021) (quoting *Bourgeois*, 977 F.3d at 637). Because "[i]ntellectual disability is a permanent condition that must manifest before the age of 18[,]" *Bourgeois*, 977 F.3d at 637 (citing *Atkins v. Virginia*, 536 U.S. 304,

13

318 (2002)), Johnson's intellectual disability claim was *not* unavailable to him previously. Johnson's "intellectual disability ripened years ago, and the courts rejected it years ago." *Johnson*, 2021 WL 17809, at *8.

Johnson's reliance on *Panetti v. Quarterman*, 551 U.S. 930 (2007), and *Stewart v. Martinez-Villareal*, 523 U.S. 637 (1998), for the proposition that "similar claims are not successive even though they are second-in-time because they should be litigated when an execution date is set" is misplaced. Informal Br. 17-18. *Martinez-Villareal* declined to treat an identical second-in-time claim as successive because it was initially dismissed for failure to exhaust state remedies. 523 U.S. at 642–45; *see also id*. at 644 ("We believe that respondent's *Ford* claim here-- previously dismissed as premature--should be treated in the same manner as the claim of a petitioner who returns to a federal habeas court after exhausting state remedies."). *Panetti* held that a numerically second § 2254 habeas petition was not successive because the claim was not ripe at the time of the initial petition. 551 U.S. at 942–47. *Martinez-Villareal* is irrelevant to the question presented, and *Panetti* is inapposite because Johnson did, in fact, raise the same intellectual disability claim in his prior § 2255 motion and on appeal, and the courts adjudicated that claim on the merits. *Roane*, 378 F.3d at 408–09. He cannot, therefore, argue that his claim was unripe at the time of his first § 2255 motion when he raised that precise claim in 2004 and litigated it to completion. Moreover, *Pannetti* addressed unripe incompetency claims under *Ford v. Wainwright*, 477 U.S. 399 (1986), not

14

intellectual disability claims under § 3596(c) or *Atkins v. Virginia*, 536 U.S. 304 (2002). As noted above, that difference is critical to determining whether late-breaking claims should be deemed so unripe as to evade the strictures on successive petitions. As the Seventh Circuit recently noted in *Bourgeois*, intellectual disability is a permanent condition, whereas incompetency may come and go in a short span of time. 977 F.3d at 63; *see also Busby v. Davis*, 925 F.3d 699, 714 (5th Cir. 2019), *cert. denied*, 140 S. Ct. 897 (2020); *Williams v. Kelley*, 858 F.3d 464, 472 (8th Cir. 2017). Intellectual disability and competency claims operate on fundamentally different conceptual planes. It therefore comes as no surprise that the Supreme Court's jurisprudence treats them differently.

Finally, Johnson's § 2255 motion is a classic example of an abuse of the writ, thus further underscoring its status as a successive petition. In assessing "what qualifies as second or successive," courts should look for guidance in: (1) "historical habeas doctrine and practice"; and (2) the "purposes" of AEDPA. *Banister v. Davis*, 140 S. Ct. 1698, 1705–06 (2020). When a second-in-time filing "would have constituted an abuse of the writ, as that concept is explained in [pre-AEDPA] cases[,]" then it is likely a "successive" petition for the purposes of Section 2244. *Id*. at 1706. This Court has held that "new claims raised in subsequent habeas petitions [are] 'abusive' if those claims were available to the petitioner at the time of a prior petition's filing." *See In re Wright*, 826 F.3d 774, 784 (4th Cir. 2016).

15

Here, Johnson's intellectual disability claim was not just available, it was litigated and decided by this Court. Johnson's claim that AEDPA—whose very purpose is to "conserve judicial resources, reduc[e] piecemeal litigation," and "lend[] finality to ... judgments within a reasonable time[,]" *Banister*, 140 S. Ct. at 1706 (citation omitted)—somehow permits a defendant to pursue the same claim of permanent intellectual disability many times over without authorization from the court of appeals finds no support in the relevant case law. Johnson's intellectual-disability claim thus required this Court's authorization. *See Winestock*, 340 F.3d at 205 ("In the absence of pre-filing authorization, the district court lacks jurisdiction to consider an application containing abusive or repetitive claims."); *In re Williams*, 364 F.3d 235, 238 (4th Cir. 2004) (the "problem of repetitive collateral litigation ha[d] absorbed the attention of Congress" prior to the passage of AEDPA).[4]

The district court's procedural ruling rested on well-established principles under AEDPA. Its ruling is not debatable as required for the issuance of a certificate of appealability. *Slack*, 529 U.S. at 484–85. This is reason enough to deny Johnson's stay application.

---

[4] Indeed, it would have been anomalous for the district court to have stood in review of this Court's 2004 ruling without explicit permission from this Court. *Accord United States v. Alston*, 722 F.3d 603, 606 (4th Cir. 2013) ("The mandate rule is a specific application of the law of the case doctrine that prohibits a lower court from reconsidering on remand issues laid to rest by a mandate of the higher court." (internal quotation marks omitted)).

### 2. Johnson's argument that § 3596(c) functions as a silent exception to AEDPA and affords him an opportunity to re-litigate his mental status is meritless.

Johnson argues that "[21 U.S.C.] § 848 and § 3596 create an independent, substantive prohibition on the implementation of the sentence based on intellectual disability." Stay Mot. 8.[5] And, he claims, unlike most § 2255 claims, § 3596(c) "contemplates that, where applicable, a determination of 'mental retardation' will be made when the government sets an execution date." Informal Br. 17. In Johnson's view, § 3596(c) trumps AEDPA's requirements, thus permitting him to move first in the district court for a revaluation of his mental status.

Not so. Neither the FDPA nor a similarly-worded provision of the Anti-Drug Abuse Act of 1988 (under which Johnson was actually sentenced) functions, *sub silentio*, as an exception to § 2244(b)(3)(A)'s requirements. Johnson states that "[t]he plain language, structure, and statutory history of the FDPA establish that Mr. Johnson is permitted to raise his status as a person with intellectual disability now, at the time when he has a pending execution date." Informal Br. 16-17. But in reality, § 3596(c) says nothing about overriding the limits on successive § 2255s. *See Bourgeois*, 977 F.3d at 632. Instead, § 3596(c) simply says that "[a] sentence of

---

[5] Johnson was convicted prior to the enactment of the FDPA. His sentence is controlled by the repealed procedures in 21 U.S.C. § 848. *See United States v. Stitt*, 552 F.3d 345, 353 (4th Cir. 2008); *see also See United States v. Roane*, No. 3:92-cr-68 (DJN), 2020 WL 6370984, at *16 n.8 (E.D. Va. Oct. 29, 2020). As Johnson points out, the relevant language in the FDPA (§ 3596(c)) mirrors that in the ADAA (§ 848(l)).

death shall not be carried out upon a person who is mentally retarded," establishing by statute the very same rule established in *Atkins*. *See id.* at 631. Johnson appears to recognize that his *Atkins* claim is subject to the strictures of AEDPA, as he recently sought authorization from this Court to file a successive *Atkins* claim. As the district court observed, neither the FDPA nor the ADAA creates any distinct process for adjudicating the very same intellectual-disability claim. *Contra* Informal Br. 18 ("Section 3596(c) (and § 848(l)) provide more specific process for inmates with compelling claims of intellectual disability than is afforded by the Eighth Amendment.").

Johnson cites no relevant authority for the proposition that § 3596(c), or its predecessor provision in the ADAA, operates as a standalone exception to the bar on successive petitions, and the government is aware of none. Couching a claim in the language of § 3596(c) is simply not enough to circumvent the requirements of § 2244(b)(3)(A). *Accord In re Wright*, 826 F.3d 774, 782 (4th Cir. 2016) ("Wright's assertion—that simply because he chose to fill out his claims on a form labeled '28 U.S.C. § 2241,' he should reap the benefits of § 2241's broad construction and subvert AEDPA's restrictions—would defeat this purpose. Such an interpretation would allow state prisoners to sidestep the statutory gatekeeping mechanisms present in § 2244 and § 2254, thereby thwart[ing] Congressional intent to restrict[] the availability of second and successive petitions through Section 2244(b). We

18

cannot embrace such an interpretation." (internal quotations marks and citation omitted)).

Johnson argues that the plain language of § 3596(c) "demonstrates that [a] determination must be made [as to a defendant's intellectual disability] when an execution date is set; it applies when the sentence of death is to 'be carried out.'" Stay Mot. 9.  While it is true that § 3596(c) bars the death penalty from being "carried out" on a person with an intellectual disability, "it does not follow,"  as the district court held, "that a determination on a defendant's intellectual disability must occur shortly before execution." *Johnson*, 2021 WL 17809, at \*10. A successful challenge under § 3596(c) "that occurs pretrial, at sentencing or in the time to raise a federal habeas petition will prevent the death sentence from being 'carried out[.]'" *Id*. Moreover, for the reasons discussed above, because intellectual disability is a permanent condition that must manifest itself prior the defendant's commission of the crime, it would make little sense for Congress to have codified a procedure to assess a defendant's intellectual disability years, or possibly decades later.

Nor does Congress's use of the word "is" in § 3596(c) change the outcome of the analysis. *See* § 3596(c); Amicus Br. 8-10. As the Seventh Circuit observed, Congress's use of the present tense verb "is" simply reflects the fact that "[i]ntellectual disability is a *permanent* condition that must manifest before the age of 18." *Bourgeois*, 977 F.3d at 637 (emphasis added); *see Atkins*, 536 U.S. at 318. Given the early manifestation and continuous nature of intellectual disability, it

would not have made sense for Congress to have phrased the statute differently, so as to proscribe, for example, "the execution of someone who merely 'was' intellectually disabled when they were sentenced, or who 'will be' intellectually disabled when their sentence is carried out." *Id*. As a permanent and continuing condition that must have manifested during youth, intellectual disability differs from "the temporary condition of incompetency, which may come and go." *Id.*; *see Ford*, 477 U.S. 399. Intellectual disability likewise differs from pregnancy, which Congress addressed in 18 U.S.C. 3596(b). Notably, although Congress provided that a death sentence could not be carried out "upon a woman *while* she is pregnant," 18 U.S.C. 3596(b) (emphasis added)—implying a transient condition—it did not use the same language in Section 3596(c).

For the same reasons, Johnson errs in arguing that the FDPA's mention of pregnancy, incompetency, and intellectual disability in proximity to each other supports his claim. As the district court explained, "§ 3596(c) "concerns who the Government may not execute. It does not concern when to determine ineligibility. The fact that eligibility for the other two types of individuals [pregnancy and incompetency] can only be determined on the eve of execution does not mean that the Court must re-review a determination of intellectual disability, particularly when

20

the defendant's ineligibility would stem from a condition that has not developed since the previous determination." *Johnson*, 2021 WL 17809, at *10.[6]

Contrary to Johnson's contention, Congress did not make its intent "plain and clear … that an inmate seeking relief under these three prohibitions should do so when an execution is imminent." Informal Br. 22-23. The clearest way for Congress to have evidenced its intent is to have actually said so. *See United States v. Pressley*, 359 F.3d 347, 349 (4th Cir. 2004) ("courts must presume that a legislature says in a statute what it means and means in a statute what it says there.") (citation omitted). Here, it did no such thing. As the Seventh Circuit put it in *Bourgeois*, "with no textual (or other) support, we are unwilling to accept Bourgeois's sweeping argument that a fresh intellectual-disability claim arises [under § 3596(c)] every time the medical community updates its literature." 977 F.3d at 637–38.[7]

---

[6] Similarly, Amicus' reliance on the principle that when "Congress uses similar statutory language in two adjoining provisions, it normally intends similar interpretations" does not actually support Johnson's position. Amicus Br. 13. Congress phrased each of the three prohibitions—concerning pregnancy, incompetency, and intellectual disability—differently. There is no "similar statutory language," and the fact that the statute is written in present-tense does not change the equation. *See Johnson*, 2021 WL 17809, at *10.

[7] Contrary to Johnson's suggestion, the government did not argue in *United States v. Higgs*, No. 20-18, or *Webster v. United States*, No. 94-CR-0121 (N.D. Tex. Nov. 14, 2002), that the text of § 3596(c) creates a *sub silentio* exception to AEDPA. *See* Informal Br. 21-22. The issue in *Higgs* pertains to § 3596(a), not § 3596(c). Section 3596(a) addresses which state's law will govern the implementation of a death sentence, and thus implicates a condition that can—and in *Higgs*, did—change. The onset of intellectual disability, however, must occur by age 18, and is not a circumstance that changes between the imposition and implementation of the sentence. *Bourgeois*, 977 F.3d at 637. And in *Webster*, the government argued that

21

Finally, Johnson's resort to legislative history is to no avail. Informal Br. 24-26. The provision at issue here, § 3596(c), derives from language in the Anti-Drug Abuse Act of 1988. *See, e.g.*, *Atkins*, 536 U.S. at 314 & n.10. During debate on that legislation, the sponsor of the amendment that added the pertinent language stated that a defendant's intellectual-disability claim "would be handled *as any other defense* would be when it came to this kind of a crime or the sentencing thereof." 134 Cong. Rec. 22,993 (1988) (statement of Rep. Levin) (emphasis added); *see also United States v. Umana*, 750 F.3d 320, 358 (4th Cir. 2014) ("When a defendant seeks to show that he is mentally retarded [under *Atkins*], he is putting on an affirmative defense that would preclude execution" (citing *Walker v. True*, 399 F.3d 315, 326 (4th Cir. 2005))). That statement undermines Johnson's argument that a prisoner can reassert an intellectual-disability claim prior to execution and that § 3596 exempts him from the normal rules of criminal and post-conviction litigation. There is likewise no indication that Congress embraced Johnson's view of § 3596(c) when it adopted the current version of the FDPA.[8]  The broader debate in Congress centered on streamlining and shortening the federal appeals process, not lengthening it. *See,*

---

under § 3596(c), intellectual disability prevents "the *implementation* of the death penalty," which is correct—not that § 3596(c) permits readjudication of rejected intellectual-disability claims immediately before any execution.  Informal Br. Ex. B.

[8]    From 1989 to 1994, Congress debated several iterations of the legislation that ultimately became the FDPA and based Section 3596(c) on language from the Anti-Drug Abuse Act of 1988.  *See* S. Rep. No. 170, 101st Cong., 1st Sess. 23 (1989).

*e.g.*, 140 Cong. Rec. 10,238-10,240 (1994) (statement of Sen. Specter) ("appeals process has been vastly overdone").

Johnson notes that, at one point during congressional debate, Senator Hatch expressed concern that the intellectual-disability provision would allow federal prisoners to raise the issue of intellectual disability "at any time," 136 Cong. Rec. 12,254 (May 24, 1990), and supported an amendment that would have modified the intellectual-disability provision to prohibit only the execution of intellectually disabled persons "who do not know the difference between right and wrong," *id.* at 12,251 (statement of Sen. Thurmond); *see id.* at 12,254-12,255. Johnson suggests that because the FDPA does not include that proposed language, Congress necessarily agreed with Senator Hatch that the provision would permit federal prisoners to raise the issue of intellectual disability "at any time."  But the Supreme Court has cautioned against attributing the views of a single legislator to the entire Congress and against drawing inferences from proposed, but unenacted, legislation. *See, e.g.*, *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990).  Both of those admonitions apply here, and in any event, the most natural inference to be drawn from the history highlighted by Johnson is that Congress wished to prohibit the execution of all intellectually disabled persons, not just those "who do not know the difference between right and wrong." 136 Cong. Rec. at 12,251.[9]

---

[9]  Amicus' reliance on the fact that § 3596(c) appears under the title "Implementation of a sentence of death" also falls flat. Amicus Br. 14-16. To begin,

At bottom, to accept Johnson's argument is to agree that § 3596(c) silently creates a multi-step process for a defendant to demonstrate his intellectual disability: at trial and appeal and/or collateral review, as well as after the government sets an execution date. Johnson cites no caselaw in support of this theory and it is similarly unsupported by § 3596(c)'s text. Moreover, as the district court held, such a two-step procedure "would require piecemeal litigation, the waste of judicial resources and a lack of finality of the defendant's death sentence, all in contravention to the aims of the AEDPA." *Johnson*, 2021 WL 17809, at *10. Johnson's proposal also begs the question of whether much *Atkins* jurisprudence constitutes a body of advisory opinions, ultimately worth nothing because the final determination of a defendant's intellectual disability will be made within 50 days of his execution. It is unlikely Congress codified such a scheme, particularly *sub silentio*. This Court should decline Johnson's invitation to manufacture a provision of the FDPA Congress most certainly did not pass.

---

as noted above, under the Savings Statute, Johnson's case is governed by the repealed procedures in § 848. *See Stitt*, 552 F.3d at 353; *Roane*, 2020 WL 6370984, at *16 n.8. Unlike § 3596(c), § 848(*l*)—which contains an identical prohibition on executing an intellectually disabled defendant—appears under the title "Imposition of sentence." Thus, to the extent a title adds anything to a statute, the title of § 848(*l*)—the provision that actually governs—defeats Amicus' argument. Nevertheless, even if § 3596(c) controlled, Johnson would not be entitled to benefit from its title. *See Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 19 n.14 (1981) ("It has long been established that the title of an Act cannot enlarge or confer powers.") (internal quotation marks and citation omitted).

### 3. Even if Johnson could satisfy the requirements of AEDPA, his underlying claim of intellectual disability is meritless.

The district court and this Court were correct in rejecting Johnson's intellectual-disability claims in his first § 2255 petition. As the government explained in its opposition to a stay in No. 21-2, the extensive evidence from prior proceedings establishes that Johnson does not possess an intellectual disability that precludes the application of the death penalty. *See* U.S. Resp. in Opp. to Motion for a Stay, No. 21-2 (Jan. 10, 2021) at 16-20.

### B.    Equitable considerations weigh against a stay.

The balance of the equities also weigh strongly against Johnson's request for a stay.

In assessing the public interest and the potential harms of staying an execution, a court must take into account "the State's strong interest in enforcing its criminal judgments without undue interference" from courts—particularly where a capital defendant has exhausted the usual avenues for review of his death sentence and brings a claim shortly before that sentence is due to be carried out. *Murphy v. Collier*, 919 F.3d 913, 915 (5th Cir. 2019) (quoting *Hill*, 547 U.S. at 584); *see also Bucklew*, 139 S. Ct. at 1133–34. Once, as here, post-conviction proceedings "have run their course," "finality acquires an added moral dimension." *Calderon v. Thompson*, 523 U.S. 538, 556 (1998). Consequently, delay "inflict[s] a profound injury to the 'powerful and legitimate interest in punishing the guilty,' an interest

25

shared by the State and the victims of crime alike." *Id.* (citation omitted).

The Supreme Court has also stressed the need to be wary of dilatory tactics and to guard against "abusive delay, which has been compounded by last-minute attempts to manipulate the judicial process." *Gomez v. United States Dist. Ct.* 503 U.S. 653, 654 (1992). So too has this Court. *See, e.g.*, *Stockton v. Angelone*, 70 F.3d 12, 13 (4th Cir. 1995) ("Last minute stays [of execution] on the part of federal courts represent an interference with the orderly processes of justice which should be avoided in all but the most extraordinary circumstances."); *see also Jones v. Murray*, 976 F.2d 169, 171 (4th Cir. 1992) (citing "yet another example of a petitioner who has waited until the eve of his execution to ... [seek relief] without a justifiable excuse for the delay"); *Peterson v. Murray*, 949 F.2d 704, 705 (4th Cir. 1991) (similar). Johnson has failed to move with appropriate dispatch at almost every stage of his litigation. This fact weighs against granting a stay. *See Nelson*, 541 U.S. at 649–50.

The public and the victims' families have an overwhelming interest in implementing the capital sentence imposed by a unanimous jury over a quarter-century ago. Johnson is a "serial killer" who "murdered multiple people on different occasions in cold blood" and "maimed several others," and whose victims included "innocent bystanders." (ECF No. 75 at 11-12) Their families have waited decades for the sentence to be enforced and are traveling this week to Terre Haute, Indiana for the execution.  Thus far, no court has found any of Johnson's many attempts to

26

challenge his convictions and sentences to warrant relief. Johnson's latest challenge is similarly meritless. The record and timeline in this case make clear that Johnson's tactics "are designed to delay [a] lawful execution[] indefinitely." *In re Fed. Bureau of Prisons' Execution Protocol Cases*, 955 F.3d 106, 129 (D.C. Cir. 2020) (Katsas, J., concurring). This Court "should not assist in that undertaking." *Id.*

## Conclusion

For the reasons stated above, this Court should deny Johnson a stay of execution.

Date: January 10, 2021                    Respectfully submitted,

                                          G. Zachary Terwilliger
                                          United States Attorney

                            By:  _____/s/_____

                                          Richard D. Cooke
                                          Joseph Attias
                                          Assistant United States Attorneys
                                          919 East Main Street, Suite 1900
                                          Richmond, Virginia 23219
                                          (804) 819-5400

## Certificate of Service and Compliance

I certify that this motion contains 7,135 words and will be followed by an unopposed motion to exceed the length limitations. I also certify that on January 10, 2021, I filed electronically the foregoing with the Clerk of the Court using the CM/ECF system and will serve the defendant's counsel in the district court via email.

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney

By: _____/s/_____

Joseph Attias
Assistant United States Attorney